# EXHIBIT 8

# In the Matter Of:

## BATER, ET AL. vs UNIQUE VACATIONS, INC., ET AL.

## STETSON ARRIOLA

October 17, 2019

*Prepared for you by*



**Bingham Farms/Southfield_ • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

ARRIOLA, STETSON
10/17/2019

Pages 1–4

**Page 1**

```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF FLORIDA
2                      MIAMI DIVISION
3   PAITON E. BATER, AMBER R.    )
     TORRALVA, JANET DESANTIS,    )
4   AND MARGARET A. TORRALVA      )
                                  )
5            PLAINTIFFS,          )
                                  ) CIVIL ACTION
6   VS.                           )
                                  ) NO.: 1:17-cv-21703
7                                 )
    UNIQUE VACATIONS, INC., a     )
8   Delaware Corporation, THE     )
    MARK TRAVEL CORPORATION, a    )
9   Nevada Corporation d/b/a      )
    Fun Jet Vacations, DWIGHT     )
10  DAVIS, JERMAINE DYER, and     )
    WILLIAM TAPPER, Jointly       )
11  and Severally                 )
                                  )
12           DEFENDANTS.  )
13  ----------------------------------
14             ORAL DEPOSITION OF
15               STETSON ARRIOLA
16              OCTOBER 17, 2019
17  ----------------------------------
18
19
20
21
22
23
24
25
```

**Page 2**

```
1        ORAL DEPOSITION OF STETSON ARRIOLA, produced as a
2   witness at the instance of the PLAINTIFFS, and duly
3   sworn, was taken in the above-styled and numbered cause
4   on the 17th of October, 2019, from 10:12 a.m. to 3:58
5   p.m., before Velma C. LaChausse, Shorthand Reporter and
6   Notary Public in and for the State of Texas, reported by
7   machine shorthand, at the law offices of Nathan Sommers
8   Jacobs, 2800 Post Oak Boulevard, 61st Floor, Houston,
9   Texas 77056, pursuant to the Federal Rules of Civil
10  Procedure and the provisions stated on the record or
11  attached hereto.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1            A P P E A R A N C E S
2
3
    FOR THE PLAINTIFFS:
4      Mr. Todd J. Weglarz
       FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.
5      19390 W. 10 Mile Road
       Southfield, Michigan 48075
6      Phone: (248)355-5555
       E-mail: t.weglarz@fiegerlaw.com
7
8
    FOR THE DEFENDANT UNIQUE VACATIONS, INC.:
9      Mr. Steven R. Safra (Via Telephone)
       Mr. Dimitri Singh (Via Telephone)
10     COLE, SCOTT & KISSANE, P.A.
       Dadeland Centre II, Suite 1400
11     9150 S. Dadeland Boulevard
       Miami, Florida 33156
12     Phone: (305)350-5300
       E-mail: steven.safra@csklegal.com
13
14
    FOR THE DEFENDANT MARK TRAVEL CORP:
15     Mr. Luis E. Suarez, Esq. (Via Telephone)
       BOIES SCHILLER FLEXNER, LLP
16     100 SE 2nd Street, Suite 2800
       Miami, Florida 33131
17     Phone: (305)539-8400
18     E-mail: lsuarez@bsfllp.com
19
20
21
22
23
24
25
```

