# EXHIBIT 16

# In the Matter Of:

# BATER, ET AL. vs UNIQUE VACATIONS, INC., ET AL.

## TAMMY GONZALEZ

October 03, 2019

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

GONZALEZ, TAMMY
10/03/2019

Pages 1–4

## Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
            CASE NO.:  1:17-cv-217013-COOK/GOODMAN
 3
 4   PAITON E. BATER, AMBER R. TORRALVA, JANET DESANTIS,
     and MARGARET A. TORRALVA,
 5
                    Plaintiffs,
 6
     vs.
 7
     UNIQUE VACATIONS, INC., a Delaware corporation, THE
 8   MARK TRAVEL CORPORATION, a Nevada Corporation d/b/a
     Fun Jet Vacations, DWIGHT DAVIS, JERMAINE DYER, and
 9   WILLIAM TAPPER, Jointly and Severally,
10       Defendants.
     _____/
11
12
13          DEPOSITION OF TAMMY GONZALEZ
                 Pages 1 through 187
14
15
16
17
               Wednesday, October 3, 2019
18               10:33 a.m. to 4:00 p.m.
              9150 South Dadeland Boulevard
19                    Suite 1400
                  Miami, Florida 33156
20
21
22
23
24          Stenographically Reported By:
             GYPSY FERREIRA-MACIAS, FPR
25           Florida Professional Reporter
```

## Page 2

```
 1                    APPEARANCES
 2
 3   On Behalf of the Plaintiffs:
 4     FIEGER, FIEGER, KENNEY & HARRINGTON, PC
       19390 West Ten Mile Road
 5     Southfield, MI 48075
       Tel.:  248-355-5555
 6     Email:  tweglarz@fiegerlaw.com
       BY:  TODD J. WEGLARZ, ESQ.
 7
 8   On Behalf of the Defendant, Unique Vacations:
 9     COLE, SCOTT & KISSANE, P.A.
       9150 South Dadeland Boulevard
10     Suite 1400
       Miami, FL 33156
11     Tel.:  305-350-5381
       Email:  thomas.scott@csklegal.com
12     BY:  THOMAS E. SCOTT, JR.,
            STEVEN SAFRA, ESQ. (via phone)
13
14   On Behalf of the Defendant, Mark Travel:
15     BOIES, SCHILLER & FLEXNER, LLP
       100 Southeast 2nd Street
16     Suite 2800
       Miami, FL 33131
17     Tel.:  305-539-8400
       Email:  lsuarez@bsfllp.com
18     BY:  LUIS E. SUAREZ, ESQ.
19
     Also present:  Dmitri Singh, Esq.,
20                  Sandals Resorts
21
22
23
24
25
```

## Page 3

```
 1                INDEX OF PROCEEDINGS
 2   Deposition of Tammy Gonzalez         Page
 3   Direct Examination by Mr. Weglarz       5
 4   Cross-Examination by Mr. Suarez       165
 5   Redirect Examination by Mr. Weglarz   166
 6   Recross-Examination by Mr. Scott      174
 7   Certificate of Oath                   184
 8   Certificate of Reporter               185
 9   Read and Sign Letter                  186
10   Errata Sheet                          187
11
12
13
14
15              PLAINTIFFS' EXHIBITS
16   Number   Description                  Page
17    1       Re-Notice of Taking Duces Tecum
             Deposition of Tammy Gonzalez     7
18
      2       Sandals Resorts and Beaches Resorts
19           Code of Conduct for Travel Agents  8
20    3       Subcontract Agreement between
             UVI and UTC                      15
21
      4       Print Screenshot                 32
22
      5       1/5/15 Sandals Resorts -
23           Tour Operator Agreement          49
24    6       3/26/15 Email from PB Customer Solutions
             to Leo Malcolm and Libby Thornton  87
25
```

## Page 4

```
 1            PLAINTIFFS' EXHIBITS (CONT'D)
 2   Number   Description                  Page
 3    7       11/8/10 D.O.T. Consent Order    125
 4    8       Travel Agents Partnership Agreement  142
 5    9       History of Hotel Change from Moon
             Palace to Beaches on 5/1/15      163
 6
 7            DEFENDANTS' EXHIBITS
 8   Number   Description                  Page
 9    10      Notice of Voluntary Dismissal-
             Robyn Shouldice vs. Unique Vacations  176
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

GONZALEZ, TAMMY
10/03/2019

Pages 5–8

---

Page 5

1  Deposition of Tammy Gonzalez, taken before Gypsy
2  Ferreira-Macias, Florida Professional Reporter and
3  Notary Public in and for the State of Florida at Large
4  in the above cause.
5                      * * * *
6          THE COURT REPORTER:  Do you swear or
7      affirm to tell the truth, the whole truth,
8      and nothing but the truth?
9      **THE WITNESS:  Yes.**
10         MR. WEGLARZ:  Okay.  This is Todd Weglarz
11     appearing on behalf of the plaintiff.
12         MR. SCOTT:  Tom Scott on behalf of UVI.
13         MR. SUAREZ:  Luis Suarez on behalf of The
14     Mark Travel Corporation.
15         MR. WEGLARZ:  Okay.  We're here for the
16     deposition of Ms. Tammy Gonzalez, taken
17     pursuant to notice and agreement of counsel.
18 THEREUPON,
19                      TAMMY GONZALEZ,
20 having been first duly sworn, was examined and
21 testified as follows:
22              DIRECT EXAMINATION
23 BY MR. WEGLARZ:
24     Q.  Good morning, Ms. Gonzalez, how are you?
25     **A.  Fine, thank you, and you?**

---

Page 6

1      Q.  Doing well.  As you know, my name is Todd
2  Weglarz.  I represent the plaintiffs on this case.
3  I'm going to ask you some questions this morning about
4  yourself and about your role with UVI and about the
5  underlying incident, of course.  If at any time you do
6  not understand a question, let me know and I'll do my
7  best to rephrase it for you; fair enough?
8      **A.  Yes.**
9      Q.  For the record, can you give us your full and
10 complete name?
11     **A.  Tammy Lynn Gonzalez.**
12     Q.  And, Ms. Gonzalez, I'm told I never ask a
13 lady her age, so I'll ask you your date of birth.
14     **A.  November 5, 1960.**
15     Q.  And where do you reside?
16     **A.  Miami, Florida.**
17     Q.  And how long have you resided in Miami?
18     **A.  Since 1983 or 2, long time.**
19     Q.  Do you maintain any other residences other
20 than in Miami?
21     **A.  No.**
22     Q.  And did you get a chance to review your
23 notice of deposition?
24     **A.  Yes.  It's one of the things you provided?**
25         MR. SCOTT:  Yeah.

---

Page 7

1          She glanced at it.
2          (Plaintiffs' Exhibit No. 1 was marked for
3  identification, a copy of which is attached hereto.)
4  BY MR. WEGLARZ:
5      Q.  Okay.  And, Ms. Gonzalez, we've marked as
6  Exhibit No. 1, the notice of deposition, and you did
7  have a chance to review that, obviously, before your
8  deposition here today, correct?
9          MR. SCOTT:  I just want to repeat what I
10     emailed you, just so it's on the record that
11     we don't recognize this as appropriate form
12     of discovery.  We're not producing any
13     documents pursuant to it.  We'll produce all
14     of the documents pursuant to the request for
15     production that we have, and we've complied
16     with that, so --
17         MR. WEGLARZ:  And I appreciate your
18     objection.  Go ahead.
19     **THE WITNESS:  I'm sorry, what was the**
20     **question?**
21 BY MR. WEGLARZ:
22     Q.  Do you remember the question?
23     **A.  No.**
24     Q.  Okay.  You did review the notice of
25 deposition before we started your deposition,

---

Page 8

1  correct?
2      **A.  Yes, briefly.**
3      Q.  Okay.  And did you review the record requests
4  that are set forth in this notice?
5      **A.  Briefly.**
6      Q.  Okay.  Does UVI have records and documents
7  responsive to this request?
8      **A.  Well, I'll have to look at them all again,**
9  **but I don't believe so, so --**
10         MR. SCOTT:  Again, we produced to you
11     everything that we had pursuant to your six
12     or five requests for production that you've
13     given us, and we're not producing documents
14     pursuant to this document, unless they've
15     been previously provided under the request
16     for production, and I've advised my client of
17     that, so that's their answer basically.
18         MR. WEGLARZ:  Okay.  Let's mark that.
19         (Plaintiffs' Exhibit No. 2 was marked for
20 identification, a copy of which is attached hereto.)
21 BY MR. WEGLARZ:
22     Q.  And, Ms. Gonzalez, we've marked as Exhibit
23 No. 2 a document your counsel provided to us this
24 morning.  Can you tell me what Exhibit No. 2 is?
25     **A.  Sure.  This is the code of conduct for travel**

---

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Pages 9–12

Page 9

1 agents.
2    Q.   And is this a document that UVI created?
3    A.   Yes, we sent this out to all retail travel
4 agencies.
5    Q.   And how many retail travel agencies would
6 have received Exhibit No. 2?
7    A.   Oh, I'd have to see exactly what's in the
8 database, but probably 30,000, 35,000.
9    Q.   Could you name them for me?  I'm just
10 kidding.
11        Would Vacations To Go have received Exhibit
12 No. 2?
13    A.   I would assume so.
14    Q.   What about Mark Travel?
15    A.   No.
16    Q.   And why wouldn't Mark Travel get Exhibit No.
17 2?
18    A.   Mark Travel is a tour operator and this is
19 for retail travel agents.
20    Q.   Okay.  And when would Exhibit No. 2 have been
21 presented to Vacations To Go?
22    A.   I couldn't say.  I don't know.
23    Q.   Can you give me your best estimate?
24    A.   I have no idea the date this went out.
25    Q.   Do you believe most likely it would have been

Page 10

1 sent to Vacations To Go before May of 2015?
2    A.   I am guessing.
3    MR. SCOTT:  Don't guess.
4    THE WITNESS:  Then I don't know.  I don't
5    know the date.
6 BY MR. WEGLARZ:
7    Q.   Is this something that is -- is there a usual
8 time frame where this code of conduct is usually sent
9 out?  I mean, is it usually sent out after an initial
10 contract is signed?
11    A.   It could be sent out before, for example, a
12 fam trip.  It's basically just telling travel agents
13 that they're not to solicit consumers when they're on
14 property.
15    Q.   And did you say fam trip?
16    A.   It's a familiarization trip.
17    Q.   Got it.  And what is UVI's role or
18 relationship with the 30,000 or so retail travel
19 agencies?
20    A.   We have a team of BDMs, which is a business
21 development manager, like a sales rep and they are
22 responsible for calling on travel agencies.
23    Q.   What does that mean?
24    A.   Giving them collateral materials, like
25 brochures, helping them if they're doing a trade show

Page 11

1 and they want some support, telling them if something
2 new is at the, one of the hotels, like a new
3 restaurant or a new initiative, those types of things.
4    Q.   Okay.  Does UVI provide any type of training
5 or any guidance to travel agents?
6    A.   It's more of education on the brands and the
7 amenities and features and facilities at the
8 properties.
9    Q.   And how would -- how does UVI typically carry
10 out the giving of this education to travel agents?
11    A.   They walk into travel agencies and talk to
12 them.
13    Q.   So they physically walk to the travel agents'
14 location and have a discussion with them?
15    A.   Well, they might drive.
16    Q.   I use the term loosely.
17    A.   They call on them in person, yes, as part of
18 their function.
19    Q.   Okay.  So it would be a face-to-face
20 discussion?
21    A.   Could be.
22    Q.   Would there be any written materials
23 provided?
24    A.   Not necessarily.
25    Q.   And what type of information would be shared

Page 12

1 with the travel agent during this education process?
2    A.   New room categories being created, new
3 restaurants.  Like I said, it's the features and
4 facilities of the resorts, understanding the brand.
5    Q.   And is this a one-time educational process or
6 is it -- do they periodically do it every year, every
7 couple of years as needed, how does that work?
8    A.   More as needed.  Each BDM has a territory
9 that they're responsible for, so you may see some of
10 your agents twice a year, and in some circumstances,
11 you may see them three or four times a year.
12    Q.   Are email communications ever shared with
13 these travel agents?
14    A.   From the BDMs.
15    Q.   We can start there.
16    A.   They may email an agent.
17    Q.   Would they exchange emails as part of this
18 education process?
19    A.   Not necessarily.
20    Q.   Okay.  Do you know if that's ever been
21 done?
22    A.   Not offhand.
23    Q.   Okay.  What types of things would be
24 mentioned or referenced or discussed in email
25 exchanges between BDMs from UVI and any of the retail

GONZALEZ, TAMMY
10/03/2019

Pages 13–16

Page 13

1  travel agents?
2      A.   Outside of the things I described, I -- they
3  may be asking to attend a show, a trade show with
4  them.
5      Q.   And how many BDMs are usually staffed at
6  UVI?
7      A.   We have 77 BDMs right now.
8          MR. SCOTT:  I'm sorry, how many?
9          THE WITNESS:  Seventy-seven.
10 BY MR. WEGLARZ:
11     Q.   And each one is responsible for a particular
12 territory?
13     A.   Correct.
14     Q.   And that's -- a territory is, I take it,
15 carved up geographically?
16     A.   Yes.
17     Q.   And in what geographic territory would
18 Vacations To Go fall in?
19     A.   Texas.
20     Q.   So there's one territory just for the state
21 of Texas?
22     A.   No, I believe there's three BDMs in Texas.
23 It's a big state.
24     Q.   And would VTG fall in one of those three or
25 all of those three, how does it work?

Page 14

1      A.   One of those three.
2      Q.   Okay.  And how are the three BDMs categorized
3  in Texas?  How are they labeled or what are they
4  called for those three?
5      A.   Just BDMs.
6      Q.   Okay.  So all three of those BDMss cover the
7  whole state of Texas or is that divided into thirds,
8  that's what I'm trying to figure out?
9      A.   It depends on population.  Texas -- you know
10 the middle of Texas is empty pretty much, so you might
11 have one in Dallas, one in Houston and then one all
12 the way over in El Paso.  I don't have the territories
13 in my head, but --
14     Q.   And do you know who the BDMs are for Texas?
15     A.   I don't, not off the top of my head.
16     Q.   Do you recall any of the BDMs' names for
17 Texas?
18     A.   No.
19     Q.   Do you know who the BDM was that communicates
20 with Vacations To Go?
21     A.   Not offhand.
22     Q.   Did you review anything to prepare yourself
23 for the deposition?
24     A.   Yes.
25     Q.   And what did you review?

Page 15

1      A.   My contract with UTC, interrogatories, the
2  request for documentation, what do you call that?
3          MR. SCOTT:  Production.
4          THE WITNESS:  Production.
5  BY MR. WEGLARZ:
6      Q.   Okay.  So the contract with UTC, when you
7  said your contract --
8      A.   Uh-huh.
9      Q.   Is that a contract between you and UTC
10 personally?
11     A.   Between UVI and UTC.
12     Q.   Okay.  The subcontractor agreement, the one
13 that was produced to me previously?
14     A.   Is that the one you produced?
15         MR. SCOTT:  I don't know.  Which contract
16     are you referring to?  I'd have to see it.
17         (Plaintiffs' Exhibit No. 3 was marked for
18 identification, a copy of which is attached hereto.)
19         MR. SCOTT:  Is that the one between UTC
20     and Mark Travel?
21         THE WITNESS:  No, this is UTC and UVI.
22         MR. SCOTT:  Okay.
23 BY MR. WEGLARZ:
24     Q.   All right.  I've shown you Exhibit No. 3.
25 Can you tell me what Exhibit No. 3 is?

Page 16

1      A.   This is my, meaning UVI's, contract with
2  UTC.
3      Q.   Okay.  And this is the one that you reviewed
4  to prepare yourself for the deposition, correct?
5      A.   Correct.
6      Q.   And tell me what this is?
7      A.   This is the agreement that my company would
8  provide, UVI would provide sales, marketing and
9  promotional services.
10     Q.   And this is the document that governs UVI's
11 responsibilities?
12         (Phone interruption.)
13         MR. SCOTT:  Wait a minute.  See if Safra
14     is off.  Let me get Renee.  Let's take a
15     pause for a minute so I can get him back
16     on.
17         MR. WEGLARZ:  Sure.
18         (A recess was taken in the deposition, after
19 which the deposition continued as follows:)
20 BY MR. WEGLARZ:
21     Q.   Ms. Gonzalez, does Exhibit No. 3 pretty much
22 set forth all of UVI's obligations and
23 responsibilities that it owes to UTC?
24     A.   Yes.
25     Q.   All right.  And does it set forth all of

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Page 17

1 UVI's responsibilities or work obligations as it
2 pertains to marketing and sales for the Sandals and
3 Beaches Resorts?
4     A.   Yeah, they felt that we provide marketing and
5 promotional services for them.
6     Q.   Is there any other document out there which
7 describes any other duties or responsibilities that
8 UVI has with respect to anything involving the Sandals
9 or Beaches Resorts or brands?
10     A.   Not that I'm aware of.
11     Q.   And tell me a little bit -- what's your
12 understanding as to the company Unique Travel
13 Corporation, who are they?
14     A.   I believe they are the worldwide
15 representative for Sandals and Beaches Resorts and
16 they've subcontracted marketing and promotional
17 services to UVI.
18     Q.   And those marketing and promotional services
19 actually, UVI does the exclusive marketing and
20 promotion for Sandals and Beaches throughout the
21 entire United States, correct?
22     A.   Correct.
23     Q.   Does UVI carry out that type of work for any
24 other resort brand?
25     A.   No, we don't.

Page 18

1     Q.   Okay.  Does UVI work for any other resort
2 brand between Beaches and Sandals?
3     A.   No, it's an exclusive agreement.
4     Q.   And how long has UVI been doing that?
5     A.   As long as I've worked there, so 34, 35
6 years.
7     Q.   And one of the things UVI is responsible for
8 is the obligations that UTC undertook in this SRI
9 agreement; is that true?
10        MR. SCOTT:  What are you referring to,
11     where in the contract?
12        MR. WEGLARZ:  Exhibit No. 3.
13        MR. SCOTT:  I understand, but is there a
14     specific provision you're referring to so she
15     can review?
16 BY MR. WEGLARZ:
17     Q.   Let me back up.  Exhibit No. 3 references an
18 SRI agreement; is that correct?
19        MR. SCOTT:  You want to take a minute and
20     review the document.
21 BY MR. WEGLARZ:
22     Q.   It's on page one.
23     A.   I see it here.  Uh-huh.  Yes, sorry.
24     Q.   Okay.  And by the way, this subcontractor
25 agreement between UTC and UVI was executed on January

Page 19

1 1st of 2015, correct?
2     A.   Yes.
3     Q.   And this was the agreement that was in effect
4 at the time that these incidents occurred in May of
5 2015, correct?
6     A.   It would be.
7     Q.   Okay.  And on the very first page here, it
8 references an agreement between UTC and Sandals
9 Resorts International 2000 Ltd.; do you see that,
10 first paragraph under recitals?
11     A.   Yes.
12     Q.   And that's referred to throughout the
13 document as the SRI agreement, correct?
14     A.   Yes, I see it in a few places.
15     Q.   And if you look at page 4 of Exhibit 3, at
16 the very top there, you see where it says, "The
17 representative --" By the way, "the representative" in
18 this contract refers to UVI, correct?
19     A.   Correct.
20     Q.   And UVI stands for Unique Vacations, Inc.,
21 correct?
22     A.   Correct.
23     Q.   And that's the company that you're the CEO
24 of, correct?
25     A.   Correct.

Page 20

1     Q.   And at the very top of page 4, it says, "The
2 representative shall comply with all requirements and
3 obligations imposed on the company under the SRI
4 agreement"; did I read that correctly?
5     A.   Yes, you did.
6     Q.   Okay.  And that is or that was one of the
7 responsibilities of UVI under this contract, to make
8 sure you're complying with the obligations imposed on
9 UTC under the SRI agreement; true?
10     A.   That's what it says, yeah.
11     Q.   And so I take it that for UVI, to make sure
12 that it is complying with the SRI I take it UVI had to
13 be familiar with the SRI agreement; true?
14     A.   No, it's not true.
15     Q.   Okay.  How do you make sure that you're
16 complying with an agreement if you don't know what the
17 agreement sets forth?
18     A.   I am contracted with UTC.  My assumption is
19 they put in my contract what I needed to abide by.
20     Q.   Have you ever seen the SRI agreement that's
21 referenced in Exhibit No. 3?
22     A.   No, I haven't.
23     Q.   Do you have any idea as to what obligations
24 are set forth in the SRI agreement?
25     A.   I have no idea.

GONZALEZ, TAMMY
10/03/2019

Pages 21–24

Page 21

1    Q.   Have you ever seen an agreement between UTC
2  and Sandals Resorts?
3    A.   No, I haven't.
4    Q.   Did UVI comply with all requirements and
5  obligations imposed on UTC under the SRI agreement?
6         MR. SCOTT:  Can we get a time frame on
7    this?  I mean, you have open-ended questions.
8    I mean, is it 2015, is it now or something
9    along that line?
10        MR. WEGLARZ:  I'm still talking about
11   the -- within the context of the contract.
12        MR. SCOTT:  I understand, but you asked
13   her have you always complied with this.  Can
14   be -- you know, for years they've had this
15   contract.  I mean, I'm just asking you if you
16   could give her a time frame.
17        MR. WEGLARZ:  I'll re-ask the question.
18        MR. SCOTT:  I'm not trying to give you a
19   hard time.
20        MR. WEGLARZ:  I understand and I
21   appreciate that, Mr. Scott.
22  BY MR. WEGLARZ:
23    Q.   With respect to paragraph H on page 4, where
24  it mentions that the representative, meaning UVI,
25  shall comply with all requirements and obligations

Page 22

1  imposed on the company, and the company means UTC,
2  correct?
3    A.   Yes.
4    Q.   Ms. Gonzalez?
5    A.   Yes.
6    Q.   It says, "UVI shall comply with all
7  requirements and obligations imposed on UTC under the
8  SRI agreement."  My question is, did UVI comply with
9  all such requirements and obligations under the SRI
10  agreement?
11    A.   I must assume so.  Nobody has told me we're
12  not doing something we should be doing.
13    Q.   Okay.  But you have no idea because you've
14  never seen that agreement, correct?
15    A.   I've never seen that agreement.
16    Q.   Do you know if that agreement was ever
17  provided to UVI?
18    A.   Not that I'm aware of.
19    Q.   Do you know if you or anyone else on behalf
20  of UVI ever requested to see the SRI agreement?
21    A.   Not that I'm aware of.
22    Q.   If you wanted to see the SRI agreement, how
23  would you get that?
24    A.   I don't think I could get it.  It's none of
25  my business.  I'm a marketing company.  I'm contracted

Page 23

1  to do specific functions.
2    Q.   So you really think that even though UVI
3  contractually agreed to comply with the obligations
4  imposed on UTC under this SRI agreement, you really
5  think the SRI agreement is no business of UVI's?
6    A.   Correct.  I'm contracted with UTC.  It's
7  their responsibility to tell me what it is they
8  contracted me to do.
9    Q.   And did UTC ever advise you of what they
10  expected you to do in other correspondence,
11  communications, other than what we see here in Exhibit
12  No. 3?
13    A.   Other than this contract, no.
14    Q.   What was your title with UVI back in 2015?
15        MR. SCOTT:  We're doing the old skip
16   around?
17        MR. WEGLARZ:  Little bit.
18        MR. SCOTT:  I like it.  It's a nice
19   touch.
20        MR. WEGLARZ:  'Cause we're still on the
21   document.
22        MR. SCOTT:  No, no, it's a nice touch.
23   It's a nice touch.
24        MR. WEGLARZ:  I'm trying to give it some
25   context.

