# EXHIBIT 22

# BATER, ET AL. v. UNIQUE VACATIONS, INC., ET AL.

## RONALD JACOBS

### November 22, 2019

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

RONALD JACOBS
November 22, 2019

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF MICHIGAN
 3                      MIAMI DIVISION
 4      ------------------------------------------------
 5   PAITON E. BATER, AMBER R. TORRALVA,
     JANET DESANTIS, and MARGARET A. TORRALVA,
 6
             Plaintiffs,
 7
        vs.        Case No. 1:17-CV-21703
 8
     UNIQUE VACATIONS, INC., a Delaware corporation,
 9   THE MARK TRAVEL CORPORATION, a Nevada Corporation
     d/b/a Fun Jet Vacations,
10   DWIGHT DAVIS, JERMAINE DYER and
     WILLIAM TAPPER, Jointly and Severally,
11
             Defendants.
12
     ------------------------------------------------
13
14
15           Deposition of RONALD JACOBS
16           Friday, November 22nd, 2019
17
18                    9:11 a.m.
                         at
19
                  US LEGAL SUPPORT
20             411 East Wisconsin Avenue
                  Milwaukee, Wisconsin
21
22
23
            Reported by Tammy R. O'Neal, RPR
24
25
```

---

**Page 3**

```
 1                    E X H I B I T S
 2   NUMBER                    PAGE IDENTIFIED
 3   Exh. 1  Addendum to tour operator agreement    65
     Exh. 2  Business agreement between Funjet and   67
 4           Vacations To Go
     Exh. 3  Bill of rights              82
 5   Exh. 4  Mark Travel's responses and           119
             objections to the Plaintiffs'
 6           Interrogatory and Request to Produce
 7
        (Original exhibits attached to original transcript;
 8      copies attached to transcript copies.)
 9
10        P R E V I O U S L Y  M A R K E D  E X H I B I T S
11
     NUMBER                    PAGE IDENTIFIED
12
13   Gonzales 5  Tour operator agreement        26
     Gonzales 6  Email from Mr. Matthew Anderson  109
14               dated March 18, 2015
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1           Deposition of RONALD JACOBS, a witness in
 2   the above-entitled action, taken at the instance of
 3   the Plaintiffs, pursuant to the Federal Rules of
 4   Civil Procedure, pursuant to notice, before Tammy R.
 5   O'Neal, RPR and Notary Public, State of Wisconsin, at
 6   US Legal Support, 411 East Wisconsin Avenue,
 7   Milwaukee, Wisconsin, on the 22nd day of November,
 8   2019, commencing at 9:11 a.m. and concluding at 1:08
 9   p.m.
10   A P P E A R A N C E S :
11
         FIEGER LAW, by
12           Mr. Todd J. Weglarz
             19390 W Ten Mile Road
13           Southfield, MI 48075
             Appeared via videoconference on behalf of
14           Plaintiffs.
15       BOIES SCHILLER FLEXNER LLP, by
             Mr. Luis E. Suarez
16           100 SE 2nd Street, Suite 2800
             Miami, FL 33131
17           Appeared on behalf of The Mark Travel
             Corporation.
18
         COLE SCOTT & KISSANE, by
19           Mr. Oscar A. Campos
             9150 Dadeland Boulevard, Suite 1400
20           Miami, FL 33156
             Appeared telephonically on behalf of Unique
21           Vacations, Inc.
22           I N D E X
23   EXAMINATION BY                   PAGE
24   BY MR. WEGLARZ:                    4
     BY MR. SUAREZ:                   130
25   BY MR. WEGLARZ:                  131
```

---

**Page 4**

```
 1           TRANSCRIPT OF PROCEEDINGS
 2           RONALD JACOBS, called as a witness herein,
 3   having been first duly sworn on oath, was examined and
 4   testified as follows:
 5           MR. WEGLARZ:  Let the record reflect we're
 6   here for the deposition of Mr. Ronald Jacobs taken
 7   pursuant to notice and agreement of counsel.
 8                    EXAMINATION
 9   BY MR. WEGLARZ:
10   Q   Mr. Jacobs, good morning.
11   A   Good morning.
12   Q   My name is Todd Weglarz, and I represent the
13   plaintiffs in this case.  I'll ask you a few
14   questions about yourself, about the booking of this
15   trip, and anything you may know about the underlying
16   incident.
17           For the record your full and complete name,
18   please?
19   A   Ronald Lee Jacobs.
20           MR. SUAREZ:  Wait, wait.  Todd, just give
21   me one second to see if they can do something to the
22   screen.  Just give me one second, okay?  Hang on.
23           MR. WEGLARZ:  Sure.
24           (Pause in proceedings.)
25           MR. SUAREZ:  Let me just introduce myself.
```


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

---

Page 5

1    I'm Luis Suarez, and I represent The Mark Travel
2    Corporation. We're here based on agreement of
3    counsel memorialized in an email. And the witness to
4    the left is Mr. Ron Jacobs. Thank you for being here
5    this morning.
6            MR. WEGLARZ: Thank you. Oscar, did you
7    want to introduce yourself for the record?
8            MR. CAMPOS: Sure. Yeah, sorry. There's
9    no Steven Safra today. This is Oscar Campos. I'm
10   sure you won't be upset. Oscar on behalf of Unique
11   Vacations, Inc.
12           MR. WEGLARZ: Actually I get along just
13   fine with Mr. Safra so I'm a little disappointed --
14           MR. CAMPOS: He's a pleasure, I know.
15           MR. WEGLARZ: He is indeed.
16   Q   Mr. Jacobs, your date of birth, please?
17   A   January 15, 1959.
18   Q   And you reside in the Milwaukee area?
19   A   Yes, sir.
20   Q   And how long have you resided out there?
21   A   About 20 years.
22   Q   And can you give me the 30-second overview as to your
23   educational background, please?
24   A   Sure. I graduated from the University of Wisconsin
25   Oshkosh in 1977 with an accounting degree.

---

Page 6

1    Q   All right. You know, I heard you graduated from the
2    University of Wisconsin Oshkosh and then you cut off.
3    A   With an accounting degree.
4    Q   Thank you. Any other education?
5    A   I had gone on to my MBA at the University of
6    St. Thomas in Minneapolis. I'm three classes short
7    of that, but I've been three classes short since I
8    joined Mark Travel 20 years ago.
9            THE WITNESS: He's having a hard time
10   hearing me I think.
11   BY MR. WEGLARZ:
12   Q   Mr. Jacobs, you keep cutting out. I wonder if you
13   need to bring that microphone closer to you.
14   A   How's that? Any better?
15   Q   Right now you sound like a million bucks. All right.
16   I heard that you were several classes short of
17   getting your MBA. Is that what you said to us?
18   A   Yes, I'm three classes short. I've been three
19   classes short since I joined Mark Travel which was 20
20   years ago.
21   Q   When did you first become employed with Mark Travel?
22   A   In September of 1999.
23   Q   Where did you work before Mark Travel?
24   A   Probably four or five other companies before that.
25   Immediately before that it was a company called

---

Page 7

1    Damark International up in the Minneapolis. And
2    before that --
3    Q   What kind of company was that?
4    A   Before that it was Musicland or Sam Goody. That was
5    also up in the Minneapolis area.
6    Q   What kind of a business is Thamark?
7    A   Damark, it's D-A-M-A-R-K.
8    Q   Sorry.
9    A   It was a mail-order catalog company that also sold
10   memberships in different portfolios, if you will. So
11   they had a membership that you could buy into that
12   corresponded to their catalog. They also had
13   memberships that were involved with like cooking. A
14   lot of different kinds of membership clubs, if you
15   will.
16   Q   Okay. So is Mark Travel -- when you were -- when you
17   were employed -- when you first became employed
18   through Mark Travel, was that your first exposure to
19   the travel industry?
20   A   Yes.
21   Q   And have you remained employed -- did you remain
22   employed with Mark Travel from 1999 up through the
23   present date?
24   A   That's correct.
25   Q   All right. There were no interruptions? You didn't

---

Page 8

1    take any breaks, go work somewhere else during
2    that -- since you've been employed in 1999?
3    A   No, other than the fact that Mark Travel went through
4    a transaction so I'm now part of Apple Leisure Group.
5    Q   Okay. And that occurred last what, last year?
6    A   About a year and a half ago.
7    Q   Have you ever had your deposition taken before?
8    A   Yes.
9    Q   How many times?
10   A   I think it's only been one other time, maybe two.
11   Q   When was the last time?
12   A   I don't recall. It's been several -- it's several
13   years though, probably 10, 12 years ago.
14   Q   And what kind of case was that?
15   A   There were some questions regarding a contract that
16   we had with a charter carrier, an airline carrier of
17   ours.
18   Q   And what was the lawsuit about?
19   A   I think there was some questions about whether or not
20   we had paid the full amount that was due.
21   Q   And was Mark Travel named as a defendant?
22   A   Yes.
23   Q   And who filed the lawsuit?
24   A   This particular air carrier I believe.
25   Q   And I'm sorry, you cut off again. It's the audio

---

Pages 5 to 8



RONALD JACOBS
November 22, 2019

Page 9

1  connection, I apologize.
2         Could you tell me the name of the carrier
3  again?
4  A  I don't recall the name of the carrier.  It was the
5     carrier from overseas, an international carrier if I
6     remember right.
7  Q  Got it.  Was this a case that was filed in Wisconsin?
8  A  I don't know.  I don't remember.
9  Q  Do you recall any other times that you were deposed
10    other than on that case that you just told me about?
11 A  No.
12 Q  Have you ever filed a lawsuit yourself?
13 A  No.
14 Q  Other than the case you just told me about, how many
15    other lawsuits are you aware of that have been filed
16    against Mark Travel or one of its travel brands?
17 A  I'm not aware, or I don't recall, of any others.
18 Q  And Mr. Jacobs, did you review any records or
19    materials before we started your deposition?
20 A  You know what, sir, can I just go back?  I should
21    clarify one thing.  There was --
22 Q  Sure.
23 A  There was a case that I was involved with over in
24    London.  That was probably seven or eight years ago.
25    That involved some fraud within our organization

Page 10

1  where we did take two of our team members to court.
2  Q  And where was that filed, what court?
3  A  It was in London.
4  Q  London?
5  A  Yes.
6  Q  As in London, England?
7  A  Yes, sir.
8  Q  And what was the ultimate disposition on that case?
9         MR. SUAREZ:  Hang on one second.
10        You can answer that question to the extent
11    there's no confidentiality agreement associated
12    with the resolution of that case.  Don't get into
13    anything that's confidential or privileged, okay?
14        THE WITNESS:  Yeah, one -- there were two
15    gentlemen.  One I believe pleaded guilty before we
16    got to court.  The other one did go to court and was
17    found guilty as well.
18 BY MR. WEGLARZ:
19 Q  And these were criminal actions, correct?
20 A  Within the organization, yes.
21 Q  And can you give me the one-minute overview as to
22    what the allegations of fraud were in that case?
23        MR. SUAREZ:  Again I'm going to give the
24    witness the same instructions.  If there's a
25    confidentiality agreement associated with that case,

Page 11

1  I'll instruct you to respect the confidentiality
2  agreement, but you can answer the question.
3         THE WITNESS:  I don't believe there is,
4  Luis, but just generally there was some stealing of
5  some funds within the organization.
6  BY MR. WEGLARZ:
7  Q  And these were two Mark Travel employees?
8  A  Funway Holidays, which was an affiliate to Mark
9     Travel, subsidiary organization.
10 Q  And I take it these two team members were working and
11    residing out in London, correct?
12 A  Correct.
13 Q  Did the incidents of fraud or the underlying
14    transactions have anything to do with Vacations To
15    Go?
16 A  No.
17 Q  Would it have anything to do with the booking of any
18    Sandals or Beaches Resorts vacations?
19 A  No, I don't think so.
20 Q  I appreciate you identifying that for me.  Any other
21    legal actions, lawsuits you're aware of other than
22    the fraud case you just told me about and the dispute
23    involving your charter carrier?
24 A  Not that I recall.  I can't believe I forgot the one
25    in London because I was heavily involved with that

Page 12

1  one so ...
2  Q  Sir, what is your current title with Mark Travel?
3  A  I'm the president of Funjet Vacations and Blue Sky
4     Tours.
5  Q  And how long have you had that title?
6  A  Probably somewhere around a year.
7  Q  I'm sorry, you cut off.  I didn't hear your answer.
8  A  Around a year.
9  Q  Just one year.  All right.  What was your title
10    before that?
11 A  So I -- when I started with Mark Travel 20 years ago,
12    I was in the finance organization.  And then after
13    9/'11 I moved over to Funjet Vacations and became the
14    vice president and general manager of that division,
15    if you will.  I did that for about two years, two and
16    a half years, and then I moved back to finance as the
17    vice president of finance.
18        I continued on with that particular title
19    until probably 2017 or '18 when I was made the CFO.
20    When the transaction happened with Mark Travel and
21    Apple Leisure Group, they retained me as I -- I
22    helped with a lot of the integration.  And then they
23    asked me to stay on to become the president of Funjet
24    and Blue Sky Tours.
25 Q  I'm really sorry, Mr. Jacobs, this connection keeps

Pages 9 to 12


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

## Page 13

1  fading in and out.  Just give me a minute.  I'm going
2  to see if there's a quick fix from our end.
3        (Pause in proceedings.)
4  BY MR. WEGLARZ:
5  Q   Sir, when you were the vice president and general
6      manager, that was shortly after 9/'11, is that what
7      you said?
8  A   That's correct.
9  Q   And that was for Funjet and Blue Sky, or just Funjet?
10 A   At that time it would have been just Funjet.  And we
11     had --
12 Q   You said you held that position --
13 A   I'm sorry, we had two other brands called TransGlobal
14     Vacation and Adventure Tours that I also oversaw.
15        (Discussion held off the record.)
16 BY MR. WEGLARZ:
17 Q   What would be the reason for going back to being the
18     VP of finance after two and a half years?
19 A   That's really where my background is.  So the CFO had
20     left the organization, so our CEO came back to me and
21     asked if I would mind going back to finance and
22     overseeing all of finance.
23        I don't think you heard that.
24 Q   All right.  Just hold on a second.
25 A   I can just tell from your face that you're not

## Page 14

1  hearing me.
2        MR. WEGLARZ:  I'm not.
3        MR. SUAREZ:  Todd, why don't you just call
4  in.  Leave the video on, but call in.
5        MR. WEGLARZ:  If we can do that.
6        (Pause in proceedings.)
7  BY MR. WEGLARZ:
8  Q   Sir, can you tell me what your general
9      responsibilities were as the CFO for Funjet?
10 A   I was the CFO for Mark Travel.
11 Q   Okay.
12        MR. CAMPOS:  Is there any way that you can
13  move the microphone closer.  We have it maxxed, and
14  I'm having a hard time hearing you.
15        (Discussion held off the record.)
16        (Pause in proceedings.)
17 BY MR. WEGLARZ:
18 Q   So you're the CFO for Mark Travel.  After you were
19     the VP/GM, when did -- when you were the CFO for Mark
20     Travel during this time, did it have anything to do
21     with Funjet?
22 A   Yes, it would have, because all of the brands roll up
23     underneath Mark Travel.  So I worked with all of the
24     brands from a financial perspective.
25 Q   And how many different brands are we talking about?

## Page 15

1        MR. SUAREZ:  At what time?
2        MR. WEGLARZ:  When he first -- when he went
3  back to the VP of finance after having the VP/GM
4  role.
5        THE WITNESS:  We probably had -- now
6  somebody else is having trouble hearing us.
7        (Discussion held off the record.)
8        (Pause in proceedings.)
9  BY MR. WEGLARZ:
10 Q   Let's try this again, folks.  And I apologize,
11     Mr. Jacobs, it's difficult getting through this with
12     all these interruptions, so hopefully this will go a
13     little bit smoother.  You can hear me okay?
14 A   Yes, sir.
15 Q   Thank you.  All right.  Right after 9/'11 is when you
16     went -- they put you in the position of vice
17     president slash general manager for Funjet, right?
18     And you did that for about two and a half years?
19 A   That's correct.
20 Q   And then they put you back as the VP of finance after
21     that, right?
22 A   Correct.
23 Q   And that's for Mark Travel.  And that would be over
24     all the brands at that time one of which included
25     Funjet, true?

## Page 16

1  A   Yes.
2  Q   All right.  And did you pretty much have the same
3      title and the same day-to-day responsibilities from
4      that point all the way until the time that you were
5      then promoted to president for Funjet and Blue Sky?
6  A   Yes.
7  Q   Okay.  So could you tell me in general what your
8      day-to-day responsibilities were as the CFO for Mark
9      Travel?
10 A   Yeah.  I mean, yes, there were numerous things, but
11     the typical kinds of things that a CFO or vice
12     president of finance would have; overseeing the
13     financial reporting, managing of cash flow, accounts
14     payable, accounts receivable.  All of those
15     departments reported up through me.
16 Q   And you had that title and position even in the
17     spring of 2015?
18 A   I would have been the VP of finance, yes.
19 Q   And can you give me a very general overview as to the
20     corporate structure or hierarchy there at Mark Travel
21     that existed in the beginning of 2015?
22 A   So LaMacchia Enterprises was the -- like the holding
23     company.  I don't know if I understand all of the
24     structure because some of it wasn't directly related
25     to me, but there was Mark Travel that encompassed all

Pages 13 to 16


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

---

Page 17

1  of the leisure brands, if you will, which also
2  included Funjet Vacations.  Then there was another
3  company called Trisept Solutions which is our
4  technology arm.  We also had Funway Holidays which I
5  spoke of earlier which was our London operator.
6  There's a couple of other real estate companies that
7  also rolled up into LaMacchia Enterprises.
8  Q   All right.  Was there someone who was directly
9  overseeing the leisure brands that included Funjet?
10 A   All of the brands had what I would consider kind of a
11 general manager or vice president what would oversee
12 those brands.
13 Q   And then would that general manager and vice
14 president, who would they report directly to?
15 A   To the CEO of the organization or the chief operating
16 officer.  I'm not sure at that time how it was
17 structured.  I think they were reporting to the
18 CEO -- COO.
19 Q   And who was the vice president and general manager
20 for Funjet back in 2015?
