# EXHIBIT 26

{00682541.DOCX}

Janet Desantis
September 23, 2019

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION


PAITON E. BATER, AMBER R. TORRALVA,

JANET DESANTIS, and MARGARET A. TORRALVA,

   Plaintiffs,

  vs.     Case No. 1:17 cv 21703

        Hon. Marcia G. Cooke

UNIQUE VACATIONS, INC., a

Delaware corporation, THE

MARK TRAVEL CORPORATION, a

Nevada corporation, d/b/a Fun

Jet Vacations, DWIGHT DAVIS,

JERMAINE DYER, and WILLIAM TAPPER,

jointly and severally,

   Defendants.

_____


  The Deposition of JANET DESANTIS,

  Taken at 19390 West Ten Mile Road,

  Southfield, Michigan,

  Commencing at 8:21 a.m.,

  Monday, September 23, 2019

  Before Elizabeth Dyan Ferguson-Evans, CSR-1347.

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| | Page 2 |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | TODD J. WEGLARZ |
| 4 | Fieger Fieger Kenney & Harrington, P.C. |
| 5 | 19390 West 10 Mile Road |
| 6 | Southfield, Michigan  48075 |
| 7 | 248.355.5555 |
| 8 | tweglarz@fiegerlaw.com |
| 9 | Appearing on behalf of the Plaintiffs. |
| 10 | |
| 11 | STEVEN R. SAFRA |
| 12 | THOMAS E. SCOTT, JR. |
| 13 | Cole, Scott & Kissane, P.A. |
| 14 | 9150 S. Dadeland Centre II |
| 15 | Suite 1400 |
| 16 | Miami, Florida  33156 |
| 17 | 786.268.6418 |
| 18 | steven.safra@csklegal.com |
| 19 | Appearing on behalf of Unique Vacations. |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 3 |
|---|---|
| 1 | LUIS E. SUAREZ |
| 2 | PATRICIA MELVILLE |
| 3 | Boies, Schiller & Flexner, L.L.P. |
| 4 | 100 Southeast Second Street |
| 5 | Suite 2800 |
| 6 | Miami, Florida  33131 |
| 7 | lsuarez@bsfllp.com |
| 8 | Appearing on behalf of Mark Travel Group. |
| 9 | |
| 10 | Also Present |
| 11 | Dmitri Singh |
| 12 | Tammy Gonzalez |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 4 |
|---|---|
| 1 | TABLE OF CONTENTS |
| 2 | |
| 3 | WITNESS                    PAGE |
| 4 | JANET DESANTIS |
| 5 | |
| 6 | EXAMINATION BY MR. SAFRA:           6 |
| 7 | EXAMINATION BY MR. SUAREZ:        190 |
| 8 | RE-EXAMINATION BY MR. SAFRA:      285 |
| 9 | EXAMINATION BY MR. WEGLARZ:       286 |
| 10 | RE-EXAMINATION BY MR. SAFRA:      301 |
| 11 | RE-EXAMINATION BY MR. SUAREZ:     303 |
| 12 | RE-EXAMINATION BY MR. WEGLARZ:    305 |
| 13 | |
| 14 | EXHIBITS |
| 15 | |
| 16 | EXHIBIT                    PAGE |
| 17 | (Exhibits attached to transcript.) |
| 18 | (Exhibit 2 retained.) |
| 19 | |
| 20 | DEPOSITION EXHIBIT 1          40 |
| 21 | DEPOSITION EXHIBIT 2          42 |
| 22 | DEPOSITION EXHIBIT 3         188 |
| 23 | DEPOSITION EXHIBIT 4         212 |
| 24 | DEPOSITION EXHIBIT 5         238 |
| 25 | DEPOSITION EXHIBIT 6         255 |

| | Page 5 |
|---|---|
| 1 | DEPOSITION EXHIBIT 7         259 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

2  (Pages 2 to 5)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

---

Page 6

1  Southfield, Michigan
2  Monday, September 23, 2019
3  8:21 a.m.
4
5          JANET DESANTIS,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          MR. WEGLARZ:  Todd Weglarz appearing on
11  behalf of the plaintiffs.
12          MR. SAFRA:  Steven Safra for Unique
13  Vacations along with Tammy Gonzales, representative,
14  and counsel, Dimitri Singh.
15          MR. SUAREZ:  Good morning, Luis Suarez and
16  Patricia Melville on behalf of The Mark Travel
17  Corporation.
18          EXAMINATION
19  BY MR. SAFRA:
20  Q.  Good morning, Ms. DeSantis.
21  A.  Good morning.
22  Q.  Do you prefer going by Janet or Ms. --
23  A.  Janet is fine.
24  Q.  Can you please state your name for the record?
25  A.  Janet DeSantis.

---

Page 7

1  Q.  We're currently in Michigan.  Is that where you live?
2  A.  No.
3  Q.  Where do you live?
4  A.  California.
5  Q.  What is the tie to Michigan that we're here?  Did you
6      used to live here?
7  A.  I used to live here.
8  Q.  When you lived here what was your address?
9  A.  5281 North Luce Road in Alma, Michigan.
10  Q.  Al --
11  A.  L-U-C-E.
12  Q.  How long did you live there?  Roughly is fine.
13  A.  Two years maybe.  Maybe two to three years.
14  Q.  Maybe I should have started with have you ever taken a
15      deposition before?
16  A.  Yes.
17  Q.  I'll briefly go over the rules just in case.  I'm
18      going to ask you a series of questions, and I will try
19      my best, unless I think you're finished and you're
20      not, to allow you to answer the question and finish
21      your answer before I start my next question.
22  A.  Okay.
23  Q.  If at any time I interrupt and you're not finished
24      with an answer, please let me know.  I'd appreciate
25      the same with my questions.  Sometimes you might

---

Page 8

1  anticipate what I'm asking, but for the sake of making
2  sure we have a clean record allow me to finish my
3  question and then go from there.
4  A.  Okay.
5  Q.  If there's anything about a question I ask that you
6      don't understand, please feel free to let me know; and
7      if you respond, we'll assume you understood the
8      question as asked.
9  A.  Okay.
10  Q.  Since there's a court reporter taking down a written
11      record we also ask responses be verbal.  It's a lot
12      harder to read back a transcript where the response is
13      a nod of the head and know what the answer will be.
14      So I will try to catch them if you unintentionally do
15      that and ask you to verbalize the answer.
16          At the same time answers that may require
17      yes or no, we ask they be yes or no and not uh-huh or
18      um-hums, which we may in context right now follow, but
19      reading back it's hard to tell what your answer was.
20  A.  Okay.
21  Q.  If you need a break at any time please feel free to
22      let us know.  And also you may at times hear either
23      the co-defense counsel or even your own counsel state
24      an objection at a time maybe between when I ask a
25      question and your answer, unless you're directed not

---

Page 9

1  to answer for some reason that counsel can discuss,
2  after that I'd appreciate if you do answer the
3  question.
4  A.  Okay.
5  Q.  The reason why this kind of jogged my memory a little
6      bit with my [sic] answer about the address, if you
7      don't have an exact if I'm asking for exact, but you
8      have an estimate or a number of years or a rough time
9      period, for example, and that's fine as well.  We ask
10      you to do your best to answer the questions --
11  A.  Okay.
12  Q.  -- to the best of your knowledge.  If you don't know
13      something, you don't know something.
14  A.  Sure.
15  Q.  You said you lived at that address for two, three
16      years.
17          How long did you live in Michigan?
18  A.  Since about 1991 -- no, sorry.
19  Q.  A number of years, ten-plus?
20  A.  Ten-plus.
21  Q.  That works for me.  That works for me.
22          Were you living in Michigan at the time
23      of the incident that we're here that's the subject of
24      this litigation?
25  A.  Yes.

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 10

1  Q.  After the incident did you move out of Michigan?
2  A.  Yes.
3  Q.  Where did you move to?
4  A.  California.
5  Q.  How long have you been in California?
6  A.  One year.
7  Q.  This incident took place in 2015?
8  A.  Correct.
9  Q.  When you said you were two to three years, was it two
10     to three years at that address in Michigan but you
11     were at another residence in Michigan?
12  A.  Yes.
13  Q.  Now I'm following.  In California, have you lived
14     there since?  About a year you said?
15  A.  Yes.
16  Q.  You have lived there ever since you moved out to
17     California?
18  A.  Yes.
19  Q.  Why did you move to California?
20  A.  My husband's job.
21  Q.  Did your entire family pick up and move?
22  A.  No.
23  Q.  You have a daughter that's also involved in this
24     litigation.  What is her name?
25  A.  Paiton Bater.

Page 11

1  Q.  Where does she presently live?
2  A.  Michigan.
3  Q.  When was the last time that you and Paiton lived
4     together?
5  A.  A year ago, little over a year ago.
6  Q.  Did you live with Paiton up to the time you moved to
7     California?
8  A.  Off and on.
9  Q.  What do you mean by that?
10  A.  She also resided with her father.
11  Q.  Are you guys -- unfortunately some of these questions
12     end up getting a little more personal, but I try to
13     keep them more in a general context for my purposes.
14     So I don't think I'll ever get too far just as a
15     preface.
16          But are you divorced?
17  A.  Yes.
18  Q.  From Paiton's father?
19  A.  Yes.
20  Q.  When did you get divorced?
21  A.  2012.
22  Q.  2012 up to the time you moved to California did you
23     have a custody share agreement?
24  A.  No.
25  Q.  So can you explain to me the living arrangements for

Page 12

1     Paiton in that time period?
2  A.  She lived with her father, and then she would come and
3     live with me at times.
4  Q.  Who was -- where was her primary residence?
5  A.  It's hard to say.  It was about equal.
6  Q.  Was there a set scheduled where certain days of the
7     week and every other weekend she would live in a
8     certain place or was it kind of as she saw fit?
9  A.  Exactly.  As she saw fit.
10  Q.  Was there any method to her timing in which in certain
11     instances she would come stay with you versus her
12     father?
13  A.  Yes.
14  Q.  Could you explain?
15  A.  She would stay with me more after the incident.
16  Q.  Why is that?
17  A.  Because we're very close and she had security and
18     safety there.
19  Q.  Prior to the incident was there any reason she would
20     stay with her father over you?
21  A.  No.
22  Q.  We might get into this a little later, but you say
23     close.
24          Could you describe what you mean by close?
25  A.  In reference to?

Page 13

1  Q.  Your relationship.  You said she was close and kind of
2     a security blanket.
3          Can you explain what you mean by that?
4  A.  We have a very close mother-daughter relationship.
5     She knows she can come to me with anything.  She can
6     talk to me about anything and it's nonjudgmental and
7     I'm in her corner.
8  Q.  Was it always?  Has it is always been that way?
9  A.  Yes.
10  Q.  Have you ever had an estranged relationship with your
11     daughter?
12  A.  No.
13  Q.  Never had any issues where -- strike that.
14          I'll ask a little more later.
15          Talking a little bit about your background,
16     are you currently employed?
17  A.  Yes.
18  Q.  What do you do for a living?
19  A.  Registered nurse navigator.
20  Q.  How long have you been in that job?
21  A.  One year.
22  Q.  That was -- that's in California?
23  A.  Yes.
24  Q.  Did you do that as well when you lived in Michigan?
25  A.  No.

4 (Pages 10 to 13)

Janet Desantis
September 23, 2019

|  | Page 14 |
|---|---|

1   Q.  What did you do when you were living in Michigan?
2   A.  Registered nurse inpatient oncology.
3   Q.  How many years have you been in nursing?
4   A.  Seven.
5   Q.  Prior to that what did you do?
6   A.  Cosmetology and had a daycare.
7   Q.  Where are you currently employed?
8   A.  Loma Linda University health system.
9   Q.  What's the address?
10  A.  11234 Anderson Street, Loma Linda, 92354.
11  Q.  When you were in Michigan, where were you employed?
12  A.  Sparrow Health System in Lansing, Michigan.
13  Q.  That took -- that would be at the time of the
14      incident?
15  A.  Yes.
16  Q.  And prior?
17  A.  Yes.
18  Q.  When did you start there?
19  A.  2012.
20  Q.  What year did you -- I don't think I asked this.  What
21      year did you get divorced?
22  A.  2012.
23  Q.  Have you spoken with your -- what's the name of
24      Paiton's father?
25  A.  Stuart Bater.

|  | Page 15 |
|---|---|

1   Q.  Have you spoken with Stuart about the incident?
2   A.  Yes.
3   Q.  Is there a reason he's not a plaintiff in this
4       lawsuit?
5   A.  I don't know.
6   Q.  Is he making a claim as a parent such as you have
7       brought in this case for Paiton?
8   A.  No.
9           MR. WEGLARZ:  I can tell you I don't
10      represent the father.
11  BY MR. SAFRA:
12  Q.  Have you discussed --
13  A.  Actually I have to say I'm not sure, but.
14  Q.  Have you discussed with him whether he -- about your
15      claim?
16  A.  I'm sorry.  What was that?
17  Q.  Have you discussed with him your claim?
18  A.  Yes.
19  Q.  What have you talked about?
20  A.  I've talked about the incident in detail and what took
21      place afterwards, and that Fieger Law represents us.
22  Q.  Did he ask whether he is included in this claim --
23  A.  No.
24  Q.  -- or whether he has a claim?
25  A.  No.

|  | Page 16 |
|---|---|

1   Q.  Did you discuss with him whether he should also bring
2       a claim?
3   A.  No.
4   Q.  We're here to talk about a trip to Jamaica.
5   A.  Correct.
6   Q.  And that trip was in May of 2015?
7   A.  Yes.
8   Q.  Prior to May of 2015 had you taken vacations before?
9   A.  Yes.
10  Q.  Can you tell me some vacations that you took prior?
11  A.  To visit relatives in Oregon, Texas, Wisconsin,
12      Illinois.
13  Q.  Did you ever go outside of the country?
14  A.  Yes.
15  Q.  Where did you go to?
16  A.  Jamaica.
17  Q.  Could you tell me about that?
18  A.  That was December 2001, went with my husband and
19      employees from his work.
20  Q.  Where did you go in Jamaica?
21  A.  Montego Bay.
22  Q.  Did you stay at a resort?
23  A.  Yes.
24  Q.  What resort?
25  A.  Wyndham.

|  | Page 17 |
|---|---|

1   Q.  Was there a name of the Wyndham hotel or is it just
2       The Wyndham?
3   A.  The Wyndham.
4   Q.  In Montego Bay, Jamaica?
5   A.  Yes.
6   Q.  How long did you stay there?
7   A.  I don't recall.
8   Q.  What was the name of the business that was associated
9       with the trip for your husband's work?
10  A.  Wilson Marine Corporation.
11  Q.  Wilsa or Wilson?
12  A.  Wilson.
13  Q.  Marine?
14  A.  Uh-hum.
15  Q.  M-A-R-I-N-E.
16  A.  Uh-hum.
17          MR. WEGLARZ:  Yes, for the court reporter?
18          THE WITNESS:  Yes.
19  BY MR. SAFRA:
20  Q.  That is one of those instances and I didn't even catch
21      it.  I appreciate it.
22          How long did you stay?
23  A.  I'm not certain.
24  Q.  Who booked the trip for you?
25  A.  Wilson Marine Corporation.

5 (Pages 14 to 17)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 18

1  Q.  Was this a promotion?  Was this a work kind of
2      seminar?
3  A.  It was a work seminar.
4  Q.  Who on your end between your husband and yourself was
5      responsible for ensuring that the travel arrangements
6      for that trip were coordinated or kept?
7  A.  Neither.
8  Q.  When you were going on that trip, did you find out
9      where are we going, what time is the flight, how long
10     are we staying, where are we staying, things of that
11     nature?
12 A.  Yes.
13 Q.  How did you find out that information?
14 A.  Through Wilson Marine.
15 Q.  Did they provide you e-mails?  Documents?
16 A.  No.
17 Q.  Okay.
18 A.  Documents.
19 Q.  Do you receive the documents from his employer and it
20     has your travel information or itinerary?
21 A.  I don't recall.
22 Q.  Did you ever speak with anybody prior to going to that
23     trip to Montego Bay about the travel and what was
24     to go on while you were there?
25 A.  Yes.

Page 19

1  Q.  Who did you speak to?
2  A.  My husband.
3  Q.  Did you speak to anybody with his employer?
4  A.  No.
5  Q.  Did you speak to any travel agents?
6  A.  No.
7  Q.  Did you speak to anybody associated with the
8      coordination of the trip?
9  A.  No.
10 Q.  So for that Montego Bay trip the only person you spoke
11     to in advance was your husband?
12 A.  Yes.
13 Q.  Did you go online at the time to do any investigation
14     or looking into the Wyndham hotel you were going to
15     stay at?
16 A.  No.
17 Q.  Did you look into anything about Montego Bay or
18     Jamaica?
19 A.  No.
20 Q.  Did you see any advertisements or promotional
21     documents regarding Montego Bay, Jamaica or The
22     Wyndham prior to going?
23 A.  Yes.
24 Q.  What did you see?
25 A.  We had a packet that had the resort we would be

Page 20

1      staying at, some pictures and some information.
2      That's all I remember about it.
3  Q.  Was that part of the documentation provided to you by
4      the employer?
5  A.  Yes.
6  Q.  Anything else?
7  A.  No.
8  Q.  At that time did you ask yourself any questions about
9      the neighboring facility or area that were of
10     importance to you before you travelled?
11 A.  Yes.
12 Q.  What?
13 A.  Was it safe?
14 Q.  Did you do anything to find out the answer to that
15     question before you went to Montego Bay, Jamaica?
16 A.  Asked people who had been there.
17 Q.  What did you find out?
18 A.  I don't recall.  I don't recall.
19 Q.  But at that time before you went to Montego Bay you
20     had asked yourself whether it was safe?
21 A.  Yes.
22 Q.  Why did you ask yourself that question?
23 A.  Because I was going out of the country.
24 Q.  Was this the first time you had been out of the
25     country?

Page 21

1  A.  Yes.
2  Q.  Other than asking some friends, did you do anything
3      else prior to your trip to Montego Bay -- I think you
4      said in 2001?
5  A.  Yes.
6  Q.  Making sure I got date right -- to find out whether
7      Jamaica was safe?
8  A.  No.
9  Q.  Do you have any specifics about what you were told by
10     your friends when you inquired about safety relative
11     to Jamaica in 2001?
12 A.  Yes.
13 Q.  What?
14 A.  As long as you stay within the resort you're safe.
15 Q.  Were you told anything about a specific resort?
16 A.  No.
17 Q.  Were you told anything with regard to outside the
18     resort, that it was unsafe?
19 A.  Yes.
20 Q.  What were you told?
21 A.  That it was best to travel with a group or with a tour
22     guide.
23 Q.  Do you know why or what was the basis for this
24     statement?
25 A.  There were drugs, people approached you.  It was just

6 (Pages 18 to 21)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 22

1     best to have somebody with you.
2   Q.   Anything else?
3   A.   No.
4   Q.   So having this thought or concern of yours and finding
5     out this information, did it prevent you from going on
6     the trip to Montego Bay, Jamaica?
7   A.   No.
8   Q.   When you were in Montego, Bay, Jamaica what did you
9     do?
10  A.   Spent time on the resort, went with a group to Dunn's
11    River Falls and went on a boat tour.
12  Q.   Did you find that it was safe?
13  A.   Yes.
14  Q.   Were you approached by anyone in the manner in which
15    your friends had told you while you were at Dunn's
16    River Falls or on the boat tour either in route or
17    physically there?
18  A.   No.
19  Q.   Did you look around and see anything of concern
20    relative to Jamaica that either substantiated or one
21    way or the other things you had heard about safety
22    pretrip?
23  A.   No.
24  Q.   Did you think to yourself once you left Jamaica in
25    2001 anything about safety in the context in which

Page 23

1     your friends told you based -- in comparison your
2     personal experience?
3   A.   No.
4   Q.   Other than that trip to Montego Bay, Jamaica in 2001
5     have you had any other vacations or trips outside the
6     country before the May 2015 Jamaica trip?
7   A.   No.
8   Q.   Had your daughter?
9   A.   No.
10  Q.   Was her first trip outside the country when you went
11    to Jamaica in May 2015?
12  A.   Yes.
13  Q.   For the trip in May 2015 to Jamaica -- strike that.
14         Sometimes this happens in bouncing around a
15    little bit and I apologize for this, but could you
16    give me a brief kind of background of your education?
17  A.   Graduated high school in 1987, went to cosmetology
18    school in 1994, and started school in -- around 2009
19    for nursing.
20  Q.   What degrees or certifications do you have?
21  A.   Bachelor of Science in nursing, certified med-surg
22    nurse RN.  That's it.
23  Q.   When did you get your RN?
24  A.   In 2012.
25  Q.   And your bachelor degree?

Page 24

1   A.   Possibly 2016.
2   Q.   So then prior to 2012 I think you said you worked in
3     cosmetology.
4         What was your position?
5   A.   I went to clients' homes and did their hair.
6   Q.   Okay.
7   A.   And worked off and on in a salon.
8   Q.   Sorry for that sidetrack but I had forgotten to ask
9     that.
10        Let's go back to the trip to Jamaica that's
11    the subject of this litigation in May 2015.  You went
12    to a resort in Jamaica?
13  A.   Yes.
14  Q.   What resort did you go to?
15  A.   Beaches Boscobel, Ocho Rios.
16  Q.   Who traveled with you?
17  A.   Margaret Torralva, Amber Torralva and Paiton Bater.
18  Q.   Who is Margaret Torralva?
19  A.   My friend.
20  Q.   Any familial relation, like family?
21  A.   Oh, no.
22  Q.   The other individual that you named is Amber Torralva.
23        Is that Margaret's daughter?
24  A.   Yes.
25  Q.   Is she friends with Paiton Bater?

Page 25

1   A.   They grew up together.
2   Q.   You paused for a second.
3         Is there some context in which -- are they
4     acquaintances?  Not friends?
5   A.   We didn't live close to where they were friends.
6     Friends has different meanings but it was more like
7     cousins is how they sort of were.  They didn't go out
8     and do things together.  They just didn't live close
9     enough.
10  Q.   Are you friends with Margaret?
11  A.   Yes.
12  Q.   What's your friendship like?
13  A.   It was great.
14  Q.   Clarifying that, is it more that you and Margaret were
15    friends and that's Margaret's daughter so when you
16    guys get together, you know, they were in a sense
17    close because you guys were longtime friends
18    situation?
19  A.   Yes.
20  Q.   How many years have you guys been friends?
21  A.   31.
22  Q.   How do you know Margaret?
23  A.   We worked together.
24  Q.   Did you guys book the trip to Jamaica in May of 2015
25    together?

7 (Pages 22 to 25)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 26

1   A.  No.
2   Q.  Who booked the trip for you?
3   A.  I did.
4   Q.  Who did you book the trip for?  You, your daughter?
5   A.  And Margaret and her daughter.
6   Q.  You booked the trip for all four?
7   A.  Yes.
8   Q.  When I asked you if you booked together, can you
9       explain to me what's the difference when you said no,
10      versus you booking on behalf of all four?
11  A.  Well --
12  Q.  Maybe you didn't understand my question.
13          MR. WEGLARZ:  Go ahead.
14          THE WITNESS:  I --
15  BY MR. SAFRA:
16  Q.  I asked if you booked --
17          MR. WEGLARZ:  You can explain it.
18  BY MR. SAFRA:
19  Q.  I asked if you booked the trip together.
20  A.  I thought you meant if we both --
21          MR. WEGLARZ:  She physically did it.
22          THE WITNESS:  -- did work on the booking.
23      I did all of the booking.
24  BY MR. SAFRA:
25  Q.  So you booked this trip for all four of you.

Page 27

1   A.  Yes.
2   Q.  What's the difference between that and working on the
3       booking together?
4   A.  We didn't work on the booking together.
5   Q.  What does working on the booking together mean?
6   A.  Speaking with the representative, the travel agent.
7   Q.  So you both speak to the travel agent?
8           MR. WEGLARZ:  No.  Go ahead.
9           MR. SAFRA:  Let her testify.
10          MR. WEGLARZ:  I will.
11          THE WITNESS:  No.
12          MR. SAFRA:  She's the witness.
13          MR. WEGLARZ:  I know.
14          MR. SAFRA:  I know you know that but -- if
15      you want to object, you can object.
16          MR. WEGLARZ:  Steve -- but you're -- she
17      answers then you try to say just the exact opposite.
18          MR. SAFRA:  No.  I am actually just asking
19      for clarification.
20  BY MR. SAFRA:
21  Q.  I asked you point blank, and I thought clearly, did
22      you book on behalf of everybody and you said no and
23      then you said you did.  So I'm trying to find out --
24  A.  You asked --
25          MR. WEGLARZ:  You didn't say on behalf.

Page 28

1           THE WITNESS:  You asked if we booked the
2       trip together.
3   BY MR. SAFRA:
4   Q.  Did Margaret do any part of any portion of the
5       booking, speaking to people, doing anything?
6   A.  Only paying her bill.
7   Q.  Other than paying her bill, who booked on behalf of
8       all four of you?
9   A.  I did.
10  Q.  Was the paying of the bill done electronically or via
11      telephone?
12  A.  I believe --
13  Q.  Like, via e-mail or online is what I meant by
14      electronically.
15  A.  Yeah, I don't recall.
16  Q.  When you say working -- and again, I'm not trying to
17      confuse.  I'm just trying to get clarity.
18          When you say working on the booking
19      together, the part that Margaret was involved in is --
20      in terms of what you were calling working is paying
21      her portion of the bill?
22  A.  Yes.  As well as researching the resort or looking
23      online at the resort.
24  Q.  We'll get to the resort because the resort you're
25      speaking of is the Moon Palace Jamaica's Grand Resort?

Page 29

1   A.  Yes.
2   Q.  Other than looking into the Moon Palace Jamaica Grand
3       and paying her bill was the rest of the booking for
4       the four of you all handled by you?
5   A.  Yes.
6   Q.  Can you take me through when you booked what did you
7       do you to book the trip first?
8   A.  I got online and found a travel agent that looked like
9       a reputable travel agent and just dialed their number
10      and came across a travel agent that seemed very nice
11      and accommodating.
12  Q.  Were you looking for a trip to a specific location?
13  A.  Yes.
14  Q.  What were you looking for?
15  A.  One in Jamaica that was near waterfalls.
16  Q.  How did this trip come about?
17  A.  I had gone in 2001 with my husband, and my daughter
18      reminded me throughout her life that she wanted me to
19      take her to Jamaica.  So I told her after I graduated
20      that I would take her to Jamaica, and so that is what
21      I gave her for her 21st birthday.
22  Q.  How did it come to be that Margaret was part of the
23      trip?
24  A.  We were good friends and we talked all the time, and I
25      told her that I was going to go and if she wanted to

8 (Pages 26 to 29)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 30

1    go and, you know, bring somebody with, that she was
2    more than welcome.  I wasn't going to go just Paiton
3    and I.
4    Q.   So I went online and found a travel agent.  Did you
5    then call that travel agent that same day?
6    A.   I don't recall.
7    Q.   Did you see different travel agents or did you do a
8    search and found the first one?
9    A.   The first one.  I did a search and found the first
10    one.
11   Q.   Do you recall what your search terms were?
12   A.   I don't.
13   Q.   Do you recall what site you used to search?
14   A.   I don't.
15   Q.   Did you go to any resort websites at that time?
16   A.   Yes.
17   Q.   What sites did you go to?
18   A.   Moon Palace.
19   Q.   You went to the Moon Palace website?
20   A.   Yes.
21   Q.   How did you get to that website?
22   A.   I don't recall.
23   Q.   Do you recall that it had its own website or was it on
24    a website with many hotels?
25   A.   I believe it had its own website.

Page 31

1    Q.   So you went searching for a resort and a travel agent?
2    A.   Yes.
3    Q.   Was the Moon Palace open and in existence at the time
4    you were searching?
5    A.   It appeared as though it was from the website.
6    Q.   Can you describe the website?
7    A.   Only thing I can recall is there was a purple color on
8    it.
9    Q.   Did it say anything other than Moon Palace Jamaica
10    Grand Resort?
11   A.   I don't recall.
12   Q.   Did it say Sandals?
13   A.   I don't recall.
14   Q.   Did it say Beaches?
15   A.   I don't recall.
16   Q.   Did it have any other hotels in Jamaica or in the
17    Caribbean as options?
18   A.   I don't recall.
19   Q.   To the extent that Moon Palace does not have its own
20    website, could you have been on a travel agent's
21    website that was advertising the Moon Palace?
22   A.   I don't recall.
23   Q.   So you don't know whose website it was that you were
24    on or even if it was affiliated with the hotel itself.
25    You just know it was about Moon Palace?

Page 32

1    A.   Yes.
2    Q.   As to the travel agent website was that the same
3    website or a different website?
4    A.   I don't recall.
5    Q.   Did you go to any other websites in finding where it
6    is in Jamaica you wanted to go other than one that
7    referenced Moon Palace and one for the travel agent
8    you ultimately called?
9    A.   Yes.
10   Q.   What other websites?
11   A.   I don't recall the websites.
12   Q.   What were they about?
13   A.   Other resorts in the area.
14   Q.   Do you recall which resorts?
15   A.   I don't.
16   Q.   Why did you choose Moon Palace -- strike that.
17        Let me start with did you choose Moon
18    Palace ultimately?
19   A.   Yes.
20   Q.   Why did you choose Moon Palace over these other
21    resorts?
22   A.   It had the location that we wanted and the amenities
23    that would be good for the girls.
24   Q.   When you say location do you mean near waterfalls?
25   A.   Yes.

Page 33

1    Q.   Anything else?
2    A.   No.
3    Q.   So in terms of the location on the island other than
4    being in proximity to the waterfalls, was there
5    anything else of consideration to you?
6    A.   No.
7    Q.   In terms of amenities, what amenities do you mean?
8    A.   I don't remember exactly, but things that were
9    appropriate for their age to keep them entertained
10    within the resort because we wanted to stay on the
11    resort for a good part of the time.
12   Q.   How old was your daughter?  Oh, she was 21.
13   A.   21.
14   Q.   Was she already 21 or turning 21?
15   A.   When I booked?
16   Q.   Yes.
17   A.   She turned 21 on March 23rd.  I don't know what date
18    it was booked.
19   Q.   But she turned 21 before the trip?
20   A.   Yes.
21   Q.   I have the Complaint and I see a reference to February
22    16th of 2015 as the booking date, and we'll get into
23    it, but for frame of reference.
24   A.   Okay.
25   Q.   The Complaint is that initial document your counsel

9 (Pages 30 to 33)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 34

1      filed in this lawsuit.
2  A.   Okay.
3  Q.   Was one of the amenities water activities and boat or
4      snorkeling, beach access and things of that nature?
5  A.   Yes.
6  Q.   Are you aware that they serve alcohol at that hotel?
7  A.   Yes.
8  Q.   Was your daughter permitted to drink?
9  A.   Yes.
10 Q.   Had she drank before, to your knowledge, this
11     vacation?
12 A.   A little.
13 Q.   With regard to the booking did you speak to
14     Margaret -- you said you spoke to Margaret about the
15     trip obviously before you did searching for the travel
16     agent.
17 A.   Yes.
18 Q.   What did you discuss?
19 A.   Different options, different resorts, and the dates
20     that we would be available.
21 Q.   Did Margaret ask you any questions about your
22     experience with your prior trip to Jamaica?
23 A.   No.
24 Q.   Did she ask you anything about whether you thought
25     Jamaica was safe?

Page 35

1  A.   I don't remember.
2  Q.   Did you say to her that you had previously heard that
3      there was some safety concerns with Jamaica?
4  A.   Can you ask that again?
5  Q.   Did you say anything to her that you were previously
6      aware or told by friends back in 2001 that there were
7      safety concerns in Jamaica?
8  A.   No.
9  Q.   Did you tell her that you were aware you should stay
10     at the resort and if you left the resort you should be
11     with groups?
12 A.   Yes.
13 Q.   Did you tell her why?
14 A.   Yes.
15 Q.   What was the reason for why?
16 A.   Because people will approach you wherever you go and
17     being that we were, you know, just the four of us, we
18     wanted to stay within a group, travel with a tour
19     guide.
20 Q.   And you mentioned in terms of approach in the context
21     of drugs.  Was there any other concern other than
22     trying to sell drugs?
23 A.   No.
24 Q.   So the safety concern was more being approached by
25     people involving the potential sale of drugs?

Page 36

1  A.   Yes.
2  Q.   Did you do anything online to see, prior to this May
3      2015 trip, either at the time of booking or prior, to
4      see if there was any other type of safety concern in
5      Jamaica?
6  A.   No.
7  Q.   Did you call anyone or do anything to try to figure
8      out one way or the other whether there were any safety
9      issues in Jamaica other than the selling of drugs?
10 A.   No.
11 Q.   Were you concerned whether there were any other safety
12     concerns?
13 A.   No.
14 Q.   Did anything prevent you from doing any online
15     research or calling anyone to find out if there was
16     anything to be concerned about in terms of safety in
17     Jamaica on a resort or outside?
18 A.   No.
19 Q.   Did you have an opportunity to do that if you had
20     wanted to prior to May of 2015?
21 A.   An opportunity meaning.
22 Q.   You could have called, you could have gone online,
23     anything prevent you from doing that?
24 A.   No.
25 Q.   When you found the travel agent site do you recall the

Page 37

1      name of the travel agent?
2  A.   Yes.
3  Q.   What was the name?
4  A.   Stetson Arriola.
5  Q.   That's the name of the person --
6  A.   The person.
7  Q.   -- or the company?
8  A.   That's the person.
9  Q.   Did that person work for a company?
10 A.   Yes.
11 Q.   What company?
12 A.   Fun Jet I believe.
13 Q.   Do you recall anything else about the website for that
14     agency?
15 A.   No.
16 Q.   I think you said you found a reputable agency.  I'm
17     not trying to put words in your mouth, but I think you
18     said you found a travel agency that looked reputable.
19 A.   Yes.
20 Q.   Was there anything about that website that you recall
21     that led you to conclude that it was reputable?
22 A.   I don't recall but I do know that I -- I must have
23     looked possibly at reviews or something.  I'm not
24     sure.
25 Q.   Did they advertise on their site actual resorts that

10  (Pages 34 to 37)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 38

1    they could book?
2    A.  I don't remember.
3    Q.  Did you call them first or communicate with them
4    online relative to this booking?
5    A.  Called them first.
6    Q.  When you called could you tell me what was first
7    discussed?
8    A.  I discussed that me and my girlfriend and our two
9    daughters wanted to go on a trip to Jamaica and we
10   needed help planning it.
11   Q.  At that time you had spoken to Margaret obviously
12   already about the trip?
13   A.  Yes.
14   Q.  She had said they wanted to go with you and your
15   daughter?
16   A.  Yes.
17   Q.  Did she give your authorization to book the trip on
18   behalf of all four of you?
19   A.  Yes.
20   Q.  Did she give you any restrictions on the booking?
21   A.  Just dates.
22   Q.  Did you have authorization from Margaret on behalf of
23   her and her daughter and on behalf of your daughter to
24   agree to any terms and conditions of the stay that the
25   travel agent provided to you as part of this booking?

Page 39

1    A.  It wasn't discussed.
2    Q.  When you booked the trip, you had authority to do
3    anything associated with that booking in terms of the
4    reservation on behalf of Margaret, her daughter, and
5    your daughter, correct?
6    A.  Yes.
7    Q.  After the initial booking, confirmation of the booking
8    when you called Fun Jet did at any time prior to the
9    actual trip in May 2015 Margaret contact you and say
10   You no longer have authorization to act on my behalf
11   relative to this booking?
12   A.  No.
13   Q.  Did either of your daughters?
14   A.  No.
15   Q.  We'll get into them but it's my understanding there
16   were subsequent conversations after that initial one
17   between you and a member of Fun Jet; is that correct?
18   A.  Yes.
19        MR. SUAREZ:  Can we take a quick break?
20        MR. SAFRA:  Can I just finish this one line
21   or is it urgent?  That's fine.  We can stop.
22        (Off the record at 9:00 a.m.)
23        (Back on the record at 9:10 a.m.)
24   BY MR. SAFRA:
25   Q.  I have handed you, Janet, what I've marked as Exhibit

Page 40

1    No. 1.  And this is -- and it's Bates-stamped on the
2    bottom response to discovery page 1 through 49.
3         MARKED FOR IDENTIFICATION
4         DEPOSITION EXHIBIT 1
5         9:10 a.m.
6    BY MR. SAFRA:
7    Q.  Do you see that?
8    A.  Yes.
9    Q.  I'm not going to ask you about all the pages but I
10   wanted to show you because the name Stetson Arriola
11   came up.
12        Do you see Stetson Arriola's name at the
13   top of page 1?
14   A.  Yes.
15   Q.  This is part of an e-mail that's been produced by
16   Vacations To Go, and there are pages that have
17   confirmations of the trip that involve you and list
18   some information for you with address and e-mails, if
19   you look on page 3.
20        Have you seen this document before?
21   A.  Page 3, I have.
22   Q.  So let's focus on page 3, then.  Do you see Stetson
23   Arriola listed as the agent in trip confirmation?
24   A.  Yes.
25   Q.  When did you see this?  Because it says Dear

Page 41

1    Ms. DeSantis at the top.
2         Was this sent to you before the trip in May
3    of 2015?
4    A.  Before the trip, yes.
5    Q.  And Stetson Arriola is associated or an employer or
6    affiliated with Vacations to Go per this document,
7    correct?
8    A.  Yes.
9    Q.  You had said Fun Jet earlier.  Did you mean Vacations
10   to Go?
11   A.  I did.
12   Q.  So when you -- the online travel agent you found and
13   you said you called Stetson, Stetson is with Vacations
14   to Go to your knowledge?
15   A.  To my knowledge.
16   Q.  Now, also I see that you have a pad in front of you.
17   A.  Yes.
18   Q.  I have seen in the deposition when you got back the
19   top page is clean but you have notes partway through
20   the pad and I would like to see them.
21        MR. WEGLARZ:  Let me see it.
22        MR. SAFRA:  For the record I believe that
23   we are allowed by law to see any notes that the
24   plaintiff has in front of her at the deposition.
25        MR. WEGLARZ:  A lot of this is privileged.

