# EXHIBIT 27

{00682541.DOCX}

Margaret Torralva
September 24, 2019

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF MICHIGAN

 3                       MIAMI DIVISION

 4   PAITON E. BATER, AMBER R.

 5   TORRALVA, JANET DESANTIS,

 6   and MARGARET A. TORRALVA,

 7                    Plaintiffs,

 8        vs.                    Case No. 1:17-cv-21703

 9                               Hon. Marcia G. Cooke

10   UNIQUE VACATIONS, INC.,

11   a Delaware corporation, THE MARK

12   TRAVEL CORPORATION, a Nevada

13   corporation d/b/a Fun Jet Vacations,

14   DWIGHT DAVIS, JERMAINE DYER,

15   and WILLIAM TAPPER,

16   Jointly and Severally,

17                    Defendants.

18   _____

19

20        The Deposition of MARGARET ANNE TORRALVA,

21        Taken at 19390 West Ten Mile Road,

22        Southfield, Michigan,

23        Commencing at 8:19 a.m.,

24        Tuesday, September 24, 2019,

25        Before Lezlie A. Setchell, CSR-2404, RPR, CRR.
```

Page 2

```
1    APPEARANCES:
2
3    TODD J. WEGLARZ
4    Fieger, Fieger, Kenney & Harrington, PC
5    19390 West Ten Mile Road
6    Southfield, Michigan 48075
7    248.355.5555
8    tweglarz@fiegerlaw.com
9        Appearing on behalf of the Plaintiffs.
10
11   THOMAS E. SCOTT
12   STEVEN R. SAFRA
13   Cole, Scott & Kissane, PA
14   Dadeland Centre II
15   9150 South Dadeland Boulevard
16   Suite 1400
17   Miami, Florida 33156
18   786.338.9357
19   thomas.scott@csklegal.com
20   steven.safra@csklegal.com
21       Appearing on behalf of Defendant
22           Unique Vacations, Inc.
23
24
25
```

Page 3

```
1    APPEARNCES (Continuing):
2
3    PATRICIA MELVILLE
4    LUIS E. SUAREZ
5    Boies Schiller Flexner, LLP
6    100 Southeast Second Street
7    Suite 2800
8    Miami, Florida 33131
9    305.539.8400
10   pmelville@bsfllp.com
11   lsuarez@bsfllp.com
12       Appearing on behalf of Defendant
13           The Mark Travel Corporation.
14
15   ALSO PRESENT:
16   Dmitri Singh
17   Tammy Gonzalez
18
19
20
21
22
23
24
25
```

Page 4

```
1                    TABLE OF CONTENTS
2
3    WITNESS                              PAGE
4    MARGARET ANNE TORRALVA
5
6    EXAMINATION
7    BY MR. SAFRA                            6
8    EXAMINATION
9    BY MS. MELVILLE                       129
10   EXAMINATION
11   BY MR. WEGLARZ                        244
12   RE-EXAMINATION
13   BY MR. SAFRA                          262
14   RE-EXAMINATION
15   BY MS. MELVILLE                       266
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                        EXHIBITS
2    EXHIBIT                              PAGE
3    (Exhibits attached to transcript.)
4    EXHIBIT 1                             120
5    Handwritten notes
6    EXHIBIT 2                             156
7    Photograph
8    EXHIBIT 3                             164
9    Thumb drive
10   EXHIBIT 4                             165
11   Photograph
12   EXHIBIT 5                             170
13   On Resort Guest Registration
14   EXHIBIT 6                             209
15   Jenison Psychological Services, PC
16   Social History Assessment
17   EXHIBIT 7                             219
18   Answers to Interrogatories
19   EXHIBIT 8                             230
20   Progress Note
21   EXHIBIT 9                             232
22   Progress Note
23   EXHIBIT 10                            246
24   Travel Itinerary
25
```

Page 6

1   Southfield, Michigan
2   Tuesday, September 24, 2019
3   8:19 a.m.
4           MARGARET ANNE TORRALVA,
5   was thereupon called as a witness herein, and after
6   having first been duly sworn to testify to the truth,
7   the whole truth and nothing but the truth, was
8   examined and testified as follows:
9           MR. SAFRA:  Steven Safra for Unique
10   Vacations, Inc., joined by Tom Scott from the law firm
11   of Cole, Scott & Kissane, as well as Dmitri Singh,
12   counsel for Unique, and representative Tammy Gonzalez.
13           MS. MELVILLE:  Good morning.  Patricia
14   Melville from Boies Schiller Flexmer, along with my
15   partner, Luis Suarez, on behalf of The Mark Travel
16   Company.
17           MR. SUAREZ:  Good morning, Ms. Torralva.
18           THE WITNESS:  Good morning.
19           MR. WEGLARZ:  And Todd Weglarz for Margaret
20   Torralva.
21               EXAMINATION
22   BY MR. SAFRA:
23   Q.  Could you please state your name for the record?
24   A.  Margaret Anne Torralva.
25   Q.  Have you ever had a deposition before?

Page 7

1   A.  No.
2   Q.  I'm sure you've had an opportunity to talk to your
3       counsel about what to expect, but I'll go over a few
4       general rules just to make sure that everything is
5       kind of understood and we're on the same page.
6   A.  Okay.
7   Q.  There's a court reporter sitting next to me that is
8       taking down everything that we're saying.  I'll ask
9       you a series of questions, and I ask that if you're
10      able to answer the question, please do, when I finish
11      the question.  If you don't know something, that's
12      fine.  We'll move onto the next item.
13           A lot of times there might be a pause in
14      the middle of your answer or my question.  I'll do my
15      best to try to recognize that and not interrupt and
16      allow you to finish your answer before I begin my next
17      question, and I'd ask, you know, the same kind of
18      reciprocal treatment.  If for any reason we interrupt
19      and don't realize that you're not finished or vice
20      versa, just let me know.  I'll do the same, and we'll
21      go from there.  It should be pretty easy.
22   A.  Okay.
23   Q.  I'd ask, and you're doing a good job so far, that
24      answers be verbal.  It's hard for the written record
25      to take down a nod of the head or know maybe later on

Page 8

1       whether an uh-huh or uh-uh is a yes or no if an answer
2       calls for such.
3   A.  Okay.
4   Q.  We'll also be listening and you might hear counsel let
5       you know if unintentionally we do that, and we'll try
6       to make sure that we avoid that type of circumstance.
7           Likewise, you might hear counsel after I
8       state a question say objection, and if the counsel
9       objects, that's fine.  He's preserving something for
10      later for discussion either with counsel or the Court,
11      and you still have to answer the question after that,
12      unless your counsel directs you otherwise.
13   A.  Okay.
14   Q.  If I ask a question and you give an answer, we'll
15      assume that you understood the question that is asked,
16      and if you don't understand it, let us know.  I'd be
17      glad to rephrase the question.
18   A.  Okay.
19   Q.  If you need a break at any time, let us know.  I will
20      ask that if a question is asked, you answer it before
21      we break, but otherwise, we can break at your leisure.
22   A.  Okay.
23   Q.  I usually take a break every 45 to 60 minutes.  I'm
24      not watching the clock intently but that's usually my
25      practice.

Page 9

1   A.  Okay.
2   Q.  We're here today for your deposition involving an
3       incident at a hotel, Beaches Ocho Rios, in Jamaica in
4       May, 2015; is that correct?
5   A.  Yes.
6   Q.  Where are we today, in Michigan for your deposition?
7   A.  Yes.
8   Q.  Do you live in Michigan?
9   A.  Yes, I do.
10   Q.  At the beginning of the deposition, we do a little bit
11      of background.  We don't get too private, but we
12      establish some certain background so we can gather
13      some information about you.
14   A.  Okay.
15   Q.  How long have you lived in Michigan?
16   A.  About 30 years.  I was born in Michigan, but I lived
17      in California but now here.
18   Q.  What's your current address?
19   A.  1519 40th Street, Wyoming, Michigan 49509.
20   Q.  Did you live at that address at the time of May, 2015?
21   A.  Yes.
22   Q.  Who lives with you now?
23   A.  Now me, my fiancee, Amber my daughter, my fiancee's
24      son and my oldest daughter and my grandson.
25   Q.  What's your fiancee's name?

Page 10

| | |
|---|---|
| 1 | A.   Silvano Caldera. |
| 2 | Q.   How old are the other children and grandchildren? |
| 3 | A.   Okay.  My oldest daughter, Amanda, lives there.  She's |
| 4 | going to be moving out soon.  She is 31.  My grandson |
| 5 | is 10, and my step, well, he's not my stepson yet but |
| 6 | son to be, he is going to be 26 on November 1st. |
| 7 | Q.   Is your grandson a child of your oldest? |
| 8 | A.   Yes. |
| 9 | Q.   Okay.  And what is your fiancee's name? |
| 10 | A.   Silvano Caldera. |
| 11 | Q.   In May, 2015, were you married? |
| 12 | A.   No. |
| 13 | Q.   Okay.  Who was living with you in May, 2015? |
| 14 | A.   Myself, Amber, and my fiancee. |
| 15 | Q.   How old was Amber at the time? |
| 16 | A.   Seventeen. |
| 17 | Q.   Has Amber been living with you continuously since? |
| 18 | A.   Yes. |
| 19 | Q.   What do you do for employment, if anything? |
| 20 | A.   Right now or when it happened? |
| 21 | Q.   Right now. |
| 22 | A.   I work at the US Post Office. |
| 23 | Q.   How long have you worked there? |
| 24 | A.   Four-and-a-half years. |
| 25 | Q.   What is your job title? |

Page 11

| | |
|---|---|
| 1 | A.   Processing clerk. |
| 2 | Q.   What do you do? |
| 3 | A.   We work on the machines that the mail goes through to |
| 4 | get it from sequence, door-to-door delivery. |
| 5 | Q.   So four-and-a-half years.  Would that have been your |
| 6 | job at the time of the incident? |
| 7 | A.   No.  I worked at Spectrum Industries.  I started |
| 8 | working at the Post Office because we were told we |
| 9 | were going to have to go back to Jamaica for the |
| 10 | criminal trial, and I was saving up money.  So I |
| 11 | worked both jobs for four months, and then I switched |
| 12 | to the Post Office.  When I found out we were going to |
| 13 | have to go to Jamaica for the criminal trial, I got a |
| 14 | second job to save up money. |
| 15 | Q.   To pay to go to Jamaica? |
| 16 | A.   Yeah, because we didn't know what costs we would incur |
| 17 | if we went back there for the criminal trial. |
| 18 | Q.   Were you working at Spectrum Industries only at the |
| 19 | time in May, 2015? |
| 20 | A.   Yes. |
| 21 | Q.   And then when you found out about the Jamaican trial |
| 22 | need, you got a second job at the US Post Office? |
| 23 | A.   Yes. |
| 24 | Q.   Do you presently work at both places? |
| 25 | A.   No.  I only did that four months.  I worked full-time |

Page 12

| | |
|---|---|
| 1 | both jobs for four months. |
| 2 | Q.   Did someone tell you you have to go to Jamaica for the |
| 3 | criminal trial? |
| 4 | A.   That's what our understanding was, but we're not going |
| 5 | to have to now. |
| 6 | Q.   Why is it that you don't have to now? |
| 7 | A.   They're going to do it via satellite or something. |
| 8 | Q.   Did anyone ever tell you you have to be involved with |
| 9 | the criminal trial at all? |
| 10 | A.   To my understanding, in the beginning we thought the |
| 11 | girls were going to have to go back there, and then |
| 12 | they said that they would do it via satellite. |
| 13 | Q.   Who is "they"? |
| 14 | A.   Well, we kept in contact with the police department in |
| 15 | Jamaica.  Then they finally wanted to talk to one |
| 16 | person, so Janet kind of took the reigns over. |
| 17 | Q.   Do you understand that involvement in the criminal |
| 18 | trial by any at this point is just voluntary? |
| 19 | A.   Yes, but we wanted them to pay for what they did, so, |
| 20 | even my daughter even though she doesn't -- she |
| 21 | doesn't want to do it, but she's going to do it. |
| 22 | Q.   Do you hold these three individuals responsible for |
| 23 | what they did to your daughter? |
| 24 | A.   Yes. |
| 25 | Q.   And I think your words were you want Jermaine Dyer, |

Page 13

| | |
|---|---|
| 1 | Dwight Davis, and William Tapper to pay for what they |
| 2 | did? |
| 3 | A.   Yes. |
| 4 | Q.   Are you seeking monetary compensation from them or |
| 5 | just -- |
| 6 | A.   I want them to go to jail for what they did. |
| 7 | Q.   Okay.  Is it your intent to sue them as well outside |
| 8 | of criminal court? |
| 9 | A.   I haven't even thought about that part. |
| 10 | Q.   Are you aware that they're named Defendants in this |
| 11 | lawsuit? |
| 12 | A.   I think so.  I knew that they were involved in it. |
| 13 | Q.   Do you know what efforts, if any, have been made to |
| 14 | try to serve them? |
| 15 | A.   I have no idea. |
| 16 | Q.   Okay.  Is it your intent to continue to try to sue |
| 17 | them in some state or country somewhere? |
| 18 | A.   I have no idea because it's very difficult with them |
| 19 | being in a different country and us being here. |
| 20 | Q.   Have you filed suit in Jamaica against them? |
| 21 | A.   Not that I know of.  All I know is about the criminal |
| 22 | trial that's supposed to start in December.  That's |
| 23 | it. |
| 24 | Q.   Now do you have direct contact -- I think you |
| 25 | mentioned Janet as kind of taking point.  Do you have |

Page 14

1    direct contact relative to the criminal trial with the
2    Jamaican police or anyone, or it all goes through
3    Janet?
4  A.  It goes through Janet, and I usually get emails
5    forwarded to me, but we haven't heard nothing in a
6    while.
7  Q.  Okay.  Since May, 2015, I think this is pretty clear
8    from your answer, but since May, 2015, to date, you've
9    always resided in Michigan?
10 A.  Yes.
11 Q.  My understanding is the hotel at issue is in Jamaica,
12    the Beaches Ocho Rios Resort is in Jamaica, and you
13    traveled from Michigan to Jamaica for that trip?
14 A.  Yes.
15 Q.  Did you go through Atlanta to get to Jamaica?
16 A.  I don't remember.
17 Q.  Okay.  Do you recall having a stop during the flight?
18 A.  Honestly I don't remember.
19 Q.  The trip, itself, was from May 5th to May 9th of 2015;
20    is that correct?
21 A.  Yes.
22 Q.  Just give me a second to finish.
23 A.  Sorry.
24 Q.  It happens.  I've been doing this for years, and I
25    still do it.

Page 15

1    And the three individuals we've been
2    talking about are named Jermaine Dyer, Dwight Davis,
3    and William Tapper.  Were they employees of the hotel
4    that you went to vacation at?
5  A.  Yes.
6  Q.  Do you recall what their job was at the hotel?
7  A.  They worked at the slide in the water park area.
8  Q.  So a lifeguard of sorts?
9  A.  I don't know.  I'm assuming since it's water, they
10    would have to be a lifeguard.
11 Q.  You saw them during your stay?
12 A.  Yes, they were at the top of the slide when you went
13    down the slide, and the first day we got there, all
14    four of us had went on that slide several times.
15 Q.  And at all times was that the type of job that you saw
16    them doing during your stay performing?
17 A.  Yes.
18 Q.  So would you agree that their responsibilities were
19    water activity related?
20    MR. WEGLARZ:  Form objection, calls for
21    speculation.
22    But you can answer if you can answer.
23    THE WITNESS:  I'm not sure.  I would have
24    to be assuming.
25 BY MR. SAFRA:

Page 16

1  Q.  Maintaining the water slide?
2  A.  That's the only time I seen them was at the top of the
3    water slide.
4  Q.  Okay.  So for the job that you saw them performing,
5    would you agree that the act of rape is outside the scope of their job duties and
6    outside the scope of their job duties and
7    responsibilities for which they were hired?
8    MR. WEGLARZ:  Form objection, no
9    foundation.
10    You can still answer if you can answer.
11    THE WITNESS:  I would assume it's not part
12    of a job description.
13 BY MR. SAFRA:
14 Q.  Would you agree that the act of rape is not something
15    that serves the purpose for which they were hired?
16    MR. WEGLARZ:  Same objection.
17    Go ahead.
18    THE WITNESS:  Can you repeat the question?
19 BY MR. SAFRA:
20 Q.  Would you agree that the act of rape does not serve
21    the purpose for which they were hired by the hotel?
22 A.  Yes.
23 Q.  And that the act of rape by any of those three
24    individuals is something self-serving?
25 A.  Yes.

Page 17

1    MR. WEGLARZ:  Form objection.
2  BY MR. SAFRA:
3  Q.  Before we get into the actual time period that you
4    were at the hotel in Jamaica, I'd like to discuss with
5    you the events prior to your travels first.
6  A.  Okay.
7  Q.  The trip, as I understand it, for you and your
8    daughter, Amber, was booked by Janet DeSantis; is that
9    correct?
10 A.  Yes.
11 Q.  Did you speak to Janet about booking this vacation
12    before?
13 A.  She called me and asked me if we wanted to go on
14    vacation with them, so...
15 Q.  What did you say?
16 A.  I said yes.  I have to make sure I have the money
17    saved up.
18 Q.  Did she ask you about going to a particular country?
19 A.  She said Jamaica.
20 Q.  Did she ask you about going to a particular hotel?
21 A.  The first time we talked, she just said Jamaica, and
22    then she said she was going to research, and I said
23    okay.
24 Q.  Did she give you any specific information regarding
25    the type of vacation she wanted to look into or

Page 18

1    research in Jamaica?
2    A.   She just said at a resort.
3    Q.   Was there a specific type of resort that she was
4         interested in researching?
5    A.   I don't remember.
6    Q.   Did you have any follow-up discussions before the trip
7         was booked regarding any research she conducted?
8    A.   When she picked the hotel, she had told me about it,
9         and I said, If it looks good to you, I'm fine with it.
10   Q.   Do you recall what she told you about the hotel?
11   A.   Just the one we were supposed to stay at was named
12        Moon Palace.
13   Q.   Do you recall anything about Moon Palace that she told
14        you prior to the booking?
15   A.   No.  I just trusted her judgment.  I had never been to
16        Jamaica, so I wouldn't really know the difference
17        between what they had to offer.
18   Q.   Did you understand that Janet had been to Jamaica
19        before?
20   A.   Yes.
21   Q.   Did Janet tell you anything regarding her prior trip
22        to Jamaica?
23   A.   She said that it was fun and safe where they were at.
24        She was at a resort with her husband's work, his
25        company or whatever.

Page 19

1    Q.   Did she tell you any concerns she had involving the
2         issue of safety in Jamaica from her experience or to
3         her knowledge?
4    A.   No, but she had went 15 years before or something.
5    Q.   And she gave a deposition yesterday, and she said she
6         went in 2001?
7    A.   Yes.
8    Q.   So that's consistent but she didn't express to you
9         when you spoke prior to booking any concerns she had
10        with safety; is that correct?
11   A.   No.
12   Q.   That was a little bit of a double negative because I
13        said she did not tell you, and I think you're meaning
14        --
15   A.   I misunderstood the question.
16   Q.   Were you told anything about any safety concerns by
17        Janet prior to going on this trip?
18   A.   No.
19   Q.   Did you give Janet full authority to act on your
20        behalf to book the travels to Jamaica in May, 2015?
21   A.   I didn't use those words, but she was the point
22        person, if you want to say.  She's the one that chose
23        the resort, and she just told me how much money it was
24        going to cost for Amber and I, and I just trusted her
25        judgment.  I had never been to Jamaica.  I have only

Page 20

1    seen what I seen on TV.
2    Q.   Did you know that she was booking the trip on your
3         behalf and your daughter's?
4    A.   Yes.
5    Q.   Did you give her permission to do that?
6    A.   Yes.
7    Q.   Did you at any time say to Janet that she should not
8         book travels on your behalf?
9    A.   No.
10   Q.   Or that you wanted to cancel?
11   A.   No.
12   Q.   Or that she did have permission but no longer has
13        permission or anything of that sort?
14   A.   No.
15   Q.   Did you ever ask Janet what -- strike that.
16            After Janet booked the trip to Jamaica for
17        May, 2015, my understanding is that you personally had
18        involvement in making some payments pre-trip on behalf
19        of yourself and your daughter; is that correct?
20   A.   Yes.
21   Q.   Did you make those payments electronically or by email
22        or online or by telephone?
23   A.   I'm not sure.  I think it was over the phone, but I'm
24        not positive.  It was a long time ago.
25   Q.   Do you recall the name of anybody you spoke to or --

Page 21

1    A.   No.
2    Q.   -- or emailed with?
3    A.   No.
4    Q.   Do you recall when the payments were made?
5    A.   I think it was before April but no.
6    Q.   Regardless of timeframe, it occurred before you
7         actually went on the trip; is that right?
8    A.   Yes.
9    Q.   Okay.  At the time in which you communicated in some
10        form with somebody to make the payments before the
11        trip, yourself, did you at any time convey to that
12        individual or company that Janet was not authorized to
13        book the trip on your behalf?
14   A.   Can you repeat that one?
15   Q.   Did you ever convey to that person or company that
16        Janet should not have booked the trip?
17   A.   No, I never did that.
18   Q.   Okay.  So Janet booked the trip for you and your
19        daughter.  You were then contacted in some form to
20        make payment, and you made the payment?
21   A.   Yes.
22   Q.   Did you ever go online before you went to Jamaica and
23        do research yourself relative to the hotel you were
24        going to stay at?
25   A.   I don't think so.

Page 22

```
1   Q.   Would that apply to both the Moon Palace Jamaica Grand
2        Resort and Spa as well as the Beaches Ocho Rios
3        Resort that you ended up actually staying at?
4   A.   I don't think I checked on either one.  I worked a lot
5        of hours, so...
6   Q.   Did you ever go to any Website to do any research
7        before the trip regarding your Jamaican vacation?
8   A.   No.  I basically trusted what Janet chose.
9   Q.   And did you rely on Janet?
10  A.   Yes.
11  Q.   Did you see any television or newspaper or press
12       advertisements or promotions pertaining to this
13       vacation and the booking and the trip?
14  A.   I don't remember.  I know I see a lot of commercials
15       now for Jamaica, but I don't remember if I did then.
16  Q.   So then there's nothing that specifically stands out
17       in that --
18  A.   Not that I can remember.
19  Q.   -- in that manner that you can recall and attribute to
20       become the basis for anything relating to your booking
21       and travels in May, 2015, and prior?
22  A.   No.
23  Q.   And when you say no, just to make sure it's clear,
24       that's correct?
25  A.   Yes, that's correct.
```

Page 23

```
1   Q.   Did you have any conversations with your daughter
2        about the trip before you went in May, 2015?
3   A.   Can you be more specific?
4   Q.   I mean, I'm assuming obviously you discussed with your
5        daughter Amber that you were going to go on a vacation
6        to Jamaica?
7   A.   Yes.  It was for her graduation.
8   Q.   Did you discuss anything more with her that you can
9        recall prior to the trip?
10  A.   The only thing I told her is when we were at the
11       resort, we stay on the resort because we're going to
12       be in a different country and you never know.  You
13       could get hit by a car and have to go to the hospital.
14       You don't want to go to a hospital in a third-world
15       country.  So that was the only stipulation.  I told
16       her you had to be careful and stay on the resort.
17  Q.   Anything else that you recall discussing prior to
18       going in May, 2015, to Jamaica?
19  A.   No.
20  Q.   Do you know if your daughter did any research or
21       anything herself prior to the trip?
22  A.   Not to my knowledge.
23  Q.   Had you ever traveled outside the country prior to
24       May, 2015, yourself?
25  A.   Yes.
```

Page 24

```
1   Q.   Where had you gone?
2   A.   Mexico and Japan, Okinawa, Japan.
3   Q.   Can you tell me about the Mexico trip?
4   A.   I was 17.  We just went into Tijuana shopping, came
5        back.  I lived in Imperial Beach.
6   Q.   A day trip?
7   A.   Yes.  Never stayed the night.  I stayed the night once
8        but it was further up.  We went horseback riding.
9   Q.   When was this, 20-plus years ago?
10  A.   Probably 35 years ago, a long time ago.
11  Q.   Just making a timeframe it's not recent.  What about
12       the trip to Japan?
13  A.   I was 18, so it was about 35 years ago, also.
14  Q.   Can you tell me about that trip briefly?
15  A.   My sister's husband was in the Marines, and I stayed
16       for six months with her and her husband in Okinawa.
17  Q.   Had your daughter ever been outside the country prior
18       to May, 2015?
19  A.   No.
20  Q.   Could you tell me a little bit about your daughter
21       before May, 2015, interests, type of person she was?
22  A.   She was a happy kid.  She was always in a good mood.
23       She was a junior in high school, and she had a group
24       of friends that she hung out with, four girls that she
25       hung out with all the time since she was nine years
```

Page 25

```
1        old.
2   Q.   Had she ever gotten into any sort of trouble prior to
3        May, 2015?
4   A.   Yes, she had weed in our car.
5   Q.   One time?
6   A.   Yes, one time.
7   Q.   She got caught?
8   A.   Yes.  Someone gave her some, and then they searched
9        the car later.
10  Q.   Who is "they"?
11  A.   The school.
12  Q.   Was that something that you understood she engaged in
13       more than on one occasion?
14  A.   No.  That was a surprise.
15  Q.   What did she say?
16  A.   She didn't say a whole lot.  She got grounded and she
17       was on probation.  She paid for all of her own court
18       costs.  She got a job.  She paid for everything
19       herself.
20  Q.   Did your daughter to your knowledge ever consume
21       alcohol before May, 2015?
22  A.   Not to my knowledge.
23  Q.   You said she had four close friends?
24  A.   Yes, or three.  It was a group of four.  There was
25       four of them.
```

Page 26

1  Q.  Thank you for the clarification.  Did you meet those
2      friends?
3  A.  Yeah, I knew those girls since they were nine years
4      old.  They practically lived at my house.
5  Q.  Could you describe this group of friends?
6  A.  They called themselves the pack mule.  They were
7      friends since nine years old.  90% of the time before
8      I moved into my house, they were at my house.
9  Q.  Were they good kids?
10 A.  Yeah, they were good kids.  They were always at my
11     house.  They were usually home.  I worked days at that
12     time, so they were always at my house.  They weren't
13     anywhere else.
14 Q.  Did the three of them to your knowledge that aren't
15     your daughter as a part of that group ever get into
16     trouble prior to May, 2015?
17 A.  No.
18 Q.  Going back to Janet, how do you know Janet?
19 A.  We met, I think I was 22, she was 19, something like
20     that, and we have been friends since then.  We met
21     where we worked at.
22 Q.  Where was that?
23 A.  Water Control.
24 Q.  In Michigan?
25 A.  In Wixom, Michigan.  I think it was Wixom.  Somewhere

Page 27

1      around this area.
2  Q.  Is this the first trip you had ever taken with Janet,
3      this being the one that's at issue in this lawsuit?
4  A.  Out of state, yes.  We've went to like Michigan
5      Adventure and stuff.
6  Q.  Out of country?
7  A.  Out of country, yes, this is the first time.
8  Q.  This is the first overnight stay?
9  A.  She stayed the night at my house before.
10 Q.  At a hotel or a resort, first overnight stay?
11 A.  Yes.
12 Q.  So you had known Paiton pretty much her whole life,
13     Janet's daughter?
14 A.  Yes.
15 Q.  How often would you see them?
16 A.  Sometimes, well, when we lived over in this area, we
17     seen each other a lot.  Once I moved to Grand Rapids,
18     I don't know, every couple of months maybe, but we
19     talked on the phone frequently.
20 Q.  When did you move to Grand Rapids?
21 A.  A long time ago.  My son is 26, so, about 26 years.
22 Q.  Okay.  Ten-plus years before the incident?
23 A.  Yeah, but we'd meet up a couple of times a year, but
24     we would talk a lot on the phone.
25 Q.  Do you still speak with the same frequency?

Page 28

1  A.  No.
2  Q.  Did it change after the incident?
3  A.  Yes.
4  Q.  Why?
5  A.  I don't know.  I think maybe because it's just really
6      hard when we're together because it brings back what
7      happened.  I don't know.
8  Q.  Do you hold Janet responsible?
9  A.  No.
10 Q.  With regard to Paiton, could you describe before May,
11     2015, from your experience and knowledge what type of
12     kid she was?
13 A.  She was shy, real quiet.
14 Q.  Did she get into trouble?
15 A.  Not to my knowledge.
16 Q.  Do you know whether she engaged in the use of alcohol
17     or drugs prior?
18 A.  She was 21, so I honestly don't know.  I don't know.
19     I don't live close enough to them to know.
20 Q.  Do you know anything about her boyfriends?
21 A.  No.
22 Q.  Do you know anything about her sexual activity prior
23     to May, 2015?
24 A.  No.
25 Q.  Do you know anything about your daughter's?

Page 29

1  A.  She had not had sex before we went there.  The police
2      or the rape kit said that her hymen was torn, so she
3      didn't have boyfriends or anything.
4  Q.  Could you tell me about your relationship with your
5      daughter prior to May, 2015?
6  A.  It was good.  She was overall a good kid.  She got in
7      trouble for smoking weed, but when she got in trouble,
8      she took her punishment from me and from the courts
9      pretty well.  They would come -- I think they came to
10     our house once to drug test her and she passed.  She
11     always did what she was told to do.
12 Q.  Did you guys ever have contention or disagreements of
13     sorts?
14 A.  Oh, yeah, when I punished her, she always would have
15     an attitude, but she'd listen to whatever her
16     punishment was.  She might not be happy but she'd
17     listen.
18 Q.  Sometimes as part of a deposition, we bounce around
19     topically.  So I'm going to go back to a topic we were
20     discussing regarding booking, and then we'll try to
21     close out some areas before we get to your actual
22     stay.
23 A.  Okay.
24 Q.  I try to tell witnesses that so that way it doesn't
25     get too confusing for them or anything.  It's

---

Page 30

1    unintentional to jump around but we do it sometimes.
2  A.  Okay.
3  Q.  I had not asked this, but we were talking about the
4       booking which Janet did for you?
5  A.  Yes.
6  Q.  Okay.  Did you speak to anybody other than Janet and
7       whoever called relative to payment regarding this trip
8       or its booking at any time prior to May, 2015, anybody
9       else or just Janet and the person who collected the
10      payment?
11 A.  That's it.
12 Q.  Do you recall who the individual or if it was online
13      the company was that you were dealing with relative to
14      payment?
15 A.  No, I don't recall.
16 Q.  Did Janet or the individual or company that contacted
17      you for payment ever make any representations to you
18      regarding the hotel and your stay?
19 A.  I don't recall.
20 Q.  Anything regarding safety or amenities or anything?
21 A.  Not that I recall.
22 Q.  Prior to May, 2015, did Janet ever forward to you any
23      emails that she received on your behalf confirming the
24      booking?
25 A.  I did receive emails, like confirmation emails, and I

---

Page 31

1       read through those.  I got one from Moon Palace in the
2       beginning, and then after I got the one for Ocho Rios.
3  Q.  Do you recall who sent you these emails?
4  A.  I don't know.
5  Q.  Could it have been a travel agent?
6  A.  It may have.
7  Q.  Do you still have them?
8  A.  I don't have that email anymore.  I was using my
9       school email, and once I graduated, it was only open
10      and I didn't get a chance to transfer my emails to my
11      new one before they closed it.
12 Q.  What school?
13 A.  GRCC.
14 Q.  Could you tell me what GRCC means?
15 A.  Grand Rapids Community College.
16 Q.  When were you a student at GRCC?
17 A.  I don't exactly remember.
18 Q.  Do you recall what your email address was?
19 A.  It was margarettorralva@grcc.edu, I think.
20 Q.  Do you recall when it was that that email address was
21      no longer accessible by you?
22 A.  Well, it was before I quit my job at Spectrum.
23 Q.  Roughly in the four months after the incident?
24 A.  Four to six months, somewhere around there.
25 Q.  At any time after receiving these emails did you ever

---

Page 32

1       contact anyone, including Janet, to try to cancel the
2       trip for any reason?
3  A.  No.
4  Q.  Did you read anything in these emails that you
5       disagreed with?
6  A.  Not that I recall.
7  Q.  The terms of price and dates of stay and other
8       information in those emails, were they acceptable to
9       you?
10 A.  Yes.
11 Q.  My understanding is is that at a point in time after
12      the initial booking at Moon Palace and before you went
13      to Jamaica in May, 2015, Janet was contacted regarding
14      a need to change the resort in which you were going to
15      stay.  Were you aware of that?
16 A.  Not until after the fact.
17 Q.  Okay.  What do you mean by that?
18 A.  They contacted her and she had like a few minutes to
19      choose a different hotel.
20 Q.  When you say "they," do you know who "they" is?
21 A.  The travel agency I'm assuming.  I don't know
22      specifically who because I wasn't talking and I didn't
23      ask.
24 Q.  I understand as to the name, but did you have an
25      understanding at the time that Janet was booking these

---

Page 33

1       travels on your behalf through a travel agent?
2  A.  Yes, she was booking it through a travel agency.
3  Q.  Would you defer to Janet as to the identification of
4       any individual or company that she was using to book
5       these travels?
6  A.  Do you mean would I ask her?
7  Q.  To the extent that Janet has testified that she spoke
8       to a particular named individual associated with a
9       particular company as the travel agent company, since
10      she was the one dealing with it, would you defer to
11      her as to that specific information given you're not
12      aware?
13 A.  Yes.
14 Q.  Did Janet tell you anything specifically about the
15      Beaches Ocho Rios Resort that you eventually stayed at
16      in May, 2015, prior to your travels?
17 A.  She told me that she asked whoever she was talking to,
18      I think she had two to choose from, which that person
19      would think was better, and he said where we stayed
20      at, so that's why we chose it, because he would give
21      her a chance to go online to look at the two places or
22      that that they were having her choose from.
23 Q.  Two follow-ups to that.  So were you aware that it was
24      a he, a male, that she was speaking to?
25 A.  No, I'm not aware.

Page 34

1  Q.  Okay.
2  A.  So that person I should say.
3  Q.  That's fair.  I just want to make sure I understand
4      all that you're aware of.  Did she say anything else
5      to you regarding her conversation with this individual
6      other than which he would recommend or the person
7      recommended thought was better?
8  A.  That's all I remember her telling me.
9            MR. WEGLARZ:  Let me know when is a good
10      time to take a two-minute break.
11           MR. SAFRA:  I have one other question, and
12      I was thinking the same thing, but I was trying to
13      finish this line.
14           MR. WEGLARZ:  Go right ahead.
15           MR. SAFRA:  And we can take more than two
16      minutes.
17  BY MR. SAFRA:
18  Q.  Did you, prior to your stay, learn anything else about
19      the Beaches Ocho Rios Resort that you recall from
20      Janet, from anyone who contacted you, or online that
21      we haven't talked about?
22  A.  No.
23           MR. SAFRA:  We can take a break.
24           MR. WEGLARZ:  Thanks.
25           (Recess taken at 8:57 a.m.)

Page 35

1            (Back on the record at 9:06 a.m.)
2  BY MR. SAFRA:
3  Q.  When Janet called you after she had been contacted
4      regarding the need to change the hotel to one of two
5      options offered to her and she made her decision for
6      the Beaches Ocho Rios Resort, that decision was made
7      on behalf of herself, her daughter Paiton, you, and
8      your daughter Amber; was that your understanding?
9            MR. WEGLARZ:  Form objection but go ahead.
10           THE WITNESS:  Yes.
11  BY MR. SAFRA:
12  Q.  She had consented to the individual she was speaking
13      to to have the booking for her, her daughter, you and
14      your daughter changed to the Beaches Ocho Rios Resort,
15      correct?
16  A.  Yes.
17  Q.  Did you say to her Do not permit that?
18  A.  No.
19  Q.  Did you say anything along the lines of or anything
20      contrary to her having your consent to that change
21      upon her being contacted by an individual saying she
22      needs to change?
23  A.  No.
24  Q.  I have put in front of you a copy of what's titled a
25      Second Amended Complaint, and this is filed in the

Page 36

1      court's record as document 121, and this is a
2      Complaint of action in a lawsuit that's been filed on
3      your behalf, as well as your daughter, Janet and her
4      daughter Paiton against a number of Defendants.  Have
5      you seen this document before?
6  A.  I don't think so.
7  Q.  Okay.  It's a lengthy document.  If you want at any
8      time to take the time to read the whole thing, we can
9      take a break and you can feel free to do so.  I'm not
10      going to ask you too many questions, but if I do, I
11      will point you to a particular place, and then you let
12      me know if you need more time or not; is that fair?
13  A.  Yes.
14  Q.  Throughout this Complaint, there are references, even
15      quotes, to various government issuances or magazine or
16      news publications or articles regarding safety in
17      Jamaica and sexual assaults, if you could take a
18      moment to glance through and see those.  For instance,
19      starting on page 18 and 19, although there's multiple
20      19's, the first 19, page 7 and 8 of 32 in the top
21      right.
22           For example, paragraph 23 talks about
23      Forbes Magazine.  Then starting in paragraph 26,
24      there's references to the US State Department, and it
25      goes on on the next page and starts quoting, and then

Page 37

1      these are referenced throughout.
2            MR. WEGLARZ:  All right.  If you want her
3      to go through them all, then I'll have her do it.
4            MR. SAFRA:  If she needs to when I ask the
5      next question, she's welcome to.
6            MR. WEGLARZ:  That's fine.
7  BY MR. SAFRA:
8  Q.  The question right now is:  Do you see what I'm at
9      least referencing that is referenced in this
10      Complaint?
11  A.  Yes, I see this.
12  Q.  Have you ever seen these government issuances or news
13      referenced magazines or news publications before?
14  A.  No.
15  Q.  So as you sit here today and you look at them in the
16      Complaint, this is the first time you're becoming
17      aware of them?
18  A.  Yes.
19  Q.  Have you prior to today ever become aware that there
20      has been another instance of sexual assault or rape in
21      Jamaica other than the incident involving your
22      daughter and Paiton?
23  A.  Are you talking about after it happened to our
24      daughters or before?
25  Q.  I was talking even up to today, but we can separate it

Page 38

