# EXHIBIT 33

{00682541.DOCX}

Paiton Bater
September 25, 2019

1              IN THE DISTRICT COURT OF THE UNITED STATES

2                FOR THE EASTERN DISTRICT OF FLORIDA

3                        MIAMI DIVISION

4

5    PAITON E. BATER, AMBER R.

6    TORRALVA, JANET DESANTIS,

7    and MARGARET A. TORRALVA,

8                      Plaintiffs,

9          vs.                Case No. 1:17-cv-21703

10                            Hon. Marcia G. Cooke

11   UNIQUE VACATIONS, INC., a

12   Delaware corporation, THE

13   MARK TRAVEL CORPORATION, a

14   Nevada corporation d/b/a Fun

15   Jet Vacations, DWIGHT DAVIS

16   JERMAINE DYER, and WILLIAM TAPPER,

17   Jointly and Severally,

18                      Defendants.

19   _____

20        The Deposition of PAITON ELISIBETH BATER,

21        Taken at 19390 West Ten Mile Road,

22        Southfield, Michigan,

23        Commencing at 4:08 p.m.,

24        Wednesday, September 25, 2019,

25        Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 2

1   APPEARANCES:

2

3   TODD J. WEGLARZ

4   Fieger, Fieger, Kenney & Harrington, P.C.

5   19390 West Ten Mile Road

6   Southfield, Michigan 48075

7   248.355.5555

8   tweglarz@fiegerlaw.com

9       Appearing on behalf of the Plaintiffs.

10

11  THOMAS E. SCOTT

12  Cole, Scott & Kissane, P.A.

13  9150 South Dadeland Boulevard

14  Suite 1400

15  Miami, Florida 33256

16  305.350.5381

17  thomas.scott@csklegal.com

18      Appearing on behalf of the Defendant, Unique

19      Vacations, Inc.

20

21

22

23

24

25

Page 3

1   LUIS E. SUAREZ

2   Boies, Schiller & Flexner, LLP

3   100 Southeast 2nd Street

4   Suite 2800

5   Miami, Florida 33131

6   305.357.8431

7   lsuarez@bsfllp.com

8       Appearing on behalf of the Defendant, The Mark Travel.

9       Corporation.

10

11  ALSO PRESENT:

12  Janet Sue DeSantis

13  Dmitri Singh

14  Tammy Gonzalez

15

16

17

18

19

20

21

22

23

24

25

Page 4

1               TABLE OF CONTENTS

2

3   WITNESS                              PAGE

4   PAITON ELISIBETH BATER

5

6   EXAMINATION

7   BY MR. SUAREZ:                        5

8

9               EXHIBITS

10

11  EXHIBIT                              PAGE

12  (Exhibits not offered.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1   Southfield, Michigan

2   Wednesday, September 25, 2019

3   4:08 p.m.

4

5               PAITON ELISIBETH BATER,

6   was thereupon called as a witness herein, and after

7   having first been duly sworn to testify to the truth,

8   the whole truth and nothing but the truth, was

9   examined and testified as follows:

10              EXAMINATION

11  BY MR. SUAREZ:

12  Q.   Can you please state your name for the record?

13  A.   Paiton Elisibeth Bater.

14  Q.   Paiton, I introduced myself earlier, my name is Luis

15       Suarez and I'm a lawyer and I represent The Mark

16       Travel Corporation in this lawsuit.

17  A.   Uh-huh.

18  Q.   Okay.  I don't represent the travel agency which is

19       Vacations to Go, I don't represent the hotel and I

20       don't represent a company by the name of UVI.  Okay?

21  A.   Okay.

22  Q.   Have you ever been deposed before?

23  A.   I don't remember.  I don't think so.

24  Q.   Okay.  Are you nervous?

25  A.   No.

Page 6

1  Q.  Okay.  Is there any reason why you -- let's back up.
2      What's your date of birth?
3  A.  3-23-1994, March.
4  Q.  How old are you now?
5  A.  25.
6  Q.  Are you currently employed?
7  A.  Uh-huh, yep.
8  Q.  You just did something that is natural in a form of
9      human conversation, which is that you're asked a
10     question and you say uh-huh or you nod.
11 A.  Right.
12 Q.  If you do that, the lady to my right can't take it
13     down and so for her to be able to do her job
14     effectively, we need, both you and I need to speak
15     audibly.  For me that's difficult because I'm soft
16     spoken and we need to keep our voice up; could you try
17     to do that for me?
18 A.  Yeah.
19 Q.  The other thing we need to do is I need to be able to
20     ask a question and then you'll give me your answer,
21     okay?
22 A.  Okay.
23 Q.  Now, from time to time, your lawyer who is sitting
24     next to your mother to your right will want to object
25     to a question that I ask or say something to the

Page 7

1      effect of object to form.  That's fine.  That's just
2      lawyer stuff.  Unless he instructs you not to answer,
3      you can go ahead and answer the question; is that
4      okay?
5  A.  Okay.
6  Q.  When I asked you the question of have you ever been
7      deposed before, you said, "I think, I don't remember."
8      So let me back up -- let me back up and try to ask you
9      a little bit about that.  Have you ever been involved
10     in a lawsuit before?
11 A.  Yes.
12 Q.  Do you know what a deposition is?
13 A.  Yes.
14 Q.  What lawsuit were you involved in?
15 A.  When I was involved in a car accident.
16 Q.  How old were you when you were involved in a car
17     accident?
18 A.  It was in 2004.
19 Q.  You were approximately ten years old?
20 A.  Approximately.
21 Q.  Approximately 4th grade?
22 A.  Yes.
23 Q.  What was that lawsuit about?
24 A.  I honestly cannot remember.
25 Q.  Okay.  Did that lawsuit involve a car accident?

Page 8

1  A.  Yes.
2  Q.  And one car was being driven by your mother?
3  A.  Yes.
4  Q.  And another car was driven by somebody else?
5  A.  Yes.
6  Q.  And that car accident resulted in a fatality, right?
7  A.  Correct.
8  Q.  And who passed away?
9  A.  The lady in the other car.
10 Q.  Okay.  And at that time did a lawyer seek to take your
11     deposition?
12 A.  Possibly.
13 Q.  Do you recall being in a room like this where a lawyer
14     asked you questions and answers?
15 A.  I don't remember exactly.
16 Q.  Okay.  Have you ever been involved in any other
17     lawsuit?
18 A.  No.
19 Q.  Have you ever given statements under oath?
20 A.  I don't remember.
21 Q.  Okay.  Do you know what it means to give a statement
22     under oath?
23 A.  Yes.
24 Q.  Okay.  A couple of ground rules, if at any time you
25     need a break, you just let me know and we'll take a

Page 9

1      break, okay?
2  A.  Okay.
3  Q.  If at any time you don't understand one of my
4      questions, would you please let me know and if I can,
5      I'll try to rephrase it?
6  A.  Yes.
7  Q.  I may if you ask me for a break, and don't take it
8      personally, ask you to let me finish sort of a line of
9      questioning before we take a break and then take a
10     break; is that all right?
11 A.  Okay.
12 Q.  Sometimes in these depositions I like to tell a
13     witness the topic that I'm going to cover so that they
14     know exactly where I'm going and what I'm trying to
15     get at.
16 A.  Okay.
17 Q.  And today, this afternoon, what I'm going to cover is
18     your residences, your education and your employment,
19     okay?
20 A.  Okay.
21 Q.  And I'm going to go in chronological order so that
22     it's easier for me to understand, okay?
23 A.  Okay.
24 Q.  So the first thing I'd like to do is tell me where --
25     what cities you've lived in and the ages you've lived

Page 10

1    in those cities?
2  A.  There was Pinckney, Michigan when I was only a few
3       years old.  Then Williamston, Michigan, and that was
4       until I was about 18.  And then Lansing, Michigan for
5       approximately a year after I turned 18, 19.  And then
6       back in Williamston, and that was maybe two years ago,
7       three --
8  Q.  And you still --
9  A.  -- or maybe four.
10 Q.  You still live in -- well, you're 25, so it had to be
11      either I'm missing a residence or it had to be more
12      than four years?
13 A.  I think it was five years, five and a half.
14 Q.  All right.  When you moved back to Williamston, did
15      you move back in with your mother?
16 A.  No, I moved in with my father because that's who I
17      lived with before.
18 Q.  Okay, so --
19           MR. SCOTT:  Can I ask you to keep your
20      voice up, young lady?
21 A.  Yeah.
22 BY MR. SUAREZ:
23 Q.  So you lived in Pinckney, Michigan until you were a
24      few years old, right?
25 A.  Yes.

Page 11

1  Q.  And who did you live with in that home?
2  A.  My family.
3  Q.  Which is?
4  A.  My mother, father and brother.
5  Q.  Okay.  Your brother's older or younger than you?
6  A.  Older.
7  Q.  What's his name?
8  A.  Cody.
9  Q.  And how much older is he than you?
10 A.  Six years older.
11 Q.  What does Cody do?
12 A.  He...
13 Q.  Is there a reason why you're smiling?
14 A.  It's kind of hard to explain.
15 Q.  Now, I'm interested.
16 A.  He etches like memorials into granite, big stones of
17      granite.
18 Q.  You mean like for --
19 A.  For headstones.
20 Q.  For cemeteries?
21 A.  Uh-huh, yes.
22 Q.  And I guess parks?
23 A.  Yes.
24 Q.  Okay.  That's what he does for a living?
25 A.  Yep.

Page 12

1  Q.  Okay.  Then you moved to Williamston, Michigan when
2       you were 18 -- excuse me, and then you stayed there
3       until you were 18?
4  A.  Correct, I stayed there.
5  Q.  And you still lived with your mother, father and Cody?
6  A.  No, I just recently moved.
7  Q.  Wait, wait.  I'm going in sequential order.  So first
8       there was Pinckney, Michigan.  And then you moved to
9       Williamston, Michigan until you were 18, right?
10 A.  Yes.
11 Q.  Is that correct?
12 A.  Yes.
13 Q.  Okay.  And who did you live with from the time you
14      were a few years old until you were 18?
15 A.  My family.
16 Q.  And that's your mother, father and Cody?
17 A.  Yes.
18 Q.  Okay.  And did you live in the same home?
19 A.  Yes.
20 Q.  And this is the home that you lived in during your
21      trip while you were -- made a trip to Jamaica, right?
22 A.  Yes.
23 Q.  We're going to be referring a lot throughout this
24      deposition to your trip to Jamaica, right?
25 A.  Right.

Page 13

1       And by that I mean, and I think you understood, a trip
2       that occurred from May 5th to May 9, 2015, okay?
3  A.  Yeah.
4  Q.  All right.  While you went on your trip to Jamaica,
5       who did you live with at the time?
6  A.  My dad.
7  Q.  I'm sorry?
8  A.  My father.
9  Q.  In May of 2015, you lived with your father?
10 A.  Yeah.
11 Q.  That's it?
12 A.  Yes.
13 Q.  Okay.  So I'm confused.  Explain that to me.
14 A.  In 2012, my parents got divorced so I lived with my
15      dad instead of both of them.
16 Q.  So in 2006 (sic) when you were 12 years old, your
17      mother and father got divorced?
18 A.  No, when I -- in 2012 when I had just turned 18.
19 Q.  Oh, okay.  Okay.  I got it.  Let's go back over that
20      so the record is clear because I'm sure it's mumbled.
21      From the time you were a few years old until 2012, you
22      lived with your mother, father and Cody, right?
23 A.  Correct.
24 Q.  Is that right?
25 A.  Correct.

Page 14

1   Q.   And you lived in Williamston, Michigan, right?
2   A.   Yes.
3   Q.   Then when you were 18, you moved somewhere, right?
4   A.   No, I stayed in the same house.
5   Q.   You stayed in the same house?
6   A.   With my dad.
7   Q.   I thought you told me that you moved to Lansing,
8        Michigan when you were 18?
9   A.   A short while after I turned 18 or 19, I don't
10       remember exactly, I moved into Lansing.
11  Q.   Okay.  So when you were 18 in 2012, you stayed in the
12       same house, your mother had moved out and you were
13       living with your father, right?
14  A.   Yeah.  And then a short while after that, I moved to
15       Lansing.
16  Q.   Okay.  At that time in 2012, is Cody living --
17  A.   No.
18  Q.   Okay.  So then approximately when you were 19, you
19       moved to Lansing, Michigan for about a year, right?
20  A.   Correct.
21  Q.   And who did you live with then?
22  A.   On my own, myself.
23  Q.   In your own apartment?
24  A.   Yes.
25  Q.   Okay.  And then when you were 19, you moved to -- back

Page 15

1        to Williamston, Michigan, right?
2   A.   I'm sorry, can you repeat that?
3   Q.   When you were 19, after spending some time in Lansing,
4        Michigan, you moved back to Williamston, Michigan,
5        correct?
6   A.   When I was about 20.
7   Q.   Okay.  So when you were about 20, in about --
8   A.   2014.
9   Q.   Excuse me, until about 2014, you moved back to
10       Lansing -- excuse me, you moved back to Williamston,
11       Michigan, right?
12  A.   Correct.
13  Q.   Okay.  And who were you living with then?
14  A.   Again, my father.
15  Q.   You moved back home with dad?
16  A.   Yes.
17  Q.   Okay.  And did anybody else live in that home?
18  A.   No.
19  Q.   Okay.  And have you stayed there living with your dad
20       ever since?
21  A.   Up until recently, yes.
22  Q.   Okay.  When you say up until recently, what does that
23       mean?
24  A.   I recently moved closer to work.
25  Q.   In what city?

Page 16

1   A.   Wixom.
2   Q.   How do you spell that?
3   A.   W-I-X-O-M.
4   Q.   Okay.  And you live alone now?
5   A.   Yes.
6   Q.   How many -- how much time have you lived alone?
7   A.   A month.
8   Q.   So for the last four to five years, you've lived with
9        dad in Williamston before you lived in Wixom?
10  A.   Yes.
11  Q.   After you turned 18 and your parents divorced, why did
12       you choose to stay with dad and not go with mom?
13  A.   It was the house I grew up in.
14  Q.   Did you ever live with your mother again after you
15       turned 18?
16  A.   I would stay with her from time to time.
17  Q.   How long would you stay with her?
18  A.   A couple weeks maybe.
19  Q.   Okay.  In 2015, when you went to Jamaica, you were
20       living with dad?
21  A.   Yeah.
22  Q.   What does your father do for a living?
23  A.   He's a mechanic.
24  Q.   Of?
25  A.   Boats.

Page 17

1   Q.   Has he always been a boat mechanic?
2   A.   No.
3   Q.   What did he do before he was a boat mechanic?
4   A.   As far as I know, he was in the Air Force.
5   Q.   What did he do there?
6   A.   He prepared parachutes and sewed a lot.
7   Q.   Okay.  Was that before you were born?
8   A.   Yes.
9   Q.   While you -- while you have known your father, he has
10       always been a boat mechanic?
11  A.   Correct.
12  Q.   Okay.  While you were growing up, what did your mother
13       do for a living?
14  A.   She did hair for a while.
15  Q.   What else did she do?
16  A.   She ended up opening a daycare for a couple years.
17  Q.   Was that before or after your parents divorced?
18  A.   Before.
19  Q.   Okay.  What else did she do?
20  A.   After that, she worked as an accounts receivable
21       specialist, I believe.
22  Q.   Okay.
23  A.   And then she went to school.
24  Q.   What years did she go to school?
25  A.   I don't remember.

|  | Page 18 |
|---|---|
| 1 | Q.  How old were you when she was going to school? |
| 2 | A.  She graduated when I graduated high school. |
| 3 | Q.  When did you graduate high school? |
| 4 | A.  2012. |
| 5 | Q.  So she went to school shortly after her divorce? |
| 6 | A.  During. |
| 7 | Q.  During.  Did she graduate? |
| 8 | A.  Yeah. |
| 9 | Q.  When? |
| 10 | A.  2012. |
| 11 | Q.  She graduated in 2012? |
| 12 | A.  (Witness nods head affirmatively.) |
| 13 | Q.  And when did she start school? |
| 14 | A.  I don't remember. |
| 15 | Q.  Okay.  We'll get into that.  After she graduated |
| 16 |     school, what did she do? |
| 17 | A.  She became a registered nurse. |
| 18 | Q.  And then what? |
| 19 | A.  Got a job at Sparrow. |
| 20 | Q.  Was she working at Sparrow during your trip to |
| 21 |     Jamaica? |
| 22 | A.  Yes. |
| 23 | Q.  Okay.  What did she do at Sparrow? |
| 24 | A.  She was an oncology nurse. |
| 25 | Q.  Is she still working there? |

|  | Page 19 |
|---|---|
| 1 | A.  No. |
| 2 | Q.  Where does she work now? |
| 3 | A.  In California. |
| 4 | Q.  That's right.  Doing what? |
| 5 | A.  I don't know exactly. |
| 6 | Q.  Okay.  And how long ago was it that your mother moved |
| 7 |     to California? |
| 8 | A.  A little over a year ago. |
| 9 | Q.  And why did she move to -- why did she move to |
| 10 |     California? |
| 11 | A.  Because there were opportunities for her there and for |
| 12 |     her husband. |
| 13 | Q.  When did your mother re-marry? |
| 14 | A.  I don't know the year. |
| 15 | Q.  Who did she marry? |
| 16 | A.  I'm sorry, what? |
| 17 | Q.  Who did she marry? |
| 18 | A.  Mark DeSantis. |
| 19 | Q.  Was your mother seeing Mr. DeSantis while you guys |
| 20 |     went to Jamaica? |
| 21 | A.  Yes. |
| 22 | Q.  When you went to Jamaica, you had not lived with your |
| 23 |     mother for about three years, right? |
| 24 | A.  Correct. |
| 25 | Q.  Have we now talked about all the cities you've lived |

|  | Page 20 |
|---|---|
| 1 |     in? |
| 2 | A.  Yes. |
| 3 | Q.  Okay.  Can you quickly tell me your education, please? |
| 4 | A.  I went to Williamston schools in Michigan. |
| 5 | Q.  What is the name -- |
| 6 | A.  Until -- |
| 7 | Q.  What was the name of your grade school? |
| 8 | A.  Explore and Discovery. |
| 9 | Q.  Both public schools? |
| 10 | A.  Yes. |
| 11 | Q.  Did you go K through 8 there? |
| 12 | A.  Yes. |
| 13 | Q.  Okay.  And then you went to high school where? |
| 14 | A.  At Williamston. |
| 15 | Q.  What was the name of that high school? |
| 16 | A.  Just Williamston High School. |
| 17 | Q.  What years were you in high school? |
| 18 | A.  20 -- |
| 19 | Q.  Let me help you out, you graduated in 2012? |
| 20 | A.  Yeah. |
| 21 | Q.  So you must have started about 2008, right? |
| 22 | A.  Yeah, end of 2008 to 2012. |
| 23 | Q.  Okay.  Did you earn any education after 2012? |
| 24 | A.  Yes. |
| 25 | Q.  What? |

|  | Page 21 |
|---|---|
| 1 | A.  I went to pharmacy tech school. |
| 2 | Q.  Okay.  Where? |
| 3 | A.  Dorsey Medical School. |
| 4 | Q.  How long did you go there? |
| 5 | A.  Six-and-a-half months. |
| 6 | Q.  And what -- did you earn a certificate? |
| 7 | A.  Yes. |
| 8 | Q.  What certificate did you earn? |
| 9 | A.  Pharmacy tech. |
| 10 | Q.  What does that mean? |
| 11 | A.  I completed the course that I went for which was |
| 12 |     pharmacy tech. |
| 13 | Q.  And that allows you -- that allows you to help in |
| 14 |     pharmacy? |
| 15 | A.  I still needed to take after getting the |
| 16 |     certification -- or the certificate. |
| 17 | Q.  Uh-huh. |
| 18 | A.  I still had to take my certification test to actually |
| 19 |     allow me to work. |
| 20 | Q.  And did you take that test? |
| 21 | A.  Yes. |
| 22 | Q.  And did you pass that test? |
| 23 | A.  No. |
| 24 | Q.  Did you ever pass that test? |
| 25 | A.  No. |

Page 22

1  Q.  Okay.  After that, did you -- did you earn any other
2      education?
3  A.  Yes.
4  Q.  What did you earn?
5  A.  Just credits.
6  Q.  Where?
7  A.  Lansing Community College.
8  Q.  Okay.  When did you take those credits?
9  A.  Over the course of the last threeish years.
10 Q.  So sometime between 2016 and 2019?
11 A.  Yeah.
12 Q.  Okay.  From 2013 to 2016, you took no credits?
13 A.  Not at LCC.
14 Q.  Did you take credits anywhere else?
15 A.  Just the two.
16 Q.  When you say just the two, you're talking about?
17 A.  Dorsey and Lansing Community College.
18 Q.  For the pharmacy tech?
19 A.  Yes.
20 Q.  Okay.  So that was between 2012 and 2013, right?
21 A.  That was about 2013.
22 Q.  Okay.  After that until you started taking courses in
23     2016 again, did you take any -- did you earn any other
24     credits?
25 A.  No.

Page 23

1  Q.  In 2015 during your trip to Jamaica, were you taking
2      any credits?
3  A.  No.
4  Q.  Are you on your way to earning a degree of some sort?
5  A.  Yes.
6  Q.  And what degree are you trying to achieve?
7  A.  I'm unsure.
8  Q.  Okay.  How far are you from earning an associate of
9      arts?
10 A.  Rather far.
11 Q.  I won't push you on that.  Good luck.
12         Can we talk a little bit about your
13     employment?
14 A.  Yeah.
15 Q.  Where did you work in high school?
16 A.  In high school I worked at Wilson Marine Corporation
17     in Howell.
18 Q.  Doing what?
19 A.  Boat detailing.
20 Q.  Is that -- that's an after school job?
21 A.  I did summers and Saturdays.
22 Q.  Cleaning boats and making them shine?
23 A.  Yes.
24 Q.  After you graduated high school, what did you do?
25 A.  After high school, I was employed by Lifetouch.

Page 24

1  Q.  Doing what?
2  A.  Accounts receivable specialist.
3  Q.  What does Lifetouch do?
4  A.  I'm sorry, what?
5  Q.  What does Lifetouch do?
6  A.  They take school photos.
7  Q.  And what did you do?  Oh, accounts receivable?
8  A.  Yeah.
9  Q.  How long were you at Lifetouch?
10 A.  Just one summer.
11 Q.  Okay.  That was the summer after you graduated high
12     school?
13 A.  Yes.
14 Q.  Where did you go to after Lifetouch?
15 A.  After Lifetouch I went to President Tuxedo.
16 Q.  And what did you do there?
17 A.  I was a sales consultant.
18 Q.  Selling tuxedos or renting tuxedos?
19 A.  Yep, both.
20 Q.  And how long were you there?
21 A.  About a year.
22 Q.  So approximately 2013 to 2014?
23 A.  I took a break in between Lifetouch and President
24     Tuxedo.
25 Q.  Okay.  How long was that break?

Page 25

1  A.  A couple years so that I could do school.
2  Q.  Do you recall what years you worked at President
3      Tuxedo?
4  A.  2014 through '15.
5  Q.  Okay.  So from approximately the summer of 2012 until
6      2014, you had no employment?
7  A.  Not that I can remember.
8  Q.  And during that time, you were enrolled as a full-time
9      student?
10 A.  For part of the time, yes.
11 Q.  And the other part of the time when you were not
12     working, working and I guess going to school part
13     time, what else did you do to occupy your time?
14 A.  I can't remember.
15 Q.  You just hung out?
16 A.  Kind of.
17 Q.  Why did you choose to switch from full-time studies to
18     part-time studies?
19 A.  My course was over.
20 Q.  And why did you just take -- why didn't you utilize
21     the other half of your time on other activities?
22 A.  I don't remember.
23 Q.  Was there ever a period of time between 2012 and 2014
24     where you were neither working nor going to school?
25 A.  I believe there were times.

Page 26

1   Q.   Okay.  How long a period of time lapsed between you
2        not -- excuse me, bad question.  How long a period of
3        time lapsed where you were not working and not going
4        to school?
5   A.   I don't know.
6   Q.   Okay.  You ultimately find a job with
7        President Tuxedo and was that a full-time job?
8   A.   Yes.
9   Q.   How did you find that job?
10  A.   I went to a bank and the person in front of me worked
11       there.
12  Q.   And you asked them or you started chatting with them
13       and he (sic) told you about opportunities?
14  A.   Yeah, she actually ended up telling me about the job
15       opportunity that just came up.
16  Q.   Okay.  And you stayed there until when?
17  A.   I was at President Tuxedo until April I believe of
18       2015.
19  Q.   So you left President Tuxedo about a month before your
20       trip to Jamaica?
21  A.   About, yes.
22  Q.   Okay.  And did you switch to another job?
23  A.   Yes.
24  Q.   Okay.  What job did you switch to?
25  A.   Back to Wilson Marine.

Page 27

1   Q.   And what did you do at Wilson Marine?
2   A.   Boat detailing.
3   Q.   Okay.  Does your father work at Wilson Marine?
4   A.   Yes.
5   Q.   Does your father own Wilson Marine?
6   A.   No.
7   Q.   Is your father part owner of Wilson Marine?
8   A.   No.
9   Q.   Do you still work at Wilson Marine?
10  A.   Yes.
11  Q.   So from approximately May of 2015 until today, you've
12       worked at Wilson Marine?
13  A.   Not consistently.
14  Q.   What does that mean?
15  A.   I stopped for school again.
16  Q.   Okay.  Was there ever a time between May of 2015 or
17       April of 2015 and 2019 and today that you were neither
18       working nor going to school?
19  A.   Not that I can remember.
20  Q.   Did you, when you left President Tuxedo, did you
21       immediately go into boat detailing?
22  A.   Yes.
23  Q.   And I'm sorry, but it's a little bit awkward that you
24       would have switched jobs and immediately gone on
25       vacation, so did they have a liberal vacation policy

Page 28

1        or how did you arrange to take a vacation so soon
2        after you switched jobs?
3   A.   It was already planned for.
4   Q.   Okay.
5   A.   And I made them aware of it.
6   Q.   Okay.  You've always -- you've remained boat detailing
7        at Wilson Marine?
8   A.   Yes.
9   Q.   Is that a, is that shop on the -- on one of the lakes?
10       Is Wilson Marine on -- a marina on one of the lakes?
11  A.   Yes.
12  Q.   Which lake?
13  A.   Chemung.
14            MR. WEGLARZ:  Is it standard spelling?
15            THE WITNESS:  I don't know.  I have no
16       idea.
17  BY MR. SUAREZ:
18  Q.   Now, I'd like to now know, I'm going to move in -- I'm
19       sorry.  We've now talked about all your employments?
20  A.   Yes.
21  Q.   Did you work in junior high?
22  A.   No.
23  Q.   Okay.  I want to go through quickly the serious
24       boyfriends you have -- you have had in chronological
25       order.

Page 29

1   A.   Okay.
2   Q.   Okay?  So can you tell me, please the first serious
3        boyfriend you've had?
4   A.   Chris.
5   Q.   What was his name?
6   A.   I'm sorry?
7   Q.   What was his name?
8   A.   Chris.
9   Q.   What was his last name?
10  A.   Beaudrie.
11  Q.   How do you spell that?
12  A.   B-E-A-U-D-R-I-E.
13  Q.   And when did you have a relationship with
14       Mr. Beaudrie?
15  A.   2012 through '14.
16  Q.   So about two years?
17  A.   Yes.
18  Q.   I noted you started after you graduated from high
19       school.  Did you have boyfriends in high school?
20  A.   No.
21  Q.   Did you date men while you were in high school?
22  A.   No.
23  Q.   After Mr. Beaudrie, what was your next relationship?
24  A.   About six months later.
25  Q.   Okay.  Who did you start dating?

Page 30

1  A.  Andy.
2  Q.  And what was Andy's last name?
3  A.  Piatkowski.
4  Q.  You'll have to help me with that one.
5  A.  If I can remember, it was P-I-A-K-O-W-S-K-I (sic) and
6      that's a total guess.  I do not remember right now.
7  Q.  And how long were you dating Mr. Piatkowski?
8  A.  About five or six months.
9  Q.  Did you end your relationship with Mr. Piatkowski
10     before or after your trip to Jamaica?
11 A.  Before.
12 Q.  Did you end your relationship with Mr. Piatkowski
13     before or after 2015?
14 A.  Before.
15 Q.  After Mr. Piatkowski, what was your next relationship?
16 A.  Last summer.
17 Q.  Okay.
18 A.  So 2018.
19 Q.  Who did you -- who did you date?
20 A.  Andrew Burke.
21 Q.  How do you spell Burke?
22 A.  B-U-R-K-E.
23 Q.  Are you still with Mr. Burke?
24 A.  No.
25 Q.  After Mr. Burke, who was your next relationship?

Page 31

1  A.  I haven't had one.
2  Q.  So you've had three serious relationships in your
3      life?
4  A.  Yes.
5  Q.  Okay.  And you had no relationships from the end of
6      2014 until the summer of 2018?
7  A.  Correct.
8  Q.  How did you meet Mr. Beaudrie?
9  A.  He went to the same high school.
10 Q.  What did Mr. Beaudrie do for a living?
11 A.  He had just gotten out of the military.
12 Q.  And you were with him for about two years, what did he
13     do in those two years?
14 A.  Taught swimming.
15 Q.  What else?
16 A.  Factory work.
17 Q.  Doing what?
18 A.  I don't know exactly.
19 Q.  Okay.  How much older was Mr. Beaudrie than you?
20 A.  About four years.
21 Q.  How long had he been in the military?
22 A.  About four years.
23 Q.  How did you meet Mr. Piatkowski?
24 A.  Mutual friends.
25 Q.  What did Mr. Piatkowski do for a living?

Page 32

1  A.  He was a pharmacy tech.
2  Q.  How did you meet Mr. Burke?
3  A.  I believe mutual friends again.
4  Q.  And what did Mr. Burke do for a living?
5  A.  He was still looking for a job.
6  Q.  So Mr. Burke did nothing?
7  A.  As far as I'm aware.
8  Q.  Okay.  Have you tried to get any other certificates
9      other than the pharmacy tech certificate?
10 A.  No.
11 Q.  After you graduated from high school, did you take any
12     health courses?
13 A.  No.
14 Q.  Do you have any licenses?
15 A.  No.
16 Q.  Do you have a driver's license?
17 A.  Oh, yeah.
18 Q.  Do you have a boater's license?
19 A.  No.
20 Q.  How long have you had a driver's license?
21 A.  Since I was 17.
22 Q.  Have you ever been convicted of a crime?
23 A.  No.
24 Q.  Have you ever been on probation --
25 A.  No.

Page 33

1  Q.  -- for a criminal charge?
2  A.  No.
3  Q.  Have you ever been suspended from a school?
4  A.  No.
5  Q.  Have you ever had any disciplinary actions at any
6      school?
7  A.  Not that I can remember.
8  Q.  Did you have demerits in high school?
9  A.  Demerits?
10 Q.  Do they still give those?  Do you know what a demerit
11     is?
12 A.  Not exactly.
13 Q.  Man I'm old, never mind.  Did you ever get punished in
14     high school so that they would tell you hey, you've
15     got to come Saturday --
16 A.  No.
17 Q.  -- and sit in a class as a punishment?
18 A.  No.
19 Q.  Did you ever get punished by a school administrator?
20 A.  No.
21 Q.  Before your trip to Jamaica, had you ever traveled
22     outside the United States?
23 A.  Not that I know of.
24 Q.  After your trip to Jamaica, had you ever traveled
25     outside the United States?

Page 34

1   A.   No.
2   Q.   Before your trip to Jamaica, had you taken family
3        vacations?
4   A.   Yes.
5   Q.   In high school, where did you go with your family?
6   A.   Florida.
7   Q.   Sorry?
8   A.   Florida.
9   Q.   Why Florida?
10  A.   Family was down there.
11  Q.   Where?
12  A.   I don't remember exactly.
13  Q.   Where did you stay?
14  A.   At family's house.
15  Q.   Did you go to any of the amusement parks or theme
16       parks?
17  A.   Just the beach.
18  Q.   East or West Coast?
19  A.   I have no idea.
20  Q.   Don't remember?  Aside from a trip going to Florida,
21       did you go anywhere else while you were in high
22       school?
23  A.   Not that I can remember.
24  Q.   After you -- between the time you graduated from high
25       school and your trip to Jamaica, did you take any

Page 35

1        vacations?
2   A.   One.
3   Q.   Where?
4   A.   To Texas.
5   Q.   Why?
6   A.   Family.
7   Q.   And what did you do there?
8   A.   Celebrated a birthday.
9   Q.   Whose?
10  A.   My uncle.
11  Q.   Which city?
12  A.   Dallas.
13  Q.   They were having a party for your uncle?
14  A.   Yes.
15  Q.   Do you have any members of your family that are in law
16       enforcement?
17  A.   No.
18  Q.   How many uncles do you have?
19  A.   Four or five.
20  Q.   Four or five.  Okay.  Let me make it easier for you.
21       On the paternal side, how many brothers and sisters
22       does your dad have?
23  A.   I don't remember.
24  Q.   On your mother's side, how many brothers and sisters
25       does your mother have?

Page 36

1   A.   Just three brothers.
2   Q.   Okay.  Are they all in Michigan?
3   A.   No.
4   Q.   Is one of the three brothers in Texas?
5   A.   Yes.
6   Q.   All right.  What does that gentleman do?
7   A.   He is a record producer.
8   Q.   Between the time of your trip to Jamaica until --
9        until 2019, did you take any vacations?
10  A.   Yes.
11  Q.   Where?
12  A.   To California.
13  Q.   For what purpose?
14  A.   To visit my mother.
15  Q.   So that was within the last two years or so?
16  A.   Yes.
17  Q.   Aside from that trip to visit your mother, did you,
18       between 2015 and 2017, did you take any vacations?
19  A.   Oh, between 2017?
20  Q.   Between 2015 and 2017, did you take any vacations?
21  A.   Oh, no.
22  Q.   And between 2017 and 2019, you went to visit your
23       mother in California?
24  A.   Yes.
25  Q.   Okay.  When you were a kid before high school, do you

Page 37

1        recall any vacations you took?
2   A.   Yes.
3   Q.   Where?
4   A.   Florida.
5   Q.   For?
6   A.   Family.
7   Q.   Go to the beach?
8   A.   Yes.
9   Q.   Was -- were your visits to Florida while you were
10       growing up in high school a yearly thing or was it
11       once every two years or was it once every three years?
12  A.   I don't remember.
13  Q.   Is any member of your family a doctor or health care
14       professional?
15  A.   Yes.
16  Q.   Who?
17  A.   My mother.
18  Q.   Aside from your mom?
19  A.   My stepdad.
20  Q.   Mr. DeSantis?
21  A.   Yes.
22  Q.   What does he do?
23  A.   He -- he was an eye doctor.
24  Q.   An ophthalmologist?
25  A.   Yes.

Page 38

1  Q.  When you say was?
2  A.  Now he teaches.
3  Q.  Where?
4  A.  In California.
5  Q.  Do you know what he teaches?
6  A.  No.
7  Q.  What is your stepdad's name?
8  A.  Mark DeSantis.
9  Q.  You told me that, I'm sorry.  What's your father's
10     name?
11 A.  Stuart Bater.
12         MR. SUAREZ:  You know, I'm about to start
13     talking about Jamaica, so I think it's probably a good
14     stopping point.
15         MR. WEGLARZ:  4:54.
16         MR. SUAREZ:  Is that good?
17         MR. WEGLARZ:  I think so.  Resume tomorrow?
18         MR. SCOTT:  Yeah, 8:00.
19         MR. SUAREZ:  Ma'am, by agreement of
20     counsel, we're going to stop today at 5:00 and we're
21     going to resume tomorrow at 8:00 a.m. to try to
22     complete your deposition tomorrow.
23         THE WITNESS:  Okay.
24         MR. SUAREZ:  Is that okay?
25         THE WITNESS:  Yes.

Page 39

1          MR. SCOTT:  I only ask you this, we all
2  have flights out tomorrow, we want to get it done, so
3  you know, 8:00.
4          THE WITNESS:  Oh, I should be at work right
5  now, so I know the feeling.
6          MR. SUAREZ:  All right.  Thank you, ma'am,
7  I appreciate it.
8          (The deposition was adjourned at 4:55 p.m.
9          Signature of the witness was not requested by
10         counsel for the respective parties hereto.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 40

1              CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                   ) SS
4  COUNTY OF WAYNE   )
5
6          I, KATHRYN L. JANES, certify that this
7  deposition was taken before me on the date
8  hereinbefore set forth; that the foregoing questions
9  and answers were recorded by me stenographically and
10 reduced to computer transcription; that this is a
11 true, full and correct transcript of my stenographic
12 notes so taken; and that I am not related to, nor of
13 counsel to, either party nor interested in the event
14 of this cause.
15
16
17
18
19
20
21
22              KATHRYN L. JANES, CSR-3442
23              Notary Public,
24              Wayne County, Michigan.
25 My Commission expires:  October 22, 2022

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF FLORIDA

MIAMI DIVISION


PAITON E. BATER, AMBER R.

TORRALVA, JANET DESANTIS,

and MARGARET A. TORRALVA,

              Plaintiffs,

       vs.           Case No. 1:17-cv-21703

                      Hon. Marcia G. Cooke

UNIQUE VACATIONS, INC., a

Delaware corporation, THE

MARK TRAVEL CORPORATION, a

Nevada corporation d/b/a Fun

Jet Vacations, DWIGHT DAVIS

JERMAINE DYER, and WILLIAM TAPPER,

Jointly and Severally,

              Defendants.

_____


    The Continued Deposition of PAITON ELISIBETH BATER,

    Taken at 19390 West Ten Mile Road,

    Southfield, Michigan,

    Commencing at 8:32 a.m.,

    Thursday, September 26, 2019,

    Before Kathryn L. Janes, CSR-3442, RMR, RPR.