**Page 4**

```
1   FOR THE NON-PARTY WITNESS STETSON ARRIOLA:
2      Mr. George R. Gibson
3      NATHAN SOMMERS JACOBS
4      2800 Post Oak Boulevard, 61st Floor
5      Houston, Texas 77056
6      Phone: (713)960-0303
7      E-mail: ggibson@nathansommers.com
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

ARRIOLA, STETSON
10/17/2019

**Page 5**

INDEX

                                                    PAGE

Stipulations........................................ 2

Appearances......................................... 3

WITNESS:  STETSON ARRIOLA

    Examination by Mr. Weglarz..................... 7

    Examination by Mr. Safra...................... 170

    Examination by Mr. Suarez..................... 185

    Further Examination by Mr. Weglarz............ 199

    Further Examination by Mr. Suarez............. 218

Signature and Changes............................. 222

Reporter's Certificate............................ 224

**Page 6**

EXHIBITS

NO.  DESCRIPTION                                    PAGE

1    Vacations to Go's Records Pertaining to Booking
     a Vacation Package for Paiton Bater, et. al     7

2    Resort Booking Checklist                        7

3    OSAC's Jamaica 2012 Crime & Safety Report      59

4    OSAC's Jamaica 2013 Crime & Safety Report      63

5    OSAC's Jamaica 2014 Crime & Safety Report      71

6    2018 U.S. Department of State Travel Advisory for
     Jamaica                                        76

7    Funjet Vacations' Bill of Rights              110

8    Vacations to Go Final Booking Confirmation    162

9    Vacations to Go Final Itinerary               166

**Page 7**

PROCEEDINGS
(Exhibit Nos. 1-2 were marked.)

STETSON ARRIOLA,
having been first duly sworn, testified as follows:
EXAMINATION

BY MR. WEGLARZ:

Q. Okay.  We're here for the deposition of Stetson Arriola.

Did I say that correctly, sir?

A. That's correct.

Q. Taken pursuant to notice and agreement of counsel.

Mr. Arriola, my name is Todd Weglarz, and I represent the plaintiffs in a case that we filed in Florida arising out of an innocent at a Beaches Resort. I'm going to ask you some questions today about yourself, about the booking of that trip, and anything else you may recall about that incident or otherwise.

A. (Nodding head.)

Q. If you do not understand a question, let me know, and I'll do my best to rephrase.  Fair enough?

A. Fair enough.

Q. For the record your full name, complete name,

**Page 8**

please.

A. Stetson Scott Arriola.

Q. What's your date of birth, sir?

A. 12-19-1984.

Q. And you live in the Houston area?

A. Correct.

Q. And have you lived there all your life?

A. No.

Q. Have you lived --

A. The majority of my life.

Q. -- in the Houston area all your life?

A. Yes.

Q. Thank you.

And have you ever had your deposition taken before?

A. No.

Q. Isn't this fun?

Did you review --

MR. SAFRA:  Todd, you forgot the stipulation.

MR. WEGLARZ:  Oh, I'm sorry.  I'll put this on the record.

MR. SUAREZ:  Hey, gang, I'm having a little difficulty hearing Mr. Arriola.

If you could speak up or get closer to the

1    mic, I'd appreciate it.

2              **THE WITNESS:  Okay.**

3              MR. WEGLARZ:  All right.  He's going to do

4    his best.

5              And I'm going to place this on the record

6    now.  Counsel have agreed because of the circumstances,

7    we have two defense lawyers participating by phone, one

8    objection by a defense counsel will apply to all, so

9    that we can try to move this as expeditiously as

10   possible.

11        Q.  (BY MR. WEGLARZ)  Mr. Arriola, have you

12   reviewed anything to prepare yourself for your

13   deposition?

14        **A.  Yes.**

15        Q.  And what did you review?

16        **A.  The documents in front of me that you have.**

17        Q.  And when you say documents, it looks like the

18   documents that were recently provided to us and they've

19   been Bates stamped VTGTX 1 through 60.  Is that correct?

20        **A.  Yes, sir.**

21        Q.  And we are --

22              MR. GIBSON:  Actually, 62.

23        Q.  (BY MR. WEGLARZ)  And we're also provided two

24   additional pages this morning stamped 61 and 62,

25   referred to as a "Resort Booking Checklist."

1              Did you look at that, as well?

2        **A.  Yes.**

3        Q.  And since we're talking about it, can you tell

4    me what your understanding is of the documents stamped 1

5    through 60?

6        **A.  (Witness perusing document.)  These would be**

7    **the confirmations sent to the customer, the notes put**

8    **into the booking from the initial conversation or call**

9    **into Vacations To Go.  To me, the first notes I spoke**

10   **with and the booking confirmation I sent out and the**

11   **travel documents that we get prepared by our provider or**

12   **wholesaler to be sent to the customer, as well.**

13        Q.  All right.  Is it your understanding that these

14   pages represent all of Vacations to Go's records and

15   documents pertaining to the booking of this trip to

16   Beaches Ocho Rios?

17        **A.  Can you say that again?**

18        Q.  Sure.

19        **A.  I'm sorry.**

20        Q.  Is it your understanding -- and by the way,

21   we're going to mark these pages Exhibit No. 1, which

22   we've already done, VTGTX 1 through 60.

23              Is it your understanding that Exhibit No. 1

24   represents all of Vacations to Go's records and

25   documents pertaining to the booking of the vacation

1    package for Janet Desantis, the Torralvas and Paiton

2    Bater?

3        **A.  Yes.**

4        Q.  And Pages 61 and 62 we've marked as Exhibit

5    No. 2.  What is your understanding as to what Exhibit

6    No. 2 is?

7        **A.  This is our recap that we follow after the**

8    **reservation is put on hold.  Before we obtain the credit**

9    **card information to process, we do a recap of the**

10   **booking with the customer.  So if there's any objections**

11   **based off the customer or anything inappropriate, you**

12   **know, anything wrong, provided wrong, we can go in there**

13   **and make the change before we process the credit card.**

14        Q.  Thank you.

15              And No. 2 it seems to be captioned "Resort

16   Booking Checklist."  Is that correct?

17        **A.  Yes.**

18        Q.  And is this a VTG document that's provided to

19   you --

20        **A.  Yes.**

21        Q.  -- as part of your employment?

22        **A.  Correct.**

23        Q.  Okay.  And we'll talk more about that shortly.

24              Did you review anything else to prepare

25   yourself for your deposition, other than Exhibits 1 and

1    2?

2        **A.  No.**

3        Q.  Okay.  Can you give me a very general overview

4    as to your educational background?

5        **A.  I have a bachelor of science [sic] in**

6    **psychology.**

7        Q.  And when did you get that?

8        **A.  In 2007.**

9        Q.  And from where?

10        **A.  University of Houston.**

11        Q.  Any other educational pursuits?

12        **A.  No.**

13        Q.  Don't take any offense to these questions.  I

14   just have to ask.  It's part of my checklist.  I'm not

15   trying to invade your privacy or anything.

16              Have you ever been arrested?

17        **A.  No.**

18        Q.  Have you ever been charged with a crime?

19        **A.  No.**

20        Q.  Have you ever been involved in a lawsuit?

21        **A.  No.**

22        Q.  Have you ever filed a lawsuit, yourself,

23   against anyone?

24        **A.  No.**

25        Q.  Have you ever had to file for a bankruptcy?

ARRIOLA, STETSON
10/17/2019

Pages 13–16

Page 13

1      A.  No.
2      Q.  And to your knowledge, you've never been named
3  as a defendant in any lawsuit, correct?
4      A.  Correct.
5      Q.  When did you first get into the travel
6  industry?
7      A.  2009.  September 2009.
8      Q.  And tell me about that.  How did you get into
9  it, where, why?
10     A.  A friend worked at Vacations To Go.  I was
11 needing a job for insurance purposes, health insurance,
12 and she said I would be good at this, and I decided
13 to -- I was down to the wire and decided to give it a
14 go-ahead.
15     Q.  Who's the friend?
16     A.  Meredith Reinhardt.
17     Q.  Prior to this opportunity in 2009 with
18 Vacations To Go, did you have any other experience with
19 the travel industry?
20     A.  No.
21     Q.  And I take it you hired in with Vacations To Go
22 in 2009?
23     A.  Correct.
24     Q.  And have you been employed there ever since?
25     A.  Yes, sir.

Page 14

1      Q.  What was your last job, prior to working at
2  Vacations To Go in 2009?
3      A.  It was freelance work.
4      Q.  What type of freelance work were you doing?
5      A.  Anywhere from music work and cosmetic work,
6  cosmetic sales work.
7      Q.  Any other jobs or work that you did, other than
8  this freelance work and working at Vacations To Go?
9      A.  When I was young worked with my grandfather in
10 his office.
11     Q.  Okay.  Other than that?
12     A.  No.
13     Q.  And when you hired in with Vacations to Go,
14 were you provided any type of orientation or training?
15     A.  Yes.
16     Q.  Describe that for me.
17     A.  They would go over the procedures of Vacations
18 To Go, the system that we use, how the inner workings of
19 the office work with claiming calls and making sales and
20 providing documentation, reviewed over the handbook of
21 the policies and procedures of Vacations To Go, and then
22 periodically throughout that we had our resort companies
23 come in and provide us trainings on the properties.
24     Q.  And did you say "resort companies"?
25     A.  Yeah, just resort chains.

Page 15

1      Q.  Understood.
2          When you mentioned your -- you would be
3  oriented, orientated on the procedures of Vacations To
4  Go --
5      A.  (Nodding head.)
6      Q.  -- tell me about that.  What kind of procedures
7  do they have?
8      A.  Just interoffice workings, how -- you know,
9  obviously HR issues where you -- you know, hours, how
10 that works, insurance, benefits, but also how our
11 computers work, how you claim a lead, the checklist of
12 what, you know, to discuss once you make the booking
13 from the client, how to send quotes if the client is
14 requesting quotes on particular places, and then how to
15 build a confirmation because it's a template, and then
16 you fill the template in, send that to them and then
17 send the documents and just to be there for the customer
18 anytime.
19     Q.  And are these procedures or policies, are they
20 put in writing?
21     A.  I believe so.
22     Q.  And what do they call this document or booklet
23 that contains these policies and procedures in writing?
24     A.  I assume just the company handbook.
25     Q.  Okay.  Okay.  And you're pride with a copy of

Page 16

1  the handbook?
2      A.  At the beginning of hire.
3      Q.  Did they ever give you another copy since then?
4      A.  Not a -- the whole handbook, but they do make
5  changes within it from HR or other upper higher-ups,
6  they'll send you paper to put into it.
7      Q.  And you've kept all those?
8      A.  I don't have them anymore at this time.
9      Q.  And when did you get rid of the handbook and/or
10 the supplements?
11     A.  When I moved back to work from home.
12     Q.  Which was how long ago?
13     A.  December of last year.
14     Q.  Would any of these procedures or policies deal
15 with giving any types of advisories or warnings to
16 customers?
17     A.  No.
18     Q.  You also mentioned that you would be oriented
19 or provided training on the system use.  What kind of
20 system is used at VTG?
21     A.  It's --
22     Q.  By the way, when I -- is Vacations To Go
23 commonly referred to as VTG?
24     A.  Yes, that's correct.
25     Q.  So if I say VTG, you know I'm talking about

ARRIOLA, STETSON
10/17/2019                                                          Pages 17–20

Page 17

1  Vacations To Go?
2      A. Correct.
3      Q. Thank you.
4              What system do they use?
5      A. It's a personal sales manager. We call it a
6  PSM, and it has templates in there for confirmations,
7  for open quotes. And it allows us to manage every
8  customer that we deal with, whether we book them or not.
9  It's a database.
10     Q. And have they been using that same system since
11 you've been employed there?
12     A. Yes.
13     Q. And you mentioned you had been provided
14 orientation or training on the inner workings of the
15 office. Is that what you've been describing for me the
16 last 10 or 15 minutes?
17     A. That's correct.
18     Q. Would they provide you anything in writing
19 pertaining to the inner workings of the office, other
20 than the handbook and the handbook supplements?
21     A. I don't understand. Sorry.
22     Q. Sure.
23          MR. GIBSON: Speak up.
24     A. I'm sorry. I don't understand.
25     Q. (BY MR. WEGLARZ) Sure.

Page 18

1              When they were giving you training and
2  instruction on the inner workings of the office, we
3  talked about, yeah, they gave me a handbook and
4  sometimes they'd supplement it, and that would give you
5  some writing as to those procedures. Anything else in
6  writing they would give you on the inner workings of the
7  office besides the handbook stuff? I mean, would they
8  give you memos? Would they send you e-mails?
9      A. Yes, they would send e-mails.
10     Q. They would send you e-mails about, hey, we're
11 going to do this policy, and we're going to implement
12 this process, things like that?
13     A. Correct.
14     Q. And who usually would send out e-mails like
15 that?
16     A. It depends on the e-mail.
17     Q. Who were your supervisors back in 2015?
18     A. I do not recall who my direct team manager was
19 in 2015. I do know that the person above that one was
20 Sam Thompson. He was either manager of the department
21 or director. I don't know when he got his promotion.
22     Q. That's Sam Thompson?
23     A. Thompson.
24     Q. Who's your direct manager now?
25     A. Darin Huskey.

Page 19

1      Q. And at some point during your employment, was
2  your direct manager someone other than Darin Huskey?
3      A. Could be, yes.
4      Q. So there was someone who had that role before
5  Mr. Huskey. Right?
6      A. Correct.
7      Q. And was the supervisor over the direct manager,
8  was that person always Sam Thompson while you were
9  there?
10     A. Yes.
11     Q. Since you've been there?
12     A. Yes.
13          MR. GIBSON: I think he may be able to
14 correct that based on the document.
15     A. Yeah, I actually could correct that.
16     Q. (BY MR. WEGLARZ) Sure.
17     A. Darin Huskey was my manager. It also shows it
18 here, yes.
19     Q. Thank you.
20          And if you were to receive e-mails advising
21 of new policies, the reinforcement of policies or a
22 supplement of policies, would those be provided by
23 either Mr. Huskey or Mr. Thompson usually or would it be
24 other personnel?
25     A. It could come from either, any of them. Again,

Page 20

1  it depends on what the particular e-mail was.
2      Q. You also mentioned that resort companies would
3  come to the office or they'd provide you -- explain that
4  process.
5      A. So this happens all the time with resort
6  companies, will come into our office to provide
7  trainings on the property, updates on the property.
8      Q. And before we talk more about that, when you
9  say come into the office, where's your office?
10     A. 5256 -- no, sorry. I'm thinking of my house.
11 On San Felipe Street. It's been years since I've been
12 in the office.
13     Q. You work out of home now?
14     A. I work from home, yes.
15     Q. And you started doing that since last year?
16     A. December 2019 -- '18.
17     Q. Prior to December of 2018, you also worked out
18 of the VTG office?
19     A. Out of the main office, yes.
20     Q. On San Felipe?
21     A. On San Felipe Street.
22     Q. How many other offices do they have in Texas?
23     A. Just one.
24     Q. Would Sandals or Beaches ever come into the
25 office to provide training or education on their

**ARRIOLA, STETSON**
10/17/2019

Pages 21–24

Page 21

1  properties?
2      A.  Yes.
3          MR. SUAREZ:  Objection; form.
4      Q.  (BY MR. WEGLARZ)  And how often did that
5  happen?
6      A.  I don't recall when at the time of this.
7      Q.  I'm not asking -- right now it's more of a
8  general question.  Can you just give me your best
9  estimate as to --
10         MR. SAFRA:  Let him finish his answer,
11 please, because he was about to talk about timing and it
12 could be before or after the incident.  He's entitled to
13 answer the question before you stop him.
14         MR. WEGLARS:  Well, I'm going to rephrase
15 the question to clean it up.
16         MR. SAFRA:  I'd like him to finish his
17 response first.
18         MR. WEGLARS:  You can follow up with it
19 later, Steve.  Come on.
20         MR. SAFRA:  You cannot stop someone from
21 answering in the middle of their answer to rephrase your
22 question because you don't like an answer.  The witness
23 should finish his answer, and then you can rephrase or
24 reask the question a different way, if you'd like.
25             You can finish your answer.

Page 22

1          MR. GIBSON:  Did you have something else to
2  say?
3      A.  It just was a matter of the timing.  I don't
4  recall, at the time in 2015, how often the training was
5  with Sandals or Beaches.
6      Q.  (BY MR. WEGLARZ)  And I appreciate that.
7          So let me ask you in general.  Can you give
8  me your best estimate as to how many times someone from
9  Sandals -- and by the way, Sandals and Beaches are owned
10 by the same company.  Is that your understanding?
11     A.  That's my understanding.
12         MR. SAFRA:  Objection; form.
13     Q.  (BY MR. WEGLARZ)  And I take it anytime someone
14 would come to the office to provide this training or
15 instruction for Sandals would also include Beaches.  Is
16 that correct?
17     A.  That is correct.
18         MR. SAFRA:  Objection; form.
19     Q.  (BY MR. WEGLARZ)  And how many times --
20         MR. SAFRA:  You're leading the witness.
21         MR. WEGLARZ:  So what?
22         MR. SAFRA:  Please take a moment -- and
23 also misstatement of facts.
24             Please answer the questions truthfully and
25 answer best to your knowledge.  Do not just accept

Page 23

1  statements of this attorney that are misstatements of
2  facts as true.
3          MR. WEGLARZ:  Okay.  Steve, that's kind of
4  a speaking objection.
5          MR. SAFRA:  I'm going to state that on the
6  record because it's improper --
7          MR. WEGLARZ:  Oh, my God.
8          MR. SAFRA:  -- this is an out-of-state --
9          THE REPORTER:  One at a time.
10         MR. SAFRA:  Hold on.  This is an
11 out-of-state, non-party witness, and it is improper to
12 lead with misstatements of facts and inject into the
13 record that are not true.  So I will say it because you
14 are going to try to use this in court as part of filing
15 and you can't do that way.  It's improper practice.
16         MR. WEGLARZ:  Well, imagine an attorney
17 trying to use deposition testimony in court.  Of course,
18 Steve.  All right?  And your representation.
19         MR. SAFRA:  You are not allowed to do
20 misstatements of facts and leading questions.
21         MR. WEGLARZ:  Well, it's not a misstatement
22 of fact.
23         MR. SAFRA:  It is because they are not
24 owned by the same company.  You haven't established the
25 foundation that he knows even who owns it, and things of

Page 24

1  that nature.  So it is a misstatement of facts.
2          MR. WEGLARZ:  Well, I disagree.
3      Q.  (BY MR. WEGLARZ)  How many times total --
4          MR. SAFRA:  The facts are what the facts
5  are.  If you don't like the truth, that's your issue to
6  deal with at a later date, but it's a fact.
7          MR. WEGLARZ:  Steve, the objection is form,
8  and then we move on so we can get this done today.
9      Q.  (BY MR. WEGLARZ)  What's your best estimate --
10         MR. SAFRA:  Asked and answered.
11     Q.  (BY MR. WEGLARZ)  -- as to the number of times
12 from -- someone from Sandals and Beaches came out to the
13 office to provide education and training?
14     A.  I could speak currently that they come once a
15 year.
16     Q.  Okay.  Do you recall it ever being less than
17 once a year?
18     A.  No.
19     Q.  Do you recall it ever being more than once a
20 year?
21     A.  I do not recall.
22     Q.  Okay.  And would this once-a-year training
23 happen the same time of year generally?
24     A.  I do not recall.
25         MR. SAFRA:  Objection.  Objection; form as

ARRIOLA, STETSON
10/17/2019                                                                    Pages 25–28

Page 25

1   to the word "training."
2       Q.  (BY MR. WEGLARZ)  And who from Sandals and/or
3   Beaches would come to the office?
4           MR. SUAREZ:  Objection; form.
5       Q.  (BY MR. WEGLARZ)  Go ahead.
6       A.  I do not recall the person that would come, but
7   we were understanding that it was a representative.
8       Q.  Okay.  They identified themselves as a
9   representative of Sandals.  Correct?
10      A.  Yes.
11          MR. SUAREZ:  Objection; form.
12      A.  It would be representative or a business
13  development manager, which we call BDMs.
14      Q.  (BY MR. WEGLARZ)  And what types of information
15  would be conveyed by the Sandals BDM?
16          MR. SAFRA:  Objection; form.  He's not
17  identified that a BDM is actually Sandals employee,
18  affiliate, representative.  Misleading.  Foundation.
19      Q.  (BY MR. WEGLARZ)  Go ahead.
20          MR. SAFRA:  I'm giving you an opportunity
21  to correct your question because of the deposition.
22  That's why I'm saying more than from.
23      Q.  (BY MR. WEGLARZ)  You can answer.
24      A.  What should I answer?
25          MR. GIBSON:  Ask him to rephrase the

Page 26

1   question.
2       A.  Wait.  Rephrase your question.
3       Q.  (BY MR. WEGLARZ)  Sure.
4           When this person would arrive at the office
5   to provide information on Sandals Resorts, you
6   understood this person to be a representative of the
7   Sandals Resorts.  Correct?
8       A.  That is correct.
9       Q.  And you understood this person to be a BDM for
10  Sandals Resorts.  Correct?
11      A.  Yes.
12      Q.  And this person, who was in the VTG building,
13  would not only give you information on Sandals Resorts
14  but also on Beaches Resorts.  Right?
15      A.  Yes.
16          MR. SAFRA:  Objection; form.  Move to
17  strike the leading question.
18      Q.  (BY MR. WEGLARZ)  And do you recall what --
19  what kind of information would they provide during these
20  training or education sessions?
21          MR. SAFRA:  Objection; form.
22      A.  From what I can recall, they would provide
23  information about the properties, updates on the
24  properties, if at the time opening or closure of
25  properties.  That's the normal protocol of these

Page 27

1   meetings.  And then promotions that they run that you
2   see everywhere, yeah, that you see like on TV, same
3   promotions.
4       Q.  (BY MR. WEGLARZ)  And who typically would
5   attend these meetings?
6       A.  All agents.  Let me rephrase.  All resort
7   agents.
8       Q.  So all resort agents of VTG --
9       A.  That's correct.
10      Q.  -- would attend?
11          And is this a one-day thing, two days?  How
12  long usually?
13      A.  It was a half a -- when Sandals comes in, it is
14  typically a half-a-day training.
15          MR. SAFRA:  Objection; form.
16      Q.  (BY MR. WEGLARZ)  And that's how you perceived
17  it or that's how they identified it, it was a training
18  session.  Correct?
19      A.  Yes.
20          MR. SAFRA:  Objection; form.
21      Q.  (BY MR. WEGLARZ)  It was a training session on
22  their properties.  Right?
23          MR. SAFRA:  Objection; form.
24      A.  That's correct.
25      Q.  (BY MR. WEGLARZ)  And would they give

Page 28

1   brochures, handouts?
2       A.  They would provide booklets, binders.
3       Q.  And would they have a binder or a booklet for
4   each agent who attended this meeting?
5       A.  Yes.
6       Q.  And what kind of information would it be in the
7   binder or booklet?
8       A.  Information about every single property
9   regarding Sandals and Beaches.
10      Q.  And would that be all Sandals and Beaches
11  properties?
12      A.  All.
13      Q.  Okay.  And can you tell me just in general what
14  types of -- what kind of information would be provided
15  for each resort?
16      A.  Room descriptions, room categories,
17  restaurants.
18      Q.  And did you rely on these training sessions to
19  educate yourself about these properties that you were
20  going to promote, book and sell through Vacations To Go?
21      A.  Yes.
22      Q.  Would they give you any other information in
23  some type of writing, other than the booklet or the
24  binder?
25      A.  They would do a PowerPoint that was a verbatim

ARRIOLA, STETSON
10/17/2019

Pages 29–32

Page 29

1  of what was in the booklet or the binder.
2      Q.  Was it always the same BDM doing these training
3  sessions?
4      A.  I do not recall.
5      Q.  Would you sometimes get e-mails from the
6  Sandals BDMs?
7      A.  Yes.
8      Q.  How often would you get an e-mail from a
9  Sandals BDM?
10     A.  I do not know.
11     Q.  Is it at least a couple of year, a couple of
12  month?
13     A.  I don't know the exact number.
14     Q.  What would be the reason for a Sandals BDM to
15  send you an e-mail?
16         MR. GIBSON:  Objection; form.
17         You can go ahead and answer if you can.
18     A.  It could include updates on properties,
19  restaurants, information, promotions.
20     Q.  (BY MR. WEGLARZ)  Then what would you do with
21  the booklets or binders that were provided?
22     A.  Keep them at my desk.
23     Q.  Okay.  And you'd get one a year.  Right?
24     A.  One a year.
25         MR. SUAREZ:  Objection; form.

Page 30

1         MR. SAFRA:  Misstates testimony.
2      Q.  (BY MR. WEGLARZ)  Would you throw out the old
3  ones or replace it with the new or you just amass -- you
4  keep them altogether?
5      A.  I would throw them out and keep the new.
6      Q.  Sure.
7         Do you still have any of those booklets or
8  binders?
9      A.  I do not know.
10     Q.  Would any of those booklets or binders be back
11  at the office?
12     A.  There could be.
13     Q.  Okay.  But each agent had their own booklet or
14  binder that they would use for their reference.
15  Correct?
16     A.  For the meeting, yes.
17     Q.  But then they would keep it, and then use it
18  accordingly?
19     A.  I don't know.
20         MR. GIBSON:  Objection; form.
21     Q.  (BY MR. WEGLARZ)  But that's what you would do?
22  That's what you did?
23     A.  I just kept it at my desk.
24     Q.  During these training sessions, would the
25  Sandals BDM ever mention or make reference to any types

Page 31

1  of risks at the destinations where any of the resorts
2  were located?
3         MR. SUAREZ:  Objection; form.
4      A.  No.
5      Q.  (BY MR. WEGLARZ)  Did Sandals mention or
6  reference State Department travel alerts or travel
7  advisories?
8         MR. SUAREZ:  Objection; form.
9      A.  I do not know.
10     Q.  (BY MR. WEGLARZ)  You don't recall them ever
11  mentioning that?
12     A.  I don't remember.  Yeah, I don't remember.
13     Q.  Okay.  Do you recall anyone from Sandals ever
14  mentioning that there's been warnings in Jamaica about
15  resort employees sexually assaulting the guests at the
16  hotels located on the north coast?
17         MR. GIBSON:  Objection; form.
18         MR. GIBSON:  Objection; form.
19         MR. SAFRA:  Objection; form.
20     A.  No.
21     Q.  (BY MR. WEGLARZ)  Have you ever heard of that
22  before?
23     A.  No.
24     Q.  If someone from Sandals were to tell you, you
25  know what, State Department does warn and alert that

Page 32

1  they have a concern about the number of sex assaults
2  being committed by resort employees at resorts on the
3  northern coast, would that have influenced your booking
4  of vacation packages on the north coast of Jamaica?
5         MR. GIBSON:  Objection; form.
6         MR. SAFRA:  Objection; form.
7      A.  I do not know.
8      Q.  (BY MR. WEGLARZ)  I take it it would at least
9  be a concern to you.  Correct?
10         MR. GIBSON:  Objection; form.
11         MR. SAFRA:  Objection; form.  Asked and
12  answered.  If you don't like the answer, you can't ask
13  it again to get him to change.
14         MR. WEGLARZ:  That's a different question,
15  Steve.
16         MR. SAFRA:  I disagree.
17     Q.  (BY MR. WEGLARZ)  Go ahead.
18     A.  Can you restate your question?
19         MR. SAFRA:  You can answer if you can.
20     Q.  (BY MR. WEGLARZ)  Had you been aware of that
21  information, I take it that would at least be a concern
22  to you?
23         MR. GIBSON:  Objection; form.
24         MR. SAFRA:  Objection; form.
25     A.  I don't know if I can answer that.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Pages 33—36

Page 33

1    Q.  (BY MR. WEGLARZ)  Any other information that
2  would be provided to you about Sandals and Beaches
3  Resorts and their properties, other than through these
4  training sessions by the BDMs?
5    A.  Wait.  Rephrase.  Restate your question.
6  Sorry.
7    Q.  (BY MR. WEGLARZ)  Sure.
8         How else did you gain your knowledge,
9  education and information on Sandals and Beaches Resorts
10  that you were selling, other than through the training
11  sessions from the Sandals BDMs?
12    A.  Through previous bookings, previous customers.
13    Q.  Okay.  And other than that?
14    A.  No.
15    Q.  Have you ever heard of a company called Unique
16  Vacations, Inc.?
17    A.  No, not prior to this.
18    Q.  Was it your understanding that the Sandals BDMs
19  who were coming to VTG to provide these training
20  sessions, was it your understanding they were employed
21  by Unique Vacations?
22        MR. SAFRA:  Objection; form.
23    A.  I don't know.  I wouldn't pay attention to
24  that.
25    Q.  (BY MR. WEGLARZ)  Okay.  If the Sandals BDMs

Page 34

1  told you during these training sessions, you know what,
2  if you book a vacation to one of our resorts on the
3  north coast of Jamaica, we want you to alert them to the
4  State Department's alerts or warnings about their
5  concern about the number of sex assaults by resort
6  workers on the north coast?
7        MR. GIBSON:  Objection; form.
8        MR. SUAREZ:  Objection; form.
9    Q.  (BY MR. WEGLARZ)  If they were to tell you, we
10  want you to warn about that, would you have complied
11  with that instruction?
12        MR. GIBSON:  Objection; form.
13        MR. SUAREZ:  Objection; form.
14    A.  I don't think I could answer that.  I don't
15  know.
16    Q.  (BY MR. WEGLARZ)  I take it you've taken
17  vacations?
18    A.  Yes.
19    Q.  Have you taken any vacations outside of the
20  continental U.S.?
21    A.  Yes.
22    Q.  Where have you vacationed?
23    A.  I vacationed to Mexico, the Yucatan in Mexico,
24  Puerto Vallarta, Los Cabos, Jamaica, Europe.  Should I
25  be specific on countries in Europe?

Page 35

1    Q.  You're doing fine just being general right now.
2    A.  Aruba, Costa Rica, the Bahamas.
3    Q.  How many times have you been to Jamaica?
4    A.  Two times.
5    Q.  When did you go last?
6    A.  I don't know the exact date.
7    Q.  Ballpark?
8    A.  Actually, 2009.
9    Q.  And then when was the time that you went before
10  that?
11        MR. SAFRA:  Objection.  Could be after.
12    A.  Could be perhaps two years before that.  Sorry.
13  Could be a few years before that.
14    Q.  (BY MR. WEGLARZ)  I thought we established the
15  last time you went to Jamaica was in 2009.  Correct?
16    A.  That was the last time I went.
17    Q.  Tell me about that trip.  How did you decide to
18  go to Jamaica in 2009?
19    A.  It was a trip provided by Vacations To Go in
20  one of our hotel chains.  We call them familiarization
21  trips.
22    Q.  They call those FAM trips?
23    A.  FAM trips, correct.
24    Q.  Where did you stay?
25    A.  We stayed at the Breezes Resorts.  They were

Page 36

1  the ones hosting the FAM trip, and we stayed in
2  Trelawny, Breezes Trelawny.  We visited the Breezes
3  owned resort in Ocho Rios, which was rooms on the beach.
4  We visited Breezes -- well, we stayed at Breezes
5  Runaway.  So correction.  Breezes Runaway Bay is where
6  we stayed, visited Breezes Trelawny.  Then we stayed at
7  the Breezes in Negril, visited the Grand Lido, which was
8  Hedonism at the time, got to see it.
9    Q.  Any other resorts or locations where you stayed
10  during that Jamaica trip?
11    A.  During 2009?
12    Q.  Yes, sir.
13    A.  No.
14    Q.  Did you -- and you never went to Jamaica since
15  then.  Correct?
16    A.  No.
17    Q.  Did you ever do any FAM trips at any Sandals or
18  Beaches Resorts?
19    A.  No.
20    Q.  Do you know why?
21        MR. SAFRA:  Objection; form.
22    A.  I typically don't like to go back to the same
23  destination more than once.
24    Q.  (BY MR. WEGLARZ)  Do they offer it?
25    A.  I don't know.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019                                                                      Pages 37–40

Page 37

1    Q.  Very good.
2         Do you have -- can you tell me what you
3    recall the Sandals BDMs telling you during these
4    training sessions?  Do you recall anything specific as
5    to what they may have said or mentioned?
6    A.  I can't recall.
7    Q.  Do you recall them mentioning anything about
8    Beaches Ocho Rios?
9    A.  They spoke of every single property in their --
10   they had in their -- you know, that they operate, I
11   guess is what the right word.
12   Q.  Based upon these presentations that the Sandals
13   BDMs would provide, did you walk away with the
14   impression that the Sandals and Beaches Resorts in
15   Jamaica were safe?
16        MR. SAFRA:  Objection; form.
17   A.  As safe as they can be.  I mean, you talk
18   about -- you can't be safe anywhere you go, so walking
19   away from a meeting like that saying a resort is
20   particularly safe, how do you know that?
21   Q.  (BY MR. WEGLARZ)  Did the Sandals BDMs give you
22   any reason to believe that any of the resorts in Jamaica
23   were unsafe?
24        MR. SAFRA:  Objection; form.
25   A.  No.  No.

Page 38

1    Q.  (BY MR. WEGLARZ)  Did the Sandals BDMs give you
2    any reason to believe that the Jamaican resorts were
3    more dangerous than any other hotel or resort around the
4    world?
5         MR. SAFRA:  Objection; form.
6    A.  Say that again.  Sorry.
7    Q.  (BY MR. WEGLARZ)  Sure.
8         Did the BDMs give you any reason to believe
9    that a resort in Jamaica, any resort in Jamaica, would
10   be more dangerous than your typical resort anywhere in
11   the world?
12        MR. SAFRA:  Objection; form.
13   A.  No.
14   Q.  (BY MR. WEGLARZ)  Did the Sandals BDMs
15   reference or make mention that Jamaica can be dangerous?
16        MR. SAFRA:  Objection; form.
17   A.  No.
18   Q.  (BY MR. WEGLARZ)  Have you ever heard that
19   Jamaica can be a dangerous country?
20   A.  Any country can be dangerous that you go to.
21   That's my understanding.  I've traveled enough around
22   the world and even inside the United States to know that
23   anywhere you travel is dangerous.  So it's not a matter
24   of me walking out of a meeting thinking that that
25   destination is dangerous.  I innately know it's

Page 39

1    dangerous anywhere.
2    Q.  Sure.
3         Other than that general understanding, and
4    look, no matter where you are, things can be dangerous?
5    A.  Absolutely.
6    Q.  Did you ever hear of anything specific about
7    Jamaica being a dangerous place or a place more
8    dangerous than other places?
9    A.  No.
10        MR. SAFRA:  Objection; form.
11   Q.  (BY MR. WEGLARZ)  And you never heard that
12   there was -- you never heard that there were any
13   reported issues of resort workers sexually assaulting
14   guests at the resorts?
15        MR. GIBSON:  Objection; form.
16        MR. SAFRA:  Objection; form.
17   A.  No.
18   Q.  (BY MR. WEGLARZ)  Now, when you hired in with
19   Vacations To Go in 2009, what was your job title?
20   A.  Vacations To Go travel counselor.
21   Q.  And have you had the same job title ever since?
22   A.  Yes.
23   Q.  What's the difference between a travel
24   counselor and a travel agent?
25        MR. SUAREZ:  Objection; form.

Page 40

1    A.  I don't know if there is a difference.  I think
2    it could be just words, the way they label it, but we're
3    not a walk-in travel agency either.
4    Q.  (BY MR. WEGLARZ)  Did you consider yourself a
5    travel agent when you were working at Vacations To Go
6    from 2009 through 2015?
7         MR. GIBSON:  Objection; form.
8    A.  Travel counselor.  I would never use travel
9    agent.
10   Q.  (BY MR. WEGLARZ)  And why not?
11   A.  Because it's -- it sounds better as a travel
12   counselor.
13   Q.  Travel counselor --
14   A.  You get a lot of kickback with travel agent,
15   saying travel agent, because people believe it's a dying
16   industry, but it's not.
17   Q.  And tell me, what is the role or the purpose of
18   a travel counselor?
19   A.  You're speaking about my job, what I do?
20   Q.  Yes, sir.
21   A.  I claim leads that are provided by our company
22   through our call system.  We get customers that will
23   either know exactly where they want to go, and those
24   customers, I proceed to book, send their confirmations,
25   their travel documents and the bon voyage e-mail and the

ARRIOLA, STETSON
10/17/2019

Pages 41–44

Page 41

1  welcome home e-mail. Also for those customers, if
2  there's any questions that they may have or any issues
3  that may arise from the initial booking to coming home,
4  they can reach out to me. And if I can answer or help
5  them with that issue that's within my control, I will.
6  If not, I would, especially after travel, forward it to
7  the provider, and then they'd deal with it from there.
8       Ones that don't know where they want to go,
9  we can give them options depending on what they want to
10 do. We have to get information out of them, where they
11 want to go, when they want to go, and then we send them
12 a list of options, and then in the end they make the
13 decision and they can either call me back or --
14 hopefully, or another agent.
15      Q. Do you have any certification or a license?
16 Sometimes I hear the term certified travel agent. Are
17 you a certified travel agent or counselor?
18      A. I haven't -- I had an IATA card, but our IATA
19 is under our company. I'm an employee of VTG, so I
20 don't think we have to be certified. I'm not sure.
21      Q. When you say IATA, I take it that's an acronym
22 for something?
23      A. It's what we use to -- that's our agency's
24 number to show that our agency is a travel agency.
25      Q. Okay. And what does that stand for?

Page 42

1       A. I don't know.
2       Q. Do you have an idea as to what it stands for?
3       A. No idea.
4       Q. It's IATA?
5       A. IATA.
6       Q. I-A-T-A?
7       A. I-A-T-A.
8       Q. International association of travel agents?
9       A. That sounds good. I don't know.
10      Q. Well, don't take my word for it. I don't know
11 either.
12      A. I don't know.
13      Q. Do you have any type of license? Does the
14 State of Texas have a license for travel counselors or
15 travel agents?
16      A. I do not have a license.
17      Q. Are you a member of any professional trade or
18 industry groups or associations, besides IATA
19 apparently?
20      A. Besides IATA, apparently, yeah. That's all I
21 know.
22      Q. Do you review any newsletters, publications
23 relating to the travel industry?
24      A. No.
25      Q. Like Travel Weekly, have you heard of that?

Page 43

1       A. Yeah, I don't do -- I don't read any of that.
2       Q. Why not? I'm just curious.
3       A. I spend 9 to 14 hours a day at my job doing my
4  job. The last thing I want to do is read a publication
5  about that.
6       Q. That's why the postman never goes for a walk.
7  Right?
8       A. Exactly.
9       Q. When you went to Jamaica in 2009, did you
10 review the State Department travel alerts, travel
11 advisories or any type of warning from the State
12 Department concerning Jamaica?
13      A. No.
14      Q. Were you aware that the State Department issues
15 warnings and travel alerts and advisories for particular
16 destinations?
17      A. In 2009?
18      Q. Yes.
19      A. No.
20      Q. When was the first time that you became aware
21 that the State Department does issue alerts and
22 advisories?
23      A. I do not recall. I don't know.
24      Q. Would it have been recently?
25      A. I don't know.

Page 44

1       Q. Were you aware that the State Department was
2  issuing warnings and advisories, prior to the booking of
3  this trip here to Beaches Ocho Rios in 2015?
4       A. I do not know.
5       Q. How did you become aware that the State
6  Department issues such warnings about destinations?
7       A. I do not know.
8           MR. SUAREZ: Objection; form.
9       A. I do not know.
10      Q. (BY MR. WEGLARZ) Did VTG ever tell you, hey,
11 by the way, the State Department does issue advisories
12 and alerts? Did they ever mention anything like that to
13 you?
14      A. When?
15      Q. At any time.
16      A. What time?
17      Q. Anytime.
18      A. I can't recall from then. Now, I do know we do
19 that now.
20      Q. Okay. Right now I don't want you to be
21 confused about the timing. I just want to know anytime,
22 even if it was just a month ago. Just a real simple
23 question. Do you recall Vacations To Go ever telling
24 you about the State Department having travel alerts or
25 travel advisories that can be reviewed and looked at?

ARRIOLA, STETSON
10/17/2019

Pages 45–48

Page 45

1    A.  Yes.
2    Q.  So now my next question is, when do you recall
3  Vacations To Go telling you about that?
4    A.  I don't know that.
5    Q.  Do you believe it would have been more recent
6  as opposed to close in time when you were hired in?
7    A.  I don't know.  I don't remember.
8    Q.  And can you tell me what Vacations To Go
9  explained to you as -- when they mentioned this
10  information about the State Department?
11    A.  Now or then?
12    Q.  The time that you recall them telling you about
13  it.  I know you don't know when it was.
14    A.  I don't know how that conversation or e-mail
15  was sent or any type of notification about the State
16  Department was sent from Vacations To Go regarding the
17  State Department.  I don't remember.
18    Q.  But you may have been notified about that
19  through an e-mail?
20    A.  Could have been e-mail, could have been
21  conversation.
22    Q.  Did Vacations To Go say that they want you to
23  review State Department warnings?
24    A.  No.
25    Q.  Did VTG ever have a policy where they wanted

Page 46

1  the agents or the counselors to direct or refer
2  customers to the State Department warnings?
3    A.  Only if asked by the customer.
4    Q.  You've had customers ask about State Department
5  warnings?
6    A.  I've had customers ask about a safety of a
7  destination.
8    Q.  And if a customer asks about the safety of a
9  destination, what do you do?
10    A.  Send them to this state.gov's website.
11    Q.  And has that been your practice ever since you
12  hired in at VTG?
13    A.  That I can recall.
14    Q.  How many times do you believe you would have
15  directed a customer to the state.gov website?
16    A.  I don't know.  I have no idea.
17    Q.  Would it be more than five?
18    A.  It would be, yeah.  I mean, I talk to a
19  thousand --
20    Q.  I know you can't give me a specific number.
21    A.  I talk to a thousand people plus a year.
22    Q.  Understood.
23        Would it be more than a hundred?
24    A.  I don't know.
25    Q.  And you knew that if you go to the state.gov

Page 47

1  website, that's where they can find -- what information
2  did you understand would be available there?
3    A.  Passport information, passport validity
4  information, travel advisories, travel levels.  That's
5  to my knowledge as of now, yes.
6    Q.  And you engaged in this practice shortly after
7  you were hired?
8    A.  I do not know.  I can't remember.
9    Q.  You certainly were engaged in this practice as
10  of 2015?
11    A.  I can't remember 2015.
12    Q.  You understand that you booked the Jamaican
13  vacation for Janet Desantis and her travelers?
14    A.  Yes.
15    Q.  If Ms. Desantis were to have asked you, hey, I
16  need some information about the safety of this area, how
17  would you have responded?
18        MR. GIBSON:  Objection; form.
19    A.  I would have -- based on procedure I would have
20  told her I cannot guarantee safety in any destination
21  that you go to.  And if I was aware of the
22  travel.state.gov's website, I would have directed them
23  to that or said, you need to look into the safety and if
24  you feel comfortable in going there, that's your
25  decision but that I don't have control of.

Page 48

1    Q.  (BY MR. WEGLARZ)  Do you believe you would have
2  told her to check out the State Department website?
3    A.  If I was aware of it, yes, and if she asked
4  about it, yes.
5    Q.  And you say if you're aware of it.  Are you
6  saying because --
7    A.  I don't recall the conversation I had with
8  Janet Desantis, and I don't know my knowledge in 2015.
9  I can tell you now what I've used to doing, what I've
10  been doing for Vacations to Go from the get-go, that I
11  can't guarantee your safety to anywhere you go, and
12  that's always been standard protocol with Vacations To
13  Go, always.  Now, where we direct you to go, that's -- I
14  can't remember.
15    Q.  So are you saying that there's a realistic
16  possibility that even in February or April of 2015, you
17  were not even aware of the State Department and the fact
18  that the State Department issues regular travel alerts
19  and advisories?
20        MR. GIBSON:  Objection; form.
21        MR. SUAREZ:  Objection to the form.
22    A.  I don't remember.  I could have been aware, I
23  could not have been aware.  I don't know.
24    Q.  (BY MR. WEGLARZ)  And because you, being a
25  trained travel counselor, because you at least for some

ARRIOLA, STETSON
10/17/2019

Pages 49–52

Page 49

1    period of time were unaware of the State Department and
2    its travel alerts and advisories, I take it you would
3    not expect your customers, like Janet Desantis, to be
4    aware of those alerts and advisories.  Correct?
5        MR. GIBSON:  Objection; form.
6        A.  Well, where you're stating that I was unaware
7    of it, I do not know if I was unaware of it.  So I can't
8    tell you if she was aware of it or not.  As someone that
9    was booking the vacation, if you're going somewhere new,
10   I feel you should become aware of it, whether you ask
11   questions or you look into it yourself.  But that's
12   outside of my parameter, unless asked about safety now.
13       Q.  Correct me if I'm wrong:  But didn't you tell
14   us earlier that there was some period of time while you
15   were working at VTG where you were unfamiliar with the
16   State Department and its travel alerts and advisories?
17       A.  Well, their advisories that they release, I
18   don't know what the advisories were.
19       Q.  I'm talking in general.
20       A.  Not as a matter of unaware of it.  Just I don't
21   remember if I knew of the website then or -- I don't
22   know.  It was 2015.  I can't remember that far.
23       Q.  All right.  I want to make sure we're on the
24   same page.
25       A.  Yeah.

Page 50

1        Q.  When you hired in and started working at
2    Vacations To Go in 2009, were you aware that there was a