Page 24

1        MR. SCOTT:  No, it's --
2        MR. WEGLARZ:  Tom, I think you're trolling
3   me.
4        MR. SCOTT:  SOP, you know.  It's SOP.
5        MR. WEGLARZ:  You can still answer
6   notwithstanding our digression.
7        MR. SCOTT:  We're just kidding.
8        MR. WEGLARZ:  I know you are.
9        THE WITNESS:  I was executive vice
10   president.
11  BY MR. WEGLARZ:
12    Q.   And when did you become executive vice
13  president?  And I am skipping around, I apologize.
14    A.   It's okay.
15        MR. SCOTT:  I'm just having fun with you.
16        MR. WEGLARZ:  Tom, it's good to see you
17   have fun once in a while.  I'm glad to see
18   it.
19        MR. SCOTT:  It's very rare.
20        MR. WEGLARZ:  I've heard.  I've seen.
21        MR. SUAREZ:  I've never heard Counsel
22   speak so much.
23        MR. SCOTT:  No comment, but you're right,
24   Counsel.
25        THE WITNESS:  Can you ask me again,

GONZALEZ, TAMMY
10/03/2019

Page 25

1    please?
2  BY MR. WEGLARZ:
3     Q.   Yes.  You said you were executive vice
4  president in 2015, correct?
5     A.   Yes.
6     Q.   When did that change?  When did you go from
7  executive vice president to CEO?  What was the next
8  progression?
9     A.   Oh, that was in the latter half of 2016.
10    Q.   So for the entire year of 2015, you were the
11 executive vice president, correct?
12    A.   I believe so.
13    Q.   As the executive vice president of UVI, would
14 you have been privy to Exhibit No. 3?
15    A.   No.
16    Q.   Who from UVI would be the most knowledgeable
17 regarding the terms of Exhibit No. 3?
18    A.   I mean, outside of me, there's --
19    Q.   Yes.
20    A.   -- really nobody else that would have this
21 contract on hand.
22    Q.   Would you have reviewed Exhibit No. 3 at any
23 time in 2015?
24    A.   Absolutely not.
25    Q.   Okay.  Who would have?

Page 26

1     A.   I am assuming it would have been the
2  president of the company at the time.
3     Q.   Okay.  Who was?
4     A.   A gentleman named Kevin Froemming.
5     Q.   And this contract is signed by Michael
6  Lamanna?
7     A.   Correct.
8     Q.   Am I saying that correctly?
9     A.   Uh-huh.
10    Q.   Is that a yes?
11    A.   Yes.
12    Q.   And Mr. Lamanna was the secretary for UVI at
13 the time, correct?
14    A.   Correct.
15    Q.   What is his position currently?
16    A.   I believe he is a vice president of finance.
17    Q.   Okay.  And it looks like the contract was
18 also signed by Carlos Bryden on behalf of UTC; is that
19 correct?
20    A.   It looks like that's the name, yeah.
21    Q.   Do you know if Mr. Bryden is still with
22 UTC?
23    A.   I don't know.
24    Q.   Have you ever communicated with Mr. Bryden?
25    A.   No, I haven't.

Page 27

1     Q.   Which individuals from UTC have you
2  communicated with?
3         MR. SCOTT:  Objection.  Form.  Overly
4  broad.
5  BY MR. WEGLARZ:
6     Q.   I'll still take an answer.  Go ahead.
7     A.   Andy Blanco, probably be it.
8     Q.   Also known as Andrew Blanco?
9     A.   Yes.
10    Q.   B-l-a-n-c-o?
11    A.   Correct.
12    Q.   Who else from UTC do you communicate with or
13 have you communicated with besides Andrew Blanco?
14    A.   It's pretty much only Andy.
15    Q.   He's your main contact?
16    A.   If I needed to contact them, yeah.
17    Q.   You couldn't call Andy and say, "Andy, can
18 you send me a copy of the SRI agreement"?
19    A.   I wouldn't do that, and I don't think he'd
20 provide it for me.
21    Q.   Why not?
22    A.   It's not my contract.
23    Q.   When did this contract here, Exhibit No. 3,
24 when did it end?
25    A.   It states in here it's a five-year

Page 28

1  contract.
2     Q.   So is this contract still in effect?
3     A.   Yes, it is signed 2015, so it would still be
4  in effect.
5     Q.   So this is still the document that sets forth
6  the relationship between UTC and UVI, correct?
7     A.   It sets forth my responsibilities, yes.
8     Q.   And those responsibilities to this day still
9  include making sure that UVI complies with all of the
10 obligations assumed by UTC under the SRI agreement,
11 correct?
12    A.   I assume so.  I've not been given any changes
13 to this document.
14    Q.   But even if UVI wanted to see what those
15 obligations were by looking at the SRI agreement,
16 you're telling me UTC would not -- they won't provide
17 that document to you even if you asked?
18    A.   I told you I don't think they would.  It's
19 not my contract.  They have what my responsibilities
20 are laid out in my contract with UTC.
21    Q.   I want to focus on Exhibit No. 1 for a few
22 minutes.  This is the notice for your deposition.  One
23 of the things that was requested, we asked that you
24 produce any records and materials that you would have
25 regarding the plaintiff's assault incident at the

GONZALEZ, TAMMY
10/03/2019

Pages 29–32

Page 29

1    Beaches Ocho Rios Resort.  Does UVI have any such
2    records or documents?
3        **A.   No, nothing outside of what we were given for**
4    **this case.**
5        Q.   All right.  What's your understanding as to
6    what was given?  What's your understanding as to what
7    those documents were?
8        **A.   I don't understand what you're asking me.**
9        Q.   Sure.  I asked you if UVI had any such
10   records that would relate to plaintiff's assault
11   incident at the resort, and I thought you said none
12   other than what was given at the start of the case?
13       **A.   Just whatever I've gotten from my legal**
14   **counsel, the request for discovery and that kind of**
15   **thing.**
16       Q.   All right.  So the only documents UVI has
17   regarding these incidents would be whatever your
18   counsel provided after this lawsuit was started?
19       MR. SCOTT:  Objection.  That's not what
20   she said.  She said whatever she gave me I
21   gave you.
22   BY MR. WEGLARZ:
23       Q.   I don't know if that's what she said, but it
24   doesn't matter.  I'll still let the question stand.
25       **A.   Say it again for me, please.**

Page 30

1        Q.   Sure.  Do you agree that the only documents
2    UVI has in its possession relating to the underlying
3    assaults concerning the plaintiffs would be whatever
4    you received from your attorney after the lawsuit was
5    started?
6        **A.   Yes, the hotels don't report to Unique**
7    **Vacations.**
8        Q.   Did you become -- when did you first become
9    aware of these incidents involving the plaintiffs?
10       **A.   When was the first paperwork that came our**
11   **way?**
12       MR. SCOTT:  The complaint.
13       **THE WITNESS:  I don't know the date that**
14   **the complaint was --**
15   BY MR. WEGLARZ:
16       Q.   That's fine.
17       **A.   -- served, but that would be been it.**
18       Q.   All right.  So prior to being served with
19   plaintiffs' complaint, you never even heard of these
20   incidents having occurred at the Beaches Ocho Rios
21   Resort, correct?
22       **A.   That's correct.**
23       Q.   With respect to item number two in the notice
24   marked as Exhibit 1, we ask for all records and
25   documents regarding the booking, scheduling and

Page 31

1    arranging of the plaintiffs' trip to the Beaches Ocho
2    Rios Resort; do you see that?
3        **A.   Yes, I do.**
4        Q.   Would UVI have any such records?
5        **A.   No, we don't.  That's not our role.  We don't**
6    **take bookings.**
7        Q.   And I appreciate your response that UVI
8    doesn't take bookings, but does UVI have custody,
9    possession or access to any of the booking,
10   scheduling-related records pertaining to this trip?
11       **A.   I can access the booking screen.  I can view**
12   **it, so if there was anything that Mr. Scott might have**
13   **asked me for, that I could have viewed in a -- in a**
14   **booking screen, but otherwise, no.**
15       Q.   And when you say you can access the booking
16   screen, how would you do that?
17       **A.   I have a log-on and I can view a reservation.**
18       Q.   And what are you logging on to, what type of
19   program?
20       **A.   It's a booking system.**
21       Q.   Okay.  What's the name of the system?
22       **A.   It's a proprietary system.  I don't think it**
23   **has a name.**
24       Q.   And this is a proprietary system that allows
25   UVI to access all bookings pertaining to all Sandals

Page 32

1    and Beaches Resorts?
2        **A.   I'm not sure how far back it goes, if I could**
3    **see everything.  It's nothing that I look at in my**
4    **normal course of duties.**
5        Q.   Did you ever log in to look at the booking
6    screen pertaining to the plaintiffs' booking and
7    registration for this particular trip?
8        **A.   I don't know what you mean by registration.**
9        Q.   All right.  Did you ever log in to the
10   booking screen to see what was there regarding the
11   plaintiffs' trip?
12       **A.   Yes, when my attorney requested it.**
13       (Plaintiffs' Exhibit No. 4 was marked for
14   identification, a copy of which is attached hereto.)
15   BY MR. WEGLARZ:
16       Q.   Okay.  I'm going to show you what we've
17   marked as Exhibit No. 4.  Does this look familiar to
18   you?
19       **A.   This looks like a screen snapshot, is what we**
20   **would call it.**
21       Q.   And does this appear to be a screen snapshot
22   similar to the booking screen you just described to me
23   a minute ago?
24       **A.   Yes.**
25       Q.   So when you would log in to the booking

GONZALEZ, TAMMY
10/03/2019

Page 33

1   screen to look for the plaintiffs' information, you
2   would have seen a screen similar to what we see here
3   on Exhibit 4?
4        A.   Similar.  Uh-huh.
5        Q.   And if we look at the top left, I think it
6   says, "UltraRes," do you see that?
7             MR. SCOTT:  Take a moment and review the
8        document before.
9             THE WITNESS:  Yes, I see that.
10  BY MR. WEGLARZ:
11       Q.   All right.  Is that -- what does that mean,
12  "UltraRes"?
13       A.   I guess that's what they named it when it was
14  built.
15       Q.   Is that the same as this program or
16  product?
17       A.   It doesn't have a name.  The IT department
18  just built it.
19       Q.   And this would be UVI's IT department?
20       A.   No, I don't have the IT department in my
21  office.
22       Q.   Okay.  Which IT department built this
23  program?
24       A.   IT is located at UVL.  This is a very old
25  system.

Page 34

1        Q.   So UVL created this booking program?
2        A.   Yes.
3        Q.   Which is accessed by UVI, correct?
4        A.   No, I have access to it.
5        Q.   Correct.
6        A.   It is not -- our course of duty is marketing
7   promotions and sales.
8        Q.   Sure.
9        A.   We don't need to reference this.
10       Q.   But you did on this case?
11       A.   Yes.
12       Q.   All right.  And how is it that you have
13  access -- are you trying to tell me you have access,
14  but not everybody from UVI has access?
15       A.   That's correct.
16       Q.   Who else at UVI would have access to the
17  booking screens besides yourself?
18       A.   I'd have to get back to you.  There's not
19  really many people.  We don't really do this.
20       Q.   Okay.  And why -- why does Tammy Gonzalez
21  have access to this?
22       A.   In this type of instance, so if I needed to
23  provide something to legal counsel, I can do it for
24  them.
25       Q.   Okay.  And so there should be screenshots

Page 35

1   similar to this pertaining to the plaintiffs' booked
2   trip to Beaches Ocho Rios, correct?
3        A.   If it was requested.
4        Q.   Sure.  And if we look at page one of Exhibit
5   No. 4, there appear to be several options or option
6   menus that can be clicked to access different
7   information?
8             MR. SCOTT:  Is this the booking screen
9        from this case?
10            THE WITNESS:  No.
11            MR. SCOTT:  Okay.
12            THE WITNESS:  Are you talking about the
13       bar across the top?
14  BY MR. WEGLARZ:
15       Q.   I am.
16            MR. SCOTT:  Did we give you this booking
17       screen?
18            THE WITNESS:  No.
19            MR. SCOTT:  Did you request it?
20            MR. WEGLARZ:  Well, I requested all
21       booking records.
22            MR. SCOTT:  I think we objected, I'm not
23       sure, but I'll talk to the client.
24            MR. WEGLARZ:  Sure.
25            MR. SCOTT:  And I'll be glad to provide

Page 36

1        it.
2             MR. WEGLARZ:  All right.  I would
3        appreciate that, thank you.
4             MR. SCOTT:  I'll just check with them,
5        and if they say, yeah, I'll give it to you.
6        I'll look at the request.
7   BY MR. WEGLARZ:
8        Q.   Yeah, you see these different icons here at
9   the top?
10            MR. SUAREZ:  Tom, when you have a minute,
11       can we take a comfort break?
12            MR. WEGLARZ:  Whenever you want.  Now is
13       fine.
14            (A recess was taken in the deposition, after
15  which the deposition continued as follows:)
16            MR. WEGLARZ:  All right.  Back on the
17       record.
18  BY MR. WEGLARZ:
19       Q.   Ms. Gonzalez, still talking about Exhibit No.
20  4.  My question to you, if you look at the top of the
21  screenshot here you see those different icons at the
22  top of the screen there?
23       A.   Uh-huh.
24       Q.   Is that a yes?
25       A.   Yes.

GONZALEZ, TAMMY
10/03/2019

Pages 37–40

---

Page 37

1    Q.   What's your understanding as to what
2  information is pulled up by hitting any one of these
3  icons?
4    A.   You can pull up availability to see what room
5  categories are available.
6    Q.   Sure.
7    A.   There is an exit.
8    Q.   What does that show you?
9    A.   Like get out of it, to leave it.
10   Q.   That's a good option to have.  What other
11 icons denote what?
12   A.   The first one would be to look up an address.
13   Q.   And it had the icon of an envelope?
14   A.   Yeah, the first one.
15   Q.   Sure.  What about the second one?
16   A.   The second one is the availability.
17   Q.   What's the third one?
18   A.   I'm not sure.
19   Q.   Looks like a --
20   A.   It looks like a tray.
21   Q.   -- food tray.  That's the icon there.  What
22 about the one next to that?
23   A.   I'm not sure about that one either.
24   Q.   What about the next three?
25   A.   I know the second to last one, which is to

Page 38

1  exit.
2    Q.   Okay.  What about the one after that, the "X"
3  or the dollar sign?
4    A.   It looks like Shrek.  I don't know what
5  that's for.
6    Q.   Maybe it plays the Shrek movie?
7    A.   That would be good.
8    Q.   And if you look at Exhibit No. 4, pages 2 and
9  3, it looks like this program also shows all comments,
10 like a log, any time there's any activity on the
11 booking, it looks like someone logs that into the
12 comment section, correct?
13   A.   That's correct.
14   Q.   And we should be able to see that type of
15 information with respect to the plaintiffs' booking,
16 correct?
17   A.   Yes.
18   Q.   Okay.  Now you mentioned this is a
19 proprietary program.  Is this the program that was
20 developed or provided by Hotel Booking Solutions,
21 Incorporated, HBSI?
22   A.   No.
23   Q.   Okay.  That's something different?
24   A.   Yes, it is.
25   Q.   Okay.  Was the HBSI system being used in

Page 39

1  2015?
2    A.   I believe it was.
3    Q.   And was this other system also used, this UVL
4  proprietary system that we see here in Exhibit No.
5  4?
6    A.   Yes, but HBSI is not a booking system.
7    Q.   Okay.  Explain what that is then, please.
8    A.   HBSI is a, like a conduit that sits between
9  the booking system and tour operators.  So tour
10 operators' bookings are transmitted electronically.
11 They go -- they leave -- this is how I understand it,
12 right?  I'm not an IT person.  They leave the tour
13 operator's office, a booking or a "check for
14 availability."  It goes to HBSI.  HBSI then looks into
15 the booking system.
16   Q.   That we see here in Exhibit 4?
17   A.   Correct.
18   Q.   Yeah.
19   A.   And then it would come back and say, yes,
20 it's available or if it's actually a booking that the
21 tour operator is booking, we go to HBSI.  HBSI shoots
22 it into that booking system, and then a confirmation
23 number gets generated and it goes back.
24   Q.   And it was UVI that actually contracted for
25 the HBSI system, correct?

Page 40

1    A.   I'd have -- I'm not sure.  I'd have to
2  check.
3    Q.   If I see an article posted by hotel online
4  saying in 2006 UVI contracted for that system with
5  HBSI, would you have any reason to disagree with
6  that?
7    A.   In 2006, it's possible.
8    Q.   And does that sound about right to you, that
9  UVI has been using that system roughly around 2006,
10 and has been using it through the present?
11   A.   We would have to look, but I would be quite
12 sure that that contract is not a UVI contract anymore,
13 since I don't -- I only do sales and marketing now.
14   Q.   Okay.  So you believe that at some point in
15 time subsequent to 2006, that contract was assumed by
16 another Sandals-related entity?
17   A.   I'm not sure.
18   Q.   Okay.
19   A.   But I do not believe that contract sits with
20 UVI anymore.
21   Q.   You're not sure, but it could be?
22   A.   I doubt it, but I'm not sure.  We'd have to
23 check.
24   Q.   And the HBSI system was used to book the
25 plaintiffs' trip; true?

---

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Pages 41–44

Page 41

1   A.   The plaintiffs' trip, to my recollection,
2   came from the tour operator, so it should have been
3   transmitted into the booking system through HBSI.
4   Q.   All right.  And all the tour operators and
5   travel agents, if they're going to book Sandals or
6   Beaches vacation packages, they're going to be going
7   through HBSI?
8   A.   No.
9   Q.   Okay.  Which one?
10  A.   It's only tour operators.
11  Q.   And Mark Travel was a tour operator?
12  A.   Fun Jet is.
13  Q.   Fun Jet is the same thing as Mark Travel,
14  correct?
15       MR. SUAREZ:  Objection.  Form.
16       THE WITNESS:  I'm not sure what their
17   corporate set-up is.  The tour operator was
18   Fun Jet.
19  BY MR. WEGLARZ:
20  Q.   Mark Travel, it's your understanding Mark
21  Travel owns Fun Jet?
22       MR. SUAREZ:  Objection to form.
23       THE WITNESS:  Yes, I'm not sure.
24  BY MR. WEGLARZ:
25  Q.   And Vacations To Go is not considered a tour

Page 42

1   operator; true?
2   A.   Correct.
3        MR. SCOTT:  I need to take a break in
4    five minutes just for one minute, okay?
5        MR. WEGLARZ:  That's fine.
6   BY MR. WEGLARZ:
7   Q.   Item number three of Exhibit No. 1 requests
8   all records and materials regarding any effort or
9   action undertaken by UVI to inquire, explore, verify
10  to make sure that plaintiffs' trip would be safe.
11  Does UVI have any such documents or materials in its
12  possession concerning that?
13  A.   No, we don't.
14  Q.   Now, I -- UVI markets and promotes vacation
15  packages to Beaches and Sandals Resorts; true?
16  A.   Correct.
17  Q.   Does UVI do anything to make sure or to
18  monitor or to even inquire that these resorts are
19  safe?
20  A.   No, we don't.
21  Q.   Okay.  Do they even do online searches just
22  to see what's going on at this resort, see if there's
23  any complaint, see if there's any warnings anywhere?
24  A.   No, we don't.
25  Q.   Item number four of your dep notice asks for

Page 43

1   all records and materials concerning any allegation of
2   assault or sex assault made by or concerning a
3   traveler or visitor to Jamaica.  Would UVI have any
4   such records or materials regarding that?
5   A.   No, we wouldn't.
6   Q.   Are you aware of any allegation made by a
7   traveler or tourist regarding sex assault while in
8   Jamaica?
9        MR. SCOTT:  Objection.  Overly broad.
10   Fifteen years?  Twenty years?  Ten years?
11   Same objection as we put in the
12   interrogatories.
13       MR. WEGLARZ:  All right.  Your objection
14   is noted.
15  BY MR. WEGLARZ:
16  Q.   Go ahead.
17  A.   Not that I recall.
18  Q.   So as you sit here today, you don't recall
19  any incident where it was alleged that a traveler or a
20  tourist had a sex assault while in Jamaica?
21  A.   Not that I recall.
22  Q.   When plaintiff's lawsuit was served, that
23  would be the first time that you would have heard of
24  such an allegation being made, that somebody was
25  sexually assaulted while vacationing in Jamaica?

Page 44

1   A.   That's my recollection.
2        MR. SCOTT:  Is this a good time for a
3    break, two minutes?
4        MR. WEGLARZ:  Sure.
5        MR. SCOTT:  Okay.  Sorry.
6        MR. WEGLARZ:  It's okay.
7        MR. SCOTT:  I need to take a break for a
8    few minutes, sorry.  I have an emergency.
9        (A recess was taken in the deposition, after
10   which the deposition continued as follows:)
11       MR. WEGLARZ:  Okay.  Back on.
12  BY MR. WEGLARZ:
13  Q.   Ms. Gonzalez, do you recall UVI being sued by
14  a plaintiff by the name of Robyn Shouldice?
15  A.   No, I don't recall.
16  Q.   Do you recall a lawsuit that was filed in May
17  of 2015 alleging that a teenager was sexually
18  assaulted while vacationing with her family on Beaches
19  Negril?
20  A.   I don't recall that.
21       MR. SUAREZ:  Can you spell that last name
22   for me, please?
23       MR. WEGLARZ:  S-h-o-u-l-d-i-c-e.
24  BY MR. WEGLARZ:
25  Q.   I take it that if you were to hear that

GONZALEZ, TAMMY
10/03/2019

Page 45

1 there's an allegation of someone being sexually
2 assaulted by a resort worker at a Beaches or a Sandals
3 resort, that's a very serious piece of information,
4 correct?
5    A.   I mean, it's an allegation, I guess.
6    Q.   Sure.  And I take it that as the CEO of the
7 company that exclusively markets and promotes these
8 resorts in the entire United States, that any
9 allegation like that would be taken seriously by you,
10 correct?
11   A.   I'm not sure what you mean by "taken
12 seriously."
13   Q.   Okay.  Would you want to -- would you market
14 and promote resorts where tourists or guests may be
15 assaulted by the hotel staff?
16   A.   That's a pretty hypothetical question.
17   Q.   It is?
18   A.   I wouldn't be aware.
19   Q.   If you had any reason to believe that guests
20 at the resorts that you were marketing or promoting
21 were being sexually assaulted by the hotel staff, I
22 take it you would not want to market those hotels,
23 correct?
24   A.   I don't even know how to answer that
25 question.  If an allegation is made, it doesn't mean

Page 46

1 it's true.
2    Q.   That's a good point.  I take it that if you
3 were to become aware of such an allegation, you would
4 at least want to look into it --
5    A.   No.
6    Q.   -- to verify if it's true or not?
7    A.   No, I wouldn't.
8    Q.   You would not?
9    A.   That is not my role.
10   Q.   And why wouldn't you want to?
11   A.   I'm a marketing company.  I'm not an
12 investigator.  I'm not an attorney.
13   Q.   And you market for Sandals and Beaches, and
14 even though -- if you're provided information that
15 guests are being assaulted by hotel staff or at least
16 that's what they're reporting, you have no desire to
17 look into that to verify as to whether or not those
18 allegations are true?
19   A.   You're asking me such a hypothetical
20 question.  I really don't know how to answer that
21 question.  I -- I don't run the resorts.  I'm not
22 responsible for the resorts in any way.  I am a
23 marketing company.  My job is to promote.
24   Q.   But you are responsible for marketing and
25 promoting those resorts, correct?