21 A   I believe it was Mike Going.
22 Q   Mike Goin?
23 A   G-O-I-N-G.
24 Q   And who was the CEO for Mark Travel in 2015?
25 A   The CEO was Bill LaMacchia.  The COO was Bill

---

Page 18

1  LaMacchia, Jr.
2  Q   And is that still true today, or is it different now
3  because of the merger?
4  A   It's different because of the merger.
5  Q   And how long was Mr. Going the VP/GM for Funjet?
6  A   I don't know that.  I don't recall.
7  Q   Do you recall roughly how many years he had that
8  position prior to 2015?
9  A   No, probably a couple years, maybe a little longer
10 than that because he was with us for quite a while.
11 I'm not really sure.
12 Q   But each brand would have their own VP/GM, right?
13 A   Yeah.  They may not have had that exact title.  They
14 may have been managing directors or -- it just kind
15 of depends on the experience of the individual.
16 Q   And then who would be directly beneath Mr. Going at
17 Funjet back in 2015?
18 A   He would have had a couple people reporting in to him
19 that would have been on the sales side, so there
20 would have been a sales director probably.
21     We have an organization that's -- it's a
22 little bit different in that we have a shared
23 services kind of environment, so we don't have a lot
24 of people that report directly into the brands.  So
25 there's various departments, whether it's finance or

---

Page 19

1  the call center or the product people or the buying
2  group.
3     They're all operating independently on
4  behalf of all of the brands, so they all have some
5  responsibility to that particular brand leader but
6  not a direct reporting line, if you will.
7  Q   I follow you.  Okay.  So really the only people who
8  would be earmarked for Funjet other than Mr. Going as
9  the VP/GM, is perhaps the sales director.  Any other
10 titles or employees directly underneath Mr. Going for
11 Funjet?
12 A   He probably had a marketing director as well that
13 reported to him.  And even --
14 Q   Do you recall who -- sorry.
15 A   Sorry.  I was just going to say even the sales
16 director, our sales team actually represented all of
17 the brands as well at that time, so the BDMs would go
18 out and represent the four, five, six brands that we
19 had.
20 Q   And BDM stands for business development manager?
21 A   That's correct.
22 Q   And how many BDMs did they have at Mark Travel back
23 in 2015?
24 A   Somewhere probably between 25 and 30.
25 Q   And the BDMs would service all of the brands?

---

Page 20

1  A   At that time I think it was four brands, yes.
2  Q   And what were the other three brands besides Funjet?
3  A   Blue Sky Tours, Southwest Vacations, and United
4  Vacations.
5  Q   And by the way, Funjet is Mark Travel, true?
6  A   What do you mean by that?
7  Q   Is Funjet a part of -- or was it a part of Mark
8  Travel back in 2015?
9  A   Yes.
10 Q   It wasn't its own separate corporate entity, was it?
11 A   No.
12 Q   It was just a brand name that Mark Travel came up
13 with the other three brands to promote its
14 company, true?
15 A   That's correct.
16 Q   Okay.  Did they have any BDMs that were assigned just
17 to Funjet back then?
18 A   No, I believe they were all representing all four
19 brands.
20 Q   And what kind of company was Mark Travel company back
21 in 2015?
22     MR. SUAREZ:  Object to form.
23     THE WITNESS:  What do you mean what kind of
24 company?
25 BY MR. WEGLARZ:

---

Pages 17 to 20


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

Page 21

1  Q   Is it -- sure.  I mean what was its business?
2  A   So really two parts to the business.  If you remember
3      I talked about Trisept Solutions which is the
4      technology part of the company, so it's -- if you
5      want to think about it as a large IT department that
6      then spun off and became kind of on their own so they
7      could continue to sell to other parties their
8      technology outside of the Mark Travel Corporation.
9          And then the Mark Travel Corporation really
10     is a travel company that has several brands where
11     we're actually what's referred to in the travel
12     industry as the tour operator.
13  Q   Okay.  And is Mark Travel also a seller of travel?
14  A   Yes.
15  Q   And Mark Travel was a seller of travel and still is
16     in the state of Florida, true?
17         MR. SUAREZ:  Object to form.
18         THE WITNESS:  So Mark Travel really doesn't
19     exist anymore since the merger.
20  BY MR. WEGLARZ:
21  Q   Back in 2015 Mark Travel was a licensed seller of
22     travel in the state of Florida, correct?
23         MR. SUAREZ:  Object to form.
24         THE WITNESS:  That's correct.
25  BY MR. WEGLARZ:

Page 22

1  Q   In fact my understanding is there's only a few states
2      that even require a license for a seller of travel;
3      is that your understanding?
4  A   I'm not sure.
5  Q   Okay.  But you do recall Florida being one of them?
6  A   Yes, as far as I know.  We sold travel there.  I'm
7      not sure of the legal licensing requirements but...
8  Q   Understood.  Did Mark Travel have an office down in
9      Florida?
10  A   We have -- we had and still do, a call center in
11     Orlando.
12  Q   And what activities went on at the call center in
13     Orlando?
14  A   Typical call center activities I guess, taking
15     reservations over the phone, customer service,
16     handling customer service calls.
17  Q   And was that all done at that physical building, or
18     would you have people answering the phones from other
19     locations but it just originated out of there?
20  A   Because we also have a call center in Milwaukee, we
21     have people that work from home.  So that was just
22     one of the facilities.
23  Q   Sure.  How many call centers did Mark Travel have
24     back in 2015?
25  A   I think it was just the two.  Well, two in the United

Page 23

1      States, and then we also had the one in London.
2  Q   So the two.  You had one in Milwaukee and one in
3      Orlando?
4  A   Yes.  And I'm a little unsure of the timing because
5      we may have had one other one out in -- out on the
6      East Coast.
7  Q   And would the different call center locations be
8      responsible for different functions?
9  A   No, not necessarily.  They pretty much handled all
10     the calls from the various brands.  We tried to train
11     our people to handle multiple calls.
12  Q   Can you tell me what types of business activities
13     that the Orlando call center would handle?
14  A   Calls from really travel agents, customers regarding
15     any bookings that they wanted to make or wanted to
16     modify, whether there were any customer service
17     issues that they would also try and help address.
18  Q   And would the Orlando call center handle all these
19     types of calls for all of the brands or just some of
20     the brands?
21  A   That strategy changed over the years, so I don't know
22     what it was back in 2015.  Sometimes we had certain
23     calls go into just one call center, but that varied.
24  Q   If there are any calls concerning anything involving
25     Funjet Vacations, would those calls be going through

Page 24

1      Orlando back in 2015 as best as you can recall?
2  A   Yes, I think they could have been handled there or in
3      Milwaukee.  They would not have been handled in
4      Funway Holidays in London.  That call center only
5      dealt with the Funway Holidays brand.
6  Q   And how many Mark Travel employees were actually in
7      Orlando or in Florida who were working out of the
8      call center?
9  A   If I recall, maybe between 100 and 200.  I'm not
10     really sure.
11  Q   And then you would also have other employees who
12     worked the call center from remote locations, right?
13  A   That's correct.
14  Q   Your best estimate as to how many you had doing that?
15  A   Back in 2015, I don't know, maybe 50.
16  Q   Did Mark Travel or Funjet have any role or
17     relationship with travel agents?
18  A   Yes, the travel agents distribute our product or sell
19     our product.
20  Q   And how many travel agents do you believe Mark Travel
21     was affiliated with back in 2015?
22  A   Probably somewhere between 5500 and 6,000.
23  Q   Can you name them all?  I'm kidding.
24  A   Sure.  So am I.
25  Q   Did Mark Travel have any relationship with Sandals


U.S. Legal Support

RONALD JACOBS
November 22, 2019

Page 25

1    and Beaches resorts back in 2015?
2         MR. SUAREZ:  Object to form.
3         THE WITNESS:  We would have had their
4    product available for us to package, yes.
5    BY MR. WEGLARZ:
6    Q   And when did Mark Travel first start marketing and
7        selling the Sandals/Beaches product?
8    A   I don't know.
9    Q   Was it ever since you started working there?
10   A   That's correct, yes.
11   Q   And I take it for this relationship to exist where
12       Mark Travel would be able to sell Sandals and Beaches
13       resort vacations, there was some type of agreement or
14       contract in place that governed that, correct?
15   A   Correct.
16   Q   And do you know -- can you tell me which Sandals
17       entity or which Sandals individual you dealt with or
18       Mark Travel dealt with regarding that agreement to
19       sell their brands?
20   A   We don't really have an agreement with Sandals per se
21       or any of their resorts individually.  We have an
22       agreement with Unique Vacations Limited I believe it
23       is.
24   Q   And was that the case ever since you started working
25       at Mark Travel, there's been this agreement with UVL

Page 26

1        (as spoken) to sell Sandals and Beaches resorts?
2         MR. SUAREZ:  Object to the form.
3         THE WITNESS:  I'm not really sure how
4    they're structured and when that came about.
5    BY MR. WEGLARZ:
6    Q   Do you have there in front of you Gonzales
7        Exhibit No. 5?
8         MR. SUAREZ:  Hang on.
9         MR. WEGLARZ:  It's the tour operator
10   agreement.
11        MR. SUAREZ:  Hang on one second.
12        MR. WEGLARZ:  Sure.
13        MR. SUAREZ:  So Todd, I have with me my
14   copy of the deposition of the corporate
15   representative of Unique Vacations, Inc., Exhibit
16   No. 5, and I'm handing him that copy which is an
17   agreement between Unique Vacations Limited and Mark
18   Travel dated January 5, 2015.  Is that what you want?
19        MR. WEGLARZ:  Yeah, Gonzales Exhibit No. 5.
20   Q   I'll give you a second to look at that, sir.
21   A   Is there anything in particular you want me to really
22       focus on or -- I just glanced through it.
23   Q   Not yet, sir.
24        MR. SUAREZ:  Just read through.
25   BY MR. WEGLARZ:

Page 27

1    Q   Yeah.  My general question to you regarding Gonzales
2        Exhibit No. 5 is what is your understanding as to
3        what this document is?
4         MR. SUAREZ:  Object to the form.
5         THE WITNESS:  It's an agreement between
6    Unique Vacations Limited and the tour operator, that
7    being Mark Travel.
8    BY MR. WEGLARZ:
9    Q   And what kind of agreement is this?
10   A   It allows us to sell their product.
11   Q   And would Mark Travel enter into similar agreements
12       with UVL over the years pertaining to the sale of its
13       products?
14        MR. SUAREZ:  Object to the form.
15        THE WITNESS:  This one looks like it's just
16   for the year of 2015.
17   BY MR. WEGLARZ:
18   Q   Right.  I'm presuming the year before that there was
19       a similar agreement between Mark Travel and UVL, and
20       then the year before that, same thing?
21        MR. SUAREZ:  Object to the form.
22   BY MR. WEGLARZ:
23   Q   I'm asking in general.
24        MR. SUAREZ:  Object to the form.
25        Hey, Todd, you know, I've given you leeway

Page 28

1    on this stuff.  There are -- because I understand
2    you're just trying to get general background, but
3    there's nine agreed topics that we've sort of agreed
4    to cover today, and I want to get to those, so can we
5    get to those, please.
6         MR. WEGLARZ:  We are.  I'm talking about
7    the relationship between Mark Travel and UVL.
8         MR. SUAREZ:  Right.  And the topic as you
9    laid out, and I don't want to quibble with you, is
10   a -- topic one and two relate to the 2015 one, so
11   let's get to the 2015 one where the incident was and,
12   you know, let's go.
13   BY MR. WEGLARZ:
14   Q   I'll still take an answer.
15        MR. SUAREZ:  Go ahead.
16        THE WITNESS:  Yeah, I'm sure we had a
17   similar agreement in other years.
18   BY MR. WEGLARZ:
19   Q   Other than Gonzales Exhibit 5 which is the 2015 tour
20       operator agreement between UVL and Mark Travel, would
21       there be any other agreement or documents out there
22       that would memorialize this relationship that allowed
23       Mark Travel to sell Sandals and Beaches resort
24       vacations?
25        MR. SUAREZ:  Object to the form.  Beyond



RONALD JACOBS
November 22, 2019

Page 29

1    the scope of the notice.  You can answer.
2          THE WITNESS:  Not that I'm aware of.
3    BY MR. WEGLARZ:
4    Q   So Mark Travel had a, for lack of a better term, a
5        partnership agreement with UVL to sell these vacation
6        resort packages for Beaches and Sandals, true?
7          MR. SUAREZ:  Object to the form.  This is
8        not a partnership agreement.  It says it.
9    BY MR. WEGLARZ:
10   Q   I'll still take an answer.
11   A   Yeah, I'm not sure.  This is the agreement we have
12       with them.  Whether it's a partnership or not, I
13       guess that's up to you guys.
14   Q   How do you consider it being a -- being the CFO of
15       Mark Travel back in 2015?
16         MR. SUAREZ:  Object to the form.
17   BY MR. WEGLARZ:
18   Q   How would you characterize this relationship?
19         MR. SUAREZ:  Object to the form.
20         THE WITNESS:  We have agreements with
21       probably 40,000 different hotel chains.
22   BY MR. WEGLARZ:
23   Q   I appreciate you telling me that.  How would you
24       characterize this agreement though?
25         MR. SUAREZ:  Object to the form.

Page 30

1          THE WITNESS:  Not really that much
2        different than any of our others.  They're all
3        agreements in terms of how we can distribute their
4        product.
5    BY MR. WEGLARZ:
6    Q   Would you consider this a joint venture?
7          MR. SUAREZ:  Object to the form, calls for
8        a legal conclusion.
9    BY MR. WEGLARZ:
10   Q   You can still answer.
11   A   No, I would not.
12   Q   Was there someone at Mark Travel that would be
13       primarily responsible for tour operator agreements
14       that are entered into on behalf of Mark Travel?
15   A   We have several different buyers that would have been
16       involved with each of the hotel chains that we work
17       with.  So no one particular person.  We divide it up
18       based on the destinations and the various hotel
19       chains.
20   Q   All right.  And obviously we know this hotel chain
21       deals with Sandals and Beaches.  What person or group
22       of persons would be responsible for these types of
23       agreements with Sandals and Beaches?
24         MR. SUAREZ:  Object to the form.  When,
25       Todd, in 2015?

Page 31

1          MR. WEGLARZ:  In 2015.
2          MR. SUAREZ:  You can answer.
3          THE WITNESS:  Yeah, I'm not totally
4        positive, but it could have been a woman by the name
5        of Jean Downing.
6    BY MR. WEGLARZ:
7    Q   And what was Ms. Downing's title?
8    A   I'm not exactly sure.  She would have been like the
9        director of our Caribbean buying.  I don't know the
10       exact title.
11   Q   This agreement appears to be signed by a Lindsay
12       North on behalf of Mark Travel --
13   A   Yes.
14   Q   -- is that correct?
15   A   Yes.
16   Q   And what was Ms. North -- why is Ms. North signing
17       this contract as opposed to anyone else from Mark
18       Travel?
19   A   She would have worked under Jean at the time.
20   Q   Is Ms. North still with Mark Travel or the merged
21       entity now that Mark Travel has transformed into?
22   A   No, she is not.
23   Q   When did Lindsay North leave Mark Travel?
24   A   Probably three months ago.
25   Q   And where is she working now?

Page 32

1    A   She works for a company called BVK.  It's an
2        advertising agency in Milwaukee.
3    Q   Thank you.  The agreement appears to be signed by a
4        Roger Sidrite (phonetic) for UVL; is that correct?
5    A   That's what it looks like, yes.
6    Q   And do you know who this person is?
7    A   No.
8    Q   Would you have ever interacted with any
9        representatives or employees from Beaches or Sandals
10       resorts or their affiliated entities?
11   A   Probably in my finance role I may have had to call
12       with them at some occasion.
13   Q   And in general that would be regarding what?
14   A   If there was a question about any payments.
15   Q   And it's your -- is it your understanding that this
16       Gonzales Exhibit No. 5, this tour operator agreement,
17       was this the agreement in effect between UVL and Mark
18       Travel for the entire calendar year of 2015?
19   A   That's what I would assume, yes.  Based on what it
20       says here it's really for that whole year, correct?
21       That's what I'm reading.
22   Q   It does.  And I'm not trying to trick you, I just ask
23       that because I see that the signatures were signed on
24       different dates.  Ms. North signed it in February,
25       and Mr. Sidrite signed it in March.  But the date



RONALD JACOBS
November 22, 2019

## Page 33

1   does say it's entered into effective on January 1,
2   and it extends through December 31 of 2015.  That's
3   your understanding as well, correct?
4   **A   Correct.  And that's not uncommon either just based**
5   **on where people are located and when they connect**
6   **with one another.**
7            MR. SUAREZ:  Hey, Todd, I really hate to do
8   this.  Can we take three minutes to go to the
9   restroom for a second?
10           MR. WEGLARZ:  Yes, we can.
11           MR. SUAREZ:  Thank you.
12           MR. WEGLARZ:  You're welcome.
13           (Recess taken from 10:10 to 10:15 a.m.)
14  BY MR. WEGLARZ:
15  Q   Mr. Jacobs, do you agree that Gonzales Exhibit No. 5
16  would be the agreement that would control the booking
17  and sale of the Beaches Ocho Rios resort vacation
18  package to my clients?
19           MR. SUAREZ:  Object to form.
20           THE WITNESS:  It controls what we actually
21  sell to travel agents or what we're able to provide
22  to travel agents.
23  BY MR. WEGLARZ:
24  Q   So let me back up.  You understand that my clients
25  have filed a civil lawsuit which arises out of an

## Page 34

1   alleged assault that took place while on vacation in
2   Jamaica?
3   **A   Yes, that's my understanding.**
4   Q   And I'm presuming you have a general understanding as
5   to the allegations that this took place back in May
6   of 2015 at the Beaches Ocho Rios resort, and it was
7   booked through Vacations To Go a couple months before
8   that?
9   **A   I was made aware of that within the last week.**
10           MR. SUAREZ:  Wait, wait, wait.  Don't get
11  into conversations that you and I may have had.  You
12  can talk about your general understanding, but don't
13  get into privileged communications.  Go ahead.