11 (Pages 38 to 41)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 42

1    MR. SAFRA:  Privilege has been waived for
2  the record.
3    MR. WEGLARZ:  How?  She has not testified
4  from this.
5    MR. SAFRA:  She has it in front of her, and
6  she has been writing additional notes just now on the
7  break, and she's had it accessible to her in front of
8  her during the deposition.  So my position is that's
9  something that is now, at least limited to the
10  document itself, subject to production.
11    MR. WEGLARZ:  I disagree.
12    MR. SAFRA:  We'll mark it and we'll keep it
13  so it's preserved, and we'll argue about that at a
14  later date before the Court.
15    MR. WEGLARZ:  Fine.
16    MR. SAFRA:  So we'll mark that as Exhibit
17  2, and for now privilege has been asserted over
18  Exhibit 2.
19    MR. WEGLARZ:  That's fine.
20    MARKED FOR IDENTIFICATION
21    DEPOSITION EXHIBIT 2
22    9:13 a.m.
23    MR. SAFRA:  By agreement can we just to
24  make sure it's kept in its place afterwards like she
25  can keep it and not attach it?

Page 43

1    MR. WEGLARZ:  I'll keep it.
2    (Off the record at 9:13 a.m.)
3    (Back on the record at 9:15 a.m.)
4  BY MR. SAFRA:
5  Q.  When we left off before the break, we were talking
6    about subsequent conversations to the initial one
7    between you and who we now know as Vacations to Go.
8    Do you recall that?
9  A.  Yes.
10  Q.  I probably was going a little too fast.  During the
11    initial conversation between you and Vacations to Go
12    did you actually book the trip during that first call?
13  A.  I don't remember.
14  Q.  If not was it within a few days or so after that
15    initial call?
16  A.  It was within the month I believe.
17  Q.  For each -- did you always after that initial call,
18    call Vacations to Go relative to this booking up until
19    the time it was booked or did you ever deal with them
20    online?
21  A.  I don't believe I did online.
22  Q.  Is there something that causes you pause that there's
23    another means of communication other than telephone?
24  A.  No.  I was trying to replay the question.
25  Q.  Not a problem.  That is fair.

Page 44

1    Did you speak with anybody else at any time
2  prior to this day other than Stetson Arriola relative
3  to making the booking?
4  A.  Yes.
5  Q.  Who else did you speak to?
6  A.  I don't know her name at all, another travel agent
7    that I had called that didn't have -- I don't recall
8    exactly, but the conversation didn't go -- I think the
9    conversation just didn't go beyond we want to book
10    this trip.
11  Q.  Let me ask you this then.  And I think -- because I
12    think I follow where you're going:
13    Was it another travel agent whose
14    information you found that you called to inquire about
15    making the trip?
16  A.  Yes, through Vacations to Go.  There was another
17    travel agent.
18  Q.  Another travel agent employed with Vacations to Go?
19  A.  Yes.
20  Q.  Did you also speak to individuals regarding payment
21    once you made the booking or was that also Stetson?
22  A.  I don't remember.
23  Q.  Do you recall ever receiving a phone call to make a
24    payment?
25  A.  I don't remember if I received a phone call or if it

Page 45

1  was done while I was on a phone call.
2  Q.  How was the payment set up?  Was it, you know, when
3    you made the booking, you gave them a credit card and
4    they charge you on certain dates before the trip, or
5    did you have to contact each time to make partial
6    payments?
7  A.  I believe we paid all at once, a deposit and then the
8    balance at a different time, I think.
9  Q.  I believe you're correct.  I'm not trying to confuse
10    you.
11    So when you made subsequent payments did
12    you do that by telephone or online?
13  A.  Telephone.
14  Q.  Each time you spoke to somebody relative to the
15    payments or the booking was it always somebody who you
16    understood to be employed by Vacations to Go?
17  A.  Yes.
18  Q.  Do you recall the names of any of the other
19    individuals?
20  A.  I don't.
21  Q.  Other than Stetson Arriola and individuals who called
22    you from Vacations to Go did you speak to anybody else
23    who's not Margaret or Paiton or Amber about the trip
24    prior to going to Jamaica in May 2015?
25  A.  No.

12  (Pages 42 to 45)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 46

1   Q.   And I mean that in terms of booking.  Everybody who
2        you spoke to relative to making the booking and the
3        payments and the travel was all with Vacations to Go?
4   A.   Yes.
5   Q.   When you called to make the booking, did you already
6        have a hotel of interest that you were specifically
7        requesting to book at?
8   A.   Yes.
9   Q.   Did you ever talk to anyone from Vacations to Go about
10       other resorts that provide similar amenities in
11       Jamaica near the waterfalls that might be available to
12       you, maybe a less expensive or better location?
13  A.   I may have, but we were particularly interested in
14       Moon Palace.
15  Q.   And Moon Palace was going to be a new resort at that
16       time then.  It was not open but was supposed to be
17       open before your trip, correct?
18  A.   No.
19  Q.   Explain.
20  A.   It was going through renovations and renovations
21       weren't done for the travelers to come in and stay.
22  Q.   At some point -- have we discussed everything that you
23       spoke about with Stetson before actually making the
24       reservation for the stay at Moon Palace that you
25       recall?

Page 47

1   A.   Yes.
2   Q.   Did at any time Stetson say -- or did you inquire with
3        Stetson about anything and he said I honestly don't
4        know?
5   A.   No.
6   Q.   Was he able to answer all of your questions relative
7        to the stay?
8   A.   Yes.
9   Q.   And the booking?
10  A.   Yes.
11  Q.   Did Margaret or your daughter or her daughter ask you
12       to find out anything specifically about the hotel or
13       the stay or Jamaica itself --
14  A.   No.
15  Q.   -- prior to the trip?
16  A.   No.
17  Q.   Ultimately you did not stay at the Moon Palace,
18       correct?
19  A.   Correct.
20  Q.   What hotel did you stay at?
21  A.   Beaches Boscobel in Ocho Rios.
22  Q.   Now, Beaches, what is Beaches?
23  A.   The resort.
24  Q.   Is that a hotel brand to your knowledge?
25  A.   I don't know.

Page 48

1   Q.   Was Moon Palace Jamaica Grand Resort and Spa
2        associated with Beaches to your knowledge?
3   A.   Not to my knowledge.
4   Q.   Do you know if it was associated with any particular
5        hotel brand like Hilton?
6   A.   I'm not aware.
7   Q.   You received a -- you have the Complaint in front of
8        you.  You received a phone call from someone from
9        Vacations to Go regarding the unavailability of Moon
10       Palace because of the renovations not been completed?
11  A.   Yes.
12  Q.   Do you recall when that telephone call took place?
13  A.   Yes.
14  Q.   Was it during the -- do you know when?
15  A.   Yes.
16  Q.   Do you have a specific date?
17  A.   Yes.
18  Q.   What date?
19  A.   April 1st, 2015.
20  Q.   How long did that call last?
21  A.   I don't recall.  Best of my knowledge between five and
22       ten minutes.
23  Q.   Was it during that call that you chose another resort
24       to stay at in Jamaica?
25  A.   Yes.

Page 49

1   Q.   Did you ever have any subsequent telephone calls to
2        that five to ten minute call with Vacations to Go
3        regarding the hotel before your trip?
4   A.   Regarding which hotel?
5   Q.   The hotel you were then going to stay at that you
6        switched to?
7   A.   No.
8   Q.   In that five to ten minute telephone conversation what
9        was discussed?
10  A.   Stetson called me and said the Moon Palace was not
11       going to be available, open to the public and that I
12       needed to choose -- that they would supplement with
13       another vacation package that was in comparison to
14       what we were paying and where we were going and what a
15       new resort offered.
16  Q.   When you say they, you mean Vacations to Go would
17       supplement?
18  A.   Yes.
19  Q.   Did Vacations to Go give you options of other
20       comparable resorts?
21  A.   Yes.
22  Q.   Do you recall what resorts?
23  A.   Sandals or Beaches Boscobel in Ocho Rios and one other
24       one.
25  Q.   Do you recall the other one?

13  (Pages 46 to 49)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 50

1  A.  I don't.
2  Q.  Do you recall if it was a Sandals or Beaches hotel or
3      a different hotel brand name like Hilton?
4  A.  I don't.
5  Q.  Were there any requests by you to only be offered
6      comparable hotels associated with a certain brand?
7  A.  No.
8  Q.  Do you even know if there was any relation in terms of
9      brand or business between the two hotels offered to
10     you?
11  A.  No.
12  Q.  Did Vacations to Go push one hotel over the other?
13  A.  I had asked his opinion.
14  Q.  What did he say?
15  A.  I had asked him -- he called and said, we can't --
16      Moon Palace isn't going to open.  We have to pick
17      between these two.  One was the Beaches resort that we
18      stayed at.  And I said Okay let me call you back so
19      that I can -- I wasn't the only one paying the bill.
20         So that I can speak with Margaret and the
21      girls and we can look online at the two and pick out
22      which one we want.  He said, we can't do that.  We
23      have to make a decision while we're on the phone.  And
24      I said, I can't call the -- I'm not paying for this
25      whole thing.  And he said No, we have got to get this

Page 51

1      reserved.  We have to do it during this phone call.
2         I said, okay.  What are my choices?  He
3      gave me my choices.  I said, I have no idea about
4      either one of them.  What do you recommend?  And he
5      highly recommended the Beaches.  And I can't recall if
6      it was because he had been there or his friend or
7      family had been there.
8  Q.  That call, you made a -- I think the verbiage in the
9      complaint is a split-second decision and agreed to
10     rebook the vacation at that resort?
11  A.  Yes.
12  Q.  On behalf of all four of you?
13  A.  Yes.
14  Q.  Subsequent to that call when you eventually told
15      Margaret and your daughters of the change in the
16      resort, did any of them say No, don't do it, or Let's
17      not go, I don't like that hotel?
18  A.  No.
19  Q.  Did anybody express a desire to cancel and not go to
20      that resort?
21  A.  No.
22  Q.  When you were on that phone call and made the
23      split-second decision, where were you?
24  A.  Standing in my backyard on Luce Road.
25  Q.  Outside?

Page 52

1  A.  Yes.
2  Q.  Did you have a computer with you?
3  A.  No.
4  Q.  Were you using a smart phone to do any online research
5      or anything while you were talking to Stetson?
6  A.  No.  I would not have known how.
7  Q.  Doing my part to make sure I understand the
8      circumstance:
9         So it would be fair to say then that at the
10      time you chose the Beaches Ocho Rios resort had you
11      ever seen any information regarding the hotel online?
12  A.  No.
13  Q.  Had you ever seen any pamphlets or advertisements
14      regarding the Beaches Ocho Rios resort?
15  A.  No.
16  Q.  The only information you had on the Beaches Ocho Rios
17      resort is what Stetson verbally gave to you in that
18      five to ten minute telephone conversation?
19  A.  Yes.  The main thing was it was a family-oriented
20      resort.
21  Q.  Any other specifics that you recall he told you?
22  A.  I don't recall anything else.
23  Q.  Did you ask him while in that telephone call anything
24      about safety at the resort or outside the resort in
25      the surrounding areas?

Page 53

1  A.  No.
2  Q.  Did you ask him about its proximity to the waterfalls?
3  A.  No.  I asked him -- I knew it was in Ocho Rios from
4      what he said.
5  Q.  And you knew Ocho Rios was either the location or in
6      close proximity to the Dunn's River Falls?
7  A.  Yes.
8  Q.  I think those are the waterfalls.
9  A.  Yes.
10  Q.  After that telephone conversation did you do any
11      online research relative to the Beaches Ocho Rios
12      Resort?
13  A.  Yes.
14  Q.  What did you do?
15  A.  Got online to look to see what the resort looked like
16      and what it offered.
17  Q.  Do you recall what website your went to?
18  A.  I don't.
19  Q.  Do you recall if it was the actual hotel website or a
20      travel agency advertising or mentioning the website?
21  A.  I don't recall.
22  Q.  How many times did you go online?
23  A.  Multiple but I don't recall how many.
24  Q.  Did you go just to see information on that actual
25      hotel?

14  (Pages 50 to 53)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 54

1  A.  Yes.
2  Q.  Did you do any research or online searching for
3      activities in -- surrounding the resort in Jamaica?
4  A.  No.
5  Q.  Did you look into any safety concerns?
6  A.  No.
7  Q.  Was safety a concern for you before you went?
8  A.  Yes.  Because I was traveling out of the country.
9  Q.  Did you do anything to look into or satisfy yourself
10     of any concerns?
11  A.  Yes.  I asked -- when Stetson told me what resort it
12     was and he said it was family oriented, I felt that we
13     would be safe because I had always heard as long as
14     you stay within the resort, you're safe.
15  Q.  Did you do anything else other than speak to Stetson
16     to satisfy your concern?
17  A.  No.
18  Q.  Did you rely on Stetson's representation to you
19     regarding it being family oriented?
20  A.  Yes.
21  Q.  As a basis to satisfy your concerns?
22  A.  Yes.
23  Q.  Was there any aspect of the amenities offered by the
24     Beaches Ocho Rios Resort itself that you relied upon
25     as satisfying any safety concerns you had other than

Page 55

1      Stetson's representation that it's family oriented?
2      Anything you read, anything else you saw?
3  A.  I don't recall.
4  Q.  Did you understand the Beaches Ocho Rios Resort to be
5      an all-inclusive resort?
6  A.  Yes.
7  Q.  What does that mean?
8  A.  All meals were provided, drinks if you wanted were
9      provided, the water sports -- some of the water sports
10     were provided, and use of the entire resort and the
11     beach.
12  Q.  Did you understand it to be an all-inclusive vacation
13     before you went?
14  A.  Yes.
15  Q.  Did any aspect of the fact that this is an
16     all-inclusive vacation have any relation to satisfying
17     any concerns you might have had relative to safety?
18  A.  Yes.
19  Q.  In what way?
20  A.  I knew that -- I didn't know.  I assumed that we --
21     that people from the outside would not be coming in
22     and approaching us.
23  Q.  So from a drug relation standpoint?
24  A.  Yes.
25  Q.  Did you have any other safety concerns before you went

Page 56

1      to Jamaica other than related to drugs in 2015?
2  A.  No.
3  Q.  Where you lived in Michigan at the time, how far away
4      is that from Detroit, a major city?
5  A.  Hour and a half.
6  Q.  Have you been to Detroit?
7  A.  Yes.
8  Q.  Many times in that time period before the trip?
9  A.  Yes.
10  Q.  Is there any reputation of crime or safety concerns in
11     Detroit?
12  A.  Yes.
13  Q.  What did you understand those to be at that time?
14  A.  There's shootings.
15  Q.  Is there any drug safety concerns or any other crime
16     you're aware of?
17  A.  That I am aware that occurs in Detroit?
18  Q.  Yes.
19  A.  Yes, drugs and prostitution and murder.
20  Q.  And rape?
21  A.  I never thought of that.
22  Q.  Prior to the trip to Jamaica had you ever gone to
23     Detroit with your daughter?
24  A.  No.
25  Q.  Did you ever have any safety concerns going into

Page 57

1      Detroit?
2  A.  No.  Because I was always with a male companion or a
3      group.
4  Q.  Had you thought about not going into the nearest major
5      metropolitan city with this reputation of crime
6      without a male companion or group and decided not to
7      prior to this trip?
8  A.  I don't recall.
9  Q.  Was it a conscious decision of yours prior to this
10     trip -- let me rephrase.
11         Was it a conscious decision not to go with
12     just your daughter alone?
13  A.  Yes.
14  Q.  For fear of safety?
15  A.  Yes.
16  Q.  And this is prior to May 2015?
17  A.  Yes.
18  Q.  And not safety concerns related to just drugs?
19  A.  I was afraid of the homeless too.
20  Q.  Did you ever have any similar concerns before you went
21     to Jamaica to look into those aspects that are
22     non-drug related since you were traveling without a
23     male companion or a group more than just Margaret and
24     her daughter?
25  A.  No, because we were staying within the resort.

15 (Pages 54 to 57)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 58

1   Q.  But were you going outside the resort, right?
2   A.  With a travel guide -- not a travel guide.  Well, it
3       was travel that was set up through --
4   Q.  An excursion?
5   A.  Yes.
6   Q.  Who did you book the excursion through?
7   A.  I don't know.
8   Q.  And this was a waterfalls and a boat activity, right?
9   A.  That was in 2001.
10  Q.  Okay.
11  A.  This was just waterfall.
12  Q.  So the May 2015 trip, it was just the waterfall
13      excursion?
14  A.  Yes.  And then shopping.
15  Q.  Were those two things booked in advanced of your stay?
16  A.  Yes.
17  Q.  Did you book them through Vacations to Go?
18  A.  No, no.
19  Q.  How did you book those two activities?
20  A.  I don't recall the waterfall.  The shopping, I believe
21      was booked through the resort.
22  Q.  Okay.
23  A.  I don't recall.
24  Q.  When you went to the hotel in Jamaica in Ocho Rios and
25      you were there May 2015, let's talk about the

Page 59

1       waterfalls.
2               How did you get there?
3   A.  A bus.
4   Q.  Do you recall anything about the bus?  Was there a
5       sign on the outside?  Was there a company name?
6   A.  I don't recall.
7   Q.  Was it just the four of you?
8   A.  No.  There was others on the bus, but I don't know how
9       many.
10  Q.  What about the shopping?  Did you walk there or take a
11      vehicle?
12  A.  We took another bus.
13  Q.  Was it with a group of people?
14  A.  We were with our own group, and then there were some
15      other travellers on the bus too.
16  Q.  Was everybody staying at the hotel?
17  A.  Yes.
18  Q.  When you went on these -- let's say for the shopping,
19      did you go to kind of like a big market area or
20      outdoor --
21  A.  A small outdoor market area.
22  Q.  Was there --
23  A.  -- souvenir shops.
24  Q.  A few blocks?
25  A.  Yes.  About two blocks.

Page 60

1   Q.  How many guides were with you?
2   A.  We had the bus driver, and he dropped us off right at
3       the shopping area.
4   Q.  The bus driver took you there and dropped you off
5       and --
6   A.  And stayed there and waited for us.
7   Q.  In the car?
8   A.  In the van -- in the bus.
9   Q.  And then you were free to walk around on your own?
10  A.  Yes.
11  Q.  And you did?
12  A.  Yes.
13  Q.  Did you have a male companion or a group to stay with
14      you or did the four of you just start shopping?
15  A.  We just shopped.
16  Q.  Okay.
17  A.  It was all tourists.
18  Q.  Did you make any requests to have a male companion or
19      a guide with you?
20  A.  No.
21  Q.  Did you have any safety concerns while you were
22      shopping on your own?
23  A.  Yes.
24  Q.  Tell me about that.
25  A.  I just let the girls know -- and we all stayed

Page 61

1       together with the girls, but to stay within that
2       shopping area because it was all tourists in that
3       area.
4   Q.  Did you tell your daughters and Margaret why?
5   A.  No.
6   Q.  Had you discussed with them previously why?
7   A.  Probably.  I don't know.
8   Q.  Going back -- and we'll get back to the stay, but
9       going back to the booking aspect, I think we were
10      talking about after you had the five to ten minute
11      telephone call and made the decision to switch to
12      Beaches Ocho Rios Resort for the four of you, other
13      than going to a website for the resort, did you ever
14      see any type of advertising or receive any other type
15      of advertising or promotional material regarding the
16      Beaches Ocho Rios Resort?
17  A.  No.
18  Q.  Did you ever see anything on TV or in a newspaper or
19      magazine or on a billboard regarding that resort?
20  A.  That resort?
21  Q.  Yes.
22  A.  No.
23  Q.  With the online search you did as to the amenities at
24      the Beaches Ocho Rios Resort after it was booked with
25      Stetson or when you rebooked, do you recall any

16  (Pages 58 to 61)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 62

1    specifics other than what we discussed regarding the
2    hotel that you read?
3 A. No.
4 Q. Did you ever do any research regarding other
5    activities such as shopping in Jamaica before your
6    stay?
7 A. Not shopping.
8 Q. What did you do?
9 A. Just waterfalls.
10 Q. Searching for other waterfalls other than Dunn's
11    River?
12 A. Yes.
13 Q. What did you find?
14 A. It's called the blue hole or the black hole.
15 Q. You did some research regarding other potential
16    activities?
17 A. Yes.
18 Q. Did you go to blue hole or black hole?
19 A. Yes.
20 Q. How did you get there?
21 A. Bus.
22 Q. Did you also book an excursion?
23 A. I pre-booked that before we went.
24 Q. With Vacations to Go?
25 A. No.

Page 63

1 Q. Who did you book that through?
2 A. I don't recall.
3 Q. Do you recall if it was online?
4 A. Yes.
5 Q. Was it through -- how did you get there?
6 A. I searched --
7 Q. Sorry. Let me rephrase. How did you get to this blue
8    or black hole?
9 A. How did I get there that day or how did I navigate --
10 Q. Yes, that day.
11 A. Bus.
12 Q. Was it just the four of you?
13 A. No. There were other people on the bus.
14 Q. Were they staying at the hotel or were they already on
15    the bus and kind of bouncing from resorts picking up
16    people?
17 A. I believe we were the only ones from that resort.
18 Q. There were other individuals from other resorts or
19    tourists that the bus would then come and pick you up
20    also?
21 A. Yes.
22 Q. Do you recall the name of the company that you booked
23    that through?
24 A. I don't.
25 Q. But it wasn't the hotel?

Page 64

1 A. No.
2 Q. Did you look into whether that company was reputable
3    and safe?
4 A. I believe I did.
5 Q. What did you do to satisfy yourself that it wasn't
6    just some random, untrustworthy company coming to pick
7    you up and take you to a waterfall you have never been
8    to?
9 A. When I research anything like that, I read reviews.
10 Q. When you say reviews do you mean kind of like Trip
11    Advisor reviews or Yelp reviews?
12 A. No. The review is from whatever site it was I was on.
13 Q. Okay. Reviews that prior customers may have left?
14 A. Yes.
15 Q. Did you look into otherwise any safety in the area of
16    the waterfall where you're going?
17 A. No.
18 Q. Did you know if there was a bus driver that was just
19    going to drop you off at this waterfall and you may be
20    approached by people trying to sell you drugs?
21 A. I was not aware.
22 Q. Knowing what you had been told and going to a place
23    that's outside the premises of a resort with a company
24    that you found online, you just trusted prior customer
25    reviews and that was enough to satisfy any safety

Page 65

1    concerns that there may be locals in the area that
2    approach you --
3          MR. WEGLARZ: Asked and answered.
4 BY MR. SAFRA:
5 Q.  -- you're not wanting to put yourself in the position
6    of?
7          MR. WEGLARZ: She's already answered that.
8 BY MR. SAFRA:
9 Q. You can answer again.
10 A. I'm sorry. You've got to ask again.
11          MR. SAFRA: Can you repeat the question?
12    (The requested portion of the record was
13    read by the reporter 9:34 a.m.)
14 Q. Knowing what you had been told and
15    going to a place that's outside the
16    premises of a resort with a company that
17    you found online, you just trusted prior
18    customer reviews and that was enough to
19    satisfy any safety concerns that there may
20    be locals in the area that approach you --
21          MR. WEGLARZ: Same objection. Answer one
22    more time.
23          THE WITNESS: Oh, my gosh that is
24    confusing.
25 BY MR. SAFRA:

17 (Pages 62 to 65)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 66

1  Q.  The customer reviews were enough to satisfy any
2      concerns you had?
3  A.  I still warned the girls to stay with us after the
4      customer reviews.
5  Q.  That did not prevent you from going?
6  A.  Correct.
7  Q.  Did you make sure that you were going to have a guide
8      or some sort of individual there with you, not just
9      staying on a bus?
10 A.  There was a guide that was with us the whole time.
11 Q.  Did you go to any other sites to check whether -- or
12     make any phone calls or ask anyone when you got to the
13     hotel regarding safety in that area of the blue or
14     black hole waterfalls before you went?
15 A.  No.
16 Q.  I don't think I asked this.  After the call with
17     Stetson where the re-booking to the Beaches Ocho Rios
18     resort, how many times did you go online to the
19     website you referenced that you couldn't recall
20     regarding that hotel?
21 A.  Multiple.
22 Q.  Okay.
23 A.  I don't recall how many.
24 Q.  Did you look into anything safety-wise regarding that
25     hotel after the call?

Page 67

1  A.  No.
2  Q.  Did anything prevent you from looking into anything?
3  A.  No.
4  Q.  Prior to May 2015 had you ever heard of a company
5      named Unique Vacations?
6  A.  Prior to the booking?
7  Q.  Prior to this day in May of 2015.
8  A.  During the booking I know that there were a few names
9      that were thrown around, but I thought that Stetson,
10     maybe he worked for these other few that I saw.  I
11     mean it was not a concern because --
12 Q.  I'm asking what you know.  I don't want you to say now
13     you think or guess or what you may have learned
14     through names that are put in this lawsuit.
15         I'm asking what did you know prior to your
16     stay and what you had heard?
17         You've identified Stetson associated with
18     Vacations to Go, correct?
19 A.  Correct.
20 Q.  You mentioned the name Fun Jet at first, which we've
21     now corrected that it was Vacations to Go, correct?
22 A.  Yes.
23 Q.  When did you hear the name Fun Jet?
24 A.  I came across it somewhere in the online paperwork
25     that Stetson sent me.

Page 68

1  Q.  To be fair some of the online paperwork is in front of
2      you marked as Exhibit 1 and on page 3 there's a
3      reference to Fun Jet.
4  A.  Yes.
5  Q.  Take your time and you can look through this, but in
6      these documents, for example, there is no reference to
7      a Unique Vacations.  You can take your time to look
8      through this.
9  A.  Sure.
10 Q.  Other than the paperwork that you got and the
11     telephone conversations, I want to know specifically
12     what you recall.
13         Prior to May 2015 had you ever heard of a
14     company named Unique Vacations or the general
15     statement you made earlier, the one like Fun Jet and
16     stuff that you're talking about?
17 A.  I had not heard of Unique Vacations before.
18 Q.  Had you ever spoken to anybody that you had associated
19     with working for Unique Vacations?
20 A.  No.
21 Q.  Had you ever heard of Sandals Resorts International?
22 A.  Yes.
23 Q.  In what context?  And this is prior to --
24 A.  TV advertising.
25 Q.  So you'd heard of Sandals hotel or the company named

Page 69

1      Sandals Resorts International?
2  A.  Sandals Resorts.
3  Q.  So the name Sandals Resorts.  In what context?  Have
4      you seen an advertisement?
5  A.  Yes.  Advertisement on TV.
6  Q.  Do you know what hotel?
7  A.  No.
8  Q.  Do you recall anything about the advertisement?
9  A.  No.
10 Q.  Do you recall where you were?
11 A.  When I saw it on TV?
12 Q.  Yes.
13 A.  At home.
14 Q.  Do you know how many times?
15 A.  Multiple.
16 Q.  Did this happen before May 2015?
17 A.  Yes.
18 Q.  Did it have anything to do with the booking of this
19     trip?
20 A.  The booking of the initial trip or when we were going
21     then to the --
22 Q.  2015 trip.
23 A.  We chose Moon Palace.
24 Q.  What is Moon Palace?
25 A.  I don't think they are affiliated with Sandals.

18  (Pages 66 to 69)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 70

1   Q.   The advertisement with Sandals that you saw have
2        anything to do with booking of this trip for May 2015?
3   A.   Oh, no.
4   Q.   Do you know of any relation between Sandals or Beaches
5        if any?
6   A.   Yes.
7   Q.   What?
8   A.   That Sandals owns Beaches.
9   Q.   How do you have that knowledge?
10  A.   I don't know if I knew it especially before I went
11       there.  I knew it was a Sandals resort, so I -- but
12       I -- I know once we were there, it was on the notepad
13       that I took my notes on and it was on --
14  Q.   It said Sandals?
15  A.   Yes.
16  Q.   At a Beaches hotel --
17  A.   Yes.
18  Q.   -- it said Sandals?
19  A.   Yes, un-hum.  There were different little
20       advertisement things.
21            MR. WEGLARZ:  That was a yes, by the way?
22            THE WITNESS:  Yes.
23  BY MR. SAFRA:
24  Q.   Prior to the stay, though, did you know of any
25       association between Sandals and Beaches?

Page 71

1   A.   Yes.
2   Q.   What was your understanding prior to arriving at the
3        hotel that there was an association?
4   A.   That it was a Sandals resort.
5   Q.   How did you have that knowledge that the Beaches Ocho
6        Rios Resort was a Sandals resort?
7   A.   I believe from Stetson.
8   Q.   Did Stetson say anything else about those brand names
9        and relationships?
10  A.   I don't recall.
11  Q.   Do you recall exactly what Stetson said to you?
12  A.   He said it was a family-oriented resort, it's Beaches
13       and somehow relevant to Sandals.
14  Q.   Do you recall specifically what he said?
15  A.   I don't.
16  Q.   Is that the extent of your recollection?
17  A.   Yeah.
18  Q.   So other than a reference to Sandals Resorts, had you
19       ever heard or spoken to anybody with a company called
20       Sandals Resorts International prior to May 2015?
21  A.   I had heard of Sandals Resorts.  I don't recall if it
22       was Sandals Resorts International.
23  Q.   Fair enough.  What about a company called Unique
24       Travel Corporation?
25  A.   No.

Page 72

1   Q.   What about a company called Unique Vacations Limited?
2   A.   No.
3   Q.   When I say what about, I'm talking about if you spoke
4        to or knew of the existence of such a named company.
5   A.   No.
6   Q.   I just want to make sure we're on the same page.  You
7        said, no, but you understood my question?
8   A.   Yes.
9   Q.   Sometimes that happens with double negatives.  I'm
10       just trying to speed some of this up.
11            What about a company named Mark Travel?
12       Prior to May 2015 had you ever heard of that company
13       or spoken with someone to your knowledge that worked
14       for them?
15  A.   I don't believe so.
16  Q.   Prior to May 2015 did you know of any relationship
17       other than Sandals and Beaches brands to the extent
18       you talked about your conversation with Stetson
19       between any of those entities, Mark Travel?  Unique
20       Vacations?
21  A.   No.
22  Q.   The resort brands?
23  A.   No.
24  Q.   Did you know of any relationship --
25  A.   No.

Page 73

1   Q.   -- other than what you've told us?
2   A.   No.
3   Q.   What about the relationship between any of those
4        companies and the two identified by you as Vacations
5        to Go and Fun Jet?
6            MR. WEGLARZ:  I'm sorry.  Can you -- when
7        you say those companies --
8   BY MR. SAFRA:
9   Q.   We mentioned Sandals Resort International.  We
10       mentioned Unique Vacations, Inc., Unique Vacations
11       Limited, Unique Travel Corp and Mark Travel.
12  A.   Yes.
13  Q.   Did you have any knowledge or information regarding
14       any relationship whatsoever between those entities and
15       Vacations to Go or Fun Jet?
16  A.   No.
17  Q.   And when I say relationship, I mean business or
18       corporate, whether one owns one or anything of that
19       sort.
20            Did you understand that?
21  A.   Yes.
22  Q.   Vacations to Go is a travel agent, correct?
23  A.   My understanding is a travel company.
24  Q.   You referenced a travel agency, travel agent.  I'm not
25       saying there's a difference between travel company.

19 (Pages 70 to 73)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 74

1    I'm not trying to get a legal context.
2         My question is more you understand it to be
3    as travel company then?
4    A.  Yes.
5    Q.  What is that?
6    A.  A company that helps you plan trips.
7    Q.  Did you understand them to own the actual hotel or
8    cruise or trip?
9    A.  To own it, no.
10   Q.  To your knowledge, they are a facilitator of
11   organizing and selling the trip?
12   A.  Yes.
13   Q.  Would you agree that the travel company such as
14   Vacations to Go does not hire employees that work at
15   the resort?
16   A.  Yes.
17   Q.  And they are not responsible for paying and keeping
18   the day-to-day activities at the hotel, employees and
19   so on?
20   A.  To the best of my knowledge, yes.
21   Q.  That would be the responsibility of the owner or
22   operator of the hotel?
23        MR. WEGLARZ:  Form objection.
24   BY MR. SAFRA:
25   Q.  Correct?

Page 75

1         MR. WEGLARZ:  No foundation.  Answer if you
2    can.
3         THE WITNESS:  Can you repeat it?
4    BY MR. SAFRA:
5    Q.  The running of the hotel, hiring of employees and
6    serving the food and drinks and doing the activities,
7    it's the hotel itself that's responsible for those --
8         MR. WEGLARZ:  Form objection.  No
9    foundation.  You can answer if you can.
10        THE WITNESS:  Best of my knowledge.
11   BY MR. SAFRA:
12   Q.  Before you went to the trip in May 2015, did you
13   expect that it was the Beaches Ocho Rios Resort that
14   was the one that was running the hotel portion and
15   Vacations to Go was simply coordinating and booking
16   and confirming your trip and travels?
17   A.  Yes.
18   Q.  If there was a company that Vacations to Go was
19   working with to assist them in their obligations to
20   you relative to the booking separate from the hotel
21   operator would you also expect their role to be
22   limited in the same respect as Vacations to Go?
23        MR. WEGLARZ:  Form objection.  No
24   foundation.
25        THE WITNESS:  I don't know.

Page 76

1    BY MR. SAFRA:
2    Q.  Let's refer to it this way, a travel company as you
3    referred to Vacations to Go, would you expect that
4    there's a similarly situated travel company in a role
5    such as Vacations to Go here that was helping them,
6    that they also would have a capacity limited in the
7    same respect and not be an operator in the hotel?
8         MR. WEGLARZ:  Form objection.  No
9    foundation.
10        THE WITNESS:  I wouldn't know.
11   BY MR. SAFRA:
12   Q.  Do you know who manages the Beaches Ocho Rios Resort?
13   A.  I don't.
14   Q.  Do you know who owns it?
15   A.  Yes.
16   Q.  Who?
17   A.  Stuart.  I forget his last name.
18   Q.  How do you know who owns the hotel?
19   A.  Because I knew -- I was told that he knew about the
20   incident within hours of it happening.
21   Q.  When you were at the resort afterwards, after the
22   incident?
23   A.  Yes.
24   Q.  Prior to your stay did you have any knowledge of who
25   owns the hotel?

Page 77

1    A.  No.
2    Q.  Do you have any basis to say that this individual owns
3    the hotel or just someone told you this person knows
4    of this?
5    A.  He owns Sandals Resorts in the Caribbean.
6    Q.  How do you know that?
7    A.  Because I looked online.
8    Q.  What website did you go to that said that?
9    A.  I don't recall.
10   Q.  Do you believe everything you read on the Internet?
11        MR. WEGLARZ:  Now you're arguing with her.
12        MR. SAFRA:  I'm not arguing, but she's
13   making statements that she claims are facts, but she
14   doesn't have any personal knowledge.  And it's
15   actually an inaccurate fact and statement.
16        So I think it's appropriate that she answer
17   truthfully.  The answer should be I read online that
18   it says this but I don't know.
19        MR. WEGLARZ:  Okay.  Tell me how you want
20   her to answer the next question and we'll have you
21   provide the answers.
22        MR. SAFRA:  I am entitled to ask my
23   follow-up questions.
24        MR. WEGLARZ:  Your question is does she
25   believe everything she reads online?

20  (Pages 74 to 77)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 78

1  BY MR. SAFRA:
2  Q.  Do you have any personal knowledge who owns the resort
3      other than what you have read on the internet?
4  A.  Other than what I read on the Internet and was told by
5      somebody who lives in Jamaica, no.
6  Q.  Who is this individual that lives in Jamaica?
7  A.  Violet Dell.
8  Q.  Who is that?
9  A.  She -- I would have to look back through my notes, but
10     she met with us at the new resort that we were put in
11     afterwards to discuss what happened kind of.  She was
12     some sort of -- I don't know.  To talk with the girls
13     like in therapy-type thing.
14 Q.  I had asked you how you knew, and you said you read it
15     on the internet.  And now someone actually told you
16     that too?
17 A.  Correct.
18 Q.  They told you that this Stuart individual is the
19     owner?
20 A.  Yes.  She actually told me first.  Then I went online
21     and looked.
22 Q.  What's the person's last name?
23 A.  Dell.
24 Q.  No.  Stuart.  Sorry.  What is Stuart's last name?
25 A.  Oh, Stuart.  I don't recall.  I would have to think

Page 79

1      about it.
2  Q.  Do you have any other basis for knowing whether or who
3      owns the resort?
4  A.  No.
5  Q.  Do you know who owns Vacations to Go?
6  A.  No.
7  Q.  Do you know who owns Mark Travel?
8  A.  No.
9  Q.  Do you know who owns Unique Vacations?
10 A.  No.
11 Q.  Do you know who owns Fun Jet?
12 A.  No.
13 Q.  Do you know if there is any relationship between Mark
14     Travel or Unique Vacations, Inc., or Unique Vacations
15     Limited or any travel company or corporation or
16     Vacations to Go or Fun Jet and the Beaches Ocho Rios
17     Resort?
18 A.  Relation?
19 Q.  Yes.  Like ownership relation?
20 A.  I am not aware of any relation.
21 Q.  Or that they are in the same group of companies.  I'm
22     not talking whether they have a business contract or
23     something.
24     MR. WEGLARZ:  Form objection.  Go ahead.
25     MR. SAFRA:  Are you objecting because I

Page 80

1  listed all entities for the sake of time or are you
2  objecting to the question on what basis?
3      I'm trying to shortcut this by listing all
4  the entities in one question but I can break them up
5  into 10 questions if you need.
6      MR. WEGLARZ:  I placed a form objection.
7      MR. SAFRA:  And I'm entitled to know the
8  basis.  So what's the basis of the objection, so I can
9  see if I need to clean it up.
10     MR. WEGLARZ:  If that's what we are going
11 to do, because you're asking her about a relationship
12 and then you conditioned it, was it a business
13 relationship.  So clarify what --
14     MR. SAFRA:  I didn't condition.  I said in
15 terms of ownership or in the same group in which they
16 are owned by or operated by the same people, not
17 whether they have a contract and are two different
18 companies like Walmart or Target or someone who sells
19 products to Walmart as an example.
20 BY MR. SAFRA:
21 Q.  Someone who sells products to Walmart is not owned by
22     Walmart.  Do you understand they're two different
23     companies and Walmart just sells it for them?
24 A.  Correct.
25 Q.  That's a business relationship.  They are not owned by

Page 81

1  the same people.  They are not related.
2      Do you understand that aspect?
3  A.  Yes.
4  Q.  So with that context I'm asking do you have any
5      understanding that Fun Jet or Vacations to Go or Mark
6      Travel or Unique Vacations, Inc., or Unique Vacations
7      Limited or Unique Travel Company have any ownership or
8      relationship to the Beaches Ocho Rios Resort?
9      MR. WEGLARZ:  Same objection.
10     THE WITNESS:  I'm not aware.
11 BY MR. SAFRA:
12 Q.  So in my example of like a Walmart and a third party,
13     if there is any relationship would that be more
14     appropriate of your understanding?
15     MR. WEGLARZ:  More appropriate for what?
16 BY MR. SAFRA:
17 Q.  Like a separate independent contractor type
18     relationship.
19     MR. WEGLARZ:  Form objection.
20     THE WITNESS:  I don't understand the
21     question.
22 BY MR. SAFRA:
23 Q.  Do you know whether any of the Unique named entities
24     that I listed, whether either of them own or operate
25     or have any association with the hotel?