```
 1       that way.
 2              Prior to your trip in May, 2015, had you
 3       ever been aware that there was an instance of sexual
 4       assault or rape in the country of Jamaica?
 5   A.  Did I hear of them, no.
 6   Q.  Okay.  Since the incident involving your daughter and
 7       Paiton, have you become aware that there is at least
 8       one other instance of sexual assault or rape in
 9       Jamaica?
10   A.  Yes.
11   Q.  Tell me about your knowledge.
12   A.  When we were over there, my daughter researched it
13       after she found out, not Amber, her sister researched
14       it afterwards when they found out what happened to
15       her, and she told me what she found out.
16   Q.  What did she tell you?
17   A.  That they have a high rape crime in Jamaica, very
18       high, like I forgot how many she said like every so
19       many minutes over there.
20   Q.  Do you recall anything else she told you?
21   A.  Just that there was a high rate of rape in Jamaica.
22   Q.  This is your oldest daughter?
23   A.  No, my second to oldest daughter.
24   Q.  What was her name?
25   A.  Angelea.
```

Page 39

```
 1   Q.  Did she tell you where she got this information?
 2   A.  Off the internet.
 3   Q.  Do you know what Website?
 4   A.  I have no idea.
 5   Q.  Do you know if she printed out what she had found?
 6   A.  Not to my knowledge.
 7   Q.  Do you know what search term she used?
 8   A.  Not to my knowledge.
 9   Q.  Do you know if it was a government Website or hotel
10       Website or just a social Website?
11   A.  I have no idea.
12   Q.  Do you recall how long after the incident that was
13       done?
14   A.  Like one or two days.
15   Q.  While you were still in Jamaica?
16   A.  Yes.
17   Q.  Did she convey what she found by telephone?
18   A.  Yes.
19   Q.  Did she ever send you any emails after that regarding
20       that issue?
21   A.  No.
22   Q.  Do you have any other source of information regarding
23       rape or sexual assault in Jamaica that you became
24       aware of after the incident?
25   A.  Yes, about two girls that got raped by gunpoint in
```

Page 40

```
 1       Jamaica at a resort.
 2   Q.  Do you know what resort?
 3   A.  No, I don't.
 4   Q.  Who did you learn that from?
 5   A.  Janet.
 6   Q.  Did Janet tell you anything else about that?
 7   A.  No.  I did read, though -- told me the article,
 8       and I remember pulling it up, but I don't remember any
 9       information.  It was about a year ago, so...
10   Q.  Was this in the Detroit Free Press?
11   A.  Yes.
12   Q.  Was this an article, also, that Janet gave an
13       interview?
14   A.  Yes.
15   Q.  Were you contacted to give an interview?
16   A.  Yes.
17   Q.  Did you speak with the press?
18   A.  Yes, and so did Amber.
19   Q.  As you sit here today, do you have any personal
20       knowledge that the hotel knew that there had been any
21       prior instances of sexual assault or rape?
22   A.  Not to my knowledge.
23   Q.  Okay.  That would include at the resort or in
24       surrounding resorts or areas in Jamaica, correct?
25   A.  I don't know.
```

Page 41

```
 1   Q.  Okay.  Do you have any personal knowledge of any acts
 2       of rape or sexual assault by either Dwight Davis,
 3       Jermaine Dyer, or William Tapper prior to, that
 4       occurred prior to the incident involving your daughter
 5       and Paiton?
 6   A.  Not to my knowledge.
 7   Q.  When you say not to your knowledge, you mean you have
 8       no knowledge of there being any such instance
 9       occurring prior to the incident involving your
10       daughter and Paiton; is that correct?
11   A.  Yes.  How would I know?  It was in Jamaica, so...
12              MR. WEGLARZ:  You answered.  You answered
13       the question.
14              MR. SAFRA:  She did answer but the first
15       part of it was a little low.
16              Did you get that?
17              COURT REPORTER:  Yes.
18              MR. SAFRA:  She got it.  Thank you.
19   BY MR. SAFRA:
20   Q.  Do you have any knowledge that any travel agent or
21       tour operator knew of any prior instances of sexual
22       assault or rape involving these three individuals or
23       otherwise in Jamaica prior to the incident involving
24       your daughter and Paiton?
25   A.  I don't know if they do or not.
```

Page 42

1   Q.   If I were to ask you questions about the substance of
2        the news or government issuances or that are
3        referenced in the Complaint that you're seeing for the
4        first time today, any information or knowledge you
5        would have would just be reading the document that's
6        the Complaint, correct, because you've never seen it
7        before?
8   A.   The part where it's talking about --
9   Q.   If I were to say to you do you agree that the quotes
10       of the US State Department issuance that are cited in
11       your Complaint do or do not say X, Y, or Z, your
12       information, your answers would be based upon reading
13       the document that's in front of you that you're seeing
14       for the first time today, correct?
15  A.   Yes.
16  Q.   I'll skip over that.  The document says what it says;
17       do you agree with that?
18  A.   Yes.
19  Q.   The government issuances, the press or magazine
20       articles that are referenced in your Complaint, the
21       documents say what they say; you have no personal
22       knowledge of anything outside of that?
23  A.   Yes.
24  Q.   The instance of sexual assault or rape that Janet
25       spoke to you about about a year ago and that was the

Page 43

1        subject of the Detroit Free Press interview or
2        article, do you know what resort that was at?
3   A.   No, I don't.
4   Q.   I don't recall if I asked this, but do you know who
5        the employer was for the three individuals, Dwight
6        Davis, Jermaine Dyer, and William Tapper?
7   A.   The resort.
8   Q.   Do you know the name of the employer, or would you
9        just say Beaches Ocho Rios Resort?
10  A.   Beaches Ocho Rios Resort.
11            MS. MELVILLE:  Ma'am, if you could speak up
12       a little bit, I would appreciate it.  Thank you.
13            THE WITNESS:  All right.
14  BY MR. SAFRA:
15  Q.   After the incident, have you done any vacation travels
16       outside of the State of Michigan?
17  A.   Yes.
18  Q.   Where have you gone?
19  A.   Colorado, Florida, Las Vegas.  I think that's it.
20       Maybe Ohio.
21  Q.   Any outside of the country?
22  A.   No.
23  Q.   Okay.  For all these travels, were they overnight stay
24       in a hotel?
25  A.   Yes.

Page 44

1   Q.   Did you book them yourself?
2   A.   Yes.
3   Q.   Okay.  Did you use a travel agent?
4   A.   No.
5   Q.   Okay.  In booking these travels, did you do any
6        research prior to going or at the time of booking into
7        any safety aspects?
8   A.   No.  I was with my fiancee, so...
9            MS. MELVILLE:  I didn't hear you, ma'am.
10           THE WITNESS:  No.
11  BY MR. SAFRA:
12  Q.   Did you look for any of these hotels that you traveled
13       to after the incident to see whether the surrounding
14       area of the hotels had any crime or safety issues?
15  A.   Can I ask him something?
16  Q.   You're not allowed to ask.  You have to answer.
17           MR. WEGLARZ:  Answer the question and then
18       we can talk right after.
19           THE WITNESS:  Okay.  When my fiancee and I
20       go on vacation, a lot of times when we get to the
21       city, we check out the hotels before we book them
22       because I don't like booking stuff online anymore.
23  BY MR. SAFRA:
24  Q.   What do you mean by check out the hotels?
25  A.   We'll drive around and find one we like, and then

Page 45

1        we'll book it after we've seen it, what kind of
2        neighborhood it's in.
3   Q.   You said you went to Las Vegas?
4   A.   Yes.
5   Q.   Do you travel to Las Vegas without a hotel?
6   A.   That was one time I booked it through Orbitz or
7        Travelocity or something.  That one was too far away.
8   Q.   What about Florida, do you drive to Florida without a
9        hotel?
10  A.   Yeah, we flew to Florida without a hotel.
11  Q.   And then you drive around the area?
12  A.   Yep.
13  Q.   And then you pick a hotel that you think is in a nice
14       area?
15  A.   Yes, and then we'll go online and book it because it's
16       cheaper that way.
17  Q.   Do you look into, when you're driving around the area,
18       do you do any research while you're sitting there
19       online as to the safety of the area, or you just rely
20       on what you visually see?
21  A.   Visual.
22  Q.   Okay.  And for Vegas, you book that hotel in advance?
23  A.   Yes.
24  Q.   Did you do any research into any safety or crime in
25       the area of the hotel before you went and booked it?

Page 46

1   A.   No.
2   Q.   Was it a concern to you for any of these stays to know
3        whether the surrounding areas were ridden with, for
4        example, sexual assault or rape activities?
5   A.   We had a male with us.  If I would have been with
6        females, I would check.
7   Q.   Okay.  So if you're traveling with just females, you
8        would check into whether there is a concern for sexual
9        assault or a safety risk for sexual assault or rape in
10       the area of where you're staying?
11  A.   Now I would.
12  Q.   But if you're traveling with a male, you wouldn't?
13  A.   Not so much because I would be with that person at all
14       times.
15  Q.   Okay.  Let's use, for example, the incident that
16       involved Janet where I think she told you that someone
17       was held up by gunpoint.  Do you think the fact that
18       you have a male with you if you're being held up at
19       gunpoint means that there's no risk?
20  A.   A lot less risk.
21  Q.   But there's still a risk?
22  A.   A slight risk.
23  Q.   Do you believe that there's a risk of such an activity
24       probably anywhere you travel?
25  A.   There's always a risk, I guess.

Page 47

1   Q.   Regardless of whether you're with a male or a female?
2   A.   Yes, but with the male, less risk.
3   Q.   Knowing that, you still did these travels after the
4        incident?
5   A.   Yes.
6            MR. SAFRA:  Let's take another couple
7        minute break because I'm going to move onto the
8        Jamaica stay.
9            MR. WEGLARZ:  All right.  Let's step out
10       and let them talk.
11           (Recess taken at 9:22 a.m.)
12           (Back on the record at 9:34 a.m.)
13  BY MR. SAFRA:
14  Q.   I probably should have asked this when we were doing
15       the general introductions, but are you on any
16       medications today?
17  A.   B-12, iron, Melatonin.
18  Q.   Anything that affects your ability today as you sit
19       here to understand the questions that are being asked
20       and answer truthfully?
21  A.   No.  I also take Trazodone to sleep, but I only take
22       it at night to sleep, and I didn't take it while I was
23       here, so...
24  Q.   Including that in the medication that you previously
25       mentioned and that one, has it affected any way your

Page 48

1        ability to, as you sit here today, understand the
2        questions that are being asked and answer truthfully?
3   A.   No.
4   Q.   I had asked you about the Second Amended Complaint and
5        whether you had seen that before, document 121 that's
6        in front of you.  Had you ever seen any prior versions
7        of a Complaint for this lawsuit, whether it's the
8        original Complaint or a draft?
9   A.   I don't know.
10  Q.   Okay.  As you sit here today, though, is there a
11       specific document that you recall seeing, you just
12       don't remember the substance of it, or you just don't
13       recall one way or the other?
14  A.   I don't recall one way or the other.
15  Q.   Okay.  So if I showed you any of the those prior
16       documents and asked about wording, do you have any
17       knowledge beyond what you might just read in terms of
18       the document presented in front of you?
19  A.   I don't know.
20  Q.   Along those lines, I'd asked you about certain
21       government issuances or press releases or magazine
22       articles and the Second Amended Complaint in front of
23       you, and I believe the record is clear on the
24       question, but someone said there might have been a
25       double negative, so I just want to re-ask the

Page 49

1        question.
2            In terms of the quoted aspects of those
3        press releases or issuances, do you have any personal
4        knowledge regarding them other than what you read in
5        front of you?
6   A.   No, I do not have any personal knowledge.
7   Q.   Okay.  We had talked about some travels after the
8        incident.  We talked about Florida, for example, where
9        you did not book the hotel in advance but drove around
10       neighborhoods to look for a nice neighborhood; do you
11       recall that?
12  A.   Yes.
13  Q.   When you're looking around, what is a nice
14       neighborhood versus a not nice neighborhood?
15  A.   Nice neighborhood has usually got several hotels when
16       we stayed in Tampa, it was near downtown, but there
17       was people fishing by the pier.  There was tourists
18       around.  I guess a bad neighborhood would be run down,
19       the hotel is not very nice, doesn't look very nice,
20       not very appealing to the eye.
21  Q.   Is there anything visually about these neighborhoods
22       that tells you one way or the other whether there is
23       crime of any sort?
24  A.   Well, the ones we typically stay at are the more well
25       kept.  They're nice hotels.  They're well kept.  They

Page 50

1    cost typically over $100 a night, 100, 150 when you
2    book them online, whereas we looked at some that were
3    less, and they were not in a very nice neighborhood.
4    The neighborhood wasn't as cleaned up or curb appeal I
5    guess you would say.
6    Q.   Is there anything about the type of people that you
7         see walking the streets around there that plays a
8         factor?
9    A.   Like places we usually stay, you can tell it's usually
10        tourists that are walking around.
11   Q.   Have you since the incident in May, 2015, gone to
12        Detroit?
13   A.   I don't think so.
14   Q.   Prior to the incident had you ever been to Detroit?
15   A.   Yes, to a baseball game, twice to the baseball game.
16   Q.   Had you ever been without a male companion?
17   A.   No.
18   Q.   With the trips after the incident, did Amber go on any
19        of them with you?
20   A.   No.
21   Q.   We talked about your knowledge of any instances of
22        sexual assault or rape in Jamaica separate from the
23        one Janet called you about that was the subject of the
24        Detroit Free Press article and the incident involving
25        your daughter and Paiton; do you recall that?

Page 51

1    A.   Yes, I recall that.
2    Q.   And those were the two instances of, you know, any
3         knowledge of a specific event other than also your
4         daughter called you about some general information she
5         obtained online, and those were the three total
6         accounts of any knowledge; is that fair?
7    A.   Yes.
8    Q.   When you were in Jamaica in May, 2015, prior to the
9         incident involving your daughter and Paiton, did
10        anyone ever mention to you at the hotel, outside the
11        hotel at an excursion or while shopping, did anyone
12        ever mention to you while in a car or a bus anything
13        regarding sexual assaults or rape in Jamaica?
14   A.   Yes, the bus driver when we went to the black hole and
15        to shopping.
16   Q.   Why didn't you mention that before when I was asking
17        you?
18   A.   Because to tell you --
19             MR. WEGLARZ:  Because that wouldn't have
20        been responsive to your question.  Sorry.  I
21        testified.
22             MR. SAFRA:  And you're coaching.
23             MR. WEGLARZ:  I'm not coaching.
24             THE WITNESS:  The way you phrased your
25        question, that's why.

Page 52

1    BY MR. SAFRA:
2    Q.   What question did I phrase when I asked you about your
3         knowledge of any sexual activity or rape in Jamaica?
4    A.   You said that I looked into.
5    Q.   I asked you about your knowledge.  I didn't ask you
6         that specific.
7    A.   That's how I took it.
8    Q.   I'm here to get what you know and what your
9         information is.  So let's try to be clear.
10            We discussed three occasions where we've
11        talked about any knowledge or information you have
12        regarding any sexual assaults or rape in Jamaica, and
13        you identified what Janet called you about.  We know
14        about the incident involving your daughter and Paiton,
15        and we talked about one of your daughters doing some
16        research generally, and you made no mention of any bus
17        driver.  Now coming back from a break speaking with
18        your counsel a few times you now mention a bus driver?
19            MR. WEGLARZ:  Oh, God.  I do object to
20        that.  Now you're putting on the record that I just
21        now told her that she needs to discuss something.
22            First of all, our discussions are subject
23        to privilege.
24            MR. SAFRA:  I will rephrase the question.
25            MR. WEGLARZ:  Please.

Page 53

1    BY MR. SAFRA:
2    Q.   You've now identified a fourth instance of knowledge
3         of any sexual assault or rape by a bus driver.  Before
4         I ask you about the specifics of that, is there
5         anything else regarding any knowledge you have of any
6         sexual assault or rape in the country of Jamaica?
7    A.   Not that I can remember.
8    Q.   And that would be from the beginning of the time to
9         today?
10   A.   Not except what was found online and the newspaper and
11        the bus driver.
12   Q.   So when you say found online, you're referring to what
13        you already testified about from what your daughter
14        had found and disclosed to you by telephone while you
15        were still in Jamaica?
16   A.   Yes.
17   Q.   Okay.  So also while you were in Jamaica now, your
18        recollection is refreshed that there's also a bus
19        driver?
20   A.   Yeah, that made a comment.
21   Q.   What was the comment?
22   A.   That Moon Palace, because we were in that general
23        area, and Janet asked about, Well, where's Moon
24        Palace, because that's where we were supposed to stay
25        at.  She told the bus driver that.  He's like, Well,

Page 54

1    that place is known as rape motel.  And we just were
2    like What?  And he's like, Yeah, and if they discussed
3    it anymore, I didn't really pay attention because I
4    was talking to Amber and Paiton, too, but we were just
5    glad that we didn't stay at that hotel, and he said
6    that -- we asked about the fire or something because
7    we were told there was a fire or something there or
8    they were redoing it, and he said that the workers
9    weren't working there no more because they weren't
10   being paid, so that hotel wasn't going to be finished
11   any time soon.
12   Q.  Anything else?
13   A.  Not that I can remember.  Those are the only thing I
14   remember, that the workers weren't getting paid and
15   they quit working.
16   Q.  The reason I asked is because you started the
17   statement by saying he told you about rape motel and
18   you weren't paying attention, but then as you kept
19   talking, you were disclosing more and more specifics.
20   So let me ask you:  Have you disclosed everything you
21   heard that bus driver say that you recall?
22   A.  That's all I recall on that.
23   Q.  Did your daughter hear that?
24        MR. WEGLARZ:  Calls for speculation.
25   BY MR. SAFRA:

Page 55

1    Q.  You were sitting there with your daughter, did she say
2    to you --
3    A.  I'm assuming she heard it because we were all sitting
4    together on the bus.
5    Q.  After you heard that, did you talk to your daughter
6    about what you heard?
7    A.  I just said we're really glad we weren't there.
8    Q.  Did you feel at any time after that that the hotel you
9    were staying at had posed any safety risk similar to
10   what you heard about the Moon Palace before the
11   incident?
12   A.  No, because Beaches and Sandals is a well-known and a
13   higher class of resort.  I didn't know where at Moon
14   Palace was on that, but I know that Beaches and
15   Sandals -- you got different levels of resorts,
16   whether you're going to Jamaica, Mexico, wherever,
17   there's different qualities.
18   Q.  I appreciate that.
19   A.  Sandals and Beaches are up on the higher top.  So when
20   we found out we were going there, I figured it was a
21   safe place to be.
22   Q.  I appreciate your statement, but let me ask my
23   question again so I can get an answer to my question.
24        After you heard the bus driver say what you
25   heard about the Moon Palace resort, you were already

Page 56

1    staying at the Beaches Ocho Rios Resort, did you, from
2    what you personally experienced and your interactions
3    on the resort property, did you have any fear of any
4    such sexual assault or rape activity relative to the
5    hotel you were staying at?
6    A.  No, I didn't because I trusted the resort.
7        MR. WEGLARZ:  You answered.
8    BY MR. SAFRA:
9    Q.  But from your visual review like you did post incident
10   when you drive around and you assess areas and
11   neighborhoods, did you visually, separate from relying
12   on a hotel, as an adult, did you see anything that
13   caused you any concern relative to all the employees
14   you were interacting with, guests or anything at the
15   resort?
16   A.  What was the question again?
17   Q.  We've talked about how you're able to on your own go
18   to neighborhoods and assess --
19   A.  Yes.
20   Q.  -- the neighborhoods as to whether they're nice and
21   appropriate for stay; do you recall that?
22   A.  Yes.
23   Q.  So physically yourself you were at the Beaches Ocho
24   Rios Resort in Jamaica before and after this
25   conversation with the bus driver and before the

Page 57

1    incident, correct?
2    A.  Yes.
3    Q.  So through your experiences at this hotel after you
4    heard what the bus driver said and before the
5    incident, did you say to yourself that there was
6    anything that caused you any alarm or concern
7    regarding that same resort being similar to Moon
8    Palace that was referred to as a rape resort or rape
9    motel?
10   A.  No, I didn't see anything that looked shady.
11   Q.  Okay.  Did you ever have any conversations with your
12   daughter after what you heard from the bus driver?
13   A.  I don't remember.
14   Q.  Did you have any concern that this was something that
15   was maybe common occurrence in Jamaica?
16   A.  I didn't know.
17   Q.  Did you see anything from going to the black hole or
18   shopping or anything in the surrounding area that
19   caused you any concern regarding crime or safety in
20   Jamaica outside the resort?
21   A.  No.
22   Q.  Do you know who the bus driver worked for?
23   A.  No.  It was some tourist thing.  Janet set it up.
24   Q.  Outside and separate and apart from the resort?
25   A.  I'm not sure.

Page 58

```
 1   Q.   Was there any identifying logos or company names on
 2        the bus?
 3   A.   I'm not sure.
 4   Q.   What about on a uniform or was the bus driver wearing
 5        a uniform?
 6   A.   I'm not sure.  I don't remember.
 7   Q.   Do you recall anything about the color of his shirt or
 8        --
 9   A.   No.
10   Q.   Okay.  What did the bus look like?
11   A.   It was like a -- it would seat maybe 18 people, and
12        you could stand up and walk to your seats.  It was
13        kind of like the short buses that they use like for
14        the city transit.
15   Q.   Were you the only people on the bus?
16   A.   Yes.
17   Q.   The four of you?
18   A.   And the bus driver.
19   Q.   But no other tourists?
20   A.   Not that I can recall.
21   Q.   Okay.  When you heard the bus driver say this, Janet
22        was conversing with the bus driver?
23   A.   Yes.
24   Q.   And you were listening?
25   A.   We were all sitting together.  You can hear everybody
```

Page 59

```
 1        on the bus.
 2   Q.   Do you have any reason to believe then that your
 3        daughter and Paiton also heard what the bus driver
 4        said?
 5   A.   No.  I assume they heard, too.
 6   Q.   Did you have any conversations after this with Amber
 7        regarding what the bus driver said about Moon Palace?
 8   A.   I might have.  I don't recall.
 9   Q.   But as you sit here today, you don't recall ever
10        having a conversation that you can talk about as you
11        sit here?
12   A.   No, I don't recall.
13   Q.   That's correct, you don't recall?  It's a double
14        negative.  That's my fault.
15   A.   I don't recall.
16   Q.   The reason we ask some of those types of questions,
17        and it's okay to say, as I said, I don't know or I
18        don't recall, so that way later on we're not surprised
19        all of a sudden.  We're entitled to know it now if you
20        recall it.  I'm not trying to call into question
21        anything you're saying by asking it again.
22             With regard to the booking, before you
23        arrived in Jamaica, have we discussed now everything
24        that you recall in terms of your involvement or
25        anything Janet told you or received or any information
```

Page 60

```
 1        you had as personal knowledge relative to the booking
 2        aspect of this vacation?
 3   A.   I think so.
 4   Q.   Is there anything else about the booking you would
 5        like to tell us at this point as you sit here today?
 6   A.   No.
 7   Q.   Any conversations, anything you received, anything you
 8        learned, we discussed everything involving booking?
 9   A.   As far as I can recall.
10   Q.   When you arrived at the Beaches Ocho Rios Resort on
11        May 5th, 2015, how did you get from the airport to the
12        hotel?
13   A.   Shuttle bus shuttle thing.
14   Q.   When you arrived at the hotel, could you explain to me
15        the check-in process that you experienced?
16   A.   We went up to the counter, and they had us go through
17        some paperwork, but it was all electronic, and their
18        computers were messing up, and you couldn't read half
19        the stuff that was on there, and they said to just
20        sign it.  I remember it was super hot, and we were all
21        standing there with our luggage.  So we did what they
22        said.  We signed the paperwork because we weren't
23        going to get into the rooms until we signed it, and
24        they couldn't get the whatever to come up right.  You
25        only could read about half of it and it would like --
```

Page 61

```
 1        there was a glitch or something.  That's all I
 2        remember.
 3   Q.   Let me ask you, when was the last time you spoke to
 4        Janet?
 5   A.   Yesterday.
 6   Q.   What did you talk about?
 7   A.   We talked about my daughter's hair.  We talked about
 8        her doing her deposition, that I had to do mine today,
 9        and my daughter is going to be doing hers today, and
10        then her daughter is going to be doing hers tomorrow
11        as far as she knows.
12   Q.   Did you talk to her after her deposition was
13        completed?
14   A.   Yes, because she came over and washed my daughter's
15        hair.
16   Q.   Did you talk about what happened during her
17        deposition?
18   A.   Vaguely.
19   Q.   What did she tell you?
20   A.   That they'll ask the same questions over and over
21        again and just keep your answers short and simple.
22   Q.   Did she tell you about the topics that came up?
23   A.   No, not really.
24   Q.   Did she tell you about what she said?
25   A.   No, she didn't tell me what her answers were.
```

Page 62

1  Q.  Did she talk to you about her reference to the bus
2      driver?
3  A.  No.  I had already remembered that because Amber and I
4      had talked about it before, not recently but --
5          MR. WEGLARZ:  You answered it.
6          MR. SAFRA:  She can finish her answer.  You
7      don't cut her off and tell her to stop answering
8      questions.  You know that.
9          MR. WEGLARZ:  Well, she's going beyond the
10     scope of your question.
11         MR. SAFRA:  That's her choice.
12         MS. MELVILLE:  That's inappropriate,
13     Mr. Weglarz.
14 BY MR. SAFRA:
15 Q.  So she told you how to answer the questions?
16 A.  No, she didn't tell me how to answer.
17 Q.  Answer them short?
18 A.  She just said use yes or no answers.
19 Q.  So she told you how to answer the questions?
20         MR. WEGLARZ:  Now we're arguing.
21 BY MR. SAFRA:
22 Q.  Do we agree she told you how to answer the questions?
23         MR. WEGLARZ:  We're arguing.
24         MR. SAFRA:  She hasn't answered the
25     question.

Page 63

1          THE WITNESS:  She said answer yes or no
2      unless they ask you to elaborate.
3  BY MR. SAFRA:
4  Q.  How long was she at your house?
5  A.  I'm at a hotel.
6  Q.  How long was she at your hotel?
7  A.  Maybe 30 minutes but she washed my daughter's hair.
8  Q.  When I deposed Janet yesterday, she got emotional
9      about your friendship and how it's not the same as it
10     used to be.
11 A.  That's true.
12 Q.  And you even talked about how it's hard for you guys
13     to be in the same place?
14 A.  For long periods of time.  That's why we don't go on
15     vacations together.
16 Q.  But yesterday it wasn't hard to be together after she
17     completed her deposition and before you took yours?
18 A.  That's not the only time.  We've still seen each other
19     since it happened.
20 Q.  Did you talk about the incident when she came over?
21 A.  No, we don't talk about what happened because we don't
22     want to deal with it.
23 Q.  But it's your testimony that you talked about the
24     deposition.  She came over.  She did your daughter's
25     hair.  You're in the middle in between your two

Page 64

1      depositions.  You talked about how the deposition went
2      generally in terms of questions, you know, being over
3      and over again and answer yes or no and short, but you
4      never talked about the substance of it at all?
5          MR. WEGLARZ:  Asked and answered.
6  BY MR. SAFRA:
7  Q.  That's what you want the jury to believe?
8          MR. WEGLARZ:  You can answer it again.
9          THE WITNESS:  She didn't tell me what the
10     questions were.  She just said to keep it short.
11 BY MR. SAFRA:
12 Q.  Did she say this in the presence of your daughter?
13 A.  I don't know if my daughter was in the room or not
14     because she was in and out of the hotel room.  So I
15     don't know if she was in there.
16 Q.  Was anyone else present?
17 A.  No.
18 Q.  Did you meet with your lawyer in preparation for your
19     deposition here today?
20 A.  Yes, this morning at 7:30.  She seen us.
21 Q.  Prior to this morning, did you meet with him?
22 A.  I saw him yesterday because I came here because I was
23     supposed to do my deposition yesterday.
24 Q.  Did you ever meet to prepare where you went over
25     documents?

Page 65

1  A.  This morning.  That was it.
2  Q.  Other than this morning --
3  A.  Because yesterday I just left before you guys
4      finished.
5  Q.  Other than this morning and yesterday, did you ever
6      have any meeting or conversation with your attorney to
7      prepare for today's deposition?
8  A.  I don't think so besides text messages.
9  Q.  When you were at the hotel and you checked in on
10     May 5th, what day of the week was that?
11 A.  I think it was a Tuesday.
12 Q.  Okay.  And the incident happened on May 8th in the
13     evening of Friday; is that correct?
14 A.  Yes.
15 Q.  And the time between May 5th when you checked in and
16     the evening of May 8th when the incident happened, did
17     you ever -- I believe you said on the water slide but
18     how many times did you come across either Dwight
19     Davis, Jermaine Dyer, or William Tapper while at the
20     resort?
21 A.  On the water slide and we had seen them once or twice
22     around the pool, but it was usually on the water slide
23     because they worked at the very top of the water
24     slide.
25 Q.  Did you ever see them interacting with your daughter

Page 66

1    or Paiton or both?
2  A.  I seen someone talking to my daughter but I don't
3     know.  It was on the first or second day.
4  Q.  How many times?
5  A.  Only that one time.
6  Q.  So on the water slide at various times and then one
7     other occasion the first or second day?
8  A.  The water slide, he talked to everyone that went up on
9     the water slides.  It wasn't just us.
10 Q.  I understand that but it was more than one occasion?
11 A.  Yeah, because we went down the slide like five or six
12    times each day.
13 Q.  I want to ask about the different instances, so I'm
14    just trying to get the world of occasions --
15 A.  I saw someone --
16 Q.  We're starting to get in the habit of kind of cutting
17    each other off.  So I just want to get the number, and
18    then we'll go back and address them one by one.
19        So multiple times on the water slide, there
20    were instances where there was interaction between one
21    of those three individuals or all of them and you or
22    people you were traveling with?
23 A.  Yes.
24 Q.  There also was an instance on the first or second day
25    in which one of those individuals you saw or are aware

Page 67

1     of conversing with both Amber and Paiton or one of
2     them?
3  A.  They were both laying over there, so I don't know if
4     they were conversing to one or both of them.
5  Q.  When you say "over there," what do you mean?
6  A.  The pool is right here.  We're on this side, and they
7     were on that side.
8  Q.  So for those who aren't in the room with us here
9     today, you're pointing to both sides of your phone, so
10    across the pool?
11 A.  Yes.
12 Q.  I want to make sure it's clear.  So that's two
13    instances of interaction.  Were there any other times
14    prior to the incident that you saw either your
15    daughter or Paiton in the presence of any of those
16    three individuals?
17 A.  I saw Amber talking to someone, but I don't believe it
18    was any of the three.
19 Q.  Okay.  Any other time?
20 A.  Not that I can recall.
21 Q.  Okay.  Separate from anything you personally
22    witnessed, did you ever become aware that Amber or
23    Paiton were hanging out, socializing or in the
24    presence of any of those three individuals outside of
25    your presence prior to the incident?

Page 68

1  A.  Not to my knowledge.
2  Q.  With regard to the water slides, the occasions on the
3     water slide where there may have been interaction, do
4     you know what, if anything, was ever discussed with
5     either your daughter or Paiton by any of these three
6     individuals?
7  A.  The only thing that I ever heard them talking was
8     Where ya from, When did you get here, and When are you
9     going home.
10 Q.  Anything else?
11 A.  That's all I heard.
12 Q.  Okay.  What about across the pool on that occasion?
13 A.  They were across the pool.  I couldn't hear if they
14    said anything, and if they did, what they said.
15 Q.  Was there anything about the interactions that you
16    personally witnessed that caused you any concern for
17    their safety or well-being?
18 A.  No.
19 Q.  And them being Paiton and Amber?
20 A.  No.
21 Q.  Have you subsequent to the incident, meaning after the
22    incident, learned of the substance of any
23    conversations that occurred in any of those scenarios,
24    on the water slides or across the pool?
25 A.  Amber had said that one of them asked to be Facebook

Page 69

1     friends or something.  I don't even know which social
2     media outlet it was.  I don't know.
3  Q.  And did they connect?
4  A.  I don't know.
5  Q.  Okay.  Anything else that you have after the incident
6     become aware of regarding conversations or interaction
7     prior to the incident between any of these three
8     individuals and either Paiton or Amber?
9  A.  No, not that I remember, not that I know of.
10 Q.  Did you allow your daughter to drink alcohol during
11    the trip?
12 A.  I knew she drank alcohol during the trip, yes.
13 Q.  Did she prior to the trip drink alcohol?
14 A.  Not to my knowledge but...
15 Q.  Was she 17 years old on the trip?
16 A.  Yes.  She was going to be 18 in November.
17 Q.  Of 2015?
18 A.  Yes.
19 Q.  Okay.  During the trip would Paiton get the drinks and
20    give them to Amber?
21 A.  No.
22 Q.  Would you get the drinks and give them to Amber?
23 A.  No.
24 Q.  How did she get alcohol?
25 A.  They served her.

Page 70