Page 42

```
 1   APPEARANCES:
 2
 3   TODD J. WEGLARZ
 4   Fieger, Fieger, Kenney & Harrington, P.C.
 5   19390 West Ten Mile Road
 6   Southfield, Michigan 48075
 7   248.355.5555
 8   tweglarz@fiegerlaw.com
 9       Appearing on behalf of the Plaintiffs.
10
11   STEVEN R. SAFRA
12   Cole, Scott & Kissane, P.A.
13   9150 South Dadeland Boulevard
14   Suite 1400
15   Miami, Florida 33256
16   786.268.6418
17   steven.safra@csklegal.com
18       Appearing on behalf of the Defendant, Unique
19   Vacations, Inc.
20
21
22
23
24
25
```

Page 43

```
 1   LUIS E. SUAREZ
 2   Boies, Schiller & Flexner, LLP
 3   100 Southeast 2nd Street
 4   Suite 2800
 5   Miami, Florida 33131
 6   305.357.8431
 7   lsuarez@bsfllp.com
 8       Appearing on behalf of the Defendant, The Mark Travel
 9   Corporation.
10
11   ALSO PRESENT:
12   Janet DeSantis
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 44

```
 1                 TABLE OF CONTENTS
 2
 3   WITNESS                          PAGE
 4   PAITON ELISABETH BATER
 5
 6   CONTINUED EXAMINATION
 7   BY MR. SUAREZ:                     47
 8   EXAMINATION
 9   BY MR. SAFRA:                     170
10   RE-EXAMINATION
11   BY MR. SUAREZ:                    178
12   RE-EXAMINATION
13   BY MR. SAFRA:                     210
14   RE-EXAMINATION
15   BY MR. SUAREZ:                    212
16   RE-EXAMINATION
17   BY MR. SAFRA:                     241
18   RE-EXAMINATION
19   BY MR. SUAREZ:                    262
20   EXAMINATION
21   BY MR. WEGLARZ:                   268
22   RE-EXAMINATION
23   BY MR. SAFRA:                     300
24   RE-EXAMINATION
25   BY MR. WEGLARZ:                   312
```

Page 45

```
 1   RE-EXAMINATION
 2   BY MR. SAFRA:                     318
 3   RE-EXAMINATION
 4   BY MR. WEGLARZ:                   320
 5
 6                 EXHIBITS
 7
 8   EXHIBIT                          PAGE
 9   (Exhibits attached to transcript.)
10
11   DEPOSITION EXHIBIT 1              48
12   DEPOSITION EXHIBIT 2              51
13   DEPOSITION EXHIBIT 4             78
14   DEPOSITION EXHIBIT 3             81
15   DEPOSITION EXHIBIT 5            113
16   DEPOSITION EXHIBIT 6            120
17   DEPOSITION EXHIBIT 7            127
18   DEPOSITION EXHIBIT 8            142
19   DEPOSITION EXHIBIT 9            198
20   DEPOSITION EXHIBIT 10           207
21   DEPOSITION EXHIBIT 11           212
22   DEPOSITION EXHIBIT 12           214
23   DEPOSITION EXHIBIT 13           216
24   DEPOSITION EXHIBIT 14           222
25   DEPOSITION EXHIBIT 15           223
```

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 46

```
1    DEPOSITION EXHIBIT 16        226
2    DEPOSITION EXHIBIT 17        238
3    DEPOSITION EXHIBIT 18        260
4    DEPOSITION EXHIBIT 19        268
5    DEPOSITION EXHIBIT 20        282
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 47

```
1    Southfield, Michigan
2    Thursday, September 26, 2019
3    8:32 a.m.
4
5              PAITON ELISIBETH BATER,
6        was thereupon called as a witness herein, and after
7        having first been duly sworn to testify to the truth,
8        the whole truth and nothing but the truth, was
9        examined and testified as follows:
10             CONTINUED EXAMINATION
11   BY MR. SUAREZ:
12   Q.  Good morning, ma'am.  You understand we're still under
13       oath and we're continuing your deposition which
14       started yesterday?
15   A.  Yes.
16   Q.  Again, my name is Luis Suarez and I represent the Mark
17       Travel Corporation which is a tour operator that was
18       sued in this lawsuit.  Sitting to my left is a
19       gentleman that I don't believe you've met, he's Steve
20       Safra, who represents an entity called UVI.
21   A.  Okay.
22   Q.  Okay?  Just for the record, ma'am, what are the papers
23       that you brought that are sitting in front of you?
24   A.  They are Facebook messages and pictures and my
25       statement from the 9th of May, 2015.
```

Page 48

```
1    Q.  Okay.  When did you get those documents?
2    A.  I just got this, the Facebook stuff today.
3    Q.  Okay.
4    A.  And I don't remember when I got that.
5    Q.  Can I see -- when you say you just got this, that
6        means your lawyer gave you a copy?
7    A.  Correct.
8    Q.  Okay.
9              MARKED FOR IDENTIFICATION:
10             DEPOSITION EXHIBIT 1
11             8:34 a.m.
12   BY MR. SUAREZ:
13   Q.  I'm going to mark these documents as Exhibit 1 to the
14       deposition, it's a -- it's an eight-page document that
15       contains what appear to be Facebook messages for a few
16       select dates and I will address these with counsel at
17       another moment.  I'm just marking it for the record to
18       indicate that they were being produced for the first
19       time this morning at 8:30 a.m., although he indicated
20       they were downloaded on July 12th at some point.
21             That said, ma'am, I don't want to waste
22       your time.  Are you under the influence of any
23       medication today?
24   A.  Just what I'm prescribed.
25   Q.  What are you prescribed?
```

Page 49

```
1    A.  Prozac for depression.
2    Q.  Okay.
3    A.  And Adderall for ADD.
4    Q.  Okay.  When we were speaking yesterday, did you have
5        any difficulty understanding my questions?
6    A.  No.
7    Q.  Okay.  If today you have any difficulty understanding
8        any of my questions, would you please let me know?
9    A.  Yes.
10   Q.  Okay.  If you answer a question, I'm going to assume
11       that you understood it and that you're giving a
12       truthful answer; is that okay?
13   A.  Yes.
14   Q.  Okay.  A couple of points I just wanted to clean up
15       from yesterday as I was thinking about some of the
16       things you've told me, I want to lay out a couple
17       markers to help guide us today and perhaps make life a
18       little easier, okay?
19   A.  Okay.
20   Q.  So first is, do you have any video of your trip to
21       Jamaica?
22   A.  I don't think so.
23   Q.  Do you know whether anyone took a video during your
24       trip to Jamaica?
25   A.  Not that I'm aware of.
```

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 50

1   Q.  You have an iPhone or --
2   A.  Now, yes.
3   Q.  Did you have a phone when you went to Jamaica?
4   A.  Yes.
5   Q.  Did your mother have a phone?
6   A.  Yes.
7   Q.  Did Amber have a phone?
8   A.  Yes.
9   Q.  Did Margaret Torralva have a phone?
10  A.  Yes.
11  Q.  Okay.  And all of those phones had capabilities to
12      take videos?
13  A.  Yes.
14  Q.  And no one took a video?
15  A.  Not that I'm aware of.
16  Q.  Okay.  Are you familiar with what Instagram stories
17      are?
18  A.  Yes.
19  Q.  And Facebook stories?
20  A.  Yeah.
21  Q.  Did anybody post any Instagram or Facebook stories?
22  A.  Not that I'm aware of.
23  Q.  Okay.  We laid out certain markers yesterday about
24      your life.  One of the things you told me is that in
25      2012 when you were 18 your parents got divorced and

Page 51

1       that you remained living in the home with your father;
2       do you recall that?
3   A.  Yes.
4   Q.  Okay.  Could you be confused about the date of the
5       divorce or the separation?
6   A.  No.
7   Q.  Okay.  We'll go through that.  So let me mark as
8       Exhibit 2 a document that I will be referring to
9       throughout the deposition for different reasons, okay?
10          MARKED FOR IDENTIFICATION:
11          DEPOSITION EXHIBIT 2
12          8:38 a.m.
13  BY MR. SUAREZ:
14  Q.  Ma'am, this is a record of a psychological evaluation
15      that was done of you on or about October 27th of 2016
16      and the review was actually completed December 15th,
17      of 2016, okay?
18  A.  Yep.
19  Q.  And one of the things that this record does is it lays
20      out some of your background history and I found it
21      useful to sort of help instead of having quizzing you
22      on dates, maybe it's better to walk through a document
23      where dates are already laid out and maybe we can do
24      this a little quicker, okay?
25  A.  Okay.

Page 52

1   Q.  So right now I'm just using this for dates and one of
2       it says -- one of the things it says is your parents,
3       here on page 2, it says your parents divorced 18 years
4       ago and your mother remarried three years ago; do you
5       see that?
6   A.  Uh-huh, yeah.
7   Q.  And if we do the math, the divorce would have been in
8       '98 and your mother's remarriage would have been in
9       2013.  So the first -- the 18 years ago is wrong, that
10      date is wrong?
11  A.  Yeah, that's wrong.
12  Q.  Okay.  And the second thing it says, it says your
13      mother remarried three years ago in 2013; is that
14      right or wrong?
15  A.  I don't remember.
16  Q.  Do you have any idea when your mother remarried?
17  A.  I don't know.
18  Q.  Did your mother remarry before or after your trip to
19      Jamaica?
20  A.  Before.
21  Q.  Okay.  Did your mother move away from Michigan before
22      or after your trip to Jamaica?
23  A.  After.
24  Q.  Okay.  Another thing it says here under family
25      history, it says that you've been residing with your

Page 53

1       biological father since 1997, which would have been
2       about when you were three years old.  And it gives the
3       impression, at least in this sentence that you were
4       only living with your biological father since you were
5       three years old; is that true or not?
6   A.  No.
7   Q.  Okay.  So you lived with your father and your mother
8       until you were 18 and you were -- in 2012, right?
9   A.  Correct.
10  Q.  So that's wrong in this document as well?
11  A.  Yes.
12  Q.  Okay.  Another thing this document says is that when
13      you were about four years old, you were hit on the
14      side of the head, so that would have been
15      approximately -- excuse me, when you were four years
16      old you hit your head on the fireplace and you
17      received stitches.  Is that true?
18  A.  Yes.
19  Q.  And it also says that when you were five years old,
20      you were hit on the side of the head with a golf club;
21      is that also true?
22  A.  Yes.
23  Q.  Okay.  Then it says when you were about ten years old,
24      you were involved in a car accident; is that true?
25  A.  Yes.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 54

1   Q.   Okay.  And we talked a little bit about your car
2        accident yesterday, right?
3   A.   Right.
4   Q.   And then it says that after that car accident, when
5        you were ten, there was a fatality, right?
6   A.   During the car accident, yes.
7   Q.   Okay.  And then how many people passed away?
8   A.   Just one.
9   Q.   Okay.  Was that person related to you?
10  A.   No.
11  Q.   And then it says that you said that your grades went
12       down after that accident.  I'm sorry.  I don't have my
13       glasses.  And that you never recovered and that it
14       almost led to you being unable to graduate from high
15       school; is that true?
16  A.   Yes.
17  Q.   And it stated that you were having -- you were unable
18       to absorb learning material; is that true?
19  A.   That's correct.
20  Q.   Okay.  So you had difficulties after your car accident
21       with your schooling, right?
22  A.   Yes.
23  Q.   Nonetheless, you graduated from high school, right?
24  A.   Right.
25  Q.   Okay.  It goes on to say that when you were about 13,

Page 55

1        you had a psychological evaluation for learning
2        disabilities; is that true?
3   A.   Yes.
4   Q.   And then it says that when you were about 16, and in
5        the 6th -- and in the -- actually, that's not there.
6        It says that when you were in the 6th grade, you began
7        having difficulties grasping concepts that you were
8        learning in school, right?
9   A.   Yes.
10  Q.   Okay.  And that's all related to the car accident you
11       had, right?
12  A.   I don't know.
13  Q.   At this point, ma'am, it said that you were in
14       cheerleading and choir in school; is that true?
15  A.   Yeah.
16  Q.   Another thing it says is that in 2010 when you were
17       about 16, your house, you were alone at home and your
18       house was broken into and you confronted the burglar
19       and pushed him out of the house; is that true?
20  A.   Yes.
21  Q.   And can you tell me about that?
22  A.   How so?
23  Q.   Yeah, what happened?
24  A.   I was watching TV because we were off school that
25       Friday and these guys -- these two guys came to the

Page 56

1        front door and knocked on the door, rang the doorbell
2        and I didn't recognize them so I didn't answer the
3        door.  And then they proceeded to go around the entire
4        house and check the windows.  And then ultimately one
5        of the two men came in through the dog door and I
6        confronted him because I thought he was my dog, and
7        ended up pushing him out of the front door.
8   Q.   Did you call the cops?
9   A.   Yes.
10  Q.   And did the cops come?
11  A.   Yes.
12  Q.   And did they issue a police report?
13  A.   I believe so.
14  Q.   What municipality was that?
15  A.   I don't know exactly.
16  Q.   Okay.  And then one of the things it says here is that
17       when you were 18 years old in about 2012, which is
18       before your trip to Jamaica, you had a two-year
19       relationship with a boyfriend who was verbally abusive
20       and physically intimidating; is that true?
21  A.   Yes.
22  Q.   Okay.  Did you seek treatment for the abuse given to
23       you by your former boyfriend?
24  A.   Not that I can remember.
25  Q.   Do you -- did you ever -- is this the gentleman called

Page 57

1        Chris?
2   A.   Yes.
3   Q.   Did you ever report Chris to the authorities?
4   A.   No.
5   Q.   Did you ever tell your mom that Chris was being
6        verbally or physically abusive towards you?
7   A.   After the fact, yes.
8   Q.   Did you tell your mom that Chris was being physically
9        and verbally abusive towards you before or after your
10       trip to Jamaica?
11  A.   Before.
12  Q.   Okay.  And did your mom help you get any treatment for
13       that at that time?
14  A.   Not that I can remember.
15  Q.   Okay.  And then the document says then in 2014 when
16       you were about 20 years old, you graduated near the
17       top of your class in your pharm tech school; is that
18       true?
19  A.   Yep.
20  Q.   But it also says that in 2014, you were taking
21       Adderall; is that true?
22  A.   Yeah.
23  Q.   Is that medication for ADD?
24  A.   Yes.
25  Q.   What medications do you recall taking while you were

Page 58

1    in high school from 2008 to 2012?
2    A.  Only vitamins that I can remember.
3    Q.  What medications do you recall taking from 2012 until
4    your trip to Jamaica?
5    A.  Adderall.
6    Q.  What else?
7    A.  Birth control.
8    Q.  What else?
9    A.  I can't remember anything else.
10   Q.  How old were you when you started taking birth
11   control?
12   A.  I was about a freshman in high school actually.
13   Q.  So about 14?
14   A.  Yeah.  Thinking back, I do remember.
15   Q.  Okay.  When your boyfriend, Chris Beaudrie, before
16   your trip to Jamaica was being verbally and physically
17   abusive towards you, did that cause you any anxiety or
18   depression?
19   A.  A little, yes.
20   Q.  Okay.  And did you ever tell that to a doctor or a
21   health care provider of any sort?
22   A.  Not that I can remember.
23   Q.  Ma'am, have you ever seen the Complaint in this
24   lawsuit?
25   A.  I don't know.

Page 59

1    Q.  Have you ever -- have you ever -- has your lawyer ever
2    given you a document that explains the lawsuit?
3    A.  Yes.
4    Q.  Have you ever read that document?
5    A.  Yes.
6    Q.  You have?
7    A.  Yes.
8    Q.  When did you read that?
9    A.  I don't know exactly.
10   Q.  Do you recall how many pages it was?
11   A.  No.
12   Q.  Do you recall when he gave it to you?
13   A.  I don't remember.
14   Q.  Do you recall anything about it?
15   A.  Not specifics, no.
16   Q.  Do you recall -- do you recall asking him questions
17   about it?
18   A.  I don't remember.
19   Q.  Do you recall him asking you whether any of the
20   statements he made in there were true?
21   A.  I don't remember.
22   Q.  And leading up to your -- leading up to your trip to
23   Jamaica, did you talk to any travel agent about your
24   trip?
25   A.  No.

Page 60

1    Q.  Did you talk to anyone from the entity known as Unique
2    Vacations, Inc., The Mark Travel Corporation, Fun Jet
3    Vacations, or Vacations to Go about your trip?
4    A.  No.
5    Q.  Did you go online and study anything about those
6    entities that I just listed?
7    A.  No.
8    Q.  Did you ever study the itineraries associated with
9    your trip to Jamaica?
10   A.  No.
11   Q.  Did you ever look at any of the itineraries associated
12   with your trip to Jamaica?
13   A.  No.
14   Q.  Did you, as best as you know, your trip to Jamaica was
15   your -- your mom's idea?
16   A.  No.
17   Q.  Whose idea was it to go to Jamaica?
18   A.  It had been my dream since I was little, since my
19   parents went.
20   Q.  When did your parents go to Jamaica?
21   A.  About 2001.
22   Q.  Okay.  You were about seven years old at that time,
23   right?
24   A.  Yes.
25   Q.  Did you look at pictures of Jamaica at that time?

Page 61

1    A.  Yeah.
2    Q.  Who showed you those photographs?
3    A.  My parents when they got back.
4    Q.  What did they tell you about it?
5    A.  That it was fun and safe and that they got to go out
6    and do fun stuff.
7    Q.  Your testimony sitting here today is that you recall
8    your mom telling you 18 years ago that Jamaica was fun
9    and safe and that you can go out?
10   A.  Not necessarily that you could go out, but that they
11   had a good time.
12   Q.  Okay.
13   A.  And they were safe on the...
14   Q.  That's your testimony that you recall 18 years ago
15   your mom telling you that Jamaica was safe?
16   A.  Yeah.
17   Q.  What did you interpret when you were seven years old
18   as to the meaning of the word safe that your mom told
19   you at that time?
20   A.  That it was a good vacation spot and...
21   Q.  Did she tell you what city she went to?
22   A.  Yes.
23   Q.  What city?
24   A.  I believe it was Montego Bay.
25   Q.  Okay.  What else did she tell you about that trip?

Page 62

1   A.   They went with my dad's work.
2   Q.   What was your dad doing at that time?
3   A.   He was a boat mechanic.
4   Q.   Okay.  How did this, your trip with your mother to
5        Jamaica originate?
6   A.   She knew that I had always wanted to go ever since
7        they went.
8   Q.   Okay.  And when did she approach you and tell you
9        about the idea of going on a trip?
10  A.   For my 21st birthday.
11  Q.   What -- you were turning 21 in 2015?
12  A.   Yes.  I think so.
13  Q.   You were born in March, right?
14  A.   Yeah.
15  Q.   So you had just turned 21 when you went to Jamaica?
16  A.   Yes.
17  Q.   Because you went to Jamaica in May, right?
18  A.   Yes.
19  Q.   Okay.  And when did she approach you about going to
20       Jamaica?
21  A.   Around my birthday in March.
22  Q.   Okay.  And what did you say?
23  A.   I said of course, I'd love to go.
24  Q.   And when did the idea of going with Amber and Margaret
25       originate?

Page 63

1   A.   I'm not sure.
2   Q.   Okay.  At the time that she told you about Jamaica,
3        did she ask you what city you wanted to go to?  She in
4        that statement is your mother, Janet?
5   A.   It was more of a combined effort of looking into
6        places instead of her saying, well, where do you want
7        to go.
8   Q.   Okay.  So what places did you look at?
9   A.   We looked all around.
10  Q.   When you say all around, what does that mean?
11  A.   All around the island.
12  Q.   You looked at with her?
13  A.   Yes.
14  Q.   And what -- what areas do you recall looking at and
15       how do you recall looking at them?
16  A.   The only two that I can remember were the Montego area
17       and the Ocho Rios area.
18  Q.   Okay.  And who decided on which city you were going to
19       go to?
20  A.   I think it was kind of both of us.
21  Q.   Okay.  And how did you make the decision to go to that
22       city?
23  A.   We looked at the resorts that they had to offer.
24  Q.   Okay.  And what resorts do you recall looking at?
25  A.   Moon Palace in Ocho Rios, and I can't remember any

Page 64

1        others except for the Sandals resorts, but that was
2        kind of more adult and we wanted something that was
3        more fun for everybody.
4   Q.   Okay.  When you say look around, you mean the
5        Internet, right?
6   A.   Yes.
7   Q.   And most any of your searching was done online on the
8        Internet, right?
9   A.   Yes.
10  Q.   You didn't go outside to anybody, correct?
11  A.   Correct.
12  Q.   Did you ask any of your friends whether they had gone
13       to Jamaica?
14  A.   Yes.
15  Q.   Which friends?
16  A.   A coworker actually.
17  Q.   Okay.  Which coworker?
18  A.   His name is Aaron Trigg and he had just got married in
19       Jamaica.
20  Q.   Where?
21  A.   Around the Ocho Rios area.
22  Q.   Which resort?
23  A.   I don't know.
24  Q.   What did he tell you about Jamaica?
25  A.   That it was beautiful and a lot of fun.

Page 65

1   Q.   Okay.  When he said a lot of fun, what did that mean
2        to you?
3   A.   That it was a fun place to visit and they had a bunch
4        of fun amenities, I guess.
5   Q.   Okay.  Was one of the criteria of your selection of
6        hotel that it needed to be an all inclusive hotel?
7   A.   Yes.
8   Q.   And by all inclusive, that means that all the food and
9        the booze were included in the hotel, right?
10  A.   Right.
11  Q.   And you know that by booze I mean alcohol, right?
12  A.   Yes.
13  Q.   Okay.  And so you were looking for a hotel where food
14       and alcohol were included, right?
15  A.   Right.
16  Q.   It was your 21st birthday trip and you were looking to
17       have a good time, right?
18  A.   Right.
19  Q.   Wanted to cut loose a little bit, right?
20  A.   Right.
21  Q.   Did you at that time, did you interact with any travel
22       agent directly?
23  A.   No.
24  Q.   Did you handle any of the logistics associated with
25       booking the trip?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 66

1  A.  No.
2  Q.  Did you look at any booking information?
3  A.  Not that I can remember.
4  Q.  Did you look at any invoices associated with the trip?
5  A.  No.
6  Q.  Did you contract with anybody related to the trip?
7  A.  No.
8  Q.  Have you ever paid for anything related to the trip?
9  A.  No.
10  Q.  Have you ever received an invoice from anybody related
11      to the trip?
12  A.  Not that I can remember.
13  Q.  When you were in Jamaica, did you pay for anything to
14      the hotel directly?
15  A.  To the gift shop.
16  Q.  What did you --
17  A.  At the hotel.
18  Q.  What did you buy?
19  A.  Souvenirs like candles and bracelets.
20  Q.  What souvenirs did you buy?
21  A.  Candles and bracelets and shot glasses.
22  Q.  I'm sorry, and what?
23  A.  Shot glasses for my friends.
24  Q.  Okay.  And you mean shot glasses --
25  A.  For alcohol.

Page 67

1  Q.  -- for alcohol?
2  A.  Yeah.
3  Q.  Did they have any logo on them?
4  A.  Not a logo, no.
5  Q.  What did they have on them?
6  A.  Just pictures of I guess local art.
7  Q.  Did they have a picture per chance of a marijuana
8      leaf?
9  A.  No.
10  Q.  Did you buy anything in Jamaica that had a marijuana
11      leaf logo on it?
12  A.  No.
13  Q.  Before your trip to Jamaica, had you ever done
14      marijuana?
15  A.  Yes.
16  Q.  How old were you when you first did marijuana?
17  A.  About 20.
18  Q.  What year?  That would be 2014?
19  A.  Yeah.
20  Q.  In high school you never did marijuana?
21  A.  Nope.
22  Q.  Did you do any other type of drugs?
23  A.  No.
24  Q.  Was marijuana one of the first drugs you tried?
25  A.  Yes.

Page 68

1  Q.  Where were you?
2  A.  I don't remember anymore.
3  Q.  Who were you with?
4  A.  Just friends.
5  Q.  What friends?
6  A.  From school, from high school.
7  Q.  So you kept friends from high school in your 20s and
8      you had marijuana with them?
9  A.  Yes.
10  Q.  Did you use marijuana once or more than once when you
11      were 20?
12  A.  More than once.
13  Q.  How often were you using marijuana?
14  A.  Maybe twice a week to go to sleep.
15  Q.  Okay.  And where were you getting this marijuana?
16  A.  From a friend.
17  Q.  Which friend?
18  A.  Josh.
19  Q.  Josh have a last name?
20  A.  Fulton.
21  Q.  F-U-L-T-O-N?
22  A.  Uh-huh.
23  Q.  How do you know Josh Fulton?
24      MR. SAFRA:  Say yes or no.
25  A.  Sorry.

Page 69

1      MR. SAFRA:  No, it happens.
2  BY MR. SUAREZ:
3  Q.  How do you know Josh Fulton?
4      MR. SAFRA:  The uh-huh was a yes, correct?
5  A.  Yes.
6  BY MR. SUAREZ:
7  Q.  How do you know Josh Fulton?
8      MR. SUAREZ:  Thank you.
9  A.  I was friends with his younger brother.
10  BY MR. SUAREZ:
11  Q.  Which younger brother?
12  A.  Steven.
13  Q.  I'm sorry, his last name is Fulton?
14  A.  Yes.
15  Q.  And he supplied you with marijuana, Josh supplied you
16      with marijuana up until your trip to Jamaica?
17  A.  No.
18  Q.  Within the year before your trip to Jamaica?
19  A.  For a few months in 2014.
20  Q.  Okay.  And when you say a few months, is that more
21      than five or less than five?
22  A.  About four or five.
23  Q.  Okay.  And at the time marijuana was illegal in
24      Michigan, correct?
25  A.  I believe so.

Page 70

1  Q. Did you like marijuana?
2  A. Not necessarily.
3  Q. And what did you like about marijuana?
4  A. It helped me get to sleep easier.
5  Q. Okay. What else did you like about marijuana?
6  A. That was really it.
7  Q. Okay. Did your mother give you veto power over the
8     selection of the hotel?
9  A. I don't remember.
10 Q. By and large the decision to select the hotel
11    ultimately resided with your mother?
12 A. I don't know, it was kind of a group effort between
13    us, so.
14 Q. When you say group effort, you mean between you and
15    your mom?
16 A. Yeah.
17 Q. So what drew you to the Moon Palace Resort aside from
18    it being an all inclusive?
19 A. The pictures that they had up on their website were
20    stunning.
21 Q. Okay. Did you look at any other pictures of any other
22    website, of any other resort, excuse me?
23 A. Yes.
24 Q. Which others?
25 A. I don't remember.

Page 71

1  Q. Did you research at the time any crime statistics
2     associated with Jamaica?
3  A. Not that I can remember.
4  Q. Had you ever heard that you needed to be careful when
5     traveling overseas?
6  A. Yes.
7  Q. How did you know that?
8  A. I don't know.
9  Q. Who told you that?
10 A. I don't remember.
11 Q. It's just something you learned by day-to-day
12    interaction with life?
13 A. Correct.
14 Q. Okay. And did you -- did you and your mom and Amber
15    and Margaret come to any type of arrangement to,
16    before your trip to make sure you were operating
17    safely?
18 A. I don't remember.
19 Q. I'm sorry?
20 A. I don't remember.
21 Q. Okay. Did you tell each other that you were going to
22    always walk around with another person present?
23 A. Yes.
24 Q. Did you establish some sort of buddy system?
25 A. In a way, yes.

Page 72

1  Q. When you say in a way, yes, what does that mean?
2  A. Nobody ever went anywhere by themselves. We didn't
3     have a set person.
4  Q. Okay, and that's an arrangement that you made before
5     you got on the flight to go to Jamaica, right?
6  A. Possibly, yes.
7  Q. When you say possibly, why are you hesitating?
8  A. Because I'm not sure when it happened.
9  Q. Okay. But sometime before you got to the resort, it
10    must have happened, right?
11       MR. WEGLARZ: Asked and answered.
12       Go ahead.
13 A. Yes.
14 BY ATTORNEY1:
15 Q. Was it your intention going to Jamaica to live up to
16    that arrangement and stick with a buddy system?
17 A. Was it my intent?
18 Q. Was that your intention?
19 A. Yeah.
20 Q. And that's because you wanted to try to stay safe,
21    right?
22 A. Yeah.
23 Q. Had you ended your relationship with Chris Beaudrie at
24    the time that you went to Jamaica?
25 A. Yes.

Page 73

1  Q. You had never looked at any travel documents related
2     to your trip to Jamaica other than maybe your boarding
3     pass on your flight, right?
4  A. Correct.
5  Q. You never looked at any confirmation e-mails, correct?
6  A. Correct.
7  Q. You never looked at any statements or advertisements
8     from Mark Travel Corporation, Fun Jet Vacations,
9     correct?
10 A. Correct.
11 Q. You never looked at any statements or advertisements
12    related to Unique Vacations, Inc., correct?
13 A. Correct.
14 Q. You never looked at any statements or advertisements
15    related to Beaches Boscabel, correct?
16 A. What do you mean?
17 Q. Did you ever look at any statements or advertisements
18    related to Beaches Ocho Rios?
19 A. Only advertisements on TV.
20 Q. What do you recall, anything that you looked at?
21 A. I don't remember exactly.
22 Q. Do you recall -- do you recall any pictures?
23 A. On the commercials?
24 Q. Yeah.
25 A. Yeah.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 74

1  Q.  What were the pictures?
2  A.  I couldn't tell you.
3  Q.  Do you recall what channel you looked at of those
4     advertisements?
5  A.  No.
6  Q.  Do you recall what program you were watching when you
7     looked at those advertisements?
8  A.  No.
9  Q.  Do you recall whether it was a particular Beaches
10    Hotel?
11 A.  I believe it was Sandals and Beaches or just Sandals.
12 Q.  Well, those are two entirely different things, so and
13    I don't want to put words in your mouth.
14       MR. WEGLARZ:  Hold on.  You're suggesting
15    to the witness that her response is improper, and I
16    object to that.  I mean, you can ask her questions and
17    she can respond to them.
18       MR. SUAREZ:  Listen, stop, stop.
19       MR. WEGLARZ:  No, you stop.
20       MR. SUAREZ:  Stop.
21       MR. WEGLARZ:  Okay.  Don't talk to me that
22    way.
23       MR. SAFRA:  You stated your position, you
24    can ask your question.
25 BY MR. SUAREZ:

Page 75

1  Q.  Ma'am, I'm going to take this in parts.  Do you recall
2     seeing a Sandals advertisement or do you recall seeing
3     a Beaches advertisement?
4        MR. WEGLARZ:  Asked and answered.
5        You can answer.
6  A.  I don't remember which it was.
7  BY MR. SUAREZ:
8  Q.  Okay.  Do you recall any statements, and by
9     statements, I mean any words in any advertisement?
10 A.  No.
11 Q.  Do you recall any particular hotel advertised in any
12    advertisement that you saw?
13 A.  No.
14 Q.  Do you recall when you watched this advertisement?
15 A.  Not exactly, no.
16 Q.  Okay.  Do you recall any image in these advertisements
17    other than maybe a picture of a beach?
18 A.  I don't remember.
19 Q.  Do you recall whether you saw this advertisement
20    within a couple months of a booking or maybe it was
21    years prior?
22 A.  I don't remember exactly.
23 Q.  It sounds to me like you had a -- you saw something
24    somewhere on TV sometime that said Jamaica has beaches
25    and is a nice place and that's about it, right?

Page 76

1        MR. SAFRA:  Objection to form.
2  A.  Yeah.
3  BY MR. SUAREZ:
4  Q.  Ma'am, when you checked into the -- do you recall what
5     airline you took to go to Jamaica?
6  A.  I don't remember.
7  Q.  Do you recall who picked you up at the airport?
8  A.  What airport?
9  Q.  In Jamaica.
10 A.  No.
11 Q.  Do you recall whether there was a guest cocktail when
12    you got to the airport?
13 A.  I don't think so.
14 Q.  I'm sorry?
15 A.  I don't think so.
16 Q.  Okay.  Do you recall whether there was a guest
17    cocktail or drink when you went to the hotel?
18 A.  I don't think so.
19 Q.  Do you recall what day you arrived?
20 A.  Yes.
21 Q.  What day?
22 A.  It was May 5th.
23 Q.  And that was a Tuesday?
24 A.  I don't know.
25 Q.  Well, you were scheduled to return on Saturday, right?

Page 77

1  A.  Yes.
2  Q.  And so if you just do -- if we just do a quick backing
3     out of that, Friday was May 8th, Thursday was May 7th,
4     Wednesday was May 6th, and Tuesday was May 5th, right?
5  A.  Right.
6  Q.  So you landed on a Tuesday and you were scheduled to
7     come back on a Saturday, right?
8  A.  Right.
9  Q.  Okay.  Do you recall what you did when you landed on
10    Tuesday?
11 A.  We waited for -- we waited for a bus to take us to our
12    resort.
13 Q.  Okay.  Then what happened?
14 A.  We got on the bus and went on our way to the resort.
15 Q.  Okay.  And on the bus, did you have any drinks?
16 A.  No.
17 Q.  Throughout this deposition, ma'am, I'm going to be
18    referring to the word drinks, okay?
19 A.  Uh-huh, yeah.
20 Q.  And do you understand when I say drinks, I mean
21    alcoholic beverage?
22 A.  Right.
23 Q.  Okay.  So unless I say otherwise, if I use the word
24    drinks, it's going to be an alcoholic beverage, right?
25 A.  Right.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 78

1  Q.  How long after you landed in Jamaica was it before you
2       had your first drink?
3  A.  I don't know.
4  Q.  Okay.  You landed in the afternoon at some point?
5  A.  I don't remember.
6  Q.  Okay.  What do you recall -- what do you recall doing
7       the first day?
8  A.  Getting to our room and exploring the grounds of the
9       resort.
10 Q.  Okay.  And what do you recall doing thereafter?
11 A.  We went to the bar a couple hours after getting there.
12 Q.  Which bar?
13 A.  The main bar, I believe.
14 Q.  And where was that?  Was it next to the pool?  Was it
15      inside the structure?  Where was it?
16 A.  It was next to the pool in front of it.
17 Q.  Let me try to help you a little bit.  This is a black
18      and white photograph of the Beaches property and I'm
19      marking it as Exhibit 4 to your deposition.
20          MARKED FOR IDENTIFICATION:
21          DEPOSITION EXHIBIT 4
22          9:16 a.m.
23 BY MR. SUAREZ:
24 Q.  I'm going to hand you a red pen.
25 A.  This?

Page 79

1  Q.  Okay.  Use that.  A pen and if you could just circle
2       and initial where you think the main bar that you went
3       to that first --
4          MR. SAFRA:  I have a blue pen since that
5       one --
6          MR. SUAREZ:  Here, the red one, the red
7       one's better, use the red one.
8          MR. WEGLARZ:  You want to use a color one
9       instead?
10         MR. SUAREZ:  Yeah, we're using red.
11         MR. SAFRA:  He means the color photo.
12         MR. WEGLARZ:  That may show up better.
13         MR. SUAREZ:  Yeah, sure.  Thank you for
14      keeping the photograph, appreciate that.
15         MR. WEGLARZ:  I don't always obstruct the
16      deposition.
17         MR. SAFRA:  Admission on the record.
18         MR. WEGLARZ:  Yeah, far from an admission.
19 BY MR. SUAREZ:
20 Q.  Can you -- can you -- let's get some markers down
21      first.  The main bar that you went to that first day
22      is where?
23 A.  I believe it's right about here.
24 Q.  So near the pool, right?
25 A.  Yeah.

Page 80

1  Q.  And where was your room?
2  A.  It was somewhere over here.
3  Q.  Okay.  Can I ask you to draw an arrow here and here
4       and put your initials next to them, please.  Here,
5       just as long as I see the marking and you're on them,
6       good.
7  A.  Okay.
8  Q.  That's good.  Thank you.  And where were the water
9       slides?
10 A.  They were over here.
11 Q.  Okay.  So that first night you went to -- that first
12      night you went to -- ma'am, I'm standing just to move
13      my files; is that okay?
14 A.  Yeah.
15 Q.  Are you taking any offense by the fact that I stand?
16 A.  No.
17 Q.  Okay.  That first night, did you go to the bar with
18      everybody or did you go to the bar just with Amber?
19 A.  With everybody.
20 Q.  Okay.  And that night, where did you have dinner?
21 A.  I don't remember.
22 Q.  What else did you do that night?
23 A.  I don't remember.
24 Q.  Do you recall what time you got home?
25 A.  What do you mean by home?

Page 81

1  Q.  Did you stay with your parents throughout that whole
2       night or did you -- did you go off with Amber by
3       yourself that night?
4  A.  I believe we were all together all day and night.
5  Q.  Okay.  Do you recall what time you went to bed?
6  A.  I don't.
7  Q.  Ma'am, I'm going to show you a guest registration that
8       I'm going to mark as -- I think I've marked as
9       Exhibit 3 to this deposition.
10          MARKED FOR IDENTIFICATION:
11          DEPOSITION EXHIBIT 3
12          9:19 a.m.
13 BY MR. SUAREZ:
14 Q.  Do you recall when you checked into the hotel signing
15      an iPad?
16 A.  Yes.
17 Q.  Do you recall, is that your signature down there?
18 A.  Yes.
19 Q.  And that says May 5th at 2:58 p.m., right?
20 A.  Correct.
21 Q.  And did you -- did the iPad appear to be working at
22      the time that you signed -- used your signature?
23 A.  No.
24 Q.  What was not working about the iPad?
25 A.  We couldn't see anything.

Page 82

1  Q.  Okay.
2  A.  Couldn't read anything.
3  Q.  Did you ask for a paper copy?
4  A.  I don't remember.
5  Q.  Did you -- did you object and say, "Hey, I want to
6       know what's on here"?
7  A.  Not that I remember.
8  Q.  Were you given an opportunity to physically grab the
9       iPad and sign it?
10 A.  Yes.
11 Q.  Okay.  Do you know how to function an iPad?
12 A.  Kind of.
13 Q.  Kind of.  It's very similar to your iPhone or your
14      mobile device, right?
15 A.  Right.
16 Q.  Did you tell the employee that you did not understand
17      anything related to the iPad?
18 A.  They saw that it was not functioning correctly.
19 Q.  Did you -- do you recall the name of the employee?
20 A.  I don't.
21 Q.  Did you tell the employee or did your mother tell the
22      employee or did Margaret tell the employee, hey, I
23      want those papers related to the registration?
24 A.  I don't remember.
25 Q.  Okay.

Page 83

1          MR. SUAREZ:  I want to take a quick break
2       if that's okay and then we'll go into a different
3       topic, okay?
4          THE WITNESS:  Okay.
5          MR. WEGLARZ:  Okay.
6          (Discussion off the record at 9:21 a.m.)
7          (Back on the record at 9:36 a.m.)
8  BY MR. SUAREZ:
9  Q.  You understand you're still under oath?
10 A.  Yes.
11 Q.  Ma'am, do you recall we talked a little bit about your
12      research before the trip and looking at what you did
13      online, do you recall specifically going to any
14      websites of any entity or property?
15 A.  All that I can remember is the Moon Palace website.
16 Q.  You recall going to the Moon Palace website, that's
17      it?
18 A.  I believe so.
19 Q.  Okay.  Do you recall whether that website said
20      anything about safety?
21 A.  I don't remember.
22 Q.  Ma'am, do you recall anything else about that website
23      other than the fact that it had pictures of a beach?
24 A.  I don't remember.
25 Q.  The first day that you got to the Beaches Resorts, did

Page 84

1       you go to the water slides?
2  A.  No.
3  Q.  What did -- did you lay out by the pool?
4  A.  I don't remember.
5  Q.  Can I ask you to look at the -- actually, before that,
6       ma'am, do you have any tattoos?
7  A.  Yeah.
8  Q.  What tattoos do you have?
9  A.  I have one on my shoulder, behind my ear, on my leg,
10      on my other leg, and then on my other ankle.  And one
11      on my ribs.  Sorry, two on my ribs.
12 Q.  So I have shoulder, ear, leg, other leg, ankle, two
13      ribs, right?
14 A.  Yes.
15 Q.  So that's seven tattoos?
16 A.  Yes.
17 Q.  Okay.  Can you tell me when you got your first one,
18      just tell me when you got your first one, what it is,
19      and your second one, third one, fourth one, fifth one?
20 A.  My first one I got after I turned 18.
21 Q.  Which one was that?
22 A.  That was the one on my ribs.
23 Q.  Okay.  You got one or two?
24 A.  Two.
25 Q.  Okay.  And you got those after you turned 18.  What do

Page 85

1       they say?
2  A.  The one -- the first one that I got was a tribute to
3       my grandma who passed away.
4  Q.  Okay.
5  A.  And then this one was, the one underneath like on the
6       bottom part of my ribs was the most recent one that
7       I've gotten, and it's moon phases.  I got it maybe a
8       year and a half to two years ago.
9  Q.  Okay.  What's the -- what's the second tattoo you got?
10 A.  The second tattoo was the feather on my right ankle, I
11      believe.
12 Q.  What is it?
13 A.  A feather.
14 Q.  Does it have any words?
15 A.  No.
16 Q.  What does the feather mean?
17 A.  Free spirit.
18 Q.  And when did you get that?
19 A.  Around age 19.
20 Q.  What was your third tattoo?
21 A.  My third one was on my thigh, on my right thigh.
22 Q.  Okay.  What tattoo is that?
23 A.  It is a model airplane.
24 Q.  Why did you get a model airplane?
25 A.  For a tribute to my grandpa.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 86

1    Q.  Was he a pilot?
2    A.  No.
3    Q.  He liked model airplanes?
4    A.  He did, yeah.
5    Q.  What's the fourth tattoo you got?
6    A.  The fourth tattoo I believe was my shoulder, my left
7        shoulder.
8    Q.  When did you get that?
9    A.  Either 2014 at the end of 2014 or the beginning of
10       2015.  I can't remember.
11   Q.  Okay.  That was before your trip to Jamaica?
12   A.  Yeah.
13   Q.  And what's on that tattoo?
14   A.  It is leopard print.
15   Q.  And why did you get that?
16   A.  Because leopards are my favorite big cat.
17   Q.  Why?
18   A.  Because they're cool.
19   Q.  In what way?
20   A.  They're fast and can do many different things with
21       their speed and their strength.
22   Q.  Okay.  What's your fifth tattoo?
23   A.  My fifth one was I believe the one behind my ear.
24   Q.  And what tattoo is that?
25   A.  It is a triangle with I believe a line or two lines in

Page 87

1        it.
2    Q.  What does that mean?
3    A.  Kind of rise forth onto higher ground, so like be
4        bigger than you think you are.
5    Q.  When did you get that?
6    A.  When?  2015, early 2015.
7    Q.  Before or after your trip to Jamaica?
8    A.  Before.
9    Q.  Okay.  I'm having trouble understanding what rise
10       forth to a higher ground means, can you explain it to
11       me a little further?
12   A.  Kind of in a way take the higher ground like take
13       the -- yeah, take the higher ground.
14   Q.  Okay.  What was your sixth tattoo?
15   A.  My sixth one was on my left ankle, wraps around my
16       leg.
17   Q.  And what -- what is that tattoo?
18   A.  It's kind of like a bouquet of flowers around my leg.
19   Q.  And why did you get that?
20   A.  Why?  Kind of as a symbol of growth after tragedy.
21   Q.  And why did you get that?
22   A.  Because of what happened in Jamaica.
23   Q.  When did you get it?
24   A.  When?  2016.
25   Q.  Okay.  And what's your seventh tattoo?