3    State Department that regularly issued travel alerts and
4    advisories for destinations?  I'm just asking you in
5    general.  I'm not asking you to recite for me what those
6    alerts or advisories specifically may have been back
7    then.  I'm just asking, did you know that the State
8    Department did this back in 2009?
9        A.  I don't know.  I don't think I was aware.  I
10   don't know.
11       MR. SAFRA:  There's a kind of like beating.
12       A.  I don't think I was aware, but I don't know.
13       MR. SAFRA:  I don't mean to interrupt, but
14   I'm hearing like a beating of a drum right now.  I don't
15   know if someone put us on hold or mute or something with
16   the phone.  It went off just now.
17       MR. GIBSON:  Can you hear us right now?
18       MR. SAFRA:  The beating stopped.  It works
19   now.  I don't know what happened.  Sorry about that.
20       MR. WEGLARZ:  That's all right.  I'm glad
21   it resolved.
22       MR. SAFRA:  Sometimes that happens when
23   someone probably puts us on hold or something.
24       MR. WEGLARZ:  Sure.
25       Q.  (BY MR. WEGLARZ)  So you do believe there was a

Page 51

1    period of time while you were working at Vacations To Go
2    that you were unaware of the State Department and its
3    travel warnings and travel alert system.  Correct?
4        MR. GIBSON:  Objection; form.
5        A.  I don't know.
6        Q.  (BY MR. WEGLARZ)  You don't recall --
7        A.  I don't recall.
8        Q.  You don't recall VTG providing you any type of
9    instruction about that during your initial training?
10       A.  I don't know.
11       MR. SAFRA:  Todd?
12       MR. WEGLARZ:  Yes.
13       MR. SAFRA:  I'm sorry to interrupt.  I'm
14   sorry to interrupt, but that banging noise, the tapping
15   noise started again.
16       MR. GIBSON:  Well, it's not here in the
17   office.  I don't know where that's coming from.
18       MR. WEGLARZ:  Yeah, we don't hear it.  Your
19   line must be getting a -- there must be a wiretap on
20   your line.
21       MR. GIBSON:  Todd, we're creeping up on an
22   hour.  I'd like to take a break.
23       MR. WEGLARZ:  We can take a break now.
24   It's a good time.  Sure.
25       MR. GIBSON:  All right.

Page 52

1        (Recess from 11:10 a.m. to 11:27 a.m.)
2    BY MR. WEGLARZ:
3        Q.  Mr. Arriola, have you heard of a company by the
4    name of Mark Travel?
5        A.  Yes.
6        Q.  And what is your understanding as to what Mark
7    Travel is?
8        A.  They're our wholesaler, slash, provider who we
9    book our vacations through.
10       Q.  And does Mark Travel provide any type of
11   regular training updates, things like that?
12       MR. SUAREZ:  Objection; form.
13       A.  Yes.
14       Q.  (BY MR. WEGLARZ)  Tell me about that.  How did
15   that work?  How often?
16       A.  I can't recall how often, but they come in and
17   give us updates on their site through -- on their system
18   that we use to book.  They'll tell us about regular
19   promo codes that are either specific to that company or
20   to VTG to use to help clients get better pricing.
21       Q.  Is this the same PSM system we were talking
22   about earlier?
23       A.  No.
24       Q.  Tell me about the Mark Travel system.
25       MR. SUAREZ:  Objection; form.

ARRIOLA, STETSON
10/17/2019

Pages 53–56

Page 53

1    A.  It's provided through Amadeus.  I assume it's
2  Amadeus that they use, and we go in there and make the
3  reservations through their online system.
4    Q.  (BY MR. WEGLARZ)  Did you say Amadeus?
5    A.  Amadeus.
6    Q.  As in Mozart?
7    A.  I don't know.  A-M-A-D-E-U-S.
8    Q.  Yes, it is.
9        Is that the VAX system?
10   A.  That is the VAX.
11   Q.  V-A-X?  So how does it work?  I know that
12  you're talking about the PSM system.
13   A.  PSM is for Vacations To Go that provides us our
14  templates to send quotes and confirmations to.
15   Q.  To the customer directly?
16   A.  To the customer directly.
17   Q.  All right.
18   A.  VAX or Amadeus, it's VAX, you know that term,
19  technical term, VAX, that once we book the reservation
20  through VAX, then the travel documents are sent to our
21  company and attached into our PSM, and then we forward
22  that to the customer and it's all logged in our notes.
23   Q.  All right.  And are the Beaches and Sandals
24  Resorts, do you also do all the bookings through VAX for
25  those?

Page 54

1    A.  No.
2    Q.  Tell me how that works.  How is that different
3  for Beaches and Sandals?
4    A.  Currently?
5    Q.  Sure.
6    A.  Currently, I don't believe we have access to
7  all of other wholesalers that carry Beaches or Sandals.
8  I'm not too sure exactly all of our wholesalers who
9  carry them, but I can also book directly through Beaches
10  and Sandals, as well, if I needed to.
11   Q.  All right.  That wasn't -- this wasn't always
12  the case?
13   A.  That has always been the case.
14   Q.  It has always been the case?
15   A.  I believe so, yes.
16   Q.  So back in 2015 if you, as a VTG travel
17  counselor, wanted to book a Sandals or Beaches Resort,
18  how would you do that, through what system?
19   A.  Whoever had the lowest price at the current
20  time, whichever wholesaler of ours had the lowest price
21  for the customer, provider -- wholesaler or provider,
22  and this is since it was -- I believe it was Funjet this
23  time.
24   Q.  How many different wholesalers or providers
25  would VTG have the option of selecting to get a Beaches

Page 55

1  or Sandals Resort?
2    A.  That, I couldn't give you an exact number.
3    Q.  So if you go through Funjet, you're going to be
4  using VAX?
5    A.  We would use VAX.
6    Q.  Even for Sandals and Beaches?
7    A.  Just through Funjet.  For Sandals and Beaches
8  or any other resort company, (shaking head.)
9    Q.  When Mark Travel would come in and provide
10  these dates, would they ever provide updates and
11  training or instruction on properties?
12   A.  They would.
13       MR. SUAREZ:  Objection; form.
14   A.  They wouldn't themselves.  They would either
15  have the property BDM come with them and share the time.
16   Q.  (BY MR. WEGLARZ)  Got it.
17       So would Mark Travel also be there when
18  Sandals would have the BDMs there for these training
19  sessions?
20       MR. SUAREZ:  Objection; form.
21   A.  I do not believe so.
22   Q.  (BY MR. WEGLARZ)  Would Mark Travel provide
23  training, instruction or guidance on how to do a proper
24  booking?
25       MR. SUAREZ:  Objection; form.

Page 56

1    A.  Not necessarily a proper booking but how to use
2  their system, but that would be very rare because we'd
3  know how to use their system.  We use it every day.
4    Q.  (BY MR. WEGLARZ)  Would they provide you with
5  information or guidance on things other than just the
6  technical aspects of the system?
7        MR. SUAREZ:  Objection; form.
8    A.  No.
9    Q.  (BY MR. WEGLARZ)  Do you recall Mark Travel
10  ever providing any training, guidance or instruction on
11  what types of warnings to give to customers when you're
12  booking their vacations?
13       MR. SUAREZ:  Objection; form.
14   A.  Not that I can recall.
15   Q.  (BY MR. WEGLARZ)  Okay.  Would Mark Travel
16  provide handbooks or binders or anything in writing
17  which would give you guidance on how to do your job?
18   A.  No.  They would have promotional packets
19  provided by the hotel, so no, Mark Travel, no.
20   Q.  Do you remember ever getting promotional
21  packets for Sandals and Beaches?
22       MR. GIBSON:  From Mark Travel?
23   A.  Yeah, from Mark Travel?
24   Q.  (BY MR. WEGLARZ)  Sure.
25   A.  No, not through Mark Travel.

ARRIOLA, STETSON
10/17/2019

Pages 57—60

Page 57

1    Q.  But through the Sandals BDMs.  Correct?
2    A.  Yes.
3         MR. SAFRA:  Objection; form.
4         MR. GIBSON:  That's why I said that,
5    because I thought we covered that already, so...
6    Q.  (BY MR. WEGLARZ)  By the way, how are you paid
7    by VTG?  Is it a straight salary?  Is it commission?  Is
8    it a combination of both?
9    A.  Is that necessary?
10   Q.  I'm not asking you for the number.
11        MR. GIBSON:  Yeah, we're -- I'm going -- I
12   didn't object to the question because you're just asking
13   about methodology.
14        MR. WEGLARZ:  Correct.
15        MR. GIBSON:  We will have issues if we go
16   to numbers but --
17   A.  Okay.  So we are --
18        MR. GIBSON:  No, he asked you.
19   A.  Okay.  Me.  We're paid via commission.
20   Q.  (BY MR. WEGLARZ)  And that's it?  It's all
21   commissions.  Correct?
22   A.  Commissions.
23   Q.  Yes?
24   A.  Yes, straight commissions.  Sorry.
25   Q.  You eat what you kill.  Right?

Page 58

1         MR. GIBSON:  Objection; form.
2    Q.  (BY MR. WEGLARZ)  Maybe that's a bad
3    expression.
4    A.  I don't know how to -- yeah.
5    Q.  They don't give you a base salary, and then you
6    can supplement that by commissions?
7    A.  They only provided base salary in the beginning
8    for the first few months or month or two when I first
9    started, and then after that you go straight commission.
10   Q.  And is it a flat commission for every booking
11   or does it vary?
12   A.  It varies.
13   Q.  And where do the Sandals and Beaches
14   commissions, how do those rate compared to the others?
15   A.  It depends on the package price.
16        MR. SAFRA:  Objection; form.
17   A.  The commissions are all set by a certain
18   percentage.  That's beyond me.
19   Q.  (BY MR. WEGLARZ)  Okay.  Do you recall Mark
20   Travel ever telling you or advising you about the State
21   Department?
22   A.  Not that I can recall.
23   Q.  Do you recall Mark Travel ever telling you or
24   advising you about the State Department's crime reports
25   or travel alerts or travel advisories?

Page 59

1    A.  Not that I can recall.
2         MR. SUAREZ:  Objection to the form.
3    A.  Not that I can recall.
4    Q.  (BY MR. WEGLARZ)  We're going to mark as
5    Exhibit 3 a copy of the Jamaica 2012 Crime and Safety
6    Report, and it's actually just excerpts from it.
7         (Exhibit No. 3 was marked.)
8    Q.  (BY MR. WEGLARZ)  I'll let you take a look at
9    that.
10        MR. SUAREZ:  Did you say you're marking it
11   as Exhibit 3?
12        MR. WEGLARZ:  Yes, sir.
13        MR. SUAREZ:  What happened to 1 and 2?
14        MR. WEGLARZ:  They're still here.  We
15   marked the first 60 pages as Exhibit 1, and then
16   Exhibit 61 and 62 is Exhibit 2.
17        MR. GIBSON:  Do you have an extra copy of
18   Exhibit 3, what you just marked?
19        MR. WEGLARZ:  I do.  I do, actually.
20        MR. GIBSON:  Thank you.
21        MR. WEGLARZ:  You're welcome.
22   Q.  (BY MR. WEGLARZ)  Mr. Arriola, have you ever
23   seen anything like Exhibit No. 3 before?
24   A.  No.
25   Q.  Have you ever heard of crime and safety reports

Page 60

1    published by the State Department?
2    A.  No.
3    Q.  If I direct your attention to the next page on
4    Exhibit No. 3, if you look at the second paragraph, I
5    think yours is highlighted.  Do you see where it says,
6    "A special concern continues to be the number of sexual
7    assaults perpetrated by hotel employees at resort hotels
8    on the north coast of Jamaica."
9         Do you see that?
10   A.  I do see that.
11   Q.  Okay.  Were you aware --
12        MR. SAFRA:  Objection; form.
13   Q.  (BY MR. WEGLARZ)  Were you aware of this
14   information in 2012 or 2013?
15   A.  No.
16        MR. SAFRA:  Objection; form.
17   Q.  (BY MR. WEGLARZ)  Were you aware of this
18   information in February or April of 2015?
19   A.  No.
20        MR. SAFRA:  Objection; form.
21   Q.  (BY MR. WEGLARZ)  Had you been aware of this
22   information here in Exhibit No. 3, had you been aware of
23   this at the time that Ms. Desantis was doing her booking
24   through you, would you have alerted her to this concern
25   noted by the State Department?

ARRIOLA, STETSON
10/17/2019

Pages 61–64

Page 61

1         MR. GIBSON:  Objection; form.
2         MR. SAFRA:  Objection; form.
3   A.  I do not know.
4   Q.  (BY MR. WEGLARZ)  Beaches Ocho Rios is on the
5 north coast of Jamaica.  True?
6   A.  Yes.
7   Q.  And you understood -- we're going to talk about
8 the booking shortly, but you understood this trip was
9 going to be taken by four women?
10   A.  Correct.
11   Q.  Two mothers and their daughters?
12   A.  Correct.
13   Q.  And one of them a 17-year-old and the other 21.
14 Correct?
15   A.  I believe, yes, I believe so.
16   Q.  Do you agree with me that four women, two
17 mothers and two daughters, taking a women's or a
18 mother/daughter getaway, they should probably be aware
19 of this information that's said here in Exhibit 3?
20         MR. SAFRA:  Objection.
21         MR. GIBSON:  Objection; form.
22         MR. SAFRA:  Objection; form.
23   A.  Aware how?
24   Q.  (BY MR. WEGLARZ)  Pardon me?
25   A.  Aware?  I don't understand.

Page 62

1   Q.  Sure.
2         Do you agree that a trip that is taken --
3 going to be taken by two moms and their daughters to the
4 north coast of Jamaica, do you agree that if the State
5 Department is issuing a concern like this about the
6 number of sex assaults perpetrated by hotel employees at
7 resort hotels on the north coast, don't you think that's
8 something that these four women should be aware of?
9         MR. GIBSON:  Objection; form.
10         MR. SAFRA:  Objection; form.
11   A.  I don't know.  I think they should determine
12 that before deciding on where they'd go, research on
13 their own.
14   Q.  (BY MR. WEGLARZ)  How would they know that?
15   A.  By doing their own research.
16         MR. SAFRA:  Please let him finish his
17 response.  Todd, let him finish his response.
18         MR. WEGLARZ:  All right.  Sorry.
19   A.  By doing their own research in each individual
20 destination, because again, like I said earlier, I can't
21 guarantee your safety in a destination, anywhere you go,
22 so we -- I would assume that if a client is traveling to
23 a specific destination, this case being Jamaica, that
24 if -- they would have done research prior to considering
25 going to that destination, if they were concerned about

Page 63

1 safety at that destination.
2   Q.  What if they weren't concerned about the safety
3 because they never heard of anything having gone wrong
4 in Jamaica or heard any negative information?
5         MR. GIBSON:  Objection; form.
6   A.  I wasn't aware of it either.
7   Q.  (BY MR. WEGLARZ)  Does the travel counselor
8 ever do research to verify that the destination is safe?
9         MR. GIBSON:  Objection; form.
10         MR. SAFRA:  Objection; form.
11   A.  No.  That's too many destinations.
12   Q.  (BY MR. WEGLARZ)  I'm going to show you what
13 we've marked as Exhibit 4, pages from the Jamaica 2013
14 Crime and Safety Report.  My general question is, do you
15 recall ever seeing this document before?
16         (Exhibit No. 4 was marked.)
17   A.  No.
18   Q.  (BY MR. WEGLARZ)  And do you believe you would
19 have been aware of such a report in 2015 when you were
20 booking the Jamaica vacation package for Ms. Desantis
21 and all?
22   A.  No.
23   Q.  And if we look at the second page of Exhibit
24 No. 4, do you see where it reports, "Crimes affecting
25 U.S. citizens in 2012 were...reports of rape and/or sex

Page 64

1 assault (15)"?
2         Do you see that?
3   A.  Yes.
4         MR. SAFRA:  Objection; form.
5   Q.  (BY MR. WEGLARZ)  And then it also reads,
6 "These numbers are not all exclusive, and the numbers
7 for rape and/or sex assaults are believed to be under
8 reported."  And it says, "Many crimes remain unreported
9 for numerous reasons, including fear of retaliation."
10         Did I read that correctly?
11         MR. SAFRA:  Objection; form.
12   A.  That is correct.
13         MR. SAFRA:  Todd, hang on.  I also insert
14 here as part of my objection improper use of a document
15 and introduction of it into evidence and improper means
16 where the witness has not seen it.  I am putting my
17 objection on the record, as well, that as part of this
18 form objection, I have an objection to the use of the
19 document in this manner because improper foundation,
20 witness has not seen the document before, and the
21 attorney is trying to introduce it by reading it into
22 the record.
23         MR. WEGLARZ:  All right.  Your objection is
24 noted.
25   Q.  (BY MR. WEGLARZ)  And you also see where it

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 65

1  reads in the report, "A special concern continues to be
2  the number of sexual assaults perpetrated by hotel
3  employees at resort hotels on the north coast."
4           Did I read that correctly?
5       A.  Yes.
6       Q.  And it --
7           MR. SUAREZ:  Objection to the form.
8       Q.  (BY MR. WEGLARZ)  And it goes on to say, "And
9  the need for forceful investigation and follow-up by the
10  hotels and by police and other security officials."
11  Correct?
12      A.  Correct.
13          MR. SUAREZ:  Same objection.
14      Q.  (BY MR. WEGLARZ)  Were you aware of this
15  information that's reported in this Jamaica 2013 Crime
16  and Safety Report, were you aware of this information at
17  the time that you were booking the Jamaica trip for
18  Ms. Desantis and company?
19      A.  No.
20      Q.  You would agree with me that if this group of
21  women were booking a trip at a resort on the north
22  coast, it would be a reasonable thing for them to be
23  made aware of this special concern noted by the State
24  Department?
25          MR. GIBSON:  Objection; form.

Page 66

1           MR. SAFRA:  Objection; form.
2       A.  I don't know.  There's -- I've booked plenty of
3  women to Jamaica on the north coast prior to 2015, so I
4  don't know if I would.
5       Q.  (BY MR. WEGLARZ)  Do you agree with me, if you
6  were aware of the information in this report at the time
7  that you were booking the trip for Ms. Desantis, you
8  probably would have told her about this?
9           MR. GIBSON:  Objection; form.
10          MR. SAFRA:  Objection; form.  Asked and
11  answered.
12      Q.  (BY MR. WEGLARZ)  Go ahead.
13      A.  I do not know.  If she would have asked, I
14  would have done standard protocol.
15      Q.  But if she did not ask, you would not have
16  alerted her?
17          MR. GIBSON:  Objection; form.
18      A.  I do not know.
19      Q.  (BY MR. WEGLARZ)  Do you believe that a travel
20  counselor has an obligation toward his or her customers
21  of known risks?
22          MR. GIBSON:  Objection; form.
23      A.  I do not know.
24      Q.  (BY MR. WEGLARZ)  Have you ever warned a
25  customer about a risk of any particular trip or

Page 67

1  destination?
2       A.  If asked.
3       Q.  So you have, but only in the context of if you
4  were specifically asked?
5       A.  If I was specifically asked about a certain
6  situation that happened in a destination, then I would
7  have followed the standard protocol of Vacations To Go.
8       Q.  And I do appreciate that explanation.
9           What I'm interested in knowing is, have you
10  done that before?  Have you warned a customer about a
11  particular risk?
12      A.  No, not that I've warned them.
13      Q.  Do you recall ever telling a customer, oh, just
14  want to let you know, there's been a lot of reported
15  crimes in that area or assaults, anything of that
16  nature?
17      A.  I don't think so.  I would have to do that for
18  every single place in the entire world, that -- my job
19  is to book the resort and handle that and their tickets
20  for their airline.  I mean, you're asking should I
21  inform them of the safety of every single -- again, I
22  service not just Jamaica.  I service the entire world.
23      Q.  I understand that.  I'm just asking --
24      A.  So --
25      Q.  -- have you ever done that?

Page 68

1           MR. SAFRA:  Let him finish.  Let him finish
2  his answer, please.
3       Q.  (BY MR. WEGLARZ)  Go ahead.
4       A.  So if a customer is concerned about a
5  particular destination and I am aware of a concern in
6  that destination, then I would direct them to consider,
7  and on their own, if they feel comfortable in going to
8  that destination and research that destination on their
9  own.
10      Q.  Have you ever provided any type of a warning to
11  a customer about any particular risk at a resort or a
12  destination?
13      A.  Isn't that the same question you just asked?
14      Q.  Yeah, but you keep transitioning and saying if.
15      A.  It's dependent on the customer.
16      Q.  And I understand that.
17          So I just want to know, did you ever have
18  the occasion to have warned someone about a particular
19  risk at a particular destination?
20      A.  I do not recall if I particularly would have
21  warned someone of a risk in a destination unless
22  asked --
23      Q.  Okay.
24      A.  -- by the customer.
25      Q.  And I understand.

ARRIOLA, STETSON
10/17/2019

Pages 69–72

1    A.  I wouldn't volunteer information on that, but
2  again, because there's crimes and it's not safe to
3  travel anywhere.  So my -- my understanding is no matter
4  where you go in the entire world, I cannot provide you
5  with a guarantee of safety to where you're able to go,
6  and that's my protocol that I follow.
7    Q.  And that's what you are telling me, and I
8  appreciate that.  I appreciate you telling me your
9  general practice and your protocol.
10    A.  (Nodding head.)
11    Q.  I'm just trying to figure out, has it ever come
12  to the point where, because of the circumstances -- has
13  anyone ever asked you a question where you did respond
14  by giving them some type of a warning about a risk at a
15  particular destination?
16    A.  Recently?  I would say --
17    Q.  At any time.
18    A.  At any time?
19    Q.  Yes.
20    A.  I believe so.
21    Q.  Okay.  How many times do you think that's
22  happened where you did have to give a warning or a risk
23  because they did ask you something?
24    A.  That, I cannot -- I do not know that number.
25    Q.  I mean, is it frequent?  Is it once a month?

1    A.  Depends on where they're going and what's
2  happening in that country.
3    Q.  Okay.
4    A.  And if it's a question that they ask me, then I
5  tell them similar to what happened in Mexico and
6  Dominican Republic recently, that happens anywhere, if
7  they ask a question about that particular destination or
8  that particular issue because it's in our mainstream
9  media or it's something that's blown up really big that
10  it's kind of common knowledge across the board and they
11  bring a question up to me saying, is it safe to go
12  there?  That's typically the question that they would
13  ask, and I would immediately say, I can't guarantee your
14  safety to go there.  Anything regarding safety issues,
15  you need to make sure that you and your family feel
16  comfortable in traveling there.  I can only speak of, is
17  this a resort that you want and the amenities listed
18  within this property, if it suits the needs for your
19  family.
20    Q.  So if you were to give a warning, that's how it
21  is, look, I can't warn you about a specific thing, you
22  have to figure that out.  Correct?
23    A.  Correct.
24    Q.  Okay.  Let's see here.  This is the only extra
25  copy I have.

1    Mr. Arriola, I've marked as Exhibit No. 5 a
2  copy of the Jamaica 2014 Crime and Safety Report.
3    Do you see that?
4    (Exhibit No. 5 was marked.)
5    A.  I see it.
6    Q.  (BY MR. WEGLARZ)  And did you ever see this
7  report at any time prior to the time that you booked the
8  Jamaica vacation to Ms. Desantis and company?
9    A.  No.
10    Q.  Okay.  Were you ever aware of the Jamaica 2014
11  Crime and Safety Report, prior to me showing it to you
12  today?
13    A.  No.
14    Q.  If we look at Page 2 of Exhibit 4 [sic], if you
15  look at the middle paragraph, do you see where they note
16  "seven reports of rape and/or sex assault"?
17    A.  Yes.
18    Q.  And then a sentence or two after that it
19  mentioned, "These numbers are not exclusive and the
20  numbers for rape and/or sexual assaults are believed to
21  be underreported."
22    Do you see that?
23    A.  Yes.
24    Q.  And I read that correctly?
25    A.  That's correct.

1    Q.  And then if you look at the next paragraph, it
2  says, "A special concern continues to be the number of
3  sexual assaults perpetrated by hotel employees at resort
4  hotels on the northern coast."
5    Did I read that correctly?
6    A.  Yes.
7    Q.  Now, as a trained and educated travel
8  counselor, do you have any concern about the State
9  Department having warned three years in a row about its
10  concern about the number of sex assaults perpetrated by
11  hotel employees at resorts on the northern coast?
12    MR. GIBSON:  Objection; form.
13    MR. SUAREZ:  Objection; form.
14    A.  I do not believe so.
15    Q.  (BY MR. WEGLARZ)  Why?
16    MR. GIBSON:  Objection; form.
17    Q.  (BY MR. WEGLARZ)  Why does this information not
18  bother you?
19    MR. GIBSON:  Objection; form.
20    MR. SUAREZ:  Objection; form.
21    A.  It's not that it doesn't bother me.  It's that
22  this information, if you pull this information up
23  probably, I'm sure, anywhere else in the entire world,
24  the numbers would either be equal or greater than this.
25  So to me, you're showing me information about a

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Pages 73–76

Page 73

1 particular destination and numbers on that particular
2 destination where millions of people travel a year and,
3 yes, go unreported, but compare that in my job to all
4 the other destinations that I carry and all the
5 countries that I carry.  This is beyond my scope.
6     Q.  (BY MR. WEGLARZ)  What is your understanding as
7 to what other destinations have had an issue with resort
8 staff sexually assaulting the guests?
9         MR. SUAREZ:  Objection to form.
10     A.  I don't have any knowledge of that.
11     Q.  (BY MR. WEGLARZ)  Okay.
12     A.  But you also showed here that it's gone
13 underreported, as well.  So then it's not reported.
14     Q.  You explained to us earlier that, you know
15 what, any place can be dangerous.  Correct?
16     A.  Absolutely.
17     Q.  Would you agree that if you're going to a
18 foreign place on a vacation, the usual rule of thumb is,
19 hey, stay within your resort, and in general, that's
20 kind of your safe spot.  Correct?
21         MR. GIBSON:  Objection; form.
22         MR. SUAREZ:  Objection; form.
23     A.  No, not just that.  Stay together.  Be aware of
24 your surroundings, just like you would do traveling
25 anywhere.  If you went to downtown in your own town, you

Page 74

1 stick together.  You don't run off and do things on your
2 own, individually.  You stay with a group of people.
3 Especially, my understanding, as a woman, if I was a
4 woman traveling in downtown anywhere, I would be with a
5 group of people.
6     Q.  (BY MR. WEGLARZ)  But a woman should feel safe
7 inside of her resort.  Do you agree?
8         MR. GIBSON:  Objection; form.
9     A.  A woman should always feel safe.  Now, where
10 they're at, the situation, that's not for me to
11 determine.
12     Q.  (BY MR. WEGLARZ)  Are you aware of any other
13 locations or destinations where there was a concern of
14 the hotel employees assaulting its guests?
15     A.  Not that I'm -- no.
16     Q.  This is kind of a unique situation.  Typically
17 you don't expect that, where it's the resort workers
18 assaulting the guests.  Right?
19     A.  This all could happen to anybody.  It doesn't
20 matter who is providing that assault.  I don't assume
21 anyone would do that, but you know it happens.
22     Q.  Is there high crime in Houston?
23     A.  Yes.
24     Q.  Is there high crime in the hotels in Houston?
25     A.  I'm sure.

Page 75

1     Q.  Okay.  So in Houston it's not unusual for a
2 hotel worker to sexually assault a guest?
3     A.  I'm not -- I don't know.  I wouldn't be
4 surprised.
5     Q.  Okay.
6     A.  Even at the Hilton you stayed at, could've
7 happened.
8     Q.  Has it?
9     A.  I don't know.  Did you look it up?
10         MR. GIBSON:  Just answer his questions.
11         THE WITNESS:  Sorry.
12     Q.  (BY MR. WEGLARZ)  But because you are an
13 insider in the travel industry, it's common knowledge
14 that you do see hotel workers sexually assaulting hotel
15 guests, it happens all the time?
16         MR. GIBSON:  Objection; form.
17     A.  I can't answer that.  I don't know.
18     Q.  (BY MR. WEGLARZ)  Would you want your daughter
19 or your niece to vacation on the northern coast of
20 Jamaica if the State Department was reporting a special
21 concern like this?
22         MR. GIBSON:  Objection; form.
23         MR. SAFRA:  Objection; form.
24         MR. SUAREZ:  Objection; form.
25     A.  I don't know.

Page 76

1         (Exhibit No. 6 was marked.)
2     Q.  (BY MR. WEGLARZ)  Have you ever heard that
3 there were rules or precautions or advisories in Jamaica
4 noting that resort staff members are prohibited against
5 fraternization and intimacy with guests?
6     A.  Restate that, please.
7     Q.  Sure.
8         Have you ever heard that there was some
9 rule or some advisory that resort staff members in
10 Jamaica are prohibited against fraternization and
11 intimacy with guests?
12     A.  Where are you seeing that?  Can I see that?
13     Q.  Sure.
14         It's Exhibit 6.  It's a travel alert or a
15 travel advisory for Jamaica.  It's highlighted here.
16     A.  Yeah, I see.  This is in 2018, so this is --
17 you're speaking about something that was done -- that
18 the state.gov's website was talking about in 2018.
19 Correct?
20     Q.  I'm not.  I'm talking in general.  Have you
21 ever heard of that before, that there was some rule or
22 some advisory prohibiting resort staff from fraternizing
23 with the guests?
24     A.  I do not know.
25     Q.  This is the first time you're hearing of that

ARRIOLA, STETSON
10/17/2019

Pages 77–80

Page 77

1    today during this deposition?
2         **A.  I do not know.**
3         Q.  If there was such a rule like that or such an
4    advisory pertaining to Jamaica, saying that resort staff
5    members are prohibited from fraternizing with its
6    guests, is that something that a travel counselor should
7    alert its customers to if they're booking a trip to
8    Jamaica?
9              MR. SAFRA:  Objection; form.
10             MR. GIBSON:  Objection; form.
11        **A.  I don't know.  I think that's outside of my**
12   **realm.**
13        Q.  (BY MR. WEGLARZ)  That's not something that you
14   would do?
15        **A.  I do not believe so.**
16        Q.  If I can see that?
17        **A.  Yeah.**
18        Q.  Thank you.
19             And it also says, "Any employee behavior
20   contradicting this policy should be rebuffed and
21   reported to hotel management and to the U.S. Embassy."
22             Have you ever heard of anything like that,
23   hey, there's some rule down there in Jamaica, if you
24   observe any resort staff fraternization with guests, you
25   got to report it to the hotel management and to the U.S.

Page 78

1    Embassy?
2              MR. SAFRA:  Objection; form.
3         **A.  I do not know.**
4         Q.  (BY MR. WEGLARZ)  If you were aware of such a
5    rule, is that something that a travel counselor should
6    alert the traveler and customer to?
7              MR. GIBSON:  Objection; form.
8              MR. SAFRA:  Objection; form.
9         **A.  I do not think so.**
10        Q.  (BY MR. WEGLARZ)  The State Department also
11   lists under "Best Practices:  In a resort" -- and this
12   is for Jamaica, "In a resort avoid secluded places or
13   situations."
14             Do you agree with that?
15        **A.  Can I see it?**
16        Q.  Sure.
17             MR. SAFRA:  Objection; form.
18        **A.  You're speaking of, "In a resort avoid secluded**
19   **places or situations.  Try to always be accompanied by**
20   **someone you know, even on visits to the restroom."**
21        Q.  (BY MR. WEGLARZ)  Yes.
22        **A.  Yes.**
23             MR. SAFRA:  Objection; form.
24        Q.  (BY MR. WEGLARZ)  You told me earlier, to be
25   safe this is how you should behave, even inside of a

Page 79

1    resort.  Correct?
2         **A.  Yes.**
3         Q.  And that's something that should be
4    communicated to your customer.  Right?
5              MR. GIBSON:  Objection; form.
6              MR. SAFRA:  Objection; form.
7         **A.  I do not believe so.**
8         Q.  (BY MR. WEGLARZ)  Why not?
9         **A.  To me, that is something that when you're**
10   **traveling outside of your own home, you should follow**
11   **those procedures anywhere you're at, no matter what.**
12   **That's the statement that should -- I would probably**
13   **assume it's on every single place that's outside of the**
14   **United States, but if we had these, I guess, for the**
15   **states, within the United States, it would probably be**
16   **on there, as well.**
17        Q.  So that information, at least to you, is common
18   knowledge?
19        **A.  Common knowledge.**
20        Q.  Okay.  And have you seen that information on
21   travel alerts, travel advisories for other destinations?
22        **A.  I don't think so.**
23        Q.  Okay.  If I can see that, please?
24        **A.  Yes.**
25        Q.  Thank you.

Page 80

1              Have you ever had any interaction with the
2    U.S. Embassy --
3         **A.  No.**
4         Q.  -- or a counselor?
5         **A.  Or what?**
6         Q.  The counselor's office, the counselor's bureau
7    in any foreign country?
8         **A.  No, sir.**
9         Q.  Have you ever had to forward your bookings or
10   confirmations or itineraries to the State Department or
11   Embassy officials?
12        **A.  No.**
13        Q.  Do you know if that's ever done, maybe not by
14   you but by someone else?
15        **A.  I do not know.**
16        Q.  Do you believe your typical travel agent or
17   travel counselor should be aware of the State Department
18   travel advisories and alerts for the destinations
19   they're selling vacations to?
20             MR. GIBSON:  Objection; form.
21        **A.  I do not know.**
22        Q.  (BY MR. WEGLARZ)  Okay.  We're going to talk
23   about Exhibit No. 1 now.  Now that we have all the
24   background questions out of the way.  I'm kidding.
25             Page 1 of Exhibit No. 1.

ARRIOLA, STETSON
10/17/2019

Pages 81–84

Page 81

1    MR. GIBSON:  Do you need another break or
2 are you okay?
3    MR. WEGLARZ:  Why don't we take a couple
4 minutes?  I'm going to force a break on you.
5    (Recess from 12:08 p.m. to 12:19 p.m.)
6    Q.  (BY MR. WEGLARZ)  Mr. Arriola, we're going to
7 talk about your first involvement in a second here.  A
8 couple of other things I want to ask you about in
9 general.  I take it you were provided with an e-mail
10 address to use for work.  Correct?
11    A.  Yes.
12    Q.  And what is your e-mail address for work?
13    A.  My first initial S, my last name,
14 A-R-R-I-O-L-A, at vacations with an S, T-O-G-O dot-com.
15    Q.  Any other e-mails that you've used for work
16 during your employment at VTG, other than that one?
17    A.  No.
18    Q.  And sometimes you have to have phone
19 discussions with customers and other people as part of
20 your job.  Correct?
21    A.  That's correct.
22    Q.  And I thought I saw in some of these e-mails
23 and other correspondence references that the phone calls
24 are recorded and may be monitored.  Is that true?
25    A.  That is correct.

Page 82

1    Q.  Does VTG record all phone calls --
2    A.  I do not know.
3    Q.  -- to your knowledge?
4    A.  I do not know.
5    Q.  That's how you understood it?
6    A.  Yes, that's correct.
7    Q.  Okay.  Have you heard or listened to any of
8 your recorded calls as it pertains to this case or this
9 booking?
10    A.  No.
11    Q.  Do you know if those even exist?
12    A.  I do not know.
13    Q.  And does VTG have a system where only one
14 person can be set up as the primary contact for each
15 booking?
16    A.  No.
17    Q.  Has that ever been the case?
18    A.  No.
19    Q.  And I also saw referenced in these pages here
20 that we've marked as Exhibit No. 1 something that's
21 referred to as a CCT.  Do you know what that is?
22    A.  Customer care ticket.
23    Q.  What does that mean?
24    A.  That means that the agent is not available to
25 take a customer's call, and the client wants to speak to

Page 83

1 a manager.  A manager is another term they use now for
2 customer care specialist.  So that manager, if they do
3 not answer or they're busy, then operator or the manager
4 will create a customer care ticket to look into it.  And
5 until the situation is resolved, then they'll close it
6 out.
7    Q.  Looking at Exhibit No. 1, Pages 1 through 3
8 appear to be some contact that Ms. Desantis had with
9 Vacations To Go before you were involved.  Am I correct?
10    A.  That's correct.
11    Q.  Okay.  Tell me your understanding as to what's
12 going on here on Pages 1 through 3.
13    A.  The client called -- either called in or
14 requested a call back from Vacations To Go, got assigned
15 to the agent listed here, Bernadette Vital, and they
16 discussed the vacation.  What they discussed, I don't
17 know.  It would be listed in the -- your custom resort
18 information, which expires because it's time-sensitive
19 pricing information, and then that's on Page 1.  That
20 was the first e-mail that Bernadette sent out because
21 the client asked for information.  Now with that
22 information, whether it was a specific resort, specific
23 destination, don't know.
24    Q.  Okay.
25    A.  Second one is a follow-up to the request.

Page 84

1 That's a standard e-mail that we send out to customers
2 just to follow-up with them to see if they're ready to
3 book or if they had any more questions or there's
4 anything else that we can help them with.  Then it
5 appears that there was either a phone conversation or
6 some kind of conversation between the 7th of February
7 and the 10th of February between Bernadette because
8 Bernadette sent an e-mail showing an excursion in
9 Jamaica to the Bob Marley.  So the client was asking
10 about excursions, and it looks like Bernadette just went
11 onto probably online Google and Googled Bob Marley
12 Excursion and picked it so she can -- the client can
13 look at it and determine if that's something she wants
14 to do, because the client probably wanted some more
15 information, which that happens a lot, just a simple
16 Google search.
17    And then that was sent with the same e-mail
18 of -- on Page 3 with the custom resort information.  So
19 then that means that on the 10th, either what was sent
20 originally on Page 1 on the 31st was updated in pricing
21 because it expired, the pricing, and they couldn't view
22 it anymore or they wanted something different.  There's
23 no way to determine that, because that expires, and we
24 aren't able to view it and the client is not able to
25 view it.  And on the 18th of February, the quote

ARRIOLA, STETSON
10/17/2019                                                                        Pages 85–88

Page 85

1  expired.  Bernadette didn't hear from the client.
2         That's when, on the 15th of March, she
3  contacted the front desk.  A customer care ticket was
4  created, so she may have asked for a manager to book
5  perhaps or -- or to speak to someone.  I'm assuming to
6  speak to someone because that was March, so she needed
7  to speak to a manager on the 15th.  And the front desk
8  had put this note into Bernadette's open quote and not
9  mine.
10     Q.  All right.  So these first three pages here, do
11 you have any idea or understanding as to what resorts
12 were being discussed or considered?
13     A.  No.
14     Q.  Do you even know if it had to do with Jamaica
15 or it could have been resorts elsewhere?
16     A.  The only way I know it's Jamaica is
17 Page No. 2.  It mentions at the bottom,
18 "jamaicacruiseexcursions.com/bobmarley."  So that makes
19 me assume that Jamaica was discussed.
20     Q.  But whether or not this custom resort reference
21 on the next page actually refers to Jamaica, you don't
22 know?
23     A.  You can't tell, no.
24     Q.  And does VTG, I mean, do they sell Jamaica
25 cruise excursions?

Page 86

1      A.  No.
2      Q.  They do not?
3      A.  We have options to do it through our
4  wholesalers, but if clients wanted to get more
5  information, we can send them a website on more
6  information to allow them to either book on their own,
7  independently, or if they want to book it through us.
8      Q.  And Bernadette Vital?
9      A.  Vital.
10     Q.  Vital?
11     A.  Yeah.
12     Q.  She's a VTG employee?
13     A.  That's correct.
14     Q.  Is she also a travel counselor?
15     A.  That is correct.
16     Q.  And does she also work -- was she working out
17 of the same building as you at the time?
18     A.  Yes.
19     Q.  Does she still work there?
20     A.  Yes.
21     Q.  Have you talked to Bernadette about this case?
22     A.  No.
23     Q.  Have you talked to her at all about this
24 booking or Ms. Janet Desantis?
25     A.  No.

Page 87

1      Q.  And then if we look at Page 4, I think this is
2  where we start seeing your name on these records.
3  Correct?
4      A.  That's correct.
5      Q.  All right.  And according to this document,
6  your first involvement with either Ms. Desantis,
7  Margaret Torralva or Amber Torralva or Paiton Bater,
8  your very first involvement with any of these four
9  people begins on what date?
10     A.  On the 16th of February.
11     Q.  Did you even know who these people were before
12 February 16th of 2015?
13     A.  No.
14     Q.  You never had any prior interactions or
15 business dealings with them prior to this date.  True?
16     A.  True.
17     Q.  So tell me, how come you're getting involved
18 now with Ms. Desantis as opposed to Bernadette?
19     A.  The clients can either call their original
20 agent back or they can call in off the cue system and
21 get a new agent.  Most of the time, unfortunately, the
22 clients don't understand that we give our extension, we
23 give our information, but they just think that we're
24 just there to answer calls and they don't understand
25 that we're individual agents.  So -- and we try to keep

Page 88

1  the customer, maintain that customer.  That's why we
2  have our extensions.  But customers get impatient if the
3  client agent is not there or they get -- you know, want
4  to do it right now, and if they want to do it right now,
5  they'll call in off our cue, and that's how I got them.
6      Q.  Jump back to Page 3 just for a second.
7      A.  Yeah.
8      Q.  You pointed this out for me, this entry for
9  March 15th.
10     A.  Yeah.
11     Q.  Where it says, "CCT, 7:12 p.m.," for March the
12 15th, and it says, "Did not receive."
13         Do you see that?
14     A.  That's correct, uh-huh.
15     Q.  And your understanding is that means the
16 customer called or what?  What does that mean?
17     A.  It could have been the customer called.  It
18 could have been the provider called.  It just means that
19 some -- someone called in to the front desk, and a CCT
20 was created and Darin did not receive it and then
21 there's no other information after that.
22     Q.  And Darin is Darin Huskey, your direct
23 supervisor?
24     A.  My manager, yes.
25     Q.  Your manager.

ARRIOLA, STETSON
10/17/2019

Pages 89–92

Page 89

1     And that same entry for CCT created on
2  March 15th, do you see the -- I think it's initials.  It
3  says "AC"?
4       **A.  Uh-huh.**
5       Q.  The letter A, the letter C, what does that
6  reference?
7       **A.  That's probably the initials of the operator**
8  **that answered the call.**
9       Q.  Okay.  Any idea who that person is?
10      **A.  No.**
11      Q.  Does that operator work out of Houston?
12      **A.  All agents do, yes.**
13      Q.  Okay.
14      **A.  Well, all operators do.**
15      Q.  All right.  So back down to Page 4, your first
16  involvement on February 16th, and tell me, how do you
17  get involved?
18      **A.  The client will either call in off the bell or**
19  **submit a call back request, the same way that Bernadette**
20  **originally got the client.  And if the quote is still**
21  **open and the client does not mention the agent's name,**
22  **then it's fair game for any other agent to take that**
23  **lead.  But if the client mentions the original agents**
24  **that they were working with, Bernadette, then I would**
25  **have sent them to the operator, to either a managed CC,**

Page 90

1  **customer care specialist or a manager or they would have**
2  **sent it to Bernadette if Bernadette was in the office.**
3       Q.  As you sit here today, do you have an
4  understanding as to how Janet initially got in touch
5  with you?  Did she call?  Did she just do something
6  online, do you know?
7       **A.  Yes, I do know.  She called.**
8       Q.  So she called and --
9       **A.  Our 1-800 number.**
10      Q.  -- she would have spoken to whom first, during
11  this phone call?
12      **A.  Me.**
13      Q.  You just happened to be there to pick up the
14  call?
15      **A.  That's correct.**
16      Q.  As you sit here today, do you have a memory of
17  that phone call?
18      **A.  No.**
19      Q.  Okay.  And looking at Page 4 of Exhibit
20  No. 1 -- by the way, see on the top right-hand corner it
21  says, "Redacted"?
22      **A.  Uh-huh.**
23      Q.  Is that a "yes"?
24      **A.  Yes.  Yes.  Sorry.  Yeah.**
25      Q.  You're fine.

Page 91

1       What's being redacted here?
2            MR. GIBSON:  He wouldn't know that.  We
3  were redacting out personally identifying information.
4            MR. WEGLARZ:  For my clients?
5            MR. GIBSON:  Yes.
6       Q.  (BY MR. WEGLARZ)  Do you know typically what
7  information is in the top right corner where we see this
8  square redacted?
9            MR. GIBSON:  It's where the black boxes
10 are, and that's just our notification to call to
11 attention that we redacted something.
12           MR. WEGLARZ:  Say no more.  Okay.  Now I
13 understand.  Thank you.
14           MR. GIBSON:  And if we need to work with
15 you on what's there, we will work with you on that.
16           MR. WEGLARZ:  I appreciate that.
17      Q.  (BY MR. WEGLARZ)  It says, "A custom care
18 ticket exists for this quote."
19      **A customer care ticket, that's the same CCT**
20 **thing we were talking about earlier?**
21      **A.  (Nodding head.)  And that was done on**
22 **March 13th.**
23      Q.  Got it.  Got it.
24           So if we look at Page 4 here and it says
25 that this document is created on February 16th,

Page 92

1  7:25 a.m., does that mean Janet called you sometime
2  prior to that?
3       **A.  That's when she called.**
4       Q.  And how long of a phone discussion was this?
5       **A.  From 7:25 a.m., I'm going to say somewhere**
6  **around 8:17 a.m. is when it perhaps ended, so probably**
7  **45 minutes.**
8       Q.  You believe you were on the phone with her for
9  that long?
10      **A.  7:25 is when the phone conversation started,**
11 **and then I got off probably the phone around 8:00 or so,**
12 **because the booking at the bottom of four, it says, "You**
13 **have booked a great vacation."  That means within that**
14 **time, I called and booked.  She called, and we made**
15 **reservations, and I sent her the confirmation.**
16      Q.  And do you recall what it was that she said to
17 you during this 45-minute-or-so phone discussion?
18      **A.  I do not recall what exactly what was said.  I**
19 **have an idea how this pretelled [sic] or how this --**
20 **what happened on this phone call.**
21      Q.  You ended up booking a vacation after this
22 phone call, right, or did you book it even during the
23 phone call?
24      **A.  No.  So the client would call in, she provided**
25 **the two quote numbers, quote one and quote two at the**

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Pages 93–96

Page 93