Page 47

1    A.   Yes, I am.
2    Q.   And you want to make sure -- and you would
3 agree your livelihood depends upon the successful
4 marketing and promotion of those resorts, correct?
5    A.   I earn a salary for what I do, yes.
6    Q.   And I take it that you understand for you to
7 have successful marketing and promotion, you need to
8 be marketing and promoting quality services,
9 correct?
10   A.   Correct.
11   Q.   Quality accommodations, correct?
12   A.   Correct.
13   Q.   You would not want to be associated with
14 substandard products, substandard services in your
15 business, do you?
16   A.   Since my business is only providing these
17 marketing services for those brands, I'm not dealing
18 with substandard products.
19   Q.   Item number six in Exhibit No. 1 asks for all
20 records and materials reflecting any role UVI had with
21 the scheduling, booking and payment of the plaintiffs'
22 vacation at Beaches Ocho Rios.  Does UVI have any such
23 records or materials?
24   A.   No, we had no role in the booking.
25   Q.   Did UVI have any role whatsoever in the

Page 48

1 booking, in the processing into anything having to do
2 with this Beaches resort vacation for the
3 plaintiffs?
4    A.   No.
5    Q.   Does UVI ever get involved with the booking
6 or the scheduling of vacations to Sandals or Beaches
7 Resorts?
8    A.   No, we don't.
9    Q.   Item number eight -- I'm sorry, item number
10 seven asks for all contracts and agreements with Mark
11 Travel.  Did UVI ever enter into any contracts or
12 agreements with Mark Travel?
13   A.   Ever?
14   Q.   Ever?
15   A.   Ever, ever, ever?
16   Q.   All three of those, yes.
17   A.   Probably in the '90s or early 2000s.
18   Q.   And what types of contracts would it have
19 entered into with Mark Travel?
20   A.   A contract allowing them to sell the product.
21   Q.   And why did that stop?
22   A.   Because we no longer do that.  We are
23 strictly marketing and promotions now.
24   Q.   Okay.  And who has kind of taken over that
25 role?

GONZALEZ, TAMMY
10/03/2019

Page 49

1     A.   UTC.
2     Q.   And actually even though UTC has overtaken
3  that role, UVI still is acting on behalf of UTC with
4  respect to those duties UTC assumes contractually with
5  Mark Travel, correct?
6     A.   **What duties are you referring to?  We're**
7  **sales and marketing.**
8          (Plaintiffs' Exhibit No. 5 was marked for
9  identification, a copy of which is attached hereto.)
10 BY MR. WEGLARZ:
11    Q.   Ms. Gonzalez, I'm going to show you what
12 we've marked as Exhibit No. 5.  Have you ever seen
13 that document before?
14    A.   **It's a tour operator agreement.**
15    Q.   Have you seen that before?
16    A.   **Yes.**
17    Q.   And why would you -- and this is an agreement
18 between UVL, Unique Vacations, Ltd, and Mark Travel,
19 correct?
20    A.   **Yes.**
21    Q.   And it looks like this agreement was signed
22 in January of 2015, correct?
23    A.   **Yes.**
24    Q.   And does UVI typically have all the tour
25 operator agreements that pertain to tour operators'

Page 50

1  ability to market, promote and sell vacation packages
2  to Sandals and Beaches?
3     A.   **No, we don't.**
4     Q.   Why would you have seen Exhibit No. 5 then
5  prior to today's deposition?
6     A.   **My attorney showed it to me.**
7     Q.   Okay.  All right.  And that would have been
8  the first time that you would have seen it?
9     A.   **Yes.  I don't issue contracts to tour**
10 **operators.**
11    Q.   UVI undertakes no role or responsibility with
12 respect to monitoring or overseeing of the tour
13 operator agreements that are out there pertaining to
14 the selling of vacation packages to Beaches or
15 Sandals?
16    A.   **Correct, we don't issue these contracts.**
17    Q.   Does UVI -- in 2015, was UVI a party to any
18 tour operator agreement?
19    A.   **I don't believe so, no.**
20    Q.   It's your understanding that all tour
21 operator agreements pertaining to Sandals and Beaches,
22 that's done by UVL, correct?
23    A.   **It was UVL.  It's UTC now.**
24    Q.   And when did that change?
25    A.   **I think that changed in '15.**

Page 51

1     Q.   After May of 2015?
2     A.   **I believe so.  I'm not exactly sure on the**
3  **date, though.**
4     Q.   Would one of the obligations set forth in the
5  SRI agreement we talked about earlier, would any of
6  those obligations have to do with the tour operator
7  agreement?
8     A.   **I don't know what's in the SRI agreement.**
9     Q.   It could.  You just don't know because you've
10 never --
11    A.   **I have no idea.**
12    Q.   Is it your understanding that Exhibit No. 5
13 is the tour operator agreement in effect at the time
14 of this incident, which governs Mark Travel's right
15 and ability to sell Sandals and Beaches vacation
16 resort packages?
17    A.   **I assume so.**
18    Q.   Item number nine asks for all records and
19 materials reflecting any communications that you or
20 UVI had with any governmental entity concerning in any
21 way the plaintiffs' incident or in any way health and
22 safety of tourists traveling to Jamaica.  Does UVI
23 have any such documents?
24    A.   **No, we don't.**
25    Q.   Did UVI ever have any interaction with any

Page 52

1  governmental entities?
2     A.   **That's pretty broad.  Any interaction with**
3  **governmental agencies --**
4     Q.   Yes.
5     A.   **Regarding what?**
6     Q.   Anything.  Does the business of UVI ever
7  occasion the interaction with a governmental entity?
8     A.   **What governmental entity?**
9     Q.   Any?
10    A.   **Not that I'm aware of.  That's a very broad**
11 **question.**
12    Q.   It is.  It is.  Do you know if UVI has ever
13 interacted with the state department for any reason?
14    A.   **Not off the top of my head, no.**
15    Q.   Would UVI ever provide itineraries or booking
16 information to the U.S. Embassy?
17    A.   **I wouldn't have booking information.**
18    Q.   And you may not.  I'm just asking if you know
19 about UVI ever having done that?
20    A.   **I couldn't provide it if I don't have it, so**
21 **no, not that I'm aware of.**
22    Q.   Do you know if that is ever done?  I mean, is
23 booking information or itinerary information ever
24 provided to U.S. embassies?
25    A.   **Not to my knowledge.  I don't think that's**

GONZALEZ, TAMMY
10/03/2019

Page 53

1 common practice.
2 Q. Would UVI have had any communications with
3 Mark Travel at any time from 2010, up through the date
4 of, say, May of 2015?
5 A. I'm sure.
6 Q. Okay. And what type of communications would
7 be going on between UVI and Mark Travel?
8 A. They could be wanting to know if we had sales
9 reps available to do shows. They could be making a
10 brochure and want photography to go into it. Sales
11 and marketing type thing, yes.
12 Q. And I take it UVI would have some documents
13 regarding that, correct?
14 A. No, not from 2010, 2015, no.
15 Q. And why not?
16 A. I wouldn't need to save things that are nine
17 years old that have no relevance.
18 Q. All right. So at some point in time, they
19 would have had such records and documents regarding
20 these communications going back and forth between UVI
21 and Mark Travel?
22 A. I have no idea. This wasn't my role back
23 then.
24 Q. But you mentioned that, well, look it, we're
25 not going to have it from 2010 or even 2015, 'cause

Page 54

1 there's no reason to save it, correct?
2 A. Uh-huh.
3 Q. Is that a yes?
4 A. That's correct.
5 Q. Any such documents would have been destroyed
6 by now?
7 A. We have a document retention policy.
8 Q. And explain the document retention policy?
9 A. It's a 90-day retention policy.
10 Q. And that applies to what documents?
11 A. Everything that's not superceded by state or
12 federal law, like HR records or accounting records,
13 you know, payroll stuff, things like that you have to
14 keep longer.
15 Q. So every 90 days, UVI will destroy all
16 records, other than those where the law says you have
17 to keep them longer?
18 A. That's the policy.
19 Q. And how is that carried out?
20 A. We have a shredding company that comes in and
21 collects the stuff and people are just supposed to get
22 rid of their documents.
23 Q. And are the employees advised, look, every 90
24 days, we want you to destroy your records and
25 documents?

Page 55

1 A. They were all given the document retention
2 policy, yes.
3 Q. Does this apply to electronic information?
4 A. Yes.
5 Q. Emails, for example?
6 A. Yes.
7 Q. So every 90 days, you expect the UVI
8 employees to delete and get rid of all electronic
9 information?
10 A. I believe it's set up automatically.
11 Q. Okay. Meaning automatically every --
12 anything that's more than 90 days old electronically
13 automatically gets deleted and wiped out?
14 A. That's my understanding of how it works.
15 Q. And how is that carried out? How is that
16 done automatically?
17 A. I mean, I don't know the details of it.
18 Q. You have someone in the IT department that
19 handles it, right?
20 A. I assume.
21 Q. And this is a policy?
22 A. Yes, it is.
23 Q. Do you know why they have such a short
24 window?
25 A. I don't.

Page 56

1 Q. And when did that policy first go in
2 effect?
3 A. I don't know the exact date. It's been in
4 effect for a few years, but I would have to check.
5 Q. Was it in effect prior to May of 2015?
6 A. I don't know the date it went into effect.
7 Q. But it hasn't been in effect for decades,
8 fair to say?
9 A. Sure. Emails haven't been around for
10 decades, so yes, that's fair to say.
11 Q. Well, and -- and, I'm sorry, I'm not just
12 talking about the emails. I'm talking about the
13 90-day policy.
14 A. I don't know exactly how long it's been in
15 effect. I would say yes, it has not been 30 years,
16 but I would have to find out.
17 Q. So the 90-day retention policy for records
18 and electronic information was something that went
19 into effect within the last few years; fair to say?
20 A. You're asking me to guess.
21 Q. Well, your best approximation?
22 A. A few years, I don't know how many.
23 Q. Okay. Within the last five years?
24 A. You're asking me to guess.
25     MR. SCOTT: Objection. Asked and

GONZALEZ, TAMMY
10/03/2019

Pages 57–60

Page 57

```
1        answered.  Speculation.  She's already
2        answered it.
3    BY MR. WEGLARZ:
4        Q.    Between five and ten years?
5        MR. SCOTT:  Same objection.
6    BY MR. WEGLARZ:
7        Q.    You don't know?
8        A.    I don't know.
9        Q.    You thought we jumped around before, hold on
10   to your seat.  I'm assuming you graduated from high
11   school?
12       A.    You are correct.
13       Q.    When?
14       A.    1978.
15       Q.    And where?
16       A.    Osceola High School in Kissimmee, Florida.
17       Q.    Any college?
18       A.    No.
19       Q.    Any other post high school educational
20   pursuits?
21       A.    No higher education, no.
22       Q.    And, I'm sorry, you told me earlier, when did
23   you first hire in with UVI?
24       A.    September 1985.
25       Q.    And you've been employed with UVI
```

Page 58

```
1    continuously ever since?
2        A.    Yes.
3        Q.    In a full-time capacity?
4        A.    Yes.
5        Q.    Were you employed by any other companies
6    during that time?
7        A.    No.
8        Q.    And how many different job titles did you
9    have while with UVI?
10       A.    Over the last 34 years?
11       Q.    Let's talk about the last 10 years.
12       A.    Okay.  I was vice president of operations.
13   Then I was senior vice president of operations.  Then
14   I was executive vice president, and then CEO, if I'm
15   recalling correctly.
16       Q.    And can you give me the month and the year
17   start for each of those titles?
18       A.    No.
19       Q.    Okay.
20       A.    I really don't remember.
21       Q.    That's an honest answer.  You were executive
22   VP, correct, in 2015?
23       A.    I believe so.
24       Q.    Were you ever associated or affiliated with
25   any other companies or entities within the last 20
```

Page 59

```
1    years, other than with UVI?
2        A.    No.
3        Q.    Were you ever a company officer or official
4    for any entity other than UVI?
5        A.    I don't believe so, no.
6        Q.    I mean, we talked a little bit about UVL.
7    Were you ever affiliated with UVL in any way, shape or
8    form?
9        A.    UVL at one point in time was the worldwide
10   representative for Sandals and Beaches, and we were
11   actually subcontracted by them to provide the
12   marketing services.
13       Q.    Similar to the subcontractor agreement we
14   talked about earlier?
15       A.    Correct.
16       Q.    But even with that affiliation, you were
17   always considered an employee of UVI, correct?
18       A.    Correct.
19       Q.    Okay.  And then my same question for UTC, did
20   you ever have any role or affiliation with UTC?
21       A.    No.
22       Q.    What about SRI, Sandals Resorts
23   International?
24       A.    No.
25       Q.    Do you belong to any professional or trade
```

Page 60

```
1    associations?
2        A.    No.
3        Q.    Are you a member of any vocational or
4    avocational or professional societies?
5        A.    No.
6        Q.    Anything like tour operators?
7        A.    I'm not a tour operator.
8        Q.    Travel agents or whatever?
9        A.    No.
10       Q.    How many times have you had your deposition
11   taken?
12       A.    I don't know, maybe five, six, seven.
13       Q.    When was the last time?
14       A.    It's been a long time.  It's probably been, I
15   would guess, over five years.
16       Q.    And what kind of case was that?
17       A.    I'd have to go back and check.  I mean, it's
18   really been a long time.
19       Q.    Do you have a general idea as to what case
20   was involved with that deposition?
21       A.    No, I would be guessing if I didn't make sure
22   to look which one was the last one.
23       Q.    And how long ago was the deposition most
24   recent in time before that one?
25       A.    I don't know, maybe a year or two before
```

GONZALEZ, TAMMY
10/03/2019

Page 61

```
 1   that.  I don't know.  I'd have to look.
 2       Q.   That's fine.  Do you recall what kind of case
 3   that involved?
 4       A.   I don't.
 5       Q.   Did you ever testify at trial?
 6       A.   No.
 7       Q.   Have you ever filed a lawsuit?
 8            MR. SCOTT:  You mean her personally?
 9            MR. WEGLARZ:  Yes.
10            MR. SCOTT:  Okay.
11            THE WITNESS:  I don't think so.
12   BY MR. WEGLARZ:
13       Q.   UVI has filed lawsuits before, correct?
14       A.   Not that I'm aware of, and it's certainly
15   nothing that I would know about before this role.
16       Q.   Okay.  Has UVI ever been involved in a
17   lawsuit in Jamaica?
18            MR. SCOTT:  You mean whether they were
19        sued in Jamaica?
20            MR. WEGLARZ:  Yes, or you're a party,
21        plaintiff or defendant, in Jamaica.
22            THE WITNESS:  I don't think so.
23   BY MR. WEGLARZ:
24       Q.   Have you ever been to Jamaica?
25       A.   Many times.
```

Page 62

```
 1       Q.   How many times?
 2       A.   A hundred in 34 years.  It's a wild guess.  A
 3   lot.  I mean, more than twice.
 4       Q.   More than a hundred?
 5       A.   I doubt it.  I'm absolutely guessing.  I
 6   mean, I've worked for this company for 34 years, so --
 7       Q.   But a hundred would not be an unrealistic
 8   estimate, would you agree?
 9            MR. SCOTT:  Don't guess, but answer it if
10        you can.
11            THE WITNESS:  If I answer it, I'm only
12        guessing.
13            MR. SCOTT:  Okay.
14            THE WITNESS:  I can't tell you exactly
15        how many times I've been to Jamaica.
16   BY MR. WEGLARZ:
17       Q.   More than 10?
18       A.   That I can say yes to.
19       Q.   More than 30?
20       A.   I believe so.
21       Q.   More than 50?
22       A.   Starting in the guessing range now.
23       Q.   When was the last time you were there?
24       A.   About two weeks ago, maybe three.
25       Q.   And how long did you stay?
```

Page 63

```
 1       A.   One night.
 2       Q.   And where did you stay?
 3       A.   Sandals Montego Bay.
 4       Q.   And why were you there?
 5       A.   I was there for a meeting.
 6       Q.   What kind of meeting was it?
 7            MR. SCOTT:  We're getting really
 8        irrelevant here and into other areas.  I
 9        mean, seriously.  She's there.  She had a
10        meeting.  I'm not going to let her go into
11        topics and things like that.
12   BY MR. WEGLARZ:
13       Q.   Can you tell me what type of meeting it
14   was?
15       A.   Evidently not.
16       Q.   Well, he didn't want you to go into topics.
17   I'm just asking you in general, is it a meeting
18   amongst Sandals' folks?  Is it a meeting because your
19   book-of-the-month club decided they're going to have
20   their annual retreat out there?  I'm just trying to
21   get a real general idea.
22       A.   We had a meeting with some SRI folks, yes.
23       Q.   Any other UVI employees who attended beside
24   yourself?
25       A.   No, there wasn't.
```

Page 64

```
 1       Q.   And how often, say, in the last five years,
 2   how often -- how many times per year are you going to
 3   Jamaica for business purposes?
 4       A.   It could be three trips a year, it could be
 5   five trips a year.
 6       Q.   Okay.  And can you tell me the topics that
 7   were discussed during this meeting?
 8            MR. SCOTT:  Which meeting?
 9            MR. WEGLARZ:  The one that she went to
10        two weeks ago.
11            MR. SCOTT:  Unless it involves something
12        in this case, I'm not going to let her answer
13        it.
14            MR. WEGLARZ:  Well, I don't know if it
15        does or didn't.
16            MR. SCOTT:  Well, then ask her.  Say, if
17        it involves this lawsuit or whatever you want
18        to say, but I'm not going to let you just
19        have an exploring expedition as to meeting
20        down there.
21            MR. WEGLARZ:  Well, you guys asked about
22        my clients' trips to places.
23            MR. SCOTT:  And she's answered about her
24        trips to places -- to Jamaica.
25            MR. WEGLARZ:  I also didn't interfere and
```

GONZALEZ, TAMMY
10/03/2019

Page 65

1   obstruct your additional questions that went
2   beyond did you go on this trip.  So that's
3   all.  If you're going to instruct her not to
4   answer, I mean, I'm not going to -- I'm not
5   going to fight you.
6       MR. SCOTT:  Okay.
7       MR. WEGLARZ:  I don't want a bandage on
8   my hand.  That looks horrible.  Are you going
9   to instruct her not to answer?
10      MR. SCOTT:  Yeah, unless it specifically
11  relates to the issues in this case in some
12  way --
13      MR. WEGLARZ:  And I'm not going to know
14  that until I hear the answer.
15      MR. SCOTT:  Well, ours were limited to
16  the issues in the case when we asked about
17  trips.
18      MR. WEGLARZ:  Yeah, no.  All right.  So
19  you'll instruct her not to answer on the
20  basis of relevance, correct?
21      MR. SCOTT:  Yeah.
22      MR. WEGLARZ:  Okay.
23      MR. SCOTT:  Not leading to admissible
24  evidence.
25  BY MR. WEGLARZ:

Page 66

1       Q.   Did this meeting mention or discuss in any
2   way any type of issue or topic that is remotely
3   related to the plaintiffs' incident?
4       A.   Not at all.
5       Q.   Did it relate in any way to assaults in
6   Jamaica?
7       A.   Not at all.
8       Q.   Did it relate in any way to the packaging of
9   Sandals or Beaches Resorts' locations?
10      A.   Not at all.
11      Q.   Have you ever been to Beaches Ocho Rios?
12      A.   Yes.
13      Q.   How many times?
14      A.   A handful.
15      Q.   When was the last time you went to Beaches
16  Ocho Rios?
17      A.   Last time I was there was probably last
18  December.
19      Q.   And why were you there last December?
20      A.   There was a travel agent function.
21      Q.   Would you have been to Beaches Ocho Rios any
22  time in 2015?
23      A.   Maybe, not that I recall.  I'd have to look
24  at my something, I don't know what, passport.
25      Q.   You understand that these incidents occurred

Page 67

1   in May of 2015.  Were you in Jamaica at all in May of
2   2015?
3       A.   I don't think so, but I'm not sure.
4       Q.   Do you know who operates the Beaches Ocho
5   Rios Resort?
6       A.   No, I don't.
7       Q.   Do you know who owns it?
8       A.   No, I don't.
9       Q.   Well, Sandals owns the Beaches Resorts brand,
10  correct?
11      A.   I don't know about the ownership.
12      Q.   Okay.  Do you know the type of security
13  that's provided at Beaches Ocho Rios?
14      A.   No, I don't.
15      Q.   Did you notice any security that was provided
16  the last time you went there?
17      A.   They're -- the properties are walled.  You
18  have to go by a guard gate, but --
19      Q.   Other than that, do they have security
20  officers, security staff?
21      MR. SCOTT:  What time frame, 2015?  Now?
22      MR. WEGLARZ:  The time she was there.
23      MR. SCOTT:  The only time that's relevant
24  is 2015 or before, and she said she can't
25  recall anything.

Page 68

1       MR. WEGLARZ:  Okay.  She didn't say
2   anything.  She didn't say she doesn't recall
3   anything.  She just told me there's a wall
4   and there's a gate.
5       MR. SCOTT:  That could be right now.  You
6   just asked is there a wall and a gate.
7       MR. WEGLARZ:  It is not --
8       MR. SCOTT:  You're talking about a trip
9   that happened in December.
10      MR. WEGLARZ:  Yes.
11      MR. SCOTT:  That's three years after the
12  fact.
13      MR. WEGLARZ:  I can follow up, I assure
14  you.
15      MR. SCOTT:  Well, then.
16  BY MR. WEGLARZ:
17      Q.   The last time you went to Ocho Rios, other
18  than the wall surrounding the perimeter and a gate you
19  have to go through, did they have any other security
20  arrangements at Beaches Ocho Rios the last time you
21  went?
22      MR. SCOTT:  That she observed.
23      THE WITNESS:  I don't know the details of
24  the security protocols, no.
25  BY MR. WEGLARZ:

GONZALEZ, TAMMY
10/03/2019

Pages 69–72

Page 69

1   Q.   Did you observe any other security at the
2   resort other than that?
3       A.   No, I was there for three hours a night for a
4   function.
5       Q.   Is it your understanding that that was the
6   type of security that they've always been providing at
7   Beaches Ocho Rios --
8           MR. SCOTT: Objection.  Speculation.
9   BY MR. WEGLARZ:
10      Q.   -- a perimeter wall and a gate to go
11  through?
12          MR. SCOTT: Objection.
13          THE WITNESS: I don't have details on
14      their security.
15  BY MR. WEGLARZ:
16      Q.   Do they have surveillance cameras there?
17      A.   I don't know all of the details.  I assume
18  there's security cameras at the hotels.
19      Q.   Okay.  How does UVI carry out the marketing
20  and promotion of the Beaches and Sandals Resorts?
21      A.   We are responsible for television
22  advertising, radio, print media.  As I said, calling
23  on travel agents, making sure they have collateral
24  material, producing brochures.
25      Q.   How does UVI make money?