14  BY MR. WEGLARZ:
15  Q   And Vacations To Go was under contract with Mark
16  Travel at that time in 2015, correct?
17  **A   I believe so.  We have contracts with -- like I said,**
18  **we have close to 6,000 travel agencies, some of which**
19  **we have actual contracts with and others we don't.**
20  Q   What is your understanding as to Mark Travel's role
21  in the booking and sale of this particular vacation
22  package?
23  **A   Well, like I said earlier, we're the tour operators**
24  **so we -- we take and bundle both air products, hotel**
25  **products, car rental, package it together, put it**

## Page 35

1   **into our -- our system which is called VAX, and**
2   **travel agents access the VAX platform.  That's**
3   **proprietary.  It's built by Trisept Solutions.  And**
4   **the travel agent accesses that product or that**
5   **package through the VAX technology.**
6   Q   So did Mark Travel, did it package this vacation for
7   Vacations To Go which then sold it to my clients?
8   **A   Yes, I'm assuming that would be the case.**
9   Q   Okay.  And Mark Travel is only able to do that
10  pursuant to its contractual relationship with UVL
11  authorizing it to go ahead and sell Beaches and
12  Sandals resort vacations, true?
13  **A   That's correct.**
14  Q   And within this tour operator agreement, they make
15  mention that there's four different types of tour
16  operator booking arrangements.  I'm looking at the
17  first page of Gonzales No. 5 at the bottom.
18           MR. SUAREZ:  Are you looking at where it
19  says article two, section one?  Is that where you're
20  looking at?
21           MR. WEGLARZ:  Yes, I am, Mr. Suarez.
22           MR. SUAREZ:  All right.
23           THE WITNESS:  So was there a question?  I'm
24  sorry.
25  BY MR. WEGLARZ:

## Page 36

1   Q   Yeah, this agreement talks about four types of
2   booking arrangements.  Do you see that?
3   **A   Yes.**
4   Q   And it looks like of those four Funjet is designated
5   as a direct connect slash HBSI.  Do you see that?
6   That's on the next page by the way.
7   **A   Correct.**
8   Q   What does that mean that Funjet is a direct connect
9   HBSI agent or operator for UVL?
10  **A   So they're correct in how they've characterized like**
11  **the four different kinds.  So with some hotel**
12  **properties or companies that we work with, we**
13  **actually build the product, if you will, into our**
14  **system directly.  So we take the directions from the**
15  **hotels in terms of the inventory, the room**
16  **categories, all of that, and we build it within our**
17  **system.**
18           **What they're referring to here is a direct**
19  **connect link with a third party called HBSI.  That**
20  **third party has access to the hotel inventory**
21  **directly with -- in this particular case Sandals and**
22  **Beaches, they pull the inventory through that third**
23  **party, HBSI, in that we have a connection with them.**
24  Q   And who owns or who manages the HBSI system?
25  **A   That's a third party.  They -- they have**

Pages 33 to 36



RONALD JACOBS
November 22, 2019

---

Page 37

1    relationships or agreements, I'm not exactly sure,
2    with thousands of hotel properties as well.
3    Q   Then how does -- you mention a couple of times the
4        VAX system.  What is that?
5    A   So that is the -- basically the booking engine that
6        we've created or Trisept Solutions has created that
7        allows the travel agents to actually look at all the
8        various inventory and packages that are built within
9        the system and then make a booking on behalf of their
10       customer.
11   Q   So how does Mark Travel -- and by the way, when you
12       say that was -- the VAX was developed by Trisept.
13       Trisept is a brand name for Mark Travel, right, or it
14       was?
15   A   Yes, Trisept Solutions.
16   Q   So Mark Travel owns the VAX access system?
17   A   Correct.
18   Q   So how did VAX -- how did that work with HBSI at all,
19       or are they two separate things that are completely
20       independent of each other here?
21   A   They're independent, yes.  So VAX would connect to
22       HBSI to pull through that inventory.
23   Q   There's mention in here in the tour operator
24       agreement of -- I'm looking at article four, cash
25       deposit and payment policies.  And that's pages three

---

Page 38

1    and four of Gonzales No. 5.  If you look at page four
2    where it talks about payments to Unique, they give
3    three options; mailing address, wire transfers and
4    beneficiary bank.
5        Do you see that?
6    A   Yes.
7    Q   What's going on there?  What's that describing?
8        MR. SUAREZ:  Hang on one second.  Hang on a
9    second.  Could you just give him a second to read one
10   and two.
11       Right there, please.  Start here and go to
12   here.
13       (Witness complies.)
14       MR. SUAREZ:  Okay, we're ready, Todd.  What
15   was your question?
16   BY MR. WEGLARZ:
17   Q   What is your understanding as to what these three
18       options are for payments to Unique; mail address,
19       wire transfers, and beneficiary bank?
20   A   They're just giving us three different ways that we
21       can make payment to them.
22   Q   And was Mark Travel responsible for collecting the
23       payments for these bookings and reservations for
24       Sandals and Beaches?
25       MR. SUAREZ:  Object to the form.  You can

---

Page 39

1    answer.
2        THE WITNESS:  We're obligated to make
3    payment for any bookings that are made within the VAX
4    system for Sandals if that's what you're asking.
5    BY MR. WEGLARZ:
6    Q   That would include you guys are also obligated to
7        collect a payment from the customer for any
8        reservations booked for Beaches or Sandals?
9        MR. SUAREZ:  Object to the form.
10       THE WITNESS:  The travel agent is obligated
11   to collect from the customer, and then they have to
12   pay us.
13   BY MR. WEGLARZ:
14   Q   All right.  And so when the travel agent collects the
15       money from the customer according to the usual
16       process and routine that you had in place back then,
17       where does that money go directly initially?  Does it
18       go into an MTC -- a Mark Travel account, or does it
19       go into a travel agent's account first in general?
20   A   It would go into a Mark Travel account.
21   Q   Okay.  And where would that account be?
22       MR. SUAREZ:  Object to the form.  You can
23   answer.
24       THE WITNESS:  Like --
25   BY MR. WEGLARZ:

---

Page 40

1    Q   Was there one general account that it was all placed
2        into, or do they have accounts all over the country?
3        MR. SUAREZ:  Object to the form.
4        THE WITNESS:  At that time we probably had
5    a half dozen accounts.  Most of the customer deposits
6    or travel agent deposits would have gone into one
7    account here in Milwaukee.
8    BY MR. WEGLARZ:
9    Q   So Vacations To Go based out of Houston, Texas, was
10       collecting moneys from customers for these
11       reservations for Beaches and Sandals.  That money
12       would go directly to the Mark Travel account there in
13       Milwaukee?
14   A   Correct.  Well, I should back up a minute, because
15       there are different options.  So some travel
16       agents -- and every travel agent has their own
17       strategy -- some travel agents are the merchant of
18       record themselves and they would collect from the
19       customer.  It could go into their bank account.  A
20       travel agent could then send us payment.  So not
21       every travel agent handles the payment process the
22       same way.
23   Q   Sure.  In the exception that you just described, that
24       was a -- that didn't happen very often, would you
25       agree?

---

Pages 37 to 40



U.S. Legal Support

RONALD JACOBS
November 22, 2019

Page 41

1   **A   It kind of depends on the travel agent and how**
2   **they're set up.  Some travel agents, you know, if**
3   **they got -- let's say they got a check from a**
4   **customer, they might deposit that check in their bank**
5   **account and pay Mark Travel when it was closer to our**
6   **due date.  So you had travel agents that could be**
7   **playing the float game just as easily as anyone else.**
8   Q   But if a travel agent is to employ that process, that
9   has to be negotiated and agreed to between the travel
10  agent and Mark Travel, right?
11  **A   No, they just have to make payment based on our**
12  **payment policy.**
13  Q   Okay.  What was the practice and arrangement with
14  Vacations To Go?
15  **A   I don't know specifically how they conducted their**
16  **business or how they treated customers.**
17  Q   Fair enough.  But at some point in time that money is
18  going to be transferred from the travel agent to the
19  Mark Travel account, right?
20  **A   That's correct.**
21  Q   And then once that money for the Beaches or Sandals
22  resort vacation is placed in the Mark Travel account,
23  where does it go from there?
24  **A   I'm not sure -- it would stay in that account and**
25  **then when our payment is due to Sandals, we would**

Page 42

1   make payment.
2   Q   All right.  And that's what I'm interested in.  What
3   was that process like when you're tendering payment
4   to Sandals slash Beaches?
5        MR. SUAREZ:  Hang on.  Object to the form.
6   BY MR. WEGLARZ:
7   Q   Go ahead.
8   **A   Based on the payment policy that they had, which you**
9   **can see in this verbiage varies depending on the time**
10  **of the year, we would process a payment to them.  I**
11  **don't know at that time whether we were wire**
12  **transferring them the funds or if we were sending a**
13  **check to them.**
14  Q   Was there a period of time where you would typically
15  send a check to them and then at some point in time
16  later that kind of transferred over to wire
17  transfers?
18  **A   No, we would --**
19       MR. SUAREZ:  Hang on.  Hang on.  Todd, I'm
20  going to object to the form, and I'm going to tell
21  you what my objection is.  The then in the statement
22  is a pronoun that's undefined, so it's -- I want to
23  be clear about who the payment is.  And I assume you
24  mean UVL.  If that's not what you mean, could you
25  please clarify that?

Page 43

1        MR. WEGLARZ:  That's a speaking objection,
2   Mr. Suarez.
3        I'm talking about Sandals because I thought
4   that's what Mr. Jacobs said.
5        THE WITNESS:  But no, our agreement is with
6   UVL, so that's who we would be making payment to.
7   BY MR. WEGLARZ:
8   Q   So what's the usual process when you're tendering
9   payment for those Sandals slash Beaches reservations?
10  That's what I'm interested in knowing.  Were you --
11  at some point in time was it always a hard copy
12  check, a wire transfer, what was the process?
13       MR. SUAREZ:  You're talking about what the
14  process was in 2015?  Is that what you're talking
15  about?
16  BY MR. WEGLARZ:
17  Q   We can start there, sure.
18  **A   Yeah.  Like I said, I'm not really sure.  Whatever**
19  **the process was it would be consistent.  Our process**
20  **is different between each hotel chains though.**
21  **Some we're wiring funds to, some we're doing a check**
22  **with, paying by check.  I don't recall exactly how we**
23  **were making payment to UVL.**
24  Q   Okay.  And UVL is actually the exclusive
25  representative for the Sandals and Beaches brand,

Page 44

1   correct?
2        MR. SUAREZ:  Object to form.
3   BY MR. WEGLARZ:
4   Q   Go ahead.
5   **A   I'm not sure if they have other brands or not.  All I**
6   **know is from this agreement which brands they're**
7   **representing.**
8   Q   All right.  So if you look at Gonzales No. 5, page
9   four where paragraph two here talks about payments to
10  Unique, remember, mailing address, wire transfers,
11  and beneficiary bank?
12  **A   Yes.**
13  Q   Where it says wire transfers, what is this pertaining
14  to?
15  **A   It's just a different method of payment.  I'm not**
16  **sure I'm clear as to what you're asking.**
17  Q   Okay.  Well, you see where it says payment bank and
18  then it's redacted after that?
19  **A   Yes.**
20  Q   Apparently what's being redacted is the name of the
21  bank?
22  **A   That would be correct.**
23  Q   Can you tell me the payment bank --
24  **A   I don't know.**
25  Q   -- that's being referenced in this contract?  Do you



RONALD JACOBS
November 22, 2019

Page 45

1  have a general understanding as to what bank was
2  being used by UVL on behalf of Sandals and Beaches or
3  wire transfers back in 2015?
4        MR. SUAREZ:  Object to the form.
5        THE WITNESS:  No, I don't recall which bank
6  it is.
7  BY MR. WEGLARZ:
8  Q   Do you recall what bank it was at any point in time
9      when Mark Travel had this relationship with UVL and
10     Sandals?
11 A   **No.  Like I said we're dealing with 40,000 hotels.**
12     **I'm dealing with dozens of airlines, multiple credit**
13     **card companies.  I don't recall which banks we're**
14     **making payment to.  That's all loaded in our system.**
15 Q   Do you know why that information is being redacted?
16 A   **I do not.**
17 Q   Still on page four of the tour operator agreement,
18     article five it says, Unique may issue, and operator
19     agrees to comply with, other terms, policies, and
20     conditions regarding the sale of resorts, related
21     products, and services.
22        Do you see that?
23 A   **No, I don't.  Where?  Article five, what paragraph?**
24 Q   First paragraph.
25 A   **First paragraph.**

Page 46

1  Q   First paragraph, yes, sir.
2  A   **So that first sentence is that what you were reading?**
3      **I'm sorry.**
4  Q   Yes, sir.
5  A   **Okay.**
6  Q   Can you tell me any other terms or policies that UVL
7      provided to Mark Travel regarding the sale of the
8      resorts?
9  A   **No, I don't -- I don't know of any others.**
10 Q   And is it your -- do you have an understanding as to
11     what law applies as it relates to this agreement if
12     we're interpreting this agreement, what law is
13     supposed to apply?
14        MR. SUAREZ:  Object to the form.  That is a
15     legal determination.
16 BY MR. WEGLARZ:
17 Q   I'll still take an answer.
18 A   **I guess it's contract law.**
19 Q   And if you look at page five of the tour operator
20     agreement, paragraph seven, the very last paragraph
21     of the document, you see where it says that any
22     disputes arising under this agreement are to be
23     resolved through arbitration in Miami, Florida?
24 A   **Yes.**
25 Q   What is your understanding as to why Miami, Florida,

Page 47

1  is being selected as the choice of forum or venue
2  involving this contract involving an out-of-country
3  party and a party located in Wisconsin?
4        MR. SUAREZ:  Objection.  Witness can answer
5      if it doesn't call for privileged information.
6        THE WITNESS:  I don't know.
7  BY MR. WEGLARZ:
8  Q   Do you recall any disputes arising out of this
9      agreement or any agreement with UVL or Sandals and
10     Beaches?
11        MR. SUAREZ:  Object to the form.
12 BY MR. WEGLARZ:
13 Q   Go ahead.
14 A   **No.**
15 Q   Were you aware that Miami, Florida, was the chosen
16     venue for dispute resolution regarding these
17     agreements?
18 A   **No.**
19 Q   Would you agree with me, sir, that according to this
20     agreement Mark Travel is acting as an agent for UVL,
21     correct?
22        MR. SUAREZ:  Object to the form.
23        THE WITNESS:  I mean I don't -- I don't
24     really understand how the legal all works.  All I
25     know is how we get the product from the hotels and

Page 48

1  put it into our system and package it.
2  BY MR. WEGLARZ:
3  Q   And according to that agreement, Mark Travel is
4      allowed to act on behalf of the Sandals and Beaches
5      resort as it pertains to the packaging and the sale
6      of those resort vacation packages, correct?
7        MR. SUAREZ:  Object to the form.
8  BY MR. WEGLARZ:
9  Q   Go ahead, sir.
10        MR. SUAREZ:  Same objection.
11        THE WITNESS:  Yeah, I mean they provide the
12     product, we package it, sell it to travel agents.  We
13     don't really have any control over their product or,
14     you know, what they do with their product.
15 BY MR. WEGLARZ:
16 Q   They retain the control and they tell you exactly how
17     you're supposed to go about packaging these trips and
18     marketing and selling them, correct?
19        MR. SUAREZ:  Object to the form.
20 BY MR. WEGLARZ:
21 Q   Go ahead, sir.
22 A   **They really just -- they provide us with the**
23     **inventory, what that product is and the content that**
24     **we can put in our system so the travel agent can**
25     **actually look at that particular property.**

Pages 45 to 48



RONALD JACOBS
November 22, 2019

---

Page 49

1  Q  Have you heard of a company known as Unique
2     Vacations, Inc.?
3  A  Yes.
4  Q  And what's your understanding as to what company that
5     is?
6  A  I believe it's just their marketing arm.
7  Q  Whose marketing arm?
8  A  I believe it's Sandals and Beaches marketing arm, but
9     I don't fully understand how they're totally
10    structured, but that's my understanding.
11 Q  Did Mark Travel have any interactions with or any
12    relationship with this company known as Unique
13    Vacations, Inc.?
14 A  Not to my knowledge.
15 Q  Did you review any depositions from this case?
16 A  What do you mean depositions?
17 Q  A transcript of a witness who provided sworn
18    testimony similar to what you're doing here today?
19 A  No.
20 Q  I mean, for example, we took the deposition of the
21    travel agent Stetson Arriola.  I was just curious if
22    you looked at that transcript.
23 A  I have not.
24 Q  I want you to assume that Mr. Arriola testified that
25    Unique Vacations, Inc., or UVI as we refer to it,

---

Page 50

1     would have BDMs, business development managers, go
2     out to Vacations To Go on occasion to provide
3     educational or training sessions for -- pertaining to
4     their products.  Are you aware or familiar with that
5     practice?
6  A  That is a practice that several of our hotel chains
7     actually do.  They have their own staff, their own
8     BDMs that go out and visit with travel agents very
9     similar to how our travel agents would visit a travel
10    agent -- or how our BDMs, I'm sorry.
11 Q  And Sandals and Beaches was one of those resorts,
12    resort properties that would do that type of
13    practice, correct?
14       MR. SUAREZ:  Object to the form.
15 BY MR. WEGLARZ:
16 Q  You may answer.
17       MR. SUAREZ:  Object to the form.
18       THE WITNESS:  I think what you're saying is
19    the UVI BDMs would be doing that.  I don't know if
20    Sandals and Beaches themselves had any BDMs.  But
21    again, I don't know how they're structured.  But what
22    you had described was UVI was the marketing BDMs that
23    went out and visited Vacations To Go or any other
24    travel agency.
25 BY MR. WEGLARZ:

---

Page 51

1  Q  Okay.  And where did you acquire that information
2     from?
3  A  That's what I just thought I heard that you had said.
4  Q  Okay.  Are you aware of any BDMs going out to travel
5     agents who are under contract with Mark Travel where
6     the BDMs on behalf of these resort properties or
7     hotel properties would give education or training
8     seminars on the product?