21 (Pages 78 to 81)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 82

1        MR. WEGLARZ: Objection. Compound.
2        THE WITNESS: I'm not aware of any.
3   BY MR. SAFRA:
4   Q.  Do you know that you sued Unique Vacations, Inc.?
5   A.  Do I know that I sued Unique Vacations? I know that
6       they are listed in the names of who the complaints
7       were filed against.
8   Q.  Do you know what Unique Vacations, Inc., does for
9       business?
10  A.  Yes.
11  Q.  What do they do?
12  A.  I believe they represent Sandals.
13  Q.  On what basis do you have that belief?
14        MR. WEGLARZ: Probably through her counsel
15      and she probably should not tell you any more about --
16        MR. SAFRA: Actually there is a complaint
17      and things of that nature.
18  BY MR. SAFRA:
19  Q.  So do you have any --
20        MR. SAFRA: I'm entitled to ask why she
21      understands my client to be in this lawsuit. And
22      there's allegations in the Complaint. If she says --
23  BY MR. SAFRA:
24  Q.  What's your knowledge?
25  A.  My knowledge --

Page 83

1        MR. WEGLARZ: That would be based upon
2      attorney-client discussions, as to --
3        MR. SAFRA: Well, then you can object
4      and --
5        MR. WEGLARZ: -- her understanding --
6        MR. SAFRA: -- tell her not to answer.
7        MR. WEGLARZ: -- as to why UVI is in the
8      lawsuit.
9   BY MR. SAFRA:
10  Q.  My question is what type of business does Unique
11      Vacations, Inc., do?
12        I said what's your basis -- what do mean by
13      that? What do they do for business to your knowledge?
14  A.  I don't know.
15  Q.  What abut Mark Travel Corporation, do you know what
16      they do?
17  A.  I know they are involved -- they are affiliated with
18      Vacations to Go.
19  Q.  What do you mean by affiliated?
20  A.  I don't know.
21  Q.  All of the activities associated with the booking or
22      any online research you did, was that all out of
23      Michigan?
24  A.  Yes.
25  Q.  The travels, as I understand it, to Jamaica you flew

Page 84

1       from Michigan to Jamaica through Atlanta, correct?
2   A.  I believe it was through Atlanta.
3   Q.  Have you ever been to Florida associated with this
4       trip?
5   A.  Yes.
6   Q.  Physically in Florida?
7   A.  Yes.
8   Q.  When did you go to Florida?
9   A.  Oh, associated with the trip. I'm sorry. No.
10  Q.  The payments you made for this trip, did you make them
11      from Michigan?
12  A.  Yes.
13  Q.  Does Margaret live in Michigan?
14  A.  Yes.
15  Q.  You said she made payments. Would the same be
16      applicable to her?
17  A.  Yes.
18  Q.  The final payment after the deposit occurred before
19      the trip, correct?
20  A.  Yes.
21  Q.  Did you understand that prior to your trip if you
22      wanted to you could cancel your trip?
23  A.  Yes.
24  Q.  Did you have an opportunity to cancel if you want?
25  A.  Yes.

Page 85

1   Q.  Did you at any time make any effort to cancel your
2       trip at either the Beaches Ocho Rios Resort or Moon
3       Palace Jamaica Grands Resort?
4   A.  No.
5   Q.  Was there any cancellation policy -- and we can look
6       through these pages because there's different
7       references to it to confirm. I'm not asking
8       specifics.
9        Were there cancellation terms provided to
10      you by Vacations to Go?
11  A.  Yes.
12  Q.  Was there any aspect of those terms regarding the
13      timing or potential change or cost penalties that
14      affected whether you would or wouldn't cancel?
15  A.  Yes.
16  Q.  Can you explain that?
17  A.  I know there was certain time period that you had.
18      There was going to be a loss of some monetary amount
19      but not sure how much.
20  Q.  For example, if you look on page 19 of Exhibit 1,
21      towards the top, there's a reference there that says
22      hotel cancel policy, hotel advisories.
23  A.  Yes.
24  Q.  Vacations to Go is advising that there's a
25      cancellation deadline of three days prior to the

22  (Pages 82 to 85)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 86

1    arrival, late cancellation penalty one night.
2         Do you see that?
3  A.  Yes.
4  Q.  So looking at that for example, so do you mean you
5    could have cancelled it but if it was after the three
6    days there's a penalty?
7         MR. WEGLARZ:  Hold on.
8  BY MR. SAFRA:
9  Q.  I'm not trying to confuse.  There's other places where
10    they say a certain amount of days prior you get a full
11    refund, a partial refund.
12         But I'm staying is that what you're
13    meaning?
14  A.  How did I answer that?
15  Q.  You had answered about there were certain days and it
16    did play a factor in terms of there being a penalty.
17    You had an opportunity to cancel.  You're just saying
18    that depending on the timing there could have been
19    full refund, there could have been penalty of money in
20    part.
21         Is that what you're talking about?
22  A.  I knew that there was a cancellation policy, but I had
23    no reason to cancel at that time.  So I knew I could
24    reference that, but I don't recall what that
25    cancellation policy said.

Page 87

1  Q.  Did you at any time think I want to cancel but because
2    there was a penalty you decided not to?
3  A.  No.
4  Q.  Did Margaret to your knowledge or your daughters?
5  A.  No.
6  Q.  Relative to this trip there's three individuals who
7    are also named defendants, and it is Dwight Davis,
8    Jermaine Dyer and William Tapper.
9         Do you recall those names?
10  A.  Yes.
11  Q.  I'll get into the specifics of their involvement in
12    the context of the incident that's the subject of this
13    litigation.  But I want to ask you some questions
14    about them first.
15         Were they employees of the hotel?
16  A.  Yes.
17  Q.  Do you know who their employer was, the actual
18    company?
19  A.  To my understanding Beaches Boscobel in Ocho Rios.
20  Q.  Did you understand Vacations to Go to be their
21    employer?
22  A.  No.
23  Q.  Or Fun Jet?
24  A.  No.
25  Q.  Or Mark Travel or Unique Vacations, Inc., that are

Page 88

1    also named defendants?
2  A.  Not to my knowledge.
3  Q.  What did you understand their job to be at the hotel?
4  A.  They were lifeguards at the water slide area, water
5    slide and pool area.
6  Q.  Is that because you saw them performing that role when
7    you were at the hotel?
8  A.  They told the girls that and I saw them performing
9    that role.
10  Q.  How many times did you see them prior to the incident?
11  A.  Maybe twice.
12  Q.  At all times as lifeguards?
13  A.  Yes.
14  Q.  There's an allegation in the Complaint in paragraph
15    17.
16  A.  Is that in this same packet?
17  Q.  No, in the Complaint.  And I can give your a copy if
18    you need.  I'll read it to you.  It says that a Mark
19    Travel employee, travel agent, assured you -- it says
20    Bater's mother -- that would be you?
21  A.  Yes.
22  Q.  -- Paiton Bater -- that the resort would be a new
23    resort property that would be safe and fun for
24    families and females -- or females and families.
25         Do you mean to say Vacations to Go because

Page 89

1    you were talking to Stetson?  Who made this -- it says
2    here Mark Travel assures --
3  A.  Stetson.
4  Q.  Are you referring to Stetson?
5  A.  Yes.
6  Q.  So that's Vacations to Go.
7  A.  Okay.
8  Q.  I'm asking.  Is that Vacations to Go?
9  A.  Yes.
10  Q.  When it says here that you booked a family vacation
11    through Mark Travel for all four plaintiffs, are you
12    referring to Stetson?
13  A.  Yes.
14  Q.  I'm not trying to say or go further, I want to make
15    sure that's who you're referencing in this statement.
16    If there's some legal argument that your counsel wants
17    to make, they can preserve that.
18         I'm asking factually that you're
19    referencing in making your statement in paragraphs 16
20    and 17 booking through Mark Travel, you're meaning
21    Stetson.
22  A.  Yes.
23         MR. WEGLARZ:  What complaint are you
24    referring to, which version?
25         MR. SAFRA:  Second amended complaint,

23  (Pages 86 to 89)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 90

1    paragraph 17 and 16.
2    BY MR. SAFRA:
3    Q.  When you say that there were statements about the
4       resort and safe and fun for females and families, are
5       you referring to the Moon Palace resort?
6          Because it is talking about that February
7       booking.
8          MR. WEGLARZ:  Show her the complaint since
9       we're now asking her --
10         MR. SAFRA:  I have a clean copy right here.
11         (Off the record at 10:10 a.m.)
12         (Back on the record at 10:10 a.m.)
13   BY MR. SAFRA:
14   Q.  It says docket entry 1221, that's the reference for
15      the court filing.
16         It talks about in paragraph 16, a February
17      16th, 2015 booking in this context, and it's for the
18      Moon Palace Jamaica Resort.  And then it talks in
19      paragraph 17 that the resort would be a new resort
20      property that was safe and fun for families.  It's
21      talking about the Moon Palace Resort, right?
22         MR. WEGLARZ:  She didn't draft the
23      document, number one.  Do you know if that's referring
24      to the Moon Palace Resort?
25   BY MR. WEGLARZ:

Page 91

1    Q.  It's a new resort property that's being referenced,
2       that would be Moon Palace?
3    A.  It seems to me this would be the Beaches resort.
4    Q.  Did you understand the Beaches resort to be a new
5       resort?
6    A.  Well, it depends on what you mean by new.  I mean, new
7       as in --
8    Q.  This is your Complaint.
9          MR. WEGLARZ:  Well, wait --
10         MR. SAFRA:  Hold on a second.  You can
11      object.  I'm entitled to ask my question.
12         MR. WEGLARZ:  I can respond.
13         MR. SAFRA:  You have to let me finish.  You
14      can't interrupt me.
15         MR. WEGLARZ:  Are you done?
16         MR. SAFRA:  I wasn't done when you started
17      talking.  So you can let me finish, and then you will
18      have an opportunity to talk.
19   BY MR. SAFRA:
20   Q.  This is your Complaint you filed in the action,
21      correct?
22   A.  Yes.
23   Q.  Did you read --
24         MR. WEGLARZ:  Objection.
25   BY MR. SAFRA:

Page 92

1    Q.  -- before you filed?
2          MR. WEGLARZ:  This is not her Complaint.
3       It's filed on her behalf.  She did not sign the
4       Complaint.  She did not draft the Complaint.  I
5       drafted the Complaint based upon the information
6       provided to me at that time.
7          But it is very unfair to this witness to
8       now get her to identify it as her document, and now
9       you're asking questions on what her intent and
10      motivation was behind each specific paragraph.  That's
11      the basis for my objection.
12   BY MR. SAFRA:
13   Q.  Did you review this Complaint before it was filed?
14         MR. WEGLARZ:  No.
15         MR. SAFRA:  Excuse me.  Are you the
16      witness?  Did you --
17         MR. WEGLARZ:  I'm a witness to this.
18         MR. SAFRA:  Hold on.
19         Did you just answer.
20         MR. WEGLARZ:  You're putting on a show in
21      front of --
22         MR. SAFRA:  I'm not putting on a show.  I
23      don't need to put on a show.  I just asked a question
24      and you answered the question, no.  You are not the
25      witness.

Page 93

1          MR. WEGLARZ:  Because you know the answer.
2          MR. SAFRA:  Excuse me.  I'm entitled to ask
3       my questions.  You can object.  The witness, under
4       oath, can answer.
5    BY MR. SAFRA:
6    Q.  Did you --
7          MR. WEGLARZ:  And she has been for hours.
8          MR. SAFRA:  Actually, no, she hasn't.
9          MR. WEGLARZ:  She hasn't been answering --
10         MR. SAFRA:  Now you answered it, so stop.
11         MR. SUAREZ:  Very kindly and very
12      respectfully, if we're going to do this, can we ask
13      the witness to step out.  Then we can clarify the air,
14      so we're not having this argument and coaching the
15      witness.  I know that may not be your intent --
16         MR. WEGLARZ:  Not the intent at all.
17   BY MR. SAFRA:
18   Q.  Going back to my question, which was a very simple
19      question, and I would like an answer from the witness,
20      did you review this Complaint before it was filed?
21   A.  Looking at it, this is not -- no.
22   Q.  Did you review a prior draft version or final version
23      of this Complaint before it was filed?
24   A.  I don't believe so.
25   Q.  The statement in paragraph 16 says, On February 16,

24  (Pages 90 to 93)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 94

1    2015 Plaintiff Bater's mother booked a family vacation
2    through Mark Travel for all four plaintiffs, two
3    mothers and their respective daughters, one of whom
4    was a minor, to stay at the all-inclusive Moon Palace
5    Jamaica Grand Resort & Spa in Ocho Rios, Jamaica from
6    May 5th, 2015 through May 9th, 2015.
7        Do you see that?
8  A.  Yes.
9  Q.  Other than the fact that there's a reference to Mark
10   Travel, and we talked about that being Stetson, is
11   that paragraph truthful and accurate?
12 A.  To the best of my knowledge.  I'm not 100 percent on
13   the dates but otherwise, yes.
14 Q.  If you look at -- and I'll go back to paragraph 17.
15   Then it goes paragraph 17, 18 19 and it goes onto
16   paragraph 20, and 20 starts to talk about that five to
17   ten minute phone call with Stetson where you re-booked
18   at a different resort.
19       Do you see that?
20 A.  Yes.
21 Q.  It's going in time sequential order paragraph to
22   paragraph as to the occurrence of events.  Is that
23   fair?
24 A.  Yes.
25 Q.  When you go from paragraph 16 of the booking and then

Page 95

1    paragraph 17 and a reference to a new resort property,
2    that would be in reference to the Moon Palace Jamaica
3    resort, not the Beaches resort, correct?
4  A.  To the best of my knowledge.
5  Q.  So when there's a reference to safe and fun for
6    friends and family, in the context of Moon Palace,
7    have we discussed all aspects in which you are talking
8    about any conversations with an employee or travel
9    agent in that regard?
10 A.  Yes.
11 Q.  What about in the context of the Beaches Ocho Rios
12   resort, did you have any conversations about safe and
13   fun for females and families other than what we talked
14   about between you and Stetson?
15 A.  What was the initial part of that question?
16 Q.  Did you have any other conversations, anything about
17   this reference to safe and fun for females and
18   families in the context of the Beaches Ocho Rios
19   resort other than the conversation you told us with
20   Stetson?
21 A.  No.
22 Q.  Paragraph 19, on April 1st, 2015, the travel agent
23   from Mark Travel called you and advised that the Moon
24   Palace was no longer available.
25       Do you see that?

Page 96

1  A.  Yes.
2  Q.  Would that be Stetson?
3  A.  Yes.
4  Q.  That's the call that's being referenced?
5  A.  Yes.
6  Q.  Was there any other call with another individual that
7    you would otherwise attribute to that paragraph 19?
8  A.  No.
9  Q.  In paragraph 20, there's -- this is the paragraph that
10   refers to we're talking about with Stetson the five to
11   ten minute call and split-second decision to re-book.
12 A.  Correct.
13 Q.  In paragraph 21, it says within a few days that you
14   and Margaret received a confirming e-mail advising
15   that -- you to review the electronic documents for
16   itinerary accuracy and to advise of any errors.  And
17   the confirming e-mail represented -- it says here that
18   Mark Travel was committed to creating vacations that
19   far exceeded the expectations of every customer and
20   providing end-to-end service every step of the way.
21       Do you see that?
22 A.  Yes.
23 Q.  Is that e-mail from Stetson?
24 A.  Yes.
25 Q.  To the extent that Stetson is employed by Vacations to

Page 97

1    Go, your reference to Mark Travel here is Stetson and
2    Vacations to Go?
3  A.  Yes.
4  Q.  It says in paragraph 22 a reference that unbeknownst
5    to plaintiffs but certainly known by the travel
6    industry, violent crime was and is a serious problem
7    throughout Jamaica.
8        Do you see that?
9  A.  Yes.
10 Q.  Did you ever have any knowledge prior to arrival,
11   prior to the incident that's the subject of this
12   litigation involving your daughter and Margaret's
13   daughter, so even staying at the hotel but before the
14   actual incident -- you understand when I say incident
15   what I'm talking about?
16 A.  Yes.
17 Q.  So before the incident did you ever have any knowledge
18   of any violent crime or serious problems throughout
19   Jamaica other than what you have told us about already
20   today?
21 A.  No.
22 Q.  Do you -- even after the incident, do you have any
23   personal knowledge that Fun Jet was aware of any
24   violent crime or serious problem throughout Jamaica
25   such as even the type of incident here with your

25  (Pages 94 to 97)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 98

1     daughter and Margaret's daughter?
2  A.  I don't know.
3  Q.  Do you know if Vacations to Go had any knowledge of
4     violent crime or serious problems such as the type
5     that is alleged to have occurred here involving your
6     daughter and Margaret's daughter?
7  A.  I don't know.
8  Q.  Would the same be true for Mark Travel?
9  A.  Yes.
10  Q.  And Unique Vacations, Inc.?
11  A.  Yes.
12  Q.  And Unique Vacations Limited?
13  A.  Yes.
14  Q.  The actual Beaches resort?
15  A.  To my knowledge?  I don't know how to answer that.
16  Q.  Do you have any personal or actual knowledge that the
17     resort, that Beach Ocho Rios Resort knew of the
18     existence of crimes such as the one alleged to have
19     occurred here involving your daughter and Margaret's
20     daughter?
21  A.  I don't know.
22  Q.  Do you know if Margaret does for any of those
23     companies?
24  A.  I don't know if she does or not.
25       MR. WEGLARZ:  How are you holding up, all

Page 99

1     right?
2       MR. SAFRA:  I'll be at a good stopping
3     point in a minute.  Just making sure that I'm --
4       (Off the record at 10:20 a.m.)
5       (Back on the record at 10:20 a.m.)
6  BY MR. SAFRA:
7  Q.  The incident here involves -- I said crime before, but
8     we are talking about rape.
9       You understood that?
10  A.  Yes.
11  Q.  Would you agree that the conduct of rape is not
12     something that serves the purpose of hire by the
13     hotel?
14  A.  I would hope not.
15  Q.  Do you agree that a lifeguard that the -- a lifeguard
16     at the occurrence or committing the act of rape is not
17     part of their job responsibilities and duties or
18     obligations?
19  A.  Correct.
20       MR. WEGLARZ:  Form objection.
21  BY MR. SAFRA:
22  Q.  You get that the hotel did not hire them to do such
23     horrendous things?
24  A.  To my knowledge.
25  Q.  So, yes, you would agree with that?

Page 100

1  A.  Yes.
2  Q.  And no part of any such horrendous act would serve the
3     fulfillment of any purpose for which the hotel hired a
4     lifeguard?
5       MR. WEGLARZ:  Form objection.  There's no
6     foundation for any of this.
7  BY MR. SAFRA:
8  Q.  Or any employee for that matter.
9       MR. WEGLARZ:  Same objection.  Calls for
10     legal conclusion too.
11       THE WITNESS:  I would agree.
12  BY MR. SAFRA:
13  Q.  Would you agree that the act of rape by these three
14     individuals as alleged in the Complaint in that manner
15     is outside the course and scope of their work?
16       MR. WEGLARZ:  Form objection.  No
17     foundation whatsoever.
18       Go ahead.
19       THE WITNESS:  I'm not in their interview.
20     I don't know what goes on when they hire these people.
21  BY MR. SAFRA:
22  Q.  They're a lifeguard as you said, right?
23  A.  Yes.
24  Q.  You would agree it is outside the scope of their work
25     as a lifeguard to commit such an act of --

Page 101

1  A.  I don't know --
2  Q.  -- rape?
3  A.  I don't know --
4       MR. WEGLARZ:  Objection.  No foundation.
5       THE WITNESS:  What within their scope is.
6       MR. WEGLARZ:  Same objection.  No
7     foundation, compound.
8  BY MR. SAFRA:
9  Q.  What does a lifeguard do to your knowledge?
10  A.  A lifeguard in the United States -- I have never been
11     a lifeguard, and I've never interviewed a lifeguard,
12     and I've never been interviewed as a lifeguard.
13  Q.  Okay.
14  A.  So to my knowledge, a lifeguard is to make sure nobody
15     gets hurt or drowns.
16  Q.  In that understanding of no one gets hurt or drowns,
17     would you -- if that's the sole purpose and limited
18     scope for which these three individuals work as hired,
19     would you agree that the act of rape is outside the
20     scope of making sure no one drowns or gets hurt?
21       MR. WEGLARZ:  Same objection.  Form, no
22     foundation.
23       Go ahead and answer.
24       THE WITNESS:  I don't believe so.
25  BY MR. SAFRA:

26 (Pages 98 to 101)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 102

1  Q.  Okay.
2  A.  Or I believe it's not outside of the --
3  Q.  You believe it's not outside or you believe it is?
4  A.  I believe it is outside of the scope of what they were
5     expected.  But how would I know?
6  Q.  As a layperson you would expect that a lifeguard is
7     outside the scope of their job and they are not hired
8     to perform such an act of rape?
9        MR. WEGLARZ:  Form objection.
10       THE WITNESS:  In the U.S. from the very
11    little I know about the interview the lifeguard and
12    the hiring, that would be expected to be outside of
13    their scope.
14 BY MR. SAFRA:
15 Q.  Are you aware prior to the incident involving your
16    daughters in May 2015 that any of the three
17    individuals, Dwight Davis, Jermaine Dyer, or William
18    Tapper ever previously had committed an act of rape?
19 A.  Not aware.
20 Q.  Do you know if any employee of the hotel, the Beaches
21    Ocho Rios Resort, ever prior to this incident engaged
22    in an act of rape?
23 A.  Not to my knowledge.
24 Q.  There are references in the Complaint to certain press
25    releases or government-issued statements -- are you

Page 103

1     aware of those -- regarding crime in Jamaica and rape?
2  A.  Am I aware of those or was I aware of those?
3  Q.  Are you aware of those?
4  A.  I am.
5  Q.  Do you know if any of those -- have you read them now?
6     Not at the time but since?
7  A.  Read --
8  Q.  Read these -- and I can go through them all, but for
9     example, the U.S. Embassy state department --
10 A.  What page?
11 Q.  Page 19.  There's a laundry list of things quoted in
12    your Complaint.
13       Have you read all of these since the
14    incident?
15 A.  I read one.
16       MR. SAFRA:  Why don't we take a break.
17       MR. WEGLARZ:  Sure.
18       MR. SAFRA:  So we're off the record.  Now
19    is a good time and you can also read them.
20       (Off the record at 10:26 a.m.)
21       (Back on the record at 10:45 a.m.)
22 BY MR. SAFRA:
23 Q.  Before we took a break, we were talking about certain
24    press releases or news publications that are
25    referenced in the second amended complaint.

Page 104

1        Did you have an opportunity to look through
2     those types of references?
3  A.  Yes.
4  Q.  Had you seen those before today?
5  A.  Before today I'd seen some of them.
6  Q.  Had you -- the first time that you saw any of them
7     after the incident?
8  A.  It was after the incident.
9  Q.  Have you had a chance to look at the various news
10    publications or various government issuances that are
11    referenced in the Complaint just now on a break?
12 A.  Say that again.
13 Q.  Did you have a chance to look at those in the
14    Complaint when we were on a break?
15 A.  To look at --
16 Q.  The different references of the various quotes?
17 A.  Online?
18 Q.  No, in this document?
19 A.  Oh, these here?
20 Q.  Yes.
21 A.  Yes.
22 Q.  To the extent that -- other than what is written here,
23    do you recall anything else from any previous read of
24    these?
25 A.  No.

Page 105

1  Q.  Some of them are quoted, for example, at length on
2     page 19, in this second amended complaint, correct?
3  A.  Some are quoted?
4  Q.  Some of the issuances by the U.S. Department of State
5     or Forbes Magazine --
6  A.  Yeah.
7  Q.  -- that form the basis of your complaint are quoted in
8     your second amended complaint.
9  A.  Yes.
10 Q.  Are you aware of any of these Forbes Magazine or news
11    or government issuances or publications of any of them
12    specifically referencing a prior incidence of rape at
13    the Beaches Ocho Rios Resort, meaning prior to the
14    incident?
15 A.  I don't recall.
16 Q.  To the extent there is information in these one way or
17    the other, would you defer to the actual written
18    publication and government issuance?
19 A.  Yes.
20 Q.  Do you have any personal knowledge outside of these
21    publications of any instance of rape prior to this
22    incident involving your daughter occurring at the
23    Beaches Ocho Rios Resort?
24 A.  Prior, no.
25 Q.  Do you know if any of the named defendants other than

27 (Pages 102 to 105)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 106

1  the three individuals, or even including them, had any
2  such knowledge prior to this incident involving your
3  daughter?
4  A.  I don't know.
5  Q.  Do you have any information that anybody at the hotel
6  prior to this incident had any actual knowledge of any
7  of its employees having ever committed rape before?
8  A.  No.
9  Q.  Do you know the names of the various resorts on the
10  north coast of Jamaica?
11  A.  The only ones that I'm aware of are Moon Palace and
12  Beaches Boscobel where we stayed and Sandals Plan --
13  it was like Sandals Plantation or something where we
14  stayed after the incident.  I know that there's
15  others.  I just don't know the names.
16  Q.  That was my follow-up question.  Are you aware that
17  there are other resorts under different brands that
18  are also on the north coast of Jamaica that are not
19  Sandals or Beaches hotels you just don't know the name
20  of them?
21  A.  I'm not aware if they're Sandals or not, but I know
22  there are other resorts.
23  Q.  Other all-inclusive resorts?
24  A.  Yes.  I am also aware there was a Sandals resort right
25  near where we were staying at the second resort.

Page 107

1  There was another Sandals resort close by too.  I
2  don't know what it was called, though.
3  Q.  Would you agree that the act of rape -- the person
4  that is the perpetrator of such an act is committing a
5  self-serving purpose?
6  A.  Yes.
7  Q.  Going back to the Complaint, if you can turn back
8  to -- what page are you on?
9  A.  19.  This is 19 also.
10  Q.  That's what I was about to say.  There are two 19s.
11  A.  Looks like four.
12  Q.  Turn to the page on the top right page 7 of 32.  I
13  just realized -- file copy, that's fine but I had not
14  realized that before either.  A few 19s.  So let's go
15  by the ones on the top right.
16  MR. SAFRA:  I don't think anything in the
17  record needs to be corrected otherwise.  We were
18  referring to paragraph numbers.
19  BY MR. SAFRA:
20  Q.  Looking on page 7 of 32, in paragraph 22, there's a
21  reference to the various either press releases or
22  government issuances we were just talking about.
23  Do you see that?
24  A.  Yes.
25  Q.  And it says in the context those that these are

Page 108

1  certainly known by the travel industry.
2  Do you see that?
3  A.  Yes.
4  Q.  Do you have any personal knowledge that any particular
5  company in the travel industry was aware of these?
6  A.  I don't know.
7  Q.  Now, for the booking for this trip to Jamaica in May
8  2015, was this the first time you had ever used
9  Vacations to Go?
10  A.  Yes.
11  Q.  Have you used them since?
12  A.  No.
13  Q.  Have you traveled outside the country since May 2015?
14  A.  No.
15  Q.  Has your daughter to your knowledge?
16  A.  No.
17  MR. WEGLARZ:  I just received an
18  announcement that --
19  MR. SAFRA:  Do we need to go off the
20  record?
21  MR. WEGLARZ:  Yeah.
22  (Off the record at 10:53 a.m.)
23  (Back on the record at 11:01 a.m.)
24  BY MR. SAFRA:
25  Q.  We're going to turn our attention now to the actual

Page 109

1  stay at the resort.  My understanding is that this
2  trip took place between May 5 to May 8 of 2015; is
3  that right?
4  A.  Through May 9th.
5  Q.  You ended up staying --
6  A.  It was scheduled through May 9th.
7  Q.  May 5th to May 9th?
8  A.  Yes.
9  Q.  When you arrived at the resort on May 5th of 2019 did
10  you go to the desk first to check in?
11  A.  Yes.  They had us go to the desk through the lobby.
12  Q.  Did everybody check in or did you check in on
13  everybody's behalf?
14  A.  Everybody checked in.
15  Q.  Tell me how that occurred.
16  A.  They had like a little iPad-type thing and we were
17  supposed to read through whatever and sign it.
18  Q.  Whatever, do you mean like registration,
19  documentation?
20  A.  Yes.
21  Q.  Did it contain information about the hotel and maybe
22  terms and conditions about activities or your stay?
23  A.  I have no idea what it contained because the iPad kept
24  turning black.  I don't know if it was turning off or
25  what was going on.  And they would take it from us and

28 (Pages 106 to 109)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

## Janet Desantis
### September 23, 2019

Page 110

1    say It's not working correctly and get it working
2    again.  So we honestly didn't have anything we could
3    read.  But we could sign.
4  Q.  I'm not asking you specifically what it said.  It was
5    whatever you typically find at a hotel where they give
6    you something to sign as part of a registration
7    process?
8           MR. WEGLARZ:  Asked and answered but go
9    ahead.
10 BY MR. SAFRA:
11 Q.  Is that what you understood it to be?
12 A.  Except it was on an iPad, which I wasn't used to, yes.
13 Q.  Understanding what you have told us about how it
14   occurred, you then signed some portion on an iPad?
15 A.  Yes.
16 Q.  Did everybody have to sign?
17 A.  Yes.
18 Q.  They gave you a key and walked you to your room?
19 A.  Yes, they took us to -- yes.
20 Q.  What time of day was this?
21 A.  Somewhere around maybe 1:00 to 2:00 maybe.
22 Q.  The incident itself that's the subject of this lawsuit
23   occurred on May 8th, which is roughly three days
24   later; is that right?
25 A.  Yes, on Friday.

Page 111

1  Q.  Could you tell me what you guys did starting that
2    afternoon of May 5th through the incident -- leading
3    up to the incident.  We'll address the incident --
4  A.  Sure.
5           So the girls were almost always with us,
6    which, I mean, they knew to stay on the resort if they
7    did go off.  But we had a lot of fun together.  So
8    they stayed with us, and they are fun kids to be with.
9    They decided -- I don't know.  I think we hung out at
10   the pool, maybe the hot tub that day altogether.
11          And then the girls decided they were going
12   to eat dinner at a different restaurant than we were
13   that evening because we were going to go to a family
14   picnic, it was called -- over by the water slide area.
15 Q.  Not to interrupt but I like the way you addressed it
16   day by day.
17          So the first day you recall the pool --
18 A.  Oh, you're talking about the first day?
19 Q.  No.  I was talking about all of them but then you
20   started saying the first day.  So I thought maybe that
21   was the way you were addressing it.  You said the
22   first day at the restaurant.  You just meant the
23   restaurant part the first day.
24          When you were testifying just now you
25   talked about going to the pool and the jacuzzi and --

Page 112

1  A.  That was on Friday.
2  Q.  On that Friday you did those activities?
3  A.  Yeah.
4  Q.  So I was saying, okay, let's do it day by day for
5    ease.  You went to separate dinners that first night?
6  A.  No, on Friday we did.
7  Q.  What was the first day?
8  A.  The first day was Tuesday I believe.
9  Q.  That's probably where I got confused.  I apologize for
10   that.
11          Between Tuesday to Friday you did the pool
12   and the beach?
13 A.  Yes.  The pool, the beach.  We did riding on this
14   inflatable tube thing they provided for --
15 Q.  One of the water sports activities at the hotel?
16 A.  Yes.  Shopped around with the vendors on the property
17   there.
18 Q.  Because for people who aren't familiar, haven't been
19   there, there are vendors that sell keepsakes --
20 A.  Yes.
21 Q.  -- local items on property, maybe around the pool or
22   at a hotel shop?
23 A.  Yes.
24 Q.  Keep going.
25 A.  And then the girls toward evening, 5:00, whatever --

Page 113

1  Q.  On Friday?
2  A.  On Friday, the 8th, said they were going to have
3    dinner themselves.  They wanted to go to some like
4    Italian restaurant, get pasta; and we wanted to do the
5    family night because it sounded fun.
6  Q.  If I could stop you there and come back to that part
7    of it, I want to talk about the prior because I feel
8    that it starts to get into maybe the incident.
9           So prior to that dinnertime on the Friday,
10   that evening of the incident.
11 A.  Yes, and that's when we spent time doing water sports
12   and the pool and laying out and eating.
13 Q.  Would you say other than when you may have gone to a
14   restaurant for a meal from when you got to the hotel
15   on May 5th to the dinner on the 8th, were you always
16   at the hotel?
17 A.  No.
18 Q.  Did you do any of the excursions such as shopping or
19   waterfalls yet in that time period?
20 A.  During the Tuesday and Friday?
21 Q.  Yes.
22 A.  Yes.
23 Q.  How many times did you leave the resort for an
24   activity in that time frame?
25 A.  I believe -- to my recollection I think we left once

29 (Pages 110 to 113)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| Page 114 |
|---|
| 1    and did the waterfall and then the shopping on the way |
| 2    back. |
| 3  Q.  That happened in one -- |
| 4  A.  I believe it was in one day. |
| 5  Q.  Otherwise, you stayed at the resort and did the laying |
| 6    out and the beach and pool and water sports? |
| 7  A.  Yes. |
| 8  Q.  And went to restaurants to eat on the property? |
| 9  A.  Yes. |
| 10  Q.  At all those times, the majority of the time with your |
| 11    daughter? |
| 12  A.  Yes. |
| 13  Q.  Prior to the dinner and the incident on May 8th, did |
| 14    you ever see Mr. Davis, Mr. Dyer or Mr. Tapper? |
| 15  A.  Jermaine is the one -- |
| 16  Q.  There is Jermaine Dyer, William Tapper and Dwight |
| 17    Davis. |
| 18  A.  Yes.  Jermaine, I saw a couple times is all. |
| 19  Q.  Could you tell me in what context? |
| 20  A.  Over by the water slides. |
| 21  Q.  There is a statement in the Complaint in paragraph 32 |
| 22    that -- this is page 9 of 32. |
| 23  A.  Okay. |
| 24  Q.  In that time period between May 5th and May 8th, that |
| 25    those three individuals were fraternizing with your |

| Page 115 |
|---|
| 1    daughter and Margaret's daughter. |
| 2    Do you see that? |
| 3  A.  Yes. |
| 4  Q.  Do you have knowledge regarding that statement? |
| 5  A.  Yes. |
| 6  Q.  Could you explain to me what it is that you have |
| 7    personal knowledge of regarding fraternization between |
| 8    these three individuals and your daughter and |
| 9    Margaret's daughter prior to the incident the evening |
| 10    of May 8th? |
| 11  A.  When we got to the resort on Tuesday, we went out to |
| 12    the pool area, and it was -- the water slides were |
| 13    over here.  The pool was over here.  There's a pool |
| 14    over there but there's a pool over here.  And there |
| 15    was Jermaine and I think Dwight, not William, that |
| 16    came up to the girls when we were laying out. |
| 17  Q.  In your presence? |
| 18  A.  Yes. |
| 19  Q.  What happened next? |
| 20  A.  They were on the other side of the pool.  They were |
| 21    talking to the girls a few minutes and they walked |
| 22    away. |
| 23  Q.  Is that the only instance you saw what is referred to |
| 24    as fraternization? |
| 25  A.  I saw them the night of the incident also, where I |

| Page 116 |
|---|
| 1    actually saw them fraternizing or whatever it is |
| 2    called. |
| 3  Q.  We'll get into that, but prior to that night of May |
| 4    8th was there any other time that you saw any of those |
| 5    three individuals with either your daughter or |
| 6    Margaret's? |
| 7  A.  Just once over at the water slide and once at the |
| 8    pool. |
| 9  Q.  That's separate from the evening of the incident? |
| 10  A.  That's separate. |
| 11  Q.  That would be two instances and the evening would be a |
| 12    third instance.  So let me ask you about those two |
| 13    incidences. |
| 14    Those two incidences, the one where you saw |
| 15    them talking across the pool, do you know what they |
| 16    discussed? |
| 17  A.  I didn't at the time but I do now. |
| 18  Q.  Thank you for that.  That's very helpful.  I |
| 19    appreciate that. |
| 20    What do you know now? |
| 21  A.  They introduced themselves to the girls.  They or he. |
| 22    I'm not 100 percent if Dwight was there too but for |
| 23    sure Jermaine. |
| 24  Q.  At least one of three, maybe two -- |
| 25  A.  Yes. |

| Page 117 |
|---|
| 1  Q.  -- of the people?  Okay.  Keep going. |
| 2  A.  But not three.  Introduced himself to them and wanted |
| 3    them to friend him on some form of social media.  It |
| 4    wasn't Facebook, it was like Twitter.  I don't know |
| 5    because I'm not familiar with those.  But some form of |
| 6    social media and -- |
| 7  Q.  Did they do it? |
| 8  A.  No.  Paiton did not.  I'm not sure if Amber did, but |
| 9    Paiton had a weird feeling and just pretended so that |
| 10    he would go away and did not. |
| 11  Q.  How long were they talking? |
| 12  A.  Maybe five minutes. |
| 13  Q.  Do you know anything else now?  I know you said you |
| 14    don't know what they talked about then. |
| 15    Do you know anything else now about that |
| 16    first encounter and what they talked about? |
| 17  A.  About what they talked about?  I know that -- with my |
| 18    daughter I know she was asked how long she was |
| 19    staying, but I don't know if it was during that |
| 20    incident or if it was a different time. |
| 21  Q.  When you say incident, first encounter? |
| 22  A.  Yes. |
| 23  Q.  I just want to separate it from the Friday night. |
| 24  A.  Sure. |
| 25  Q.  Is there anything else about that first conversation |

30 (Pages 114 to 117)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

## Page 118

1    or encounter that you're aware of now that you haven't
2    told us, something discussed or anything that you saw?
3    A.  No.
4    Q.  Was there any touching of any sort?
5    A.  No.
6    Q.  Did your daughters come back to you after that first
7    conversation directly?
8    A.  I think we continued to lay out, but we were right on
9    the other side of the pool.
10   Q.  Did they look like they were uncomfortable or anything
11   of concern?
12   A.  I'm always focusing on my own daughter so I noticed
13   that Paiton seemed a little bit.
14   Q.  Did you go over to her and ask her what is going on?
15   A.  No.
16   Q.  Who was that?
17   A.  No.
18   Q.  What did they say to you?
19   A.  No.
20   Q.  How would you describe how she looked?
21   A.  Just fidgety.
22   Q.  Did you ask her at any time after that anything about
23   this fidgety look?
24   A.  Not about her being fidgety, no.
25   Q.  Was there anything that you witnessed at that time, at

## Page 119

1    this first encounter that caused you any concern?
2    A.  No.
3    Q.  The second time you saw your daughter or both your
4    daughter -- or was it your daughter and Amber --
5    A.  They were always together.
6    Q.  In the context of one or all of these three
7    individuals, you said there was a second instance?
8    A.  Yes.
9    Q.  Tell me about that.
10   A.  Just over by the water slides, I just noticed the
11   girls would go up, and while they are waiting to go
12   down, they were talking with the guys.
13   Q.  Do you know what they spoke about?  And let me know if
14   it was then or now, if you do.
15   A.  Then I did not.  But now I know that during one of
16   their meetings the guys asked if they would be leaving
17   and going to any clubs off the resort.
18   Q.  Do you know what the answer was?
19   A.  The answer was, no.
20   Q.  Anything else discussed to your knowledge?
21   A.  I don't know.
22   Q.  Is the source of the substance of the conversations in
23   either of these two instances your daughter?
24   A.  Repeat.
25   Q.  Is the source, the basis for your knowledge of

## Page 120

1    anything discussed in either of these two instances
2    your daughter, she told you?
3    A.  My daughter and Amber.
4    Q.  That was going to be my next question.  Is there
5    anything else that they told you relative to these two
6    occurrences that you have not told us about today in
7    terms of what they talked about?
8    A.  I know that during the time I saw them at the water
9    slide, there was not.  There was nothing else that I
10   know that was talked about at that time.
11   Q.  What about the first time?
12   A.  The first time, no.
13   Q.  The second time, did you see them at the water slide
14   talking?
15   A.  Yes.  When they went up the steps to go down the water
16   slide while they were waiting their turn, they were
17   talking.
18   Q.  Do you remember how many of these three individuals?
19   A.  One for sure, maybe two.
20   Q.  Do you know which --
21   A.  Never a third.
22   Q.  Do you know which one?  Sorry to interrupt.
23   A.  It was Jermaine and Dwight.
24   Q.  Did you see in the second time on the water slide
25   anything about your daughter that caused you any

## Page 121

1    concern?
2    A.  No.
3    Q.  Did she look uncomfortable or fidgety?
4    A.  No.
5    Q.  When she got off the slide, did she come back to you?
6    A.  No.
7    Q.  Okay.
8    A.  They were continuously going up the slide.
9    Q.  Did they talk each time with him at the top?
10   A.  I was there for one time that they went up that I saw
11   them, and then they came down and we moved on to
12   another area.
13   Q.  When you say we, all four of you?
14   A.  Margaret and I.
15   Q.  How long were your daughters doing the slide and/or
16   something else when you moved on?
17   A.  I don't know.
18   Q.  Do you know what they did if anything other than slide
19   when you moved on?
20   A.  Yes.  They followed us.  I don't know if we went back
21   to the room at that time or went over to the pool.
22   Q.  Were they alone for at least a small amount of time?
23   A.  Yes.
24   Q.  Do you know if that was an hour?  More than an hour?
25   A.  It was always less than an hour.