```
1   Q.  You personally saw her being served by a bartender?
2   A.  Yes.
3   Q.  Did she have a fake ID?
4   A.  No.
5   Q.  How many drinks did Amber have to your knowledge,
6       let's say, the first day?
7   A.  I don't know.  Maybe a couple, two, maybe three.  We
8       got there at noon.  We were back in the room by nine.
9   Q.  What about the second day which would be May 6th?
10  A.  I honestly don't know.
11  Q.  Let's talk about the day of.  Do you recall if Amber
12      had any drinks on that Friday of May 8th?
13  A.  I saw her with one or two.  That was it.
14  Q.  Okay.  When was that?
15  A.  Around early in the day because we were still laying
16      out, and then --
17  Q.  Tell me about -- sorry.
18  A.  Maybe midday.
19  Q.  Tell me, what were the activities that you guys did
20      that day on Friday?
21  A.  On Friday?
22  Q.  Take me through the day.
23  A.  We got up.  We went and got breakfast, and then we
24      laid out at the pool for a while, and then they had a
25      banana thing that you ride on behind a --
```

Page 71

```
1   Q.  Banana boat?
2   A.  It's kind of like a --
3   Q.  A big float?
4   A.  Yeah, they pull it behind the boat, and they kind of
5       whip you around the lake.
6   Q.  When you say we, you mean all four of you?
7   A.  Yes, all four of us went on that several times, and
8       then we found out that we got a free massage with our
9       package, so all four of us got a massage, and then in
10      between there, we had went in and out of our room, and
11      then after the massage, I think we went back to our
12      room, all of us went back to the room, and then the
13      girls and I, I think we might have went swimming.  I'm
14      not even sure, but I know Janet and I ended up eating
15      at the barbecue thing that they were having by the
16      pool, and the girls ate at an Italian restaurant.
17  Q.  You mean for dinner?
18  A.  Yes.
19  Q.  Prior to dinner, were the four of you always together
20      all day?
21  A.  Pretty much.  If we weren't like right by each other,
22      we could see them from where we were at.  That's the
23      way it was pretty much the whole time except Friday.
24  Q.  There is reference in the Second Amended Complaint
25      that's in front of you, and you're free to look at it,
```

Page 72

```
1       but there's reference to fraternization between
2       Mr. Davis, Mr. Dyer, and Mr. Tapper, and your daughter
3       Amber and Paiton.  Do you know what is being
4       referenced in terms of fraternization?
5   A.  I read the article or the thing in here.  It says
6       they're not supposed to talk or communicate or --
7   Q.  What are you referencing?
8   A.  When I read it, where is it at?
9   Q.  Are you referencing the --
10          MS. MELVILLE:  Why don't you let her find
11      it rather than you directing her to.
12          MR. WEGLARZ:  She was going to look for the
13      paragraph.  Do you mind if I help her find it?
14          MR. SAFRA:  She's saying they're not
15      supposed to talk.
16          THE WITNESS:  I assume fraternization, that
17      means talking, right?
18          MR. SAFRA:  On paragraph 32 on page 9 of 32
19      on the top --
20          MR. WEGLARZ:  Is it okay if I turn the
21      page?
22          MR. SAFRA:  Yes.
23          MR. WEGLARZ:  Thank you.  What paragraph?
24          MR. SAFRA:  Paragraph 32 is a reference to
25      fraternization.
```

Page 73

```
1   BY MR. SAFRA:
2   Q.  Is there another paragraph in here where you saw
3       something about not talking?
4   A.  Must be --
5   Q.  What were you referencing when you said not supposed
6       to talk?
7   A.  Fraternization means talking.  That's how I took it,
8       fraternization means talking.
9   Q.  I understand but I just want to clear up the record.
10      You had made a statement about you reading something
11      about they're not supposed to be talking.  Was there
12      anything else in this document that you were talking
13      about, or was it the reference to fraternization?
14  A.  It was the reference to fraternization.
15  Q.  I want to make sure you're not talking about the
16      government issuances or news press releases or
17      anything of that sort because I want to ask you about
18      the fraternization, but you started talking about
19      something else.  You meant the fraternization?
20  A.  Yes.
21  Q.  So with regard to the reference on the fraternization,
22      the statement in the Complaint says that between
23      May 5th and May 8th, those three individuals were
24      fraternizing with your daughter and Paiton.  Are you
25      aware of any fraternization?
```

Page 74

1  A.  Well, when we were at the water slide when they talked
2      to all of us.
3  Q.  Okay.  So the questions that you talked about where
4      you're from that you detailed for us already, that's
5      what you're referring to as fraternization?
6  A.  As far as I know, yes.
7  Q.  Was there any other fraternization that you're aware
8      of?
9  A.  I don't know.
10 Q.  Everything and anything that you might be aware of
11     that might arguably constitute fraternization, have
12     you told us about it as you sit here today?
13 A.  Amber had said one of the young men, I do not know
14     which one, had asked something about her social media.
15 Q.  Which you told us about?
16 A.  Yes, that's the only thing I know.  That's it.
17 Q.  I'm just trying to make sure I've heard everything
18     that you're aware of.
19 A.  As far as I remember.
20 Q.  Thank you.  I asked you whether you saw anything that
21     caused you concern in terms of interactions between
22     any of those three individuals and either your
23     daughter and Paiton.  I'm going to ask you a slightly
24     different question, okay?
25          Were you told anything prior to the

Page 75

1      incident by your daughter or Paiton or Janet regarding
2      anything involving these three individuals, Mr. Dyer,
3      Mr. Tapper, or Mr. Davis, that you didn't personally
4      witness but they mentioned to you that caused you
5      any concern regarding safety?
6  A.  Not that I can think of.
7  Q.  Do you know how many drinks Amber had prior to dinner
8      on that Friday?
9  A.  No, I do not.
10 Q.  Do you know whether she had a drink?
11 A.  I know she had at least one because I saw her when we
12     were sitting by the pool earlier.
13 Q.  Now at dinner, you guys ate separately; you ate with
14     Janet, and Amber and Paiton went and ate on their own?
15 A.  Yes.
16 Q.  When did you next see your daughter Amber?
17 A.  I saw her once or twice because of where they were at
18     because the pool is right here.  Like the bar area is
19     right here, and our room was like right there.
20 Q.  And for sake of the written record, it's hard for them
21     to understand what it means by here, here, and here.
22     So let me ask you a few questions because I've got the
23     benefit of seeing your hand motions.
24          So was the restaurant on one side of the
25     pool and the bar on the other side of the pool?

Page 76

1  A.  The restaurant that they went to was not by the pool.
2      That's where we got breakfast.  The restaurant that's
3      right by the pool is where they served breakfast at.
4  Q.  I'm focusing more on after dinner.  I asked you when
5      you saw them, and you said two occasions.  Where was
6      the first instance you saw your daughter after dinner?
7  A.  It would be by a railing not in the bar but past the
8      bar.
9  Q.  Okay.  Were you on your way to your room from dinner
10     when you saw her?
11 A.  I don't know where I was coming from, but I was
12     walking through there.
13 Q.  Did you stop to talk to your daughter?
14 A.  No, but I waved to her and she waved back.
15 Q.  What was she doing?
16 A.  She was talking to somebody.
17 Q.  Do you know if it was one of the hotel employed
18     gentlemen?
19 A.  Of the three, I'm not sure.
20 Q.  Was it a male?
21 A.  Yes.
22 Q.  Do you know anything about that male that you can
23     describe for us to identify?
24 A.  He was taller than my daughter.  I don't know how much
25     taller.

Page 77

1  Q.  Was he white or black?
2  A.  He was black.  All the employees were.
3  Q.  So it was an employee?
4  A.  It looked like an employee, I was assuming since he
5      was in shorts and a T-shirt.
6  Q.  And a black gentleman?
7  A.  Yes.
8  Q.  Okay.  Was there anything else about that gentleman
9      you could describe as you sit here today?
10 A.  No.
11 Q.  Do you know if it was one of the three individuals?
12 A.  I do not know.
13 Q.  Is it possible that it was?
14 A.  I guess so.  I honestly don't know.  I don't even
15     really remember what he looks like besides he was
16     taller than my daughter.
17 Q.  Did he have a drink in his hand?
18 A.  No.
19 Q.  Did she have a drink in her hand?
20 A.  No.
21 Q.  Was Paiton there?
22 A.  No.  Paiton was going to the bar.
23 Q.  She was going to the bar or she was at the bar?
24 A.  She was walking towards it.
25 Q.  So you saw her walking towards the bar?

Margaret Torralba
September 24, 2019                                          78 to 81

Page 78

1   A.   Yes.
2   Q.   Was she alone?
3   A.   Yes.
4   Q.   How long were you there; was it quick, just a wave and
5        walked by?
6   A.   Yeah.  Janet stopped and said something to Paiton.  I
7        don't know what she said to her.
8   Q.   Did you say anything to Amber or Paiton?
9   A.   I don't know if I said anything to Paiton or not, but
10       I did not say anything to Amber at that point.
11  Q.   Did you and Janet talk about anything after you
12       departed from that encounter?
13  A.   About the girls?
14  Q.   Yes.
15  A.   No.
16  Q.   Or the gentleman that your daughter was speaking to?
17  A.   No.
18  Q.   Did you have any concern regarding her standing there
19       alone with --
20  A.   No.  They were like three feet apart.
21  Q.   Let me finish my question, please.
22            Did you have any concern regarding your
23       daughter standing there with a gentleman employee of
24       the resort?
25  A.   No.

Page 79

1   Q.   Did it look like they were socializing?
2   A.   Not really.  They were about three feet apart.  I
3        didn't know if he was asking her a question or what.
4   Q.   Did it look like they were standing there and talking
5        or as if she was stopping to ask a question about
6        something regarding the hotel and amenities?
7   A.   I don't know.  I only saw them for a few minutes.  It
8        didn't look like they were engaged in a conversation.
9   Q.   In the few minutes that you did see them, were they
10       standing three feet apart the entire time?
11  A.   Yes.
12  Q.   Did they look like they were talking to each other?
13  A.   I didn't see either one of them talking back and
14       forth, so I don't know.
15  Q.   Were they facing each other?
16  A.   No.  I think they were facing towards where we were at
17       because Amber seen me and waved.
18  Q.   Did they look like they were standing there
19       purposefully next to each other or coincidentally?
20  A.   I honestly don't know.  I don't know.
21  Q.   Okay.  But the entire three minutes --
22  A.   It wasn't very long to make an assumption.
23  Q.   But they didn't move from where they were standing; is
24       that correct?
25  A.   No, they did not move as far as I know.

Page 80

1   Q.   You said there was once or twice that you saw her
2        after dinner before the incident.  Was there another
3        time?
4   A.   That was once and I think that was the only time.
5   Q.   Okay.  Did you go to your hotel room after you left
6        the vicinity in which you waved to your daughter after
7        dinner?
8   A.   Yes.
9   Q.   Did you ever leave the hotel room at any time before
10       you went to look for your daughter, which we'll get
11       into, your daughter and Paiton later on that then
12       started the sequence of the incident?
13  A.   I don't think so.
14  Q.   Or at least the extent to which you were involved in
15       the incident?
16  A.   I don't think I left the hotel until I went to look
17       for them.
18  Q.   And by hotel, you mean hotel room?
19  A.   Yes, hotel room.
20  Q.   Did Janet see to your knowledge Paiton or Amber again
21       after that initial encounter and walk-by on the way to
22       the hotel room?
23  A.   I don't know.  I don't think so.
24  Q.   Did Janet accompany you to the hotel room when you
25       went after that?

Page 81

1   A.   Yes, we walked together.
2   Q.   Okay.  Do you know where Amber and Paiton were while
3        you were in the hotel room?
4   A.   I think they were going to go to the piano bar to do
5        karaoke or to the hot tub.
6   Q.   What is your basis for that knowledge?
7   A.   Because we had talked to them earlier that day, and
8        that's what they had planned on doing after dinner.
9   Q.   Did they ever mention anything else about their plans?
10  A.   Not that I can remember.
11  Q.   How long were you in your hotel room before you went
12       looking for your daughter?
13  A.   Less than an hour I think.
14  Q.   What time was it that you got to your hotel room
15       about?
16  A.   I'd be guessing.
17  Q.   Okay.  Was it after 10 p.m.?
18  A.   No.
19  Q.   Was it after 11 p.m.?
20  A.   No.  It was between 8:30 and 9:00 that we went to our
21       hotel room.  I think it was closer to 8:30, but I'm
22       not sure.  I don't know the exact time.
23  Q.   Had you had anything to drink that day or evening?
24  A.   Maybe one drink.  I don't like alcohol, so I didn't
25       really drink.

Page 82

1  Q.  So 8:30 to 9 roughly is when you recall you going to
2      the hotel room after seeing your daughter?
3  A.  It was probably around 8:30.
4  Q.  Do you recall what time the incident happened?
5  A.  I went to look for her.  We left the hotel room around
6      9:30 because I told Janet I wanted to speak to Amber.
7  Q.  And if Janet's recollection is more closer to 10:30/11
8      p.m., do you think that that's possible?
9  A.  It could be.
10 Q.  So is it possible then that your daughters were out at
11     the karaoke or the bar or the hot tub for a couple
12     hours before you went looking for your daughter?
13 A.  No.  I feel like it was like an hour.  We weren't back
14     at the room for very long.  So maybe I'm wrong about
15     what time we went back to our room, but it was only
16     about maybe an hour we were in our room.
17 Q.  My understanding, I have the benefit of, you know,
18     having some information from other depositions and
19     testimony, is that at some point, and we talked about
20     it a little bit, you left the room to go look for your
21     daughter?
22 A.  Yes, we both did.
23 Q.  Why?
24 A.  I just had an uneasy feeling, that was part it, and we
25     were supposed to leave at 7:30 I think the bus was

Page 83

1      picking us up.  The bus was going to pick us up to
2      take us to the airport very early.  None of us had --
3      well, I think I had started packing, but Amber and
4      Paiton hadn't packed, and they had bought a lot of
5      gifts for friends, and they were going to have to
6      figure out how to fit everything in their bags, and I
7      told Amber to make sure she was back early, and I was
8      going to go remind her that she had to make sure she's
9      back early.
10 Q.  Okay.  So you need to pack and reminding her that she
11     has to go back early.  Can you explain to me what you
12     mean by an uneasy feeling?
13 A.  I just had an uneasy feeling, that's it.
14 Q.  Okay.  Was there something about --
15 A.  No.  Everything seemed normal like it did every day --
16 Q.  Okay.
17 A.  -- that we were there.
18 Q.  Okay.  At the time that you -- strike that.
19         You left the room?
20 A.  Uh-huh.
21 Q.  Where did you go?
22 A.  I think we checked the hot tubs first, which you had
23     to pass the pool to go over by the hot tubs.  The hot
24     tubs were between the pool and the water slides, and
25     they had several hot tubs.  So we checked all three of

Page 84

1      the hot tubs.  Then we walked over to the -- I think
2      we walked down to the beach next, and then there was a
3      bar between the beach and like the water slides.  So
4      we checked that.
5  Q.  Were you walking with Janet this whole time?
6  A.  We were walking and talking because we didn't think
7      nothing of it.  We just figured we missed them
8      wherever they were at.  So then we went over to the
9      piano bar.
10 Q.  So it was a calm and casual walk just looking for your
11     daughters in the various aspects of the resort?
12 A.  Yes, but when we hadn't found them for like 10 or 15
13     minutes, I'm like, all right, what the heck, and so we
14     kept on looking, and then we came up because you can
15     take an elevator from where like the resort and the
16     bar and stuff is down to the beach.  So we had went to
17     the beach, went back up the elevator.
18 Q.  Were you going back to your room thinking they might
19     have just gone back to the room and you didn't cross
20     paths?
21 A.  I think we were going to go back and check our room.
22     I'm not sure.  I don't know where we were going to
23     look at that point.
24 Q.  What do you mean by what the heck; what were some
25     possibilities going through your mind?

Page 85

1  A.  One possibility is did they go off the resort even
2      though Amber knew not to go off the resort, and I was
3      very positive she wasn't going to go off the resort
4      because I told her you could get in a car accident,
5      you could get mugged, anything, and you don't want to
6      deal with hospitals or the police in a third-world
7      country, and that's what I told her.  And she said:  I
8      wouldn't go off the resort because I wouldn't know
9      where to go anyway.
10 Q.  And this concern you had regarding hospitals and
11     police and muggings in third-world countries, is that
12     knowledge that you had prior to going on this trip?
13 A.  Just about stuff I heard when I was a teenager back in
14     Mexico.
15 Q.  So these concerns you had are something you had for a
16     long time before the trip?
17 A.  Yeah, and --
18 Q.  Keep going.
19 A.  So when we came back up the elevator, Amber was
20     standing between the elevator and the room that they
21     were taken into.
22 Q.  And when you saw Amber and you got off the elevator up
23     to the point that you got -- I'm assuming you walked
24     towards your daughter?
25 A.  Yes.

Page 86

1   Q.   Tell me in that sequence what happened and what was
2        said.
3   A.   I went up to Amber.
4   Q.   Did you walk?
5   A.   I walked pretty fast but I didn't run to her because
6        from where I was at, you couldn't really tell.  She
7        was just standing there like she was holding
8        this, standing like this.
9   Q.   When you say "like this," just for sake of the written
10       record, you have your hands together and on your
11       chest?
12  A.   Yes.
13  Q.   Underneath your chin?
14  A.   Yes.  When I got close enough to see her, I could see
15       her crying.
16  Q.   Okay.  Now at that point in time, did you have any
17       thoughts or concerns at any time that there was ever
18       an incident of concern for her safety such as rape or
19       sexual assault?
20  A.   I knew something happened, but I did not know what.
21  Q.   Okay.  And my question is a little bit more specific,
22       though.  Had you ever thought to yourself up and to
23       that point in time that you got to your daughter that
24       there was ever any concern regarding her safety such
25       as sexual assault or rape?

Page 87

1   A.   There was concerns about her safety, but I don't think
2        I really went into my mind on what it could have been.
3   Q.   When you say concerns of safety, are you talking about
4        the type of off-premises safety and mugging, that
5        that's the concern that you had?
6   A.   I honestly don't know.  I was concerned when I could
7        not find her.
8   Q.   And as you saw her and you found her, were some of
9        those concerns alleviated that she was on the
10       premises?
11  A.   No, because she was standing there crying.
12  Q.   Okay.  Did you have any knowledge that at that point in
13       time that she had been raped or sexually assaulted?
14  A.   No.  How would I have?  No.
15  Q.   Did you have any knowledge that she had been
16       physically injured in any way?
17  A.   Her bottom lip was puffy and like swollen.
18  Q.   So you visually saw her lip swollen?
19  A.   Yes.
20  Q.   Were you aware of anything else?
21  A.   No, not besides tears coming down her face and her
22       looking shocked.  I said her name several times and
23       she didn't respond.
24  Q.   Okay.  Were you affected in any way emotionally at
25       that point in time?

Page 88

1   A.   Yeah, yeah, I was getting not hysterical but I was
2        getting upset.
3   Q.   You were concerned because your daughter was crying?
4   A.   Yeah.
5   Q.   But you didn't have any trauma at that point in time
6        because you didn't know what had happened?
7   A.   No, because at that point I didn't know exactly what
8        happened.
9   Q.   You didn't have any trauma at that point in time; you
10       were just a concerned mother, you agree?
11  A.   Yes, I agree.
12  Q.   Where was Janet?
13  A.   I believe she got off the elevator behind me but --
14       she was with me at the time, but I don't know if she
15       got to Amber at the same time as I did or not.  I
16       can't really remember.
17  Q.   Close proximity, a few seconds?
18  A.   Yes.
19  Q.   What happened next?
20  A.   I'm like, Amber, and she wasn't answering me.  I
21       didn't slap her hard, but I tapped her on the face to
22       snap her out of it, and I'm like, Amber, where is
23       Paiton, because I looked around both ways, and I
24       didn't see Paiton anywhere.
25  Q.   Were you concerned that Amber was just drunk?

Page 89

1   A.   No.  She didn't look drunk.  She looked scared.
2   Q.   Then what happened next when you asked her where's
3        Paiton?
4   A.   She pointed to the room.
5   Q.   Did Janet say anything?
6   A.   I think she was like, Amber, where's Paiton, where's
7        Paiton, and Amber wasn't saying anything.  She was
8        just like acting like she was in shock, and she
9        pointed to the room.  So Janet and I was pounding on
10       the door.
11  Q.   You pounded on a door to a room that was adjacent to
12       where Amber was standing?
13  A.   Yes.
14  Q.   Okay.  Was the door closed?
15  A.   Yes.
16  Q.   Now --
17  A.   You couldn't open them.  I tried.
18  Q.   You tried?
19  A.   Yes.
20  Q.   Was there a lock on the door?
21  A.   It was locked somehow.  I don't know.  I don't know if
22       there was a padlock.  All I know is I tried to open
23       the door.  I twisted the knob and tried to push and
24       pull it.  It wouldn't open.
25  Q.   I'm going to ask you about that in a second.  I want

---

Page 90

1      to ask you some questions relative to Amber.  At any
2      time did you see Amber inside that room?
3   A.   No.
4   Q.   At any time were you in the area of that room while
5      Amber was, to your knowledge, inside?
6   A.   Yes, we probably went by it going to the piano bar.
7   Q.   So you might have gone by it while you were looking
8      for your daughter, correct?
9   A.   Yes.
10  Q.   When you went by it, though, did you know Amber was in
11     the room?
12  A.   No.
13  Q.   Did you experience any trauma or anything walking by
14     that room when you were just looking for your
15     daughter?
16  A.   No.
17  Q.   So at the time when you were in the room, not in the
18     room -- strike that.
19         At the time that you were outside the room
20     and Amber was there with you, okay, after you got off
21     the elevator, okay, did you see anybody else come out
22     of that room while Janet was there with you as well?
23  A.   Not while Janet was there with me.
24  Q.   Did you ever see Amber inside that room with a
25     gentleman?

---

Page 91

1   A.   No.
2   Q.   Did you ever see Amber physically touched by Dwight
3      Davis, Jermaine Dyer, or William Tapper?
4   A.   No.
5   Q.   Did you ever get physically touched by Dwight Davis,
6      Jermaine Dyer, or William Tapper?
7   A.   No.
8   Q.   Did you experience any physical injury to yourself
9      relating to what either or all of those three
10     individuals did to your daughter having not seen it?
11  A.   Physically?
12  Q.   Yeah, did you get touched?
13  A.   No.
14  Q.   Was there any physical impact to you, whatsoever,
15     relative to the incident involving your daughter?
16  A.   Not physically.
17  Q.   When you say not physically, are you leaving the door
18     open and saying there might be emotional or mental?
19  A.   Yeah, emotional, yes.
20  Q.   Now that's after the fact, right?
21  A.   That's after the fact.  That's not right now.
22  Q.   And it wasn't during the incident either because Amber
23     was already outside the room when you first got there?
24  A.   At that point, I didn't know what happened.
25  Q.   And at that time, the incident was over?

---

Page 92

1   A.   Yes.  I just seen my daughter was extremely upset over
2      something.
3   Q.   And at that time you didn't know what it was?
4   A.   No.
5   Q.   Now you said you turned to the door and tried to open
6      the door.  Were you helping Janet find Paiton?
7   A.   Yes, we were still looking for Paiton because we asked
8      her Where's Paiton.
9   Q.   So did you turn your back to your daughter to then
10     face the room?  I'm trying to understand the sequence.
11  A.   Yes, she was still standing there.
12  Q.   So your daughter is crying, and Janet is there, and
13     you're looking for Paiton with Janet.  Did you stop
14     consoling your daughter to try to help open the door?
15  A.   She went over by the door with us, I think, but yes, I
16     was pounding on the door because she said that Paiton
17     was in there.
18  Q.   So she verbally said Paiton was in there?
19  A.   We said Where's Paiton.
20  Q.   She pointed?
21  A.   Yes.
22  Q.   I'm just trying because there's a written record and
23     they can't see you, so I'm trying to make sure it's
24     understood.
25         Did Amber ever verbally ever say anything

---

Page 93

1      during that time you were outside the room?
2   A.   I don't remember.
3   Q.   But you recall she pointed to the room when asked
4      where Paiton was?
5   A.   Yes.
6   Q.   Now when you turned your attention to the room and you
7      couldn't open the door, you said you guys were
8      pounding, you and Janet, on the door?
9   A.   Yes.
10  Q.   Okay.  Could you see inside the room?
11  A.   No.
12  Q.   Could you hear anything that was going on inside the
13     room?
14  A.   No.  It was noisy.
15  Q.   Now there's also, if you recall, there's little holes
16     in the blocks that make up the walls to that room; do
17     you recall that?
18  A.   Yes.
19  Q.   Could you see through those?
20  A.   No.  They're too high up.
21  Q.   They're high up and there was something on the other
22     side blocking or many things blocking, correct?
23  A.   We could not see inside the room.
24  Q.   So did Janet eventually leave the area of that room to
25     go to the front desk?

---

Page 94

1   A.   Yes.
2   Q.   Okay.  In the time that you and Janet were outside
3        that room, could you or Janet see anything that was
4        going on?
5   A.   No.
6   Q.   Could you hear anything that was going on?
7   A.   No.
8   Q.   Did you know whether there was anything of concern
9        going on inside that room?
10  A.   Positively, no, but did we think something bad was
11       happening, yeah, because the doors were locked.
12  Q.   Did you think that there was -- strike that.
13            What bad were you concerned about?
14  A.   That she was being assaulted somehow.
15  Q.   So you thought that she might be assault in there?
16  A.   If she were in a locked room, yeah.
17  Q.   Do you know that Janet testified that she thought they
18       were smoking marijuana?
19            MR. WEGLARZ:  So what's the question?
20            THE WITNESS:  That's what Janet thought.
21            MS. MELVILLE:  Are you asserting an
22       objection?
23            MR. WEGLARZ:  Yeah, I am because --
24            MR. SAFRA:  Okay.  Then your objection is
25       asserted.

Page 95

1            MS. MELVILLE:  Say objection to form.
2            MR. WEGLARZ:  Well, you're just making
3        statements and I think the witness -- unless I'm
4        wrong, is there a special rule that says we're not
5        going to ask questions now, we're just going to give
6        statements, and she still has to keep talking to you?
7        I mean, I think this is a question-and-answer session.
8            MR. SAFRA:  Let me ask the question.
9            MS. MELVILLE:  Are you done with your
10       speaking objection?
11            MR. WEGLARZ:  Not yet.
12  BY MR. SAFRA:
13  Q.   Ma'am, did Janet ever say to you that she had any such
14       concern?
15  A.   About what?
16  Q.   You said that you were worried about that there might
17       be an assault going on in that room; is that fair?
18  A.   That's what I said.
19  Q.   Did you know whether Paiton was in that room alone?
20  A.   I did not know if she was in the room alone, but if my
21       daughter is standing outside a room balling and in
22       shock, then I'm assuming something bad happened, and
23       if Paiton is still in that room and both, there's two
24       doors, one here and one down here, and both doors were
25       locked and you can't get in and we're knocking on the

Page 96

1        door and pounding on the door and saying to open the
2        door and we know that her daughter is in there, then
3        yes, I don't know about Janet, I can't speak for her,
4        but I'm going to assume something bad is going on.
5   Q.   Okay.  Now is it possible that your daughters went
6        into that room, and then when Amber walked out, the
7        door closed and automatically locked, and she was just
8        stuck in that room alone by herself doing nothing
9        wrong?
10  A.   No, that didn't occur to me because my daughter was
11       standing there crying.
12  Q.   So the first thing that occurred to you when you
13       turned to that locked room knowing only Paiton is in
14       there and having no knowledge of anybody else --
15  A.   A my daughter being hysterical --
16            MR. WEGLARZ:  Let him finish his question.
17  BY MR. SAFRA:
18  Q.   Your first thought when your daughter is standing
19       there crying next to you and Paiton is in a locked
20       room to your knowledge alone, is that she might be
21       assaulted or raped?
22            MR. WEGLARZ:  Asked and answered.  She's
23       already answered that question.
24            Go ahead and answer it again.
25            THE WITNESS:  I didn't say she was alone.

Page 97

1        I didn't know if she was in there alone.
2   BY MR. SAFRA:
3   Q.   Okay.  To your knowledge, Paiton was in that room at
4        that time because that's where your daughter pointed,
5        correct?
6   A.   Yes.
7   Q.   Did you know if there was anybody else in the room?
8   A.   I did not know.
9   Q.   Okay.  So to your knowledge --
10  A.   But I was assuming --
11  Q.   Let me ask my question, please.  Did you have any
12       actual knowledge that there was anybody else in that
13       room?
14  A.   No.
15  Q.   So you're pounding on a locked door.  The only
16       knowledge you have is that Paiton is in that room, and
17       your daughter is crying outside the room, correct?
18  A.   Yes.
19  Q.   And the first thought that comes to your mind is that
20       Paiton might be in the process of being assaulted or
21       raped?
22  A.   Being hurt or being kept in there without wanting to
23       be in there because why would my daughter be standing
24       outside the door crying.
25  Q.   So your concern is she's locked in a room and not

Page 98

1    wanting to be there, but you didn't say to yourself at
2    that point that there -- at that moment, you weren't
3    saying to yourself that she might be assaulted and
4    raped; you just were concerned something is going on,
5    is that fair?
6  A. Pretty much but I'm assuming that she was being held
7    in there against her will because why wouldn't she
8    open the door if we're pounding on the door?
9  Q. Did she respond?
10 A. No, nobody responded.  When they did respond is
11   because I kept on pounding on the door when Janet went
12   to get --
13 Q. And I'll ask about that.  So just to make sure the
14   record is clear, though, you thought something bad was
15   happening in that room?
16 A. Because of my daughter.
17 Q. You did not know what was going on, correct?
18 A. Correct.
19 Q. And you didn't specifically say to yourself rape or
20   sexual assault; you just thought something against her
21   will?
22 A. Yes.
23 Q. Okay.  How long was it that you and Janet were banging
24   on the door before she left to go to the front desk?
25 A. I'm not sure, maybe a couple of minutes before Janet

Page 99

1    ran to the front desk.
2  Q. And at that time --
3  A. Maybe five minutes.
4  Q. At that time you did not hear anything that was going
5    on?
6  A. No.
7  Q. Double negative.  At that time did you hear anything
8    going on inside?
9  A. No.
10 Q. Did you see anything going on inside?
11 A. No.
12 Q. Did Janet to your knowledge hear or see anything going
13   on inside?
14 A. No.
15 Q. Did Janet suffer, from anything you saw, any physical
16   harm?
17 A. No.
18 Q. Was she ever touched by any of the three individuals?
19 A. No, not to my knowledge.
20 Q. Did Janet ever say to you anything about what she
21   thought was going on inside that room?
22 A. No.
23 Q. Did you say anything to her about what you thought
24   might be going on in that room?
25 A. No, not that I can remember.

Page 100

1  Q. Okay.  She then left to go to the front desk.  What
2    happened next?
3  A. I kept on pounding on the door, and I said, You need
4    to open the door because Janet is going to get
5    security.  I was standing at the door on the left-hand
6    side, and as I'm pounding on the door and yelling that
7    Janet is going to get security, a young man opened up
8    the door and took off running.
9  Q. Okay.  So can you describe the man?
10 A. He was a black man.  That's all I can remember now.
11 Q. Do you know if he was an employee?
12 A. He had employee's clothes on.
13 Q. Do you know if it was Dwight Davis, Jermaine Dyer, or
14   William Tapper?
15 A. Later on I found out it was, I think it was Jermaine,
16   but I'm not positive.
17 Q. Was Janet there with you when the man left the room?
18 A. No.  She was walking back fast with security, and I
19   told them --
20 Q. Did you see Janet walking back fast with security, or
21   you just came to learn of that afterwards?
22 A. I just came to learn that they were walking back
23   pretty quickly with security.
24 Q. I want to know what you actually saw and heard at the
25   time.

Page 101

1  A. I didn't see until she walked around the corner.  She
2    was still walking pretty fast around the corner
3    because you had to go around the left to get to the
4    office.
5  Q. Understood.  So there was a point in time on her way
6    back from the front desk with security that she turned
7    a corner, and that's when you saw her walking fast?
8  A. Yes.
9  Q. Had the man already left the room at that time?
10 A. Yes.
11 Q. So did Janet ever see the guy actually leave the room
12   or he was already outside the room?
13         MR. WEGLARZ:  Form objection.  Go ahead.
14         THE WITNESS:  Janet did not see him leave
15   the room.
16 BY MR. SAFRA:
17 Q. Let me ask it a little different way because of the
18   objection.  At the time the man left the room, could
19   you see Janet, or was she still behind the corner?
20 A. She was still behind the corner.
21 Q. Outside the room did you ever see any other gentleman
22   leave?
23 A. No.
24 Q. What happened next?
25 A. Janet and the security guy came around the corner just

Page 102

1  a couple minutes, maybe a minute or two, and I asked
2  them if they saw the guy running past them, and
3  they're like yeah.  This is what Janet told me.  The
4  security asked him if he was working that day, and he
5  said yes, and I told him, I said, That's the guy that
6  came out of the room because there's only one path.
7  So it was the only person that ran past them.  It had
8  to be the same person that ran out of the room, and
9  Janet went to the door and told Paiton to come here.
10 Q. Did Janet ever enter the room?
11 A. I think she did but I'm not sure.  I did not.
12 Q. Was there anybody else inside the room with Paiton at
13    the time that the doors got opened?
14 A. Not to my knowledge.
15 Q. Okay.  Just the one individual who ran out?
16 A. To my knowledge, yes.
17 Q. Is that when you first learned that there was somebody
18    in the room with Paiton?
19 A. Yes.
20 Q. Once Janet got to the room, the door was open?
21 A. Yes.
22 Q. And she asked Paiton to come here?
23 A. Yes.
24 Q. Okay.  What happened next?
25 A. Amber and I had started walking before because we were

Page 103

1  by the first door.  They were by the second door.  So
2  we were maybe 15 feet ahead of them.  We all started
3  walking back to the room.
4  Q. Did you ask Amber or Paiton what happened?
5  A. Amber was still crying.  She wouldn't say anything.
6  Q. Okay.  And what about Paiton?
7  A. I don't know.  She was 10 or 15 feet behind me.
8  Q. So you were walking with your -- you had said you all
9     were walking, but you were walking apart?
10 A. About 10 or 15 feet apart.  We all started walking so
11    we're still about 10 or 15 feet apart.
12 Q. So you're with Amber walking, and Janet is with her
13    daughter Paiton?
14 A. Yes.
15 Q. Could you hear anything that Janet and Paiton were
16    talking about?
17 A. I wasn't paying attention.  I was trying to get my
18    daughter to --
19 Q. So if I asked you what they spoke about, do you have
20    any knowledge?
21 A. I have no idea.
22 Q. So between the time that you left the outside of the
23    room with Amber, where did you go, to your hotel room?
24 A. Yes.
25 Q. And you got to your hotel room.  Did Amber say

Page 104

1  anything to you?
2  A. No.  She was still upset.
3  Q. Did you ask your daughter about whether something bad
4     happened to her?
5  A. I asked her a bunch of questions, but she didn't say
6     anything.
7  Q. What did you ask her specifically?
8  A. I asked what happened, why was Paiton in the room by
9     herself, and she just would just shake her head.  She
10    didn't say anything.  She didn't tell me anything.
11 Q. Did you ask her if they were drinking?
12 A. No.
13 Q. Did you ask her if they were smoking marijuana?
14 A. No, because I didn't think Amber would be doing that.
15 Q. Why?
16 A. Because she was on probation.
17 Q. Okay.  Did you ask Amber if she was assaulted?
18 A. Not at that point, no.
19 Q. Did you ask her if she was raped?
20 A. No, not at that point.
21 Q. Did you have any concern at that point that anything
22    bad had physically happened to Amber?
23 A. Yes.
24 Q. Is it because of the lip?
25 A. That and because she was crying and my daughter is

Page 105

1  usually --
2  Q. Could she have been crying because Paiton was locked
3     in the room, and she thought something bad was
4     happening to Paiton?
5  A. Yeah, but she was more hysterical.  I felt like
6     something happened to her.  I just didn't know what.
7     At that point I wasn't going to push her to have her
8     tell me.  I wanted her to tell me on her own.
9  Q. So you went back to the hotel room?
10 A. Yes, we were all back to the hotel room.
11 Q. What happened next?
12 A. I think Amber was the first one to go in the bathroom,
13    and then Paiton went in there, and they took a shower,
14    and after they took a shower, at some point I think I
15    left the room while they were in the shower.
16 Q. Before you left the room, they actually came out of
17    the bathroom, correct?
18 A. I honestly don't know.  I don't know the exact
19    sequence of what happened.
20 Q. There was a contentious argument between you and your
21    daughter?
22 A. Yes.
23 Q. Tell me about that.
24 A. We got in an argument because I had told her when we
25    came to the resort that her and Paiton had to stay

Margaret Toombs, Pro Se
September 24, 2019                                          106 to 109

Page 106

1  together.  We're at a resort.  We're in a different
2  country.  There's safety in numbers.  You always have
3  to stay together.
4          And she said okay, and when I found her,
5  they were not together, even though I didn't find
6  Amber doing anything she wasn't supposed to be doing,
7  but she was super upset, and they weren't together.
8  At that point I didn't know if she was upset because
9  she knew that I was going to be upset that they
10 weren't together or what, and we argued about it.
11 Q.  Tell me about the argument; what was specifically
12     said?
13 A.  I don't know exactly.  I know at one point --
14 Q.  This is in the hotel room after the incident, right?
15 A.  Yes.
16 Q.  At one point you were saying?
17 A.  We were yelling back and forth and I honestly -- I
18     don't know the words that were said.
19 Q.  But yelling about what, not being alone?
20 A.  Yeah, because I told them, I said:  We are in a
21     different country.  You don't go anywhere by yourself
22     in a different country because you don't know how the
23     legal system or anything works here.
24          And I told her --
25 Q.  That's in the hotel room that you're saying this

Page 107

1  again?
2  A.  Yes, and I told her that the reason that I let her
3  come is because she knew that they had to stay
4  together, and up until that night, we were always
5  together, even the girls were with us or they were
6  always together.
7  Q.  While in the hotel room during this yelling, what did
8  Amber say?
9  A.  I don't remember.
10 Q.  Did Janet get involved in this confrontation?
11 A.  I don't think so.
12 Q.  Do you recall Janet saying to you that she didn't like
13     how you were speaking to your daughter?
14 A.  I don't remember that.
15 Q.  Do you recall Janet trying to stop you and that's what
16     caused you to leave the room?
17 A.  I know she told me to calm down, that I needed to calm
18     down.
19 Q.  Having concern for your daughter being harmed or her
20     safety, do you think that was the appropriate time for
21     you to start yelling at her about being alone?
22 A.  Probably not but at that point I didn't know what
23     happened, and I was on edge.
24 Q.  At that point in time she was crying, and she had a
25     little bit of a swollen lip.  Did you have any concern

Page 108

1  that there was anything involving sex that occurred?
2  A.  At that time I didn't know what occurred.  I had no
3  idea what occurred.
4  Q.  Is there anything that you saw on her body such as
5  bruises or marks, her being your daughter, or the way
6  her clothes were, that led you to believe that there
7  was any sort of sexual activity that had occurred?
8  A.  She went straight into the bathroom and took a shower
9  and changed her clothes, so I didn't see what her
10 clothes looked like.
11 Q.  But you saw her outside the room, correct?
12 A.  But she was standing like this.
13 Q.  But you saw her clothes, her pants, her shirt.  She
14     had her hands on her chest, but you saw her clothes,
15     correct?
16 A.  Yes.
17 Q.  And you walked her there to the hotel room?
18 A.  Yes.
19 Q.  Did you have any concern that there was anything
20     inappropriate that had occurred from the neck down
21     based upon anything that you saw?
22 A.  I didn't really look to investigate.
23 Q.  But nothing stood out?
24 A.  Nothing stood out besides her acting scared and upset.
25 Q.  While you were outside the room with Amber and Janet

Page 109

1  was there with you and also while Janet went to the
2  front desk, did you ever encounter anybody else before
3  the man left the room?
4  A.  When Janet had went up there, some guy walked by, and
5  I asked him to get a hotel employee, and he just kept
6  walking.
7  Q.  Do you know if he went to walk to get an employee?
8  A.  I don't think so.  He just ignored me and kept
9  walking.
10 Q.  Was that guy --
11 A.  He wasn't an employee; he was a tourist.
12 Q.  So a guest at the hotel walked by?
13 A.  Yes.
14 Q.  Anybody else?
15 A.  Not to my knowledge.
16 Q.  When you were in the room and there was the yelling
17     and then you left, at that point in time did you know
18     whether or did you know that Paiton or Amber had
19     gotten raped?
20 A.  No.
21 Q.  Were involved in any sort of sexual activity?
22 A.  No.
23 Q.  Did Janet?
24 A.  Not to my knowledge, no.
25 Q.  How long were you out of the room?