Page 88

1    A.  The one that's on the bottom of my ribs.
2    Q.  And what is that?
3    A.  The moon phases.
4    Q.  What does that mean?
5    A.  I just really like the stars and the moons.
6    Q.  Okay.  After your relationship with Chris, Chris
7        Beaudrie, did you get any tattoos as a result of that
8        relationship?
9    A.  No.
10   Q.  And do you have piercings?
11   A.  Yes.
12   Q.  Which pierce -- I see you have a couple on your face
13       and your ears.  When did you get -- how many piercings
14       do you have?
15   A.  I have five on my ears collectively and then one
16       septum piercing.
17   Q.  I'm sorry, one what?
18   A.  Septum.
19   Q.  Oh, got it.
20           MR. SAFRA:  Is that the nose?
21           THE WITNESS:  Yeah, this.
22   BY MR. SUAREZ:
23   Q.  I'm counting that you have seven piercings, two on one
24       ear?
25   A.  These ones are closed up.  And this is closed up, so I

Page 89

1        don't --
2    Q.  Oh, but the white?
3    A.  Yeah.
4    Q.  So one --
5    A.  One, two, three, four, five -- oh, six, my bad.
6           MR. SAFRA:  I think it's a pole that goes
7        through, so it looks like two from our vantage point.
8           MR. SUAREZ:  Oh, okay.
9           THE WITNESS:  No.
10          MR. SAFRA:  No?  Okay, I'm wrong, so.
11   BY MR. SUAREZ:
12   Q.  Let me -- let me just see what I'm understanding.
13   A.  Yeah.
14   Q.  And it will make it easier.
15   A.  Yeah.
16   Q.  I don't want to spend a lot of time on the piercings,
17       so on your left ear I count you have a white earring
18       and another one in the middle of the ear, right?
19   A.  Correct.
20   Q.  Okay.  And then on your nose or septum you have one,
21       correct?
22   A.  Uh-huh.
23   Q.  On then on your right ear, I see you have a white
24       earring which is one, two in the upper ear, correct?
25   A.  Yes.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 90

1  Q.  And a third one in sort of inside that's like a ring?
2  A.  Yeah, it's called the rook.
3  Q.  A rook?
4  A.  Yeah.
5  Q.  Okay.  And did you have all of those piercings when
6     you went to Jamaica?
7  A.  Not all of them, no.
8  Q.  What did you have, which ones did you have?
9  A.  I had the two bottom lobes -- or lobes and I also had
10    four surface anchors in my collar bones, but I no
11    longer have those.
12 Q.  You had surface anchors on your collar bones when you
13    went to Jamaica?
14 A.  Yeah.
15 Q.  Okay.  In high school what piercings did you have?
16 A.  Just my two ears.
17 Q.  Ear lobes.  The rest of the piercings you got after
18    you turned 18?
19 A.  Yes.
20 Q.  How many piercings did you have before you went to
21    Jamaica?
22 A.  Just the two lobes and my four surface anchors, I
23    believe.
24 Q.  And those surface anchors are on your collar bones?
25 A.  They were, yeah.

Page 91

1  Q.  Okay.  And going back to the sequencing of the trip,
2     on Tuesday, May 5th, do you recall laying out by the
3     pool?
4  A.  I don't remember.
5  Q.  Do you recall meeting a gentleman by the name of
6     Jermaine that day?
7  A.  Yes.
8  Q.  What do you recall about meeting Jermaine?
9  A.  He seemed friendly like all the other employees there.
10 Q.  Do you recall anything he said?
11 A.  He asked for Amber and mine, our names and...
12 Q.  Okay.  And that was in the presence of your mom?
13 A.  I believe she was nearby, but not right there.
14 Q.  Okay.  Do you recall anything else he said?
15 A.  He asked if we had Instagram.
16 Q.  Okay.  And what did you say?
17 A.  I did not -- well, I had one, but I hadn't used it in
18    years.
19 Q.  Okay.
20 A.  So it was inactive.
21 Q.  What was your handle?
22 A.  Paiton, underscore, Elisibeth.
23 Q.  Okay.  Did he ask you if you had Facebook?
24 A.  Yeah.
25 Q.  Did he ask you if you had any other social media?

Page 92

1  A.  I don't remember.
2  Q.  Did you have Facebook?
3  A.  Yes.
4  Q.  Did you give him your Facebook?
5  A.  I gave him my first and last name which he could then
6     use to find me on Facebook if he wanted.
7  Q.  And did he find you?
8  A.  I don't believe so.
9  Q.  Did you friend him on Facebook?
10 A.  Not that I remember.
11 Q.  Okay.  Have you gone back to search your Facebook to
12    figure out whether he friended you or not?
13 A.  I have not.
14 Q.  Okay.  Did Amber give him his Facebook -- her
15    Facebook, excuse me?
16 A.  I know that she gave him her name.
17 Q.  Did she give him her Facebook?
18 A.  Well, with her name, he could find either one of us on
19    Facebook.
20 Q.  Do you know whether Amber friended him on Facebook?
21 A.  I don't know.
22 Q.  Do you know whether Amber gave him your Instagram --
23    excuse me, do you know whether Amber gave him her
24    Instagram?
25 A.  I'm not completely sure.

Page 93

1  Q.  Do you recall anything else about that conversation?
2  A.  No.
3  Q.  Do you recall having drinks on Tuesday, May 5th?
4  A.  What do you mean by drinks?  Like how many are you...
5  Q.  Let's just first establish a couple things.  I think I
6     told you earlier that when I say drinks in this
7     deposition, I mean alcoholic beverages.
8  A.  Right.
9  Q.  You got that?
10 A.  Right.
11 Q.  And we also established that this was an all inclusive
12    resort, right?
13 A.  Right.
14 Q.  And you're of age, right?
15 A.  Right.
16 Q.  And you were going to have fun, right?
17 A.  Right.
18 Q.  And drinking for you and for some people is fun,
19    right?
20 A.  I guess.
21 Q.  Okay.  And you were on vacation, right?
22 A.  Uh-huh, yes.
23 Q.  And so to me, if you get there on vacation and your
24    first day and you're in Jamaica, you're going to have
25    a couple drinks, right?

Page 94

1   A.  I suppose.
2   Q.  And did you have a couple drinks your first day?
3   A.  Yes.
4   Q.  Okay.  Do you recall how many drinks you had?
5   A.  I believe it was only one.
6   Q.  Okay.  Do you recall what drink you had?
7   A.  I believe they called it Jungle Juice.
8   Q.  And do you know what is in Jungle Juice?
9   A.  I don't remember.
10  Q.  Do you know why they called it Jungle Juice?
11  A.  I don't remember.
12  Q.  Okay.  Who were you with when you had that drink?
13  A.  I was with my mother, Margaret and Amber.
14  Q.  Okay.  Is it possible that you had more than one
15      drink?
16  A.  No.
17  Q.  If Amber testified that you had three or four drinks
18      on Tuesday, she'd be wrong?
19  A.  I don't know.  Maybe.
20  Q.  Do you have an express recollection of having only one
21      drink on Tuesday?
22          MR. WEGLARZ:  Asked and answered.
23          Go ahead and answer it again.
24  A.  I only remember having one.
25  BY MR. SUAREZ:

Page 95

1   Q.  And it's possible you had more than one?
2   A.  It's possible.
3   Q.  Wednesday, May 6th, do you recall what you did?
4   A.  Yes.
5   Q.  What did you do?
6   A.  We got up what felt like 5:00 a.m. and went to go get
7       breakfast at the big buffet that they had every day.
8   Q.  Okay.
9   A.  And I believe we went down to the beach for a short
10      while after breakfast.
11  Q.  Okay.  And when you say we, you mean you're all
12      together now?
13  A.  The whole group of us, yes, all four.  We kind of just
14      hung around the beach and the main pool for the day
15      really that I can remember.
16  Q.  When you say the main pool, is that the one near the
17      water slide?
18  A.  No.
19  Q.  Okay.  Did you go to the water slide on Wednesday,
20      May 5th?
21  A.  I can't remember.
22  Q.  Did you leave the property Wednesday, May 5th?
23  A.  I don't think so.
24  Q.  Do you recall where you had lunch?
25  A.  No.

Page 96

1   Q.  Do you recall having lunch?
2   A.  Yes.
3   Q.  In the evening, did you recall having dinner?
4   A.  Yes.
5   Q.  With who?
6   A.  I believe it was all four of us.
7   Q.  Did you and Amber go to the bar on Wednesday?
8   A.  I don't remember.
9   Q.  Do you recall having drinks on Wednesday?
10  A.  Yes.
11  Q.  Do you recall how many drinks you had Wednesday?
12  A.  Yes.
13  Q.  How many drinks did you have?
14  A.  Less than five.
15  Q.  How tall are you?
16  A.  5' 3".
17  Q.  And how much do you weigh?
18  A.  About 130.
19  Q.  Were you 5' 3", about 130 in May of 2015?
20  A.  I believe so, yeah.
21  Q.  You were more or less the same height and same weight?
22  A.  Correct.
23  Q.  Okay.  Did you have those five drinks in the morning
24      or did you have it in the evening?
25  A.  It was kind of spread throughout the day as I ate.

Page 97

1   Q.  Do you know what I mean by the word -- do you know
2       what -- if I use the word buzz, do you know what I
3       mean by the word buzz?
4   A.  Yeah.
5   Q.  Yeah?  What does the word buzz mean to you?
6   A.  Feeling affected from alcohol, but still able to
7       comprehend what's going on.
8   Q.  And feeling affected by alcohol means -- feeling
9       affected by alcohol means that it makes you feel
10      loose, happy?
11  A.  Yeah.
12  Q.  Euphoric, yeah?
13  A.  Yeah.
14  Q.  At what -- by what time did you get a pretty good buzz
15      going?
16  A.  Maybe by dinner.
17  Q.  At dinner you had a pretty good buzz going?
18  A.  A little bit of a buzz.
19  Q.  Yeah?  So you had most of your drinks in the afternoon
20      at some point?
21  A.  Between lunch and obviously going to bed.
22  Q.  So you -- you kept a pretty good buzz by around dusk
23      until the time you went to bed, right?
24  A.  Yeah.
25  Q.  Do you recall having any interaction with Jermaine on

1    Wednesday, May 6th?
2  A.  Yes.
3  Q.  Okay.  What interactions do you recall?
4  A.  I can only remember him approaching, I believe it was
5    me and Amber and just seeing how we were enjoying it,
6    enjoying our stay.
7  Q.  Were you and Amber by yourselves at that time?
8  A.  I don't remember.
9  Q.  Okay.  And what else do you recall about your
10    interaction?
11  A.  That he still seemed friendly.
12  Q.  And how many times did you interact with him on
13    Wednesday?
14  A.  I think just the one time.
15         MR. WEGLARZ:  Mr. Suarez, I do not want to
16    interfere with your questioning, but when it's a good
17    time for you, we'd like to take just a two-minute
18    break.
19         MR. SUAREZ:  Okay, let me get just a couple
20    more questions asked.
21         MR. WEGLARZ:  Sure, you bet.
22  BY MR. SUAREZ:
23  Q.  Okay.  So your recollection today is that you had one
24    interaction with Jermaine on Tuesday and another
25    interaction with Jermaine on Wednesday for a total of

1    two interactions?
2  A.  Correct.
3  Q.  And did you meet with either Dwight or William Tapper
4    on those two days, Tuesday or Wednesday?
5  A.  Not that I can remember.
6  Q.  Okay.  What was your understanding of what Jermaine
7    did at Beaches?
8  A.  He told us that he was a lifeguard.
9  Q.  Okay.  And would it be your understanding -- what is
10    your understanding of what a lifeguard does?
11  A.  Supervises the pool area, makes sure no harm is coming
12    to the pool goers.
13  Q.  Okay.  And to the extent that a lifeguard would commit
14    a rape like the ones that are alleged in this case, it
15    would be your understanding that's beyond the scope of
16    a lifeguard's responsibility, right?
17         MR. WEGLARZ:  Form objection.
18         You can answer.
19  A.  Can you repeat the question?
20  BY MR. SUAREZ:
21  Q.  Yeah, sure.
22         MR. WEGLARZ:  Sorry.
23  BY MR. SUAREZ:
24  Q.  To the extent that a lifeguard were to commit a rape
25    like the ones that are alleged in this case, it would

1    be your understanding that that's certainly beyond the
2    scope of a lifeguard's responsibility, correct?
3         MR. WEGLARZ:  Same objection.
4         Go ahead.
5  A.  I don't know.
6  BY MR. SUAREZ:
7  Q.  It's not a lifeguard's responsibility to commit rape,
8    right?
9         MR. WEGLARZ:  Same objection, form.
10  A.  I mean, I've never been a lifeguard, so I don't know.
11  BY MR. SUAREZ:
12  Q.  Do you think under any scenario, a lifeguard's job
13    description would include committing rape on a patron?
14  A.  Probably not.
15  Q.  It would shock you if it were, right?
16  A.  Right.
17  Q.  Before we break, May 6th, you went to -- do you recall
18    what you did?
19  A.  The 6th?
20  Q.  The 6th, yeah, which is Thursday.
21  A.  Yes.
22  Q.  I'm sorry, May 6th -- May 6th was Wednesday.  May 7th
23    was Thursday, thank you.
24         MS. DeSANTIS:  Sorry.
25         MR. SUAREZ:  Thank you.

1  BY MR. SUAREZ:
2  Q.  May 7th was Thursday, do you recall what you did?
3  A.  Yeah.
4  Q.  And what did you do?
5  A.  We took a bus from our resort --
6  Q.  Uh-huh.
7  A.  -- to I don't know exactly where it was, but it was
8    the Blue Hole --
9  Q.  Okay.
10  A.  -- attraction that they had there.
11  Q.  Okay.
12  A.  And then after we were done with the Blue Hole, we
13    went kind of just like shopping around in I believe
14    downtown Ocho Rios.
15  Q.  Okay.  What time did you get back to the resort?
16  A.  I don't know.
17  Q.  Approximately?
18  A.  I don't know.
19  Q.  Was it in the afternoon?
20  A.  It was the afternoon.
21  Q.  Okay.  Did you drink at the Blue Hole or at the
22    shopping?
23  A.  No.
24  Q.  And in the evening before dinner, did you get a good
25    buzz going?

Page 102

1   A.   No.
2   Q.   Did you drink that evening again?
3   A.   Yes.
4   Q.   And at what time did you feel the effects of the
5        alcohol?
6   A.   I didn't really.
7   Q.   Okay.  Did you have about five drinks?
8   A.   No.
9   Q.   How many drinks did you have that evening?
10  A.   Maybe two or three.
11  Q.   Within how much, how many periods of time?
12  A.   Between the time we got back in the afternoon from the
13       Blue Hole until about dinner time was I think my last
14       drink.
15  Q.   What time did you go to bed?
16  A.   I'm not sure.
17  Q.   Okay.  May 8th, you stayed on the property?
18  A.   Yes.
19  Q.   And what did you do in the morning and the afternoon?
20  A.   In the morning, we went to breakfast.  And then kind
21       of just laid out in the sun.
22  Q.   By the way, did you go to the water slide on May 7th?
23  A.   I don't remember if it was May 7th or the 6th, but it
24       was one or the other.
25  Q.   So, and thank you for the clarification.  May 6th --

Page 103

1        May 7th you went to Blue Hole?
2   A.   Right.
3   Q.   Did you go to the water slide that day?
4   A.   I'm not sure if it was that day or not.
5   Q.   And so if it wasn't that day, you went to the water
6        slide on Tuesday, May 6th, right?
7   A.   I was thinking Wednesday-ish.
8   Q.   I'm sorry, Wednesday, May 6th, right, you went
9        Wednesday, May 6th to the water slide?
10  A.   Possibly, yeah, if it wasn't Thursday, it was
11       Wednesday.
12  Q.   Did you -- when you went to the water slide, was
13       Jermaine working the top of the water slide on
14       Wednesday?
15  A.   I don't remember.
16  Q.   Okay.  Thursday, May 7th, did you interact with
17       Jermaine?
18  A.   I believe so.
19  Q.   Describe that interaction.
20  A.   I don't remember exactly what happened.  I just
21       remember he came up and was still friendly.
22  Q.   So it was some point in the afternoon.
23  A.   I'm not sure.
24  Q.   Well, if you went to -- did he go to the Blue Hole
25       with you in the morning?

Page 104

1   A.   Oh, we're still on Thursday?  Sorry.  No, he didn't.
2   Q.   And if he didn't go to the Blue Hole with you on
3        Thursday, and I'm assuming he didn't go shopping with
4        you on Thursday, he must have interacted with you in
5        the afternoon, right?
6   A.   Right.
7   Q.   Okay.  How did that -- where did that interaction take
8        place?
9   A.   Somewhere around the main pool, I believe.
10  Q.   Did you meet either William Tapper or Dwight Davis --
11       excuse me?
12            MR. SAFRA:  You're right.
13  BY MR. SUAREZ:
14  Q.   Yeah, or Dwight Davis?
15  A.   On Thursday, I may have met Dwight.
16  Q.   Okay.  When you say may have met Dwight, why is that
17       jogging your memory?  Where did you meet Dwight?
18  A.   I don't remember where I would have met him besides
19       just on the premises.
20  Q.   What do you recall about meeting?
21  A.   He was quiet.
22  Q.   Okay.  What else do you recall about that interaction?
23  A.   He briefly introduced himself and was friendly just
24       like the other employees at the place.
25  Q.   Did you give him your Facebook or Instagram?

Page 105

1   A.   Not that I can remember.
2   Q.   Did you give -- did Amber give him her Facebook or
3        Instagram?
4   A.   Not that I know of.
5   Q.   By the way, did you ever -- before this time or during
6        this day, did you ever give Jermaine or Dwight your
7        phone number?
8   A.   No.
9   Q.   Did Amber give Dwight or Jermaine her phone number?
10  A.   Not that I'm aware of.
11  Q.   Okay.  What drinks were you having -- what drinks were
12       you having when you had drinks that evening, Thursday,
13       May 7th?
14  A.   I believe it was Purple Haze, iced Purple Haze.
15  Q.   And what is in iced Purple Haze?
16  A.   I can't remember.
17  Q.   You're smiling, why are you smiling?
18  A.   Because it was so long ago and I haven't had any since
19       then.
20  Q.   The two or three drinks you had were iced Purple Haze?
21  A.   Yeah.
22  Q.   Did you go to the water slide on Thursday?
23  A.   Possibly, but I don't remember exactly which date.
24  Q.   The water slides at that property closed by 5:00 p.m.,
25       right?

Page 106

1    A.  I don't know.  Sometime in the afternoon, yeah.
2    Q.  The water slide closed sometime at dusk, right?
3    A.  Yes.
4    Q.  May 8th, that Friday, and then I'm going to take the
5        break that your counsel requested.  Walk me through
6        the events up until the time you had dinner with
7        Amber?
8            MR. WEGLARZ:  I'll place a form objection
9        to your question.
10           But go ahead and answer.
11   A.  Well --
12           MR. SUAREZ:  In light of the form
13       objection, let me parse it out.
14   BY MR. SUAREZ:
15   Q.  You got up in the morning at what time?
16   A.  Maybe 6:00 or 7:00.
17   Q.  And what --
18   A.  It seemed super early.
19   Q.  What did you do next?
20   A.  We went to breakfast.
21   Q.  And what did you do thereafter?
22   A.  I believe we just laid out by the pool and tanned.
23   Q.  Okay.  And did you go to the water slide that day?
24   A.  I don't remember if we did that during the day.
25   Q.  Okay.  Do you recall going to the water slide in the

Page 107

1        afternoon?
2    A.  Not in the afternoon, no.
3    Q.  Okay.  Do you recall going to water slide at all that
4        day?
5    A.  Yes.
6    Q.  So it would either have to be the morning or afternoon
7        or the evening, so do you recall when you went to the
8        water slide?
9    A.  It was the evening because they kept it open late that
10       night.
11           MR. SAFRA:  Objection, form.
12   BY MR. SUAREZ:
13   Q.  Do you have a recollection of them keeping it open
14       late on the evening of May 8th?
15   A.  Yeah.
16   Q.  Okay.  Do you recall where you had breakfast?
17   A.  At the main --
18   Q.  Do you recall --
19   A.  -- cafe.
20   Q.  Do you recall what you had?
21   A.  A lot of fruit.
22   Q.  Do you recall having lunch that day?
23   A.  Yes.
24   Q.  Do you recall what you had?
25   A.  I believe pasta.

Page 108

1    Q.  Okay.  So in the morning you laid out, what did you do
2        in the afternoon?
3    A.  I believe I went to the gift shop.
4    Q.  And then what else did you do?
5    A.  I'm not sure.
6    Q.  That evening you and Amber were going to spend the
7        evening on your own, right?
8    A.  Right.
9    Q.  And by what point did you and Amber develop a pretty
10       good buzz?
11   A.  I don't remember being super buzzed.
12   Q.  Do you remember being buzzed?
13   A.  I remember being slightly buzzed.
14   Q.  By what point do you remember being slightly buzzed?
15   A.  Maybe 8:00.
16   Q.  Okay.  And was Amber also buzzed by 8:00?
17   A.  I'm not sure.
18   Q.  Okay.  How much had you had to drink in the afternoon
19       of May 8th?
20   A.  About three or four drinks.
21   Q.  Okay.  So when you say -- do you recall what you
22       drank?
23   A.  Yeah.
24   Q.  What did you drink?
25   A.  The frozen Purple Haze.

Page 109

1    Q.  All of the drinks were frozen Purple Haze?
2    A.  Yes.
3    Q.  Do you recall what was in those frozen Purple Hazes?
4    A.  I don't remember.
5    Q.  So to me, you were having four -- do you know -- I
6        don't want to put words in your mouth, do you know
7        within what time span you had those three or four
8        drinks?
9    A.  Between 11:30 or so in the morning and 7:30 to 8:00.
10   Q.  All right.
11           MR. SUAREZ:  I'm going to let you take that
12       break and then we'll move on.
13           MR. WEGLARZ:  Thank you.
14           MR. SUAREZ:  Actually, hang on, I'm just
15       going to -- let me say one thing.
16   BY MR. SUAREZ:
17   Q.  By the time of 7:30 or 8:00 on that day, had you seen
18       Jermaine before 7:30?  I mean that's a bad question.
19           Before 7:30, had you seen Jermaine?
20   A.  I can't remember.
21   Q.  Before 7:30, had you seen Dwight Davis?
22   A.  Yes.
23   Q.  Where?
24   A.  I believe so.  I don't remember where.
25   Q.  Before 7:30, had you seen William Tapper?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 110

1   A.  No.
2   Q.  Dwight Davis, what did he do?
3   A.  He said that he was a lifeguard.
4   Q.  Okay.  Do you recall at any point any logos on any of
5       the clothing that Dwight Davis, William Tapper or
6       Jermaine Dyer were wearing?
7   A.  I don't remember.
8   Q.  Okay.  How did you -- where did you see Dwight Davis
9       on May 8th?
10  A.  I don't remember.
11  Q.  Who was with you?
12  A.  Amber.
13  Q.  Okay.  Were your parents -- were either Margaret or
14      Janet with you?
15  A.  I'm not sure.
16  Q.  Now, do you recall what he said to you?
17  A.  I don't.
18  Q.  Do you recall what you said to him?
19  A.  No.
20  Q.  Do you recall making plans to see Jermaine and Dwight
21      later that evening?
22  A.  No.
23  Q.  By, before 7:30, had you and Amber gone to the water
24      slide?
25  A.  I believe so.

Page 111

1   Q.  Did you and Amber eat dinner before or after 7:00?
2   A.  I'm not sure.
3   Q.  Did you -- when you went to the water slide, do you
4       recall who was working at the top of the water slide?
5   A.  Yes.
6   Q.  Who?
7   A.  I believe it was Dwight.
8   Q.  Do you recall at what time you went to the water
9       slide?
10  A.  No.
11  Q.  Do you recall Dwight telling you anything when you
12      went to that water slide?
13  A.  No.
14  Q.  Do you recall you telling Dwight anything when you
15      went to that water slide?
16  A.  No.
17  Q.  Okay.
18          MR. SUAREZ:  I'm going to take a break real
19      quick.
20          (Recess taken at 10:18 a.m.)
21          (Back on the record at 10:34 a.m.)
22  BY MR. SUAREZ:
23  Q.  So, ma'am, we were going through the events of the
24      8th, of May 8th before we broke for a second.  I want
25      to go back and just do what I call some housekeeping

Page 112

1       issues.  That week, were you supposed to be on any
2       medication?
3   A.  Yes.
4   Q.  And what medication were you supposed to be on that
5       week?
6   A.  My birth control.
7   Q.  And anything else?
8   A.  Not that I can remember.
9   Q.  And were you on ADD medication at that time?
10  A.  No.
11  Q.  No.  Before you embarked on your trip, did your
12      mother, Ms. DeSantis, give you any instructions about
13      what to do, what not to do?
14  A.  Yes.
15  Q.  What instructions did she give you?
16  A.  To stay on the resort.
17  Q.  I'm sorry?
18  A.  Stay on the resort.
19  Q.  Okay.  What other instructions?
20  A.  I don't know.
21  Q.  Did she tell you before you got there that you needed
22      to stay with either Margaret, Amber or herself?
23  A.  Yes.
24  Q.  Okay.  And that was always, not just off the resort?
25  A.  That was all the time.

Page 113

1   Q.  Yeah.  By the time of May 8th at about 8:00 p.m., had
2       you and Amber ever broken that rule?
3   A.  No.
4   Q.  Okay.  So where did you have dinner that evening?
5   A.  The Italian restaurant that they had on the premises.
6   Q.  Did you have a drink at the restaurant?
7   A.  Yes.
8   Q.  What did you drink?
9   A.  I believe I drank the frozen Purple Haze.
10  Q.  Purple Haze or Blue Haze?
11  A.  Purple.
12  Q.  Okay.  Do you recall at what time you finished dinner?
13  A.  I don't remember.
14  Q.  One of the things your counsel -- I've studied a
15      little bit what your counsel has handed us for the
16      first time this morning.
17          MR. SUAREZ:  Actually, I didn't mark this.
18      I'll mark it now as Exhibit 5.
19          MARKED FOR IDENTIFICATION:
20          DEPOSITION EXHIBIT 5
21          10:37 a.m.
22          MS. DeSANTIS:  I think you have one on
23      there.
24          MR. SUAREZ:  Yeah, but there's two,
25      apparently two separate documents.

```
                                              Page 114
1            MS. DeSANTIS:  Oh, oh.
2    BY MR. SUAREZ:
3    Q.  So I'm marking as Exhibit 5 the second, what appears
4        to be the second document that I was handed this
5        morning.  And here there is apparently some sort of
6        messaging exchanged between, going on between Janet
7        and Amber on Facebook; do you see that?
8    A.  Yes.
9    Q.  Okay.  And why is Janet, your mother, messaging with
10       Amber on Facebook and not messaging with you?
11   A.  Because --
12            MR. WEGLARZ:  Form objection.  Calls for
13       speculation.
14            You can answer.
15            MR. SUAREZ:  The other part of that is
16       wholly inappropriate.  Just limit it to form.  If you
17       say speculation, you're coaching the witness, there's
18       plenty of law on that.  So just please, it's the
19       second time in the series of these depositions that
20       I'm going to ask you respectfully not to do that.
21            MR. WEGLARZ:  Well, it is so obviously
22       inherent and implied in the question.
23            MR. SAFRA:  But she should know.
24            MR. SUAREZ:  She'll know.
25            MR. WEGLARZ:  Well --
```

```
                                              Page 115
1            MR. SAFRA:  That's why you limit to
2        objection and form.
3            MR. SUAREZ:  Let's go.  Let's go.
4            MR. WEGLARZ:  You know it's an unfair
5        question to ask that, you know that.
6            MR. SAFRA:  That doesn't prevent the
7        question from being asked because you think it's
8        unfair.  You say objection, form, and that's the end
9        of it.
10            MR. WEGLARZ:  You have my objection in.
11   BY MR. SUAREZ:
12   Q.  Why is -- why is Janet DeSantis writing to Amber
13       Torralva through Facebook?
14            MR. WEGLARZ:  Same objection.
15            Go ahead.
16   A.  Because she wanted to check on how we were doing when
17       she was not with us.
18   BY MR. SUAREZ:
19   Q.  Okay.  Why is she not writing to you?
20   A.  Because I could never get my phone to connect to their
21       Wi-Fi.
22   Q.  Okay.  Why is Margaret not included on these messages?
23   A.  I don't know.
24   Q.  And it says here that Amber, that your mom -- that
25       your mom, Janet, says, "We're going at 7:49 (sic) p.m.
```

```
                                              Page 116
1        on May 8th," it says, "We're going over to the family
2        outdoor food things that they have over by the water
3        slide.  Be there or be square" at 7:48 p.m., right?
4        Do you see that?
5    A.  Yes.
6    Q.  And Amber responds at 8:09 p.m., "Me and Pait just ate
7        where we are," but it says, "Ate -- ate last night.
8        We were hungry."  That's right?
9    A.  Right.
10   Q.  So clearly during this time frame, you all are not
11       together, right?
12   A.  Right.
13   Q.  Okay.  And what time did you start dinner?
14   A.  I'm not sure.
15   Q.  Okay.  Is Amber, when you and Amber were -- when you
16       were texting with Janet, was she showing you these and
17       were you communicating about how to respond to your
18       mom?
19   A.  I don't remember.
20   Q.  Okay.  Your mom was going over to the water slide or
21       the food thing over by the water slide and you guys
22       just ate, right?
23   A.  Right.
24   Q.  Then several minutes later, there's a picture of, that
25       Amber apparently is sending your mom with what I
```

```
                                              Page 117
1        believe are goofy faces at 8:14, right?
2    A.  Right.
3    Q.  Are they goofy faces?
4    A.  Yes.
5    Q.  You were clowning around?
6    A.  Yes.
7    Q.  You guys seemed pretty happy, right?
8    A.  Right.
9    Q.  Could it be that you guys are pretty buzzed there?
10            MR. WEGLARZ:  Form objection.
11            But go ahead.
12   A.  Not necessarily.
13   BY MR. SUAREZ:
14   Q.  By that time you had already had several Blue Hazes,
15       right, or Purple Hazes, right?
16   A.  A few, yeah.
17   Q.  And Paiton also had a few of those, right?
18   A.  Amber.
19   Q.  Excuse me, and Amber also had a few, right?
20   A.  I don't know if she had.
21   Q.  Were you with her?
22   A.  Yeah.
23   Q.  Did you watch her drink alcoholic beverages?
24   A.  I don't know if it was alcohol in there.
25   Q.  Okay.  Then that message -- by the way, you had seen
```

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 118

1    Amber have alcoholic beverages during your vacation,
2    right?
3  A.  Right.
4  Q.  And she drank like the rest of you drank during your
5    vacation, right?
6        MR. WEGLARZ:  Form objection.
7  A.  We all didn't drink the same and the same amounts and
8    everything.
9  BY MR. SUAREZ:
10 Q.  I understand that, but she drank --
11 A.  She drank.
12 Q.  And you drank and your mom drank and Margaret drank,
13   right?
14 A.  Right.
15 Q.  Okay.  When I say drank, I mean alcohol, right?
16 A.  Right.
17 Q.  Okay.  And then was this picture, I'm assuming this
18   picture was taken in your hotel room, right?
19 A.  Correct.
20 Q.  At 8:14, right?
21 A.  Correct.
22 Q.  And then the next text message that I see here is at
23   10:33 p.m. between where Janet sends you both a text
24   message that says you're both dorks, right?
25 A.  Right.

Page 119

1  Q.  So there's a period of time between 8:14 and 10:33
2    p.m. that you all are separated, right?
3  A.  Correct.
4  Q.  Okay.  What happened between that time frame?  What
5    did you do after you were in the room?
6  A.  I believe that was when we went to the water slides.
7  Q.  Okay.  Why did you go to the water slides?
8  A.  Because they were open late.
9  Q.  And who told you -- who told you that the water slides
10   were open late?
11 A.  I don't know.
12 Q.  Had Dwight or Jermaine told you that the water slides
13   were open late that day?
14 A.  I don't remember.
15 Q.  Had William Tapper told you that the water slides --
16 A.  No.
17 Q.  -- were open late that day?
18     What did you do between -- before -- what
19   did you do before you went to the -- if it wasn't
20   William Tapper, Dwight Davis or Jermaine Dyer that
21   told you that the water slides were open late that
22   day, what is the source of your knowledge that the
23   water slides were open late that day?
24 A.  I don't remember.
25 Q.  Between 8:14 and 10:00, what did you do?

Page 120

1  A.  We went to the water slides.
2  Q.  Okay.  And what did you do after the water slides?
3  A.  We went to the piano bar briefly.
4  Q.  Who did you see at the water slides when you went
5    there?
6  A.  We saw all three of the men.
7  Q.  Okay.  And what did they tell you?
8  A.  I know that two of them were kind of flirting.
9  Q.  Okay.  How so?
10 A.  But I don't really remember specifics.  We were
11   wearing bikinis.
12 Q.  You were both -- you both went in that evening to the
13   water slide in bikinis?
14 A.  Yes.
15 Q.  Where was your other clothing?
16 A.  I'm not sure.
17 Q.  I'm sorry?
18 A.  I'm not sure.
19 Q.  Okay.  Do you recall how long after the 8:14
20   photograph you went to the water slide?
21 A.  I don't recall.
22 Q.  It says on your statement, I'm happy to mark it as
23   Exhibit 6 to your declaration.
24     MARKED FOR IDENTIFICATION:
25     DEPOSITION EXHIBIT 6

Page 121

1      10:47 a.m.
2  BY MR. SUAREZ:
3  Q.  That you went to water slides at about 10:00 p.m.
4      Do you think that is, that statement is
5    correct or no?
6  A.  Yes.
7  Q.  You think it's correct?
8  A.  Yes.
9  Q.  So what did you do -- if that's correct, what did you
10   do between 8:14 and 10:00 p.m.?
11 A.  We had gone to -- we went to the water slides briefly.
12 Q.  Okay.
13 A.  And then we went --
14 Q.  Before 10:00 p.m.?
15 A.  Right.
16 Q.  Okay.
17 A.  And then we went to the piano bar --
18 Q.  Okay.
19 A.  -- because they were having like a karaoke kind of
20   thing.
21 Q.  Okay.  And then what did you do?
22 A.  Then we sat at the main bar area for a while and went
23   back to -- no, sorry.  We went back to the water
24   slides and then we sat back at the main bar.
25 Q.  Did you go to the hot tub at any moment?

Page 122

1  A.  I'm sorry?
2  Q.  Did you go to the hot tub at any moment?
3  A.  I don't remember.
4  Q.  Okay.  So the sequence of the events after 8:14 as you
5      recall it, is that you went -- excuse me, between 8:14
6      and about 10:00 p.m., that you went to the water slide
7      and then you went to the piano bar to sing karaoke,
8      right?
9  A.  Correct.
10 Q.  And at that piano bar, did you have a drink?
11 A.  Yes.
12 Q.  What did you have?
13 A.  I don't remember.
14 Q.  Could it have been the Purple -- excuse me, a Purple
15     Haze?
16 A.  Possibly.
17 Q.  Would you have any reason to believe that you would
18     have changed your drink that night?
19         MR. WEGLARZ:  Form objection.
20 A.  I don't think I would have.
21 BY MR. SUAREZ:
22 Q.  So it's probable that at the piano bar, you had a
23     Purple Haze?
24         MR. WEGLARZ:  Objection.
25 A.  Right.

Page 123

1  BY MR. SUAREZ:
2  Q.  Did you sing a song?
3  A.  Yes.
4  Q.  What song did you sing?
5  A.  Piano Man.
6  Q.  Did Amber sing a song?
7  A.  She sang the Piano Man with me.
8  Q.  Okay.  Did you sing more than one song?
9  A.  Yes.
10 Q.  What other songs did you sing?
11 A.  I don't know the names of them.
12 Q.  You were having a pretty good time?
13 A.  Yes.
14 Q.  Okay.  And then about 10:00 p.m., you decided to go
15     back to the water slide?
16 A.  Yes.
17 Q.  And those gentlemen, Dwight Davis, Jermaine and
18     William Tapper were still there, right?
19 A.  No.
20 Q.  They were not?
21 A.  We didn't make it to...
22 Q.  You didn't make it to the water slide at that time?
23 A.  Right.
24 Q.  What happened?
25 A.  Jermaine and Dwight ended up stopping us.  They kind

Page 124

1      of -- we kind of crossed paths on our way to the water
2      slides and they said they had just closed.
3  Q.  Okay.  Can I ask you to look at the paragraph on,
4      where it starts, it says, "On Friday, May 8th, about
5      10:00 p.m., Amber and I decided to go down to the
6      water slide.  When we got there, I saw Jermaine and
7      another guy that I was seeing for the first time.  He
8      introduced himself and Dwight and I saw him doing
9      lifeguarding, so I assumed that he is a lifeguard too.
10     Amber and I went down the slides about two times and
11     when I went back to where Jermaine and Dwight was, I
12     saw another guy and he told us his name but I don't
13     remember, but he is a lifeguard too.  Dwight and the
14     third guy told Amber and I that they were twins and
15     then asked the guys to take pictures -- "
16         MR. SAFRA:  It says, "I then asked the guys
17     to take pictures."
18         MR. SUAREZ:  Yeah, that's what I said.
19 BY MR. SUAREZ:
20 Q.  "I then asked the guys to take pictures," and the next
21     sentence I can't read.
22         MR. SUAREZ:  Maybe your copy has it.
23         MS. DeSANTIS:  It's hard to read the
24     writing.
25         MR. SUAREZ:  Can I see what you're holding?