```
1   top of the left-hand corner of Page 4.  That shows me
2   that she knew exactly where she wanted to go.  Those
3   quotes are built from our website, that the client's
4   build.  She could have even received those quotes from
5   Bernadette, and they could have been expired and we
6   would have to reprice it out or they could have been
7   updated quotes.  I view those quotes, and then we make
8   the booking from there.  She's ready to book.
9        Q.  So before Janet calls you on the morning of
10  February 16th, she has an interaction through the VTG
11  website --
12       A.  Yes.
13       Q.  -- to get this info that she's now presenting
14  to you over the phone.  Correct?
15       A.  That's correct.
16       Q.  And do we know when she had this interaction
17  through the website?
18       A.  She could -- that's what I was saying earlier.
19  She could have -- she may not have had interaction
20  through the website.  She could have received it from
21  Bernadette or she could have gone to the website and
22  received this number.  Two different ways.
23       Q.  But don't you guys usually check that info?
24  You can find out.  Right?
25       A.  No, because these quotes are ran every second.
```

Page 94

```
1   Like, she ran it at 490014 and in the same time she
2   could have ran another quote and it's already now
3   490027.  It's already went up.  Thirteen quotes have
4   already been ran in that timeframe.
5        Q.  Can you tell me what those quotes were for?
6        A.  I do not know.  I assume for what we booked,
7   because it was booked within a 45-minute time frame.  So
8   I'm going to assume it was for the Moon Palace Jamaica
9   for the original booking.  That's where she wanted to
10  go.  We booked her.
11       Q.  Is there a recording of this phone call?
12       A.  I don't know.  I do not believe so.
13       Q.  How do you know that?
14       A.  I don't know that they keep them that far out.
15       Q.  Do you know how long they usually keep them
16  for?
17       A.  No.
18       Q.  Do they have a general retention policy?
19       A.  No.
20       Q.  Do you know if anyone has looked for that
21  recording?
22       A.  I do not know.
23       Q.  Have you asked to get a copy of the recording?
24       A.  Yes.
25       Q.  And what were you told?
```

Page 95

```
1        A.  We don't have it.
2        Q.  And when were you told that?
3        A.  When I received my first deposition paperwork.
4        Q.  I take it you also asked for copies of all
5   recordings that may exist regarding this booking?
6        A.  Yeah, just to know what was going on.
7        Q.  And they said all of them had been destroyed?
8        A.  No.  They just said they don't have them.
9   I believe even my director or manager, one of them, said
10  that they just recorded and taped over.
11       Q.  Okay.
12       A.  From what my understanding was.
13       Q.  Did he say how long it usually takes to go full
14  cycle to start taping over?
15       A.  No, I don't know.
16       Q.  As you sit here today, can you tell me anything
17  that Janet Desantis told you during this phone call on
18  February the 16th?
19       A.  No.
20       Q.  Can you tell me what you told her during this
21  phone discussion?
22       A.  No.
23       Q.  Would you have warned her about anything and --
24  about anything whatsoever about this trip to the Moon
25  Palace in Jamaica?
```

Page 96