Page 70

1       A.   I get a fee for my services.
2       Q.   All right.  And who pays you that fee?
3       A.   UTC.
4       Q.   And I take it you draw a regular salary?
5       A.   Myself?
6       Q.   Yes.
7       A.   Yes.
8       Q.   And who pays that salary?
9       A.   UVI.
10      Q.   Are all the UVI employees paid directly by
11  UVI?
12      A.   Yes.
13      Q.   Okay.  Does UTC sometimes pay some of the UVI
14  staff?
15      A.   No, they don't.
16      Q.   Okay.  All right.  But UVI earns its revenues
17  through the contract it has with UTC, correct?
18      A.   Correct.
19      Q.   Any other sources of revenue for UVI, other
20  than the contract with UTC?
21      A.   No.
22      Q.   And the revenues that are earned off of that
23  contract, is that -- I take it some of it is
24  performance-based, correct?
25      A.   I get my operating expenses covered, plus 3

Page 71

1   percent.
2       Q.   Three percent of what?
3       A.   Gross revenues, I believe.
4       Q.   Gross revenues of --
5       A.   Of the --
6       Q.   -- UVI?
7       A.   No, of the resorts, bookings.
8       Q.   So does anyone else at UVI have a similar
9   compensation package where they get a percentage of
10  the bookings?
11      A.   No, no, no.  I think you may have
12  misunderstood.  That's not me personally.  That is
13  UVI.
14      Q.   UVI gets 3 percent of the resorts' gross
15  bookings?
16      A.   Revenue, yes, I believe that's how it
17  works.
18      Q.   The revenue is earned off of bookings?
19      A.   Correct.
20      Q.   So, technically, the plaintiffs' vacation
21  package to Beaches Ocho Rios, UVI earned 3 percent for
22  whatever was paid on that trip; true?
23      A.   If it's part of the gross revenue, yes.
24      Q.   Does UVI -- other than doing marketing and
25  promotion, does UVI get involved in any way with

Page 72

1   customer service pertaining to the resorts?
2       A.   Customer service is not dealt with at our
3   office.  I mean, sometimes erroneously we'll get a
4   complaint letter, we'll just forward it on.
5       Q.   You would forward it on to who?
6       A.   The customer service department sits at UVL.
7       Q.   But UVI has received complaints from tours
8   and guests in the past, correct?
9       A.   Yes.
10      Q.   And then when that happens that information
11  would be forwarded to customer service at UVL?
12      A.   Correct.
13      Q.   Do you know how it is that UVI would be
14  receiving complaints from guests?
15      A.   I assume a customer made a mistake and sent
16  it to the wrong place.
17      Q.   And how would these complaints have been
18  received, through regular mail, the U.S. mail?
19      A.   Could be.
20      Q.   Emails?
21      A.   Could be.
22      Q.   Faxes?
23      A.   I don't think anyone uses faxes anymore.
24      Q.   You'd be surprised.
25      A.   Really?  I don't think I've gotten a fax in a

GONZALEZ, TAMMY
10/03/2019

Page 73

1  hundred years.
2      Q.   But UVI has received complaints through the
3  email?
4      A.   Yes, mistakenly.
5      Q.   And UVI, I take it, would still have copies
6  of those emails, correct?
7      A.   No, I wouldn't.
8      Q.   They would have been destroyed per the 90-day
9  policy?
10     A.   Uh-huh.  And there's no reason to keep them.
11     Q.   Well, I take it UVI would be interested in
12 knowing the complaints that are out there regarding
13 the resorts that you are promoting and marketing,
14 correct?
15     A.   No.
16     Q.   Okay.  Do you recall seeing or reviewing any
17 complaints coming in to UVI regarding the resorts?
18     A.   Ever in 34 years?  I'm sure I've read some
19 complaint letters.
20     Q.   And I'm sure you may have, according to your
21 practice, have it reviewed.  What I'm interested in
22 knowing is, as you sit here today, do you actually
23 remember reviewing any complaints that came in?
24     A.   No, nothing that sounds out in my head.
25     Q.   All right.  Then the next question.  Can you

Page 74

1  recall the substance of the complaint?
2      A.   Not offhand.
3      Q.   Do you recall anyone complaining about having
4  been harassed or assaulted at any Beaches or Sandals
5  resort?
6      A.   Not offhand.
7      Q.   Had you received any such complaint, I take
8  it you would be concerned and would want to follow up
9  on it?
10     A.   No.
11     Q.   You would just simply forward it to UVL and
12 let them deal with?
13     A.   They have to investigate it.
14     Q.   And did you follow up to see what UVL did or
15 did not do pertaining to that complaint?
16     A.   No, I don't.
17     Q.   And who at UVL, which is what, UTC now,
18 correct?
19     A.   No.
20     Q.   Okay.  Who at UVL is responsible for
21 overseeing the complaints that are forwarded to
22 them?
23     A.   The people who work in the customer service
24 department.
25     Q.   Is there someone who oversees that, though,

Page 75

1  one individual?
2      A.   I don't really know the structure of their
3  company.
4      Q.   Okay.  How many employees does UVI have?
5      A.   About 215.
6      Q.   The headquarters is located in Miami,
7  correct?
8      A.   Correct.
9      Q.   Does UVI have any other offices in Florida?
10     A.   No.
11     Q.   Does UVI maintain offices anywhere else other
12 than the headquarters in Miami?
13     A.   No, the only thing I've got outside of Miami
14 are those 77 business development managers and they
15 work out of their homes, so they're everywhere.
16     Q.   Okay.  They are across the country,
17 correct?
18     A.   That's correct.
19     Q.   And besides yourself, I know you're the CEO,
20 who are the other corporate officers for UVI?
21     A.   I think Mike Lamanna is still the corporate
22 secretary, but I'm not sure.  I'd have to look it up
23 and let you know who's what.
24     Q.   How many corporate officers does UVI have?
25     A.   I don't know.  I'd have to let you know.

Page 76

1      Q.   What are the titles of the other corporate
2  officers?
3      A.   I don't know.
4      Q.   Are there some officers who are recently
5  retired or left the business?
6      A.   I don't think so.  I don't know.
7      Q.   And what type of company is UVI, by the
8  way?
9      A.   We are a marketing and promotions company.
10     Q.   Does UVI have any licenses?
11     A.   What type of licenses?  I'm not sure.
12     Q.   Any?
13     A.   I mean, other than any license you might need
14 to do business, there's nothing that comes to mind.
15     Q.   What types of licenses does UVI need to do
16 business?
17     A.   I don't think I need any license to do
18 business, quite frankly, but I'm not sure.
19     Q.   You're not aware of any licenses that UVI
20 has?
21     A.   No, this hasn't come up since I've had this
22 role.  Nothing like this has come up that I'd have to
23 look into that.
24     Q.   Is UVI considered a seller of travel in the
25 state of Florida?

GONZALEZ, TAMMY
10/03/2019

Page 77

1    A.   I don't believe so.  We don't sell travel.
2    Q.   All right.  Is UVI a licensed seller of
3 travel in the state of Florida?
4    A.   I'm not sure.
5    Q.   Do you know what a seller of travel is?
6    A.   Is it a travel agency?
7    Q.   Well, I'm --
8    A.   I don't know.
9    Q.   Sure.  As the CEO of UVI, if UVI is a
10 licensed seller of travel with the state of Florida,
11 can you tell me what a licensed seller of travel is?
12    A.   I can't tell you.  I don't know what a
13 licensed seller of travel is.
14        MR. SCOTT:  Lunch is here, when you're
15    ready.
16 BY MR. WEGLARZ:
17    Q.   Okay.  Are you involved with the filing of
18 any corporate reports?
19    A.   No, I'm not.
20    Q.   Who at UVI is involved with that?
21    A.   That would be somebody in the finance
22 department.
23    Q.   Did you tell me before it was Andrew, is it
24 Blanca or Blanco?
25    A.   It depends on how you pronounce it.  It's

Page 78

1 Blanco, B-l-a-n-c-o.
2    Q.   Andrew Blanco, I think you told me, was the
3 person that you communicated with before who's from
4 UTC?
5    A.   Correct.
6    Q.   Is Andrew Blanco also affiliated with UVI?
7    A.   No.
8    Q.   Is there another Andrew Blanco, to your
9 knowledge?
10    A.   No.  He doesn't work for UVI.
11    Q.   Okay.  If the 2019 corporation annual report
12 filed with the State of Florida lists Andrew Blanco as
13 a CFO for UVI, would that be incorrect?
14    A.   I don't know.  I don't file those reports.
15 I'd have to look into it.
16    Q.   Has Andrew Blanco ever worked for UVI?
17    A.   Yes.
18    Q.   Okay.  And during what period of time?
19    A.   Up until 2006.
20    Q.   Okay.  So since 2006, he has not been
21 affiliated with UVI; true?
22    A.   He's not on my payroll.
23    Q.   And was it at that point that he then started
24 working for UTC, 2006?
25    A.   No, UVL.

Page 79

1    Q.   And then when UVL --
2    A.   Then UTC was formed.
3    Q.   And then it went from UVL to UTC?
4    A.   Yes.
5    Q.   That started when?
6    A.   I think UTC was formed sometime in 2015.
7    Q.   Any other UVI employees who have worked for
8 other Sandals-related entities besides Mr. Blanco?
9    A.   In 2006, when UVL was formed, they took IT
10 responsibilities, call center responsibilities, so
11 there were other people that migrated, left UVI, were
12 hired by UVL.
13    Q.   Okay.  And when they created UVL, I mean, did
14 they basically recruit staff from UVI to now staff
15 this newly created UVL?
16    A.   Listen, I wasn't privy to what happened back
17 in 2006 regarding that type of thing.
18    Q.   Do you know who Brian Mair is?
19    A.   Yes.
20    Q.   Who is Brian Mair?
21    A.   Brian Mair is listed as the president of
22 UVI.
23    Q.   Oh, and how long has Brian Mair been the
24 president of UVL?
25    A.   Not UVL, UVI.

Page 80

1    Q.   I'm sorry, I misheard you then?
2    A.   Oh, I don't know exactly how long.
3    Q.   How long has he been with UVI?
4    A.   I don't know exactly.
5    Q.   Has he ever been affiliated with UVL or
6 UTC?
7    A.   Not that I'm aware of.
8    Q.   Has Brian Mair ever been considered a
9 chairman for UVI?
10    A.   Not that I'm aware of.
11    Q.   What does the president of UVI do?
12    A.   Well, he's actually quite ill.  I haven't
13 seen him in several years.
14    Q.   Oh, I'm sorry to hear that.  How long has --
15        MR. SCOTT:  Come on, you were aware of
16    that.  I told you that.
17        MR. WEGLARZ:  I didn't know for several
18    years.  And, you know, Mr. Scott, it's nice
19    to hear that your representations are
20    affirmed.
21        MR. SCOTT:  I don't say them unless I've
22    got facts to back them up.
23        MR. WEGLARZ:  That's the word on the
24    street.
25        MR. SCOTT:  And you can ask her what his

GONZALEZ, TAMMY
10/03/2019

Pages 81–84

Page 81

1    problem is, and she'll tell you.
2  BY MR. WEGLARZ:
3    Q.   Let me ask you, what is his problem?
4    A.   He has Parkinson's disease.
5    Q.   That's horrible.  So he's had that for quite
6  a while, I take it?
7    A.   I assume.  I don't know the date he was
8  diagnosed, but --
9    Q.   But for several years, he's been unable to
10 work or tend to any work responsibilities because of
11 the disease; fair to say?
12   A.   (Nods head.)
13   Q.   Yes?
14   A.   Yes, sorry.
15   Q.   That's okay.  So if the most recent corporate
16 report filed with the State of Florida for 2019 lists
17 Mr. Mair as a chairman, that would be inaccurate,
18 correct?
19   A.   I don't know.  I haven't seen the report.
20   Q.   Are UVI employees provided with work email
21 addresses?
22   A.   Yes.
23   Q.   And what is your UVI work email address?
24   A.   They are first initial, last name, so it's
25 tgonzalez@UVI.sandals.com.

Page 82

1    Q.   Do you have any other work-related email
2  addresses besides that?
3    A.   No.
4    Q.   And is every UVI employee provided with an
5  email address with a domain like that?
6    A.   @UVI.sandals.com?
7       MR. SCOTT:  Objection.  That's two
8       questions, you know, compound, but okay, she
9       can answer it.
10      MR. WEGLARZ:  Your objection is
11      sustained, too.
12      MR. SCOTT:  Thank you, Judge.
13      MR. WEGLARZ:  All right.  I should be
14      saying the same.
15 BY MR. WEGLARZ:
16   Q.   But they all end with UVI.sandals.com,
17 correct?
18   A.   Yeah.
19   Q.   And I take it UVI doesn't give non-UVI
20 employees those email addresses, correct?  It's only
21 for employees?
22   A.   It should be.
23   Q.   And you have no other email addresses,
24 work-related, other than that one?
25   A.   Not that I'm aware of.

Page 83

1    Q.   Okay.  Like they don't give you a Sandals
2  address or a Beaches email address?
3    A.   No.  I don't work for Sandals or Beaches.
4    Q.   All right.  Well, I thought if I threw that
5  question out there, you'd just admit you work for
6  Beaches and it would be done?
7    A.   Could go home.
8    Q.   But you didn't fall for it.  So Dmitri really
9  prepped you.  He did a good job.
10   A.   I may just be smart on my own.
11   Q.   That's not what Dmitri -- no, you are.
12 Sorry.
13      Have you heard of an employee named Leo
14 Malcolm?
15   A.   Yes.
16   Q.   Who is that?
17   A.   Leo Malcolm works in the operations
18 department.
19   Q.   And that's the operations department of UVI,
20 right?
21   A.   Correct.
22   Q.   Is he still there?
23   A.   Yes, he is.
24   Q.   How long has he been with UVI?
25   A.   Fifteen years, 16 years, somewhere in that

Page 84

1  neighborhood.
2    Q.   And how long has he been with the operations
3  department?
4    A.   I believe the whole time.
5    Q.   And does he report to the headquarters in
6  Miami?
7    A.   He is in Miami.
8    Q.   Right.  That's where he reports to for his
9  job, correct?
10   A.   Sure.
11   Q.   And at that location, is it only UVI
12 employees who are in that office?
13   A.   At Unique Vacations?
14   Q.   Yes.
15   A.   At my office, yes.
16   Q.   In the headquarters.  Are there UVL employees
17 who sometimes work out of that office?
18   A.   They could.
19   Q.   Have you ever observed that?
20   A.   That somebody from UVL came to UVI?
21   Q.   Yes.
22   A.   Sure.
23   Q.   Not that they'll just walk in.  They'll use
24 an office and work out of there for a period of time,
25 correct?

GONZALEZ, TAMMY
10/03/2019

Pages 85–88

Page 85

1  A.  For a day, yeah, they could.
2  Q.  Any other Sandals-related companies who come
3  in and use the UVI headquarters as an office?
4  A.  I have several empty offices in my building,
5  so if somebody needed to come up and spend a day
6  working out of Miami for some reason, I could
7  certainly have a place for them to sit.
8  Q.  And UVI never gets involved with any
9  bookings, assisting with bookings for Beaches' or
10  Sandals' vacations?
11  A.  We can help.  We would help more with tour
12  operator bookings.
13       (Phone interruption.)
14       MR. WEGLARZ:  Boy, I thought your phone
15  was loud.  That's loud.
16       MR. SCOTT:  I hope that's not a fire
17  alarm.
18       THE WITNESS:  It's the phone.
19       MR. SCOTT:  Is it the phone?
20       THE WITNESS:  I think it's the phone.
21       MR. SCOTT:  Steve?
22       (A recess was taken in the deposition, after
23  which the deposition continued as follows:)
24       MR. SAFRA:  Sorry, I got disconnected
25  while I was trying to un-mute, so I apologize

Page 86

1  for interrupting.
2       MR. WEGLARZ:  You're fine.
3       MR. SAFRA:  Are we still on the record,
4  Tom?
5       MR. SCOTT:  Yeah.
6       MR. WEGLARZ:  I hung up by accident when
7  you were making a reference, and I didn't
8  want to, you know, speak and I tried to email
9  Tom when you would say things like
10  Sandals-related, and I wanted to object to
11  form for those three or four questions where
12  you said Sandals-related.
13       MR. WEGLARZ:  It's fine.
14       MR. SAFRA:  Can we agree that we have an
15  objection to form --
16       MR. WEGLARZ:  Sure.
17       MR. SAFRA:  -- when you say, you know,
18  someone like is concerned with or some
19  connection to the brand, you know, I probably
20  would not have an objection, but when you say
21  Sandals-related, we have to object.
22       MR. WEGLARZ:  That's fine.
23       MR. SAFRA:  Just in case.
24       MR. WEGLARZ:  Okay.
25  BY MR. WEGLARZ:

Page 87

1  Q.  All right.  We're going to break in a minute.
2  I just want to follow up on your last response.  You
3  said UVI can help sometimes with these bookings and
4  reservations.  Explain that for me.
5  A.  Only with tour operator bookings.  So as I
6  explained, there is an electronic way that bookings
7  are transmitted from a tour operator into a booking
8  screen.  For example, if there is a glitch in the
9  system or it pulled back a price that looked wrong, I
10  have a couple of people at Unique that can help tour
11  operators with that.  So if a tour operator reported
12  to, for example, Leo Malcolm, whom you brought up --
13  Q.  Yes.
14  A.  -- that I got a confirmation back in the
15  wrong category, we would then take it to IT and let
16  them know that there is a problem with the system.
17  This came -- this is wrong, just a rough example.
18  Q.  And you understand that Leo Malcolm did have
19  some role with respect to the booking and reservation
20  of the plaintiffs' trip, correct?
21  A.  No, I don't know that.
22  Q.  Hold on.
23       (Plaintiffs' Exhibit No. 6 was marked for
24  identification, a copy of which is attached hereto.)
25  BY MR. WEGLARZ:

Page 88

1  Q.  I'll give you a second to look at it.  Let me
2  know when you're ready.  I don't want to interfere
3  with that.
4       MR. SCOTT:  Okay.
5       THE WITNESS:  Okay.
6  BY MR. WEGLARZ:
7  Q.  All right.  Looking at Exhibit No. 6, these
8  are records that were provided by Mark Travel
9  pertaining to the booking --
10  A.  Uh-huh.
11  Q.  -- of the resort vacation package, and if we
12  look at page 1, there's an email from Leo Malcolm to
13  PB Customer Solutions and Libby Thornton; do you see
14  that?
15  A.  Yes.
16  Q.  And it's dated March 26th of 2015?
17  A.  Uh-huh.
18  Q.  Is that a yes?
19  A.  Correct, sorry.
20  Q.  And Leo Malcolm, at least according to the
21  document, is sending this from his UVI Sandals email
22  address, correct?
23  A.  Yes.
24  Q.  Now, a lot of it is redacted, but it appears
25  to me that he is sending an email to Mark Travel

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Pages 89–92

Page 89

1  showing that he has made rooms available at the
2  Beaches Ocho Rios Resort for Janet Desantis, Paiton
3  Bater and Margaret and Amber Torralva; do you see
4  that?
5      A.   I see their names on it, yeah.
6      Q.   Is that your understanding as to what's going
7  on here with Mr. Malcolm?
8      A.   No, what this looks like to me --
9      Q.   Sure.
10     A.   -- is that Fun Jet or Mark Travel was
11 notified that Moon Palace was not available and they
12 probably reached out to different partners to say, Do
13 you have any availability on these dates, that's what
14 I think this is.
15     Q.   Okay.  And so why is Leo Malcolm getting
16 involved checking out the availability for Beaches
17 Ocho Rios?
18     A.   They would reach out to him because he's
19 their operational contact when they have booking
20 issues.  Like I said, the example I gave you with the
21 system, something going wrong.
22     Q.   Okay.  And is the operational contact
23 different from the, what did we call them before,
24 the -- was it DBMs?
25     A.   BDMs.

Page 90

1      Q.   BDMs?
2      A.   Yes.
3      Q.   So what's an operational contact?
4      A.   Those are the people that I told you, if a
5  tour operator has a problem with the booking,
6  something wrong with transmission, BAT information
7  was sent back, that's -- there's people to contact to
8  try to help solve that.
9      Q.   Okay.  And so what Mr. Malcolm did was, he
10 assisted Mark Travel with this particular booking.  He
11 went and looked for availability at Beaches so that
12 they could rebook the reservation that was cancelled
13 at Moon Palace, correct?
14     MR. SCOTT:  Argumentative.
15     You can answer.
16     THE WITNESS:  Oh.  Look, from this very
17     small piece of paper that you just gave me.
18 BY MR. WEGLARZ:
19     Q.   Yes.
20     A.   The way things like this would traditionally
21 work, if Moon Palace didn't open in time, they would
22 go out to everybody who had made a booking.  So it
23 would be Fun Jet, Gogo Tours, consumers, travel agents
24 and say it's not going to be available.  Then the tour
25 operators, etcetera, in turn, before they get into --

Page 91

1  and I'm guessing how this would work in this case, but
2  before you call the client to say, your hotel is not
3  available, they probably checked with two or three or
4  four or maybe ten other hotels to say, Do you have
5  availability, and then they must go back to the
6  client, and it's not always the tour operator, it's
7  the travel agent, and say, "This is what's available
8  because what you booked is not available," but I'm
9  hypothesizing on this situation.
10     Q.   Well, if -- and you understand that the
11 travel agent in this case is Vacations To Go,
12 correct?
13     A.   I do.
14     Q.   And they're in a contract with Fun Jet or
15 Mark Travel, correct?
16     A.   I don't know if they're under contract, but
17 that's who they made the booking through.
18     Q.   And if Vacations To Go wanted, they could
19 have rebooked this trip with Beaches or Sandals on its
20 own without having to involve Leo Malcolm, right?
21     A.   If they wanted to, they could have gone
22 directly to a call center.
23     Q.   And that's usually how they do it, right?
24     A.   There's different channels.
25     Q.   All right.  You have tour operators and the

Page 92

1  travel agents booking Beaches or Sandals Resorts, they
2  usually don't get UVI involved, do they?
3      A.   Not unless there's a problem.
4      Q.   Okay.  But really this problem here, there's
5  no problem from Beaches or Sandals' end on this
6  reservation.  This is a problem unrelated to Beaches
7  or Sandals.  Moon Palace isn't available, correct?
8      A.   Correct.
9      Q.   I mean, UVI isn't here to assist with
10 problems with Moon Palace, are they?
11     A.   I'm not assisting with a problem in Moon
12 Palace in this example.
13     Q.   So what we have is, we have Mark Travel and
14 Vacations To Go looking to book some clients into a
15 Beaches resort and then they reach out to their
16 operational contact at UVI, who is Leo Malcolm,
17 correct?
18     A.   What you have is an email from Fun Jet asking
19 about room types that are available, clients have
20 partial oceanview and concierge rooms, and she's
21 asking if we can give the same type of accommodation
22 at Palaces' net rate, that's what this email is
23 asking.
24     Q.   Well, there's -- you're talking about the
25 email subsequent to the one sent by Mr. Malcolm,

GONZALEZ, TAMMY
10/03/2019

Page 93

1  correct?  The net rate is the email that was sent by
2  Tammy Willis after Leo sends his email saying, Hey,
3  here's the room categories in red that he made
4  available?
5      A.   Yes, he --
6          MR. SCOTT:  Why don't we take a break and
7      let her look at the document over lunch and
8      then we can pick this up.
9          MR. WEGLARZ:  We can.  I'm just about
10     done.
11  BY MR. WEGLARZ:
12     Q.   If you look at page -- it's the fourth page
13  of the exhibit, and it's Bates stamped 35.
14     A.   Uh-huh.
15     Q.   And if you -- if you see the email from a Mr.
16  Anderson, this is dated March 18th, the very last
17  paragraph there's a reference, "Dee provided some
18  information that Sandals Grand or Sandals Grande has
19  advised they would..." that they would be or be able
20  "...to take guests at the Moon Palace rate, but this
21  should still be worked out and aligned with Sandals
22  before moving forward"; do you see that?
23     A.   I do.
24     Q.   And then it looks like a week later --
25     A.   Uh-huh.