9        MR. SUAREZ:  Object to the form.  Todd,
10    can -- it's a -- you're asking two different
11    questions in there.
12 BY MR. WEGLARZ:
13 Q  All right.  I'll break it down.  Are you aware of any
14    representatives going out to Mark Travel travel
15    agents and providing education or training on Sandals
16    or Beaches resorts?
17       MR. SUAREZ:  Object to the form.
18       THE WITNESS:  Yeah, they're not Mark Travel
19    employees.  Is that what you're -- I'm not sure
20    you're asking -- or I'm clear as to what you're
21    asking.
22       It's not the Mark Travel BDMs that would
23    provide any training about Sandals.
24 BY MR. WEGLARZ:
25 Q  Right now I'm not even asking about that, I'm just

---

Page 52

1     asking in general.
2  A  Okay.
3  Q  Are you aware of BDMs, regardless of where they're
4     from, who would go out to travel agencies that are
5     under contract with Mark Travel where they would go
6     out to these travel agencies and provide education or
7     training on Sandals and Beaches properties?
8  A  Yes, I do believe they have BDMs that know that
9     product and train travel agents.
10 Q  My next question, and those BDMs who would provide
11    that education or training on Sandals properties or
12    Beaches properties were from where?  Where did they
13    come from?
14 A  I don't know.
15 Q  Could be from Sandals and Beaches, right?
16       MR. SUAREZ:  Objection.
17 BY MR. WEGLARZ:
18 Q  Since they're providing the information on it?
19       MR. SUAREZ:  Objection, speculation.  You
20    can answer.
21       THE WITNESS:  I don't know.  I don't know
22    where -- every hotel -- not every hotel.  Many hotels
23    have representatives, some within the hotel
24    themselves that go out and train.  Others are
25    contracted.  They hire independent contractors to go

---


U.S. Legal Support

RONALD JACOBS
November 22, 2019

Page 53

1      out and train on their behalf.  I am not sure what
2      Sandals or UVI does in particular.
3  BY MR. WEGLARZ:
4      Q   Okay.  Does Mark Travel sometimes have its own
5      employees, personnel, or representatives located at
6      the site of any of these resorts or hotels?
7      A   No.
8      Q   Has that ever happened before?
9      A   No, not to my knowledge.
10     Q   Would Mark Travel have its name listed or put up at
11     any of these resort properties?
12         MR. SUAREZ:  Object to the form.  Beyond
13     the scope of the notice.
14         Are you talking about -- when you say
15     'these properties,' what do you mean, just to
16     understand whether we're within the notice or outside
17     of the notice.
18  BY MR. WEGLARZ:
19     Q   The properties that were -- the properties that gave
20     authorization to Mark Travel to book its rooms.
21         MR. SUAREZ:  You can answer that question.
22         THE WITNESS:  Yeah, I don't know if we
23     would have had any signage at any of those
24     properties.
25  BY MR. WEGLARZ:

Page 54

1      Q   Would Mark Travel have signage or any type of
2      presence at any of the Sandals and Beaches
3      properties?
4      A   I don't -- I don't know.
5      Q   Have you ever heard of that happening where Mark
6      Travel would have a presence or some type of signage
7      at a Sandals or Beaches property?
8      A   Most of our signage is at the airport.
9      Q   And what would be the purpose for that?
10     A   Just to let people know that they're connecting with
11     a transfer.  And then I do believe we have some --
12     some resorts that may have some of our signage within
13     the resort itself along with, you know, other brands
14     that are represented or sold that sell that product.
15     Q   Okay.  Did Mark Travel belong to any professional
16     associations, any trade memberships, any professional
17     societies?
18         MR. SUAREZ:  Objection, beyond the scope of
19     the notice.
20  BY MR. WEGLARZ:
21     Q   Go ahead.
22     A   We belong to the USTOA.
23     Q   And what does that stand for?
24     A   United States Tour Operator Association.
25     Q   And Mark Travel was a member of that in 2015 I take

Page 55

1      it?
2      A   I believe so, yes.
3      Q   And any other societies, groups, or memberships that
4      Mark Travel was part of?
5          MR. SUAREZ:  Same objection, beyond the
6      scope of the notice.
7  BY MR. WEGLARZ:
8      Q   Go ahead, sir.
9      A   Yeah, I'm not aware of ...
10     Q   Were you yourself a member of USTOA?
11         MR. SUAREZ:  Todd, come on.  We have a
12     notice --
13         THE WITNESS:  No.
14         MR. SUAREZ:  -- we have topics.  It's
15     beyond the scope of the notice.
16  BY MR. WEGLARZ:
17     Q   Was Mark Travel a member of ARC?
18         MR. SUAREZ:  Objection, beyond the scope of
19     the notice.
20         THE WITNESS:  Yes.
21  BY MR. WEGLARZ:
22     Q   Go ahead, sir.
23     A   Yes.
24     Q   And you agree that travel agencies are the backbone,
25     or they were the backbone of Mark Travel's existence?

Page 56

1      A   Yes.
2      Q   And Mark Travel considered itself as providing a
3      24-hour service for its customers?
4      A   24 by seven, yes.
5      Q   And what was this 24-by-seven service that Mark
6      Travel was able to provide to travel customers as
7      compared to Expedia, groups like that?
8          MR. SUAREZ:  Objection, beyond the scope of
9      the notice.
10  BY MR. WEGLARZ:
11     Q   Go ahead, sir.
12     A   We really think highly of our organization and want
13     to make sure that customers have a great vacation, so
14     we offer the 24-by-seven service.  If customers are
15     not able to get ahold of their travel agent and need
16     to reach out, you know, for whatever reason, we
17     welcome their call.
18     Q   And what type of service does Mark Travel provide as
19     part of this 24/7?
20     A   It's really if there's a customer that has a
21     complaint while they're in -- you know, we call it
22     pre, post, and during travel.  So there's -- whatever
23     stage that customer is in, if they have a question or
24     a comment.
25     Q   Wasn't Mark Travel also publicizing and announcing



RONALD JACOBS
November 22, 2019

Page 57

1  that, look, we offer this 24/7 service, this is what
2  separates us from just the simple online services
3  that will get you a price for a room and a flight and
4  nothing more, right?
5              MR. SUAREZ:  Object to the form.
6  BY MR. WEGLARZ:
7   Q   Go ahead.
8   A   That's correct.  There are definitely differences in
9       service levels.  There's different levels of service
10      even between our competitors and us.  Everybody has a
11      different model.  But yes, if you were to call
12      Expedia and you had an issue while you were in the
13      destination, I would like to think that we're going
14      to give you better service than what Expedia is.
15  Q   And Mark Travel was announcing and they were
16      broadcasting and advertising not only do we give a
17      24/7 service, but we're also there at the destination
18      if you need us, right?
19              MR. SUAREZ:  Object to the form.
20              THE WITNESS:  So we contract with
21      destination representatives, otherwise known as DMCs
22      or destination management companies because we're not
23      in those destinations.  If a customer has an issue
24      though, they can raise the issue directly with that
25      DMC.

Page 58

1  BY MR. WEGLARZ:
2   Q   And what do the DMCs typically do, or how do they
3       assist a traveler?
4              MR. SUAREZ:  Object to the form.
5              THE WITNESS:  They're going to try and help
6       the traveler or the customer with whatever the issue
7       is at that time just because they're there, we're not
8       physically on site to help.
9   BY MR. WEGLARZ:
10  Q   So which destination management company did Mark
11      Travel contract with for travelers going to Jamaica?
12  A   I think it was called JTB.  I'm not really sure of
13      that.
14  Q   When you say you're not sure of it, meaning you're
15      not sure of the name of the company --
16  A   Correct.
17  Q   -- or you're not sure that there was one?
18  A   No, I'm not sure of the company's name.
19  Q   Would there be just one DMC for the entire country of
20      Jamaica, or did you have different ones in different
21      locations?
22  A   I'm pretty sure we only used one in every
23      destination.
24  Q   So that would be just one DMC in Jamaica?
25  A   Correct.

Page 59

1   Q   Do you recall it being the same company, or did you
2       ever have to change over to different companies to
3       fulfill that role?
4   A   I'm not sure.  I didn't oversee that group.
5   Q   Who did oversee the DMCs?
6   A   Lisa Iwanski.
7   Q   And Lisa would have been fulfilling that role back in
8       2015?
9   A   Yes.
10  Q   And is JTB or whatever the name of it is, was that a
11      company located and based in Jamaica?
12  A   That's my understanding, yes.
13  Q   And I take it that if there was a need to get a DMC
14      involved, there would be some communication between
15      Mark Travel and the DMC?
16  A   If the issue became that, you know, significant, yes.
17      The customer may just go to the DMC and ask them a
18      question about how to get to someplace.  They're not
19      going to reach back out to us then for that.
20  Q   And how would the customer, the traveler, even know
21      about the DMC's existence?
22  A   I believe we notify the customer on the travel
23      itinerary documents that if they have an issue in
24      destination ...
25  Q   And if there is a problem that is fielded by the DMC,

Page 60

1       do they usually report back to Mark Travel or Funjet?
2   A   Yes.
3   Q   Do you recall there being reports by any of the DMCs
4       in Jamaica?
5   A   No, I'm not close enough to those reports.
6   Q   If you had a customer who becomes a victim of a crime
7       while on vacation at a Mark Travel vacation package
8       that was put together for them, are they provided any
9       type of instruction as to what they should do in that
10      circumstance?
11              MR. SUAREZ:  Object to the form.
12  BY MR. WEGLARZ:
13  Q   Go ahead.
14  A   No different than any other customer.  They would
15      just notify us of whatever the issue was.
16  Q   And if a customer wanted to notify Funjet or Mark
17      Travel about an incident occurring while on vacation,
18      who would they be in touch with?  Who are they put in
19      touch with at Mark Travel?
20  A   Through the DMC are you asking?
21  Q   I'm just asking in general.
22              MR. SUAREZ:  What year?
23  BY MR. WEGLARZ:
24  Q   2015.
25  A   The customer -- the customer can reach out to our



Page 61

1   customer service line, or they could contact the DMC,
2   so they have a couple of different options, as well
3   as going back --
4   Q   Do you recall --
5   A   They could call their travel agent as well which is
6   typically what their first call is going to be.
7   Q   So if they have an adverse event or an adverse
8   incident while on vacation, whether they report it to
9   the general customer service number or through the
10   DMC, or even through the travel agent, there is a
11   system in place where Mark Travel expects to get
12   notified of such a communication, correct?
13   MR. SUAREZ:  Object to the form.
14   THE WITNESS:  Again, I think it's just
15   depending on the -- you know, what the issue is.  If
16   a customer gets to their hotel, they don't like their
17   room, there's something wrong with the room -- I'm
18   just using an example -- they're going to come back
19   to the travel agent or us, and then we're going to
20   try and work with the hotel to get them into a
21   different room or ...
22   So we're doing whatever we can.
23   BY MR. WEGLARZ:
24   Q   Got it.  If you have a customer who says oh, my God,
25   while I was at this resort, I was assaulted, and they

Page 62

1   report it to the travel agent, you expect that travel
2   agent to report that information back to Mark Travel,
3   correct?
4   MR. SUAREZ:  Object to the form.  Beyond
5   the scope of the notice.
6   BY MR. WEGLARZ:
7   Q   Go ahead.
8   MR. SUAREZ:  Beyond the scope.
9   BY MR. WEGLARZ:
10   Q   Go ahead.
11   A   I would think the travel agent would report it to us,
12   yes.
13   Q   If it's reported to the DMC, you'd expect the DMC to
14   report that information back to Mark Travel, true?
15   MR. SUAREZ:  Object to the form.  Beyond
16   the scope.
17   THE WITNESS:  Yes, I would expect that.
18   BY MR. WEGLARZ:
19   Q   Are you aware of any such complaints like that?  Do
20   you recall that ever happening where Mark Travel was
21   made aware of a traveler, customer, having been a
22   victim of a crime while on vacation?
23   A   Other than this latest one, I was not aware of any
24   others.
25   Q   What do you mean by this latest one?

Page 63

1   A   Why I'm here today.
2   Q   Okay.  So other than this incident here involving the
3   alleged sex assaults of my clients, you've never
4   heard of any customer of Mark Travel who was a victim
5   of crime while on vacation or while at a resort
6   property anywhere that was sold by Mark Travel?
7   MR. SUAREZ:  Objection, beyond the scope of
8   the notice.
9   BY MR. WEGLARZ:
10   Q   Go ahead.
11   A   That's correct.
12   MR. SUAREZ:  Hey, Todd, we've been going
13   for another hour.  Can we take a quick break?
14   MR. WEGLARZ:  Yes, sir.
15   (Recess taken from 11:04 to 11:06 a.m.)
16   BY MR. WEGLARZ:
17   Q   Mr. Jacobs, I want to show you -- we're going to mark
18   this actually as Exhibit No. 1 to your deposition.
19   And it's the addendum to the tour operator agreement.
20   Do you have a copy of that handy, Luis?
21   MR. SUAREZ:  Yeah, hang on a second.  The
22   copy I gave him has the sticker from Tammy's
23   deposition.  So you want to mark the first one -- do
24   you want to mark it as Exhibit 1, or are you going to
25   leave it as Tammy Exhibit 5?

Page 64

1   MR. WEGLARZ:  I didn't know I marked the
2   addendum in Tammy's dep.
3   MR. SUAREZ:  I'm sorry, we're talking past
4   each other.  The document -- the first document you
5   gave the witness was Exhibit 5.  That document the
6   court reporter is asking whether you want that
7   document marked as Exhibit 1 before we mark the
8   addendum.
9   MR. WEGLARZ:  I don't.  I think it's
10   already identified as Gonzales No. 5, so I'll leave
11   it as-is unless that bothers you.
12   MR. SUAREZ:  Doesn't bother me, I just want
13   to do whatever you're telling me.
14   And then the addendum that you sent over
15   doesn't have the second page.  So let me see if I can
16   hand him my copy, hang on.
17   (Discussion held off the record.)
18   MR. SUAREZ:  Do you want to mark this
19   addendum as Exhibit 1, or no?  It has --
20   MR. WEGLARZ:  Yes.
21   (Exhibit 1 marked for identification.)
22   THE WITNESS:  Am I done with this other
23   agreement?
24   MR. WEGLARZ:  Yeah, for now.  Just put it
25   facedown and maybe we'll come back to it, but I think



RONALD JACOBS
November 22, 2019

Page 65

1   we're pretty much done with it, sir.
2        THE WITNESS:  Okay.
3   BY MR. WEGLARZ:
4   Q   Now I'm directing your attention to what we've marked
5       as Exhibit No. 1 to your deposition, and it appears
6       to be an addendum to that tour operator agreement,
7       but I'll give you a minute to take a look.
8   A   (Witness complies.)
9   Q   My question to you is what is your understanding as
10      to what Exhibit No. 1 is?
11       MR. SUAREZ:  Object to the form.
12       THE WITNESS:  It's an addendum to the
13      previous agreement that we looked at.
14  BY MR. WEGLARZ:
15  Q   And it's an addendum essentially saying what?
16       MR. SUAREZ:  Object to the form.
17       THE WITNESS:  It's really I guess number
18      two where they want us to make sure that we're
19      including in our documentation what they have in
20      quotes.
21  BY MR. WEGLARZ:
22  Q   Do you recall this being an issue back in 2015?
23  A   No, I do not.
24  Q   Do you recall this addendum occurring or
25      representatives from Mark Travel and Unique

Page 66

1   discussing or talking about this addendum?
2   A   No.
3   Q   And do you agree with me that this addendum appears
4       to be a provision that UVL wanted inserted in all
5       booking documents for Sandals and Beaches basically
6       telling the traveler and the customer that they are
7       to go to the Sandals website to read the terms and
8       conditions that will affect their rights?
9        MR. SUAREZ:  Object to the form.
10       THE WITNESS:  That's how I would understand
11      it, yes.
12  BY MR. WEGLARZ:
13  Q   And this agreement appears to be dated or effective
14      August 2015, right?
15  A   Correct.
16  Q   And because there was an agreement to do this on
17      August 10 of 2015, I take it that prior to that this
18      was not being done on the booking documents, true?
19       MR. SUAREZ:  Object to the form.
20       THE WITNESS:  I don't know.
21  BY MR. WEGLARZ:
22  Q   Is this a typical thing to do in booking
23      documentation, booking agreements, to have a clause
24      like this?
25       MR. SUAREZ:  Object to the form, beyond the

Page 67

1   scope.
2   BY MR. WEGLARZ:
3   Q   Go ahead.
4   A   I don't know.
5   Q   And this looks like it was signed by whom on behalf
6       of Mark Travel?
7   A   I believe that's Leila Patterson.
8   Q   And who is Leila Patterson?
9   A   She would have worked within our buying team as well.
10  Q   Did she also work under Ms. Downing?
11  A   I believe so.  Within that organization, yes.  I
12      don't know if she directly reported to Jean or not.
13      Jean Downing, that is.
14  Q   Sir, I want to direct your attention to a document
15      that we're going to mark as Exhibit No. 2 to your
16      deposition.  And that is going to be the business
17      agreement between Funjet and Vacations To Go.
18       (Exhibit 2 marked for identification.)
19  BY MR. WEGLARZ:
20  Q   Just let me know when you're done looking at it so I
21      don't interrupt you.
22  A   Okay.  (Witness reads document.)  Okay.
23  Q   Thank you.  What is your -- can you tell me your
24      understanding as to Jacobs Exhibit No. 2.
25       MR. SUAREZ:  Object to the form.

Page 68

1        THE WITNESS:  This would be our agreement
2       with the travel agent.
3   BY MR. WEGLARZ:
4   Q   And the travel agent is Vacations To Go?
5   A   That's correct.
6   Q   And would this be the agreement that would govern
7       Vacations to Go promoting, offering, booking, and
8       selling the vacation package to my clients involved
9       in this case?
10  A   Yes, or any other clients that they would sell to.
11  Q   In effect during the time of spring and summer of
12      2015?
13  A   That's correct.
14  Q   And what's your understanding as to how far back the
15      relationship goes between Mark Travel and Vacations
16      To Go?
17       MR. SUAREZ:  Object to the form.  Beyond
18      the scope.