31 (Pages 118 to 121)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 122

1  Q.  Do you know how many times your daughters were --
2     strike that.  Let me start this over.
3        Was there ever a time prior to the evening
4     of May 8th where your daughter was either alone or
5     with Amber for more than an hour outside of your
6     presence?
7  A.  No.
8  Q.  How many times less than an hour did that occur?
9  A.  I don't know.
10 Q.  At least once?
11 A.  Yeah, at least once.
12 Q.  Were they always on premises during those time or
13    times?
14 A.  Yes.
15 Q.  Were they doing water sports or pool activities?
16 A.  We always did the water sports with them and pool --
17    they would go to the hot tub sometimes.
18 Q.  Or lay out?
19 A.  No.  It was more so the hot tub or the piano bar.
20    They liked karaoke.
21 Q.  Other than the pool or the hot tub or the piano bar,
22    did they do anything else to your knowledge
23    activity-wise at the hotel outside of your presence?
24 A.  No.
25 Q.  Whether you knew then or now?

Page 123

1  A.  No.
2  Q.  The piano bar/karaoke that's an evening activity,
3     right?
4  A.  Yes.
5  Q.  Did they go on their own and do the piano bar and
6     karaoke on their own in the evening?
7  A.  Yes.
8  Q.  Do you know if at that time, either then or now,
9     either of these three individuals, Mr. Davis, Mr. Dyer
10    or Mr. Tapper were at the piano bar during karaoke?
11 A.  Not that I'm aware of.
12        MR. SAFRA:  Off the record.
13        (Off the record at 11:20 a.m.)
14        (Back on the record at 11:21 a.m.)
15 BY MR. SAFRA:
16 Q.  You were not aware at the time and you haven't become
17    aware of since?
18 A.  That they were at that -- oh, yeah.  I'm not aware
19    that they were either time.
20 Q.  Other than immediately after seeing the -- strike
21    that.
22        Other than seeing the -- your daughter in
23    the presence of either of these three individuals on
24    two occasions did you ever come to learn prior to the
25    incident that your daughters had seen them outside

Page 124

1     your presence on other occasions?
2  A.  Yes, at the water slides different days.
3  Q.  Did they say anything to you about that?
4  A.  They said they were friendly.
5  Q.  Did they tell you what they talked about?
6  A.  The guys, they took pictures.  They guys took Amber's
7     phone and took pictures of the girls or Amber took a
8     picture of them or something.  I don't know exactly
9     which way that went.
10 Q.  You learned this prior to the incident?
11 A.  No, no.  I learned that afterwards.  I know I learned
12    it afterwards.
13 Q.  Prior to the incident had you learned of any other
14    encounters?
15 A.  No.
16 Q.  Prior to the incident did you ever have any concern
17    about the interactions you saw between either of these
18    three individuals and your daughters?
19 A.  No.
20 Q.  Or your daughter and Amber.
21 A.  Right.  No.
22 Q.  Did your daughter or Amber ever say anything involving
23    either of these three individuals?
24 A.  No.
25 Q.  You mentioned a phone.  Afterwards what did you learn

Page 125

1     regarding pictures in your daughter's phone?
2  A.  In Amber's phone.  There were pictures of the guys.
3  Q.  With your daughter?
4  A.  I don't recall, but I know there were pictures of at
5     least two of the guys.
6  Q.  To make sure it's clear, I think you said they took
7     pictures of your daughter and Amber, but there's also
8     pictures of them?
9  A.  I thought that.  I can't say for certain, but I do
10    know there was pictures of at least two of the guys on
11    Amber's phone.
12        MR. SAFRA:  Were those pictures produced?
13        MR. WEGLARZ:  I don't have those, right?
14        THE WITNESS:  I don't know.
15        MR. SAFRA:  Well, we'll ask tomorrow for
16    them.
17        MR. WEGLARZ:  Photos of the lifeguards.  I
18    don't have those, but I gave you all the photos we do
19    have.
20        MR. SAFRA:  If you could -- I assume if
21    they were not deleted and she saw them that they are
22    on the phone or hopefully were kept.
23        THE WITNESS:  Amber deleted them because
24    she was so upset about the incident.
25        MR. SAFRA:  If you can ask before her

32 (Pages 122 to 125)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 126

1   deposition tomorrow if they do have them, produce it;
2   otherwise, I understand the statement of account.
3          MR. WEGLARZ:  We will.  Thank you.
4   BY MR. SAFRA:
5   Q.  Could you describe the photo for me?  Was your
6   daughter also in it?
7   A.  I didn't see the photos.  I just know that they -- I
8   know they had pictures of the guy -- Amber had at
9   least a picture of two of the guys.
10  Q.  At least one of the guys as I understand it also had
11  her cell phone number.
12         Is that true?
13  A.  Who's her?
14  Q.  I think it was either your daughter or Amber.
15  A.  Yeah.  I don't think it was Paiton.
16  Q.  One of them tried to communicate --
17  A.  Yes.
18  Q.  -- afterwards via text message or social media?
19  A.  I'm not certain.  I thought it was through social
20  media.
21  Q.  Okay.  Do you know if either of them gave one of the
22  resort employees, one of the three individuals their
23  phone number?
24  A.  I know that Paiton did not from what she said.
25  Q.  Did you ask her about that, and you know for certain

Page 127

1   it's a no --
2   A.  I know for certain that she told me that she didn't
3   put him on any social media and her phone number was
4   not given.
5   Q.  What else did she tell you about any communications
6   with them other than to the actual sequence of the
7   incident?
8   A.  With Paiton, nothing, just in person.
9   Q.  The interactions that you have described at the water
10  slides, is that the extent of what is referred to in
11  the Complaint as the fraternization or outside the
12  pool?
13  A.  There was more the night of May 8th.
14  Q.  We'll get into that.  I appreciate that.  But is that
15  the extent of the fraternization prior to the
16  incident?
17  A.  Water slide and then the pool the day we got there.
18  Q.  Do you know if they ever were together on the beach?
19  A.  I don't believe so.
20         No.  Jermaine came up to us on the beach.
21  Q.  Who is us?
22  A.  All four of us.
23  Q.  Can you explain that to me?
24  A.  We were sitting under a covered whatever in the
25  chairs, and I believe that's when he came up and asked

Page 128

1   if the girls were -- asked us all if we were going to
2   be leaving the resort at all.  But I don't remember
3   any further than that.
4   Q.  Is there anything about that encounter that caused you
5   any concern or alarm?
6   A.  We thought it was little weird that he came up and
7   said something but then he left right away.  I just
8   can't remember what it was exactly he said.
9   Q.  Did you ever discuss with Margaret or your
10  daughters -- the two of your daughters what you just
11  said?
12  A.  I just discussed that they should always stick
13  together and under no circumstance leave the resort.
14  Q.  Did you have any conversation with them at the resort
15  based upon anything you saw prior to the incident
16  regarding make sure you stick together?
17  A.  We said that every day and we told -- me and Margaret.
18  Q.  Was there ever -- other than normal circumstance, stay
19  together, was there anything you witnessed at the
20  resort, an act or a conversation or behavior of an
21  employee that caused you further concern and
22  specifically a need to say Make sure you stay alone or
23  just general mom telling your daughter don't go off
24  anywhere alone?
25  A.  The employees spoke with the girls.  They spoke with

Page 129

1   us too but we just told them to stick together because
2   we don't know anybody there and the employees were --
3   Q.  I'm not trying to say otherwise but was there --
4   A.  Every employee in the area was very friendly in
5   talking to --
6   Q.  And my question --
7   A.  -- us as well.
8   Q.  My question more was any of this friendliness by
9   the employees a reason why you were saying Stick
10  together?  That you had some sort of safety concern or
11  is it just you as a mother --
12  A.  A little bit.  I think it goes hand-in-hand me as
13  mother and saying stick together.
14  Q.  Did you have a concern prior to the incident that one
15  of these employees might commit an act of rape?
16  A.  Absolutely not.
17  Q.  So nothing behaviorally caused you a concern that they
18  were going to do such an act prior to the incident?
19  A.  No.
20  Q.  Did you think they were going to try to do something
21  like sell drugs?
22  A.  Yes.
23  Q.  Did you talk to your daughters about that?
24  A.  Yes.
25  Q.  Prior to the incident?

33 (Pages 126 to 129)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 130

1  A.  Yes.
2  Q.  What did you say to them -- while at the resort?
3  A.  Just be -- yes.  Just be careful because on the
4      perimeters of the resort, people are trying to sell
5      marijuana.  We didn't know what the guys in the
6      resort -- we wanted them to be careful in case there
7      was anybody offering something.
8  Q.  You told them that at the resort?
9  A.  Yes.
10 Q.  Did your daughters ever try any of those types of
11     drugs prior to this date?  By this date, the mean the
12     day of the incident.
13 A.  I wasn't aware of Paiton trying any, but I don't know.
14 Q.  I'm not asking from a criminal type of standpoint.
15     I'm just wanting to know if there was a basis for you
16     making the statement as if you were aware that they
17     had done that before.
18 A.  I was aware that Amber had.
19         (Off the record at 11:31 a.m.)
20         (Back on the record at 11:31 a.m.)
21 BY MR. SAFRA:
22 Q.  What's your understanding of what Amber had done
23     before?
24 A.  She had marijuana on her.
25 Q.  On her then?

Page 131

1  A.  On her person.  No, no.  When she was back in Grand
2      Rapids?
3  Q.  By Grand Rapids, to make sure we don't confuse it with
4      the waterfalls, that's in Michigan.
5  A.  In Michigan, yes.
6  Q.  This case is also in Florida.
7  A.  Oh.
8  Q.  Did you talk to your daughter outside the presence of
9      Amber about Amber's prior possession of marijuana and
10     your concern relative to the stay in Jamaica?
11 A.  Yes.
12 Q.  Tell me about that.
13 A.  I just told her that she had been caught with
14     marijuana and that that's clearly what they kind of
15     promote with their advertising and stuff -- that
16     Jamaica promotes, and to be careful because when we
17     were there in 2001 I know we where offered that by
18     somebody, a groundskeeper.
19         So I did -- and I told her, which is not
20     the thing to do, You're responsible for Amber while
21     we're there if you're apart from us.  Just watch her
22     to make sure.
23 Q.  You are aware of advertisements promoting marijuana in
24     Jamaica?
25 A.  Yes.  If you look at the Rastafarian stuff, it has the

Page 132

1      pot leaf on there.
2  Q.  While you're in Jamaica and you're looking at -- like
3      in the shopping area in the city, tourists, you're
4      saying there are, for example, the colors of Jamaica
5      on touristy items are the marijuana leaf on them?
6  A.  Yes.
7              MR. WEGLARZ:  Can we take a second?
8         (Off the record at 11:32 a.m.)
9         (Back on the record at 11:34 a.m.)
10 BY MR. SAFRA:
11 Q.  When you're talking about promotional and advertising
12     materials in the context of marijuana, are you talking
13     about just what you saw in the shops, around town?
14 A.  Yeah.  That, and, you know, anything online.  A lot of
15     things online will have -- it's just the colors and
16     the pot leaf going hand-in-hand.
17 Q.  Just generally or are you talking about a
18     hotel-related promotional advertising --
19 A.  No, generally.
20 Q.  Just your experience in life, not necessarily relative
21     to this trip booking and hotel?
22 A.  And from being there in 2001.
23 Q.  So, yes, and from being there in 2001?
24 A.  Yes, that is correct.
25 Q.  Prior to the evening of May 8th, 2015 have we

Page 133

1      discussed everything involving these three individuals
2      that you personally witnessed at the time?
3  A.  Yes.  That I recall, yes.
4  Q.  Have we discussed everything -- again, it's prior to
5      the evening of the 8th -- everything that your
6      daughters have told you since the incident regarding
7      anything that happened or occurred involving these
8      three people?
9  A.  Yes.
10 Q.  Did you ever have any encounter with another employee
11     prior to the evening of May 8th that caused you
12     concern, whether something you encountered yourself or
13     with your daughters?
14 A.  No.
15 Q.  Up until the evening of May 8th how would you describe
16     you trip?
17 A.  Great.  Lots of fun, very relaxing.
18 Q.  Was the hotel staff accommodating?
19 A.  Very friendly.
20 Q.  The services and the amenities you were looking for,
21     how was that?
22 A.  We were not pleased with Sesame Street going around
23     the pool every night, but otherwise it was fine.
24 Q.  It's a family of all ages, all-inclusive resort?
25 A.  Yes.  And it was more -- we realized once we got there

34 (Pages 130 to 133)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 134

1      more toward the younger kids.
2   Q.  You mean under the age of 12, 13?
3   A.  Yes.
4   Q.  Other than that, though, no instances of issue prior
5      to the incident?
6   A.  No.
7   Q.  Anytime you needed anything, an employee would
8      accommodate or try reasonably?
9   A.  Yes.
10  Q.  Let's get to the evening of May 8th, 2015, this is the
11     night of the incident.
12          I think you said you ate dinner separate
13     from your daughters?
14  A.  Yes.
15  Q.  Tell me about that.
16  A.  Margaret and I ate over by the water slide area where
17     they had a big picnic and buffet set up, and the girls
18     ate at an Italian restaurant within the resort
19     together.
20  Q.  Were those in close proximity to each other?
21  A.  I don't know.
22  Q.  Were you able to see your daughters during dinner?
23  A.  No.
24  Q.  Around what time did you eat dinner?
25  A.  Around 6:00.

Page 135

1   Q.  Did your daughters eat around the same time?
2   A.  Yes.
3   Q.  Prior to that had you had any alcohol at any time
4      during your stay?
5   A.  Yes.
6   Q.  What about the days of May 8th?
7   A.  None.
8   Q.  What about your daughters, had they had anything to
9      drink at the resort -- or your daughter?
10  A.  Yes.
11  Q.  How much did she have prior to May 8th that you're
12     aware of?
13  A.  Oh, I don't know.
14  Q.  More than one drink?
15  A.  Yes.
16  Q.  What about the night or the day of or early evening of
17     May 8th before 6:00 p.m., are you aware of whether
18     your daughter had anything to drink that day?
19  A.  Yes.
20  Q.  Do you know how many drinks she had?
21  A.  Several but I don't know how many.
22  Q.  Do you know what she was drinking?
23  A.  I don't.
24  Q.  Would you say more than five?
25  A.  I can't say more than five or -- I don't know.

Page 136

1   Q.  More than three?
2   A.  I don't know.
3   Q.  Okay.
4   A.  More than two.
5   Q.  That's fine.
6          What were you doing in the afternoon prior
7      to dinner?
8   A.  Laying out at the pool and going back and forth to the
9      water slide area.  I believe we used the hot tub.  I'm
10     not 100 percent, but I believe we went back out on the
11     water sports one more time together.  All four of us
12     did that.
13  Q.  Did you all go back to the room together to get ready
14     for dinner?
15  A.  We were in the room together briefly, and then they
16     would leave and come back or one of us would leave and
17     come back.
18  Q.  When you went to dinner how long was it until you --
19     were you apart from your daughter?
20  A.  Dinner?  Before I saw her again, maybe an hour.
21  Q.  Did you see her at a time between dinner and the
22     incident?
23  A.  Yes.  Oh, yes.
24  Q.  After dinner where did you see your daughter?
25  A.  I believe over by the water slides, and I don't know

Page 137

1      if they were using the water slides or just went over
2      by that picnic area and the pool area I saw them.  I
3      saw them in the bar area right around the corner from
4      our room.
5   Q.  Were they having a drink in the bar area?
6   A.  Yes.
7   Q.  Do you know how long they were there?
8   A.  An hour.
9   Q.  Do you know --
10  A.  Maybe.
11  Q.  -- if any of these three individuals, Mr. Dyer,
12     Mr. Davis or Mr. Tapper were there?
13  A.  They were not in the bar.
14  Q.  Did you talk with your daughter about anything that
15     you recall or anything of concern?
16  A.  I know that I said stick together, but I don't recall
17     anything else.
18  Q.  Normal conversation, how was dinner, something of that
19     sort?
20  A.  Yes.  Where did you go.
21          MR. WEGLARZ:  I need a minute.  I
22     apologize.
23          MR. SAFRA:  No problem.
24          (Off the record at 11:41 a.m.)
25          (Back on the record at 11:46 a.m.)

35 (Pages 134 to 137)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 138

1  BY MR. SAFRA:
2  Q.  Do you know what time it was when you left your
3      daughter's presence at the bar?
4  A.  Last time I left her at the bar, it was probably -- I
5      don't know -- sometime before 10:30 maybe.
6  Q.  10:30 in evening?
7  A.  P.m.
8  Q.  You said the last time.  Did you see her at the bar
9      that evening after dinner and go somewhere and come
10     back?
11 A.  Yes.
12 Q.  How many times did that occur?
13 A.  Probably four.
14 Q.  And that was over a span of about an hour?
15 A.  Yes.
16 Q.  Where did you go?
17 A.  So the bar was like here and our room was right around
18     the corner, and I would just run out and check on
19     them.
20 Q.  Since people can't see -- it's a written record --
21     where you're pointing -- that's fine -- for the sake
22     of this, your went back to the room?
23 A.  Yes.
24 Q.  You went back to the room and then you would go back.
25     Was she always at the bar each time you went back --

Page 139

1  A.  Yes.
2  Q.  -- or did you have to go find her?
3          Each time you went back were any of those
4      three individuals there?
5  A.  No.
6  Q.  Each time you went back did your daughter have a
7      drink?
8  A.  She had a drink in front of her.
9  Q.  Did it have alcohol?
10 A.  To my knowledge it did.
11 Q.  Was Amber there as well?
12 A.  Yes.
13 Q.  Was she drinking?
14 A.  She had a drink in front of her.
15 Q.  Alcohol?
16 A.  To my knowledge it was.
17 Q.  Did you ever at a time that day and that evening when
18     you went to the bar feel as though your daughters had
19     drank too much?
20 A.  No.
21 Q.  Were they acting in any way that caused you concern
22     that they were starting to get drunk?
23 A.  They were happy and laughing but otherwise, no.
24 Q.  Okay.
25 A.  I have a picture of them that I took with them on my

Page 140

1      last visit with them.
2  Q.  At the bar?
3  A.  Yes.
4          MR. SAFRA:  I don't have all the
5      photographs in front of me, but has that picture been
6      produced?
7          MR. WEGLARZ:  I don't know.
8  BY MR. SAFRA:
9  Q.  You say you have a picture.  Is it on your phone?
10         MR. SUAREZ:  I have a copy of pictures.
11         THE WITNESS:  This is like my third phone.
12         MR. SAFRA:  On a break we can look.
13         MR. SUAREZ:  I have the pictures.  I'm
14     happy to hand them to you.  I don't believe we have
15     the picture that you're referencing.
16 BY MR. SAFRA:
17 Q.  Do you still have that picture somewhere regardless --
18 A.  I think so.
19 Q.  -- of whether it's included?
20         Where do you keep that picture?
21 A.  I think it's on social media.
22 Q.  Not in hard copy form?
23 A.  No.
24 Q.  Do you have a Facebook account?
25 A.  Yes.

Page 141

1  Q.  Do you have any other type of social media account?
2  A.  No.
3  Q.  So it would be on your Facebook?
4  A.  I believe so.
5  Q.  We have served social media requests for discovery and
6      the response has not yet been received.
7          MR. WEGLARZ:  True.
8          MR. SAFRA:  Obviously, I would expect that
9      they would be provided.  I reserve the right to ask
10     additional questions.  Honestly, I don't think we'll
11     have too many, but if you could --
12         MR. WEGLARZ:  We're still going through it.
13     There's lots of material.  So I have three people
14     going through it.
15         MR. SAFRA:  Okay.  Understood.  We'll deal
16     with that in due course.
17 BY MR. SAFRA:
18 Q.  What's your -- the name of your Facebook?  Some people
19     do first and last name.  Some people do first and
20     middle.
21 A.  It is under I believe Janet Marks DeSantis.
22 Q.  Have you ever deleted anything from your Facebook
23     account pertaining to this vacation stay at the
24     Beaches Ocho Rios Resort?
25 A.  I don't recall if I did or not.  I don't believe I did

36 (Pages 138 to 141)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 142

1    afterwards.
2  Q.  After you filed this lawsuit -- or after you first
3       contacted an attorney did you ever go into your social
4       media account and make any changes to any posts or
5       pictures regarding the incident or stay?
6  A.  No.
7  Q.  Do you know if your daughter did to hers?
8  A.  To my knowledge she did not.
9  Q.  To the extent you have any pictures on your media or
10      in your possession, please preserved them.  We've
11      requested them, and counsel will make sure we get what
12      we're entitled to.
13          You said at some point you left around
14      10:30 or just before 10:30, the bar, the last time you
15      saw your daughter before incident?
16  A.  Somewhere around that, yes.
17  Q.  At what time roughly or how much after that did you
18      next see your daughter?
19  A.  At what time or around?
20  Q.  Yeah.  Was it an hour later, two hours later, 20
21      minutes later?
22  A.  It was about I have to say 20 minutes later.
23  Q.  So close to about 11:00-ish you next saw your
24      daughter?
25  A.  Yes, somewhere around that time.

Page 143

1  Q.  Where did you next see your daughter?
2  A.  In the room that she was raped in.
3  Q.  What room was that?
4  A.  It was a maintenance room that contained drainpipes or
5       pipes that run the pools and held the dirty towels
6       from the pool area.
7  Q.  I think there's reference to a laundry room in the
8       complaint.  Was it a laundry --
9  A.  There wasn't a washer and dryer in it, but it's the
10      maintenance but it's where all the dirty laundry was.
11  Q.  Was it a loud room?
12  A.  Yes.
13  Q.  Were there machines in there?  The Complaint says
14      there were loud and noisy machines.  Is that the pool
15      machines?
16  A.  Yes, the pumps.
17  Q.  When you saw your daughter in that room was she the
18      only person in the room?
19  A.  When I saw her, yes.
20  Q.  Tell me what transpired between when you saw her at
21      the bar and when you saw her at the room and where you
22      went.  Take me through the sequence of events.
23  A.  After I saw her it was just as matter of minutes and
24      Margaret wanted to go get Amber to come back to the
25      room to pack because we were leaving in the morning.

Page 144

1  Q.  You were in your room with Margaret?
2  A.  Yes.  We were just sitting in the bed talking.  And we
3       went out to the bar area where the girls had been and
4       they were not there.  We thought, okay, they must be
5       down at the piano bar.
6          So we went and looked at the piano bar, and
7       they were not there.  We ended up looking on all
8       levels and all areas and on the beach for the girls
9       and could not find them.
10          Then we came back up the elevator that
11      takes you down from our floor to the beach.  And we
12      came up that, and when the elevator doors opened it
13      exposed us to the big open -- and it's open to the
14      outside -- hallway.  It's covered but it's open to the
15      outside.  Amber was at the end of this hallway.
16  Q.  So you saw Amber?
17  A.  Yes.  And nobody else was around.
18  Q.  Then did you walk over to Amber or did she walk to
19      you?
20  A.  We walked to her.
21  Q.  Did Amber run to you or just wait there and wait
22      for you or walk to you also?
23  A.  I don't know that she was aware we were coming up to
24      her, but we went up to her.
25  Q.  Was her back to you?

Page 145

1  A.  No, not the whole time.  She was --
2  Q.  So what do you mean she wasn't --
3  A.  -- pacing.
4  Q.  -- aware?
5  A.  She was not herself.  There was something wrong, but
6       we didn't know what was going on.
7  Q.  Did you think it was alcohol initially?
8  A.  Sort of, but it was like somebody who was in shock.
9       She wasn't talking.
10  Q.  So tell me --
11  A.  She was hardly communicating.
12  Q.  Tell me what then happened once you approached her.
13      Were you with Margaret by the way?
14  A.  Yes.  I asked where Paiton was because they were
15      always together.
16  Q.  And what did she say?
17  A.  She pointed to the room.  There were two metal doors
18      right there where she was at, and she pointed to the
19      doors.
20  Q.  Then what happened?
21  A.  I said Is she in there with anybody, and she said --
22      she shook her head yes.
23  Q.  Then what happened?
24  A.  We pounded on the door, and then I ran to the front
25      desk area and Margaret continued to pound on the door.

37 (Pages 142 to 145)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| Page 146 |
|---|

1    And I told them at the front desk that my daughter was
2    locked in a room with an employee.
3    Q.   How did you know there was an employee in there?
4    A.   Because it was a locked room.
5    Q.   You said you asked Amber if she was in there with
6    someone, and she said yes.
7    A.   Correct.
8    Q.   Did you know that it was an employee?
9    A.   I assumed it.  I assumed it.
10   Q.   So you knew she was in there with someone, and you
11   didn't know who but you assumed it was an employee?
12   A.   Right.
13   Q.   So you're at the front desk.
14        Keep going?
15   A.   The manager was standing right there, and I turned
16   around and he ran with me but he was behind me.  We
17   ran back to almost the room area.
18   Q.   How did you know it was a manager?
19   A.   I knew that after the fact.
20   Q.   Do you recall the name of the person?
21   A.   I don't right now.
22   Q.   If it's in your notes or something, I'm not trying to
23   test your memory.
24   A.   It might very well be in those.
25   Q.   You can have a document later potentially.  I just

| Page 147 |
|---|

1    wanted to ask what you recall.
2         Prior to going to the front desk did you
3    talk to anybody else after you saw Amber and until the
4    time you went to the front desk?
5    A.   No.
6    Q.   Do you know if Margaret did?
7    A.   Yes.
8    Q.   When did you learn that Margaret did?
9    A.   At some point after the rape.  I don't know if it was
10   the next day or --
11   Q.   You say rape.
12        That's something that afterwards you have
13   learned is what is alleged to have occurred in that
14   room; is that correct?
15   A.   Yes.
16   Q.   But at the time up until you went to the front desk,
17   do you agree you did not know what was going on or if
18   there was a rape going on inside the locked room?
19   A.   I did not know.
20   Q.   Do you know if Margaret knew what was going on in that
21   room?
22   A.   Margaret did not know.
23   Q.   To your knowledge did Amber know at that time what was
24   going on in that room?
25   A.   I think she probably had a big fear of what was going

| Page 148 |
|---|

1    on.
2    Q.   You came back with the manager.  When you got back was
3    the room unlocked?
4    A.   Yes.  Someone ran past us in the hall.
5    Q.   As you were going with the manager --
6    A.   Yes.
7    Q.   -- another person ran past you.
8    A.   And I yelled to Margaret Was he in the room with
9    Paiton, and she said yes, and the manager stopped him.
10   Q.   Was that an employee of the hotel?
11   A.   That was Jermaine.
12   Q.   So that was Jermaine Dyer?
13   A.   Yes.  It's Dwight Davis and Jermaine Dyer.
14   Q.   In terms of names, yes, it's names like --
15   A.   Jermaine Dyer.
16   Q.   -- Davis and Jermaine Dyer.  So Jermaine Dyer ran past
17   you?
18   A.   Yes.
19   Q.   And the manager stopped him?
20   A.   Yes.
21   Q.   What happened next?
22   A.   He stood there and talked to him.  I went around the
23   corner.  The door was open at that point then.  And I
24   pulled the doors open.  It was dark in there and I
25   just yelled Paiton.  And I saw her.  There was

| Page 149 |
|---|

1    another -- there was a room, like a rectangular shaped
2    room and beyond that was an archway, square archway
3    that led into another room where all the pool pipes
4    were.  And she was crouched down and cowering and
5    popped her head out.
6         MR. SAFRA:  I'll stop there and go back to
7    the front, so we can -- do you need a moment?
8         MR. WEGLARZ:  Let's take a break.
9         (Off the record at 11:59 a.m.)
10        (Back on the record at 12:04 p.m.)
11   BY MR. SAFRA:
12   Q.   I'm going to ask you a little bit still about the
13   portion of the incident we were talking about before
14   you saw your daughter.  Then we'll address that
15   separately, and that way we can deal with any
16   emotional aspects at the same time.
17   A.   Sure.
18   Q.   When you first saw Amber after you got off the
19   elevator and you said you went over and she pointed at
20   the room --
21   A.   Yes.
22   Q.   -- and you banged on the door.
23   A.   Yes.
24   Q.   Did you immediately run to the front desk?
25   A.   I ran to the front desk within a minute or two.

38 (Pages 146 to 149)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 150

1   Q.   Is the door locked?
2   A.   Yes.
3   Q.   When you ran back you said an individual ran by you.
4   A.   Yes.
5   Q.   Did you see anybody else run out of that room?
6   A.   No.
7   Q.   Was there anybody else in the room other than your
8        daughter when you arrived at the room?
9   A.   Not that I'm aware of.
10  Q.   Do you know if there was more than one of these three
11       individuals or more than Jermaine Dyer -- do you know
12       if William Tapper or Dwight Davis were ever in that
13       room with your daughter, Paiton?
14  A.   They were.
15  Q.   When did you come to learn of that?
16  A.   When we were back in our room and the girls said they
17       were raped.
18  Q.   We'll talk about that conversation in a few.  I'm
19       trying to keep it in sequence.  But on that topic did
20       Margaret ever tell you that she saw two other
21       individuals come out of that room?
22  A.   She said she did not.  She saw Jermaine and that was
23       it.
24  Q.   Was she there at all times --
25  A.   Yes.

Page 151

1   Q.   -- until that door opened?
2   A.   Yes.
3   Q.   What is your understanding of how the two other
4        individuals were in that room and how they got out of
5        that room without Margaret or you seeing them?
6   A.   There was multiple areas with doors in the front.
7        There was two areas.  We know for sure there were two
8        areas with double metal doors.  We don't know how the
9        other two got out.
10  Q.   That's fine.  I was trying to get your understanding.
11       I'll ask a little bit more about -- did your daughter
12       tell you that all three were there at the same time or
13       was it an instance of you, know, one person going in
14       and leaving, then another coming in and leaving?
15  A.   She said there was one person that raped her,
16       then immediately another person that raped her, then
17       immediately another person that raped her.
18  Q.   So it may well be that two of the people left before
19       you even got to that door?
20  A.   Yes.
21  Q.   By -- I mean got to that door, I mean, the first time
22       when you were pounding before you got to the front
23       desk.
24  A.   Yes.
25  Q.   Okay.

Page 152

1   A.   The first person that raped Amber was the last person
2        that raped Paiton, and he was the one that ran.
3   Q.   I'll ask you about that understanding, but all that
4        information you obtained after the incident --
5   A.   Yes.
6   Q.   -- when you were either back in your hotel room or
7        since?
8   A.   Yes.
9   Q.   With regard to the time you arrived back after going
10       to the front desk and the manager was still with
11       Jermaine and you got back to that room --
12  A.   Say the first part.
13  Q.   You say the manager stopped and was with Jermaine?
14  A.   Yes.
15  Q.   Did you continue running towards Margaret?
16  A.   Yes.
17  Q.   The door was unlocked at that time?
18  A.   It was ajar, yes.
19  Q.   You went inside?
20  A.   I opened the doors and stood there.
21  Q.   Now, prior to that time when you were there banging on
22       the door before you went to the front desk, when you
23       were physically in the presence of that room could you
24       hear what was going on inside?
25  A.   Not at all.

Page 153

1   Q.   Could you see anything going on inside?
2   A.   No --
3   Q.   And I know from some of the photos there's little
4        crevices in the walls or viewpoints, some of which
5        look like they might be obstructed from items on the
6        inside.
7            Even with those, you did not see
8        anything --
9   A.   No.
10  Q.   -- going on.
11  A.   No.
12  Q.   So anything that your daughter was involved in, in
13       that incident of alleged rape or rape, not meaning
14       anything by that, anything that went on relative to
15       that sequence of events, you did not personally see
16       anything that transpired in that room?
17  A.   No.
18  Q.   Would the same be true for anything that happened with
19       Amber?
20  A.   Yes.
21  Q.   Was anything that Amber was involved in, any aspect of
22       this incident, was that over by the time that you and
23       Margaret arrived at the elevator?
24  A.   Yes.
25  Q.   Was Margaret with you at all times prior to that?

39  (Pages 150 to 153)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 154

1   A.  Yes.
2   Q.  So Margaret and you were not near that room at any
3       time that Amber was inside prior to arriving?
4   A.  We probably walked past it.
5   Q.  At that time that you might have walked past it, did
6       you know she was in that room?
7   A.  No.
8   Q.  Did you see anything that was going on in that room?
9   A.  No.
10  Q.  Did you hear anything?
11  A.  No.
12  Q.  Did Margaret to your knowledge?
13  A.  No.
14  Q.  Did you knock on the door or anything prior?
15  A.  No.
16  Q.  In terms of Amber's incident, if I could refer to it,
17      inside that room of pumps and machinery and towels, to
18      your knowledge Margaret did not see or hear any part
19      of that?
20  A.  No.
21  Q.  And neither did you?
22  A.  No.
23  Q.  Do you know where your daughter, Paiton, was during
24      that?
25  A.  During?

Page 155

1   Q.  while Amber was in the room.  Was she also in the
2       room?
3   A.  Shortly afterwards.
4   Q.  Shortly afterwards.  Were they ever --
5   A.  Shortly after Amber went in Paiton was in.
6   Q.  You learned after the incident that shortly after
7       Amber was in, Paiton was in?
8   A.  Yes.
9   Q.  Were they ever in that room together?
10  A.  Yes.
11  Q.  I'll ask you a little more about that when we talk
12      about what you learned after the incident.
13  A.  Okay.
14  Q.  Did you suffer any physical bodily harm or injury
15      during the time you were banging on the door or
16      running to the front desk?
17  A.  Physically, no.
18  Q.  When you walked in and opened the doors and walked
19      into the room and you said you saw your daughter
20      crouching down, it was after that, that you learned --
21      some time after that and we'll get into it -- some
22      time after that that you first learned your daughter
23      was raped, correct?
24  A.  Yes.
25  Q.  It was after that time that you first learned that

Page 156

1       Amber was raped?
2   A.  Yes.
3   Q.  Would that also be true for Margaret to your
4       knowledge?
5   A.  Yes.
6   Q.  Were you ever touched in any inappropriate manner by
7       Jermaine Dyer, Dwight Davis or William Tapper?
8   A.  No.
9   Q.  Was Margaret to your knowledge?
10  A.  No.
11  Q.  Did you ever see your daughter with either of these
12      three individuals, Dwight Davis, Jermaine Dyer or
13      William Tapper inside that room?
14  A.  No.
15  Q.  Did Margaret to your knowledge?
16  A.  No.
17  Q.  What did you think was going on in that room at the
18      time, if anything?
19  A.  I thought the girls had been lured in there to smoke
20      pot.
21          (Off the record at 12:14 p.m.)
22          (Back on the record at 12:55 p.m.)
23  BY MR. SAFRA:
24  Q.  Before we took a break, we were talking about what you
25      saw or heard if anything during the actual incident

Page 157

1       sequence where you thought they were smoking
2       marijuana.  And on a break, counsel said there might
3       have been some double negatives.  So I just want to
4       repeat to make sure.  I thought it was okay but I
5       apologize.
6           Relative to what we now know to be the rape
7       or a rape incident involving your daughter Paiton
8       inside the room --
9   A.  Yeah.
10  Q.  -- did you see any aspect of that incident?
11  A.  No.
12  Q.  Did you hear anything going on during the rape?
13  A.  No.
14  Q.  There were loud noises you said from these pumps and
15      stuff.
16  A.  Yes.
17  Q.  Did you suffer any physical injury to your body
18      relative to the incident?
19  A.  No.
20  Q.  Did Margaret to your knowledge see or hear any part of
21      it?
22  A.  No.
23  Q.  Did she suffer any physical injury to your knowledge?
24  A.  Not that I'm aware of.
25  Q.  With regard to Amber, you were with -- Amber's

40  (Pages 154 to 157)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 158

1    incident of rape, you were with Margaret during what
2    you now know to be a time when Amber was getting raped
3    in that room?
4  A.  I was with Margaret at that time.
5  Q.  You and -- let me start with when you guys were
6    together and you said there was a point where you
7    might have walked by that room while it was going on?
8  A.  Correct.
9  Q.  But you did not know it was going on in that room when
10    you might have walked by it, correct?
11 A.  Correct.
12 Q.  As to Amber's rape incident, did you hear anything
13    going on in that room that made you aware of it?
14 A.  No.
15 Q.  During its occurrence?
16 A.  No.
17 Q.  Would the same be true for Margaret to your knowledge?
18 A.  Yes.
19 Q.  Margaret did not see or hear anything?
20 A.  No.
21 Q.  You did not -- did you see anything involving Amber's
22    rape?
23 A.  No.
24 Q.  Did Margaret suffer then any physical injury relative
25    to Amber's rape?