```
                                                    Page 110
1   A.   Maybe 30 minutes.  I don't know.
2   Q.   At some point you came back?
3   A.   Yes, I came back.
4   Q.   Were the three of them still in the room, the three
5        being Janet, Amber, and Paiton?
6   A.   I think so.
7   Q.   What happened next or when was the next time you saw
8        them?
9   A.   When I was in the room.  So the girls had to be in
10       there.
11  Q.   What happened next when you got back?
12  A.   Both girls were still upset, and Janet said:  I think
13       something happened to them.
14  Q.   Did Janet say anything to you about what happened?
15  A.   No.  She just said:  I think something happened to
16       them.
17           I don't know if the girls said anything to
18       her while I was gone or not.
19  Q.   From your conversation upon your return with Janet,
20       did it seem to you that Janet knew what it was, or
21       when she said something happened, it was clear to you
22       she did not yet?
23  A.   I don't know if she knew or not.
24  Q.   Okay.  Then what happened when you got back; when did
25       you first learn that your daughter or Paiton got
```

```
                                                    Page 111
1        raped?
2                MR. WEGLARZ:  Form.
3                Go ahead and answer.
4                MR. SAFRA:  Strike that.  What's the
5        problem with the question?
6                MR. WEGLARZ:  It's compound.
7                MR. SAFRA:  You want me to separate Paiton
8        and Amber?
9                MR. WEGLARZ:  You don't have to.  I'm just
10       placing my objection on the record.
11  BY MR. SAFRA:
12  Q.   When was the first time you learned that Amber got
13       raped?
14  A.   Shortly after I got back I think.
15  Q.   Got back to the hotel room?
16  A.   Yes.
17  Q.   This time would you say it's probably almost 45
18       minutes to an hour after the incident since you were
19       gone from the room?
20  A.   I would say about 45 minutes to an hour.  I'm
21       guessing.
22  Q.   When I say incident, 45 minutes to an hour after you
23       first saw your daughter upon getting off the elevator
24       and Paiton was still in the room?
25  A.   Yeah, probably about an hour I would guess.
```

```
                                                    Page 112
1   Q.   Do you know where or how long prior to that Amber had
2        anything happen to her?
3   A.   I don't know.
4                MS. MELVILLE:  Can we take a restroom
5        break?
6                MR. SAFRA:  Yes.
7                MS. MELVILLE:  Thank you.
8        (Recess taken at 10:45 a.m.)
9        (The requested portion of the record was
10       read by the reporter at 10:58 a.m. as
11       follows:
12       "Question:  Do you know where or how long
13       prior to that Amber had anything happen to
14       her?
15       "Answer:  I don't know.")
16       (Back on the record at 10:58 a.m.)
17  BY MR. SAFRA:
18  Q.   Before we took the break, we were I think at the point
19       in that evening where you came back to the hotel room,
20       and I believe it's in that hotel room then that you
21       first learned that either Paiton or Amber or both had
22       been assaulted or raped; is that correct?
23  A.   Yes.
24  Q.   Could you tell me how you learned?
25  A.   Janet was asking the girls what happened, and both of
```

```
                                                    Page 113
1   the girls started crying, and Janet I think
2   specifically asked Paiton:  Did something happen to
3   you in that room?
4        And I think Paiton nodded or something, and
5   then Janet asked her what happened, and she was just
6   looking at her.  And she was like:  Were you raped?
7        And Paiton said:  Yes.
8        Then I looked at Amber and I said:  Were
9   you?
10       And she shook her head yes.  Then Paiton
11  said that three people attacked her, and I looked at
12  Amber and I said:  Did three people attack you, also?
13       She said:  No, only one.
14       And then we all kind of -- I think we might
15  have sat down, I'm not sure, and we were talking about
16  what we should do, should we call the police and
17  report it, or should we just pack up our stuff and go
18  home and get the heck out of there, because I knew if
19  we reported it, there was going to be a trial and
20  everything, and I asked the girls if they wanted to
21  report it, and they both -- I don't even know if they
22  answered me or not, and Janet is like -- I think Janet
23  called the police from our room, and then we talked
24  about it for a while, and then I told the girls, I
25  said:  If we report it, you're both going to get a
```

Page 114

1   rape kit done.  And I said:  Being in a third-world
2   country, I don't even know how they do that here.
3
4        I went to school for criminal justice, so I
5   kind of told them a little bit about what I thought
6   would happen, and I told them to make the decision
7   whether they wanted to report it or not.
8   Q.   This was all in the conversation in the room?
9   A.   This is still in the room.
10  Q.   How long did that conversation take place?
11  A.   Not very long.  Not very long.
12  Q.   Do you know which individual Amber was identifying,
13       whether it was Mr. Davis, Mr. Dyer, or Mr. Tapper, as
14       her assailant?
15  A.   If I remember correctly, which I don't know if I do or
16       not, I think it was Jermaine.  I don't know what his
17       last name is.
18  Q.   Jermaine Dyer?
19  A.   But I'm not 100% positive.
20  Q.   Did they tell you anything else about either of their
21       incidents at that time?
22  A.   Not at that time.
23  Q.   Did you cry?
24  A.   Yes, I cried.
25  Q.   What happened next?

Page 115

1   A.   We went down to the front desk, told them we needed to
2        talk to the manager, and they said I had to stay in
3        the front office to wait for the police to get there,
4        and Janet and both the girls and the manager at the
5        hotel went to the room to show them where it happened.
6   Q.   Why did you need to stay but they were able to go to
7        the room?
8   A.   Because I think the hotel manager said that someone
9        had to stay up front so when the police got there, and
10       Janet just took off with the girls, so I just kind of
11       got voted to stay and wait for the police, and I think
12       the police arrived while they were in the room.
13  Q.   Did you ever personally go back to the room?
14  A.   No.
15  Q.   Do you know what was in the room?
16  A.   I seen pictures.
17  Q.   Okay.  So other than pictures, do you have any
18       personal knowledge of what was in that room?
19  A.   Besides what the girls said and the pictures, that's
20       it.  I never physically went in the room.  I only
21       walked by the room.
22  Q.   Did you physically ever look in the room that you
23       recall seeing anything in particular when the door was
24       opened?
25  A.   No.  When that door opened and Paiton ran out, Janet

Page 116

1   was there by then, by the time Paiton was starting to
2   come out, and I was standing beside Amber.
3   Q.   Janet did not go in the room, correct?
4   A.   I think she looked in the room.  She might have
5        stepped in the room but I'm not positive.
6   Q.   What have you since learned, if anything, was in that
7        room?
8   A.   I know there was a button off something, some bodily
9        fluids on the floor, a used condom and a bunch of
10       laundry baskets with dirty laundry.
11  Q.   Do you know if that condom was used by any of the
12       three individuals during their encounter with either
13       Amber or Paiton?
14  A.   I would not be able to answer that question.  I don't
15       know.
16  Q.   Is it possible?
17  A.   It's possible.
18  Q.   Did you ever talk to your daughter about how it came
19       to be that she was in that room?
20  A.   She won't talk about it to no one but her counselor.
21  Q.   Have you ever come to learn from anyone how it came to
22       be that your daughter was in that room?
23  A.   Just from what I heard.  The only thing I heard is
24       that he took her by the wrist and said he wanted to
25       tell her something and pulled her in the room.

Page 117

1   Q.   Who told you this?
2   A.   Amber that night when she was talking to the police.
3   Q.   Okay.  Is there anything else you learned about how it
4        came to be that she got in that room?
5   A.   No.
6   Q.   Did you ever learn anything about what happened in
7        that room?
8   A.   She did admit that she was raped.
9   Q.   Anything else more specifically that you became aware
10       of after the incident?
11  A.   Not that I can think of right now, no.
12  Q.   Did you ever hear your daughter say that she had gone
13       into that room voluntarily and wanted to kiss the
14       gentleman but did not want it to go further than that?
15  A.   I read that in the police report.
16  Q.   Did you ever ask your daughter about that?
17  A.   Yeah, but she never really -- she doesn't like to talk
18       about it, so I didn't push her.  That's why I put her
19       in counseling, so she could talk to the counselor.
20  Q.   Do you think it's possible that that's what happened,
21       that your daughter went in there, and she was kissing
22       the gentleman, and he wanted to go further, and she
23       had said no and he kept going?
24  A.   It could be a possibility.
25  Q.   Is the behavior of your daughter pre-incident that you

Page 118

1   are aware of and experienced and know of as her mother
2   the type that it is possible that she would want to
3   kiss or engage in kissing this gentleman?
4              MR. WEGLARZ:  Form objection.
5   BY MR. SAFRA:
6   Q.  Is that something that surprises you?
7   A.  Yes, it surprised me because we're in a different
8       country, and she didn't know anyone.  So, yes, it did
9       surprise me.
10  Q.  Were you ever aware of anything about your daughter
11      that in the past is of a similar situation where you
12      are aware of her kissing and engaging with other
13      gentlemen she just met or boys?
14  A.  No, I'm not aware of her kissing someone she just met.
15  Q.  When the police arrived, could you take me through
16      what happened next?
17  A.  That's kind of blurry.  I know the police came.  I
18      don't know how long we stood there and talked to them.
19      I don't even know if they went -- I'm pretty sure they
20      went and checked the room out, but I'm not sure
21      exactly, but at some point, all four of us got in the
22      back of a cop car, and they took us to the hospital.
23  Q.  When you say the four of us, you mean you, your
24      daughter, Paiton, and Janet?
25  A.  Yes.

Page 119

1   Q.  Hospital off resort premises?
2   A.  Yes.
3   Q.  What happened there?
4   A.  They did a rape kit on both the girls, and they gave
5       them HIV medication, the morning-after pill
6       medication, and I don't know what other kind of
7       medication.  They give them a bunch of different
8       medications.
9   Q.  Did you receive any treatment?
10  A.  No.
11  Q.  Did you receive any medication?
12  A.  No.
13  Q.  Were you on any medication at the time?
14  A.  Iron pills and at that time I think iron pills might
15      have been the only thing I was taking at that time.  I
16      might have had Melatonin, but I don't think I did.  I
17      think it was just iron pills at the time.
18  Q.  There may be some questions and follow-up on that
19      area.
20  A.  I'm not exactly positive.  I think it was only iron
21      pills I was taking at that time.
22  Q.  There may be some questions by the other counsel on
23      that area, and we've agreed that I'll let them go, and
24      if I have any follow-up after that, I'll do it.  I'm
25      just going to focus more on what happened while you

Page 120

1   were in Jamaica and then probably finish my line of
2   questioning and defer.
3   A.  Okay.
4   Q.  After the hospital, you were supposed to leave that
5       next morning, correct?
6   A.  Yes.
7   Q.  Did you leave then?
8   A.  No.
9   Q.  How long did you stay in Jamaica after that?
10  A.  I believe it was four or five more days.
11  Q.  Where did you stay?
12  A.  They moved us to a different resort.  I don't know the
13      name of it.  It was a couples resort, though.  It
14      wasn't a family resort.
15  Q.  A Sandals Resort?
16  A.  I'm assuming it was since Sandals is the one that
17      moved us.
18  Q.  Do you recall seeing the name Sandals at the resort?
19  A.  No.  Everything is a blur.
20             MARKED FOR IDENTIFICATION:
21             EXHIBIT 1
22             Handwritten notes
23             11:09 a.m.
24  BY MR. SAFRA:
25  Q.  I was provided yesterday a document that I'll mark as

Page 121

1   Defendants' Exhibit Number 1 for this deposition, and
2   it's a composite of a bunch of pages of documents that
3   are in handwriting.  The pages are not numbered.  It
4   looks like the top for this photocopy is cut off from
5   the version yesterday because it's a copy of it where
6   it used to say, you know, Paiton Bater's file in a
7   circle, but I don't think any of the substance of the
8   other pages is cut off, if you could take a look at
9   that for a second and tell me what that is.
10  A.  Stuff about when we went to the hospital.
11  Q.  Whose handwriting is this?
12  A.  Looks like mine because I got really sloppy
13      handwriting.
14  Q.  My understanding from Janet is that this is, maybe it
15      will help refresh, I'm not trying to trick you or
16      anything, but my understanding is that this is
17      handwritten notes by both --
18  A.  This is Janet's --
19  Q.  Hold on.  Let me finish.
20  A.  Okay.
21  Q.  My understanding from Janet is that these are
22      handwritten notes by both you and Janet that you made
23      while in Jamaica after the incident.  So take a moment
24      to look, and let me know if that's accurate.
25  A.  I would say yes, that's accurate.

Page 122

1   Q.   Do you see some handwriting that is yours and some
2        that looks like Janet's?
3   A.   Yes.
4   Q.   Okay.
5   A.   We both have really sloppy handwriting, so I'd have to
6        read through it to see exactly who wrote what.
7   Q.   I understand that but you see your handwriting and
8        hers?
9   A.   Yeah, I feel like a couple of them, yeah.
10             MR. SAFRA:   I'm not going to go through,
11       counsel, every page and say which one is yours and
12       which one is hers if there's no question as to
13       authenticity of it.
14             MR. WEGLARZ:   There's not.
15  BY MR. SAFRA:
16  Q.   Were all of these notes taken after the hospital when
17       you arrived at the different Sandals Resort you were
18       then staying in?  And I believe some of the note head
19       that's copied there even says Sandals on it.
20  A.   I would think so.
21  Q.   Do you recall taking any notes when you were at the
22       Beaches Ocho Rios Resort post incident?
23  A.   No, the first resort we were at I didn't take any
24       notes.
25  Q.   After you left the hospital, did you go back to the

Page 123

1        Beaches Ocho Rios Resort and gather your stuff?
2   A.   Yes.
3   Q.   How long were you there?
4   A.   They gave us like, I think, maybe 30 minutes, I think.
5        They didn't give us very long.  They told us to go
6        gather all of our belongings.
7   Q.   Did they say to you that you have to get out in 30
8        minutes?
9   A.   Go get your stuff.  We're going to wait, and we're
10       going to take you to a resort where you'll feel safer.
11  Q.   Did anybody say to you:  You only have 30 minutes.
12       Get your stuff and get out?
13  A.   No.  I don't think they gave us a time limit.
14  Q.   If you needed more time, do you feel like you could
15       have gotten another moment, or you had sufficient
16       time?
17  A.   We just wanted to get out of there, so we just got
18       everything together as quickly as possible.
19  Q.   Do you recall taking any notes while you were getting
20       your stuff?
21  A.   No, I don't recall that.
22  Q.   Did Janet to your knowledge?
23  A.   Not to my knowledge.
24  Q.   How long were you at the Sandals Resort?
25  A.   The new one?

Page 124

1   Q.   Yes.  The first one was Beaches, correct?
2   A.   Yes.
3   Q.   So this is the only Sandals Resort?
4   A.   Okay.  We were at the police station until like 3:00
5        in the afternoon on Saturday.  So by Saturday night, I
6        think they moved us Saturday night, but I'm not even
7        positive.
8   Q.   How many days did you stay?
9   A.   I want to say we were supposed to leave Saturday, I
10       want to say four or five, but I'm not positive.
11  Q.   Is there any reason why you stayed four or five days
12       versus leaving Sunday?
13  A.   Yes.  They had to arrest all three suspects and have
14       the first trial before they would let us leave if we
15       wanted to have criminal charges taken up against them.
16       They said we had to stay there until they caught all
17       three.
18  Q.   So if you wanted to assist --
19  A.   If we wanted to further --
20  Q.   Let me ask my question.  It's just a part of the
21       process.
22             If you wanted to assist with the criminal
23       investigation, the Jamaican police with the criminal
24       investigation and charges to be brought, it was your
25       understanding that you needed to stay?

Page 125

1   A.   Yes, they told us unless we dropped -- if we dropped
2        the charges, we could leave Saturday, but if we wanted
3        to bring charges against them, we had to stay until
4        they caught all three of them.
5   Q.   What did you do while you were waiting for the police
6        to catch all three individuals?
7   A.   We stayed in the room mainly because the girls were on
8        medication, so they couldn't be in the sun, and they
9        had a counselor come and see them.
10  Q.   "They" being the police?
11  A.   From the police department.
12  Q.   You participated in some activities around the resort
13       as well, correct?
14  A.   We did yoga once but then the girls started getting
15       sick from the sun, and we forgot that they weren't
16       supposed to be in the sun, but besides that, I think
17       once the sun started going down, we sat in the pool.
18  Q.   Feel free to review your notes, but the girls actually
19       participated in yoga for 45 minutes or so before they
20       decided that the sun was bothering them?
21  A.   We went out there at sunrise for the yoga thing, but
22       it could have been 45 minutes, but I don't know how
23       long.  I know they left before us because I looked
24       back, and I seen that they had went and sat in the
25       shade, and I don't really remember doing a whole lot

Page 126

1    after that.  I know we went in the pool after the sun
2    went down because once they realized the sun made them
3    sick.
4  Q.  There's a document with an Exhibit 1 that's dated
5      May 12th.
6  A.  Okay.
7  Q.  Do you see the date at the top?
8  A.  Yes.
9  Q.  It's up here.  Then partway through it says that both
10     girls went to yoga at 7:00 a.m., and after 45 minutes
11     they C-O, I think that stands for complained of,
12     burning in their face; do you see that?
13 A.  Yes.  I didn't know it was 45 minutes.  I thought it
14     was sooner than that, but I know they left because
15     they said that the sun was bothering them, and Janet
16     said it was the medication that they were taking.
17 Q.  Does Janet have experience?
18 A.  She's a nurse.
19 Q.  Okay.
20 A.  And it was on one of the pill bottles that they gave
21     the girls that said to stay out of the sunlight.
22 Q.  Was there any other activities that the girls engaged
23     in while at the resort waiting for the gentlemen to be
24     caught?
25 A.  If they did, I don't remember.  I know we had to go

Page 127

1    get clothes for court.  We had to go into town and buy
2    something because most of our dresses were spaghetti
3    straps, and we had to buy a sweater.
4  Q.  How did you get to the shopping area?
5  A.  We had someone from the US Embassy from the time that
6      it happened until the time we left was with us at all
7      times, security guy from the US Embassy.
8  Q.  And they drove you into town?
9  A.  Yes, him and his driver.
10 Q.  And when you parked?
11 A.  He went to the stores with us.
12 Q.  Went to the stores with you, okay.  I'm going to go
13     through my notes while I just maybe find some
14     questions I may have missed.  There may be more
15     jumping around at this point.  I'm going to defer to
16     counsel for the other party here.
17         Back to the payments that you made for this
18     trip, you made them from Michigan?
19 A.  Yes.
20 Q.  Okay.  Did you ever at any time step in Florida to
21     your recollection relative to this trip to Jamaica?
22 A.  I don't understand what stepped into Florida means.
23 Q.  Like you were never physically in Florida during any
24     portion of travels pertaining to this trip, correct?
25 A.  No, I don't think so.  I've been to Florida before

Page 128

1    this trip.
2  Q.  No, you don't think so or yes, you agree?
3  A.  I've been to Florida before the trip.
4  Q.  But not relative to this trip?
5  A.  Not relative to this trip.
6  Q.  I think I asked you this before but I just want to
7      make sure that I did, and then this will be my last
8      question.
9          As you sit here today, do you have actual
10     knowledge that any of these three individuals prior to
11     the incident involving Paiton or Amber had ever
12     committed any sexual assault or rape before?
13 A.  I have no knowledge one way or the other.
14 Q.  Do you have any knowledge that any of the parties that
15     you've sued are aware of any such an event?
16 A.  I have no idea.
17 Q.  Would the same be true for the hotel?
18 A.  I would have no knowledge if they knew or not.
19         MR. SAFRA:  I have no further questions at
20     this time.
21         MS. MELVILLE:  Can we just take a break so
22     I can move down?
23         MR. SAFRA:  Let's switch.
24         (Recess taken at 11:19 a.m.)
25         (Back on the record at 11:27 a.m.)

Page 129

1              EXAMINATION
2  BY MS. MELVILLE:
3  Q.  Ma'am, same rules as before.  If you can't hear me or
4      don't understand my question, just let me know.  I
5      don't want you answering a question that you're not
6      sure of what the question is, all right?
7  A.  Okay.
8  Q.  If you need a break, I'll be happy to give you a
9      break.  This is not an endurance contest.  All I would
10     ask is that if we're in the middle of a question,
11     answer the question, and then we'll give you a break,
12     all right?
13 A.  Yes.
14 Q.  Are you holding up okay so far?
15 A.  Yes.
16 Q.  If you need lunch, hungry, just let me know and we'll
17     make that happen.
18 A.  Okay.
19 Q.  I'm going to try and follow up on what Mr. Safra asked
20     you about earlier today, so I may skip around a little
21     bit.  So please just bear with me, and I'll try to let
22     you know when I'm moving to a different area, all
23     right?
24 A.  Okay.
25 Q.  Okay.  So you told us about who you currently live

Page 130

1   with today and your fiancee.  Who is Amber Torralva's
2   father?
3   A.  His name is Daniel Torralva.
4   Q.  And where does he live today?
5   A.  Elwell, Michigan, I think.
6   Q.  When did you divorce Mr. Torralva?
7   A.  I think it was 2007 or 2008, one of the two.  I think
8       it was 2007, but I'm not positive.
9   Q.  How far does Daniel Torralva live from where you and
10      Amber live?
11  A.  About an hour-and-a-half.
12  Q.  Does Amber have contact with her father?
13  A.  Very little.
14  Q.  Why is that?
15  A.  Partly because he was very abusive in our marriage,
16      and I'm sure you guys know he was incarcerated.
17  Q.  Was he incarcerated as a result of the abuse?
18  A.  Towards the girls and other girls, yes.
19  Q.  Was there some sort of sexual abuse?
20  A.  Yes.
21  Q.  I apologize for the question, but was Amber Torralva
22      sexually abused by her father?
23  A.  She's never admitted it.
24  Q.  But did you believe she was?
25  A.  I believe she was but she never -- she's never

Page 131

1   acknowledged it unless she did it to her counselor but
2   never to me.
3   Q.  Did she have a counselor prior to the incident for
4       which you brought this lawsuit?
5   A.  When she was nine, probably a year, at least a year
6       after I got divorced, we had a counselor come to our
7       house and talk to her and my -- I have five kids but
8       only three of them lived with me at the time, so...
9   Q.  And would you mind just, and I'm going to come back to
10      the counselor, but can you just run through who your
11      children are and what their ages are?
12  A.  Their ages now?
13  Q.  Yes.
14  A.  Amanda, she's 31.  Angela is 29.  Daniel, I think he
15      just turned 27.  Dakota just turned 24, and then Amber
16      is 21.
17  Q.  And you said that your fiancee's son lives with you?
18  A.  Yes.
19  Q.  What is his name?
20  A.  His name is Silvano.  We call him Junior, though.
21  Q.  Silvano, Junior?
22  A.  Yes.
23  Q.  And he is how old?
24  A.  He's going to be 26 on November 1st.
25  Q.  And who was the counselor that you had come to your

Page 132

1   house when your daughter Amber was nine years old?
2   A.  I don't remember.  I don't even know how I found them.
3       I couldn't accurately tell you how I even got them,
4       but I know she seen a counselor, and a counselor also
5       saw Amber at school like once a week.
6   Q.  From that time period?
7   A.  When she was nine.
8   Q.  How long did she have counseling when she was nine?
9   A.  I think it was maybe a year with the school, the whole
10      school year, and then at home, I think it was after
11      maybe three to six months, the counselor said that
12      they didn't need to really see a counselor because the
13      counselor said they were doing good.  For what they
14      experienced, they were all doing well.
15  Q.  And after the time that that counseling ended, did
16      Amber have any other counseling at all prior to the
17      trip to Beaches in 2015?
18  A.  Yes, part of her probation.
19  Q.  Okay.  So between the time that Amber had counseling
20      at school when she was about nine years old for about
21      a year up until her probation, did she have any other
22      counseling?
23  A.  No.
24  Q.  Okay.  I'm going to talk about the probation shortly,
25      but let me just ask you, you said that your

Page 133

1   ex-husband, Daniel Torralva, was abusive.  Was he
2   physically abusive to you?
3   A.  Yes.
4   Q.  And did you have to seek counseling for that physical
5       abuse?
6   A.  I haven't.  I should.
7   Q.  Did you say you should?
8   A.  Yes.
9   Q.  Are you still suffering the effects of that physical
10      abuse from Mr. Torralva?
11  A.  From the abuse in general, yes, it does affect me.  I
12      know that for a fact it does, but I work a lot, and so
13      before I worked at the Post Office, it was money.  Now
14      I just -- I feel like I need to go but I haven't.
15  Q.  Okay.  And was he also mentally abusive to you?
16  A.  Yes.
17  Q.  Was he mentally abusive to your children?
18  A.  To some extent, yes.
19  Q.  Was he mentally abusive to Amber?
20  A.  Not so much.  She was the youngest one.  He was more
21      mentally abusive to my son, my older son.
22  Q.  And did you prosecute a case against your ex-husband?
23      That's probably a bad question, so I'll withdraw it.
24  A.  Okay.
25  Q.  Did you seek to have the authorities prosecute your

Page 134

1   ex-husband, Mr. Torralva, for the abuse?
2   A.   Other people sought it first, but I added mine because
3        I knew.  My two older daughters had told me.
4   Q.   Who were the other people who sought to prosecute him?
5   A.   Two little girls.  I think it's two or three girls
6        that lived on our street but I babysat them.
7   Q.   So you were providing babysitting services for people
8        in the neighborhood; is that right?
9   A.   Uh-huh.
10  Q.   Yes?
11  A.   Yes.
12  Q.   And during the time that you were babysitting, did
13       your ex-husband, Mr. Torralva, sexually abuse those
14       children?
15  A.   Yes.
16  Q.   So the parents of those children went forward with an
17       action to prosecute him for that abuse?
18  A.   Yes.
19  Q.   And then you joined in that action?
20  A.   Yes, when I found out it was happening to my kids,
21       also.
22  Q.   Now you told us a little bit about your work history
23       and some of what you studied in school.  You talked
24       about studying criminal justice; is that right?
25  A.   Yes.

Page 135

1   Q.   Did you go to college after you -- strike that.
2             Did you graduate from high school?
3   A.   Yes.
4   Q.   Did you go to college after that?
5   A.   Not until I was like -- it was after I got divorced.
6   Q.   And after you got divorced in approximately 2008, you
7        went to college; is that right?
8   A.   Yes.
9   Q.   Where did you go and what did you study?
10  A.   Grand Rapids Community College and criminal justice.
11  Q.   Did you get some sort of degree?
12  A.   Associate's Degree.
13  Q.   This may feel at some times as if we're having a
14       conversation, but it's going to make it hard for the
15       court reporter if we're talking over each other, all
16       right?  So I'll try to let you finish, and if you
17       could try to let me finish, it'll make it go a little
18       bit easier, all right?
19  A.   Okay.
20  Q.   So you got an Associate's Degree in criminal justice?
21  A.   Yes.
22  Q.   Did you go onto any further schooling after that?
23  A.   No.
24  Q.   Did you ever take any jobs in the field of criminal
25       justice?

Page 136

1   A.   No.
2   Q.   Why not?
3   A.   Because I got a job at the Post Office, and they paid
4        more than what the criminal justice was going to pay.
5   Q.   Okay.
6   A.   With better benefits.
7   Q.   And that's where you're working today, right?
8   A.   Yes.
9   Q.   And you mentioned at the time that you went to Jamaica
10       in 2015, you were working at a company called Spectrum
11       Industries; is that right?
12  A.   Yes.
13  Q.   What was your job function at that time?
14  A.   I was -- I had several different names.  A quote
15       assistant, someone would come in and ask for how much
16       it would cost to E-coat something, and I would have to
17       give them -- I had a formula to go through, figure out
18       how much the cost would be, send them back their
19       quote, and then we would get sample parts, and I ran
20       all the sample parts on the floor, also.
21  Q.   Okay.  You mentioned just a few minutes ago Amber's
22       probation.  What year did Amber go on probation?
23  A.   It was the same year we went to Jamaica.
24  Q.   2015?
25  A.   No, I'm sorry, it was 2014.  Sorry about that.

Page 137

1   Q.   Sure, no problem.  Do you remember what time of year
2        it was when she went up --
3   A.   Yes, it was her birthday.
4   Q.   When's her birthday?
5   A.   November 20th.
6             MR. WEGLARZ:  I apologize.  Can we just
7        take a moment?
8             MS. MELVILLE:  Sure.
9             (Off the record at 11:38 a.m.)
10            (Back on the record at 11:41 a.m.)
11            MS. MELVILLE:  And during the break that we
12       just took, I was informed by my co-counsel, Mr. Safra,
13       that Mr. Weglarz has produced a set of three folders
14       that contain pictures from Facebook and other social
15       media outlets relative to a request for production,
16       and we're in the process of reviewing those records.
17       We obviously reserve the right to ask questions about
18       those documents and have the opportunity to fully
19       review them before we close any of the depos we're
20       here for today.
21  BY MS. MELVILLE:
22  Q.   Before the break, ma'am, we were talking about Amber's
23       probation, and I think you said she went on probation
24       on her birthday, November 20th, 2014?
25  A.   Well, that's not when she went on.  That's when she

Page 138