Page 125

1      It wasn't produced to us --
2          MR. SAFRA:  Our copy is cut off.  That's
3      what he is saying.
4          MS. DeSANTIS:  Oh, yeah.
5          MR. SAFRA:  It's not a matter of reading.
6          MS. DeSANTIS:  Let's see, it should be the
7      top of that page.  Is that right?  I can find it up
8      here, it should have been at the top of Amber and,
9      yeah, I think it's the top.  It should be page 3.
10     This is 2 where Friday ends.  Do you see where it's...
11         MR. SUAREZ:  All right.  So this -- where's
12     the "I then"?
13         MR. SAFRA:  Here.
14         MR. SUAREZ:  This is 2, so it should be
15     here.
16         MS. DeSANTIS:  Yeah, it starts with the
17     last page.
18         MR. SUAREZ:  All right.  So in my -- you
19     know what?  There's a -- I'm going to stop right here
20     for a second.
21         MR. SAFRA:  Can we go off the record,
22     please?
23         MR. SUAREZ:  No, I want to stay on the
24     record.
25         MR. SAFRA:  Oh.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 126

1      MR. SUAREZ:  What I've marked as Exhibit --
2 can you show me the exhibit number on there?
3      THE WITNESS:  6.
4      MR. SUAREZ:  What I've marked as Exhibit 6
5 is an 8-and-a-half by 11 document that is Paiton
6 Bater's statement dated 5-9-15 at 8:00 a.m.  Okay?
7 What I'm seeing for the first time today is what
8 appears to be an 8-and-a-half by 12 document that
9 Mrs. DeSantis has that doesn't have the sentences cut
10 off from the top of the document and so and it has
11 sentences at the bottom of the document or signature
12 marks at the bottom of the document.  And so what I'm
13 going to ask counsel for a second to do is to take a
14 break and see if somebody at his staff can make us an
15 8-and-a-half by 12 copy.
16 BY MR. SUAREZ:
17 Q.  So that that way I can ask you questions with the full
18 sentences and the full signatures and I'm not dealing
19 with a butchered document.  It will make this whole
20 thing go a lot quicker.
21      MR. WEGLARZ:  Absolutely.
22      MR. SUAREZ:  Thank you.
23      MR WEGLARZ:  You bet.
24      MR. SUAREZ:  Thank you, Janet.
25      MS. DeSANTIS:  I want to make sure they're

Page 127

1 all here.
2      MR. SAFRA:  Now going off?
3      MR. SUAREZ:  Yeah, we're now going off.
4      (Recess taken at 10:54 a.m.)
5      (Back on the record at 11:08 a.m.)
6 BY MR. SUAREZ:
7 Q.  All right.  We now have and I marked as Exhibit 7 what
8 appears to be an 8-and-a-half by 11 document that
9 counsel provided that has all the sentences and all
10 the signatures and is not cut off, and so we can use
11 that to finish talking about what we were talking
12 about.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 7
15      11:09 a.m.
16 BY MR. SUAREZ:
17 Q.  Let's go in parts and just to --
18      MR. SUAREZ:  Yeah, I marked that as 7.
19 BY MR. SUAREZ:
20 Q.  And because we took a break and just for context, you
21 will recall that at 8:14, you were apparently in the
22 room, right?
23 A.  Correct.
24 Q.  And then at 10:33, your mom says that you're both
25 dorks and then at 10:55 your mom sends another text

Page 128

1 message to both of you that says, "Amber, you need to
2 stay with Paiton and maybe slow down with the drinks."
3 Do you see that?
4 A.  Yep.
5 Q.  So that's the time frame that we're trying to
6 ascertain what happened, okay?
7 A.  Okay.
8 Q.  All right.  So and what it says here is that "on
9 Friday, May 8th, about 10:00 p.m., Amber and I decided
10 to go down to the water slides.  When we got there, I
11 saw Jermaine and another guy that I was seeing for the
12 first time and he introduced himself and Dwight, and I
13 saw him doing lifeguarding, so I assumed he is a
14 lifeguard too."  That's the first sentence, right?
15 A.  Right.
16 Q.  And the only thing that seems to me inconsistent
17 between what you told me earlier and what's on the
18 sentence is the about 10:00 p.m.  It would seem to me
19 that the first time you went to a water slide is a
20 little earlier than 10:00 p.m., after 8:14; is that
21 right?
22 A.  I'm not sure.
23 Q.  Okay.  So but the sequencing of what you said is it
24 seems consistent with what you talked about earlier,
25 okay?

Page 129

1 A.  Okay.
2 Q.  So the first thing is you guys went to the water
3 slide.  Do you recall the name of the gentleman that
4 introduced himself to you for the first time?
5 A.  Do I now?
6 Q.  Yes.
7 A.  Yes.
8 Q.  What's that gentleman's name?
9 A.  William.
10 Q.  And what's his last name?
11 A.  Tapper.
12 Q.  Okay.  At the time you went to the water slides for
13 the first time after going to the hotel room, did you
14 stop anywhere along the way to that water slide?
15 A.  What time?  I'm sorry.
16 Q.  So after the room, after the hotel room shot at 8:14,
17 it says here that you went to water slide, right?
18 A.  Right.
19 Q.  And what my question is, on the way to that water
20 slide that evening where you saw Jermaine and Dwight,
21 did you stop anywhere along the way?
22 A.  Maybe the bar.
23 Q.  Maybe the bar.  And did you have a drink?
24 A.  I would have, yeah, if I stopped there.
25 Q.  Okay.  Do you think you stopped there on the way to

Page 130

1    the water slide?
2  A.  I'm not 100 percent sure.
3  Q.  But it would be a reasonable thing that you think you
4      would have done at that time, right?
5  A.  Right.
6  Q.  Okay.  Do you know if Amber also had a drink?
7  A.  I don't know.
8  Q.  Okay.  And then it says that Amber and you went down
9      the slides about two times and I went and -- and when
10     I went back to where Jermaine and Dwight was, I saw
11     another guy and he told us his name but I don't
12     remember, but he is a lifeguard too.  Is this a fourth
13     gentleman or is this William Tapper?
14 A.  No, that was William Tapper.
15 Q.  So it's the same guy that's the third guy that you
16     referenced in the earlier sentence?
17 A.  Right.
18 Q.  Okay.  "Dwight and the third guy told Amber and I that
19     they were twins."  Did they look alike?
20 A.  Yes.
21 Q.  Okay.  "I then asked the guy to take pictures of Amber
22     and I."  And then there is a scribble and it says,
23     "Amber's phone."  Is that right?
24 A.  On Amber's phone.
25 Q.  On Amber's phone, right?

Page 131

1  A.  Yes.
2  Q.  It says, "Amber then took pictures of the guys also on
3      her phone," right?
4  A.  Right.
5  Q.  Now, sitting here today, I still don't have those
6      pictures?
7         MR. WEGLARZ:  You have one of them.  I
8      didn't mean to --
9         MR. SUAREZ:  No, we don't.  And if you
10     think I have those pictures, if you think I have those
11     pictures, I'd like you to point it out to me, please.
12        MR. WEGLARZ:  You do have one picture taken
13     of Amber and Paiton that this statement refers to.
14        MR. SAFRA:  With the gentlemen?
15        MR. WEGLARZ:  Not with the gentlemen, it's
16     just a picture of Amber and Paiton.
17 BY MR. SUAREZ:
18 Q.  Okay.  Let's go back.  We're still on the record.
19        Okay.  But see, these two sentences say, "I
20     then asked the guys to take pictures of Amber and I --
21        MR. WEGLARZ:  Yes.
22 BY MR. SUAREZ:
23 Q.  -- on Amber's phone."  So I have the picture of Amber
24     and you, okay?
25 A.  Correct.

Page 132

1  Q.  Which picture is that?  Let's see, I'm going to show
2      you the picture --
3         MR. WEGLARZ:  It's in the -- I don't know
4      if you printed it off.
5         MR. SUAREZ:  I think I know, I think I may
6      know what you're talking about.
7         MR. WEGLARZ:  I can pull it up here, if you
8      need me too.
9         MR. SUAREZ:  I've never seen that one
10     before in my life.
11        MR. WEGLARZ:  It was on the thumb drive.
12        MR. SAFRA:  You mean yesterday?  Or two
13     days ago?  So that's on the thumb drive you gave us
14     two days ago?
15        MR. WEGLARZ:  Whenever I gave you the thumb
16     drive this week, Monday or Tuesday.
17        MR. SUAREZ:  Wait.  Wait.  Wait, let's be
18     clear, we read a sentence about a picture taken that
19     evening a few minutes ago, okay?  Counsel said we had
20     a picture.  That picture, he's now pulled up that
21     picture which is a picture of two young ladies, Amber
22     and Paiton in a bikini, and has shown it to me and he
23     said that picture was produced in a thumb drive the
24     day before yesterday for the first time that had a
25     series of pictures.  That's what just transpired.  I

Page 133

1      just want to make a record of what transpired.
2         What I'd like counsel very politely to do
3      is can you please print that picture so I can ask the
4      witness about some things?  Can you print a copy of
5      that picture because I don't have it?
6         MR. WEGLARZ:  I can do whatever it is you
7      want.
8         MR. SUAREZ:  Thank you.
9         MR. SAFRA:  And to add to that, on that
10     thumb drive, or roughly, are in excess of 100
11     photographs which as a courtesy counsel tried to
12     quickly read through to use during the deposition
13     which was not provided.  We have not had ample time to
14     analyze the various photographs.
15        MR. WEGLARZ:  I understand that's your
16     position, but you guys have been here for a full week
17     with at least two lawyers per side.  I think you've
18     had time to go through the pictures I gave you.
19        MR. SAFRA:  In all fairness --
20        MR. SUAREZ:  You mean the pictures -- you
21     mean the pictures that you got at least in July?  You
22     mean those pictures that you had for months and it's
23     now September 25th?  You mean those pictures?
24        MR. WEGLARZ:  Yeah, if you want to get in
25     an argument, that's fine.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 134

1        MR. SUAREZ:  No, I don't want to get in an
2   argument.
3        MR. WEGLARZ:  You still don't know how many
4   files are on there, okay?
5        MR. SUAREZ:  I don't.  I have no way of
6   knowing.
7        MR. WEGLARZ:  And I provided way more
8   information and documents than all the defendants
9   combined in this case, so to start feigning that
10  you're just outraged because of the lack of
11  cooperation in producing discovery is just beyond
12  belief, it really is.
13       MR. SAFRA:  I don't think that anyone is
14  feigning, but I think it is an inaccurate statement
15  that you're saying we've had ample time while taking
16  four depositions to also review recently produced
17  photographs, numerous in count, that for days we've
18  been politely saying that it's acceptable that for
19  months you haven't had the time to review the social
20  media documents that included these photographs, but
21  yet a week is fine?  I think that that's -- that's
22  kind of what's going on here.
23       MR. WEGLARZ:  That's clever.  See, I did
24  the hard work for you.  I have reduced it to only the
25  pictures of the incident.  I took out the cat photos,

Page 135

1   I took out the dog photos.  I took out the cancer
2   photos, okay?  You got the relevant stuff, but to get
3   there, I had to review it all.
4        MR. SAFRA:  Okay.  While we're on the topic
5   of the document production, though, let me also add to
6   the record that with regard to the statement and the
7   copy that's not cut off that was just entered into the
8   record, Janet very kindly advised us when we were on a
9   break figuring out the availability or differences or
10  obtaining a copy of this that she obtained it in
11  May 2015 while she was in Jamaica.
12       MR. WEGLARZ:  Maybe you should not talk to
13  my client when I'm not around.
14       MR. SAFRA:  You were here.  You were in the
15  room.
16       MR. WEGLARZ:  Maybe you should stop
17  talking --
18       MR. SUAREZ:  You were in the room.  Excuse
19  me, that is wholly inappropriate because we have not
20  said -- stop, we have not said one word, one word to
21  your client without you being present, not one.
22       MR. WEGLARZ:  You know what --
23       MR. SAFRA:  That you were in the room.
24       MR. SUAREZ:  That is not right.  You were
25  in the room when she said she conned the police.

Page 136

1        (Off the record at 11:19 a.m.)
2        (Back on the record at 11:19 a.m.)
3        MR. SAFRA:  Counsel, Todd Weglarz was in
4   the room when her client said she conned the police to
5   get the document --
6        MS. DeSANTIS:  Let's walk out.
7        MR. SAFRA:  -- that in 2015 that we are
8   getting today and Todd has walked out in the middle of
9   being on the record while I'm making this statement.
10  Let the record be clear, we at no time spoke to them.
11  We can go off the record now.
12       (Recess taken at 11:19 a.m.)
13       (Back on the record at 12:04 p.m.)
14       MR. WEGLARZ:  I want to make a
15  clarification of the record.  There was a disagreement
16  which led to an argument amongst counsel where I
17  represented or I accused Mr. Safra of talking to my
18  client outside of my presence.  I had an opportunity
19  to talk to my client, to talk to opposing counsel and
20  to actually review the transcript that the court
21  reporter has provided for us and I am of the
22  understanding that Mr. Safra did not talk to my client
23  outside of my presence.  My reaction was in response
24  to Mr. Safra representing that my client said
25  something while we were on break.

Page 137

1        I interpreted that to mean that this
2   happened outside of my presence and after reflecting
3   back, I've come to learn that did not happen.  That
4   happened while I was here.  So all of us just want to
5   correct the record.  And none of my comments were
6   directed towards Mr. Suarez, this was a dispute
7   Mr. Safra and I were having.
8        MR. SAFRA:  Thank you, Counsel.
9        MR. SUAREZ:  I appreciate plaintiff's
10  counsel's clarification of the record and making that
11  point utterly clear.  Thank you.
12       MR. WEGLARZ:  I think we all agree it was
13  an honest mistake in misinterpretation.
14       MR. SUAREZ:  It was.  We can move on.
15  Thank you.
16       (Discussion off the record at 12:06 p.m.)
17       (Back on the record at 12:16 p.m.)
18  BY MR. SUAREZ:
19  Q.  Paiton, I noticed that your hair color today is green.
20      How long have you had that color?
21       MR. WEGLARZ:  Form objection.
22  A.  Over a year.
23  BY MR. SUAREZ:
24  Q.  What was the color of your hair when you were in
25      Jamaica?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 138

1   A.  Auburn.
2   Q.  Okay.  Paiton, we've been talking about the statement
3       that's been attributed to you and it's Exhibit 7, and
4       you have a copy in front of you.  It says here that
5       this statement was made on May 9th, which would have
6       been Saturday at 8:00 a.m.; is that right?
7   A.  Correct.
8   Q.  Is this statement your handwriting?
9   A.  I'm sorry, what?
10  Q.  Is this statement your handwriting?
11  A.  No.
12  Q.  Whose handwriting is this statement?
13  A.  The person or rather the lady who worked at the police
14      station there and took it down as I said it.
15  Q.  And this -- this statement is made the morning after
16      the incident, right?
17  A.  Yes.
18  Q.  And before that time, you had been with your mother,
19      Amber and Margaret for the evening and the night,
20      right?
21  A.  Of what day?
22  Q.  So after the -- I'm going to go back to the incident,
23      after the incident, you had spent the evening with
24      your mother, Margaret and Amber, right?
25  A.  Yes.

Page 139

1   Q.  Who was present while you're making this statement?
2   A.  Amber and Margaret were getting their statements taken
3       down in the same room.
4   Q.  So you had an opportunity to listen as Amber and
5       Margaret were making their statements?
6   A.  No.
7   Q.  Were they in the same room?
8   A.  Yes.
9   Q.  Could you hear what they were saying?
10  A.  No.
11  Q.  Okay.  Was it a room about the size of this conference
12      room?
13  A.  I don't know.
14  Q.  Okay.  Do you recall the room?
15  A.  Vaguely.
16  Q.  What order were the statements given?  Who went first?
17  A.  We all did it at just about the same time.
18  Q.  But who went first?
19  A.  I don't know.
20  Q.  Did your mother give a statement before you or after
21      you?
22  A.  During the same time that I was making mine.
23  Q.  A different woman wrote her statement down than your
24      statement?
25  A.  A different person, yes.

Page 140

1   Q.  A different person.  Did the same person that wrote
2       your statement down write any other of the statements?
3   A.  Not that I'm aware of.
4   Q.  Was your mother present and next to you while you were
5       making this statement?
6   A.  No.
7   Q.  How far away was she?
8   A.  I don't know.
9   Q.  I'm sorry?
10  A.  I don't know.
11  Q.  Was she in the room?
12  A.  No.
13  Q.  Who was in the room?
14  A.  The lady taking my statement down and Margaret and
15      Amber and the person taking Amber's down and
16      Margaret's down.
17  Q.  So in the room with you were two persons from the
18      police station and Margaret and Amber?
19  A.  Yes.
20  Q.  Where was your mother?
21  A.  In another room.
22  Q.  Okay.  There's a signature mark, on the first page of
23      this document there's a signature mark of witness, is
24      that you?  Is that your signature?
25  A.  Yes.

Page 141

1   Q.  Okay.  And on every page in the bottom there's a
2       signature mark, is that your signature?
3   A.  Yes.
4   Q.  And on the last page, there is a signature, is that
5       your signature?
6   A.  Yes.
7   Q.  Okay.  And on the second to last page in the bottom,
8       there's a signature, is that your signature right
9       here?
10  A.  Yes.
11  Q.  Okay.  Going back to where we left off before we took
12      a break, I was asking you about the sequencing of the
13      evening and we were at the point where you went
14      from -- actually, before we do that, let me ask you
15      one other thing, which is, after you made the
16      statement to the person that wrote it down, did you
17      have an opportunity to read the statement?
18  A.  Yes.
19  Q.  And did you read it?
20  A.  Yes.
21  Q.  Did you read the whole thing?
22  A.  Yes.
23  Q.  Did you talk to anybody while you were reading it?
24  A.  No.
25  Q.  Did you talk to your mother while you were reading it?

f2a2c7a3-f397-4e67-92e8-f79d5cabe5b5

Page 142

1  A.  No.
2  Q.  Okay, and after you read it, you signed it?
3  A.  Yes.
4  Q.  And how long did it take you to read it?
5  A.  I don't know.
6  Q.  Going back to the statement, we were at the
7      point of the evening where you had left your room and
8      the picture on the bed and you had gone to the water
9      slide and then along the way you had stopped at a bar.
10     And then you asked the guys to take pictures of Amber
11     and you on Amber's phone; is that right?
12 A.  At the water slides we asked them to take pictures --
13     a picture of us.
14 Q.  And when you say them, who is them?
15 A.  I believe it was Dwight and Jermaine were there.
16 Q.  Okay.  Where was William?
17 A.  I don't know.
18 Q.  Okay.  And who took the pictures, Dwight or Jermaine?
19 A.  I don't know.
20 Q.  I'm going to mark as Exhibit 8 a copy of a color
21     photograph that your counsel provided.
22         MARKED FOR IDENTIFICATION:
23         DEPOSITION EXHIBIT 8
24         12:23 p.m.
25 BY MR. SUAREZ:

Page 143

1  Q.  Who is in those photos?
2  A.  Amber and myself.
3  Q.  Okay.  And was that the photo or one of the photos
4      that was taken by the guys at the water slide?
5  A.  Yes.
6  Q.  Okay.  Now, are there -- are there other photos that
7      you recall taking with the guys at the water slide at
8      that time?
9  A.  Not that I can remember.
10 Q.  And that's, the photo is dark so that's taken in the
11     evening, correct?
12 A.  Yes.
13 Q.  All right.  Who was present when that photo was taken?
14 A.  Jermaine and Dwight, Amber and myself.
15 Q.  Okay.  Were there other people near there?
16 A.  Probably.
17 Q.  Do you know anybody else who was near there?
18 A.  I don't know of them -- or I don't know who they are,
19     but there were kids running around.
20 Q.  It then says back to the statement, can you hand me
21     the photograph?  It then says, "Amber then took
22     pictures of the guys also on her phone."  Do you
23     recall her doing that?
24 A.  Vaguely, yes.
25 Q.  Okay.  Have you seen any photographs that Amber took

Page 144

1      with the guys on her phone?
2  A.  No.
3  Q.  Is the guys that she -- that you're referring to in
4      this statement, Dwight, Jermaine and William or just
5      Dwight and Jermaine?
6  A.  I'm not 100 percent sure.
7  Q.  Who are the guys that you're referring to in this
8      statement?
9  A.  I don't know if it's just the two or all three of
10     them.
11 Q.  But it was either all three of them or a subset of
12     them, correct?
13 A.  Right.
14 Q.  Okay.  And then it says, "We all sat and chat for a
15     while."  Where did you sit?
16 A.  I don't remember.
17 Q.  And then it says that -- well, did you -- do you
18     recall what you chatted with the guys about?
19 A.  No.
20 Q.  Did you make any plans or arrangements to see the guys
21     later that evening?
22 A.  No.
23 Q.  Okay.  And then it says, "And I went to the bathroom
24     and left the guys" -- sorry, I misread that.  Then it
25     says, "Then Amber and I went to the bathroom and left

Page 145

1      the guys at the poolside."  You say you left the guys
2      at the poolside, do you mean where the water slide was
3      or you're talking about some other location?
4  A.  I don't know looking back.
5  Q.  Okay.  And then it says, "After we left the bathroom,
6      Amber and I went to the piano bar.  They had a sing
7      along and Amber and I sung a few songs."  Do you see
8      that?
9  A.  Yep.
10 Q.  And that's what you testified earlier to that you sang
11     the Piano Man and another song, right?
12 A.  Correct.
13 Q.  Did you have a drink at the bar while you were
14     singing?
15 A.  Yes.
16 Q.  Okay.  Did you have more than one drink at the bar
17     while you were singing?
18 A.  No.
19 Q.  Did you have the Purple Haze?
20 A.  Yes.
21 Q.  Okay.  And then it says, "We stayed at the piano bar
22     for about half hour and then Amber and I decided to go
23     to the poolside again."  When you say that you decided
24     to go to the poolside again, was that to go back to
25     where you had been chatting with the guys?

Page 146

1  A.  I'm not sure.
2  Q.  Okay.  Then it says, "While there, I saw Dwight
3      passing and Amber said let's go hang out and we said,
4      "Hey, Dwight," and he stopped and we went to where he
5      was at the center of the path where the two twins
6      were."  What does that mean?
7  A.  The two other guys, Jermaine and William.
8  Q.  I thought Dwight and William were the twins?
9  A.  That's what we had thought, yes, but...
10 Q.  So this -- this statement here could be mistaken,
11     right?
12 A.  It could be.
13 Q.  And so -- so it was Amber who called out Dwight,
14     right?
15 A.  Yes.
16 Q.  Okay.  And then it says that Amber, you -- Amber,
17     Dwight and I, meaning you, chatted for a while, while
18     Amber and I were dancing because we could hear the
19     music from where we were.  Do you know how long you
20     chatted with him?
21 A.  I don't know.
22 Q.  Do you know what you chatted about?
23 A.  No.
24 Q.  Were you still feeling an effect of a buzz at that
25     time?

Page 147

1  A.  A slight buzz.
2  Q.  Yes?
3  A.  Yes.
4  Q.  Okay.  Can you look at Exhibit Number 4 and tell me
5      where you were at that time?  Point out where you were
6      at that time?  I hand you back a red pen.
7  A.  We were approximately here.
8  Q.  And what is -- can you please draw the arrow and
9      initial there, please?
10     MR. SAFRA:  Could you also write like
11     page 3 next to that signature so we can differentiate
12     it from the prior markings, we're on page 3 of the
13     statement so at least we know which one?
14     MR. SUAREZ:  Yeah, yeah.
15     MR. SAFRA:  Thank you.
16 BY MR. SUAREZ:
17 Q.  And that X, what is that X?
18 A.  That's where the three paths, one from the area with
19     the spa and piano bar come down and meet the one from
20     the elevator and you can get off the elevator and take
21     a right and you would make it down there.
22 Q.  Okay.
23 A.  Or if you come from the main stage, it's a straight
24     shot down.
25 Q.  Okay.  What level is that on?

Page 148

1  A.  I'm not 100 percent sure of the number.
2  Q.  Is that level on the -- is that level the same level
3      as the bar?
4  A.  No.
5  Q.  Okay.
6  A.  It's, but it's a slight -- it's like a half level
7      almost.
8  Q.  There's no stair.  It's basically a straight path,
9      right?
10 A.  Yeah.
11 Q.  How far is the bar from where you were standing?
12 A.  Maybe 60 to 80 feet.
13 Q.  Okay.  "Jermaine then walked up and held onto Amber's
14     hand."  When you were dancing, did the guys join in
15     the dancing?
16 A.  No.
17 Q.  When you were singing, did the guys join in the
18     singing?
19 A.  They weren't there, so no.
20 Q.  Well, it said that Amber, Dwight and you were chatting
21     for a while and you were dancing, so Dwight was there,
22     right?
23 A.  Right.
24 Q.  So was Dwight dancing with you?
25 A.  No.

Page 149

1  Q.  And Jermaine was -- excuse me, and was he singing with
2      you?
3  A.  No.
4  Q.  Okay.  Jermaine then walked up and hold onto Amber
5      hand and said they wanted to talk to you.  And you
6      said to Jermaine, be careful because I'm her legal
7      guardian at the moment.  What did you mean by that?
8  A.  I was responsible for watching over her and making
9      sure she was okay because our parents were back at the
10     room.
11 Q.  What did you think Jermaine could do?
12 A.  I don't know.
13 Q.  And when you said be careful, what does that mean?
14 A.  Don't do anything stupid.
15 Q.  What do you mean by don't do anything stupid?
16 A.  Like go off the premises.
17 Q.  What else?
18 A.  That's it pretty much.
19 Q.  Okay.  "Jermaine then walked off with Amber still
20     holding her hand."  Did Amber swat Jermaine's hand
21     away.
22 A.  Not that I saw.
23 Q.  Was Amber -- was Amber voluntarily holding Jermaine's
24     hand?
25 A.  I don't know.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 150

1  Q.  Did Amber appear like she was struggling to get her
2      hand released from Jermaine?
3  A.  I don't know.
4  Q.  Did you see her struggling to get away from Jermaine
5      at that moment?
6  A.  No.
7  Q.  Did she call back out at you and say, "Hey, tell
8      Jermaine not to hold my hand"?
9  A.  No.
10 Q.  Did she appear to try to walk away from Jermaine?
11 A.  I don't remember.
12 Q.  Were they holding hands before or after you said be
13     careful?
14 A.  During, before and after.
15 Q.  They were holding hands before and after you said be
16     careful, right?
17 A.  Yes.
18 Q.  Did Jermaine respond to anything when you said be
19     careful?
20 A.  I don't remember.
21 Q.  Did Jermaine smile or laugh when you said that?
22 A.  I don't remember.
23 Q.  "He took a right turn and then they stopped.  I could
24     see both of them standing and talking."  How long were
25     they standing and talking?

Page 151

1  A.  Not that long.
2  Q.  How far were they standing from you?
3  A.  About 60 to 70 feet away.
4  Q.  At that moment, were they still holding hands?
5  A.  I don't remember.
6  Q.  At that moment, did you think anything was wrong with
7      them standing and talking?
8  A.  No.
9  Q.  And then it says, "And I was still standing where
10     Dwight was.  I then saw Jermaine going into a room
11     holding Amber's hand."
12         MR. SAFRA:  "Still holding."
13 BY MR. SUAREZ:
14 Q.  Excuse me, "still holding Amber's hand."  Had you seen
15     that room before?
16 A.  I had seen the door throughout the week.
17 Q.  Could you tell whether that room, from where you were
18     standing, could you tell whether that room was lit or
19     not?
20 A.  I couldn't tell.
21 Q.  Could you see Jermaine pulling Amber into the room?
22 A.  I don't know.
23 Q.  "I said to Dwight, what were they doing?  And he said
24     let's go and find out.  And Dwight and I walked down
25     to the door and stood there for a while, about two

Page 152

1      minutes."  During those two minutes, what were you
2      doing with Dwight?
3  A.  We were just kind of standing there and waiting.  We
4      weren't talking or anything.
5  Q.  And then it says, "I heard Amber laughing."  Is that
6      right?
7  A.  Yeah.
8  Q.  And did you hear her laughing?
9  A.  Yes.
10 Q.  Okay.  "And then the third guy came with a big bin of
11     laundry and opened the door that Jermaine and Amber
12     went into."  Is that right?
13 A.  Yes.
14 Q.  Who was the third guy?
15 A.  William.
16 Q.  Did you tell -- say anything to William when he walked
17     by?
18 A.  Not that I remember.
19 Q.  Did William say anything to you?
20 A.  No.
21 Q.  Do you recall what Dwight told you?
22 A.  No.
23 Q.  Do you recall what you told Dwight?
24 A.  No.
25 Q.  Do you recall what topics you were chatting about?

Page 153

1  A.  We weren't chatting, we were waiting down there.
2  Q.  You were waiting, you waited for about two minutes and
3      you didn't say anything to each other?
4  A.  No.
5  Q.  Are you sure that the third guy that went into the
6      room was William?
7  A.  Yes.
8  Q.  Okay.  Are you sure, did you recognize William at the
9      time?
10 A.  Yes.
11 Q.  Then it says, "When the third guy that I don't know
12     his name opened the door."  That's a mistake, right?
13     You do know his name, right?
14 A.  I didn't at the time.
15 Q.  I'm sorry?
16 A.  I did not know his name at the time of giving this
17     statement.
18 Q.  But you had met William before, correct?
19 A.  Yeah, for about 2 seconds.
20 Q.  Okay.  And you just didn't catch his name?
21 A.  Exactly.
22 Q.  He's one of the twins?
23 A.  Supposed twins, yes.
24 Q.  It says, "The third guy that I don't know his name
25     opened the door and I saw Amber standing and she

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 154

1    seemed -- or standing.  She seemed to be okay, but I
2    didn't see Jermaine.  Inside the room was kind of
3    dark.  I also saw sheets, bins and pipes."  Is that
4    right?
5  A.  Yes.
6  Q.  Now, that room has lights, right?
7  A.  Yes.
8  Q.  It was a room, were some of the lights turned off, on
9    or were they all off?
10 A.  All of them were off.
11 Q.  Okay.  That room at the top part outside has -- the
12   top -- the top part of the wall has squares with
13   little slats in them where there's no obstruction
14   between the inside and the outside, right?
15 A.  Correct.
16 Q.  So light can permeate from the outside into the room,
17   right?
18 A.  Right.
19 Q.  Okay.  And so the room had some partial illumination
20   from the light that was coming outside, right?
21 A.  Not where Amber was.
22 Q.  Okay.  When the third guy went to open the room, did
23   you see him use a key?
24 A.  Yes.
25 Q.  You think there was a key that he used?

Page 155

1  A.  Yes.
2  Q.  And he -- did he put that key in his pocket?
3  A.  I don't know.
4  Q.  And then it says, "You stepped in the room to get
5    Amber and Dwight came in behind me and closed the door
6    behind him."  At the time that Dwight closed the door
7    behind him, were you concerned?
8  A.  Yes.
9  Q.  Okay.  Did you yell?
10 A.  No.
11 Q.  Did you tell Dwight, "Open the door"?
12 A.  I don't remember.
13 Q.  Did you tell -- did you walk towards the door and open
14   the door?
15 A.  I couldn't.
16 Q.  Why?
17 A.  He was blocking my way.
18 Q.  But did you try?
19 A.  I tried to turn around, but he was blocking my way, so
20   I couldn't move.
21 Q.  Did you step around him and say, "Please let me aside
22   so I can open the door"?
23 A.  I couldn't.
24 Q.  Why couldn't you say that?
25 A.  I couldn't try, even try to step around him.

Page 156

1  Q.  But I'm asking you if you asked him to step aside so
2    that he could -- so that you could get around him?
3  A.  No.
4  Q.  It says, "Dwight then held onto my hand."  Did you
5    swat his hand away?
6  A.  I don't remember.
7  Q.  Did you pull your hand away?
8  A.  I don't remember.
9  Q.  Did you smack your hand away?
10 A.  I don't remember.
11 Q.  Did you say, "Release my hand"?
12 A.  I don't remember.
13 Q.  And then it says, "And pulled me through some sheets
14   and bins."  When he pulled you through some sheets and
15   bins, you're walking away from the door, right?
16 A.  Yes.
17 Q.  Was he in front of you or behind you?
18 A.  At that point, he had gotten in front of me.
19 Q.  Okay.  When he got in front of you, why didn't you
20   turn around and walk towards the door?
21 A.  Because he was grabbing my arm.
22 Q.  Did you tell him, "Release my arm"?
23 A.  No.
24 Q.  Did you pull your arm away?
25 A.  I don't remember.

Page 157

1  Q.  Did you smack your arm away?
2  A.  I don't remember.
3  Q.  Did you yell?
4  A.  No.
5  Q.  Did you scream?
6  A.  No.
7  Q.  Did you say, "Why are you holding onto my hand"?
8  A.  I don't remember.
9  Q.  At this point, there was nothing between you and the
10   door, correct?
11 A.  I don't know.
12 Q.  Was there any person standing between you and the
13   door?
14 A.  There was no person that I can remember.
15 Q.  Okay.  And Amber wasn't between you and the door,
16   right?
17 A.  She was beside the door, but there was still half the
18   door that could be opened.
19 Q.  Right.  So you could walk straight to the door?
20 A.  No.
21 Q.  Why?
22 A.  Because there were mounds on mounds of towels, dirty
23   towels and --
24 Q.  But you could walk --
25 A.  -- carts.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 158

1  Q.  You could walk through the same path that took you to
2      where you were standing there, right?
3  A.  If I knew exactly which way to go back, yes.
4  Q.  Okay.  Do you recall how big this room was?
5  A.  Not exactly.
6  Q.  Do you recall, was it one room or two rooms?
7  A.  One large room that I remember.
8  Q.  Was there a dividing wall?
9  A.  I don't know.
10 Q.  And then it says, "There was a little light in the
11     room that was coming through some pattern holes on the
12     walls," and then it says, "this light was outside,"
13     right?
14 A.  Yes.
15 Q.  And so there was some illumination in the room, right?
16 A.  Once I got back to the corner, yes.
17 Q.  When you say back to the corner, you mean in the room
18     in the back?
19 A.  In the corner that was blocked by the mounds of towels
20     and the big carts of whatever the heck was in there.
21 Q.  Okay.
22 A.  So it was a far corner away from the door.
23 Q.  And when you got to that corner, you could no longer
24     see Amber, correct?
25 A.  I could see her head.

Page 159

1  Q.  Okay.  And then could you see Jermaine?
2  A.  I don't remember.
3  Q.  And then it says, "In the center of the path that we
4      were standing earlier," what does that mean?
5  A.  It's supposed to read as one sentence with some
6      pattern holes, that sentence with the light coming
7      through the room or in the room through the holes on
8      the wall.  But the light was coming in from outside in
9      the center of the path that we had just been standing
10     in.
11 Q.  So there was some light in the center of the path that
12     you had just been standing in, right?
13 A.  Outside of the doors, yes.
14 Q.  Okay.  And it was illuminating some of the room that
15     you were in, right?
16 A.  Once I got in there, yes.
17 Q.  Okay.  And then it says, "Dwight stopped, still
18     holding onto my hand."  You were still holding hands
19     with Dwight, right?
20 A.  Yes.
21 Q.  And then at that moment, had you tried to remove your
22     hand?
23 A.  I don't remember.
24 Q.  At that moment, did you try to get away from Dwight?
25 A.  I don't remember.

Page 160

1  Q.  Okay.  "And he used his other hand and unbutton my
2      shorts," and it says, "I was so scared and afraid, but
3      I was mostly worried about Amber."  Do you see that?
4  A.  Yes.
5  Q.  At that moment, did you yell out to Amber and say are
6      you okay?
7  A.  No.
8  Q.  When you had walked by Amber with Dwight going towards
9      the end of the room, did you ask Amber if she was
10     okay?
11 A.  I don't remember.
12 Q.  Did you ask her if she needed any help?
13 A.  I don't remember.
14 Q.  Did she seem like she was in distress?
15 A.  When I walked -- when I first walked in the room, no.
16 Q.  Okay.  When you walked by and towards her to go to the
17     corner room, did she seem like she was in distress?
18 A.  Not that I can remember.
19 Q.  Okay.  At that moment, had Amber turned and called to
20     you and said, "I need help"?
21 A.  No.
22 Q.  Dwight then said -- when Dwight tried to unbutton your
23     shorts, what did you do?
24 A.  I kind of became paralyzed.  I couldn't move.
25 Q.  Did you tell him to stop?

Page 161

1  A.  I told him to, yes.
2  Q.  And did you yell at him to stop?
3  A.  I don't think I yelled.
4  Q.  Before that moment, had he kissed you?
5  A.  I don't remember.
6  Q.  Had you kissed him?
7  A.  No.
8  Q.  Then it says, "Dwight then quickly turned me around.
9      Now my back was turned to Dwight and he started
10     pulling down my bikini and I told him to stop but he
11     didn't."
12         MR. WEGLARZ:  You want to take a break,
13     Paiton?
14         THE WITNESS:  No.
15         MR. WEGLARZ:  Are you sure?
16         MR. SAFRA:  Let the record reflect the no
17     is a response to counsel.  I don't want it to be read
18     as a response to the question.
19         MR. WEGLARZ:  I appreciate that.
20 A.  What was the question?
21 BY MR. SUAREZ:
22 Q.  It says, then it says that "Dwight then quickly turned
23     me around.  Now my back was turned to Dwight.  He
24     started pulling down my bikini and I told him to stop
25     but he didn't."  Is that what happened?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 162

1  A.  Yes.
2  Q.  Then it said, "Instead he held onto my head and bend
3      me over and pulled down my bikini entirely.  He then
4      pushed his penis into my vagina and had sexual
5      intercourse with me against my will."  Do you need to
6      take a break?
7  A.  No.
8  Q.  While this was happening, did you do anything?
9  A.  I don't remember.
10 Q.  "I then felt Dwight taking his penis out of my vagina
11     and then I saw the guy, I don't know his name, he
12     grabbed me and pulled me over to where he was standing
13     and bend me over.  I tried to push him off with my
14     hands, but he was too strong.  I couldn't fight him
15     off.  He pushed his penis in my vagina and had sexual
16     intercourse with me against my will."  Where did that
17     gentleman come from?
18 A.  I don't know.
19 Q.  When you walked to the corner of the room, did you
20     realize he was standing there?
21 A.  He wasn't standing there when I was in there in the
22     first place.
23 Q.  Is there a separate door in that room other than the
24     door you walked into?
25 A.  On the opposite end of the room, yes.

Page 163

1  Q.  Okay.  When this gentleman grabbed you, did you try to
2      run away?
3  A.  I couldn't make my legs move, so no.
4  Q.  Did you yell?
5  A.  I don't think so.
6  Q.  At that point, could you hear anything coming from the
7      other room?
8  A.  It was all one room.
9  Q.  There was a wall separating one room from the other
10     room, right?
11 A.  I don't know.  Amber and I were in the same room, just
12     different ends.
13 Q.  Could you see Amber while -- from where you were
14     standing?
15 A.  I could see the top of her head.
16 Q.  Could you see what Amber was doing?
17 A.  No.
18 Q.  Could you see what was being done to Amber?
19 A.  No.
20 Q.  Could Amber see what you were doing?
21       MR. WEGLARZ:  Form objection.
22 A.  I don't know.
23 BY MR. SUAREZ:
24 Q.  Could you see -- could Amber see what was being done
25     to you?