```
1            MR. GIBSON:  Objection; form.
2        A.  I do not believe so.
3            Now to go back to your previous question
4   before that one.  Do I know what I said to her?  I know
5   I recapped the booking, because that's standard
6   protocol.
7        Q.  (BY MR. WEGLARZ)  You would have recapped
8   whatever we see, like in the booking confirmation?
9        A.  On the booking confirmation.
10       Q.  We'll get to that.
11       A.  And on the --
12       Q.  Itinerary?
13       A.  -- resort booking checklist, which was --
14       Q.  Exhibit No. 2?
15       A.  -- Exhibit No. 2.
16       Q.  And that's really just pertaining to
17  identifying information, dates, times?
18       A.  Make sure we have the dates right, make sure
19  the names are correct.
20       Q.  Got it.
21           Now, do you typically make notes about what
22  was discussed during these phone discussions?
23       A.  I typically do, especially if it's a thing that
24  requires to go possibly back to a manager.  I will
25  notate, that way, a manager will know what's happening.
```

ARRIOLA, STETSON
10/17/2019

Pages 97–100

Page 97

1     Q.   Yeah.
2          A.   Now, in ten years of working there, today, my
3     notes are perfect.  I take way more than I should
4     possibly take, just to make sure I cover myself.
5     Q.   Sure.
6          And if you do take notes concerning a phone
7     discussion, where do you note it?  Where is it logged?
8          A.   It's logged into it -- either the open quote
9     before the sale is made or in the booking confirmation
10    after the sale is made, but those logs are put -- tied
11    to both open quote and the booking confirmation.
12    Q.   Did you make --
13         A.   They're copied automatically.
14    Q.   Did you make any notes regarding this
15    discussion with Janet?
16         A.   No.
17    Q.   And if you did, where would we see it on these
18    pages here, if you did?
19         A.   Depends on when that would be.
20    Q.   Well, hypothetically --
21         A.   Okay.  So originally she was ready to book.  We
22    booked the reservation.  That was done.  Sent her a
23    confirmation, sent her a thank you e-mail, sent a
24    booking confirmation, did the booking confirmation, and
25    this is -- I'm moving forward.  And then schedule change

Page 98

1     came, which I eventually got to.  Then the final payment
2     was -- e-mail was sent out, and then she contacted the
3     front desk.
4          MR. GIBSON:  Identify the page you're on.
5          THE WITNESS:  Okay.  Sorry.
6          A.   On Page 11, she contacted the front desk again.
7     A CCT was created for a manager.  She talked to Tink
8     Tinker, which is a manager, service manager, and she
9     "called to apply payment -- final payment.  The card did
10    not go through.  She will call back tomorrow."  That was
11    a note.  That was on the 13th.  So on the 14th -- and
12    the CCT was closed.  That means the manager handled it.
13    There was nothing that she could do further.  Client
14    said she'll call back tomorrow.
15         So on the 14th she made a final payment,
16    and I can only assume that because her E docs were
17    finally assigned to me on the 15th.
18    Q.   Okay.
19         A.   If I would have notated -- if I had any reason
20    to notate anything, I would have notated it there.  But
21    based on these notes, we know final payment was
22    processed.  E doc was assigned to the agent.  A new
23    confirmation at 7:17 was sent showing like everything
24    was paid, and then her documents were sent out on the
25    16th, as well.  So the documents being assigned on the

Page 99

1     15th, I don't know what day that was.  I may not have
2     been in the office.  It may have been on a weekend.  On
3     the 16th I updated the confirmation showing paid in
4     full, sent it to her, and already had E docs already
5     preassigned to my system, and I forward them to her as
6     soon as I get in my office at 7:00 o'clock.  So it took
7     me that time to get everything, all my e-mails and stuff
8     sent out.
9     Q.   Understood.  And thank you for that.
10         Going back to Page 4.
11         A.   Okay.
12    Q.   Where it lists the e-mails here, just above it
13    it says, "Existing agent comments or e-mails" --
14         A.   Yes.
15    Q.   -- in that row --
16         A.   That's correct.
17    Q.   -- the top row.  Correct?
18         If you would have made notes regarding your
19    discussion with Janet, would we see it listed in here
20    somewhere?
21         A.   That's correct.
22    Q.   That would be considered -- it's not an e-mail,
23    so it would be a comment, right, and it would be
24    recorded in here?
25         A.   If it was something that needed to be notated.

Page 100

1     Q.   Right, if it was actually notated.
2          A.   If it was required to be notated.  We don't
3     notate the entire conversation with the customer.
4     Q.   Right.  But if you do it should be recorded
5     here?
6          A.   That is correct.
7     Q.   Fair enough.
8          And is that -- 45 minutes, to me that
9     sounds like a long phone call.  Is that a typical phone
10    call when you're doing a booking?
11         A.   No.
12         MR. SUAREZ:  Todd, which page are you on so
13    I can follow along?
14         MR. WEGLARZ:  I'm still on Page 4.
15         MR. SUAREZ:  45 minutes?
16         A.   No.  Because in the time that it went from
17    7:25 a.m. to, let's say, 8:00 o'clock, right before
18    8:17, more than likely probably around 8:00 is when I
19    closed it and -- closed it out, she -- we made the
20    booking.  So I have to one, either put them on hold,
21    which is what I normally do, to go verify the rate
22    through our provider, which in this case was Funjet,
23    verify the price, get the reservation built, then come
24    back online, go over the details of the booking, go over
25    transportation, transfers to and from the airport, and

ARRIOLA, STETSON
10/17/2019

Pages 101–104

Page 101

1 then offer insurance on the booking, discuss insurance,
2 gather the names of all four travelers and their dates
3 of birth, put that into the booking. I typically would
4 have done that right away to secure the price so it
5 wouldn't change on the customer, because it can change
6 instantaneously.
7          So I do that to make sure that the customer
8 can get the price that we're quoting instead of waiting
9 and waiting and waiting, and I put the reservation on
10 hold. Then I obtain all the personal information in
11 regards to -- you know, we had her e-mail address and
12 her telephone number, made sure those were correct, get
13 her billing address, and then I recap -- use this resort
14 booking checklist and recap over the booking with her.
15     Q. (BY MR. WEGLARZ) Okay.
16     A. And then confirm that she wants insurance.
17     Q. I take it if you were to provide any particular
18 warnings to her during this phone call, then that would
19 be something that you would log and make a note of.
20 Correct?
21     A. I do not know.
22     Q. Do you usually make notes regarding phone
23 discussions like this that are like 45 minutes which
24 generated a booking?
25          MR. SUAREZ: Objection; form.

Page 102

1     A. This booking was what we would refer to as a
2 quick sell. This means that the client knew what they
3 wanted, where they wanted to go, and it was just a
4 matter of obtaining that booking, getting it processed,
5 being as cordial on the phone to obtain that customer
6 for future travel, be nice, use your customer service
7 and book it and be done. So there's no notes required
8 in this time except when I put in the WCB at 7:37. That
9 would allow me to close that quote to work on getting it
10 booked. I usually would type that in there.
11     Q. (BY MR. WEGLARZ) And WCB stands for what
12 again?
13     A. Will call back or it's just a quick num -- or
14 like working, it's shorter than working.
15     Q. So on February 16th it was one phone
16 discussion. Correct?
17     A. February 16th is one phone discussion.
18     Q. And you believe it was Ms. Desan -- she already
19 selected Moon Palace. Right?
20     A. Yes.
21     Q. Did you know anything about Moon Palace at this
22 time?
23     A. Not much. I knew about the company itself,
24 Palace Resorts.
25     Q. Did you know that it was undergoing a

Page 103

1 renovation?
2     A. That is correct.
3     Q. Did you explain that to Ms. Desantis?
4     A. I do not recall the conversation I had with
5 her, but based on protocol, if it's a property that is
6 that new, I would approach it and say, you're booking a
7 property that has yet to open, that you're taking the
8 risk of it not opening on time. So you just have to
9 keep in mind that if they don't open in time, we may
10 have to look at an alternative option for you to stay
11 at, and also everything may not be up to par.
12 Restaurants may not be open. You know, training at the
13 property for the resort staff may not be open. It may
14 not be perfect. You know, it's just a new opening
15 property, which a lot of people complain about. But I
16 always inform them.
17     Q. And if you're giving an explanation like that,
18 I take it that's something that you would usually note
19 or log, because you don't want the customer later on to
20 say, hey, you never explained that to me?
21          MR SAFRA: Objection; form.
22     A. Now, yes, I would. Then, I don't think I
23 would, because I don't know how the calls were recorded,
24 and I assume the calls were recorded and kept. So I
25 always depended on the phone call. So if the client

Page 104

1 called back and complained about something, they would
2 have gone to a manager and the manager would have pulled
3 the call and said, hey, yes, we never did inform you,
4 we'll take care of this.
5     Q. (BY MR. WEGLARZ) Did you have prior bookings
6 at Moon Palace that had to be relocated because they
7 couldn't open as planned?
8     A. I do not recall. I don't remember.
9     Q. And you would agree with me that you didn't do
10 any special research regarding Moon Palace or the area
11 or Jamaica at the time of this booking?
12     A. No.
13     Q. You agree with that?
14     A. I agree with that.
15     Q. And you did not warn Ms. Desantis about
16 anything as it pertained to this trip, during the time
17 of this phone call. You agree with that. Correct?
18     A. I don't remember the exact details of the
19 conversation.
20     Q. Let me ask a different question. Do you
21 recall -- as we sit here today, do you recall giving any
22 type of warning to Ms. Desantis during this phone call?
23     A. I do not recall.
24     Q. And even though you're having this discussion
25 with Janet Desantis, you understood that she was

ARRIOLA, STETSON
10/17/2019

Pages 105–108

Page 105

1  traveling with three other persons.  Correct?
2      **A.  Yes.**
3      Q.  And you're also providing your services, not
4  only to Ms. Desantis but also to these three other
5  people?
6      **A.  That's correct.**
7      Q.  They are intended beneficiaries of your
8  services.  Correct?
9           MR. GIBSON:  Objection; form.
10     **A.  Beneficiary.  Explain it.  Sorry.**
11     Q.  (BY MR. WEGLARZ)  Well, even though you're not
12  dealing with them directly, they're benefiting from your
13  services through Janet.  True?
14     **A.  Yes, they have access to me to call me at any**
15  **time, just like Janet would, if they have questions or**
16  **concerns.**
17     Q.  All right.  Just give me a minute.  These got
18  out of order.  I don't know why.
19           MR. WEGLARZ:  Hold on guys.  I'm just
20  sorting the pages of Exhibit No. 1.
21     Q.  (BY MR. WEGLARZ)  Okay.  Mr. Arriola, correct
22  me if I'm wrong, but I believe the formal booking
23  confirmation for the Moon Palace booking begins on
24  Page 27 of Exhibit 1.  Give you a second to look at
25  that, and tell me if I'm correct or if I'm wrong.

Page 106

1      **A.  (Witness perusing document.)**
2           **That is for us to view, yes.**
3      Q.  (BY MR. WEGLARZ)  That's what?  I'm sorry.
4      **A.  That's for us to view, yes, but not the client.**
5      Q.  Okay.
6      **A.  The client receives her confirmation on Page 5**
7  **at 12:08 p.m., at 2-16, around four hours after the**
8  **initial booking.**
9      Q.  So you're directing me to the e-mail sent to
10  the client which would --
11     **A.  On page --**
12     Q.  -- link directly to the booking confirmation?
13     **A.  On Page 5 and Page 6, because both of them got**
14  **e-mails.**
15     Q.  Yes.
16     **A.  I've got both clients' e-mails.  They received**
17  **the booking confirmation.  When they click on that**
18  **booking confirmation, the link, booking confirmation is**
19  **usually hyperlinked.**
20     Q.  Right.
21     **A.  You click on that, and then you view what's on**
22  **Page 27.**
23     Q.  All right.  And that's what I thought.
24     **A.  Yeah.**
25     Q.  So what we see beginning on Page 27 and going

Page 107

1  for four pages and ending on Page 30, is the actual
2  booking confirmation for the Moon Palace trip.  Correct?
3      **A.  That's correct, yes, sir.**
4      Q.  And within the booking confirmation, that
5  includes everything that you discussed with
6  Ms. Desantis.  Correct?
7      **A.  That is correct.**
8      Q.  And if you were going to give her any warning,
9  we are going to see the warning reflected in this
10  booking confirmation.  True?
11           MR. GIBSON:  Objection; form.
12     **A.  This is a template of what Ms. Desantis booked.**
13     Q.  (BY MR. WEGLARZ)  Right.
14     **A.  Not what was discussed.**
15     Q.  Okay.
16     **A.  What was booked.  What she agreed to book.**
17     Q.  I thought you said that that's what you would
18  have discussed with her, you would have discussed with
19  her all the information that we see in the
20  confirmations?
21     **A.  We would have discussed this -- these details**
22  **that are listed here.  That goes in conjunction with**
23  **Exhibit -- what is this, 2?**
24     Q.  2.
25     **A.  Exhibit 2.**

Page 108

1      Q.  As you sit here today, do you recall anything
2  you discussed with Janet Desantis that is not set forth
3  on Pages 27 through 30?
4      **A.  I do not recall.**
5      Q.  And looking at the last page of that
6  conversation which is Page 30, do you see where it says,
7  "Printed February 16th, 2015 at 12:11 p.m."?
8      **A.  Yes.**
9      Q.  What does that refer to?
10     **A.  That means the client printed this on**
11  **February 16th at 12:11 p.m.**
12     Q.  And how would you know, a travel counselor in
13  Houston, Texas, know if your client in Michigan printed
14  this actual document?
15     **A.  Somehow they're linked through our company.  I**
16  **don't know the actual -- how they do it, but it is**
17  **linked, just as them viewing it is linked, as well.**
18     Q.  Do we know who printed it, whether it was Janet
19  or Margaret or someone else?
20     **A.  It had to be someone within the two e-mails**
21  **that were on file.**
22     Q.  Looking at Page 29, do you see where it says,
23  "Vacations To Go Terms and Conditions"?
24     **A.  Yes.**  Q.  And at the top it says, "Vacations To Go is a

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Pages 109–112

Page 109

1  bonded, fully accredited travel agency in operation
2  since 1984."
3          Did I read that correctly?
4     A.  That is correct.
5     Q.  When it says "fully accredited," accredited by
6  whom?
7     A.  I do not know.
8     Q.  It says, "We are one of the largest retail
9  travel companies in the United States and enjoy a
10 stellar reputation within the industry."  Correct?
11    A.  That's what it says.
12    Q.  And then the fourth paragraph, it says, "Please
13 click here to view the provider's terms and conditions."
14         What is that referring to?
15    A.  My understanding is, is that would be on
16 Funjet's terms and conditions.
17    Q.  All right.  That's not referring to terms and
18 conditions of any resort or any -- that's Funjet.
19 Right?
20    A.  I believe so.
21    Q.  Okay.
22         MR. SUAREZ:  Please note my objection to
23 that last question.  Objection to form.
24         MR. WEGLARZ:  All right.  I'm writing it
25 down.

Page 110

1     Q.  (BY MR. WEGLARZ)  This?
2     A.  Let me see.
3         MR. SUAREZ:  Todd, what page are you
4  showing him?
5         MR. WEGLARZ:  I'm showing him Funjet terms
6  and conditions or bill of rights.
7     A.  I believe that would be it.  I have not clicked
8  that before, so I don't know.
9         MR. SUAREZ:  What page is that from the
10 VTG, Todd?
11         MR. WEGLARZ:  Actually, it's TMTC, Page 6.
12         MR. SUAREZ:  Hang on a second.  I got to go
13 get that binder.
14         MR. WEGLARZ:  Take your time, Lui.  Take
15 your time.
16         (Recess taken from 12:58 p.m. to 1:00 p.m.)
17         (Exhibit No. 7 was marked.)
18    Q.  (BY MR. WEGLARZ)  Mr. Arriola, I'm going to
19 show you what we marked as Exhibit No. 7.  That's what
20 you were looking at just a few minutes ago.
21         So when we look at the booking confirmation
22 that we've been talking about under the "Vacations To Go
23 Terms and Conditions," where it says, "Please click here
24 to view the provider's terms and conditions," it's your
25 understanding that we'll see this document here marked

Page 111

1  as Exhibit No. 7.  Correct?
2         MR. SUAREZ:  Objection; form.
3     A.  I believe so.
4     Q.  (BY MR. WEGLARZ)  And that would be Funjet's
5  terms and conditions or bill of rights.  Correct?
6         MR. SUAREZ:  Objection; form.
7     A.  I assume so.
8     Q.  (BY MR. WEGLARZ)  Do you agree that a customer
9  may be confused as to what company you're working for if
10 they're getting documents that have Vacations To Go on
11 it, documents that say Funjet Vacations on it?
12         MR. GIBSON:  Objection; form.
13    Q.  (BY MR. WEGLARZ)  Go ahead.
14         MR. SUAREZ:  Objection to form.
15    A.  Customers are always confused, yes.
16    Q.  (BY MR. WEGLARZ)  Okay.  What's Funjet's role
17 in this booking here?  What did they do?
18    A.  Listed on the confirmation --
19         MR. SUAREZ:  Objection to form.
20    A.  Listed on the confirmation that the customer
21 can view, if read, would show that they are the
22 operator, which is right under travel details.  So that
23 would inform them that they are the operator of who we
24 were booking through.
25    Q.  (BY MR. WEGLARZ)  What does that mean, what are

Page 112

1  they operating?
2         MR. SUAREZ:  Objection to the form.
3     A.  They are our wholesaler or our provider.
4  They're the ones that provide the price and the package.
5     Q.  (BY MR. WEGLARZ)  Okay.  So in the literal
6  sense, they're really not operating anything, that's
7  just a term that's used.  Correct?
8         MR. SUAREZ:  Object to the form.
9     A.  They are -- I assume so, yeah.
10         MR. SUAREZ:  Hey guys, I need a second in
11 between the question and answer to be able to note my
12 objection.  So if you can give me a second, I'd
13 appreciate it.
14         MR. WEGLARZ:  All right.  We'll try to
15 accommodate you, Luis.  Always do.
16         MR. SUAREZ:  Thank you.
17         THE WITNESS:  Okay.  Sorry.
18    Q.  (BY MR. WEGLARZ)  You're fine.
19         Do you know if anyone clicked here on the
20 booking confirmation to review those terms and
21 conditions?
22    A.  That, I do not know.
23    Q.  Do you know if that's something that's also
24 monitored or recorded just like they're able to tell me
25 if somebody actually printed the booking confirmation?

ARRIOLA, STETSON
10/17/2019

Pages 113–116

Page 113

1    A.  I do not believe so.

2    Q.  So you would agree with me that Vacations to Go
3 is assisting on this reservation, as well as Mark
4 Travel, the operator.  Correct?

5         MR. SUAREZ:  Object to the form.  That's
6 not what this document says.

7         MR. WEGLARZ:  But that wasn't my question.

8         MR. SUAREZ:  Okay.

9    A.  Can you restate it?  Sorry.

10    Q.  (BY MR. WEGLARZ)  Sure.

11         Would you agree with me that both Vacations
12 to Go and Mark Travel are part of this booking and
13 reservation?

14         MR. SUAREZ:  Object to the form.

15    A.  We're part of the booking because we book it on
16 the client's behalf.

17    Q.  (BY MR. WEGLARZ)  And Mark Travel was also a
18 part of it, as well.  Correct?

19         MR. SUAREZ:  Object to the form.

20    Q.  (BY MR. WEGLARZ)  I mean, their name is all
21 over the documentation.

22         MR. SUAREZ:  Object to the form.

23    A.  So Funjet is the one that we book it through.
24 They're the ones that provide us the package.

25    Q.  (BY MR. WEGLARZ)  And explain that to me.  How

Page 114

1 does Funjet provide you with the package?

2         MR. SUAREZ:  Object to the form.

3    A.  My understanding is our website runs, I assume,
4 algorithms or however the site is set up, to find the
5 lowest price between all of our operators, providers,
6 suppliers, to determine the lowest price for our
7 customers.

8    Q.  (BY MR. WEGLARZ)  And I thought you said
9 earlier that as part of this booking transaction, while
10 Janet was on the phone, you had to verify the rate
11 through Funjet.  Correct?

12    A.  Because on the --

13         MR. SUAREZ:  Object to the form.

14    A.  Sorry.

15    Q.  (BY MR. WEGLARZ)  That's okay.

16    A.  On the fast deals the R number that's on
17 Page 4, on that number would show exactly what the
18 client wants to book for hotel, it will show the dates,
19 the room category, the specific air schedule.  It even
20 shows when that client pulled that quote.  And what I
21 see that the client doesn't see is the time that the
22 client pulled it, as well as the wholesaler, operator,
23 provider, to book it through.

24    Q.  Which is Funjet here?

25    A.  Which is Funjet.

Page 115

1    Q.  And so you would have verified this through
2 what program?

3    A.  Through our website.

4         MR. SUAREZ:  Object to the form.

5    Q.  (BY MR. WEGLARZ)  Is that through VAX?

6         MR. SUAREZ:  Object to the form.

7    Q.  (BY MR. WEGLARZ)  If you want to verify this
8 rate through Funjet --

9         MR. SUAREZ:  Object to the form.

10    Q.  (BY MR. WEGLARZ)  -- how do you physically do
11 that?

12    A.  If I wanted to verify the rate, I would -- and
13 it states to go to -- our website shows that price that
14 we're pulling right now, that Funjet has the lowest
15 price for that deal, I will go to Funjet, to VAX,
16 because that's where you access Funjet.

17    Q.  That's what I thought.

18         And that's what you did here because you
19 had to verify the rate through Funjet.  Right?

20         MR. SUAREZ:  Object to the form.

21    Q.  (BY MR. WEGLARZ)  Go ahead.

22    A.  That's correct.

23    Q.  So you then went through VAX, which is Funjet's
24 system.  Right?

25    A.  Yes.

Page 116

1    Q.  And what happens?  Tell me the magic that
2 happens, once you enter VAX, to try to verify this rate.

3         MR. SUAREZ:  Object to the form.

4    A.  We just pull the exact same itinerary that's
5 pulled on our website and choose the exact package that
6 the client wants to book, because there's other flight
7 options, there's other hotels that Funjet has listed on
8 there.  I am choosing exactly what the client wanted.

9    Q.  (BY MR. WEGLARZ)  Right.

10    A.  So I have to plug in the dates, where they're
11 flying from, where they're going, the dates of travel,
12 how many passengers.  If there's a promo code being
13 applied, I would apply that.  Hit the search button, and
14 then it will pull all the air and all the hotels up
15 that's operated within that destination through Funjet,
16 and I would go in there and choose the air schedule that
17 the client wanted and choose the resort and the room
18 category that the client wanted, and then I hit check
19 out and then it has a recap screen for me to put the
20 information under the clients.

21    Q.  And is there a way to -- I mean, is this
22 step-by-step process that you just described for me, is
23 that recorded or documented somewhere?  Can I get
24 screenshots showing each step that you did that you just
25 identified for us?

ARRIOLA, STETSON
10/17/2019

Pages 117–120

Page 117

1          MR. SUAREZ:  Object to the form.
2      Q.  (BY MR. WEGLARZ)  Or is there a log maintained
3  showing these steps that you just told us about?
4          MR. SUAREZ:  Object to the form.
5      A.  No.  That's just standard.  That's just
6  standard.
7      Q.  (BY MR. WEGLARZ)  And if the rate, for whatever
8  reason, wasn't available anymore through Funjet, you
9  would be able to tell that through the VAX.  Right?
10     A.  Yes.
11     Q.  Let's say the hotel was completely booked at
12  that point in time, VAX would tell you that, as well.
13  Correct?
14     A.  That's correct.
15     Q.  It's like a real-time availability thing they
16  tell you, and that's operated by Mark -- by Funjet.
17  Correct?
18     A.  That's correct.
19     Q.  And what's Funjet's relationship to Mark
20  Travel?
21     A.  I don't know.
22         MR. SUAREZ:  Object to the form.
23  Foundation.
24     Q.  (BY MR. WEGLARZ)  Is it your understanding that
25  Mark Travel owns and operates Funjet?

Page 118

1          MR. SUAREZ:  Object to the form.
2  Foundation.
3      A.  I don't know the details of the companies.
4      Q.  (BY MR. WEGLARZ)  But you know there's a
5  relationship between Funjet and Mark Travel?
6          MR. SUAREZ:  Let him finish his answer.
7          MR. WEGLARZ:  I did.
8      A.  No.  I mean, I just assume when you say Funjet,
9  Mark Travel has been said along the same lines as
10  Funjet.
11     Q.  (BY MR. WEGLARZ)  All right.  Then you told us
12  about -- you kind of took us through the steps.  The
13  final payment was made, we believe it was between March
14  the 13th and March the 16th.  Correct?
15     A.  Give me one moment.  (Witness perusing
16  document.)
17         Final payment was made anywhere between
18  March 13th and March 15th, somewhere within that time.
19     Q.  All right.  And if we look at Page 43 of
20  Exhibit 1.
21         MR. SUAREZ:  What page?
22         MR. WEGLARZ:  43.
23     A.  Forty --
24     Q.  (BY MR. WEGLARZ)  43.
25     A.  43.  Okay.

Page 119

1      Q.  What was your question?
2      A.  Well, I'm going to ask it now.
3      A.  Sorry.
4      Q.  I was directing your attention to that page.
5         We see a series of events being logged here
6  close in time to when the final payment was made.  True?
7      A.  That is correct.
8      Q.  And we're looking at Page 43.  If you look at
9  the very top of Page 43, there's this entry that says
10  front desk for March 13, 7:18 p.m., "Front desk, CCT
11  created, wants to speak to TM/MNG."
12         TM stands for?
13     A.  Team manager.
14     Q.  MNG stands for manager?
15     A.  Yes.
16     Q.  And then after that it says -- has the @ symbol
17  and M.
18         What does that mean?
19     A.  Probably the operator's name, code, whatever
20  they put in there.
21     Q.  Got it.  Okay.
22         So after the final payment goes through,
23  then we see the final booking confirmation and the
24  actual travel itinerary that is produced.  Correct?
25     A.  That is correct.

Page 120

1      Q.  What's the difference between the itinerary and
2  the booking confirmation?
3      A.  From my understanding, the booking confirmation
4  is the record of receipt of what the client purchased
5  through Vacations To Go.  It just shows exactly what we
6  booked for the customer and the details, their flights,
7  their airline confirmation numbers, you know, just a
8  receipt, so that way they receive something right after
9  they make a deposit or do final payment.  It's our
10  confirmation.
11         The travel itinerary is Funjet's documents
12  that showed this vacation has been paid in full, and the
13  documents are sent to us to send to the customer to go
14  over the details more fully in regards to, you know,
15  seat assignments, because we don't include that on our
16  confirmation, the class of service with the airline, the
17  transfer company, the resort booked, and here they show
18  on Page 45 the hotel's address, the included promotions,
19  which we don't include on ours.  Then the hotel
20  cancellation policy fee on Page 46, and then the notes
21  of like cribs and, you know, what to expect at the time
22  of check-in.  Then the ground transfers, as I mentioned
23  earlier, which goes into 46 and 47, and then all their
24  travel value, additional travel information and that...
25     Q.  So fair to say that the booking confirmation

ARRIOLA, STETSON
10/17/2019

Pages 121–124

Page 121

1  information represents the pertinent information being
2  provided by VTG for that trip.  Correct?
3          MR. GIBSON:  Objection; form.
4          MR. SUAREZ:  Object to the form.
5      A.  Not pertinent information.  The confirmation is
6  just a receipt to show that you've purchased it.  Like
7  go to a business and you buy something from them, you
8  can receive a receipt, but your item that you're
9  getting, that item that you're getting is -- I would
10  assume would be the travel itinerary.
11      Q.  (BY MR. WEGLARZ)  Okay.  But the itinerary is
12  really Funjet's.  That's all the information provided by
13  Funjet.  Correct?
14      A.  Funjet.
15      Q.  And you're delivering --
16          MR. SUAREZ:  Object to the form.
17      Q.  (BY MR. WEGLARZ) -- it for Funjet?
18          Go ahead.
19      A.  Yes, Funjet is the one that we book everything
20  through, so they're the ones that have the contracts or
21  information with the transfer company and with the
22  hotels, with -- you know, they're the ones that have the
23  air, you know, I guess they ticket their air through
24  their ticket department.
25          All I'm doing is making my reservation

Page 122

1  through Funjet's on this particular booking, and I'm
2  sending you a confirmation saying, hey, this is what we
3  discussed.  This is what we booked.  Here's what your
4  card was charged, you know, and especially if there's a
5  balance owed, how much you owe on that.  If you
6  purchased the insurance, here's the insurance
7  information and the policy number on our confirmation.
8      Q.  And the travel itinerary for this Moon Palace
9  trip, that's generated by Funjet.  Right?
10      A.  Yes.
11          MR. SUAREZ:  Object to the form.
12      A.  Sorry.  Yes.
13      Q.  (BY MR. WEGLARZ)  And what's -- once this
14  itinerary was generated, it was then sent to
15  Ms. Desantis and Ms. Torralva on March 16th via e-mail.
16  Correct?
17          MR. SUAREZ:  Object to the form.
18      Q.  (BY MR. WEGLARZ)  I'll direct to your
19  attention, look at Page 13.
20      A.  I can tell you on Page 43.
21      Q.  (BY MR. WEGLARZ)  All right.  Tell me.
22      A.  Yes, March 16th at 7:46 a.m., they received the
23  travel documents, both jsbater11@gmail.com and
24  margarettorralva@email.grcc.edu.
25      Q.  And an actual copy of that formal itinerary, we

Page 123

1  can see on Pages 44 through 48.  Correct?
2      A.  That is correct.
3      Q.  And are you familiar with the information
4  that's usually provided in an itinerary like this?
5      A.  I'm familiar with what was booked, yes.  The
6  past traveler details, the transfers, the hotel
7  information.
8      Q.  And we see on the itinerary the Funjet
9  Vacation's logo.  Right?
10      A.  Yes.
11      Q.  And if we look on the next page, directing your
12  attention to Page 45 of the itinerary, there's a section
13  there called, "Hotel details."  Correct?
14      A.  Yes.
15      Q.  Those details are being provided by Funjet?
16          MR. SUAREZ:  Object to the form.
17      A.  Yes.
18      Q.  (BY MR. WEGLARZ)  And it gives different
19  information about different things about the hotel.
20  Correct?
21          MR. SUAREZ:  Object to the form.
22      A.  It gives information regarding the room type,
23  the address and the included promotions, all the way
24  down to Page 46, which will include the added values per
25  room and how to use that, and then the important

Page 124

1  information section, the all-inclusive program -- I
2  mean, all-inclusive amenities, and then the hotel
3  cancellation.
4      Q.  (BY MR. WEGLARZ)  Okay.
5      A.  And ground transfers.
6      Q.  And included within the hotel information is
7  the hotel sales advisories, correct, Page 46?
8      A.  Yes.
9      Q.  And it talks about the hotel's cancellation
10  policy.  Right?
11      A.  Yes.
12      Q.  And by the way, is there a cancellation penalty
13  basically for any type of cancellation regardless of how
14  far in advance it is?
15          MR. GIBSON:  Are you asking generally or
16  this particular?
17      Q.  (BY MR. WEGLARZ)  Generally.  Generally.
18      A.  Generally, I mean, it depends.
19      Q.  So you can cancel pretty much for any reason
20  provided you give enough advance notice, you'll get a
21  hundred percent refund?
22      A.  No, that's not true.
23      Q.  Usually there's some type of penalty,
24  regardless of the reason, regardless of how far in
25  advance.  Right?

ARRIOLA, STETSON
10/17/2019

Pages 125–128

Page 125

1      A.  It depends.
2              MR. SAFRA:  Objection; misstatement of
3      fact.
4      Q.  (BY MR. WEGLARZ)  Now, if you look at Page 47,
5      there's a section called, "Additional travel
6      information."  Correct?
7      A.  Yes.
8      Q.  And the information under additional travel
9      information is also provided by Funjet.  Right?
10             MR. SUAREZ:  Object to the form.
11     A.  Yes.
12     Q.  (BY MR. WEGLARZ)  And do you see the first
13     section is, "FAA Hazardous Materials Policy."  Correct?
14     A.  Yes.
15     Q.  Funjet is advising the traveler about federal
16     law, how it applies to hazardous materials onboard.
17     Correct?
18             MR. SUAREZ:  Object to the form.
19     A.  Yes.
20     Q.  (BY MR. WEGLARZ)  It talks about which
21     hazardous materials are forbidden.  Correct?
22             MR. SUAREZ:  Object to the form.
23     Q.  (BY MR. WEGLARZ)  And they probably forbid all
24     hazardous materials?
25             MR. SUAREZ:  Object to the form.

Page 126

1      A.  Yes.
2      Q.  (BY MR. WEGLARZ)  I think everyone pretty much
3      understands it's common sense that hazardous materials
4      are forbidden on the flights.  Correct?
5              MR. SUAREZ:  Object to the form.  Improper
6      hypothetical.  Lacks expertise.
7      A.  Yes.
8      Q.  (BY MR. WEGLARZ)  Even though it's common
9      sense, still, Funjet says, you know what, we're still
10     going to advise the traveler of this FAA hazardous
11     materials policy.  Correct?
12             MR. SUAREZ:  Object to the form.
13     A.  Yes.
14     Q.  (BY MR. WEGLARZ)  And then further on down
15     there's a section called, "Identification Required for
16     International Travel."
17             Do you see that?
18     A.  Yes.
19     Q.  And it advises the traveler about the specific
20     identification that will be required for this trip.
21     Correct?
22             MR. SUAREZ:  Object to the form.
23     A.  Yes.
24     Q.  (BY MR. WEGLARZ)  Then it says, you know, if
25     you want more information regarding identification

Page 127

1      requirements, consult your travel agent or you can go
2      visit the State Department website.  True?
3              MR. SUAREZ:  Object to the form.  That's
4      not what it said.
5      A.  I don't see that.
6      Q.  (BY MR. WEGLARZ)  Page 47.
7      A.  Where at?
8      Q.  It says, "For more information regarding proper
9      identification requirements, please consult your travel
10     agent or visit the State Department's consular website
11     at www.travel.state."
12             Do you see that?
13     A.  I do see that.
14     Q.  And it says, "Or the U.S. Department of
15     Homeland Security website."  Correct?
16     A.  Yes.
17     Q.  Okay.  Do you know why there would be specific
18     mention of the FAA hazardous materials policy and of the
19     specific identification requirements?
20             MR. SUAREZ:  Object to the form.
21             MR. GIBSON:  Objection; form.
22     A.  No.
23     Q.  (BY MR. WEGLARZ)  Why not just let the traveler
24     figure it out for themselves, right, because really
25     they're responsible for knowing that.  Right?

Page 128

1              MR. SUAREZ:  Object to the form.
2      A.  I mean, I don't know.
3      Q.  (BY MR. WEGLARZ)  All right.  Would you agree
4      with me that a reason -- your typical reasonable
5      traveler, when they're looking through this travel
6      information, they're being notified of FAA hazardous
7      materials policy and identification requirements, after
8      reviewing that, okay, I guess these are the main
9      pertinent things I need to be aware of when I go on my
10     trip to Jamaica?
11             MR. GIBSON:  Object to the form.
12             MR. SUAREZ:  Object to the form.
13     A.  Yes, but it also mentions travel.state.gov,
14     which provides you with all the information that you
15     need for that destination, not just identification
16     purposes.
17     Q.  (BY MR. WEGLARZ)  But it doesn't say, look --
18     it says to go to that website only if you need more
19     information on identification requirements.  Right?
20             MR. GIBSON:  Objection; form.
21             MR. SUAREZ:  Object to the form.
22     A.  That is correct.
23     Q.  (BY MR. WEGLARZ)  So if someone says, I know
24     what ID I need to have, I don't need to go to those
25     websites, that would be the reasonable interpretation of

ARRIOLA, STETSON
10/17/2019

Pages 129–132

Page 129

1   that.  Correct?
2              MR. GIBSON:  Objection; form.
3              MR. SUAREZ:  Object to the form.
4        **A.  I assume so.**
5        Q.  (BY MR. WEGLARZ)  And then further below that,
6   it says, "Important notice:  The Mark Travel
7   Corporation, its employees," et cetera, et cetera.
8              Do you see that?
9        **A.  Yes.**
10       Q.  Why is the Mark Travel Corporation being listed
11  on this itinerary?
12             MR. GIBSON:  Objection; form.
13       **A.  I don't know.**
14       Q.  (BY MR. WEGLARZ)  What does Mark Travel
15  Corporation have to do with this trip?
16             MR. GIBSON:  Objection; form.
17             MR. SUAREZ:  Object to the form.
18       **A.  I couldn't answer that.**
19       Q.  (BY MR. WEGLARZ)  Do you agree with me, and I
20  thought you said before, sometimes this stuff is
21  confusing.  Right?
22             MR. SUAREZ:  Object to the form.
23       **A.  Are you talking about between Mark Travel**
24  **Corporation and Funjet, the names?**
25       Q.  (BY MR. WEGLARZ)  And I apologize.

Page 130

1        **A.  Sorry.**
2        Q.  I believe you said that in the context of
3   customers are confused a lot.  Correct?
4              MR. GIBSON:  Objection; form.
5              MR. SUAREZ:  Object to the form.
6        **A.  I'm not sure.**
7        Q.  (BY MR. WEGLARZ)  And you would agree that
8   Vacations To Go is also listed on the itinerary,
9   correct, at the very top of Page 44?
10       **A.  That is correct.**
11       Q.  Actually, it says, "Thank you for choosing
12  Funjet Vacations."  Then right beneath that, it says,
13  "Vacations To Go," and lists the address for VTG.
14  Correct?
15       **A.  That is correct.**
16             MR. SUAREZ:  Object to the form.
17       Q.  (BY MR. WEGLARZ)  So in the same itinerary the
18  traveler is seeing Funjet Vacations, Vacations To Go, as
19  well as Mark Travel all in the same document.  Correct?
20       **A.  Yes.**
21       Q.  Your typical traveler may believe that all
22  three of these companies are in on this thing together,
23  in on the booking of this trip and the itinerary being
24  produced.  Correct?
25             MR. GIBSON:  Objection; form.

Page 131

1              MR. SUAREZ:  Object to the form.
2        **A.  I don't know.**
3        Q.  (BY MR. WEGLARZ)  Between February 16, the date
4   that you had this phone discussion with Ms. Desantis,
5   until March the 16th when the final booking confirmation
6   and itinerary are produced for the Moon Palace trip, did
7   you have any other phone discussions with anyone
8   involved with this trip?
9        **A.  I do not believe so.**
10       Q.  Okay.  When the last payment was applied, which
11  would have been a couple of days before March the 16th,
12  were you involved with that in any way?
13       **A.  I do not remember.**
14       Q.  That's fair.
15             Any and all of your interactions between
16  February the 16th and March the 16th, other than your
17  phone call that we talked about already, we would see
18  documented here in Exhibit No. 1, correct, these 60
19  pages here?
20       **A.  That is correct.**
21       Q.  Through the e-mails and notes that we see here.
22  Correct?
23       **A.  That is correct.**
24       Q.  Okay.  And you would agree with me, when we
25  look at the final booking confirmation and we look at

Page 132

1   the itinerary that was produced for Moon Palace, you
2   would agree with me there is nothing in there warning
3   the travelers about any risk of harm in Jamaica.
4   Correct?
5              MR. SUAREZ:  Object to the form.
6        **A.  I do not believe so.**
7        Q.  (BY MR. WEGLARZ)  You would agree that there's
8   no such warning in either of those documents, booking
9   confirmation or the itinerary?
10             MR. SUAREZ:  Object to the form.
11       **A.  I do not believe so.**
12       Q.  (BY MR. WEGLARZ)  Okay.  You would agree that
13  there is no mention or warning about the State
14  Department's concern about the number of sex assaults
15  being committed by resort employees at resorts on the
16  north coast of Jamaica?
17             MR. SUAREZ:  Object to the form.
18       **A.  I do not believe so.**
19       Q.  (BY MR. WEGLARZ)  Meaning you agree with what I
20  just said.  Correct?
21             MR. SUAREZ:  Object to the form.
22       **A.  I believe so.  I would -- I mean, I have to**
23  **look and read through it, but I do not believe so.**
24       Q.  (BY MR. WEGLARZ)  All right.  And if you were
25  Ms. Desantis or Ms. Torralva or Amber or Paiton, if you

ARRIOLA, STETSON
10/17/2019

Pages 133—136

Page 133

1  were to read the itinerary or the confirmation, there's
2  nothing there telling you that, oh, my God, there's a
3  concern about the number of sex assaults being committed
4  by resort employees on the north coast?
5        MR. SUAREZ:  Object to the form.
6     A.  I do not believe so.
7     Q.  (BY MR. WEGLARZ)  Meaning you agree with that?
8     A.  I'd have to look at it, but yeah.
9        MR. SAFRA:  Object to the form.
10    Q.  (BY MR. WEGLARZ)  And if the State Department
11 did have a reported concern about the number of sex
12 assaults being committed by resort employees on the
13 north coast, do you agree that that's information that
14 should be disclosed to the traveler?
15       MR. GIBSON:  Objection; form.
16    A.  I do not know.
17    Q.  (BY MR. WEGLARZ)  Do you think it would be --
18 do you think it would be reasonable to disclose that
19 type of information to the traveler?
20       MR. GIBSON:  Objection; form.
21       MR. SUAREZ:  Object to the form.
22       MR. SAFRA:  Objection; asked and answered.
23    A.  I do not know.
24       MR. SAFRA:  Todd, can we take a break when
25 you're done with this line of questions?

Page 134

1        MR. WEGLARZ:  Yeah, we can take one right
2  now.  Let's take two minutes.
3        (Recess taken from 1:32 p.m. to 1:45 p.m.)
4     Q.  (BY MR. WEGLARZ)  All right.  Mr. Arriola, we
5  will get through this.
6        Do you recall that there was a change in
7  the booking where you had to change the trip from the
8  Moon Palace to the Beaches Ocho Rios Resort?
9        MR. SAFRA:  Object to the form.
10    A.  I do recall that, based on what is provided in
11 front of me.
12    Q.  (BY MR. WEGLARZ)  Okay.  What was the -- what
13 precipitated that change?
14    A.  My understanding is that the Moon Palace
15 suffered from a fire and was unable to open in time.  So
16 therefore, what normally would happen in a situation
17 where a resort doesn't open in time or something
18 happened and it affects the client's travel dates, we
19 receive a call from the provider, operator, wholesaler,
20 which in this case is Funjet, and they offer an
21 alternative resort of equal or greater value.
22    Q.  So when did you -- when were you notified that
23 Moon Palace had a fire and that those current bookings
24 would have to be relocated?
25    A.  I do not know an exact date.  I can only assume

Page 135

1  that it was a date when the confirmation was changed to
2  Beaches.
3     Q.  Do you recall how you were notified of the fire
4  and the inability of Moon Palace to open in time?
5     A.  I would not have exact recollection, but I would
6  assume it would be -- something like this would be a
7  phone call.
8     Q.  Do you recall getting a phone call and being
9  advised of this?
10    A.  I do not recall.
11    Q.  And do you recall who would have made -- who
12 called you?
13    A.  The person or company?
14    Q.  Both.
15    A.  I don't know the person.  It would have been
16 Funjet that would have called.
17    Q.  Okay.  And would there be any notes, any logs
18 that would document these events?
19    A.  On my end, if this was something that would
20 have taken more than a day or the client needed longer
21 time, then it would have been logged in to my notes of
22 that information, so that way, if it went back to a
23 manager and I was not here, then the manager would have
24 been aware of what happened.  But according to the notes
25 in front of us, the switch was made on the particular

Page 136

1  day, whenever it went from Moon Palace to Beaches, which
2  I don't -- I need my notes.
3        MR. GIBSON:  Try Page 49.
4        THE WITNESS:  49?  Yeah, here we go.
5     A.  Yeah, so that would have been on April 1st is
6  when that switch would have been made.
7     Q.  (BY MR. WEGLARZ)  And you're looking at
8  Page 49?
9     A.  Page 49.
10    Q.  Of Exhibit 1.  Right?
11    A.  Exhibit 1, yes, sir.
12    Q.  And you see the e-mail there that sends out the
13 new itinerary for the rebooked trip.  Correct?
14    A.  For the Beaches, yes.
15    Q.  Did you -- was this trip rebooked to Beaches
16 the same day you received this phone call from Funjet
17 advising about the Moon Palace fire?
18    A.  I do not recall.
19    Q.  Do you have an understanding as to whether this
20 trip was rebooked the same day that you found out?
21    A.  I do not remember.
22    Q.  Did you have other clients or customers who had
23 to be rebooked from Moon Palace to a different place
24 because of this?
25    A.  I do not remember.

ARRIOLA, STETSON
10/17/2019

Page 137

1    Q.  Do you recall having to relocate anyone else
2  besides this group of four because of the fire at Moon
3  Palace?
4    A.  I do not remember.
5    Q.  And when you received this phone call from
6  someone from Funjet advising you about this, did they
7  tell you what your options were or what the customers'
8  options were as to where they can rebook?
9    A.  I do not remember.  However, I do know, based
10  on our company protocol, if something like this were to
11  happen, the clients were typically given options.  One,
12  of the equal or greater value to a different property.
13  They can always do a property of their choice, and we
14  can see if the switch would be allowed provided by Moon
15  Palace or Funjet, whoever makes those decisions.  Or the
16  client would typically be able to cancel for a refund.
17    Q.  And how were the clients here notified of this
18  incident concerning Moon Palace?
19    A.  I don't remember.  It would more than likely
20  have to have been based on a phone call.
21    Q.  And did you make that phone call?
22    A.  I do not remember, but I do believe so.
23    Q.  Okay.  And you believe you called who, Janet
24  Desantis?
25    A.  I would have called the telephone number listed

Page 138