Page 94

1      Q.   -- that's when we have Leo Malcolm sending
2  this email, "Hey, I've got these room categories in
3  red," and he lists the plaintiffs for a partial
4  oceanview for Beaches, correct?
5      A.   Correct.
6      Q.   And he's saying, look it, I can make this
7  available, I'm making this available for Desantis,
8  Bater and Torralva, correct?
9      A.   He would have been responding to a request
10  about availability.
11     Q.   And how would Mr. Malcolm even know that
12  these rooms were available and that they could be used
13  by my clients?
14     A.   Because we do inventory control at my office
15  as well.
16     Q.   All right.  And so Mr. Malcolm would have
17  physically have done what, so that he assured himself
18  he could make these rooms available?
19     A.   It was four years ago.  I don't know.  He
20  might have asked somebody.  He might have asked me.
21  He might have viewed the system.  I don't know.
22     Q.   Okay.  And what Mr. Malcolm is doing is
23  saying, Hey, look it, I can provide these rooms for
24  these four named individuals, correct?
25     A.   I don't believe that he would have paid any

Page 95

1  attention to who the people are.
2      Q.   Well, how do you know that?
3      A.   Because we don't care who the people are.  If
4  someone is saying, "Are there rooms available," our
5  answer is going to be, "Yeah, we can help you if you
6  guys need help," or "No, we can't help."
7          MR. WEGLARZ:  Okay.  We can take a break
8      now.
9          THE WITNESS:  Perfect.
10         (A recess was taken in the deposition, after
11  which the deposition continued as follows:)
12         MR. WEGLARZ:  Back on.
13  BY MR. WEGLARZ:
14     Q.   Ms. Gonzalez, other than Leo Malcolm, any
15  other UVI operational contacts for Mark Travel/Fun
16  Jet?
17     A.   No.
18     Q.   Any other UVI employees assigned to Mark
19  Travel/Fun Jet, other than the three BDMs we talked
20  about earlier and Leo Malcolm?
21         MR. SUAREZ:  Objection to form.
22         THE WITNESS:  Yeah, we actually didn't
23     talk about any BDMs with Mark Travel.
24  BY MR. WEGLARZ:
25     Q.   Oh, that was for VTG, I apologize?

Page 96

1      A.   Yeah.
2      Q.   Which BDMs would be assigned to Mark Travel
3  if they're different than the three in Texas?
4          MR. SUAREZ:  Object to the form.
5          THE WITNESS:  There is -- it's either two
6      or three people who deal exclusively with
7      tour operators, but Mark Travel is not one of
8      them currently.
9  BY MR. WEGLARZ:
10     Q.   Okay.  Back in 2015?
11     A.   Yeah, there was a tour operator BDM named
12  Libby Thornton.
13     Q.   Any others besides Ms. Thornton assigned to
14  Mark Travel back in 2015?
15     A.   Not that I recall.
16     Q.   Okay.  And, again, the BDM does the
17  education, provides the information?
18     A.   Yes.
19         MS. RENEE:  I'm sorry for the
20     interruption.
21         (A recess was taken in the deposition, after
22  which the deposition continued as follows:)
23         MR. SCOTT:  You're on speaker, Steve.
24         MR. SAFRA:  Hello?
25         MR. WEGLARZ:  Okay.  We ready?

GONZALEZ, TAMMY
10/03/2019

Page 97

```
1   BY MR. WEGLARZ:
2       Q.   Okay.  The information or the education
3   provided by the BDMs, would it be any different
4   regarding the info provided by the BDM for Fun Jet
5   versus the info provided by the BDM for Vacations To
6   Go?
7           MR. SUAREZ:  Object to form.
8           THE WITNESS:  Not necessarily.  It would
9       be, you know, updates on product and
10      amenities, features.
11  BY MR. WEGLARZ:
12      Q.   So it should be the same stuff, correct?
13          MR. SUAREZ:  Same objection.
14          MR. SCOTT:  Objection.  Argumentative.
15          THE WITNESS:  We just segregate a team
16      that deals with retail and a team that deals
17      with wholesale.
18  BY MR. WEGLARZ:
19      Q.   And would this information or education that
20  is provided, would it ever include warnings, safety
21  alerts, travel alerts, travel advisories?
22          MR. SUAREZ:  Object to the form.
23          THE WITNESS:  No.
24  BY MR. WEGLARZ:
25      Q.   Would the travel agents or the tour operators
```

Page 98

```
1   ever advise of the type of warning, travel alerts,
2   safety advisories, whatever, pertaining to any of the
3   areas where these Sandals or Beaches resorts are?
4           MR. SUAREZ:  Object to the form.
5           THE WITNESS:  By my office?  By Unique
6       Vacations?
7   BY MR. WEGLARZ:
8       Q.   By UVI?
9           MR. SUAREZ:  Same objection.
10          THE WITNESS:  No.
11  BY MR. WEGLARZ:
12      Q.   How about by any other Sandals or
13  Beaches-related entity?
14          MR. SUAREZ:  Same objection.
15          MR. SCOTT:  Yes, the objection is that
16      "Beaches-related entity."  I think Safra made
17      that point earlier.
18          MR. WEGLARZ:  I'm trying to include the
19      whole circus of entities, SRI, UVL, UTC.  Go
20      ahead.
21          MR. SUAREZ:  Object to the form.
22          THE WITNESS:  Not that I'm aware of.
23  BY MR. WEGLARZ:
24      Q.   And why not?
25          MR. SUAREZ:  Same objection.
```

Page 99

```
1           MR. SCOTT:  Objection.  Answer it, if you
2       know.  Try not to speak for somebody else,
3       but objection to form.
4           THE WITNESS:  Well, I can speak for
5       UVI.
6   BY MR. WEGLARZ:
7       Q.   Sure.
8       A.   It's not our responsibility.  Duty to warn is
9   not something for us to do.
10      Q.   Okay.  But UVI does undertake the
11  responsibility of educating its tour operators and the
12  travel agents on the product that you're promoting in
13  advertising, correct?
14          MR. SCOTT:  Objection.  Asked and
15      answered three or four times.
16          MR. WEGLARZ:  Go ahead.
17          THE WITNESS:  On the brands.
18  BY MR. WEGLARZ:
19      Q.   Correct?
20      A.   Correct, on the brands.
21      Q.   Okay.  With respect to the tour operators and
22  the agents who are authorized to sell Sandals and
23  Beaches resort vacations, are they restricted in any
24  way as to what information they can share with the
25  customer or the traveler?
```

Page 100

```
1       A.   Is the travel agent or tour operator
2   restricted?
3       Q.   Yes.
4       A.   Not that I'm aware of.
5       Q.   If the tour operator feels for whatever
6   reason they need to give a warning to a resort in any
7   particular area, are they free to do that without
8   violating any type of an agreement or condition in
9   their deal with Sandals or Beaches?
10          MR. SUAREZ:  Object to the form.
11          MR. SCOTT:  Objection.  Form.
12          MR. SUAREZ:  Speculation.
13          MR. SCOTT:  Speculative.  You can answer
14      it, if you can.
15          THE WITNESS:  I -- I don't know what they
16      do.  As far as I know, it's the state
17      department's responsibility to post travel
18      warnings.
19  BY MR. WEGLARZ:
20      Q.   And I don't know if that quite answers my
21  question.  If the tour operator feels for whatever
22  reason that they -- you know, I think I should warn
23  this customer about something going on in this area or
24  at the resort, I just think -- I think I should do it,
25  I'm going to warn them about reports of prior sex
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Page 101

1   assaults in this region, they can go ahead and do
2   that, the tour operator, if they want to do it, and
3   they don't have to worry about violating any contract
4   or agreement that's giving them permission to sell
5   Sandals or Beaches Resorts; true?
6       MR. SUAREZ:  Objection to form.
7       MR. SCOTT:  Objection.  Form.
8   Speculative.
9       **THE WITNESS:  As far as I know, there's**
10      **nothing in the contract with the tour**
11      **operators about that.**
12  BY MR. WEGLARZ:
13      Q.   Okay.  And if you found out that a tour
14  operator or an agent who does have authority to sell
15  Beaches and Sandals Resorts locations, if you found
16  out that they were issuing warnings, you would have no
17  problem with that, correct?
18      MR. SUAREZ:  Objection.
19      MR. SCOTT:  Objection.  Speculative.
20      Argumentative.  Beyond her scope and
21      knowledge.
22  BY MR. WEGLARZ:
23      Q.   Go ahead.
24      **A.   I would be surprised if they did.  The hotels**
25  **are in designations with travel warnings of one or**

Page 102

1   two.
2       Q.   You would be surprised if they did what?
3       MR. SUAREZ:  Object to the form.
4       **THE WITNESS:  I don't know what they do**
5       **with their business.  I don't run their**
6       **business.  I don't tell them how to run a**
7       **business.**
8   BY MR. WEGLARZ:
9       Q.   But if it ever was brought to your attention
10  that they may be giving warnings that are similar to
11  what the state department is advising of, you would
12  not have a problem with that?
13      MR. SUAREZ:  Object to form.
14      MR. SCOTT:  Objection.  Hypothetical.
15  Speculative.
16      MR. WEGLARZ:  Go ahead.
17      **THE WITNESS:  I would be surprised to**
18      **hear it.**
19  BY MR. WEGLARZ:
20      Q.   And I know you'd be surprised, but
21  hypothetically, if you were aware of such information,
22  you wouldn't have a problem with it?
23      MR. SUAREZ:  Object to form.
24      MR. SCOTT:  Same objection.  Having a
25      problem.  Form.

Page 103

1       **THE WITNESS:  I don't think so.**
2   BY MR. WEGLARZ:
3       Q.   You wouldn't tell the operator or agent, hey,
4   you can't be giving warnings about any vacations to
5   our resorts, that's a violation of our agreement, or
6   anything to that effect?
7       **A.   No, I just said --**
8       MR. SUAREZ:  Object to form.
9       **THE WITNESS:  Sorry.**
10      MR. SCOTT:  Objection to form.  Asked and
11      answered.  Answer it if you can.
12      **THE WITNESS:  Same answer, I didn't see**
13      **anything in the contract that would prohibit**
14      **them from doing that.**
15  BY MR. WEGLARZ:
16      Q.   All right.  Are you aware of the state
17  department's warnings or travel advisories?
18      MR. SUAREZ:  Object to form.
19      **THE WITNESS:  Yes, I am.**
20  BY MR. WEGLARZ:
21      Q.   You familiarized or you familiarized yourself
22  with the state department's travel alerts and
23  advisories, correct?
24      MR. SCOTT:  Objection.  Overly broad.
25      Time period, etcetera, when she --

Page 104

1       MR. WEGLARZ:  Go ahead.
2       MR. SCOTT:  If you can answer it.
3       **THE WITNESS:  I am aware of it because**
4       **when I travel personally, if I'm going to**
5       **Europe or another country, I usually look at**
6       **it.**
7   BY MR. WEGLARZ:
8       Q.   And you've been to Jamaica numerous times,
9   correct?
10      **A.   Correct.**
11      Q.   And every time you go to Jamaica, you make
12  sure you check the state department travel alerts and
13  advisories, correct?
14      **A.   No, no, I said when I travel personally on**
15  **vacation, I check my destinations.**
16      Q.   But you don't do it for business?
17      **A.   No, I've traveled to Jamaica many, many times**
18  **over the years, and I've never had an issue and I'm**
19  **not -- I have no fear.**
20      Q.   Was there a policy or a rule in force in
21  Jamaica that prohibited resort staff members from
22  fraternizing and getting intimate with resort
23  guests?
24      **A.   I wasn't aware of it.**
25      Q.   Have you ever heard of that being a policy or

GONZALEZ, TAMMY
10/03/2019

Pages 105–108

Page 105

1  a rule anywhere in Jamaica?
2      A.   I heard of it last week when I was at your
3  office.
4      Q.   Did you ever hear of such a rule or a policy
5  at any hotel or resort in the country of Jamaica?
6      A.   No, I wouldn't be privy to that.
7      Q.   All right.  When you went yourself to Beaches
8  Ocho Rios not too long ago, do you recall there being
9  a posting about such a rule, resort staff members are
10 prohibited from fraternizing with guests?
11     A.   No, I didn't see anything, but I was in one
12 restricted area where the event was.
13     Q.   Do you know if that is a current rule or
14 policy down there in Jamaica with respect to the
15 resorts?
16         MR. SCOTT:  You mean for the whole
17     country by the -- by the government?
18         MR. WEGLARZ:  We'll start there, yes.
19         THE WITNESS:  No, I'm not aware.
20 BY MR. WEGLARZ:
21     Q.   Do you know if that's a policy or rule at any
22 resort or hotel in Jamaica?
23     A.   I am not aware of it.
24     Q.   Do you know if that's a rule or policy at any
25 Sandals or Beaches resort in Jamaica?

Page 106

1      A.   Not that I'm aware of.  I don't know employee
2  policies.
3      Q.   Understood.  How about at any Beaches or
4  Sandals resort anywhere, have you heard of such a rule
5  or a policy?
6      A.   No, I'm not aware.
7      Q.   Have you ever heard that the state department
8  was reporting it had a special concern about the
9  number of sexual assaults perpetrated by hotel
10 employees at resort hotels on the north coast of
11 Jamaica?
12     A.   Not that I recall.
13     Q.   When was the first time you ever heard of
14 such a thing?
15     A.   Well, I certainly heard about, you know, the
16 things pertaining to this case.
17     Q.   So the first time you've heard of such a
18 concern, that would be what, like within the last few
19 weeks?
20     A.   Yeah, whenever we started.
21         MR. SCOTT:  The case, you mean.
22         MR. WEGLARZ:  Yeah.
23         MR. SCOTT:  Okay.
24 BY MR. WEGLARZ:
25     Q.   Okay.  Prior to being served with this

Page 107

1  lawsuit, you never heard that there was some reported
2  concern by the state department about the number of
3  sex assaults being committed by resort employees at
4  the resorts on the north coast?
5      A.   No.
6      Q.   Have you ever heard of that being an issue or
7  a concern anywhere in the world --
8         MR. SCOTT:  Objection.  Overly broad.
9      Time.
10 BY MR. WEGLARZ:
11     Q.   -- some warning, some concern being reported
12 about the number of sex assaults being perpetrated by
13 hotel employees?
14     A.   Not that I recall.
15     Q.   Would you agree that's an unusual type of
16 alert or warning?
17         MR. SCOTT:  Objection.  Form.
18         THE WITNESS:  I -- I mean, I couldn't say
19     if that's unusual or not.
20 BY MR. WEGLARZ:
21     Q.   If you're traveling to -- I think you already
22 told us, look, I've been to Jamaica so many times, I
23 don't need to read the state department travel alerts
24 because you're familiar with that place, you're
25 comfortable with it, you don't need to go to the state

Page 108

1  website; true?
2         MR. SUAREZ:  Objection to form.
3         MR. SCOTT:  Objection to form.  Compound.
4      Repetitious.  Overly broad.
5         Can you answer that?
6         THE WITNESS:  I'm sorry, you'll have to
7      ask me again.
8  BY MR. WEGLARZ:
9      Q.   Sure.  You don't review the state department
10 website for your trips to Jamaica because you've been
11 there numerous times, correct?
12     A.   Correct.
13         MR. SUAREZ:  Object to the form.
14 BY MR. WEGLARZ:
15     Q.   So you feel that because you're that
16 acquainted with that area, there's no need to check,
17 correct?
18         MR. SUAREZ:  Objection.
19         MR. SCOTT:  Objection.  Form.
20      Argumentative.
21 BY MR. WEGLARZ:
22     Q.   Go ahead.
23     A.   I feel very safe at Sandals Beaches when I'm
24 there.
25     Q.   But I take it -- you did say, though, you do

GONZALEZ, TAMMY
10/03/2019

Pages 109–112

Page 109

1  review the state department website for areas where
2  you're traveling to on a personal -- for personal
3  reasons, correct?
4      A.   Sure, I might take a look.
5      Q.   And these are the areas that you're not so
6  familiar with, correct?
7      A.   Europe, for example, yeah.
8      Q.   And if there was a state department alert or
9  warning stating that they have a special concern about
10 the number of sex assaults being perpetrated by hotel
11 employees in the area where you're going to, I take it
12 that would be a significant piece of information?
13         MR. SCOTT:  Objection.  Asked and
14      answered.  She's already responded to that
15      question.
16 BY MR. WEGLARZ:
17     Q.   Go ahead.
18     A.   The state department warnings that I've
19 looked at just give you a number, all right?  So
20 things are on the level one, level two, level three.
21 I think it goes up to level five.
22     Q.   But that was something that they currently
23 enacted, correct?
24     A.   I don't think so.  I think that's been out
25 for a while.

Page 110

1      Q.   Okay.  If someone was planning a vacation to
2  Jamaica, and if there was a state department report or
3  a warning regarding its concern, its continued concern
4  about the number of sex assaults being committed by
5  hotel employees at the resorts, do you agree that
6  that's information that the traveler would probably
7  want to know?
8          MR. SUAREZ:  Objection.  Form.
9          MR. SCOTT:  Objection.  Speculative.
10      Hypothetical.  Beyond the scope of her
11      knowledge.
12 BY MR. WEGLARZ:
13     Q.   Go ahead.
14     A.   I think it's the traveler's responsibility to
15 look up where they're going and know where they're
16 going.
17     Q.   And how would the traveler know what to look
18 up or where to look it up?
19         MR. SUAREZ:  Object to the form.
20         THE WITNESS:  I would say you just Google
21      travel warnings or something.  That's what I
22      would do.
23 BY MR. WEGLARZ:
24     Q.   And if you have a group like we have here
25 with the two mothers and the two daughters booking

Page 111

1  this trip to Beaches Ocho Rios?
2      A.   Uh-huh.
3      Q.   Do you agree that this group probably should
4  have been made aware of this state department reported
5  concern about the number of sex assaults being
6  perpetrated by hotel employees at the resorts?
7          MR. SCOTT:  Objection.  Form.
8      Hypothetical.  Asked and answered.  She
9      already answered that.
10         MR. SUAREZ:  Object to form.
11 BY MR. WEGLARZ:
12     Q.   You can still answer.
13     A.   I agree with what I said earlier, which is,
14 it's the traveler's responsibility.  Now on a separate
15 note, I've sent my daughter down.  She's gone to the
16 hotels.  I've never worried about her.  The level of
17 warning Jamaica's at, is the same level that United
18 Kingdom is on, Spain, Italy, France, Antarctica,
19 Dominican Republic, Mexico, but I think it's the
20 traveler's responsibility to do their research.
21         MR. SUAREZ:  Todd, an objection for one
22      is an objection for all?
23         MR. WEGLARZ:  Sure.
24         MR. SCOTT:  How much more do you have, do
25      you think?

Page 112

1          MR. WEGLARZ:  Hour-and-a-half, two hours.
2  BY MR. WEGLARZ:
3      Q.   And if it's the travelers responsibility, do
4  you agree that the traveler should at least be advised
5  as to where they can look to find that information?
6          MR. SUAREZ:  Object to form.
7          MR. SCOTT:  Same objection.
8          THE WITNESS:  You're asking me to answer
9      the question as if I were a travel agent
10     talking to a consumer.  I don't know what
11     they feel their responsibilities are.
12 BY MR. WEGLARZ:
13     Q.   What if you are a licensed seller of
14 travel?
15         MR. SUAREZ:  Object to form.
16         THE WITNESS:  Well, that's pretty
17     hypothetical.
18 BY MR. WEGLARZ:
19     Q.   Well, I believe UVI is a licensed seller of
20 travel in the state of Florida, but you're not aware
21 of that?
22     A.   I'm not dealing with consumers or making
23 bookings or selling hotel rooms.
24     Q.   But as a promoter of vacation packages, do
25 you think it would be reasonable to advise the

GONZALEZ, TAMMY
10/03/2019

Pages 113–116

Page 113

1    customer, the traveler, of current state department
2    warnings and alerts?
3        A.    No.
4            MR. SCOTT:  That's the fifth time you've
5        asked her that question and she's answered
6        it.
7            MR. SUAREZ:  Object to the form.
8    BY MR. WEGLARZ:
9        Q.    Do you think it would be reasonable to advise
10   the customer or the traveler of a place where they can
11   go to find any warnings or travel alerts?
12           MR. SUAREZ:  Same thing.  She answered it
13       previously.
14           MR. SUAREZ:  Object to the form.
15   BY MR. WEGLARZ:
16       Q.    Go ahead.
17           MR. SUAREZ:  Object to the form.
18           THE WITNESS:  No.
19   BY MR. WEGLARZ:
20       Q.    You don't fault the plaintiffs in this case
21   for not being aware of those advisories or alerts, do
22   you?
23           MR. SCOTT:  Object.  Legal conclusion.
24       Beyond her scope as a lay witness.
25           THE WITNESS:  I'm not finding fault with

Page 114

1        anybody.
2    BY MR. WEGLARZ:
3        Q.    'Cause even you yourself, you were completely
4    unaware of these reports, correct?
5            MR. SUAREZ:  Object to form.
6            MR. SCOTT:  Objection.  What reports?
7        Form.
8    BY MR. WEGLARZ:
9        Q.    Well, as you sit here today, you know that
10   the state department did have reports and warnings out
11   there for a period of several years, where they note
12   their special concern about the number of sex assaults
13   perpetrated by hotel employees at resort hotels on the
14   north coast?
15       A.    No.
16           MR. SUAREZ:  Object to the form.
17           MR. SCOTT:  She's already indicated she
18       didn't know.
19           THE WITNESS:  What I know is the state
20       department puts up advisories by levels, one,
21       two, three, four, and I think five is like
22       Iraq.
23   BY MR. WEGLARZ:
24       Q.    You would have reviewed the state department
25   alerts, warnings and advisories between 2013 and 2015,

Page 115

1    correct?
2        A.    Probably.
3            MR. SUAREZ:  Object to the form.
4    BY MR. WEGLARZ:
5        Q.    For the country of Jamaica, correct?
6        A.    No.
7        Q.    For what areas?
8        A.    My daughter volunteers to work at like a
9    turtle hatchery in Costa Rica, looked at that.  She
10   did something else in maybe Honduras or Guatemala.  I
11   looked at the advisory then.
12       Q.    Now why was it important to you, as a mother,
13   knowing your daughter was going to those areas, to be
14   informed about any travel advisories or alerts
15   affecting that area?
16           MR. SUAREZ:  Object to the form.
17           THE WITNESS:  That's my responsibility as
18       a parent, I felt.
19   BY MR. WEGLARZ:
20       Q.    And how did you know to go there?
21           MR. SUAREZ:  Object to the form.
22           THE WITNESS:  Google.
23   BY MR. WEGLARZ:
24       Q.    Google what?
25       A.    I just put in -- I mean, you're asking me to

Page 116

1    remember what I did many years ago, but I would just
2    put in travel warnings or travel advisories for, you
3    know, maybe I pinpointed the destination, maybe not,
4    but it would have just been a Google search.
5        Q.    Do you believe tour operators should be aware
6    of all state department travel alerts, advisories and
7    warnings pertaining to the destinations where they're
8    selling vacation packages for?
9            MR. SUAREZ:  Object to form.
10           MR. SCOTT:  Objection.  Asked and
11       answered, and beyond the scope of her
12       knowledge.
13   BY MR. WEGLARZ:
14       Q.    Go ahead.
15       A.    No, not necessarily, but I don't know.  I'm
16   not a tour operator.  I don't know what their policies
17   are regarding this.
18       Q.    And have you ever heard of any issue or
19   problem involving sex assaults being committed by
20   resort employees in Jamaica?
21           MR. SCOTT:  Objection.  Asked and
22       answered.
23           MR. SUAREZ:  Form.
24           THE WITNESS:  No.
25   BY MR. WEGLARZ:

GONZALEZ, TAMMY
10/03/2019

Pages 117–120

Page 117