19       THE WITNESS:  I'm not sure how long we've
20      had the relationship with them.
21  BY MR. WEGLARZ:
22  Q   At least ten years or so?
23       MR. SUAREZ:  Same objection.
24       THE WITNESS:  Probably.  Again, I'm not
25      sure.  You know, we have ...



U.S. Legal Support

RONALD JACOBS
November 22, 2019

---

Page 69

1  BY MR. WEGLARZ:
2  Q   Sure.  I understand.  Who do you think -- who from
3      Mark Travel in your opinion would probably know the
4      most about the relationship between Funjet and
5      Vacations To Go?
6          MR. SUAREZ:  Object to the form.  Beyond
7      the scope.
8          THE WITNESS:  That probably varies from
9      year to year in terms of whether it's somebody from
10     our BDM team.  Those relationships all change.
11 BY MR. WEGLARZ:
12 Q   Okay.  Are you saying you can't even tell me?
13         MR. SUAREZ:  Same objection.
14         THE WITNESS:  Right.  I don't know who
15     would have had the closest relationship with them
16     back in 2015.
17 BY MR. WEGLARZ:
18 Q   Which BDM do you recall having more contact with VTG
19     than others?
20         MR. SUAREZ:  Object to the form.  Beyond
21     the scope.  What year?
22 BY MR. WEGLARZ:
23 Q   Just in general over the last ten years.
24         MR. SUAREZ:  Beyond the scope.
25         THE WITNESS:  Yeah, I mean the document's

---

Page 70

1      signed by Mike Going so I know he would have had a
2      relationship with them.
3  BY MR. WEGLARZ:
4  Q   That was my next question.  The person who signed
5      this document here, Exhibit No. 2, that's Mike Going?
6  A   Correct.
7  Q   And where's Mr. Going these days?
8  A   He's operating his own company now.  He works with I
9      believe three other gentlemen in a consulting
10     organization.
11 Q   So he's no longer part of the merged entity between
12     Apple and Mark Travel?
13 A   That's correct.
14 Q   What's the name of his company?
15 A   I don't recall.
16 Q   And where's it located?
17 A   Well, he's still in the Milwaukee area.  There's
18     another gentleman from Minneapolis, maybe two
19     gentlemen from Minneapolis that he's also in
20     partnership with I guess.  I don't know the name of
21     the company.
22 Q   What's the name of his partner?
23 A   Terry Morrison is one of the gentlemen.  And he also
24     used to work for Mark Travel.
25 Q   All right.

---

Page 71

1  A   He was on the sales side.
2  Q   Who's the other partner?
3  A   I don't recall his name.
4  Q   And the person who apparently signed on behalf of
5      Vacations To Go, it looks like it's Troy Broinbolt
6      (phonetic).  You see that?
7  A   Yes.
8  Q   Do you know who that person is?
9  A   I believe I've met him once but ...
10 Q   Back in 2015 what was your role or involvement, if
11     any, with respect to Vacations To Go doing sales
12     pursuant to this contract?
13 A   No specific involvement.  It wouldn't have been any
14     different than any other travel agent.
15 Q   I mean would anything having anything to do with this
16     contract even make it to your attention or to your
17     desk?
18 A   No, other than the terms and terms of the commissions
19     that we would pay that travel agent.
20 Q   If you look at page two of Exhibit 2, you see where
21     they talk about the waiver incentive?
22 A   Yes.
23 Q   What's that referring to?
24         MR. SUAREZ:  Wait, wait, wait.  Where are
25     you, Todd?

---

Page 72

1          MR. WEGLARZ:  Page two.  It's at the top of
2      the page, top third.
3          THE WITNESS:  Right here, Luis.
4          MR. SUAREZ:  Okay, yes.  Okay, go ahead.
5          THE WITNESS:  So, we sell kind of a trip
6      protection product that's called the pretravel
7      penalty waiver.
8  BY MR. WEGLARZ:
9  Q   And what is that?
10 A   So there's different forms of that where a customer,
11     if he wants to cancel for any reason, if he bought
12     this product, he's able to cancel.  There's other
13     forms --
14 Q   Insurance?
15 A   There's other forms where they can actually also buy
16     an insurance product that goes with it.
17 Q   Is Vacations To Go, is that an authorized travel
18     agency?  I mean does Mark Travel have to authorize
19     the agency before they'll agree to enter into
20     agreements like this?
21         MR. SUAREZ:  Object to the form.  I don't
22     understand the question.
23 BY MR. WEGLARZ:
24 Q   Sure.  Does Mark Travel or Funjet have to vet these
25     travel agencies before they enter into business

---



RONALD JACOBS
November 22, 2019

Page 73

1   agreements like we see here in Exhibit 2?
2   **A   When they start with us, yes, we go through a little**
3   **bit of a vetting process where we're asking, you**
4   **know, for specific documents from them.  Do they have**
5   **a website, what's their business, 1099 information.**
6   Q   What else is involved?
7          MR. SUAREZ:  Object to the form.
8          THE WITNESS:  Nothing.
9   BY MR. WEGLARZ:
10  Q   And do the resorts have to vet or authorize these
11  travel agents?
12         MR. SUAREZ:  Objection, form.
13         THE WITNESS:  Not to my knowledge, no.
14  BY MR. WEGLARZ:
15  Q   Do you know if Vacations To Go was certified or
16  authorized by Sandals?
17         MR. SUAREZ:  Object to the form.
18         THE WITNESS:  Not to my knowledge.
19  BY MR. WEGLARZ:
20  Q   Did Sandals or Beaches have a requirement where they
21  wanted to approve or certify travel agents for
22  selling their services?
23         MR. SUAREZ:  Object to the form.
24         THE WITNESS:  No.
25  BY MR. WEGLARZ:

Page 74

1   Q   Go ahead.  Okay.
2          The agreement was UVL was under contract
3   with Mark Travel, and then UVL would allow Mark
4   Travel to go ahead and find the travel agents that
5   Mark Travel felt were suitable to sell Sandals
6   products and services, true?
7          MR. SUAREZ:  Object to the form.  Todd,
8   you're --
9   BY MR. WEGLARZ:
10  Q   Go ahead.
11         MR. SUAREZ:  Are we going back to the
12  agreement with UVL?
13  BY MR. WEGLARZ:
14  Q   You can still answer, sir.
15  **A   UVL really doesn't have any -- I mean we -- our**
16  **business operates with basically two different sides.**
17  **We're working with hotels and airlines to obtain the**
18  **product that they want us to sell.  Then we work with**
19  **travel agents, and the airlines and hotels don't have**
20  **anything really to -- they don't control the**
21  **relationship that we have with travel agents.  I**
22  **guess that's the best way for me to put it.**
23  Q   Right.  They relied on you to do that stuff.  You go
24  out and find the travel agents that you think will be
25  able to sell our products and services, and that's

Page 75

1   fine with us, right?
2          MR. SUAREZ:  Object to the form.
3   BY MR. WEGLARZ:
4   Q   Go ahead, sir.
5   **A   Yes.  I mean I don't know how they rely on us**
6   **necessarily, but they're just providing us product.**
7   Q   Okay.  And then, sir, looking at the -- still page
8   number two of the business agreement here, section
9   four, sales and marketing.
10         If you look at paragraph B, and at that
11  first sentence, they talk about your business
12  development manager.
13  **A   Yes.**
14  Q   What's that referring to?
15  **A   Specifically with this agency or -- I guess I'm not**
16  **clear what you're asking.**
17  Q   Yes, specifically with respect to this contract.
18  **A   So all of our contracts are very similar to this**
19  **where we offer to work with the travel agency if they**
20  **want some help with us to market the product.  And if**
21  **they put together a proposal that we think is going**
22  **to be relevant in the marketplace, there's times**
23  **where we'll actually share that cost with them.**
24  Q   As long as the plan is approved by the business
25  development manager from Mark Travel, right?

Page 76

1   **A   That's correct.**
2   Q   And who is that business development manager provided
3   by Mark Travel during this time?
4   **A   I don't know who the Vacations To Go business**
5   **development manager was at that time.**
6   Q   I mean I interpret this as meaning there's one
7   assigned BDM to Vacations To Go.  Is that how you
8   look at it?
9          MR. SUAREZ:  Object to the form.
10         THE WITNESS:  Yeah, there's typically one
11  BDM that would be assigned to an agent and then there
12  would be a regional director that would be
13  potentially also involved.  And then as you read
14  further down, there's a couple other people that
15  actually are from the marketing department that would
16  also look at that proposal.
17  BY MR. WEGLARZ:
18  Q   Sure.  And do you recall who the one BDM was that was
19  assigned to Vacations To Go at any point in time?
20  **A   No, I don't.**
21  Q   Do you recall who the regional director would have
22  been?
23         MR. SUAREZ:  Object to the form.
24         THE WITNESS:  No, I don't.
25  BY MR. WEGLARZ:

Pages 73 to 76


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

Page 77

1    Q   Page four at the top of the page -- oh, and by the
2        way, these pages are out of order and I apologize for
3        that.  It's just the way they were presented to me.
4        So when I tell you to jump to page four, it's really
5        page three of the agreement if you look at the Bates
6        numbers.
7    A   Okay.
8    Q   And we see sub part F where it talks about provide
9        feedback to appropriate sales and marketing staff on
10       product marketing, customer experiences, or other
11       information issues that may impact achievement of the
12       established goals.
13           Do you see that paragraph?
14   A   No, I don't.  He said F, right?
15           MR. SUAREZ:  Yeah, it would be -- it's
16       misnumbered.  It's here.
17   BY MR. WEGLARZ:
18   Q   It's Bates 4 because it's out of sequence?
19           MR. SUAREZ:  So it would be section five --
20       no.
21   BY MR. WEGLARZ:
22   Q   It's actually section four.
23           MR. SUAREZ:  Section four.
24           THE WITNESS:  F.
25           MR. SUAREZ:  F, right?

Page 78

1    BY MR. WEGLARZ:
2    Q   Yes, sir.
3    A   Okay.
4    Q   Do you agree that what this provision is calling for
5        is -- this is an agreement where Vacations To Go
6        agrees to provide Mark Travel feedback relative to
7        customer experiences at these properties that are
8        being bundled and packaged by Mark Travel and
9        Vacations To Go, correct?
10           MR. SUAREZ:  Object to the form.
11   BY MR. WEGLARZ:
12   Q   Go ahead.
13           MR. SUAREZ:  Same objection.
14           THE WITNESS:  Yes, they should -- you know,
15       not every agency does that.  We have closer
16       relationships with some than others, but yeah, we
17       would hope to get feedback from all of them.
18   BY MR. WEGLARZ:
19   Q   And how is that usually done?  How does an agency
20       usually carry out this obligation to provide Mark
21       Travel with feedback on customer experiences at these
22       properties?
23           MR. SUAREZ:  Object to the form.
24           THE WITNESS:  Primarily it's really through
25       discussions with the BDM whenever they were to meet

Page 79

1        or have a call or email.
2    BY MR. WEGLARZ:
3    Q   And how often does the Funjet or Mark Travel BDM have
4        a discussion or some type of contact with the
5        designated agency?
6            MR. SUAREZ:  Object to the form.
7            THE WITNESS:  That can vary based on the
8        size of the agency, the size of the BDM's area to
9        travel to, or their schedule.
10   BY MR. WEGLARZ:
11   Q   Sure.  I take it sometimes there would be phone
12       communications, sometimes correspondence, sometimes
13       email communications, right?
14   A   That's correct.
15   Q   And there should be a file of those types of
16       communications somewhere, right?
17           MR. SUAREZ:  Object to form.
18           THE WITNESS:  Yeah, I don't know if
19       there's -- the BDMs keep all their emails or how
20       exactly they file their information.
21   BY MR. WEGLARZ:
22   Q   So what is the -- what were the customer experiences
23       with the Sandals and Beaches properties?
24           MR. SUAREZ:  Object to form.
25           THE WITNESS:  I don't know.

Page 80

1    BY MR. WEGLARZ:
2    Q   Do you have an understanding as to any type of
3        feedback that was provided by any of the agencies to
4        Mark Travel?
5            MR. SUAREZ:  Object to the form.
6            THE WITNESS:  No.  I mean we get feedback
7        every day.  I get calls every day.
8    BY MR. WEGLARZ:
9    Q   You get calls regarding this type of feedback?
10   A   No, if --
11   Q   What kind of calls would you get that would relate to
12       this?
13   A   No, if a travel agent had an issue with us, you know,
14       they're not getting a response from our group
15       department.  Or they want to call and thank me for a
16       new policy or procedure that we've put out there.  It
17       would just be normal business interaction that I
18       might have with a travel agent.  And I'm sure they
19       have the same kinds of contacts with our BDMs.
20   Q   Do you recall there being any customer experiences
21       where they complained about being the victim of
22       crime or suffering any type of personal injury?
23   A   No, I do not.
24   Q   And when we have this contractual obligation from the
25       agent to provide feedback regarding customer

Pages 77 to 80



RONALD JACOBS
November 22, 2019

Page 81

1    experiences, is that something that is really going
2    to cross your desk being the CFO, or is that going to
3    probably be brought to the attention of someone else
4    at Mark Travel?
5  A   If we got that feedback, it would be probably to
6    someone else.
7  Q   Probably Mr. Going would be the most relevant person
8    pertaining to that subject?
9  A   I guess that would really be up to the travel agent,
10    who they wanted to reach out to.
11  Q   On that same page if we look at section six where it
12    says General Terms and Conditions.  You see that?
13  A   Yes.
14  Q   First paragraph it talks about this Funjet Vacations
15    bill of rights.  I'm actually going to attach that as
16    the next exhibit, the bill of rights.  So hopefully
17    Mr. Suarez has that in front of him?
18        MR. SUAREZ:  Let me look at it.
19        MR. WEGLARZ:  Mark Travel Bates 6 through
20    13.
21        MR. SUAREZ:  Todd, is that -- never mind.
22        Okay.  I'm handing the witness the bill of
23    rights, TMTC 6 through 13.  Do you want to mark that?
24        MR. WEGLARZ:  Yes, we're going to call it
25    Jacobs No. 3.

Page 82

1        (Exhibit 3 marked for identification.)
2  BY MR. WEGLARZ:
3  Q   Mr. Jacobs, my question to you is this bill of rights
4    that we marked as Exhibit No. 3 to your deposition,
5    is this part of Jacobs No. 2, the business agreement
6    with Vacations To Go?
7  A   What do you mean part of?  It's referred to in the
8    agreement, yes.
9  Q   Okay.  You see where it says as set forth on
10    Exhibit C attached hereto, or on Exhibit C hereto?
11  A   Yes.
12  Q   Is Exhibit No. 3, is that what that's referring to,
13    Exhibit No. 3 here, if you know?
14  A   That would be my understanding, but I can't tell.
15  Q   Have you seen this document before, Exhibit No. 3?
16  A   Yes.
17  Q   And what is this?
18  A   It's our bill of rights, lays out all the terms and
19    conditions.
20  Q   And it's the terms and conditions spelled out between
21    or amongst whom?
22  A   It's for the passenger, the traveler.
23  Q   So if we look at the business agreement which is your
24    Exhibit No. 2, if we look at that paragraph, it says
25    the agency agrees to abide by the Funjet terms and

Page 83

1    conditions such as the bill of rights, correct?
2  A   Correct.
3  Q   So doesn't that -- I mean the way I read that is
4    that's really something that you're expecting the
5    agency to be bound by as opposed to the traveler or
6    the customer.
7        MR. SUAREZ:  Object to the form.
8        THE WITNESS:  Yeah, because they're the
9    ones that are actually doing the contracting with us
10    or the booking with us I should say.
11  BY MR. WEGLARZ:
12  Q   Is this bill of rights also referred to as the
13    operator participant contract?  Because that's what
14    it seems to say in this paragraph here?
15        MR. SUAREZ:  Object to the form.
16  BY MR. WEGLARZ:
17  Q   Go ahead.
18  A   That's the way I would read it as well, yes.
19  Q   And Vacations To Go is the operator participant,
20    right?
21        MR. SUAREZ:  Object to the form.
22        THE WITNESS:  Yes.
23  BY MR. WEGLARZ:
24  Q   And are you saying that though the agency is required
25    to comply with this bill of rights thing here, this

Page 84

1    is also supposed to be communicated to the traveler
2    or the customer?
3        MR. SUAREZ:  Object to the form.
4        THE WITNESS:  Yes.
5  BY MR. WEGLARZ:
6  Q   Do you know if this bill of rights was ever provided
7    to my clients?
8  A   I do not know.
9  Q   And if we look at this bill of rights, your Exhibit
10    No. 3, if we look at page -- Bates No. 10, are you
11    there?
12  A   I believe so, yes.
13  Q   All right.  I'll direct your attention towards the
14    bottom, the last full paragraph which starts out as
15    important notice regarding passport requirements for
16    international travel.  Do you see that?
17  A   Yes, sir.
18  Q   What is your understanding as to what this paragraph
19    is about?
20        MR. SUAREZ:  Object to the form.
21        THE WITNESS:  It's really a notification to
22    make sure that the customer has a valid passport if
23    they're --
24  BY MR. WEGLARZ:
25  Q   Why?

Pages 81 to 84


U.S. Legal Support

RONALD JACOBS
November 22, 2019

---

Page 85

1    A    -- if they're traveling internationally.
2    Q    And why provide such an instruction or a warning to
3         the traveler about the passport requirements for
4         international travel?
5    A    It's the only way customers can travel
6         internationally.
7    Q    Isn't that common sense?  Doesn't everyone pretty
8         much know if you're going to an out-of-country
9         location, you need to bring your passport?
10              MR. SUAREZ:  Object to the form.
11   BY MR. WEGLARZ:
12   Q    Go ahead.
13              MR. SUAREZ:  Beyond the scope.
14              THE WITNESS:  It should be common sense,
15        but there's millions of people that do not have a
16        U.S. passport today.
17   BY MR. WEGLARZ:
18   Q    And this is a basic rule that's listed regularly on
19        the state department website, true?
20              MR. SUAREZ:  Object to the form.  Beyond
21        the scope.