Page 159

1  A.  Not that I'm aware.
2  Q.  You talked about after you opened double doors and you
3    went inside the room and you came upon your daughter,
4    Paiton, and she was crouched down?
5  A.  Yes.  But I didn't go inside the room.  I just opened
6    the doors.
7  Q.  You could see her once you opened the doors?
8  A.  Yes.
9  Q.  Did you at some point enter the room once you saw her?
10 A.  No.
11 Q.  Could you take me through all that you heard and
12    personally saw at that time up until I believe you
13    were back in your hotel room talking with your
14    daughters -- or daughter?
15 A.  So in front of me when I opened the doors there was a
16    huge mound of dirty towels, and behind it -- I didn't
17    see Paiton until she came out from behind another wall
18    going into the other room and stood up.  And she was
19    crying and apologizing and I was really confused.  The
20    lights were off in there.
21 Q.  At that time you did not know what happened?
22 A.  No.
23 Q.  Sorry.  At that time did you know what happened?
24 A.  No.  She came, she stood up and I said Get out here,
25    and she stood up and came up over the towels and like

Page 160

1    right into my arms.  We're close but we don't -- you
2    know, it was very weird.
3  Q.  I apologize but to follow in the sequence, was she
4    fully dressed?
5  A.  Yes.
6  Q.  Keep going.
7  A.  I just held onto her and she was sobbing and crying
8    and I was confused because we've always -- my kids
9    have always been aware that they can tell me anything
10    and I will try to understand.  I'm not going to yell
11    at them.
12        And so it was just weird and I just told
13    her Paiton, it's me.  This is me you're talking to.
14    You can trust me.  You're okay.  Everything is okay.
15 Q.  Did you ask her about what you thought was marijuana
16    usage?
17 A.  No, not at that moment.
18 Q.  Did you smell anything of the sort that led you to
19    believe that that also had been going on?
20 A.  No.
21 Q.  Keep going.
22 A.  And then the manager came up, and Margaret and Amber
23    had gone back to the room.  And Paiton and I were
24    taken to just a little table somewhere from the room
25    that it happened in -- somewhere between there and the

Page 161

1    bar I believe.
2  Q.  Did Paiton say anything else between the time you got
3    to the table --
4  A.  Nothing.
5  Q.  And she came over into your arms?
6  A.  Yes, she did.  She said I just want to go back to the
7    room.  She just kept repeating it.  It's the last
8    thing on your mind as to that really happened.
9        Then we sat and talked to the manager who
10    wanted to know what happened for just a couple
11    minutes.  And then we were distracted on something and
12    we ended up going back to the room.
13 Q.  What was discussed with the manager?
14 A.  He just wanted to know what occurred and --
15 Q.  Did Paiton tell -- was it a him?
16 A.  Yeah.
17 Q.  Did Paiton tell him at that time in your presence what
18    occurred?
19 A.  Sort of.  She was -- it was hard to get much out of
20    her, but she had said that I was in the room.  He -- I
21    don't know.  I don't know who said Were you in the
22    room?  I don't know how it came out or what, but it
23    was known after whatever she said that she was in the
24    room with an employee from the resort.
25 Q.  Was there anything at that time discussed that -- in

41 (Pages 158 to 161)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 162

1    terms of what was going on in terms of it being rape
2    or anything in that room or just discussed that she
3    was in that room with that employee?
4  A.  It was discussed that she was in that room and what
5    was going on, but I don't recall.  It was such a
6    tense --
7  Q.  But you think at that table is the first time that you
8    learned that there was a rape?
9  A.  No.
10 Q.  So --
11 A.  It wasn't.
12 Q.  Just that they were in a room.  It was locked.  It was
13   just them.
14 A.  Yes.
15 Q.  That's the extent in terms of the discussion with the
16   manager?
17 A.  To my recollection, yes.
18 Q.  That is fair.  That' all I'm asking you for.  Then you
19   proceeded to go to the room, your room?
20 A.  Yes.
21 Q.  Your resort hotel room?
22 A.  Yes.
23 Q.  Did you stop and speak to anybody else?
24 A.  No.
25 Q.  Were you with your daughter at all times on your way

Page 163

1    to the room?
2  A.  Yes.
3  Q.  Once you got to the room what happened?
4  A.  Amber was in the shower with the door locked, which
5    she never did, and Paiton knocked on the door and told
6    her she wanted to come in there too.  And I think, you
7    know, I don't know.
8  Q.  They went in the shower room area and closed the door
9    just the two of them?
10 A.  Yes.  They both were -- Amber showered, and she got
11   out and sat on the toilet edge or whatever and Paiton
12   got in the shower.
13 Q.  Did you hear anything they spoke about?
14 A.  Nothing.
15 Q.  Did they talk to your knowledge, you just don't know
16   what?
17 A.  We never heard them talking.
18 Q.  Were you outside the bathroom area with Margaret?
19 A.  Sitting on a bed or something, yes.
20 Q.  In the hotel room?
21 A.  Yes.
22 Q.  Did you and Margaret talk?
23 A.  Yes.
24 Q.  What did you talk about?
25 A.  Just about what maybe happened in there, you know, or

Page 164

1    we were trying to figure out what exactly happened --
2  Q.  Did Margaret --
3  A.  -- and why the girls were that upset.
4  Q.  Did Margaret know why at that time?
5  A.  Well, I think we both thought that they went in there
6    and kind of snuck away maybe and went in there and
7    smoked pot.
8  Q.  Which is fine, but I meant did Margaret know at that
9    time that their daughters were in the bathroom that
10   there was a rape?
11 A.  No, no.
12 Q.  So still at that time both you and Margaret to your
13   knowledge thought that they had been smoking marijuana
14   possibly and you did not know about any instance of
15   rape?
16 A.  No.
17 Q.  Well, that might have been a double negative.
18        Did you know -- I said you did not know,
19   and you said no, so I want to make sure it's clear.
20        Did you have any knowledge at that time
21   still of the instance of rape?
22 A.  No.
23 Q.  Did Margaret?
24 A.  No.
25 Q.  You said they took turns in the shower, and one went

Page 165

1    in and sat on the toilet.
2        So I'm assuming at some point the door to
3    the bathroom opened or you went in there?
4  A.  Amber came out and Paiton was still in the shower.
5  Q.  What happened next?
6  A.  My best recollection Amber came out, and she got mad
7    at Amber -- or Margaret got mad at Amber and walked
8    over and pulled her phone out of her hand and told her
9    she lost her phone because she thought she was lying
10   to her about nothing happening in there.
11 Q.  So there was a conversation at least of some sort --
12 A.  And a slight confrontation too.
13 Q.  And Amber said nothing happened, nothing happened?
14 A.  Yeah.
15 Q.  There was a confrontation of what sort?
16 A.  That Margaret was angry at Amber, and then I yelled at
17   Margaret and Margaret left the room.
18 Q.  So there was -- it was known to all that there was
19   some sort of contentious or argumentative
20   confrontation of sorts between --
21 A.  It was known --
22        MR. WEGLARZ:  Form objection.  Calls for
23   speculation.
24        MR. SAFRA:  Poorly phrased.  I'll withdraw
25   it.

42 (Pages 162 to 165)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 166

1  BY MR. SAFRA:
2  Q.  So you witnessed there being confrontation between
3      them?
4  A.  Yes.
5  Q.  And you yelled at Margaret?
6  A.  Yes.
7  Q.  What did you say to her?
8  A.  I told her that I didn't like the way that she was
9      treating Amber, and that I thought she was wrong and I
10     told her.
11 Q.  Margaret left the room?
12 A.  Yes, she was mad.
13 Q.  Then what happened?
14 A.  She was gone for a little bit of time.  Then I went
15     looking for her because I was like my gosh, where is
16     Margaret at?  And --
17 Q.  Did your daughter and Amber stay in the hotel room?
18 A.  Yes.
19 Q.  How long were you gone?
20 A.  I want to say maybe around 15 minutes because I did
21     the whole resort again.
22 Q.  Do you know -- have you learned since of anything that
23     was talked about or that went on between Amber and
24     your daughter Paiton while you were out of the room or
25     while they were in the bathroom?

Page 167

1  A.  Yes.
2  Q.  Can you tell me?
3  A.  I'm not sure if it was Paiton saying it to Amber or
4      Amber saying it to Paiton, but one of them asked -- I
5      believe Paiton asked Amber if she was raped, and Amber
6      said yes, I believe.  Or it was that Amber -- I don't
7      know.  But they understood that each other was raped
8      at that point.
9          And they made a promise to each other that
10     they would not tell us because they didn't want to
11     ruin our vacation.
12 Q.  Everything you learned about what went on in that
13     building you learned after you returned to the room
14     when you went out to look for Margaret?
15 A.  Everything that went on in that room?
16 Q.  In that room.
17 A.  Yes.
18 Q.  The room where your daughter and Amber were raped?
19 A.  Yes.
20 Q.  At some point when you returned from going to get
21     Margaret after she left the hotel room, you learned
22     about the rape.
23         What did you learn occurred with regard to
24     Amber?
25 A.  She was raped by Jermaine.

Page 168

1  Q.  Do you know how she got into that room?
2  A.  They were talking -- the guys had finished work.  The
3      water slides were closed down.  They finished work --
4      this is my understanding -- and as they were walking
5      out, stopped and talked to the girls.  And Jermaine
6      grabbed Amber's hand and said Come here.  I got to
7      tell you something.  And --
8  Q.  Were the girls still at the bar or --
9  A.  They were just outside of the bar.  They were in a
10     hallway, in a big open hallway by where the elevator
11     was.  Or maybe it wasn't.  But he then, according to
12     Amber -- I don't know who opened the door because they
13     had to have a key.
14         I don't know if there was anybody else
15     involved, but Jermaine pulled her into the maintenance
16     room, on the left side of the maintenance room.
17 Q.  And where -- what is your knowledge now that you have
18     learned since the incident of where your daughter was?
19 A.  Paiton was still standing where they were in the hall,
20     and she saw Amber go around the corner and said Wait a
21     minute.  I'm responsible for her.  Where did he just
22     take her?  And whoever it was that she was with -- I
23     don't know if it was William or Dwight, said Come on.
24     Let's go find her.
25         They went to the same two metal doors.  I

Page 169

1      don't know, again, who opened the doors.  The doors
2      were opened and she said -- or a door was open.  I
3      don't know if they both were.  She said that the
4      lights were off.  She could see Amber standing there,
5      but she could not see anybody else.
6          And she a took one step and reached for
7      Amber, and the person that was with her was behind her
8      and shoved her into the room and then the door shut.
9  Q.  Did you learn anything else that happened in there
10     before Amber left the room?
11 A.  That he raped her vaginally and tried to rape her
12     rectally.
13 Q.  Who is her?  Amber?
14 A.  Amber.
15 Q.  Do you know -- you said tried.  Do you know what
16     actually --
17 A.  He raped her vaginally.
18 Q.  Do you know when Paiton learned of that?
19 A.  Learned what happened to Amber?
20 Q.  Yes.
21 A.  While they were in the bathroom together.
22 Q.  After the incident and after the table?
23 A.  Yes.
24 Q.  That's when she learned?
25 A.  Yes.

43 (Pages 166 to 169)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 170

1   Q.  So when they were both in that room, do you know how
2       it came to be that Paiton was in the room alone
3       without Amber?
4   A.  Yes.  Amber was forced out when she had a panic
5       attack.  She was pushed out of the room, and they were
6       not raped near each other.
7   Q.  What happened next from what you learned of the
8       incident?  Once Amber was pushed out of the room, had
9       anything happened to your daughter while Amber was
10      still in the room?
11  A.  I don't know.
12  Q.  Do you know if Amber said anything to Paiton or
13      anything before she was outside the room?
14  A.  I don't know if they said anything to each other.  I
15      have not heard anything.
16  Q.  I'm just asking what you have been told.
17  A.  Yeah.
18  Q.  All this information you're learning about what
19      occurred that after the incident?
20  A.  Yes.
21  Q.  After you returned from going to find Margaret --
22  A.  That was after that.
23  Q.  And the source of your information, everything you
24      learned about what happened inside that room with the
25      pumps where the rapes took place was from your

Page 171

1       daughter Paiton, or Amber?
2   A.  Yes.
3   Q.  Is it your understanding that once Amber was pushed
4       out of the room is when your daughter was raped?
5   A.  My understanding is Paiton was being raped by the
6       first or second guy when Amber was forced out of the
7       room.
8   Q.  So it had already started in terms of sequence with
9       your daughter but in a separate area of the room while
10      Amber was still in there?
11  A.  Yes.
12  Q.  Is there anything else about what went on in that room
13      relative to either Amber or your daughter Paiton that
14      you have since come to learn that we have not talked
15      about?
16  A.  Yes.
17  Q.  Could you tell me what that is?
18  A.  That Paiton was pulled over into the opposite side of
19      the room and behind a laundry cart into a corner area
20      and then she was then raped.
21  Q.  Anything else?
22  A.  That happened in the room?
23  Q.  That you have since learned about.
24  A.  She looked like she had been drug through the dirt.
25      She had brand-new very white shorts on.  So it was

Page 172

1       very clear that it looked like she had been drug
2       through the dirt.
3   Q.  Drug like dragged?
4   A.  Well --
5   Q.  I'm just making sure we're not talking about drugs.
6   A.  Oh, yes, dragged.
7   Q.  The shorts looked as though they had dirt and stuff on
8       them?
9   A.  Yes.
10  Q.  Do you know the cause of that?
11  A.  I didn't even notice it until they were out of their
12      clothes and showering.
13  Q.  Anything else we haven't talked about that you have
14      after the incident come to learn relative to what
15      happened in that room?
16  A.  I know that one of the men had a backpack on and that
17      was a lot of the fear for the girls.
18  Q.  Did you learn any specifics as to -- and I'm sorry to
19      ask this -- the details in which -- I know you said
20      one of them they tried to penetrate from the backside.
21          Did you learn any other details about the
22      rape occurrences that you haven't told us about for
23      either Paiton or Amber?
24  A.  I know from the medical records things with Paiton.
25  Q.  Anything else that's not written in the medical

Page 173

1       records?
2   A.  There was evidence right there out in the open for
3       everybody to see that sexual encounters had happened
4       in that room.
5   Q.  What evidence?
6   A.  The men's bodily fluids.
7   Q.  Where were those?
8   A.  Right inside the door.  And Paiton said over where she
9       was raped, but we could not see that because it was
10      blocked by a laundry cart.
11  Q.  Did you go back to the room that you saw this?
12  A.  I stepped into the room because I was taking pictures,
13      and they told me then I had to get out of the room.
14  Q.  Did you just see liquid then later on when you
15      learned what happened you realized what it was?
16          Because up until you coming back to the
17      room after finding Margaret, you said you didn't know
18      what happened.  But now seeing liquids, I'm confused.
19          Can you clarify that?
20  A.  When this happened and the girls were out of the room
21      and we went back to the room, they then said We're
22      going to bring somebody in for forensics.  We want to
23      see where this happened.  Then they took me and the
24      two girls back to the room.  They opened the doors and
25      that's the first thing I saw.

44 (Pages 170 to 173)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 174

1  Q.  Is that the first time that you learned what had
2      happened when you went back?
3  A.  I learned in the room and then we went back to -- I
4      learned in the hotel room, and then we went back to
5      the maintenance room to show them where this had
6      happened.
7  Q.  When you returned -- I don't know if I got to this.
8      If I did, I apologize.
9           When you returned with Margaret, is that
10     the first time you learned that there was a rape?
11 A.  When I returned where with --
12 Q.  Back to the hotel room after going to find Margaret.
13 A.  I didn't find her when I went out looking, but she
14     came out 10 minutes later.  And then that's when we
15     learned that the girls had been raped.
16 Q.  They told you?
17 A.  I asked them.
18 Q.  What made you think that that might have been
19     something to ask?
20 A.  Because I knew something happened in there.  They were
21     just too distraught.  They were very -- they were not
22     saying a thing, but they were continuously crying.
23     Their hair was wet.  It was long.  It was just hanging
24     stringing down by their face.
25          And I said -- I thought what are they

Page 175

1      not -- you were in there -- did you go in there to
2      kiss somebody?  Were you making out with people?
3      Which you can't say that in Jamaica.  But they said
4      no.  And then I thought I've got to go to the extremes
5      and see if something -- if they maybe had sex with
6      these guys.
7           And I said the resort has requested that
8      you do a rape test kit to see if you had sex with any
9      of these guys.  And I said Did you have sex with
10     anybody?  And Amber stood there with her head down.
11          And I looked at Paiton and I said Did you
12     have sex with any of them?  And she didn't say a word
13     and just held three fingers up.  And I said Oh, my
14     God, were you raped?  And they both shook their heads
15     and just sobbed.
16 Q.  When did the hotel ask for the rape kit?
17 A.  They didn't.
18 Q.  I thought you just said that the hotel had asked --
19 A.  I did say that.  That is something I said to my kids.
20     I used to tell my son I already know because the
21     school called, and then he would confess to everything
22     he did.
23 Q.  So you said that to try to invite --
24 A.  Yes.  I thought if I go to the extremes, they will let
25     me know if they were in there swapping drugs --

Page 176

1  Q.  I am not --
2  A.  -- making out --
3  Q.  I'm not questioning your handling.  I just wanted to
4      know if a manager actually did say to you prior to
5      that time, I need a rape kit.
6  A.  No.
7  Q.  Did they then tell you any details before you went
8      back?
9  A.  No.
10 Q.  It's after you went back to the room after learning
11     that that you say you saw male fluids on the floor.
12 A.  Yes.
13 Q.  And that's the evidence of the existence of sexual
14     activity or rape you spoke of?
15 A.  Yes.  And Amber had like another anxiety attack at the
16     door when the doors opened.
17 Q.  Let me ask you this:
18          Did you ever come to learn that Amber --
19     has she ever told you that Amber voluntarily went in
20     the room to kiss and didn't want it to go further?
21 A.  I know Amber said she was either being kissed or
22     kissing or whatever in the room, but she said that she
23     was taken by the hand and led in there.
24 Q.  Okay.
25 A.  I don't know --

Page 177

1  Q.  Did she ever say she had gone in there and the
2      intention was to kiss but not go further, then it
3      turned into rape?
4  A.  She never said that.
5  Q.  When you went back to the room with your -- either --
6      well, with your daughters and saw the bodily fluids we
7      spoke about, we talked about a conversation in the
8      hotel and I asked you what else you've learned.
9           Have we talked about everything you learned
10     in terms of what happened inside that room involving
11     either Paiton or Amber that you have learned after the
12     incident?
13 A.  I believe so.
14 Q.  At some point did you go with your daughter to a local
15     hospital or get medical treatment?
16 A.  Yes.
17 Q.  Could you tell me what happened?
18 A.  Before, during or --
19 Q.  What happened?  At some point you went somewhere?
20 A.  Yes.  I called the police and the police came to the
21     hotel and they -- when we were leaving there --
22     because the resort wanted us just to see a resort
23     nurse.  I said, No, they need to go to the hospital.
24     So the police took us in a Jeep Cherokee, all four of
25     us in the back seat.  There was a female police

45 (Pages 174 to 177)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| Page 178 |
| --- |

1    officer on the right and a male officer on the left.
2    And they drove us to a horrific hospital.
3  Q.  Is it there that they did a rape kit test?
4  A.  Yes.  But they didn't -- yes, but I had to teach them
5    how to do it.
6  Q.  There seemed some hesitancy in your response.
7  A.  We were there for six Hours.  They were the only two
8    people in this ER that had three rooms.  They had old
9    flowered stained sheets on the bed and each girl took
10   approximately three hours for them to do this rape
11   test kit.
12       And they were not going to scrape under
13   Paiton's nails, and I said Yes, you are because she
14   had showered.  They were not going to swab their
15   rectums, and I said, you're going to do it.  I had to
16   teach them how to do a rape test kit.  I'm an oncology
17   nurse.  I have no idea how to do a rape test kit.  All
18   you do is open it up and read it step by step.
19  Q.  This is at the hospital?
20  A.  Yes.
21  Q.  This is not at the resort.
22  A.  No, that was at the hospital.
23  Q.  It's not a resort-run facility --
24  A.  No.
25  Q.  -- to your knowledge?  That's a double negative.

| Page 179 |
| --- |

1  A.  It's not a --
2  Q.  To your knowledge it's an independent facility?
3  A.  Yes.
4  Q.  There's a reference in the Complaint of medications
5    being given to your daughter and Amber and that it
6    caused some sickness or vomiting.
7       Did it cause any other type of physical
8    response or injuries?
9  A.  It's hard to know because of what they went through
10   afterwards.  They were sick-sick for about six weeks.
11   HIV medications can do that, and they had to be on
12   them because it's highly prevalent over there.
13  Q.  How do you know that?
14  A.  Because of all the research I have done since.  And
15   they had antibiotic injection while they were at the
16   hospital.
17  Q.  Did they end up contracting any of those things that
18   these medications --
19  A.  No.
20  Q.  -- were serving the purpose of --
21  A.  They did not luckily.  Because when we got home, one
22   of the HIV medications was expired.
23  Q.  They have since been tested and --
24  A.  Oh, yes, multiple times.
25  Q.  Once the six weeks passed, did they have any other

| Page 180 |
| --- |

1    lingering -- separate from emotional -- to your
2    knowledge like physical injuries that they were still
3    either sick, vomiting, things of that nature?
4  A.  I don't believe vomiting.  They had extreme fatigue
5    for months, but that's all I can recall.
6  Q.  There's a reference to your daughter sleeping
7    with a knife under her pillow.
8       Does she still do that?
9  A.  I wouldn't doubt it.
10  Q.  Do you know one way or the other?
11  A.  Well --
12  Q.  Ask her --
13  A.  I know she carries one.
14  Q.  You said she always -- I interrupted.  She always
15    what?
16  A.  I don't know what I was going to say, but she's in an
17    apartment of her own now.  I know she has some sort of
18    protection in that apartment.
19  Q.  Did she before the incident carry some sort of
20    protection on her?
21  A.  She carried a knife.
22  Q.  So before the incident she carried a knife as well?
23  A.  Yes.
24  Q.  Afterwards it's the same knife, but now she sleeps
25    with it under her pillow?

| Page 181 |
| --- |

1  A.  I think she was sleeping with a bigger knife under her
2    pillow.  It was with her father.  She was staying with
3    her father.
4  Q.  Did she sleep with a knife under her pillow before the
5    incident?
6  A.  No.  They slept with a gun in the house after that.
7  Q.  Even with the father there?
8  A.  Oh, yes.  He probably had a knife under his pillow.
9  Q.  Before the incident as well?
10  A.  No.  I mean he just was afraid of everything.
11  Q.  After the hospital did you fly directly home?
12  A.  No.
13  Q.  I think you mentioned another resort.
14  A.  We left the hospital after six to seven hours I
15    believe and went directly to the police station.  And
16    I don't know where the police station was.
17  Q.  Then did you stay at another affiliated hotel of the
18    Beaches Ocho Rios Resort for an evening?
19  A.  It was a Sandals Plantation something.
20  Q.  Did you refuse at any point to stay at any hotel
21    associated with this Beaches Ocho Rios Resort?
22  A.  No.
23  Q.  Did you consider going to other hotels or looking into
24    flights directly home?
25  A.  I wasn't -- no.

46  (Pages 178 to 181)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 182

1  Q.  Okay.
2  A.  I wasn't willing to just up and leave.
3  Q.  There's a reference in the Complaint as part of
4     damages, embarrassment, humiliation and disgrace.
5  A.  Concerning who?
6  Q.  Concerning plaintiffs Paiton Bater and Amber have
7     suffered injuries and damages and it lists a bunch,
8     but that's the one that -- do you know what is meant
9     by embarrassment, disgrace and humiliation?
10 A.  They were raped.  They were stripped naked.
11 Q.  And if it's individualized to themselves, I
12    understand.  I'm just wanting to know if that's
13    something that -- are they telling people and so other
14    people know and so they are suffering embarrassment
15    and disgrace because it's others?  Have they been kept
16    confined?
17 A.  It wasn't due to telling people.  It was due to how
18    they felt being violated.
19 Q.  So it's more an internal feeling.
20 A.  Yes.
21 Q.  Maybe amongst you and immediate family members?
22 A.  That they felt embarrassed?
23 Q.  The embarrassment, disgrace, humiliation --
24 A.  I think it was just within themselves, that --
25        MR. WEGLARZ:  Belated objection.

Page 183

1  BY MR. SAFRA:
2  Q.  Do you find that that type of injury has gotten better
3     or worse since the incident?
4        MR. WEGLARZ:  Same objection.  No
5     foundation.
6        Answer if you can.
7  BY MR. SAFRA:
8  Q.  Did you personally witness -- you're talking about
9     your daughter, that Paiton -- that she's embarrassed,
10    suffering disgrace or humiliation?
11 A.  Yes.
12 Q.  Has that gotten better or worse?
13 A.  Oh, personally, yeah.  I don't know.
14 Q.  Have you observed that other people are finding out
15    about this, and then that's making them feel even more
16    humiliated or embarrassed or disgraced?
17 A.  No.  It doesn't make her more humiliated.
18 Q.  Have you talked with your daughter about seeking help?
19 A.  Yes.
20 Q.  Does she try to keep the topic of this confidential?
21 A.  From her friends and stuff?
22 Q.  Yes.
23 A.  No.
24 Q.  Does she openly talk about it to them?
25 A.  She does.  She does now.

Page 184

1  Q.  I understand you have also spoken with the media.
2  A.  Yes.
3  Q.  Why is that?
4  A.  There was a case in the paper.  I believe it was
5     about -- I don't know.  There was a rape case in
6     Jamaica in the paper.  It was the same story that they
7     were told -- that we were told.  This has never
8     happened before.
9        There was evidence found in that room that
10    there was a rape before in that maintenance room.  We
11    knew it had probably happened before.
12 Q.  You're telling me there was evidence found in the room
13    when you went back that there had been a rape before?
14 A.  Not by me but what was documented.  That there had
15    been sexual activity in that room.
16 Q.  That there had been sexual activity.
17 A.  Yes.
18 Q.  You agree you have no knowledge or information that
19    there was a prior rape in that room?
20 A.  Not a prior rape but --
21 Q.  There might not have even been sex.  In fact, an
22    employee might have been in that room and satisfied
23    himself.
24        Isn't that true?
25 A.  With a condom?

Page 185

1        MR. WEGLARZ:  Objection.  We're arguing.
2  BY MR. SAFRA:
3  Q.  It could have, correct?
4        MR. WEGLARZ:  Anything is possible.
5  BY MR. SAFRA:
6  Q.  Then don't make a statement that there's a prior rape
7     if you're not aware.
8        MR. WEGLARZ:  Look it, Mr. Safra --
9        MR. SAFRA:  Well, I think --
10       MR. WEGLARZ:  -- you can't instruct her how
11    to answer.  If that's what she thinks, that's what she
12    thinks.
13 BY MR. SAFRA:
14 Q.  Do you agree that it was a misstatement of you -- do
15    you have any personal knowledge that there was any
16    rape in that room prior to any sexual activity
17    involving Amber or Paiton?
18 A.  No.  I just know that there was evidence that --
19    missing buttons that had been torn off of someone's
20    jeans.
21        No, I don't.
22 Q.  Do you know if that button came from an employee?
23 A.  No.
24 Q.  The case that you otherwise referenced in the context
25    of the press, that was involving a resort that was not

47 (Pages 182 to 185)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 186

1      a Sandals or Beaches resort; isn't that true?
2   A.   I don't recall.
3   Q.   Would you defer to the actual press article?
4   A.   What?
5   Q.   Would you defer to the actual press release article?
6   A.   To find that out?
7   Q.   Yes.
8   A.   Yes.
9   Q.   Did the Detroit Free Press contact you or did you
10       reach out to them?
11  A.   I reached out to the person who wrote the story so
12       that I could contact the person that it happened to.
13  Q.   Did they ask you to give a statement and be
14       interviewed, the press?
15  A.   Yes.
16  Q.   Did you do that?
17  A.   Yes.
18  Q.   Did your daughter have anything to say about you
19       making public to the world through press releases and
20       articles?
21  A.   Yes.
22  Q.   What did she say?
23  A.   She said I want other people to be aware so this
24       doesn't happened to somebody else's kids.
25           MR. WEGLARZ:  Come on, Steve.

Page 187

1           MR. SAFRA:  Move to strike the comments
2   from counsel.
3           MR. WEGLARZ:  Well, you know she's crying
4   and she's upset by your insinuation.
5           THE WITNESS:  Sorry.
6           MR. SAFRA:  She was not prior to my
7   question, just your coaching of it is causing the
8   emotion a little bit more.  And the truth of the
9   matter is that these are the types of things that you
10  would ask at trial, so I'm entitled to ask them now to
11  know what might be said.
12          MR. WEGLARZ:  You can ask questions but you
13  don't have to -- the way you're doing it in a
14  judgmental way, this is not an easy subject for a
15  mother and daughter to go through.
16          MR. SAFRA:  Now that you've gotten your
17  statement on the record, which I move to strike, I am
18  not asking in a judgmental way.  I'm trying to find
19  out what will be said at trial.
20          I think that I have been very clear with my
21  intentions, my view of the situation and I've tried to
22  be respectful this whole time, and I hope that that is
23  how you feel.
24          Can we take a break?
25          (Off the record at 1:34 p.m.)

Page 188

1           MARKED FOR IDENTIFICATION
2           DEPOSITION EXHIBIT 3
3           1:42 p.m.
4           (Back on the record at 1:44 p.m.)
5   BY MR. SAFRA:
6   Q.   I have handed you what I have marked as Exhibit 3,
7        which is a composite of a photocopy of handwritten
8        notes, not stamped by page.  On the top it says for
9        Paiton Bater's file.
10           Do you see that?
11  A.   Yes.
12  Q.   Are these your handwritten notes?
13  A.   Actually there's some in here that's Margaret's, small
14       areas.
15  Q.   Could you tell me which are yours starting with the
16       first page?
17  A.   First page are mine until -- no.  The first page is
18       Margaret's.
19  Q.   What is this?
20  A.   This is a pad of paper that was in the room.  It was
21       the only pad of paper we had.
22  Q.   In the hotel room?
23  A.   Yes, that we could just keep notes of things.
24  Q.   Between the two of you, you made notes while at the
25       hotel?

Page 189

1   A.   Yes.
2   Q.   This is the compilation of your notes and Margaret's?
3   A.   Yes.
4   Q.   There's a stamp on here that says Received December
5        16th, 2015.
6            Do you see that?
7   A.   Yes.
8   Q.   That's the stamp from your law firm?
9   A.   Yes.
10  Q.   Do you know why if it was received December 16, 2015
11       by the Fieger law firm we're only getting this today?
12  A.   I don't know why.
13          MR. WEGLARZ:  She's not going to know why.
14          MR. SAFRA:  I'm going to take the time
15  while co-defense counsel is questioning to look
16  through this and reserve the right to ask questions.
17  You've previously been served a request for production
18  and we should have received this well in advance of
19  today.
20          Otherwise, I have spoken with counsel and I
21  think there's some intention by the co-defendant to
22  address damages line of questioning.
23          So rather than overlap or do piecemeal,
24  counsel has granted me the right to come back and ask
25  some follow-up if need be.  But I'm going to

48 (Pages 186 to 189)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 190

1    relinquish questions for the time being to co-counsel.
2         Otherwise, thank you so much for your time
3    in case I don't get to say that.  I know that some of
4    these topics are emotion and personal.  I appreciate
5    you addressing them here today and understanding that
6    I'm doing my job.
7         But I understand the gravity and the nature
8    of what a rape is.  I'm not trying to go into inquires
9    on anything that I shouldn't.
10        Thank you.
11        MR. WEGLARZ:  Thank you, Steve.  I
12   appreciate it.
13        MR. SAFRA:  And my client, who is here,
14   Unique Vacations, Tom Scott and I, it's an unfortunate
15   circumstance.  We're sorry that this happened to you.
16   But we obviously understand that in litigation we have
17   our differences of opinion on liability and damages.
18        MR. SUAREZ:  Of course.
19        EXAMINATION
20   BY MR. SUAREZ:
21   Q.  Good afternoon, ma'am.  We met early this morning when
22   we got here.  Just to refresh your recollection, my
23   name is Luis Suarez.  I represent the Mark Travel
24   Corporation in this lawsuit.
25        Sitting to my left is Patricia Melville, my

Page 191

1    law partner, and she also represents The Mark Travel
2    Corporation in this lawsuit.
3    A.  Okay.
4    Q.  Do you understand that?
5    A.  Yes.
6    Q.  Same ground rules apply.  I'm soft-spoken by nature.
7    If you wish for me to raise my voice or if you can't
8    hear me, would you please let me know?
9    A.  Sure.
10   Q.  Just so you know, I'm going to try very, very hard not
11   to be repetitive of what Mr. Safra covered today.
12   Because of that, I'm going to need to bounce around a
13   little because I just took notes on his questioning.
14   And where I can I'm going to try not to repeat but I
15   want to go --
16   A.  Okay.
17   Q.  I want to go back to the beginning of this lawsuit --
18   excuse me -- of this deposition today.  And I believe
19   sitting before you is a document that we marked as
20   Exhibit 1.
21        These documents were produced to us by an
22   entity named Vacations to Go that was your travel
23   agent for this trip.
24        Do you understand that?
25   A.  Yes.

Page 192

1    Q.  Essentially this document has 49 pages.  And the first
2    part of this document, 1 through 22, appear to be --
3    and I'm giving you this intro so we can speed this up
4    and you know exactly where I'm going.
5         One through 22 appear to be confirmations
6    that were sent to you relating to this trip from
7    Vacations to Go, your travel agent.
8         Do you understand that?  Can you just
9    quickly glance at that please?
10   A.  I don't recall this page because I don't recall this
11   at all, but starting here I do.
12   Q.  For the record, I'll -- I'm going to give you what I
13   understand you're saying, but before that I want you
14   to get to 22.  Go through each page and see if what
15   I --
16   A.  I don't know if I'm going to know where 22 is.
17        MR. WEGLARZ:  I'll go through it with you.
18        MR. WEGLARZ:  Actually I'd like you to end
19   at 21 and then we'll go to 22.
20        MR. WEGLARZ:  Okay.  You want us to stop at
21   20?
22        MR. WEGLARZ:  At 21.
23        MR. WEGLARZ:  She's quickly glanced at
24   them.  I think you already have a question out there.
25   If you're going to ask her to identify if she's

Page 193

1    received each one of these documents, I think she
2    would have to have the opportunity to review the
3    records she did in fact receive and compare it.
4         MR. SUAREZ:  Okay.  I can tell you that
5    there are requests for productions.  You produced
6    about 600 pages.  I don't believe I have all the
7    e-mails that she received, and I don't believe I have
8    all the e-mails she sent.  And I'll tell you why
9    shortly because it will become clear when I go through
10   this questioning.
11        Maybe they don't exist, but I don't know
12   that I have them all.  So let me proceed with my
13   questioning and we'll go from there.
14        MR. WEGLARZ:  Sure.
15   BY MR. SUAREZ:
16   Q.  All right.  So you previously said 1 and 2 you don't
17   recall receiving, right?
18   A.  Right.  They don't look familiar.
19   Q.  Page 3, it says, Dear Ms. DeSantis, and that is a --
20   this appears to be a confirmation sent from Vacations
21   to Go, your travel agent to you.
22        Do you see that?
23   A.  Yes.
24   Q.  Do you recall receiving this document from Vacations
25   to Go?

49 (Pages 190 to 193)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

---

Page 194

1  A.  Yes.
2  Q.  And you see where it says the word confirmation?
3      Well, you see the little note is signed by Stetson
4      Arriola, correct?
5  A.  Yes.
6  Q.  And Mr. Arriola is a travel agent for Vacations to Go,
7      correct?
8  A.  Yes.
9  Q.  And he was your point of contact for booking this
10     trip, correct?
11 A.  Yes.
12 Q.  Do you know where Mr. Arriola is physically?
13 A.  I believe Texas.
14 Q.  Do you have a log somewhere either on your mobile
15     phone or at home of every phone call you made to
16     Mr. Arriola?
17 A.  No, but I don't have the same phone.
18 Q.  Do you recall e-mailing Mr. Arriola?
19 A.  I recall responding to e-mails of his.
20 Q.  If you see here where it says agent, Stetson Arriola,
21     and that's to the right of where it says Vacations to
22     Go, right?
23 A.  Yes.
24 Q.  Under that it says, sarriola@vacationstogo.com, right?
25 A.  Yes.