```
1    got in trouble.  So I guess it would be a month or two
2    after that.
3  Q.  Okay.  So let's just step back for a second.  November
4    20th, 2014, your daughter turned 17; is that right?
5  A.  Yes.
6  Q.  And you mentioned she had a group of friends, three
7    other friends that she hung out with.  What were their
8    names?
9  A.  Courtney, Breanna, and Allison.
10 Q.  What are their last names, Courtney?
11 A.  It's Allison McKenna, Brianna Diaz, and I don't
12    remember Courtney's last name.  I want to say Cox but
13    I don't think that's it.
14 Q.  Were these friends from school?
15 A.  From elementary school, from the time I got divorced
16    when I moved into Grandville, so nine years old.
17 Q.  Tell me what happened on November 20th, 2014, where
18    your daughter Amber got in trouble as you say?
19 A.  The school security found marijuana in her car.
20 Q.  Why was the school security looking in her car?
21 A.  Someone turned her in.
22 Q.  Do you know who turned her in?
23 A.  No.  They have an anonymous thing where you get $50 if
24    you turn someone in and they find something.
25 Q.  Did your daughter get suspended from school at that
```

Page 139

```
1    time?
2  A.  I want to say she got suspended for three days I
3    think.  I'm not sure.  I know she got suspended for a
4    certain amount of time.
5  Q.  So I presume the school called the authorities, and
6    police officers came out when they found the
7    marijuana?
8  A.  I don't know if the police was in the office when I
9    went in there or not.  I remember sitting down talking
10    to the principal.  The principal was here, me, and
11    then Amber.  I'm sure they probably did.  She was
12    never handcuffed or taken or anything.
13 Q.  But at some point it went through a court process
14    because she got probation; is that right?
15 A.  Yes.
16 Q.  And that court process happened during the --
17 A.  The beginning of the year.
18 Q.  The beginning of 2015?
19 A.  Yes.
20 Q.  Okay.  And what were the details of her probation; did
21    she have to do community service?
22 A.  I don't know if she did community service.  She would
23    be drug tested when she came in to see the probation
24    officer, and she had to go to counseling.  That was
25    part of the probation, and I think she might have got
```

Page 140

```
1    community service, but I'm not positive on that.
2  Q.  Did you ask her where she got the marijuana from?
3  A.  She said a friend gave it to her.
4  Q.  Which friend?
5  A.  She didn't say.  She wouldn't say.
6  A.  She refused to turn in that friend?
7  A.  Yes.
8  Q.  And I presume you grounded her?
9  A.  Yes.
10 Q.  How long was she grounded?
11 A.  I don't know, two or three months.
12 Q.  Did she have a boyfriend at that time?
13 A.  No.
14 Q.  Had she had a boyfriend prior to this time?
15 A.  No, not to my knowledge.
16 Q.  Okay.  You said she got drug tested during her
17    probation?
18 A.  Yes.
19 Q.  How many times was she drug tested?
20 A.  I don't know if they tested her every time she went in
21    to see her probation officer, but they did come to my
22    house one time.  She always passed.
23 Q.  Do you know how often she had to see her probation
24    officer?
25 A.  I want to say either once a week or once every two
```

Page 141

```
1    weeks, but I'm not positive.
2  Q.  How long was her probation?
3  A.  One year, I think, one or two years.
4  Q.  And she was allowed to travel outside the country?
5  A.  She had to get permission from her probation officer.
6  Q.  Has she been in trouble since this marijuana
7    possession?
8  A.  After Jamaica she got in trouble.
9  Q.  What kind of trouble did she get into after Jamaica?
10 A.  For stealing.
11 Q.  You said stealing?
12 A.  For stealing.
13 Q.  What did she steal?
14 A.  I want to say a phone case.  I'm pretty sure it was a
15    phone case.
16 Q.  Do you recall when this happened?
17 A.  I know it was nice out but I don't remember.
18 Q.  Was it the same year as the trip to Jamaica or the
19    following year?
20 A.  I think it might have been the same year but I'm not
21    -- I don't know.
22 Q.  How did you find out that she had been caught
23    stealing?
24 A.  She told me and she had to go to court for it.
25 Q.  Did she get arrested?
```

Page 142

1  A.  I don't think so.  I think she came home with a paper
2      saying she had to go to court.
3  Q.  Did she tell you who she was with when she did the
4      shoplifting?
5  A.  Yes, a new girl that she didn't hang out with before
6      we went to Jamaica.
7  Q.  What's the name of that girl?
8  A.  I don't think it was Brooke.  I can't think of the
9      girl's name.  I know what she looks like, but I can't
10     think of her name.
11 Q.  Okay.  Is she still friends with her?
12 A.  Yes, they're still friends.  She hangs out with Brooke
13     more than anyone else now, but that girl she does
14     still talk to.
15 Q.  And she didn't know Brooke before what happened in
16     Jamaica?
17 A.  They all went to school, but Amber didn't really start
18     hanging out with Brooke and her friends until after
19     Jamaica.
20 Q.  Okay.  Is Amber currently working?
21 A.  Yes.
22 Q.  Does she go to school?
23 A.  No.  She graduated from high school.
24 Q.  Did she go to college after high school?
25 A.  No.

Page 143

1  Q.  Did you encourage her to go to college?
2  A.  Yes.
3  Q.  Has Amber ever been suspended from high school or
4      school other than the suspension you just talked
5      about?
6  A.  No.
7  Q.  She's never been suspended for a period of ten days?
8  A.  That might have been when they caught her with the
9      marijuana.
10 Q.  Okay.
11 A.  So it must have been two weeks instead of just three
12     days.  I couldn't remember how long she was suspended,
13     but that's the only time that I can recall her ever
14     getting suspended.
15 Q.  Okay.  I want to take you back to what you talked
16     about earlier today in terms of booking the trip.
17          I get distracted easily, ma'am, so I'll
18     just let them finish.
19          MR. WEGLARZ:  Sorry.
20          MS. MELVILLE:  That's okay.
21 BY MS. MELVILLE:
22 Q.  Leading up to your trip to Jamaica, did you ever read
23     any document that contained the word Funjet?  And I'm
24     not talking about what you've seen since you filed
25     this lawsuit.  I'm talking about leading up to the

Page 144

1      trip.
2  A.  So let me ask, is that after I got itineraries from
3      you guys or before?
4  Q.  I'm asking you leading up to your trip, so before you
5      --
6  A.  Before we even booked it, I never even heard of Funjet
7      before then.
8  Q.  Okay.  So let me do this again.  Before you went to
9      Jamaica, had you ever heard of the name Funjet?
10 A.  On my itineraries from the thing, I had Funjet, Mark
11     Travel, and Vacations To Go on different parts of the
12     itineraries.
13 Q.  Itineraries, did you look at those in preparation for
14     your deposition today?
15 A.  I looked at them again, but I read through them before
16     we went because I wanted to make sure what we could
17     and couldn't take on the airplane, and when we were
18     going to go, what airline we were going to take and
19     all that.
20 Q.  And what did you learn when you did that in terms of
21     what you could and couldn't take on the plane?
22 A.  Batteries or something.  I'm trying to think now.
23     Alcohol.  I wanted to know if I bought alcohol in
24     Jamaica, if I could bring it back, which I didn't do
25     that.

Page 145

1  Q.  Why did you want to do that?  I think you told us you
2      don't drink.
3  A.  I don't drink but my fiancee drinks once in a while.
4  Q.  Okay.
5  A.  And I did have maybe five drinks the whole five days
6      we were there, and their rum was pretty smooth.
7      That's why I don't drink is because I don't like the
8      taste of alcohol.
9  Q.  When you say the rum was pretty smooth, what do you
10     mean?
11 A.  You didn't choke on it like some of the stuff you
12     drink over here.
13 Q.  Were you drinking a frozen drink?
14 A.  Most of the drinks were like the Slurpee kind of
15     stuff.
16 Q.  Okay.  And did you find they were pretty easy to
17     drink, so you drank more than one -- strike that.
18          Did you find they were pretty easy to
19     drank, so you drank your one drink pretty quickly?
20 A.  No, I didn't drink it quickly.  You could still taste
21     the alcohol in it.
22 Q.  So you said you looked at itineraries to figure out,
23     number one, what you couldn't bring on the plane and
24     how much alcohol you could bring back?
25 A.  Not how much, just if you could.  I didn't even know

Page 146

1      if it was a possibility.  I looked at it to find out
2      when we were leaving, what airline we were taking,
3      when we were coming back, how much like shampoo,
4      conditioner, how big of bottles you could take on the
5      plane because I hadn't flown for a while before this,
6      so...
7   Q.  Okay.  So you looked at what your arrangements were
8      for your flights then on the itineraries, right?
9   A.  Yes.
10  Q.  And you saw that you were being forwarded information
11      from other companies like, for instance, Delta
12      Airlines, right?
13  A.  It had what Delta said on our flight information right
14      on there.
15  Q.  Okay.  So you were being forwarded your reservations
16      from Delta; is that right?
17  A.  That and for Sandals or Beaches Resort.
18  Q.  So you were being forwarded from your travel agent who
19      you recall as Stetson Arriola, right?
20         MR. WEGLARZ:  Form objection.  Go ahead.
21         THE WITNESS:  I guess that was his name.  I
22      remember hearing that name because it's a different
23      name, but yes, he was a travel agent that Janet spoke
24      to, and the only reason I remember the name is because
25      of his particular name.

Page 147

1   BY MS. MELVILLE:
2   Q.  You remember it today because you looked at those
3      documents within the last couple days, right?
4   A.  Well, I remember Stetson Arriola from when we talked
5      about it from when we were making the reservations
6      because Janet made a joke about that last name.
7   Q.  What did she say?
8   A.  Arriola, that's why his last name stuck in my head.
9   Q.  So she was making a reference to a female body part?
10  A.  Yes, but that's the only reason why that name stuck in
11      my head, because if it would have been a regular name,
12      I probably wouldn't have recognized the name unless I
13      was told it.
14  Q.  Right.  So what do you remember that conversation to
15      be with Janet; she told you that the travel agent's
16      name was Stetson Arriola?
17  A.  She started laughing.  She goes:  Can you imagine
18      having that name?
19         This was years ago, so I don't remember
20      exactly what the words were.
21  Q.  Do you remember where you were when you were having
22      this conversation; were you on the phone, in person?
23  A.  On the phone.
24  Q.  Where were you in the booking process when she had
25      this conversation with you?

Page 148

1   A.  I don't know.  I don't remember.
2   Q.  Had you already paid for some portion of the trip?
3   A.  I don't remember.
4   Q.  Do you remember how you paid?  And when I say how, I
5      mean, did you pay a partial payment and then a later
6      payment?
7   A.  I don't remember.  I think I paid it all at one time
8      but I'm not sure.  I don't remember.
9   Q.  Do you remember whether you used your credit card to
10      pay for the trip?
11  A.  I don't know.  I might have used -- I know I used
12      mine, but I might have also used my fiancee's.  So I'm
13      not sure.  I don't remember.  I know he gave me money
14      to help pay for the trip.
15  Q.  And why didn't he go on the trip with you?
16  A.  Because he doesn't like Jamaica.
17  Q.  He had been there before?
18  A.  No.
19  Q.  How did he know that --
20  A.  He won't go to any Caribbean places.  He doesn't like
21      the Caribbean he says.
22  Q.  Where is he from?
23  A.  Mexico.
24  Q.  Did he tell you what he doesn't like about the
25      Caribbean?

Page 149

1   A.  Yeah, he said he doesn't really particularly like
2      black people.
3   Q.  Okay.  Did he say why?
4   A.  No.  He's got friends but he said he doesn't want to
5      go there.
6   Q.  Okay.  Why didn't you bring any of your other children
7      on the trip?
8   A.  Amber was the only one living at home, and she was
9      going to be graduating the following year.  My three
10      older kids had kids of their own.  They obviously
11      weren't going to be able to go, and my son that's
12      three years older or two-and-a-half years older than
13      Amber didn't really care to go.
14  Q.  Okay.  You don't recall any conversations with
15      Mr. Arriola, do you?
16  A.  No.  I could have talked to him when I paid, but no, I
17      don't know who I talked to.  It's four-and-a-half
18      years ago.
19  Q.  But yet you remember The Mark Travel Corporation and
20      Funjet, right?
21  A.  Because they were in the things.
22  Q.  In the things that you've reviewed the last couple
23      days?
24  A.  Well, I had some, all the paperwork at home, but I
25      just reviewed it the last couple of days before I came

Page 150

1   down here.
2   Q.   Do you remember the name of the company that Stetson
3        Arriola worked for?
4   A.   I think it was Vacations To Go, but you have all three
5        things on it, so I didn't know if they were all one
6        and the same or what because one document would have
7        all three names on it.
8   Q.   That's something you remember from before you went to
9        Jamaica, that the document had all --
10  A.   No, because I didn't really do any of the process.  I
11       was not in the process of making the reservations.
12       Janet did all the leg work, and I just trusted her to
13       do it.
14  Q.   If you could let me get my whole question out, that
15       will make it a bit easier on us both, all right?
16  A.   Okay.
17  Q.   So when you looked at the paperwork before the trip
18       and you saw Delta on there, did you think that
19       Mr. Arriola maybe worked for Delta?
20  A.   No.
21  Q.   Do you remember looking at Mr. Arriola's email address
22       and seeing that it had a vacationstogo.com email
23       address on it?
24  A.   I think so but I'm not positive.
25  Q.   That would likely inform you who his employer was,

Page 151

1        right?
2   A.   Yes.
3   Q.   Not Delta, right?
4   A.   Yes.
5   Q.   Not The Mark Travel Company, right?
6   A.   But their email is in there, also, and you have it
7        throughout the thing, and they're all travel agencies.
8        Delta is not a travel agency.  So if you have three
9        different names of three different travel agencies in
10       there --
11  Q.   You didn't research at that time to figure out who the
12       travel agencies were?
13  A.   No, because I trusted Janet.
14  Q.   So how did you know that the name The Mark Travel
15       Company had to do with a travel agency at that time?
16       And I'm talking about before you went to Jamaica.
17  A.   It says Mark Travel.  I figured travel agency.
18  Q.   It could have been a tour operator though, right?
19  A.   If it said travel operator, I wouldn't think it was.
20  Q.   But you didn't know what it was; you didn't know
21       whether it was a travel agent, a tour operator, or
22       some other company totally wholly unrelated to the
23       itinerary?
24  A.   Since they were sending information with our
25       itinerary, I was assuming, but was I 100% positive,

Page 152

1        no.
2   Q.   Did you ask Janet?
3   A.   I just paid the money to go.  I didn't really pay
4        attention to which travel agency we went through.  I
5        didn't have any part of that.  She chose the resort we
6        went to, and she chose the travel agency, so I just
7        gave her the money for our trip.
8   Q.   Okay.  And did you ever speak to anybody before your
9        trip to Jamaica in relation to your trip from The Mark
10       Travel Company?
11  A.   To pay, I spoke to somebody from somewhere to pay.
12  Q.   Okay.  But do you know that that person worked at The
13       Mark Travel Company?
14  A.   I have no idea.
15  Q.   More likely that you spoke to somebody at Vacations To
16       Go where Stetson Arriola worked?
17            MR. WEGLARZ:  Form objection.
18            THE WITNESS:  I have no idea.  I barely
19       remember -- I know I paid because I went on the trip,
20       but it was over five years ago.
21  BY MS. MELVILLE:
22  Q.   You don't know one way or the other whether you spoke
23       to somebody at The Mark Travel Company; is that right?
24  A.   Yes, I do not know.
25  Q.   And you don't know whether you spoke to someone at

Page 153

1        Funjet; is that right?
2   A.   I do not know.
3   Q.   Okay.  And you don't know who Janet selected as a
4        travel agent; is that right?
5   A.   I knew it was one of the three that was on the
6        paperwork, but I thought they were all three combined
7        together.
8   Q.   Did you talk to her about that?
9   A.   Before we went?
10  Q.   Yes.
11  A.   No.  I wasn't worried about anything.  I thought we
12       were going to go there and have fun, so...
13  Q.   Did you talk to her after the incident in Jamaica
14       about who the travel agent was?
15  A.   No, but we talked about how they switched our things
16       at the last minute but that was it.  We didn't talk
17       about the travel agencies.
18  Q.   Whose idea was it to file this lawsuit?
19  A.   Janet's.
20  Q.   When did she tell you she wanted to file the lawsuit?
21  A.   I don't remember.
22  Q.   Were you initially in favor of filing the lawsuit?
23  A.   I would say yes because I feel like we went someplace
24       that we -- we went someplace thinking that we were
25       going to be safe and have fun, and it turned out

Page 154

1    totally opposite.
2    Q.   Do you think Janet should have done more research into
3         safety in Jamaica before deciding to go to Ocho Rios?
4    A.   No, because at that point you didn't hear about
5         anything going on anyplace.  I never heard anything
6         about Jamaica.  I'm assuming she didn't know anything
7         about anything bad going on in Jamaica or we wouldn't
8         have went there.  We would have went somewhere else.
9    Q.   When did you come up with the rule that the two girls,
10        and when I say the two girls, I mean Paiton and Amber,
11        had to stay together the entire trip in Jamaica?
12   A.   Before we went.
13   Q.   Why did you come up with that rule?
14   A.   Because I always make my girls go in twos, or if
15        they're going someplace, they have to have two or more
16        people in their group.
17   Q.   Why is that?
18   A.   Probably because of the way my ex-husband was, and I
19        don't trust a whole lot of people.
20   Q.   So you've always been nervous about your girls'
21        safety?
22   A.   Yeah.
23   Q.   So you wanted them to travel in twos?
24   A.   Yes.
25   Q.   Okay.  You recounted the day of the incident in

Page 155

1         Jamaica and mentioned that you saw Amber at some point
2         in the night speaking with a male who appeared to work
3         on the property?
4    A.   Yes.
5    Q.   And was she traveling in twos at that point in time?
6    A.   Well, Paiton was maybe 15/20 feet from her.  They were
7         together up until that point.  She just walked away to
8         the bar to get a drink.
9    Q.   That's right, she went to the bar?
10   A.   Yes.
11   Q.   And Amber was speaking to this man by herself?
12   A.   Yes.
13   Q.   And you didn't stop and go over to Amber and tell her
14        --
15   A.   No, because she looked at me and she --
16   Q.   Ma'am, if you can let me please get my question out.
17   A.   Sorry.
18   Q.   You didn't stop and go over and tell Amber, Hey,
19        remember, you got to stick with Paiton, did you?
20   A.   No.
21   Q.   And this is the day -- am I right that this is the day
22        after you had had this conversation on the bus with
23        the bus driver about the Moon Palace purportedly
24        having been a rape hotel I think you described it as?
25   A.   Yes.

Page 156

1    Q.   At this point in the evening --
2         It's in the evening, isn't it?
3    A.   It was probably around 7:30/8:00.  It wasn't that
4         late.
5    Q.   Was it dark already, getting dark?
6    A.   No, it was not dark.
7    Q.   Okay.  You're armed with this knowledge purportedly
8         that there had been a rape at another neighboring
9         hotel; isn't that right?
10   A.   Yes.
11   Q.   And you didn't stop and tell your daughter:  Hey, why
12        are you talking to this gentleman?  Why don't you go
13        over to the bar with Paiton?
14   A.   If Paiton wouldn't have been within talking distance
15        or yelling distance of Amber, I would have said
16        something to them.  They were still -- they could
17        still see each other.  We could see her.  If I thought
18        -- if she still would have been at the hot tub, which
19        is across the resort --
20   Q.   You know what --
21   A.   -- I would have said something.
22             MS. MELVILLE:  Let me stop you there
23        because I'm going to mark Exhibit 2.
24             MARKED FOR IDENTIFICATION:
25             EXHIBIT 2

Page 157

1             Photograph
2             12:04 p.m.
3    BY MS. MELVILLE:
4    Q.   I'm going to hand you what I've marked as Exhibit 2.
5         This is the same exhibit as yesterday.  Do you
6         recognize this?
7    A.   Yes.  Water slides were over here.  They did the -- I
8         recognize this pool because the piano bar was beside
9         this pool.
10   Q.   Here's what I'm going to have you do as we go along.
11        I think where we just were, we were talking about
12        where you saw Amber speaking with the gentleman who
13        looked like he worked at the resort?
14   A.   Yeah, but you can't see it on this picture.
15   Q.   Okay.  Can you just indicate and draw with the pen,
16        circle where it was near?
17   A.   It was on the other side of the hotel.  You can't
18        really see that side.
19   Q.   So on the back side of these rooms here?
20   A.   Yeah, because I'm trying to think of where our
21        particular room was.  I recognize the elevator.  I
22        recognize this is where you went on the banana boat
23        and the pool by the piano bar.
24   Q.   Can you just circle where you're talking about in
25        terms of the piano bar and put a 1 on it.

Page 158

1   A.   Over here, right into this building somewhere.
2   Q.   The piano bar is there, right?
3   A.   Yes.
4   Q.   Where is the hot tub?
5   A.   They were in the hot tub by the pool.
6   Q.   There's several pools, aren't there?
7   A.   Yeah, there's several pools and I'm pretty sure
8        there's several hot tubs.  If I'm correct, because you
9        can't really tell -- if you had a different view, I'd
10       be able to show you, but there was like a bar area,
11       and then the pool was like 20/30 feet from that.
12       There was no wall there.  It was just chairs and
13       everything.
14   Q.   Okay.
15   A.   If the hot tub was on the other side of that pool, but
16       I think there was one up here, and then there was some
17       around a bush.  If she would have been in one of those
18       places where you can't see where Paiton was at, I
19       would have had an issue, but Amber was still in
20       Paiton's line of vision.
21   Q.   Okay.
22   A.   I said just not to go anywhere without the other
23       person, like if you can still see each other, and I
24       think maybe from that end of the table to this end of
25       the table, maybe a little bit further than each other,

Page 159

1        that's still being in the same vicinity, or I would
2        have came up.  If I would have saw either one of the
3        girls completely alone, I would have went up and said,
4        you know, Where is Amber or Where's Paiton.
5   Q.   And when you and Ms. DeSantis left Amber at that
6        point, where did you all go to at that point; were you
7        going back to the room at that point?
8   A.   Can you repeat the question?
9   Q.   Sure.  When you left where Amber was speaking to the
10       gentleman who worked at the resort, where did you go
11       to; did you go back to your room at that point?
12   A.   Janet and I went back to the room.  Paiton and Amber
13       stayed there.
14   Q.   And are you able to determine from that picture of the
15       property where your room was?
16   A.   No, I can't tell.  If I seen the other side of it, I
17       would be able to, but this was all facing the beach,
18       and our rooms were not anywhere in there.
19   Q.   Okay.  Was your room closer to where the courtyards
20       are?
21   A.   If you know which building they served the breakfast
22       in --
23   Q.   Does it look like it was in that area?
24   A.   This might have been, right there, the bar, that's the
25       pool, and that's where they served breakfast, and then

Page 160

1        our room was right here.
2   Q.   So the bar that you've been referring to today is the
3        bar that's closest to where you have breakfast; is
4        that right?
5   A.   Yes.
6   Q.   Okay.  And so your room was off of where the bar was?
7   A.   Right around the corner.
8   Q.   Okay.
9   A.   Our room was almost directly across from the buffet.
10   Q.   And what floor were you on?
11   A.   The first floor I believe.
12   Q.   Ground level or one level up?
13   A.   I think we were ground level.
14   Q.   Am I right that Paiton went to this bar by the
15       breakfast area, is that where she went to?
16   A.   Yeah, and Amber was right there, too.  Amber was still
17       in the bar area.  They were both in the same area.
18   Q.   Okay.  Let me take you back to where you find out that
19       you're no longer going to Moon Palace and you're going
20       to Beaches, okay?
21            How did you find that out?
22   A.   Janet told me.
23   Q.   How did she tell you?
24   A.   She said that they called and said that the
25       construction was not going to be done on Moon Palace,

Page 161

1        so she had to choose, and she said she's sorry but she
2        had to choose on the phone at that moment.  She wasn't
3        able to Google it and see which one is better.  She
4        told me she had asked the guy his opinion which was
5        the better of the two.  I think they gave her two to
6        choose from.  I'm not sure.
7   Q.   My question actually was how did she tell you; were
8        you on the phone together or in person?
9   A.   Sorry.  I misunderstood what you said.  We were on the
10       phone.
11   Q.   Okay.  And did you understand from having looked at
12       the documents that you had received by email from
13       Mr. Arriola at Vacations To Go that you had an
14       opportunity to cancel your reservations for a certain
15       amount of time leading up to the trip?
16   A.   We didn't want to cancel our trip.  We had already
17       taken time off of work.  I had already gotten time
18       approved off for Amber.  We didn't want to have to
19       cancel it and re have to do everything.  It was going
20       to be a big pain.
21   Q.   Certainly.  So when Janet got the call from
22       Mr. Arriola about the change from Moon Palace and Moon
23       Palace not being available, one of the options you all
24       could have taken was to cancel the trip, but that
25       wasn't what you wanted to do; isn't that right?

Page 162

```
 1   A.   I don't know.  She never gave that as an option to me,
 2        but we wouldn't have chose that option because we
 3        already had taken the time off.  We had already paid
 4        at that point, and so we were going to go, and he said
 5        that the one we went to was better, I think, than Moon
 6        Palace.  It was a better value.
 7   Q.   He didn't say that to you; is that right?
 8   A.   No, he didn't say that to me.  I didn't talk to him.
 9   Q.   When you learned on the phone from Janet that you're
10        going to Beaches rather than Moon Palace, you didn't
11        do any research into Beaches, did you?
12   A.   No.  I just relied on Janet, and she said she was told
13        that was a little bit nicer than Moon Palace.
14   Q.   And you didn't even go online to look at the Beaches
15        Resort, did you?
16   A.   No.  I've heard commercials on radio about Beaches and
17        Sandals.  You hear them on TV and radio all the time,
18        so I didn't really -- I didn't check into anything.  I
19        worked a lot of hours to pay for the trip, and I was
20        also a single, well, I'm engaged but Amber is my only
21        child that was living at home, but I also had four
22        other kids that I had to deal with other things.
23   Q.   I understand.
24             MR. SAFRA:  And I object to form.
25   BY MS. MELVILLE:
```

Page 163

```
 1   Q.   You said that you saw advertisements.  Was this prior
 2        to going to Jamaica or since coming back from Jamaica?
 3   A.   I think both.  I think I've seen commercials or heard
 4        commercials on both.  I know since prior you seen them
 5        all the time, but I don't know if I seen them on TV,
 6        but I think I heard them on the radio.
 7             MR. SAFRA:  Objection; asked and answered.
 8        I think the record is already clear what she had seen
 9        before the incident and if it related to this trip at
10        all in terms of advertisements.
11             THE WITNESS:  I didn't look into anything.
12        I relied on Janet.
13   BY MS. MELVILLE:
14   Q.   That's right, you relied on Janet to do that research?
15   A.   Yes, because she was doing it, and she said she would
16        just inform me what she found out.
17   Q.   So you didn't rely on any commercials you may or may
18        not have seen before you went to Jamaica?
19   A.   No.  I just heard it was nice out there.
20   Q.   Is that correct, you didn't rely on any commercials?
21   A.   No, I didn't rely on anything.  I relied on Janet to
22        book it and re-book it.
23   Q.   And you did not rely on any of the commercials you've
24        just mentioned; is that right?
25             MR. WEGLARZ:  Asked and answered.
```

Page 164

```
 1             But go ahead and answer it again.
 2             THE WITNESS:  No, I did not rely on them.
 3   BY MS. MELVILLE:
 4   Q.   Okay.  I think you mentioned that you had worked a lot
 5        of hours to pay for the trip, but you also mentioned
 6        that your fiancee paid for some portion of the trip?
 7   A.   Yes.
 8   Q.   Do you know how much he paid?
 9   A.   He paid for my trip, and I paid for Amber's.
10             MS. MELVILLE:  Why don't we take a break
11        now.
12             (Recess taken at 12:14 p.m.)
13             MARKED FOR IDENTIFICATION:
14             EXHIBIT 3
15             Thumb drive
16             12:14 p.m.
17             MR. SAFRA:  I'm going to mark a thumb drive
18        that was recently provided to us this morning mid
19        deposition around 11:30 a.m. or so that I'll mark as
20        Exhibit 3, and this thumb drive has been identified as
21        containing photographs retrieved from social media of
22        three of the Plaintiffs.  There's three folders on
23        that thumb drive for Paiton, Amber, and Janet, and the
24        photos, themselves, are in their JPEG form.  They're
25        not on a social media such as a screen shot on
```

Page 165