Page 164

1        MR. WEGLARZ:  Form objection.
2  A.  I don't know.
3  BY MR. SUAREZ:
4  Q.  Did you and Amber have any communication during this
5      time?
6  A.  No.
7  Q.  Then it says while -- then it says, "While the guy I
8      don't know his name was raping me, I saw Jermaine
9      walking towards me.  The minute Jermaine reached where
10     I was, he grabbed me and the guy I don't know his name
11     pulled out of me and Jermaine pushed inside of my
12     vagina.  He was the most forceful.  He was going very
13     hard.  I was in so much pain and I kept telling
14     Jermaine to stop but he couldn't (sic).  He just kept
15     pushing his penis into my vagina harder and harder.  I
16     tried to sink my nails in his thighs, but it wasn't
17     working while Jermaine was raping me.  The guy I don't
18     know his name and Dwight left."
19       Had Amber already left the room during this
20     time?
21 A.  I don't know.
22 Q.  Had the two gentlemen who left, how did they exit the
23     room?
24 A.  I have no idea.
25 Q.  When Jermaine -- when Jermaine -- it says then, "When

Page 165

1      Jermaine walked (sic) through, he pulled his pants up
2      and walked back to the door that we came in through."
3      Was Amber in the room when Jermaine walked out?
4  A.  No.
5  Q.  I read to you your statement of what happened to you;
6      is that a truthful and accurate account of what
7      happened to you?
8  A.  Yes.
9  Q.  Is there anything about that statement that you would
10     like to change?
11 A.  No.
12 Q.  Okay.  It then says that "I bend down and I saw Amber
13     coming in the room."
14       MR. SAFRA:  It's Amber leaving.
15 BY MR. SUAREZ:
16 Q.  Right, "Amber leaving the room, then Jermaine went
17     through the door and ran.  I took up my shorts and
18     bikini from off the ground.  There was a lot of dirt
19     on my bottom.  I put on my shorts and I was so afraid
20     and embarrassed, I didn't want to go outside.  I went
21     to the door and went" -- I -- I don't know what the
22     next word says.
23 A.  It says I went -- sorry.  I went to the door and went
24     to peep out.
25 Q.  What does that mean?

Page 166

1   A.  Like peep my head out.
2   Q.  Okay.  Is that the first door or the door of the room
3       you're in?
4   A.  It's the door that I had originally came out of -- or
5       came into.
6   Q.  So what I don't understand about this statement is, it
7       says that Jermaine went -- when Jermaine was done, he
8       went back to the door that we came through.  So you're
9       talking about Jermaine went back to the room where
10      Amber was in, right?
11  A.  We were in the same room.
12  Q.  But what door is he going through?
13  A.  The same door that we all went into.
14  Q.  You're saying there's one door?
15  A.  There was the door that we all went into with where I
16      was over in the corner.
17  Q.  Uh-huh.
18  A.  And where Amber was behind that door.
19  Q.  Okay.
20  A.  And then I believe that there was another portion to
21      the left of that door that we all went into that I
22      never saw, but I knew it was there because there was
23      another door like a few steps away or maybe like
24      30 feet away from the original door we went into to
25      get into the other part of that room.  It was all one

Page 167

1       big room with two doors.
2   Q.  There was one big room, right?  Was there a wall --
3       was -- first of all, there was one big structure,
4       right?
5   A.  Yes.
6   Q.  Okay.  And there was a door that all four people went
7       through, right?
8   A.  Yes.
9   Q.  Okay.  And the other gentleman who we now know is
10      William Tapper, right?
11  A.  Correct.
12  Q.  Okay.  That's one door.  Where's the other door of
13      that room?
14  A.  If you're staring at the room from the sidewalk and
15      you're at the door that everybody went in, if you look
16      to your left, there's another door down there.
17  Q.  Okay.  You never went in that door?
18  A.  No.
19  Q.  And you didn't see anybody come in or out of that
20      door, correct?
21  A.  No.
22  Q.  I'm sorry?
23  A.  I did not.
24  Q.  And if you're facing the door as you're describing,
25      and you go to the right of the room -- to the right

Page 168

1       and towards the back, that's the room that you were
2       in, right?
3   A.  If you're looking at the room from the sidewalk, yes.
4   Q.  If you're looking at the room from the sidewalk, yes?
5   A.  It's off to the right where I was at.
6   Q.  And when you were right here, you saw Jermaine walk
7       back to the door that we came through, he's walking
8       towards the door that you all came in?
9   A.  Yes.
10  Q.  Did you ever see anybody come in and out of the other
11      door --
12  A.  No.
13  Q.  -- that you never went through?
14  A.  No.
15  Q.  Do you know how -- do you know whether Dwight and
16      William exited from the main door or the other door?
17  A.  I don't know.
18  Q.  When you peeped out the door, you saw Margaret and you
19      bent down (sic) and you were crying, and then you saw
20      my mom come and opened the door and took me out.  Is
21      that right?
22  A.  I had crouched behind a pile of the dirty towels that
23      was in there after I saw Margaret and my mom.
24  Q.  Why had you crouched after you saw it?
25  A.  Because I was embarrassed and I was still in shock.

Page 169

1   Q.  And then it says you saw a security guard -- well, no,
2       I'm sorry, I skipped one.  It says, "I was still
3       crying when my mom took me out, I didn't see
4       Margaret."  When your mom walked in, what did she tell
5       you?
6   A.  I don't remember.
7   Q.  What did you tell your mom at that time?
8   A.  I don't remember.
9   Q.  And then it says that you saw a security guard and
10      your mom and you were crying and you did not tell
11      anybody what happened; is that right?
12  A.  Yes.
13  Q.  Okay.  When -- and you, your mom, Amber and Margaret
14      walked towards, back towards your room, right?
15  A.  Margaret and Amber walked separately.
16  Q.  Okay.
17  A.  They went first.
18  Q.  Walking towards your room, right?
19  A.  Yes.
20  Q.  And you and your mother walked behind Margaret and
21      Amber, right?
22  A.  Yes.
23  Q.  Okay.  And then during that walk, did your mom and
24      you -- during that walk, did your mom and you talk
25      about anything?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 170

1  A.  I don't remember.
2        MR. SAFRA:  Before you go beyond the
3  incident, can we take a break for a second to chat?
4        MR. SUAREZ:  Sure.
5        MR. SAFRA:  Off the record?
6        MR. WEGLARZ:  Let's do that.
7        (Discussion off the record at 1:03 p.m.)
8        (Back on the record at 1:04 p.m.)
9            EXAMINATION
10  BY MR. SAFRA:
11  Q.  Paiton, as a matter of agreement of counsel, we
12    usually don't go in and out of turn, but for sake of
13    addressing the incident part, we've all agreed that
14    I'll ask those questions at this time.  I'm going to
15    limit my questions to just the sequence of the
16    incident itself.
17  A.  Okay.
18  Q.  When you got to the room with Dwight and you were
19    standing outside for a few minutes, did one of you try
20    to open the door?
21  A.  I don't remember.
22  Q.  You said that the other gentleman carrying the towels
23    that appeared used the key?
24  A.  Yes.
25  Q.  Could you describe what he was holding?  Was it a

Page 171

1    bunch of keys, like 100 keys to different rooms?  Was
2    it a single key?  Was there a key chain?
3  A.  I don't remember.
4  Q.  What is it about that that you recall there being a
5    key?
6  A.  Because there was no handle on the door itself.
7  Q.  Was it a push door?
8  A.  I don't know.
9  Q.  Was there a lock and a handle below it or I mean just
10    a lock in the door?
11  A.  Yes.  It was just a dead bolt in the door.
12  Q.  When the door opened, the statement that was gone over
13    with you that you acknowledged is that you could see
14    Amber?
15  A.  Yes.
16  Q.  You could not see Jermaine, though, correct?
17  A.  Correct.
18  Q.  Did Amber make any movement towards you to leave?
19  A.  Not that I remember.
20  Q.  Did she look at you in a way that you interpreted she
21    was in trouble?
22  A.  Not at that moment, no.
23  Q.  Did she ask for help either verbally or through
24    motion?
25  A.  Not that I remember.

Page 172

1  Q.  Did anything occur that gave you pause in entering
2    that room from what you saw with Amber?
3  A.  What do you mean?
4  Q.  Did something that you saw as you saw Amber before
5    you're walking into that room give you pause that
6    there was trouble?  Like I shouldn't go in there,
7    something's wrong?
8  A.  Once Dwight had walked right up against me to
9    essentially push me in without actually pushing me in,
10    that was when I realized oh, great, something's not
11    right.
12  Q.  But prior to that, nothing that you saw in terms of
13    Amber gave you any alarm?
14  A.  No.
15  Q.  Is that correct?  It's a double negative; is that
16    correct?
17  A.  Yes.
18  Q.  And you did not see Jermaine at that time?
19  A.  No.
20  Q.  And again, that's a double negative.  You did not see
21    Jermaine, that's correct?
22  A.  Correct.
23  Q.  So was there anything preventing Amber at that moment
24    from exiting the room?
25  A.  Not that I'm aware of.

Page 173

1  Q.  In terms of the actual incident when you and Dwight
2    are in the room, there was a point in the sequence of
3    the incident where you talked about Dwight quickly
4    turning you around; do you recall that?
5  A.  Yes.
6  Q.  Did that time period of the sequence in which Dwight
7    turned you around before Jermaine came over, was that
8    quick?
9  A.  It was probably within five minutes.
10  Q.  And I think you were asked about whether you saw Amber
11    still in the room at some point, and I'm not sure that
12    I followed exactly, so let me ask you about that.
13    Jermaine then came to you after Dwight, correct?
14  A.  No.
15  Q.  William Tapper did?
16  A.  Yes.
17  Q.  And then Jermaine?
18  A.  Yes.
19  Q.  So when Jermaine came to you, okay, and I think you
20    said he was the one that was much more forceful?
21  A.  Yes.
22  Q.  You were asked if Amber was still in the room and I
23    think you said no.  In reviewing the statement later
24    on, I think you acknowledged that after Jermaine left
25    you and it says, "When Jermaine were through, he

Page 174

1      pulled his pants up and walked back to the door that
2      we came in through, I bend down and I saw Amber
3      leaving the room." Do you see that?
4   A.  Yes.
5   Q.  So Amber was still in the room up to and through the
6      entire time and the point in which Jermaine was done
7      and pulled up his pants, correct?
8   A.  I'm not sure.
9   Q.  I mean, to your knowledge, did Amber leave the room
10     and come back in?
11  A.  No.
12  Q.  So in seeing that he's pulling his pants up and
13     walking back toward the door and then that's when you
14     saw Amber leaving the room, it's fair to say Amber was
15     in that room that entire time, correct?
16         MR. WEGLARZ:  Form objection.
17  A.  Yeah.
18         MR. WEGLARZ:  Go ahead and answer, if you
19     can answer.
20  BY MR. SAFRA:
21  Q.  Well, explain to me then from what you saw, you had
22     your interactions with Dwight, you had your inter --
23     and before that Amber was in the room, correct?
24  A.  Correct.
25  Q.  Then you had your interaction with William Tapper,

Page 175

1      correct?
2   A.  Correct.
3   Q.  Then you had your interaction with Jermaine?
4   A.  Yes.
5   Q.  Correct?  Did either of the two prior individuals come
6      back to you after that?
7   A.  No.
8   Q.  So then Jermaine pulls up his pants and he walks back
9      toward the door, at that time you also see Amber
10     leaving the room, correct?
11  A.  I'm not sure.
12  Q.  The statement that you took on the morning after the
13     incident, does it reflect that that is what you had
14     recalled being what happened at that time, the morning
15     after?
16  A.  That's what I recalled at that time.
17  Q.  And at that time, would you say being closer in time
18     to the incident, your recollection might be better
19     than years later?
20  A.  Not necessarily, no.
21  Q.  Do you believe that there is any untruthfulness or
22     inaccuracy in the statement that it is at this time
23     that you saw Amber leave the room and Jermaine was
24     walking to the door?
25  A.  I don't know.

Page 176

1   Q.  And I'm not trying to say purposeful, I'm just saying
2      is there anything about it, is it possible that this
3      is true, you just don't recall?
4   A.  It's possible that it's true.
5   Q.  And that's fair.  I'm not trying to make you feel
6      otherwise.  So but you agree according to this
7      statement and your account that morning after, Amber
8      left the room as Jermaine was walking away from you
9      towards the door?
10  A.  Yes.
11  Q.  And that is a statement you signed at that time?
12  A.  Right.
13  Q.  Okay.  A few segments later in the incident sequence,
14     it talks about you going to the door.  Prior to that
15     moment that you went to the door and you peeped out,
16     had you heard anyone banging on the door?
17  A.  No.  It was very loud in there.
18  Q.  And when you peeped out, you saw Margaret bending
19     down, was she with Amber?
20  A.  I don't remember this time.
21  Q.  Was Margaret banging on the door as you were at the
22     door?
23  A.  No.
24  Q.  Was she standing at the door or bending near the door?
25  A.  I don't know.

Page 177

1   Q.  Did she see you?
2   A.  I don't know.
3   Q.  When you walked up to that door, was there anyone else
4      in the room with you before you got to the door?
5   A.  Not that I'm aware of.
6   Q.  And you saw Jermaine run out?
7   A.  Yes.
8   Q.  And according to this statement, you saw Amber leave
9      or I mean by that point she was not in there anyways,
10     right?
11  A.  Correct.
12  Q.  Was the door open when you approached it?
13  A.  It was slightly cracked, yes.
14  Q.  This will be my last question on this.
15         MR. WEGLARZ:  Sure.
16  BY MR. SAFRA:
17  Q.  At this point in time, my understanding from your
18     responses to the questions from counsel, you had had
19     at least six Purple Hazes that day in a time period
20     after lunch, and you talked about feeling slightly
21     buzzed at different points in time.  Did you still
22     feel that same buzz at the time period at which the
23     incident sequence was over?
24         MR. WEGLARZ:  Form objection -- sorry, form
25     objection.

Page 178

1    Go ahead.
2 A.  Absolutely not.
3 BY MR. SAFRA:
4 Q.  Was there a point in time when you no longer felt
5     buzzed?
6 A.  Yes.
7 Q.  When?
8 A.  As soon as stuff started happening that I wasn't okay
9     with.
10 Q.  Okay.  So up until the time in which you were standing
11    outside the room and Dwight got in proximity to you
12    that -- and I'm not -- I think you described it as
13    either kind of pushed or a form of pushed or into the
14    room, up until that point but not after?
15 A.  Correct.
16       MR. SAFRA:  We can take a break.
17       MR. WEGLARZ:  Okay.  Let's do that.
18       (Recess taken at 1:16 p.m.)
19       (Back on the record at 1:38 p.m.)
20       RE-EXAMINATION
21 BY MR. SUAREZ:
22 Q.  So then you and your mom and Margaret and Amber walked
23    back to your room, directly back to your room, right?
24 A.  No.
25 Q.  Where did you go first?

Page 179

1 A.  My mom and I talked to security.
2 Q.  Do you recall how long you talked to security?
3 A.  I don't.
4 Q.  Do you recall what you told them or her?
5 A.  No.
6 Q.  Okay.  Do you recall whether that security took any
7     notes?
8 A.  I don't recall.
9 Q.  Were Margaret and Amber present for that?
10 A.  No.
11 Q.  And then you got to your -- you got to your room
12    without talking to your mother or your mother not
13    talking to you, right?
14 A.  How do you mean?
15 Q.  Right, so you walked from the room of the incident to
16    your room, which I believe was either 1032 or 1132,
17    I'm not -- I don't remember the room number?
18 A.  My mom and I talked to security before we went back to
19    the room.
20 Q.  Okay.  And did your mom and you have a conversation as
21    to what happened?
22 A.  I don't remember.
23 Q.  Okay.  Do you remember anything your mom told you
24    during that time?
25 A.  No, I don't.

Page 180

1 Q.  Then I believe Amber went in to take a shower and you
2     went into the bathroom with her, correct?
3 A.  She had locked the door, so I knocked and she let me
4     in.
5 Q.  Okay.  And what happened when you all were taking a
6     shower?  What happened in that bathroom?
7 A.  Amber was showering and I was on the toilet going to
8     the bathroom and she poked her head out of the curtain
9     and looked at me and I just kind of started bawling.
10 Q.  And then what happened?
11 A.  She finished her shower and I got in to take a shower.
12    And then when I was done with my shower, my mom came
13    in.
14 Q.  Before your mom came in, had Amber and you agreed not
15    to tell anybody what happened?
16 A.  No.
17 Q.  So if you look at the last sentence, it says, "Amber
18    and I (sic) went into the shower and I told her to let
19    me in.  I sat on the toilet and cried while Amber
20    showered.  I then showered when Amber was through.  I
21    still did not tell anybody what happened."  Did you
22    not tell Amber what happened while you were in the
23    shower?
24 A.  I did not tell her, no.
25 Q.  Okay.  And did she tell you what happened to you?

Page 181

1 A.  Not that I can remember.
2 Q.  Excuse me, did she tell you what happened to her?
3 A.  Not that I can remember.
4 Q.  Did she ask you why you were crying?
5 A.  I don't know.
6 Q.  Okay.  And you did not make any pact with her in that
7     room not to tell anybody, correct?
8 A.  Not that I remember.
9 Q.  Then it says that when you came out of the room, Amber
10    and you started packing your clothes in your suitcase
11    and then you started talking and crying.  And you told
12    Amber what happened and she told me what happened to
13    her.  Were your -- was your mom and Margaret present
14    when that happened?
15 A.  No.
16 Q.  Were they in the room when that happened?
17 A.  I don't believe so.
18 Q.  Did you and Amber agree to keep this quiet?
19 A.  I don't think we agreed to keep anything quiet.
20 Q.  Okay.  Then your parents came back in the room?
21 A.  Well, yeah.
22 Q.  And what happened next?
23 A.  I wasn't going to say anything, there was no pact
24    made.
25 Q.  Okay.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 182

1   A.  And my mom knew that there was something wrong, and
2       she ended up, I don't remember how, but she ended up
3       getting it out of us.
4   Q.  What did your mom say?
5   A.  I don't remember.
6   Q.  How did she get it out of you?
7   A.  I don't remember.
8   Q.  Who spoke first, your mom or you or Margaret or Amber?
9   A.  I don't remember.
10  Q.  When you say that your mom got it out of you, why
11      wouldn't you want to tell your mom what happened
12      immediately?
13  A.  Because I was embarrassed.  I thought it was my fault.
14  Q.  Then it says that the police came and they took all
15      four of you to a hospital; is that right?
16  A.  Yes.
17  Q.  And a doctor examined you?
18  A.  Yes.
19  Q.  And did -- was your mom in the room when the doctor
20      examined you?
21  A.  Yes, I asked her to be.
22  Q.  Okay.  And there was also a police lady that was --
23      that was present, right?
24  A.  In the room?
25  Q.  Yes.

Page 183

1   A.  I don't remember.
2   Q.  Well, if you scroll down the statement, it says, "And
3       she, police lady, was in the room when I was being
4       examined by the doctor."  Do you see that?
5   A.  I see that, yes.
6   Q.  Is that true?
7   A.  I don't remember it right now, but if I said it before
8       when right after everything had been done, I don't see
9       a reason why it wouldn't be true.
10  Q.  And then sometime the next morning after you were at
11      the police station -- excuse me, at the medical
12      facility, you went to the police station; is that
13      right?
14  A.  Yes.
15  Q.  And during all of this time, your mom and Margaret and
16      Amber were with you, right?
17  A.  Yes.
18  Q.  And then that next morning, you gave this statement,
19      right?
20  A.  Yes.
21  Q.  Okay.  What did you provide physically to the police?
22  A.  I didn't provide anything to the police.
23  Q.  Did you give them your phone?
24  A.  I'm sorry, what?
25  Q.  Did you give them your phone?

Page 184

1   A.  No.
2   Q.  Did you give them your clothing?
3   A.  No.
4   Q.  When did they ever collect your phone and your
5       clothing?
6   A.  No.  They didn't.
7   Q.  When then --
8   A.  They collected my clothing for the rape test kit at
9       the hospital.
10  Q.  Okay.
11  A.  And put it in the kit to send it off.
12  Q.  Who did, the hospital or the police?
13  A.  I believe it was the hospital personnel.
14  Q.  Okay.  Did the hospital personnel take your phone?
15  A.  No.
16  Q.  Did the police take your phone?
17  A.  No.
18  Q.  Did they look for your phone?
19  A.  Not that I can remember.
20  Q.  Your phone was always in your possession?
21  A.  No -- well, the next day, yes.  On the 9th, yes.
22  Q.  Where was your phone from the 8th to the 9th?
23  A.  In the room.
24  Q.  And it was always in the room?
25  A.  I believe so.

Page 185

1   Q.  Okay.  And after the 9th, you kept your phone with
2       you?
3   A.  Yes.
4   Q.  Okay.  And you've never given your phone to any
5       Jamaican medical doctors or any Jamaican authorities
6       or any Jamaican police officers, right?
7   A.  Nope, I have not.
8   Q.  The next day, May 9th, what happened?
9   A.  Where am I starting from?
10  Q.  Well, after you gave this statement, the day you gave
11      this statement?
12  A.  After I gave the statement, we were then taken back I
13      believe by the police to the resort and we were told
14      to collect, pack up all of our clothing, all of our
15      belongings into our suitcases because they were moving
16      us to a different resort.
17  Q.  Why were they moving you to a different resort?
18  A.  I don't know.
19  Q.  Okay.  So then do you recall the name of the
20      different -- of the other resort that you moved to?
21  A.  Yes.
22  Q.  And what resort was that?
23  A.  It was the Sandals Plantation.
24  Q.  Okay.  And you went and stayed in a room in Sandals
25      Plantation from the 9th through the 14th with your

Page 186

1       mom, Amber and Margaret, correct?
2    A.   Correct.
3    Q.   And what did you do during those six days?
4    A.   I mainly slept.
5    Q.   Okay.
6    A.   And then ordered room service for food and fell asleep
7         before I could eat it because of the medications.
8    Q.   What medications were you taking at that time?
9    A.   HIV preventives and the morning after pill and
10        antibiotics that they put me on, they at the hospital
11        put me on.
12   Q.   Were you at that time, were you -- were you taking any
13        medications that were not prescribed to you by the
14        Jamaican doctor?
15   A.   I was still taking my birth control, if that's what
16        you mean.
17   Q.   Okay.  And in addition to your birth control, are you
18        taking anything else that you had been taking before
19        this incident?
20   A.   I had only been taking my birth control before it, so
21        that's the only thing I was taking.
22   Q.   On the 9th, did you call anybody state side?
23   A.   I did not.
24   Q.   When you say I did not, it suggests to me that
25        somebody else did.  So did somebody else call anyone

Page 187

1         state side?
2    A.   My mother did.
3    Q.   Who did she call?
4    A.   My father I believe.
5    Q.   Who else?
6    A.   Mark DeSantis, her husband.  And I believe that was
7         the day that she had to call my boss to tell him I
8         wasn't going to be back home for work.
9    Q.   Okay.  What excuse did she give your boss for --
10   A.   I was raped.
11   Q.   -- you not showing up to work?
12        So she told him the truth?
13   A.   Yes.
14   Q.   And what boss is that?
15   A.   Ron Wilson.
16   Q.   From the 9th through the 14th, did you e-mail any of
17        your friends?
18   A.   Not that I can remember.
19   Q.   From the 9th to the 14th, did you text any of your
20        friends?
21   A.   No.
22   Q.   Did you tell anybody state side what happened to you?
23   A.   I don't remember.
24   Q.   From the 9th to 14th, did you call anybody state side?
25   A.   No.

Page 188

1    Q.   Do you have a recollection of communicating with
2         anybody state side in any way?
3    A.   No.
4    Q.   What else did you do during those six days?
5    A.   We went to the police station multiple times to
6         identify the men.
7    Q.   Okay.  Have the men been tried?
8    A.   I'm not sure yet.
9    Q.   Okay.  Do you know whether there's a trial coming up?
10   A.   There is, yes.
11   Q.   Do you have a lawyer in Jamaica?
12   A.   I don't remember.
13   Q.   Have you been asked to testify at that trial?
14   A.   I don't remember.
15   Q.   Do you recall speaking to a Jamaican lawyer?
16   A.   Yes.
17   Q.   And do you still talk to that lawyer?
18   A.   I don't know.
19   Q.   Do you have e-mails to that lawyer?
20   A.   No.
21   Q.   Okay.  If there's a trial there, are you going to
22        testify against these men?
23   A.   Of course.
24   Q.   Do you recall sun bathing or doing yoga during that
25        week that you were at the Sandals?

Page 189

1    A.   Briefly, yes.
2    Q.   Okay.  Then did you do anything else in Jamaica while
3         you were there for that week?
4    A.   We got KFC.
5    Q.   What else?  What else?
6    A.   We picked up our prescriptions from one of the local
7         pharmacies that they had nearby.
8    Q.   What else?
9    A.   I don't remember.
10   Q.   Had you -- when you in the prior week when you were in
11        Jamaica before the incidents, were you involved in
12        booking any of the excursions?
13   A.   What do you mean by involved with?
14   Q.   Did you personally book any of the excursions?
15   A.   No.
16   Q.   Your mother did all of that?
17   A.   I don't know if it was just my mother.
18   Q.   Okay.  Could have been your mother or Margaret?
19   A.   Right.
20   Q.   Okay.  Are you aware of any other rape that has
21        transpired at the Beaches in Ocho Rios?
22   A.   What do you mean by aware?
23   Q.   Have you come to learn of any other rape that has
24        transpired at the Beaches of Ocho Rios at any point in
25        your life?

Page 190

1   A.  I don't think so.
2   Q.  Are you aware of any other rape that has occurred in
3       Ocho Rios at any point in your life?
4   A.  Not officially, but yes.
5   Q.  When you say not officially, what do you mean?
6   A.  I don't have proof --
7   Q.  Okay.
8   A.  -- that it happened.
9   Q.  And what is your source of knowledge that that
10      happened?  Are you taking about Amber or are you
11      talking about somebody else?
12  A.  No, it's nobody that I know.
13  Q.  Okay.  So what is your source of knowledge that you
14      think a rape has happened in Ocho Rios?
15  A.  Our bus driver when we went out on our Blue Hole
16      excursion mentioned.
17  Q.  What do you recall your bus driver saying?
18  A.  He mentioned the fact after we told him that oh, yeah,
19      we were supposed to stay at the Moon Palace, he said,
20      "Well, it's a good thing you didn't.  It's known as
21      the rape resort."
22  Q.  And do you recall what entity that bus driver worked
23      for?
24  A.  No.
25  Q.  Do you recall who booked and contracted with that bus

Page 191

1       driver?
2   A.  I don't know.
3   Q.  Did he tell -- did he tell you about the names of any
4       ladies who had been raped?
5   A.  No.
6   Q.  This was -- this information was before your incident,
7       right?
8   A.  Correct.
9   Q.  It was the day before your incident, right?
10  A.  Correct.
11  Q.  And after he told you that, did the four of you take
12      any additional precautions while you were in your
13      Beaches Resort?
14  A.  No, because we thought we were safe.
15  Q.  Did you stick with the buddy system?
16  A.  Yes.
17  Q.  And you used the buddy system up until the time that
18      Amber walked off with Jermaine, right?
19  A.  Yes.  But I could still see her.
20  Q.  Well, there came a point in time that she walked into
21      a room and you couldn't see her, right?
22  A.  Right.
23  Q.  After the incident, have you communicated with
24      Paiton about the -- excuse me, with Amber about the
25      incident?

Page 192

1   A.  Not really.
2   Q.  After the incident, have you communicated with anybody
3       at Beaches about the incident?
4   A.  No.
5   Q.  After the incident, have you communicated with any
6       travel agent or tour operator or marketing company
7       about the incident?
8   A.  No.
9   Q.  Do you know who owns the hotel you stayed at?
10  A.  I don't know his name.
11  Q.  You would agree with me that -- you would agree with
12      me that the purpose of Jermaine Dyer, Davis and Tapper
13      that as employees of Beaches, that their purpose was
14      not to be at Beaches to commit rape?
15          MR. WEGLARZ:  Form objection, asked and
16      answered.
17          Go ahead, answer it again.
18  A.  Sorry, can you restate it?
19  BY MR. SUAREZ:
20  Q.  Yeah.  Jermaine Davis (sic), Jermaine, Dwight and
21      William as employees of Beaches Boscabel weren't there
22      at the resort for the purpose -- for the purpose of
23      committing rape, right?
24  A.  Correct.
25  Q.  Right?

Page 193

1   A.  Correct.
2           MR. SAFRA:  Could you ask that same
3       question as Beaches Ocho Rios, not Boscabel, please?
4           MR. SUAREZ:  Sorry.  I'm sorry, sorry about
5       that.
6   BY MR. SUAREZ:
7   Q.  Jermaine Davis (sic), Dwight Dyer (sic), William
8       Tapper as employees of Beaches Ocho Rios weren't there
9       for the purpose of committing rape, right?
10  A.  Correct.
11          MR. SAFRA:  Sorry.
12          MR. SUAREZ:  No problem.
13  BY MR. SUAREZ:
14  Q.  They're not there to commit heinous acts, right?
15  A.  Not that I'm aware of.
16  Q.  And to the extent that they committed that act, that
17      is wholly self serving and for them, right?
18          MR. WEGLARZ:  Form objection.
19          Go ahead.
20  A.  Can you restate?
21  BY MR. SUAREZ:
22  Q.  They were doing that for their own selfish heinous
23      benefits, correct?
24          MR. WEGLARZ:  Form objection.
25          Go ahead.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 194

1  A.  I don't know.
2  BY MR. SUAREZ:
3  Q.  Well, let me ask it this way.  They were committing
4     rape for their own benefit and not the benefit of any
5     hotel or entity, right?
6         MR. WEGLARZ:  Form objection.
7         Go ahead.
8  A.  I don't know if they were doing it because they
9     wanted -- because they seeked pleasure from it.  I
10    don't know that.  But they weren't doing it, I'm
11    sure --
12 BY MR. SUAREZ:
13 Q.  They were doing it for -- they were doing it for
14    themselves, right?
15 A.  I don't know if they were doing it for themselves
16    specifically.  I mean, why does somebody rape somebody
17    else?  There could be a million answers.
18 Q.  Do you have any reason to believe that Dwight,
19    Jermaine, William committed rape for the benefit of
20    any hotel or any travel agency or any tour operator?
21 A.  No.
22 Q.  After the rape, did you communicate with Jermaine,
23    Dwight or William?
24 A.  No.
25 Q.  After your trip to Jamaica, have you ever been

Page 195

1     overseas again?
2  A.  No.
3  Q.  After your trip to Jamaica, how has your relationship
4     been with Amber?
5  A.  With Amber, it's been very good.
6  Q.  Do you still communicate with Amber?
7  A.  From time to time, yes.
8  Q.  Do you live in the same city?
9  A.  No.
10 Q.  How often do you communicate with Amber?
11 A.  I don't know.
12 Q.  Since the incident, do you have e-mails and text
13    messages with Amber?
14 A.  No.
15 Q.  To the extent you communicate with Amber after the
16    incident, it is simply by phone?
17 A.  Yes.
18 Q.  Do you have any reason to believe that the hotel or
19    any travel agency or tour operator were aware that
20    Jermaine, Dwight and William were rapists?
21 A.  I have no reason to believe that they were aware, no.
22 Q.  Do you have any reason to believe that Fun Jet
23    Vacations, The Mark Travel Corporation, Unique
24    Vacations, Inc., had any reason to believe that
25    William, Jermaine and Dwight were rapists?

Page 196

1         MR. WEGLARZ:  Form objection.  No
2     foundation.
3         Go ahead and answer, if you can.
4  A.  I don't know.
5  BY MR. SUAREZ:
6  Q.  Do you think there's anything that The Mark Travel
7     Corporation, Fun Jet Vacations, Unique Vacations,
8     Inc., could have done to prevent the rape that was
9     committed upon you?
10        MR. SAFRA:  Form objection.
11        MR. WEGLARZ:  Form objection, no
12    foundation.
13 BY MR. SUAREZ:
14 Q.  You can answer.
15 A.  I don't know.
16 Q.  Have you ever heard or read any statements issued by
17    Fun Jet Vacations and Mark Travel Corporation or
18    Unique Vacations, Inc.?
19 A.  No.
20 Q.  Mr. Safra asked you a question earlier about six
21    drinks in a day, was there any day between May 5th and
22    May 8th that you believe you had more than six drinks
23    in a day?
24 A.  No.
25 Q.  Did you keep a log or a diary after the incident?

Page 197

1  A.  No.
2  Q.  After the incident, have you posted any information on
3     Facebook or social media or Instagram about the
4     incident?
5  A.  Yes.
6  Q.  What did you post?
7  A.  I posted the article that came out that they asked me
8     a few questions for.
9  Q.  You're talking about the article in the Detroit Free
10    Press?
11 A.  Yes.
12 Q.  Okay.  What else?
13 A.  Mainly awareness.
14 Q.  What else?
15 A.  Of rape awareness.
16 Q.  What else?
17 A.  Nothing that I can think of.
18 Q.  The article that you mentioned in the Detroit Free
19    Press, the only Ocho Rios rape that is referred to
20    therein is yours; is that right, and Amber's?
21 A.  I believe so.
22 Q.  On Thursday you went to -- I will mark as Exhibit 9 to
23    your deposition a collection of photographs about --
24    about your vacation.
25        MARKED FOR IDENTIFICATION:

Page 198

1     DEPOSITION EXHIBIT 9
2         2:10 p.m.
3  BY MR. SUAREZ:
4  Q.  I just want to quickly go through a couple.  I won't
5      ask you about each one.  The first page and we
6      numbered the pages here, one through 15.  So the first
7      page, that's Amber, you, your mom and Margaret, right?
8  A.  Correct.
9  Q.  And you have a drink in your hand; is that an
10     alcoholic drink?
11 A.  It's not in my hand, and yes, there was alcohol.
12 Q.  Is that your drink?
13 A.  Yes.
14 Q.  And the glass was right in front of you?
15 A.  Yes.
16 Q.  And Paiton has a drink as well?
17 A.  Amber.
18 Q.  Excuse me, Amber has a drink as well?
19 A.  I don't know if there was alcohol in it or not.
20 Q.  You suspect there was alcohol in it?
21 A.  I don't know.
22 Q.  And there's the next page, it's you and it's blurry,
23     it's you and Amber, right?
24 A.  Yes.
25 Q.  And you guys are at a bar?

Page 199

1  A.  Yes.
2  Q.  Okay.  And there's a drink in front of Amber; is that
3      alcoholic?
4  A.  I don't know.
5  Q.  The next page is a picture of Amber; is that right?
6  A.  Yes.
7  Q.  And you're smiling; is that right?
8  A.  Yes.
9  Q.  And that looks like something that may be a Blue or
10     Purple Haze; is that accurate?
11 A.  I have no idea.
12 Q.  Do you think that drink is alcohol?
13 A.  I don't know.
14 Q.  Okay.  There's a picture of Amber at dinner with a
15     napkin around her neck; do you know why she's wearing
16     a napkin around her neck?
17 A.  Yes.
18 Q.  Why?
19 A.  Because she was having fun and she's a goofy girl.
20 Q.  Okay.  What night were you having dinner?
21 A.  I'm not 100 percent sure.
22 Q.  Is that an alcoholic beverage in front of her?
23 A.  I don't know.
24 Q.  The next picture is you and Amber at a bar and you
25     both have what appear to be drinks in front of you; is

Page 200

1      that right?
2  A.  I have alcohol in mine, I don't know about hers,
3      though.
4  Q.  Okay.  Do you know what night that was?
5  A.  Not 100 percent sure.
6  Q.  Is that a Purple Haze?
7  A.  No.
8  Q.  What is that?
9  A.  I don't remember.
10 Q.  Okay.  The next page, which is page -- there's a
11     picture of Amber in a bikini with her mom; is that
12     right?
13 A.  Yes.
14 Q.  Do you know what day that was?
15 A.  Not 100 percent sure.
16 Q.  The next page, Amber has her face painted, she has a
17     drink in her hand, do you know what day that was?
18 A.  Not 100 percent.
19 Q.  The next day is an interesting picture, Amber is
20     holding a One Love sign that she must have borrowed
21     from someplace and you appear to be having a really
22     good time next to Amber.
23 A.  Yes.
24 Q.  What's going on in this photo?
25 A.  She ended up making some weird face and made me laugh

Page 201

1      so hard I almost tripped on my own foot.
2  Q.  Were you guys buzzed at this moment?
3  A.  No.
4  Q.  The next -- the next picture and your mom's laughing,
5      and you're now laughing, is a picture of you crouched,
6      what appears to be you crouched under a bathroom sink,
7      why are you crouched under a bathroom sink?
8  A.  Because I was trying to scare, hide and scare Amber.
9  Q.  Okay.  And there's a drink on top of the counter,
10     whose drink is that?
11 A.  Possibly mine.
12 Q.  Okay.  Is it an alcoholic drink?
13 A.  Most likely.
14 Q.  Who's taking this photograph?
15 A.  Amber.
16 Q.  And you're trying to scare her and she's taking the
17     photograph?
18 A.  She caught me before I could scare her.
19 Q.  The next photograph is a picture -- the next -- are
20     you possibly buzzed in that photograph?
21 A.  No.
22 Q.  You normally crouch under -- under bathroom sinks to
23     scare people?
24 A.  Not usually bathroom sinks, but I like to scare
25     people.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 202

1  Q.  Okay.  Next picture is picture 10 and it appears to be
2      Amber jumping off the Blue Hole; is that right?
3  A.  Yes.
4  Q.  She's doing the Tarzan rope?
5  A.  Yeah.
6  Q.  Who's the gentleman that's next to her in a tank top?
7  A.  I don't know what his name was.  He was our guide
8      through the Blue Hole.
9  Q.  You met him at the Blue Hole?
10 A.  Yes.
11 Q.  And did you become friendly with him?
12 A.  What do you mean by friendly?
13 Q.  Did you communicate with him?
14 A.  Yeah.
15 Q.  Did you converse with him?
16 A.  Yeah.
17 Q.  Did he ask you your name?
18 A.  I don't remember.
19 Q.  Did he ask Amber her name?
20 A.  I don't remember.
21 Q.  Did you guys ask his name?
22 A.  I don't remember.
23 Q.  Do you know whether you took a selfie with him or not?
24 A.  Yes.
25 Q.  Did you take a selfie?

Page 203

1  A.  Yes.
2  Q.  Is this a picture of the selfie you took with him?
3  A.  Yes.
4  Q.  Okay.  And that would be picture Number 11.  Why were
5      you taking a picture with him?
6  A.  Because we wanted to make a photographic memory of who
7      helped us have a good time there.
8  Q.  And the next picture, there's a picture of both of you
9      with the same gentleman, picture 12, you guys are in
10     bikinis and he's standing in the middle of you, right?
11 A.  Yes.
12 Q.  Do you recall his name?
13 A.  No.
14 Q.  Did you think this guy was good looking?
15 A.  Not my taste.
16 Q.  How about Amber?
17 A.  Not that I'm aware of.
18 Q.  Okay.  The next picture is a close-up of the same
19     photograph, right?
20 A.  Yes.
21 Q.  Okay.  And the following pictures, 14 and 15 are a
22     picture of Amber taking pictures with a guy that's
23     selling pot brownies, right?
24 A.  Yes.
25 Q.  Did you guys buy any of the pot brownies?