1  on the information under the cell phone, which is
2  blacked out.
3    Q.  For Janet Desantis?
4    A.  For Janet Desantis.
5    Q.  All right.  And when did you make this phone
6  call to Janet?
7    A.  I do not remember.  Somewhere around --
8  before -- either before or on the 1st of April.
9    Q.  On or before April 1?
10    A.  Yes.
11    Q.  Do you have any memory or recollection of your
12  phone discussion with Janet Desantis on or before
13  April 1st of 2015 when you were discussing the Moon
14  Palace incident?
15    A.  I do not remember.
16    Q.  Do you have any understanding as --
17        MR. WEGLARZ:  Strike that.
18    Q.  (BY MR. WEGLARZ)  By saying that I take it you
19  don't have any idea or understanding as to what you
20  discussed with her or what you said.  Right?
21    A.  I don't remember what I discussed with her.  I
22  know what we normally do based on procedure under
23  situations like this, which was just mentioned.
24    Q.  Okay.  Do you know which of those -- did you
25  explain all those options?

Page 139

1    A.  I would have explained all three.
2    Q.  Do you have any idea as to how Ms. Desantis
3  responded to that?
4    A.  I do not recall, but I can tell you on
5  April 1st it was made -- obviously the choice was made
6  to go to the Beaches Ocho Rios because the confirmation
7  was changed.
8    Q.  And do you know how or why Beaches was selected
9  as opposed to any other place?
10    A.  I do not know, but it is of equal or greater
11  value, and we -- travel agents assume, based on our
12  experience, greater value.
13    Q.  Would Beaches have been suggested by you?
14    A.  If it was an option to be given, yes.
15    Q.  Did others explore options to find out what
16  other resorts would have availability for these guests
17  that had to be relocated?
18    A.  That, I don't know.
19    Q.  Is that something that's done?  Is that usually
20  done in a scenario like this?
21    A.  Not by me.
22    Q.  Maybe not by you, but by someone at VTG or
23  through Funjet?
24    A.  Not through VTG.  I don't know how Funjet comes
25  up with the options that they choose on the new property

Page 140

1  that's chosen.  But I'm given a call saying Moon Palace
2  is no longer available for your clients.  We're -- our
3  option to move them to Beaches -- our option to the new
4  hotel is going to be Beaches, are they okay with that,
5  and then I present it to the client because we know it's
6  either if they're not okay with it, they can choose
7  another property or they can cancel their booking.
8    Q.  And is that what likely happened here?
9    A.  That's more than likely what happened here.
10    Q.  So Funjet called you, told you what happened to
11  Moon Palace, we're going to have to relocate these
12  folks, Beaches does have a spot for them --
13    A.  (Nodding head.)
14    Q.  -- see if they're okay with that, something
15  along those lines?
16    A.  Exactly.
17    Q.  All right.  Did you have an understanding as to
18  what Ms. Desantis' version of this discussion with you
19  is?
20        MR. SUAREZ:  Object to the form.
21    Q.  (BY MR. WEGLARZ)  Go ahead.
22    A.  What she thinks we talked about?
23    Q.  Yes.
24    A.  I have -- no, I'm not sure.  I'm not sure.
25    Q.  If she's of the understanding that you called

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 141

1  her, you explained the trip has to be rebooked because
2  Moon Palace is no longer available and that you told --
3  you explained Beaches as being an option and another
4  property, is that possible that that happened?
5       A.  I would have mentioned, Ms. Desantis,
6  unfortunately the Moon Palace is no longer available.  I
7  received a call from Funjet.  They are offering the
8  Beaches Ocho Rios as an alternative property, and of
9  course, that is of equal or greater value.  And I always
10 mention that, because a lot of people want to know if
11 that property is similar to the one that they're staying
12 at.  I would also mention if there were kickbacks from
13 the customer, that they could go to another property.
14 And if there were kickbacks from the customer, they
15 always had the option to cancel.  And I do mention that
16 on the phone just for the cancellation purposes.
17       MR. GIBSON:  You mean, pushback from the
18 customer?
19       A.  Pushback, being them upset.  Yeah, being them
20 upset about, why am I not going to the resort that I
21 originally booked?
22       Q.  (BY MR. WEGLARZ)  Okay.
23       A.  Why are you making us go to a different
24 property?
25           Well, I didn't start the fire.  I'm not the

Page 142

1  one choosing the new property.  I'm just a relayer of
2  information, but here's your option.  It's of equal or
3  greater value.  Beaches is a property that we assume to
4  be greater value.  It's a property that's very hard to
5  get into, because it is so popular.  So that would -- I
6  would have mentioned, it is, you know, you have a month
7  out, but it's a time-sensitive situation, because
8  Beaches is such a good option to choose from what we
9  understand as agents.  But if you don't like it, choose
10 a different hotel or you can cancel.  And that's how the
11 conversation, I would assume, would have gone.
12       Q.  You're assuming that's how it went?
13       A.  I'm assuming that's how that would have gone.
14       Q.  You believe, most likely, you just offered the
15 Beaches option.  Correct?
16       A.  I didn't offer the Beaches option.  I would
17 have followed that exact same protocol that I just
18 mentioned.
19       Q.  Well, you would have explained to her that
20 Funjet has made arrangements for them to relocate to
21 Beaches.  Right?
22       A.  That would have been an offer for them to take.
23       Q.  And that was the only scenario that was set in
24 place where there was an availability, at least at that
25 time, when you made the phone call and discussed it with

Page 143

1  her.  Correct?
2       A.  That, I'm not sure.  I don't know.  Funjet
3  could've had -- again, the client has a choice to do
4  what they want to do.  They have the choice to choose
5  the property if they wanted to go to a different
6  property.
7       Q.  Okay.
8       A.  Funjet chooses -- Funjet -- I don't know how
9  they pick it.  I don't know what property they do to
10 choose it.  They did it, informed me of it, but the
11 client in the end had the option to go to a different
12 hotel.
13       Q.  Okay.  I understand.
14           But when Funjet called you, they said, hey,
15 they can go to Beaches, we know that's available, we
16 made sure, see if they want it?
17       A.  That is correct.
18       Q.  You're not aware of them offering any other
19 resort, other than Beaches.  Correct?
20       A.  No, because we know, we understand because of
21 these situations that happen, especially when they don't
22 open, that the client has those three options.  It's a
23 natural understanding in our industry that they can pick
24 the option that they choose, that Funjet chooses.  If
25 the client kicks back and says, no, well, what about

Page 144

1  this property?  Then I go back to Funjet and say, hey,
2  can we move them over to this property?  Or the client
3  really kicks back and is like, you know what, I don't
4  want to go to -- I don't want to go on vacation anymore.
5  I really wanted to go to this motel.  Then we would have
6  gone back to Funjet and said, client doesn't want any of
7  the options.  They want to cancel.  Can we get a full
8  refund?  And typically they would have given the full
9  refund on the client -- for the client.
10      Q.  If Ms. Desantis testified that she asked you
11 what you recommended, what do you think is the best
12 option for me, and you said, like the Beaches, would you
13 have any reason to disagree with that?
14          MR. GIBSON:  Objection; form.
15      A.  I wouldn't have any reason to disagree with
16 that.  Beaches is a property of high value, from my
17 understanding.  If she would have asked me, what do you
18 think about the property, I would have simply responded,
19 Beaches is of equal or greater value, typically greater.
20 It's hard to get in to.  I've had -- you know, I've
21 booked a property before or, you know, we just know it
22 to be a property that's a good property.
23      Q.  (BY MR. WEGLARZ)  And did you say --
24      A.  And it would have been short, unless she would
25 have asked questions.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Page 145

1    Q.  And you would have told her it was a quality
2  property?
3    **A.  Yes.**
4    Q.  And what do you base that on?
5    **A.  Personally I base it on pricing, past**
6  **customers' experiences at the resort mainly, the**
7  **amenities within the property itself, the food quality,**
8  **and the fact that you see these properties on TV all the**
9  **time.**
10    Q.  When you say past customer experiences, where
11  do you -- how are you aware of the past customer
12  experiences?
13    **A.  My recommendations for properties are based on**
14  **customers' responses back from a property.  If I've**
15  **booked someone to a property before and they've liked it**
16  **or -- it's not that they liked it.  It's that I didn't**
17  **get negative feedback from a customer.  I remember more**
18  **of the negative feedback from customers before I**
19  **remember the positive.**
20    Q.  Sure.
21    **A.  I do too many bookings to remember all that.**
22    Q.  Sure.
23    **A.  But the negative feedbacks are the ones that**
24  **will push me away from providing recommendations, would**
25  **push me away from not giving it as an option, you know,**

Page 146

1  because clients call all the time being like, where do I
2  go, what resort should I say stay at?  And I can't give
3  them an answer, because I don't know who they are, I
4  don't know what their tastes are like.  But I can say,
5  hey, you know, property A, B, C or D, these are
6  properties we've booked before, we recommend, here you
7  go, take a look at them, make your choice, call me back
8  and let me know what you want.
9    Q.  Were there any negative customer responses to
10  Beaches?
11    **A.  Not that I can recall.**
12    Q.  What negative customer responses do you recall
13  from any resort?
14    **A.  Oh, I get them all the time.  I get a call back**
15  **saying that the rooms weren't good.  The rooms smelt bad**
16  **because they were moldy.  It was humid, even though**
17  **they're in a Caribbean destination.  You know, light**
18  **fixtures aren't attached to the wall.  I get even**
19  **feedback about service.  You know, they felt like the**
20  **service wasn't up to par.  They weren't willing to help**
21  **them.  The food was bad.  The food had flies on them.**
22  **The food -- there's bad responses.  I get a lot of bad**
23  **responses on resorts, and then I'd get bad responses on**
24  **resorts from people that have gone to really nice**
25  **properties that I've gotten a ton of good feedback from,**

Page 147

1  and it's just subjective.  It's their opinion.
2    Q.  Was Beaches selected during this same phone
3  call with Ms. Desantis on or before April the 1st?
4    **A.  I do not recall.**
5    Q.  I believe it's her testimony that she recalls
6  you telling her that you needed her -- you needed her to
7  tell you right then and there during that phone call as
8  to whether she wanted to make the switch.  Would that
9  have been true?
10    **A.  Absolutely not.**
11    Q.  Okay.
12    **A.  Absolutely not.**
13    Q.  If she wanted to discuss it with her companions
14  who were going on the trip with her, would you have
15  allowed that?
16    **A.  Absolutely.**
17    Q.  Did you lose any commission because of the
18  relocation?
19    **A.  I do not recall.  I do not believe so.**
20    Q.  How much was your commission on this trip?
21      MR. GIBSON:  I'm going to instruct you not
22  to answer that question.
23      It's personal, and he doesn't need to
24  disclose his commission on this particular trip.
25      MR. WEGLARZ:  All right.  I think it's

Page 148

1  relevant.  I'm only asking for this trip, but okay.
2    Q.  (BY MR. WEGLARZ)  When you offered the option
3  of the Beaches Resort to Ms. Desantis, did you give her
4  any warning about the north coast of Jamaica and what
5  was being reported by the State Department regarding its
6  concern of resort employees sexually assaulting guests?
7    **A.  I do not recall.**
8      MR. SUAREZ:  Object to the form.  Object to
9  the form.
10    Q.  (BY MR. WEGLARZ)  Did you warn her about any
11  risks regarding her trip to Jamaica?
12    **A.  I do not recall.**
13      MR. SUAREZ:  Object to the form.
14    **A.  Sorry.**
15    Q.  (BY MR. WEGLARZ)  Would you have discussed this
16  relocation or this rebooking with anyone from Sandals?
17    **A.  No.**
18    Q.  Would you have received any e-mails regarding
19  the Moon Palace incident or the rebooking?
20    **A.  I do not remember.  I do not recall.**
21    Q.  Do you believe you would received an e-mail
22  letting you know that the Moon Palace is not going to be
23  available, Beaches is available for your customers?
24    **A.  No.  Typically we would have received an e-mail**
25  **stating -- if an e-mail was sent, we would have received**

ARRIOLA, STETSON
10/17/2019

Pages 149–152

Page 149

1    an e-mail from Palace Resorts that this incident had
2    happened, to reach out to your operator, your tour
3    operator, your provider, your wholesaler, or they'll
4    reach out to you, which Funjet reached out to us.  And
5    Palace Resort wouldn't -- I don't know who makes the
6    decision on going to Beaches, whether that's Palace or
7    Funjet.  I have no idea.
8        Q.  Did you have any other phone -- by the way, how
9    long did this phone discussion last with Ms. Desantis?
10       A.  I don't remember.
11       Q.  Okay.  But it was just a single phone call
12   regarding this Palace Moon incident and the rebooking.
13   Right?
14       A.  I do not recall.
15       Q.  Okay.  So it may have been more than one phone
16   call?
17       A.  Could have been.
18       Q.  And if it is more than one phone call, is that
19   documented or logged anywhere?  Is there anything we
20   could look at that could tell us either way?
21       A.  No.  And the only thing that would make me
22   assume that there wasn't more than one phone call, and
23   this is assuming, is that there's no notes for a manager
24   to decide -- to know what was going on in case I was out
25   of the office, because I wouldn't want the managers to

Page 150

1    be blindsided by a call from Ms. Desantis about what's
2    going on.
3        Q.  Okay.
4        A.  So I only assume that the decision was made by
5    the client to make the switch to the Beaches on the call
6    because that's why the confirmation was changed and
7    there were no notes put in there, but I don't remember.
8        Q.  Do you agree that if you were to tell Janet
9    Desantis she had to decide right then and there during
10   that phone call on whether she wants to rebook to
11   Beaches, that would be an unreasonable thing to do?
12           MR. GIBSON:  Objection; form.
13       A.  Yes.  I wouldn't have done that.
14       Q.  (BY MR. WEGLARZ)  She should be permitted the
15   time to consider it and to look into it.  Correct?
16       A.  Absolutely.
17       Q.  Okay.  Do you have any reason to believe that
18   you had any further telephone discussions with
19   Ms. Desantis after this one discussion about Moon Palace
20   and the rebooking?
21       A.  I do not recall.
22       Q.  Do you believe --
23           MR. WEGLARZ:  Strike that.
24       Q.  (BY MR. WEGLARZ)  Once this trip was rebooked
25   to Beaches, did you have any further discussions with

Page 151

1    Ms. Desantis?
2        A.  I do not believe so.  It wasn't put in the
3    notes, but I can say that based on the notes in our --
4    what is this, Exhibit 1?
5            MR. GIBSON:  Yeah.
6        Q.  (BY MR. WEGLARZ)  Yes.
7        A.  Exhibit 1, that she did view the confirmation
8    multiple times after the change was made between the
9    time of the change and the time of her travel, and after
10   the travel documents were sent showing the new property
11   at the Beaches.  After that was done, that's when I sent
12   the schedule change on the air, as well, to inform them,
13   hey, this is what your current schedule change is on
14   your airfare, give you an update on it.  That was on the
15   7th.  After that on the 7th, she viewed -- and this is
16   on Page 59, she viewed it twice that same day right
17   after I sent it.  On the 8th at 3:17 a.m., she viewed
18   it.  On the 11th at 6:25 she viewed it.  The 24th, 12:45
19   she viewed it.  27th of April at 3:33, she viewed it
20   again.  So she viewed this confirmation --
21       Q.  What was that last date?
22       A.  April 27th.
23       Q.  April 27th?
24       A.  April 27th at 3:33 p.m.
25       Q.  She would have reviewed what?

Page 152

1        A.  That shows all the times that she reviewed her
2    confirmation.
3        Q.  But that wouldn't be the confirmation for
4    Beaches?
5        A.  Yes.
6        Q.  Okay.
7        A.  That would have been, yes.  The confirmation
8    had already been changed over to Beaches on those dates.
9        Q.  And how is it that you know that?
10       A.  Because the confirmation was changed on the 1st
11   of April at 1:46 p.m.
12       Q.  How do you know Janet Desantis reviewed the
13   confirmation on these dates and times?
14       A.  The two customers, either Janet Desantis or
15   J.S. Bater, or whichever e-mail.  One of the two e-mails
16   viewed those confirmations that many times.  Only the
17   customer that views it, is it logged on our side.  Every
18   time they open up their confirmation, from one of the
19   two e-mails that we have, if there's one e-mail or two,
20   it would log it in that it was viewed on that time with
21   the IP address so we know which computer it was from.
22   So if you knew the IP address, you would say, oh, it
23   came from this computer at this home.
24       Q.  So what's being recorded is, you know that an
25   IP address opened up the link for the confirmation.

ARRIOLA, STETSON
10/17/2019

Pages 153–156

Page 153

1  Correct?
2      A.  From her e-mail.  It only can come from her
3  e-mail, or if she forwarded it to someone, that could
4  have happened.
5      Q.  Right.
6      A.  You know, if she forwarded it to her daughter.
7      Q.  If she leaves it on the computer, her daughter
8  could come in and click it on?
9      A.  Click and view, and it shows that they viewed
10  it, and she continued to do so even after the bon voyage
11  e-mail.  On Page 60 she viewed it again the 3rd, 4th,
12  and then after the 4th, there was no more viewing it.
13      Q.  Well, someone reviewed it at that IP address.
14  Correct?
15      A.  Someone within the two e-mail addresses or
16  within the IP address.
17      Q.  And the two e-mail addresses, you're talking
18  about the one for Janet Desantis and the other for
19  Margaret Torralva?
20      A.  That's correct.
21      Q.  It could have been -- they could have been
22  reviewed -- all of them could have been reviewed by
23  Margaret Torralva.  Right?
24      A.  Could.
25      Q.  All of them could have been reviewed by Janet

Page 154

1  Desantis and no one else.  Correct?
2      A.  Could.
3      Q.  You just don't know.  Correct?
4      A.  Determine the IP address.
5      Q.  Did you ever have any phone discussions with
6  Margaret Torralva?
7      A.  I do not recall.
8      Q.  Did you have any phone discussions with either
9  Amber Torralva or Paiton Bater?
10      A.  I do not recall.
11      Q.  You mentioned that you get complaints all the
12  time.  How do you get complaints?
13      A.  On our surveys.  So we send out -- which she --
14  we send out a survey to the customer on their welcome
15  home e-mail.  So it's not logged into our system.  It is
16  now.  It wasn't then.  So as agents can see it and keep
17  track of it.  Clients get a survey for performance of
18  the agent and to be able to evaluate the resort and the
19  experience at the resort.  And that's what I mean when I
20  get bad comments, it's typically about a resort.
21      Q.  Is this -- explain the survey, is it digital,
22  is it hard copy, what is it?
23      A.  I think it's all e-mail.
24      Q.  And they fill out the survey through the
25  e-mail?

Page 155

1      A.  I believe so.
2      Q.  All right.
3      A.  I'm not sure.
4      Q.  Is it like a link?
5      A.  I've never been able to take a survey, so I
6  don't know how the surveys are -- how they view the
7  survey.
8      Q.  Did you say they weren't logged, but they are
9  now?
10      A.  So they weren't logged in the confirmations,
11  under the notes of the confirmations, but they are now.
12      Q.  What are you saying?
13      A.  That means right here when you see on Page 59
14  the bon voyage e-mail went out to J.S. Bater, that's
15  logging into the notes that that e-mail went out.  The
16  welcome home e-mails now are logged into the notes.
17          MR. GIBSON:  It doesn't show up here.
18          MR. WEGLARZ:  Okay.
19      A.  To show the survey and what the client says
20  about the agent and the resort.
21      Q.  (BY MR. WEGLARZ)  Was such a survey sent to
22  this group here, Desantis, Torralva and Bater?
23      A.  I do believe so.
24      Q.  Did they fill it out?
25      A.  I do not know.

Page 156

1      Q.  And what's done with the filled-out surveys?
2      A.  Well, if they do not like the agent, it hurts
3  as agents, which affects our scores.
4      Q.  Are the surveys returned to the agent?
5      A.  The surveys are returned to the agent.  We get
6  an e-mail of that, so that way we're aware of what we
7  need to work on.
8      Q.  Are the surveys sent to someone else, though,
9  as well?
10      A.  Yeah, I think it's an internal.  It goes to a
11  manager.  It goes to, I think, a manager and to the
12  agent, so that way we know.  And the only thing that
13  affects those agents is the performance for the agent,
14  not the resort.  But we use the resort's comments to
15  help us understand the quality of the property and was
16  it a reasonable feedback, you know, like...
17      Q.  So don't you as the counselor get to see the
18  survey pertaining to the resort?
19      A.  I do.
20      Q.  And what's done with this information?
21      A.  We use it just to help with, you know, giving
22  recommendations for properties.  Or if we get enough bad
23  surveys about a particular property, some agents will
24  pull back from offering, send it as a list.
25      Q.  Does management track the information provided

ARRIOLA, STETSON
10/17/2019

Pages 157–160

Page 157

1  in the surveys?
2      A.  I don't know.  I know they track the agent
3  information, because that affects my customer service
4  score.
5      Q.  If you wanted to -- have you looked at any of
6  the surveys for any of the resorts in Jamaica recently?
7      A.  I'm sure, yeah.
8      Q.  And where do you find those?  Like if you want
9  to look at them, where do you look?
10     A.  Now we can click on -- you have to click on the
11 client, because it's in the notes of the booking.  Or it
12 could be in my e-mail, as well.
13     Q.  So you have to search each one separately by
14 client?
15     A.  For the resort, not for the client -- I mean,
16 not for the agent.  The agent is logged into our PSM
17 under our survey score.  The resort is never logged into
18 our PSM at all, like under, you know, click on this to
19 view all the resort comments.  You have to click on the
20 actual client to see what their survey was about.
21     Q.  Those are all stored somewhere digitally?
22     A.  Probably, I assume.
23     Q.  Do you recall anyone complaining about having
24 been assaulted while on vacation?
25     A.  Not that I recall.

Page 158

1      Q.  You don't recall anyone complaining that they
2  were sexually assaulted or someone tried to sexually
3  assault them while they were on vacation?
4      A.  Not that I can recall.
5      Q.  And are negative reviews of resorts shared with
6  other counselors and other VTG staff?
7      A.  No.
8      Q.  They don't have meetings every month --
9      A.  No, no.
10     Q.  -- just to go through the trends?
11     A.  No.  Because each agent gets their own reviews
12 about that property.  We book -- a lot of agents book
13 the same resorts all the time, but everyone has
14 different opinions about it.  Like I could receive a
15 negative review about that one resort, and then a week
16 later have a client come back and rave about that exact
17 same resort and say it was the most magnificent thing
18 that they've ever done, and the first person was like,
19 that's the biggest dump in the world.  Here's the
20 problems with it.  It happened all the time.
21     Q.  And do the counselors ever share the negative
22 reviews of the resorts with other customers?
23     A.  No.
24     Q.  Why not?
25     A.  We're not going to go into detail about the

Page 159

1  review, but if a property received a negative review
2  enough and the client is like, hey, I want to go to this
3  property and I received a negative review about that
4  property, I'll ask one simple question.  What's the
5  reason behind going to this resort?  Have you been there
6  before?  That's the only thing that I ask.  Once they
7  answer that question, we move on.
8      Q.  You wouldn't tell them, hey, we got some
9  negative reviews and they said --
10     A.  No, because that person may absolutely love
11 that property.  I can't tell if that person is the type
12 of person that is on the positive end of the review or
13 on the negative end of the review.  Everyone has
14 different tastes.
15     Q.  Were there any negative reviews about any
16 resort in Jamaica?
17     A.  Negative reviews about resorts in Jamaica, is
18 that what you said?
19     Q.  Yeah.  Do you recall any negative reviews?
20     A.  Yeah.
21     Q.  Like what?
22     A.  I can't recall the exact details, but all
23 resorts get negative reviews on the occasion.
24     Q.  And what -- do you recall the types of negative
25 reviews for any of the Jamaican resorts?

Page 160

1      A.  What I mentioned earlier, which was the food,
2  the service, the room qualities.
3              That's similar to the question that you
4  asked earlier.
5      Q.  Do you recall any complaints about Beaches Ocho
6  Rios?
7      A.  No.
8      Q.  Do you recall any complaints about any resorts
9  in Ocho Rios?
10     A.  Yes.
11     Q.  Like, such as?
12     A.  Bad food quality, bad service quality.  It's
13 the same type of response that most people provide,
14 didn't like the food, didn't like the service.
15     Q.  Which resorts in Ocho Rios, if not Beaches?
16     A.  I couldn't tell you off the top of my head.
17     Q.  Do you recall any negative reviews about any
18 Beaches or Sandals resort in Jamaica?
19     A.  I have gotten bad reviews about resorts about
20 Sandals and Beaches -- in Sandals.  Let's be particular
21 here.  Sandals resorts in Jamaica, but not necessarily
22 Beaches.
23     Q.  What about Beaches Negril?
24     A.  No.
25     Q.  No negative surveys?

ARRIOLA, STETSON
10/17/2019

Pages 161–164

Page 161

1    A.  I can assure, no, on that.
2    Q.  Would you want to book a customer at a hotel if
3  a hotel employee raped someone at that hotel?
4          MR. GIBSON:  Objection; form.
5          MR. SAFRA:  Objection; form.
6    A.  I don't think it would necessarily stop me from
7  doing it, because I would hope that -- because that's a
8  situational thing, that it would be rectified and
9  handled, and why ruin the reputation of a good property
10 based on one bad egg when I've had a ton of people
11 travel to that property before and rave about it and go
12 back to it on numerous occasions, or at least try to get
13 to go back to it but can't because it's usually booked.
14   Q.  Do you forward the negative reviews about the
15 resort to the resort itself?
16   A.  Depends.
17   Q.  Under what circumstances is that done?
18   A.  Let me rephrase.  If I get a negative review
19 about a resort that requires extra attention or the
20 customer creates a big enough problem, we forward those
21 survey responses to the wholesaler, provider, tour
22 operator, and then they are the ones that coordinate the
23 information through the resort.  I don't do it directly
24 to the resort.  I send it to the wholesaler providers at
25 the travel department.

Page 162

1    Q.  And that's Funjet?
2    A.  Funjet, any wholesaler provider, whoever that
3  vacation was booked through and the client complaint.
4    Q.  Are the negative surveys ever provided to the
5  U.S. Embassy or the State Department?
6    A.  Not that I'm aware of.  That would be above my
7  head.  I don't think so.
8    Q.  And once this trip was rebooked to Beaches Ocho
9  Rios, there was a final booking confirmation and a final
10 itinerary that was issued.  Correct?
11   A.  That's correct.
12   Q.  Just like the other confirmation and itinerary
13 we discussed for Moon Palace.  Correct?
14   A.  Correct.
15   Q.  The only difference being that it's now at a
16 different hotel, and maybe some of the hotel advisories
17 may be a little bit different.  Correct?
18   A.  It would be different, yes.
19   Q.  I'm going to hand you what I've marked as
20 Exhibit No. 8, which is VTGTX 58 -- well, I'll show it
21 to you.  Do you believe Exhibit No. 8 is the final
22 booking confirmation for the trip to Beaches Ocho Rios?
23          (Exhibit No. 8 was marked.)
24   A.  This is 58?  That is the final confirmation
25 that they received, yes.

Page 163

1    Q.  (BY MR. WEGLARZ)  And this would have been sent
2  to both Janet Desantis and Margaret Torralva.  Correct?
3    A.  It was sent to both.
4    Q.  And that was sent via e-mail.  Correct?
5    A.  That is correct.
6          MR. SUAREZ:  Hang on a second, Todd.  You
7  said VTG 58?
8          MR. GIBSON:  That's the e-mail.
9          MR. WEGLARZ:  That's the e-mail.
10         MR. GIBSON:  It's not the confirmation
11 itself.
12   A.  It's the e-mail and not the confirmation, yeah.
13   Q.  (BY MR. WEGLARZ)  Right.  And then the next
14 page is a different number.  It doesn't go --
15         MR. SUAREZ:  Let's go back there, Todd.
16 You said that was the final booking confirmation --
17         MR. WEGLARZ:  Right.
18         MR. SUAREZ:  -- was VTG 58, and that's not
19 accurate.  That's not the final booking confirmation.
20         MR. WEGLARZ:  Well, it's the e-mail in
21 closing it.
22         MR. SUAREZ:  No, I think what you're
23 referencing there is the flight change issue and that
24 the confirmation would have been on 54.  You might want
25 to clarify that.

Page 164

1          MR. GIBSON:  Travel itinerary.
2          MR. WEGLARZ:  That's the itinerary, which I
3  will get to.
4    A.  So can I speak?
5    Q.  (BY MR. WEGLARZ)  Yeah.  Go ahead.
6    A.  So 54 shows a travel itinerary new sched --
7  because Funjet will send out, when they do a schedule
8  change, they will send out documents just like I send
9  out a confirmation on 58 that states of a schedule
10 change.  The only thing that's different from this
11 travel itinerary and this travel confirmation is solely
12 for the purpose of letting the client know that their
13 flight times have changed, to give them an update on
14 their flight times.
15         That's what I sent out, because I send it
16 out to make sure that I do my due diligence to let them
17 know, and I just don't rely on Funjet sending out a
18 schedule change e-mail.  That's protocol for Vacations
19 To Go to inform the client, hey, your schedule has
20 changed and also makes the client feel like, oh, their
21 agent is doing something besides just taking my credit
22 card.  That's the only thing that e-mail is about.
23   Q.  Okay.  I'm going to continue.  I just want to
24 make sure we're clear here.
25         Exhibit No. 8 includes the e-mail sent to

ARRIOLA, STETSON
10/17/2019

Pages 165–168

Page 165

1  the customers which encloses the final booking
2  confirmation for the trip to Beaches.  Correct?
3     **A.  It's the last confirmation that they received**
4  **going over the flight schedule change.**
5     Q.  It changed just because there was a minor
6  change in the flight.  Correct?
7     **A.  That is correct.**
8     Q.  But every time you have a change --
9        MR. SUAREZ:  Object to the form.
10    Q.  (BY MR. WEGLARZ)  Every time you do have a
11 change like that, you have to reissue the booking
12 confirmation, right --
13       MR. SUAREZ:  Object to form.
14    Q.  (BY MR. WEGLARZ) -- so it reflects all current
15 and accurate information?
16    **A.  That is correct.**
17    Q.  And then the second page of Exhibit 8 is the
18 actual booking confirmation, and that's a four-page
19 document.  Correct?
20    **A.  This is a confirmation from Vacations To Go,**
21 **yes.**
22    Q.  And is there any warning in that final booking
23 confirmation about any risks the travelers may face
24 while traveling to Jamaica?
25       MR. SUAREZ:  Object to the form.

Page 166

1     **A.  Not that I can recall.  That's the same --**
2  **nothing has changed on this confirmation that we**
3  **discussed earlier, except the flight times.**
4     Q.  (BY MR. WEGLARZ)  Okay.  And again, when we see
5  the click here for the terms and conditions, what we're
6  seeing is -- is that on the booking confirmation or is
7  that on the itinerary?  I apologize.
8     **A.  That is on the booking confirmation.**
9     Q.  The only terms and conditions that will be
10 referred to in the booking confirmation would be what we
11 see here in Exhibit 7?
12    **A.  I believe so.**
13    Q.  Got it.
14       And then what I've marked as Exhibit No. 9
15 here, I believe that's the final itinerary for the trip
16 to Beaches Ocho Rios.  Correct?
17       (Exhibit No. 9 was marked.)
18    **A.  They received -- should have received an**
19 **itinerary with the change to Beaches Ocho Rios.  This**
20 **itinerary is just another one informing them of the**
21 **flight schedule change.**
22    Q.  (BY MR. WEGLARZ)  This is the last --
23    **A.  But nothing is changed on this e-mail.**
24    Q.  This is the last version of the itinerary
25 provided to the customers?

Page 167

1     **A.  Correct.**
2     Q.  And it contains all of the current and
3  up-to-date information about their trip.  Correct?
4     **A.  About their flight times, yes.**
5     Q.  Is there any warning in there about any risk
6  the travelers may face while traveling to Jamaica?
7        MR. SUAREZ:  Object to the form.
8     **A.  Not that I can see.**
9     Q.  (BY MR. WEGLARZ)  Is there any warning about
10 any concern about the number of sex assaults being
11 committed by resort staff against guests at resorts on
12 the northern coast?
13       MR. SAFRA:  Object to the form.  Asked and
14 answered.
15    **A.  It's the same answer I gave you earlier.  I**
16 **don't see it.  I mean, it's the exact same itinerary**
17 **that's provided by the Moon Palace.  All that's changed**
18 **is Moon Palace to Beaches.**
19    Q.  (BY MR. WEGLARZ)  Right.  In either the final
20 booking confirmation or in the final itinerary, is there
21 any mention of any rule or policy in Jamaica that resort
22 staff are prohibited from fraternization with guests?
23       MR. SUAREZ:  Object to the form.
24    Q.  (BY MR. WEGLARZ)  Go ahead.
25    **A.  Not that I can see.**

Page 168

1     Q.  Is there mention in either of those two
2  documents of any mention that if such fraternization is
3  observed, it should be reported to hotel management in
4  the U.S. Embassy?
5        MR. SUAREZ:  Object to the form.
6     Q.  (BY MR. WEGLARZ)  Go ahead.
7     **A.  Not that I can see on these documents.  I don't**
8  **know about the bill of rights paperwork, but in these**
9  **two documents I do not see that information.**
10    Q.  And again, this final itinerary is a document
11 that is generated by Funjet.  Correct?
12    **A.  The travel itinerary is.**
13    Q.  Exhibit No. 9?
14    **A.  Exhibit No. 9.**
15    Q.  That is a Funjet document?
16    **A.  That is correct.**
17    Q.  And you, yourself, you never verbally --
18       MR. WEGLARZ:  Strike that.
19    Q.  (BY MR. WEGLARZ)  Did you ever verbally warn
20 Janet Desantis, Margaret Torralva, Amber Torralva or
21 Paiton Bater about any risk of harm they may face while
22 traveling to Jamaica?
23    **A.  Not that I can recall.**
24    Q.  Did you ever verbally warn any of those four
25 individuals about any reported concern about the number

ARRIOLA, STETSON
10/17/2019

Pages 169–172

Page 169

1  of sex assaults being committed by resort employees at
2  resorts on the northern coast?
3     **A.  Not that I can recall.**
4     MR. SUAREZ:  Object to the form.
5     **A.  Sorry.  Not that I can recall.**
6     Q.  (BY MR. WEGLARZ)  And did you ever verbally
7  advise or warn any of these four customers of yours
8  about where they should go or look to if they want to
9  find warnings or travel alerts or advisories affecting
10 Jamaica?
11    **A.  Not that I can remember.**
12    MR. SUAREZ:  Object to form.
13    Q.  (BY MR. WEGLARZ)  To this day have you ever
14 reviewed any State Department travel alerts, travel
15 advisories or travel warnings?
16    **A.  Yes.**
17    Q.  Okay.  When did you first do that?
18    **A.  I don't remember.**
19    Q.  Under what circumstance?
20    **A.  Under -- most recently under the Dominican**
21 **Republic circumstance, but I do view the**
22 **travel.gov.state [sic] site when I have customers ask**
23 **about passport validity, which is identification, and I**
24 **direct them to go to this site to view more information**
25 **regarding travel to that destination.**

Page 170

1     Q.  When they have questions about the passport
2  validity?
3     **A.  Absolutely, because if you check the passport**
4  **validity on their website, it will show you all the**
5  **information needed for travel there.  So if the customer**
6  **was concerned about anything regarding the**
7  **United States' recommendation to the destination, it's**
8  **going to be on that site.**
9     Q.  That's been known by travel agents for years.
10 Correct?
11    **A.  I assume so.**
12    Q.  Those are all the questions I have.  Thank you
13 for your time.
14    **A.  Thank you.**
15    MR. SAFRA:  Do you want to take a break
16 before I ask some follow-up questions?
17    **THE WITNESS:  I'm ready.**
18    MR. GIBSON:  We're ready to go.
19    **THE WITNESS:  Let's just keep going.**
20    MR. SAFRA:  Sounds great.
21           EXAMINATION
22 BY MR. SAFRA:
23    Q.  I'm obviously going to be asking you questions
24 by telephone.  If at any time, the fact that I'm asking
25 you questions by telephone, it either comes out unclear

Page 171

1  or is interrupted by technology, I'd be glad to repeat
2  the question.  Just let me know.  At the same time,
3  while I've done a good job, sometimes realizing when you
4  are not finished with an answer, if I unintentionally
5  cut you off because I can't see if you're looking
6  through a document or if you are in your thought, just
7  let me know, as well.  I'm not intending to ever stop
8  you from completing an answer.
9     Does that sound fair?
10    **A.  Yes.**
11    Q.  Earlier today you were asked some questions
12 about a company by the name of Unique Vacations, Inc.
13 And you said you had never heard of that company.  Do
14 you recall that?
15    **A.  That's correct.**
16    Q.  And you identified with regard to the Janet
17 Desantis booking, on behalf of herself and her three
18 travel companions, speaking with Janet Desantis and
19 potentially an individual that you could not identify
20 that you recall associated with Funjet.  Do you recall
21 that?
22    **A.  I do.**
23    Q.  What I gather from your testimony then is, did
24 you ever speak to anybody that you associated being
25 employed or a representative of a company by the name of

Page 172

1  Unique Vacations, Inc. relative to this booking?
2     **A.  No.**
3     Q.  Prior to this booking, did you ever speak to
4  anybody that fell in the same category as either being
5  employed or a representative of Unique Vacations, Inc.?
6     **A.  Not that I can recall.**
7     Q.  I heard at various times today testimony from
8  you regarding the fact that you cannot be a guarantor or
9  you can't guarantee safety.  Do you recall that?
10    **A.  Yes.**
11    Q.  Very generally, am I understanding correctly
12 that that has been a practice of yours to make
13 statements to potential customers who may book with you
14 that you are speaking with, since you started working at
15 Vacations To Go in 2009.  Correct?
16    **A.  Yes, I believe so.**
17    Q.  And I believe you said that given that it was
18 your pattern and practice, that it's likely you said the
19 same to Janet as involved in this booking here.
20 Correct?
21    MR. WEGLARZ:  Form objection.  Go ahead.
22    **A.  If asked I believe, yes.**
23    Q.  (BY MR. SAFRA)  This statement and practice of
24 yours regarding not being able to guarantee safety, that
25 applies to every country that you sell or promote

ARRIOLA, STETSON
10/17/2019

Page 173

1   resorts for, including but not limited to Jamaica.
2   Correct?
3       A.  That is correct.  Not just countries but
4   states, even in the United States.
5       Q.  And this is since before the booking here in
6   2015.  Correct?
7       A.  Yes, I believe so.
8       Q.  You were also asked about presentations to you
9   that you referred to at times as a training or
10  education, some of which you associated with the Sandals
11  or Beaches brand.  Do you recall that?
12      A.  Yes.
13      Q.  And you referred to a BDM?
14      A.  That's correct.
15      Q.  When the reference was made by counsel in
16  questions to you as to a Sandals BDM or a BDM that is
17  speaking to the subject of a Sandals or Beaches brand
18  hotel, do you know who that BDM is employed by?
19          MR. WEGLARZ:  Asked and answered, but go
20  ahead.
21      A.  I do not believe so, no.
22      Q.  (BY MR. SAFRA)  Do you know if that BDM who was
23  presenting or visiting your office was an employee of a
24  Sandals or Beaches hotel?
25      A.  I would assume, yes.

Page 174

1       Q.  Assume because they're speaking for the brand.
2   Correct?
3       A.  Correct, and they're driving their cars.
4       Q.  These hotels are -- okay.  These hotels are
5   located in the Caribbean.  Right?
6       A.  That is correct.
7       Q.  Are you aware that there may be a contract
8   between these branded hotels or an entity associated
9   with them in a foreign country with a company in the
10  United States that may be responsible for marketing or
11  promotions of their hotels and amenities?
12          MR. WEGLARZ:  Form objection.
13      A.  I am not aware.
14      Q.  (BY MR. SAFRA)  So the BDM could be an employee
15  of a company that the hotel has contracted with to go
16  around and educate people as to their amenities.  That's
17  fair.  Right?
18      A.  Yes.
19      Q.  So you have no personal knowledge, then,
20  whether the BDM visiting you, at any time during your
21  employment since 2009, was employed by Sandals or
22  Beaches or just an independent contracted entity
23  individual.  Correct?
24      A.  That is correct.
25      Q.  So to the extent that questions were asked of

Page 175

1   you and the reference was the Sandals BDM, you're not
2   saying in any of your responses that the BDM is Sandals
3   or Beaches.  You're just saying there was a BDM that
4   came to your office or spoke at a certain date and time,
5   and that the subject matter was Sandals or Beaches brand
6   hotel.  Is that fair?
7           MR. WEGLARZ:  Form objection.  Go ahead.
8       A.  I mean, yes, but in the four hours of the
9   training it's all about Beaches and Sandals, and I am
10  required to be in that meeting.  If I -- all attendance
11  is required for that specific meeting.  There are other
12  meetings where attendance isn't necessarily required.
13  But in order to be able to maintain --
14      Q.  (BY MR. SAFRA)  But again --
15      A.  -- our validity with Sandals and Beaches, we
16  have to attend these meetings.
17      Q.  But again, if a person speaking on behalf of
18  those brand of hotels and you have no knowledge, when
19  you answered any of your prior questions as to who
20  employed that individual, on what basis they authorize
21  to or require you to attend?
22      A.  That is correct.
23      Q.  Correct?
24      A.  That is correct.
25      Q.  And when you refer to these as training, I

Page 176

1   think you said that this is more specifically pertaining
2   to the amenities at the resort, the type of hotels and
3   room rates or room types.  Correct?
4       A.  That is correct.
5       Q.  But since you use the word training, I wanted
6   to make sure it's clear.  Nobody who's ever spoken to
7   you about a Sandals or Beaches brand hotel has ever
8   provided you training how to perform the services that
9   you provide to your employer, Vacations To Go.  Correct?
10      A.  I do not believe so.
11      Q.  You do not believe so, as in you agree that it
12  has not been done?  It's a double negative, that's why I
13  ask that, so let me rephrase the question, if need be.
14      A.  Yeah.
15      Q.  For the services you provide Vacations to Go,
16  as an employee of that company, the training you're
17  referring to, that is not training on how you do your
18  job for Vacations To Go, your training that you are
19  calling it with regard to Sandals or Beaches is really
20  informational and educational meetings regarding the
21  hotel and its amenities so then you can then provide
22  your job as part of Vacations To Go to fulfill your job?
23          MR. WEGLARZ:  Form objection.
24      A.  Yes.
25      Q.  (BY MR. SAFRA)  So the fact that you use the

ARRIOLA, STETSON
10/17/2019

Pages 177–180

Page 177

1   word "training," there's no training by anyone
2   associated with Sandals or Beaches as to your duties and
3   responsibilities as an employee of Vacations To Go.
4   Correct?
5       A.  My duties and responsibilities of Vacations To
6   Go is to sell resort properties.  In order for me to be
7   able to sell those resort properties, I would have to
8   become familiar with those resort properties, not just
9   based on customers' responses but by the training
10  provided by that resort and hotel.
11      Q.  But you say "training."  Training is
12  information so you can sell the service --
13      A.  Training --
14      Q.  -- or the amenity.  Correct?
15      A.  Correct.  Training on being able to sell the
16  property itself.
17      Q.  But Sandals or Beaches branded representative
18  doesn't tell you what you can or can't say to a
19  perspective customer.  Correct?
20      A.  That is correct.
21      Q.  They don't say to you what you do or should not
22  do as a Vacations To Go employee.  Correct?
23      A.  That is correct.
24      Q.  The training is, you would agree, limited to
25  here's the hotel, here's the amenities we have offered

Page 178

1   at the hotel, the room type, the rate and special.
2   Correct?
3       A.  That is correct.
4       Q.  If Vacations To Go or Funjet, as you testified,
5   tells you a hotel is not available and they want to give
6   a equal or greater value resort, as you testified about,
7   and one of those alternatives happens to be a Sandals or
8   Beaches Resort, are there instances where there are
9   differences in price, I would assume, when you're
10  getting one of greater value?
11          MR. SUAREZ:  Object to the form.
12      A.  So we assume, yes, there's going to be -- if
13  there is a greater value, there is a price difference in
14  that property.  Typically the property is more expensive
15  than the one the client booked.  But it's not the
16  client's responsibility to absorb that cost.  That's
17  through --
18      Q.  (BY MR. SAFRA)  And that was --
19          MR. GIBSON:  Wait.  I think he's not done
20  yet.
21      A.  Yeah, that's through -- that's either through
22  Funjet or through Palace Resort or through the new