```
1      Q.   Did you have any understanding or knowledge
2  as to how safe or dangerous Jamaica was?
3         MR. SUAREZ:  Object to the form.
4         MR. SCOTT:  Objection.  Asked and
5      answered.  She's already testified to that.
6  BY MR. WEGLARZ:
7      Q.   Okay.
8      A.   Based on my personal knowledge.  Like I said,
9  I've never had any issues at all.
10     Q.   All right.  But did you have an understanding
11 as to the reports that were out there?  For example, I
12 forget which, maybe it was Forbes that said it's the
13 third dangerous country in the world?
14        MR. SUAREZ:  Objection to form.
15 BY MR. WEGLARZ:
16     Q.   Were you aware of that?
17     A.   When was that published?
18     Q.   A few years ago.
19        MR. SCOTT:  Objection.  Are you -- if
20     you're -- if you know about it, tell him.
21        THE WITNESS:  No, I don't.  I just don't
22     know if you were talking about today or if
23     you were talking about in 2015.
24 BY MR. WEGLARZ:
25     Q.   Did you ever hear that Jamaica was reportedly
```

Page 118

```
1  a very dangerous place to go?
2      A.   No, only from what I heard last week that
3  came up in your office.
4      Q.   Besides what you hear from this lawsuit,
5  anything besides that, did you ever hear that it was a
6  dangerous place?
7      A.   A few years ago, Jamaica had a problem, like,
8  internally with some of their people, and I know they
9  put some additional defense force out, but not at the
10 resorts.
11     Q.   All right.  That's the only thing you've ever
12 heard of?
13     A.   That's the only thing I can recall, yeah.
14     Q.   You never heard anything that it was reported
15 to be the third most dangerous place in the world or
16 the fifth most dangerous, or the second most
17 dangerous, anything like that?
18        MR. SUAREZ:  Object to the form.
19        MR. SCOTT:  Asked and answered.
20        THE WITNESS:  No.
21 BY MR. WEGLARZ:
22     Q.   And you think it's a safe place?
23        MR. SUAREZ:  Object to the form.
24        THE WITNESS:  I've never had any
25     problems.
```

Page 119

```
1  BY MR. WEGLARZ:
2      Q.   You went to Beaches Ocho Rios, that was a
3  safe place, right?
4      A.   I've said I've never had a problems at all
5  when I've gone to Jamaica or any of our resorts.
6      Q.   Beaches is a family-oriented resort,
7  correct?
8      A.   Yes.
9      Q.   And you think a teenager should feel safe to
10 walk around the resort, even by herself?
11        MR. SCOTT:  Objection.
12        THE WITNESS:  I would think so.
13 BY MR. WEGLARZ:
14     Q.   Okay.  Do you see any issue or problem with
15 resort staff fraternizing with guests?
16        MR. SCOTT:  Objection.  Form.
17        THE WITNESS:  What do you mean by the
18     fraternizing?
19 BY MR. WEGLARZ:
20     Q.   Discussing things that are not pertinent to
21 the resort's operation and business?
22        MR. SCOTT:  Objection.  Beyond the scope
23     of her knowledge.
24        THE WITNESS:  No, I'm sure they say,
25     "Where are you from?  How was your trip?"
```

Page 120

```
1      You know, things like that.
2  BY MR. WEGLARZ:
3      Q.   How about, Hey, you want to go to a club
4  afterwards off property?
5         MR. SCOTT:  Objection.  Speculation.
6         THE WITNESS:  I'm sorry, ask that
7      again.
8  BY MR. WEGLARZ:
9      Q.   Sure.  How about resort staff asking guests
10 out to a club off the resort property?
11     A.   Do I think it's appropriate, is that your
12 question?
13     Q.   Yes.
14     A.   I wouldn't know what the circumstance was
15 behind that conversation, if one happened.  I wouldn't
16 know if the guest asked, Hey, is there a place to go?
17 I don't know.
18     Q.   What if the resort staff is asking the guest
19 for their Facebook information?
20        MR. SCOTT:  Same objection.
21     Speculation.
22 BY MR. WEGLARZ:
23     Q.   Any issue with that?
24        MR. SCOTT:  Beyond her knowledge.
25        THE WITNESS:  I mean, you're just asking
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GONZALEZ, TAMMY
10/03/2019

Page 121

1     me for my personal opinion on hypothetical
2     situations?  You know, I don't know.  I don't
3     know how friendly people get.  There are many
4     times repeat guests that are very friendly
5     with staff.
6   BY MR. WEGLARZ:
7     Q.   Well, what about the opposite, where staff is
8   very friendly with guests?
9     A.   Staff is friendly with all guests.
10    Q.   And you see nothing wrong with, Hey, can we
11  be friends on Facebook?  Let's meet for a drink after.
12    A.   I mean, really having no conversation to put
13  into context, no, I think it's probably fine.
14    Q.   Who is responsible for the hiring and firing
15  of the staff at the Beaches Ocho Rios Resort?
16        MR. SCOTT:  Objection.  Beyond the scope
17    of her knowledge.
18        THE WITNESS:  I don't know.  I don't know
19    if it's Sandals -- SRI in Jamaica.  I don't
20    know if it's the individual hotels.  I know
21    we have nothing to do with the hiring and
22    firing of the staff.
23  BY MR. WEGLARZ:
24    Q.   That's my next question.  Does UVI have any
25  role whatsoever in the staffing of the Beaches Ocho

Page 122

1   Rios Resort?
2     A.   Not at all.
3     Q.   Do you even know who the staff members are?
4     A.   Besides knowing a general manager or two, no.
5     Q.   If there are hires and fires, is UVI made
6   aware of that?
7     A.   Never.
8     Q.   The three individuals who were involved in
9   this incident, did you know who those individuals
10  were?
11    A.   No, I didn't.
12    Q.   Did you ever hear of those names before?
13    A.   Not before this.
14    Q.   Okay.  You know who they are now, obviously,
15  correct?
16    A.   Sure.  Their names are in here somewhere.
17    Q.   Do you know anything about their background?
18    A.   Not at all.
19    Q.   Do you know if anyone looked into it to see
20  if they had any type of history doing this or anything
21  in their background that perhaps would have made them
22  not a suitable candidate to work at this resort?
23    A.   No, I don't.  I have nothing to do with it at
24  all.
25    Q.   Do you know what happened to these three

Page 123

1   individuals employment-wise since this alleged
2   incident?
3     A.   Not really.
4     Q.   Do you know if they were ever terminated?
5     A.   I don't know.  I assume they're not there
6   right now while this is going on, but I don't know.
7     Q.   And I just want to make sure I understand
8   your testimony.  As you sit here today, you're telling
9   me aside from what you heard last week in my office
10  during four verbose and lengthy depositions, you've
11  never even heard of a historic concern over the
12  incident of sex assaults against guests by hotel
13  employees of resort hotels on the north coast of
14  Jamaica?
15    A.   Not that I recall.  I focus on the Sandals
16  and Beaches brand.
17    Q.   Do you know that the state department issues
18  crime and safety reports for Jamaica?
19    A.   No.
20    Q.   So if they were to come out with a 2000 crime
21  and safety report, 2013 crime and safety report, a
22  2014 crime and safety report, that's news to you, this
23  is the first time you're hearing that?
24    A.   I haven't read that.
25    Q.   Have you heard anyone discuss these state

Page 124

1   department annual crime and safety reports for
2   Jamaica?
3         MR. SCOTT:  Objection.  Overly broad.
4     Time, who, rate.
5         THE WITNESS:  Not that I recall.
6   BY MR. WEGLARZ:
7     Q.   Do you have any idea or understanding of any
8   procedures or policies or efforts to undertake to try
9   to eliminate incidents of sex assault by resort
10  employees in Jamaica?
11    A.   No, that wouldn't fall under my purview.
12    Q.   Have you heard that such efforts are being
13  undertaken now or recently?
14    A.   Not that I recall.
15    Q.   Do you know who the Jamaica Ministry of
16  Tourism is?
17    A.   I know it's a department of the government.
18    Q.   Does UVI have any type of dealings or
19  interaction with that department?
20    A.   No, we don't.
21    Q.   Have you ever visited the U.S. Embassy in
22  Jamaica?
23    A.   No, I haven't.
24    Q.   Do you know any embassy officials in
25  Jamaica?

GONZALEZ, TAMMY
10/03/2019

Pages 125–128

Page 125

1    A.   No, I don't.
2    Q.   And you've never sent any info to the U.S.
3  Embassy and they've never sent any information to you?
4  I'm talking you and/or UVI.
5    A.   Not that I'm aware of.
6    Q.   Are you aware of any resort-related incidents
7  in Jamaica that's been reported to the U.S. Embassy?
8    A.   No.
9    Q.   Okay.  And UVI does not regularly reach out
10  or ask the embassy to provide any such information or
11  reports?
12    A.   No.
13        MR. SCOTT:  Asked and answered three
14    times.
15        THE WITNESS:  No, we don't.
16  BY MR. WEGLARZ:
17    Q.   Has UVI ever engaged in deceptive and/or
18  unfair trade practices?
19        MR. SCOTT:  Objection.  Legal conclusion.
20        Overly broad.  Go ahead and answer it.
21        THE WITNESS:  Not that I'm aware of.
22        (Plaintiffs' Exhibit No. 7 was marked for
23  identification, a copy of which is attached hereto.)
24  BY MR. WEGLARZ:
25    Q.   Okay.  I'll give you a minute to look at

Page 126

1  that.
2        MR. SUAREZ:  This is seven?
3        MR. WEGLARZ:  Yes, sir.
4        THE WITNESS:  Okay.
5  BY MR. WEGLARZ:
6    Q.   Exhibit No. 7, have you ever seen this
7  before?
8    A.   No, I haven't.
9    Q.   Okay.  And it appears to be an order issued
10  by the Department of Transportation back in 2010
11  issued against Unique Vacations, Inc., finding that
12  UVI did indeed engage in deceptive and unfair trade
13  practices.  Does this refresh your memory of anything
14  like that happening or occurring a few years ago
15  involving UVI?
16    A.   No.  I mean, in 2010, this would not have
17  been in my radar at all, in my responsibilities.
18    Q.   Who had your position back in 2010 at UVI?
19    A.   Probably Kevin Froemming at that point was
20  still the president.
21    Q.   And according to the State of Florida, they
22  reference that six complaints had been filed against
23  UVI as a licensed seller of travel, three of them in
24  2019 and I think three of them, at least a couple
25  years ago.  Do you -- are you aware of any of those

Page 127

1  complaints?
2    A.   Not that I recall.
3    Q.   Do you recall any complaint being made with
4  the State of Florida pertaining to anything about
5  UVI?
6    A.   Not -- not since I've been in this role that
7  I recall.
8    Q.   Do you recall anything like that even before
9  you assumed the role of CEO?
10    A.   No.
11    Q.   If there were a complaint made against the
12  State of Florida --
13        MR. SCOTT:  Against the State of Florida?
14  BY MR. WEGLARZ:
15    Q.   I mean, with the State of Florida, regarding
16  anything dealing with UVI, who from UVI would handle
17  that?
18    A.   I mean, this -- are you talking about this
19  from 2010, I have no idea.
20    Q.   No, no, no, this is different.  I'm not
21  talking about Exhibit 7.
22    A.   I guess it depends on when and my assumption
23  would be whoever is in charge.
24    Q.   Well, if there are three complaints
25  referenced for 2019 alone, are you assuming that those

Page 128

1  complaints would have been made known to you?
2    A.   I assume.  I don't recall any, though.
3    Q.   Okay.
4        MR. SCOTT:  What year?
5        MR. WEGLARZ:  2019.  Three in 2019 and
6        three in 2017.
7        MR. SCOTT:  What's the relevancy of these
8        kind of complaints to a sexual assault case?
9        MR. WEGLARZ:  That's why I'm asking.  I
10        don't know.
11        MR. SCOTT:  Do you have any knowledge of
12        it?
13        THE WITNESS:  I don't recall any of
14        them.
15  BY MR. WEGLARZ:
16    Q.   Maybe these are six complaints about sex
17  assaults.  I don't know.  That's why I'm asking.  I
18  haven't seen any other information.
19        MR. SCOTT:  Do you have any --
20        THE WITNESS:  I don't have any
21        information.
22  BY MR. WEGLARZ:
23    Q.   You're not even aware of the complaints?
24    A.   Nothing is coming to mind.
25    Q.   Okay.  All right.  And it says the business

GONZALEZ, TAMMY
10/03/2019

Page 129

1  responded to each of the six complaints.  That's news
2  to you as well, correct?
3      A.   Yeah.  Does it say who responded?
4      Q.   No.
5      A.   Oh.
6          MR. SCOTT:  Does it say what the
7      complaint is even?
8          MR. WEGLARZ:  No, that's why I'm
9      asking.
10         MR. SCOTT:  Okay.  Or what the
11     disposition was?
12         MR. WEGLARZ:  That's why I'm asking.
13         MR. SCOTT:  Okay.
14  BY MR. WEGLARZ:
15     Q.   UVI does educate and guide its tour operators
16  and its travel agents on how to book and sell vacation
17  packages to Beaches and Sandals; true?
18     A.   I'm not sure what you mean about guiding
19  them.  We -- as a marketing company, our job is to
20  educate about the brand, what the resorts have on
21  site, features of facilities.  We show pretty
22  pictures.
23     Q.   After you had a chance to look at the couple
24  of emails that included Leo Malcolm, and I know we
25  took a break.  I mean, did you have a chance to

Page 130

1  reflect further on those documents to perhaps gain a
2  deeper understanding as to what was going on at that
3  time as reflected by those documents?
4      A.   No, I think it's what I told you before the
5  break.
6      Q.   Okay.  Just making sure.
7      A.   Yeah.
8      Q.   You would agree that UVI did assist the tour
9  operator, Fun Jet, with the booking of this vacation
10  at the Beaches Ocho Rios Resort?
11     A.   No, no, we did not assist with the booking.
12  We checked availability for them.  We didn't make the
13  booking.
14     Q.   And you were able to confirm the availability
15  for the tour operator, correct?
16     A.   We manage inventory control, so we can look
17  at our inventory and say, yes, if you need eight
18  rooms, there's eight rooms available.
19     Q.   All right.  And because Mr. Malcolm was able
20  to confirm availability, that allowed the booking to
21  be made, correct?
22         MR. SUAREZ:  Objection to form.
23         THE WITNESS:  In essence, yes.  They
24     could have made the booking without checking
25     first.

Page 131

1  BY MR. WEGLARZ:
2      Q.   And I take it that UVI has always represented
3  to the tour operator, Mark Travel, that Beaches is a
4  very good, family-friendly resort, correct?
5          MR. SUAREZ:  Objection to form.
6          THE WITNESS:  Yes, we represent that it's
7      a good quality, that it's a family resort and
8      what the resort offers.
9  BY MR. WEGLARZ:
10     Q.   Right.  And you represent that it's a good
11  quality and it's a safe resort, correct?
12         MR. SUAREZ:  Objection to form.
13         THE WITNESS:  We actually don't promote
14     or talk about safety in any of our marketing
15     materials.
16  BY MR. WEGLARZ:
17     Q.   Why, because you don't want the consumers to
18  know about the safety?
19         MR. SCOTT:  Objection. Argumentative.
20         MR. SUAREZ:  Calls for privilege.
21         MR. WEGLARZ:  She can answer.
22  BY MR. WEGLARZ:
23     Q.   Go ahead.
24     A.   The answer is no.
25     Q.   But you do tell the tour operator, you do

Page 132

1  tell the agents, look, Beaches Ocho Rios is a fun,
2  family-friendly resort that families should have a
3  good time in, correct?
4          MR. SUAREZ:  Objection to form.
5          MR. SCOTT:  Objection.  Asked and
6      answered.
7          THE WITNESS:  I don't think we've ever
8      used those words in our marketing material.
9  BY MR. WEGLARZ:
10     Q.   I'm paraphrasing.
11     A.   We would certainly point out the difference
12  between the two brands, that Beaches is for families
13  and Sandals is for couples.
14     Q.   And they're fun places to go on vacation,
15  correct?
16     A.   I don't even know if anywhere it says fun.
17  It might, but I don't recall.
18     Q.   But that's the impression you want them left
19  with, correct?
20     A.   I want them left with the impression that
21  there is a value proposition, that there is a lot to
22  do at the resort, that everything is included.  Those
23  are the kind of pillars that we try to get across.
24     Q.   All right.  And the travel will have a good,
25  fun time going on that trip, right?

GONZALEZ, TAMMY
10/03/2019

Pages 133–136

Page 133

1    A.    I hope people have fun who go on vacation,
2  but I'm not promising anyone they're going to have fun
3  on vacation.
4    Q.    And why can't you promise that?
5    A.    Because some people just don't have fun.  I
6  can't control what makes fun for you as opposed to
7  what makes fun for Luis.
8    Q.    And sometimes other things can happen,
9  correct?
10   A.    Like what?  What do you mean?
11   Q.    I don't know, that's what I'm asking you as
12 the promoter?
13       MR. SCOTT:  Objection.
14       THE WITNESS:  I don't understand the
15       question.
16 BY MR. WEGLARZ:
17   Q.    Oh, this record retention policy, is that
18 reduced to writing anywhere?
19   A.    I'm sorry, are you asking if there is a
20 policy in writing?
21   Q.    Yes.
22   A.    Yes.
23   Q.    Okay.  And that written policy is where?  Is
24 it part of a policy and procedure binder or a rule
25 book?  Where?  Tell me about that.

Page 134

1    A.    It's not anywhere specific.  It's the policy
2  that was put out years ago and every once in a while
3  we'll remind human resources just email that out again
4  to remind everybody of the policy.
5    Q.    Are there any other policies regarding the
6  business operations of UVI that are set forth or
7  reduced to writing besides the record retention
8  policy?
9    A.    I mean, there's many policies for the
10 company, you know, get to work on time, you get an
11 hour for lunch, don't work overtime unless it's
12 pre-approved.  A lot of it is just done with
13 onboarding with human resources.
14   Q.    Are there policies in UVI in writing that
15 give job descriptions?
16   A.    There are job descriptions for positions,
17 yes.
18   Q.    Are there policies that set forth the duties
19 and responsibilities of the employees for a particular
20 position?
21   A.    Yes, that would be your job description.
22   Q.    Are there ever regular meetings that are held
23 amongst officers and employees of UVI?
24       MR. SCOTT:  Objection. Overly broad.
25       Meetings for what purposes?

Page 135

1        MR. WEGLARZ:  Any purpose relating to the
2  operation of UVI.
3        THE WITNESS:  Yes, we have meetings.
4  BY MR. WEGLARZ:
5    Q.    Okay.  What types of meetings?
6    A.    Every Monday, I have a, we call it a huddle.
7  All the department heads come in the conference room.
8  Nobody even sits down.  Tell me the top three things
9  that are going on in your department, and we move on,
10 that kind of thing.
11   Q.    What other meetings are held besides the
12 every Monday huddle meetings?
13   A.    God, we might have marketing meetings,
14 brainstorming sessions to try to think of something
15 new to do, sales department has meetings.  You know,
16 it's a business, of course, there's meetings.
17   Q.    Are minutes ever kept?
18   A.    No, we're very informal at our office.
19   Q.    Are you aware of any corporate meeting
20 minutes ever being taken?
21   A.    For UVI?
22   Q.    For UVI.
23   A.    Not since I've been in this role.
24   Q.    Okay.  Have you ever been to a meeting
25 involving a corporation other than UVI where minutes

Page 136

1  would have been kept?
2    A.    I'm not sure I understand, but --
3    Q.    Were you ever invited to attend a meeting
4  with UVL, maybe they were keeping minutes on them?
5        MR. SCOTT:  It's a little over broad.
6        Ever?
7        THE WITNESS:  I mean, I'm trying to
8        think.  I mean, you know, if there's a
9        meeting with UVL, it could be because there's
10       IT needs.  I'm sure they would create a RAD
11       and a framework for what, you know, the user
12       is asking for.
13 BY MR. WEGLARZ:
14   Q.    All right.  But you do recall attending UVL
15 meetings?
16   A.    No, that's not what I said.
17   Q.    All right.  Well, that's what I'm trying to
18 ask you.
19   A.    Yeah, I would have no reason to go to another
20 company's meetings.
21   Q.    I'm just asking you if you recall ever doing
22 that?
23   A.    No.
24   Q.    Okay.  I mean, do reps from UVL and UVI ever
25 get together every so often just to talk about the

GONZALEZ, TAMMY
10/03/2019

Pages 137–140

Page 137

1   status of the independent contractor agreement,
2   anything like that?
3       A.   No.
4       Q.   Who's Adam Stewart?
5       A.   The deputy chairman.
6       Q.   Of?
7       A.   Sandals Resorts, SRI Jamaica, I believe.
8       Q.   How often do you see him?
9       A.   Occasionally, I don't know, a few times a
10  year.
11      Q.   And under what circumstances would you be
12  seeing Mr. Adam Stewart?
13      A.   I'll probably be seeing him next week.
14  There's a global sales meeting, and I'm sure he'll
15  come to address the sales team.
16      Q.   Do you recall watching Mr. Stewart's
17  interview with, I thought it was ABC News?
18      A.   Adam Stewart's interview with ABC News?
19      Q.   Yes.
20      A.   I don't recall.  When was that?
21      Q.   Within the last year, I believe.
22      A.   No.
23      Q.   Do you recall him mentioning that he's aware
24  of maybe a handful of sex assault incidents at his
25  resort, he said in the region of around 10?

Page 138

1       A.   No.
2       Q.   You've never heard of -- you never heard from
3   any source whatsoever that Mr. Adam Stewart made such
4   a statement?
5       A.   Not that I recall.
6       Q.   Do you recall Mr. Stewart ever mentioning
7   anything to you or to the group with which you
8   attended, a function where he was present, talking
9   about incidents of alleged sex assault?
10      A.   No.
11      Q.   You don't -- do you recall there ever being a
12  meeting with UVI folks or folks from a Sandals-related
13  entity?
14           MR. SCOTT:  Same objection.
15  BY MR. WEGLARZ:
16      Q.   Where they say, Hey, you know what, we need
17  to talk about these allegations of sex assault, we
18  want to try to take care of this problem?
19      A.   Not that I recall.
20      Q.   And who is Butch Stewart?
21      A.   He is the chairman of the resorts.
22      Q.   Is that Adam's father?
23      A.   Yes.
24      Q.   How often do you see Butch?
25      A.   Few times a year.

Page 139

1       Q.   Under the same circumstances that you see
2   Adam?
3       A.   No, no.  He would be -- he's -- at the end of
4   the day, right, the hotels, he is the client.  This is
5   what we represent.  So certainly if he wanted us to do
6   a marketing campaign around, I don't know, dining, he
7   might come up, sit down with the marketing team and
8   say, I want to put a focus on this.  Vice versa, we
9   just re-branded weddings, so that is presented to him.
10  You know, he's the client.
11      Q.   And has Butch Stewart ever mentioned anything
12  about these allegations of sex assaults at the
13  resorts?
14      A.   Not to me.
15      Q.   Do you know if there's ever been any emails
16  or communications sent out to anyone at any entity
17  related to the Sandals or Beaches Resorts mentioning
18  or discussing this involving sex assaults?
19      A.   Not that I'm aware of.  I wouldn't know.
20      Q.   Are you aware of any settlements made with
21  any aggrieved travelers who had allegations of sex
22  assault at any Beaches or Sandals resort?
23      A.   I don't know.
24           MR. SCOTT:  Objection to form.  Overly
25      broad.