22              THE WITNESS:  I believe so.  I don't know.
23   BY MR. WEGLARZ:
24   Q    And then this warning also states that other than
25        notifying or alerting the traveler about the passport

---

Page 86

1         requirement for international travel, it directs them
2         to the state department website.  And it says to
3         consult your travel agent or the destination
4         consulate for further information if you need further
5         information about passport requirements, true?
6              MR. SUAREZ:  Object to form.  Beyond the
7         scope.
8    BY MR. WEGLARZ:
9    Q    Go ahead, sir.
10   A    Yes, that's what it says.
11   Q    And then if we look at the next paragraph after that,
12        Bates No. 10, your Exhibit 3, it then gives the
13        traveler an alert or warning about baggage
14        limitations, correct?
15   A    Yes.
16   Q    And it warns the traveler that, hey, some airlines
17        impose additional charges for checked luggage,
18        correct?
19   A    Correct.
20   Q    And again, these are common sense things.  I mean the
21        traveler can just simply go to the website of the
22        particular carrier to find these things out, right?
23   A    They potentially could, yes.
24   Q    So why does Funjet/Mark Travel still provide an alert
25        or warning about this if all the traveler has to do

---

Page 87

1         is just really go to the website?
2              MR. SUAREZ:  Object to the form.  Beyond
3         the scope.
4    BY MR. WEGLARZ:
5    Q    You can still answer.
6    A    That's just our policy.  We've tried to be -- let
7         customers know what's expected so they don't get
8         surprised.
9    Q    Is that part of the service that's provided, making
10        sure that Mark Travel customers have a reasonably
11        safe, satisfying, and fun travel experience?
12              MR. SUAREZ:  Object to the form.  Beyond
13        the scope.
14   BY MR. WEGLARZ:
15   Q    Go ahead.
16   A    That's our -- that's our desire, yes.
17   Q    Look at the next page, sir, Bates 11, section five,
18        captioned Responsibilities.  Do you see that?
19   A    Yes.
20   Q    And if we look down, it says Funjet's
21        Responsibilities.  Do you see that?
22   A    Yes.
23   Q    And then the second sentence after that, it says,
24        Funjet is responsible to you for making all
25        arrangements for transportation, accommodations, and

---

Page 88

1         services offered, correct?
2              MR. SUAREZ:  Wait, wait.  That's -- that's
3         part of the sentence.  Do you want to read the rest
4         of the sentence or no?
5    BY MR. WEGLARZ:
6    Q    We can take it one chunk at a time.
7              MR. SUAREZ:  I'm sorry.  Is the question is
8         that what it says or is the --
9    BY MR. WEGLARZ:
10   Q    Yes, that's all.
11   A    Yes.
12   Q    And that's what Funjet did in this case pertaining to
13        this registration and booking for my clients' trip to
14        Beaches Ocho Rios, Funjet made all the arrangements
15        for the flight and resort accommodations, correct?
16              MR. SUAREZ:  Object to the form.
17              THE WITNESS:  That's my understanding, yes.
18   BY MR. WEGLARZ:
19   Q    And I believe Mark Travel also monitors significant
20        weather that may affect particular destinations; is
21        that true?
22              MR. SUAREZ:  Object to the form.
23              THE WITNESS:  I was just reading the rest
24        of the sentence.  Were you going to -- did we need to
25        go over the rest of it or not?

---

Pages 85 to 88


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

Page 89

1  BY MR. WEGLARZ:
2  Q   Your lawyer may want to go through that, I don't
3      know.
4  A   Okay.
5          MR. SUAREZ:  Well, you had said that we're
6      going to take it in parts, so I think it's a fair
7      question from the witness.  But okay, go ahead, and
8      move on.  I'm not going to tell you how to take your
9      deposition.
10 Q   I want to move on.  Mark Travel also monitors
11     significant weather that may affect travel
12     destinations, true?
13         MR. SUAREZ:  Object to the form.  Where are
14     you reading so I can follow along?
15         MR. WEGLARZ:  I'm not reading that from any
16     particular part of this exhibit.
17         MR. SUAREZ:  Okay.
18         THE WITNESS:  Yes, we do.
19 BY MR. WEGLARZ:
20 Q   Mark Travel will alert or warn its customers about
21     weather that may impact a destination, right?
22 A   Yes, we do.
23 Q   Why does it do that?
24 A   Well, if there's a hurricane coming, we'd like to let

Page 90

1      our customers know.
2  Q   And why do you think the customer should know if
3      their vacation may be impacted by a hurricane?
4          MR. SUAREZ:  Object to the form.
5          THE WITNESS:  I guess it's just common
6      sense.
7  BY MR. WEGLARZ:
8  Q   Right.  I mean that was my point.  I mean I don't
9      know if you're on to this, but the media seems to
10     like to play up the hurricane coverage, right?
11         MR. SUAREZ:  Object to form, beyond the
12     scope.
13         THE WITNESS:  The media plays up a lot of
14     things, yes.
15 BY MR. WEGLARZ:
16 Q   So why not just rely on your customer's common sense
17     to watch the news or read the news to figure out if
18     there's a hurricane in the vicinity of the place
19     where they plan on taking a vacation?
20 A   Very few people taking a vacation in a destination
21     are watching the news.
22 Q   And how did Mark Travel go about warning or alerting
23     its customers about weather that may impact a
24     destination?
25         MR. SUAREZ:  Object to the form.  Beyond

Page 91

1      the scope.
2  BY MR. WEGLARZ:
3  Q   You can still answer.
4  A   Well, a lot -- in a lot of cases it's the DMC,
5      because they're in-destination, that are going to
6      advise customers.
7  Q   But that's after they already reach the destination,
8      right?
9  A   Correct.
10 Q   Mark Travel will go issue alerts to warn customers
11     about upcoming weather that may impact travel even
12     before they depart for that destination?
13         MR. SUAREZ:  Object to the form.  Beyond
14     the scope.
15         THE WITNESS:  Yeah, I thought you were
16     referring to something that was actually happening in
17     a destination.  Beforehand I'm not clear as to what
18     we do with that, Todd.
19 BY MR. WEGLARZ:
20 Q   Fair enough.  Do you believe a tour operator has a
21     duty to warn a customer of any travel risks?
22         MR. SUAREZ:  Object to the form.  Beyond
23     the scope.
24 BY MR. WEGLARZ:
25 Q   You may answer.

Page 92

1  A   That's really not our responsibility.  Again, our
2      role really is to be a package provider and offer the
3      product to travel agents.
4  Q   Do you believe a tour operator should ever warn a
5      traveler about a particular risk at a destination?
6          MR. SUAREZ:  Object to the form.  Beyond
7      the scope.
8          THE WITNESS:  No, I don't believe that's
9      our role.
10 BY MR. WEGLARZ:
11 Q   Has Mark Travel ever warned a traveler about any
12     particular risk at any destination?
13         MR. SUAREZ:  Object to the form.  Beyond
14     the scope.
15         THE WITNESS:  We have -- now, I don't know
16     exactly when we started, but we have incorporated
17     putting warnings on our website if the -- if there's
18     a travel advisory update.
19 BY MR. WEGLARZ:
20 Q   And I did notice that by the way.  That's now a
21     regular part of the Funjet website -- I think there's
22     like an instruction that they should refer to the
23     state department website for any alerts, warnings, or
24     advisories affecting any particular destination,
25     correct?

U.S. Legal Support

RONALD JACOBS
November 22, 2019

Page 93

1   A   Correct.
2   Q   And when did Funjet start doing that?
3   A   I don't recall when we started doing that.
4   Q   Is it relatively recently?
5           MR. SUAREZ:  Object to form.
6           THE WITNESS:  Yeah, I believe it's probably
7       been within the last several years when we've
8       experienced more travel advisory updates from the
9       U.S. government.
10  BY MR. WEGLARZ:
11  Q   You would agree that Funjet started doing that after
12      2015?
13          MR. SUAREZ:  Object to the form.
14          THE WITNESS:  I don't know.
15          MR. SUAREZ:  Hey Todd, it's noon.  Can we
16      take a quick break?
17          MR. WEGLARZ:  Sure.
18          MR. SUAREZ:  And Todd, can I ask you before
19      you go, can I ask you where you're at and how much
20      time you have left?
21          MR. WEGLARZ:  I don't think I'll be any
22      longer than an hour and a half, two hours maximum.
23          MR. SUAREZ:  Well, that presents a problem.
24          MR. WEGLARZ:  Okay.
25          MR. SUAREZ:  Because in our email of

Page 94

1       November 15 we represented and agreed that Mr. Jacobs
2       would be available until -- during the morning of.
3       And it's now noon, and Mr. Jacobs has other
4       commitments and has already blocked off time this
5       morning and had blocked off time obviously for
6       yesterday, so that's a problem.
7           MR. WEGLARZ:  I didn't know that we had to
8       be done by noon.  You didn't tell me that.
9           MR. SUAREZ:  Well, my email says the
10      morning of.  Look at my email of the 15th.  So, you
11      know, I'm willing to stay a little bit, but I got to
12      get the witness out of here.
13          MR. WEGLARZ:  Well, hold up.  I thought you
14      said you will make him available in the morning.  I
15      can't find your email.  I apologize.
16          MR. SUAREZ:  It says in my email, is
17      available during the morning of November 21, 2019, in
18      Milwaukee.  It's the first line of my email so ...
19          MR. WEGLARZ:  That doesn't tell me that it
20      has to be done by noon.
21          MR. SUAREZ:  Okay, well.  Morning is a
22      fairly universal word.  So that said, like I said --
23          MR. WEGLARZ:  It is.
24          MR. SUAREZ:  Like I said, I'm willing to
25      stay a little bit, but you know, I'm talking about

Page 95

1       like 20 minutes, because I got to get the witness to
2       where he needs to be.  He's got commitments at one.
3           MR. WEGLARZ:  Okay.
4           MR. SUAREZ:  He's got commitments at one,
5       so I'm going to invite you to wrap it up in 20
6       minutes.  I'll be courteous in that regard because we
7       had some technical issues, but I can't infringe upon
8       the witness much further than that.  Let's take a
9       quick break.  We'll do three minutes and we'll come
10      back.
11          MR. WEGLARZ:  You deposed my clients for
12      over six hours.
13          (Recess taken from 12:05 to 12:09 p.m.)
14          THE WITNESS:  I'm back, Todd.
15          MR. WEGLARZ:  Thank you.  Are we ready to
16      go?
17          MR. SUAREZ:  Yep.
18  BY MR. WEGLARZ:
19  Q   Mr. Jacobs, other than Funjet's website directing the
20      customer to review travel alerts, advisories, and
21      warnings at the state department website, is a
22      similar instruction also listed or published in the
23      booking documents now?
24  A   I'm not sure.  I don't know if we're doing that or
25      not.

Page 96

1   Q   Who from Mark Travel or Funjet would know that?
2   A   I mean I could find out but Lisa --
3   Q   Who do you think would be the --
4   A   Lisa Iwanski.
5   Q   Go ahead.  I'm sorry.
6   A   Lisa Iwanski would probably be the best person to
7       find out from.
8   Q   And why do you think that's a reasonable thing to do
9       to provide a warning or an alert like that to the
10      customer?
11  A   It's just a -- I guess something we're offering to
12      customers.
13  Q   And the rationale for that would be some people may
14      consider that common sense, but there's a lot of
15      people who really don't know about state department
16      websites giving travel advisories, true?
17  A   That's true.
18  Q   Have you ever heard of any issues or problems in
19      Jamaica with travelers?
20  A   No.
21  Q   Have you ever heard of a traveler alleging to have
22      been assaulted while at a resort?
23  A   No, not until this particular case came to my
24      attention.
25  Q   So this would be the first time you ever heard of

Pages 93 to 96


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

---

Page 97

1    anything like that happening, and that was just
2    within the last week or so, right?
3    A    That's correct.
4    Q    Do you ever go to the state department website to
5    review travel advisories and warnings?
6    A    On occasion I've been to that website, yes.
7    Q    Have you ever reviewed the crime and safety reports
8    put out by the state department?
9    A    No, I have not.
10   Q    Have you heard that the state department for several
11   years put in its annual Jamaica crime and safety
12   reports its concern about the number of sex assaults
13   perpetrated by hotel employees at resort hotels on
14   the north coast of Jamaica?
15   A    No, I'm not aware of that.
16   Q    Assuming that to be true, that the state department
17   was publishing that concern for several years and
18   reported that it's a continued concern that it has,
19   do you agree with me that a tour operator and a
20   seller of travel probably should bring that to the
21   attention of its customers?
22        MR. SUAREZ:  Object to the form.
23   BY MR. WEGLARZ:
24   Q    Go ahead.
25   A    I think it goes back to what I had said earlier.  I'm

---

Page 98

1    not sure that really is our role.  Customers go
2    wherever they want to go to.  We're just providing
3    the product.
4    Q    But you're now alerting customers to check the state
5    department website for safety related advisories and
6    warnings, right?
7        MR. SUAREZ:  Object to the form.
8        THE WITNESS:  Correct.
9    BY MR. WEGLARZ:
10   Q    So why -- if it's not Mark Travel's responsibility or
11   obligation to do that, then why is it doing it?
12       MR. SUAREZ:  Object to the form.
13       THE WITNESS:  Just a benefit to the
14   customer, letting them know.  There's so much media
15   attention that's been given to different destinations
16   over the last several years, we just thought --
17   BY MR. WEGLARZ:
18   Q    Like Mexico?
19   A    Correct.
20   Q    Like Mexico for example.  But you are -- you've been
21   in the travel business for decades, right?
22   A    Yes.
23   Q    And even you who is a high ranking official for a
24   major travel company never even heard of an alleged
25   sex assault occurring at a resort in Jamaica until

---

Page 99

1    just a couple weeks ago, correct?
2    A    That's correct.
3        MR. SUAREZ:  Object to the form of the
4    question.  Just give me a second between question and
5    answer.
6        THE WITNESS:  That's correct.
7    BY MR. WEGLARZ:
8    Q    Do you agree with me that it would be a reasonable
9    thing to do to place a customer or traveler on notice
10   of a state department's reported concern about the
11   number of sex assaults perpetrated by hotel employees
12   at resort hotels on the north coast of Jamaica?
13       MR. SUAREZ:  Object to the form.
14       THE WITNESS:  No, I don't -- I think I've
15   answered that a couple times.  I don't believe that's
16   our role.
17   BY MR. WEGLARZ:
18   Q    If you have a customer who just booked a resort
19   package to a resort located on the north coast of
20   Jamaica, do you agree with me that that traveler
21   would probably want to be made aware of any reported
22   concerns like I've been reading to you for the last
23   few minutes?
24       MR. SUAREZ:  Object to the form.
25   BY MR. WEGLARZ:

---

Page 100

1    Q    Go ahead.
2    A    Customers do an awful lot of research on their own,
3    and I can't tell you what one customer would feel
4    better about or -- in making their decision as to
5    where they go.
6        I mean I do -- even my own kids.  They're
7    going to make their own decision what they feel
8    comfortable with in terms of where they travel.
9    Q    Would you want your daughter traveling to Jamaica and
10   staying at a resort on the north coast if there was a
11   reported concern like I just read by the state
12   department?
13       MR. SUAREZ:  Object to the form.  Beyond
14   the scope.
15   BY MR. WEGLARZ:
16   Q    Go ahead.  You can answer, sir.
17   A    I have friends that ask me all the time whether I
18   would take my children to a particular destination
19   after a recent travel advisory comes up.  There's
20   been a lot to the DR recently.  And my answer's
21   always the same, yes, I still feel safe.  We all have
22   our own obligation in terms of being aware of our
23   surroundings.
24       It's no different than me traveling with my
25   family to Chicago or New York.  We all have the

---



RONALD JACOBS
November 22, 2019

---

Page 101

1  same -- I guess -- what's the right word?  We can all
2  make our own decisions as to where you want to travel
3  to.
4  Q   You agree with me that a risk where you go to a
5  resort and you may be assaulted by the actual resort
6  staff, that's a very unusual risk, isn't it?
7        MR. SUAREZ:  Object to the form.  Beyond
8  the scope.
9  BY MR. WEGLARZ:
10  Q   Go ahead, sir.
11  A   Yeah, like I said, this is the first time that I'm
12  even hearing of it.
13  Q   And we know that Detroit has crime, Chicago has
14  crime, but are you aware of any hotels in Chicago and
15  Detroit where a traveler is at risk of being sexually
16  assaulted by the resort staff?
17        MR. SUAREZ:  Object to form.  Beyond the
18  scope.
19        Todd, if I'm agreeing to go beyond the
20  witness's agreed time, let's get to things we really
21  need.  I don't want to walk out of here and have an
22  issue with you.  Go ahead.
23        THE WITNESS:  I'm not aware.
24  BY MR. WEGLARZ:
25  Q   Does Mark Travel do its own research into any of the

---

Page 102

1  resorts or look at any information or data to make
2  sure that the product and services it's selling are
3  reasonably safe and fit for its travelers?
4        MR. SUAREZ:  Form.
5        THE WITNESS:  No, I mean we -- some of our
6  buying group goes to visit the properties.
7  BY MR. WEGLARZ:
8  Q   And what does the buying group do when they visit the
9  property to make sure that it's fit and safe for its
10  intended purpose?
11        MR. SUAREZ:  Object to the form.  He didn't
12  say that it was fit and safe.
13  BY MR. WEGLARZ:
14  Q   Go ahead.
15  A   Yeah.  No, they're really working with the resort to
16  determine if there's any -- you know, a restaurant
17  that's closed for renovation or a pool that's been
18  closed for renovation that we need to update our
19  content with.  And most of the time the hotel --
20  Q   When they --
21  A   -- has done that already.
22  Q   And when they do this type of visit, will they also
23  ask the hotel about, you know, any recent problems,
24  crimes, issues like that?
25        MR. SUAREZ:  Object to the form.

---

Page 103

1        THE WITNESS:  I don't think so.  I don't
2  know though.
3  BY MR. WEGLARZ:
4  Q   Is it the right -- is it a regular practice and
5  routine for Mark Travel or Funjet to review the
6  safety of destinations?
7  A   No, not to my knowledge.
8  Q   Is it the regular practice for Mark Travel and Funjet
9  to review the state department's reports and
10  advisories and warnings?