---

Page 195

1  Q.  Is that the e-mail where you recall e-mailing
2      Mr. Arriola?
3  A.  I don't recall.
4  Q.  You see where it says charges down below?  Do you
5      recall paying 4,000 -- I'm sorry -- because you didn't
6      pay the whole thing.
7          Do you recall the total charges of this
8      trip were going to be about $5,000?
9  A.  Yes.
10 Q.  Ma'am, if I you could ask you to go to page 7, and
11     that document appears to end at page 10, right?
12 A.  Yes.
13 Q.  And I'm just walking through the composite Exhibit 1.
14 A.  Yes.
15 Q.  This appears to be another confirmation, correct?
16 A.  Yes.
17 Q.  And you received this confirmation as well, correct?
18 A.  Yes.
19 Q.  And the difference between this confirmation and the
20     prior confirmation you received is that this one
21     reflects the property as Beaches Ocho Rios; whereas,
22     the prior one reflected the property as the Moon
23     Palace, correct?
24 A.  Yeah.
25 Q.  And this was sent to you by Stetson Arriola from

---

Page 196

1      Vacations to Go, correct?
2  A.  Yes.
3  Q.  He was -- once you switched to Beaches he remained
4      your main point of contact, right?
5  A.  Yes.
6  Q.  And do you still have -- you see where it says
7      Customer Mrs. Janet Sue DeSantis?
8  A.  Yes.
9  Q.  Do you see where it says down below
10     jsbater11@gmail.com?
11 A.  Yes, that is my e-mail.
12 Q.  I'm going to take a wild guess that that's your
13     e-mail, correct?
14 A.  Yes.
15 Q.  Do you still have that e-mail address?
16 A.  Yes.
17 Q.  Have you gone through a search of that e-mail address
18     to see whether you have produced all e-mails that you
19     sent to Vacations to Go?
20 A.  Yes.  I have them in a folder.
21 Q.  Have you produced those to counsel?
22 A.  Yes.
23 Q.  I have not yet seen any of those e-mails between you
24     and Vacations to Go from jsbater11, so I'll follow up
25     with counsel in a moment to make sure I have them.

---

Page 197

1  A.  Okay.
2  Q.  Okay.  The next document starts at 11 and goes through
3      I believe page 21.  And what I think this is is the
4      confirmation of your flight arrangements.
5          MR. WEGLARZ:  I don't think this is all one
6      document.  I think this is a couple documents.
7  BY MR. SUAREZ:
8  Q.  Let's take this in parts then.
9          Ma'am, can I ask you to look at that real
10     quick.
11 A.  Yes.
12 Q.  Let's take this in parts.  Let's just first look at
13     document 11 through 13.  That's again another
14     confirmation from Vacations to Go you sent from
15     Stetson Arriola.
16         Do you see that starting at page 11?
17 A.  I see it.
18 Q.  Do you recall receiving this document?
19 A.  I don't remember.
20 Q.  I'd like to now turn to -- the next is a document
21     related to flight information.  I don't want to spend
22     time on that right now.
23         I would like to now turn to what is a
24     document identified as page No. 22 if that's okay.
25     Starting from page 22 to 49 -- did I give you a chance

---

50  (Pages 194 to 197)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 198

1      to look at 22 through 49?
2  A.  I skimmed it. I didn't get to read anything.
3  Q.  And to me -- this was produced by Vacations to Go,
4      your travel agent, and to me it appears to be a log
5      detailing the points of contact that you had with
6      Vacations to Go.
7          That is what it appears to me.
8  A.  Okay.
9  Q.  So if you note, it starts at 2-16-15 at 7:37 a.m. and
10     it goes all the way to 4-29-15 at 7:09 a.m., and
11     there's reference the next day at 5-29-15 at 8:18 p.m.
12         Do you see that?
13 A.  Yes.
14 Q.  The first question, ma'am, is do you recall first
15     contacting Vacations to Go on February 16, 2015 at
16     7:37?
17 A.  I recall contacting them in February of 2015.
18 Q.  How did you hear of Vacations to Go?
19 A.  I searched travel agencies online.
20 Q.  What was it about Vacations to Go as a travel agent
21     that lured you to them?
22 A.  It sounded good from what I had read, which I don't
23     recall what I read at this time, but I know whatever
24     it was I saw and read, it sounded like a reputable
25     place to use.

Page 199

1  Q.  Did you know anybody that had used Vacations to Go
2      before?
3  A.  No.
4  Q.  Did you ask anybody about Vacations to Go?
5  A.  No.
6  Q.  Did you look at a ranking of travel agencies anywhere
7      in the United States to determine which were reputable
8      and which were not?
9  A.  I don't recall.
10 Q.  Do you recall reading any statements associated with
11     Vacations to Go?
12 A.  I don't recall.
13 Q.  Did you ever print out any statements associated with
14     Vacations to Go?
15 A.  I don't believe so.
16 Q.  Do you recall ever hearing any statements related to
17     Vacations to Go?
18 A.  No.
19 Q.  How long between the time you first contacted Stetson
20     Arriola and you actually booked your vacation at the
21     Moon Palace?
22 A.  Seems like it could have been a month, maybe less than
23     a month but I'm not sure.
24 Q.  It says here that you had a cell phone called (517)
25     930-1827.

Page 200

1          Do you still have that cell phone?
2  A.  Yes.
3  Q.  Did you have that cell phone at the time you made the
4      booking?
5  A.  Yes.
6  Q.  Did you -- do you do your personal travel through your
7      cell phone?
8  A.  What do you mean?
9  Q.  Did you do this personal travel through your cell
10     phone?
11 A.  I believe I did.
12 Q.  Who's your cell phone provider?
13 A.  At the time it was Verizon.
14 Q.  I have on 2-16 at the bottom of this at 8:17, it says
15     that there's an e-mail from S. Arriola,
16     vacationstogo.com to jsbater11@gmail.com.
17         Do you see that?
18     MR. WEGLARZ:  What page?
19     THE WITNESS:  12.
20     MR. SUAREZ:  22.
21     MR. WEGLARZ:  Which one?
22     MR. SUAREZ:  The fourth entry is an e-mail
23     from Stetson Arriola to -- at 8:17 a.m. --
24     THE WITNESS:  Yes, I see that.
25 BY MR. SUAREZ:

Page 201

1  Q.  Do you recall receiving this e-mail?
2  A.  I don't recall.
3  Q.  Do you have any reason to believe that you didn't
4      receive an e-mail to jsbater -- to
5      jsbater11@gmail.com?
6  A.  To J.S. Bater, no.
7  Q.  I apologize, ma'am.  I have a friend by the name of
8      Sabater (phonetic), so that's why I keep saying
9      Sabater.
10         You're right.  It should be S. Bater.  I
11     appreciate you telling me that.
12         Do you see that?
13 A.  What was your question again?
14 Q.  Do you have any reason to believe that you didn't
15     receive -- you must have received a series of e-mails
16     from Stetson Arriola.
17 A.  I got a series of e-mails from him.  I don't know
18     exactly the dates and times I got them.
19 Q.  I can cut to the chase here and to try to save some
20     time, just give me one second.  I quickly counted and
21     in this document between pages 22 and 49 there appear
22     to be about approximately 15 e-mails that were sent
23     from Stetson Arriola to you regarding your travel in
24     this matter.
25         Does that seem right to you, more or less?

U.S. LEGAL SUPPORT
www.uslegalsupport.com

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 202

1    A.  15?
2    Q.  Yeah.
3    A.  Yeah.
4    Q.  I don't see in here, in this document that anybody
5        else from Vacations to Go ever e-mailed you.
6            My question is did anybody else from
7        Vacations to Go ever e-mail you?
8    A.  Not that I remember.
9    Q.  And I don't see in here, in this document, that you
10       received any e-mails from my client, the Mark Travel
11       Corporation.
12           Did you ever receive any e-mails from my
13       client, The Mark Travel Corporation?
14   A.  Not that I recall.
15   Q.  Did you ever receive any e-mails from an entity known
16       as Fun Jet?
17   A.  Well, it's advertised in this packet.
18   Q.  I admit at the bottom of one of the --
19   A.  On the right in the middle.
20   Q.  On the bottom --
21   A.  There and there's more.
22   Q.  Right.  So let's point to that real quick so the
23       record's clear.
24           Before we go to that, do you recall ever
25       receiving any e-mails from an entity known as Fun Jet?

Page 203

1    A.  I don't know.
2    Q.  Have you searched for any e-mail received from an
3        entity known as Fun Jet?
4    A.  No.
5    Q.  Do you recall ever talking to anybody who represented
6        himself or herself as somebody who is employed by Fun
7        Jet?
8    A.  I didn't believe so.
9    Q.  Do you recall ever talking to anybody who represented
10       himself or herself as somebody who represented The
11       Mark Travel Corporation?
12   A.  Not to my knowledge.
13   Q.  Do you recall ever seeing, reading or hearing any
14       words or statements that were issued by The Mark
15       Travel Corporation?
16   A.  Not that I'm aware of.
17   Q.  Do you recall ever hearing or reading any words or
18       statements that were issued by an entity known as Fun
19       Jet?
20   A.  Say that again.
21   Q.  Do you recall ever hearing or reading any words or
22       statements that were issued by an entity known as Fun
23       Jet?
24   A.  I recall that the name was familiar, and it was
25       somewhere in my e-mail with, who I thought I was

Page 204

1        corresponding with, Stetson Arriola.
2    Q.  For example, let me invite you to turn -- just to make
3        sure I understand this right, let me invite you to
4        turn to page 31 of the documents produced by Vacations
5        to Go, right?
6    A.  Yes.
7    Q.  March 16, 2015 there's an e-mail at 7:47 from Stetson
8        Arriola at Vacations to Go, correct?
9    A.  Yes.
10   Q.  To yourself, jsbater11@gmail.com, correct?
11   A.  Yes.
12   Q.  And Margaret Torralva, T-O-R-R-A-L-V-A, at
13       email.grcc.evu, correct?
14   A.  Yes.
15   Q.  And it says there Your travel documents.  Here it is.
16       It's been prepared as an e-doc and is included below
17       this message.  It's been a pleasure.  Enjoy.  Thank
18       you for choosing Fun Jet Vacations, Vacations To Go,
19       5851 31st Street, Houston, Texas 77057-2484, correct?
20   A.  Yes.
21   Q.  To the extent that you say that you recall receiving
22       anything from Fun Jet, it would be in this type of
23       e-mail below, an e-mail from your travel agent,
24       correct?
25   A.  I don't recall where it would be.

Page 205

1    Q.  I guess my statement is correct, sitting here today if
2        I asked you do you recall having heard or read any
3        statement or words issued by an entity known as Fun
4        Jet, you can't recall any, correct?
5    A.  I can recall the name Fun Jet while I was making these
6        reservations.
7    Q.  But you don't know what Fun Jet was, correct?
8    A.  I didn't know where it played in Vacations to Go.
9    Q.  So my question is do you recall hearing any words or
10       statements issued by any persons who represented
11       themselves as representatives of Fun Jet?
12   A.  It was my belief that that would be Stetson Arriola.
13   Q.  Well, Stetson Arriola -- do you recall Stetson Arriola
14       ever telling you that he represented Fun Jet?
15   A.  I don't recall.
16   Q.  Do you recall Stetson Arriola ever writing to you that
17       he represented Fun Jet?
18   A.  I don't know.
19   Q.  Did Stetson Arriola, even though his e-mail says
20       Vacations to Go, ever tell you that although I work
21       and represent Vacations to Go, I really work for Fun
22       Jet?  Did he ever tell you that?
23   A.  I don't recall him saying that.
24   Q.  You don't have any basis sitting here today to tie
25       Stetson Arriola to Fun Jet, correct?

52 (Pages 202 to 205)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 206

1  A.  I don't -- I have e-mails that has Fun Jet Vacations
2      on it from Stetson Arriola who worked for Vacations to
3      Go.
4  Q.  But you don't know why that's there, correct?
5  A.  Correct.
6  Q.  You also have e-mails from Stetson Arriola that have
7      other logos on them, correct?
8  A.  I don't know.  Here is another one with Fun Jet on it,
9      and his name is right below it.
10 Q.  But what does it say below his name?
11 A.  Master travel counselor.
12 Q.  What does it says below that?
13 A.  Vacations to Go, five years.
14 Q.  What does it say below that?
15 A.  His e-mail address.
16 Q.  And what is his e-mail address?
17 A.  Sarriolavacationstogo.com.
18 Q.  You're referring to page 35, correct?
19 A.  Yes.
20 Q.  While we're at page 35, let's stop right there, right,
21     and let's point to -- let's see what it is you're
22     looking at really quick.
23         If you go -- if you look at right above
24     page 35, first of all, next to it, it says on page 35,
25     there's a logo, correct?

Page 207

1  A.  Yes.
2  Q.  Can you make out that logo?
3  A.  Are you talking about this here or others?
4  Q.  There's apparently four logos.  There's one that says
5      TOP on the left.  There is another one that says Thank
6      you for choosing.  There's another one that says Fun
7      Jet Vacation.  There's another one that says USIA or
8      OA, correct?
9  A.  It appears as though it says that, yes.  I see them.
10 Q.  Above that there's something that says important
11     notice, correct?
12 A.  Yes.
13 Q.  And that important notice says The Mark Travel, its
14     employees, officers, directors, shareholders,
15     collectively, Fun Jet does not own, control, operate
16     any hotels or any air, land or water transportation
17     vehicles or companies of any kind including without
18     limited -- excuse me -- without limitation airplanes,
19     helicopters, boats, rental cars, ground transportation
20     vehicles, transport companies, shuttle services, buses
21     or local tour companies, which may offer excursions or
22     tours.
23         Fun Jet Vacation occasionally enters
24     contracts into with hotels and air, land or water
25     transportation companies but all such entities are

Page 208

1      owned and operated by independent contractors.
2          Did I read that correctly?
3  A.  Yes.
4  Q.  Do you recall receiving that statement?
5  A.  I don't recall.
6  Q.  And then below that it says Fun Jet Vacations is not
7      responsible for any negligent or willful act, omission
8      or failure to act on the part of any such entity or
9      its employees or any other third party beyond its
10     control.  The Fun Jet Vacation's name and logo may
11     appear on posted or hand-held signs at your hotel, at
12     the airport of your departure destination, in vans,
13     buses, coaches or elsewhere during your vacation.
14         This use of Fun Jet Vacation's name and
15     logo is solely intended to help you identify persons
16     or entities who might provide service to you during
17     the trip but does not indicate and should not be
18     understood by you to indicate that Fun Jet Vacations
19     owns, controls, or operates any entity displaying such
20     a sign or that Fun Jet Vacations employs or controls
21     any person holding or displaying such a sign.
22         Did I read that correctly?
23 A.  Yes.
24 Q.  Do you recall receiving that statement?
25 A.  I don't recall.

Page 209

1  Q.  Do you recall while you were boarding the plane in the
2      United States to go to Atlanta and go to Jamaica any
3      person or entity with a sign that said Fun Jet
4      Vacations or The Mark Travel Corporation?
5  A.  I don't recall seeing any.
6  Q.  When you landed in Jamaica do you recall seeing any
7      person or entity with any sign or logo that used the
8      words or phrases Fun Jet Vacation or The Mark Travel
9      Corporation?
10 A.  I don't remember.
11 Q.  In your entire stay in Jamaica at the Beaches Ocho
12     Rios or in the subsequent hotel or any of the buses or
13     on any of the excursions that you did, do you recall
14     any entity, person displaying the logo Fun Jet
15     Vacations or The Mark Travel Corporation?
16 A.  No.
17 Q.  Do you recall ever accessing any website of the Fun
18     Jet Corporation?
19 A.  I don't remember.
20 Q.  Do you recall accessing any website of The Mark Travel
21     Corporation?
22 A.  I don't remember that either.
23 Q.  Do you recall ever calling any 1-800 number or phone
24     number associated with Fun Jet Vacations or The Mark
25     Travel Corporation?

53 (Pages 206 to 209)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 210

1   A.  I believed Stetson's was a 1-800 number, Stetson
2       Arriola.
3   Q.  But Stetson Arriola works for Vacations to Go,
4       correct?
5   A.  Yes.  Well, I don't know who he worked for because
6       this is advertised so much in here.
7   Q.  Well, but there is an important paragraph immediately
8       below -- above what you just pointed at that explains
9       exactly what Fun Jet is, correct?
10  A.  It tells what they are not responsible for -- what Fun
11      Jet Vacations is not responsible for and what their
12      name and logo is intended for.
13  Q.  Above that it explains what The Mark Travel
14      Corporation is, and it refers therein as an example
15      how they're part of -- how Fun Jet Vacations is part
16      of that, correct?
17  A.  It explains what they don't own.
18  Q.  Do you recall ever e-mailing somebody with an e-mail
19      address that had the words Fun Jet Vacations?
20  A.  I don't remember.
21  Q.  Do you recall ever e-mailing anybody that had an
22      e-mail that had The Mark Travel Corporation on it?
23  A.  I don't remember.
24  Q.  Do you recall accessing the Vacations To Go website?
25  A.  Vaguely.

Page 211

1   Q.  Do you know how many times you accessed the Vacations
2       To Go website?
3   A.  It would have been multiple times.
4   Q.  Were you the only person that spoke to Stetson Arriola
5       at Vacations to Go?
6           MR. WEGLARZ:  Form objection.  Answer if
7       you can answer.
8           THE WITNESS:  I believe that Margaret spoke
9       with someone from there to make a payment, but we
10      don't know who it was we spoke with to make our final
11      payment.
12  BY MR. SUAREZ:
13  Q.  Did either of the girls, Amber or Paiton speak to
14      anyone at Vacations to Go?
15  A.  No.
16          MR. WEGLARZ:  Same objection.
17  BY MR. SUAREZ:
18  Q.  Did you ever use the Vacations to Go website before
19      February 16th, 2015?
20  A.  No.
21  Q.  Did you ever use the Vacations to Go website after you
22      returned from Jamaica in late May or mid-May of 2015?
23  A.  No.
24  Q.  Did you ever go on -- did you ever do a Google search
25      for The Mark Travel Corporation?

Page 212

1   A.  Not that I'm aware of.
2   Q.  Did you ever do a Google search for Fun Jet Vacations?
3   A.  Not that I'm aware of.
4   Q.  Do you ever recall accessing either of their websites?
5   A.  I don't remember.
6   Q.  After you returned from Jamaica do you recall writing
7       to either Fun Jet Vacations or The Mark Travel
8       Corporation?
9   A.  I did not.
10  Q.  Did you write to Vacations to Go?
11  A.  No.
12          MR. SUAREZ:  I'm going to mark this as the
13      next exhibit, which I believe is Exhibit 4.
14          MARKED FOR IDENTIFICATION
15          DEPOSITION EXHIBIT 4
16          2:21 p.m.
17  BY MR. SUAREZ:
18  Q.  This was produced in this file -- in this litigation
19      and was entered to the record on June 25th of 2018.
20          Do you see that above there?
21  A.  Yes.
22  Q.  This purports to be the number of times that you
23      accessed the Vacations to Go website.  I counted here
24      about 19 times.
25          Do you see that?

Page 213

1   A.  Yes.
2   Q.  Does it --
3           MR. WEGLARZ:  I have to --
4   BY MR. SUAREZ:
5   Q.  Does it sound like --
6           MR. WEGLARZ:  I'm sorry, Counsel.  I'm not
7       trying to disrupt you, but the beginning of your
8       question was this purports to be the number of times
9       that you accessed this website, and I respectfully I
10      disagree.  This is just something -- it doesn't say
11      that at all.
12          MR. SUAREZ:  Your objection is noted in the
13      record.
14  BY MR. SUAREZ:
15  Q.  I counted about 19 times.  Does it sound right to you
16      that you would have accessed the Vacations to Go
17      website about 19 times?
18  A.  I don't recall.
19  Q.  Do you recall accessing the Vacations to Go more than
20      10 times?
21  A.  I don't recall that.
22  Q.  Do you recall accessing the Vacations to Go website
23      more than five times?
24  A.  I don't recall.
25  Q.  Now, could you help me understand how you -- do you

54 (Pages 210 to 213)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 214

1    recall how many times you spoke to Stetson Arriola?
2    A.  How many times I talked to him on the phone?
3    Q.  Yes.
4    A.  Maybe between five and ten times.
5    Q.  Do you recall how many times you e-mailed Stetson
6      Arriola?
7    A.  E-mailed him maybe between 10 and 20.
8    Q.  Do you recall how many times you received e-mails from
9      Stetson Arriola?
10   A.  I can guess about 15.
11   Q.  Did you ever write to Stetson Arriola to ask him any
12     questions about the safety of Ocho Rios, Jamaica?
13   A.  No.
14   Q.  Did Stetson Arriola ever write to you about the safety
15     of Ocho Rios, Jamaica?
16   A.  No.
17   Q.  Ma'am, did you ever receive an invoice from an entity
18     known as Fun Jet Vacations or The Mark Travel
19     Corporation?
20   A.  Did I ever receive --
21   Q.  -- an invoice.
22   A.  An invoice?
23   Q.  Yes.
24   A.  An invoice --
25   Q.  Did you ever receive an invoice from either Fun Jet

Page 215

1    Vacations or The Mark Travel Corporation?
2    A.  I don't know.  I don't know by invoice what I would be
3      looking for.
4    Q.  Ma'am, can I grab that for a sec?
5    A.  Yes.
6    Q.  Did Stetson Arriola ever ask you to sign a document
7      that was a contract between you and your party and Fun
8      Jet Vacations or the Mark Travel Corporation?
9    A.  I don't know.
10   Q.  Let me have No. 2 -- I was trying to do some
11     housekeeping.  Two, just for the record -- sometimes
12     these get lost in depositions.  I like to keep them in
13     order.
14         Ma'am, do you have a lawyer in Jamaica?
15   A.  I did.  I don't think he is active in the case
16     anymore.
17   Q.  When did you first hire a lawyer?
18   A.  I believe November or October -- probably November of
19     2015.
20   Q.  Without telling me the substance of what you
21     discussed, why did you hire that lawyer?
22   A.  Because I had nobody -- people were not returning
23     my -- the prosecuting attorney was not returning my
24     phone calls in a timely manner.  It would be weeks
25     later.  And we had no idea what was going on.  We

Page 216

1    needed somebody to watch the proceedings for us.
2    Q.  Ma'am, how much have you paid that lawyer?
3    A.  It was between a thousand and 1,400.
4    Q.  And when you say you don't know whether he still
5      represents you -- did I understand that correctly?
6    A.  Yes.
7    Q.  Why do you say that?
8    A.  There's been no contact with him since I got a date
9      for the criminal trial.
10   Q.  Does he still --
11   A.  Maybe even before that.
12   Q.  Does he still send you monthly invoices?
13   A.  No.
14   Q.  Do you correspond with him via e-mail?
15   A.  No.
16   Q.  Have you ever corresponded with him or her via --
17   A.  Yes.
18   Q.  I'm sorry?
19   A.  Yes.
20   Q.  Ma'am, admittedly -- you said earlier today something
21     that confused me.  I'm just going to lay it right out
22     there:
23         You said Well, this trip I wanted to take
24     my daughter, who was turning 21 to -- on her 21st
25     birthday this trip, right?

Page 217

1    A.  Yes.
2    Q.  And I don't know how it is that Margaret and Amber
3      became involved in this trip.
4          Could you explain that to me?
5    A.  Margaret and I were best friends, and I told her I was
6      taking Paiton on a trip to Jamaica and asked her if
7      she wanted to go.
8    Q.  Had you ever vacationed with Margaret and Amber
9      before?
10   A.  No.
11   Q.  I'm sorry?
12   A.  No.
13   Q.  Okay.
14   A.  Just visiting each other is mainly what we did.
15   Q.  This was the first time that you vacationed with Amber
16     and Margaret?
17   A.  Yes.
18   Q.  How many children do you have?
19   A.  Two.
20   Q.  Did you invite your son -- I believe your other child
21     is a son.
22   A.  Yes.
23   Q.  Did you invite your son on this trip?
24   A.  No.
25   Q.  Why not?

55 (Pages 214 to 217)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 218

1  A.  Because he was -- let's see.  He was living his own
2      life and had a girlfriend and he's six-and-a-half
3      years older and it was a girls' trip only.
4  Q.  Margaret has five children, correct?
5  A.  Yes.
6  Q.  Some of those are females, correct?
7  A.  Yes.
8  Q.  Why weren't any of the other females invited?
9  A.  Because she could only afford to take one.
10 Q.  Was there a special occasion or motive for her
11     inviting Amber?
12 A.  Amber's graduation.
13 Q.  From?
14 A.  High school.
15 Q.  Did you tell Margaret and Amber about your 2001 trip
16     to Jamaica?
17 A.  Some information about it, yes.
18 Q.  Did you express any concerns to them about safety?
19 A.  I expressed that the rumor has always been, you know,
20     if you go to Jamaica you stay on the resort because
21     you're safe on the resort.
22 Q.  What do you mean by safe?
23 A.  That nobody is going to approach you.  There's people
24     milling around on the outskirts of the resort and
25     trying to sell marijuana and God only knows what.

Page 219

1  Q.  How long a time elapsed between the time that you
2      talked to Margaret about this trip and you contacted
3      Stetson Arriola at Vacations to Go?
4  A.  When I first brought it up, maybe a few weeks.
5  Q.  Did you and Margaret have any conversations about any
6      other places in the Caribbean?
7  A.  No.
8  Q.  Did you and Vacations to Go have any conversations
9      about any other places in the Caribbean?
10 A.  No.
11 Q.  Whose decision was it to choose Jamaica?
12 A.  Paiton's.
13 Q.  Why did she want to go to Jamaica?
14 A.  Because she had wanted to go ever since 2001 when her
15     father and I went.
16 Q.  Why?
17 A.  She saw pictures and she loved Bob Marley music.  I
18     think that was probably what her reasons were.
19 Q.  Were you aware of Amber's drug usage before going to
20     Jamaica?
21 A.  I was aware that Amber was caught with marijuana.
22 Q.  Before the trip?
23 A.  Yes.
24 Q.  Do you know whether Paiton has ever used marijuana?
25 A.  I know that she's used marijuana.  She has told me.

Page 220

1  Q.  Were you aware that Paiton used marijuana before you
2      went to the Beaches resort in Jamaica?
3  A.  I don't recall if she used it before.  I don't recall
4      when it was.
5  Q.  Have you ever caught Paiton with marijuana?
6  A.  No.
7  Q.  Did you ever smell it on her clothing?
8  A.  No.
9  Q.  Do you have any -- how far was the place you went to
10     in 2001 with your then husband from the Beaches
11     resort?
12 A.  It was in Montego Bay.
13 Q.  Do you know how far Montego Bay is from Ocho Rios?
14 A.  I know Montego Bay is on the northern -- I think
15     northwestern side.  That is where the airport is.  And
16     Ocho Rios is more north toward the middle of the
17     island.
18 Q.  Whose decision was it to book Ocho Rios and not
19     Montego Bay?
20 A.  I was probably a good influence.
21 Q.  Why?
22 A.  We wanted to be near where the falls were instead of
23     having to drive for an all-day excursion.  We didn't
24     want to have to drive for a long time, wanted to be
25     close.

Page 221

1  Q.  Which falls did you see while there?
2  A.  We went to the blue hole I think is what it's called.
3  Q.  Did you see any other falls?
4  A.  No.
5  Q.  Did you do the Tarzan rope in the blue hole?
6  A.  Yes.
7  Q.  Did you do the Tarzan rope?
8  A.  Yes.
9  Q.  Did all the others do the Tarzan rope?
10 A.  Yes.
11 Q.  It's a big rope that hangs from the blue hole and you
12     jump on it and you swing off it, right?
13 A.  Yes.
14 Q.  How far is the drop from the Tarzan rope?
15 A.  Seems like maybe it was six feet, five feet, maybe.
16 Q.  When you researched Ocho Rios, did you research the
17     safety related to Ocho Rios?
18 A.  No.  I was looking for a resort that was reputable.
19 Q.  Did you ever go on the state department or any U.S.
20     website and look up information related to Ocho Rios?
21 A.  I wasn't aware of a website that was for state
22     department that would give me information.  I would
23     have -- I didn't look up anything but would have just
24     Googled.
25 Q.  Did you ever ask Stetson Arriola any information

56 (Pages 218 to 221)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 222

1    related to the safety associated with Ocho Rios?
2  A.  No.
3  Q.  Did you ever ask Stetson Arriola to comment on safety
4    associated with any Sandals property or Ocho Rios?
5  A.  I don't remember.
6  Q.  Do you recall ever asking Stetson Arriola to research
7    the safety associated with any Beaches properties?
8  A.  I did not ask him to.
9  Q.  We talked a little about your contacts with people in
10   Jamaica and in Jamaica proper.  You talked about one
11   woman.
12       Do you have friends in Jamaica?
13  A.  No.
14  Q.  Do you interact with somebody in Jamaica still?
15  A.  No.
16  Q.  Did you ever have friends in Jamaica?
17  A.  No.
18  Q.  Do you have friends that are Jamaican?
19  A.  No.
20  Q.  Do you have any friends that traveled to Ocho Rios
21   before you?
22  A.  I believe so, acquaintances.
23  Q.  Who?
24  A.  I believe it may have been work friends or just in
25   passing someone saying I have been there, I've been to

Page 223

1    Negril or I've been to Montego Bay.  But I don't
2    recall who at all.
3  Q.  Paiton was born in 1994, right?
4  A.  Yes.
5  Q.  And in 2004 I understand Paiton was involved in a car
6    accident of some sort.
7  A.  Me and both of my kids, yes.
8  Q.  That accident resulted in some fatalities, correct?
9  A.  In a fatality, the other vehicle.
10  Q.  I'm sorry?
11  A.  In a fatality.  One fatality.
12  Q.  Did Paiton suffer any anxiety or issues associated
13   with that car accident?
14  A.  Yes.
15  Q.  Did you get Paiton treatment for that car accident?
16  A.  We went to counseling afterwards.
17  Q.  Who was your counselor?
18  A.  I don't recall.  I don't even recall the town it was
19   in.
20  Q.  I'm sorry?
21  A.  I don't recall the town the counselor was in.
22   Probably was Lansing, but I don't know who it was.
23  Q.  My impression of your conversation earlier today is
24   that aside from actually giving your credit card to
25   Stetson Arriola at Vacations to Go and paying for the

Page 224

1    events, aside from the fact that Margaret did that,
2    you were the point of contact in terms of the
3    logistics and the planning and the reservations
4    associated with it; is that correct?
5  A.  Yes.
6  Q.  You paid your bill when you got it from Vacations to
7    Go and Margaret paid their bill?
8  A.  Yes.
9  Q.  When I said your in the last question, I meant Paiton
10   and you, correct?
11  A.  Correct.
12  Q.  How long after you got back to -- from Jamaica did you
13   stay -- well, let me ask you this:
14       When you left for Jamaica were you living
15   in Michigan?
16  A.  Yes.
17  Q.  After you came back from Jamaica you were living in
18   Michigan, correct?
19  A.  Yes.
20  Q.  How long after you came back from Jamaica did you
21   remain in Michigan?
22  A.  Until 2018.
23  Q.  So for about three years, correct?
24  A.  Yeah.
25  Q.  To be sure, your move to California had nothing to do

Page 225

1    with your trip to Jamaica, correct?
2  A.  No.
3  Q.  Did your move --  I'm suffering from the Safra
4    syndrome.
5        Did your move to California have anything
6    to do with your trip to Jamaica?
7  A.  No.
8  Q.  The gentleman you're currently married to, what is his
9    name?
10  A.  Mark DeSantis.
11  Q.  Did you know Mr. DeSantis before you went to Jamaica?
12  A.  Yes.
13  Q.  How long before you went to Jamaica were you dating
14   Mr. DeSantis?
15  A.  Two years.
16  Q.  Have you had conversations with Mr. DeSantis about
17   your trip to Jamaica?
18  A.  Yes.
19  Q.  Did Paiton turn 21 before or after your trip to
20   Jamaica?
21  A.  Before.
22  Q.  Amber was not 21 while she was in Jamaica, right?
23  A.  No.  She was 17.
24  Q.  Not withstanding the fact that she was 17, she was
25   permitted to drink in Jamaica, correct?

57 (Pages 222 to 225)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 226

1   A.  They served her in Jamaica.
2   Q.  In your presence she was permitted to drink, correct?
3   A.  She was served when they were at the bar that night.
4       She was never served in front of us.
5   Q.  When you say in front of us, you mean in front of you?
6   A.  Me and Margaret.
7            MR. SAFRA:  Sorry to interrupt.  Do you
8       mean legally or as a mom, did she allow her daughter
9       to drink there?
10           MR. SUAREZ:  As a mom.  Thank you for
11      clarifying.
12           THE WITNESS:  I allowed my daughter to
13      drink there, yes.
14  BY MR. SUAREZ:
15  Q.  Did Amber have an alcoholic beverage in your presence
16      while you were in Jamaica?
17  A.  Yes.
18  Q.  Did you tell her not to drink while you were in
19      Jamaica?
20  A.  Her mother did.
21  Q.  My question is, did you?
22  A.  I did not.
23  Q.  Since you returned from Jamaica have you done any
24      research on what travel agents are reputable and which
25      ones are not?

Page 227

1   A.  No.  I don't have a need.
2   Q.  Have you ever read anything to suggest that Vacations
3       to Go is not a reputable travel agency?
4   A.  No.
5   Q.  Did Margaret ever look up resorts in Jamaica to your
6       knowledge?
7   A.  Resorts?
8   Q.  Yes.
9   A.  I'm not sure if she did or not.
10  Q.  You said that Margaret and you were good friends.  Are
11      you still good friends?
12  A.  Not like we were.
13  Q.  Do you still maintain contact?
14  A.  When needed.
15  Q.  It sounds to me -- do you need to take a break?
16  A.  No.
17           MR. WEGLARZ:  Are you sure?
18           THE WITNESS:  I'm fine.
19           (Off the record at 2:42 p.m.)
20           (Back on the record at 2:42 p.m.)
21  BY MR. SUAREZ:
22  Q.  Ma'am, it sounds to me, and correct me if I'm wrong,
23      that when you called Mr. Stetson Arriola and asked him
24      for -- to help you with a booking, you were pretty
25      much willing to take either of the two properties he

Page 228

1       suggested, right?
2   A.  I didn't have a choice.  I had to pick one of the two
3       properties.
4   Q.  No, but my question was -- and thank you, but I'm
5       going to -- in February of 2016 [sic] when you called
6       him, right, and said I want to go to Jamaica, how many
7       properties did he suggest?
8   A.  I told him we were looking into Moon Palace.  I don't
9       recall him suggesting any.
10  Q.  So it was your decision to go to Moon Palace?
11  A.  Yes.
12  Q.  How did you arrive at Moon Palace?
13  A.  Just researching online and it had amenities that we
14      wanted for the girls and it was located on that part
15      of the island.
16  Q.  At that time when you were identifying Moon Palace,
17      you were aware that it was under renovation, right?
18  A.  Yes.
19  Q.  Okay.
20  A.  Stetson told us.
21  Q.  We all know that that renovation was not completed by
22      the time you went to Jamaica in May of 2015, right?
23  A.  Right.
24  Q.  At some point, I believe it was about April 1st, he
25      called to explain it was not going to be ready and you

Page 229

1       had to make a choice, correct?
2   A.  Yes.
3   Q.  And he said you had to choose between one and two,
4       correct?
5   A.  Yes.
6   Q.  And you made a choice for Beaches?
7   A.  Yes.
8   Q.  You had another choice, correct, which was to cancel
9       the trip, correct?
10  A.  No.  The other choice was a different resort.
11  Q.  In your contractual documents, you had the right to
12      cancel your trip to way after April 1st, correct?
13  A.  I believe so.
14  Q.  A third choice for you would have been to cancel your
15      trip, right?
16  A.  Correct.
17  Q.  Did you undertake after you made the choice to go to
18      Beaches resort, did you do any research about Beaches
19      resort to decide whether you in fact still wanted to
20      go there or if you wanted to cancel?
21  A.  I did research a little bit.  I looked online at the
22      resort.
23  Q.  And you made the decision to still go there, correct?
24  A.  Yes.  It wasn't ideal because it had -- I think the
25      other place might have had a casino or something and

58 (Pages 226 to 229)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 230

1      this didn't, but we talked about it and --
2   Q.   By the way, when you booked Moon Palace was the idea
3      for you to all stay in one room?
4   A.   I believe so.
5   Q.   That was your original intention?
6   A.   Yes.
7   Q.   When you went to Beaches resort you were all staying
8      in one room as well, correct?
9   A.   Yes.
10  Q.   In terms of the room and the facilities you got
11     comparable or better facilities?
12  A.   Can you repeat?
13  Q.   In terms of the actual room or the facilities you got
14     comparable or better facilities, right?
15  A.   I don't know.  I have never seen Moon Palace.
16  Q.   You booked one room with Moon Palace and you got a
17     room at Beaches, right?
18  A.   Yes.
19  Q.   It wasn't like they gave you less in terms of a room
20     than Moon Palace, right?
21  A.   I don't know.  I don't know what Moon Palace look like
22     or what it entailed.
23  Q.   At any time -- you were there from May 8th until --
24     you originally intended to be there from May 8th to
25     May 9th, correct?

Page 231

1   A.   May 5th.
2   Q.   Excuse me.  May 5th to May 9th.
3   A.   Yes.
4   Q.   Thank you for the clarification.  You ended up staying
5      a few days later, correct?
6   A.   Yes.
7   Q.   I believe you stayed until the 14th?
8   A.   I believe it was the 14th.
9   Q.   During your original trip from May 5th to May 9th did
10     you ever see Paiton, your daughter inebriated?
11  A.   No.
12  Q.   Did you ever see her drink more than three drinks in a
13     day?
14  A.   I never saw -- I never -- to my recollection it would
15     be less than five, but I don't know because it was
16     always the same looking glass.
17  Q.   When you say less than five, would it be less than
18     five in a day?
19  A.   Yes.
20  Q.   Did you ever see -- when you say less than five, would
21     you say less than five but more than three?
22  A.   I'm not sure.
23  Q.   Did you ever see Amber drink three drinks in a day
24     from May 5th to May 9th?
25  A.   I don't recall seeing how many drinks she had.  Lots

Page 232

1      of times they looked like slushies.
2   Q.   Your original Moon Palace resort was all-inclusive as
3      well, correct?
4   A.   Yes.
5   Q.   And this one was an all-inclusive resort?
6   A.   Yes.
7   Q.   Just to follow up, did Dwight Davis ever touch you?
8   A.   No.
9   Q.   Did Jermaine Dyer ever touch you?
10  A.   No.
11  Q.   Did William Tapper ever touch you?
12  A.   No.
13          (Off the record at 2:49 p.m.)
14          (Back on the record at 2:49 p.m.)
15  BY MR. SUAREZ:
16  Q.   How did you meet Margaret?
17  A.   I worked with her.
18  Q.   Where?
19  A.   31 years ago.  Water control in Wixom, Michigan.
20  Q.   What did you guys do?
21  A.   Assembled water-saving devices for toilets.
22  Q.   Sounds like fun.
23          Did you text Margaret before your trip?
24  A.   Yeah.
25  Q.   About your trip?