```
 1   Facebook, but that's the manner in which it's
 2   represented that these photos are.
 3             MR. SUAREZ:  This is Luis Suarez, counsel
 4   for The Mark Travel Corporation, and I will just add
 5   that this was produced to us at approximately 11:45
 6   and it's now 12:15.  So we really haven't had the
 7   chance to go through these documents in any meaningful
 8   detail and photographs in any meaningful detail.
 9             MR. SAFRA:  I'd also like to mark, if I
10   could have a sticker for Exhibit 4.  I did do a brief
11   review while counsel was questioning, and I picked a
12   segment of 15 photographs that we'll mark as composite
13   Exhibit 4 that I may ask some questions about when
14   counsel is done.
15             MARKED FOR IDENTIFICATION:
16             EXHIBIT 4
17             Photograph
18             12:16 p.m.
19             MR. SAFRA:  We can take a break now.
20             MR. WEGLARZ:  I need to place something on
21   the record.
22             MR. SAFRA:  Yes, of course.
23             MR. WEGLARZ:  I can represent that these
24   are the photos extracted from the voluminous data we
25   received from, I believe it's from Facebook, and these
```

Page 166

1    are the photos from the Jamaica trip.  There are
2    multiple other photos, but you haven't received those
3    because I haven't gone through all of them, and I can
4    tell you they aren't relevant, but I can tell you that
5    these are the photographs that we are marking as an
6    exhibit.
7              MR. SAFRA:  We're still waiting on other
8    responses from the social media.
9              MR. WEGLARZ:  I'm going through it.
10             MR. SAUREZ:  Can you represent when you
11   received these photographs?
12             MR. WEGLARZ:  I don't know.
13             MR. SAUREZ:  Was it more or less than a
14   month ago?
15             MR. WEGLARZ:  I cannot tell you.  I don't
16   know that right now.
17             MR. SAUREZ:  Can you check for me, please?
18             MR. WEGLARZ:  Sure, but I have other
19   things, also, to attend to.
20             MS. MELVILLE:  We'll take a five-minute
21   break.
22             (Recess taken at 12:17 p.m.)
23             (Back on the record at 12:31 p.m.)
24   BY MS. MELVILLE:
25   Q.   Again, we're going to skip around, and so I apologize

Page 167

1    for that, but I'll try to direct you when I'm moving
2    to a different area.
3              I want to take you back to when you arrived
4    in Montego Bay, okay?
5    A.   Yes.
6    Q.   Did you all get off the plane and go to the little
7    what I'll call holding area for Sandals and Beaches
8    when you arrived?
9    A.   Yes.
10   Q.   How long were you in there?
11   A.   I don't know.  I'm going to guess maybe a half hour.
12   I don't know.  It didn't seem like we were there that
13   long.
14   Q.   And how long had you been traveling that day, five or
15   six hours maybe?
16   A.   I think so.  I don't even know what time our flight
17   left anymore.
18   Q.   Okay.  Do you remember what it looked like in there;
19   can you picture it in your mind?
20   A.   Kind of.  I remember going through Customs or
21   whatever, and then you could get something to drink,
22   and I think you might have been able to get something
23   to eat.
24   Q.   Do you remember them serving alcoholic beverages in
25   that area?

Page 168

1    A.   I'm pretty sure they did.
2    Q.   Did you have a drink while you were there?
3    A.   I was served one but I drank a couple drinks out of
4    it.
5    Q.   Was there actually somebody serving your drink, or was
6    it self service?
7    A.   No.  I think it was self service, I think.  I'm not
8    positive.
9    Q.   Did Ms. DeSantis have a drink?
10   A.   I think we all got something to drink.
11   Q.   And when you say we all got something to drink -- and
12   when I say drink, I mean an alcoholic beverage.
13   A.   I don't know.  I don't know if everyone got an
14   alcoholic beverage then.
15   Q.   Okay.
16   A.   Because I feel like it was still morning.
17   Q.   Did you have alcohol?
18   A.   I think I got one, but I didn't drink it because I
19   didn't like it.  I just took a couple of drinks, but I
20   didn't finish it.
21   Q.   Did Amber have an alcoholic beverage?
22   A.   I'm not sure.
23   Q.   You can't say one way or the other at this point?
24   A.   I can't say one way or another because I don't -- I
25   remember where we were at and everything, but I don't

Page 169

1    remember if she got something or not.
2    Q.   Okay.  And then you got on the bus to Beaches,
3    correct?
4    A.   Yes.
5    Q.   And that ride is about an hour and 45 minutes or so;
6    is that right?
7    A.   Somewhere around there.
8    Q.   Did you guys stop before you got to the resort?
9    A.   Yes.
10   Q.   Did you stop at a place that has a bar at it?
11   A.   I don't think so.  We bought food.
12   Q.   You bought food there?
13   A.   Yes.
14   Q.   Do you remember whether Amber had an alcoholic
15   beverage there?
16   A.   I don't think so.  I don't know if they served alcohol
17   there.
18   Q.   Okay.  When you got to --
19   A.   They got jerk chicken.  That's all I remember.
20   Q.   You guys ate jerk chicken at the rest stop?
21   A.   Yes, wherever we stopped at.
22   Q.   And then when you got to the Beaches Hotel, did you
23   arrive and have to spend some time in the lobby area?
24   A.   Yes.
25   Q.   How long was that wait?

Page 170

1   A.   A while.  I don't know how long but we were there for
2        a while.
3   Q.   Were you offered champagne at that point or sparkling
4        wine.
5   A.   I don't know.  I don't remember drinking any.
6   Q.   Do you remember Amber having an alcoholic beverage
7        while you were waiting to get your room?
8   A.   No, I don't remember.
9   Q.   Okay.
10                    MARKED FOR IDENTIFICATION:
11                    EXHIBIT 5
12                    On Resort Guest Registration
13                    12:35 p.m.
14  BY MS. MELVILLE:
15  Q.   I've marked as Exhibit Number 5 the resort guest
16       registration, and I'm going to ask you to turn to the
17       page marked JD0033; do you see that at the bottom
18       right corner?
19  A.   Yes.
20  Q.   Up near the middle of the page it has your name
21       Margaret Torralva?
22  A.   Yes.
23  Q.   And it says signed 2015 May 05 at 14:58 Eastern
24       Daylight Time; do you see that?
25  A.   Yes.

Page 171

1   Q.   Is that your signature to the right there?
2   A.   What you can see of it, yes.
3   Q.   It does appear to be your signature?
4   A.   Yes.
5   Q.   Okay.  Right below that, is that your daughter's name,
6        Amber Torralva?
7   A.   Yes.
8   Q.   Is that her signature as you recognize it?
9   A.   What you can see of it I'm assuming, yes.
10  Q.   And I know you had testified regarding what you signed
11       when you got to the hotel.  You're not contesting that
12       this is your signature, though, right?
13  A.   No.
14  Q.   And you're not contesting that this is your daughter's
15       signature, are you?
16  A.   No.
17  Q.   And do you know what Ms. DeSantis's signature looks
18       like?
19  A.   I'm assuming that's probably hers.  I don't know.  It
20       looks like a little bit of scribbling, but like I
21       said, all their equipment was messed up.
22  Q.   And I'm just asking you whether that's their
23       signatures there.  That's simply what I'm asking,
24       okay?
25  A.   I guess so.

Page 172

1   Q.   You're not sure as to Ms. DeSantis?
2   A.   I would say yes.
3   Q.   Okay.  And how about for Paiton Bater?
4   A.   I would say yes.
5   Q.   That appears to be her signature there?
6   A.   I would say yes.
7   Q.   Did you witness your daughter sign at the hotel?
8   A.   Yes.
9   Q.   Did you witness Paiton Bater sign at the hotel?
10  A.   I was standing right there.  I don't know if I watched
11       her sign.
12  Q.   Did you witness Ms. DeSantis sign at the hotel?
13  A.   I was standing there but I didn't physically watch her
14       write her name.
15  Q.   But you did physically see Amber your daughter sign;
16       is that right?
17  A.   She was standing next to me.
18  Q.   Okay.  You can put that aside.
19            Leading up to the trip to Jamaica, did you
20       have any emails between you and Janet leading to the
21       trip?
22  A.   I don't know if I got emails from her or not.
23  Q.   Okay.
24  A.   We talked on the phone a lot.
25  Q.   Did you all text about the trip prior to it?

Page 173

1   A.   I don't know.  I remember talking a lot.  I don't know
2        if we texted at all or not.  We could have.
3   Q.   And how about after the trip, did you talk with Janet
4        DeSantis about what had happened on the trip?
5   A.   I don't know.  I think when we did talk, it was
6        usually on the phone.  I'd rather talk on the phone
7        than text.
8   Q.   Okay.  Do you recall having any emails with Janet from
9        2015 to today related to what happened in Jamaica?
10  A.   Yes.
11  Q.   Okay.  Have you produced those emails to your
12       attorney?
13  A.   No.  Janet might have but I haven't.
14  Q.   And this is a new email address, right?
15  A.   No.  This was back with my GRCC email.  I don't have
16       access to it anymore.
17  Q.   What email do you have today?
18  A.   Maggie.torralva@gmail.com.
19  Q.   And have you sent emails to anyone related to what
20       happened to your daughter Amber in Jamaica using that
21       new email address other than your attorney?
22  A.   And Jenna which works for him.
23  Q.   Okay.  So no emails between you and Amber about what
24       happened?
25  A.   No.

Page 174

1   Q.   Do you not email your daughter?
2   A.   No, I don't ever email her.
3   Q.   Okay.  No emails with Janet on this new email address?
4   A.   I don't think so.  I don't think so.
5   Q.   Is it possible there could be?
6   A.   I guess there's a possibility whether it would be like
7        about -- if there is any, it would be having to do
8        with the criminal trial.
9   Q.   Okay.  And would it be easy for you to just go in and
10       search through your emails to see if you have any such
11       emails?
12  A.   From Janet?  Yeah, I could.
13  Q.   Maybe on a break you could do that?
14  A.   Yeah.
15  Q.   If you could, I would appreciate it, and then if you
16       could turn them over to your attorney so we can get
17       copies of them.
18  A.   I honestly don't know if I have any or not.
19  Q.   I'm just asking that you take the step to look and see
20       if you do.
21  A.   Okay.
22  Q.   How about your daughter, does she prefer to speak on
23       the phone, or do you text her?
24  A.   I'd rather speak on the phone, so the majority of the
25       time I talk to her.  I don't like texting.

Page 175

1   Q.   Does she text you?
2   A.   Like if she's not going to come home at night or if
3        she's going to be late or something, she'll text me if
4        she's at work.
5   Q.   Do you know whether you have any texts with her about
6        what happened in Jamaica?
7   A.   No, I would have never texted her over the phone.
8   Q.   Why not?
9   A.   Because it was hard enough to deal with it.  We don't
10       really talk about it, so I don't never text her.
11  Q.   You said you don't really --
12  A.   I text her but I don't remember ever texting her about
13       anything that happened.
14  Q.   Okay.  And you said it's hard enough to talk about.
15       When was the last time you spoke with your daughter
16       Amber about what happened in Jamaica?
17  A.   When we found out we were going to have to go to Miami
18       for a deposition, but then the girls ended up not
19       going.
20  Q.   And when was that; was it sometime this year?
21  A.   Yes, it was like August or September.
22  Q.   And how did this conversation take place where you
23       talked to Amber about what happened in Jamaica?
24  A.   Do you want to know the context of the conversation?
25  Q.   I want to know how it took place in terms of --

Page 176

1   A.   Face-to-face.
2   Q.   So were you guys at home?
3   A.   Yes.
4   Q.   And how long was the conversation?
5   A.   Maybe 15 minutes.
6   Q.   Okay.  And what was the content of the conversation?
7   A.   I told her that we got a call, and at that point all
8        four of us were going to have to go down and give a
9        deposition, and her response is the normal one.  She
10       doesn't like doing it because it brings up everything
11       that happened, and she's trying to put it behind her.
12  Q.   Is she not in favor of going forward with this
13       lawsuit?
14  A.   I don't know exactly what her feelings are on it
15       because I had told her before if she wants to drop the
16       lawsuit, she can, and she's never said she did.
17  Q.   Okay.  Did you talk about, during this 15-minute
18       conversation, about her potentially dropping the
19       lawsuit so she didn't have to go forward with a
20       deposition?
21  A.   At the end of the conversation, like if you get to the
22       point where you don't want to do this anymore, you can
23       drop out because it's her right.  It happened to her,
24       so...
25  Q.   Okay.  And if she dropped out, would you drop out of

Page 177

1        the lawsuit, also?
2   A.   I don't know.  I don't even know how that would go
3        about, so I never really questioned or thought about
4        it.
5   Q.   Okay.  What else did you talk about in terms of what
6        happened in Jamaica during this 15-minute
7        conversation?
8   A.   I told her what I thought they were going to ask.
9   Q.   At the deposition?
10  A.   Yes.
11  Q.   And what did you tell her?
12  A.   That mainly they were going to ask -- well, to my
13       understanding, I told her that they were probably
14       going to ask her what happened and she was going to
15       have to tell them, and that was about it.  I didn't go
16       into detail about anything.  She didn't really ask a
17       whole lot of questions.
18  Q.   And that was the last time you spoke with Amber about
19       what happened in Jamaica; is that right?
20  A.   Yes.
21  Q.   Have you spoken to her within the last couple days
22       leading up to the deposition about the deposition
23       process and what's she's going to have to talk to the
24       lawyers about today?
25  A.   She knew she was going to have to relive the

Page 178

1   experience.  I told her she might have to tell them
2   that.  I said besides that, I didn't know what you
3   guys were going to ask.
4   Q.  You mentioned earlier today that when you saw
5       Ms. DeSantis yesterday, she washed your daughter's
6       hair.  Why did she do that?
7   A.  My daughter has really thick curly hair.  She has a
8       problem even when she washes it that the top of her
9       hair looks oily.  She had washed her hair yesterday
10      morning, and her hair still looked oily.
11              Janet had a cosmetology license.  She said:
12      Well, are you sure you're getting the soap out?
13              And Amber is like:  Yeah, I think so.
14              Janet washed it and she said:  You've got
15      to wash your hair twice because your hair is thick and
16      long, and you've got to make sure it suds up really
17      good to get all of the oils out of your hair.
18              That is why she washed it.
19  Q.  How long did that process take?
20  A.  At least 15 minutes, 10/15 minutes to wash it, rinse
21      it and everything.
22  Q.  And prior to going to Jamaica, what was your
23      relationship like with Amber?
24  A.  It was good.  She's a teenage daughter.  She had
25      gotten into trouble.  She got in trouble for it, but

Page 179

1   she is overall a good kid.  She wasn't disrespectful
2   to me.
3   Q.  Okay.  And after when you came back from Jamaica, so
4       between the time you returned from Jamaica and today,
5       what has your relationship been like with Amber?
6   A.  We still have a pretty good relationship.  I seen her
7       make choices that I don't agree with afterwards.
8   Q.  What choices are those?
9   A.  Choice of friends.
10  Q.  Anything else?
11  A.  No, just she wasn't the same person she used to be.
12  Q.  In what way?
13  A.  Before she was always goofing off, happy-go-lucky,
14      always laughing, always making funny faces, and she's
15      not so much that person anymore.  She's getting back
16      to that point, but when we first came back, she was
17      very reserved and didn't -- I think she didn't finish
18      school the rest of that week when we got back, and she
19      just wasn't the happy person she used to be.
20  Q.  When you said she's getting back to where she used to
21      be recently?
22  A.  It seems like she's happy more often.
23  Q.  And how do you think she's been able to get to that
24      point where she's now happy more often?
25  A.  Counseling, I think counseling did her a great, helped

Page 180

1   her a great deal.
2   Q.  Is she still in counseling?
3   A.  Yes.
4   Q.  Were there any friends that Amber had before the trip
5       to Jamaica that you didn't like?
6   A.  The main friends that I knew about were Allison,
7       Courtney, and Brianna, and I liked all four of those
8       girls.
9   Q.  Were there some other fringe friends that you thought
10      might be causing her some trouble, maybe the person
11      that gave her the marijuana?
12  A.  Yeah, the ones that she started hanging out with
13      afterwards, yeah, they tended to be a wilder group
14      than what Amber used to hang out with.
15  Q.  Amber got in trouble with marijuana possession before
16      the trip, right?
17  A.  Yes, but she just met a couple of those girls but she
18      wasn't really hanging out with them a whole lot.  She
19      was still mainly friends with Allison, Courtney, and
20      Brianna.
21  Q.  And did you ever come to learn who the girl was or the
22      person was that gave her the marijuana?
23  A.  No, she never told.
24  Q.  Okay.  Have there been any other choices that you
25      haven't told me about that you don't agree with?  You

Page 181

1   said that Amber has made some choices since you got
2   back from Jamaica.  Is there anything else we haven't
3   discussed?
4   A.  After we got back, she started drinking more.
5   Q.  When you say drinking more, do you mean drinking
6       alcohol?
7   A.  Yes, and I wasn't really aware of her drinking before,
8       so, and I never really caught her.  Now she's over 21,
9       so now I know she drinks occasionally, but I never
10      really caught her, but I can assume that she was, and
11      I talked to her counselor about her attitude at least
12      once.
13  Q.  And prior to the trip to Jamaica, did you keep alcohol
14      in the house?
15  A.  No, I don't.  We don't keep alcohol in our house.
16  Q.  Prior to the trip?
17  A.  Prior to the trip.
18  Q.  Why not?
19  A.  Because my boyfriend doesn't drink a whole lot.  I
20      don't really drink a whole lot, and if we do drink,
21      it's usually at a function that we're going to, and I
22      don't really like the taste of alcohol.
23  Q.  Prior to the trip, had you ever been in Amber's
24      presence where she was drinking an alcoholic beverage?
25  A.  Prior to the trip?

Page 182

1   Q.   Yes.
2   A.   No.
3   Q.   Okay.  And when you went to Jamaica, foreign country,
4        why didn't you advise your daughter not to drink
5        alcohol at all during the trip?
6   A.   I told her I preferred her not to.
7   Q.   Okay.  And you're her mother and she's 17 years old.
8        Did you ever at any point during the trip advise
9        anyone at the Beaches Resort that she shouldn't have
10       alcohol, they shouldn't serve her alcohol?
11  A.   No, I never talked to any of the people.
12  Q.   You testified earlier today that she was served
13       alcohol in your presence during the trip; isn't that
14       right?
15  A.   Yes, she was served alcohol at least once in my
16       presence.
17  Q.   And you didn't --
18  A.   I didn't want her to --
19  Q.   Ma'am, let me finish my question, please.  I'm sorry.
20            MR. WEGLARZ:  Maybe she's also trying to
21       also finish her answer.
22            MS. MELVILLE:  Thank you for that, Todd.
23            I'll give you the chance to answer.  Let me
24       get my question out, all right?
25            MR. WEGLARZ:  Same objection then.  I mean,

Page 183

1        I know you may be talking over each other, but I still
2        think she should be entitled to get out the rest of
3        her answer, just as you should be entitled to get out
4        the rest of your question.
5            MS. MELVILLE:  Absolutely.  I completely
6        agree.
7   BY MS. MELVILLE:
8   Q.   So, ma'am, my question is this:  At any time when you
9        saw someone at the Beaches property serve your
10       under-age daughter alcohol, did you stop them and say,
11       Excuse me, my daughter is under age, please do not
12       serve her alcohol?
13  A.   No, I did not.
14  Q.   You could have done that; isn't that right?
15  A.   Yes, I could have.
16  Q.   And you could have enforced your rule with your
17       under-age daughter and told her, You can't have
18       alcohol, right?
19  A.   Yes.
20  Q.   Okay.  Are you aware of whether during the trip Amber
21       smoked marijuana while at the Beaches property?
22  A.   No, I'm not aware of that, and I don't think she did.
23  Q.   Did you ask her whether she did?
24  A.   Yes, and she said no.
25  Q.   When did you first ask her whether she smoked

Page 184

1        marijuana during the trip?
2   A.   After everything happened.
3   Q.   During the trip at any time did you ask her whether
4        she smoked marijuana?
5   A.   No.
6   Q.   Okay.  Did you ever ask Paiton whether Paiton during
7        the trip smoked marijuana?
8   A.   No.
9   Q.   Did Amber ever to your knowledge eat any brownies that
10       had marijuana in them?
11  A.   No.
12  Q.   Do you know if Amber during the trip had any pot
13       gummies or gummy candies that had marijuana in them?
14  A.   No, she did not.
15  Q.   How do you know for certain that she didn't have any
16       gummies with marijuana in them?
17  A.   First of all, she wouldn't be able to get them on the
18       plane.  Second of all, she was going to be drug tested
19       Saturday morning.  There was no way she was going to
20       take a chance because part of the deal with the
21       probation officer was, yes, she could go to Jamaica,
22       but if she tested positive on anything, she was going
23       to jail.  So there's no way she was going to take that
24       chance.
25  Q.   And how did you know that?

Page 185

1   A.   Because she told me when she came back because she had
2        to ask for permission to go.
3   Q.   When you say Saturday, you mean the Saturday following
4        the trip?
5   A.   The Saturday we got home, she had to go see her
6        probation officer, and they were going to drug test
7        her that morning because we were supposed to be home,
8        I think, before noon.
9   Q.   How about Paiton, do you know whether Paiton had any
10       brownies that had marijuana in them during the trip?
11  A.   Not as far as I know.  I never saw them with that.
12       They did take a picture with a guy on the side of the
13       road, but that was it, and they thought it was funny,
14       that's why.
15  Q.   Do you know if Paiton ever had any pot gummies while
16       she was on the trip?
17  A.   Not as far as I know.  I never seen anything.
18  Q.   You mentioned some pictures and why don't we do that
19       now.  I'm going to hand you what's marked as Exhibit
20       Number 4.
21            Why don't we number this first one as
22       number 1, and do you have a pen?  If you can just put
23       a 1 on it, that'll make it easier for us.
24            Do you recognize everyone in this picture?
25  A.   Yes.

Page 186

1  Q.  Starting from left to right, who is on the left?
2  A.  Amber, Paiton, Janet, and then me.
3  Q.  Amber, Paiton, Janet?
4  A.  And me.
5  Q.  Where is this photo taken?
6  A.  On the side of a pool at a bar counter.
7  Q.  Which pool is it on the property?
8  A.  It's the one that's over by that bar, if I'm correct.
9      You can't see it in here.
10 Q.  Is it close to the breakfast area?
11 A.  Yes.
12 Q.  Okay.  Do you recall what day this was?
13 A.  If I'm correct, I think it was the first day.
14 Q.  So the first afternoon?
15 A.  I think so.  I couldn't be positive because you can't
16     really tell.  We're all in our bathing suits.
17 Q.  Okay.  You said Amber?
18 A.  Yes.
19 Q.  Does Amber have a beverage in front of her?
20 A.  Yes.
21 Q.  Is that an alcoholic beverage to your recollection?
22 A.  I would assume, yes.
23 Q.  Do you know what type of drink it was, pina colada?
24 A.  No idea.
25 Q.  Does Paiton have a drink?

Page 187

1  A.  Yes.
2  Q.  Is it an alcoholic beverage?
3  A.  I'm assuming, yes.
4  Q.  And then there's a drink next to you; is that right?
5  A.  Yes.
6  Q.  Is that an alcoholic beverage?
7  A.  I'm assuming, yes.
8  Q.  Do you remember what you were drinking?
9  A.  No.
10 Q.  All right.  Let's turn to the next page which we'll
11     mark at the bottom number 2, and I'm going to do the
12     same thing with you here.  Tell me who's on the left?
13 A.  Amber, Paiton.
14 Q.  Okay.  Is that a tattoo on Paiton?
15 A.  Yes.
16 Q.  Do you know where this picture is taken?
17 A.  No.  I'm assuming it's the bar but it could be -- I
18     don't know which one.
19 Q.  Okay.  And the people next to Amber and Paiton, do you
20     recognize them?
21 A.  No.  They're not us.
22 Q.  Okay.  Does Amber have an alcoholic beverage in front
23     of her?
24 A.  Yes.
25 Q.  Do you know when this picture was taken?

Page 188

1  A.  No.
2  Q.  And is this the bar that's right by the breakfast
3      area?  If you look, you see the railing in the back.
4  A.  I have no idea.
5  Q.  Okay.  Did you say you didn't know -- do you recall
6      which day this was?
7  A.  I don't know which day it was.
8  Q.  Okay.  Let's go to the next page.  We'll mark this as
9      number 3.  Who's in this picture?
10 A.  Amber.
11 Q.  And is she drinking an alcoholic beverage?
12 A.  Yes.
13 Q.  Do you know what day this was taken?
14 A.  No.
15 Q.  Let's go to the next page.
16 A.  Do you want me to number each of them, so 3?
17 Q.  Yes, that's 3.  This is number 4.  Who's in that
18     picture?
19 A.  Amber.
20 Q.  Do you know where this was taken?
21 A.  Yes.
22 Q.  Where?
23 A.  At the Italian restaurant that we all went to I think
24     the second or third day.  I'm not sure which day.
25 Q.  It's an enclosed restaurant; is that right?

Page 189

1  A.  Yes.
2  Q.  Does Amber have an alcoholic beverage in front of her?
3  A.  I'm not sure if she had alcohol in that one or not
4      because we're getting ready to eat dinner.
5  Q.  Did you take this picture?
6  A.  I think Janet did.  I don't know.
7  Q.  Okay.  Let's go to the next one.  We'll mark number 5
8      on it.  Again, who's on the left?
9  A.  Amber.
10 Q.  And then on the right?
11 A.  Paiton.
12 Q.  Where is this one taken?
13 A.  I think it's at the bar by the pool.
14 Q.  Right next to the breakfast area?
15 A.  Yes.
16 Q.  Okay.
17         MR. WEGLARZ:  What page is this?
18         MS. MELVILLE:  Number 5.
19 BY MS. MELVILLE:
20 Q.  And is it Amber and Paiton again?
21 A.  Yes.
22 Q.  So Amber is on the left and Paiton is on the right,
23     correct?
24 A.  Yes.
25 Q.  Does Amber have an alcoholic beverage in her hand?

Page 190

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Does Paiton have one? |
| 3 | A. | Yes. |
| 4 | Q. | Do you know what day this was? |
| 5 | A. | No. |
| 6 | Q. | It's actually the evening time, isn't it? |
| 7 | A. | Yes, it's nighttime but I don't know which night it |
| 8 | | was. |
| 9 | Q. | Okay.  Is there anybody you recognize behind them? |
| 10 | | There's some other people in the picture. |
| 11 | A. | No. |
| 12 | Q. | You don't recognize them? |
| 13 | A. | No. |
| 14 | Q. | Were you around when this picture was taken? |
| 15 | A. | We were probably at the pool area even if it was |
| 16 | | nighttime.  Janet might have taken the picture but I |
| 17 | | didn't. |
| 18 | Q. | So you don't really know who took the photo; is that |
| 19 | | right? |
| 20 | A. | No, I don't know who took it. |
| 21 | Q. | Okay.  Let's go to the next page which we'll mark as |
| 22 | | number 6.  Tell me who's on the left. |
| 23 | A. | Amber. |
| 24 | Q. | And who's on the right? |
| 25 | A. | Me. |

Page 191

| | | |
|---|---|---|
| 1 | Q. | Where is this picture taken, do you know? |
| 2 | A. | It's at the same bar thing in the pool. |
| 3 | Q. | The pool by the breakfast area? |
| 4 | A. | Yes. |
| 5 | Q. | Do you know what day this was? |
| 6 | A. | No.  We were wearing the same bathing suit, so it |
| 7 | | might have been the first day because I had like three |
| 8 | | bathing suits and so did Amber. |
| 9 | Q. | Does Amber have an alcoholic beverage in front of her? |
| 10 | A. | Yes. |
| 11 | Q. | Do you have an alcoholic beverage? |
| 12 | A. | Yeah, but it could have been the same ones from the |
| 13 | | first one. |
| 14 | Q. | I know you anticipate where I'm going, but if you |
| 15 | | could let me get the whole question out, I'd |
| 16 | | appreciate it, all right? |
| 17 | | So it looks like both of you have alcoholic |
| 18 | | beverages in front of you; is that right? |
| 19 | A. | Yes. |
| 20 | Q. | Let's turn the page and mark this as number 7.  Who is |
| 21 | | that? |
| 22 | A. | That's Amber. |
| 23 | Q. | Do you know where this was taken? |
| 24 | A. | I think it was in the bathroom. |
| 25 | Q. | Bathroom by the beach? |

Page 192

| | | |
|---|---|---|
| 1 | A. | No, by the hotel or not the hotel but I think, if I'm |
| 2 | | correct, it's the one by the restaurant, the breakfast |
| 3 | | area and restaurant area I think, but I'm not |
| 4 | | positive. |
| 5 | Q. | Do you know who took this picture? |
| 6 | A. | I think Janet did. |
| 7 | Q. | Do you know what day this is? |
| 8 | A. | Maybe Thursday night maybe. |
| 9 | Q. | Did your daughter get -- |
| 10 | A. | I think she got her face painted on Thursday. |
| 11 | Q. | And I appreciate that you knew where I was going. |
| 12 | A. | Sorry. |
| 13 | Q. | Does your daughter have an alcoholic beverage in her |
| 14 | | hand? |
| 15 | A. | I'm assuming so. |
| 16 | Q. | Where did your daughter get her face painted? |
| 17 | A. | By the pool. |
| 18 | Q. | Okay.  And you think this was in the evening time? |
| 19 | A. | I think she had her face painted around like maybe 4 |
| 20 | | or 5:00.  I'm not sure. |
| 21 | Q. | And forgive me, I don't recall asking this on this |
| 22 | | particular photo, but does Amber have an alcoholic |
| 23 | | beverage in her hand? |
| 24 | A. | I'm assuming so. |
| 25 | Q. | She appears to be drinking in the picture? |

Page 193

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Let's go to the next page. |
| 3 | A. | What page was that? |
| 4 | Q. | That was 7.  We'll mark this next one as number 8. |
| 5 | | Who's in the picture here? |
| 6 | A. | Paiton and Amber. |
| 7 | Q. | Paiton on the left, Amber on the right? |
| 8 | A. | Yeah. |
| 9 | Q. | Do you know where this was taken? |
| 10 | A. | Yep, it was back behind our rooms.  So we might have |
| 11 | | been on the second floor.  I remember we had to go |
| 12 | | back behind unless we went out the slider doors but if |
| 13 | | you wanted to go in the handle door.  So it was on the |
| 14 | | other side of our rooms. |
| 15 | Q. | Do you remember what day this was that this was taken? |
| 16 | A. | Maybe it had to be Wednesday or Thursday. |
| 17 | Q. | Why did it have to be one of those two days? |
| 18 | A. | Because Friday we were gone all day. |
| 19 | Q. | Friday you were gone all day where? |
| 20 | A. | Hang on a second.  I don't think it was the first day. |
| 21 | | So that was Tuesday, we went to the blue hole on |
| 22 | | Thursday, so maybe Wednesday or Thursday when we went |
| 23 | | to the blue hole.  I don't know. |
| 24 | Q. | Were you around when this picture was taken? |
| 25 | A. | Yes, I think Janet took the picture.  We were with |

Page 194

```
 1      them.  We were walking back to our room, and they seen
 2      that sign.
 3   Q. And it looks like they picked up the sign; is that
 4      right?
 5   A. Yes.
 6   Q. Was it in the ground and they picked it up?
 7   A. I think they had it in like something, a hole or
 8      something that wasn't stuck in the ground, I think.
 9   Q. And what does the sign say on it?
10   A. One love.
11   Q. And does that mean anything to you?
12   A. No.
13   Q. Did your daughter Amber like Bob Marley's music?
14   A. Somewhat I guess.  I don't know.  She doesn't really
15      listen to Bob Marley.  I've heard his music before,
16      but...
17   Q. Was Paiton a Bob Marley fan?
18   A. As far as I know, yes, she liked Bob Marley.
19   Q. Okay.  Let's turn to the next picture, number 9 we'll
20      mark it.  Do you know who that is in the bottom
21      underneath the sink?
22   A. I'm pretty sure it was Paiton.
23   Q. Do you know when this was taken?
24   A. I think it was the same night we went to the Italian
25      restaurant, but I don't know which night that was.
```

Page 195

```
 1   Q. The Italian restaurant, the picture we saw a few
 2      minutes ago; is that right?
 3   A. Yes, when all four of us went.
 4   Q. Do you know who took this picture?
 5   A. I think Amber did.
 6   Q. Did you ever ask why she was crouched -- let me strike
 7      that.
 8          Have you ever seen this picture before
 9      today?
10   A. Yes.
11   Q. Did you ever ask why Paiton was crouching down
12      underneath the sink?
13   A. Yeah.  She was goofing off.  She was hiding.
14   Q. Hiding from?
15   A. I don't know.  I think she was going to try to scare
16      her mom or something.  She was just goofing off.
17   Q. Were you all in the bathroom together?
18   A. They went in before us.
19   Q. Where is this bathroom?
20   A. It's somewhere between the restaurant and where we got
21      breakfast at.
22   Q. Between the Italian restaurant and the breakfast
23      restaurant?
24   A. Yes, I think that's where it's at.  I'm not positive
25      that's where it's at.
```

Page 196

```
 1   Q. Is that an alcoholic beverage on the counter there?
 2   A. I'm assuming.  I know they drank some drinks without
 3      alcohol in them every single time.  So, yes, that's a
 4      drink on the counter.  Do I know it has alcohol in it?
 5      No, I don't know that for sure.
 6   Q. Do you know if at this time Paiton was acting goofy
 7      because she had had a couple drinks and was a little
 8      bit inebriated?
 9          MR. WEGLARZ:  Form; calls for speculation.
10          THE WITNESS:  I don't know.  I think she
11      was just having fun.
12   BY MS. MELVILLE:
13   Q. But she could have been inebriated at the time?
14          MR. WEGLARZ:  Same objection.
15          THE WITNESS:  I don't know.
16   BY MS. MELVILLE:
17   Q. Let's go to the next page we'll mark as number 10.
18      Have you seen this picture before?
19   A. Yes.
20   Q. Okay.  Where is this?
21   A. This was at the black hole or blue hole, whatever it's
22      called.
23   Q. How far is the blue hole from the Beaches Resort?
24   A. I don't know.  It was a little bit of a drive, but I
25      don't know how far.
```

Page 197