Page 204

1  A.  Heck no.
2  Q.  Did you try any of the pot brownies?
3  A.  No.
4  Q.  Did the guy give you any samples?
5  A.  No.
6  Q.  Can you hand me that photo back, please?
7  A.  This one?
8  Q.  Yeah.  Do you think that -- you were older than Amber
9      in the trip, right?
10 A.  Yes.
11 Q.  And you were, I don't know, three or four years older
12     than her, right?
13 A.  Yes.
14 Q.  Did Amber look up to you?
15 A.  I don't know.
16 Q.  Did you feel that Amber looked up to you?
17 A.  I never really thought about it.
18 Q.  Before you went to Jamaica, you had been at bars
19     before, right?
20 A.  Yes.
21 Q.  Okay.  Do you know whether Amber had been to bars
22     before, before she went to Jamaica?
23 A.  I don't know.
24 Q.  Before you went to Jamaica, you had experienced the
25     effects of -- the effect of a buzz, correct?

Page 205

1  A.  Yes.
2  Q.  Before you went to Jamaica, you had been drunk before,
3      correct?
4  A.  No.
5  Q.  You had never been drunk before, before you went to
6      Jamaica?
7  A.  No.
8  Q.  How are you differentiating between buzz and being
9      drunk?
10 A.  If I'm drunk, I have zero control over what's right
11     and wrong in my mind.
12 Q.  Okay.
13 A.  I can't differentiate.
14 Q.  And if you're buzzed, what does that tell you?
15 A.  I'm still able to function.
16 Q.  Do you have any -- before going to Jamaica, did you
17     have any friends in Jamaica?
18 A.  No.
19 Q.  After going to Jamaica, have you had -- developed any
20     friendships with any Jamaicans?
21 A.  No.
22 Q.  There was a woman you spoke with at the police called
23     Violet, right?
24 A.  Yes.
25 Q.  And have you communicated with Violet after the --

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 206

1    after the incident?
2    A.   Once or twice in the Sandals Resort that we were moved
3    to.
4    Q.   Okay.  Did you do that verbally or in writing?
5    A.   Verbally.
6    Q.   Okay.  Did any of the gentlemen who raped you use a
7    condom?
8    A.   Not that I'm aware of.
9    Q.   Do you have any way of saying how long the rape
10   lasted?
11   A.   I have no way to tell how long, no.
12   Q.   After the incident, you returned state side, in the
13   last four years, have you had any trouble with the
14   law?
15   A.   No.
16   Q.   Have you been on probation for any reason?
17   A.   No.
18   Q.   Have you been suspended from work or school for any
19   reason?
20   A.   No.
21   Q.   I would like to move on to the period of time when you
22   returned from -- actually, no, I'd like to go over a
23   little bit of your medical history, if I could.  You
24   had some trouble with your mom when you were up to
25   about 15 years old, right?

Page 207

1    A.   Yeah.
2    Q.   And what was that trouble related to?
3    A.   I was like any teenage girl thinking that their mother
4    was out to get them.
5    Q.   Okay.  When you were about 14 or 15, did you have
6    mononucleosis?
7    A.   Yes.
8    Q.   And do you know why you got mononucleosis?
9    A.   No idea.
10   Q.   Do you know that they call mononucleosis the kissing
11   disease?
12   A.   Yes.
13   Q.   Were you kissings boys at the time?
14   A.   Heck no.
15   Q.   Let me mark for you to try to keep this going what
16   shall be as Exhibit 10.
17            MARKED FOR IDENTIFICATION:
18            DEPOSITION EXHIBIT 10
19            2:22 p.m.
20   BY MR. SUAREZ:
21   Q.   It's a medical record that was produced to us and it
22   says, this is when you were 15 years old.  It says
23   that "History of Chief Complaint:  This 15-year-old
24   female was seen in the office today for pills found
25   for -- for pills found on patient.  Mom is very

Page 208

1    concerned."  What pills did your mom catch you with?
2    A.   I believe it was the pills I was prescribed for my
3    shoulder.
4    Q.   What pills are those?
5    A.   Tylenol 3.
6    Q.   And what else?
7    A.   Just Tylenol 3 pills.
8    Q.   But if you were prescribed Tylenol 3 pills for your
9    shoulder, why is your mom dragging you to a doctor to
10   complain that she found pills in your purse?
11            MR. WEGLARZ:  Form objection.
12            You can answer.
13   A.   Because they weren't in a container.
14   BY MR. SUAREZ:
15   Q.   And your mom wanted you to get drug testing?
16   A.   Possibly.  I don't remember the actual statement,
17   but...
18   Q.   Well, the nurse's comment there says, "Patient is here
19   with her mother, mother found pills in her purse.
20   Mother would like to discuss drug testing."  Did you
21   ever get drug testing at the time?
22   A.   I don't remember.
23   Q.   Before you got to the doctor, did you simply tell your
24   mom, "Hey, these are Tylenol 3 prescription pills that
25   I got"?

Page 209

1    A.   I don't remember.
2    Q.   It just makes little sense that your mom would take
3    you to a doctor if you had a prescription for Tylenol
4    3, why would she do that?  Why is there a conflict
5    there?
6            MR. WEGLARZ:  Form objection.
7            Go ahead and answer.
8    A.   I think I may have overreacted and tried to, in a
9    way -- what's the word -- defend something that didn't
10   need to be defended.
11   BY MR. SUAREZ:
12   Q.   What does that mean?
13   A.   I thought she was accusing me of something I didn't do
14   so I -- yeah.
15   Q.   Was it an old prescription or current prescription?
16   A.   I don't remember.
17   Q.   When you say that you thought she was accusing you of
18   something that you didn't do, what do you think she
19   was accusing you of?
20   A.   Having drugs that weren't mine.
21   Q.   Why would your mother have that suspicion?
22   A.   I don't know.
23   Q.   Were you hanging out with a crowd or were you getting
24   into trouble or was she suspicious of your behavior?
25   Why would your mother think that you are having some

Page 210

1    drugs that you're not supposed to have on you?
2  A.  I don't know.
3  Q.  When was the shoulder injury that you got that
4    prescription for?
5  A.  Sometime maybe between summer of '08 and maybe spring
6    of '09.
7  Q.  What did you do to get that prescription?  When you
8    said your shoulder injury, what were you doing that
9    caused your shoulder injury?
10 A.  We never could pinpoint an exact event.
11       MR. SAFRA:  Do you mind if I ask a question
12    about that?
13       MR. WEGLARZ:  Sure, go ahead.
14       RE-EXAMINATION
15 BY MR. SAFRA:
16 Q.  Is it possible that the Tylenol 3 prescription was
17    from your 2004 nasal surgery and that's why your mom
18    was concerned because you shouldn't have it in your
19    purse and still be using it years later?
20 A.  I don't think so.
21 Q.  You understand that Tylenol 3 is codeine?
22 A.  Yes.
23 Q.  And that's a serious prescription?
24 A.  Yes.
25 Q.  And that's one associated with surgical and not just

Page 211

1    shoulder injuries?
2  A.  Right.
3  Q.  Do you know what doctor prescribed it for you for just
4    a shoulder injury with unknown cause?
5  A.  Yes.
6  Q.  What doctor?
7  A.  My family doctor.
8  Q.  What's the name?
9  A.  Picone.
10 Q.  Where is that doctor located?
11 A.  He was located in Williamston.
12 Q.  What address?
13 A.  I don't know the address.
14 Q.  What's the doctor's first name?
15 A.  I don't remember.
16 Q.  What's the name of the facility?
17 A.  I don't remember.
18 Q.  Is it still there?
19 A.  Yes.
20       MR. SAFRA:  We would request authorization
21    to request the records.
22       MS. DeSANTIS:  He's deceased.
23       MR. SAFRA:  Is the office still there?
24       MS. DeSANTIS:  Uh-huh.
25       MR. WEGLARZ:  Yes, I think you have the

Page 212

1    records anyway.
2        MR. SAFRA:  We just got authorizations, so
3    I haven't got a response, but we'll need to get them
4    because --
5        MR. WEGLARZ:  I think I sent you the actual
6    records.
7        MR. SAFRA:  Yeah, but the records that we
8    did receive from your office had gaps in time, and
9    Tylenol 3 codeine, if it was prescribed has to be a
10    serious injury, so there's more to this, so I'll
11    address it to through the records.
12       Keep going, Counsel.
13       RE-EXAMINATION
14 BY MR. SUAREZ:
15 Q.  I will show you the next record, ma'am.  By the way,
16    at this time in 2009, is your mom already a nurse?
17 A.  No.
18       MR. SUAREZ:  I've lost the stickers.
19       MARKED FOR IDENTIFICATION:
20       DEPOSITION EXHIBIT 11
21       2:29 p.m.
22 BY MR. SUAREZ:
23 Q.  I hand you another document from when you were 15
24    years old.  Again, your mom is taking you to the
25    doctor, and it says, "Patient's mom is here with

Page 213

1    patient.  Patient has been through a lot since 2007
2    with a fatal car accident patient was involved in loss
3    of a very close mother (sic), several other deaths,
4    seven in all.  Patient does not feel good about
5    herself."  Well, the first thing is the fatal car
6    accident date there is wrong, right?
7  A.  Right.
8  Q.  It was in 2004, right?
9  A.  Right.
10 Q.  Then it says you lost your very close grandmother,
11    when did your grandmother pass away?
12 A.  I believe in 2007.
13 Q.  And when it says that several other deaths, seven in
14    all, patient does not feel good about herself, who
15    else passed away?
16 A.  I don't remember now.
17 Q.  You don't remember the seven people that they're
18    referring to here?
19 A.  No.
20 Q.  Okay.  And then it says, "She does not feel like she
21    has friends at school.  Mom does not want her put on
22    meds, but would like to get in for counseling.
23    Patient was found crying in her closet with NOC
24    wrapped up in her deceased grandmother's blanket and
25    laying on her casket cover.  Mom is very concerned.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 214

1     Also since being put on Loestrin by gynecologist,
2     patient is very emotional.  Also not having menses."
3     What is Loestrin?
4  A.   It's a birth control.
5  Q.   Okay.  Why were you on birth control when you were 15?
6  A.   Because my periods were not the most pleasant.
7  Q.   Then it says that you were seen in the office for
8     severe anxiety, depression and obsessiveness; is that
9     right?
10 A.   I believe so.
11 Q.   What was causing your severe anxiety and your
12    depression at the time?
13 A.   The loss of my grandma.
14 Q.   How did your grandmother pass away?
15 A.   Cancer.
16 Q.   What kind?
17 A.   It started with breast cancer and spread to her bones
18    and brain, I believe.
19 Q.   Have you been tested for the breast cancer gene?
20 A.   I've been tested for one of the breast cancer genes
21    and it did come back positive for one of them so far.
22          MARKED FOR IDENTIFICATION:
23          DEPOSITION EXHIBIT 12
24          2:32 p.m.
25 BY MR. SUAREZ:

Page 215

1  Q.   I want to mark as the next exhibit, Exhibit Number 12,
2     which is a document from the time that you were -- in
3     February 2018.  And this document discusses some
4     gynecological issues that you're having.  At the time
5     it says at the bottom that you had two lifetime sexual
6     partners; is that true?
7  A.   Yes.
8  Q.   And I'm assuming that there is a gentleman by the name
9     of Chris and another gentleman?
10 A.   Yes.
11 Q.   Is it one of your other boyfriends we talked about
12    yesterday?
13 A.   No.
14 Q.   Who is it?
15 A.   It was a mutual friend that I had.
16 Q.   What's his name?
17 A.   Austin.
18 Q.   Did you have a relationship with Austin?
19 A.   Not really, no.
20 Q.   How did you meet him?
21 A.   Mutual friends of ours.
22 Q.   Did you -- did you meet with Austin -- were you with
23    Austin before or after you were with Chris?
24 A.   Before.
25 Q.   And then I believe you told me you had a relationship

Page 216

1     with Chris for about two years --
2  A.   Yes.
3  Q.   -- is that right?
4          What years were those?
5  A.   2012 to 2014.
6  Q.   Were you only with Chris?
7  A.   What do you mean?
8  Q.   Yeah, during that year, were you exclusive in a
9     relationship with Chris?
10 A.   During the two years?
11 Q.   Yes.
12 A.   Yes.
13 Q.   Okay.
14          MARKED FOR IDENTIFICATION:
15          DEPOSITION EXHIBIT 13
16          2:36 p.m.
17 BY MR. SUAREZ:
18 Q.   I'm going to show you a document which I'll mark as
19    Exhibit 13, which is dated when you were 19 years old.
20          MR. SAFRA:  And what's the date on this
21    one?
22 BY MR. SUAREZ:
23 Q.   This is 12-27-13.  And if you look at that document in
24    your history, it says that you had -- that you're
25    sexually active and that you're there for a

Page 217

1     gynecological exam and that you had four lifetime
2     sexual partners; is that true?
3  A.   No.
4  Q.   Okay.  That document is wrong?
5  A.   Yes.
6  Q.   However -- it says that you're on Sprintec and that
7     you are happy with it?
8  A.   I was at this time, yes.
9  Q.   And Sprintec is a birth control device --
10 A.   Correct.
11 Q.   -- is that true?
12 A.   Correct.
13          MR. SUAREZ:  Can I take a quick break?
14          (Recess taken at 2:37 p.m.)
15          (Back on the record at 3:02 p.m.)
16 BY MR. SUAREZ:
17 Q.   We're back on the record, ma'am, I'm standing because
18    I'm trying to just move my files quickly.  If it
19    bothers you, I will gladly sit down.
20 A.   Okay.
21 Q.   If you feel that it's somehow in your space, anything
22    like that, you'll let me know, okay?
23 A.   Okay.
24 Q.   Ma'am, about, I don't know, six months or seven months
25    after you got back from Jamaica, you went to see your

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 218

1     admitting -- what I believe you testified earlier was
2     your internal medicine doctor, John Picone, right, is
3     that him?
4  A.  Yes.
5  Q.  So your internal medicine doctor is John Picone,
6     right?
7  A.  Yes.
8  Q.  And this is a record that we received from him dated
9     December 21st of 2015.  And what you're complaining of
10    at the time appears to be a sore throat and whatnot.
11    Then the next section of that, it says that you deny
12    depression, sleep issue, feeling tired or having poor
13    appetite or feeling bad about yourself; do you see
14    that?
15 A.  Yes.
16 Q.  Okay.  Would that have been true if your doctor
17    recorded that?
18       MR. WEGLARZ:  Well, hold on.  I object to
19    the form of the question.
20       MR. SUAREZ:  Okay, great.
21       MR. WEGLARZ:  I object to the form.
22 BY MR. SUAREZ:
23 Q.  Would that have been true if your doctor recorded
24    that?
25       MR. WEGLARZ:  I still object.

Page 219

1        MR. SUAREZ:  Okay.
2  BY MR. SUAREZ:
3  Q.  Ma'am, you can answer.
4  A.  Can you repeat the question?
5  Q.  Sure.
6        MR. WEGLARZ:  And I'm actually just a
7     little confused by the question too.
8        MR. SAFRA:  Okay, objection, form, he'll
9     restate the question.
10 BY MR. SUAREZ:
11 Q.  Ma'am, are you -- let me ask you this.  This is a
12    statement from John Picone who treats you before,
13    right?
14 A.  Yes.
15 Q.  Okay.  You know Mr. Picone, right -- or Dr. Picone,
16    right?
17 A.  Yeah.
18 Q.  And he's been your doctor for a while, right?
19 A.  Yes.
20 Q.  And how long was he your doctor?
21 A.  I'm not sure exact.
22 Q.  Okay.  And are you in the habit of telling Dr. Picone
23    the truth or are you in the habit of telling
24    Dr. Picone lies?
25 A.  The truth.

Page 220

1  Q.  Are you in the habit of telling your medical providers
2     the truth or are you in the habit of telling them
3     lies?
4  A.  The truth.
5  Q.  Okay.  So if your doctor is recording something, a
6     questionnaire on a medical form where you are denying
7     depression and a host of other things, you would
8     believe that you were telling the truth at the time,
9     right?
10       MR. WEGLARZ:  I object to that question
11    then.  I don't follow it.
12 BY MR. SUAREZ:
13 Q.  Please answer.
14       MR. WEGLARZ:  You can answer.
15 A.  I'm sorry, can you repeat it?
16 BY MR. SUAREZ:
17 Q.  Yeah.  If your doctor is recording you on a
18    questionnaire where you are denying depression and a
19    host of other things, you believe that you were
20    telling the truth at the time, right?
21 A.  Right.
22       MR. WEGLARZ:  Same objection.
23 BY MR. SUAREZ:
24 Q.  Okay.  Now, ma'am, the next thing that I have is the
25    following month, right, in December of 2016, do you

Page 221

1     have a recollection -- I'm sorry, going back to the
2     last record, do you have a recollection of having told
3     him that at the time?
4  A.  Looking back on it now, no.
5        MR. WEGLARZ:  Told him what?  I'm sorry.
6  BY MR. SUAREZ:
7  Q.  Sorry?  I'm sorry, what did you say, ma'am, I didn't
8     hear your answer because your counsel was speaking,
9     looking back on it now, no?  Is that what your answer
10    was?
11 A.  Yes.
12 Q.  Okay.  There's a questionnaire here that's called
13    depression screening, where he goes through a list of
14    one, two, three, four, five, six, seven, eight, nine,
15    nine different questions that he's reporting on, okay?
16    And it starts and I don't want to go through each one
17    because we have the record, but it starts by saying
18    little or no pressure in doing things, that's issue
19    one.  He reports not at all.  Feeling down, depressed
20    or hopeless, not at all.  Trouble falling or staying
21    asleep, not at all.  Feeling tired or having little
22    energy, not at all.  Feeling bad about yourself, not
23    at all and it goes on.  It's a negative report as to
24    all these issues.  And that's your doctor's record.
25    Is there any reason to believe that what he's

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 222

1    reporting there is not accurate?
2              MR. WEGLARZ: Okay. And that's --
3              MR. SUAREZ: Just object to form.
4              MR. WEGLARZ: That's an okay question. Can
5    she at least see the document if you're asking her if
6    it's accurate, that's all I'm asking. That's all I'm
7    asking.
8              MR. SUAREZ: The first thing I did was show
9    her the document.
10   BY MR. SUAREZ:
11   Q.  Go ahead.
12   A.  And your question was what exactly?
13   Q.  Is there any reason -- do you have any reason to
14       believe that what he's reporting at the time was not
15       accurate or not the truth?
16             MR. WEGLARZ: Under the depression
17       screening or are you asking about the entire document?
18             MR. SUAREZ: I'm talking about under the
19       depression screening.
20             MR. WEGLARZ: Okay.
21   A.  I have no reason to believe that it was incorrect.
22             MARKED FOR IDENTIFICATION:
23             DEPOSITION EXHIBIT 14
24             3:07 p.m.
25   BY MR. SUAREZ:

Page 223

1    Q.  Okay. And can you hand me that, please? And this was
2        on December 21, 2016. And then about a month later in
3        January of 2016, there's another document, this time
4        by a provider by the name of Michael Maser, do you
5        know Dr. Maser?
6    A.  Maser, yes.
7    Q.  I'm sorry?
8    A.  Maser, yes.
9    Q.  Maser, M-A-S-S-E-R (sic).
10             MARKED FOR IDENTIFICATION:
11             DEPOSITION EXHIBIT 15
12             3:08 p.m.
13   BY MR. SUAREZ:
14   Q.  And apparently you're doing -- you're there for
15       follow-up on thyroid issues you were having, and
16       that's dated January 25th of 2016; do you see that?
17             MR. SUAREZ: Here, I have a copy for
18       counsel.
19             MR. WEGLARZ: Thank you.
20   A.  Where does it say thyroid issues?
21   BY MR. SUAREZ:
22   Q.  You see chief complaint number one, under subjective,
23       the first thing it says on document, follow-up, F/U,
24       follow-up after thyroid labs?
25   A.  Okay.

Page 224

1    Q.  Okay? I want to ask you about medications you're
2        taking at the time, okay? Down at the bottom; do you
3        see that medication?
4    A.  Yes.
5    Q.  Okay. It says you're taking Xanax .25-milligram
6        tablet three times a day. You're taking Adderall,
7        you're taking diflucan, what's diflucan for?
8    A.  I can't remember.
9    Q.  And that you're taking Sprintec with it, which is
10       still your birth control, right?
11   A.  Correct.
12   Q.  What are you taking the -- who prescribed the Xanax
13       for you?
14   A.  When I went to counseling, I got prescribed the Xanax.
15   Q.  Okay. And how long did you take Xanax?
16   A.  I mean I'm still taking it.
17   Q.  You're still taking it?
18   A.  On occasion when I need it.
19   Q.  Did you start taking Xanax before or after your trip
20       to Jamaica?
21   A.  After.
22   Q.  Okay. Had you ever taken Xanax before your trip to
23       Jamaica?
24   A.  Not that I can remember.
25   Q.  And then you start going to a different medical

Page 225

1    provider one year after, one year and three months
2    more or less, after you came back from Jamaica, and
3    what I think happens is that you start going to SMG
4    Lansing Internal Medicine, right?
5    A.  Correct.
6    Q.  And SMG Lansing is different than the Picone doctors
7        you had been seeing, right?
8    A.  How do you mean different?
9    Q.  Yeah, it's not the same group, is it?
10   A.  No.
11   Q.  It's a new group, right?
12   A.  Right.
13   Q.  Okay. And the SMG Lansing is part of the Sparrow
14       medical facility, right?
15   A.  Correct.
16   Q.  And Sparrow is the place where your mother works,
17       right?
18   A.  She worked.
19   Q.  Was she working there at the time?
20   A.  Yes.
21   Q.  And was she working there in 2015?
22   A.  Yes.
23   Q.  Was she working there in 2016?
24   A.  Yes.
25   Q.  And was she working there in 2017?

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 226

1   A.   Yes.
2   Q.   Okay.  And when you start going to the place where
3        your mother works at, you start seeing doctors there,
4        right?
5   A.   Correct.
6   Q.   And this is the first time you ever see those doctors,
7        right?
8   A.   Yes.
9   Q.   Okay.  And so this happens in October of 2016 and what
10       I'm going to do, ma'am, is to try to save a little bit
11       of time is I'm going to mark this as composite -- as
12       composite --
13           MR. WEGLARZ:  15?
14           MR. SUAREZ:  No, 16.
15           MARKED FOR IDENTIFICATION:
16           DEPOSITION EXHIBIT 16
17           3:12 p.m.
18  BY MR. SUAREZ:
19  Q.   I'm going to mark it as composite 16 as your records
20       and I've tabbed a couple of the things I want to talk
21       to you about.  The first thing I want to talk to you
22       about is I tabbed at page 5, okay?  And it says that,
23       the first line says that the patient presents with her
24       mother to get established as a new patient, right?
25  A.   Yes.

Page 227

1   Q.   Okay.  And so whose idea was it to go to this new
2        provider, your mom's or yours?
3   A.   I wanted a new provider.
4   Q.   Okay.
5   A.   And she heard he was a good provider.
6   Q.   Okay.  And then if you go to about the fourth
7        sentence, it says you have seen a psychologist but you
8        did not get along with her, so you stopped going.
9        Which was the psychologist you didn't get along with?
10  A.   I don't remember her name.
11  Q.   Okay.  Do you recall where she was?
12  A.   Yes.
13  Q.   Do you recall, okay, where was she?
14  A.   She was in the facility in East Lansing.
15  Q.   Okay.  Do you recall what group she was part of?
16  A.   No.
17  Q.   Do you have records that would help us identify that
18       psychologist?
19  A.   Possibly.
20  Q.   And then about, I'm going to turn the page, about two
21       months later in December of 2016 -- by the way, ma'am,
22       do you know when you hired your lawyers?
23  A.   No.
24  Q.   Do you know if it was before or after 2016?
25  A.   I don't know.

Page 228

1   Q.   Do you know if it was before or after 2017?
2   A.   I don't remember.
3           MR. SAFRA:  Counsel, do you know offhand?
4           MR. WEGLARZ:  It was before the December
5        2015 note, I can tell you that.
6           MR. SUAREZ:  And it was before
7        December 2015 or 2016?
8           MR. WEGLARZ:  2015.
9           MR. SUAREZ:  Thank you, Counsel.
10  BY MR. SUAREZ:
11  Q.   So if you look at this -- I'm sorry.
12  A.   That's okay.
13  Q.   If you look at the bottom here of page 20, it says in
14       the last sentence, it says you've gained some weight
15       since stopping thyroid replacement and your bowel
16       movements are getting better.  Did you have your
17       thyroid removed?
18  A.   No.
19  Q.   When it talks there about thyroid replacement, what
20       does that mean?
21  A.   A medication that I was briefly on.
22  Q.   Okay.  And to the ex -- had you gained any weight?
23  A.   Yes.
24  Q.   To the extent you had any weight gain, do you think it
25       was because of your thyroid replacement?

Page 229

1   A.   I don't know.
2   Q.   And then in April of 2016, you go back to the same
3        internal medicine group and it says there that you're
4        there for routine follow-up, and it says that you're
5        doing much better with anxiety, depression and PTSD,
6        and is that right?
7   A.   At that time, yeah, I was doing better with it.
8   Q.   And that's about two years almost after the incident,
9        right?
10  A.   Right.
11  Q.   Okay.  Were you diagnosed with ADD before or after you
12       went to Jamaica?
13  A.   I don't remember.
14  Q.   Were you on Adderall before or after you went to
15       Jamaica?
16  A.   After.
17  Q.   You were also on Adderall before, right?
18  A.   Yeah.  Briefly.
19  Q.   Because you were on Adderall when you were doing your
20       pharmaceutical tech school, right?
21  A.   Right.
22  Q.   And that was in 2014, right?
23  A.   Right.
24  Q.   And so if you were on Adderall in 2014, that means you
25       must have been diagnosed with ADD before you went to

Page 230

1    Jamaica, right?
2  A.  I'm not sure if they diagnosed me with ADD when I did
3      my previous psych eval.
4  Q.  They had some concern about your attentiveness or they
5      wouldn't have put you on Adderall; is that right?
6  A.  I wasn't put on Adderall.
7  Q.  In 2014 you weren't taking Adderall?
8  A.  I was taking it.
9  Q.  You're just parsing out the definition of put?
10  A.  I was never put on it by a doctor.
11  Q.  You were diagnosed to take it, right?
12  A.  I don't remember.
13  Q.  How did you get the Adderall?
14  A.  A friend of mine.
15  Q.  You were taking Adderall without a prescription?
16  A.  Yes.
17  Q.  In 2014?
18  A.  Yes.
19  Q.  So was that person dispensing Adderall to you
20      illegally?
21  A.  Yes.
22  Q.  And you were getting it illegally?
23  A.  Yes.
24  Q.  And did you do that in 2013?
25  A.  No.

Page 231

1  Q.  Did you do that in 2012?
2  A.  No.
3  Q.  Did you pay for the Adderall?
4  A.  No.
5  Q.  Okay.  Which friend gave you the Adderall illegally?
6  A.  I don't remember the name.
7  Q.  Where did you meet that friend?
8  A.  I believe in high school.
9  Q.  In high school you began taking Adderall illegally?
10  A.  No, I met the person in high school.
11  Q.  Oh, I'm sorry, I misunderstood.  Male or female?
12  A.  Female.
13  Q.  If you had to locate that person now, where would that
14      person be?
15  A.  I do not know.
16  Q.  Did you ever combine Adderall with alcohol?
17  A.  No.
18  Q.  Did you ever use Adderall for any social benefit?
19  A.  No.
20  Q.  Do you know whether your friend was stealing Adderall?
21  A.  I don't know.
22  Q.  Why were you taking Adderall?
23  A.  To help me focus.
24  Q.  In there, in that medical record, it says that you
25      were concerned that you wouldn't do well at school and

Page 232

1      you were requesting Adderall, right?
2  A.  After I had been diagnosed with ADD, yes.
3  Q.  And did they prescribe Adderall to you?
4  A.  Yes.
5  Q.  And did you begin taking it?
6  A.  Yes.
7  Q.  How long did you take it?
8  A.  I'm still taking it.
9  Q.  And did you ever go on Wellbutrin?
10  A.  I don't know.
11  Q.  You referenced earlier that you were -- that you had
12      taken Prozac, when did you start taking Prozac?
13  A.  A year and a half ago.
14  Q.  And are you still taking Prozac?
15  A.  Yes.
16  Q.  So you're taking Prozac and Adderall?
17  A.  Yes.
18  Q.  And your birth control pill?
19  A.  No.
20  Q.  You're no longer taking birth control?
21  A.  No.
22  Q.  That's a double negative, are you still taking birth
23      control?
24  A.  I'm not still taking birth control.
25  Q.  Can I have that back, please?  When was the last time

Page 233

1      you saw the internal medicine doctors at SMG Lansing?
2  A.  I'm not sure.
3  Q.  And after you returned from Jamaica, did you and your
4      mom ever go to a counselor together?
5  A.  She went with me to my appointments.
6  Q.  Did she sit in the room at your appointments?
7  A.  For the first two.
8  Q.  Okay.  And thereafter, you went by yourself?
9  A.  Yes.
10  Q.  After you came back from Jamaica, did you go with your
11      mother to any appointments?
12  A.  Yes.
13  Q.  Her appointments?
14  A.  Oh, not that I can remember.
15  Q.  After you came back from Jamaica several months later,
16      your mom was part of a partial hospitalization; did
17      you go see your mother during that time?
18  A.  No.
19  Q.  Why not?
20  A.  Because she was working and then would go there during
21      the day because she couldn't work.
22  Q.  But that doesn't explain why you couldn't go there?
23  A.  I was working as well.
24  Q.  Because you were working, you didn't go see your mom?
25  A.  Right, our schedules never lined up.

f2a2c7a3-f397-4e5f-92e8-f79d5cabe5b5

Page 234

1  Q.  Ma'am, going back to the room for one second, do you
2      know whether the door inside had a turn lock or a key
3      lock?
4  A.  It had a dead bolt on the inside I believe.
5  Q.  Was it a dead bolt that you can turn with your hand or
6      did you need to turn it with a key?
7  A.  I'm not sure.
8  Q.  Ma'am, since the incident, have you become aware of
9      whether Jermaine, Dwight and William had ever
10     victimized anybody else before they victimized you?
11 A.  I have no idea if they did.
12 Q.  Ma'am, from the time you returned from Jamaica until
13     today, have you worked continuously at the boat
14     detailing place?
15 A.  No.
16 Q.  When did you stop?
17 A.  In 2018.
18 Q.  How long did you stop for?
19 A.  About a year, a little over a year.
20 Q.  In that year, what did you do?
21 A.  I went to school.
22 Q.  And what were you studying at that time?
23 A.  I was doing prerequisites.
24 Q.  For?
25 A.  Eventually it was going to turn into --

Page 235

1  Q.  I'm sorry?
2  A.  Eventually it would turn into veterinary technician or
3      veterinarian.
4  Q.  And why did you stop school?
5  A.  Because I couldn't afford to keep paying and not have
6      a job.
7  Q.  And did you ask your parents, either your mother or
8      father to help you with your school expense?
9  A.  No.
10 Q.  And then you resumed work at the boat detailing place?
11 A.  Yes.
12 Q.  Ma'am, either before or after your trip to Jamaica,
13     have you become aware of any rape in or near the Beach
14     at Ocho Rios that you were at?
15 A.  Not that I can remember.
16 Q.  Have you ever been to Montego Bay?
17 A.  That's where we landed.
18 Q.  Okay.  Did you go to the -- did you get off at that
19     airport?
20 A.  Yes.
21 Q.  And did you just simply connect flights or was there
22     time between the first flight and the second flight?
23 A.  Are you talking about when we landed in Jamaica?
24 Q.  Yes, ma'am.
25 A.  We landed in Montego Bay and then took a bus to the

Page 236

1      resort.
2  Q.  How long was that bus?
3  A.  I don't know.
4  Q.  Was there alcohol on that bus?
5  A.  No.
6  Q.  Ma'am, have you ever used tobacco?
7  A.  I'm sorry?
8  Q.  Have you ever smoked cigarettes?
9  A.  Yes.
10 Q.  Did you smoke for a long time?
11 A.  No.
12 Q.  What cigarettes did you smoke?
13 A.  I don't remember.
14 Q.  Have you ever vaped?
15 A.  No.
16 Q.  Ma'am, have you ever authored any statement that have
17     been admitted in the -- excuse me, have you ever
18     authored any statement that you have ever sent to the
19     press or to any type of public service outlet about
20     your experience in Jamaica?
21 A.  I was asked questions by a reporter for the article.
22 Q.  That's the one for the Detroit Press?
23 A.  Yes.
24 Q.  And that's the one that your mom called the reporter
25     at the Detroit Press?

Page 237

1          MR. WEGLARZ:  Form objection.
2  A.  I don't know how it happened.
3  BY MR. SUAREZ:
4  Q.  Okay.  Have you given any other statements other than
5      the one to the Detroit Press?
6  A.  Not that I can remember.
7  Q.  Have you ever had any legal trouble in your life?
8  A.  How do you mean legal trouble?
9  Q.  Has a cop ever issued you a citation?
10 A.  Yes.
11 Q.  For?
12 A.  Speeding.
13 Q.  Anything else?
14 A.  Not that I can think of.
15 Q.  Ma'am, did you ever have any conversation with a
16     gentleman by the name of Stetson Arriola?
17 A.  No.
18 Q.  Have you ever tried a pot brownie?
19 A.  No.
20 Q.  Ma'am, do you still have a Facebook account?
21 A.  Yes.
22 Q.  Ma'am --
23          MR. SUAREZ:  Todd, do you have color copies
24     of the doors of the rooms?
25          MR. WEGLARZ:  Yes.

Page 238

1          MR. SUAREZ:  Can I borrow that for a
2     second, do you mind?
3          MR. WEGLARZ:  Luis, I normally don't do it,
4     but because it's you, I will.
5          MR. SUAREZ:  I don't have color copies.  Do
6     you mind if I mark this?
7          MR. WEGLARZ:  I don't mind.  I was going to
8     mark it myself.
9  BY MR. SUAREZ:
10 Q.  Ma'am, I'm marking photographs of the room where the
11     incident occurred.
12          MR. SAFRA:  It's a composite and may have
13     other things on it.
14 BY MR. SUAREZ:
15 Q.  Yeah, it's a composite of a number of photographs that
16     have been produced to us.  But there's a picture of
17     the door.
18          MR. SAFRA:  Is this Exhibit 17?
19          MR. SUAREZ:  Yeah.
20          MARKED FOR IDENTIFICATION:
21          DEPOSITION EXHIBIT 17
22          3:33 p.m.
23 BY MR. SUAREZ:
24 Q.  Of the door.  I'm going to ask you two questions about
25     this.  One is -- what is that bolt on the front, I'm

Page 239

1     pointing to the first page, page 36 of Exhibit 17, the
2     top page of the picture.  What does that lock appear
3     to be to you?
4  A.  It looks like a dead bolt.
5  Q.  And when you say dead bolt, does that mean something
6     you turn with your hand or does that mean something
7     you turn with a key?
8  A.  With your hand.
9  Q.  Does that refresh your recollection as to whether that
10     room could be opened from the inside with your hand?
11 A.  Yes.
12 Q.  Okay.  So you would agree that that room, you could
13     open it from the inside at the time of the incident
14     with your hand, right?
15 A.  I couldn't.
16 Q.  No, but it would have been possible because that's
17     where it is, right?
18 A.  Yeah.
19 Q.  Okay.  The second question then is, when you were
20     describing the room earlier today, my impression is
21     that Amber was before this wall and you ended up
22     behind this door wall; is that true?
23 A.  No.
24 Q.  Okay.  So where was Amber?
25          MR. SAFRA:  Feel free to look through the

Page 240

1     photos.
2          MR. WEGLARZ:  Yeah, there's others.
3          MR. SUAREZ:  I was trying to spare you
4     that.
5  A.  On this page, that's where I was.
6          MR. SUAREZ:  Okay.  So first for the
7     record, so for the record, the witness is looking at
8     page 35 and she's pointing to page -- to the back
9     corner next to the slats and says that she was there
10     at that point, okay?
11          MR. WEGLARZ:  Can we have her circle it?
12     Maybe that would be a little more accurate.
13          MR. SUAREZ:  Sure, yes.  Just give me one
14     second.
15          MR. WEGLARZ:  Thank you.
16 BY MR. SUAREZ:
17 Q.  Would you with a red mark, the red pen just circle and
18     initial it, please.  Ma'am, is the room where you
19     indicated on page 35 inside as you walk into the door
20     to the right?
21 A.  Yes.
22 Q.  And would it be on the corner toward the right of that
23     room?
24 A.  It was the front right corner.
25 Q.  Okay.  And where was Amber?

Page 241

1  A.  Amber was behind this door when it was shut.
2  Q.  Right.  But when you walked into the room, where was
3     Amber?
4  A.  Behind that door when it was shut.
5  Q.  Okay.  So you and Amber were in the same room?
6  A.  Yes.
7  Q.  Could you draw and initial that, please?
8          MR. SAFRA:  And that's page 37 of
9     Exhibit 17.
10          MR. SUAREZ:  The top page.
11          MR. WEGLARZ:  The top photo?
12          MR. SUAREZ:  The top photo.
13          MR. SAFRA:  I'll address it in mine.
14          MR. SUAREZ:  Off the record.
15          (Recess taken at 3:38 p.m.)
16          (Back on the record at 3:38 p.m.)
17          MR. SUAREZ:  You know, I believe I don't
18     have any more questions other than to say thank you,
19     ma'am, for your testimony today.
20          I'd like to pass it along to Mr. Safra with
21     a reservation I'm going to go through my notes, that
22     I, if I have anything else, I can clean up after
23     Mr. Safra.
24          RE-EXAMINATION
25 BY MR. SAFRA:

Page 242

1   Q.  Paiton, can I call you Paiton?
2   A.  Yes.
3   Q.  Okay.  Do you need a break before I start?
4   A.  No.
5   Q.  I know that intermittently I have asked you a few
6       questions that in between counsel and you and I have
7       already spoken which is not necessarily a typical
8       process.  I'm going to ask a few questions now as part
9       of in a sense follow-up to questions that may have
10      previously been asked and I will do my best not to
11      repeat questions.
12          If there is something that is unclear
13      because I might be jumping around to avoid repetition
14      and you need some follow-up or don't understand
15      anything I'm asking you due to the bouncing back and
16      forth, let me know; is that fair?
17  A.  Okay.
18  Q.  I'm going to start with Exhibit 17 that was just being
19      shown to you and on page 37, you had circled an area
20      behind the door that Amber was?
21  A.  Yeah.
22  Q.  Is that the location where Amber was when you first
23      were outside the room and the door was opened and you
24      talked about seeing her?
25  A.  Yes.

Page 243

1   Q.  Okay.  Now, if you turn to the first page of
2       Exhibit 17, which is numbered page 36, there's a chair
3       in that area from this vantage point; is that correct?
4   A.  Yes.
5   Q.  Was Amber in that chair?
6   A.  No.
7   Q.  Was she standing near the chair?
8   A.  She was standing in front of the chair when I -- when
9       the door initially opened up.
10  Q.  Okay.  So the area in front of the chair on the first
11      page, page 36 of Exhibit 17?
12  A.  Yeah.
13  Q.  And that's the white chair?
14  A.  Yeah.
15  Q.  There's only one chair in the photo, correct?
16  A.  Yeah.
17  Q.  Okay.  Now, there are two doors to that entryway; do
18      you see that?
19  A.  Yes.
20  Q.  Which door -- or are both doors open?
21  A.  No.
22  Q.  Which door was opened?
23  A.  I believe it was the right, right side.
24  Q.  The right side of the door and the chair is behind the
25      left door?