23  property.  But that's beyond where I know who absorbs
24  that cost.  It is at no cost to the customer to make
25  that switch.

Page 179

1       Q.  (BY MR. SAFRA)  and that's what I was going to
2   next follow-up with, so I appreciate that.
3           So if Vacations To Go does not decide to
4   absorb the difference in cost, do you have to call
5   Sandals or Beaches to get their approval to give
6   additional discounts or promotions to your customers?
7       A.  No, that's not --
8           MR. SUAREZ:  Object to form.
9       A.  That's not Vacations To Go's responsibility.
10  All we're there to do is just to inform the client of
11  the hotel that was being provided by Funjet.
12      Q.  (BY MR. SAFRA)  Well, do you need to call
13  Sandals or Beaches, then, if Funjet decides to do it?
14      A.  No, that's not my responsibility.
15      Q.  In your practice, then, if that is something
16  that Funjet decides to absorb as a cost, they don't need
17  to seek approval from Sandals or Beaches because Sandals
18  or Beaches doesn't tell them how to do their job.
19  Correct?
20      A.  I don't know that.  I can't answer that
21  question.
22      Q.  With regard to the BDM, you get those types of
23  presentations and trainings from every resort you offer
24  for every brand hotel around the world.  Correct?
25      A.  No.

Page 180

1       Q.  Do you get them for more than one?
2       A.  Yes.
3       Q.  Tell me which ones.
4       A.  We got them from the more popular properties
5   that are out there.  Beaches, Sandals, Iberostar,
6   Secrets, Dreams, the AM umbrella, AMResort umbrella,
7   Palladium properties, RIU properties.  We get training
8   on the more popular properties, the ones that are sold
9   more by Vacations To Go, I assume.  Vacations To Go are
10  the ones that set up those meetings, either through
11  Vacations To Go representatives through the hotels or
12  through the wholesaler provider.  That's beyond my job
13  title.
14      Q.  So it's not just Sandals and Beaches, there's
15  at least ten different branded hotels?
16      A.  That is correct.  Sandals and Beaches is the
17  only one that requires a four-hour meeting on their
18  resort and attendance is mandatory.  I mean, Vacations
19  To Go tried to make mandatory on all the trainings, but
20  I just know from my personal experience with Beaches and
21  Sandals, it is -- they make sure that whenever they
22  schedule, that all agents are present in those meetings,
23  and they are half-a-day meetings, where the other hotels
24  are usually 30 minutes, 45 minutes.
25      Q.  One of those reasons reasonably may be that

ARRIOLA, STETSON
10/17/2019

Pages 181–184

Page 181

1  they want to make sure that if someone is going to sell
2  their resort, they know what amenities they're selling.
3  Correct?
4      A.  That is correct.
5      Q.  But they don't tell you what you should or
6  should not say to your customers when selling outside
7  the scope of amenities and room rates and types of rooms
8  for a particular hotel.  Right?
9      A.  I believe so.  That's right.
10     Q.  And they don't push one hotel over another.
11 Correct?
12         MR. WEGLARZ:  Form objection.
13     A.  No.  I mean, they just sell the properties as
14 they are.
15     Q.  (BY MR. SAFRA)  They go over all of their
16 resorts in all of the countries including Jamaica, Saint
17 Lucia, the Bahamas?
18     A.  Correct.  And Turks and Caicos.
19     Q.  Without stressing selling one over another.
20 Correct?
21     A.  That's correct.
22     Q.  As to the reservation with Janet Desantis, did
23 you ever speak to anybody that you associated with the
24 Sandals brand or a Sandals hotel specific to this
25 reservation and booking?

Page 182

1      A.  Are you asking did I speak to anyone within
2  Sandals or Beaches brand?
3      Q.  I was starting with Sandals, but my follow-up
4  question was going to be Beaches.
5      A.  No, I didn't speak with anyone.
6      Q.  You referred to what is a standard protocol as
7  part of fulfilling your job responsibilities at
8  Vacations To Go.  Do you recall that?
9      A.  Yes.
10     Q.  What's the standard protocol?
11     A.  In regards to?
12     Q.  It was your wording.  You were talking at times
13 about giving -- in one question it was about warnings
14 you were asked, and you talked about your general
15 statement of safety and you referenced the word a few
16 times in your answers, standard protocol, and I'm asking
17 what standard protocol are you referring to?
18         MR. WEGLARZ:  Form objection.
19     A.  In regards to that is if the client brings up
20 something in regards to safety issues, passport validity
21 issues, I would say, I can't guarantee your safety
22 regarding passport validity.  You would need to visit
23 the state.gov's website.  The state.gov's website has
24 that information, and that's if I'm being asked about
25 that.  That's standard protocol, because we can't

Page 183

1  guarantee Vacations -- and I tell the clients Vacations
2  To Go can't guarantee your safety anywhere you travel,
3  as when you leave your home or in your home.
4      Q.  When you say standard protocol, you're talking
5  about that unwritten practice?
6      A.  Correct.
7      Q.  And that standard protocol is one that you
8  implement and follow as an employee of Vacations To Go.
9  Correct?
10     A.  That is correct.
11     Q.  Do any of the hotel brands that you sell tell
12 you to do that or you do that because Vacations To Go
13 has you do that?
14     A.  I believe it's just because Vacations To Go has
15 me do that.
16     Q.  When you spoke with Janet Desantis or you did
17 speak with her, you were asked some questions about
18 e-mails and telephone calls and her three travel
19 companions, two of them being recipients of e-mail, do
20 you recall those questions from earlier?
21     A.  I do.
22     Q.  Whether you e-mailed one of two e-mail
23 addresses or spoke to Janet Desantis on the telephone,
24 did you understand in all your communications with any
25 of those four individuals relative to the subject

Page 184

1  booking and reservation, that the person on the
2  receiving end of your communication had the authority to
3  act on behalf of all four people?
4      A.  Yes.
5      Q.  Did you understand that the person you were
6  communicating with had the ability to book and reserve a
7  trip and bind the three individuals to the travel and
8  the terms associated with it?
9      A.  Yes.
10         And give me one moment, please.  (Witness
11 perusing document.)  Where's the confirmation?
12         So my understanding is either Janet
13 Desantis offered her credit card and Ms. Margaret's
14 credit card to pay for the reservation for the deposit,
15 or both customers were on the line to provide that
16 credit card.  That, I can't recall.  But based on the
17 confirmation because two credit cards were provided to
18 pay for this reservation, either I spoke with one
19 customer or I could have potentially spoken to both of
20 the women.
21     Q.  And that is speaking to or communicating with
22 one or both that they also had the ability to book,
23 reserve, bind and act on behalf of their daughters.  Is
24 that your understanding?
25     A.  That is correct.

ARRIOLA, STETSON
10/17/2019

Pages 185–188

Page 185

1    Q.  Going back to the presentation by a brand
2  representative associated with Sandals & Beaches, a BDM
3  that you talked about, you talked about the meetings
4  taking place, you know, estimated once a year, and you
5  talked about as of recent.  Do you know if any of those
6  meetings ever took place before 2015?
7    A.  I do not recall.
8    Q.  Is it possible that those have started and
9  occurred only after 2015?
10   A.  Yes.
11        MR. WEGLARZ:  Form objection.
12   A.  Yes, it is possible.
13        MR. SAFRA:  I have no further questions.
14              EXAMINATION
15  BY MR. SUAREZ:
16   Q.  Mr. Arriola, how are you today?
17   A.  I'm good.  Thank you for asking.
18   Q.  I won't be nearly as long as Mr. Weglarz, but I
19  will have a few questions.
20        My name is Luis Suarez, and I represent the
21  Mark Travel Corporation.  One, have you ever seen the
22  contracts between the Mark Travel Corporation and
23  Vacations To Go?
24   A.  No, sir.
25   Q.  Have you ever seen the contracts between

Page 186

1  Vacations To Go and Funjet?
2    A.  No, sir.
3    Q.  Have you ever seen the contracts between the
4  Mark Travel Corporation and any -- and Unique Vacations,
5  Inc., or any entity affiliated between -- or excuse
6  me -- any entity affiliated with Sandals or Beaches?
7    A.  No, sir.
8    Q.  Have you ever seen any contracts between Funjet
9  and Unique Vacations, Inc., or any entity related to or
10  affiliated with Sandals or Beaches?
11   A.  No, sir.
12   Q.  You are wholly employed by Vacations To Go.
13  Correct?
14   A.  Yes, sir.
15   Q.  And Vacations To Go is the travel agency that
16  sold the vacation package to Mrs. Desantis,
17  Mrs. Torralva, Ms. Bater and Ms. Torralva.  Correct?
18   A.  Correct.
19   Q.  You were the person who spoke to Mrs. Desantis
20  and possibly Mrs. Torralva.  Correct?
21   A.  That is correct.
22   Q.  To your knowledge, did anybody from Mark Travel
23  Corporation or Funjet ever speak to or communicate
24  directly with Ms. Desantis, Mrs. Torralva, Ms. Torralva
25  or Ms. Bater?

Page 187

1    A.  No.
2    Q.  For all intents and purposes, the party of
3  four, the Desantis, the two Torralvas and the Baters
4  were your clients.  Correct?
5    A.  Yes.
6    Q.  Did you ever forward to the --
7        MR. SUAREZ:  Scratch that.
8    Q.  (BY MR. SUAREZ)  When Ms. Desantis paid for her
9  vacation packages, she paid Vacations To Go.  Correct?
10   A.  She paid Funjet Vacations.  She gave us a
11  credit card, in which we paid Funjet Vacations with.
12  Vacations To Go does not collect any money in the house.
13  The credit cards process to Funjet through VAX.
14   Q.  Okay.  But she gave you the credit card, and
15  you went into your system and your access to VAX and you
16  inputted the credit card?
17   A.  Into VAX, yes, sir.
18   Q.  Okay.  And VAX is a software that your travel
19  agency, Vacations To Go, uses to communicate to Mark
20  Travel Corporation or Funjet.  Correct?
21   A.  I believe so, yes.  Yes.
22   Q.  The clients, meaning the four people who
23  purchased packages, have no access to VAX.  Correct?
24   A.  That is correct.
25   Q.  You did not give them access to VAX.  Correct?

Page 188

1    A.  That is correct.
2    Q.  To your knowledge, the clients never spoke
3  directly to Funjet or the Mark Travel Corporation in any
4  way, shape or form.  Correct?
5    A.  That is correct.
6    Q.  You mentioned earlier that Mark Travel or
7  Funjet provided some training to you as a travel agent.
8  Is that right?
9    A.  That's correct.
10   Q.  Okay.  That training is related to how to use
11  the technology where they price the airfare and the
12  hotel reservations.  Correct?
13   A.  Yes, training on how to use VAX and updates on
14  VAX.
15   Q.  Correct.  They train you on their software, on
16  the technology.  Right?
17   A.  That's correct.
18   Q.  They don't train you, and when I say "they,"
19  the Mark Travel Corporation and Funjet does not train
20  you regarding any resort, any resort, period.  Correct?
21   A.  I do not recall.
22   Q.  The Mark Travel Corporation and Funjet doesn't
23  come to you to give you information about any resort.
24  Correct?
25   A.  I do not recall.

ARRIOLA, STETSON
10/17/2019

Pages 189–192

Page 189

1   Q.  Okay.  Now, the Mark Travel Corporation and
2   Funjet does not own, operate or manage any hotel or
3   resort.  Is that correct?
4       **A.  That, I do not know.**
5       Q.  Do you recall speaking to anybody at Funjet or
6   Mark Travel Corporation about this trip that involved
7   the two Torralvas, Ms. Desantis and Ms. Bater?
8       **A.  I do not remember the initial conversation, but**
9   **I had to have spoken to someone about the switch in the**
10  **property.**
11      Q.  Okay.  Do you recall who you spoke to?
12      **A.  No.**
13      Q.  Do you recall how many times you spoke to them?
14      **A.  No.**
15      Q.  Do you recall making any notes or memoranda
16  about your conversation with them?
17      **A.  No.**
18      Q.  Do you recall anything about the conversation?
19      **A.  No, sir.**
20      Q.  Aside from that one communication that you --
21  spoken communication that you had with either Mark
22  Travel or Funjet about the switch, do you recall any
23  other conversation with Mark Travel or Funjet related
24  to the trip by the two Torralvas, Ms. Bater and
25  Ms. Desantis?

Page 190

1       **A.  The only communication we had would be the**
2   **e-mail notification regarding the flight change.**
3       Q.  Did you ever represent to Ms. Bater,
4   Ms. Torralva, Ms. Desantis and the other Ms. Torralva
5   that you worked for Mark Travel or Funjet?
6       **A.  No.**
7       Q.  Did you ever tell Ms. Bater or represent --
8   excuse me.
9           MR. SUAREZ:  Scratch that.
10      Q.  (BY MR. SUAREZ)  Did you ever represent to
11  Ms. Bater, Ms. Torralva, Ms. Torralva and Ms. Desantis
12  that you represented Mark Travel or Funjet?
13      **A.  No.**
14      Q.  Did you ever tell Ms. Bater, Ms. Torralva,
15  Ms. Torralva or Ms. Desantis that you were the agent of
16  Mark Travel or Funjet?
17      **A.  No.**
18      Q.  Other than price and availability of a
19  reservation, have you ever inquired of Mark Travel or
20  Funjet information about any resort in Jamaica?
21      **A.  Can you rephrase that question, please?**
22      Q.  Sure.
23          The information that you get from Mark
24  Travel or Funjet is through the VAX system.  Correct?
25      **A.  It's either through the VAX system or our BDM**

Page 191

1   from Funjet.
2       Q.  Okay.  I'm going to ask you about the BDM in a
3   second.  The BDM from Funjet.  Okay?
4       **A.  Yes.**
5       Q.  Who is that person?
6       **A.  It's on the tip of my tongue.**
7       Q.  Hello?
8       **A.  Yeah.  I'm sorry.  I can't remember her name**
9   **exactly.  I don't want to be inaccurate in the name of**
10  **her.  I don't remember exactly.  I'm sorry.**
11      Q.  Do you recall who the BDM for Funjet was for --
12          MR. SUAREZ:  I'm sorry.  Scratch that.
13      Q.  (BY MR. SUAREZ)  Do you recall who the BDM was
14  for Funjet in 2015?
15      **A.  I do not recall, but I assume it's the same**
16  **person.  I believe we had the same person the entire**
17  **time, but I cannot recall a hundred percent.**
18      Q.  That BDM from Funjet does not tell you -- or
19  did not tell you anything related to any resort in
20  Jamaica.  Correct?
21      **A.  That, I don't know.**
22      Q.  Okay.  The BDM from Funjet did not ever tell
23  you any information about any resort involving the
24  Sandals or Beaches logo.  Correct?
25      **A.  That, I cannot recall.**

Page 192

1       Q.  Do you recall ever sharing any information
2   related to the BDM from Funjet to anybody in this party,
3   meaning Ms. Desantis, Ms. Bater or the two
4   Ms. Torralvas?
5           I'm sorry.  I didn't hear you.
6       **A.  Yeah, I'm trying to process the question, what**
7   **you asked.  Can you restate it?  I'm so sorry.**
8       Q.  Yeah.
9           Do you recall ever sharing any information
10  that you learned from a BDM from Funjet related to
11  Sandals or Beaches Resorts to Ms. Desantis,
12  Ms. Torralva, Ms. Torralva or Ms. Bater?
13      **A.  No.**
14          MR. WEGLARZ:  Hey, Luis, I need to take a
15  90-second break, if that's okay.
16          MR. SUAREZ:  For you anything, Todd.
17          MR. WEGLARZ:  Well, I appreciate that.
18  I'll be right back.
19          (Recess from 3:09 p.m. to 3:17 p.m.)
20          MR. SAFRA:  When I had said I have no
21  further questions, I don't think I said thank you for
22  your time.  So thank you.
23          **THE WITNESS:  Oh, you're welcome.**
24          MR. WEGLARZ:  That's just the kind of guy
25  you are, Steve.

ARRIOLA, STETSON
10/17/2019

Pages 193–196

Page 193

1     (Reporter read back.)
2     Q.  (BY MR. SUAREZ)  Mr. Arriola, do you recall
3  sharing any information that you received from Funjet or
4  the Mark Travel Corporation regarding any country with
5  Ms. Torralva, Ms. Torralva, Ms. Desantis or Ms. Bater?
6     MR. WEGLARZ:  Form objection, but go ahead.
7     A.  Are you speaking of just general information?
8     Q.  (BY MR. SUAREZ)  I'm talking about any
9  information -- I'm talking about -- let me repeat the
10  question.
11     Do you recall sharing any information you
12  received from Funjet or Mark Travel regarding any
13  country with Ms. Torralva, Ms. Torralva, Ms. Bater or
14  Ms. Desantis?
15     A.  No.
16     Q.  Did you ever tell Ms. Desantis, Ms. Desantis
17  [sic], Ms. Torralva or Ms. Torralva that they were
18  contracting with the Mark Travel Corporation or Funjet?
19     A.  That, I'm not sure.  I'm not a hundred percent
20  sure.
21     Q.  Did you ever forward to Ms. Torralva,
22  Ms. Torralva, Ms. Desantis or Ms. Bater any contract for
23  them to execute that bore the name Mark Travel or Funjet
24  Corporation?
25     A.  The only thing I sent to them was a travel

Page 194

1  itinerary.
2     Q.  That's it?
3     A.  Yes, sir.
4     Q.  You view Ms. Torralva, Ms. Torralva,
5  Ms. Desantis and Ms. Bater as clients of Vacations To
6  Go.  Is that correct?
7     A.  Yes.
8     Q.  In fact, you would have liked for the Mark
9  Travel Corporation or Funjet to talk to your clients.
10  Correct?
11     MR. GIBSON:  Objection; form.
12     A.  Yes.
13     Q.  (BY MR. SUAREZ)  If I could direct your
14  attention back to Exhibit 1 for a second, and if I could
15  ask you to pull up Pages 47 and 48, I'd appreciate it.
16     A.  Okay.
17     Q.  And Mr. Weglarz, plaintiff's counsel, asked you
18  a series of questions about 47 and 48.  Do you recall
19  that?
20     A.  Yes.
21     Q.  Okay.  One of the things he didn't ask you
22  about was at the bottom of 47 and at the top of 48 there
23  are two important notices related to the Mark Travel
24  Corporation and Funjet.  Do you see those?
25     A.  Yes.

Page 195

1     Q.  Did any of -- Ms. Desantis, Ms. Torralva,
2  Ms. Torralva or Ms. Bater ever ask you any questions
3  about those notices?
4     A.  No.
5     Q.  Did Ms. Torralva, Ms. Torralva, Ms. Desantis or
6  Ms. Bater ever tell you that they were confused in any
7  way by those notices?
8     A.  No.
9     Q.  Have you ever been given any authority on
10  behalf of Mark Travel Corporation or Funjet to make
11  representations on their behalf, other than
12  communicating price and availability?
13     A.  No.
14     Q.  You have never received any monies directly
15  from the Mark Travel Corporation or Funjet.  Correct?
16     A.  Wait.  Rephrase your question.  I mean, wait.
17  Restate your question.  Sorry.
18     Q.  Have you ever received any monies directly from
19  Mark Travel Corporation or Funjet?
20     A.  During what time?
21     Q.  At any time in 2015, did you receive any monies
22  directly from Mark Travel Corporation or Funjet?
23     A.  To me, no.  To Vacations To Go, that's --
24     MR. GIBSON:  He's asking you.
25     A.  To me, no.  Sorry.  To me, no.

Page 196

1     Q.  (BY MR. SUAREZ)  Correct.  That's my question.
2  You -- you, Stetson Arriola, did Stetson Arriola ever
3  receive any monies directly from Mark Travel or Funjet?
4     A.  In 2015, no.
5     Q.  Have you ever been to the Mark Travel
6  Corporation's headquarters?
7     A.  No.
8     Q.  Have you ever been to any office of the Mark
9  Travel Corporation?
10     A.  No.
11     Q.  Have you ever been to the headquarters of
12  Funjet or any office related to Funjet?
13     A.  No.
14     Q.  How many travel agents worked at Vacations To
15  Go in 2015?
16     A.  I do not know.
17     Q.  Roughly?
18     A.  I couldn't tell you.
19     Q.  Is it over a hundred or less than a hundred?
20     A.  Over a hundred in the whole company.
21     Q.  Over?  Right.
22     Over 500 or less than -- over 500 other
23  less than 500?
24     A.  That, I don't know.
25     Q.  Can you say whether it was over 450 or under

ARRIOLA, STETSON
10/17/2019

Pages 197–200

Page 197

1   450?
2       A.  I -- I don't know.
3       Q.  On February 16, 2015, Ms. Desantis booked her
4   vacation through Vacations To Go.  Is that correct?
5       A.  That's correct.
6       Q.  And she booked that vacation through Vacations
7   To Go for all four plaintiffs.  Correct?
8       A.  That's correct.
9       Q.  At the time that they did that, you did not
10  make any representations about the resort on behalf of
11  Mark Travel or Funjet.  Correct?
12      A.  I don't understand the question.  I'm sorry.
13      Q.  Did you tell -- did you tell -- do you recall
14  making any assurances to Ms. Desantis on February 16,
15  2015?
16      A.  I do not recall.
17      Q.  The day of the switch, do you recall making any
18  recommendations to Ms. Desantis?
19      A.  I do not recall.
20      Q.  The day of the switch, do you recall telling
21  Ms. Desantis to call Mark Travel or Funjet?
22      A.  That, I do not recall, but I more than likely
23  usually would say that Funjet -- I received a call from
24  Funjet about the Moon Palace not being available and
25  that they decided to switch to -- or offer the switch to

Page 198

1   Beaches.
2       Q.  My question is a little different.  Do you
3   recall telling Ms. Desantis to call Funjet or Mark
4   Travel on the day of the switch?
5       A.  Oh, for them to call Mark Travel or Funjet?
6       Q.  Yes.
7       A.  No.
8       Q.  At any time did you tell Ms. Desantis or
9   members of her group to call Funjet or Mark Travel?
10      A.  No.
11      Q.  At any time in your employment at Vacations To
12  Go, did Mark Travel or Funjet ever communicate to you
13  any information about the north coast of Jamaica?
14      A.  Not that I can recall.
15      Q.  Vacations To Go was the travel agent that sold
16  the vacation package to these plaintiffs.  Right?
17      A.  That is correct.
18      Q.  To the extent that any entity had a
19  relationship with the purchaser of travel, in this case
20  the Desantis and her group, that was Vacations To Go.
21  Correct?
22          MR. GIBSON:  Objection; form.
23      A.  Can you repeat the question?  Sorry.
24      Q.  (BY MR. SUAREZ) Yeah, sure.
25          In this case the travel agent was Vacations

Page 199

1   To Go, and the travelers who were purchasing travel
2   packages were Ms. Desantis, Ms. Torralva, Ms. Torralva
3   and Ms. Bater.  Correct?
4       A.  That's correct.
5       Q.  To your knowledge, the airfare and the hotel
6   package that Vacations To Go sold to the plaintiffs here
7   was delivered.  Correct?
8       A.  That is correct.
9           MR. WEGLARZ:  Belated form objection.
10      Q.  (BY MR. SUAREZ) When you spoke to or
11  communicated with the plaintiffs here, Ms. Desantis,
12  Ms. Torralva, Ms. Torralva and Ms. Bater, do you recall
13  making any warranty?
14      A.  No.
15      Q.  Mr. Arriola, I thank you very much for your
16  time today.
17          MR. SUAREZ:  I don't believe I have any
18  further questions, and I yield the floor to whoever is
19  going to ask questions next.  Thank you.
20          THE WITNESS:  Thank you.
21          MR. WEGLARZ:  I'll have a few more
22  questions, and hopefully we'll be done real soon.
23              FURTHER EXAMINATION
24  BY MR. WEGLARZ:
25      Q.  Mr. Arriola, I want to direct your attention to

Page 200

1   Exhibit 1, Page 31.
2       A.  Okay.
3       Q.  And this is our final booking confirmation for
4   the trip.  Do you remember that?
5       A.  This is the booking confirmation showing the
6   switch to Beaches.
7       Q.  And if you look at Page 31, you'll see where it
8   says payments.  Correct?
9       A.  That's correct.
10      Q.  And it says it looks like there were four
11  payments total for this trip, and all of them were paid
12  directly to Funjet.  Correct?
13      A.  There's five payments --
14          MR. SUAREZ:  Object to form.  Object to
15  form.  That doesn't -- that's not what he testified to.
16  That's a misstatement.
17          MR. WEGLARZ:  Okay.
18          MR. SUAREZ:  What he said is that he took
19  the information --
20          MR. WEGLARZ:  Hey, Luis, that's a speaking
21  objection.  Come on.
22          MR. SUAREZ:  Objection; form.
23          MR. WEGLARZ:  Thank you.
24      A.  There's five payments.  Four payments were
25  processed and paid to Funjet via VAX.

ARRIOLA, STETSON
10/17/2019

Pages 201–204

Page 201

1      Q.  (BY MR. WEGLARZ)  Right.  According to
2  Exhibit 1, Page 31, we show four payments here paid to
3  Funjet.  True?
4      A.  That's correct.
5           MR. SUAREZ:  Object to form.
6      A.  That's what it shows.
7      Q.  (BY MR. WEGLARZ)  There's also a payment to CSA
8  Insurance.  Is that correct?
9      A.  That's the fifth one, yes.
10     Q.  And who operates CSA Insurance?
11     A.  I don't know who operates it.  That's a
12  different entity from Funjet.
13     Q.  Is that a VTG entity?
14     A.  I don't think it's a VTG entity.  I think it's
15  a company that offers insurance.
16     Q.  And then let's move along to Page 33, which is
17  Page 3 of the booking confirmation, and see where it
18  says, "Additional travel details"?
19     A.  Yes.
20     Q.  It says, "Documents/tickets," and then right
21  beneath that it says, "Funjet will e-mail your
22  documents/tickets approximately one week after your
23  booking is paid in full."
24          Did I read that correctly?
25          MR. SUAREZ:  Object to form.

Page 202

1      A.  That's correct.
2      Q.  (BY MR. WEGLARZ)  And the document/tickets that
3  are sent as contemplated in this paragraph, we're
4  talking about the travel itinerary that we'd discussed
5  ad nauseam previously.  Correct?
6           MR. SUAREZ:  Object to form.
7      A.  That's correct.
8      Q.  (BY MR. WEGLARZ)  And actually you're the one
9  who physically sent out the itinerary, but you explained
10  the itinerary is a Funjet itinerary.  Correct?
11          MR. SUAREZ:  Object to form.
12     Q.  (BY MR. WEGLARZ)  You can answer.
13     A.  Yes.
14     Q.  So actually, Funjet is allowing you to go ahead
15  and e-mail their itineraries, correct, they're
16  authorizing you to do that?
17          MR. SUAREZ:  Object to form.
18     Q.  (BY MR. WEGLARZ)  Go ahead.
19     A.  Yes.
20     Q.  And then if we look at Page 54 of Exhibit 1,
21  which is the travel itinerary for the Beaches trip, are
22  you with me?
23     A.  Yes.
24     Q.  If you look at Page 54 and the Funjet Vacations
25  itinerary, it says right at the top here, "Need help?"

Page 203

1  Call your travel agent or Funjet Vacations at
2  800-558-3060."  Correct?
3           MR. SUAREZ:  Objection; form.
4      A.  That's correct.
5      Q.  (BY MR. WEGLARZ)  So Funjet is saying, hey,
6  customer, if you need help regarding this vacation or
7  trip, call your travel agency or call us, we will help
8  you.  Correct?
9           MR. SUAREZ:  Object to form.
10     A.  They -- yes, they could call, they could
11  contact Funjet.  However, Funjet will not speak with
12  them.  They will push you back to your agent.
13     Q.  (BY MR. WEGLARZ)  Lucky you.
14     A.  Yeah.
15     Q.  But at least according to the traveler, when
16  they see this itinerary, wow, Funjet is helping me out
17  on this.  In fact, if I need help, they're saying I can
18  give them a call.  Right?
19          MR. SUAREZ:  Object to form.  That's not
20  what it says.  It misstates the document.
21     Q.  (BY MR. WEGLARZ)  Do you agree with my --
22     A.  It says if you need help, call a travel agent
23  or Funjet Vacations at their telephone number.
24     Q.  Right.  Right.
25          And then if we look at Page 57 of the same

Page 204

1  itinerary, we briefly talked about this.  Do you see
2  where it says, "Important notice"?  It says, "The Mark
3  Travel Corporation, its employees, officer, directors
4  and shareholders," and then it says, "collectively
5  Funjet Vacations."  Right?
6      A.  Correct.
7      Q.  Basically they're saying, hey, Mark Travel
8  Corporation, its employees, its directors, officers and
9  shareholders are collectively really Funjet Vacations.
10  Right?
11          MR. SUAREZ:  Object to form.
12     A.  I assume so, yes.
13     Q.  (BY MR. WEGLARZ)  Is that how you read this?
14     A.  Yes.
15     Q.  As a normal person?  Yes?
16          MR. SUAREZ:  Object to form.
17     A.  Yes.
18     Q.  (BY MR. WEGLARZ)  Oh, and --
19          MR. SUAREZ:  Object to form as to "normal
20  person."
21          MR. WEGLARZ:  Hey, I think he's a normal
22  person.  I disagree with your assessment.
23          MR. SUAREZ:  No, but he can't testify as to
24  what other normal persons say.
25          MR. WEGLARZ:  That's why they call it

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

ARRIOLA, STETSON
10/17/2019

Pages 205–208

Page 205

1 litigation.
2          MR. GIBSON: All right. Come on, guys.
3 Let's go.
4          MR. WEGLARZ: It's a Florida thing.
5          MR. GIBSON: Let's finish up.
6     Q. (BY MR. WEGLARZ) All right. Mark Travel does
7 pay money to Vacations To Go. Right?
8     **A. Yes, they pay commissions.**
9     Q. And that's how Vacations To Go, that's how it
10 earns revenues. Correct?
11    **A. (Nodding head.)**
12    Q. And that's how Vacations to Go, in turn,
13 compensates its staff. Correct?
14    **A. Yes.**
15    Q. Is Tara Wicker the BDM from Funjet?
16    **A. She is the current one, yes.**
17    Q. And she's been the BDM from Funjet for quite a
18 while. Correct?
19    **A. For a very long time, yes.**
20    Q. As you recall it?
21    **A. As I recall, yes.**
22    Q. She was the BDM back in 2015?
23    **A. I don't remember then but could be.**
24    Q. You guys still sell Beaches and Sandals resort
25 vacations. Right?

Page 206

1     **A. That is correct.**
2     Q. And the BDM is still coming in at least once a
3 year to do these training sessions?
4          MR. SAFRA: Objection; form.
5     **A. I do believe so, yes.**
6     Q. (BY MR. WEGLARZ) Have they mentioned anything
7 about the sex assault issues that have hit the media?
8     **A. Not that I can recall.**
9          MR. GIBSON: Objection; form.
10    Q. (BY MR. WEGLARZ) Have they mentioned anything
11 about the sex assault issues that hit the media
12 concerning Jamaica?
13         MR. SAFRA: Objection; form.
14         MR. SUAREZ: Object to form.
15    Q. (BY MR. WEGLARZ) Go ahead.
16    **A. Not that I can recall.**
17    Q. It's still business as usual from Sandals,
18 isn't it?
19         MR. GIBSON: Objection; form.
20         MR. SAFRA: Objection; form.
21         MR. SUAREZ: Object to form.
22    Q. (BY MR. WEGLARZ) You haven't noticed anything
23 different from Sandals when they come in to do the
24 training sessions. Right?
25    **A. Not that I can recall.**

Page 207

1          MR. SAFRA: Objection; form.
2     Q. (BY MR. WEGLARZ) Has there ever been a
3 discussion or a meeting regarding how are we going to
4 handle the incidents happening in the Dominican Republic
5 or the incidents that were occurring in Mexico a couple
6 years ago? Do you remember anything like that?
7          MR. GIBSON: Objection; form.
8          MR. SUAREZ: Objection; form.
9     **A. Within VTG?**
10    Q. (BY MR. WEGLARZ) Yes.
11    **A. No meetings.**
12    Q. Any suggestions, any talk about, you know,
13 should we disclose this to clients, how should we do it,
14 anything along those lines?
15         MR. SUAREZ: Object to form.
16    **A. We received an e-mail. If clients ask about**
17 **it, how to respond and how to assist them especially if**
18 **they wanted to cancel or move destinations.**
19    Q. (BY MR. WEGLARZ) And who sent the e-mail?
20    **A. I don't recall.**
21    Q. One of the higher-ups?
22    **A. Yes.**
23    Q. From VTG?
24    **A. Yes.**
25    Q. They say, look, here's how we're going to

Page 208

1 handle this situation. If they ask, then provide them
2 info. Correct?
3          MR. GIBSON: Objection; form.
4     **A. Provide them with the options to be able to**
5 **cancel or relocate.**
6     Q. (BY MR. WEGLARZ) What if they --
7     **A. If they request to cancel or relocate.**
8     Q. What if they don't ask or mention anything
9 about it, did it say how you would handle that?
10    **A. They wouldn't call or ask.**
11    Q. Don't disclose anything about what's going on
12 in the Dominican or in Mexico if they don't specifically
13 inquire about it. Correct?
14         MR. GIBSON: Objection; form.
15         MR. SUAREZ: Objection; form.
16    **A. If they don't call --**
17    Q. (BY MR. WEGLARZ) Go ahead.
18    **A. If they don't call --**
19         MR. SUAREZ: Really, Todd? Are we going to
20 talk about all the 180 countries in the world? Come on.
21         MR. WEGLARZ: No, just those two.
22    Q. (BY MR. WEGLARZ) Kind of a don't ask, don't
23 tell. Right?
24         MR. GIBSON: Objection; form.
25         MR. SUAREZ: Object to form.

ARRIOLA, STETSON
10/17/2019

Pages 209–212

Page 209

1    Q.  (BY MR. WEGLARZ)  By the way, VAX is actually
2  Mark Travel's system that it uses.  Correct?
3            MR. SUAREZ:  Object to form.
4    A.  I assume.
5    Q.  (BY MR. WEGLARZ)  That's not VTG's system?
6    A.  Not VTG's system.
7            MR. SUAREZ:  Object to form.
8    Q.  (BY MR. WEGLARZ)  Mark Travel and Funjet are
9  giving special access rights to VTG to use it so that
10 you can do bookings and reservations through them.
11 Correct?
12           MR. GIBSON:  Objection; form.
13           MR. SUAREZ:  Objection; form.
14    A.  I assume so.
15    Q.  (BY MR. WEGLARZ)  Did you say earlier that it's
16 possible that the Sandals BDM training sessions were not
17 occurring until after February of 2015?  I may have
18 misunderstood you.
19    A.  I just don't remember.  I don't recall.
20    Q.  Is it fair to say that, as long as you recall
21 working at VTG, you recall Sandals coming in at least
22 once a year doing these BDM training sessions?
23    A.  That, I don't --
24           MR. SAFRA:  Objection; form.  Asked and
25 answered.

Page 210

1    A.  That, I don't recall.
2    Q.  (BY MR. WEGLARZ)  Do you recall Sandals BDMs
3  doing these training sessions, as far back as you recall
4  Sandals having BDMs?
5            MR. SAFRA:  Objection; form.  Asked and
6  answered multiple times.
7            MR. WEGLARZ:  Sure.
8            (Brief interruption.)
9            MR. SAFRA:  Luis, can you put yourself on
10 mute so I can hear the witness?  What was the answer?
11    A.  I don't recall.
12    Q.  (BY MR. WEGLARZ)  Do you recall who the Sandals
13 BDMs were?
14           MR. SAFRA:  Objection; asked and answered.
15    A.  No, I do not recall.
16    Q.  (BY MR. WEGLARZ)  Hunter Smith, does that ring
17 a bell?
18    A.  That rings a bell.
19    Q.  Is he still the BDM?
20    A.  I do believe so.
21    Q.  Do you recall there being a Sandals BDM other
22 than Hunter Smith?
23    A.  I do not recall.
24    Q.  Do you sometimes get e-mails from Hunter Smith?
25    A.  Yes.

Page 211

1    Q.  And when I Google Sandals BDM, I get this
2  directory that lists the BDMs for the State of Texas.
3  For example, right here do you see here on my laptop it
4  says, "Southeast Texas:  Hunter Smith."
5            Do you see that?
6            MR. SAFRA:  Objection; form.  I am not
7  there.  To show the witness Internet sites that can't be
8  verified later that aren't printed and acceptable, to be
9  entered as an exhibit and also exceeds the scope of my
10 cross and you're asking these questions, this is
11 entirely improper and I object to the entire line or
12 usage or looking at a computer screen.
13           MR. WEGLARZ:  All right.  Well, I assure
14 you it does not exceed the scope.
15           MR. SAFRA:  Anything you Google can change
16 in a few minutes.  If you want to use the screen, you
17 can print it out and enter it as an exhibit.  It is
18 entirely improper for the manner in which this
19 deposition has been agreed to be taken.
20           MR. WEGLARZ:  Let's just get this done.
21           MR. SAFRA:  It exceeds the scope of cross.
22    Q.  (BY MR. WEGLARZ)  Now, on this directory here,
23 under Hunter Smith --
24           MR. SAFRA:  I object again.  Then this depo
25 is done.  Then this depo is done.

Page 212

1            MR. WEGLARZ:  You're canceling --
2            MR. SAFRA:  Just stop --
3            MR. WEGLARZ:  -- the depo?
4            MR. SAFRA:  Excuse me.  Let me finish my
5  statement.  You are Googling.  I propose this exceeds
6  the cross.  You didn't do this on direct.  You are
7  pulling up things on an Internet screen while people
8  are -- I've agreed as a courtesy to attend this
9  deposition by telephone, and you're showing it to the
10 witness, and we don't have an opportunity to look at it.
11 You can print it.  You can e-mail it to everybody.  You
12 can enter it as an exhibit.  But you cannot pull up and
13 not enter it as an exhibit and show it to a witness, and
14 we have no way to look at the truthfulness, completeness
15 or anything of this document.  So if you're going to
16 proceed in this manner, yes, let's get the judge on the
17 phone.  Or let's cancel the depo and suspend it and come
18 back another day.
19           MR. WEGLARZ:  Okay.  But this is not your
20 witness.
21           MR. SAFRA:  But you can't conduct the
22 deposition this way, because we have no way to look at
23 your -- what you're using.
24           MR. WEGLARZ:  Okay.  Your objection is
25 noted.  This is going to take 20 seconds, Steve.

ARRIOLA, STETSON
10/17/2019

Pages 213–216

Page 213

1    MR. SAFRA:  Then take a picture of it,
2  print it, and you can have a solution to your problem.
3  But you can't continue the deposition without it.
4         MR. WEGLARZ:  Says who?
5         MR. SAFRA:  You can take a picture and
6  e-mail it to me.  I want to know what website you're
7  looking at.  I want to know if it's an official website.
8  I have a right to know what you're doing.
9         MR. WEGLARZ:  Steve, I just want to get
10  through this.  Okay?
11         MR. SAFRA:  So take a picture, print it and
12  e-mail it.  Otherwise, the deposition stops right now.
13         MR. WEGLARZ:  And why are you screaming?
14  You're screaming really loud.  It's really coming
15  through over here.
16         MR. SAFRA:  Because you're proceeding to
17  ask questions.
18         MR. WEGLARZ:  This is just silly.  All
19  right.  But please stop screaming.
20         MR. SAFRA:  I'm on speaker phone.  I'll
21  stop screaming.
22         MR. WEGLARZ:  This is just silly.
23         MR. SAFRA:  Go off the record.  Do your
24  thing.  Send me a copy.  Then you can ask your question.
25         MR. WEGLARZ:  Okay.

Page 214

1         MR. SAFRA:  That's not how we do things in
2  Florida.
3         Are we back on the record?
4         THE REPORTER:  We're still on the record.
5         MR. SAFRA:  On the record I just received
6  a picture where the website address says
7  "taportal.sandals.com/bdm," and there are some names
8  that are referenced and there is no verification of the
9  owner or host of this website, whose website it is, how
10  it's been accessed or anything of that sort.  The
11  screenshot has been sent to me, and I have a copy.
12         MR. WEGLARZ:  Can I proceed now?
13         MR. SAFRA:  Depends on the question.
14         MR. WEGLARZ:  Okay.
15         MR. SAFRA:  I don't know whose website this
16  is.
17         MR. WEGLARZ:  You just read it into the
18  record.
19         MR. SAFRA:  This is not -- I read the
20  address.  Do you know that there are government state
21  websites that have information and addresses and reports
22  to government websites?  But from the look at the logo
23  on this website, I can't verify that this is a Sandals
24  website.
25         MR. WEGLARZ:  Well, Sandals owns the

Page 215

1  Sandals.com domain.
2         MR. SAFRA:  But this isn't Sandals.com.
3  This is taportal.sandals.com.  There are addresses that
4  look like government websites, and they change letters
5  and add a word and they could look like it.
6         MR. WEGLARZ:  I know, but this isn't a
7  governmental -- a fake government website.
8         MR. SAFRA:  This is not www.sandals.com,
9  which is a Sandals brand website.
10         MR. WEGLARZ:  Okay.  Can I just finish,
11  please?
12         MR. SAFRA:  Depends on the question.
13    Q.  (BY MR. WEGLARZ)  Mr. Arriola, continuing, for
14  Hunter Smith, do you see the e-mail address that is
15  listed under his name is hsmith@uvi.sandals.com?
16    A.  Yes.
17    Q.  Does that refresh your memory that you received
18  e-mails from this e-mail address from Mr. Smith?
19    A.  I can't recall if it's that --
20         MR. SAFRA:  Objection; form.
21    A.  -- e-mail address.
22    Q.  (BY MR. WEGLARZ)  Do you recall getting e-mails
23  with UVI in the e-mail address?
24    A.  I can't recall.
25         MR. SAFRA:  Objection; form.

Page 216

1         MR. WEGLARZ:  See, that's it.  It's very
2  harmless, very benign.  Everyone's blood pressure is up.
3         MR. SAFRA:  Are you done?
4         MR. WEGLARZ:  No.
5         MR. SAFRA:  You said that was it.  I wasn't
6  sure.
7         MR. WEGLARZ:  That was it on this very
8  objectional line of questioning.
9    Q.  (BY MR. WEGLARZ)  What percentage of your
10  bookings are for Sandals, Beaches Resorts?
11    A.  I do not know.
12         MR. SAFRA:  Objection; form.  Outside of
13  the scope of the cross.  Please give me an opportunity
14  to object.
15    Q.  (BY MR. WEGLARZ)  Any idea, 5 percent?
16    A.  I do not know.
17    Q.  Greater than 5?
18         MR. SAFRA:  Same objection.
19    Q.  (BY MR. WEGLARZ)  Greater than 50?
20         MR. SAFRA:  Same objection.  Same
21  objection.
22    A.  I do not know.
23    Q.  (BY MR. WEGLARZ)  You knew that this group of
24  travelers, being Desantis, the Torralvas and Bater, that
25  they were not familiar with Jamaica?

1    **A. I do not know.**

2        MR. SUAREZ: Objection; form.

3    Q. (BY MR. WEGLARZ) You didn't know either way?

4    **A. I do not know.**

5    Q. Did they give you any reason to believe that

6 they were very familiar with Jamaica?

7        MR. SUAREZ: Object to form.

8    **A. I do not know.**

9    Q. (BY MR. WEGLARZ) Have you ever heard of a Leo

10 Malcolm, who may be affiliated with Sandals?

11    **A. I do not know.**

12        MR. SAFRA: Objection; form.

13    Q. (BY MR. WEGLARZ) I think that's all I have.

14 Just give me one second.

15        I do want to ask you this. You would agree

16 with me Ms. Desantis never said that -- she never

17 specifically told you, oh, I can bind the other three on

18 these arrangements. Correct? She never said that to

19 you specifically?

20        MR. SUAREZ: Objection to the form.

21    **A. I do not recall.**

22    Q. (BY MR. WEGLARZ) Because she was calling and

23 making arrangements for three others besides herself,

24 you would agree, you would just assume that obviously

25 she was acting on their behalf?

1        MR. SUAREZ: Object to the form.

2    **A. That's if the phone conversation was just**

3 **between me and her.**

4    Q. (BY MR. WEGLARZ) I'm sorry. Say that again.

5    **A. That's if the phone conversation was, I guess,**

6 **assuming between her and myself, but I don't recall.**

7    Q. Fair enough.

8        Okay. That's it. Thank you.

9        FURTHER EXAMINATION

10 BY MR. SUAREZ:

11    Q. I've got a couple of questions, Mr. Arriola. I

12 won't be long.

13        The first is, if I go back to Page 31, we

14 talk about the payments on the bottom of Page 31. To be

15 sure, Ms. Desantis gave you the credit cards, and you

16 processed them through the VAX system. Correct?

17    **A. That is correct.**

18    Q. No one in Ms. Desantis party gave the payment

19 directly to Mark Travel or Funjet. Is that correct?

20        MR. WEGLARZ: Objection; form.

21        MR. GIBSON: Objection; form.

22        MR. SUAREZ: I'm sorry?

23        MR. WEGLARZ: We're objecting to the form,

24 that's all.

25    Q. (BY MR. SUAREZ) Did anybody -- did anybody --

1 did Ms. Desantis, Ms. Torralva, Ms. Torralva or

2 Ms. Bater provide to Funjet any payment directly, to

3 your knowledge?

4        MR. WEGLARZ: Same objection.

5    **A. To my knowledge, no.**

6    Q. (BY MR. SUAREZ) Did Funjet or Mark Travel ever

7 e-mail any of your clients, being Ms. Torralva,

8 Ms. Torralva, Ms. Bater, Ms. Desantis directly?

9    **A. To my knowledge, no.**

10    Q. You testified earlier that if one of your

11 clients in 2015 had received an itinerary with the 1-800

12 number for Funjet Vacations, Funjet Vacations had, as a

13 policy at that time, to push those people back to their

14 travel agent. Is that correct?

15    **A. That is correct.**

16        MR. WEGLARZ: Form objection. Calls for

17 speculation, but go ahead.

18        MR. SUAREZ: No, it doesn't call for

19 speculation.

20    Q. (BY MR. SUAREZ) In 2015 are you aware that

21 Funjet had as a policy to push anybody that called them

22 directly back to their travel agent like Vacations To

23 Go?

24        MR. WEGLARZ: Same objection. Go ahead.

25    **A. That is correct. They would always -- anytime**

1 **a client would call the wholesaler or provider or tour**

2 **operator, that tour operator would direct them back to**

3 **the agent.**

4    Q. (BY MR. SUAREZ) If we go back quickly to

5 Page 47, Mr. Weglarz read you the first part of the

6 sentence, but he didn't read you the second part of the

7 sentence, so I want to make sure that you read that. It

8 says, "The Mark Travel Corporation, its employees,

9 officers, directors, shareholders, collectively Funjet

10 Vacations, does not own, operate, control any hotels or

11 any air, land or water transportation vehicles or any

12 companies of any kind including without limitations

13 airplanes, helicopters, boats, rent-a-cars, ground

14 transportation vehicles," et cetera.

15        Did you -- do you see where that is

16 written?

17    **A. Yes.**

18    Q. Did you ever indicate to your clients that that

19 was not true?

20    **A. No.**

21    Q. Did you ever hear from Ms. Desantis,

22 Ms. Torralva, Ms. Torralva or Ms. Bater that they were

23 somehow confused by that sentence?

24    **A. I'm not believing so, no.**

25    Q. Okay. I have no further questions,

**ARRIOLA, STETSON**
10/17/2019

Pages 221–224

---

Page 221

1    Mr. Arriola. Thank you again for your time. I
2   appreciate it.
3      **A. Thank you.**
4          MR. WEGLARZ: Are we all set?
5          MR. GIBSON: Luis, you got anything?
6          MR. SUAREZ: I just finished. I think
7   you're asking to Steve.
8          MR. WEGLARZ: Yeah, Steve.
9          MR. SAFRA: I'm fine.
10        MR. WEGLARZ: All right. Then we're done.
11        MR. SUAREZ: Thank you very much everybody.
12       **THE WITNESS: Thank you.**
13     (Proceedings concluded/recessed at 3:58 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 222

1         CHANGES AND SIGNATURE
2   WITNESS NAME: STETSON ARRIOLA
3   DATE OF DEPOSITION: OCTOBER 17, 2019
4   PAGE LINE     CHANGE        REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

---

Page 223

1      I, STETSON ARRIOLA, have read the foregoing
2   deposition and hereby affix my signature that same is
3   true and correct, except as noted above.
4
5
6           _____
7         STETSON ARRIOLA
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 224

1   THE STATE OF _____)
2   COUNTY OF _____)
3
4      Before me, _____, on
5   this day personally appeared STETSON ARRIOLA, known to
6   me (or proved to me under oath or through
7   _____) (description of identity
8   card or other document) to be the person whose name is
9   subscribed to the foregoing instrument and acknowledged
10  to me that they executed the same for the purposes and
11  consideration therein expressed.
12      Given under my hand and seal of office this
13  _____ day of _____, _____.
14
15           _____
16         NOTARY PUBLIC IN AND FOR
17         THE STATE OF _____
18         COMMISSION EXPIRES: _____
19
20
21
22
23
24
25

---

ARRIOLA, STETSON
10/17/2019

Pages 225–228

Page 225