Page 140

1           THE WITNESS:  Not that I'm aware of.
2   BY MR. WEGLARZ:
3       Q.   Has UVI ever participated or negotiated any
4   settlements with any aggrieved travelers?  And I'm
5   not -- and that's not restricted to assault or sex
6   assaults.  I'm talking over on anything?
7           MR. SCOTT:  I don't understand the
8      question.  Can you rephrase it?
9   BY MR. WEGLARZ:
10      Q.   Sure.  Has UVI ever engaged in a settlement
11  with an aggrieved traveler?
12      A.   I don't know off the top of my head.  I'll
13  have to check.
14      Q.   Was that something that UVI could or would
15  do, negotiate a settlement with an aggrieved traveler
16  to try to make things all right?
17      A.   It doesn't seem likely, but I would have to
18  check.
19      Q.   So if a guest is disappointed about any facet
20  of the trip, and if someone decides, you know what,
21  we'll give you a week's vacation or some other
22  compensation, who usually does that?
23      A.   That could come from customer service.
24      Q.   UVL?
25           MR. SCOTT:  Not --

GONZALEZ, TAMMY
10/03/2019

Pages 141–144

Page 141

1    THE WITNESS:  Yeah, customer service at
2  UVL, yeah.
3    MR. SAFRA:  Object to form, and assert
4  any attorney-client privilege to the extent
5  that it might be done through an attorney and
6  as part of litigation and that this might be
7  trying to incorporate potential settlement
8  conversation at this stage answering the
9  question, and it's totally inappropriate.
10   MR. WEGLARZ:  Your objection.
11   MR. SAFRA:  And, Todd, you know exactly
12  what I mean.
13   THE COURT REPORTER:  I'm sorry, repeat
14  that for me.
15   MR. SAFRA:  I object and I assert
16  attorney-client privilege and confidential
17  settlement communication trying to be used
18  and this may be things that are done through
19  attorneys unbeknownst to the witness, and,
20  Todd, totally inappropriate for you to be
21  doing.
22   MR. WEGLARZ:  Okay, Steve.
23   MR. SAFRA:  You know exactly what I mean.
24   MR. WEGLARZ:  Okay.  Well --
25   MR. SCOTT:  If any of your answers

Page 142

1  involve attorney-client relationships or
2  conversations you may have had, I don't know
3  if they did or didn't, especially, you know,
4  in this particular case, since -- I'm saying
5  this on the record, that would have been
6  through mediations, as you know, so she's not
7  going to respond to any of that.
8    MR. SAFRA:  Or that I had any
9  conversation with counsel last week where
10  unbeknownst to the client, I may have tried
11  to suggest alternatives where maybe we could
12  reach some kind of resolution through,
13  unbeknownst to the client, something my
14  client has never been involved in and now
15  you're trying to use it in the deposition.
16  Totally inappropriate.
17   MR. WEGLARZ:  Okay.  Steve, that's not
18  what I'm getting at at all.  It's not.
19   MR. SAFRA:  Okay.  Then at least we have
20  that clear.
21   MR. WEGLARZ:  Yes, yes.
22   (Plaintiffs' Exhibit No. 8 was marked for
23  identification, a copy of which is attached hereto.)
24  BY MR. WEGLARZ:
25   Q.  I'll give you a minute.

Page 143

1    A.  I've never seen it, but okay.
2    Q.  And Ms. Gonzalez, I've just handed to you
3  Exhibit No. 8.  Have you ever seen a document like
4  Exhibit No. 8 before?
5    A.  No, I've never seen this document before.
6    Q.  Okay.  Have you ever seen documents similar
7  to Exhibit No. 8?
8    MR. SUAREZ:  Object to the form.
9    THE WITNESS:  No, this is dated June 24,
10   2015, before I was in this role.
11  BY MR. WEGLARZ:
12   Q.  Okay.  But you were with UVI for years,
13  correct?
14   A.  Yes, I have been.
15   Q.  Did you ever hear of a travel agent
16  partnership agreement?
17   A.  No, I've never seen that before.
18   Q.  Are there contracts or agreements that are
19  entered into with particular travel agents?
20   A.  Not by UVI.
21   Q.  Okay.  By UTC or UVL?
22   A.  Not that I'm aware of.
23   Q.  Do you review Trip Advisor?
24   A.  Do I ever look at Trip Advisor?  Sometimes.
25   Q.  Okay.

Page 144

1    A.  It's not a normal course of my business,
2  so --
3    Q.  Okay.  Do you know if anyone from UVI reviews
4  the Trip Advisor reviews pertaining to any Beaches or
5  Sandals Resorts?
6    A.  It's -- it's not anybody's job there to do
7  that.
8    Q.  Okay.  But is that done?
9    A.  I wouldn't know if somebody went online and
10  looked.
11   Q.  Are you aware of any complaints made by any
12  review posted on Trip Advisor pertaining to any
13  Beaches or Sandals resort?
14   A.  That's a really broad question.  People make
15  all kinds of comments on Trip Advisor.  Just because a
16  comment is on Trip Advisor doesn't mean it's true.
17   Q.  I understand that, but are you aware of any
18  Trip Advisor reviews complaining about any Beaches or
19  Sandals resort?
20   A.  I have looked at Trip Advisor before.  I've
21  seen compliments.  I've seen people who aren't happy
22  with their vacation.  Nothing that stands out in my
23  mind.
24   Q.  Do you recall any complaints being made about
25  allegations of sex assault?

GONZALEZ, TAMMY
10/03/2019

Pages 145–148

---

Page 145

1     A.   Not offhand.
2     Q.   Did you respond or did you do anything in
3  response to seeing any negative review about any
4  Beaches or Sandals resort posted on Trip Advisor?
5     A.   No.
6     Q.   Do you know if any Sandals or Beaches-related
7  entity regularly reviews the Trip Advisor comments or
8  postings?
9          MR. SUAREZ:  Object to the form.
10 BY MR. WEGLARZ:
11    Q.   Go ahead.
12    A.   I believe somebody has that role.
13    Q.   Okay.  And that somebody is from which
14 company?
15         MR. SUAREZ:  Same objection.
16         THE WITNESS:  I'm not sure.  I'd have to
17    check and find out.  I don't know if it's UVL
18    or UTC or --
19 BY MR. WEGLARZ:
20    Q.   Okay.  Do you know what an online reviewer
21 is?
22    A.   Isn't that somebody who goes on and posts a
23 review online?
24    Q.   Well, actually, I think it's someone on
25 behalf of the hotel who will respond to negative --

---

Page 146

1     A.   Okay.
2     Q.   -- postings?
3     A.   Okay.
4     Q.   Does UVL or UTC, whoever does this for
5  Sandals or Beaches, are you aware that they have
6  someone who does that?
7     A.   I don't know who might do that.  I don't know
8  if the hotels do that.  I don't know if it's a
9  specific job in one of the other companies we
10 mentioned.
11    Q.   And why did you go look at the Trip Advisor
12 reviews?
13    A.   No particular reason.  I might have just
14 popped in there one day.  I don't -- certainly don't
15 go in there often.
16    Q.   And you would have reviewed the reviews for
17 the Beaches and Sandals Resorts for Jamaica?
18    A.   I'm not reviewing the reviews.  You know, I
19 might go in there every once in a while and read them,
20 but there's nothing with my job or my responsibilities
21 that would require me to do that.
22    Q.   Understood, but you've done that on your own
23 on occasion?
24    A.   Maybe, some time in the past.
25    Q.   And you've done that for Beaches and Sandals

---

Page 147

1  Resorts in Jamaica, right?
2     A.   I haven't done it for anything specific.
3     Q.   Okay.  Did you do it for resorts other than
4  Beaches or Sandals?
5     A.   Sure, I look at other resorts, too.  Listen,
6  it's nothing -- like I said, it's nothing that I do in
7  my normal course of business, nothing that I do that
8  falls under my area of responsibility, nothing that I
9  do on a regular basis, so I can't even tell you the
10 last time I went to Trip Advisor.
11    Q.   Do you believe a seller of travel should warn
12 of known reported dangers regarding any particular
13 destination?
14         MR. SCOTT:  Objection.  She's answered
15    that five times now or six or seven.
16         MR. WEGLARZ:  This one is a little
17    different.
18         THE WITNESS:  How is it different?
19 BY MR. WEGLARZ:
20    Q.   Sure.  If the seller of travel is aware of
21 reported dangers or reported hazards affecting a
22 particular destination --
23    A.   Uh-huh.
24    Q.   -- that the seller of travel is selling a
25 trip for, do you believe the seller of travel should

---

Page 148

1  warn about that?
2          MR. SCOTT:  Objection to form.  Seller of
3     travel, are we talking travel agent, are we
4     talking travel company like hers, are we
5     talking a tour operator?
6          THE WITNESS:  We're talking a seller of
7     travel as licensed by the State of Florida.
8          MR. SCOTT:  Already told you she doesn't
9     even know what that is.
10         THE WITNESS:  I think it's the state
11    department's duty to warn.
12 BY MR. WEGLARZ:
13    Q.   Do you know who Peter Tarlow is?
14    A.   No.
15    Q.   Did you ever hear that name before?
16    A.   Not that I recall.
17    Q.   Are you aware that there is allegedly a
18 security audit being done with respect to the resorts
19 in Jamaica?
20         MR. SCOTT:  You asked her that question
21    about an hour-and-a-half ago.  Objection.
22    Asked and answered.
23         MR. WEGLARZ:  I did not ask about any
24    security audit.
25         MR. SCOTT:  You asked about the security

---

GONZALEZ, TAMMY
10/03/2019

Pages 149–152

Page 149

1    problems, if the government was conducting an
2    audit down there of hotels and things like
3    that.
4        MR. WEGLARZ:  If I did, I apologize, but
5    I don't recall asking that.
6        THE WITNESS:  No, I wouldn't necessarily
7    be aware of that.
8    BY MR. WEGLARZ:
9        Q.   Are you aware that Peter Tarlow is a hired
10   expert for UVI on this case?
11       A.   No, I didn't hire him.
12       MR. SCOTT:  I employed him, and you know
13       that.  I actually wrote you an email and told
14       you I had employed him as an expert
15       witness.
16       MR. WEGLARZ:  Well, and it's not a
17       stretch to infer that maybe others affiliated
18       with your client would be aware of that, too.
19       I'm just asking.
20       MR. SCOTT:  Only through attorney-client
21       communications, which are privileged.
22       MR. WEGLARZ:  Not necessarily.  He was
23       not serving as your retained expert at all
24       times while he was undertaking this audit.  I
25       mean, I'm presuming he wasn't.

Page 150

1        MR. SCOTT:  I don't know.
2    BY MR. WEGLARZ:
3        Q.   Have you heard of the term or phrase,
4    "certified Sandals specialist"?
5        A.   Yes.
6        Q.   What is that?
7        A.   That is travel agents can go through a
8    certification process, which means they've seen the
9    hotel.  It means they've gone to a workshop, which
10   really talks about the brands.  And, again, like I
11   said, what the hotels offer, the different restaurants
12   and dining options, the water sports options that are
13   available.  The different room types, the different
14   types of suites, the different levels of service.
15   It's that kind of information.
16       Q.   Is Vacations To Go a certified Sandals
17   specialist?
18       A.   I don't know off the top of my head.  I can
19   find out and get back to --
20       Q.   You track that stuff at UVI, correct?
21       A.   That would be part of the sales department
22   function.
23       Q.   And who monitors the certified Sandals
24   specialist program?
25       A.   It would be the sales department.  I don't

Page 151

1    know the exact individual.
2        Q.   Sales department from UVI?
3        A.   Uh-huh, the one that runs the 77 BDMs, yes.
4        Q.   Okay.  And what types of workshops are done
5    as part of this certified Sandals specialist
6    program?
7        A.   It's like I just told you, they will -- the
8    BDM will talk about the different resorts, where
9    they're located, the different types of room
10   categories, the room classifications, the different
11   dining options -- it's all about the amenities and the
12   features of the resorts.
13       Q.   And are there three certification levels for
14   the Sandals specialist program?
15       A.   They're not certification levels.  There's
16   levels for travel agents and it has to do with the
17   commission they can earn based on productivity.
18       Q.   So the levels are achieved by productivity?
19       A.   Correct.
20       Q.   It's not like you have to take extra
21   workshops?
22       A.   No.
23       Q.   And would this certified Sandals specialist
24   apply to tour operators?
25       A.   No.

Page 152

1        Q.   Just travel agents?
2        A.   Correct.
3        Q.   Have you heard of the preferred Sandals
4    agency program?
5        A.   It's one of the levels.
6        Q.   Okay.  And the only distinguishing feature
7    between the levels, even when talking about preferred
8    Sandals agency, has to do with volume or revenue?
9        A.   Productivity.
10       Q.   Productivity?
11       A.   As far as I know, yeah.
12       Q.   Do you have a Trip Advisor account?
13       A.   Me personally?
14       Q.   Yes.
15       A.   No.
16       Q.   Does UVI?
17       A.   I don't think so.
18           Can we take a bathroom break?  Is this a
19       good time for a bathroom break?
20       MR. WEGLARZ:  Yeah, that's fine.
21       (A recess was taken in the deposition, after
22   which the deposition continued as follows:)
23   BY MR. WEGLARZ:
24       Q.   Ms. Gonzalez, the subcontractor agreement
25   which we marked as Exhibit No. 3, it also references

GONZALEZ, TAMMY
10/03/2019

Pages 153–156

Page 153

1  the fact that the company --
2      MR. SCOTT:  Wait, let her get to it.
3      MR. WEGLARZ:  Oh, I'm sorry.
4      MR. SCOTT:  'Cause that was done a long
5  time ago.  And what section are you referring
6  to?
7      MR. WEGLARZ:  It's on page 1.
8      MR. SCOTT:  Okay.  Thank you.
9  BY MR. WEGLARZ:
10     Q.  Once you're there, let me know.  This should
11  be real easy.
12     A.  Three, got it.
13     Q.  All right.  Page one, second to last
14  paragraph.
15     A.  Yes.
16     Q.  Do you see the reference to the IP license
17  agreement?
18     A.  Yes.
19     Q.  In fact, it says UTC and UVI are actually
20  entering into an intellectual property license
21  agreement, correct?
22     A.  Yes, it does.
23     Q.  Okay.  Do you have a copy of that?
24     A.  I don't.
25     Q.  Is that stored, kept or maintained

Page 154

1  anywhere?
2      A.  I've never seen it since I've had this role.
3  I mean, I have an understanding of what it means, but
4  I would have to check to see where there might be a
5  copy.
6      Q.  Okay.  And what is your understanding as to
7  what is set forth in the IP license agreement?
8      A.  It allows us to use logos and trademarks and
9  things like that when we advertise.
10     Q.  Okay.  And also Exhibit No. 3 on page 2
11  references a marketing plan that UVI is supposed to
12  develop and come up with, correct?
13     A.  Correct.
14     Q.  And do you have all the marketing plans that
15  have been developed pursuant to this agreement?
16     A.  You know, since I've come into this role, and
17  I know this is in here, nobody has ever asked me to
18  produce anything, right?  We come up with marketing
19  initiatives, but nobody has ever asked for a marketing
20  plan.
21     Q.  But they exist, correct?  So if Scott says,
22  Hey, can you give me those marketing plans --
23     A.  No.
24     Q.  Can you --
25     A.  We don't --

Page 155

1      Q.  -- get those?
2      A.  No.
3      Q.  Oh.  Are you saying there's no -- what you
4  meant was, no one from UTC ever asked for a marketing
5  plan?
6      A.  Correct.
7      Q.  Okay.  Does that mean one wasn't developed or
8  it just wasn't asked for?
9      A.  They've never asked for one.
10     Q.  But you guys developed one, correct?
11     A.  No.
12     Q.  Okay.  So it wasn't developed because no one
13  said, Hey, I need you to start working on that
14  marketing plan?
15     MR. SUAREZ:  Objection to form.
16     THE WITNESS:  Right.
17  BY MR. WEGLARZ:
18     Q.  All right.  Making sure I understand.  So is
19  this a real agreement?
20     MR. SCOTT:  Objection.  Form.
21  BY MR. WEGLARZ:
22     Q.  I mean, that's the question I have.  'Cause
23  first of all, it says, look it, you have to comply
24  with all the obligations under the SRI agreement and
25  you've said, I've never seen it in my life and I can't

Page 156

1  get to it even if I wanted to.  Then it says, we're
2  also creating an IP license agreement and you've never
3  seen it before, correct?
4      A.  Correct.
5      Q.  It also says you're going be developing a
6  marketing plan.  You're saying, We never developed
7  that, correct?
8      A.  I said nobody's ever asked me to develop one.
9      MR. SCOTT:  Why don't you ask her how
10     they do the marketing plan?
11  BY MR. WEGLARZ:
12     Q.  And because no one asked for one, a marketing
13  plan was never developed; true?
14     A.  Yes, I do not have a formal marketing plan
15  that we draft the previous year for the next year.  We
16  have marketing initiatives we know we want to
17  accomplish.
18     Q.  Can you produce those?
19     A.  I don't think I would still have any right
20  now.  I mean, the last big initiative we did was
21  re-launching weddings.  That was about a
22  year-and-a-half ago.
23     Q.  And in that same paragraph that discusses the
24  marketing plan, it mentions how the marketing plan is
25  supposed to be presented to the company within 60 days

GONZALEZ, TAMMY
10/03/2019

Pages 157–160

---

Page 157

1  after the date of this agreement?
2     A.   Uh-huh.
3     Q.   And then marketing plans for each subsequent
4  year shall be formulated and submitted on or before
5  October 31 of the then current year; do you see
6  that?
7     A.   I do.
8     Q.   Okay.  Was that done?
9     A.   Nobody has ever asked me, since I've been in
10 this role, to produce a marketing plan and present it.
11    Q.   Okay.  So you'd agree no such marketing plans
12 were presented to the company as called for in this
13 paragraph here?
14    A.   Yes, but you -- you have to understand,
15 Unique Vacations has served in this role for many,
16 many, many years, so I'm sure there is an amount of
17 confidence and faith that with what we're doing is
18 successful or else I don't think they'd keep renewing
19 my contract.
20    Q.   On page 3 of Exhibit 3, paragraph F, the last
21 sentence talks about the representative shall be
22 permitted or the representative, being UVI, shall
23 permit the company and SRI to inspect the
24 representative's operations in order to ensure
25 compliance with the agreement.  I'm assuming there was

Page 158

1  never such -- they never did such an inspection,
2  correct?
3     A.   No, I would think the only thing that they
4  would ever want to inspect would go to ensure that we
5  are exclusive, that we're not promoting and marketing
6  other resort brands, but nobody has ever called and
7  said, We're coming in for an inspection.
8     Q.   Okay.  And then paragraph G, it talks about
9  how the representative shall act as the company's
10 payment processing agent with respect to processing of
11 customer payments for bookings; do you see that?
12    A.   Yes.
13    Q.   Is that done?  Does UVI do that for  --
14    A.   In some cases, yes.
15    Q.   And explain that for me, please.
16    A.   We're still not actually doing the booking
17 transaction, but there are some banks and credit card
18 companies that don't want to deal with foreign banks,
19 so those are processed.  The payments go into a
20 custodial account and then the money is disbursed the
21 next day.
22    Q.   This is a custodial account in the name of
23 UVI?
24    A.   I believe so.
25    Q.   Do you know if UVI -- and how long has UVI

Page 159

1  had this custodial account?
2     A.   Well, I'm aware of it since, you know, this
3  has become my role, so I would say, pretty comfortable
4  saying three years anyway, but I don't know exactly.
5     Q.   And where is that account located
6  physically?
7     A.   I believe it's Miami.
8     Q.   Do you know if that account was used at all
9  with respect to the processing of the plaintiffs'
10 booking and reservation?
11    A.   It would not have been.
12    Q.   Do you know how the payment would have been
13 made and transferred regarding the rebooking of this
14 trip to Beaches Ocho Rios?
15    A.   Payment for the stay would have come from Fun
16 Jet to UTC.
17    Q.   And do you know -- do you have any idea as to
18 when that was done?
19    A.   I believe tour operators are invoiced seven
20 days before or after arrival.  I mean, there's some
21 variance in terms, but I could find out exactly, but
22 it's usually just -- just prior to travel.
23    Q.   And is it possible that it did go into the
24 UVI custodial account?
25    A.   No.

Page 160

1     Q.   You would agree according to this contract,
2  it should have, correct?
3     A.   This is -- no, I don't agree with that
4  because this is talking about credit cards, and I
5  believe tour operators normally pay with checks.
6     Q.   Do you agree, according to this contract, it
7  says, "UVI shall act as the company's payment
8  processing agent with respect to processing of
9  customer payments for bookings for the resorts as
10 instructed by the company"?
11    A.   Yes.
12    Q.   Okay.  It doesn't accept --
13    A.   No, no, no, see, I don't think --
14          MR. SCOTT:  Explain it to him.
15 BY MR. WEGLARZ:
16    Q.   Please.
17    A.   That's why I'm saying, I don't think you
18 understand how it works, okay?
19    Q.   Probably don't.
20    A.   When a consumer goes to a travel agent, and
21 I'm going to make some assumptions, okay?
22    Q.   Sure.
23    A.   This is how I think it works.
24    Q.   Sure.
25    A.   Consumer goes to travel agent.  Consumer pays

GONZALEZ, TAMMY
10/03/2019

Pages 161–164

Page 161

1    the travel agent.  Travel agent goes to a tour
2    operator.  Travel agent pays the tour operator.  Tour
3    operator electronically transmits a booking into the
4    system.  Tour operator pays with a check.  So, no, we
5    would not have processed a consumer credit card for a
6    booking that was made by a tour operator.
7        Q.    And I want to make sure I understand this
8    thing with UVL and UTC.
9        A.    Uh-huh.
10       Q.    UVL still exists, correct?
11       A.    Correct.
12       Q.    Did UTC replace UVL in some way or form?
13       A.    UVL used to be the worldwide representative
14   for Sandals and Beaches and UVL contracted UVI to do
15   the marketing.
16       Q.    Correct?
17       A.    Correct.
18       Q.    Yep.
19       A.    Then for some reason, which I'm not privy to,
20   UTC became the worldwide representative for Sandals
21   and Beaches.  Now, UTC still contracts UVI for the
22   marketing, and I believe they contract UVL for the
23   reservation services and some IT services, you know,
24   some other things, but that's kind of how it works.
25       Q.    Okay.  So UVL is still the same existing

Page 162

1    corporation, but it does different things now?
2        A.    It doesn't have the same responsibilities.
3        Q.    And where is UVL located?
4        A.    Nassau.
5        Q.    In the Bahamas?
6        A.    Correct.
7        Q.    And I see profiles of employees of UVL across
8    the United States.  Do they now have representatives
9    or employees within the United States?
10       A.    I don't think UVL employs in the United
11   States.
12       Q.    I do.
13       A.    Well, then I can't comment on what it is.
14       Q.    That's news to you?
15       A.    Yes.
16       Q.    Okay.  All right.  Do you know Roger
17   Seivright?  Am I pronouncing it correctly?
18       A.    Seivright.
19       Q.    Close enough.
20       A.    Close.
21       Q.    Where does he work?
22       A.    He's the managing director for UVL.
23       Q.    And how long has he been with UVL?
24       A.    I think probably since it was formed, which
25   would have been around 2006-ish.

Page 163

1        Q.    Where does he live?
2        A.    In Nassau, Bahamas.
3        Q.    Did he ever live in Florida?
4        A.    Yes.
5        Q.    Do you recall what period of time?
6        A.    It would have been previous to 2006, but I
7    couldn't give you an exact span.
8        Q.    Andrew Blanco lives in Florida, correct?
9        A.    No, he lives in Panama.
10       Q.    Brian Mair is still in Florida?
11       A.    I believe so, yes.
12       Q.    Just give me a minute to look over my notes.
13       A.    Sure.
14       Q.    I may be done.
15            (Plaintiffs' Exhibit No. 9 was marked for
16   identification, a copy of which is attached hereto.)
17   BY MR. WEGLARZ:
18       Q.    Have you ever seen that document before,
19   Exhibit No. 9?
20            MR. SCOTT:  Let her look at it a minute,
21       will you?
22            THE WITNESS:  No.  No, I don't.
23   BY MR. WEGLARZ:
24       Q.    You've never seen that document before?
25       A.    No, I haven't.