11  A   No, those things raise themselves up really within
12  the media.  We're not out there every day looking to
13  see if the state department's updated an advisory,
14  though.
15  Q   What is your understanding as to how this vacation
16  package was booked?
17  A   I don't know what you mean.  I would imagine it was
18  booked like any other vacation package that Vacations
19  To Go would have booked with us.
20  Q   Did you review any documents pertaining to the
21  booking?
22  A   I glanced at a couple yesterday with my lawyer.
23        MR. SUAREZ:  Don't talk about what we
24  talked about.
25  BY MR. WEGLARZ:

---

Page 104

1  Q   Can you tell me what you reviewed pertaining to the
2  booking?
3  A   I think it was just an example of the travel
4  itinerary or the confirmation.
5  Q   Did you look at any emails?
6  A   No.
7  Q   Do you have an understanding as to how this
8  destination was selected?
9  A   No.
10  Q   Do you have any idea if this was a destination
11  selected by the customer, the travel agent, the tour
12  operator?
13  A   I'm assuming it was the customer that, working with
14  the travel agent, made a determination on the
15  destination they wanted to travel to.
16  Q   Were you aware that this vacation package was
17  initially booked through Moon Palace?
18  A   Yes, they did -- we did discuss that, yes.
19        MR. SUAREZ:  Wait, wait, don't talk about
20  what we talked about.
21  BY MR. WEGLARZ:
22  Q   Did you review any booking records or booking
23  information pertaining to Moon Palace?
24  A   No.
25  Q   And is Moon Palace -- is Moon Palace one of the

---

Pages 101 to 104



RONALD JACOBS
November 22, 2019

Page 105

1  properties that Mark Travel is allowed to market and
2  promote and book?
3  **A  Yes.**
4  Q  Next to the agreement --
5  **A  In 2000 -- in 2015.  We no longer work with that**
6  **hotel today.**
7  Q  And what's the name of that property or that entity
8  that you contracted with to do that?
9  **A  Palace Resorts I believe is their name.**
10 Q  And how come you guys stopped booking for Palace
11 Resorts?
12          MR. SUAREZ:  Object to the form.  Beyond
13 the scope.
14          THE WITNESS:  I don't know.  That was a
15 business decision they made.
16 BY MR. WEGLARZ:
17 Q  And what's your understanding as to why this trip had
18 to be changed from Moon Palace to Beaches Ocho Rios?
19 **A  It's my understanding that there was a delay in the**
20 **renovation or the opening of that particular resort.**
21 Q  All right.  And then so how did the switch come about
22 to change it over to Beaches?
23 **A  I have no idea.**
24          MR. WEGLARZ:  Well, Mr. Suarez, you'll
25 agree that that's within one of my topics, right?

Page 106

1          MR. SUAREZ:  What's the question for the
2  witness?
3          MR. WEGLARZ:  Well, it's actually for you.
4          MR. SUAREZ:  You and I can --
5          MR. WEGLARZ:  It's kind of hard for me to
6  ask him how this occurred and happened when he
7  doesn't know.  This is like one of the most important
8  issues in the entire case, but that's fine.
9          THE WITNESS:  That's pretty typical though
10 if we have an issue with a hotel that's not opening
11 on time or whatever, that's pretty -- that's pretty
12 common.  Not common.  It's not common, but it does
13 happen where a hotel doesn't open or they have an
14 issue with the hotel, and then the travel agent's
15 going to work with the customer to find an
16 alternative accommodation.
17 BY MR. WEGLARZ:
18 Q  Okay.  Does Mark Travel do anything -- Mark Travel or
19 Funjet, do they do anything to try to assist the
20 customer in a situation like that?
21          MR. SUAREZ:  Object to the form.
22          THE WITNESS:  We would work with the travel
23 agent to try and get them another booking.
24 BY MR. WEGLARZ:
25 Q  Did that happen in this case?

Page 107

1  **A  Yes.**
2  Q  Tell me what Mark Travel did to provide --
3  **A  Yeah, I don't know --**
4  Q  -- assistance.
5  **A  I don't know about that, if we provided assistance.**
6  **I thought you asked if it happened that they got a**
7  **different accommodation.  I don't know our --**
8  Q  What would you --
9  **A  -- involvement.  Sorry.**
10 Q  If you wanted to figure out exactly what Mark Travel
11 did to assist in rebooking this trip to Beaches Ocho
12 Rios, what would you need to look at or review to
13 figure that out?
14 **A  We'd have to go back into the reservation system, the**
15 **booking system and see if there were any notes in**
16 **there.**
17 Q  And where specifically would we find the notes that
18 would document and track how this thing was rebooked?
19 **A  Within the VAX booking engine itself.**
20 Q  All right.  What do they call these types of notes?
21 **A  Just notes.**
22 Q  Okay.  And you never tried looking at those notes or
23 going to the VAX system yourself to see what was
24 there?
25 **A  No, I did not.**

Page 108

1  Q  All right.  Well, hopefully you can take a peek at
2  Gonzales No. 6 which your counsel should have.
3          MR. SUAREZ:  Todd, I'm going to hand him
4  Gonzales 6, but I really am infringing on the
5  witness's time, and we're approaching 12:30, so I've
6  got to wrap this up.
7          MR. WEGLARZ:  Okay.  Well, I wish you would
8  have told me that there was a time constraint.  You
9  didn't --
10          MR. SUAREZ:  I was clear about that in an
11 email about the morning of.  I'm handing the witness
12 Gonzales 6 at your request, so I don't want to
13 quibble with you about our agreement.  I think
14 they're pretty clear.
15          MR. WEGLARZ:  It's not pretty clear.  It's
16 not clear at all.
17          MR. SUAREZ:  All right.  You know the
18 circumstances around which -- you know --
19          MR. WEGLARZ:  What time is your flight?
20          MR. SUAREZ:  No, no, no.  Let's go.  It's
21 not my --
22          MR. WEGLARZ:  That's what I thought.
23          MR. SUAREZ:  It's not my issue, it's the
24 witness's issue.  He is an executive at a company.
25 We infringed upon his time as an accommodation and a



RONALD JACOBS
November 22, 2019

Page 109

1      courtesy and an agreement with you and we have
2      complied wholly and fully with that.  So let's go.
3              MR. WEGLARZ:  No.
4              MR. SUAREZ:  Go ahead.  Ask the question.
5      BY MR. WEGLARZ:
6      Q    Okay.  Sir, have you had a chance to look at
7      Gonzales No. 6?
8      A    Yes.  Not a lot to this I guess.
9      Q    No, there's not.  I agree with you there.  This is
10     the first time you're even looking at these
11     documents, correct?
12     A    Yes.
13     Q    And I think the easiest way to piece this together I
14     guess is looking at Bates No. 35.
15     A    Page number 35?
16     Q    Appears to be, yeah, Bates 35.
17             MR. SUAREZ:  Bates 35.
18     BY MR. WEGLARZ:
19     Q    It's not necessarily in order.
20     A    Got it.
21     Q    It's an email from Mr. Matthew Anderson dated
22     March 18, 2015.  Do you see that?
23     A    Yes.
24     Q    And it looks like he's alerting certain folks about
25     Moon Palace not being able to open on time, right?

Page 110

1      A    Correct.
2      Q    Who's Matthew Anderson by the way?
3      A    Former employee that was also within the buying team.
4      You can see that he's copied a couple other people
5      that we've already talked about.  He used to work for
6      Jean Downing.  You see Leila Patterson's been copied
7      on this as well.
8      Q    Correct.  And all these folks here, CC Jean Downing,
9      Dinah Jones, Missy Janik, Jazzman Wilks, Beth
10     Weinrich, and Leila Patterson, are these all Mark
11     Travel employees?
12     A    That I don't know for sure.  I recognize most of them
13     as Mark Travel employees, yes, but I don't know
14     Jazmann Wilks I guess she would be the only one that
15     I don't recognize.
16     Q    And then it looks like we have an email.  This is
17     page one of the Exhibit, Bates No. 36.  It's the
18     front page.  Looks like we have an email from a Leo
19     Malcomb dated March 26 of 2015.  Do you see that?
20     A    Yes.
21     Q    And it appears that Mr. Malcomb is making rooms
22     available for the folks who are affected by the Moon
23     Palace not being able to open on time, true?
24     A    I believe so.  That's what it looks like, yes.
25     Q    And who's Leo Malcomb by the way?

Page 111

1      A    I have no idea.
2      Q    You've never heard of that name before?
3      A    No, sir.
4      Q    If you look at the exhibit, it looks like Leo Malcomb
5      has an email address from UVI.Sandals.  Do you see
6      that?
7      A    Yes.
8      Q    So why would someone purportedly from UVI be helping
9      out and making rooms available at a Beaches resort
10     for Mark Travel customers?
11             MR. SUAREZ:  Objection, form.  Todd ...
12     Go ahead, answer.
13             THE WITNESS:  I don't know.
14     BY MR. WEGLARZ:
15     Q    So if I were to ask you what led up to Mr. Malcomb
16     getting involved, you have no idea, fair to say?
17     A    That's correct, yes.  I don't know.
18     Q    Are you aware of UVI or Unique Vacations, Inc., ever
19     assisting with bookings and reservations pertaining
20     to Sandals and Beaches resorts?
21     A    No.  I don't know what their process or procedures
22     would be.
23     Q    Have you ever heard of UVI employees or
24     representatives ever assisting Mark Travel or Funjet
25     employees with respect to anything pertaining to

Page 112

1      travel?
2      A    No.
3      Q    Are you aware of any warnings being provided by Mark
4      Travel/Funjet to my clients pertaining to their trip
5      to Beaches Ocho Rios resort?
6              MR. SUAREZ:  Object to the form.
7              THE WITNESS:  No.
8      BY MR. WEGLARZ:
9      Q    Is it your understanding that Mark Travel slash
10     Funjet did not provide any type of warnings to my
11     clients as it pertained to their trip to Beaches Ocho
12     Rios in Jamaica?
13             MR. SUAREZ:  Object to the form.
14             THE WITNESS:  Isn't that the same question?
15             MR. SUAREZ:  It is.
16             MR. WEGLARZ:  Kind of.
17             MR. SUAREZ:  One was a positive.  The other
18     one was a negative.
19             THE WITNESS:  I'm not aware of us providing
20     any warnings.
21     BY MR. WEGLARZ:
22     Q    And what about the travel agent, Vacations To Go, are
23     you aware of any warnings or advisories that they
24     provided to my clients pertaining to their trip to
25     Beaches Ocho Rios resort?


U.S. Legal
Support

RONALD JACOBS
November 22, 2019

---

Page 113

1          MR. SUAREZ:  Object to form.
2          THE WITNESS:  No, I am not.
3  BY MR. WEGLARZ:
4  Q   If the travel agent, Vacations To Go, wanted to give
5      a warning to my clients about their trip to Beaches
6      Ocho Rios, were they allowed to do that?
7          MR. SUAREZ:  Object to the form.
8          THE WITNESS:  Yeah, I mean they all run
9      their business differently.  I'm not sure.  Some are
10     more -- you know, some have stronger relationships
11     with their customers than others.  So I don't know
12     how they all conduct their business.
13  BY MR. WEGLARZ:
14  Q   Sure.  So hypothetically let's say --
15         Oh, by the way the travel counselor for
16     Vacations To Go is a person by the name of Stetson
17     Arriola.  Does that name ring a bell to you?
18  A   **No, sir.**
19  Q   Assuming or hypothetically if Mr. Arriola was the
20     travel counselor who did book and sell this trip to
21     my clients, if he wanted to say, hey, I think it's
22     great you're going to the Beaches Ocho Rios resort,
23     but I just want you to know that the state department
24     for the last few years has published a concern about
25     the number of sex assaults being committed by resort

---

Page 114

1      employees against the guests at the hotels on the
2      north coast of Jamaica, do you have any problem with
3      that warning if that's what the travel agent wanted
4      to do?
5          MR. SUAREZ:  Object to the form.
6          THE WITNESS:  No, I do not.
7  BY MR. WEGLARZ:
8  Q   Would that upset you as a high ranking official for
9      Mark Travel and Funjet Vacations if the travel agent
10     was issuing warnings like that for the properties and
11     services Mark Travel is trying to sell?
12         MR. SUAREZ:  Object to the form.
13         THE WITNESS:  No, it would not.
14  BY MR. WEGLARZ:
15  Q   Would such a warning or instruction by the travel
16     agent, would that violate any of the terms of the
17     agreement that Mark Travel has with UVL or with the
18     Sandals and Beaches resorts to market and sell its
19     products and services?
20         MR. SUAREZ:  Form.
21         THE WITNESS:  Not to my knowledge.
22  BY MR. WEGLARZ:
23  Q   Are you familiar with someone by the name of Raquel
24     Rutledge?
25  A   **No.**

---

Page 115

1  Q   If a tour operator or a seller of travel is aware
2      that one of its customers is about to go to an area
3      that is crime infested, do you believe the tour
4      operator or seller of travel should tell its customer
5      about that risk?
6          MR. SUAREZ:  Object to the form.
7  BY MR. WEGLARZ:
8  Q   Go ahead.
9  A   **No.  I think we've talked about this a couple of**
10     **times.  I don't really think that that is our role.**
11  Q   So if Mark Travel is sending customers to crime
12     infested areas, you don't think that Mark Travel has
13     the obligation to advise and warn the customer of
14     that fact?
15         MR. SUAREZ:  Objection, form, asked and
16     answered.  Go ahead and answer.
17         THE WITNESS:  That's correct.
18  BY MR. WEGLARZ:
19  Q   Does Mark Travel or Funjet ever review other sites
20     where they have travel reviews or travel ratings for
21     particular areas or destinations?
22         MR. SUAREZ:  Object to the form.
23         THE WITNESS:  No, I don't think we -- we do
24     have some TripAdvisor links though that are also on I
25     think on our website or in the booking engine as

---

Page 116

1      well.  But I don't think we're now reviewing those I
2      don't believe.
3  BY MR. WEGLARZ:
4  Q   You don't have someone who monitors the TripAdvisor
5      reviews or ratings?
6  A   **Not on a daily basis.  If there's something that**
7      **actually comes about that becomes an issue, then I**
8      **think some of our folks would monitor that more**
9      **closely.**
10  Q   Okay.  I know they may not look at it on a daily
11     basis, but do they periodically review it like
12     weekly, monthly, yearly?
13  A   **I don't believe so, only if something gets elevated.**
14  Q   Did Mark Travel have a response team ever put
15     together pertaining to destinations or sites?
16  A   **No, not to my knowledge.**
17  Q   And did Mark Travel or Funjet or its other brands,
18     did they ever assemble or gather incident reports
19     pertaining to particular properties or destinations?
20         MR. SUAREZ:  Object to the form.
21         THE WITNESS:  Yeah, it would have been the
22     same kind of communication we talked about earlier,
23     if a DMC or somebody would have reported something to
24     us.
25  BY MR. WEGLARZ:

---



RONALD JACOBS
November 22, 2019

Page 117

1   Q   And are those incident reports, are they forms that
2       are generated by Mark Travel or Funjet?
3           MR. SUAREZ:  Object to the form.  He said
4       the DMCs.
5   BY MR. WEGLARZ:
6   Q   Yes, he did.  And I'm asking if the incident reports
7       that are generated as a result of that, is this a
8       form that's produced by Mark Travel or Funjet?
9   A   Yeah, I don't know the exact process.  Lisa would be
10      the one that handles that.  I don't know --
11  Q   But you are aware of some -- sorry.
12  A   Go ahead.
13          MR. SUAREZ:  Finish your answer.
14          THE WITNESS:  I was just going to say --
15  BY MR. WEGLARZ:
16  Q   You are aware --
17          MR. SUAREZ:  Wait, sorry, you guys are
18      talking past each other.
19          Finish your answer.
20          THE WITNESS:  I'm sure there's a particular
21      form for each destination that we probably have some
22      process with the DMC to make sure that they fill out.
23      I'm just not close enough to that to know the exact
24      details.
25  BY MR. WEGLARZ:

Page 118

1   Q   You know who Tim Mullin is, right?
2   A   Yes, I do.
3   Q   He's a high ranking executive at Apple, Apple
4       Vacations?
5   A   He used to be, yes.
6   Q   He talked about how several years ago they had a
7       practice of collecting weekly incident reports from
8       particular resorts.  Is a practice or process like
9       that something that Mark Travel or Funjet ever did?
10  A   I don't know what our process is.  I don't know if we
11      get stuff from the DMCs weekly or monthly.  I'm not
12      sure how that works, Todd.
13  Q   And again, the person who would know the most about
14      that process if it existed would be whom?
15  A   Lisa Iwanski.
16  Q   Thank you.  And did Mark Travel or Funjet ever do
17      anything to make sure that its customers were safe
18      when going to these resorts and destinations being
19      sold by Mark Travel?
20          MR. SUAREZ:  Object to the form.
21  BY MR. WEGLARZ:
22  Q   Go ahead.
23  A   No, not to my knowledge.
24  Q   Give me a minute.  I do want to show you the next
25      exhibit I want to attach, and that's Mark Travel's

Page 119

1       responses and objections to the Plaintiffs'
2       Interrogatory and Request to Produce.
3           Hopefully you have a copy of that, Luis.
4           MR. SUAREZ:  I think I do.  Hang on.  Are
5       you marking them?
6           MR. WEGLARZ:  Yeah, we're going to call
7       this Exhibit No. 4.
8           (Exhibit 4 marked for identification.)
9   BY MR. WEGLARZ:
10  Q   Mr. Jacobs, I'm going to -- because I'm trying to go
11      quickly here, because I know you have to go, so if
12      you look at the very last page, you'll see your
13      signature page to these responses.
14  A   Yes.
15  Q   Is that indeed your signature?
16  A   That's correct.
17  Q   And what you're signing -- I believe that's what this
18      is saying is that you are -- that you read Mark
19      Travel's answer to interrogatory No. 1, and that
20      answer to No. 1 is true and correct to the best of
21      your knowledge.
22          Did I read that correctly or paraphrase
23      that correctly?