Page 233

1   A.   I believe so.
2   Q.   Did you e-mail Margaret about your trip before your
3      trip?
4   A.   I forwarded e-mails to her.
5   Q.   Sorry?
6   A.   I forwarded e-mails to her.
7   Q.   From your J.S. Bater address?
8   A.   Yes.
9   Q.   During your trip did you text Margaret?
10  A.   During the trip, I don't think so.
11  Q.   During the trip did you text Paiton?
12  A.   No, I don't believe so.
13  Q.   During the trip did you text Amber?
14  A.   Yes.
15  Q.   Is that a text message you sent to her Facebook?
16  A.   I believe it was Facebook.
17  Q.   Do you still have a copy of that message?
18  A.   A copy of it?  No, because I don't have the same
19     phone.
20     It went through Facebook, so it may still be on your
21     Facebook.
22  A.   Oh.
23  Q.   What did that message say?
24  A.   I believe asking on Friday where they were and telling
25     them where we were at.

59 (Pages 230 to 233)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 234

1  Q.  Did she respond?
2  A.  I don't believe she responded to that one.
3  Q.  Do you still have e-mails in your possession between
4     you and Margaret?
5  A.  The stuff that was forwarded?
6  Q.  Yes.
7  A.  I didn't delete anything, so if I sent her stuff and
8     forwarded stuff, it's still there.
9  Q.  Those e-mails have not been produced.  So I'm going to
10    ask you not to destroy them and we'll deal with them
11    through counsel.  Okay?
12 A.  Okay.
13        MR. SAFRA:  Same with the social media
14    messages.  I'm sure they're among the documents.
15 BY MR. SUAREZ:
16 Q.  Do you have text messages after you came back from
17    Jamaica to Margaret?
18 A.  Text messages?  Oh, yeah.
19 Q.  About the trip?
20 A.  Probably.
21 Q.  Again, similar to what Mr. Safra just said, I'm going
22    to ask you to retain those.  Okay?
23 A.  Okay.
24 Q.  All right.
25 A.  Remember, I don't have my same phone.  I'm three

Page 235

1     phones past.
2  Q.  Remind me who your provider was at the time?
3  A.  At the time it was Verizon.
4  Q.  Have you contacted Verizon to try to get those e-mails
5     or text messages?
6  A.  No.
7  Q.  Ma'am, why aren't you friends with Margaret anymore?
8  A.  Because it's too hard to -- extremely hard to be with
9     the four of us anymore because of what happened.  And
10    I feel that I have researched.  I have stressed.  I
11    have worried, and she has stepped back because she
12    could not deal with the stress.  And so I took
13    initiative, and it's just made it very difficult to be
14    around Amber too.
15 Q.  Do you feel as if Margaret in part holds you
16    responsible for this?
17 A.  No.
18 Q.  Do you feel in part Margaret blames you for this?
19 A.  No.
20 Q.  Did you e-mail or text either of the girls about the
21    trip before the trip?
22 A.  I most likely did Paiton, and I could have Amber
23    forwarded -- you know, copied the same e-mails to her
24    if I did.  I don't recall if I did that or let
25    Margaret take care of that part of it.

Page 236

1  Q.  After you returned from Jamaica did you e-mail or text
2     any of the girls about the trip?
3  A.  I did send a text to Amber, and I talked to my
4     daughter, you know, anything she wants to discuss
5     about it.  And we may have through e-mail.  We mostly
6     do it through just talking.
7  Q.  During the trip did you post anything on Facebook or
8     Instagram?
9  A.  During the trip a few pictures.
10 Q.  I have not received any of those photographs.  I'm
11    going to ask you to preserve those.
12        Do you have an Instagram account?
13 A.  No.
14 Q.  Do you have any other type of social media account?
15 A.  No.
16 Q.  Do you know whether either the girls or Margaret
17    posted on either Facebook or Instagram during the
18    trip?
19 A.  I don't know if Margaret did.  Amber I believe posted
20    on something, but I don't know what.  I think it -- I
21    think for sure on Facebook but I'm not 100 percent.
22 Q.  Other than Stetson Arriola can you give me the name of
23    any person other than -- excuse me -- that works at
24    Vacations to Go?
25 A.  No.

Page 237

1  Q.  Can you give me the name of any person that works at
2     Fun Jet?
3  A.  No.
4  Q.  Can you give me the name of any person that works at
5     The Mark Travel Corporation?
6  A.  No.
7  Q.  When you called Steve Arriola --
8  A.  Stetson.
9  Q.  He is going to be Steve until you guys put in my brain
10    that he's Stetson.
11        When you called Stetson Arriola to ask for
12    Moon Palace, you had already determined that you
13    wanted Moon Palace?
14 A.  Yes.
15 Q.  You did not ask him for any independent advice on each
16    of them, correct?
17 A.  I don't believe so.
18 Q.  When Stetson Arriola called to give you a choice to
19    move to one of two other resorts did you ask Stetson
20    to rank them in terms of safety?
21 A.  No.
22 Q.  It sounds to me like the two daughters and Margaret
23    deferred to you in terms of what decisions to make
24    regarding this vacation.
25        Why did they have so much confidence in

60 (Pages 234 to 237)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 238

1    your ability?
2         MR. WEGLARZ: Form objection. Calls for
3    speculation. But go ahead if you want to answer.
4         THE WITNESS: She -- it sounds like I have
5    OCD and I don't. That I keep everything organized and
6    take the initiative to do things, so she let me do it;
7    whereas, she's more of -- doesn't take the initiative.
8    BY MR. SUAREZ:
9    Q.  The April 1st phone call that Stetson made, do you
10   recall if that was morning or evening?
11   A.  It was during the daytime. I don't know if it was
12   morning, but it was not dark.
13   Q.  What was Margaret's reaction when you told her you
14   switched and chosen the Beaches resort?
15   A.  I don't recall.
16        MARKED FOR IDENTIFICATION
17        DEPOSITION EXHIBIT 5
18        2:59 p.m.
19   BY MR. SUAREZ:
20   Q.  Ma'am, showing you Exhibit 5, which is a printout of a
21   picture of the Beaches Ocho Rios Resort; is that
22   right?
23   A.  Yes.
24   Q.  This is a picture I printed off a website in
25   preparation for this deposition within the last couple

Page 239

1    of days. Okay?
2    A.  Yes.
3    Q.  I just want to know if you could just take a pen and
4    tell me where -- I believe you were in room 1132,
5    right?
6    A.  I believe it was 1132.
7    Q.  Can you tell me where on the property 1132 is?
8    A.  I believe it was more in here but back. So it was on
9    this side of the building. But I think it was on this
10   floor.
11   Q.  So the record reflects -- and she drew an arrow to
12   where she thinks her room was and it's next to sort of
13   what I perceive to be some sort of tower in the
14   middle. She's now putting a circle on the area where
15   the --
16        MR. SAFRA: What I typically do, if you
17   don't mind, in the white space below, could you put
18   your initials?
19   BY MR. SUAREZ:
20   Q.  To orient myself a little bit, where was the bar that
21   you say you saw your daughters on the evening of the
22   5th?
23   A.  It was between the room and -- so the elevator is
24   here, and straight ahead of the elevator is a wall.
25   That bar was right in there but not near the elevator,

Page 240

1    back on that side of it, sort of in the middle.
2    Q.  And that bar faced the pool?
3    A.  It was right directly next to it. I don't know if it
4    faced -- how much of it you could see.
5    Q.  It was close to your room?
6    A.  Very.
7    Q.  Could you see the bar from your room?
8    A.  No. It was around the corner.
9    Q.  Set that aside for a second. I want to ask a couple
10   questions.
11        From the time you made the change to
12   Beaches Ocho Rios Resort on April 1st of 2015 to May
13   5th, did you and Margaret ever research the Beaches
14   resort for the purposes of determining whether you
15   would stay or change that resort?
16   A.  Not for that purpose.
17   Q.  What day did you go to the blue hole falls?
18   A.  I believe it was on Thursday the 7th.
19   Q.  You said you went to the falls by bus. Did you
20   organize that bus trip through Beaches?
21   A.  No. I organized that through something online -- I
22   don't recall what -- before the trip.
23   Q.  Do you recall the entity that organized that bus trip?
24   A.  No.
25   Q.  Do you recall how you found that bus trip?

Page 241

1    A.  I Googled but I don't know what I looked under.
2    Q.  The shopping trip, did you organize that through
3    Beaches?
4    A.  I don't recall how that was organized.
5    Q.  Did you organize that shopping trip before or after
6    you came back from Jamaica?
7    A.  What?
8    Q.  I'm sorry. Did you organize that shopping trip before
9    or during the trip to Jamaica?
10   A.  I don't recall it. It may -- I feel like it was
11   probably at the resort, but I'm not sure.
12   Q.  Between April 1st and May 4th before you left, did you
13   look at Trip Advisor for any safety reviews associated
14   with Beaches resort?
15   A.  No.
16   Q.  What is Paiton's Instagram handle?
17   A.  Instagram? I didn't know she had one.
18   Q.  What is Amber's Instagram handle?
19   A.  Didn't know she had one either.
20   Q.  Do you know what Instagram handles are?
21   A.  No.
22   Q.  They are creations that -- according to what my kids
23   tell me, they are creations you can make to identify
24   you on Instagram.
25        MR. SAFRA: Like an account name.

61 (Pages 238 to 241)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 242

1  BY MR. SUAREZ:
2  Q.  Like an account name.  It can be your name.  It can be
3      whatever you want.
4  A.  Yeah.
5  Q.  Do you know what Margaret's Instagram handle is?
6  A.  I didn't know she had one.
7  Q.  Have you ever asked them for their Instagram handles?
8  A.  No.  I don't know how to do anything except for
9      Facebook.
10 Q.  Okay.
11 A.  As far as social media.
12 Q.  Do you know whether Paiton, Amber and Margaret have
13     Facebook?
14 A.  Paiton does, Amber does, yes, and Margaret does.
15 Q.  Did you research any reports associated to safety
16     about Fun Jet Corporation?
17 A.  No.
18 Q.  Did you ever research any reports related to safety
19     about The Mark Travel Corporation?
20 A.  No.
21 Q.  Do you recall any words or statements in any
22     advertisements issued by Fun Jet Vacations or The Mark
23     Travel Corporation?
24 A.  Yes.
25 Q.  What word or statement do you recall?

Page 243

1  A.  The Fun Jet logo in my e-mails.
2  Q.  The only thing you recall about the Fun Jet Vacations
3      is the logo in your e-mails?
4  A.  The logo and the little bit of information about thank
5      you for booking with Fun Jet or something like that.
6  Q.  The only two things you recall are thank you for
7      booking with Fun Jet and the logo that says Fun Jet?
8  A.  Those are the things I recall.
9  Q.  You referenced a woman by the name of Violet earlier
10     today.
11 A.  Yes.
12 Q.  Who is Violet?
13 A.  She was -- to my recollection she was -- I believe
14     worked with the police department and provided
15     counseling to those who are raped in Jamaica.
16 Q.  When did you first meet Violet?
17 A.  This rape occurred on Friday, the 8th.  I met her the
18     evening of the 9th at the new resort.  She came there.
19 Q.  How many times did you see Violet?
20 A.  Two, possibly three.
21 Q.  Did you always see Violet while you were in Jamaica?
22 A.  Did I always see her?
23 Q.  I mean, after you left Jamaica did you have any
24     contact with Violet again?
25 A.  I e-mailed her a couple times.

Page 244

1  Q.  After you left Jamaica?
2  A.  Yes.
3  Q.  Do you have her e-mail address?
4  A.  I should.  I should have it.
5  Q.  And you have those e-mails?
6  A.  I haven't deleted anything.
7  Q.  I'm going to ask you to preserve those.
8  A.  Okay.
9  Q.  While you were in Jamaica between May 9th and May
10     14th, you think you saw her three times?
11 A.  At least two times.
12 Q.  How long were those meetings?
13 A.  The first one, my guess is an hour and a half.
14         MR. SUAREZ:  Off the record.
15         (Off the record at 3:09 p.m.)
16         (Back on the record at 3:37 p.m.)
17 BY MR. SUAREZ:
18 Q.  Back on the record.
19         Did you make your payments online or via
20     phone to Vacations to Go?
21 A.  I believe it was via phone.
22 Q.  Did Dwight Davis -- did you see on any of the uniforms
23     of Dwight Davis, William Dyer or Mr. Tapper any logos
24     that said Fun Jet or The Mark Travel Corporation?
25 A.  Not that I'm aware of.

Page 245

1  Q.  Admittedly you went through quickly with Mr. Safra the
2      interactions between your daughter and Mr. -- excuse
3      me -- and Amber Torralva and Mr. Dyer, Davis and
4      Tapper.
5          Parsing that out, were all three of them
6      lifeguards?
7  A.  I know that Dwight and Jermaine were.  I believe
8      William was also.
9  Q.  You said one of the times you saw them talking was at
10     the water slide, right?
11 A.  Um-hum, yes.
12 Q.  Was that at the top of the tower or at the bottom?
13 A.  At the top.
14 Q.  Who was at the top when you saw that?
15 A.  Amber, Paiton and either Dwight or Jermaine.  I don't
16     know which one.
17 Q.  Do you recall what day that was?
18 A.  I don't.
19 Q.  Aside from the time that you saw them chatting at the
20     top of the tower, do you recall any other time that
21     you saw them together?
22 A.  Yes.
23 Q.  Take those -- take the days in order.  May 5th, do
24     your recall them being together in the day?
25 A.  Yes.

62 (Pages 242 to 245)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| Page 246 | Page 248 |
|---|---|

**Page 246**

1  Q.  That was the first day you were there?
2  A.  Yes.
3  Q.  Why do you recall them them being together that day?
4  A.  Why do I recall?  Because it was just the girls and us
5      at the pool area.  The girls were on one side of the
6      and we were on the other side of the pool laying out.
7      And one or two of the guys came up and talked to them.
8      I believe it was just Jermaine.
9  Q.  So the gentleman Jermaine or somebody else -- I don't
10     want to put words in your mouth -- came up to talk to
11     your daughter and Amber?
12 A.  Yes.  Jermaine or Dwight.
13 Q.  That was for what purpose?
14 A.  The girls told me after the fact that he was
15     requesting that they friend him or whatever it is on
16     social media.  It was not on Facebook but I'm not
17     certain what social media it was.
18 Q.  Do you know whether either of the girls did that on
19     May 5th?
20 A.  I know that Paiton did not, but I'm not sure if Amber
21     did or not.
22 Q.  When you say you know -- and I'm not quibbling with
23     you.  When you say you know that Paiton did not,
24     that's because you asked Paiton and she told you?
25 A.  Yes.

**Page 247**

1  Q.  You have not gone in and checked Paiton's social
2      media, correct?
3  A.  No.
4  Q.  Do you recall any other -- do you recall what date May
5      5th was?
6  A.  What date?
7  Q.  Yes, what day of the week it was.
8  A.  Tuesday.
9  Q.  Do you recall any other interactions between Jermaine,
10     Dwight and Mr. Tapper and the girls on Tuesday?
11 A.  No.
12 Q.  By the girls, I'm referring to Amber and Paiton,
13     right?
14 A.  Yes.  I did not --
15 Q.  I should say young ladies.
16 A.  Yeah.
17 Q.  Wednesday, May 6th, do you recall any interactions
18     between the three gentlemen and Amber or Paiton?
19 A.  I don't know what day, but there was another
20     interaction before Friday.
21 Q.  That could have been Wednesday or Thursday?
22 A.  Yes.  Well, probably not Thursday because we were gone
23     most of the day.
24 Q.  So that's the day --
25 A.  Tuesday.

**Page 248**

1  Q.  So that's the day you went to the blue hole?
2  A.  Yes.  I believe it was Wednesday.
3  Q.  Where was that interaction?
4  A.  On the beach.
5  Q.  Were you present in that interaction?
6  A.  Yes.
7  Q.  What happened during that interaction?
8  A.  I believe it was Jermaine came up to Paiton or
9      Amber -- I don't remember which one -- and asked them
10     what their plans were or if they were going anywhere
11     off of the resort.
12 Q.  At that moment do you recall having any conversation
13     with either Amber or Paiton about interacting with
14     Jermaine, Dwight or Mr. Tapper?
15 A.  Yes.
16 Q.  What did you say?
17 A.  I think it was Amber turned to me and said That was
18     weird and I agreed.  And I can't remember if Margaret
19     was there or not.
20 Q.  The next interaction that you witnessed or were
21     present for between the three gentlemen, Davis, Dyer
22     and Tapper and Amber or Paiton was when?
23 A.  Can you repeat that?
24 Q.  The next interaction that you recall between Davis --
25 A.  Friday.

**Page 249**

1  Q.  -- Dyer and Tapper?
2  A.  Friday, May 8th.
3  Q.  Around what time?
4  A.  Between 10:00 and 11:00 p.m.
5  Q.  At night?
6  A.  Yes.
7  Q.  This was before the alleged incident?
8  A.  Yes.
9  Q.  How long were you present for that interaction?
10 A.  Three minutes, four minutes.
11 Q.  At that moment did your daughter Paiton have a drink
12     in her hand?
13 A.  In her hand?
14 Q.  Yes.
15 A.  I don't recall if she did or not.
16 Q.  Had you seen Paiton with a drink in her hand in the
17     evening?
18 A.  Yes.
19 Q.  Do you recall what was said during that interaction?
20 A.  When I saw her with a drink in her hand?
21 Q.  Yes.  No, no.  When you saw her interacting with
22     Davis, Dyer and Tapper.
23 A.  We asked the girls what they were doing, what their
24     plans were.
25 Q.  Did either Davis, Dyer, or Tapper say anything at that

63 (Pages 246 to 249)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 250

1    time?
2  A.  No, not at all.
3  Q.  After the -- after you moved hotels on the 9th and
4      stayed to the 14th, what did you do you those days?
5  A.  One day we went shopping because we were required to
6      get clothes that covered our shoulders and our feet --
7      shoes that covered our feet for court.  The girls
8      slept a lot.  They were very sick.  Margaret and I and
9      the girls went to do yoga one of the mornings with the
10     girls, realized that they were getting burned and they
11     couldn't be in the sun because of one of the
12     medications so they went back to the room.
13           What else did we do?  We sat in the room a
14     lot.  We also went and spoke with Linton Gordon.
15 Q.  In the hotel did you visit the spa for any reason?
16 A.  The spa?
17 Q.  Yes.
18 A.  The first hotel?
19 Q.  Second hotel.
20 A.  No.
21 Q.  The yoga, you that did at the new hotel, how long was
22     that?
23 A.  I don't know.  I don't recall.  It was like 45 minutes
24     maybe.
25 Q.  Did all of you go or just you?

Page 251

1  A.  All four of us went.
2  Q.  The girls stayed for about 45 minutes?
3  A.  No.  That's about how long the yoga was.  The girls
4      only stayed, my guess is, 15 or 20 minutes.  And they
5      started burning due to their medications they were on,
6      being in the sun, photosensitivity.
7  Q.  Ask you to turn back to Exhibit 3 please.  For
8      whatever reason these documents are your notes that
9      were just produced to us for the first time this
10     morning.  So I have not been able to study them in any
11     exhaustive detail.
12           But if I can point you to -- I'm going to
13     use my thumb --
14 A.  Here?
15 Q.  Yeah, the middle of that page.  I don't have -- excuse
16     me one second.
17           This is the fourth page of Exhibit 3.
18 A.  Before I do this, I want to add that we did leave the
19     resort three other times as well to go to the police
20     station in Ocho Rios.
21 Q.  Okay.
22 A.  You had asked before what we did.
23 Q.  Thank you for that clarification.  If I understand
24     what you just said, between May 9th and May 14th at
25     the new hotel, after the incident, you went to -- you

Page 252

1    went off campus in Ocho Rios to a play station?
2  A.  Police station.
3  Q.  Oh, to a police station?
4  A.  Yes.  I think it was Ocho Rios police but it could be
5      called something different.
6  Q.  Okay.  Going back to this document, it says that on
7      page 4, it says that on May 11th and May 12th --
8  A.  Mother's Day.
9  Q.  You all went to do yoga, correct?
10 A.  Yes.
11 Q.  And you're in that -- in those notes if I'm
12     understanding what you wrote there, it says that the
13     girls -- that Amber and Paiton stayed for 45 minutes.
14     But if I understood your earlier answer, they stayed
15     for a lot less.
16           Which is right?
17 A.  This must be after it because I took -- I wrote this
18     down in real time, so they must have stayed longer
19     than I thought.
20 Q.  This must be accurate.  Page 4 is correct, right?
21 A.  Yes.
22 Q.  Is that the only time during those days that you-all
23     did yoga?
24 A.  Yes.
25 Q.  Ma'am, Mr. Safra asked you about talking to the press?

Page 253

1  A.  Yes.
2  Q.  Do you recall that?
3  A.  Yes.
4  Q.  And in there you mentioned -- or he mentioned an
5      incident that occurred in Montego Bay or Negril.  I
6      don't recall which one.
7  A.  I don't recall either.
8  Q.  Did you find in your research, in your travels any
9      other incidents of rape in Ocho Rios?
10 A.  In Ocho Rios?
11 Q.  Yes.
12 A.  I'm not sure --
13 Q.  Okay.
14 A.  -- where they were.
15 Q.  Did you find any other incident of rape in Beaches?
16 A.  Somewhere I know that I did.  I don't know where.
17 Q.  Okay.  Did you find --
18           MR. SAFRA:  Objection.  Form.
19 BY MR. SUAREZ:
20 Q.  When I said Beaches, did you find any other incidents
21     of rape in the beaches of Ocho Rios?
22           MR. SAFRA:  Objection.  Form.
23           THE WITNESS:  I don't recall where it was.
24 BY MR. SUAREZ:
25 Q.  Do you have any documents in your possession that

64  (Pages 250 to 253)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 254

1    would reflect any incidents of rape that you found
2    after the event at the Beaches Ocho Rios hotel?
3         MR. SAFRA:  Objection.  Form.
4         THE WITNESS:  No.
5    BY MR. SUAREZ:
6    Q.  You mentioned when you were discussing with Mr. Safra
7        something about a piano bar?
8    A.  Yes.
9    Q.  The first time you went to the piano bar was Friday or
10       did you guys go -- did your group go in the evening
11       every --
12   A.  I never went to the piano bar.  I went past it.
13   Q.  Do you know whether the girls went before Friday, did
14       they ever go to the piano bar?
15   A.  I believe that they did once to karaoke.
16   Q.  And I don't mean to be disrespectful, ma'am.  I'm
17       referring to them as the girls because you referred to
18       them as the girls.
19   A.  Yes.
20   Q.  I'm fully aware that they were 17 and 21.
21   A.  Yeah.
22   Q.  I apologize for that use of the word.  All right?
23   A.  Yeah.
24   Q.  For the use of the word girls.
25   A.  Yes.

Page 255

1    Q.  But did Amber and Paiton go to the piano bar before
2        that?
3    A.  Before the 8th I believe they went one time.
4    Q.  Okay.  In the evening?
5    A.  I believe it was open, and I think that's when they
6        went.
7    Q.  Do you know who they went with?
8    A.  Each other.
9    Q.  Do you know anybody else that joined their party?
10   A.  No.
11   Q.  Ma'am, I'm going to mark as Exhibit 6 pictures that I
12       believe have been produced to us regarding this
13       incident.
14            MARKED FOR IDENTIFICATION:
15            DEPOSITION EXHIBIT 6
16            3:54 p.m.
17   BY MR. SUAREZ:
18   Q.  Now, I'm going to ask you to quickly go through that.
19       Those are not all the pictures of your trip, correct?
20   A.  I'm kind of looking to see.  No, I think there's a few
21       more.
22   Q.  Okay.  I'm going to ask you to preserve the ones that
23       you have.
24   A.  Sure.
25   Q.  And I'm going to ask counsel to make sure that we get

Page 256

1    copies of those.
2         For instance, you said earlier -- I want to
3    make sure this is correct -- you have pictures between
4    Amber and Paiton and the three gentlemen?
5    A.  It's a picture -- I know that the men had a picture
6        taken of them because it was revealed on the night the
7        girls went through the photo lineup.  I don't know if
8        there was three people in the picture or two people in
9        the picture.  I don't know.  And I don't know if there
10       was -- the girls were in the picture too.
11   Q.  And there's also -- there are also pictures that you
12       say that you personally took immediately after the
13       incident, correct?
14   A.  Yes.
15   Q.  And those are not included in Exhibit 6?
16   A.  They are all in here.
17   Q.  Those are included?
18   A.  Yes.
19   Q.  I thought you said you had pictures of bodily fluids.
20   A.  They're black and white.  You're not going to see
21       them.  I can tell you where it's at.
22   Q.  Well --
23   A.  You can tend to see an outline.
24   Q.  Instead of taking valuable time, I'm going ask you to
25       produce the color copies so we have those because I

Page 257

1    don't believe we have those.
2         MR. WEGLARZ:  I believe I gave them to you
3    in color.
4         MR. SUAREZ:  Perhaps I don't have them.
5    Maybe the other counsel has them.
6         MR. WEGLARZ:  We'll get them to you.
7    BY MR. SUAREZ:
8    Q.  Ma'am, I'm going to ask you to go back to Exhibit No.
9        5, please, for a second.  I want you, where you can,
10       to point out -- my apologies, ma'am.  I understand
11       it's really difficult and I mean no offense.  It's
12       just my job.  I need to know how this happened.  Okay?
13   A.  Sure.
14   Q.  Can you point in this picture where you believe the
15       room was where this incident occurred?
16   A.  So it can't be seen here, but it's straight ahead of
17       the floor we stayed on.  It's straight ahead of
18       wherever that elevator dropped you off, where it opens
19       up.  So when you get off the elevator, I believe it
20       was the second floor.  We weren't on ground level
21       but -- I don't know.  We had to go up the elevator.
22            Anyway, it wasn't up here.  But straight
23       ahead are the two doors, straight ahead, and I think
24       slightly to the right are the two doors --
25   Q.  Was it --

65 (Pages 254 to 257)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 258

1   A.  -- that the rape occurred in.
2   Q.  Was it on the same level as the bar?
3   A.  Yes.
4   Q.  So you can't see that hallway in that picture?
5   A.  No.
6   Q.  Okay.  You testified earlier that you thought the
7       girls may have gone -- your initial thought was the
8       girls may have gone into the room because they wanted
9       to smoke pot; is that right?
10  A.  Right.
11  Q.  Did you have any indication when you were leaving for
12      Jamaica that Amber and Paiton may have wanted to smoke
13      pot while they were there?
14  A.  No.
15  Q.  Despite the fact that you knew that both of them used
16      pot before they got there?
17  A.  I don't know if Paiton used it before or if it was
18      after.  I don't know when she did.  I don't know that
19      Amber used pot.  She was caught with pot in her
20      possession.
21  Q.  Were you aware that Amber was on probation because of
22      pot?
23  A.  Yes.
24  Q.  Okay.  Were you aware of that before you went to
25      Jamaica?

Page 259

1   A.  Before the trip, yes.
2   Q.  Ma'am, I'm going to mark as Exhibit 7 this travel --
3       this travel itinerary that was produced to us by your
4       counsel.  Okay?
5           MARKED FOR IDENTIFICATION:
6           DEPOSITION EXHIBIT 7
7           4:00 p.m.
8           MR. SAFRA:  The marked version of the
9       exhibits will be attached to the transcript.
10          MR. SUAREZ:  Yes, please.
11  BY MR. SUAREZ:
12  Q.  So this is 19 pages of what's introduced to us by your
13      counsel.  Okay?
14  A.  Okay.
15  Q.  My first question is -- the first question says at the
16      top that it's a travel itinerary.
17          Do you see that?
18  A.  Yes.
19  Q.  And now do you see at the top where it says Need help?
20      Call your travel agent or Fun Jet Vacations at
21      1-800-558-306?
22          Do you see that?
23  A.  Yes.
24  Q.  The question to you is did you ever call that 1-800
25      number?

Page 260

1   A.  No.
2   Q.  Do you recall receiving this travel itinerary from
3       Stetson Arriola at Vacations to Go?
4   A.  I'd have to glance through it.  This is for the
5       flights.  Yes.
6   Q.  Did you call Stetson Arriola with any questions about
7       your -- about this itinerary after you received it?
8   A.  I don't believe so.
9   Q.  Ma'am, did Beaches refund your monies after these
10      trips?
11  A.  No.
12  Q.  Did they partially refund your monies after this trip?
13  A.  No.
14  Q.  Did they comp any part of your stay after this trip?
15  A.  No.  Except for the second resort we didn't pay for.
16  Q.  They comped May 9th through May 14th?
17  A.  Yes.
18  Q.  Did you ever call Stetson Arriola at Vacations to Go
19      to ask for a refund?
20  A.  No.
21  Q.  Did you ever call Fun Jet or Mark Travel Corporation
22      to ask for a refund?
23  A.  No.
24  Q.  Ma'am, May 9th, Saturday, who did you call in relation
25      to this incident?

Page 261

1   A.  On the 9th?
2   Q.  Yeah.  Friday night was the 8th.  So on the 9th who
3       did you call in relation to this?
4   A.  My husband, Paiton's father.
5   Q.  What is his name?
6   A.  Stuart, S-T-U-A-R-T, Bater -- sorry -- B-A-T-E-R.
7   Q.  Who else?
8   A.  I believe the embassy.  I called the embassy.  I also
9       called the hospital that I work for to talk to the
10      rape crisis nurse.
11  Q.  What was her name?
12  A.  I don't know.  She was nobody that I knew.  I just
13      asked to speak with one who was in the ER.
14  Q.  How long was that conversation?
15  A.  Maybe 15 minutes discussing medications and what
16      needed to happen and --
17  Q.  Did you call her before or after you went to visit the
18      Jamaican authorities and facilities to do the rape
19      kit?
20  A.  I called while they were doing -- I called while they
21      were at the hospital doing the rape test kit during
22      that time.
23  Q.  You called the rape crisis nurse in the United States?
24  A.  Yes.
25  Q.  And what was the name of the hospital you called?

66 (Pages 258 to 261)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 262

1    A.   Sparrow.
2    Q.   Anyone else you recall calling on May 9th?
3    A.   Just work to let them know I didn't know when I would
4         be back.
5    Q.   May 10th through May 14th, did you -- aside from the
6         people we've talked about, your husband and Paiton's
7         father, who else did you call?
8    A.   Between those days?
9    Q.   Yes.
10   A.   I was on the phone with the man from the embassy
11        because he was in the same resort, so I'd call him on
12        my phone.
13   Q.   Okay.
14   A.   Cooper.
15   Q.   And when you say he was at the same resort, you mean
16        he --
17   A.   The second one where we were at.
18   Q.   He was staying there at the second resort?
19   A.   Yes.
20   Q.   The gentleman from the embassy?
21   A.   Yes, him and his driver, bodyguard whatever he has.
22   Q.   From the U.S. embassy?
23   A.   Yes.
24   Q.   Do you recall his name?
25   A.   Who?

Page 263

1    Q.   That gentleman.
2    A.   The guy that was with Vincent Cooper?
3    Q.   Yes.  Vincent Cooper was from the United States
4         embassy.
5    A.   Yes.  But he was with a driver, slash --
6    Q.   He was staying at the new hotel?
7    A.   Yes.
8    Q.   What's the new hotel's name?
9    A.   Sandals Plantation or something -- something like
10        that.
11   Q.   Okay.  And do you recall Vincent Cooper's --
12   A.   Yeah, I'm trying to think.  I don't recall.
13   Q.   Do you have e-mails between you and Vincent Cooper?
14   A.   I believe so.
15   Q.   Do you have e-mails within that time frame with either
16        your husband or Stuart, Paiton's father, or anybody
17        else?
18   A.   E-mails, not with her father.  I don't believe with my
19        husband.
20   Q.   Okay.  You referenced earlier -- you referenced
21        earlier speaking to the media.
22             How long after this incident did you first
23        speak with the media?
24   A.   In 2018.
25   Q.   How long after this incident did you hire an attorney?

Page 264

1    A.   Oh, a few months.
2    Q.   Did you have a prior relationship with the Fieger
3         firm?
4    A.   No.
5    Q.   How did you come to learn of the Fieger firm?
6    A.   Everybody knows about the Fieger firm.
7             MR. WEGLARZ:  Yeah, man.
8             (Off the record at 4:09 p.m.)
9             (Back on the record at 4:09 p.m.)
10   BY MR. SUAREZ:
11   Q.   Last night on Sunday, did you meet with -- and I don't
12        want to know the substance of what you discussed, but
13        did you meet with Mr. Weglarz?
14   A.   Yes.
15   Q.   How long did you meet with him?
16   A.   45 minutes.
17   Q.   Did you meet with him on Saturday?
18   A.   No.
19   Q.   Who was present at your meeting with Mr. Weglarz
20        yesterday?
21   A.   My husband came but then he left the room, and
22        Margaret, Amber and Paiton.
23   Q.   And you all met for 45 minutes?
24   A.   Yes, about.
25   Q.   Did you all meet -- did you all on Saturday --

Page 265

1             (Off the record at 4:10 p.m.)
2             (Back on the record at 4:10 p.m.)
3    BY MR. SUAREZ:
4    Q.   Did you meet with him on Saturday as well,
5         Mr. Weglarz?
6    A.   No.
7    Q.   Before this trip, had you ever been to a Sandals or
8         Beaches property?
9    A.   No.
10   Q.   Ma'am, are you -- have you met Paiton's boyfriends?
11   A.   I believe I've met most of them.
12   Q.   Prior to the trip had you met Paiton's boyfriends?
13   A.   Yes.
14   Q.   Can you describe them for me?
15   A.   Like describe what?
16   Q.   According to the records she had three or four
17        boyfriends before the trip and I'm just wondering if
18        you can give me any description of them.
19   A.   One in particular that I can remember, he was a quiet
20        guy.  His name was Chris.  I don't recall his last
21        name but -- I mean, I don't know how else to describe
22        him.  I mean, he was not a hard worker.  I don't -- I
23        don't know.  I mean, he had blondish, thin blond hair
24        and maybe 5'6", 5'7".
25             MR. SUAREZ:  Can we go off the record here?

67 (Pages 262 to 265)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 266

1        (Off the record at 4:13 p.m.)
2        (Back on the record at 4:13 p.m.)
3        MR. SUAREZ:  Go back on the record.
4    BY MR. SUAREZ:
5    Q.  With the clarification what -- can you describe any of
6        her boyfriends in any other details?
7    A.  Her boyfriend Chris that she had was I believe in his
8        early 20s from Williamston.  Not a hard worker and
9        maybe 5'6" or 7 and sandy blond hair.
10   Q.  Any others?
11   A.  She had another one.  I don't know if she classified
12       him as a boyfriend.  They were very good friends.  I
13       think they dated after she came back, but they were
14       very close friends before.  I don't remember his name.
15       Only met him maybe once or twice but knew his family,
16       nice guy from Williamston.
17   Q.  Any other kids you remember?
18   A.  I don't remember right now.
19   Q.  We all have kids and we all have some boyfriends or
20       girlfriends of our kids that we don't like.
21            Was there any boyfriend of Paiton's that
22       you don't like?
23   A.  Chris.
24   Q.  You're not -- you didn't like Chris?
25   A.  Yes, I did not like Chris.

Page 267

1    Q.  Why did you not like Chris?
2    A.  Because he was very selfish, thought only of himself
3        and didn't care about Paiton.  She went to school.  He
4        didn't work.
5    Q.  While you were in Jamaica did you or any of -- or
6        Margaret or Amber, Paiton seek any help from any
7        psychologists or even psychiatrists or any mental
8        health therapists?
9    A.  While we were in Jamaica?
10   Q.  Yes.
11   A.  Violet Dell, yes.
12   Q.  So Violet was a mental health giver?
13   A.  It seems that she did something with -- that's what
14       she was doing was like a therapy session when she came
15       to the resort.
16   Q.  Who was her real employer?
17   A.  I don't know.  She made it sound like it was the
18       police department, but I don't know if it was -- it
19       was a little fuzzy as to what -- who she worked for.
20   Q.  Do you have her last name written down anywhere?
21   A.  Written down?
22   Q.  Yes.
23   A.  You know, actually it's in here.
24   Q.  The document they handed us this morning?
25   A.  Yes.

Page 268

1    Q.  Thank you for that.
2    A.  She's somewhere towards the back I believe.
3    Q.  The witness is pointing to Exhibit 3.
4    A.  It's D-E-L-L if I remember.  I know it's in here.
5        Right here.  Page 4 she's on but it just references
6        her first name here, but I'm sure that it's in here
7        with her last name.  And if we read through it, it may
8        even say who she was with.
9    Q.  Okay.
10   A.  I don't know where it's at.  I don't see it but I'm
11       also skimming.
12   Q.  Okay.  Well, we're looking for her last name.  So if
13       you could find it I'd appreciate that at some moment.
14   A.  You want to see it written?
15   Q.  No.  I just need to know her last name.
16   A.  Oh, it's Dell.
17   Q.  It's Dell?
18   A.  D-E-L-L.
19   Q.  You had mentioned something about your daughter being
20       into Bob Marley.
21            That's some hobby she had before the trip?
22   A.  Yes.
23   Q.  Did she go to Bob Marley concerts in the States then?
24   A.  No.
25   Q.  How long after you arrived stateside in May did you

Page 269

1        wait before seeking mental help for yourself?
2    A.  I believe a week or less than a week.
3    Q.  Okay.  And based on the records I have received for
4        you, you continued that mental health therapy for
5        about -- intermittently for about a year and a half to
6        two years; is that right?
7    A.  At least.  I'm currently also.
8    Q.  How often are you currently going to mental health
9        therapy?
10   A.  Since moving to California it's been maybe four times,
11       but it was just --
12   Q.  How long -- how long ago did you move to California?
13   A.  A year.
14   Q.  So in the last year you've been four times to mental
15       health?
16   A.  Yes.
17   Q.  And today is -- 2018.  So in the first year how often
18       did you go to mental health therapy?
19   A.  In 2015 --
20   Q.  Yeah.
21   A.  -- that first year --
22   Q.  So May of '15 to May of '16.
23   A.  As I recall it was every week.
24   Q.  And it was for how long?
25   A.  Each visit?