```
 1   Q. Okay.  Who's in the picture?
 2   A. Our tour guide, the one that helped us get up the
 3      waterfall before he jumped off of it.
 4   Q. Okay.  And who else is in the picture?
 5   A. Amber.
 6   Q. The waterfall is not in this picture, though, right?
 7   A. No.  We're still climbing up it.  You had the rope
 8      that you could jump into the water, and then you go
 9      out and come back in, and then you climb up some more
10      and literally jump off the waterfall.
11   Q. Is this tour guide the same tour guide that drove the
12      bus?
13   A. No.
14   Q. Somebody else?
15   A. Yes.
16   Q. Do you remember what his name was?
17   A. No, I don't.
18   Q. How long were you at the blue hole?
19   A. I don't know.  I don't know how long it took us to get
20      up there, maybe a couple hours, because I know we
21      jumped off the waterfall, and then we went into a
22      cave.  A couple hours maybe.
23   Q. How high was the waterfall that you jumped off?
24   A. I don't know.
25   Q. Did everyone jump?
```

Page 198

1  A.   Yes.
2  Q.   When I say everyone, I mean you, Paiton, Amber, and
3       Ms. DeSantis?
4  A.   Yes.
5  Q.   Okay.  Did anyone, during the time that you were at
6       the blue hole, did any of the four of you have any
7       alcoholic beverages?
8  A.   No, I don't think they served anything.  I don't think
9       we had anything besides water.
10 Q.   Let's turn the page, and we'll mark this next one as
11      number 11.  Who's in the picture here starting from
12      left to right?
13 A.   Paiton, I don't know his name, and Amber.
14 Q.   Was that the tour guide?
15 A.   Yes.
16 Q.   Is it taken at the blue hole?
17 A.   I think so.
18 Q.   Is it possible it was taken somewhere else?
19 A.   I don't know.  It looks like our tour guide, but I
20      couldn't be 100% positive.
21 Q.   When was this taken?
22 A.   I'm assuming if it's the young man from the tour
23      guide, it would have been at the blue hole if it's
24      him.
25 Q.   Can you say whether this is before or after the

Page 199

1       incident at Beaches?
2  A.   It was definitely before.
3  Q.   How do you know it was definitely before?
4  A.   Because the incident happened Friday night, and we
5       left Saturday morning, and we were at the police
6       station, the hospital, and then went to a different
7       resort.
8  Q.   Did this tour guide go with you, meet you at the
9       Beaches property?
10 A.   He picked us up, I think, at the Beaches property --
11      oh, no, no, no -- sorry.  I'm getting confused.
12           The bus driver picked us up there.  I don't
13      know if that's the guy from the blue hole or not.  I'm
14      not sure.  If it's the guy from the blue hole, it
15      would be at the blue hole.
16 Q.   And the man that's in picture number 11 is the same
17      man that's in picture number 10, is that right, at
18      least according to the shirt?
19 A.   Yes.  So that would have been at the blue hole.
20 Q.   Okay.  And let's turn the page to the next one we'll
21      mark as number 12.  Do you recognize this picture?
22 A.   Yes, it was right before we were getting on the bus to
23      leave, I think.
24 Q.   And who's in the picture from left to right?
25 A.   Paiton, the guide, and Amber.

Page 200

1  Q.   Okay.  And is the bus featured in this picture?
2  A.   No.
3  Q.   Okay.  We'll mark the next one as number 13.  It
4       appears to be another shot; is that right?
5  A.   Yes.
6  Q.   Do you recognize these as pictures that were posted
7       onto one of the girls' Facebook pages?
8  A.   I don't know.  I don't even think I'm friends with
9       Amber on Facebook, so I don't know what's on her
10      Facebook.
11 Q.   Do you have Facebook?
12 A.   Yes.  I don't post anything on Facebook.
13 Q.   How come you're not friends with your daughter on
14      Facebook?
15 A.   I don't know.  I never really requested it.  When I
16      took her phone when she'd get in trouble, I'd just go
17      through everything on her phone, so...
18 Q.   So the times that she would get in trouble, you'd take
19      her phone from her?
20 A.   Yeah, best punishment for a teenager.
21 Q.   I know that too well.  So you'd go through photos on
22      her phone when she'd get in trouble?
23 A.   Yeah, I'd go through everything on her phone.
24 Q.   Text messages?
25 A.   Some text messages but not all but I would go through

Page 201

1       her photos.
2  Q.   Did you go through Amber's phone after the incident in
3       Jamaica?
4  A.   No, because the Jamaican police had it.
5  Q.   And did they eventually give it back to you?
6  A.   Yes.
7  Q.   When they gave it back to you, did you go through her
8       phone?
9  A.   No, I did not.
10 Q.   Why not?
11 A.   Because we were dealing with everything and we were
12      going home, and I just never ended up asking to go
13      through it.
14 Q.   Okay.  Again on this picture that's marked number 13,
15      this is Paiton, the tour guide, and then Amber, is
16      that right, from left to right?
17 A.   Yes.
18 Q.   Go to the next page and we'll mark it as number 14.
19      Who's in that picture?
20 A.   Amber.
21 Q.   Who's the next person?
22 A.   Some guy that was selling brownies on the side of the
23      road when we were going to the black hole, and Amber
24      asked if I'd let her take a picture.
25 Q.   She asked if the guide would let her take a picture?

Page 202

1  A.   The guy was driving the bus, the bus driver, the
2       guide, and he stopped because this guy was in the
3       middle of the road, and Amber is like, Can I take a
4       picture?  Because she thought it was funny.
5  Q.   The bus driver and the guide who took you up the falls
6       are two different people, is that right, or are they
7       the same person?
8  A.   The guide that went up the waterfall with us is a
9       different person than the guy that drove us there.  We
10      had a bus driver that was our guide through there, and
11      he also took us downtown, but the guy that walked up
12      the waterfall, that would be a different person.
13 Q.   Okay.  And the man that we've seen in these pictures
14      is the guy that took you up the falls, correct?
15 A.   The guy that took us up the falls.
16 Q.   Correct?
17 A.   Yes.
18 Q.   Take me back to number 14.  Was this picture taken
19      before or after you went to the blue hole?
20 A.   On the way.
21 Q.   On the way to and so Amber looks out the window and
22      sees what?
23 A.   Sees him standing on the side of the road and they
24      started laughing, and Amber is like:  Can I take a
25      picture?

Page 203

1            And I said:  No, Amber, you're not getting
2       off the bus.
3            The bus driver said it was safe, she can
4       take a picture.
5  Q.   And you trusted the bus driver?
6  A.   Yes, because at that point we felt safe there.
7  Q.   You're outside the resort, aren't you?
8  A.   Yes, but we had a tour guide, someone that worked in
9       the industry, and he said he took people from
10      different resorts to like the blue hole or whatever.
11      We weren't by ourselves.
12 Q.   How long did you stop for?
13 A.   A few minutes.
14 Q.   How far into the trip were you when Amber saw this man
15      on the side of the road?
16 A.   I think we were over halfway there I think.  I don't
17      know.  I don't remember.
18 Q.   And did Amber Instagram this picture or put this
19      picture on Facebook?
20 A.   Probably.  I would assume she probably did.
21           MR. WEGLARZ:  Form objection.
22           You can continue your answer.
23 BY MS. MELVILLE:
24 Q.   Keep going.
25 A.   She probably did because she thought it was funny.

Page 204

1  Q.   Was she concerned that maybe her parole officer might
2       see this picture?
3           MR. WEGLARZ:  Form; calls for speculation.
4           Go ahead.
5           THE WITNESS:  No, because she knew she was
6       going to pass the test.  She can't get in trouble for
7       a picture.
8  BY MS. MELVILLE:
9  Q.   And this picture says brownies on it, right?
10 A.   Yes.
11 Q.   With a marijuana leaf; is that right?
12 A.   Yes.
13 Q.   And then there are what appear to be from the picture
14      brownies in them, right?
15 A.   Yes, but there is no way I would let her buy anything
16      from the side of the road from somebody.  I just let
17      her take the picture.
18 Q.   Okay.  Did Amber think this picture was funny?
19 A.   Yes, she did.
20 Q.   Were you unhappy about that?
21 A.   I didn't really appreciate the picture.  I don't know
22      if you can see the number on this but it is on there.
23 Q.   That was number 14.  We'll turn to the next page, and
24      we'll mark this as number 15, and this is another shot
25      of Amber and the man from the side of the road; is

Page 205

1       that right?
2  A.   Yes.
3  Q.   And it appears to be a different picture because the
4       tray of what would appear to be pot brownies is turned
5       a different direction; do you see that?
6  A.   Yes.
7  Q.   And tell me, how long did it take for Amber to get
8       these shots with this man?
9  A.   Not very long.  I don't know for sure how long.  We
10      weren't stopped very long at all.
11 Q.   And who took the picture?
12 A.   I think it was Paiton, but I'm not sure, Paiton, maybe
13      Janet.
14 Q.   Do you think Janet would have taken the picture?
15 A.   I don't know.  I don't think I took it because I
16      didn't like the picture and I don't have it on my
17      phone, so it wouldn't have been me.  So I don't know
18      who took the picture.
19 Q.   Do you know if Amber gave, and I'm switching topics
20      again, gave the guide from the blue hole her Facebook
21      page?
22 A.   Not to my knowledge.
23 Q.   Do you know if she gave -- do you know if Amber gave
24      the guide from the blue hole her Instagram handle?
25 A.   Not to my knowledge.

Page 206

1  Q.  Does Amber have Instagram?
2  A.  She does now.  I don't know if she did then.
3  Q.  Does she have any other form of social media like
4      Snapchat?
5  A.  I think she has Snapchat.
6  Q.  Do you know what her name is in Snapchat?
7  A.  No.
8  Q.  What's her name on Instagram?
9  A.  I don't know.  I think it might -- I don't know if
10     that's her or Angelea, Mystical Flower maybe.
11 Q.  And what does that stand for, Mystical Flower, do you
12     know?
13 A.  No.  She has like a lot of like crystals and stuff.  I
14     don't know.  I don't know what Mystical Flower stands
15     for.  I don't know.
16 Q.  Do you know what name she goes by on Facebook?
17 A.  Amber Torralva.
18 Q.  Okay.  Do you know if Amber gave the guy from the blue
19     hole her phone number?
20 A.  Not to my knowledge.
21 Q.  How long did the Jamaican police have Amber's phone?
22 A.  From the morning after, Friday night/Saturday morning,
23     until we left.  I think we left Thursday.  So she got
24     it back after the trial thing.  So we left that same
25     day, I think.  So Thursday, five days.

Page 207

1  Q.  And what was the trial thing that you're referring to?
2  A.  The arraignment for the three young men.
3  Q.  Do you know if the police copied anything from her
4      phone?
5  A.  I'm assuming they did.  I don't know.
6  Q.  Okay.  Does Amber still have the same phone?
7  A.  No.
8  Q.  Did you preserve that phone?
9  A.  No.  She dropped it in either the toilet or something.
10     It got wet and so that phone -- she had to get a new
11     phone.  She's had several phones since then, and she's
12     either broken them or dropped them in water or
13     something.
14 Q.  And you mentioned a little while ago that when Amber
15     gets in trouble, you take her phone away from her and
16     you go through the phone.  How many times have you
17     done that?
18 A.  I think twice.
19 Q.  Did you do that when she was caught with marijuana?
20 A.  No, I did not.  I took her phone but I didn't go
21     through it.
22 Q.  When was the last time you took her phone and went
23     through it?
24 A.  I don't remember.
25 Q.  What was the reason for taking her phone and going

Page 208

1      through it the two times that you did; what were the
2      reasons?
3  A.  Her attitude.
4  Q.  Did she have a bad attitude with you?
5  A.  At times she didn't want to listen to whatever I was
6      telling her.  I don't even remember what the reason
7      was, but she was being argumentative, and it was
8      before she got her license.
9  Q.  Before she got what license?
10 A.  Her driver's license or I would take her car.
11 Q.  How old was she when she got her driver's license?
12 A.  Sixteen.
13 Q.  So before she turned 16, on two occasions you took her
14     phone away from her and went through it; is that
15     right?
16 A.  Yes.
17 Q.  Did you find anything of concern on Amber's phone
18     during the two times you took it away and went through
19     it?
20 A.  No, not really.  She was still talking to the same
21     friends.  I didn't find anything really incriminating,
22     but just her knowing that I took her phone from her
23     would make her mad.
24 Q.  And how long did you take the phone away from her
25     those two times?

Page 209

1  A.  I don't know.  It was years and years ago.
2  Q.  Okay.  You talked about the trips that you've been
3      to --
4           And I'm switching subjects again, ma'am.
5      Are you doing all right?
6  A.  Yeah, I'm fine.
7           MS. MELVILLE:  We're going to take a break.
8           (Recess taken at 1:19 p.m.)
9           MARKED FOR IDENTIFICATION:
10          EXHIBIT 6
11          Jenison Psychological Services, PC
12          Social History Assessment
13          2:02 p.m.
14          (Back on the record at 2:02 p.m.)
15 BY MS. MELVILLE:
16 Q.  Ma'am, are you okay to proceed?
17 A.  Yes.
18 Q.  Okay.  I'm going to hand you what I've now marked as
19     Exhibit Number 6.  Up on the top of the document, it
20     says Jenison Psychological Services; do you see that?
21 A.  Yes.
22 Q.  Do you recognize that name?
23 A.  Yes.
24 Q.  Is that where Amber has had mental health treatment?
25 A.  Yes.

Page 210

1  Q.  What's the date of the document, do you see it?
2  A.  6-8-2015.
3  Q.  Okay.  And is Amber's name on the document?
4  A.  Yes.
5  Q.  And that's her date of birth, correct, 11-20-1997?
6  A.  Yes.
7  Q.  If we turn to the third page, if you just flip three
8      pages, that's going to be easiest because it's not
9      properly marked.  Do you see under the third, well,
10     the second full paragraph there where it says:  Amber
11     stated that she used marijuana.
12             Do you see that?
13 A.  Okay.
14 Q.  Just go ahead and read that to yourself, that
15     paragraph, and then I'll ask you some questions about
16     it.
17 A.  Yes, I read it.
18 Q.  Did you understand that on June 8, 2015, Amber
19     represented to the mental health worker that she was
20     saying that she wanted to get a medical marijuana
21     card?
22 A.  I see that.  I read that, yes, right now.
23 Q.  Is this the first time that you're learning that Amber
24     wanted to get a medical marijuana card?
25 A.  She had mentioned something maybe a couple months ago

Page 211

1      but that was it.  Back at that time, no, I did not.
2  Q.  And when did she mention to you that she wanted to get
3      a medical marijuana card?
4  A.  I don't know, within the last year.
5  Q.  Forgive my ignorance but is marijuana for medical
6      purposes allowed here in Michigan?
7  A.  Marijuana is legal in Michigan.
8  Q.  Okay.
9  A.  It wasn't in 2015.
10 Q.  It was not in 2015?
11 A.  No.  Medical marijuana was but not --
12 Q.  Okay.  And when she mentioned medical marijuana, a
13     medical marijuana card to you in the last couple
14     months, how did you respond?
15 A.  It was like in the last year.  I didn't -- she's over
16     18, so I didn't -- I asked her if she really thinks
17     she needed it.
18 Q.  Okay.
19 A.  I think that's my response.
20 Q.  And what did she say?
21 A.  She said:  Yes, for anxiety.
22 Q.  And she also said that she's got back pain.  What was
23     her back pain from, do you know?
24 A.  I don't know.  When she was younger, she did complain
25     about her back hurting a lot.  I don't know what it

Page 212

1      was caused from.
2  Q.  To your knowledge, Amber's back pain wasn't caused by
3      anything that happened at the Beaches Resort in
4      Jamaica; is that right?
5  A.  I don't think so, no.
6  Q.  And that was a double negative.  Let me rephrase the
7      question, ma'am.
8  A.  Sorry.
9  Q.  You're not aware of any back injury that Amber
10     suffered while at the Beaches Resort in Jamaica, are
11     you?
12 A.  No, I'm not aware of that.
13 Q.  Okay.  Now the first sentence of this paragraph
14     states:  Amber stated that she used marijuana.
15             And this is June of 2015.  Do you see that?
16 A.  Yes.
17 Q.  So she's telling her therapist at this point in time,
18     just about a month after the incident, that she uses
19     marijuana.  Did you understand that at the time?
20 A.  I know she used marijuana before she got in trouble,
21     but to my knowledge, she hadn't used it while she was
22     on probation because she was drug tested.  So to my
23     knowledge, I did not know.  I knew she used it before
24     because she got in trouble before we went to Jamaica.
25 Q.  Okay.  And is it your understanding -- strike that.

Page 213

1              And your understanding is that she used it
2      more than just the one time where she was found with
3      it in her car; is that right?
4  A.  My assumption is, yes, she did because why would she
5      have it in her car?
6  Q.  Do you have a family history of depression and
7      anxiety?
8  A.  Anxiety and depression, on my side of the family I
9      have both, my sisters and my mom.
10 Q.  And how about yourself?
11 A.  I've never been diagnosed with anxiety or depression.
12 Q.  And I know we talked about --
13 A.  Except for situational.
14 Q.  Okay.  When were you diagnosed with situational
15     depression?
16 A.  After the rape.
17 Q.  After the incident in Jamaica?
18 A.  Yes.
19 Q.  Okay.  Were you ever diagnosed with depression after
20     your ex-husband, after the details of what your
21     ex-husband had done to the neighborhood children
22     and/or your children came to light?
23 A.  I went to the doctor, but I was never prescribed
24     anything for depression or anything because I was
25     still functioning.  I was still working.  So I don't

Page 214

1   know how to answer that question.
2   Q.   Which doctor did you go to?
3   A.   Way back then, it would have been Dr. Breitweiser
4        because it would have been under my old doctor.
5   Q.   How long did you go to that doctor?
6   A.   I did not go for counseling.  I went there because a
7        friend of mine told me I should go to the doctor and
8        get checked out because I wasn't eating.
9   Q.   Okay.  And I know you said you didn't get any medicine
10       for depression.  Did you get any medicine at all from
11       that doctor?
12  A.   No.
13  Q.   Did you ever get any, prior to going on the trip to
14       Jamaica, did you ever take any medication related to
15       anxiety or depression or to help you with trouble
16       sleeping?
17  A.   Not that I can recall, except Melatonin.
18  Q.   So you never took Xanax prior to going to Jamaica?
19  A.   Not to my knowledge.  I think I took one of Janet's to
20       sleep after it happened, but no, I never was
21       prescribed anything like that.
22  Q.   And you never took Klonopin prior to going to Jamaica?
23  A.   No.
24  Q.   Okay.  And you mentioned today that you take a
25       medicine to help you sleep?

Page 215

1   A.   Trazodone.
2   Q.   Did you ever take Trazodone prior to going to Jamaica?
3   A.   No.  They said that medicine is for depression, but
4        they said that they use it more for a sleep aid
5        because it didn't really help for depression.  That's
6        what Dr. Breitweiser had told me.
7   Q.   Prior to going to Jamaica, did you throughout your
8        life ever have trouble sleeping?
9   A.   When I was on a different shift, like a third shift or
10       something like that.
11  Q.   Tell me what you mean by that.
12  A.   When you go to work at 3:30 in the morning, you have
13       trouble sleeping.
14  Q.   And when were you going to work at 3:30 in the
15       morning?
16  A.   After I got divorced.
17  Q.   And that was in 2008?
18  A.   2007 or 2008, I can't remember.  I don't know exactly
19       which year it was.  I would have to do the math.
20  Q.   And how long did you have to do a third shift where
21       you're waking up that early and going to work?
22  A.   I want to say six months, maybe a year, because then I
23       still worked for the same place but I got on the day
24       shift at 8:00, but I don't know the exact amount.
25  Q.   Did you have to take anything to help you sleep during

Page 216

1        that time period?
2   A.   I would either take Melatonin or over-the-counter
3        sleeping pills.
4   Q.   Did you stop taking the Melatonin and over-the-counter
5        sleeping pills when you got on a regular shift?
6   A.   Yes, unless I was just having a really bad night where
7        I tossed and turned a lot, but then it was typically
8        just Melatonin.
9   Q.   And you said you didn't take the Trazodone last night.
10       Why not?
11  A.   Because it makes you really groggy, and I didn't want
12       to be in here and be tired.
13  Q.   Talking about right now, how often a week do you
14       generally take the Trazodone?
15  A.   Typically every day unless I have to get up early in
16       the morning because I work second shift.  So I don't
17       have to get up.
18  Q.   Tell me what second shift means.
19  A.   2 p.m. to 10 p.m. or later.
20  Q.   Okay.  So the Trazodone doesn't interfere with you
21       getting to work because you're getting up later; is
22       that right?
23  A.   Yes.
24  Q.   Are there any other side effects that you can report
25       from taking the Trazodone?

Page 217

1   A.   Just makes me really groggy for like the first couple
2        hours when I wake up, and that's why I don't take it
3        if I have an appointment in the morning.
4   Q.   And is the Trazodone for depression or is it for
5        sleeping?
6   A.   Sleeping.
7   Q.   Are you taking anything currently for depression?
8   A.   No.
9   Q.   Since you came back from Jamaica in 2015, did you take
10       anything from 2015 to today for depression?
11  A.   They prescribed me Klonopin for, I think, anxiety and
12       depression, I'm not sure, and I was on Klonopin for
13       three months maybe, maybe six months.  It wasn't very
14       long.  They said it's addictive.
15  Q.   When you said "they," who is "they"?
16  A.   The doctor's office said it's an addictive medication,
17       so they didn't want to keep me on it.
18  Q.   Was this a therapist or just a regular doctor?
19  A.   Regular doctor.
20  Q.   Did you go to therapy after you came back from
21       Jamaica?
22  A.   No.
23  Q.   And you said you were on Klonopin for about three
24       months?
25  A.   I think it was three months.  I'm not sure how long.

Page 218

1   Q.   Did you take it daily, or was it just when necessary?
2   A.   Daily just every day.
3   Q.   Did you feel any side-effects from taking the
4        Klonopin?
5   A.   No.  It helped me sleep at night.
6   Q.   Okay.  Are you sleeping all right at night now?
7   A.   I was up until we had to come over here.
8   Q.   Did you not get a good night's sleep last night?
9   A.   No.
10  Q.   And the night before did you sleep okay?
11  A.   No.
12  Q.   I'm switching topics again.
13  A.   Okay.
14  Q.   How much marijuana was Amber caught with in her car?
15  A.   I don't know.
16  Q.   If you turn to the fifth page of this document --
17  A.   Okay, so after the third, just count two more?
18  Q.   That's correct.  It should say Education; do you see
19       that?
20  A.   Yes.
21  Q.   If you go three paragraphs down, Amber was suspended,
22       do you see that?
23  A.   Yes.
24  Q.   Go ahead and read that sentence.
25  A.   Amber was suspended --

Page 219

1   Q.   You can read it to yourself.
2   A.   Oh, okay.
3            Yes.
4   Q.   Do you recall Amber being suspended during her first
5        semester of 11th grade?
6   A.   Yeah, that would be when she got caught with the
7        marijuana in her car.
8   Q.   And you're not aware of her, of Amber being suspended
9        at any other time; is that right?
10  A.   I'm not aware of it.
11  Q.   When the marijuana was found in Amber's car, was Amber
12       in the car?
13  A.   No.  She was in class.
14  Q.   Okay.
15  A.   Can I say something on that?  They pulled her out of
16       class to search her car, so she was standing there,
17       but she was not in her car.
18            MARKED FOR IDENTIFICATION:
19            EXHIBIT 7
20            Answers to Interrogatories
21            2:15 p.m.
22            MS. MELVILLE:  I'm going to hand you what I
23       marked as Exhibit Number 7.
24            Mr. Weglarz, this is what you gave us
25       either this morning or last night, the interrogatory

Page 220

1        responses.  Do you have another copy?  I have the one
2        that Luis wrote on.
3            MR. WEGLARZ:  I don't.  I'll just look at
4        Margaret's here.  That's fine.  I can see it from
5        here.
6   BY MS. MELVILLE:
7   Q.   Ma'am, just take a minute to go through that document,
8        and then I'll ask you some questions about it, all
9        right?
10           Is this the first time you're seeing this
11       document?
12  A.   Yes.
13  Q.   Okay.  These were given to us by your counsel, and
14       they are your Answers to Interrogatories, which are
15       questions that we propounded to you, and I'm just
16       going to go through some of them and ask you if
17       they're accurate, all right?
18  A.   Okay.
19  Q.   The first one, we just talked about the medicines
20       you're on.  You're not currently taking Zoloft; is
21       that right?
22  A.   That's right.
23  Q.   And you're not currently taking Klonopin; is that
24       right?
25  A.   That's right.

Page 221

1   Q.   Okay.  So if you look at that answer, this answer is
2        not accurate, is it?
3            MR. WEGLARZ:  Well, which one?
4            MS. MELVILLE:  The first one.
5            MR. WEGLARZ:  I want to make sure we're
6        clear.
7            I object to the form, especially with
8        respect to how you premised the question but go ahead.
9   BY MS. MELVILLE:
10  Q.   This answer is not accurate, is it?
11           MR. WEGLARZ:  Make sure you read the
12       question and the answer.
13           THE WITNESS:  The top part, the Zoloft and
14       Klonopin, is not correct because I don't take those
15       now.
16  BY MS. MELVILLE:
17  Q.   And if you turn to the next page, you'll see that
18       under answer number 3 where it says, Plaintiff also
19       estimates her future medical expenses as follows,
20       counseling every other week, you're not currently
21       going to counseling, are you?
22  A.   No.
23  Q.   And you never went to counseling; isn't that right?
24  A.   That's correct.
25  Q.   And then monthly medications, you're not currently on

Page 222

1     Xanax or Zoloft, right?
2  A.  Correct.
3            MS. MELVILLE:  Medical management by an
4     M.D., which likely stands for a doctor, is that right,
5     Mr. Weglarz?
6            MR. WEGLARZ:  Yes, MD does stand for
7     medical doctor.
8  BY MS. MELVILLE:
9  Q.  Are you currently seeing a doctor for anything you
10     claim occurred to you medically from the incident in
11     Jamaica?
12  A.  No, but I was going to be going to him when I get
13     back.
14  Q.  Who is that?
15  A.  Dr. Breitweiser.
16  Q.  We stepped over each other, and that was probably my
17     fault, so I apologize.  Dr. Breitweiser?
18  A.  Yes.
19  Q.  He's your primary care?
20  A.  Yes.
21  Q.  Do you have insurance?
22  A.  Yes.
23  Q.  Does it pay for your trips to Dr. Breitweiser to see
24     him?
25  A.  Except the co-pay.

Page 223

1  Q.  How much is your co-pay?
2  A.  $30 I think.  I think it's $30.
3  Q.  How often do you see Dr. Breitweiser?
4  A.  I don't know, a couple times a year.
5  Q.  When did you last see him?
6  A.  Sometime in the summer.
7  Q.  This summer?
8  A.  This past summer.
9  Q.  Was it related to any injury you claim you suffered as
10     a result of --
11  A.  No.  Sorry.
12  Q.  So you didn't see Dr. Breitweiser in the summer as a
13     result of anything that happened while you were in
14     Jamaica; is that right?
15  A.  That's right.
16  Q.  Why did you go to Dr. Breitweiser in the summer?
17  A.  Because I'm anemic.
18  Q.  Okay.  And I've had the opportunity to look at some of
19     your medical records as well, and I saw that you had
20     recently an incident relating to breast cancer?
21  A.  Seven years ago.  I think it was seven years ago.  It
22     was six or seven years ago.
23  Q.  When that happened, did you suffer any mental trauma
24     related to your diagnosis?
25  A.  No.  I just dealt with it.

Page 224

1  Q.  When you go back to Dr. Breitweiser, do you have a
2     visit currently scheduled with him?
3  A.  Not with him, no.
4  Q.  You have it scheduled with another doctor?
5  A.  I have an appointment coming up, but it has nothing to
6     do with this.
7  Q.  Okay.  It has something to do with some other ailment?
8  A.  Yes, yes.
9  Q.  Okay.  Is it counseling or is it --
10  A.  No.
11  Q.  Tell me, ma'am, after the incident in Jamaica, did you
12     suffer any health impacts at all?
13  A.  Where you go to the doctor or can you elaborate on
14     that question?
15  Q.  Well, if you look at -- strike that.
16            Have you had any stomach issues as a result
17     of the incident in Jamaica?
18  A.  Sick to my stomach, not being able to sleep,
19     nightmares.
20  Q.  Okay.  And let me just parse those out.  So you said
21     you were sick to your stomach?
22  A.  Yes, I didn't eat a lot.
23  Q.  Did you have to take any medication for that?
24  A.  No.
25  Q.  How long did that last?

Page 225

1  A.  A couple of months.
2  Q.  Did you lose weight?
3  A.  Yeah, not a significant amount but I lost weight.
4  Q.  Did you see a doctor for that?
5  A.  No, I did not.
6  Q.  And what's the next thing you felt after coming back
7     from Jamaica?
8  A.  Couldn't sleep, nightmares.
9  Q.  Have the nightmares ceased?
10  A.  Yes, but every time we have to deal with stuff,
11     everything will come back.
12  Q.  So when you say every time you have to deal with
13     stuff, are you talking about dealing with the incident
14     in Jamaica in terms of the criminal case?
15  A.  That and the deposition, just anything that reminds me
16     of the case.
17  Q.  So you'll have a couple nights of nightmares and then
18     it'll go away?
19  A.  The nightmares will go away if I focus on something
20     positive when I go to sleep, but like sick to my
21     stomach and not being able to sleep will last for a
22     while.
23  Q.  And when you say a while, what do you mean, a week to
24     ten days?
25  A.  Anywhere from a couple weeks to a couple months.

Page 226

1   Q.   Anything else that you felt since coming back from
2        Jamaica?
3   A.   Not that I can think of.
4   Q.   Is there anything that you used to do before you went
5        to Jamaica that you can not do anymore since returning
6        from Jamaica?
7   A.   That I cannot or won't?
8   Q.   Let's parse it out, that you can not do?
9   A.   I can't go to sleep easily.
10  Q.   Anything else?
11  A.   I worry more about my kids when they go out or go do
12       something, especially my daughters, but those are the
13       two main things.
14  Q.   Is there anything that you won't do?
15  A.   I won't travel outside the country by myself or with
16       just women again.
17  Q.   And you mentioned, and I'm going to switch topics
18       again, you mentioned that your fiancee did not go on
19       the trip because he doesn't like the Caribbean?
20  A.   Yes.
21  Q.   Did he talk to you at the time that you told him, I'm
22       going to go on a trip with Janet, Amber, and Paiton,
23       did he talk to you about any safety concerns he had
24       about you doing that?
25  A.   No.  He just said to have fun.

Page 227

1   Q.   Okay.  And before going to Jamaica, you understood
2        that -- you had told us earlier that you had gone to
3        Tijuana, right?
4   A.   Yes, when I was young.
5   Q.   And during that trip, you were concerned about your
6        safety in Tijuana; isn't that right?
7   A.   Not really.  I was 17, 18, 19 years old.  I don't even
8        think I was 19.  I was 17 or 18.  No.
9   Q.   Before going to Jamaica you, as you warned your
10       daughter, not to go off the premises, right?
11  A.   Yes.
12  Q.   You warned her that she didn't want to go to the
13       hospital in a foreign country; is that right?
14  A.   Yes.
15  Q.   You warned her that she needed to always stay in twos
16       with Paiton; isn't that right?
17  A.   Yes.
18  Q.   So you understood there were certain safety concerns
19       with going to Jamaica which was a foreign country?
20  A.   No.  That was just I do that even here because of the
21       way my ex-husband was.  There's always safety in
22       numbers.  There's more safety in numbers, and I've
23       always pushed that with all of my kids, and so no, I
24       did not know that it was not safe.  It was just I
25       don't trust people, and being in a different country,

Page 228

1        you don't want to deal with the medical or the legal
2        side of any foreign country.
3   Q.   Did you also advise your daughter Amber that it would
4        be important to have her wits about her when she was
5        in a foreign country and not to drink too much or do
6        any illegal drugs?
7   A.   I told her -- I didn't tell her she couldn't do
8        illegal drugs because her probation officer had.  Yes,
9        I did tell her to make sure if she drank, to make sure
10       she had her wits about her, to be functioning, to be
11       completely functioning.
12  Q.   Do you think there were times during the trip that
13       Amber didn't completely have her wits about her
14       because of the fact that she had had some alcoholic
15       beverages?
16  A.   I never seen her out of control.
17  Q.   And I think there's a difference between being out of
18       control and not having your wits about you.  Do you
19       think that Amber got to the point where she didn't
20       necessarily have her wits about her because she had
21       had some alcoholic beverages during the trip?
22  A.   I don't know.
23  Q.   Are you familiar with a boyfriend that Amber had by
24       the name of Heusto?
25  A.   Heusto.

Page 229

1   Q.   When was Heusto Amber's boyfriend?
2   A.   After Jamaica.
3   Q.   How did she meet Heusto?  Can you spell that for us,
4        ma'am.
5   A.   I think it starts with a J but I'm not sure.
6   Q.   Do you know where he's from?
7   A.   I think Puerto Rico maybe.  I don't know of him but
8        his family.  He went to Grandville schools, so he had
9        to live in Grandville School District.
10  Q.   Is that where Amber was going to school at the time?
11  A.   Yes.
12  Q.   And I think you told us earlier, and I'm jumping
13       around again and I'm sorry, that the trip to Jamaica
14       was a graduation present for Amber; is that right?
15  A.   An early one.
16  Q.   Okay.  When did she graduate from high school?
17  A.   The following fall, or not the fall, the following
18       year in May.  So it was a year after Jamaica.
19  Q.   And was that the regularly scheduled time, it would
20       have been the regularly scheduled time that she would
21       graduate, right?
22  A.   Yes, she graduated on time.
23  Q.   So when she came back from Jamaica, you're saying she
24       met Heusto for the first time in high school?
25  A.   I'm sure she knew him, but I don't think she dated him

Page 230

1   until afterwards.  I never seen him at my house.
2              MARKED FOR IDENTIFICATION:
3              EXHIBIT 8
4              Jenison Psychological Services
5              Progress Note
6              2:30 p.m.
7   BY MS. MELVILLE:
8   Q.   I'm handing you Exhibit 8.  Have you seen this before?
9   A.   No.
10  Q.   If you look at the top of the document, it says
11       Jenison Psychological Services?
12  A.   Yes.
13  Q.   And it says:  Client Amber Torralva?
14  A.   Yes.
15  Q.   And the date of service is what?
16  A.   8-13-15.
17  Q.   And if you look down under client's clinical status,
18       stop there.  8-13-15 is about three months after the
19       incident in Jamaica; is that right?
20  A.   Yes.
21  Q.   If you look down under the client's current clinical
22       status, it says:  Amber reports that she and her
23       former boyfriend had hooked up at a party.
24              Do you see that?
25  A.   No.  Which one is underneath, the clinical part or the

Page 231

1       --
2   Q.   Where it starts client's current clinical status.
3   A.   Okay, yeah.
4   Q.   And then it says:  She thought they were
5       getting back together.
6              Do you see that?
7   A.   Yeah, I can barely read it but yes.
8   Q.   And he told her that not only did he have a new
9       girlfriend but she is three months pregnant.
10             Do you see that?
11  A.   Yes.
12  Q.   Do you understand that the former boyfriend they're
13       talking about here is Heusto?
14  A.   Yes, I'm assuming so because Heusto had a girlfriend
15       she found out was pregnant, three months along.
16  Q.   Right, and if you go back three months from the date
17       of this, this is Jamaica, right, just about?
18  A.   But it doesn't say that she hooked up with him three
19       months ago.  She found out his girlfriend was three
20       months pregnant.
21  Q.   Here's what I'm asking, ma'am.  I'm just trying to get
22       a timeline for when Heusto was Amber's boyfriend.
23  A.   As far as I knew, it was after we got back.
24  Q.   Okay.  Is it possible that she didn't tell you about
25       Heusto until after you got back?

Page 232

1   A.   Anything is possible, I guess, but I didn't know about
2       him until after Jamaica.
3   Q.   Okay.  We can put that one away.  I've got another
4       one.
5   A.   I remember her telling me his girlfriend was three
6       months pregnant.  She told me after we got back that
7       she had slept with him.  So she had slept with him
8       after we got back from Jamaica.
9              MS. MELVILLE:  I'm going to hand what I'm
10             going to mark as Exhibit Number 9.
11             MARKED FOR IDENTIFICATION:
12             EXHIBIT 9
13             Jenison Psychological Services
14             Progress Note
15             2:33 p.m.
16  BY MS. MELVILLE:
17  Q.   You said that Heusto is from Puerto Rico?
18  A.   His family.  I don't know if he is.  That's his
19       nationality, I think, but I'm not sure.
20  Q.   Okay.  And is his ethnicity Caucasian, black?
21  A.   Puerto Rican I think.  He's definitely not Caucasian,
22       and he didn't look black.  He looked Hispanic.
23  Q.   Go ahead and have a look at that record, and then I'll
24       ask you some questions.
25  A.   So it says she didn't have flashbacks when she had --

Page 233

1   Q.   And I'm going to ask you some questions.  You can go
2       ahead and read it, and then I'll ask you some
3       questions.
4   A.   Okay.
5   Q.   What's the date of this document?
6   A.   8-26-15.
7   Q.   A little over three-and-a-half months from the
8       incident in Jamaica.
9   A.   Yes.
10  Q.   And as you saw, it talks about the fact that Amber is
11       having sexual intercourse with Heusto, right?
12  A.   It says that she had sex and she didn't have
13       flashbacks but it didn't say when.  It doesn't say
14       that she was still having sex.
15  Q.   And then it says:  It seems that she was able to
16       separate the rape from a consensual act.
17             Do you see that?
18  A.   Yes.
19  Q.   Did you and Amber ever talk about this?
20  A.   Yes, I found out when she found out his girlfriend was
21       pregnant, and it was after Jamaica.
22  Q.   So about the time of that other document we just
23       looked at?
24  A.   This one, so about the beginning or middle of August.
25  Q.   And at that point in time, Amber was 17 years old,

Page 234

1   right?
2   A.   Yeah, she was still 17.
3   Q.   How did you find out?
4   A.   She told me that she was upset, and she told me that
5        Heusto's girlfriend was pregnant.
6   Q.   Okay.  Did you have any conflict with Amber about the
7        fact that she was having a sexual relationship with
8        Heusto?
9   A.   I had told her I didn't want, abstinence is the best
10       policy, and I didn't want her having unprotected sex.
11       I didn't want her having sex, period, especially after
12       the rape, until she could deal with the rape.
13  Q.   And how did she respond?
14  A.   She didn't.  I don't even know if she was listening to
15       me to be honest.  She didn't respond at all.
16  Q.   Prior to that time in July of 2015, were you having
17       conflict issues with Amber because she didn't want to
18       have a curfew and wanted to come and go as she
19       pleased?
20  A.   Yes, we did have it.
21  Q.   Was that something that had been an ongoing problem
22       with Amber in terms of her curfew?
23  A.   Just that summer.  Before that summer, there wasn't,
24       but she still had a curfew, and she still had to be
25       back.

Page 235

1   Q.   And what was her curfew in the summer?
2   A.   11:30, 11 or 11:30, I'm not sure.
3   Q.   Are you aware that Amber purportedly received a text
4        message from one of the three men who have been
5        implicated in the rape in Jamaica after the incident?
6   A.   Yes, when she got her phone back, she found out.
7   Q.   What did the text message say?
8   A.   I do not know.  She just said that -- I think it was
9        through Facebook Messenger, I think that's what she
10       said, but I'm not sure.
11  Q.   She never showed you what the message said?
12  A.   No.
13  Q.   Did you ask to see it?
14  A.   No.  At that point we were leaving Jamaica and getting
15       ready to go home.
16  Q.   Do you know if she deleted the message through
17       Facebook Messenger?
18  A.   I don't know if she did or not, but she told me and
19       Janet and Paiton and all of us that she couldn't
20       believe he texted her after what happened or messaged
21       her.  I think she said messaged but I'm not sure.
22  Q.   Do you recall in January of 2016 the fact that your
23       son was having issues with the use of drugs and
24       alcohol?
25  A.   Yes.

Page 236

1   Q.   And was that impacting Amber?
2   A.   Probably at that time, I don't know if he was living
3        with me or not, but I ended up kicking him out of my
4        house because of his drug use.  So I'm sure it
5        impacted her to some degree.
6   Q.   Did Amber ever tell you that she felt she was having
7        -- she felt pressure from family members to confront
8        her brother?
9   A.   She never told me that.
10  Q.   Okay.  Did she ever tell you that she had a text from
11       a close friend telling her that she was a different
12       person in a negative way?
13  A.   Yes, I did know about that.
14  Q.   Did that have anything to do with the fact that her
15       brother was suffering from -- was using drugs and
16       alcohol?
17  A.   I don't know why they said that.
18  Q.   Okay.  Who was the friend that said she was a
19       different person in a negative way?
20  A.   If I'm correct, it would have been Allison.
21  Q.   Okay.  In the summer of 2016, were you and Amber
22       having issues because you thought that Amber was out
23       of control?
24  A.   To some degree, yes.  That's when I called her
25       counselor.

Page 237

1   Q.   Which counselor?
2   A.   Susan Powers.
3   Q.   And in what way was she out of control?
4   A.   She was partying and she was wearing skimpier clothing
5        than she used to wear, and I had talked to her
6        counselor about it, and she said that was normal.
7   Q.   Okay.  And when you say she was partying, do you mean
8        she was using alcohol and drugs, or was she going out?
9        Tell me what you mean by partying.
10  A.   Using alcohol and marijuana.  That's all I know that
11       she used was alcohol and marijuana.
12  Q.   And you were certain during this timeframe in June of
13       2016 that she was using alcohol and marijuana?
14  A.   I couldn't say for certain, but I had a pretty good
15       guess that she was.
16  Q.   In 2016 was marijuana legal in Michigan?
17  A.   No, it was not I don't think.  I don't know when it
18       became legal.
19  Q.   Earlier today you told us that after the incident and
20       after you located Amber the evening, Friday, May 8th,
21       you noticed she had a bruised lip; is that right?
22  A.   It was puffy.  I didn't realize it was bruised until
23       we got back to Michigan because I seen it, and it was
24       all black.
25  Q.   Did she ever tell you how she got that?

Margaret Torralba Dva
September 24, 2019                                    238 to 241

Page 238

1    A.   She said during the rape.
2    Q.   Did she say she was struck, or did she say how it
3         happened?
4    A.   She said he kept on biting her lip really hard.
5    Q.   Okay.  Did she have any other physical injuries that
6         she told you about?
7    A.   No, not that I could see.
8    Q.   You said not that you could see and my question was --
9    A.   No, not that I know of.
10   Q.   I'm going to switch around again and I apologize.
11             Prior to going to Jamaica, did you speak
12        with any friends about the Beaches Resort other than
13        Janet?
14   A.   I might have told people at work that I was going
15        there.
16   Q.   Did you speak with anybody who had been there before?
17   A.   No.
18   Q.   Have you ever prior to going to Jamaica researched the
19        safety of any products?
20   A.   No.
21   Q.   Since going to Jamaica, have you ever researched the
22        safety of any products?
23   A.   Cars.
24   Q.   And what did you do to do that research?
25   A.   Put in the make and model of the car.

Page 239

1    Q.   When did you do that?
2    A.   When my daughter told me she does it.
3    Q.   Which daughter?
4    A.   Angelea.
5    Q.   Did you ever prior to going to Jamaica research the
6         safety of a location that you were traveling to?
7    A.   No.
8    Q.   Has Amber been out of the country since you all went
9         to Jamaica?
10   A.   Yes.
11   Q.   Where did she go?
12   A.   Mexico.
13   Q.   Where in Mexico?
14   A.   I don't know.  I don't know what resort she went to.
15        She went -- I don't know.
16   Q.   Who did she go with?
17   A.   Twelve classmates.
18   Q.   When did she go?
19   A.   After she graduated from high school.
20   Q.   How soon after?
21   A.   I don't know.  Shortly.
22   Q.   So sometime in the summer of 2016?
23   A.   I think so.
24   Q.   Did you know at the time where in Mexico she went?
25   A.   At the time I knew the resort and everything because I

Page 240

1         got the name of it, but I don't remember it now.
2    Q.   When I say where, I don't necessarily mean the Rios in
3         Mexico.  I mean did she go to Cancun, did she go to
4         Cozumel?
5    A.   I think it was Cancun.
6    Q.   Did you do any research on the safety of Cancun before
7         she went?
8    A.   No.  Her friend's mom did all the research for it.
9    Q.   Which friend?
10   A.   It wasn't Brooke.  I don't know her friend's name.
11        I'm having a blank on the other two girls' names.
12   Q.   How long was she in Mexico?
13   A.   I think five days.
14   Q.   Were you concerned about her safety while she was
15        there?
16   A.   Yes.
17   Q.   What did you do to alleviate those concerns?
18   A.   She had to call me or FaceTime me every single day,
19        and if she didn't, I would call them.  Only one time I
20        had to call her, and they FaceTimed me back.
21   Q.   Did any adults go on the trip?
22   A.   No.
23   Q.   And at the time her and her classmates would have been
24        17/18 years old?
25   A.   They were all over 18.

Page 241

1    Q.   They were all 18 or over?
2    A.   Yes, 18 or over.
3    Q.   Amber was 18 at the time?
4    A.   Yes, Amber was 18.  I told her not to go, but...
5    Q.   Do you know if she drank while she was in Cancun?
6    A.   Yes.
7    Q.   You do know she did?
8    A.   Yes.  She was 18, so...
9    Q.   You mentioned the bus driver who took you to the blue
10        hole.  Do you know what his name is?
11   A.   No.
12   Q.   Do you have any information on what tour company Janet
13        DeSantis used to book that?
14   A.   No.
15   Q.   During your stay at the Beaches Resort, did you ever
16        see any signs with the name Funjet on them?
17   A.   At the resort?
18   Q.   Yes.
19   A.   I don't recall.
20   Q.   Same question for The Mark Travel Corporation, did you
21        ever see any signs with that name on it while you were
22        at the Beaches Resort?
23   A.   I don't recall.
24   Q.   On any of the tours that you went, did you ever see
25        signs for Funjet?

Page 242

1   A.   I don't recall.
2   Q.   On any of the tours that you went while in Jamaica,
3        did you ever see signs for Mark Travel?
4   A.   I don't recall.
5   Q.   Do you have any invoices from your trip to Jamaica?
6   A.   I might have paper copies, but I don't have them,
7        sorry.  I looked on my phone, and there's nothing on
8        my phone.
9   Q.   When you went over to the Sandals Resort, was that
10       four days you were there, five days?
11  A.   I think it was four days by the time I got there.
12  Q.   Did you use the spa while you were there?
13  A.   The spa?
14  Q.   Right, the spa.
15  A.   We went in the hot tub.
16  Q.   If there's an invoice for the spa for approximately
17       $140, do you know who would have used the spa while
18       you were at Sandals?
19  A.   I don't know.  I don't know if any of us did.
20  Q.   Did you ever get a refund from Beaches?
21  A.   No.
22  Q.   We talked about the person at the US Embassy who you
23       had contact with while you were in Jamaica; do you
24       remember that?
25  A.   Yes.

Page 243

1   Q.   Did you ever make any formal statements to the US
2        Embassy?
3   A.   Only to the -- only person we talked to from the US
4        Embassy was the guy that was with us, besides making
5        the phone call at the Embassy.
6   Q.   Okay.  So you didn't make a formal statement which you
7        signed to the US Embassy?
8   A.   Not that I recall.
9   Q.   What's your relationship like now with Amber?
10  A.   It's pretty good.
11  Q.   Has she stopped going out to party as much?
12  A.   She doesn't party as much that I know of.
13  Q.   Do you think she'd tell you if she was because you
14       said "that I know of"?
15  A.   I don't know.
16  Q.   You're not sure whether she'd tell you one way or the
17       other?
18  A.   I'm not sure.
19  Q.   Have you ever used a travel agent prior to your trip
20       to Jamaica?
21  A.   No.
22  Q.   Have you ever used a travel agent since your trip to
23       Jamaica?
24  A.   No.
25  Q.   What do you believe the travel agent did wrong in this

Page 244

1        case?
2   A.   Failure to warn of rapes being committed by employees
3        on resorts.
4   Q.   Anything else?
5   A.   The failure to warn for safety issues.
6   Q.   Is there anything else?
7   A.   Not that I can think of.
8             MS. MELVILLE:  I'm going to take a few
9        minute break, and I should be close to being done.
10            MR. WEGLARZ:  Let's take a couple minutes.
11       (Recess taken at 2:49 p.m.)
12       (Back on the record at 3:23 p.m.)
13            MS. MELVILLE:  Ma'am, I don't have anything
14       further.
15            MR. WEGLARZ:  Do you have anything?
16            MR. SAFRA:  No.
17            MR. WEGLARZ:  Okay.  I'll have a few
18       questions.
19            MR. SAFRA:  Can we do what we did yesterday
20       that if one Defendant objects, it's on behalf of both
21       Defendants?
22            MR. WEGLARZ:  Yes, I have no problem with
23       that.
24                       EXAMINATION
25  BY MR. WEGLARZ:

Page 245

1   Q.   Ms. Torralva, you recall getting emails from
2        Mr. Stetson Arriola, correct?
3             MS. MELVILLE:  Objection to form.
4   BY MR. WEGLARZ:
5   Q.   You can still answer.
6   A.   Yes.
7   Q.   And you understood that Stetson Areola was from the
8        travel agency that Janet was dealing with to book this
9        trip to Jamaica?
10  A.   Yes.
11  Q.   Okay.  And Mr. Arriola would send you emails attaching
12       the itineraries for your trip, correct?
13            MS. MELVILLE:  Objection to form.
14            THE WITNESS:  Yes.
15            MS. MELVILLE:  If you can allow me a minute
16       just to put my objection on the record.
17       (Discussion off the record at 3:24 p.m.)
18       (Back on the record at 3:25 p.m.)
19  BY MR. WEGLARZ:
20  Q.   And, Ms. Torralva, when you would get these emails
21       from Mr. Arriola and they would have the itinerary
22       attached, you would review the emails, and you would
23       review the itinerary, correct?
24            MS. MELVILLE:  Objection to form.
25            THE WITNESS:  Yes.

Page 246