Page 244

1   A.  Yeah.
2   Q.  Was the left door closed?
3   A.  I believe so.
4   Q.  Okay, but you were able as you were standing there to
5       see Amber through the right side open door when it was
6       opened?
7   A.  Yes.
8   Q.  Turning to page 37 again, where you identified by your
9       initial and circle where Amber was behind the door, I
10      think you identified that the area where you were was
11      to the right?
12  A.  Yes.
13  Q.  Okay.  About how far to the right behind that door?
14  A.  As far as they could take me back there.  I don't know
15      exactly how far.
16  Q.  Looking through these photographs turning to page 32,
17      do you see the area in 32 where you were?
18  A.  Yes.
19  Q.  Okay.  Could you circle for me, I believe it's by the
20      panels on the wall?
21  A.  Right here.
22  Q.  Were you by the wall?
23  A.  I was up against the wall and one of these bins, but
24      taller.
25  Q.  Now, the wall that you are pointing to is a wall that

Page 245

1       has a bunch of holes on the top, correct?
2   A.  Yes.
3   Q.  Is that to the outside?
4   A.  Yes.
5   Q.  Okay.
6           MR. WEGLARZ:  Did she just circle that?
7           MR. SAFRA:  Yes, and she initialed it.
8           MR. WEGLARZ:  Can you tell us what page?
9           MR. SAFRA:  32.
10          MR. WEGLARZ:  Thank you.
11  BY MR. SUAREZ:
12  Q.  Turning back to page 36 and the doorway, is that the
13      door that you're talking about when you say it was the
14      location of that room that was both entered by you and
15      in which you exited?
16  A.  Yes.
17  Q.  Is that the door that as you exited, you saw your --
18      you saw Margaret and later your mother?
19  A.  Yes.
20  Q.  Would you venture that the location in which you were
21      that you identified on the other pages was at least 20
22      or 30 feet inside that room away from that door?
23  A.  At least, yeah.
24  Q.  You were asked about the usage of Adderall.
25  A.  Yeah.

52  (Pages 242 to 245)

Page 246

1   Q.   Did your mom know that you were using Adderall in
2        2013?
3   A.   I don't know.
4   Q.   Do you recall telling her that you were?
5   A.   No.
6   Q.   Or her ever finding out?
7   A.   No.
8   Q.   Did she ever have knowledge that you were taking any
9        other kind of prescription drug in which you did not
10       have a prescription for usage yourself prior to
11       May 2015?
12  A.   No.
13  Q.   Was that in -- was your usage of Adderall in any way
14       the reason why your mom took you to a doctor once she
15       found Tylenol 3 in your purse?
16  A.   No.
17  Q.   The three individuals, Mr. Dyer, Mr. Tapper and
18       Mr. Davis, they were employees of the hotel, correct?
19  A.   Yes.
20  Q.   Prior to being outside the room right before the
21       incident happened and the gentleman opened the door
22       and you saw Amber, do you know what portion of the
23       incident I'm talking about?
24  A.   Like?
25  Q.   When you were standing outside right before the person

Page 247

1        that you testified used the key to open that door, up
2        to that point in time was there anything that either
3        Mr. Dyer, Mr. Davis or Mr. Tapper did that caused you
4        any concern for your safety?
5   A.   No.
6   Q.   Did they do anything to alarm you or make you feel
7        uncomfortable?
8   A.   Just the flirting.
9   Q.   Did you tell anybody about this flirting --
10  A.   No.
11  Q.   -- that might have made you feel uncomfortable or
12       alarmed?
13  A.   Not that I can remember.
14  Q.   Did you report it to your mother?
15  A.   I don't remember.
16  Q.   Did you report it to Margaret?
17  A.   No.
18  Q.   Did you report it to anyone at the hotel?
19  A.   No.
20  Q.   Do you think that if you had reported it to one of
21       those people, someone would have done something about
22       it?
23           MR. WEGLARZ:  Form objection.
24  A.   Yes.
25  BY MR. SAFRA:

Page 248

1   Q.   Other than the flirtation, was there anything else
2        that caused you any alarm or potential
3        uncomfortableness prior to the instance and the
4        incident sequence that I've talked about with the door
5        and the key and those three individuals?
6   A.   Not that I can think of.
7   Q.   Did Amber ever tell you anything with regard to any
8        alarm or discomfort or cause for concern involving
9        these individuals prior to that time?
10  A.   No.
11  Q.   When these individuals flirted, did you flirt back?
12  A.   I don't think so.
13  Q.   Did Amber?
14  A.   I don't think so.
15  Q.   Did they flirt with you on more than one occasion?
16  A.   Yes.
17  Q.   Did you say to them after the first instance, stop?
18  A.   No.
19  Q.   Did you leave their presence and walk away when you
20       felt uncomfortable from receiving the flirtation?
21  A.   Yes.
22  Q.   Did you then see them again?
23  A.   Yes.
24  Q.   Did you hang out with them or stay away from them?
25  A.   They would -- they would more find us than us seeking

Page 249

1        them out.
2   Q.   But according to your testimony, you were hanging out
3        with them a lot that evening?
4   A.   That evening, yeah.  Because they were -- we would
5        cross paths.
6   Q.   And as you went from the poolside to the bar and back
7        to the poolside, they didn't follow you to the bar,
8        did they?
9   A.   No.
10  Q.   And you knew they were over by the poolside or the
11       water slide, right?
12  A.   We assumed.
13  Q.   And you voluntarily left the bar and you went back to
14       the area where they were, correct?
15  A.   Only because we wanted to go down the slides.
16  Q.   The slides were closed.
17  A.   But we didn't know that when we started heading there.
18  Q.   So when you ran into them on the way there and you
19       learned that they were closed, I think you told us
20       that one of them started holding Amber's hand,
21       correct?
22  A.   Yes.
23  Q.   Well, did your discomfort regarding the prior
24       flirtation cause you to say let's stop hanging out
25       with them and let's leave?

Page 250

1   A.  I don't know.
2   Q.  Well, in fact, what happened was, is Amber then
3       started to walk off and instead of you stopping it,
4       you said you're responsible for her to be careful,
5       correct?
6   A.  Right.
7   Q.  At no point in time did you say I'm uncomfortable,
8       they flirted with us or anything of that sort, right?
9       Isn't that true?
10  A.  Can you restate, please?
11  Q.  At no point in time prior to Amber walking away, did
12      you say to anybody that you were uncomfortable from
13      prior flirtation, you're seeing Amber holding hands
14      with a gentleman and she's leaving you alone with
15      another gentleman, you didn't say anything about prior
16      discomfort or any cause of concern?
17  A.  No, I didn't.  Because I wasn't concerned at that
18      point.
19  Q.  With regard to the drinks, have you ever had a Long
20      Island Iced Tea?
21  A.  I've tried a sip.
22  Q.  You know Long Island Iced Tea is a mixture of multiple
23      types of alcohol, for example, the typical mixture is
24      vodka, tequila, rum, gin and then some mixers,
25      nonalcoholic mixtures --

Page 251

1   A.  Right.
2   Q.  -- is that fair?
3   A.  Yeah.
4   Q.  You're aware of that?
5   A.  Yeah.
6   Q.  Now, the drink Purple Haze has come up a lot in this
7       deposition.  And you had some of those while you were
8       in Jamaica, correct?
9   A.  Yes.
10  Q.  Okay.  Did you understand that the Purple Haze was of
11      a similar nature with a mixture of alcohol such as
12      gin, vodka and tequila?
13  A.  I was aware that it was a mixture, but I didn't
14      remember what exactly it was.
15  Q.  But you agree it was a drink that wasn't just vodka,
16      soda, it had multiple liquors mixed together?
17  A.  Right.
18  Q.  It was a strong drink, right?
19  A.  Yeah.
20  Q.  Did you ever see Amber Facebook messaging or texting
21      with any of the three employees prior to the night of
22      May 8th?
23  A.  I don't think so.
24  Q.  Did she ever say to you that she had been?
25  A.  I don't remember.

Page 252

1   Q.  Now, you were shown what was marked as Exhibit
2       Number 1 to -- number 2 -- number 5, sorry, you were
3       shown Exhibit Number 5 earlier from counsel which is
4       the Facebook messages between Amber and your mother?
5   A.  Uh-huh.
6   Q.  Do you recall that?
7   A.  Yeah.
8   Q.  And on the second page of Exhibit Number 5, there was
9       the photograph that, of you and Amber that Amber had
10      sent on or about 8:14 p.m. when you were in your hotel
11      room?
12  A.  Right.
13  Q.  Okay.  How long after that did you leave the hotel
14      room?
15  A.  I don't know.
16  Q.  Is it a couple minutes?  Less than 15 minutes?
17  A.  I'm not sure.
18  Q.  Were you in the room a half hour to an hour?
19  A.  Possibly.  I didn't really look at a clock the entire
20      time I was on vacation.
21  Q.  And sometime in that period you left the room?
22  A.  Yeah.
23  Q.  Did your mom or Margaret come back to the room while
24      you were in that room?
25  A.  I don't remember.

Page 253

1   Q.  Do you ever recall seeing them again that evening?
2   A.  Yeah.
3   Q.  Before the incident, before the time after the
4       incident?
5   A.  Yes.
6   Q.  Who did you see?
7   A.  My mother.
8   Q.  Where did you see your mother?
9   A.  She came looking for me and Amber.
10  Q.  And she found you at the piano bar?
11  A.  No, she found us at the main bar.
12  Q.  At the main bar.  Okay.  And did you talk to your
13      mother?
14  A.  Yes.
15  Q.  And then she went back to the room to pack?
16  A.  Yes.
17  Q.  And when she went back to the room to pack, she then
18      sent a message to Amber that said, "Amber, you need to
19      stay" -- and then she put in all capital letters --
20      "WITH Paiton, and maybe slow down with the drinks."
21      Isn't that true?
22  A.  Right.
23  Q.  And this was around 10:55 p.m. that evening?
24  A.  Right.
25  Q.  According to your statement, you had at least gone to

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 254

1    the water slides once or maybe the second time that
2    evening at around 10:00 p.m., correct?
3    A.  Between 9:00 and 10:00, yes.
4    Q.  So for over an hour, you were between the water slides
5        or poolside and the bars, correct?
6    A.  Yes.
7    Q.  Why did your mom write Amber after she saw you that
8        she needs to be careful and stay with you, in all
9        capitals, and maybe slow down on drinking?
10           MR. WEGLARZ:  Form objection.
11           Go ahead and answer.
12   A.  I don't know.
13   BY MR. SAFRA:
14   Q.  Did your mom witness that you were intoxicated?
15           MR. WEGLARZ:  Same objection.
16   A.  I wouldn't say I was highly intoxicated.  I was
17       slightly buzzed.
18   BY MR. SAFRA:
19   Q.  Is it normal for your mom if she sees you slightly
20       buzzed to say that you should slow down with the
21       drinks?
22           MR. WEGLARZ:  Form objection, no
23       foundation.
24           Go ahead.
25   A.  I don't know.

Page 255

1    BY MR. SAFRA:
2    Q.  Did you give your mom an impression that you were
3        under the influence of alcohol sufficient that you
4        should slow down with drinks?
5            MR. WEGLARZ:  Same objection.
6            Go ahead.
7    A.  I don't know.
8    BY MR. SAFRA:
9    Q.  Did Amber tell you at that time that your mom sent
10       this message?
11   A.  I don't remember.
12   Q.  But whatever impression or action or verbiage you
13       conveyed with your mother when she came down to that
14       main bar that evening, you agree she left and she sent
15       a message to Amber that she needs to stay with you and
16       you both need to slow down on your drinks, right?
17   A.  I mean she never specified.
18           MR. SAFRA:  And I don't need the mom
19       shaking her head and pointing at messages and marking
20       anything on a paper.
21           MR. WEGLARZ:  Hey, Mr. Safra.
22   BY MR. SAFRA:
23   Q.  You can answer the question.
24           MR. WEGLARZ:  Instead of saying you don't
25       need the mom, just say --

Page 256

1            MR. SAFRA:  Janet.
2            MR. WEGLARZ:  -- "Mrs. DeSantis.  May I ask
3    you please," let's be civil.  That's all I'm asking.
4            MR. SAFRA:  Okay.  I don't think --
5            MR. WEGLARZ:  See, now this will get you
6    upset that I asked you to do that.
7            MR. SAFRA:  No.
8            MR. WEGLARZ:  You're going to just unwind
9    now, here we go.
10           MR. WEGLARZ:  No, what I'm going to do --
11   what I'm going to do is say, and I think you know from
12   sitting here, that there was no intention of me to be
13   anything but civil.  Do I think that what you say is
14   an appropriate alternative to the exact same thing I
15   said, yes, but I'm not going to let you say on the
16   record that I was being something uncivil or have it
17   read that I am because that's only in writing and not
18   verbally or have you then say oh, here we go and make
19   it more dramatic than it needs to be.
20           I'm going to ask my question, the witness
21   is not under oath -- Mrs. DeSantis who is here and she
22   should not be pointing at things, grabbing a pen,
23   underling things or shaking her head no.  I ask a
24   question, you can object to form and she can answer.
25           MR. WEGLARZ:  Understood, but you are --

Page 257

1            MR. SAFRA:  Read back the question.
2            MR. WEGLARZ:  You are yelling at
3    Mrs. DeSantis.
4            MR. SAFRA:  I am not yelling.
5            MR. SUAREZ:  That's not fair, Todd, come
6    on.
7            MR. WEGLARZ:  You are.
8            MR. SUAREZ:  He reacted appropriately to
9    the fact that the mother doesn't like the question and
10   she's trying to instruct the witness by pointing at a
11   paper and by shaking her head.  Yes, that could be a
12   natural human emotion, but it's inappropriate behavior
13   in a court type proceeding where there's a witness
14   under oath and should be testifying as to her
15   memories, so Mr. Safra's reaction was completely
16   normal.
17           MR. SAFRA:  And I did not yell.
18           MR. WEGLARZ:  It was -- I disagree.  And
19   Mrs. DeSantis is not an attorney.
20           MR. SAFRA:  If you want to hear yelling,
21   this is yelling.
22           MR. WEGLARZ:  Oh, so you admit now you are
23   yelling at the witness?
24           MR. SAFRA:  This is yelling, I'm yelling at
25   you because it's recording, and I want the recording

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 258

1  to reflect this is yelling.  What I was saying before
2  is just a normal voice.
3          MR. WEGLARZ:  Okay.  Now, please,
4  Mrs. DeSantis is not an attorney.  She may not know
5  that it's improper.  She is her mother.  She's trying
6  to help her daughter who's been through a horrible
7  rape.  She didn't think she was doing anything to
8  violate the rules, just be civil to her.  Tell her,
9  you know what, I know you're trying to help your
10  daughter and I ask that you please don't do that.  You
11  will find that she will respond to you.
12          MS. DeSANTIS:  I do apologize.
13          MR. SUAREZ:  No offense taken.
14          MR. SAFRA:  Could you read back the
15  question?
16          (The following record was read by the
17          reporter at 3:58 p.m.:  "QUESTION:  But
18          whatever impression or action or verbiage
19          you conveyed with your mother when she came
20          down to that main bar that evening, you
21          agree she left and she sent a message to
22          Amber that she needs to stay with you and
23          you both need to slow down on your drinks,
24          right?
25          ANSWER:  I mean she never specified.")

Page 259

1          MR. SAFRA:  So then the question was
2          answered.
3  BY MR. SAFRA:
4  Q.  Have you ever been arrested?
5  A.  No.
6  Q.  With regard to the booking of this trip, did you
7      authorize your mom to book the trip on your behalf?
8  A.  Yes.
9  Q.  Did you consent to her binding you to any terms and
10     conditions or obligations of stay --
11         MR. WEGLARZ:  Form objection.
12  BY MR. SAFRA:
13  Q.  -- in making the booking?
14         MR. WEGLARZ:  Form objection.
15         Go ahead.
16  A.  Yes.
17  BY MR. SAFRA:
18  Q.  Do you agree that the act of sexual assault or rape is
19      not that which a lifeguard is hired by a hotel to
20      perform?
21         MR. WEGLARZ:  Asked and answered multiple
22         times, form objection.
23  A.  No, it's not what a lifeguard should be hired to do.
24      They're there to protect people, not rape them.
25  BY MR. SAFRA:

Page 260

1  Q.  And the act of sexual assault or rape by a lifeguard
2      at a hotel is them stepping aside from their duties --
3         MR. WEGLARZ:  Form objection.
4  BY MR. SAFRA:
5  Q.  -- correct?
6  A.  Yes.
7  Q.  I'm going to show you what I'll -- do you need a
8      break?
9  A.  No.
10  Q.  I'm going to show you what I'll mark as Exhibit 18 to
11      your deposition and ask you if you've ever seen this
12      document before?
13         MARKED FOR IDENTIFICATION:
14         DEPOSITION EXHIBIT 18
15         4:00 p.m.
16  BY MR. SAFRA:
17  Q.  It's a photocopy of smaller pages, but I'm talking
18      about the actual substance of the pages, have you seen
19      those documents?
20  A.  No.
21  Q.  Okay.  Is any of this your handwriting?
22  A.  Of this, no.
23  Q.  And there's a bunch of pages that seem to be written
24      by either the same hand or the same two people's
25      hands, is any of that yours?

Page 261

1  A.  No.
2  Q.  After the incident when you were at the Sandals hotel,
3      did you get into an argument with your mother ever?
4  A.  I don't remember.
5  Q.  Did you ever get angry or slam doors?
6  A.  I don't remember.
7  Q.  Do you remember getting angry and slamming doors
8      stating to your mother that you were upset because you
9      felt that your rape was being downplayed and that
10      Amber's was more important because she was a virgin?
11  A.  I don't remember.
12  Q.  Did you ever tell your mom that you wanted to be alone
13      because you felt like she wasn't listening to her --
14      to you?
15  A.  I don't remember.
16  Q.  Do you have any reason to dispute that occurrence to
17      the extent it was something notated by your mother at
18      the time?
19  A.  I have no reason to dispute it because I didn't -- I
20      wasn't in my right state of mind after the assault.
21  Q.  There was reference to, in other depositions, a
22      condom; do you know anything about a condom as part of
23      the incident?
24  A.  I remember there being an old used condom being found
25      there.

Page 262

1   Q. After the incident?
2   A. Yes.
3   Q. Do you know if that used condom was used with Amber?
4   A. I don't know.
5   Q. Is that possible?
6   A. I have no idea.
7   Q. And I think counsel asked you about it in terms of
8      you, so I won't repeat that portion.
9          Did you ever have any conversations with
10     Margaret?
11  A. I don't remember.
12  Q. And I meant post incident?
13  A. Yeah, I don't remember.
14  Q. Is that what you understood me asking?
15  A. Yes.
16         MR. SAFRA: I have no further questions.
17         RE-EXAMINATION
18  BY MR. SUAREZ:
19  Q. I think I do have a couple of questions. After the
20     incident, do you recall whether the police explained
21     to you anything about the laws of rape in Jamaica?
22  A. I don't remember.
23  Q. Do you know if they told you what the age of consent
24     was --
25  A. I don't remember.

Page 263

1   Q. -- in Jamaica?
2          MR. WEGLARZ: Objection, relevance.
3   BY MR. SUAREZ:
4   Q. Ma'am, after the incident, do you recall having done
5      yoga in the new hotel?
6   A. Yes.
7   Q. Do you know how long you did yoga?
8   A. Not very long before we had to stop because
9      medication, we weren't supposed to be outside.
10  Q. By the way, ma'am, whose -- are any of these notes
11     your handwriting?
12  A. No.
13  Q. Whose handwriting is that?
14  A. My mother.
15  Q. And who else?
16  A. Margaret, I'm assuming.
17  Q. And who else?
18  A. I don't know. I thought it was just the two.
19  Q. Did you ever buy -- when you went to the bar at the
20     Beaches Resort, did you just order drinks or did you
21     need to scan a card or show a band or show a room key
22     in order to get the drinks?
23  A. You just ordered the drink.
24  Q. Okay. And did you ever have occasion to get drinks
25     for the staff that you were interacting with?

Page 264

1   A. No.
2   Q. Did you ever get drinks for Jermaine or Dwight Davis
3      or Bill Tapper?
4   A. No.
5   Q. Did Amber ever get drinks for Jermaine, Dwight Davis
6      or William Tapper?
7   A. No.
8   Q. Just give me one second, please.
9          MR. SAFRA: You want to take a break?
10         (Recess taken at 4:07 p.m.)
11         (Back on the record at 4:08 p.m.)
12  BY MR. SUAREZ:
13  Q. Ma'am, you answered some questions from Mr. Safra
14     about the room that you were in with Amber, and we had
15     a conversation about where you were and where Amber
16     was. Can you do me a favor and draw the walls of the
17     room and the doors of the room and just put an X on
18     where you were and where Amber was?
19  A. It's not going to look pretty.
20  Q. That's fine. I don't want you to be percussive, but I
21     want to get an understanding of what your
22     understanding of the room is. If you want to look at
23     this picture?
24         MR. WEGLARZ: If you need to use the
25     photos.

Page 265

1   BY MR. SUAREZ:
2   Q. If you want to look at the photos, I'm happy to have
3      you do that.
4   A. Do you want me to include the doors that we didn't
5      use?
6   Q. Yeah, yeah. I do. I don't want you to alter your
7      memory in any way.
8   A. Amber was in a chair. It's supposed to be a chair
9      behind this door.
10         MR. SAFRA: Could you put her initials?
11         MR. SUAREZ: She's writing it out.
12         MR. SAFRA: Oh, okay.
13  A. And then there was a wall back here, a short wall that
14     I hid behind afterwards.
15  BY MR. SUAREZ:
16  Q. Okay.
17  A. And then over here in the corner from here, I had to
18     like maneuver around a bunch of stuff. I think I had
19     to actually like crawl over mounds. And then over
20     here was where I was raped.
21         MR. SAFRA: Could you do me a favor and put
22     a star where you said you crawled behind.
23  A. I don't know exactly where.
24         MR. SAFRA: Okay.
25  A. Oh, you mean -- okay.

Page 266

1           MR. SAFRA:  Yes, like a star.  And could
2      you do an arrow on the end of the line that you did as
3      the maneuvering line so we know that that is not a
4      wall in the path.
5  BY MR. SUAREZ:
6   Q.  And can you close out the room to the extent you
7      remember how it was.
8   A.  I don't know how far back this went.
9   Q.  Okay.
10  A.  I don't know about over here.
11  Q.  Okay.
12          MR. SAFRA:  So when you say, just to make
13      sure the record is clear, when you say how far back
14      this went, you're pointing to the area in the diagram
15      that is above where you put the star that you were
16      hiding?
17          THE WITNESS:  Yes.
18  BY MR. SUAREZ:
19  Q.  There is a -- if you look at photograph -- if you look
20      at photograph 33, what I understand, the photograph on
21      the right side of 33 and on the left side of 33, where
22      I understand you crouched under after the incident was
23      behind the wall that's reflected there, right?
24  A.  Yes.
25  Q.  Okay.  And so there's a wall that comes at the end

Page 267

1      here, right, the room finishes?
2   A.  I couldn't see that one through the dark.
3   Q.  That's fine.
4   A.  Just pretend that's a straight line.
5   Q.  I understand you don't know where this wall ends here.
6   A.  Right.
7   Q.  All right.  And, ma'am, when you -- when the incident
8      finished, if I understood your testimony earlier, you
9      came back to this door first, the doors you had used?
10  A.  Yeah.
11  Q.  And then you went back and crouched to where you put
12      this star, right?
13  A.  Yes.
14  Q.  Okay.  Thank you.
15  A.  This might have been over a little bit too, though.
16          MR. SAFRA:  You mean over like the place
17      where you drew the star on the left to a little bit
18      more to the right?
19  A.  It might have been more parallel or whatever with the
20      actual door.
21          MR. SUAREZ:  Thank you.  I appreciate it.
22      I have no further questions.
23          MR. SAFRA:  Can I just ask him one thing
24      before we pass it off?
25          MR. WEGLARZ:  Sure.

Page 268

1          (Recess taken at 4:13 p.m.)
2          (Back on the record at 4:13 p.m.)
3          MR. SAFRA:  I have nothing further.
4          MR. SUAREZ:  I have nothing further.
5          MR. WEGLARZ:  I'll have just a few
6      questions.  Paiton, we'll get you out of here quickly,
7      okay?
8          MR. SUAREZ:  Objection for one is objection
9      for all?
10          MR. SAFRA:  For defendants.
11          MR. WEGLARZ:  Yes.
12          MR. SAFRA:  I also didn't say thank you for
13      you time, obviously you understand the circumstances
14      are not ideal for which we have to ask you questions,
15      but we appreciate you bearing with us as we go through
16      them and do our job.
17          MR. SUAREZ:  Likewise thank you.
18          MARKED FOR IDENTIFICATION:
19          DEPOSITION EXHIBIT 19
20          4:14 p.m.
21          EXAMINATION
22  BY MR. WEGLARZ:
23  Q.  All right.  Paiton, I want to talk about Exhibit 19
24      hopefully just for a minute.  This area here, this
25      little star that represents where you were, what did

Page 269

1      you say, cowering or hiding behind?
2   A.  Kind of crouched.
3   Q.  Crouched, I'm sorry.  And were you trying to explain
4      to us you knew kind of right in this area where you
5      were crouched, you know that there is a wall right
6      behind you right there, is that what you were saying?
7      I want to make sure I understand this layout.
8   A.  This was like a little wall, like a little, I guess --
9          MR. SUAREZ:  Look at page 33 --
10  A.  It was a little part of a wall that jet out.
11          MR. SUAREZ:  -- of Exhibit 17 on the right,
12      and the left photograph shows the wall that is jetting
13      out.
14  BY MR. WEGLARZ:
15  Q.  Okay.  So do me a favor.  Can you show me where this
16      area is on your drawing where it is on either of these
17      photos on 33, just as best you can.  Okay.  So you
18      drew a red circle on the photo in the right, correct,
19      on page 33?
20  A.  Yes.
21          MR. SUAREZ:  Can you initial next to that
22      photo, please?  Thank you.
23  BY MR. WEGLARZ:
24  Q.  All right.  Thank you.
25          MR. SAFRA:  I think what she was saying is

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 270

1    that in her drawing it might be a little bit more
2    right on top of the door versus to the right.
3    A.  Yeah.
4          MR. SAFRA:  Which is fine.
5    A.  That's why I didn't major in art.
6          MR. WEGLARZ:  Nor anyone here.
7          MR. SAFRA:  That's fine, I think that's
8    fine.
9    BY MR. WEGLARZ:
10   Q.  And, Paiton, you mentioned earlier that you recall
11       the -- you recalled at least Jermaine flirting with
12       you during your stay, correct?
13   A.  Yes.
14   Q.  Do you recall Dwight and Mr. Tapper also flirting with
15       you?
16          MR. SAFRA:  Objection, form.
17   BY MR. WEGLARZ:
18   Q.  Go ahead.
19   A.  The night of, I remember Dwight flirting.
20   Q.  And you would see Jermaine every day, right?
21   A.  Just about, yeah.
22   Q.  And Amber testified that Jermaine would call the two
23       of you beautiful ladies and asked if you guys are
24       going to any parties or going to any clubs off
25       property; do you remember Jermaine doing that?

Page 271

1          MR. SUAREZ:  Object to the form.
2    A.  I do remember.
3    BY MR. WEGLARZ:
4    Q.  Did he do it more than once?
5          MR. SUAREZ:  Object to the form.
6    A.  I'm not sure.
7    BY MR. WEGLARZ:
8    Q.  And I think you told us that he asked for -- he wanted
9        your Facebook or Instagram information and he also
10       wanted Amber's Facebook or Instagram information,
11       correct?
12          MR. SAFRA:  Objection, form.
13   BY MR. WEGLARZ:
14   Q.  Correct?
15   A.  Yeah.
16   Q.  Now, I think you told us that when Jermaine or the
17       other resort staff would flirt with you, it did make
18       you feel a little bit uncomfortable, correct?
19          MR. SAFRA:  Objection, form.
20   BY MR. WEGLARZ:
21   Q.  A little uncomfortable?
22          MR. SAFRA:  Same objection.
23   A.  A little bit, but not to the point where I feared for
24       my life.
25   BY MR. WEGLARZ:

Page 272

1    Q.  And even though you felt a little bit uncomfortable,
2        you still felt it was safe to be around them because
3        they were part of the resort, right?
4          MR. SAFRA:  Objection, form.
5    A.  Right, uh-huh.
6    BY MR. WEGLARZ:
7    Q.  In fact --
8          MR. SAFRA:  Give me a moment to do the
9        objections, so that way she hears your answer.
10   BY MR. WEGLARZ:
11   Q.  In Jamaica, if there's anyplace you should feel safe
12       at all when you're out on a vacation in Jamaica, you
13       should feel safe inside of your resort, correct?
14          MR. SAFRA:  Objection, form.
15   BY MR. WEGLARZ:
16   Q.  That's how you felt?
17   A.  You should, yes.
18          MR. SAFRA:  Same objection.
19   BY MR. WEGLARZ:
20   Q.  And if you felt that there was some kind of trouble
21       going on or if you needed help, you felt like you
22       should be able to rely and reach out to the resort
23       staff to help you, right?
24          MR. SUAREZ:  Object to the form.
25   A.  Yeah.

Page 273

1    BY MR. WEGLARZ:
2    Q.  Were you ever told or were you ever advised at any
3        time before you took your Jamaica trip that the State
4        Department warned or issued a warning that it was
5        concerned about the number of sex assaults committed
6        by hotel employees at resorts?
7          MR. SUAREZ:  Object to form.
8          MR. SAFRA:  Object to form.
9    A.  Was I aware of the?
10   BY MR. WEGLARZ:
11   Q.  Were you ever told of that?
12   A.  No.
13   Q.  Did anyone ever tell you that?
14   A.  No.
15   Q.  If you --
16          MR. SAFRA:  That same objection when he
17       repeated.
18          MR. WEGLARZ:  Continuing.
19   BY MR. WEGLARZ:
20   Q.  Had you been warned that before you went on the
21       Jamaica trip that the State Department warned it was
22       concerned about the number of sex assaults committed
23       by hotel employees at resorts, would you have even
24       gone on this trip?
25          MR. SUAREZ:  Objection to form.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 274

1          MR SAFRA:  Objection to form.
2   A.  If I had been told about it, no.
3   BY MR. WEGLARZ:
4   Q.  Had you been told that the State Department issued
5       that warning during your trip, would you agree that
6       you would have never even socialized with resort
7       staff?
8          MR. SUAREZ:  Objection.
9          MR. SAFRA:  Object to form.
10  A.  Yeah, I wouldn't have.
11  BY MR. WEGLARZ:
12  Q.  And do you agree that if you were warned during your
13      trip that the State Department was concerned about the
14      number of sex assaults committed by hotel employees at
15      resorts, do you agree you would have never let
16      Jermaine walk away with Amber that evening?
17         MR. SUAREZ:  Object to form.
18         MR. SAFRA:  Object to the form.
19  A.  I wouldn't have let him.
20  BY MR. WEGLARZ:
21  Q.  And if you were warned even during your trip that the
22      State Department warned about its concern about the
23      number of sex assaults committed by hotel employees at
24      resort hotels, do you agree you would have never gone
25      near that room that night, true?

Page 275

1          MR. SAFRA:  Object to form.
2          MR. SUAREZ:  Object to form.
3   A.  Yeah, true.
4   BY MR. WEGLARZ:
5   Q.  Were you ever told or were you ever advised that
6       fraternization between resort workers and guests was
7       strictly prohibited?
8          MR. SUAREZ:  Objection to form.
9          MR. SAFRA:  Object to form.
10  A.  Are you asking if I was ever advised?
11  BY MR. WEGLARZ:
12  Q.  Yeah, did anyone ever tell you that, did anyone ever
13      publish a rule saying guess what, we have a rule --
14         MR. SUAREZ:  Object to form.
15  BY MR. WEGLARZ:
16  Q.  -- resort staff should not be fraternizing with
17      guests?
18         MR. SUAREZ:  Object to form.
19         MR. SAFRA:  Object to form.
20  A.  I never heard that.
21  BY MR. WEGLARZ:
22  Q.  Had the hotel told you that we have these rules or had
23      there been some type of sign, or someone told you,
24      look, hotel staff should not be fraternizing with
25      guests, and if you do observe such conduct, you should

Page 276

1       report that immediately to the hotel management and to
2       the U.S. Embassy, would you have reported Jermaine's
3       interaction with you when he was asking you for your
4       Instagram, your Facebook or asking if you are going to
5       any parties or clubs off property?
6          MR. SAFRA:  Objection to form and
7       relevancy.  The hotel is not a party in this case.
8          MR. SUAREZ:  Object to form.
9   BY MR. WEGLARZ:
10  Q.  Go ahead.
11  A.  I would have absolutely told somebody on staff.
12  Q.  And had you been told that there were rules strictly
13      prohibiting fraternization between resort workers and
14      resort guests, do you agree that you would have
15      refrained from all socialization with Jermaine and
16      with Dwight and with William Tapper?
17         MR. SUAREZ:  Object to the form.
18  A.  Yes.
19  BY MR. WEGLARZ:
20  Q.  And would you agree that if you were told about those
21      rules, this incident doesn't happen?
22         MR. SAFRA:  Objection to form.
23         MR. SUAREZ:  Objection, form.
24  A.  I don't think it would have.
25  BY MR. WEGLARZ:

Page 277

1   Q.  Now, earlier you were asked if you felt that the
2       Beaches Resort or whether UVI or a company called Mark
3       Travel or Fun Jet, you were asked do you think they
4       had any reason to believe that this -- that these
5       resort staff members would assault you.  I want to ask
6       you this question.  Let's assume if prior to you going
7       on your Jamaica trip that the State Department did
8       issue a warning that it was concerned about the number
9       of sex assaults being committed by hotel staff against
10      guests at resorts on the northern coast, do you think
11      maybe that would give the resort a reason to believe
12      that its staff members may assault you?
13         MR. SAFRA:  Objection to form.
14         MR. SUAREZ:  Object to form.
15  A.  Can you repeat the question?
16  BY MR. WEGLARZ:
17  Q.  Sure.
18  A.  If the State Department did have a warning out there
19      say at the time where you guys were booking your trip
20      and at the time that you went on your trip, if there
21      was a warning by the State Department that it was
22      concerned about the number of sex assaults being
23      committed by hotel employees at the resorts for those
24      resorts on the northern coast, if there was such a
25      warning out there, then doesn't that give the resort a

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 278

1    reason to believe that maybe its resort workers may
2    assault its guests?
3           MR. SAFRA:  Objection, form.
4           MR. SUAREZ:  Objection, form.
5    A.  Yeah.
6    BY MR. WEGLARZ:
7    Q.  And if there was a company call Mark Travel and if
8    they were involved in the booking of this trip, if
9    there was such a warning out there by the State
10   Department, doesn't it make sense that that company
11   should be aware of State Department warnings in areas
12   where they're selling vacations to?
13          MR. SUAREZ:  Object to form.
14   Mischaracterization of Mark Travel.
15   BY MR. WEGLARZ:
16   Q.  Go ahead.
17   A.  Can you repeat the question?
18   Q.  Sure.  That's fine.  You understood that Ocho Rios is
19   on the northern coast, correct?
20   A.  Yeah.
21   Q.  And if there's a warning out there that says you know
22   what, we're the State Department from the United
23   States, and we have a concern about the number of sex
24   assaults hotel employees are committing at these
25   resorts on the northern coast, if you were made aware

Page 279

1    of that before you went on this trip, you would have
2    never gone on this trip, would you?
3           MR. SAFRA:  Objection to form.
4           MR. SUAREZ:  Objection to form.
5    A.  I wouldn't have.
6    BY MR. WEGLARZ:
7    Q.  You did not deal directly with the booking agent or
8    the travel agent in the setting up of this trip, true?
9    A.  True.
10   Q.  But you understand because of those efforts that were
11   undertaken by your mother, you were part of those
12   booking arrangements, correct?
13   A.  Yes.
14   Q.  You received a flight ticket, correct?
15          MR. SUAREZ:  Object to the form.
16   A.  Yes.
17   BY MR. WEGLARZ:
18   Q.  You were considered to be a traveller who would be
19   benefiting from the reservations made at the Beaches
20   Resort, correct?
21          MR. SUAREZ:  Object to form.
22   A.  Yes.
23   BY MR. WEGLARZ:
24   Q.  You'd agree that you were an intended recipient of the
25   booking and travel arrangements that your mother made,

Page 280

1    correct?
2           MR. SUAREZ:  Object to form.
3    A.  Yes.
4    BY MR. WEGLARZ:
5    Q.  And did you understand that Beaches and Sandals were
6    pretty much the same company?
7           MR. SUAREZ:  Objection, form.
8           MR. SAFRA:  Objection, form.
9    A.  Yes.
10   BY MR. WEGLARZ:
11   Q.  In fact, when you arrived at the Beaches Resort, you
12   saw the Sandals logo all over the place, correct?
13          MR. SAFRA:  Objection, form, foundation,
14   mischaracterization, misstatement of facts.
15          MR. SUAREZ:  Objection.
16          MR. SAFRA:  It doesn't exist.
17          MR. WEGLARZ:  Wait a minute.
18          MR. SAFRA:  Now you're misleading and
19   you're putting facts on the record that are
20   unsupported not only by facts of record in this case,
21   but facts that exist out there in the real world.
22   Okay?
23          MR. WEGLARZ:  Are you done?  I do not want
24   to interrupt you.
25          MR. SUAREZ:  Well, now I have to go back

Page 281

1    through a bunch of things because you're now injecting
2    through leading questions of your own client which is
3    improper on its own, improper facts and untruthful
4    statements into the record.  So go.
5           MR. WEGLARZ:  So you weren't done.  Are you
6    done now?
7           MR. SAFRA:  I'm done now.
8           MR. WEGLARZ:  Thank you.  I thought my
9    objections were so improper because if I said anything
10   more than objection or anything more than form, that
11   was improper, yet you're giving objections that are
12   ten to 15 paragraphs long, so --
13          MR. SAFRA:  Actually it's one time and it's
14   one time because you're leading your own client which
15   is improper on its own.
16          MR. WEGLARZ:  So it's a form objection,
17   thank you.
18   BY MR. WEGLARZ:
19   Q.  When you went to the Beaches Resort, you saw the
20   Sandals logo all over the place, right?
21          MR. SAFRA:  Objection, form.
22   A.  I saw it on papers that we had in the room that we
23   stayed in.
24   BY MR. WEGLARZ:
25   Q.  And you say on papers meaning like when they give you

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 282

1  stationery, a pad of paper to make notes, it would say
2  Sandals on it, correct?
3       MR. SAFRA:  Objection, form.
4       MR. SUAREZ:  Objection, form.
5  A.  It would say Beaches by Sandals.
6  BY MR. WEGLARZ:
7  Q.  If I were to show you a copy of this letter that a
8  Mr. Brian Roper, general manager of Beaches Ocho Rios
9  that he sent to your mother and Mrs. Torralva --
10       MR. SAFRA:  Is this ever produced or Bate
11  stamped?
12       MR. WEGLARZ:  Yes.
13       MR. SAFRA:  Okay.  What's the Bates stamp
14  for it because I don't see it on the document?
15       MR. WEGLARZ:  I don't have the Bates stamp
16  for it, but it's in the same set of records that we
17  sent you that include the police statements and other
18  items.
19  BY MR. WEGLARZ:
20  Q.  If we look at this letter here --
21       MR. WEGLARZ:  And we'll mark that as the
22  next exhibit, I apologize, whatever number that is.
23       MARKED FOR IDENTIFICATION:
24       DEPOSITION EXHIBIT 20
25       4:28 p.m.