```
1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF FLORIDA

3                    MIAMI DIVISION

4    PAITON E. BATER, AMBER R.    )

5    TORRALVA, JANET DESANTIS,     )

6    AND MARGARET A. TORRALVA      )

7                                  )

8            PLAINTIFFS,           )

9                                  ) CIVIL ACTION

10   VS.                           )

11                                 ) NO.: 1:17-cv-21703

12                                 )

13   UNIQUE VACATIONS, INC., a     )

14   Delaware Corporation, THE     )

15   MARK TRAVEL CORPORATION, a    )

16   Nevada Corporation d/b/a      )

17   Fun Jet Vacations, DWIGHT     )

18   DAVIS, JERMAINE DYER, and     )

19   WILLIAM TAPPER, Jointly       )

20   and Severally                 )

21                                 )

22            DEFENDANTS.   )

23   -----------------------------------

24

25              REPORTER'S CERTIFICATION
```

Page 226

```
1           DEPOSITION OF STETSON ARRIOLA

2                OCTOBER 17, 2019

3

4        I, Velma C. LaChausse, Shorthand Reporter and

5    Notary Public in and for the State of Texas, hereby

6    certify to the following:

7

8        That the witness, STETSON ARRIOLA, was duly sworn

9    by the officer and that the transcript of the oral

10   deposition is a true record of the testimony given by

11   the witness;

12

13       That the deposition transcript was submitted on

14   _____ to the witness or to the attorney

15   for the witness for examination, signature and return to

16   me by _____;

17

18       That the amount of time used by each party at the

19   deposition is as follows:

20   Mr. Todd J. Weglarz.....03 HOUR(S):58 MINUTE(S)

21   Mr. Steven R. Safra.....00 HOUR(S):20 MINUTE(S)

22   Mr. Luis E. Suarez.....00 HOUR(S):34 MINUTE(S)

23   Mr. George R. Gibson.....00 HOUR(S):00 MINUTE(S)

24

25       That pursuant to information given to the
```

Page 227

```
1    deposition officer at the time said testimony was taken,

2    the following includes counsel for all parties of

3    record:

4        Mr. Todd J. Weglarz, Counsel for Plaintiffs;

5        Mr. Steven R. Safra and Mr. Dimitri Singh (Via

6    Telephone), Counsel for Unique Vacations, Inc.;

7        Mr. Luis E. Suarez, Esq. (Via Telephone), Counsel

8    for Defendant Mark Travel Corp.;

9        Mr. George R. Gibson, Counsel for Non-Party Witness

10   Stetson Arriola

11

12       That $_____ is the deposition officer's

13   charges to the Plaintiffs for preparing the original

14   deposition transcript and any copies of exhibits;

15

16       I further certify that I am neither counsel for,

17   related to, nor employed by any of the parties or

18   attorneys in the action in which this proceeding was

19   taken, and further that I am not financially or

20   otherwise interested in the outcome of the action.

21

22       Certified to by me this 27th day of October, 2019.

23

24

25       _____
```

Page 228

```
1    Velma C. LaChausse

2    Notary Public in and for the

3    State of Texas

4    Commission Expiration:  03/22/2022

5    U.S. Legal Support, Inc.

6    Firm Registration # 122

7    16825 Northchase Drive

8    Suite 800

9    Houston, Texas 77060

10   (713) 653-7100

11   (713) 653-7143 Fax

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```