Page 164

1        Q.    Do you have any idea as to what those entries
2    are or who those individuals are that are referenced
3    in there?
4        A.    Well, I certainly heard Stetson's name last
5    week 'cause it's a very memorable name.
6        Q.    Indeed it is?
7        A.    Stetson Arriola, but no, other than that, I
8    would not know who he is.
9        Q.    You don't recognize any of those names as
10   being UVI representatives, agents or employees?
11       A.    No, I don't.
12       Q.    In reviewing the Trip Advisor comments and
13   postings for the Beaches or Sandals Resorts in
14   Jamaica, there's quite a few comments regarding
15   complaints about, you know, a lot of the comments they
16   hear from staff are inappropriate, a lot of sexual
17   innuendo.  Have you heard of any problem like that
18   going on at the resorts?
19       A.    Not that I'm aware of.
20       Q.    For example, one reviewer says he recalls a
21   bartender handing a guest a drink calling it his pimp
22   juice and making that comment in the presence of his
23   eight-year-old, and he just thought it was
24   inappropriate.  Do you agree staff comments, staff
25   discourse like that would be inappropriate at any

GONZALEZ, TAMMY
10/03/2019

Pages 165–168

Page 165

1  resort, let alone a family-oriented resort?
2      A.   I mean, look, an eight-year-old is an
3  eight-year-old.  I don't know if that's a one-off,
4  and, again, like I said, what's on Trip Advisor isn't
5  necessarily true, but, yeah, of course there's things
6  that should not be said in front of an
7  eight-year-old.
8      Q.   And if things like that were going on at a
9  resort, you would agree with me that travelers should
10 be made aware of that so they can make their own
11 decision as to whether that's the appropriate place
12 for them to go?
13     A.   I guess the traveler could go on Trip Advisor
14 and read comments and make their decision if they're
15 going to base it on that.
16     Q.   And that's information you believe they
17 should have available to them to make the appropriate
18 decision?
19     A.   Anybody can go on Trip Advisor and read
20 comments.
21     MR. WEGLARZ:  All right.  That's all I
22 have.  Thanks.
23     MR. SCOTT:  Counsel?
24              CROSS-EXAMINATION
25 BY MR. SUAREZ:

Page 166

1      Q.   I think I only have one question.  Ms.
2  Gonzalez, is it a true statement to say that, to your
3  knowledge, the Mark Travel Corporation and Fun Jet did
4  nothing wrong in this case?
5      A.   That's 100 percent true.
6      MR. SUAREZ:  Thank you, I have no further
7  questions.
8      MR. WEGLARZ:  I may have a question or
9  two now.
10     MR. SCOTT:  Once you ask that, I want to
11 take a break and see if I have anything.
12     MR. WEGLARZ:  Okay.
13     MR. SUAREZ:  Ask her now.
14     MR. WEGLARZ:  I can ask her, yeah.
15     MR. SCOTT:  Yeah, I kind of want to wrap
16 this up.
17             REDIRECT EXAMINATION
18 BY MR. WEGLARZ:
19     Q.   Do you have an understanding as to what Mark
20 Travel did in this case?
21     A.   It's what I explained to you before, how I
22 understand the process works, when a consumer goes to
23 a travel agent, the travel agent is just booking it
24 with the tour operator.  The tour operator is only
25 facilitating that book.  The tour operator, they don't

Page 167

1  talk to the client.  They didn't make the sale.
2  They're just passing the booking through.
3      Q.   But I thought you told me earlier, you don't
4  even know what a travel agent does or does not do?
5      MR. SUAREZ:  Object to the form.
6      THE WITNESS:  No, I told you I don't know
7  what they say.  I don't know how they conduct
8  their business, but I certainly know a travel
9  agent sells travel to consumers.
10 BY MR. WEGLARZ:
11     Q.   And as a seller of travel, does a travel
12 agent have any responsibility to warn the traveler of
13 anything?
14     MR. SUAREZ:  Objection to form.
15     MR. SCOTT:  Objection.  Asked and
16 answered.  She's already indicated that, an
17 answer to that.
18     THE WITNESS:  I believe it's the
19 consumer's responsibility to do their
20 research on their trip.
21 BY MR. WEGLARZ:
22     Q.   Does the travel agent have the responsibility
23 to advise the traveler of that, look, it's your
24 responsibility to do the research to make sure that
25 this trip is going to be safe?

Page 168

1      MR. SUAREZ:  Objection to form.
2      THE WITNESS:  I don't believe so, no.
3  BY MR. WEGLARZ:
4      Q.   Would the travel agent have the
5  responsibility to say, look, it's your responsibility
6  to go online and look at the current state department
7  warnings?
8      MR. SUAREZ:  Objection to form.
9      THE WITNESS:  I don't think it's
10 something they have to do, no.
11 BY MR. WEGLARZ:
12     Q.   It would be something that would be
13 reasonable, though, correct?
14     MR. SUAREZ:  Objection.  Form.
15     THE WITNESS:  Maybe if somebody said they
16 wanted to go to Iraq or Afghanistan, maybe in
17 that case the travel agent would say, I don't
18 know, think about it, do some research, but
19 no, not as a normal course of business.
20 BY MR. WEGLARZ:
21     Q.   If it's reported that hotel employees are
22 assaulting resort guests, do you believe the travel
23 agent should advise the traveler of that --
24     MR. SUAREZ:  Objection.
25 BY MR. WEGLARZ:

GONZALEZ, TAMMY
10/03/2019

Pages 169–172

Page 169

1      Q.   -- that it affects that destination?
2           MR. SUAREZ:  Objection.  Form.
3           **THE WITNESS:  If it's reported where?**
4   BY MR. WEGLARZ:
5      Q.   By the state department?
6           MR. SUAREZ:  Objection.  Form.
7           **THE WITNESS:  I don't know if the travel**
8      **agent knows what the state department**
9      **reports.**
10  BY MR. WEGLARZ:
11     Q.   Okay.  If the travel agent is aware of that,
12  you would agree the travel agent should at least
13  advise the traveler of that?
14          MR. SUAREZ:  Objection.  Form.
15          **THE WITNESS:  I can't agree with that.**
16     **They run their business the way they run**
17     **their business.  I told you, I think -- when**
18     **I travel, when my daughter travels, I check.**
19  BY MR. WEGLARZ:
20     Q.   Well, and I understand it's your opinion that
21  the travel agent in this case did nothing wrong.  Does
22  the travel -- do you agree the travel agent should
23  look at the state department warnings and travel
24  advisories?
25          MR. SUAREZ:  Objection.  Form.

Page 170

1           MR. SCOTT:  Objection.  Form.  Beyond her
2      scope.  She's not a travel agent.
3           **THE WITNESS:  Beyond my scope for sure.**
4   BY MR. WEGLARZ:
5      Q.   Okay.  Well, and that's fine.  If it's beyond
6   your scope, then why are you testifying that you
7   believe the travel agent did nothing wrong?
8      **A.   I wasn't asked about the travel agent.  I was**
9   **asked about Mark Travel.**
10          MR. SCOTT:  She was asked about the tour
11     operator.
12          THE COURT REPORTER:  I'm sorry, I didn't
13     get your objections because the witness was
14     answering.
15          MR. SUAREZ:  I said objection to form.
16          MR. SCOTT:  And I said she was -- she
17     mentioned about a tour operator, not a travel
18     agent.
19  BY MR. WEGLARZ:
20     Q.   So you believe --
21          MR. SCOTT:  And I referred -- sorry.  I
22     did that in the third person.
23  BY MR. WEGLARZ:
24     Q.   So you believe the seller of the travel has
25  no responsibility to be familiar with the state

Page 171

1   department's travel alerts or warnings, but the
2   purchaser of the travel has that responsibility?
3           MR. SUAREZ:  Object to form.
4           **THE WITNESS:  Yes, I think the consumer**
5      **has the responsibility.**
6   BY MR. WEGLARZ:
7      Q.   Okay.  And that's not a shared
8   responsibility?  It's all consumer, nothing on the
9   seller?
10          MR. SUAREZ:  Objection.  Form.
11          **THE WITNESS:  Listen, there's 50, 60 or**
12     **70 travel agencies in the United States,**
13     **maybe some do do that as a normal course of**
14     **business, none that I'm aware of, but I -- I**
15     **don't know.**
16  BY MR. WEGLARZ:
17     Q.   And can you conceive -- can you conceptualize
18  that maybe not all travelers are aware that there are
19  state department warnings out there?
20          MR. SUAREZ:  Objection to form.
21          **THE WITNESS:  In the same way that maybe**
22     **not all travel agents are aware.  I mean,**
23     **these are -- if the state department**
24     **information is there, anybody could see it.**
25     **I don't think the duty to warn, certainly**

Page 172

1      **doesn't lie with me, I don't think it lies**
2      **with the tour operator.  I don't necessarily**
3      **think it lies with the travel agent.**
4   BY MR. WEGLARZ:
5      Q.   And the same thing for the tour operator.  Do
6   you think the tour operator should be checking state
7   department travel advisories and alerts and warnings?
8           MR. SCOTT:  Asked and answered multiple
9      times.
10          MR. WEGLARZ:  Well, that was before she
11     gave her expert opinion.
12          MR. SCOTT:  She didn't give an expert
13     opinion.
14          MR. SUAREZ:  Object to form.
15          MR. SCOTT:  That's sarcastic.  She didn't
16     give an expert -- she's not claiming she's an
17     expert.
18          MR. WEGLARZ:  All right.  I'll stipulate
19     to that, that's fine.
20          MR. SCOTT:  Look it, she's here as a
21     corporate representative.  We have not
22     designated her as an expert witness.  She's
23     giving factual answers to your questions,
24     that's it.
25          MR. WEGLARZ:  Well, she also testified

GONZALEZ, TAMMY
10/03/2019

Pages 173–176

Page 173

1    that she doesn't believe the co-defendant did
2    anything wrong, so it's a little bit more.
3        MR. SCOTT:  And she answered it the best
4    she could.
5        MR. WEGLARZ:  That's why I'm asking it.
6    I have to at least follow up.
7    BY MR. WEGLARZ:
8        Q.   You do not believe that the tour operator --
9    I understand it's your opinion Fun Jet or Mark Travel
10   did nothing wrong with respect to the booking and the
11   sale of this trip.  Do you believe the tour operator
12   has the responsibility to be familiar with state
13   department warnings, advisories and alerts?
14       MR. SUAREZ:  Objection.  Form.
15       **THE WITNESS:  I don't know if they are or**
16   **aren't familiar with them.**
17   BY MR. WEGLARZ:
18       Q.   Do you think they should be familiar with
19   them?
20       MR. SCOTT:  Asked and answered.
21       MR. SUAREZ:  Same objection.
22       **THE WITNESS:  No, I don't think it's**
23   **their duty to warn.**
24   BY MR. WEGLARZ:
25       Q.   You believe that state department warnings,

Page 174

1    alerts and advisories are relevant, but it's just not
2    the responsibility of the seller, it's the
3    responsibility of the purchaser?
4        MR. SUAREZ:  Objection.  Form.
5        **THE WITNESS:  That's what I believe.**
6    BY MR. WEGLARZ:
7        Q.   Okay.  You believe it's pertinent
8    information, but the responsibility of the purchaser,
9    not the seller?
10       MR. SUAREZ:  Objection.  Form.
11       MR. SCOTT:  Objection.  Form.  She's
12   given you every answer and I think she's
13   answered that five times.
14       **THE WITNESS:  Yes.**
15       MR. WEGLARZ:  All right.  That's all I
16   have.  Thank you.
17       MR. SCOTT:  Let's take a break, see if I
18   have anything.
19       (A recess was taken in the deposition, after
20   which the deposition continued as follows:)
21                CROSS-EXAMINATION
22   BY MR. SCOTT:
23       Q.   A couple areas I just want to cover.  What is
24   an inventory control?
25       **A.   The inventory control that we do, it's -- we**

Page 175

1    just make sure that there are rooms available to sell,
2    that things aren't oversold.  It's just --
3        Q.   It's to advise on --
4        **A.   Maintaining inventory and advising on**
5    **availability.**
6        Q.   Advising on availability?
7        **A.   Correct.**
8        Q.   Okay.  Was UVI involved in the booking
9    process in this case?
10       **A.   No, we weren't.**
11       Q.   Did UVI have any contact with the plaintiff
12   in this case?
13       **A.   No, we didn't.**
14       Q.   Let me see Plaintiffs' Exhibit 6.  It's the
15   email.
16       **A.   Yeah, I just saw it.**
17       Q.   I'm going to hand you Plaintiffs' Exhibit 6.
18   What does this document reflect?
19       **A.   It reflects that we were asked to see if**
20   **there was rooms available because one of the hotels in**
21   **Jamaica was not going to be ready on time, and we were**
22   **saying what the availability was.**
23       Q.   Okay.  Another series of questions.  At
24   lunchtime, as your counsel, did I hand you certain
25   documents concerning and from the Shouldice file that

Page 176

1    counsel mentioned earlier?
2        **A.   You did.**
3        Q.   Okay.  Did those documents refresh your
4    recollection as to why you did not recall the case?
5        **A.   Absolutely, and I didn't recall the case**
6    **because the case was dropped by the plaintiff, nothing**
7    **ever came of it.**
8        Q.   Let me hand you and I'd like to mark this as
9    an exhibit.
10       (Defendants' Exhibit No. 10 was marked for
11   identification, a copy of which is attached hereto.)
12   BY MR. SCOTT:
13       Q.   I'd like to hand you -- what is that
14   document?
15       **A.   It's a notice of voluntary dismissal without**
16   **prejudice.**
17       Q.   Against who?
18       **A.   Against the defendant, Unique Vacations.**
19       Q.   By who?
20       **A.   By the plaintiff.**
21       Q.   Okay.  Read the -- what does that notice
22   say?
23       **A.   "Notice of Voluntary Dismissal without**
24   **prejudice against defendants, Unique Vacations, Inc.,**
25   **Sandals Resorts International.  Comes now, the**

GONZALEZ, TAMMY
10/03/2019

Pages 177–180

Page 177

1  plaintiff, Robyn Shouldice, by and through her
2  undersigned counsel and pursuant to Rule 1.420,
3  Florida Rules of Civil Procedure, and hereby notifies
4  the Court and the parties hereto of this Voluntary
5  Dismissal without prejudice of this cause against
6  defendants, Unique Vacations, Sandals Resorts," and it
7  says certificate of service, "I hereby certify that a
8  true and correct copy of the above and foregoing was
9  served the 5th of January, 2016."
10     Q.   Thank you.  That will be a defense exhibit.
11          The HSBI (sic) --
12     A.   HBSI.
13     Q.   HSBI -- I'm not great on acronyms.  That's
14  why I got kicked out of the Army.
15          Does UVI have any involvement with that
16  system?
17     A.   No, no, that's electronic transmission
18  bookings coming from tour operators.
19     Q.   Plaintiffs' counsel asked you if you were
20  made aware of an alleged sexual assault, would you
21  change your position on notice by your company?
22     A.   No, I wouldn't.
23     Q.   Why not?
24     A.   Duty to warn is not my responsibility.
25     Q.   Okay.  A couple of follow up questions.  Has

Page 178

1  UVI ever insured or guaranteed customer safety from
2  any criminal activity in any of its marketing or
3  promotional campaigns, to the best of your ability?
4     A.   No.
5     Q.   Best of your knowledge?
6     A.   No.
7     Q.   Has it ever done the same when speaking with
8  travel agents or tour operators?
9     A.   No.
10    Q.   It has never done?
11    A.   No.
12    Q.   Are you aware -- let me say this.  Is UVI
13  aware of any special circumstances or other
14  information at the time the plaintiffs booked their
15  vacation that would have created a duty to UVI to
16  provide warning or warnings of potential sexual
17  assault at Beaches Ocho Rios?
18    A.   No.
19    Q.   Does UVI own or operate Beaches Ocho Rios?
20    A.   No.
21    Q.   Does UVI hire, train or employ any of the
22  resort staff, including the alleged perpetrators in
23  this case?
24    A.   No.
25    Q.   Plaintiffs' counsel inferred that this was

Page 179

1  not a real contract, the one you have with UTC; do you
2  agree with that?
3     A.   No.
4     Q.   Why?
5     A.   Because it is a real contract.  I have
6  essential functions that I'm contracted to do, which
7  is marketing, advertising, promoting and that's what I
8  do.
9          MR. SCOTT:  Okay.  Nothing further.
10         Anything else?
11         MR. WEGLARZ:  Yeah, I have one or two
12    questions.
13         MR. SCOTT:  Go ahead.
14         FURTHER REDIRECT EXAMINATION
15  BY MR. WEGLARZ:
16    Q.   Ms. Gonzalez, do you believe that UVI has a
17  responsibility to market and promote products and
18  services that are reasonably safe?
19         MR. SUAREZ:  Objection to form.
20         MR. SCOTT:  Objection.  Asked and
21    answered four times.
22         THE WITNESS:  Yes.
23  BY MR. WEGLARZ:
24    Q.   And did UVI do anything to make sure that the
25  resort services that you are marketing and promoting

Page 180

1  were indeed reasonably safe?
2     A.   No, that's not my role.
3     Q.   Okay.  And when I asked you questions about
4  the Shouldice case, you didn't recall it?
5     A.   Correct.
6     Q.   All right.  Then after you looked at some
7  documents, it refreshed your memory that that case did
8  exist, correct?
9         MR. SUAREZ:  Object to form.
10        THE WITNESS:  Well, it made me remember
11    why I didn't recall.  It never became
12    anything.
13  BY MR. WEGLARZ:
14    Q.   Okay.  But did it refresh your memory about
15  the case at all?  Do you even remember what was
16  alleged?
17    A.   No, nothing came of it.
18        MR. SUAREZ:  Objection to form.
19        THE WITNESS:  Sorry.  Nothing came of it.
20    It was dismissed.  I don't need to keep that
21    in my head.
22  BY MR. WEGLARZ:
23    Q.   But you did recall that the case was
24  dismissed even before -- I mean, you heard about this
25  case previously and you were told it was dismissed,

GONZALEZ, TAMMY
10/03/2019

Pages 181–184

Page 181

1  correct?
2      A.  You asked me about the case.
3      Q.  Yes.
4      A.  I told you I didn't recall it.  When we went
5  to lunch, Tom showed me the paperwork or Mr. Scott
6  showed me the paperwork, which made me realize why I
7  didn't recall it.  It was dismissed.
8      Q.  Okay.  Hold on.  I think I'm done, but I'm
9  looking at one more thing.
10         Ms. Gonzalez, do you recall the Shouldice
11  case involving an allegation that a resort employee by
12  the name Cameron Selmon led a teenage minor into a
13  small concrete shed by the pool at the Beaches Negril
14  Resort, and he was able to open the door into that
15  shed with his keys, escorted the minor child into the
16  room, and then sexually assaulted her?
17      A.  No.
18      Q.  Does that refresh your memory about any
19  allegation?
20         MR. SAFRA:  Objection to form.
21      THE WITNESS:  No.
22  BY MR. WEGLARZ:
23      Q.  Do you have a concern with that type of
24  conduct?
25         MR. SUAREZ:  Objection.  Form.

Page 182

1         MR. SCOTT:  Objection.  Form. Asked and
2      answered.
3  BY MR. WEGLARZ:
4      Q.  I mean, if true, why would you want to
5  promote Beaches Negril if something like this
6  happened?
7         MR. SUAREZ:  Objection.
8         MR. SCOTT:  Objection.
9      THE WITNESS:  If true, why would they
10      drop the case?
11  BY MR. WEGLARZ:
12      Q.  Do you know why?
13      A.  I have no idea.
14      Q.  Did you or anyone at UVI ever take a look
15  into this to see if the allegation was true or not?
16         MR. SUAREZ:  Objection.  Form.
17      THE WITNESS:  Not that I'm aware of.
18  BY MR. WEGLARZ:
19      Q.  Do you think that would be a good idea, to
20  make sure that the product that is being marketed and
21  promoted is indeed safe --
22         MR. SUAREZ:  Objection to form.
23  BY MR. WEGLARZ:
24      Q.  -- for the travelers?
25         MR. SUAREZ:  Objection to form.

Page 183

1         MR. SCOTT:  Objection to form.
2      THE WITNESS:  No.
3         MR. SCOTT:  Anything else?
4         MR. WEGLARZ:  That's it.
5         MR. SCOTT:  Okay.  We're not going to
6  waive, so she'd like to read.  Thank you,
7  guys.
8         THE COURT REPORTER:  Are you ordering a
9  transcript?
10         MR. WEGLARZ:  Yeah, I am.
11         THE COURT REPORTER:  Would you like a copy?
12         MR. SUAREZ:  I'll get a copy, yes.
13         THE COURT REPORTER:  Copy?
14         MR. SCOTT:  Yeah, sure.
15      (The deposition was concluded at 4:00 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 184

1              CERTIFICATE OF OATH
2    STATE OF FLORIDA    )
                         )  ss.
3    COUNTY OF MIAMI-DADE )
4        I, Gypsy Ferreira-Macias, Florida Professional
5    Reporter, Notary Public, State of Florida, certify
6    that Tammy Gonzalez personally appeared before me on
7    the 3rd day of October, 2019, and was duly sworn.
8        Signed this 9th day of October, 2019.
9
10
                    _____
                    Gypsy Ferreira-Macias, FPR
11                  Notary Public, State of Florida
                    Commission No.:  FF151583
12                  Exp.:  December 13, 2022
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 185

```
 1              CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA    )
                         )   ss.
 3   COUNTY OF MIAMI-DADE )
 4        I, Gypsy Ferreira-Macias, Florida
 5   Professional Reporter, certify that I was authorized
 6   to and did stenographically report the deposition of
 7   Tammy Gonzalez; that a review of the transcript was
 8   requested; and that the transcript is a true record of
 9   my stenographic notes.
10        I further certify that I am not a relative,
11   employee, attorney, or counsel of any of the parties,
12   nor am I a relative or employee of any of the parties'
13   attorneys or counsel connected with the action, nor am
14   I financially interested in the action.
15        Dated this 9th day of October, 2019.
16
17
18            _____
              Gypsy Ferreira-Macias, FPR
              Florida Professional Reporter
19
20
21
22
23
24
25
```

Page 186

```
 1   October 9, 2019
 2
 3
 4   Ms. Tammy Gonzalez
     c/o THOMAS E. SCOTT, JR.
 5   Cole, Scott & Kissane, P.A.
     9150 South Dadeland Boulevard
 6   Suite 1400
     Miami, FL 33156
 7
     In Re:  Paiton E. Bater, et al. vs. Unique Vacations,
 8         Inc., et al.
           Deposition of Tammy Gonzalez, taken on 10/3/19
 9         U.S. Legal Support Job No. 2019228
10   Dear Ms. Gonzalez,
11   The transcript of the above-referenced proceeding is
     now available for your review.
12
     Please call (305)373-8404 to schedule an appointment
13   between the hours of 9:00 a.m. and 4:00 p.m., Monday
     through Friday, at a U.S. Legal Support office located
14   nearest you.
15   Please complete your review within 30 days.
16   Sincerely,
17   _____
18   Gypsy Ferreira-Macias, FPR
     U.S. Legal Support, Inc.
19   700 East Dania Beach Boulevard
     First Floor
20   Dania Beach, FL 33004
21
22   cc via transcript:  Todd J. Weglarz, Esq.
                         Luis E. Suarez, Esq.
23
24
25
```

Page 187

```
 1                  ERRATA SHEET
 2   DO NOT WRITE ON TRANSCRIPT--ENTER CHANGES ON THIS PAGE
 3        IN RE:  PAITON E. BATER, Et Al. VS.
                UNIQUE VACATIONS INC., Et Al.
 4                 TAMMY GONZALEZ
                     10/3/19
 5
     Page No.   Line No.    Change          Reason
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true.
24   _____     _____
25   Date                 Tammy Gonzalez
```