24  A   That's correct.
25  Q   Now, if we go back to page number two, I want you to

Page 120

1       look at the interrogatory No. 1.
2           MR. SUAREZ:  Read one and the response,
3       please.
4   BY MR. WEGLARZ:
5   Q   Right.
6   A   (Witness complies.)
7           I'm just reading one, right?
8           MR. SUAREZ:  Yes, just one.
9   BY MR. WEGLARZ:
10  Q   Yes.
11  A   Yep.
12  Q   My question to you is what did you review, what did
13      you look at, who did you talk to in your effort to
14      answer this particular question?
15          MR. SUAREZ:  I'll let him answer the
16      question.  I just don't want him to talk about
17      anything he talked about with me.
18          Go ahead.
19          Or with his in-house lawyers.
20          Go ahead.
21          THE WITNESS:  He would have been the only
22      other person that I talked to is our internal
23      counsel.
24  BY MR. WEGLARZ:
25  Q   Did you look at any records?

Pages 117 to 120



RONALD JACOBS
November 22, 2019

Page 121

1   A   No, sir.
2   Q   Did you engage in your own effort to try to figure
3       out the answer to this question?
4           MR. SUAREZ:  You can answer to the extent
5       it doesn't call for information you shared with
6       Mr. -- with whatever in-house counsel you worked
7       with.  Go ahead.
8           THE WITNESS:  Can you repeat the question
9       again, I'm sorry?
10  BY MR. WEGLARZ:
11  Q   Sure.  Did you review any type of information or
12      records on your own in an effort to try to answer
13      this question?
14  A   No.
15  Q   So when you signed this jurat with your signature
16      saying that you're attesting to the truthfulness of
17      this answer, were you basically just relying on
18      something that an attorney told you?
19          MR. SUAREZ:  Object to the form.
20          And Todd, I'm going to let him answer, but
21      the answer calls for privileged information.  You're
22      saying --
23          MR. WEGLARZ:  No, I'm not asking for the
24      substance.  I'm just asking if that's the only thing
25      he relied on.  That's all.

Page 122

1           MR. SUAREZ:  Go ahead.  Answer the
2       question.
3           THE WITNESS:  Just my not knowing the case,
4       so I wasn't made aware of it until this, so I didn't
5       really have any other knowledge.
6   BY MR. WEGLARZ:
7   Q   Well, it sounds to me like you really don't -- you
8       can't tell me either way if Mark Travel was aware of
9       any incidents of alleged sex assault to have occurred
10      in Jamaica during this time period.
11          MR. SUAREZ:  Hang on a second.  Ask him the
12      question.  You're trying to -- just ask -- object to
13      the form.  Ask him a question.
14  BY MR. WEGLARZ:
15  Q   That was a question.  Are you able to answer -- as
16      you sit here today, are you able to answer
17      interrogatory No. 1 or question number one as set
18      forth in Exhibit 4?
19          MR. SUAREZ:  Read the question and answer.
20          THE WITNESS:  As far as I understand, Mark
21      Travel was not contacted.  The travel agents -- the
22      travel agent, Vacations To Go, was contacted.  We
23      were not.
24          MR. SUAREZ:  But --
25  BY MR. WEGLARZ:

Page 123

1   Q   But this is asking for any allegations of sex assault
2       for the seven-year period before my clients'
3       incident.
4   A   Right.  And I have no knowledge of any of those -- of
5       any -- of any reports of any of that kind.
6   Q   Okay.  What did you look at though to determine
7       there's no reports like this at Mark Travel that
8       would put anyone on notice of an allegation of sex
9       assault in Jamaica?
10          MR. SUAREZ:  Object to form.
11  BY MR. WEGLARZ:
12  Q   Go ahead.
13          MR. SUAREZ:  Go ahead.
14          THE WITNESS:  I just would have relied on
15      legal counsel to advise me of that.
16  BY MR. WEGLARZ:
17  Q   Okay.  And do you have any idea, any understanding as
18      to what records or documents were reviewed to support
19      that representation?
20  A   No, I don't know what he would have -- what he would
21      have looked at.
22          MR. SUAREZ:  Hey Todd, I'm now at over an
23      hour -- almost over an hour from where we were
24      supposed to be.
25          MR. WEGLARZ:  Well, okay, but you didn't

Page 124

1       tell me that before.
2           MR. SUAREZ:  Respectfully I disagree, but
3       you know, the --
4           MR. WEGLARZ:  Right.
5           MR. SUAREZ:  During the morning of is a
6       very clear statement so, you know, you keep saying
7       that and that's against objective fact.  Do I have to
8       pull out the email and read it into the record?  I
9       don't think so.  So I've been more than
10      accommodating.
11          MR. WEGLARZ:  Not as accommodating as I was
12      to you.
13          MR. SUAREZ:  Not sure that's true, but go
14      ahead.
15  BY MR. WEGLARZ:
16  Q   So Mr. Jacobs, let me ask you this, if you were to
17      try to figure out on your own -- if you wanted to
18      find out if Mark Travel was aware of any allegations
19      of sex assault occurring against a resort guest in
20      Jamaica during the seven-year period before my
21      clients' incident, where would you start?  What
22      records or documents would you review first to try to
23      figure this out on your own?
24  A   I would have probably gone to Lisa Iwanski.
25  Q   And how would -- why would she be a good place to



RONALD JACOBS
November 22, 2019

## Page 125

1    start?  How would she know?

2    **A   Well, at that time she was in charge of our call**

3        **center, and she was also in charge of the operations**

4        **in destinations.  So if something was reported, I**

5        **would think that she would have been apprised of it.**

6    Q    Did you ever yourself talk to Lisa about information

7        that's being requested in question No. 1?

8    **A   No.**

9            MR. SUAREZ:  Can I see the last page,

10       please?

11   BY MR. WEGLARZ:

12   Q    Were you ever -- now, with respect to plaintiffs'

13       Exhibit 4 for your deposition here, the other items

14       here are requesting various documents and records.

15       I'm presuming your response to this question will be

16       that you didn't look for these, but I'll ask it.

17            Did you ever try to locate or find the

18       records being requested in here?

19            MR. SUAREZ:  Hang on.  He's not supposed

20       to.  That's not his -- he's not swearing as to the

21       records.  He's swearing as to the interrogatory

22       responses.

23            MR. WEGLARZ:  I appreciate the speaking

24       objection.  I still want the question to stand.

25            MR. SUAREZ:  Okay.

## Page 126

1            THE WITNESS:  No, I would have left that up

2        to our legal counsel.

3    BY MR. WEGLARZ:

4    Q    Okay.  Do you know if anyone from Mark Travel

5        attempted to locate the records being requested in

6        Exhibit No. 4?

7    **A   I do not know.  This is a serious enough allegation,**

8        **right?  That's why I'm here?**

9    Q    Yes.

10   **A   That's why I'm here.  Our company takes it serious.**

11       **I think our legal --**

12   Q    Yes.

13   **A   I think our legal counsel would have taken it**

14       **serious, so if you were looking for documents, I'm**

15       **pretty much sure that he went and looked for whatever**

16       **you asked for.**

17   Q    And he may have.  I'm just curious as to why I don't

18       have his signature verifying that everything has been

19       searched and this is all they can come up with.

20            MR. SUAREZ:  Because that's not -- that is

21       not the obligation under an RFP, and you know it

22       well.  So you're misleading the witness into thinking

23       that there's an obligation under RFP for his lawyer

24       in-house to sign or swear a certification.  You know

25       that's not the law, so that's not fair.

## Page 127

1    BY MR. WEGLARZ:

2    Q    And who do you believe is the in-house counsel who

3        would have undertaken these efforts?

4    **A   Peter Schaefer.**

5    Q    And he's also a corporate official with the company

6        or he was, correct?

7            MR. SUAREZ:  Object to form.

8            THE WITNESS:  Still is.

9    BY MR. WEGLARZ:

10   Q    And his formal title is what?

11   **A   I don't know.  I think it was secretary and legal**

12       **counsel.  And I don't know if that's changed under**

13       **Apple Leisure Group either, so I don't know what his**

14       **current title is.**

15   Q    Vacations To Go, are they still under contract with

16       Mark Travel and Funjet?

17            MR. SUAREZ:  Object to the form.

18   BY MR. WEGLARZ:

19   Q    Or the entity that has now morphed into Apple?

20            MR. SUAREZ:  Object to the form.  Beyond

21       the scope.

22            THE WITNESS:  Yes.

23   BY MR. WEGLARZ:

24   Q    You can still answer.  Okay.  And I know you're

25       human, and I'm sure when you heard about this

## Page 128

1        allegation, I take it you had some concern about it,

2        correct?

3    **A   That's correct.**

4    Q    Any concern to look into this incident to see what

5        happened to try to see if there's a way to make sure

6        it doesn't happen again to another customer of Mark

7        Travel?

8            MR. SUAREZ:  Object to the form.  Beyond

9        the scope.  Go ahead.

10           THE WITNESS:  No.  Like I've said it a

11       couple times, I don't believe that's our role.  You

12       know, what goes on in a destination is kind of out of

13       our hands.

14   BY MR. WEGLARZ:

15   Q    So if Mark Travel is sending customers to resorts

16       where the customers are getting sexually assaulted,

17       that's really not Mark Travel's business, correct?

18           MR. SUAREZ:  Objection to form.  Improper

19       hypothetical.  You can answer.

20   BY MR. WEGLARZ:

21   Q    Do you think Vacations To Go did anything wrong in

22       this incident?

23   **A   No.**

24   Q    Do you think --

25   **A   Whoever did the sexual assault are the people that**



RONALD JACOBS
November 22, 2019

Page 129

1    did the wrong.
2  Q  And I appreciate that and thank you.
3        Do you believe Unique Vacations, Inc., did
4    anything wrong with respect to this incident? And
5    I'm talking about making rooms available, promoting
6    vacation packages, the booking, the reservation, and
7    whatnot. Do you have any reason to believe that
8    Unique Vacations, Inc., did anything wrong in this
9    case?
10       MR. SUAREZ:  Object to the form. Beyond
11   the scope.
12       THE WITNESS:  I have no idea.
13 BY MR. WEGLARZ:
14  Q  Do you believe Unique Vacations, Inc., or Vacations
15   To Go were wrong for not warning my clients about the
16   risk of sex assault at resorts on the north coast of
17   Jamaica?
18       MR. SUAREZ:  Object to the form. Beyond
19   the scope. Go ahead.
20 BY MR. WEGLARZ:
21  Q  Go ahead.
22  A  No.
23  Q  All right. In light of the circumstances I know you
24   have to go so I will stop.
25       MR. SUAREZ:  I've got just a handful --

Page 130

1        MR. WEGLARZ:  Thank you.
2        MR. SUAREZ:  I've got just a handful of
3    questions.
4        EXAMINATION
5  BY MR. SUAREZ:
6  Q  Sir, first you -- earlier today in this deposition
7    you talked about call centers in Florida. Do you
8    recall that?
9  A  In Orlando, yes.
10  Q  And the plaintiffs in that case, however, did not use
11   those call centers, they booked through Vacations To
12   Go which is in Texas, correct?
13  A  That's correct.
14  Q  And Vacations To Go is an independent, separate
15   company, travel agent, correct?
16  A  Correct.
17  Q  You -- when I say 'you' the Mark Travel Corporation
18   does not own, manage, control, or operate the Beaches
19   resort that this alleged incident occurred, correct?
20  A  That's correct.
21  Q  The Mark Travel Corporation does not own, manage,
22   operate, or control the employees of the Beaches
23   resort where this alleged incident occurred, correct?
24  A  Correct.
25  Q  The Mark Travel Corporation does not own, manage,

Page 131

1    operate, or control an entity known as Unique
2    Vacations, Inc., correct?
3  A  Correct.
4  Q  The Mark Travel Corporation does not own, operate,
5    manage, control an entity known as Unique Vacations
6    Limited, correct?
7  A  Correct.
8  Q  The Mark Travel Corporation does not own, manage,
9    operate, control Vacations To Go, correct?
10  A  Correct.
11  Q  The Mark Travel Corporation does not own, manage,
12   operate, or control the Sandals trademark, correct?
13  A  Correct.
14  Q  The Mark Travel Corporation does not own, manage,
15   operate, or control the Beaches trademark, correct?
16  A  Correct.
17       MR. SUAREZ:  Thank you. I have no further
18   questions at this time.
19       MR. WEGLARZ:  I have a few follow-up on
20   that. I'm sorry, Oscar. If you have questions, go
21   ahead.
22       MR. CAMPOS:  No questions.
23       EXAMINATION
24 BY MR. WEGLARZ:
25  Q  Sir, you just testified that UVI does not own,

Page 132

1    manage, operate, or control Vacations To Go.
2        MR. SUAREZ:  No, no, no.
3  BY MR. WEGLARZ:
4  Q  What does UVI do?
5        MR. SUAREZ:  No, no, no.
6        THE WITNESS:  I don't think that was the
7    question.
8        MR. SUAREZ:  That wasn't the question. You
9    misspoke. I said the Mark Travel Corporation, not
10   UVI. I didn't ask UVI. If I did, it was
11   unintentional and I'll withdraw that question if
12   that's what you want.
13       MR. WEGLARZ:  I thought you mentioned
14   Vacations To Go as well.
15       MR. SUAREZ:  I said -- let's be clear, I
16   said Mark Travel Corporation does not own, manage,
17   operate, or control Vacations To Go; is that correct?
18       THE WITNESS:  That's correct.
19       MR. SUAREZ:  And Mark Travel does not own,
20   manage, operate, or control UVI; is that correct?
21       THE WITNESS:  That's correct.
22       MR. SUAREZ:  Okay, go ahead.
23 BY MR. WEGLARZ:
24  Q  Mark Travel does however have some control over
25   Vacations To Go, at least pursuant to the contractual

Pages 129 to 132



RONALD JACOBS
November 22, 2019

Page 133

1  obligations assumed by each side in its agreement,
2  true?
3          MR. SUAREZ:  Object to form.  The agreement
4  speaks for itself.  They have an agreement.  Go
5  ahead.
6          THE WITNESS:  Yes, whatever is in that
7  agreement, that's the extent of our control.
8  BY MR. WEGLARZ:
9  Q   So there is some control, and that's assumed by
10  contract, true?
11  A   That's correct.
12  Q   Vacations To Go is acting as an authorized agent for
13  Mark Travel, correct?
14          MR. SUAREZ:  Object to form.  That
15  misstates the document.
16          MR. WEGLARZ:  That's a speaking objection
17  too, but go ahead.
18          THE WITNESS:  No, the way I understood the
19  questions that were being asked is that we don't
20  have, you know, operating control of that entity.
21  BY MR. WEGLARZ:
22  Q   You're allowing the entity to act on Mark Travel's
23  behalf when it is soliciting, promoting, booking, and
24  selling vacation packages to customers, correct?
25          MR. SUAREZ:  Object to form.

Page 134

1          THE WITNESS:  They, like many travel
2  agents, access our system to acquire the product.
3  BY MR. WEGLARZ:
4  Q   Because you're giving them permission to do that on
5  Mark Travel's behalf, correct?
6          MR. SUAREZ:  Object to form.
7          THE WITNESS:  That is correct.
8  BY MR. WEGLARZ:
9  Q   If the travel agent or travel counselor from
10  Vacations To Go made phone calls to talk to
11  representatives from Mark Travel, wouldn't those
12  calls go through the call center?
13  A   Some could, yes.
14  Q   And those calls would go through the call center in
15  Orlando, correct?
16  A   Could be Orlando, could be Milwaukee, could be a
17  work-at-home agent that picks up the call.
18  Q   And how do we determine if a phone call went to the
19  Orlando center versus the Milwaukee center?
20  A   I don't know if we can tell you that or not.  It
21  would be in the system itself though.  So I'm not
22  sure of that.
23  Q   What determines if a call's going to be routed
24  through Orlando versus Milwaukee?
25  A   However that call routing was set up back in 2015.

Page 135

1  So I think we talked about that a little bit earlier.
2  Some Funjet calls may have been routed to Milwaukee.
3  Some might have been routed to Orlando.  We have the
4  capability to route calls based on the level of the
5  agency.
6  Q   And what agency level was being routed through
7  Orlando?
8  A   That's what I'm saying.  I don't know at that time
9  what that would have been.
10          MR. WEGLARZ:  All right.  That's all I
11  have.  Thank you, sir.
12          MR. SUAREZ:  I have nothing further except
13  to say thank you for your time today, Mr. Jacobs.
14          And we will read the deposition.
15          THE COURT REPORTER:  It's my practice to
16  take orders on the record if there are any.
17          MR. WEGLARZ:  Yeah, I will order.
18          MR. SUAREZ:  I'll take a copy.
19          MR. CAMPOS:  I will too, please.
20          (Discussion held off the record.)
21          MR. WEGLARZ:  I just want an e-tran with
22  PDF copies of the exhibits that we marked today.
23          MR. SUAREZ:  I'll take that.
24          (Deposition concluded at 1:08 p.m.)
25

Page 136

1  STATE OF WISCONSIN )
                      ) SS:
2  MILWAUKEE COUNTY   )
3
4          I, Tammy R. O'Neal, RPR and Notary
5  Public in and for the State of Wisconsin, do hereby
6  certify that the preceding deposition was recorded by
7  me and reduced to writing under my personal
8  direction.
9          I further certify that said deposition was
10  taken at US Legal Support, 411 East Wisconsin Avenue,
11  Milwaukee, Wisconsin, on the 22nd day of November,
12  2019, commencing at 9:11 a.m. and concluding at 1:08
13  p.m.
14          I further certify that I am not a relative
15  or employee or attorney or counsel of any of the
16  parties, or a relative or employee of such attorney
17  or counsel, or financially interested directly or
18  indirectly in this action.
19          In witness whereof, I have hereunto set my
20  hand and affixed my seal of office on this 27th day
21  of November, 2019.
22
23          _____
24                  TAMMY R. O'NEAL, RPR
                    Notary Public
25  My commission expires 8/2/23.