68  (Pages 266 to 269)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 270

1    Q.   Yes.
2    A.   One hour.
3    Q.   And at some point in September of that year you
4         were -- and I'd ask you to describe it -- you were
5         partially hospitalized.
6              What does that mean?
7    A.   Partial inpatient psych.
8    Q.   What does that mean?
9    A.   It's a day -- you go to the hospital and you're there
10        for I believe six to eight hours.
11   Q.   Okay.
12   A.   And it's just constant therapy.
13   Q.   But you sleep at home?
14   A.   Yes.
15   Q.   And you were there for I believe about less than two
16        weeks -- about two weeks?
17   A.   Yes.
18   Q.   Have you ever had to have that treatment again?
19   A.   No.
20   Q.   Okay.  Are you currently under medication?
21   A.   On medication?
22   Q.   Related to your mental health therapy.
23   A.   Yes.
24   Q.   What medications are you on?
25   A.   Xanax and -- well, Zoloft that I was weaning off of

Page 271

1         when I went to Jamaica, and I've never been able to go
2         down now.
3    Q.   Were you ever on Xanax or Zoloft before you went to
4         Jamaica?
5    A.   I was Zoloft.  I don't know if I was Xanax.  Yes, I
6         think I was.  I think I had an old prescription.
7    Q.   Did you have a mental health therapist that you
8         visited before you went to Jamaica?
9    A.   Yes.
10   Q.   Why did you go visit that therapist?
11   A.   Regarding my divorce.
12   Q.   Okay.  And when was your divorce?
13   A.   2012, the end of 2012.
14   Q.   Okay.  And you saw that person from 2012 to 2015?
15   A.   I saw one person in 2012 and I believe into 2013.  I
16        saw then somebody else in St. John, Michigan after
17        that.
18   Q.   So you have taken Zoloft and Xanax before the trip to
19        Jamaica?
20   A.   Yes.
21   Q.   From 2004 when you had the accident with the fatality
22        to 2012 did you also go see a mental health therapist?
23   A.   Yes.  But I don't recall how often or when.
24   Q.   And did that person treat you with medication?
25   A.   No.

Page 272

1    Q.   What was that person's name?
2    A.   I don't know.
3    Q.   Some of your records say that you have a history of
4         anxiety.
5              When did anxiety begin for you?
6    A.   Teenage years.
7    Q.   Okay.  And roughly that's how long?  What years was
8         that for you?  I don't know the --
9    A.   1980s.
10   Q.   In your teenage years did you see mental health
11        therapists for some reason?
12   A.   I did I believe in -- let me think here -- maybe '87,
13        '88.  1988.
14   Q.   How old were you in 1988?
15   A.   Nineteen -- 18 to 19.
16   Q.   And we're now in -- you're now 40-something?
17   A.   50.
18   Q.   50.
19             So from the time of 18 until now you've
20        been seeing a mental health therapist for one reason
21        or another the greater part of your adult life, right?
22   A.   Yes.
23   Q.   And that person -- one of your conditions has been to
24        treat you for anxiety, right?
25   A.   Yes.

Page 273

1    Q.   And I don't mean to pry, ma'am.  Did you suffer some
2         sort of abuse as a child or is there a reason for
3         having seen a mental health therapist for --
4    A.   Looking back on it now, most likely, yeah.
5    Q.   I'm sorry?
6    A.   Looking back on it now from my mother.
7    Q.   Okay.
8    A.   It was mental abuse.  Some physical when we were kids
9         but it was mental basically.
10   Q.   So you've been seeing a mental health therapist
11        largely for the last approximately 30 years for one
12        reason or another, right?
13   A.   Yes.
14   Q.   How old were you when you first started taking Xanax?
15   A.   I was in my 40s but I don't know how old I was.
16   Q.   So you've been -- you were taking Xanax long before
17        the trip to -- you were taking Xanax long before your
18        trip to Jamaica, right?
19   A.   I don't know what long constitutes, but I had had like
20        two prescriptions of it.  And I took -- I mean, I had
21        a pill that was broken into four pieces, so that's how
22        I took it.  That's why it lasted.
23   Q.   Did you have issues with your first husband related to
24        abuse?
25   A.   Just mental issues.

69 (Pages 270 to 273)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

| Page 274 |
|---|

1   Q.   Did either Mr. Tapper, Davis or Dyer ever tell you
2        that they worked for either Fun Jet Vacations or the
3        Mark Travel Corporation?
4   A.   No.
5   Q.   Did you ever see a sign that said Fun Jet Vacation or
6        the Mark Travel Corporation?
7   A.   Sign, no.
8   Q.   Did you ever see on paper any indication that they
9        worked for either Fun Jet Vacation or Mark Travel
10       Corporation?
11  A.   Not that I recall.
12           (Off the record at 4:26 p.m.)
13           (Back on the record at 4:26 p.m.)
14  BY MR. SUAREZ:
15  Q.   Ma'am, the evening of May 9th you called your daughter
16       to remind her to take a birth control pill, right?
17  A.   The evening of May --
18  Q.   Of May 8th.  Excuse me.  The evening of May 8th.
19  A.   I called her or I went and got her -- she was sitting
20       at the bar -- to tell her that her phone alarm was
21       going off.  And she told me what it was for.  It was
22       to remind her to take birth control.
23  Q.   So you went to get her to remind her to take birth
24       control?
25  A.   I went to get her to tell her that her phone alarm was

| Page 275 |
|---|

1        going off.
2   Q.   Were you aware prior to that day that that alarm was
3        for her to take birth control?
4   A.   No.
5   Q.   Were you aware that she was on birth control?
6   A.   I believe so.
7   Q.   Did you ever have occasion to hear that alarm and
8        remind her to take birth control before?
9   A.   No.
10  Q.   How often -- how many times before May 15th did you go
11       on vacation either by yourself or with somebody in the
12       last -- five years before May 2015?
13  A.   Vacations?
14  Q.   Yeah.
15  A.   Maybe once.
16  Q.   Where was that to?
17  A.   Well, it was -- in five years.  My gosh, it would have
18       been in Michigan, possibly to Illinois to visit
19       family.
20  Q.   Did you use a travel agency at that time?
21  A.   No.  I drove.
22  Q.   When you went to either Michigan or Illinois did you
23       search for any websites to figure out whether those
24       places were safe or not?
25  A.   No.  I grew up where I was going.

| Page 276 |
|---|

1   Q.   There's a medical record that relates to Paiton that
2        talks about you finding her on top of a casket cover
3        when she was very young after the accident.
4            Can you tell me what that was about?
5   A.   That's like a couple stories mixed together.  She -- I
6        found her in the closet in her bedroom on Holt Road
7        sitting -- no, I didn't find her.  She told me about
8        it.  That she would sit in the closet on the blanket
9        that was my mom's quilt when my mom was dying.  She
10       was very close to my mom.
11           It also covered her casket at some point
12       during the funeral.  So she would sit with it because
13       she missed her grandma.
14  Q.   And you saw -- and how old roughly was Paiton at that
15       time?
16  A.   So that was in 2007, 12 years ago.  She was, by my
17       math, 12, 13.
18  Q.   And you got her mental health therapy at that time?
19  A.   No.
20  Q.   Did you ever go to joint therapy with Margaret?
21  A.   No.  No.
22  Q.   Did you ever go to group therapy with Margaret, Paiton
23       and Amber?
24  A.   No.  No.
25  Q.   Are you aware of -- are you aware of either before or

| Page 277 |
|---|

1        after your trip to Jamaica of any reported rapes in or
2        near Ocho Rios, Jamaica?
3   A.   No.
4   Q.   Do you recall receiving anything from Stetson Arriola
5        at Vacations to Go titled the bill of rights?
6   A.   I don't recall.
7   Q.   Does Paiton smoke?
8   A.   No.
9   Q.   Did she smoke before the trip?
10  A.   No.
11  Q.   Your partial hospitalization was -- followed an
12       episode you had with your employer, right?
13  A.   Yes.
14  Q.   Can you tell me about that?
15  A.   I worked as a floor nurse in hematology/oncology and I
16       had multiple days that I would have anxiety or just
17       break down because of what had happened to Paiton.
18       And I was inconsolable the day that I left and went to
19       the ER and requested psych help.
20  Q.   How many months after you left Jamaica did you have an
21       episode with your boss?
22  A.   I left Jamaica in May and this is mid -- beginning of
23       mid-September.
24  Q.   So about four months later?
25  A.   Three and a half to four, yeah.

70 (Pages 274 to 277)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 278

1   Q.  And what did you tell your boss?
2   A.  I didn't have to tell her anything.  She -- she knew
3       what had happened.  She knew that we kept getting
4       e-mails that we were going to have some sort of
5       hearing for the guys, and we wouldn't hear about it
6       for three more weeks after the time passed and they'd
7       say that they didn't go.  It was -- it was crazy.  But
8       she knew that I was leaving to go seek mental health
9       help.
10  Q.  In 2001 when you went to Montego Bay with your then
11      husband would you characterize Montego Bay as
12      dangerous?
13  A.  Based on what I knew then, no.
14  Q.  Were you concerned about your safety when you went to
15      Montego Bay in 2001?
16  A.  Somewhat.
17  Q.  Did you research the safety of Ocho Rios in either
18      2014 or 2015 as you were preparing for your trip?
19  A.  No.
20  Q.  Was it your idea to go to Ocho Rios?
21  A.  Yes.
22  Q.  Was it your idea to go to Moon Palace?
23  A.  I believe so.
24  Q.  How many installments did you make to Vacations to Go?
25  A.  I believe two, the deposit and then the lump sum.

Page 279

1   Q.  How long before the lump -- how long before the trip
2       did you make the lump sum?
3   A.  I believe I paid in full before -- in May.  I believe
4       I paid in full in March.  No, in -- yeah, I think it
5       was in March.
6   Q.  Did you pay before or after you chose the Beaches
7       property?
8   A.  Before.
9           (Off the record at 4:41 p.m.)
10          (Back on the record at 4:53 p.m.)
11  BY MR. SUAREZ:
12  Q.  We're back on the record.  When you last saw -- I'm
13      sorry, ma'am.  Are you ready?
14          When you last saw your daughters the
15      evening of May 8th before the incident where were
16      they?
17  A.  At the bar around the corner from our room.  At the
18      bar around the corner from our room.
19  Q.  And at that moment they had shorts and shirts on?
20  A.  Yes.
21  Q.  At the time you saw Amber when you went looking for
22      them, what was she wearing?
23  A.  Shorts and a shirt with her bathing suit underneath,
24      but I don't know what she was wearing for sure for
25      clothes.

Page 280

1   Q.  At the time that you saw Paiton what was she wearing?
2   A.  She was wearing white shorts and a shirt with her
3       bathing suit underneath.
4   Q.  Ma'am, are you aware that you filed a lawsuit in Texas
5       against travel agent Vacations to Go?
6   A.  Yes.
7   Q.  Why are you bringing that lawsuit?
8   A.  Why am I what?
9   Q.  Why are you bringing that lawsuit?
10          MR. WEGLARZ:  Objection, form.
11          But go ahead.  You can answer it.
12  BY MR. SUAREZ:
13  Q.  Let me keep it very simple:
14          What do you believe that Vacations to Go,
15      your travel agent did wrong?
16  A.  They didn't warn me about what went on in Jamaica, the
17      intensity of rapes in the resort.
18  Q.  Ma'am, I represent a tour operator Fun Jet Vacations
19      and the Mark Travel Corporation.
20          You understand that, right?
21  A.  Yes.
22  Q.  And what do you believe the tour operator did wrong
23      with respect to you?
24  A.  Who's the tour operator.
25  Q.  Fun Jet Vacations and the Mark Travel Corporation.

Page 281

1   A.  I was led -- I was not given a chance to look and
2       investigate which resort I wanted to go to and was led
3       to believe -- I was told that this was the best choice
4       to make.  And I wasn't warned about the rapes that are
5       occurring in Jamaica.
6   Q.  Okay.  So all of those things -- all of those three
7       things that you've just identified to me were between
8       you and Stetson Arriola at Vacations to Go.
9           My question to you is a little different.
10      My question to you is what do you believe my client
11      Fun Jet Vacations and Mark Travel Corporation, which
12      is a tour operator, what do you think my client did
13      wrong?
14          MR. WEGLARZ:  Asked and answered.  I think
15      she did just answer that question.  I mean you're
16      trying to limit it just to Vacations to Go, but she
17      did answer that exact same question.
18          THE WITNESS:  And my understanding was that
19      they were all in -- they were all one -- they all --
20      it all worked together, Fun Jet and Vacations to Go.
21  BY MR. SUAREZ:
22  Q.  And you gained that understanding solely from the fact
23      that there is a logo attached to one of the documents
24      that you -- that you state?
25  A.  There's information in here stating Thank you for

71 (Pages 278 to 281)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 282

1     booking with Fun Jet.
2     Q.  Okay.  And there's also information --
3     A.  It came from Stetson Arriola.
4     Q.  Let's talk about that.
5           It's very clear that Stetson Arriola
6     throughout these documents says that he works for
7     Vacations to Go, which is a travel agency that you
8     contacted, right?
9           MR. WEGLARZ:  Form objection.
10          Go ahead and answer.
11          THE WITNESS:  From what I understand from
12    what you've told me, I now know that he worked for
13    Vacations to Go only.
14    BY MR. SUAREZ:
15    Q.  And in the very document that you are pointing to
16    right now for this purpose, you're pointing to a logo
17    that is on page 5 of this document, which is Exhibit
18    No. 7.  Okay.  And that is the same page that has two
19    paragraphs directly explaining what Mark Travel and
20    Fun Jet are, right?
21          MR. WEGLARZ:  No foundation.
22          THE WITNESS:  Can I look at that?
23    BY MR. SUAREZ:
24    Q.  Sure.  Go ahead.
25    A.  I'm not referring just to this here.

Page 283

1     Q.  Okay.
2     A.  There's more of it in here.
3     Q.  I understand that -- I understand that --
4     A.  And it was sent by Stetson Arriola who is making our
5     reservations for us.  Why would -- why would Target
6     send me information on Meijer?
7     Q.  Because a travel agent works with tour operators, and
8     what that document is explaining is exactly that.
9     Just like he sends you information on Delta Airlines,
10    right?
11          So my question to you is what do you
12    think -- if you look at page 5, it explains what we
13    are and what we own and we don't own.  The same page
14    that you say has the logo, right above that it says
15    notices as to the tour operator, Fun Jet Vacation,
16    Mark Travel.
17          My question to you is -- and I'm going to
18    ask it one last time and let it go.
19          What do you think they did wrong?
20          MR. WEGLARZ:  She answered that.
21          Go ahead and answer it again.
22          THE WITNESS:  I was not -- my -- I was
23    misled.
24    BY MR. SUAREZ:
25    Q.  By Mr. Arriola?

Page 284

1     A.  Yes.
2     Q.  Okay.  Thank you, ma'am.
3           And when you say Mr. Arriola misled you,
4     how did Mr. Arriola mislead you?
5     A.  Because he said that Moon Palace was going to -- would
6     most likely be open by then and we could go ahead and
7     make our reservations for that.  He never suggested
8     another resort at that time.
9           It appears to me that in that paperwork
10    that it was known a few weeks before April 1st that
11    Moon Palace wasn't going to open.  I was never
12    informed.
13          Yet then, I received a call from Stetson
14    Arriola, wherever he worked, and informed me that I
15    had minutes to choose from two, only two options, of
16    which I couldn't research at all without losing money
17    is how it made me feel.
18    Q.  Is there anything else you felt you were misled about
19    by Mr. Arriola?
20    A.  Yes.  He told me that this resort was a good resort to
21    go to.  I said what resort -- I had nobody else.  What
22    resort do you recommend?  This Ocho Rios Beaches.
23    This is a great resort, family oriented.
24          MR. SUAREZ:  Ma'am, at this time I have no
25    further questions for you except to say thank you and

Page 285

1     to have a good evening.  I suspect my counsel will
2     have follow-up.
3           MR. SAFRA:  I have two questions.
4           RE-EXAMINATION
5     BY MR. SAFRA:
6     Q.  In terms of after the incident, as you sit here today
7     is there anything that you are unable to do that you
8     attribute to what you experienced in this incident
9     that you were able to do before the incident?
10    A.  Yes.
11    Q.  What is it that you now can't do but you were able to
12    before the incident?
13    A.  I cannot take care of -- I cannot take care of
14    Jamaican men in healthcare, which is a huge part of
15    health -- I mean healthcare is all kinds of different
16    people.  And now I simply don't feel that I can take
17    care of them in a way that they deserve.
18    Q.  I want to ask a couple follow-ups on that.  Before I
19    do, is there anything else?
20    A.  Things have been affected.  I wouldn't say that I
21    can't do.  But other things I can't -- I can't look at
22    a laundry cart without breaking down.
23    Q.  Any household chores or things of that nature,
24    anything that you can't do that you have to go and,
25    you know, maybe hire someone else to do?

72 (Pages 282 to 285)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 286

1   A.  No, I can't --
2   Q.  In terms of the service of Jamaican men under your
3       employ, have you lost a job as a result of that
4       inability?
5   A.  No.
6   Q.  Have you got a pay cut or not received maybe a
7       promotion as a result of that?
8   A.  I haven't had a pay cut except for all the wages that
9       I've lost.
10  Q.  And I understand we have the lost wages aspect of
11      this --
12  A.  I haven't had a pay cut.
13  Q.  Has your job been negatively affected at all in terms
14      of your day-to-day and your ability to do your job and
15      advance to any extent based upon your inability to
16      provide services to males of Jamaican descent?
17  A.  Has it been affected you're asking?
18  Q.  Have you had financial impact through this inability
19      beyond just your lost wages claim?
20  A.  And the mental healthcare that I get, no.
21          MR. SAFRA:  I have no further questions.
22          MR. WEGLARZ:  I have a couple of questions.
23      (Off the record at 5:03 p.m.)
24      (Back on the record at 5:04 p.m.)
25          EXAMINATION

Page 287

1   BY MR. WEGLARZ:
2   Q.  Ms. DeSantis, we spent a lot of time looking over a
3       lot of records and documents including the
4       itineraries, the e-mails that you received from
5       Stetson Arriola, and I think you were talking about
6       lastly here Exhibit No. 7, and these will be the
7       copies of itineraries that we provided to defense
8       counsel.
9          You recall looking at those, correct?
10  A.  Yes.
11  Q.  Now, Stetson would send you e-mails from a Vacations
12      to Go e-mail address, true?
13  A.  Yes.
14  Q.  And you looked to Stetson as being your travel agent,
15      correct?
16  A.  Yes.
17  Q.  I think you told us earlier you initially found the
18      Moon Palace resort yourself going online, correct?
19  A.  Yes.
20  Q.  So why wouldn't you just book the Moon Palace resort
21      directly with the hotel as opposed to finding a travel
22      agent?
23  A.  Because I felt like it would be safer to have somebody
24      book it rather than just book it in another country
25      and not know anything.

Page 288

1   Q.  You relied upon the expertise of the travel company in
2       booking and making sure that where you were staying
3       would be safe, correct?
4          MR. SUAREZ:  Object to the form.
5          THE WITNESS:  Yes.
6   BY MR. WEGLARZ:
7   Q.  And Stetson Arriola became your travel agent, correct?
8   A.  Yes.
9   Q.  And he would send you e-mails from the Vacations to Go
10      e-mail address and he would attach documents to those
11      e-mails sometimes, correct?
12  A.  Yes.
13  Q.  A lot of those documents would be the itineraries that
14      he provided for your trip, correct?
15  A.  Yes.
16  Q.  And you would see these documents and, for example,
17      Exhibit No. 7, there's a travel itinerary and you
18      would see the logo Fun Jet Vacations, correct?
19  A.  Yes.
20  Q.  You would also see reference to Mark Travel, correct?
21  A.  I don't recall.
22  Q.  But you recall getting itineraries from Fun Jet
23      Vacations from Stetson Arriola, correct?
24  A.  Yeah.
25          MR. SUAREZ:  Object to the form.  Misstates

Page 289

1       the document -- hang on.  Misstates the document.
2          She did not get an itinerary from Fun Jet
3       Vacations.  She got it from Stetson Arriola at
4       Vacations to Go.
5          Go ahead.  Sorry.
6   BY MR. WEGLARZ:
7   Q.  But the itinerary was on Fun Jet Vacations letterhead,
8       correct?
9          MR. SUAREZ:  Object to the form.
10         THE WITNESS:  Yes.
11  BY MR. WEGLARZ:
12  Q.  And I take it you believe that Mr. Arriola was acting
13      on behalf of Fun Jet Vacations?
14         MR. SUAREZ:  Object to the form.
15         THE WITNESS:  Absolutely.
16  BY MR. WEGLARZ:
17  Q.  And you recently believed that he was authorized to
18      act on behalf of Fun Jet Vacations, correct?
19         MR. SUAREZ:  Object to the form.
20         THE WITNESS:  Yes.
21  BY MR. WEGLARZ:
22  Q.  Someone from Fun Jet said You know what, we're going
23      to allow Mr. Arriola to use our letterhead and our
24      logo when he books and sells vacation packages in
25      Jamaica, correct?

73 (Pages 286 to 289)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 290

1          MR. SUAREZ:  Object to the form.
2          THE WITNESS:  Can you say that again?
3   BY MR. WEGLARZ:
4   Q.  Sure.  You believe that Fun Jet Vacations was allowing
5       Stetson Arriola to use their logo to go ahead and sell
6       vacation packages under their name, correct?
7   A.  Yeah.
8   Q.  For example, if we look at Exhibit 7 here, this
9       itinerary, it says Thank you for choosing Fun Jet
10      Vacations, correct?
11  A.  Yes.
12  Q.  And right underneath that it says Vacations to Go,
13      correct?
14  A.  Yes.
15  Q.  You thought these two companies are working together,
16      correct?
17         MR. SUAREZ:  Object to the form.
18         THE WITNESS:  Of course.
19  BY MR. WEGLARZ:
20  Q.  Now, if -- if there were state department warnings out
21      there saying that Look it, there's been a number of
22      rapes and sex assaults committed against tourists in
23      the country of Jamaica, would you have expected your
24      travel agent or the travel or tour operator to warn
25      you of that information?

Page 291

1          MR. SUAREZ:  Object to the form.
2          THE WITNESS:  Yes.
3          MR. SAFRA:  I haven't been yelling join,
4   join, join because it's been pretty quick, but I've
5   been joining in all those.
6          MR. SUAREZ:  Todd, just pause for a second
7   so I can say form, because you're leading her and I
8   just want to preserve the objection.  So I want to
9   make sure that --
10         MR. WEGLARZ:  Do you think I am?  Because I
11  thought I was not leading.
12         MR. SCOTT:  You're leading your witness.
13         MR. SUAREZ:  I do think you are.  Just give
14  me a pause.  I'm going to say form and then you can
15  continue going.
16         MR. WEGLARZ:  Because I'm a reasonable guy
17  I'll give you a form objection to every one of my
18  questions.
19         MR. SUAREZ:  No.  Thank you very much.  I
20  appreciate it.  Because -- I'm going to tell you why.
21  I appreciate the courtesy but not all judges allow
22  that and if you get five pages into a transcript and
23  you say No, Judge, we had a standing objection, they
24  don't know where it ends.
25         So please allow me the courtesy to say

Page 292

1       form.
2          MR. WEGLARZ:  Understood.
3   BY MR. WEGLARZ:
4   Q.  If your travel agent or if your tour operator or
5       anyone else involved with this vacation package knew
6       that the state department was warning and reporting
7       that there was a concern, there was a problem in
8       Jamaica where hotel employees were sexually assaulting
9       tourists inside the hotels on the north coast, would
10      you have expected them to warn you of that
11      information?
12         MR. SUAREZ:  Object to the form.
13         THE WITNESS:  Yes.
14  BY MR. WEGLARZ:
15  Q.  Had you been warned or advised that there were those
16      problems going on in Jamaica, tourists being sexually
17      assaulted, there being a special concern about hotel
18      employees on the north coast sexually
19      assaulting tourists and travelers, would the four of
20      you women have taken this trip to Jamaica?
21         MR. SUAREZ:  Object to the form.
22         THE WITNESS:  Absolutely not.
23  BY MR. WEGLARZ:
24  Q.  You told us earlier on May the 8th when you and
25      Margaret -- you realized that you couldn't find the

Page 293

1       girls, right?
2   A.  Right.
3   Q.  And you started looking everywhere for them, correct?
4   A.  Yeah.
5   Q.  And then you saw -- you said you saw Amber in the
6       hallway?
7   A.  Yes.
8   Q.  Correct?  And you asked where Paiton was and she
9       pointed towards the doors of that laundry room or
10      maintenance room?
11  A.  Yeah.
12         MR. SUAREZ:  Object to the form.
13  BY MR. WEGLARZ:
14  Q.  And she told you that she was in there with someone
15      else, correct?
16         MR. SUAREZ:  Object to the form.
17         THE WITNESS:  I asked her is she in there
18      with a guy and she said yes.  She shook her head yes.
19  BY MR. WEGLARZ:
20  Q.  And you tried opening the doors?
21  A.  Yes.
22         MR. SUAREZ:  Object to the form.
23  BY MR. WEGLARZ:
24  Q.  And you could not because they were locked?
25         MR. SUAREZ:  Object to the form.

74 (Pages 290 to 293)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 294

1        THE WITNESS:  Correct.
2   BY MR. WEGLARZ:
3   Q.  And then you started pounding on the door?
4        MR. SUAREZ:  Object to the form.
5        THE WITNESS:  Yeah.
6   BY MR. WEGLARZ:
7   Q.  Now, you already told us that at the time you didn't
8       know at the time that she was sexually assaulted or
9       was getting sexually assaulted at that time at that
10      moment when you were pounding on the doors, correct?
11       MR. SUAREZ:  Object to the form.
12       THE WITNESS:  I did not know that she was.
13  BY MR. WEGLARZ:
14  Q.  Remember you told us that you then went towards the
15      front desk to get some help?
16       MR. SUAREZ:  Object to the form.
17       THE WITNESS:  Yes.
18  BY MR. WEGLARZ:
19  Q.  You were walking back with the manager or the employee
20      to go back to that room?
21       MR. SUAREZ:  Hang on.  Hang on.  Just pause
22      for a second.  I need to be able to say object to the
23      form, and I don't want to interrupt.
24       He's leading you and I need to be able to
25      say object to the form.  And I want to make sure she

Page 295

1       has them and I'm going to object to form on almost
2       every question.
3        So once again just take a breath, one
4       Mississippi, and I'm going to say object to the form.
5       Okay?
6        THE WITNESS:  Okay.
7        MR. WEGLARZ:  I can't believe you're
8       calling this leading, but that's fine.  We can agree
9       to disagree.
10  BY MR. WEGLARZ:
11  Q.  And while you were walking back to that room that's
12      when you noticed one of the lifeguards walking out,
13      right?
14       MR. SUAREZ:  Object to the form.
15       THE WITNESS:  Yes.  I was running back.
16  BY MR. WEGLARZ:
17  Q.  I think that that was a pretty intense time during
18      this situation, correct?
19       MR. SUAREZ:  Object to the form.
20       THE WITNESS:  Yes.
21  BY MR. WEGLARZ:
22  Q.  And when you saw Paiton covered in that room when you
23      went into that maintenance room?
24       MR. SUAREZ:  Object to the form.
25       THE WITNESS:  I'm sorry.  Can you say

Page 296

1       that --
2   BY MR. WEGLARZ:
3   Q.  You saw her like -- maybe I'm not paraphrasing
4       correctly.  I thought you said she was cowered over?
5        MR. SUAREZ:  Object to the form.
6        THE WITNESS:  She was cowering behind a
7       wall, squatted down and cowering.
8   BY MR. WEGLARZ:
9   Q.  You knew something happened.  You just weren't sure.
10      You thought maybe they were smoking marijuana and she
11      was getting in trouble, right?
12       MR. SUAREZ:  Object to the form.
13       THE WITNESS:  Yes.
14  BY MR. WEGLARZ:
15  Q.  And later on, it was still that evening, you found out
16      that your daughter was actually raped?
17       MR. SUAREZ:  Object to the form.
18       THE WITNESS:  I did.
19  BY MR. WEGLARZ:
20  Q.  And I take it that when you learned she was raped you
21      probably re-lived those moments of you pounding on
22      that door, running for help, trying to get your
23      daughter out of that room, right?
24       MR. SUAREZ:  Object to the form.
25       THE WITNESS:  When I found out she was

Page 297

1       raped?
2   BY MR. WEGLARZ:
3   Q.  Yes.
4   A.  Yes.
5   Q.  Those thoughts go through your head that while I was
6       pounding on the door she was getting raped, correct?
7   A.  Absolutely.
8        MR. SUAREZ:  Object to the form.
9   BY MR. WEGLARZ:
10  Q.  And I take it that's just a gut-wrenching feeling,
11      correct?
12       MR. SUAREZ:  Object to the form.
13       THE WITNESS:  Yes.
14  BY MR. WEGLARZ:
15  Q.  Do you re-live that moment?
16  A.  Still to this day.
17       MR. SUAREZ:  Object to the form.
18       THE WITNESS:  Yes.
19  BY MR. WEGLARZ:
20  Q.  Were you severely distressed as a result of this
21      incident and because of where you were and how you
22      found out about what happened?
23       MR. SUAREZ:  Object to the form.
24       THE WITNESS:  Yes.
25

75  (Pages 294 to 297)

Janet Desantis
September 23, 2019

Page 298

BY MR. WEGLARZ:
1
2  Q.  Have you suffered physically because of this severe
3     emotional distress?
4         MR. SUAREZ: Object to the form.
5         THE WITNESS: Yes.
6  BY MR. WEGLARZ:
7  Q.  Do you find yourself nervous?  Do you find yourself
8     not able to go to sleep?  Tell me about the physical
9     things you go through as a result of this.
10        MR. SUAREZ: Object to the form.
11        THE WITNESS: Sick to my stomach a lot,
12     wake up in the night.  I have nightmares still.  And
13     yeah, just the whole situation is very stressful.
14 BY MR. WEGLARZ:
15 Q.  And because of this you're on continued medications,
16     correct?
17 A.  Yes.
18        MR. SUAREZ: Object to the form.
19 BY MR. WEGLARZ:
20 Q.  Now, we've heard that you have had issues with anxiety
21     and you receive mental health care even before this
22     incident, correct?
23        MR. SUAREZ: Object to the form.
24        THE WITNESS: Yes.
25

Page 299

BY MR. WEGLARZ:
1
2  Q.  Do you agree that your issues with anxiety and stress,
3     have they been aggravated as a result of this
4     incident?
5         MR. SUAREZ: Object to the form.
6         THE WITNESS: Absolutely.
7  BY MR. WEGLARZ:
8  Q.  And do you need to take medications like Zoloft and
9     Xanax?
10 A.  Yes.
11        MR. SUAREZ: Object to the form.
12        MR. SAFRA: My standing objection along
13     that line I join.  Can I just put that on the record?
14     Because I don't want to be continuing --
15        MR. WEGLARZ: Yes, you can.  No problem.
16        MR. SAFRA: Not to interrupt the line.
17        MR. WEGLARZ: I appreciate that.  I really
18     do, Mr. Safra.
19        MR. SAFRA: Mark that.
20        MR. WEGLARZ: Let me talk to my client
21     really quick.  I think we'll be done.
22        (Off the record at 5:16 p.m.)
23        (Back on the record at 5:20 p.m.)
24 BY MR. WEGLARZ:
25 Q.  Ms. DeSantis, do you recall when you were in Jamaica

Page 300

1     going to one of the events or excursions, whatever you
2     call it, you were on a bus -- you were on a bus ride
3     going to the event or was it you were on the bus ride
4     coming back?
5         MR. SUAREZ: Object to the form.
6         THE WITNESS: I don't recall if it was
7     going to our excursion for the day or coming back.
8  BY MR. WEGLARZ:
9  Q.  Do you recall, though, when you were on this bus that
10     you were driving past the area where the Moon Palace
11     resort was?
12 A.  Yes, where I assumed that it was.
13 Q.  Okay.  And did you ask the bus driver Hey, where is
14     the Moon Palace resort?  Is that close by?  Do you
15     remember asking the bus driver anything along those
16     lines?
17        MR. SUAREZ: Object to the form.
18        THE WITNESS: I asked the bus driver is
19     Moon Palace in this area somewhere because that's
20     where we were supposed to go but they told us that it
21     was -- had a small fire or it wasn't going to be open
22     or something.
23 BY MR. WEGLARZ:
24 Q.  And what was the bus driver's response?
25        MR. SUAREZ: Object to the form.

Page 301

1         THE WITNESS: The bus driver said Oh, Moon
2     Palace, that's known as the rape resort.  He said that
3     resort was never -- he said it's not going to be open
4     for a long time, if not a few years because the
5     workers aren't being paid and nothing's being worked
6     on.  It was a big fire that they had had.
7         MR. SUAREZ: Object to form.  Move to
8     strike.
9         MR. WEGLARZ: That's all I have.
10        MR. SAFRA: I have follow-up questions.
11        RE-EXAMINATION
12 BY MR. SAFRA:
13 Q.  What was the name of the bus driver?
14 A.  I don't recall his name.
15 Q.  Do you know who he worked for?
16 A.  I don't.
17 Q.  Can you describe him?  Was he wearing any shirts or
18     anything with logos, any identification?
19 A.  I don't recall but he was -- he was a dark-skinned
20     Jamaican man.  If I had to guess, it would be over 40
21     years old.
22 Q.  This bus driver -- this bus trip, this occurred before
23     the incident?
24 A.  Yes.
25 Q.  And you -- were you aware -- or at the time did you

76  (Pages 298 to 301)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 302

1    know of any association between the Moon Palace resort
2    and the Beaches resort in terms of the hotel business
3    or otherwise?
4  A.  No.
5  Q.  Did your knowledge or this statement -- your knowledge
6    of this statement by this bus driver regarding rape,
7    did that cause you any concern?
8  A.  Yeah.  I was a little taken aback.
9  Q.  Did you do anything to look into it before -- in the
10   time between that bus ride and the actual incident?
11 A.  Just warned the girls to always stick together and
12   stay on the resort, and I mean the same thing I always
13   had, and not give any personal information to anybody.
14 Q.  Did you tell your daughters what this bus driver said
15   or were they within earshot where they heard it?
16 A.  They were within earshot.  I don't know if they recall
17   or they heard it.  They were sitting right with us.
18 Q.  So prior to -- strike that.
19        Did you at any time try to end your trip
20   early and leave now that you had knowledge from this
21   bus driver of rape in Jamaica?
22 A.  I had knowledge from the bus driver of rape at the
23   Moon Palace, and I -- we thanked God that we weren't
24   staying at the Moon Palace then and that we were at a
25   Sandals resort because Sandals was so popular and well

Page 303

1    known so we figured it was a safer place to be.
2  Q.  Do you know if the bus driver was confused and he was
3    talking about a resort that's not Moon Palace?
4  A.  We specifically said Moon Palace.
5  Q.  Do you know if the bus driver could be, you know,
6    unaffiliated with any hotel and was repeating words
7    from a third party, confused?
8        Do you have any reason to believe that he
9    could be misunderstood?
10 A.  Not at all.
11 Q.  Did you ever look into or do research afterwards
12   whether there's ever been an incident of rape at the
13   Moon Palace resort?
14 A.  After the incident I did.
15 Q.  Did you actually find that to be true in anything you
16   found on the Internet?
17 A.  I don't recall.  I don't want to say a positive, yes,
18   because I don't recall.
19        MR. SAFRA:  No further questions.
20        RE-EXAMINATION
21 BY MR. SUAREZ:
22 Q.  So you never found any information online and have
23   never seen a document that would corroborate or
24   substantiate what that bus driver allegedly told you?
25 A.  I researched it.  I don't remember if I found

Page 304

1    anything.
2  Q.  Okay.  Do you have -- did this bus driver -- that's
3    the bus driver that you got independently?
4  A.  Yes.
5  Q.  You hired that person directly?
6  A.  Yes.
7  Q.  He was your employee?
8  A.  Yes.  Well --
9  Q.  He was your contractor?
10 A.  I guess.
11 Q.  Do you have the receipts of that bus ride?
12 A.  I don't know.
13 Q.  Do you know -- do you still have the credit card that
14   you paid that bus driver with?
15 A.  There could be something in e-mails.
16 Q.  Do you still have the credit card that you paid that
17   bus driver with?
18 A.  Oh, no.
19 Q.  Okay.  You say there could be something in e-mail.
20   What does that mean?
21 A.  There's e-mail correspondence to reserve a tour guide
22   is what I call them, bus driver.
23 Q.  This alleged trip happened Monday, Tuesday, Wednesday
24   or Thursday?
25 A.  I believe that it happened on Thursday.

Page 305

1  Q.  And when you got to the hotel, did you ask anybody
2    about this bus driver -- this alleged bus driver
3    information?
4  A.  No.
5  Q.  Did you ever ask the police about this bus driver
6    information?
7  A.  No.
8  Q.  Did you ever ask Violet about this bus driver
9    information?
10 A.  I don't recall if I asked her.
11 Q.  But you were armed with acknowledge allegedly from
12   this bus driver from Thursday until you got back to
13   the resort at about 5:00 until the next day.
14        The next day you didn't investigate these
15   statements?
16 A.  No.
17        MR. SUAREZ:  Thank you.  I have no further
18   questions.
19        RE-EXAMINATION
20 BY MR. WEGLARZ:
21 Q.  The bus driver didn't tell you Look, this problem is
22   with the resorts on the north coast.  He just
23   mentioned one specific hotel?
24        MR. SUAREZ:  Object to the form.
25        THE WITNESS:  Moon Palace.

77 (Pages 302 to 305)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a

Janet Desantis
September 23, 2019

Page 306

1       MR. WEGLARZ:  That's all I have.
2       MR. SUAREZ:  For the record, what's going
3    to happen is these exhibits will travel with the
4    deposition, but the court reporter is going to make
5    sure we get copies back to us tomorrow morning for the
6    start of the deposition.
7       MR. SAFRA:  With the exception of Exhibit
8    2, which counsel will log and take a picture of to
9    preserve authenticity.
10      MR. WEGLARZ:  Yes.
11      (The deposition was concluded at 5:33 p.m.
12    Signature of the witness was not requested by
13    counsel for the respective parties hereto.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 307

1       CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3           ) SS
4    COUNTY OF OAKLAND )
5
6       I, Elizabeth Dyan Ferguson-Evans, certify
7    that this deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10    reduced to computer transcription; that this is a
11    true, full and correct transcript of my stenographic
12    notes so taken; and that I am not related to, nor of
13    counsel to, either party nor interested in the event
14    of this cause.
15
16
17
18
19
20    _____
21    Elizabeth Dyan Ferguson-Evans,
22    CSR-1347
23    Notary Public,
24    Oakland County, Michigan.
25    My Commission expires: September 21, 2024

78 (Pages 306 to 307)

2a0f911f-ad33-41b2-9f81-5b37a9b4e19a