```
 1  BY MR. WEGLARZ:
 2  Q.   And you did get an itinerary for the trip to Jamaica
 3       for the Beaches Ocho Rios Resort, right?
 4  A.   Right.
 5            MS. MELVILLE:  Objection to form.
 6            THE WITNESS:  Sorry.
 7  BY MR. WEGLARZ:
 8  Q.   And you reviewed the itinerary for that trip, correct?
 9            MS. MELVILLE:  Objection to form.
10            THE WITNESS:  Yes.
11            MARKED FOR IDENTIFICATION:
12            EXHIBIT 10
13            Travel Itinerary
14            3:26 p.m.
15  BY MR. WEGLARZ:
16  Q.   And I will hand you Exhibit 10, and does that refresh
17       your recollection, your memory, that that is the
18       itinerary that you received for your trip to the
19       Beaches Ocho Rios Resort?
20  A.   Yes.
21  Q.   And within this itinerary are certain pieces of
22       information, true?
23            MS. MELVILLE:  Objection to form.
24            MR. SAUREZ:  Objection to form.
25            MR. WEGLARZ:  Can I just give you a
```

Page 247

```
 1       continuing objection?
 2            MS. MELVILLE:  No, no.
 3            MR. SUAREZ:  No, and I explained why
 4       yesterday.  Not all judges accept it.
 5  BY MR. WEGLARZ:
 6  Q.   There's flight details on this itinerary, correct?
 7  A.   Yes.
 8            MS. MELVILLE:  Objection to form.
 9  BY MR. WEGLARZ:
10  Q.   And they also give hotel details, correct?
11            MS. MELVILLE:  Objection to form.
12            THE WITNESS:  Yes.
13  BY MR. WEGLARZ:
14  Q.   And within the hotel details, we see things that are
15       pointed out like promotions at the hotel, true?
16            MS. MELVILLE:  Objection to form.
17            THE WITNESS:  Yes.
18  BY MR. WEGLARZ:
19  Q.   We see hotel sales advisories, correct?
20            MS. MELVILLE:  Objection to form.
21            THE WITNESS:  Yes.
22  BY MR. WEGLARZ:
23  Q.   And they give you information about the ground
24       transportation, correct?
25            MS. MELVILLE:  Objection to form.
```

Page 248

```
 1  BY MR. WEGLARZ:
 2  Q.   It's on this page here, I'm sorry.
 3  A.   Yes.
 4  Q.   And they have a section called Additional Travel
 5       Information, correct?
 6            MS. MELVILLE:  Objection to form.
 7            THE WITNESS:  Yes.
 8  BY MR. WEGLARZ:
 9  Q.   And they even tell you about the FAA hazardous
10       materials policy, correct; do you see that there?
11  A.   Yes.
12            MS. MELVILLE:  Objection to form.
13  BY MR. WEGLARZ:
14  Q.   And they also give an explanation about the
15       identification required for international travel,
16       correct?
17            MS. MELVILLE:  Objection to form.
18            THE WITNESS:  Yes.
19  BY MR. WEGLARZ:
20  Q.   What was your understanding as to what ID you had to
21       bring to travel to Jamaica?
22  A.   Passports.
23  Q.   Okay.  And within this itinerary, you see the name
24       Funjet Vacations, correct?
25            MS. MELVILLE:  Objection to form.
```

Page 249

```
 1            THE WITNESS:  Yes.
 2  BY MR. WEGLARZ:
 3  Q.   And within this itinerary, they also talk about Mark
 4       Travel Corporation, correct?
 5            MS. MELVILLE:  Objection to form.
 6  BY MR. WEGLARZ:
 7  Q.   Do you see that?
 8  A.   Yes.
 9  Q.   And were you ever advised or warned that Jamaica had
10       any issues with a high number of sex assaults or
11       rapes?
12  A.   No.
13            MR. SUAREZ:  Object to form.
14  BY MR. WEGLARZ:
15  Q.   Were you ever warned or advised that Jamaica had a
16       problem with hotel employees sexually assaulting
17       guests or tourists at the resorts located on the north
18       coast?
19            MS. MELVILLE:  Objection to form.
20            THE WITNESS:  No.
21  BY MR. WEGLARZ:
22  Q.   Had you been advised of either of those things, an
23       inordinate number of rapes or sex assaults in Jamaica,
24       or had you been advised that there was a problem with
25       hotel employees sexually assaulting guests on the
```

Page 250

1        north coast, would you have gone on this trip?
2                    MS. MELVILLE:  Objection to form.
3                    MR. SUAREZ:  Objection to form.
4                    THE WITNESS:  No, I would not.
5    BY MR. WEGLARZ:
6    Q.    Were you ever advised or told that there were certain
7          rules or warnings in Jamaica where resort staff
8          members are prohibited from fraternizing with the
9          guests?
10                   MS. MELVILLE:  Objection to form.
11                   THE WITNESS:  Not that I recall.
12   BY MR. WEGLARZ:
13   Q.    Do you recall anyone advising or reporting that if
14         resort employees are fraternizing with any of the
15         guests, that this conduct should be rebuffed and it
16         should be immediately reported to hotel management and
17         the US Embassy?
18                   MS. MELVILLE:  Objection to form.
19                   MR. SUAREZ:  Objection to form.
20                   THE WITNESS:  Not that I recall.
21   BY MR. WEGLARZ:
22   Q.    When you were down at the Beaches Ocho Rios Resort,
23         did you see any rules or postings advising of
24         something like that, Look, that our employees should
25         not be engaging in fraternization with the guests, and

Page 251

1          if you do see such conduct, report it to us
2          immediately?
3                    MS. MELVILLE:  Objection to form.
4                    THE WITNESS:  No, I did not.
5    BY MR. WEGLARZ:
6    Q.    Had you seen such rules, would you have reported the
7          fraternization that you witnessed between these
8          lifeguards or these hotel workers and your daughter?
9                    MR. SAFRA:  Objection to form.
10                   MS. MELVILLE:  Join.
11                   THE WITNESS:  Yes.
12   BY MR. WEGLARZ:
13   Q.    Earlier on in your deposition, you were asked about
14         meeting with me before we did your deposition today;
15         do you remember those questions?
16   A.    Yes.
17   Q.    Do you remember, I believe you told them that you
18         remembered meeting with me earlier this morning,
19         correct?
20   A.    Yes.
21   Q.    And a little bit yesterday as well, correct?
22   A.    Yes.
23                   MS. MELVILLE:  Objection to form.
24                   THE WITNESS:  Yes.
25   BY MR. WEGLARZ:

Page 252

1    Q.    Do you recall what you did on Sunday?
2    A.    Sunday night we did meet with you, but I did forget
3          about that.
4    Q.    I have that impression on a lot of people.  Don't
5          worry about that.  And was it a real quick meeting; do
6          you recall how long we met?
7    A.    Not very long.
8    Q.    Do you recall what time we met?
9    A.    I think 6:00 but I'm not sure.
10   Q.    And even before you went on this trip to Jamaica, you
11         recall seeing commercials on TV about Sandals Resorts,
12         right?
13                   MS. MELVILLE:  Objection.
14                   MR. SAFRA:  Objection; form.
15                   THE WITNESS:  I don't know for sure, TV or
16         radio.
17   BY MR. WEGLARZ:
18   Q.    You knew Sandals was considered to be a reputable
19         vacation place, resort place, correct?
20                   MS. MELVILLE:  Objection to form.
21                   MR. SAFRA:  Objection to form.
22                   THE WITNESS:  Yes, it's higher end than
23         some of the places.
24   BY MR. WEGLARZ:
25   Q.    You knew that the Sandals resorts had a reputation for

Page 253

1          being a safe and a nice place to go on vacation,
2          correct?
3                    MR. SAFRA:  Objection; form.
4                    MS. MELVILLE:  Join.
5                    THE WITNESS:  Yes.
6    BY MR. WEGLARZ:
7    Q.    And when Janet DeSantis told you that the trip had to
8          be rescheduled or had to be rebooked because Moon
9          Palace was no longer available -- strike that.
10                   I need to ask you this first.  Did you know
11         that Beaches was part of Sandals?
12                   MR. SAFRA:  Objection; form.
13                   THE WITNESS:  Yes, you usually hear the two
14         together.
15   BY MR. WEGLARZ:
16   Q.    Okay.  And then when Janet DeSantis explained to you
17         that you no longer could have the trip at Moon Palace
18         and that they had to change it and they did change it
19         to Beaches Ocho Rios Resorts, did you feel comforted
20         knowing that it was a Sandals Resort and those are
21         supposed to be nice and safe places?
22                   MR. SAFRA:  Objection; form.
23                   MS. MELVILLE:  Join.
24                   THE WITNESS:  Yes.
25   BY MR. WEGLARZ:

Page 254

1  Q.  And when you arrived at Beaches Ocho Rios Resort, I
2      think you explained to us that you had to sign in or
3      you had to sign something before you went to your
4      room, correct?
5              MS. MELVILLE:  Objection to form.
6              THE WITNESS:  Yes.
7  BY MR. WEGLARZ:
8  Q.  You had to sign an iPad; is that what it was?
9              MS. MELVILLE:  Objection to form.
10             THE WITNESS:  It was an electronic device.
11     I don't know if it was an iPad.
12 BY MR. WEGLARZ:
13 Q.  You mentioned something about the device not
14     functioning.  What did you mean by that?
15 A.  It kept on glitching, like you would be trying to read
16     what you were signing and it would glitch back and
17     forth.
18 Q.  Were you able to read what it was that you were
19     signing?
20 A.  Some of it but not all of it.
21 Q.  Do you have any idea as to what it said?
22 A.  We asked or I asked and they said pretty much on the
23     itinerary with the hotel.
24 Q.  Okay.  And for you to get your room, it was necessary
25     for you to sign the iPad, correct?

Page 255

1  A.  Yes.
2  Q.  So you signed the iPad just so that you could get your
3      room and get on with your vacation, right?
4              MS. MELVILLE:  Objection to form.
5              MR. SAUREZ:  Objection to form.
6              THE WITNESS:  Yes.
7  BY MR. WEGLARZ:
8  Q.  Earlier you told us about a comment made by the bus
9      driver, and I believe what you said is he referred to
10     the Moon Palace resort as a rape motel or rape resort?
11             MR. SAUREZ:  Object to the form.
12 BY MR. WEGLARZ:
13 Q.  Do you remember that?
14 A.  Yes.
15 Q.  He never mentioned anything more than that, did he?
16             MR. SAFRA:  Objection to form.
17             THE WITNESS:  He mentioned about the
18     workers, yes.
19 BY MR. WEGLARZ:
20 Q.  He never mentioned anything more about rapes in the
21     Moon Palace other than that comment?
22             MS. MELVILLE:  Objection to form.
23             THE WITNESS:  No.
24 BY MR. WEGLARZ:
25 Q.  The bus driver didn't say, You know what, historically

Page 256

1      there's been a problem with hotel employees sexually
2      assaulting the guests in Jamaica?
3              MR. SAFRA:  Objection; form.
4              MS. MELVILLE:  Objection to form.
5  BY MR. WEGLARZ:
6  Q.  Right, the bus driver didn't tell you that?
7  A.  No.
8              MS. MELVILLE:  Objection to form.
9  BY MR. WEGLARZ:
10 Q.  It was a comment about a hotel.  He said rape motel
11     and that was all the bus driver told you, right?
12             MR. SAFRA:  Objection to form.
13             MS. MELVILLE:  Objection to form.
14             THE WITNESS:  About rape, yes.
15 BY MR. WEGLARZ:
16 Q.  You talked a little bit about the photos that were
17     marked as exhibits, and there were a few photos taken
18     with the tour guide at blue hole or black hole?
19 A.  I think it's blue hole but I'm not positive.
20 Q.  Why did you guys take pictures with the tourist guide?
21             MS. MELVILLE:  Objection to form.
22             THE WITNESS:  He asked us if we would take
23     a picture with him.
24 BY MR. WEGLARZ:
25 Q.  He wanted the picture, correct?

Page 257

1              MS. MELVILLE:  Objection to form.
2              THE WITNESS:  Yes, he asked.
3  BY MR. WEGLARZ:
4  Q.  So you were accommodating the tour guide; that's what
5      he wanted, so you thought you'd cooperate with the
6      request, correct?
7              MS. MELVILLE:  Objection to form.
8              THE WITNESS:  Yes.
9              MR. SAFRA:  Objection to form.  She isn't
10     even in the picture.  There's no proof or foundation
11     that she was even there, that she took the picture or
12     whether, in fact, it was a selfie by the people who
13     are in the picture.
14 BY MR. WEGLARZ:
15 Q.  Had you known that there were rules that prohibited
16     resort employees from fraternizing with the guests,
17     would you have made sure that your daughters were not
18     fraternizing with hotel staff?
19             MR. SAFRA:  Objection; form and foundation.
20             MS. MELVILLE:  Join.
21 BY MR. WEGLARZ:
22 Q.  You can answer.
23 A.  Yes, I would have made sure.
24 Q.  When returned home after the Jamaica trip, do you
25     remember seeing your doctor within a few weeks or a

Page 258

1    month after this incident happened?
2              MS. MELVILLE:  Objection to form.
3              THE WITNESS:  Yes.
4    BY MR. WEGLARZ:
5    Q.   And would that be at Metro Health where your doctor
6         is?
7    A.   Yes.
8              MS. MELVILLE:  Objection to form.
9              MR. SAFRA:  Objection.
10   BY MR. WEGLARZ:
11   Q.   And do you recall your doctor telling you and
12        diagnosing you with situational depression and
13        situational insomnia during that visit?
14             MR. SAFRA:  Form.
15             MS. MELVILLE:  Objection to form.
16             THE WITNESS:  Yes.
17   BY MR. WEGLARZ:
18   Q.   And I believe your doctor prescribed Klonopin for the
19        depression, as well as Zoloft for the depression.  Do
20        you recall that?
21             MS. MELVILLE:  Objection to form.
22             THE WITNESS:  Yes.
23   BY MR. WEGLARZ:
24   Q.   And were you experiencing depression and insomnia
25        because of this incident, these incidents that

Page 259

1    occurred in Jamaica?
2              MS. MELVILLE:  Objection to form.
3              THE WITNESS:  Yes.
4    BY MR. WEGLARZ:
5    Q.   And your doctor had you on these medications at least
6         for a few months in 2015, correct?
7              MS. MELVILLE:  Objection to form.
8              THE WITNESS:  Yes.
9    BY MR. WEGLARZ:
10   Q.   All right.  And this incident still bothers and
11        affects you, correct?
12             MS. MELVILLE:  Objection to form.
13             THE WITNESS:  Yes.
14   BY MR. WEGLARZ:
15   Q.   Do you agree that it would be reasonable for you to
16        have therapy or counseling to help you cope and get
17        over something like this?
18             MS. MELVILLE:  Objection to form.
19             MR. SAFRA:  Objection to form.
20             THE WITNESS:  Yes.
21   BY MR. WEGLARZ:
22   Q.   You're not in counseling now, right?
23   A.   No.
24   Q.   And you have a full-time job, correct?
25             MS. MELVILLE:  Objection to form.

Page 260

1              THE WITNESS:  Yes.
2    BY MR. WEGLARZ:
3    Q.   You're a very busy woman, true?
4    A.   Yes.
5    Q.   If you had more time, would you go get counseling for
6         yourself?
7              MR. SAFRA:  Objection; form.
8              MS. MELVILLE:  Join.
9              THE WITNESS:  Yes.
10   BY MR. WEGLARZ:
11   Q.   And I believe you explained to us that, you know, any
12        time you have something that involves this case, going
13        down to a mediation on this case or preparing for a
14        deposition on this case, knowing that the criminal
15        case is upcoming, it brings back the memories of this
16        incident, doesn't it?
17             MR. SAFRA:  Objection to form.  Move to
18        strike preparatory statement referencing mediation.
19        It can't be played later on.
20             MR. WEGLARZ:  I'm not going to talk about
21        what happened.
22             MR. SAFRA:  I know but the mere existence
23        of it could be leading to a jury --
24             MR. WEGLARZ:  Understood.  Objection is
25        noted.

Page 261

1    BY MR. WEGLARZ:
2    Q.   Go ahead.
3    A.   Can you repeat the question?
4    Q.   Sure.  Any time you have to get involved with
5         something involving the pending cases involving these
6         incidents in Jamaica, it causes you to relive the
7         moment and causes you to become stressed out, correct?
8              MS. MELVILLE:  Objection to form.
9              THE WITNESS:  Yes.
10   BY MR. WEGLARZ:
11   Q.   And you start having symptoms, correct?
12   A.   Yes.
13             MS. MELVILLE:  Objection to form.
14   BY MR. WEGLARZ:
15   Q.   So fair to say any reliving of the moment or going
16        back to try to remember the moment causes you stress
17        and symptoms, correct?
18             MS. MELVILLE:  Objection to form.
19             THE WITNESS:  Yes.
20   BY MR. WEGLARZ:
21   Q.   Including sleeplessness?
22             MS. MELVILLE:  Objection to form.
23             THE WITNESS:  Yes.
24             MR. WEGLARZ:  That's all I have.  Thank
25        you.

Page 262

1    MR. SAFRA:  I have a few follow-up
2    questions.
3                    MR. WEGLARZ:  Sure.
4                    RE-EXAMINATION
5    BY MR. SAFRA:
6    Q.   You were asked by your counsel just now about what you
7         would have done in terms of allowing your daughter to
8         fraternize with employees at the Beaches Ocho Rios
9         Resort had you been aware of rules either by the hotel
10        or maybe government regulations or recommendations or
11        issuances.  Do you recall that question?
12   A.   Yes.
13   Q.   I think you answered that but for the rules by the
14        hotel, you would not have let your daughter -- had you
15        known of them, you would not have let your daughter
16        fraternize; is that right?
17   A.   I would have watched her closely.
18   Q.   So not knowing of the rules then, you did not watch
19        your daughter closely on the flip side, and you
20        allowed her to fraternize with the employees?
21   A.   No.
22   Q.   That is the reverse of it.  So on the one hand, if you
23        knew of rules that someone else issued, then you would
24        have stopped or watched your daughter who fraternized,
25        but since you didn't know of the rules, she was free

Page 263

1         to fraternize, correct?
2    A.   I never saw her fraternizing, except talking, and I
3         don't know if that's considered fraternizing because
4         she was standing there talking.
5    Q.   Well, earlier you said that was the type of
6         fraternizing that was referenced in your Complaint
7         when I asked you those questions, the talking that you
8         witnessed was fraternizing.  That was your sworn
9         testimony under oath.  You allowed that to happen and
10        you were not watching your daughter closely, because
11        according to you, you didn't know of the rules which
12        had you known, then you would have watched your
13        daughter more closely.  That's your testimony, isn't
14        it?
15                    MR. WEGLARZ:  Asked and answered.  Go
16        ahead, answer.
17                    THE WITNESS:  Had I known the strict
18        guidelines and what would happen, I would have told
19        her not to talk to anybody.
20   BY MR. SAFRA:
21   Q.   But since you didn't know the rules, then you let her
22        talk to everybody, correct?
23   A.   No, she did not talk to everybody.
24   Q.   Well, you didn't watch her closely because you didn't
25        know of the rules?

Page 264

1    A.   I did watch her closely.
2    Q.   You were also asked questions by your counsel about
3         having to relive the events of this incident through
4         your involvement in this lawsuit; do you recall that?
5    A.   Yes.
6    Q.   Well, you voluntarily filed this lawsuit, correct?
7    A.   Yes.
8    Q.   You were voluntarily electing to relive these moments
9         each day when you're involved in this lawsuit because
10        this is a suit you filed, correct?
11   A.   Yes, I filed this suit.
12   Q.   You could have not filed this lawsuit and never had to
13        relive the moments again; isn't that true?
14   A.   No.
15   Q.   At least pertaining to this suit, you wouldn't have to
16        relive it?
17   A.   Pertaining to the suit but I'm sure in other aspects
18        something could remind me.
19   Q.   You were also asked by your counsel about a
20        relationship or association between Sandals and
21        Beaches, and you talked about an advertisement you
22        saw, and the wording you used was you said usually
23        together, correct?
24   A.   They'll be in the same commercial.  Typically you'll
25        hear Sandals and Beaches.

Page 265

1    Q.   Is that your only understanding of a relationship
2         between Sandals and Beaches?
3    A.   Yeah.
4    Q.   So if I told you that never in the history of their
5         business has there ever been a commercial or
6         advertisement or promotion in which Sandals and
7         Beaches have ever been in the same document, release,
8         or commercial, then do you believe your memory is
9         mistaken?
10   A.   If that was true, it would have to be, but I've always
11        heard the two together.
12   Q.   That's your recollection but if I'm telling you and
13        you accept as true for sake of this question that
14        there has never been an advertisement where Sandals
15        and Beaches are together, then you're not aware of an
16        association between Sandals and Beaches other than
17        just accepting or assuming that your counsel is
18        correct in telling you that; isn't that true?
19                    MR. WEGLARZ:  Well, hold on.  Object to
20        that question.  That's unfair.
21                    MR. SAFRA:  Well, you led her to believe
22        that there is, and there has never been a commercial
23        with the two of them together.  Never.  So your
24        question is entirely inappropriate and misleading.
25                    So let's assume for my follow-up question

Page 266

1   that there has never been a commercial --
2           MR. WEGLARZ:  That wasn't my question by
3   the way.  Sorry to interrupt but that's a
4   misrepresentation.
5           MR. SAFRA:  You led her to believe there's
6   an association and relationship.
7           MR. WEGLARZ:  No.
8           MR. SAFRA:  And she said yes because of an
9   advertisement.
10  BY MR. SAFRA:
11  Q.   I'm saying assuming there's never been an
12       advertisement where Sandals and Beaches have ever been
13       together in a commercial or on the radio, the two
14       sources you mentioned, then do you have any knowledge
15       that there's any association between Sandals and
16       Beaches?
17  A.   No.
18          MR. SAFRA:  No further questions.
19          MS. MELVILLE:  I have a few.
20               RE-EXAMINATION
21  BY MS. MELVILLE:
22  Q.   Ma'am, your counsel directed you to the travel
23       itinerary you say you received prior to going on the
24       trip; do you recall that?
25  A.   Yes.

Page 267

1   Q.   And you said that you reviewed all these pages before
2        you went on the trip; is that right?
3   A.   Yes.
4   Q.   And did you read everything that was in them before
5        you went on the trip?
6   A.   I read all the bold print and skimmed through
7        everything else.
8   Q.   So when you say you read all the bold print, are you
9        talking about the bold print on the first page of the
10       document, second page?
11  A.   I read everything about the airlines, everything about
12       the hotel, and then skimmed through like the tobacco
13       thing.
14  Q.   The hazard materials policy?
15  A.   Yes.
16  Q.   Dream vacation care you read, the identification?
17  A.   I skimmed through that.
18  Q.   You skimmed through dream vacation care?
19  A.   I'm assuming so.  It was five years ago.
20  Q.   It's been a long time?
21  A.   Yes, or four-and-a-half years ago, well, five since it
22       was in April when I got them.
23  Q.   I think you told your counsel you looked at what ID
24       you needed?
25  A.   Yes.

Page 268

1   Q.   And so you saw the language that it was your
2        responsibility to provide the correct documents for
3        your travel ID?
4   A.   Yes, passports.
5   Q.   And then right below that you saw in bold the
6        important notice:  The Mark Travel Corporation, its
7        employees, on page 5, employees, officers, directors,
8        and shareholders collectively, Funjet Vacations does
9        not own, control, or operate any hotels or any air,
10       land, or water transportation vehicles or companies of
11       any kind, including without limitation airplanes,
12       helicopters, boats, rental cars, ground transportation
13       vehicles, transport companies, shuttle services,
14       buses, or local tour companies which may offer
15       excursions or tours.  Funjet Vacations occasionally
16       enters into contracts with hotels and air, land, or
17       water transportation companies but all such entities
18       are owned and operated by independent contractors.
19               You saw that language, too, didn't you,
20       ma'am?
21  A.   I skimmed through it.
22  Q.   You read that before your trip?
23  A.   I skimmed through it.  I don't know if I read it word
24       for word.
25  Q.   But you did see it?

Page 269

1   A.   Yes, it was in all the paperwork that I saw.
2   Q.   It also says right below that:  Funjet Vacations is
3        not responsible for any negligent or willful act,
4        omission or failure to act on the part of any such
5        entity or its employees or of any other third party
6        beyond its direct control.  The Funjet Vacations name
7        and logo may appear on posted or handheld signs at
8        your hotel, at the airport of your departure of your
9        destination, in vans, buses, coaches, or elsewhere
10       during your vacation.  This use of the Funjet
11       Vacations name and logo is solely intended to help you
12       identify persons or entities who might provide
13       services to you during your trip but does not indicate
14       and should not be understood by you to indicate that
15       Funjet Vacations owns, controls, or operates any
16       entity displaying such a sign or that Funjet Vacations
17       employs or controls any person holding or displaying
18       such signs.
19               You would have read through that as well
20       when you received your itinerary?
21  A.   Yes.
22          MS. MELVILLE:  I don't have anything else.
23          MR. WEGLARZ:  Anyone?
24          MR. SAFRA:  That concludes the deposition.
25          MR. WEGLARZ:  That's all I have.

Margaret Tombalakva
September 24, 2019                           270 to 271

Page 270

```
1           MR. SAFRA:  Thank you so much for your
2  time.
3           MS. MELVILLE:  You have the ability to read
4  or waive.
5           MR. SAFRA:  In Michigan they don't do that.
6           MR. WEGLARZ:  It still applies.
7           MR. SAFRA:  I just was repeating your
8  comment yesterday.
9           MR. WEGLARZ:  We'll waive it.  We trust in
10  the court reporting outfit.
11           MR. SAFRA:  That concludes the deposition.
12           MR. SUAREZ:  Are you also waiving
13  yesterday, DeSantis?
14           MR. WEGLARZ:  Yes.
15           MR. SUAREZ:  Thank you.  We are ordering
16  copies.
17           COURT REPORTER:  Mr. Weglarz, I assume but
18  I always ask if you are ordering the transcript.
19           MR. WEGLARZ:  Yes, electronic, please.
20           (The deposition was concluded at 3:59 p.m.
21      Signature of the witness was not requested by
22      counsel for the respective parties hereto.)
23
24
25
```

Page 271

```
1              CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF MACOMB  )
5
6           I, LEZLIE A. SETCHELL, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10      reduced to computer transcription; that this is a
11      true, full and correct transcript of my stenographic
12      notes so taken; and that I am not related to, nor of
13      counsel to, either party nor interested in the event
14      of this cause.
15
16
17
18
19
20
21              *Lezlie Setchell*
22           LEZLIE A. SETCHELL, CSR-2404
23           Notary Public,
24           Macomb County, Michigan.
25  My Commission expires: April 17, 2024
```