Page 283

1       MR. SUAREZ:  This is 20.  This is post
2  incident.  There's no date on it, but it seems from
3  the substance that it's post incident.
4       MR. SAFRA:  So I also preserve my rights to
5  object to the introduction of the document as
6  evidence.  I mean if you're saying it's pre-incident,
7  I'm actually -- I'll let you stipulate to that, if you
8  want.
9       MR. WEGLARZ:  I'm sorry, stipulate?
10       MR. SAFRA:  There's no date on it.  If you
11  want to say it's pre-incident, then I'll withdraw my
12  objection.  I'm saying it's a post incident document
13  and I'm preserving my right to object to its
14  introduction.
15       MR. WEGLARZ:  That's fine.
16       MR. SUAREZ:  Okay.  Go ahead.
17       MR. WEGLARZ:  I don't know why Beaches
18  would send out letters without dating it, but
19  apparently they do.  Now, it's my understanding it
20  happened after the assault.  But I don't know the
21  exact date.
22  BY MR. WEGLARZ:
23  Q.  For example, have you ever seen this letter before
24  that was sent to your mom and Mrs. Torralva after the
25  assault?

Page 284

1       MR. SUAREZ:  Objection to form.
2  A.  No.
3  BY MR. WEGLARZ:
4  Q.  But you do see on this letter the Beaches logo,
5  correct?
6       MR. SAFRA:  Objection to form.  If you've
7  never seen the document before, it says what it says.
8  You can't introduce documents that way and it's
9  improper because then if you ask follow-up questions
10  even after, those also should be excluded.  So I'm
11  preserving the rights, I'm giving a speaking objection
12  on purpose because you can't give a document to
13  someone and then ask questions on the topic, it's
14  improper in Florida if they've never seen the document
15  before.
16       MR. WEGLARZ:  Your objection is noted.
17  BY MR. WEGLARZ:
18  Q.  You see a Beaches logo on Exhibit Number 20?
19  A.  Yes.
20  Q.  Okay.  You've seen that logo before, correct?
21       MR. SAFRA:  Objection to this whole line of
22  questioning.
23  A.  Yes.
24  BY MR. WEGLARZ:
25  Q.  That logo looks very familiar to you because you've

Page 285

1  seen it numerous time when you were down there at the
2  resort on your vacation in Jamaica, right?
3       MR. SAFRA:  Objection, form.
4  A.  Correct.
5  BY MR. WEGLARZ:
6  Q.  And if you look at that Beaches logo on this letter
7  here, it says Beaches Resorts For Everyone by Sandals,
8  correct?
9       MR. SAFRA:  Objection, form.
10       MR. SUAREZ:  Objection.
11  BY MR. WEGLARZ:
12  Q.  In fact, if you look at that letter, it's signed by
13  the general manager from Beaches Ocho Rios and
14  immediately underneath that we see the Sandals logo,
15  correct?
16       MR. SAFRA:  Objection, form.
17       MR. SUAREZ:  Objection.
18  A.  Yes.
19  BY MR. WEGLARZ:
20  Q.  While you were down at that resort the entire time,
21  you always considered yourself to be in a Beaches and
22  a Sandals Resort, correct?
23       MR. SAFRA:  Objection, form.
24       MR. SUAREZ:  Objection.
25  A.  Yeah.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 286

1  BY MR. WEGLARZ:
2  Q.  And you felt like you always knew that Sandals had a
3     great reputation for providing quality resorts and
4     services, correct?
5            MR. SAFRA:  Objection, form.
6  A.  Yes.
7  BY MR. WEGLARZ:
8  Q.  You felt safe at that resort, didn't you?
9            MR. SAFRA:  Objection, form.
10 A.  In the beginning, yes.
11           MR. SAFRA:  And this is the point in time
12    unless there's additional questions to follow up, that
13    I would say all those relate back to the document and
14    should be stricken and excluded.  And I don't see
15    relevancy.
16 BY MR. WEGLARZ:
17 Q.  Early on in your deposition, do you remember being
18    asked questions about whether or not you knew how to
19    operate an iPad; do you remember that?
20 A.  Yes.
21           MR. SUAREZ:  Objection to form.
22           MR. SAFRA:  Wait.  Objection to form.
23 BY MR. WEGLARZ:
24 Q.  I'm taking you back to the time when you first got to
25    the resort when you guys had to check in, correct?

Page 287

1  A.  Yeah.
2  Q.  You had to sign an iPad, correct?
3  A.  Yes.
4  Q.  You explained to us that it wasn't working, correct?
5  A.  Yes.
6  Q.  Then you were asked, well, don't you know how to
7     operate an iPad; do you remember that?
8            MR. SAFRA:  Objection to form.
9            MR. SUAREZ:  Objection to form.
10 A.  I do remember that.
11 BY MR. WEGLARZ:
12 Q.  Let me ask you this, do you know how to fix an
13    improperly functioning iPad?
14           MR. SUAREZ:  Objection to form.
15 A.  Heck no.
16 BY MR. WEGLARZ:
17 Q.  I didn't think so.  You basically signed the iPad
18    because they told you to do it because you wanted to
19    get up to your room, correct?
20           MR. SUAREZ:  Objection to form.
21           MR. SAFRA:  Objection to form.
22 A.  Yeah.
23 BY MR. WEGLARZ:
24 Q.  You weren't able to read or review anything, true?
25           MR. SUAREZ:  Objection to form.

Page 288

1  A.  True.
2  BY MR. WEGLARZ:
3  Q.  Sorry, I'm very rude by just stepping in front of you
4     like that.  Paiton, I'll show you what we've marked --
5     well, I know we referred to this.  It's Amber
6     Exhibit 1, Margaret Torralva Exhibit 5, but it's the
7     resort guest registration, I know you didn't review
8     this because you just signed an iPad that wasn't
9     functioning with nothing on it.  But had you been able
10    to review it, you see here where it talks about you're
11    coming to this Beaches Resort and then they talk about
12    all the rights about Sandals Resorts, correct?
13           MR. SAFRA:  Objection, form.
14           MR. SUAREZ:  Objection form.
15 A.  Yes.
16 BY MR. WEGLARZ:
17 Q.  Do you see that?
18           MR. SAFRA:  And mischaracterization of the
19    document.  It refers to a company.
20           MR. WEGLARZ:  Called Sandals Resort.
21           MR. SAFRA:  International LTD, it does not
22    refer to resorts under the Sandals brand name which is
23    what your question said which is misleading and
24    improper.
25           MR. WEGLARZ:  Well, I don't want to be

Page 289

1  misleading and improper.  So let's see.
2            MR. SAFRA:  I know because I wrote the
3     document.
4            MR. WEGLARZ:  Well, it's a pretty good
5     document.
6  BY MR. WEGLARZ:
7  Q.  So it looks like according to the Sandals and Beaches
8     folks, when you register at a Beaches resort, you know
9     what -- who they want you to discharge right away?
10    Sandals Resorts International.
11           MR. SAFRA:  Objection, form.
12           MR. SUAREZ:  Objection.
13 BY MR. WEGLARZ:
14 Q.  It sure sounds like those two companies are the same
15    to me.
16           MR. SAFRA:  Objection, is there a question?
17           MR. WEGLARZ:  No.
18 BY MR. WEGLARZ:
19 Q.  You were asked a lot of questions about what happened
20    on May the 8th; you remember that, right?
21 A.  Yes.
22 Q.  You were asked about alcoholic drinks that you
23    consumed that day, correct?
24 A.  Yes.
25 Q.  The one thing you weren't asked about is did you eat

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 290

1     at all that day?
2  A.  Of course.
3  Q.  Okay.  Did you have breakfast that day?
4  A.  Yes.
5  Q.  Did you have lunch that day?
6  A.  Yes.
7  Q.  Did you have dinner?
8  A.  Yes.
9  Q.  And this was an all inclusive resort, correct?
10 A.  Yes.
11 Q.  Now, all inclusive, does that mean like everything is
12    included, if you want to get food, you just get food.
13    You don't have to pay a separate bill for that?
14        MR. SAFRA:  Objection, form.
15 A.  I believe it meant everything, if you wanted to get
16    more food, you could go get more food.
17 BY MR. WEGLARZ:
18 Q.  Can you tell me anything more about what you ate or
19    how much you ate that day on May the 8th, did you eat
20    a lot, a little?
21        MR. SAFRA:  Objection, form.
22 A.  I do remember because it was the last day that we were
23    going to be there at the resort, I wanted to make sure
24    that I at least tested any kind of food they had for
25    breakfast for sure, so I had almost one of everything.

Page 291

1  BY MR. WEGLARZ:
2  Q.  All right.
3  A.  Because when we go back home, it's gone.
4  Q.  And what about for dinner?  What did you have for
5     dinner?
6  A.  I believe we went to the Italian restaurant and I
7     would have definitely gotten some sort of pasta.
8  Q.  You filled yourself up, fair to say?
9         MR. SAFRA:  Objection, form.
10        MR. SUAREZ:  Objection, form.
11 A.  Yeah.
12 BY MR. WEGLARZ:
13 Q.  You were completely full after you had dinner that
14    evening, correct?
15        MR. SAFRA:  Objection, form.
16        MR. SUAREZ:  Objection, form.
17        She doesn't eat like you, Todd.
18 A.  Yeah.  I was completely stuffed.
19 BY MR. WEGLARZ:
20 Q.  And about what time do you think you finished dinner
21    that evening?
22 A.  I'm not 100 percent sure.
23 Q.  Do you recall what you ate besides pasta for dinner?
24        MR. SAFRA:  Objection, form.
25        MR. SUAREZ:  Objection, form.

Page 292

1  A.  Possibly some bread with it.
2  BY MR. WEGLARZ:
3  Q.  And do you recall having lunch that day too?
4         MR. SUAREZ:  Objection, form.
5  A.  Yes.
6  BY MR. WEGLARZ:
7  Q.  And what did you have for lunch?
8  A.  I believe I had pasta then too.  I like pasta.
9  Q.  That's good.  Now, you were asked quite a few
10    questions on the statement that you provided to the
11    police; do you remember that?
12 A.  Yeah.
13 Q.  And you were asked questions about on May the 8th when
14    you met up with or you're standing near Dwight and the
15    twin, correct, do you remember that on the path?
16        MR. SUAREZ:  Objection to form.
17 A.  Yeah.
18 BY MR. WEGLARZ:
19 Q.  I'm going to show you, do you have a copy of your
20    statement there in front of you?  Yeah, you do.  It's
21    on page 3.  It's the first paragraph, maybe halfway
22    down, see where it says, "I saw Dwight passing and
23    Amber said let's go hang out," do you follow me?
24    Wait, it's different.
25        MR. SUAREZ:  Here.  That's the one we

Page 293

1     actually marked.
2  BY MR. WEGLARZ:
3  Q.  "Let's go hang out and we said, 'Hey, Dwight,' and he
4     stopped and we went to where he was at the center of
5     the path"; do you see that?
6  A.  Yeah.
7  Q.  It says, "where the two twins were."  It says, "Amber,
8     Dwight and I chat for a while.  Amber and I were
9     dancing because we could hear the music from where we
10    were," correct?
11 A.  Right.
12 Q.  Maybe I heard the questions wrong, it's possible, but
13    I thought they're asking you were you also dancing and
14    singing in that area, you weren't also singing at that
15    time, right?
16 A.  No.  We had just --
17        MR. SUAREZ:  Objection to form.
18 A.  We had just come from singing.
19 BY MR. WEGLARZ:
20 Q.  So you met up in this area, you stood over there with
21    Dwight and you were dancing a little bit because you
22    could still hear the music from where you were,
23    correct?
24        MR. SUAREZ:  Objection to form.
25 A.  From the main stage area, yeah.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 294

1  BY MR. WEGLARZ:
2  Q.  Then you described for us how you got into that room,
3     correct?
4  A.  Yes.
5  Q.  Did you go in that room to get Amber?
6  A.  Yes.
7  Q.  You wanted to get her and --
8        MR. SAFRA:  Objection, form to prior
9     question.
10 BY MR. WEGLARZ:
11 Q.  You wanted to get her out of that room, correct?
12       MR. SUAREZ:  Objection, form.
13       MR. SAFRA:  Objection, form.
14 A.  Yes.
15 BY MR. WEGLARZ:
16 Q.  And I'm not going to take you through what happened
17    inside that room because we've spent a lot of time on
18    that.  But after -- after you were -- let me back up.
19       Without having to go into those assaults,
20    let me ask you this question.  You were assaulted by
21    three different Beaches Resort employees, correct?
22       MR. SUAREZ:  Objection to form.
23 A.  Yes.
24 BY MR. WEGLARZ:
25 Q.  And you were asked a lot of questions, oh, you didn't

Page 295

1     scream, you didn't yell, do you remember all those
2     questions?
3        MR. SAFRA:  Objection, form.
4  A.  Of course.
5  BY MR. WEGLARZ:
6  Q.  Let me ask you, Paiton, why didn't you scream while
7     you were being assaulted by three different male
8     resort employees?
9        MR. SAFRA:  Objection, form.
10       MR. SUAREZ:  Objection, form.
11 A.  Because I was terrified and in shock still and
12    paralyzed.  I couldn't move.  I couldn't do anything.
13    Because no amount of training of any sort can get you
14    prepared to be in that situation.
15 BY MR. WEGLARZ:
16 Q.  Okay.  After these assaults, we spent a little bit of
17    time on asking you about, well, you know, did you see
18    Amber after the assaults, do you remember talking
19    about that?
20 A.  Yes.
21 Q.  Explain that for me.  Where do you recall Amber being
22    the first time you saw her after the assaults while
23    you were still in the room?
24       MR. SAFRA:  Objection to form.
25       MR. SUAREZ:  Objection to form.

Page 296

1  A.  Right outside the door that we all entered and exited.
2  BY MR. WEGLARZ:
3  Q.  All right.  If she is right outside the door, was the
4     door closed?
5  A.  It was cracked.
6        MR. SUAREZ:  Objection, form.
7  BY MR. WEGLARZ:
8  Q.  And the only reason why you were inside of that room
9     was because a resort employee had a key and opened up
10    that door, correct?
11       MR. SAFRA:  Objection, form.
12 A.  Correct.
13 BY MR. WEGLARZ:
14 Q.  And then all of a sudden, you find yourself inside of
15    a dark, loud, maintenance room with old laundry and
16    sheets all over the place; do you recall that?
17       MR. SAFRA:  Objection, form.
18       MR. SUAREZ:  Objection, form.
19 A.  Yes.
20 BY MR. WEGLARZ:
21 Q.  And this was really a room that could only be accessed
22    by employees, correct?
23       MR. SAFRA:  Objection, form.
24       MR. SUAREZ:  Objection, form.
25 A.  Yes.

Page 297

1  BY MR. WEGLARZ:
2  Q.  And really it was because of this employment
3     relationship that allowed these employees to commit
4     this crime, correct?
5        MR. SAFRA:  Objection.
6        MR. SUAREZ:  Objection, form.
7  A.  Yes.
8  BY MR. WEGLARZ:
9  Q.  They had the security to know they could lock the door
10    from the inside to make sure other people couldn't get
11    in while they were committing crimes, correct?
12       MR. SAFRA:  Objection, form.
13       MR. SUAREZ:  Objection, form.
14 A.  Correct.
15 BY MR. WEGLARZ:
16 Q.  After the assaults, you had a chance to take a look at
17    that room, correct?
18 A.  Yes.
19       MR. SUAREZ:  Objection, form.
20 BY MR. WEGLARZ:
21 Q.  Did that room look like that perhaps assaults had been
22    going on there before?
23       MR. SAFRA:  Objection, form, speculation.
24       MR. SUAREZ:  Objection, form.
25       MR. SAFRA:  Speculation.

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 298

1  A.  There were buttons from what I assumed to be other
2     pants or shorts in the room.  And I know my bracelet
3     was torn off, that was from that assault, not a
4     previous one.
5  BY MR. WEGLARZ:
6  Q.  And there was an old used condom on the floor?
7        MR. SAFRA:  Objection, form.
8        MR. SUAREZ:  Objection, form.
9  A.  Yes.
10 BY MR. WEGLARZ:
11 Q.  And the only people who can access that room are
12    employees, correct?
13       MR. SUAREZ:  Objection, form.
14 A.  As far as I'm aware.
15 BY MR. WEGLARZ:
16 Q.  And there was a sign outside of the door that said
17    authorized personnel only, correct?
18       MR. SUAREZ:  Objection, form.
19 A.  Yes.
20 BY MR. WEGLARZ:
21 Q.  When Jermaine was flirting with you and when Jermaine
22    was asking for your Facebook name and your Instagram
23    name and asking whether you would -- whether you're
24    going to any parties or clubs off the resort, you
25    don't recall any resort worker or resort manager

Page 299

1     coming around and telling Jermaine not to engage in
2     that behavior, correct?
3        MR. SAFRA:  Objection, form.
4        MR. SUAREZ:  Objection, form.
5  A.  Yeah, I don't remember that happening.
6  BY MR. WEGLARZ:
7  Q.  Did you almost -- did you get the feeling that most of
8     the resort staff was hitting on the younger women?
9        MR. SAFRA:  Speculation.
10       MR. SUAREZ:  Objection, form.
11       MR. SAFRA:  Objection, form.
12 BY MR. WEGLARZ:
13 Q.  Let me ask a different question.  Did you feel like
14    most of the resort staff, the male resort staff were
15    hitting on you and Amber?
16       MR. SAFRA:  Objection, form.
17       MR. SUAREZ:  Objection, form.
18 A.  There was multiple that were.
19 BY MR. WEGLARZ:
20 Q.  I mean, this just wasn't some random act, maybe
21    Jermaine just said it once and you never experienced
22    it again during your several day stay, this is
23    something you experienced by a resort staff worker on
24    a daily basis, correct?
25       MR. SUAREZ:  Objection, form.

Page 300

1        MR. SAFRA:  Objection, form.
2  A.  Correct.
3  BY MR. WEGLARZ:
4  Q.  It was pretty much the culture over there, correct?
5        MR. SAFRA:  Objection, form.
6        MR. SUAREZ:  Objection, form.
7  A.  Yes.
8        MR. WEGLARZ:  That's all I have.
9        MR. SAFRA:  I have follow-up.
10         RE-EXAMINATION
11 BY MR. SAFRA:
12 Q.  When you're standing outside the room and you saw the
13    sign that said employees only and the door is locked,
14    remember --
15       MR. WEGLARZ:  Mischaracterization.
16 BY MR. SAFRA:
17 Q.  I'm sorry, when you're standing outside the room and
18    it says unauthorized - or authorized personnel only --
19    what did the sign say?
20       MR. SUAREZ:  It says danger, authorized
21    personnel only.
22 BY MR. SAFRA:
23 Q.  When you're standing outside the room and you see a
24    sign, it says danger, authorized personnel only, and
25    the door is closed and your friend Amber is inside,

Page 301

1     you know that's a place you're not supposed to be,
2     right?
3  A.  Right.
4  Q.  If it caused you concern like your counsel asked you
5     about, why didn't you go get help?
6  A.  Because my first main concern was getting Amber.
7  Q.  So then you just stood out there for a few minutes
8     when it's your main concern to go get her and you
9     didn't even try to open the door according to your
10    sworn testimony earlier; isn't that true?
11 A.  I didn't try to open the door because I didn't have a
12    key.
13 Q.  So you just stood there for two minutes and didn't ask
14    someone for anything and in your sworn testimony
15    earlier, you said you didn't say anything to Dwight,
16    you just stood and didn't even talk to him according
17    to your testimony earlier as you stood outside the
18    door; isn't that true?
19 A.  Yeah.
20 Q.  So you're concerned about your friend Amber, you're
21    standing outside a room that says danger authorized
22    personnel only for two minutes with an employee and
23    you say nothing and made no attempts to go inside,
24    correct?
25 A.  Correct.  But I had no reason to assume she was being

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 302

1     harmed at that moment.
2  Q.  So then you didn't have the concern that your counsel
3     tried to make your testimony and leading you in his
4     answers -- in his questions either, did you?
5  A.  I had concern.
6  Q.  But your concern caused you to stand outside for two
7     minutes, say nothing to the employee you're talking to
8     before for a while, not ask him to open the door and
9     get Amber, not ask him for help or not go for help
10    yourself otherwise, correct?
11 A.  I wasn't following, sorry.
12 Q.  Your concern that you had as you stood outside this
13    closed door and this room that says authorized
14    personnel only caused you to stand there with an
15    employee you had previously been chatting with for a
16    while, for more than two minutes, say nothing to him
17    about your concern, not ask him to open the door, and
18    make no attempt to open the door yourself or go for
19    help from someone else; isn't that correct?
20 A.  Yes.
21 Q.  So then when someone comes and actually opens the door
22    with I think you said a basket of laundry and you have
23    this purported concern for Amber, you see Amber in the
24    doorway while you're outside the door, right?
25 A.  Yeah, and I went to -- I went to step in and grab her.

Page 303

1  Q.  You said nothing to her, though, when you saw her,
2     correct?
3  A.  Correct.
4  Q.  Did you say, "Amber, what are you doing?"
5  A.  Not that I remember.
6  Q.  When you see a sign that says authorized personnel
7     only, do you stand outside the room because you know
8     you're not supposed to go in and call for Amber or do
9     you enter a room that you're not supposed to be in?
10    You entered the room, right?
11 A.  I took one step in the room to grab her hand.
12 Q.  So the answer is yes?
13 A.  Yes.
14 Q.  Okay.  Now, your counsel asked you a bunch about
15    rules, let's talk about rules for a moment.  You
16    understand you're only supposed to take prescription
17    drugs if they're prescribed for you?
18 A.  Yes.
19 Q.  So when you got Adderall from a friend, you understand
20    that's against the rules to take it if it's not
21    prescribed for you?
22 A.  Yes.
23 Q.  Did you listen to those rules or did you take the
24    Adderall?
25 A.  I took the Adderall.

Page 304

1  Q.  Okay.  So the fact that someone told you or you had
2     knowledge that it's against the rules to take
3     prescription drugs that aren't for you, you still did
4     it, correct?
5  A.  Yes.
6  Q.  Okay.  Are you aware of the drinking age in Jamaica of
7     18?
8  A.  Yes.
9  Q.  Okay.  How old was Amber when she was with you?
10 A.  She was 17.
11 Q.  Did you have that knowledge about the 18 drinking age
12    in Jamaica before you went on the trip?
13 A.  Yes.
14 Q.  So when you went on the trip having known of that
15    drinking rule beforehand, did you tell Amber to not
16    drink because she's 17 and that's against the rules?
17 A.  I wasn't her mother.  It wasn't my responsibility to
18    tell her that.
19 Q.  Okay, but you drank with her the whole trip?
20 A.  I -- I never was sure if she had actual alcohol in her
21    beverage.  I didn't watch them make her beverages.  I
22    didn't watch them make mine.
23 Q.  All the times you were at the bar with Amber on this
24    trip, did you ever hear her order a drink?
25 A.  Yeah.

Page 305

1  Q.  Okay.  When you heard her order a drink, did it have
2     alcohol in it at any time?
3  A.  I don't know.
4  Q.  Okay.  So in all the times you were at the bar, as you
5     sit here today you don't know even if on one occasion
6     you heard Amber order a drink with alcohol?
7  A.  I don't know if she ever asked for alcohol.
8  Q.  Do you know her to have been in your presence when she
9     had an alcoholic drink in her possession at the
10    resort?
11 A.  I don't know.
12 Q.  Under oath, this is played back for a jury someday,
13    your testimony is that during the entire trip and all
14    of the drinks you had, three, four, five, six
15    sometimes a day, you don't remember one occasion where
16    Amber was with you also and she had alcohol in your
17    drink -- in her drink?
18 A.  I can't be 100 percent sure.
19 Q.  And you don't recall on one occasion ever hearing her
20    order a drink with alcohol?
21 A.  I can't be 100 percent sure.
22 Q.  Do you believe that she was drinking alcohol while
23    you were on the trip?
24 A.  I don't know.
25 Q.  Did you ever ask her, Amber, that's a drink that looks

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 306

1    like a tropical drink with alcohol like we saw in the
2    photo, the purple one, for example, that was shown to
3    you as part of an exhibit, did you say, "Does that
4    have alcohol?  It's against the rules for you to be
5    drinking because you're under the age of 18," as her
6    legal guardian as you called it?
7  A.  I wasn't her mother.
8  Q.  Okay.  But you're aware of those rules and someone's
9    in your presence that may be breaking the rule and you
10    did nothing to see if it should be stopped or was
11    happening, right?
12  A.  I kept her in my vision at all times if we weren't
13    with our parents.
14  Q.  But my question was, you did nothing to see if the
15    drinks she had that looked like it might have alcohol
16    in it had it in it or was following the rules at any
17    time, correct?
18  A.  Correct.
19  Q.  So the existence of a rule and your knowledge of a
20    rule doesn't really play a factor in whether you're
21    going to follow it or not always, correct, it's
22    circumstantial?
23        MR. WEGLARZ:  Form objection,
24    argumentative.
25  BY MR. SAFRA:

Page 307

1  Q.  You can answer.
2        MR. WEGLARZ:  Do you remember the question?
3  A.  Not really.
4  BY MR. SAFRA:
5  Q.  The existence of a rule doesn't necessarily -- and
6    your knowledge of it doesn't necessarily mean you're
7    going to follow it; do you agree with that?
8  A.  Depending on circumstances.
9  Q.  Have you ever been in Detroit?
10  A.  To Detroit?
11  Q.  Yes.
12  A.  Yes.
13  Q.  How far away is Detroit from here or where you live?
14  A.  I don't know.
15  Q.  When was the last time you went to Detroit?
16  A.  Last winter.
17  Q.  Was this after the accident?
18  A.  Yes.
19  Q.  I mean the incident?
20  A.  Yes.
21  Q.  Let me ask again, is it after the incident?
22  A.  Yes.
23  Q.  Who did you go with?
24  A.  My work.
25  Q.  Are you aware of the government issuances or news

Page 308

1    articles regarding crime in Detroit or levels of
2    warning?
3  A.  I don't know specifics.
4  Q.  Did you look into it?
5  A.  No.
6  Q.  If someone told you that the crime in Detroit or
7    levels of warnings for travelers was something along
8    the lines of the types of crimes that were occurring
9    in Jamaica, would you not go to Detroit?
10        MR. WEGLARZ:  Form objection to that.
11  A.  The reason I went to Detroit was with my work so that
12    we could get work done for our boat show, so I know
13    that I was always going to be safe around the guys
14    that I worked with.
15  BY MR. SAFRA:
16  Q.  So if it's going with someone from work to an area
17    with certain levels, then that's an instance where you
18    might go still?
19        MR. WEGLARZ:  Sorry, hold on.
20  BY MR. SAFRA:
21  Q.  You can strike that, I'll ask the question again.  If
22    this work trip happened to be to Jamaica knowing what
23    you now have been told from your counsel about safety
24    or warnings, would you not go on that trip or is it
25    then okay to go because it's part of your work trip

Page 309

1    and your work people?
2  A.  I wouldn't go.
3  Q.  Okay.  What if I told you Detroit has the same level
4    of warnings as -- excuse me?
5        MR. WEGLARZ:  They don't.  That's a
6    misrepresentation.
7        MR. SAFRA:  Actually it's not.
8        MR. WEGLARZ:  Oh, it is, I guarantee it.
9        MR. SAFRA:  Well, you'll find out.
10        MR. WEGLARZ:  All right.  Good.
11  BY MR. SAFRA:
12  Q.  If I told you, let's assume Detroit has the same level
13    of warnings as Jamaica, you would not go to Detroit
14    anymore?
15        MR. WEGLARZ:  Form objection.
16  A.  I don't know.
17  BY MR. SAFRA:
18  Q.  So if I asked if you'd go to Jamaica again, you say to
19    counsel I wouldn't go if I'd known that.  The truthful
20    answer is I don't know, correct?
21  A.  No.
22        MR. WEGLARZ:  No, it's not.  Now you're
23    arguing with her.
24        MR. SAFRA:  You can object to form.
25  BY MR. SAFRA:

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 310

1  Q. You were asked about your last day of the trip and the
2     food you ate, do you recall that line of questioning?
3  A. Yes.
4  Q. And you said how you wanted to taste everything?
5  A. Yes.
6  Q. You wanted to make sure you got your money's worth the
7     last day and take advantage of your last day of
8     vacation, right?
9  A. Yes.
10 Q. Same applies to alcohol consumption, right?
11 A. No.
12 Q. You wanted to drink as much as you could that last day
13    before your vacation was over and no longer free
14    drinks, right?
15 A. No.
16       MR. SAFRA: No further questions.
17       MR. WEGLARZ: Anything for you, Luis?
18       MR. SAFRA: Should I address that or just
19    leave it?
20       MR. SUAREZ: I think it's a breach of
21    contract, you should.
22 BY MR. SAFRA:
23 Q. Okay. Sorry I forgot about this. You were shown
24    Exhibit 20 which was that letter that you had not seen
25    before?

Page 311

1  A. Yeah.
2  Q. But there's some topics addressed and I'll ask if you
3     have any knowledge of it. Do you understand that
4     there was an offer by the hotel that you stayed at to
5     reimburse you for the cost of the trip?
6  A. I don't remember.
7  Q. Have you ever been asked if you wanted to accept or
8     decline the reimbursement of the costs of the trip to
9     Jamaica in May?
10 A. I don't remember.
11 Q. Have you been back to Jamaica since?
12 A. Not in a million years.
13 Q. But you were actually going to go for the criminal
14    trial, right?
15 A. If it was absolutely necessary and I had to face them,
16    then I would go.
17 Q. Do you need a moment?
18 A. I'm good.
19 Q. Do you understand that your mom had reached out to the
20    Sandals or Beaches Hotel regarding that trip?
21 A. I don't remember.
22 Q. Were you ever told that she reached out to them
23    because if she goes to Jamaica, she'd need a place to
24    stay?
25 A. I don't remember.

Page 312

1  Q. And that there was a willingness to stay at a Sandals
2     or Beaches Resort?
3  A. I don't remember.
4  Q. And a request to reimburse for the travel expenses?
5  A. I don't remember.
6  Q. Do you agree that if someone is requesting in a
7     subsequent trip, subsequent to May 2015 to go and stay
8     at one of those resorts while in Jamaica, that you
9     would only go if you felt it was safe, right?
10       MR. WEGLARZ: Calls for speculation.
11    Objection.
12 A. I don't know.
13 BY MR. SAFRA:
14 Q. Would you go to the hotel if you thought it wasn't
15    safe? I think your answer to counsel was you wouldn't
16    go, right?
17 A. No.
18 Q. No, you wouldn't go?
19 A. I would not go.
20       MR. SAFRA: I have no further questions.
21       MR. SUAREZ: I have nothing further.
22       MR. WEGLARZ: I have just one or two.
23       RE-EXAMINATION
24 BY MR. WEGLARZ:
25 Q. The last time you went to Detroit, you were never told

Page 313

1     or warned that the State Department was concerned
2     about the number of sex assaults being committed by
3     the hotel workers in Detroit, correct?
4        MR. SAFRA: Objection, form.
5        MR. SUAREZ: Objection to form.
6  A. Correct. I never stayed at a hotel.
7  BY MR. WEGLARZ:
8  Q. Okay. There's a lot of crime in Detroit, we all know
9     that, right?
10 A. Common knowledge, yeah.
11 Q. Okay. But it's not common knowledge that Detroit has
12    hotels where the resort staff are raping people and
13    raping their guests, correct?
14       MR. SAFRA: Object to form.
15       MR. SUAREZ: Object to this question for
16    form and the prior question, I don't know if the court
17    reporter heard me.
18 BY MR. WEGLARZ:
19 Q. Go ahead.
20 A. Can you restate?
21 Q. Sure. There's a big difference between staying in a
22    location that has a high crime rate versus staying in
23    a resort or a hotel --
24       MR. SAFRA: Object.
25 BY MR. WEGLARZ:

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 314

1  Q.  -- with a warning saying that the hotel workers may
2      commit sex assault on a guest?
3           MR. SAFRA:  Objection to form.
4           MR. SUAREZ:  Objection to form.
5  BY MR. WEGLARZ:
6  Q.  Go ahead.
7  A.  There is a difference.
8  Q.  When you stayed in Detroit, I take it, you don't feel
9      comfortable walking around by yourself late at night
10     in the city of Detroit, correct?
11          MR. SUAREZ:  Objection to form.
12 A.  I've never had to.
13 BY MR. WEGLARZ:
14 Q.  And you never would, would you?
15          MR. SUAREZ:  Objection to form.
16 A.  No.
17 BY MR. WEGLARZ:
18 Q.  But if you stayed in Detroit and you stayed in a
19     hotel, you would feel safe staying inside your hotel
20     because that's where you're supposed to be safe,
21     correct?
22          MR. SAFRA:  Objection to form.
23          MR. SUAREZ:  Objection, form.
24          MR. WEGLARZ:  Okay.  Nothing else.
25          MR. SAFRA:  Read or waive?

Page 315

1  BY MR. WEGLARZ:
2  Q.  Oh, one other question, do you think that the resort
3      bartending staff would have knowledge of the drinking
4      age in Jamaica?
5           MR. SAFRA:  Objection to form.
6           MR. SUAREZ:  Objection to form.
7           MR. SAFRA:  Speculation.
8  A.  Yes.
9  BY MR. WEGLARZ:
10 Q.  Did the resort staff ever ask you for your ID when you
11     were ordering alcoholic drinks?
12          MR. SAFRA:  Objection to form.
13          MR. SUAREZ:  Objection to form.
14 A.  No.
15 BY MR. WEGLARZ:
16 Q.  Do you recall the resort staff or the bartending staff
17     ever asking for Amber's identification when she
18     ordered a drink?
19          MR. SAFRA:  Objection to form.  She's never
20     been in the presence of Amber where she recalls her
21     ordering alcoholic drinks, so how could she answer
22     whether they asked for ID?
23          MR. WEGLARZ:  Hold on.  I trust Luis.  I
24     thought the proper objection was just to say you
25     object and say form and that was it?

Page 316

1           MR. SAFRA:  It is, but if you are saying --
2           MR. WEGLARZ:  Hold on.  Is that correct?
3           MR. SUAREZ:  If you want to have the
4      conversation about objections, I'm happy to do so
5      later tonight over a beer, but for right now let's
6      finish this examination.  The witness is here.
7           MR. WEGLARZ:  There's this rule that only
8      Mr. Safra can do these long, verbose speaking
9      objections and nobody else.
10          MR. SAFRA:  No, that's not a rule, but when
11     you try to have your client answer under oath a
12     certain way and then change the testimony or ask
13     questions so she'll say yes to you when you lead her,
14     that is improper practice under Florida law.  So I
15     will give a speaking objection before she just takes
16     what you say as true and injects testimony as her own
17     that she has no personal knowledge of.
18          MR. WEGLARZ:  Fine.  Are you done with the
19     objection?
20          MR. SAFRA:  I guess it depends on your next
21     question.
22          MR. WEGLARZ:  But you are at least done
23     with the last question?
24          MR. SAFRA:  Yeah.
25          MR. WEGLARZ:  Thank you.

Page 317

1  BY MR. WEGLARZ:
2  Q.  The bartending staff seemed to have no problem serving
3      alcoholic drinks regularly to you and your friend
4      Amber, correct?
5           MR. SUAREZ:  Objection to form.
6           MR. SAFRA:  Objection to form, without
7      knowledge.
8  A.  They had no problem serving to me, no.
9  BY MR. WEGLARZ:
10 Q.  And even that night, May the 8th, by the repeated
11     questions you were asked, do you get the impression
12     that you're being accused of being really drunk and
13     intoxicated and that's why this incident happened?
14          MR. SAFRA:  Objection to form.
15          MR. SUAREZ:  Objection to form.
16 A.  Yeah.
17 BY MR. WEGLARZ:
18 Q.  Were you drunk and wasted and not in control of your
19     faculties at the time that these sex assaults
20     occurred?
21          MR. SAFRA:  Objection, form.
22          MR. SUAREZ:  Objection, form.
23 A.  Not at all.
24 BY MR. WEGLARZ:
25 Q.  When you had your last two or three alcoholic drinks,

f2a2c7a3-f397-4e57-92e8-f79d5cabe5b5

Page 318

1     I take it, those drinks were given to you by a
2     bartender, correct?
3           MR. SUAREZ:  Objection, form.
4   A.  Correct.
5   BY MR. WEGLARZ:
6   Q.  Did any bartender prior to giving you those drinks or
7     at the time of giving you those drinks, say ma'am, I'm
8     sorry, but you appear to be under the influence.  I
9     don't think it's a good idea for you to have another
10    drink, did anyone ever say anything like that to you?
11          MR. SAFRA:  Objection, form.
12          MR. SUAREZ:  Objection, form.
13  A.  Not that I can remember, no.
14          MR. WEGLARZ:  Okay.  That's all I have,
15    thanks.
16          RE-EXAMINATION
17  BY MR. SAFRA:
18  Q.  I have one question to follow up to the last part.
19    But you do know from the documents you reviewed that
20    your mom after seeing you that evening told Amber that
21    you guys need to slow down on your drinks?
22          MR. WEGLARZ:  Oh, now you're
23    misinterpreting the evidence because that text message
24    does not apply to the both of them, it applies to
25    perhaps one person, but not to Paiton.  So for that

Page 319

1     reason I object to the form of your question.
2   BY MR. SAFRA:
3   Q.  You are aware that after your mom saw you that evening
4     that she, according to the documents, sent a message
5     to Amber that said Amber, you need to stay with Paiton
6     and maybe slow down with the drinks, correct?
7   A.  Correct.
8   Q.  Does that remind you that Amber was drinking?
9   A.  She may have been, but I don't know for sure.
10  Q.  Your mom comes down -- your mom comes down to the bar
11    and she sees Amber for a brief moment and she knows
12    Amber's drinking and needs to slow down drinks, but
13    you're hanging out with her all night and for hours
14    and you can't even tell if she's had one drink, is
15    that what you want the record to reflect?
16  A.  She did not seem intoxicated.
17  Q.  That wasn't my question.
18  A.  To me.
19  Q.  My question was, your mother came down to the bar for
20    a few moments that evening and she could tell that
21    Amber needed to slow down on her drinks, correct?
22  A.  Apparently, yes.
23  Q.  And you'd been with Amber all night, right?
24  A.  Yes.
25  Q.  Is it your testimony under oath being with her all

Page 320

1     night that evening that you couldn't even tell if she
2     had one drink?
3   A.  Yeah.
4           MR. SAFRA:  No further questions.
5           RE-EXAMINATION
6   BY MR. WEGLARZ:
7   Q.  Do you agree that all, any and all alcohol consumed by
8     you or Amber would have been provided by the resort?
9           MR. SAFRA:  Objection, form.
10  A.  Yeah.
11  BY MR. WEGLARZ:
12  Q.  Did you guys ever bring in your own alcohol?
13          MR. SAFRA:  Objection, form.
14  A.  Not at all.
15  BY MR. WEGLARZ:
16  Q.  There would be no reason to because at an all
17    inclusive resort, they provide you with all the
18    alcohol, correct?
19          MR. SAFRA:  Objection, form.
20  A.  Right.
21          MR. WEGLARZ:  Okay, that's all.
22          MR. SAFRA:  Do you want to read or waive?
23          MR. WEGLARZ:  Waive.
24          MR. SUAREZ:  I have nothing further except
25    to say thank you.

Page 321

1           MR. SAFRA:  Thank you.
2           MR. WEGLARZ:  Did you also waive for Amber?
3           MR. SAFRA:  Yes.  I'm ordering the
4   original.
5           MR. SUAREZ:  Copy.
6           MR. WEGLARZ:  Copy.
7           (The deposition was concluded at 5:07 p.m.
8     Signature of the witness was not requested by
9     counsel for the respective parties hereto.)

Page 322

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                 ) SS
4    COUNTY OF WAYNE   )
5
6         I, KATHRYN L. JANES, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20                          Kathryn L. Janes
21
22              KATHRYN L. JANES, CSR-3442
23              Notary Public,
24              Wayne County, Michigan.
25   My Commission expires:  October 22, 2022