# EXHIBIT 34

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF MICHIGAN

 3                      MIAMI DIVISION

 4   PAITON E. BATER, AMBER R.

 5   TORRALVA, JANET DESANTIS,

 6   and MARGARET A. TORRALVA,

 7                  Plaintiffs,

 8        vs.                    Case No. 1:17-cv-21703

 9                               Hon. Marcia G. Cooke

10   UNIQUE VACATIONS, INC.,

11   a Delaware corporation, THE MARK

12   TRAVEL CORPORATION, a Nevada

13   corporation d/b/a Fun Jet Vacations,

14   DWIGHT DAVIS, JERMAINE DYER,

15   and WILLIAM TAPPER,

16   Jointly and Severally,

17                  Defendants.

18   _____

19

20        The Deposition of AMBER R. TORRALVA, VOLUME I,

21        Taken at 19390 West Ten Mile Road,

22        Southfield, Michigan,

23        Commencing at 4:01 p.m.,

24        Tuesday, September 24, 2019,

25        Before Lezlie A. Setchell, CSR-2404, RPR, CRR.
```

Page 2

```
1   APPEARANCES:
2
3   TODD J. WEGLARZ
4   Fieger, Fieger, Kenney & Harrington, PC
5   19390 West Ten Mile Road
6   Southfield, Michigan 48075
7   248.355.5555
8   tweglarz@fiegerlaw.com
9        Appearing on behalf of the Plaintiffs.
10
11  THOMAS E. SCOTT
12  STEVEN R. SAFRA
13  Cole, Scott & Kissane, PA
14  Dadeland Centre II
15  9150 South Dadeland Boulevard
16  Suite 1400
17  Miami, Florida 33156
18  786.338.9357
19  thomas.scott@csklegal.com
20  steven.safra@csklegal.com
21       Appearing on behalf of Defendant
22          Unique Vacations, Inc.
23
24
25
```

Page 3

```
1   APPEARNCES (Continuing):
2
3   PATRICIA MELVILLE
4   LUIS E. SUAREZ
5   Boies Schiller Flexner, LLP
6   100 Southeast Second Street
7   Suite 2800
8   Miami, Florida 33131
9   305.539.8400
10  pmelville@bsfllp.com
11  lsuarez@bsfllp.com
12       Appearing on behalf of Defendant
13          The Mark Travel Corporation.
14
15  ALSO PRESENT:
16  Tammy Gonzalez
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                  TABLE OF CONTENTS
2
3   WITNESS                                  PAGE
4   AMBER R. TORRALVA
5
6   EXAMINATION
7   BY MR. SAFRA                              5
8
9                     EXHIBITS
10
11  Exhibit                               Page
12  (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1   Southfield, Michigan
2   Tuesday, September 24, 2019
3   4:01 p.m.
4                  AMBER R. TORRALVA,
5        was thereupon called as a witness herein, and after
6        having first been duly sworn to testify to the truth,
7        the whole truth and nothing but the truth, was
8        examined and testified as follows:
9
10                  EXAMINATION
11  BY MR. SAFRA:
12  Q.   Could you please state your name for the record?
13  A.   Amber Torralva.
14  Q.   Have you ever had your deposition taken before?
15  A.   No.
16  Q.   Okay.  I'm going to start the deposition by going
17       through some of the general rules for a deposition.
18       You may have met with your counsel before and
19       discussed some, but I just want to make sure that we
20       have a common understanding as to some of the basics
21       of what's going to happen here and that you know what
22       to expect and that we can rely upon the testimony at
23       the end based upon us knowing that you were aware of
24       the instructions.
25            I'm going to ask you a series of questions
```

Page 6

1    about the lawsuit that you filed here and the incident
2    at the Beaches Ocho Rios Resort in Jamaica in May,
3    2015.  There might be some counsel that also ask
4    questions as well after I complete, including maybe
5    your own.
6  A.  Okay.
7  Q.  I ask that during the deposition -- naturally in
8    conversation you may anticipate what I might be asking
9    you and answer before I have an opportunity to maybe
10   finish the question.  We have a court reporter here
11   who is taking down things that we're asking, and it's
12   a lot more clear afterwards in the written transcript
13   that she's taking down that you let me finish my
14   question, and then I'll let you answer, and we'll go
15   back and forth like that.
16 A.  Okay.
17 Q.  Sometimes, though, in conversation I might be pausing
18   during a question or you might be pausing during an
19   answer, and we think the other one is finished and we
20   start talking, and that's okay if it happens, but if I
21   do that to you, please let me know because I'm not
22   meaning to stop you, and I want you to give full and
23   complete answers, and likewise, if it happens, I'll
24   let you know if I wasn't done with my question.  I'll
25   be happy to do that.  Does that sound fair?

Page 7

1  A.  Uh-huh.
2  Q.  One thing otherwise I'll say is she's taking down
3    statements both from you and me, so the response you
4    just gave just now of uh-huh doesn't really transcribe
5    into writing.
6  A.  Okay.
7  Q.  So I'd ask that you give audible answers because
8    saying things such as uh-huh or uh-uh or nodding of
9    the head doesn't let us know when we read it back
10   whether that was a yes or a no.
11 A.  Right.
12 Q.  So I will try to pay attention in case you do that,
13   and your counsel I'm sure will be doing the same and
14   may interject if it happens.
15 A.  Okay.
16 Q.  If you don't know an answer to a question or you're
17   not sure of something, that is fine.  We're here to
18   find out what you know.  If it's a matter of a lack of
19   understanding, feel free to let me know.  I would be
20   glad to rephrase the question.  Does that sound fair?
21 A.  Yes.
22 Q.  Okay.  If you answer a question that's asked, we will
23   assume that you understood the question as asked and
24   answered truthfully.
25 A.  Okay.

Page 8

1  Q.  If you need a break at any time, we can take a break.
2    I usually take a break every 45 to 60 minutes
3    naturally.  It seems we're going to start the
4    deposition here today, so we probably will just go,
5    and at the first break, you know, continue it until
6    tomorrow by agreement of counsel, but if you need a
7    break at any time, feel free and just let us know.  If
8    there is a question pending, though, you will have to
9    answer the question before we go on the break.
10 A.  Okay.
11 Q.  I think that pretty much covers the basics.  Your
12   counsel may object from time to time after I ask a
13   question and that's fine.  He's just preserving for a
14   later date a discussion with the Court or counsel.
15   You still have to answer the question unless your
16   counsel directs you not to.
17 A.  Okay.
18 Q.  Where do you currently reside?
19 A.  Where do I live?
20 Q.  Where do you live?
21 A.  I live in Wyoming with my mom.
22 Q.  When you say Wyoming, do you mean the City of Wyoming
23   in Michigan?
24 A.  Yes.
25 Q.  Can you state your address for the record?

Page 9

1  A.  Yes, 1519 40th Street.
2  Q.  We have to remember that we're in Michigan right now
3    and we know that, but someone who may be reading this
4    later may think you're talking about the State of
5    Wyoming.  Likewise, sometimes you might be using your
6    hands to maybe explain some of your answer.  Just
7    verbalize it if you can.  Sometimes it might happen
8    when we talk about the resort, you know, this is here,
9    this is there.  It's better to use a little bit more
10   description, so that way when we read it back later,
11   we know what "here" and "there" is.
12 A.  Right.
13 Q.  Back to address, did I ask you can you state your
14   current address?
15 A.  Yeah, 1519 40th Street, Wyoming, Michigan.
16 Q.  How long have you lived there?
17 A.  I want to say like five or six years.
18 Q.  If you don't know an exact answer, your mom can't help
19   you.  I know she's in the room for the deposition.
20   She's a party and she's allowed to be here.  No one
21   can help you answer, but if you give your best guess
22   or estimate, that's fine.  We're not holding you to if
23   you say five or six years and it's seven, that that's
24   something untruthful.  We know you're doing your best
25   and we appreciate that.

Page 10

1      MR. WEGLARZ:  Maybe I misinterpreted why
2   you looked over here.  I thought you did it so
3   Mr. Scott could hear you.
4   BY MR. SAFRA:
5   Q.   I think you were looking at your mom.  They can't help
6        you answer questions.
7   A.   Got it.
8   Q.   Were you living at that residence at the time in May,
9        2015?
10  A.   Yes.
11  Q.   Who do you currently live with?
12  A.   My mom.
13  Q.   Does anybody else live with you?
14  A.   Her boyfriend Silvano and his son and my sister.
15  Q.   Have they lived there since the incident?
16  A.   No.  It was just my mom, Silvano, and myself.
17  Q.   At the time of the incident?
18  A.   Yes.
19  Q.   Are you currently employed?
20  A.   Yes.
21  Q.   What do you do?
22  A.   I'm a server at Ginza.  It's a restaurant.
23  Q.   How long have you been employed there?
24  A.   I actually just moved there from my other job, so
25       about like a couple weeks.

Page 11

1   Q.   What did you do for employment prior?
2   A.   I was also a server at Sakura.  It's another
3        restaurant.
4   Q.   How long were you at Sakura?
5   A.   Three years.
6   Q.   Does that put you an employee at that restaurant at
7        the time of the incident?
8   A.   No.
9   Q.   Were you employed at the time of the incident?
10  A.   Yes.
11  Q.   What did you do at that time?
12  A.   I was a server at Logan's Roadhouse.
13  Q.   How long were you there?
14  A.   I want to say about a year.
15  Q.   Was that the job you had prior to Sakura?
16  A.   Yes.
17  Q.   Always as a server?
18  A.   Uh-huh.
19  Q.   Prior to that time, did you have any job?
20  A.   Yes.
21  Q.   Where?
22  A.   Steak 'n Shake.
23  Q.   Were you also a server?
24  A.   Uh-huh.
25  Q.   Any other employment?

Page 12

1   A.   No.
2   Q.   Were you also a student at the time of this incident
3        in May, 2015?
4   A.   Yes.
5   Q.   Where were you enrolled in school?
6   A.   Grandville High School.
7   Q.   What year were you?
8   A.   I was a junior in high school, 11th grade.
9   Q.   So this was the latter part of your junior year when
10       this incident occurred?
11  A.   Yes.
12  Q.   When I say "this incident," in case it's unclear, it
13       is the incident that is the subject of this lawsuit
14       that occurred at the resort in Jamaica on May 8, 2015.
15  A.   Yes.
16  Q.   Okay.  Do you have any other certifications or
17       degrees?
18  A.   No.
19  Q.   Do you have a high school diploma?
20  A.   Yes.
21  Q.   Any college courses?
22  A.   No.
23  Q.   Any other licenses?
24  A.   No.
25  Q.   Have you made any attempts to go to school post high

Page 13

1        school but delayed it for any reason?
2   A.   Well, I went to orientation, but I never continued
3        after that.
4   Q.   When was that?
5   A.   That was the fall after graduation.
6   Q.   So that would be in 2017?
7   A.   Yes.
8   Q.   Okay.  The fall of 2017?
9   A.   Uh-huh.
10  Q.   Is there any reason you didn't go on?
11  A.   I just felt like it wasn't for me at that time.
12  Q.   Have you for any reason not considered going back for
13       reasons pertaining to this lawsuit?
14  A.   No.
15  Q.   I was just checking for a double negative to make sure
16       that the question and answer was clear, so I was
17       reading mine back.  You can ignore me on that.
18  A.   Okay.
19  Q.   Prior to the trip to Jamaica in May, 2015, which I'll
20       ask you about in detail both, you know, pre-trip and
21       during the trip, had you ever prior to and separate
22       from that trip traveled prior to 2015?
23  A.   Yes.
24  Q.   Where did you travel to?
25  A.   I had gone to Florida.  I think that's about it.

Page 14

1   Q.   When did you go to Florida?
2   A.   We go every even year, we had a timeshare, so the year
3        was 2014.
4   Q.   So this was 2015, so in 2014 you went to Florida?
5   A.   Uh-huh.
6   Q.   How many times had you gone to Florida prior to this
7        incident?
8   A.   I'm not exactly sure.
9   Q.   Where is the timeshare?
10  A.   In Kissimmee.
11  Q.   Had you gone more than once?
12  A.   Yes.
13  Q.   Had you gone more than three times?
14  A.   Yes.
15  Q.   Okay.  Who's the "we" in the "we had a timeshare"?
16  A.   My family, so my mom and my dad, but she took over.
17  Q.   They got divorced?
18  A.   Yeah.
19  Q.   That's why I was asking the "we" because I didn't know
20       which maybe side of the family.  So it was a timeshare
21       that your parents had when they were together, and
22       then when they separated, your mother has the
23       timeshare?
24  A.   Yes.
25  Q.   What is your father's name?

Page 15

1   A.   Daniel Torralva.
2   Q.   What is your mother's name?
3   A.   Margaret Torralva.
4   Q.   Do you have any siblings?
5   A.   Yes.
6   Q.   Could you tell me their names and age?
7   A.   Yes, Amanda is 31, Angelea 28, Daniel 26, and Dakota
8        just turned 24.
9   Q.   Do you all have the same parents?
10  A.   Yes.  Actually, Angelea is 29.  Sorry.
11  Q.   Did any of them travel with you on the trip to
12       Jamaica?
13  A.   No.
14  Q.   Were they invited to go and just decided not to?
15  A.   I don't believe they were.
16  Q.   Do you know why is it that only you were going with
17       your mother on the trip?
18  A.   It was kind of like a girls trip.
19  Q.   You have sisters, so...
20  A.   Yeah, they were just not able to go.  They had kids
21       and stuff.
22  Q.   When you went to Florida and you stayed in your
23       timeshare, can you describe what type of place that
24       is?
25  A.   Yeah, it was a resort just like Summer Bay Resort to

Page 16

1        be exact.
2   Q.   Is that the name of it, Summer Bay Resort?
3   A.   Uh-huh.
4   Q.   Does it have a pool and water activities?
5   A.   Yeah.
6             MR. WEGLARZ:  For the court reporter, just
7        make sure you say yes or no instead of uh-huh or
8        uh-uh.
9             THE WITNESS:  Okay.
10            MR. WEGLARZ:  You're doing great, though.
11  BY MR. SAFRA:
12  Q.   Does it have a pool and water sports activities?
13  A.   Yes.
14  Q.   When you were there in 2014, did you do any of those
15       activities?
16  A.   I had went to the pool, yes, but --
17  Q.   Did it have a slide?
18  A.   There was no slides.
19  Q.   Did it have lifeguards?
20  A.   I don't remember.  Most likely.
21  Q.   Were you involved at all in coordinating or scheduling
22       the trip?
23  A.   No.
24  Q.   Who did that?
25  A.   My mom.

Page 17

1   Q.   Did you ever have any conversations with your mom
2        prior to that trip about safety concerns or things you
3        should or should not do when you were in Florida at
4        this resort?
5   A.   No.
6   Q.   You were 16 at the time?
7   A.   Yes.
8   Q.   Did your mom give you any restrictions while at the
9        resort which you could or could not do or go?
10  A.   Yes.
11  Q.   Tell me what those were.
12  A.   She just said to always be with somebody, never to be
13       alone, and to not leave the resort.
14  Q.   Are those the same instructions that your mom gave you
15       relative to your trip to Jamaica?
16  A.   Yes.
17  Q.   Did she give you any different or additional
18       instructions other than the ones that she also gave
19       you the year prior in Florida?
20  A.   I don't believe so.
21  Q.   Would you say the conversations with your mother
22       regarding safety or what you should or should not do
23       when going to the resort in Jamaica were the same as
24       when you went to the resort in Florida?
25  A.   Yes.

Page 18

1   Q.   Did your mom ever tell you that if you left the resort
2        and were by yourself and didn't listen to her
3        instructions, that you wouldn't be allowed to go on
4        the trip?
5   A.   I don't think she said that, but I knew she didn't
6        want me to do those things.
7   Q.   So for the Florida trip in 2014 or the Jamaica trip in
8        2015, your mother did not tell you at any time that if
9        you didn't abide by her instructions, that the trip
10       would be cancelled in a sense; is that correct?
11  A.   Yes.
12  Q.   For the trip to Jamaica in May, 2015, do you know who
13       booked the trip for you?
14  A.   I believe it was Janet.
15  Q.   And what's the basis for that belief?
16  A.   She just did most of like the planning and booking.
17       That's what I know.
18  Q.   Did you hear that from Janet herself or from her
19       mother or see a document?
20  A.   I knew from my mom.
21  Q.   Did you know that before the trip?
22  A.   Yes.
23  Q.   Okay.  And I say before the trip because there's times
24       where we might be asking you questions where it's
25       important to know was it before the trip or after the

Page 19

1        trip, especially when it comes to when we talk about
2        the actual event and things that happened in which you
3        maybe personally saw or knew versus maybe what you
4        learned afterwards.
5   A.   Okay.
6   Q.   So that's why sometimes it might be important, you
7        know.  I ask that you just try to pay attention to
8        time sequences so that way we understand exactly what
9        you're meaning.
10  A.   Okay.
11  Q.   Did you have any involvement in the booking of the
12       trip to Jamaica prior to May, 2015, when you arrived
13       at the resort?
14  A.   No.
15  Q.   Were you ever asked anything relative to the booking
16       by either your mom or Janet in terms of things you
17       wanted to do or places to go?
18  A.   No.  They asked me about like some things that we
19       could potentially like want to do but that was about
20       it.
21  Q.   Like excursions?
22  A.   Yes.
23  Q.   Such as going to waterfalls?
24  A.   Yes.
25  Q.   Anything pertaining to travel arrangements or choosing

Page 20

1        of hotels?
2   A.   No.
3   Q.   Was that all decided by Janet and your mom?
4   A.   I believe so.
5   Q.   Okay.  Did you understand that Janet or your mom were
6        booking a trip on your behalf?
7   A.   Yes.
8   Q.   Did you allow them to do that?
9   A.   Yes.
10  Q.   Would you view it as Janet did it for you or your mom
11       did it for you or both?
12  A.   Both I guess.
13  Q.   Okay.  Did you consent to them booking a trip under
14       your name and on your behalf?
15  A.   Yes.
16  Q.   Did you at any time prior to arriving in Jamaica in
17       May, 2015, for your stay at the Beaches Ocho Rios
18       Resort ever tell your mom or Janet that you withdraw
19       your consent or agreement for them to book a trip for
20       you to Jamaica?
21  A.   No.
22  Q.   Did you ever talk to your mom or Janet about any
23       advertisements or news articles or radio commercials
24       or TV commercials or anything that you saw pertaining
25       to a Jamaican hotel prior to May, 2015, and your

Page 21

1        arrival in Jamaica?
2   A.   No.
3   Q.   Did you ever see anything like that that pertained to
4        the trip pre your arrival?
5   A.   No.
6   Q.   And the decision to choose -- strike that.
7             Did you understand that your trip initially
8        was booked at a hotel called the Moon Palace?
9   A.   No.
10  Q.   Did you ever learn of the name of the hotel you were
11       going to stay at before you arrived in Jamaica in May,
12       2015?
13  A.   I did hear about it, but it got cancelled, so...
14  Q.   It got cancelled?
15  A.   Or something.
16  Q.   And then re-booked at another hotel?
17  A.   Yeah.
18  Q.   What do you know about that that you recall?
19  A.   I don't really know much.
20  Q.   So if the name of the first hotel was Moon Palace,
21       that may be true; you just don't recall?
22  A.   I do know that was true because of like talk that I've
23       heard.
24  Q.   After the incident?
25  A.   I don't know.

Page 22

1  Q.  Okay.  And then the name of the second hotel was the
2      Beaches Ocho Rios Resort?
3  A.  Yes.
4  Q.  Did you hear anything prior to arriving in Jamaica
5      regarding why it was changed or cancelled?
6  A.  I thought that there was a fire.  I could be wrong,
7      though.  I never like looked it up or anything.
8  Q.  Did you do any research online into the hotels --
9  A.  No.
10 Q.  Let me just finish the question.
11 A.  Sorry.
12 Q.  I know it's not intentional.
13         Did you ever do any research online before
14     arriving in Jamaica regarding the Moon Palace Hotel?
15 A.  No.
16 Q.  Did you do any research online prior to arriving in
17     Jamaica in May, 2015, regarding the Beaches Ocho Rios
18     Resort?
19 A.  No.
20 Q.  Did you talk to anybody, friends, family, anyone other
21     than your mother or Janet regarding either of those
22     hotels prior to going to Jamaica?
23 A.  No.
24 Q.  Did you have any concerns about going to Jamaica prior
25     to arriving in May, 2015?

Page 23

1  A.  No.
2  Q.  Did you think that traveling to Florida in 2014 --
3      strike that.
4         Did you have any concerns prior to going to
5      Florida?
6  A.  No.
7  Q.  Did you think that traveling to Florida when you went
8      in 2014 might not be safe?
9  A.  No.
10 Q.  Did you think that travel to Jamaica might not be
11     safe?
12 A.  It didn't cross my mind, no.
13 Q.  Did your mom ever mention to you that it crossed her
14     mind prior to going in May, 2015?
15 A.  No.
16 Q.  Did Janet?
17 A.  I don't think so.
18 Q.  Did you ever have any conversations with Paiton about
19     the booking?
20 A.  No.
21 Q.  Did you ever speak yourself to any travel agents or
22     someone that you associated as being a travel agent or
23     with a travel agent relative to the trip to Jamaica in
24     May, 2015?
25 A.  No.

Page 24

1  Q.  Did you speak with anybody that you thought might be a
2      travel company or a tour operator?
3  A.  No.
4  Q.  Did you speak with anybody at the hotel prior to
5      arrival?
6  A.  No.
7  Q.  Do you know who owns the hotel?
8  A.  No.
9  Q.  There's three individuals that are associated with the
10     incident, and the names are Jermaine Dyer, Dwight
11     Davis, and William Tapper.  Do you know those names?
12 A.  Yes.
13 Q.  Do they work at the hotel?
14 A.  Yes.
15 Q.  Do you know who their employer is?
16 A.  No.
17 Q.  Do you know what their job was at the hotel?
18 A.  I thought that they might have been like lifeguards.
19 Q.  Why is that?
20 A.  I saw one of them at least in like uniform.
21 Q.  What do you mean by uniform?
22 A.  Like in a lifeguard uniform.
23 Q.  Okay.  Were they by the water area?
24 A.  Yes.
25 Q.  Where?

Page 25

1  A.  By the pool.
2  Q.  Okay.
3  A.  And slides, I think, by the slides.
4  Q.  You said one of them.  Would that be for all three?
5  A.  No.
6  Q.  Do you know which one you're talking about of the
7      three?
8         MR. SAUREZ:  Can I ask you very politely to
9      speak up a little bit.
10        THE WITNESS:  Yeah, sorry.
11        MR. SAUREZ:  I appreciate that.  I'm soft
12     spoken as well, so I will return the favor later on in
13     this deposition, okay?
14        THE WITNESS:  Thank you.
15 BY MR. SAFRA:
16 Q.  You mentioned one of them; did I hear you right?
17 A.  Yes.
18 Q.  Do you know which one?
19 A.  I don't anymore.
20 Q.  Okay.  Did you encounter all three of them only at
21     some point during your stay, all three of these
22     individuals, but recall only one of them in the role
23     of lifeguard?
24 A.  I believe so.
25 Q.  Explain to me if that's not correct.  I'm trying to

Page 26

1    get your understanding.
2  A.  Can you rephrase the question?
3  Q.  I asked if you have you seen all three of these
4      individuals during your stay?
5  A.  Yes.
6  Q.  So one of them you saw by the water at the slides.
7      Where did you see the other two?
8  A.  I don't recall.
9  Q.  Do you know what the other two's jobs were?
10  A.  No.
11  Q.  For the one that you know is a lifeguard and the other
12      two that you don't know whose job they were, do you
13      recall them such that you know they were employees?
14  A.  Yes.
15  Q.  You just don't know what their job title was?
16  A.  Right.
17  Q.  Do you recall where it was you saw them the first
18      time?
19  A.  Not anymore.
20  Q.  And I'm talking about the other two obviously because
21      you identified one.  If I were to ask you which one of
22      those three individuals I named was the one you speak
23      of as the lifeguard, would you be able to tell me?
24  A.  I don't know if it's correct.
25  Q.  What's your best recollection?

Page 27

1  A.  Jermaine.
2  Q.  Okay.  Now understanding that all three are employees
3      and one that you understand to be a lifeguard, would
4      you agree with me that regardless of what their
5      position is, that the purpose for which they were
6      employed and hired by the hotel was not to commit
7      assault or rape?
8      MR. WEGLARZ:  Form.  I'm just going to
9      place a form objection on the record, but you can
10      still go ahead and answer.
11      THE WITNESS:  Okay.  Can you rephrase that
12      again?
13  BY MR. SAFRA:
14  Q.  Not a problem.  One of them you identified as a
15      lifeguard, but you identified all three as employees.
16      Regardless of the other two's position, do you agree
17      with me that the hotel did not hire them to commit an
18      act such assault or rape?
19  A.  Yes.
20      MR. WEGLARZ:  And same objection.  You have
21      her answer.
22      You know what, I'm going to take a minute;
23      is that okay?
24      MR. SAFRA:  I'd like to finish these two
25      questions before we take a break on this line of

Page 28

1      questioning.
2      MR. WEGLARZ:  Okay.
3  BY MR. SAFRA:
4  Q.  Would you agree with me that the scope of duties of
5      their employ did not include committing an act of
6      sexual assault or rape?
7      MR. WEGLARZ:  Same objection; form of the
8      question, no foundation.
9      But you can still go ahead and answer,
10      Amber, go ahead.
11      THE WITNESS:  So you're asking me if --
12  BY MR. SAFRA:
13  Q.  One is a lifeguard and the other two are employees,
14      and they have duties and responsibilities similar to
15      what a server has at a restaurant; do you understand
16      that aspect?
17  A.  Yes.
18  Q.  Do you agree with me that whatever position the two
19      are, that these are employees that you don't know what
20      they do and the one lifeguard, that in any instance,
21      their duties and responsibilities, the scope of their
22      work did not include committing assault or rape of a
23      guest?
24  A.  Yes.
25      MR. WEGLARZ:  Same objection.  You can

Page 29

1      answer.
2      MR. SAFRA:  Did you get an answer?
3      COURT REPORTER:  I did.
4  BY MR. SAFRA:
5  Q.  In fact, such a heinous act would be outside the scope
6      of any employee's employment; would you agree with
7      that?
8      MR. WEGLARZ:  Same form objection.
9      THE WITNESS:  Yes.
10  BY MR. SAFRA:
11  Q.  And that the act of sexual assault or rape is a
12      self-serving act of each of those three individuals;
13      do you agree with that?
14      MR. WEGLARZ:  Same objection.
15      THE WITNESS:  Yes.
16  BY MR. SAFRA:
17  Q.  Would you agree that it doesn't serve any purpose of
18      the hotel?
19      MR. WEGLARZ:  Same objection.
20      THE WITNESS:  Yes.
21      MR. SAFRA:  We can take a break now.
22      MR. WEGLARZ:  Thank you.
23      (Recess taken at 4:29 p.m.)
24      (Back on the record at 4:41 p.m.)
25  BY MR. SAFRA:

Page 30

1   Q.   With regard to the booking, and it's probably clear
2        from some of your answers to my questions already but
3        I just want to make sure, if I were to ask you about
4        the names of an individual or individuals or a company
5        or travel agency or operator that either your mom or
6        Janet communicated with relative to the booking of the
7        trip to Jamaica prior to May, 2015, and your arrival
8        in Jamaica, would you know any of those names?
9   A.   No.
10  Q.   Okay.  And you did not speak to anybody that was
11       communicating with your mom or Janet in that regard,
12       correct?
13  A.   Correct.
14  Q.   As you sit here today, do you have any personal
15       knowledge that the hotel was aware of any sexual
16       assault or rape by Dwight Davis, Jermaine Dyer, or
17       William Tapper prior to May 8th, 2015, meaning, that
18       they had ever done such a thing before May 8th, 2015?
19  A.   Not to my knowledge.
20  Q.   Do you have any knowledge that The Mark Travel
21       Corporation or Unique Vacations, Inc., had any
22       knowledge that any of those three individuals ever did
23       such an act before May 8, 2015?
24  A.   I'm not aware of that.
25  Q.   Do you know if those three individuals ever even did

Page 31

1        an act of that sort prior to May 8, 2015?
2   A.   I don't know.
3   Q.   Do you know if there's ever been an act of sexual
4        assault or rape at the hotel by any employee prior to
5        May 8, 2015?
6   A.   I don't have knowledge of that but I believe it.
7   Q.   Say that last part again.
8   A.   I don't have knowledge of it, but I believe that it
9        would be true.
10  Q.   On what basis would you believe it to be true?
11  A.   Just from the room that I was in, there was things
12       left in the room, like there was a button.  It could
13       have been like just like an employee's but just the --
14  Q.   Those were things you saw in the room prior to or
15       during the incident or you learned of after the fact?
16  A.   I learned after.
17  Q.   And you're guessing that those being in the room may
18       be evidence that another act occurred?
19  A.   Yes.
20  Q.   Is there any other basis for your belief?
21  A.   No.
22  Q.   Do you know if those items were used in the incident
23       involving you or Paiton?
24  A.   I don't know.
25  Q.   Do you know if those were items that resulted from

Page 32

1        actions between consensual employees?
2   A.   I don't know.
3   Q.   Or consensual guests?
4   A.   I don't know.
5   Q.   So understanding what you said about learning of items
6        in that room after your incident on May 8, 2015, do
7        you have any personal knowledge of there ever being an
8        instance of sexual assault or rape at that hotel, the
9        Beaches Ocho Rios Resort, prior to May 8, 2015?
10  A.   No.
11  Q.   Do you have any knowledge that Funjet or a company
12       with the name Funjet in it had any knowledge of any
13       sexual assault or rape at that resort prior to May 8,
14       2015?
15  A.   I don't know.
16            MR. SAFRA:  I have no further questions for
17       today, and we'll continue tomorrow.
18            MR. WEGLARZ:  I agree.  I have no
19       questions.  We'll see you tomorrow.
20            MR. SAFRA:  Can you hold op one second
21       before we do that?
22            MR. WEGLARZ:  Sure.
23            (Recess taken at 4:45 p.m.)
24            (Back on the record at 4:46 p.m.)
25  BY MR. SAFRA:

Page 33

1   Q.   Sorry.  Two questions.  Prior to this lawsuit or
2        retaining your attorney, had you ever even heard of a
3        company by the name of Unique Vacations, Inc.?
4   A.   No.
5   Q.   Have you ever to your knowledge had any dealings with
6        anybody who worked with or is associated with Unique
7        Vacations, Inc., prior to this lawsuit or retaining
8        your attorney?
9   A.   No.
10            MR. SAFRA:  No further questions.
11            MR. SAUREZ:  Same questions as to the other
12       Defendant.
13            MR. SAFRA:  No problem.  I'm just
14       apologizing that I'm saying I was finished and I'm
15       not.  I'm feeling bad trying to get this part over.
16  BY MR. SAFRA:
17  Q.   Had you ever prior to retaining your counsel or this
18       lawsuit ever heard of a company by the name Funjet?
19  A.   I don't think so.
20  Q.   Or the company by the name of Mark Travel Corporation?
21  A.   No.
22  Q.   Or Vacations to Go?
23  A.   No.
24            MR. SAFRA:  All right.  No further
25       questions for today.  We'll continue to tomorrow.

Page 34

```
1          MR. WEGLARZ:  Okay.
2          (Discussion off the record at 4:47 p.m.)
3          (Back on the record at 4:48 p.m.)
4          MR. SAUREZ:  Just a special record to
5    memorialize what we discussed and we have it on paper.
6    Today is September 24th.  Counsel has decided that in
7    light of yesterday and today, how long the depositions
8    go, that tomorrow we will continue with the deposition
9    of Amber Torralva and do our best.  We're going to
10   start at 8:00, and we're going to do our best to
11   complete that deposition, and time permitting, we will
12   continue Paiton Bater thereafter, and if need be,
13   we'll come in on Thursday to finish Paiton Bater.  The
14   deposition of Tammy Gonzalez which was supposed to be
15   tomorrow will be moved to Miami and will take place on
16   October 3rd.  The deposition of Stetson Arriola will
17   be October 17th pursuant to a Notice that counsel
18   sent.
19          Thereafter, the corporate representative,
20   Ron Jacobs, of my client, The Mark Travel Corporation,
21   will be taken at a mutually agreeable date and time
22   between counsel, and counsel for Plaintiff will work
23   with counsel for Mark Travel on the amended corporate
24   rep Notice that is mutually agreeable to both parties.
25   As presently stands, there is no validly noticed
```

Page 35

```
1    deposition for the corporate representative of The
2    Mark Travel Corporation.
3          That's it.  Have a good afternoon, ladies
4    and gentlemen.
5          MR. WEGLARZ:  Okay.  Well, you told me you
6    were just going to address the dep for the corporate
7    rep.  It's a bunch of other stuff, and this is why I
8    didn't want to really have to do this because now
9    we're just going to go back and forth on this.
10          MR. SAUREZ:  Tell me where I went wrong.
11          MR. WEGLARZ:  You should have just been up
12   front with me.
13          MR. SAUREZ:  I was up front with you.
14          MR. WEGLARZ:  Maybe you didn't do it
15   intentionally.  That's fine.
16          MR. SAFRA:  I was very up front with you.
17          MR. WEGLARZ:  Because of the circumstances
18   of these depositions taking longer than anticipated,
19   all counsel have conferred, and we decided the most
20   practical, efficient, reasonable way to get through
21   these deps is to move Ms. Gonzalez's deposition to the
22   3rd so that we can finish the daughter's deposition.
23          MR. SAFRA:  Ms. Gonzalez is here in
24   Michigan.  I'm not disagreeing with you, I'm just
25   saying, since there's now a record.
```

Page 36

```
1          MR. WEGLARZ:  I'm willing to take her
2    deposition tomorrow.  This is why I didn't want to
3    have to put this on the record.  There was no need to
4    do it, but I am trying to cooperate with counsel.
5    Counsel is trying to cooperate with me and that's
6    greatly appreciated.  We will move Gonzalez to the
7    3rd, and that is before the hearing on the 4th,
8    Ms. Gonzalez.  We are going to accommodate each other,
9    so I have agreed to that.  We are going to finish
10   Amber tomorrow.  We are going to do Paiton right after
11   Amber.  I'm hoping we can get Paiton done.  I still
12   haven't -- I haven't guaranteed 100% that we can do
13   Paiton on Thursday.  I will work with you.  If that's
14   what we have to do, I'm going to try everything in my
15   soul to do it, but I just told Janet that, Look, we
16   should have them both done tomorrow, right?
17          MR. SAUREZ:  We are all proceeding in good
18   faith, but just so you know, counsel for Mark Travel
19   has already booked, based on what we talked about this
20   morning, and changed my flight to accommodate the
21   Thursday schedule because I understood and I paid an
22   additional amount of money because I thought you
23   wanted to finish Paiton Bater, and I'm trying to do my
24   best to do that.
25          MR. WEGLARZ:  I do and also understand we
```

Page 37

```
1    have to modify Ms. DeSantis's schedule, Mrs.
2    DeSantis's schedule, and we've already paid for a
3    change of flight fee, and I don't know if that takes
4    into account Thursday or not.  I just don't know.  I'm
5    not saying it's impossible.  I'm saying I haven't
6    quite addressed that possibility yet, that's all.
7          With respect to your --
8          MR. SCOTT:  You would admit, though, that
9    we've all agreed from day one that we might have to go
10   through Thursday and stay here for deposition, right?
11          MR. SAUREZ:  Mr. Scott told me.  I wasn't
12   present at that time, but that's what he told me.
13   That's why I booked it.
14          MR. WEGLARZ:  If you guys put that in
15   email, I'll be honest, I don't recall.
16          MR. SAFRA:  It was because what happened
17   was my initial email when we talked about this, I said
18   to you that I was unavailable on Wednesday and we
19   would continue to Thursday if need be, and it's even
20   in the Notice and all, but look, we're all here under
21   the same intent.  Let's just keep going until
22   tomorrow.
23          MR. WEGLARZ:  That's why I agreed to this.
24          MR. SAFRA:  Let's just keep going until
25   tomorrow, we'll just keep spinning our wheels, so
```

Page 38

1    let's just call it.
2          MR. WEGLARZ:  Then with respect to the
3    comment about Mr. Jacobs' dep not being Noticed
4    properly or it being an invalid Notice of Deposition,
5    I do not agree to that.  I have agreed to amend the
6    Notice, and I will do that.
7          MR. SAUREZ:  And you've agreed that the
8    date will be after the 17th, too, right?
9          MR. SAFRA:  After the 17th?
10         MR. SAUREZ:  Of October.  There is no date
11   right now.
12         MR. SAFRA:  I understand.  Can I be honest
13   with you?  I don't think counsel respectfully can do
14   that.  The Courts in the Southern District do not like
15   counsel to just extend de facto discovery deadlines on
16   their own.
17         MR. SAUREZ:  I had offered the 15th, and I
18   had offered the 9th.  One is a religious holiday, and
19   the other counsel, Mr. Scott, is not available, and
20   the 17th is now Stetson Areola.  So I think by
21   logistical reasons, it's going to have to be the 18th
22   or after.
23         MR. SAFRA:  I understand.  Can we all agree
24   to go off the record and then finish this
25   conversation?

Page 39

1          MR. WEGLARZ:  I'm fine with it.
2          MR. SAUREZ:  I'd rather have a record of
3    what we're talking about.
4          MR. SAFRA:  Well, I don't think that
5    anybody can on the record agree to just unilaterally
6    extend it.  We all in good faith will do what we can.
7    There's a motion pending, and then I think that's all
8    we can say right now.  Should we go off the record?
9          MR. WEGLARZ:  I will try to accommodate you
10   any way that I can.  If you're saying that, Look, I
11   would prefer this deposition to go after the 17th,
12   will I accommodate you?  Yes.  I try to accommodate
13   all Brother Counsel and Sister Counsel.  So, yes, I
14   will try to extend that courtesy to you if that's what
15   you need if I can do it.  I mean, obviously there's
16   some other things, though, that I do not control.
17         MR. SAUREZ:  The reason I need it is
18   because, let's be clear, the scheduling here has
19   changed in manners, and I'm not ascribing blame to
20   anybody, in manners uncontrolled by counsel.
21         MR. WEGLARZ:  I agree.
22         MR. SAUREZ:  That's why I need it, okay?
23         MR. WEGLARZ:  I do understand.
24         MR. SAUREZ:  Okay.  Have a good evening,
25   guys.

Page 40

1          COURT REPORTER:  I know you are ordering,
2    Mr. Safra, as you indicated earlier.
3          Will you be ordering, counsel?
4          MS. MELVILLE:  Yes, I will be ordering.
5          MR. WEGLARZ:  Yes, of course we will order.
6          (The deposition was concluded at 4:56 p.m.
7    Signature of the witness was not requested by
8    counsel for the respective parties hereto.)

Page 41

1                CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                     ) SS
4    COUNTY OF MACOMB  )
5
6          I, LEZLIE A. SETCHELL, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19                         *Lezlie Setchell*
20
21
22                         LEZLIE A. SETCHELL, CSR-2404
23                         Notary Public,
24                         Macomb County, Michigan.
25         My Commission expires: April 17, 2024

1    IN THE DISTRICT COURT OF THE UNITED STATES

2         FOR THE EASTERN DISTRICT OF FLORIDA

3              MIAMI DIVISION

4

5  PAITON E. BATER, AMBER R.

6  TORRALVA, JANET DESANTIS,

7  and MARGARET A. TORRALVA,

8              Plaintiffs,

9       vs.              Case No. 1:17-cv-21703

10                       Hon. Marcia G. Cooke

11  UNIQUE VACATIONS, INC., a

12  Delaware corporation, THE

13  MARK TRAVEL CORPORATION, a

14  Nevada corporation d/b/a Fun

15  Jet Vacations, DWIGHT DAVIS

16  JERMAINE DYER, and WILLIAM TAPPER,

17  Jointly and Severally,

18              Defendants.

19  _____

20       The Continued Deposition of AMBER TORRALVA, Volume II,

21       Taken at 19390 West Ten Mile Road,

22       Southfield, Michigan,

23       Commencing at 8:26 a.m.,

24       Wednesday, September 25, 2019,

25       Before Kathryn L. Janes, CSR-3442, RMR, RPR.

## Page 43

```
1   APPEARANCES:
2
3   TODD J. WEGLARZ
4   Fieger, Fieger, Kenney & Harrington, P.C.
5   19390 West Ten Mile Road
6   Southfield, Michigan 48075
7   248.355.5555
8   tweglarz@fiegerlaw.com
9       Appearing on behalf of the Plaintiffs.
10
11  THOMAS E. SCOTT
12  STEVEN R. SAFRA
13  Cole, Scott & Kissane, P.A.
14  9150 South Dadeland Boulevard
15  Suite 1400
16  Miami, Florida 33256
17  305.350.5381
18  786.268.6418
19  thomas.scott@csklegal.com
20  steven.safra@csklegal.com
21      Appearing on behalf of the Defendant, Unique
22      Vacations, Inc.
23
24
25
```

## Page 44

```
1   LUIS E. SUAREZ
2   Boies, Schiller & Flexner, LLP
3   100 Southeast 2nd Street
4   Suite 2800
5   Miami, Florida 33131
6   305.357.8431
7   lsuarez@bsfllp.com
8       Appearing on behalf of the Defendant, The Mark Travel
9       Corporation.
10
11  ALSO PRESENT:
12  Margaret Torralva
13  Tammy Gonzalez
14  Dmitri Singh
15
16
17
18
19
20
21
22
23
24
25
```

## Page 45

```
1                   TABLE OF CONTENTS
2
3   WITNESS                                    PAGE
4   AMBER TORRALVA
5
6   CONTINUED EXAMINATION
7   BY MR. SAFRA:                                6
8   EXAMINATION
9   BY MR. SUAREZ:                             78
10  EXAMINATION
11  BY MR. SCOTT:                             219
12  RE-EXAMINATION
13  BY MR. SUAREZ:                            234
14  EXAMINATION
15  BY MR. WEGLARZ:                           239
16  RE-EXAMINATION
17  BY MR. SCOTT:                             253
18  RE-EXAMINATION
19  BY MR. WEGLARZ:                           254
20  RE-EXAMINATION
21  BY MR. SUAREZ:                            255
22
23
24
25
```

## Page 46

```
1                      EXHIBITS
2
3   EXHIBIT                                    PAGE
4   (Exhibits attached to transcript.)
5
6   DEPOSITION EXHIBIT 1                          8
7   DEPOSITION EXHIBIT 2                         14
8   DEPOSITION EXHIBIT 3                         48
9   DEPOSITION EXHIBIT 4                         77
10  DEPOSITION EXHIBIT 5                        147
11  DEPOSITION EXHIBIT 6                        155
12  DEPOSITION EXHIBIT 7                        170
13  DEPOSITION EXHIBIT 8                        173
14  DEPOSITION EXHIBIT 9                        174
15  DEPOSITION EXHIBIT 10                       177
16  DEPOSITION EXHIBIT 11                       177
17  DEPOSITION EXHIBIT 12                       178
18  DEPOSITION EXHIBIT 13                       181
19  DEPOSITION EXHIBIT 14                       185
20  DEPOSITION EXHIBIT 15                       189
21  DEPOSITION EXHIBIT 16                       194
22  DEPOSITION EXHIBIT 17                       196
23  DEPOSITION EXHIBIT 18                       198
24  DEPOSITION EXHIBIT 19                       200
25  DEPOSITION EXHIBIT 20                       202
```

                                                    Page 47

1   Southfield, Michigan
2   Wednesday, September 25, 2019
3   8:26 a.m.
4
5            AMBER TORRALVA,
6   was thereupon called as a witness herein, and after
7   having first been duly sworn to testify to the truth,
8   the whole truth and nothing but the truth, was
9   examined and testified as follows:
10           CONTINUED EXAMINATION
11  BY MR. SAFRA:
12  Q.  Good morning, Amber.
13  A.  Good morning.
14  Q.  We're continuing the deposition that we started
15      yesterday.  When I went over at the beginning the
16      rules of the deposition, the same would apply today.
17  A.  Okay.
18  Q.  You were sworn in under oath again.  That would be the
19      same.  One thing I did not ask you yesterday and I
20      would want to ask, is were you taking any medications
21      yesterday that would have affected your ability to
22      understand the questions that are asked and answer
23      truthfully?
24  A.  No.
25  Q.  What about today?

                                                    Page 48

1   A.  No.
2   Q.  Having had an evening to, between the deposition
3       yesterday and today, with regard to the questions that
4       I asked you yesterday, is there anything additional
5       that you thought of overnight that you're saying oh, I
6       want to make sure I tell him today that I didn't tell
7       him yesterday when he asked me a certain question?
8   A.  No.
9   Q.  We were at the point in the sequence of the events of
10      this incident in your travels that we were at the stay
11      on your arrival in Jamaica.
12  A.  Okay.
13  Q.  You traveled to Jamaica for the stay at Beaches Ocho
14      Rios Resort on May 5, 2015; is that correct?
15  A.  Yes.
16  Q.  When you traveled to Jamaica, do you recall if you had
17      a stopover on your flight?
18  A.  I don't recall.
19  Q.  When you arrived in Jamaica that first day, could you
20      tell me what you recall?
21  A.  We did a lot of like pool activities and stuff.  I
22      don't really remember a whole lot what we did on the
23      first day.
24  Q.  Did you go to -- did you go to the resort and check
25      in --

                                                    Page 49

1   A.  Yes.
2   Q.  -- and go to your room?
3   A.  Yes.
4   Q.  Okay.  I'm going to show you what I'll mark as Exhibit
5       Number 1 to your deposition and it's a document
6       entitled On Resort Guest Registration and just ask if
7       that is your signature on page JD0034 next to the name
8       Amber Torralva?
9   A.  Yes.
10           MARKED FOR IDENTIFICATION:
11           DEPOSITION EXHIBIT 1
12           8:29 a.m.
13  BY MR. SAFRA:
14  Q.  Do you recall at check-in signing an iPad?
15  A.  I don't.
16  Q.  So if I asked you any questions about anything that
17      was written in an iPad at check-in that you may have
18      signed, would you have any recollection?
19  A.  No.
20  Q.  After check-in, you went to the room, do you recall
21      about how long you were able to go and enjoy the pool
22      and water activities that day?
23  A.  As soon as we all got settled in.
24  Q.  Was this early afternoon?
25  A.  I don't remember.

                                                    Page 50

1   Q.  Did you have anything to drink that day, alcohol wise?
2   A.  I don't remember.
3   Q.  Did you have any alcoholic drinks at any time at the
4       resort before the incident?
5   A.  Yes.
6   Q.  And again, we discussed yesterday, but the incident
7       I'm referring to is the happenings of the evening of
8       May 8, 2015; is that fair?
9   A.  Yes.
10  Q.  Do you recall how many drinks you had in this couple
11      days between when you arrived and the incident?
12  A.  Not a lot.  I don't remember exact.
13  Q.  Do you recall meeting either Dwight Davis, Jermaine
14      Dyer or William Tapper prior to the incident?
15  A.  Yes.
16  Q.  Could you tell me how many times to start you recall
17      seeing either of those three individuals?
18  A.  I know I met two of them like in the beginning of the
19      trip.
20  Q.  Was it on one occasion or more than one occasion?
21  A.  I want to say more than one occasion.
22  Q.  Do you know which two?
23  A.  It was Jermaine and Dwight.
24  Q.  Do you recall where?
25  A.  The pool.

Page 51

1   Q.   Would this be where the water slide is?
2   A.   No.
3   Q.   Any other instances before I ask you some specifics on
4        those one or more instances that you recall with
5        Jermaine and Dwight before the evening of May 8th?
6   A.   I don't think so.
7   Q.   Could you tell me about what you recall in terms of
8        the instances in which you recall that you've
9        identified involving Jermaine and Dwight?
10  A.   I just remember him introducing himself to us.
11  Q.   By the pool?
12  A.   Yes.
13  Q.   When you say us, do you mean you and Paiton Bater?
14  A.   Uh-huh and I'm pretty sure my mom and Janet.
15  Q.   What was he doing?
16  A.   Just asking when we got there, how long we were going
17       to be there.
18  Q.   Being friendly?
19  A.   Yeah.
20  Q.   Was this Jermaine and Dwight or just one of them?
21  A.   I want to say it was just Jermaine in the beginning, I
22       don't remember Dwight.
23  Q.   How many times do you recall seeing Jermaine before
24       the night of the incident?
25  A.   Frequently throughout the stay of us being there.

Page 52

1   Q.   What do you mean by frequently?
2   A.   Like just randomly throughout like passing the pool
3        and getting food.
4   Q.   How many times did you have conversations personally
5        with Jermaine prior to the incident?
6   A.   Maybe like two or three times.
7   Q.   Other than asking you how long you were staying there
8        and when you arrived as you identified, do you recall
9        the specifics of any other conversation with Jermaine
10       during that time?
11  A.   No.
12  Q.   Would you agree that the conversations were along the
13       lines of the type you'd expect from an employee of a
14       hotel that might be offering you a drink or food or
15       asking how your stay is?
16  A.   Yeah.  It was all like friendly and work friendly.
17  Q.   Did you ever get to a point where you felt like the
18       conversation was uncomfortable and beyond what you
19       would expect of a hotel employee?
20  A.   No.
21  Q.   With regard to Dwight, could you tell me what you
22       recall in terms of any interaction with him prior to
23       the incident?
24  A.   I don't really recall.
25  Q.   Separate from these instances in which you have

Page 53

1        personal interaction with either of those two
2        individuals prior to the incident, did you see, but
3        not personally interact yourself, Paiton Bater
4        interact with any of these three individuals?
5   A.   I don't know.
6   Q.   Did she ever tell you while you were at the hotel or
7        even after that she had been socializing or
8        fraternizing with these three individuals when you
9        were not there?
10  A.   No.
11  Q.   Did she interact with them in your presence?
12  A.   I don't know.
13  Q.   Do you recall any conversations that Paiton had with
14       either of those three individuals prior to the
15       incident?
16  A.   There was conversations when like we were together
17       when they would come up to us.
18  Q.   Have we discussed those conversations or are you now
19       talking about something different?
20  A.   I think we discussed them.
21  Q.   Okay.  So prior to the evening of May 8, 2018, have we
22       discussed all interactions that you recall between
23       yourself and either of these three individuals or that
24       you personally witnessed another travel companion of
25       yours such as your mom, Janet or Paiton?

Page 54

1   A.   Can you restate that?
2   Q.   Prior to the incident, have we now spoken about
3        everything that you can recall regarding a
4        conversation either you had or you witnessed that your
5        mom, Paiton or Paiton's mom had with either of these
6        three individuals?
7   A.   Yes.
8   Q.   I'm going to get to the incident and the evening of
9        the incident in a few minutes, but I just want to ask
10       additional questions about that time period before the
11       incident during your stay.
12  A.   Okay.
13            MR. WEGLARZ:  I need one minute.
14            MR. SAFRA:  Not a problem.
15            (Recess taken at 8:36 a.m.)
16            (Back on the record at 8:37 a.m.)
17  BY MR. SAFRA:
18  Q.   Were you taking any medication yourself at the time of
19       the stay?
20  A.   None.
21  Q.   And obviously, I'm talking pre-incident, you
22       understand that?
23  A.   Yes.
24  Q.   I'd like to show you what I'll mark as Exhibit 2 and
25       ask you to let me know what it is that this composite

Page 55

1        exhibit is of photographs?
2                MARKED FOR IDENTIFICATION:
3                DEPOSITION EXHIBIT 2
4                8:38 a.m.
5   A.   So you want me to just tell you who?
6   BY MR. SAFRA:
7   Q.   I would first look through the 15 photographs and just
8        identify generally what this is?
9   A.   Uh-huh.  These are just pictures from the vacation.
10  Q.   Pictures of you, Paiton, your mom or Janet?
11  A.   Yes.
12  Q.   Some of these pictures taken by you?
13  A.   Yes.
14  Q.   Some of these taken by one of them or all by you?
15  A.   Not all by me.  Some by...
16  Q.   Do these photographs fairly and accurately depict
17       events that occurred during your stay?
18  A.   Yes.
19  Q.   Now, the first or the majority of the beginning of the
20       photographs, there are drinks in the photos; do you
21       see those?
22  A.   Yes.
23  Q.   Do those drinks all contain alcohol?
24  A.   Not all of them.
25  Q.   Would you say that the majority of them do?

Page 56

1   A.   Yeah, I guess.
2   Q.   Is there one in particular that you can identify that
3        you -- as not containing alcohol?  And the pictures
4        are numbered on the bottom right and you can reference
5        it by number.
6   A.   So I know 4.
7   Q.   So picture number 4?
8   A.   Wasn't alcohol and, let's see, I don't think there's a
9        drink in 8.
10  Q.   Only in those that have drinks?
11  A.   Okay.  Yeah.
12  Q.   Earlier I was asking about how many drinks you may
13       have had.  Are these photographs all pre-incident?
14  A.   Yes.
15  Q.   Okay.  Would this help refresh your recollection as to
16       the number of drinks that you may have had prior to
17       the incident?
18  A.   I'm not exactly sure.
19  Q.   Would you agree that you had more than five during
20       those days?
21  A.   I don't think I had more than five in a day.
22  Q.   In a day, okay.
23  A.   Yeah.  No more than five in a day.
24  Q.   So overall in those, from May 5th to the evening of
25       May 8th, it would be more than five drinks?

Page 57

1   A.   Throughout the stay, yes.
2   Q.   Okay.  On a day, how many would you estimate that you
3        had on average?
4   A.   Between like three and four.
5   Q.   Would the same be true for the day of the incident of
6        May 8th?
7   A.   Yes.  I want to say yes.
8   Q.   Would each of those drinks, were you a morning drinker
9        or are they all at or after lunch?
10  A.   Like after lunch.
11  Q.   Do you recall what time you ate lunch on Friday, May
12       8th?
13  A.   No.
14  Q.   Was it after 12:00?
15  A.   I don't know.
16  Q.   What time do you normally eat lunch?
17  A.   I don't know.
18  Q.   Can you take me through the events through check-in
19       and the activities that you participated in leading up
20       to the incident?
21  A.   I don't really remember anymore.  I know that we did a
22       lot, though, at the resort.
23  Q.   Did you use the pool?
24  A.   Uh-huh.
25  Q.   Did you use the water slides?

Page 58

1   A.   Uh-huh, yes.
2   Q.   Is that a yes to both questions?
3   A.   Yes.
4   Q.   Did you go on the beach?
5   A.   Yes.
6   Q.   My understanding is there was this banana boat that
7        would be pulled by a boat, do you recall going on
8        that?
9   A.   Yes.
10  Q.   Is there anything else that you recall participating
11       in activity wise or amenity wise?
12  A.   I remember getting a massage at one point.
13  Q.   Anything else?
14  A.   We like left the resort and went to like the Blue
15       Hole.
16  Q.   Okay.  That's an excursion --
17  A.   Uh-huh.
18  Q.   -- off premises?
19            MR. WEGLARZ:  Is that yes?
20  A.   Yes.
21  BY MR. SAFRA:
22  Q.   Is that the water, Tarzan Swing --
23  A.   Yes.
24  Q.   -- and water area depicted in some of the photographs
25       in Exhibit Number 2?

Page 59

1   A.   Exhibit Number 2?
2   Q.   The entire exhibit is Exhibit Number 2, but there are
3        page numbers then.
4   A.   Okay, then yes.
5   Q.   With regard to those photos, I believe there's three
6        of them at the end of Exhibit 2, is the individual
7        that is depicted in the photo with you the guide at
8        the Blue Hole?
9   A.   Yes.
10  Q.   He does not work at the hotel, correct?
11  A.   Correct.
12  Q.   Was he -- were you socializing and talking to him?
13  A.   While I was there, yes, at the Blue Hole.
14  Q.   How did it come to be that he was working at the
15       Tarzan Swing and then on what looks like either dirt
16       or a beach taking pictures with you and Paiton?
17  A.   That was I believe after, so like once we were done
18       with the swing.
19  Q.   Were you then hanging out with him?
20  A.   No.
21  Q.   Okay.  Did it just happen he was near you?
22  A.   I don't recall.
23  Q.   Was Paiton socializing with him and then you guys were
24       all together?
25  A.   I don't think so.

Page 60

1   Q.   Did you ask him to leave the platform that he was
2        working on and come and take a picture with you?
3   A.   I don't recall.
4   Q.   So do you have any information or recollection as to
5        how it came to be that he was taking multiple pictures
6        with you guys?
7   A.   I don't recall.
8   Q.   Was one of you speaking to him?
9   A.   I'm sure, yeah.
10  Q.   Do you recall if it was you?
11  A.   I don't recall.
12  Q.   Was it Paiton?
13  A.   I don't know.
14  Q.   How well did you know Paiton?
15  A.   I've known her since I was a child, but we lived far
16       away so we never really were ever really close.
17  Q.   How would you describe her pre-incident?
18  A.   Nice, fun.
19  Q.   Did you know anything about her friends?
20  A.   No.
21  Q.   Do you know if she ever got into trouble at school or
22       otherwise?
23  A.   No.
24  Q.   Do you know whether she had any history of sexual
25       activity pre-incident?

Page 61

1   A.   No.
2   Q.   She was older than you at the time, correct?
3   A.   Yes.
4   Q.   How old was she?
5   A.   21.
6   Q.   And you were 17?
7   A.   Yes.
8   Q.   Did you idolize her a little bit?
9   A.   No.
10  Q.   Did you look up to her as an older female?
11  A.   I guess.
12  Q.   On the day of May 8, 2015, were you at the hotel the
13       entire day?
14  A.   Yes.
15  Q.   Do you recall exactly what you did that day?
16  A.   No.
17  Q.   Was that one of the days in which you interacted or
18       came across Jermaine Dyer or Dwight Davis?
19  A.   Yes.
20  Q.   Could you tell me if -- which of the instances you've
21       spoken about or what happened that day?
22  A.   No.
23  Q.   When was it that you first came in contact with either
24       of them that Friday?
25  A.   I don't recall.

Page 62

1   Q.   Now, my understanding is that that evening you and
2        Paiton had dinner separate from your mother and
3        Paiton's mother; is that correct?
4   A.   I don't recall.
5   Q.   Before I ask you some questions about that evening,
6        let me ask you additional questions about the stay.
7        With regard from the -- to the time period from when
8        you checked in up until dinner the evening of Friday,
9        May 8th, when you were at the resort, how often would
10       you and Paiton be together or you be alone outside the
11       presence of either your mother or Janet or both?
12  A.   We were always together typically, like one of us.  We
13       were never really alone.
14  Q.   When you say always together, do you mean you and
15       Paiton or do you mean with one of your mothers?
16  A.   Just like the buddy system, so either me and Paiton or
17       my mom and I or Janet and I.
18  Q.   So how many times were you and Paiton alone without
19       one of your mothers?
20  A.   Not that much.  We were typically like all together
21       for the most of the time, so maybe like a couple
22       times.
23  Q.   In the evenings before May 8th, would you stay out
24       later with Paiton when your moms would go back to the
25       room?

Page 63

1  A.  I don't recall.  I don't think so because there wasn't
2      much to do.
3  Q.  Did you go to bars or karaoke prior to May 8th?
4  A.  No.
5  Q.  Was May 8th -- do you recall going to a bar the
6      evening of May 8th?
7  A.  Yes.
8  Q.  Was that the first time you went to a bar with Paiton
9      alone that trip?
10 A.  Yes.
11 Q.  And I'm meaning in the evening, not during the day.  I
12     believe there's photographs that might say daytime
13     otherwise, is that what you understood?
14 A.  Yes.
15 Q.  I was asking you about dinner the evening of May 8th,
16     and you said you don't recall eating separate from
17     your mothers?
18 A.  From my memory, I thought we had ate dinner together,
19     but I could have been thinking of a different day.
20 Q.  Was there one night that you recall eating dinner
21     separate from your mother and Janet, you just don't
22     recall which evening that was then?
23 A.  Yes.
24 Q.  Okay.  And that's fair.  I'm just trying to make sure
25     I understand.

Page 64

1  A.  (Witness nods head affirmatively.)
2  Q.  So is there anything in particular about dinner Friday
3      night of May 8th that you recall?
4  A.  No.
5  Q.  Okay.  Now, with regard to the dinner that you had
6      just with Paiton separate from either of your mothers,
7      could you tell me about that dinner?
8  A.  I don't really remember.
9  Q.  Did you come into contact with any employees that you
10     recall at that time?
11 A.  No.
12 Q.  Did you -- do you recall speaking to anybody that
13     worked at the hotel while you and Paiton were having
14     dinner without your mothers present during that
15     dinner?
16 A.  No.
17 Q.  The evening of May 8th, what is the first thing you
18     remember?
19 A.  The first thing I remember is going down the slides
20     and then going to the piano bar.
21 Q.  You went down the slides in the evening?
22 A.  Yes.
23 Q.  What time of the evening are you?
24 A.  I don't know.
25 Q.  Was it black, like night out?

Page 65

1  A.  It was nighttime, yes.
2  Q.  So the slides were still open while the sun was down?
3  A.  Yes.
4  Q.  What do you recall about going down the slides?  Let
5      me ask that question a little bit better.  Did you --
6      was it just you and Paiton.
7  A.  Yes.
8  Q.  Were there employees there?
9  A.  Yes.
10 Q.  Who?
11 A.  I don't remember.
12 Q.  Was it one of the three individuals, Jermaine Dyer,
13     William Tapper or Dwight Davis or more than one?
14 A.  I want to say either Dwight or William, but I don't
15     know.
16 Q.  Was there at least one of them there?
17 A.  Yes.
18 Q.  You just don't know which?
19 A.  Yes.
20 Q.  Was there two of them there, you just don't know which
21     ones?
22 A.  Yes.
23 Q.  Was there three of them there?
24 A.  No.
25 Q.  So two of these three individuals were working the

Page 66

1      water slide the evening that you're speaking of?
2  A.  Yes.
3  Q.  Did you speak to either of them or both?
4  A.  I don't remember.
5  Q.  Did Paiton?
6  A.  I don't know.
7  Q.  Do you know whether yes, you did, but you don't recall
8      what was discussed?
9  A.  Yes, they might have just said like hi while we were
10     going down.
11 Q.  What about in terms of conversations with Paiton, did
12     they speak, you just don't recall what?
13 A.  I don't know.
14 Q.  Did anything about the conversations at the top of the
15     water slides cause you any concern or fear for your
16     safety?
17 A.  No.
18 Q.  What about anything you witnessed in terms of
19     interactions with Paiton?
20 A.  No.
21 Q.  Would the same be true for all communications or
22     interactions with these individuals prior?
23 A.  Yes.
24 Q.  How long were you at the water slides that evening?
25 A.  Not that long.

Page 67

1   Q.   You said you then went to the bar?
2   A.   Yes.
3   Q.   Okay.  Who went to the bar, just the two of you, you
4        and Paiton?
5   A.   Yes.
6   Q.   Did the gentlemen follow and go with you?
7   A.   No.
8   Q.   How long were you at the bar?
9        Not that long.
10  Q.   More than an hour?
11  A.   No.
12  Q.   More than 30 minutes?
13  A.   About an hour.
14  Q.   About an hour?
15  A.   Yes.
16                  (Whereupon Ms. Margaret Torralva left the
17              room at 9:18 a.m.)
18  BY MR. SAFRA:
19  Q.   And during that hour, where were you and Paiton?
20  A.   In the bar, it was like the piano bar.
21  Q.   Sitting at the bar?
22  A.   Yeah.  I don't recall exactly.
23  Q.   But in the area or vicinity of the bar itself?
24  A.   Yes.
25  Q.   Were you getting drinks?

Page 68

1   A.   I was not.
2   Q.   Was Paiton drinking?
3   A.   I think Paiton got a drink, but I'm not entirely sure.
4   Q.   At any time that you were in the bar, did either of
5        the three individuals, Jermaine Dyer, William Tapper
6        or Dwight Davis appear?
7   A.   No.
8   Q.   Did Paiton ever leave your side during the time you
9        were at the bar?
10  A.   No.
11  Q.   Did you ever see your mother at any time that you were
12       on the water slides or at the bar that evening?
13  A.   No.
14  Q.   Did you ever see Janet?
15  A.   I saw them but not at the bar or the slides.  I saw
16       them later in the night.
17  Q.   When you say later in the night, is that after the
18       incident?
19  A.   Yes.
20  Q.   I'm still talking pre-incident, so I appreciate that.
21       At the time that you were at the bar or at the water
22       slide or any time prior that evening, you know, after
23       dinner, do you recall ever seeing either your mom or
24       Janet?
25  A.   No.

Page 69

1   Q.   When you were at the bar, did Janet ever come down and
2        speak to you or Paiton?
3   A.   I don't think so.
4   Q.   This was the only time that you recall ever being at
5        that bar?
6   A.   Yes.
7   Q.   Do you recall what it is that Paiton was drinking?
8   A.   No.
9   Q.   Could you describe her demeanor at the time?
10  A.   No.
11  Q.   Was she under the influence of alcohol?
12  A.   I don't know.
13  Q.   Were you under the influence of alcohol?
14  A.   I don't think so.
15  Q.   And by that I mean, you know, I understand you've
16       mentioned having a drink, but I mean under the
17       influence such that you believe it has had an effect
18       on your demeanor?
19  A.   I think I might have had like a buzz.
20  Q.   Okay.  That's the term I was going to use, but I
21       didn't know if that would be something you would
22       follow.
23  A.   Okay.
24  Q.   So I'll use your word.  When buzzed, you mean that you
25       had enough that you were starting to feel the effects

Page 70

1        of alcohol?
2   A.   Yes.
3   Q.   Do you believe the same to have been true of Paiton at
4        that time that you were at the bar?
5            MR. WEGLARZ:  Objection, form, calls for
6        speculation.
7            You can still answer.
8   A.   I don't know.
9   BY MR. SAFRA:
10  Q.   Did you notice anything about her behavior?
11  A.   No.
12  Q.   That would lead you to believe that she might also be
13       feeling a buzz?
14  A.   No.
15  Q.   How many drinks does it usually take you at that time
16       or did it take you to feel a buzz?
17            MR. WEGLARZ:  Form objection.
18            Go ahead.
19  A.   I don't know.
20  BY MR. SAFRA:
21  Q.   Had you ever had a drink before this vacation in
22       Jamaica?
23  A.   Yes.
24  Q.   Would you agree that in your past experiences of
25       drinking that would take more than three drinks for

Page 71

1    you to feel a buzz?
2  A.  I don't know.
3  Q.  Would it take more than two?
4  A.  I don't know.
5  Q.  Would it take one drink and you would feel a buzz --
6  A.  No.
7  Q.  -- in your experience.  So more than two?
8  A.  Yes.
9  Q.  Or at least two?
10 A.  Yes.
11 Q.  Do you recall how much you weighed at that time?
12 A.  No.
13 Q.  Do you have an estimate?
14 A.  Like 110 maybe.
15 Q.  110 pounds?
16 A.  Yes.
17 Q.  After or you said you were at the bar for roughly an
18      hour that evening with Paiton, did you participate in
19      any karaoke activity?
20 A.  I believe we sang one song.
21 Q.  Are any of the photos that are in Exhibit 2 from the
22      evening of the incident?
23 A.  I don't think so.
24 Q.  Is one photo in there also that is on page number 6,
25      sorry, I'm looking at it upside down.

Page 72

1            (Whereupon Ms. Margaret Torralva re-entered
2                 the room at 8:56 a.m.)
3  BY MR. SAFRA:
4  Q.  That is page number 9, that's why.  It was upside
5      down.  It looks like somebody is crouching under a
6      bathroom sink?
7  A.  Yes.
8  Q.  That's in a public area of the hotel, not a hotel
9      room, correct?
10 A.  Correct.
11 Q.  Who is that?
12 A.  Paiton.
13 Q.  What is Paiton doing?
14 A.  Being funny.
15 Q.  Hiding under the sink in the bathroom?
16 A.  Yes.
17 Q.  Is that her drink on the counter?
18 A.  I believe so.
19 Q.  Is this the evening of the incident?
20 A.  I don't think so.
21 Q.  Why is she hiding under the sink in the bathroom?
22 A.  I think she was trying to scare me --
23 Q.  Was she --
24 A.  -- when I was going.
25 Q.  -- inebriated or buzzed?

Page 73

1  A.  I don't know.
2  Q.  Is that behavior of her that you were accustomed to?
3  A.  Yes.
4  Q.  Can you explain that to me?
5  A.  What do you want me to explain?
6  Q.  What is your experience with Paiton that this is the
7      type of behavior that you would come to expect or be
8      accustomed to?
9  A.  She was just messing around having fun.
10 Q.  What else have you experienced of her, with her that
11      would be of this type of fun?
12 A.  I don't know.
13 Q.  I mean, was she -- had she had a few drinks at this
14      time?
15 A.  I don't know.
16 Q.  Had you ever been with her before when she was
17      drinking?
18 A.  No.
19 Q.  Did her behavior change as she drank?
20 A.  She was a little more laid back, I guess.  I don't
21      know.
22 Q.  Did she become more social?
23 A.  I guess.
24 Q.  Was she a social person that would talk to, you know,
25      people that you ran into?

Page 74

1  A.  Maybe.
2  Q.  Going back to the night of the incident, you said you
3      were at the bar for roughly an hour, what happened
4      next?
5  A.  We had left and came back.  We were going to go back
6      to the water slides, but they were closed, so from
7      there, I think Paiton had got another drink.  And I
8      think she might have saw my mom and Janet when she was
9      getting a drink.
10 Q.  Okay.  So at some point that evening between the bar
11      and the incident, your recollection is that Paiton saw
12      either your mom or Janet?
13 A.  Yeah.
14 Q.  Did you see --
15 A.  No.
16 Q.  -- your mom or Janet?
17 A.  No.
18 Q.  Okay.  What did you recall regarding Paiton's
19      interaction with either of them?
20 A.  I just thought that she told me that she saw them.
21 Q.  Okay.  So did you physically see her encounter either
22      your mom or her mom or she just told you that she did?
23 A.  She just told me.
24 Q.  Did she tell you that evening or after the incident?
25 A.  That evening.

Case 1:17-cv-21703-MGC   Document 162-24  Entered on FLSD Docket 12/21/2019   Page 22 of
77
Amber Tolorva et va
September 25, 2019                                    75 to 78

Page 75

1   Q.   Okay.  Where were you?
2   A.   I was waiting in like a hallway for her, I believe.
3   Q.   So the water slides were closed, and if I understand
4        correctly, I'm just trying to understand the sequence
5        of events, she went back into the bar to get a drink
6        and you were in the hallway?
7   A.   Yes.
8   Q.   And your understanding is when she came back to you,
9        she had said that she saw either her mom or your mom?
10  A.   Yes.
11  Q.   Did she tell you anything they talked about?
12  A.   No.
13  Q.   Were you alone in the hallway?
14  A.   Yes.
15  Q.   When Paiton came back to you, did she come back to you
16       alone?
17  A.   Yes.
18  Q.   Okay.  What happened next?
19  A.   We -- we ended up seeing Jermaine and I think the
20       other two.  I don't know when they came about, I don't
21       remember anymore.  And then Jermaine said that he had
22       something to tell me or show me, I don't really
23       remember and he like took me be by the hand into the
24       room.
25  Q.   Let me stop you there and I want to discuss the

Page 76

1        sequence of events before the room.
2   A.   Okay.
3   Q.   You're mentioning three individuals?
4   A.   Yes.
5   Q.   So my understanding of your testimony is that you do
6        recall three individuals, but not necessarily the
7        identification of all three?
8   A.   Uh-huh.
9   Q.   Can you say yes or no?
10  A.   Yes, sorry.
11  Q.   And they approached you, were you still in that
12       hallway?
13  A.   Yes.
14  Q.   How far away from the room was this?
15  A.   It was in that same hallway.  It was just like you had
16       to walk just like a little bit.  Not very far.
17  Q.   Would you say more than 50 feet?
18  A.   No, less.
19  Q.   And they walk up to you and do they say hello?
20  A.   Yes.
21  Q.   And then he says, "I need to tell you something"?
22  A.   I think --
23  Q.   Or what else did he say first?
24  A.   I think they asked what we were doing next.
25  Q.   And what did you say?

Page 77

1   A.   We were going to go to the slides and they told us
2        that they were closed.
3   Q.   What else was talked about before you started walking
4        with him towards the room?
5   A.   I don't recall.
6   Q.   What did Paiton say?
7   A.   I don't know.
8   Q.   And other than or prior to this interaction, the
9        extent of your conversation with any of these three
10       individuals was brief and regarding your stay and
11       hotel service such as food and drinks, right?
12  A.   Yes.
13  Q.   And then this individual says, "I need to show you
14       something"?
15  A.   I don't exactly remember what he said, but along those
16       lines.
17  Q.   And then he -- how did you get from that point to the
18       room?
19  A.   He had taken me there.
20  Q.   What do you mean by taken?
21  A.   Like grabbed my hand or arm.
22  Q.   Did he grab you hard, was he holding your hand to just
23       direct you where?
24  A.   It wasn't hard right away.
25  Q.   Okay.  And did you pull your hand back when he first

Page 78

1        grabbed you?
2   A.   I don't think so.
3   Q.   Did you find it odd for the extent in which you
4        previously interacted with him --
5   A.   Yes.
6   Q.   -- that he even reached out?
7   A.   Yes.
8   Q.   Where on your arm was it?
9   A.   Like my hand I want to say.
10  Q.   Your right or left hand?
11  A.   I don't know.
12  Q.   Below your wrist, though, where the actual hand is
13       versus a forearm?
14  A.   Yeah.
15  Q.   Did you feel it was more like holding hands at first?
16  A.   I guess.
17  Q.   Was it of any sexual nature?
18  A.   I didn't think so.
19  Q.   Did you scream?
20  A.   No.
21  Q.   Did you ask why are you touching me?
22  A.   No.
23  Q.   Did you then walk with him before it became a more
24       either forceful or firm hold?
25  A.   Yes.

Page 79

1  Q.  Did you say anything to Paiton, "I'll be right back"?
2  A.  Yes.
3  Q.  What did you say to Paiton?
4  A.  I don't remember exactly.
5  Q.  Where did you think you were going?
6  A.  I didn't know.
7  Q.  What did you think you were being shown?
8  A.  I thought I was just going to be taken away from the
9      people.
10 Q.  From what people?
11 A.  That were standing over there, so Paiton and I, I don't
12     remember if the two other guys were there or not.
13 Q.  Why did you think that you were going to be taken away
14     from them?
15 A.  Because he told me that he had -- I don't know his
16     exact words, but he said something.
17 Q.  Prior to that time, your mother had told you what you
18     referred to as the buddy system?
19 A.  Yes.
20 Q.  Did you voluntarily leave Paiton?
21 A.  Yes, but I didn't know where I was going to be taken
22     to.  I thought it was just going to be a small thing.
23 Q.  What do you mean by a small thing?
24 A.  I thought I was just going to be right back, kind of
25     like pull me aside.

Page 80

1  Q.  Did you ask for what reason?
2  A.  Yeah.
3  Q.  What did he tell you?
4  A.  I don't know.
5  Q.  You said "show me something," I mean as you're
6      standing there and someone that you've rarely
7      interacted with asked to take you away from your buddy
8      system and go with you somewhere to show you
9      something, you didn't ask any questions?
10 A.  I don't remember.
11 Q.  And then he grabs your hand in a non-firm like manner,
12     you didn't ask any questions?
13 A.  I don't remember.
14 Q.  As you started walking to this room before you got to
15     the room, was anything talked about?
16 A.  I don't recall.
17 Q.  At some point, though, you do recall that it got more
18     firm of a handhold?
19 A.  Yes.
20 Q.  Was it more just a tighter grip or did he grab you in
21     a different manner?
22 A.  A tighter grip.
23 Q.  On your hand?
24 A.  Yes.
25 Q.  Were your fingers interlocked?

Page 81

1  A.  No.
2  Q.  At any point in time before you entered that room, did
3      you get nervous?
4  A.  Yes.
5  Q.  Did you scream?
6  A.  No.
7  Q.  Did you say anything to him?
8  A.  I don't know.  I don't remember.
9  Q.  Did he ever put another hand on you other than holding
10     your hand firmly before you got in that room?
11 A.  No.
12 Q.  Did he ever, you know, grab you and take you into the
13     room or was it just by the hand, but with a more firm
14     hold?
15 A.  By the hand.
16 Q.  What did you think was going on?
17 A.  I don't know.
18 Q.  Did you think -- were you attracted to him?
19 A.  No.
20 Q.  Was Paiton flirting with the other gentlemen at the
21     time?
22 A.  I don't think so.
23 Q.  My understanding from the testimony yesterday of your
24     mother and in review of some of the documentation, you
25     gave a statement to the police afterwards; do you

Page 82

1      recall that?
2  A.  Yes.
3  Q.  And yesterday it was acknowledged as part of that,
4      your mother, you had told the police that you were
5      kissing the guy and that was something that you were
6      willing and then it went beyond when you got in the
7      room?
8  A.  Yes.
9  Q.  Is that something that you recall?
10 A.  Yes.
11 Q.  Okay.  So as you're going to this room, was it your
12     expectation that you would kiss this gentleman and
13     that's why you were going into a different area?
14 A.  I didn't know what was going to happen.
15 Q.  Was it your hope or intent to do that, but not go
16     further, or explain it to me so I can understand?
17 A.  No.
18         MR. WEGLARZ:  At what point?  I'm sorry.
19     Object to the form.  I won't say anything else because
20     then you'll say I'm coaching, so object to the form.
21         MR. SAFRA:  I thought the question was
22     pretty clear, so that's fine, your objection is
23     preserved.
24         MR. WEGLARZ:  It doesn't reference --
25         MR. SAFRA:  Your objection is preserved.

Page 83

1   It did.
2   A.   What was the question again?
3   BY MR. SAFRA:
4   Q.   No problem.  As you're leaving Paiton's presence and
5        you're walking with the gentleman to the room and he's
6        holding your hand before he firmly grabbed your hand
7        and took you to the room, what was your expectation in
8        terms of what you were going to do with this
9        gentleman?
10  A.   I didn't have an expectation.  I didn't know what was
11       going on.
12  Q.   At what point in time did you form an expectation or
13       think that you're going to willingly kiss the
14       gentleman?
15            MR. WEGLARZ:  Form objection.
16            Go ahead.
17  A.   I...
18  BY MR. SAFRA:
19  Q.   Let me strike that.  Did you at some point form the
20       thought or belief or understanding or want that you
21       were going to kiss this gentleman willingly?
22  A.   I don't know.
23  Q.   Well, can you explain then when you told the police of
24       this kissing before it got to a point of sexual
25       activity that you did not want, can you explain

Page 84

1        then --
2             MR. WEGLARZ:  There's no -- I'm sorry, I
3        thought you were done with your question.
4   BY MR. SAFRA:
5   Q.   Can you -- you were there, I was not.  And I'm aware
6        from the testimony of your mother and you've
7        acknowledged this desire to kiss; is that correct?
8   A.   I consented to kiss him until he got forceful and
9        started biting.
10  Q.   And I understand that, and I want to ask about the
11       forceful nature, but I'm trying to understand what was
12       going on and happened up to the point that it got
13       forceful.  So can you explain to me the events up to
14       the point in time where he got forceful beyond
15       kissing, from when you left Paiton and you're walking
16       towards the room?
17  A.   Once we got into the room, I was confused on what was
18       going on and then he kind of like came on to me.  And
19       then I kissed him back and then I wanted -- I like let
20       him know how I was feeling and I didn't want to
21       continue.
22  Q.   Stop right there because I want to just ask about that
23       before we get in -- to be fair, the reason why also is
24       I want to be able to ask you the questions before
25       maybe we get to a more emotional point.

Page 85

1   A.   Okay.
2   Q.   And so that's why I'm breaking it up.  So you're in
3        the room -- I mean, you're walking to the room and we
4        went through the firmness of the holding and it got
5        more firm as you're going into the room?
6   A.   Uh-huh.
7   Q.   At that point in time, did you expect that you might
8        kiss or do something of that sort with this gentleman?
9   A.   I don't know.
10  Q.   Do you know which of the three gentlemen it was?
11  A.   Jermaine.
12  Q.   Did you ask him what are we going in here to see?
13  A.   Yes.
14  Q.   You thought he was going to show you something, what
15       did he say?
16  A.   I don't know.
17  Q.   At this point that you're going into this room, what
18       did you see in the room or understand it to be?
19  A.   It was dark.  I don't -- I didn't really know what it
20       was.  It was like an employee room like a whole bunch
21       of towels or sheets or something.
22  Q.   So you're going into this room that's dark, it has
23       towels and sheets, but you knew it was an employee
24       room?
25  A.   Yeah.

Page 86

1   Q.   A restricted area of sorts?
2   A.   Yeah.
3   Q.   Did you think at that point this is something more
4        intimate that is going to happen?
5   A.   I didn't know.
6   Q.   Had you ever kissed a guy before?
7   A.   Yeah.
8   Q.   So then you're in this room, before the point that it
9        gets to be more forceful, tell me step by step what
10       happened?
11  A.   I don't really remember.
12  Q.   Did you go right inside the doorway and the door
13       closed?
14  A.   Yes.
15  Q.   Who closed the door?
16  A.   Jermaine.
17  Q.   Okay.  And then are you standing right there in the
18       doorway or did you walk more into the room?
19  A.   Standing right there by the doorway.
20  Q.   And in that doorway, he started to kiss you?
21  A.   Yes.
22  Q.   And then you kissed him back?
23  A.   Yeah.
24  Q.   How long did that happen?
25  A.   Not very long, like a couple seconds.

Page 87

1   Q.   And then you stopped kissing him and I believe you
2        said you spoke to him?
3   A.   Yes.
4   Q.   What did you say to him?
5   A.   I don't remember.
6   Q.   Did you -- what happened after, whatever it is you
7        said to him?
8   A.   I wanted to leave and I think he -- I don't know
9        exactly what I said.
10  Q.   Okay.  So make sure I understand.  You don't recall
11       specifically the words you used?
12  A.   Yes.
13  Q.   But my understanding is you conveyed at least in some
14       form you wanted to leave?
15  A.   Yes.
16  Q.   Okay.  Anything else that you recall?  Not just
17       necessarily the exact words, but what it is that you
18       said to him even in terms of a summary of what you
19       said?  Like you're saying to me you don't recall what
20       you said, but then you're telling me you said you
21       wanted to leave?
22  A.   Yes.
23  Q.   I don't want to know the exact words, but I want to
24       know exactly what you conveyed to him?
25  A.   I said I was uncomfortable and to let me out of the

Page 88

1        room.
2   Q.   Did you understand that the door was locked or
3        anything?
4   A.   I don't know.
5   Q.   Okay.  Was he holding you with both arms at that time
6        where you said you wanted to leave?
7   A.   I don't recall.
8   Q.   Did you try to leave and he prevented you from leaving
9        when you said that to him?
10  A.   I -- no.
11  Q.   And after you said you wanted to leave, what happened
12       next?
13  A.   He continued.
14  Q.   Continued what?
15  A.   To like get control over me.
16  Q.   In what way?
17  A.   Like with his body.
18  Q.   Did he press himself on you?  Did he use his hands?
19       And I apologize for having to ask the specifics of
20       this and have you recount it, but I obviously need to
21       understand what happened.
22  A.   He had pushed me back into I think what was like a
23       chair and like started to like take -- try to take my
24       pants off.
25  Q.   Did you do anything in response?

Page 89

1   A.   Yeah.  Like I was scared and was trying to stop it,
2        but he was forceful and stronger than me.
3   Q.   Did you scream?
4   A.   I don't know.
5            MR. WEGLARZ:  Let me know -- I want to take
6        a break.
7            MR. SAFRA:  Yeah, because that's actually a
8        good time.
9            MR. WEGLARZ:  Yeah.
10           MR. SAFRA:  We can go off the record.
11           (Recess taken at 9:15 a.m.)
12           (Back on the record at 9:42 a.m.)
13       MARKED FOR IDENTIFICATION:
14       DEPOSITION EXHIBIT 3
15       9:42 a.m.
16  BY MR. SAFRA:
17  Q.   Before we took a break, we were at the point I believe
18       in the incident that based upon your recollection, you
19       were then pushed into a chair; do you recall that?
20  A.   Uh-huh, yes.
21  Q.   Was Paiton in the room at that time?
22  A.   Yes.
23  Q.   Before I talk about Paiton entering the room and that
24       aspect of this incident, I want to kind of finish up a
25       little bit on anything pertaining to you.  Could you

Page 90

1        tell me to your best recollection as you sit here
2        today what happened next --
3            MR. WEGLARZ:  Sorry, Tom -- Steve.
4   BY MR. SAFRA:
5   Q.   And the sequence after you --
6            MR. WEGLARZ:  I'll be right back, sorry.
7            MR. SAFRA:  We can go off the record.
8            (Discussion off the record at 9:43 a.m.)
9            (Back on the record at 9:45 a.m.)
10  BY MR. SAFRA:
11  Q.   Before I talk about Paiton entering the room and
12       anything you may have witnessed in terms of Paiton's
13       aspect of the incident, you were mentioning that you
14       were pushed into a chair by Jermaine; is that correct?
15  A.   Yes.
16  Q.   Okay.  Tell me everything that you recall as you sit
17       here today that happened after he pushed you into the
18       chair?
19  A.   Once he pushed me into the chair, he kind of just
20       forced himself onto me.
21  Q.   Anything else?
22  A.   Anything else as in what?
23  Q.   Anything else as you sit here today about that portion
24       of this incident up until you were outside of the room
25       that you recall as you sit here?

Page 91

1   A.   I just recall like the rape happening at that time.
2   Q.   And in terms of that aspect of the incident, was it
3        just in the front vaginally?
4   A.   Yes.
5   Q.   Anything else?
6   A.   No.
7   Q.   I'm going to show you what I marked as Exhibit 3, if
8        you could identify this document for me.
9   A.   What do you want me to do?
10  Q.   Identify what is this document.
11  A.   This is the police report.
12  Q.   And this is a statement with your name on it, it
13       purports to be a statement of yours?
14  A.   Yes.
15  Q.   Is that your handwriting?
16  A.   No.
17  Q.   Who wrote this document?
18  A.   I believe the lady I was telling it to.
19  Q.   A police officer?
20  A.   Yes.
21  Q.   On the last page there is a signature that purports to
22       be your signature in multiple places; do you see that?
23  A.   Yes.
24  Q.   Is that your signature?
25  A.   One of them, yes.

Page 92

1   Q.   When you say one of them?
2   A.   Oh, two of them.  Yes.
3   Q.   The two of them are your signature and two are your
4        mother's?
5   A.   Yes.
6   Q.   Did you see a copy of this document before you signed
7        it or see this statement?
8   A.   I didn't get to reread it, no.
9   Q.   You did not get to reread it?
10  A.   Correct.
11  Q.   So you gave a statement to the police and they took
12       notes and wrote down what you were saying?
13  A.   Yes.
14  Q.   Then they asked you to sign the statement?
15  A.   Yes.
16  Q.   Did you -- you did not read it before you signed it?
17  A.   Correct.
18  Q.   Okay.  Let me ask you about, did the police give you
19       an opportunity to read it?
20  A.   I don't recall.
21  Q.   Did you ask before, when they said sign this document,
22       did you say I'd like to read this document to make
23       sure that you accurately took down what I told you and
24       they didn't let you?
25  A.   I don't believe I said that, no.

Page 93

1   Q.   If you had wanted to read this document before you
2        signed it to ensure its accuracy of the statement you
3        gave to the police, do you agree that you had that
4        opportunity to do that if you wanted?
5   A.   I don't recall.
6   Q.   Was your mother present at the time that you gave this
7        statement?
8   A.   Yes.
9   Q.   Was your mother present at the time that you signed
10       this?
11  A.   Yes.
12  Q.   Did your mother ask to read the statement to ensure
13       its accuracy before she also signed the document?
14  A.   I don't know that.
15  Q.   The document that it says here she was a witness to?
16  A.   I don't know.
17  Q.   I'm going to go through some of the aspects of this
18       and some other counsel may go into more detail, but
19       there's a reference here to --
20            MR. WEGLARZ:  Can you have a copy for her
21       as well?
22            MR. SAFRA:  Yeah.
23            MR. WEGLARZ:  Thank you.
24  BY MR. SAFRA:
25  Q.   Turning to page 4, there is reference here

Page 94

1        pre-incident to interactions that you had with one of
2        the employees at the resort, Jermaine, who you've
3        identified as the assailant involving you?
4   A.   Yes.
5   Q.   Do you see that?  And it talks about you continued
6        seeing him at the resort and he was always talking to
7        Paiton and it says, "I," that's you, "and sometimes
8        hitting on us.  When I say he was hitting on us, I
9        mean he was being flirtatious, but Paiton and I never
10       took up his offer.  He would call us beautiful ladies
11       and asked us if we were going to any parties or clubs
12       off property.  I told him no because we were there
13       with our parents."  Do you see that?
14  A.   Yes.
15  Q.   Does that refresh your recollection that that had
16       occurred?
17  A.   Yes.
18  Q.   So prior to the incident, you had interacted with
19       Jermaine and had the impression that there was
20       flirtation being directed towards you?
21  A.   Yes.
22  Q.   And Paiton?
23  A.   Yes.
24  Q.   Would the same be true for the other gentlemen?
25  A.   I don't recall having many interactions.

Page 95

1  Q.   And in a response to this flirtation, you gave
2       Jermaine your social media Instagram account
3       information to friend, correct?
4  A.   It says that, but I think it was a Facebook, not
5       Instagram.
6  Q.   So following flirtation being directed your way by
7       Jermaine, you then responded before the incident when
8       this occurred by giving him your Facebook social media
9       account information?
10 A.   Yes.
11 Q.   Did you become friends on Facebook?
12 A.   Yes.
13 Q.   At that time?
14 A.   Yes.
15 Q.   Is there anything else about your interactions with
16      Jermaine pre-incident that this now refreshes your
17      recollection that the conversations and interactions
18      were more than just employee, can I get you a drink or
19      how's your stay and how long you're here?
20 A.   I don't really remember anymore.
21 Q.   But this did occur as it says in this statement?
22 A.   Yes.
23 Q.   On page 6, it says that when you left the piano bar
24      that evening of May 8th, that Paiton and you were
25      going back to the slides and you saw Dwight in the

Page 96

1       hallway and he said the slides were closed, which we
2       had talked about earlier?
3  A.   Uh-huh.
4  Q.   He was talking to Paiton and you and then Paiton went
5       to the bar to get a quick drink, does this refresh
6       your recollection that you were then with Dwight in
7       the hallway, not alone?
8  A.   Yes.
9  Q.   What did you and Dwight talk about?
10 A.   I don't recall.
11 Q.   It says here that Dwight asked you what you were going
12      to do and you told him you weren't sure, maybe go back
13      to the piano bar, then Paiton returned with her drink
14      in hand and then Jermaine joined?
15 A.   Yes.
16 Q.   Okay.  It says Jermaine told you that he had something
17      to tell you and he held onto your right hand and
18      pulled you to the side, is that what you were
19      testifying about earlier?
20 A.   Yes.
21 Q.   It says here was not forceful, that's consistent with
22      your statement?
23 A.   Yeah.
24 Q.   And so you walked with him to the door that had the no
25      unauthorized personnel sign, is that what happened?

Page 97

1  A.   Yes.
2  Q.   Okay.  He opened the door and you walked with him into
3       the room, is that voluntarily walked into the room?
4  A.   Yes.
5  Q.   Does that refresh your recollection that there was no
6       forceful grasp of your hand prior to being inside that
7       room?
8  A.   Yes.
9  Q.   And this statement was given closer in time to the
10      incident, correct?
11 A.   Yes.
12 Q.   So prior to being inside that room, there was no
13      forceful nature of any touching by Jermaine to you; is
14      that correct?
15 A.   He did grab my hand forcefully once we got closer to
16      the door.
17 Q.   Well, it says here it wasn't forceful, so you walked
18      with him.  He opened the door and I walked with him
19      into the room.  Does it say here that there was any
20      force at any time?
21 A.   It doesn't.
22 Q.   Okay.  Is that something, saying that it wasn't
23      forceful at first, if it was forceful before you got
24      into the room, do you think that would be something
25      important that you would say?

Page 98

1  A.   Yes.
2  Q.   But you did not tell the police that at that time,
3       correct?
4  A.   Yes, correct.
5  Q.   It says, "Jermaine started to kiss me on my lips, I
6       was surprised at first and I felt unsure.  I did not
7       know if I wanted to stop or continue."  Is that a fair
8       statement?
9  A.   Yes.
10 Q.   Is that what happened?
11 A.   Yes.
12 Q.   And it says you did not say anything to him and he did
13      not say anything to you either at that time, is that
14      what happened next?
15 A.   Yes.
16 Q.   At that time, he tried to pull your shorts down with
17      his hands, correct?
18 A.   Correct.
19 Q.   And you used your hands to pull your shorts down
20      instead, correct?
21           MR. WEGLARZ:  Whoa, whoa, what?  I'm sorry.
22           MR. SAFRA:  Sorry, I misread that, you can
23      strike that.  I misread the sentence.
24           MR. WEGLARZ:  Yes, you did.
25           MR. SAFRA:  That was not intentional.

Case 1:17-cv-21703-MGC   Document 162-24 Entered on FLSD Docket 12/21/2019   Page 28 of 77
Amber Toler, et al. v
September 25, 2019                                    99 to 102

Page 99

MR. WEGLARZ:  Thank you.
BY MR. SAFRA:
1
2
3  Q.   You used your hands to move his hands away and stopped
4       kissing him at that time, correct?
5  A.   Yes.
6  Q.   At that time the door opened, who entered the room?
7  A.   Paiton.
8  Q.   So was the door locked?
9  A.   I don't know.
10 Q.   Did you understand that that door if it was locked
11      could not be opened from the outside?
12 A.   I don't know.
13 Q.   Would you assume that to be true?
14 A.   I don't know.
15 Q.   Well, if -- have you ever come to learn that that door
16      if locked could not be opened from the outside?
17 A.   Yes.
18 Q.   Because after the incident, the account from your
19      mother and Janet is they tried to open the door from
20      the outside and could not?
21 A.   Right.
22 Q.   So if Paiton and the other employees were allowed to
23      enter the room while you were in there, would you
24      agree that the door was not locked during this time?
25 A.   Well, she came in with somebody, so I don't know if

Page 100

1       there was like a key or something.
2  Q.   Do you recall the door being locked after you entered
3       it?
4  A.   I don't know.
5  Q.   It says the door opened and Jermaine stopped trying to
6       take your shorts off at that time.  And in the room --
7       in the room walked Paiton and Dwight, so just one
8       employee with Paiton?
9  A.   Yes.
10 Q.   Okay.  At that time had you said to Jermaine stop or
11      anything along those lines other than just pushing his
12      hand away from taking your pants off?
13 A.   I don't recall.
14 Q.   Did you say to Paiton as she walked in, "He's trying
15      to take my pants off and I don't want to, let's go,
16      let's get out of here"?
17 A.   I did not.
18 Q.   You could clearly see Paiton and Dwight as they walked
19      in the room, correct?
20 A.   I wouldn't say clearly, but I did see them.
21 Q.   It says here, "I could clearly see Paiton and Dwight
22      when they walked into the room," does that refresh
23      your recollection that that's a truthful and accurate
24      statement of what happened?
25 A.   I guess.

Page 101

1  Q.   Where did Dwight and Paiton go once they entered the
2       room?
3  A.   They, I thought it was the back of the room, but I
4       don't know.
5  Q.   Could you see them?
6  A.   No.
7  Q.   After that, did Jermaine continue to kiss you?
8  A.   I don't recall.
9  Q.   It says here in the new paragraph in the middle of
10      page 7, "Jermaine continued kissing me.  I kissed him
11      back a little and then he tried taking off my shorts
12      again."  Do you see that?
13 A.   Yes.
14 Q.   Does that refresh your recollection of what happened
15      after Paiton and Dwight were in the room and walked --
16 A.   Yes.
17 Q.   -- further to where they were?
18 Q.   Right.  Can you repeat that?
19 Q.   I wasn't finished with my question so it was in the
20      middle.
21 A.   Okay.
22 Q.   I said does that refresh your recollection as to what
23      happened after Paiton and Dwight had entered the room
24      and walked to where they were?
25 A.   Yes.

Page 102

1  Q.   At this point in the sequence of events, you had --
2       you were kissing Jermaine and he tried to take off
3       your shorts and you brushed his hand away, correct?
4  A.   Yes.
5  Q.   Then Paiton and Dwight enter the room, was anything
6       said that you recall to Paiton by anybody?
7  A.   I don't know.
8  Q.   Did she say anything to you?
9  A.   I don't think so.
10 Q.   She then walks with Dwight to another location in that
11      room that you could not see, correct?
12 A.   Correct.
13 Q.   Then Jermaine and you start kissing again?
14 A.   Yes.
15 Q.   And then he tries to take your shorts off again?
16 A.   Yes.
17 Q.   At any time did you say stop?
18 A.   Yes.
19 Q.   In that sequence?
20 A.   I don't know when exactly.
21 Q.   Okay.  So and we'll get to that because I think it
22      comes next in the sequence, but I just wanted to try
23      to take this step by step.  Prior, let's go through
24      the sequence and you can tell me if that's what you're
25      referencing in terms of telling him to stop.

Page 103

1   A.   Okay.
2   Q.   At some point did Jermaine unzip your shorts?
3   A.   Yes.
4   Q.   Did he pull them down or did you pull them down?
5   A.   He pulled them down.
6   Q.   Was it at that time or what did you feel at that time?
7   A.   I was scared.
8   Q.   Is it at that time, the first time where you said stop
9        to Jermaine?
10  A.   Yes.
11  Q.   So prior to your pants coming off when you started
12       kissing again and he started to try to take them off a
13       second time and you said earlier a few questions ago
14       that you said stop, it was after your pants were off
15       that we're talking about that first time, not before?
16            MR. WEGLARZ:  When you mentioned stop, you
17       mean verbally?
18            MR. SAFRA:  Verbally.
19  A.   Yes.
20  BY MR. SAFRA:
21  Q.   Okay.  Did you say anything else to Jermaine?
22  A.   I said I wanted to leave.
23  Q.   It says here in your statement that you also said "No,
24       I don't want to do this."  Is that truthful and
25       accurate?

Page 104

1   A.   Yes.
2   Q.   Did Jermaine say anything to you in response?
3   A.   No.
4   Q.   It says here, if you look at the bottom of page 7 that
5        Jermaine said, "Come on."  Do you see that?
6   A.   Yes.
7   Q.   Does that refresh your recollection as to what he
8        said?
9   A.   I guess.
10  Q.   Was that a truthful and accurate account of what
11       happened?
12  A.   I just don't really remember anymore.
13  Q.   So you don't recall at the time.  At the time that you
14       gave this statement, it was closer in time to the
15       incident, in fact, it was, I believe, the day after?
16  A.   It was actually that same night.
17  Q.   Or the same night?
18  A.   Yes.
19  Q.   Would you agree that your recollection of what
20       happened the same night of the incident was more
21       complete or more accurate than with the passage of
22       time?
23  A.   Yes.
24  Q.   It says that it's at this point that he forcefully
25       pushed you back into the chair; is that true?

Page 105

1   A.   Yes.
2   Q.   Okay.  So earlier when we were talking about him
3        bringing you in the room and you kissing and then you
4        said no, and then he pushed you back in the chair,
5        maybe that was more general.  But everything that we
6        just went over regarding Paiton entering the room and
7        the pants and when it was that you first told him you
8        didn't want to do this and stop, all of that, does
9        this refresh your recollection, occurred before you
10       were pushed in the chair, correct?
11  A.   Yes.
12  Q.   During this time, did you at any point in time see
13       what Paiton was doing?
14  A.   No.
15  Q.   Did Paiton look when she walked in that room like she
16       was being brought into that room with any force?
17  A.   I don't recall.
18  Q.   She voluntarily walked into that room, correct?
19            MR. WEGLARZ:  Form objection.
20  A.   I don't know.
21            MR. WEGLARZ:  Calls for speculation.
22  BY MR. SAFRA:
23  Q.   Prior to that when they were flirting with you --
24            MR. SUAREZ:  Part of that is just
25       inappropriate, just leave it at form objection,

Page 106

1        because if you say calls for speculation, you're
2        coaching the witness.  I think the law is clear on
3        that.
4   BY MR. SAFRA:
5   Q.   Previously in the instances when these employees were
6        flirting with you and Paiton that we discussed, Paiton
7        was flirting back, correct?
8   A.   I don't know.
9   Q.   Paiton gave her social media contact as well, correct?
10  A.   I don't know.
11  Q.   When Paiton and Dwight walked into the room, the light
12       from the outside allowed you to see them, correct?
13  A.   Yes.
14  Q.   Did it look like Paiton was in any sort of trouble?
15  A.   I don't know.
16  Q.   Did you put in your statement anywhere that you could
17       see that you said at the time when your recollection
18       was better because it's the night of, that Paiton was
19       in any -- looked like she was in any sort of trouble
20       or that Paiton was being forced into that room by
21       anyone?
22  A.   I don't know.
23  Q.   Well, here's your statement.  Do you see anywhere that
24       you told the police anything of that sort?
25  A.   I don't recall like, I remember seeing Paiton walk

Page 107

1    into the room, but there was a lot going on with my
2    situation, so I didn't -- I was confused on what was
3    happening with her, but I did not -- I didn't get to
4    act on anything because of the panic, I guess.
5 Q. Well, you say panic, but once the door closed and
6    Paiton was in the room, you consensually and
7    voluntarily started kissing Jermaine again, correct?
8           MR. WEGLARZ: Steve, come on.
9 A. I didn't start kissing him willingly.
10 BY MR. SAFRA:
11 Q. Well, it says here "Jermaine continued kissing me, I
12    kissed him back a little after Paiton was in the
13    room," isn't that what this statement says?
14 A. It does say that because I was only --
15           MR. WEGLARZ: Still on page 7?
16           MR. SAFRA: Yes.
17 A. I said that because I was scared.
18 BY MR. SAFRA:
19 Q. You were scared when you were telling the police what
20    happened to you that --
21 A. No, I was scared when it was happening, that's why I
22    kissed him back a little.
23 Q. Did you say to Paiton, "He's kissing me, he's trying
24    to take my shorts off"?
25 A. No.

Page 108

1 Q. Did you see -- you said you saw Paiton and it says
2    here you saw them walk to the back of the room, did it
3    look like Paiton was being dragged into the room?
4 A. I don't know.
5 Q. Or pulled by anyone?
6 A. I don't know.
7 Q. But in the context of you, you tell the police about
8    how when you were led away by Jermaine towards that
9    room, it was not forceful, correct?
10 A. Correct.
11 Q. So that was important information for you to tell the
12    police, correct?
13 A. Yes.
14 Q. So wouldn't you believe -- wouldn't you agree it's
15    also important that if something forceful is being
16    done at that time, you also tell the police that?
17 A. Yes.
18 Q. So if that did occur, it would have been something you
19    told the police, correct?
20 A. Yes.
21 Q. At some point in time you left the room, correct?
22 A. Uh-huh, yes.
23 Q. Okay. Did you ever see Paiton inside that room again
24    after she walked to the back and the door got closed?
25 A. No.

Page 109

1 Q. Did you hear anything?
2 A. No. It was loud in there.
3 Q. Did you hear anything regarding Paiton?
4 A. No.
5 Q. How far away from you was she?
6 A. I don't know.
7 Q. Afterwards did you go to the room?
8 A. No.
9 Q. You didn't walk to the room with Janet and Paiton
10    after the incident?
11 A. Yes.
12 Q. Okay. So when you went in that room, were you able to
13    see where you were?
14 A. When I got back to --
15 Q. After the incident and you went back with someone from
16    the hotel or the police and Janet and Paiton, did you
17    identify where you were in that room?
18 A. Yes.
19 Q. Did Paiton identify where she was in that room?
20 A. I think so.
21 Q. Do you know where, do you recall where she was in that
22    room that she identified?
23 A. No.
24 Q. You agree that it was probably 10 feet?
25 A. I am not sure.

Page 110

1 Q. Do you recall how large the room was?
2 A. It was big.
3 Q. How big, bigger than this conference room?
4 A. Yes.
5 Q. Could you hear anything that Paiton was doing?
6 A. No.
7 Q. Did you hear any screams or signs of trouble?
8 A. No.
9 Q. Did you hear any signs of pleasure?
10 A. No.
11 Q. Did you leave the room before Jermaine?
12 A. Yes.
13 Q. So at some point the actual occurrence of the rape, as
14    you refer to it, ended, is that because he backed off?
15 A. Yes.
16 Q. And after he backed off, what did you do?
17 A. I said to let me out.
18 Q. And did he let you leave the room?
19 A. Yes.
20 Q. Okay. And did you immediately leave the room?
21 A. Yes.
22 Q. Did you yourself, were you in the chair at that time?
23 A. At what time?
24 Q. When you said I want to leave the room and he let you
25    out, were you in the chair?

Case 1:17-cv-21703-MGC   Document 162-24 Entered on FLSD Docket 12/21/2019   Page 31 of
77
Amber Tolonova, et al
September 25, 2019                                        111 to 114

Page 111

1   A.   I believe so.
2   Q.   Okay.  Did you get up and walk over to the door to
3        leave?
4   A.   Yes.
5   Q.   Did you open the door and walk out?
6   A.   I think he opened the door.
7   Q.   Did he have to use a key or just turn the handle?
8   A.   I don't recall.
9   Q.   And then you went outside the room?
10  A.   Yes.
11  Q.   And where did you go next?
12  A.   Well, I was going to go somewhere else and then I saw
13       my mom and Janet.
14  Q.   How long transpired between when you exited that room
15       and you saw your mom?
16  A.   It was within like 25 seconds.
17  Q.   And you were standing there doing what?
18  A.   Crying.
19  Q.   Were you concerned that something might be happening
20       to Paiton in that room?
21  A.   Yes.
22  Q.   Did you try to get Paiton before you left the room?
23  A.   No.
24  Q.   Did you scream for Paiton?
25  A.   No.

Page 112

1   Q.   Did you call for her in a non-screaming voice?
2   A.   No.
3   Q.   Did you bang on the door and say, "Paiton is in there,
4        let me out"?
5   A.   No.
6   Q.   "Or let her out"?
7   A.   I did once my mom and Janet came to me.
8   Q.   Okay.  Prior to your mom or Janet arriving, did you
9        do -- take any action in knocking on the door or doing
10       anything to try to see if Paiton was okay or get to
11       Paiton?
12  A.   No.
13  Q.   Did you call for help from anybody and say your friend
14       was in there?
15  A.   No.
16  Q.   I was just assaulted?
17  A.   No, I was in shock.
18  Q.   How do you know how long transpired if you were
19       confused and in shock between the time you left the
20       room and you saw your mom?
21  A.   Because it was fast.
22  Q.   Did you look at a watch?
23  A.   No.
24  Q.   Have you ever thought, you know, it seems like time is
25       going really slow, but really it could have been five

Page 113

1        or ten minutes?
2   A.   No.
3   Q.   But that portion, you're certain it was about
4        25 seconds?
5   A.   I'm certain it was like fast.
6   Q.   So does -- could fast be a couple minutes?
7   A.   Could be less --
8             MR. WEGLARZ:  Asked and answered.
9   A.   -- than a minute.
10  BY MR. SAFRA:
11  Q.   It could be less than a minute, but it could be more
12       than a minute, correct?
13  A.   No.
14  Q.   So despite all of your shock, despite all of your
15       confusion, despite your inability to recall
16       interactions of flirtation beforehand, one thing
17       you're certain of as you sit here today years later is
18       that it was less than a minute?
19  A.   Yes.
20  Q.   How were you so certain?
21  A.   Because I was --
22            MR. WEGLARZ:  What kind of question is
23       that?  Objection.
24  A.   I was shocked.
25  BY MR. SAFRA:

Page 114

1   Q.   Because you were shocked?
2   A.   It was so fast that I saw them after.  Like it was
3        kind of like wow, like I would now just see them like
4        right after that.
5   BY MR. SAFRA:
6   Q.   Okay.  But do you agree, though, you're in a state of
7        shock at the time?
8   A.   Yes.
9   Q.   You believe it was less than a minute?
10  A.   Yes.
11  Q.   But you don't know, correct?
12  A.   Correct.
13  Q.   It says here in your statement while you were standing
14       outside you saw your mom and Paiton's mom walking
15       towards you?
16  A.   Yes.
17  Q.   You felt scared when you saw them because you knew it
18       was not going to turn out good?
19  A.   Yes.
20  Q.   Did you say anything to the police about you were in
21       shock or you saw them immediately or any of this time
22       period?
23  A.   I don't know.
24  Q.   That would be important information to give them if it
25       was something that had happened in that time span,

Page 115

1    correct?
2  A.  I guess.
3  Q.  You were -- were you concerned at that time that your
4      mom was going to get mad at you because you weren't
5      with Paiton as part of the buddy system?
6  A.  Yes.
7  Q.  Were you concerned at that time that your mom was
8      going to get mad at you because you went in that room
9      with that man?
10 A.  Yes.
11 Q.  Did your mom start yelling at you?
12 A.  Yes.
13 Q.  Outside that room she started yelling at you, correct?
14 A.  Yes.
15 Q.  What did she think you were doing?
16 A.  I think she thought I was either like smoking or doing
17     something bad.
18 Q.  And by that do you mean smoking marijuana?
19 A.  Yes.
20 Q.  Did she ask you at that moment outside the room if you
21     were smoking marijuana?
22 A.  I think so.
23 Q.  Turning to page 9 of the statement it says with regard
24     to outside that room when your mom approached, "My mom
25     started yelling at me because she thought that I was

Page 116

1      smoking.  I told her no and that she was wrong.  Both
2      my mom and Janet asked where Paiton was and I pointed
3      at the door."  Do you see that?
4  A.  Yes.
5  Q.  Does that refresh your recollection as to the
6      conversation with your mother?
7  A.  Yes.
8  Q.  So at that time, was it your understanding that your
9      mom thought you were smoking marijuana?
10 A.  Yes.
11 Q.  And she thought it was in that room, correct?
12 A.  Yes.
13 Q.  And your mom and you had that verbal interaction
14     before you pointed at the door to where Paiton was?
15 A.  Yes.
16 Q.  And before they asked you where is Paiton, according
17     to the statement, the occurrence of the conversation
18     and yelling involving smoking is accounted for before
19     you then say they asked you where Paiton was and you
20     pointed at the door; does that refresh your
21     recollection?
22 A.  Yes.
23 Q.  Is that what happened?
24 A.  Yes.
25 Q.  And it's at that time, the first time that you, Janet

Page 117

1      or your mom knocked on that door of the room that
2      Paiton was in, correct?
3  A.  Yes.
4  Q.  It actually says here, though, that it was your two
5      mothers that knocked on the door and you sat on a
6      stump, did you ever knock on the door?
7  A.  I don't know.  I don't think so.
8  Q.  Okay.  So if you look in the middle of page 9, it
9      references only the mothers, but you testified here
10     today that you also knocked on the door, does that
11     refresh your recollection that you never knocked on
12     the door?
13 A.  Yes.
14 Q.  While your mom was banging on the door, did you have
15     any conversations with her?
16 A.  No.
17 Q.  If you turn to page 9, it says here to refresh your
18     recollection, "Janet left to get security and my mom
19     kept banging on the door and she asked me what they
20     were doing inside the room and what was going on in
21     there.  I don't remember what I said to her."  Do you
22     see that?
23 A.  Yes.
24 Q.  Does that refresh your recollection as to any verbal
25     conversation or statements you had with your mother at

Page 118

1      that time?
2  A.  I still don't remember.
3  Q.  Would this be a truthful and accurate statement that
4      was taken the night of the incident?
5  A.  Yes.
6  Q.  Do you have anything to dispute any of these
7      statements that we have gone over here from your
8      account the night of the incident that you gave to the
9      police that we have gone over here today?
10 A.  Can you restate that?
11 Q.  Do you as you sit here today, we have gone through
12     various aspects of your statement to the police; do
13     you understand?
14 A.  Yes.
15 Q.  And some of them have refreshed your recollection?
16 A.  Yes.
17 Q.  Do you have as you sit here today any disagreement or
18     dispute with any of these aspects of your statement
19     that we have gone over today such that you say they're
20     not truthful or accurate?
21 A.  No.
22         MR. SAFRA:  We can take a break.
23         (Recess taken at 10:15 a.m.)
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 4

Page 119

1             10:16 a.m.
2             MR. SAFRA:  Ordering original transcript.
3             (Whereupon Mr. Safra left the room
4             at 10:28 a.m.)
5             (Back on the record at 10:28 a.m.)
6                  EXAMINATION
7    BY MR. SUAREZ:
8    Q.   Ma'am, I just introduced myself to you again.  I'm
9         Luis Suarez and I represent The Mark Travel
10        Corporation --
11   A.   Okay.
12   Q.   -- which was a tour operator that provided some
13        services to a travel agent that Ms. DeSantis used.
14        Because Mr. Safra had to leave, I'm going to be asking
15        a majority of the remaining questions today.  He asked
16        me to bat cleanup and I agreed to do so, okay?
17   A.   Okay.
18   Q.   You, like I, suffer the same infirmity in that we are
19        soft spoken and the court reporter to my right has
20        asked me very kindly to speak up and I'm going to try
21        to do so.  I'm going to ask you to do the same thing,
22        is that okay?
23   A.   Yes.
24   Q.   So before we broke, you were going through this
25        statement with Mr. Safra, and I'm going to hand you

Page 120

1         another copy because I'd like you to have it in front
2         of you while I ask you some other questions about
3         this, okay?
4    A.   Okay.  Thank you.
5             MR. SCOTT:  Has that been marked for ID?
6             MR. WEGLARZ:  Yes.
7             MR. SUAREZ:  Yes, it has.  It is Exhibit
8         Number 3 to Amber Torralva 9-25-19 deposition.
9    BY MR. SUAREZ:
10   Q.   I was unclear admittedly in your prior answers as to
11        when you made this statement, do you recall the
12        sequencing of events after the incident?
13   A.   Yes.  So after the incident, we had went back to the
14        room and then we ended up telling our moms and then
15        they went to the lobby and then from there, somebody
16        took us to the police.  Actually, I don't know if
17        that's true.  I don't know if we went to like a
18        hospital first and then the police or flip-flop.  I
19        don't recall.
20   Q.   Okay.  And that's what I was getting at precisely is
21        there was the incident and then at some point you
22        ended up in a position to be able to make this
23        statement.  I just don't know when that was.
24   A.   I was up all night, I know that for sure so I think --
25   Q.   So before you made this statement, you had been up all

Page 121

1         night?
2    A.   Yeah, I was like falling asleep while it's being
3         taken.
4    Q.   So it sounds like and I don't want to put words in
5         your mouth, and if it's not true, please tell me, but
6         what it sounds like to me is that there was an
7         incident, there was an episode where you talked to
8         your mother, Ms. DeSantis and Ms. Bater.  Then you got
9         some medical treatment and that took some time?
10   A.   Yes.
11   Q.   And then you gave this statement?
12   A.   Yes.
13   Q.   Is that right?
14   A.   Uh-huh.
15   Q.   And your recollection is that you gave this statement
16        the following morning at some point, so the morning of
17        May 9, 2015; is that right?
18   A.   Yes.
19   Q.   One of the things that was unclear to me in your prior
20        statements were a couple of things.  One is the timing
21        of this event, so can you -- at what time was it that
22        you met with Jermaine in the hallway before you went
23        into the room?
24   A.   I don't know exactly what time.  I thought it said
25        maybe around like 10:00.  I don't know exactly,

Page 122

1         though.
2    Q.   10:00 in the evening?
3    A.   Yes.  But that could be wrong.
4    Q.   Well, let's back up and see if we can't walk through
5         this together.  What time did you have dinner?
6    A.   I don't know.
7    Q.   What time did you go to the water slide?
8    A.   I don't recall.
9    Q.   Before you left to enjoy your final evening at Beaches
10        with Paiton, did your mother give you a curfew?
11   A.   I don't recall.
12   Q.   From the time that you went into the room until the
13        time you exited the room, how much time elapsed?
14   A.   I am not entirely sure, not an hour, less than that.
15        I don't really know.
16   Q.   Was it more or less than ten minutes?
17   A.   Maybe like 15 minutes, I think.
18   Q.   Did you have your cell phone with you that evening?
19   A.   I don't recall.
20   Q.   While you were in Jamaica, did you have a cell phone?
21   A.   Yes.
22   Q.   And while you were in Jamaica, were you communicating
23        with people?
24   A.   Yes.
25   Q.   Okay.  Were you communicating with people because the

Page 123

1    resort had Wi-Fi or were you just using an
2    international plan to communicate with people?
3    A.   Because the resort had Wi-Fi.
4    Q.   Okay.  All around the property?
5    A.   I don't know that.
6    Q.   But were you using your phone every day during those
7         four days?
8    A.   Most likely.
9    Q.   And were you posting messages to either your Facebook
10        account or your Instagram account?
11   A.   I don't know.
12   Q.   Okay.  Do you recall texting anybody while you were at
13        the resort?
14   A.   Maybe.
15   Q.   When you say maybe, why is -- is that a memory?
16   A.   Because I don't exactly remember.  But I could have
17        been texting with them the days I was there.
18   Q.   Did you have -- who would you have been texting with
19        while you were there?  Did you have a best friend?
20   A.   Yeah.  I had a group of girlfriends.
21   Q.   And what were their names?
22   A.   Emma, Avery and Brooke.
23   Q.   Okay.
24   A.   And Allison, Brianna and Courtney.
25   Q.   Okay.  Can you quickly give me Emma, Avery and Brooke,

Page 124

1         Allison's and Courtney's last name?
2    A.   Avery Millenbach, Brooke Birtles, Emma Despres,
3         Allison McKenna, Courtney Rodgers, and Brianna Diaz.
4    Q.   It sounds to me you had a group chat going, telling
5         them about your vacation?
6    A.   Yes.
7    Q.   And that was just a message, were you using a message
8         app or what were you using?
9    A.   Message, like iMessage so if you have like a Wi-Fi you
10        can like send them.
11   Q.   And was it one group chat or was it --
12   A.   It was two.
13   Q.   It was two group chats, did they have a name?
14   A.   I don't know them.
15   Q.   Sometimes people put funny names on group chats.
16   A.   Yeah.
17   Q.   As you know.
18   A.   Right.
19   Q.   Do you recall either of the group chats' names?
20   A.   I don't remember one of them, but the other one could
21        have been pac, pac mule.
22   Q.   I'm sorry?
23   A.   Pac, P-A-C, just pac.
24   Q.   And you had a second word called what?
25   A.   Mule.

Page 125

1    Q.   What is mule?
2    A.   Pac mule, just M-U-E-L (sic), I think.
3    Q.   And what is that supposed to mean?
4    A.   That's just what we call ourselves.
5    Q.   It's clearly making you smile so, and I'm clearly
6         missing a reference, so --
7    A.   We just called ourselves that because we've been
8         friends since the fifth grade, so.
9    Q.   Okay.  Did you draw a line between one group and
10        another group?
11   A.   Yes.  I had one group since like elementary school and
12        the other group I started hanging out with in high
13        school.
14   Q.   Let's do the elementary school first, who's that?
15   A.   Allison, Brianna and Courtney.
16   Q.   And then high school?
17   A.   Emma, Avery and Brooke.
18   Q.   Did you communicate with these people before you left
19        on your vacation?
20   A.   I think so.
21   Q.   Did you create that group chat before you left on
22        vacation?
23   A.   Yes.
24   Q.   And I said that, did you create those group chats
25        before you left on vacation?

Page 126

1    A.   Yes, those were already made.
2    Q.   And I presume that you made those because you wanted
3         to report to your friends about the fun times you were
4         going to be having in Jamaica, right?
5    A.   They just were already made.
6    Q.   Something you all used to communicate with each other?
7    A.   Yeah.
8    Q.   Okay.  Do you recall sending pictures or messages from
9         Jamaica while you were there to the two group chats?
10   A.   No.
11   Q.   Have you gone back to look through those group chats
12        to see what you sent and what you received?
13   A.   No.
14   Q.   Do you still have the phone or phone number that you
15        used while you were in Jamaica?
16   A.   I don't have the same phone.  I don't know if I have
17        the same number or not.  I think it might have been
18        different.
19   Q.   What is your Instagram handle?
20   A.   Mystical Flower.
21   Q.   Why do you call it Mystical Flower?
22   A.   Just because.
23   Q.   What does Mystical Flower mean to you?
24   A.   Nothing.
25   Q.   How did you come up with Mystical Flower?

Page 127

1  A.   I don't know.
2  Q.   Is Mystical Flower a reference to a marijuana leaf?
3  A.   No.
4  Q.   Okay.
5  A.   That's funny.
6  Q.   I want to go back to the incident one second.  When
7       you walked in the room with Jermaine, was the room lit
8       or unlit?
9  A.   Unlit.
10 Q.   When you -- who closed the door behind you?
11 A.   He did.
12 Q.   Okay.  When he opened the door, do you recall him
13      using a key of any sort to open the door?
14 A.   I don't recall.
15 Q.   Okay.  Do you recall him pressing a lock?
16 A.   I don't recall.  I don't know if I was paying
17      attention.
18 Q.   Did anybody tell you that -- or did you see a lock on
19      that door?
20 A.   I saw something, but I don't know exactly what it was,
21      if it was like a lock or I don't know.
22 Q.   You don't recall seeing keys or a lock on that door,
23      right?
24 A.   Right.
25 Q.   When you say that he pushed you onto a chair, what

Page 128

1       kind of chair was it?  Was it a plastic chair or
2       wooden chair?
3  A.   It was a plastic chair.
4  Q.   And you said that the episode in the room lasted
5       approximately 15 minutes?
6  A.   Yeah, I'm not entirely sure, though.
7  Q.   Okay.  Did Jermaine use a condom?
8  A.   No.
9  Q.   Did you ask him to use a condom?
10 A.   No.
11 Q.   You were in 11th grade and going into senior year when
12      you took this trip, right?
13 A.   Yes.
14 Q.   What was the purpose of the trip?
15 A.   It was part of Janet's birthday I think, Paiton's
16      birthday and my like graduation gift.
17 Q.   Why were you getting a graduation gift an entire year
18      before you were graduating?
19 A.   Well, it wasn't just solely based on that, but it was
20      a part of that.
21 Q.   At the time you went on this trip, did you have a job?
22 A.   Yes.
23 Q.   What were you doing?
24 A.   I believe I was at Logan's Roadhouse at that time.
25 Q.   Were all three gentlemen, Jermaine, Dwight and

Page 129

1       William, they were all lifeguards?
2  A.   I am not entirely sure.
3  Q.   Which ones are you sure were lifeguards?
4  A.   Jermaine and Dwight I thought for sure were, but I'm
5       not exactly sure anymore.
6  Q.   They were employees of the Beaches Boscobel Hotel?
7  A.   Yes.
8  Q.   Do you recall there being any logos ever on any of
9       their uniforms?
10 A.   No.
11 Q.   You got there May 5th, correct?
12 A.   I believe so.
13 Q.   And you originally were planning to stay -- May 5th
14      was a Tuesday, right?
15 A.   I don't know anymore.
16 Q.   Well, the date of the incident was Friday, right?
17 A.   Yes.
18 Q.   And the incident was May 8th, right?
19 A.   Yes.
20 Q.   Okay.  So just by doing a little bit of math, Tuesday
21      would have been May 5th, Wednesday would have been
22      May 6th, Thursday would have been May 7th and Friday
23      would have been May 8th, right?
24 A.   Yes.
25 Q.   Okay.  You got there Tuesday, do you recall what you

Page 130

1       did when you got there?
2  A.   Not exactly.  I know we got settled in and got into
3       the pool like as soon as we could.
4  Q.   Okay.  And how long before -- how long in between the
5       time you got there and the time you went to the -- to
6       the pool, did you have an alcoholic beverage?
7  A.   Maybe.
8  Q.   That was a bad question.  Did you have an alcoholic
9       beverage between the time you settled in and the time
10      you got there?
11 A.   Yeah, I guess.
12 Q.   What time did you get there?
13 A.   I don't know.
14 Q.   Okay.  Where did you have dinner that night?
15 A.   I don't know.
16 Q.   Where did you -- did you go to a bar that night?
17 A.   I don't know.
18 Q.   Okay.  The next day, Wednesday, do you recall what you
19      did that day?
20 A.   No.
21 Q.   Okay.  Do you recall where you had dinner?
22 A.   No.
23 Q.   Do you recall whether you went to a bar or not?
24 A.   Maybe, I don't know, though.
25 Q.   Okay.  The following day, Thursday, which would have

Page 131

1  Q.  been May 7th, do you recall what you did that day?
2  A.  We might have went to the Blue Hole that day.  I don't
3      know, though, when we did those things.  I would have
4      to like look back at pictures or something or dates.
5  Q.  When you say you'd look back at pictures, do you have
6      photographs in your possession of that trip?
7  A.  I do, but I guess I wouldn't know when I did certain
8      things on certain days.
9  Q.  Have you provided all of the photographs you have on
10     the trip to your counsel?
11 A.  I believe so.  I don't know.
12 Q.  Okay.  And those photographs are in digital media?
13 A.  Yes.
14 Q.  On your iPhone?
15 A.  Facebook.
16 Q.  On your Facebook?
17 A.  I don't have them on my phone anymore.
18 Q.  How do you go by -- are they still on your Facebook?
19 A.  I think so.
20 Q.  Okay.  How do you go -- what name do you go by on
21     Facebook?
22 A.  Amber Torralva.
23 Q.  And you haven't deleted any photographs from that
24     vacation?
25 A.  I don't think so.

Page 132

1  Q.  I'm going to ask that you not delete them so that we
2      can preserve that for this case, okay?
3  A.  Okay.
4  Q.  When do you first recall meeting Jermaine?
5  A.  I don't remember when I first met him.
6  Q.  It says here as to this that you met Jermaine on
7      Tuesday, May 5th; is that right?
8  A.  Yes.
9              MR. WEGLARZ:  What page are you on, Luis?
10             MR. SCOTT:  Page 4.
11             MR. WEGLARZ:  Thank you.
12 BY MR. SUAREZ:
13 Q.  I'm on page 4; is that right?
14 A.  Yes.
15 Q.  Okay.  And did you meet him at the top of the water
16     slide?
17 A.  No.
18 Q.  Where did you meet him?
19 A.  By the pool.
20 Q.  Okay.  And do you recall what you talked about when
21     you met him?
22 A.  I'm not exactly.  Just like casual things.
23 Q.  Okay.  Did you see him again after that first meeting?
24 A.  Probably, I don't remember.  I don't really remember
25     all the interactions I had with him.

Page 133

1  Q.  Now, it says here that, and I'm switching to, at least
2      in my -- my copy doesn't have numbers at the bottom,
3      but I want you to know where I am, so.
4              MR. WEGLARZ:  Should be in the top right.
5  BY MR. SUAREZ:
6  Q.  The top right of the page is 5, so I'm sorry, go to
7      the top of page 4, please.
8  A.  Okay.
9  Q.  It says, "I continued seeing with him" -- here it
10     says, "I continued seeing him at the resort and he is
11     always talking to Paiton and I and sometimes hitting
12     on us."  Do you see that?  It's the second paragraph,
13     page 4.
14 A.  I don't know if I'm on the same page.
15 Q.  Here, I'll help you out here.
16 A.  This one.
17 Q.  Yeah.  It says, "I continued seeing him at the resort
18     and he is always talking to Paiton and I and sometimes
19     hitting on us."
20 A.  Okay.
21 Q.  Right?  Do you see that?
22 A.  Yeah.
23 Q.  And then it says, "When I say he was hitting on us, I
24     mean he was being flirtatious, but Paiton and I never
25     took him up on his offer."  Do you see that?

Page 134

1  A.  Uh-huh.
2  Q.  Then it says he would call us beautiful ladies and
3      asked us if we were going to parties and clubs off
4      property.  I told him that we couldn't because of our
5      parents, right?
6  A.  Uh-huh.
7              MR. WEGLARZ:  Is that a yes?
8  A.  Yes, sorry.
9  BY MR. SUAREZ:
10 Q.  When you say he was hitting on you, can you give me
11     examples of what he did?
12 A.  Not anymore, I don't really remember.
13 Q.  Did you come to the understanding that he was
14     attracted to you?
15 A.  I guess.
16 Q.  Okay.  And did you come to that understanding before
17     or after the day of the incident?
18 A.  I guess after.
19 Q.  Okay.  While he was hitting on you, before the
20     incident, you never suspected or -- or got some
21     indication that you felt maybe he was into you?
22 A.  I guess, yeah.
23 Q.  Okay.  Did you enjoy the attention?
24 A.  Not really.
25 Q.  Okay.  And then it says you gave him your Instagram

Page 135

1    user name to follow you and Paiton gave him her
2    Facebook account, right?
3  A.  Yeah.  It says my Instagram, but I thought I gave him
4    my Facebook as well.
5  Q.  Have you ever contact -- so you think you gave him
6    both your Instagram --
7  A.  No, I think I just gave him my Facebook and not my
8    Instagram.
9  Q.  Have you ever gone back to check to see whether he
10    still follows you on Instagram?
11  A.  Well, like once I got back home and months later, I
12    got requests from him to follow me, and I didn't
13    accept it, so that's why I thought he never had my
14    Instagram.
15  Q.  Do you recall what his Instagram handle was?
16  A.  I don't.
17  Q.  When you say you think you gave him your Facebook,
18    have you ever gone back to your Facebook to check to
19    see whether he still friends you on Facebook?
20  A.  He has not and we're not friends.
21  Q.  Did you remove him?
22  A.  Yes.
23  Q.  Do you recall removing him?
24  A.  I don't recall, but he's not my friend anymore on
25    there.

Page 136

1  Q.  How do you know he's not your friend?
2  A.  Because I wouldn't keep him there after what happened.
3  Q.  Well, I understand that you wouldn't keep him there,
4    but I'm asking you a slightly different question.  He
5    either was your friend or he wasn't your friend on
6    Instagram, so can we establish that fact?  Was he your
7    friend on Instagram -- excuse me, on Facebook?
8  A.  Yes.  He was at one point.
9  Q.  Okay.  And he became your friend on Facebook before
10    the date of the incident, right?
11  A.  Right.
12  Q.  And at some point after the incident, you're telling
13    me you removed him as your friend, right?
14  A.  Yes.
15  Q.  Was that years later or was that days later?
16  A.  Probably days later.  Like probably after the
17    incident.
18  Q.  Okay.  Did you ever use the Facebook messenger and to
19    message with Jermaine while you were there?
20  A.  I don't believe so.
21  Q.  When you came out of the room, what were you wearing?
22  A.  My shorts and shirt.
23  Q.  And is that what you were wearing when you walked in
24    the room?
25  A.  Yes.

Page 137

1  Q.  And did you have a bathing suit on underneath?
2  A.  Yes.
3  Q.  When you walked out of the room, did you still have
4    your bathing suit on?
5  A.  Yes.
6  Q.  Did your bathing suit ever come completely off?
7  A.  I think my bathing suit bottoms might have ripped, but
8    I like had them on when I left.
9  Q.  Okay.  And you left your clothing with the police?
10  A.  Yes.
11  Q.  Have you ever -- have you ever -- have they ever
12    returned your clothing?
13  A.  No.
14  Q.  Do you have a recollection of your bottoms ripping or
15    no?
16  A.  I don't remember anymore.
17  Q.  Okay.  At any time during the incident, do you recall
18    screaming any words?
19  A.  I remember telling him to stop.  I don't know if I was
20    screaming.
21  Q.  My question is a little different.  At any time during
22    the incident, do you recall screaming any words?
23  A.  No.
24  Q.  At any time during the incident, do you recall asking
25    anybody who was in the room for help?

Page 138

1  A.  No.
2  Q.  At any time during the incident, do you recall asking
3    Paiton for help?
4  A.  No.
5  Q.  You went into the room first with Mr. -- with
6    Jermaine, correct?
7  A.  Yes.
8  Q.  How long after you going into the room with Jermaine
9    did Paiton come into the room?
10  A.  I'm not entirely sure.  Yeah, I don't know anymore.
11  Q.  Okay.
12          MR. WEGLARZ:  And you don't have to guess.
13  A.  Okay.
14          MR. WEGLARZ:  I don't think Mr. Suarez
15    wants you to do that.
16  BY MR. SUAREZ:
17  Q.  Was it -- was it immediately after?
18  A.  No.
19  Q.  Within a minute or was it a couple of minutes?
20  A.  A little longer than a couple of minutes maybe.
21  Q.  Okay.  And when Paiton came in, she came in with
22    Dwight, right?
23  A.  I'm not sure.
24  Q.  Okay.  But she came in with another gentleman?
25  A.  Yes.

Case 1:17-cv-21703-MGC   Document 162-34  Entered on FLSD Docket 12/21/2019   Page 38 of
77
Amber Torrans et al
September 25, 2019                                                139 to 142

Page 139

1   Q.   Okay.  And who, do you know who opened the door?
2   A.   No.
3   Q.   Do you know who closed the door?
4   A.   No.
5   Q.   Was Paiton within arms' distance of you when she
6        walked by?
7   A.   I couldn't reach her, so no.
8   Q.   When Paiton walked by, did you say anything to her to
9        suggest that you were being harmed?
10  A.   I don't think so.
11  Q.   Okay.
12  A.   I was confused.
13  Q.   When you say -- you've said that several times.  You
14       say you were confused.  Were you still buzzed at that
15       moment and by buzzed, I mean under the influence of
16       alcohol?
17  A.   I want to say I was.
18  Q.   You want to say you were still buzzed?
19  A.   Yes.
20  Q.   Okay.  And when Paiton walked by, did you exchange any
21       words?
22  A.   No.
23  Q.   Was -- were Jermaine and you still in physical contact
24       at that moment?
25  A.   No, I don't think so, no.

Page 140

1   Q.   When people walked in the room, you and him stopped
2        for a second?
3   A.   Yes.
4   Q.   And you let people walk by?
5   A.   Yes.
6   Q.   And then you continued doing what you were doing,
7        right?
8   A.   Yes.
9   Q.   Okay.  Was there any -- could you hear Paiton laughing
10       or giggling at any moment?
11  A.   No.
12  Q.   After you all walked into -- excuse me, after you were
13       all in the room, was anybody laughing or giggling?
14  A.   No.
15  Q.   Okay.  Do you recall Jermaine saying any words to you?
16  A.   No.
17  Q.   Do you recall Paiton saying any words to you?
18  A.   No.
19  Q.   Do you recall whatever gentleman Paiton was with
20       saying any words to you?
21  A.   No.
22  Q.   When Paiton walked by, what did you think Paiton and
23       the gentleman she was with were going to do?
24  A.   I don't know.
25  Q.   What did you suspect they were going to do?

Page 141

1   A.   I don't know.
2   Q.   Did you suffer any physical injury in terms of
3        bruising as a result of this incident?
4   A.   I had bruising on my lip.
5   Q.   Okay.  Aside from bruising on your lip, did you have
6        any other type of bruising?
7   A.   I don't think so.
8   Q.   Ma'am, and I don't mean to pry and I don't mean to be
9        disrespectful, but I do have a job to do, so I have to
10       ask you a series of questions.  Before this incident,
11       had you made out with gentlemen?
12  A.   Made out with who?
13  Q.   Gentlemen.
14  A.   Not really, no.
15  Q.   Did you have a boyfriend before you went to --
16  A.   No.
17  Q.   Did you have any boyfriend before you went to Jamaica?
18  A.   No.
19  Q.   Had you ever made out with a boy before you went to
20       Jamaica?
21  A.   Yes.
22  Q.   You understand what I mean by making out?
23  A.   Yes.
24  Q.   Kissing on the lips?
25  A.   Yes.

Page 142

1   Q.   Okay.  That's not -- that was not the first time you
2        had kissed somebody on the lips, correct?
3   A.   Correct.
4   Q.   Do you understand what I mean by the phrase hook up?
5   A.   Yes.
6   Q.   Okay.  Before you went to Jamaica, did you hook up
7        with boys in your high school?
8   A.   No.
9   Q.   Did you hook up with anyone?
10  A.   No.
11            MR. WEGLARZ:  Mr. Suarez, let me know when
12       we can take a two-minute break.
13  BY MR. SUAREZ:
14  Q.   At any moment in time?
15  A.   At any moment in time what?
16  Q.   So before going from the beginning of time until you
17       went to Jamaica, okay, from the beginning of your life
18       until you went to Jamaica?
19  A.   Right.
20  Q.   Had you ever hooked up with a boy?
21  A.   No.
22  Q.   No.  From the beginning of time until you went to
23       Jamaica, had you ever made out with a boy?
24  A.   Yes.
25  Q.   Okay.  And that was in high school or before high

Page 143

```
 1    school?
 2 A. High school.
 3 Q. Okay.  Was that a boyfriend you had?
 4 A. No.
 5 Q. How long had it -- how long had you known that boy?
 6 A. Since school, all of school.
 7 Q. Was that the only time you made out with a boy?
 8 A. Yes.
 9              MR. WEGLARZ:  Is now a good time,
10    Mr. Suarez?
11              MR. SUAREZ:  Can I just finish the -- can I
12    just finish the incident because I don't like to have
13    to go back, is that okay?  I'm just trying to be
14    polite to the witness.
15              MR. WEGLARZ:  And I appreciate that.  How
16    about I wanted to actually talk to you just for a
17    minute.
18              MR. SUAREZ:  Sure.  No problem.
19              MR. WEGLARZ:  Thank you, I appreciate it.
20              (Recess taken at 11:03 a.m.)
21              (Back on the record at 11:06 a.m.)
22 BY MR. SUAREZ:
23 Q. If you go to page 8, the top.  Let me find it.  I'm
24    going to go to -- for your page, it's page 89 on your
25    page.  It says here that Jermaine had sexual
```

Page 144

```
 1    intercourse with you for about a minute or two
 2    minutes; is that accurate?
 3 A. Yes.
 4 Q. After you got out of the room, did anybody other than
 5    Janet or your mom walk by?
 6 A. No.
 7 Q. When your mom approached you and started yelling at
 8    you, what did she say?
 9 A. She was concerned on why I was alone.  I don't
10    remember exactly what she said.  And where Paiton was.
11 Q. There came a point in time that Paiton came out of the
12    room, correct?
13 A. Yes.
14 Q. Who -- did anybody come out of the room before Paiton?
15 A. I don't know.
16 Q. Okay.  Do you recall when Jermaine came out of the
17    room?
18 A. No.
19 Q. Do you recall any other gentlemen coming out of the
20    room?
21 A. No.
22 Q. Do you recall any other gentleman entering the room
23    after you entered the room?
24 A. No.
25 Q. To the extent that you recall inside the room while
```

Page 145

```
 1    you were present at the incident, was you, Jermaine,
 2    Paiton and a gentleman that you don't remember his
 3    name, correct?
 4 A. Uh-huh, yes.
 5 Q. Is that a true statement?
 6 A. Yes.
 7 Q. Do you recall any other gentleman in the room with you
 8    during that time?
 9 A. No.
10 Q. As best as you recall, there were four of you in the
11    room, correct?
12 A. Yes.
13 Q. Do you know whether that room had any other methods to
14    enter the room or to leave the room?
15 A. Yes.  I know that there was two doors.
16 Q. Okay.  Where was the second door?
17 A. I'm not entirely sure, but I want to say it was where
18    the other guy took Paiton.
19 Q. Okay.
20 A. Like on that side.
21 Q. Do you recall voices, hearing voices of more than four
22    people that evening?
23 A. No.  It was loud in there.
24 Q. After you left the room and your mother and you had an
25    argument or she scolded you, what happened next?
```

Page 146

```
 1 A. Janet and my mom left the room to talk like
 2    separately, and then --
 3 Q. You got ahead of me.  There was the incident and you
 4    ended up going back to your room, right?
 5 A. Yes.
 6 Q. Okay.  Did you go anywhere between the incident and
 7    directly to your room?
 8 A. No.  We went directly to the room.
 9 Q. And then once you got to your room, who walked into
10    the room with you?  And by the room, I mean your hotel
11    room, 1132.
12 A. I believe it was all four of us.
13 Q. Okay.  And did you go anywhere when you walked in the
14    room?
15 A. No, just walked in.
16 Q. Okay.  Well, it says here on page 10 that you walked
17    in your room and that you went to the bathroom and
18    took a shower?
19 A. Yes.
20 Q. Is that true?
21 A. That is true.
22 Q. At some point, Paiton walked into the bathroom with
23    you, correct?
24 A. Correct.
25 Q. Okay.  And did you and Paiton have a conversation in
```

Page 147

1   that bathroom?
2   A.  Yes.
3   Q.  What did you tell Paiton?
4   A.  I told her that I was raped and then she told me that
5       she was raped by all three and I didn't know that --
6   Q.  Okay.
7   A.  -- until then.
8   Q.  And did you and Paiton come to an understanding as to
9       whether you would tell your parents this or not?
10  A.  We were planning on not saying anything, and then we
11      ended up telling them.
12  Q.  Why were you planning on not saying anything?
13  A.  Because Paiton did not want to stress her mom out any
14      more because she was dealing with like a sickness or
15      something.
16  Q.  Okay.  And why were you planning on not telling
17      anyone?
18  A.  Just because Paiton wasn't.
19  Q.  I'm sorry?
20  A.  Just because Paiton wasn't planning on telling, so I
21      was going to not say anything.  And then it just ended
22      up coming out.
23  Q.  Well, before we get there, what happened after you
24      came out of the room with Paiton?
25  A.  Out of the bathroom?  I don't remember exactly.  I

Page 148

1       think that my mom and Janet were still like, I don't
2       know if they were arguing or what.
3   Q.  Why were your mom and Janet arguing?
4   A.  I don't know if they were arguing, but my mom was,
5       like thought that we had done something wrong in that
6       room.
7   Q.  When you say that your mom had thought you had done
8       something wrong in the room, what do you think your
9       mom thought you had done wrong?
10  A.  I think she thought I was smoking weed in that room.
11  Q.  Why would she think that you smoke weed?
12  A.  Because I got in trouble with weed.
13  Q.  Before the trip, you had smoked weed?
14  A.  Yes.
15  Q.  Is there anything else that you think that your mom thought
16      that you had done wrong in the room?
17  A.  I don't know.
18  Q.  When you had a conversation with your parents, Janet,
19      Margaret, you and Paiton and came out to tell them
20      about the incident, who first used the word rape?
21  A.  I don't know.
22  Q.  Okay.  Who spoke first?
23  A.  Paiton.
24  Q.  And who first said that she had been raped, you or
25      Paiton?

Page 149

1   A.  I don't exactly remember.
2   Q.  Then you and Paiton stepped out of the room, right?
3   A.  I don't know.
4   Q.  Well, it says here that after -- it says here in the
5       middle of the paragraph, it says, "After Paiton and I
6       came out of the shower, my mom and Janet left the room
7       and I told Paiton that Jermaine raped me.  Janet came
8       back into the room and I was just lying down.  Then
9       Janet said that she wanted to talk to Margaret in
10      private and Paiton and I stepped out of the room."  So
11      actually I got the sequencing wrong there.  So you and
12      Paiton came out of the bathroom, and then Janet and
13      Margaret stepped out?
14  A.  Uh-huh.
15  Q.  Do you recall, or could you hear what Janet and
16      Margaret were talking about at that time?
17  A.  No.
18  Q.  And then they came back into the room and then you and
19      them had a conversation where you explained that you
20      had been raped?
21  A.  Yeah.  Janet asked if anything had happened.  I do
22      recall that.
23  Q.  Do you recall between the time once you got back to
24      your hotel room and this particular moment of you
25      having a conversation with your parents, do you recall

Page 150

1       whether you sent anybody a text message?
2   A.  No.
3   Q.  Do you recall whether you sent anybody an e-mail?
4   A.  No.
5   Q.  Do you know whether you did or didn't?
6   A.  I don't think I did.  It wouldn't be on the top of my
7       head to do.
8   Q.  When you went to -- thereafter you left the room and
9       went to talk to somebody who was a night manager, do
10      you recall what you told the night manager?
11  A.  No.
12  Q.  Do you recall his name?
13  A.  No.
14  Q.  And you went there with your mom, Janet and Paiton,
15      right?
16  A.  Yes.
17  Q.  Do you recall the -- eventually the police got there,
18      right?
19  A.  Yes.
20  Q.  And you went to -- the police took you to get examined
21      medically, right?
22  A.  Yes.
23  Q.  And there was a female police officer there, correct?
24  A.  Yes.
25  Q.  Do you recall her name?

Page 151

1    A.   No.
2    Q.   Was Janet present when they were examining you
3         medically?
4    A.   I believe so.
5    Q.   Okay.  After that, after you left the place where they
6         treated you medically, where did you go to next?
7    A.   The police station.
8    Q.   Okay.  And that's where you signed this statement?
9    A.   Uh-huh.
10             MR. WEGLARZ:  Is that a yes?
11   A.   Yes.
12   BY MR. SUAREZ:
13   Q.   Who did you -- who did you talk to?
14   A.   A lady, I don't know her name.
15   Q.   It was already morning when you talked to this lady?
16   A.   It was still dark, so it was like -- I don't know
17        when.
18   Q.   Was it like dusk --
19   A.   Yes.
20   Q.   -- or dawn?  Yes?
21   A.   Yeah, dusk most likely.
22   Q.   I forgot what's the difference between dawn and dusk,
23        admittedly it's not my first language.
24             MS. GONZALEZ:  Dawn is morning, dusk is
25        evening.

Page 152

1    BY MR. SUAREZ:
2    Q.   I'm sorry, I confused you because you agreed with me
3         on a statement that was clearly wrong, thank you.  So
4         it was dawn when you went to the police station?
5    A.   Yes.
6    Q.   And that's when you made this statement?
7    A.   Uh-huh.
8    Q.   And you had been with, by that time, you had been with
9         your mom, Janet and Paiton for several hours, right?
10   A.   Yes.
11   Q.   Okay.  That evening, you received a text message,
12        correct?
13   A.   Maybe.
14   Q.   Well, I don't want to put words in your mouth.  Did
15        you receive a message from Jermaine Dyer on the
16        evening of May 8th?
17   A.   Yes.
18   Q.   And did you receive a message from Jermaine Dyer after
19        the incident?
20   A.   I don't recall.
21   Q.   Okay.  Do you recall receiving a message from Jermaine
22        Dyer before the incident?
23   A.   I don't know the time frame.
24   Q.   Okay.  Do you recall irrespective of time frame, do
25        you recall receiving any message from Jermaine Dyer?

Page 153

1    A.   Yes.
2    Q.   I hand you a copy of Exhibit 4 to your deposition.  I
3         just received this document from your counsel this
4         morning for some reason, okay?  So I didn't have a
5         chance to look at it before today, but what it
6         appeared to be is a message from Jermaine Dyer to you,
7         Amber, dated May 8, 2015, at 10:37 p.m., correct?
8    A.   Yes.
9    Q.   Okay.  And it says below that that it was generated by
10        Amber Torralva on July 10, 2019 at 9:42 a.m., right?
11   A.   Yes.
12   Q.   Okay.  So you went into what I presume is your
13        Facebook account and I do that for two reasons, one,
14        because I see your little picture there and that's how
15        Facebook does things, and two, because it says
16        Facebook on the bottom and it has sort of a file path,
17        but I don't know if this file path corresponds to you
18        or not, okay?
19   A.   Okay.
20   Q.   But is this your Facebook account?
21   A.   Yes.
22   Q.   And Jermaine Dyer texted you, right?
23   A.   Yes.
24   Q.   Or messaged you, right?
25   A.   Yes.

Page 154

1    Q.   And it says "I'm leaving now but I wanted to say bye
2         to you before I leave.  It's Jermaine."  Do you recall
3         receiving that on May 8th?
4    A.   I guess, yeah.
5    Q.   Okay.  And do you recall receiving that before or
6         after the incident?
7    A.   I don't -- I don't remember.
8    Q.   Did the incident happen before or after 10:37?
9    A.   I don't remember.
10             MR. SCOTT:  What's the exhibit number now?
11             MR. SUAREZ:  4.
12   BY MR. SUAREZ:
13   Q.   Did you respond to this message?
14   A.   No.
15   Q.   Have you searched for responses, any responses?
16   A.   Did I search?  What does that mean?
17   Q.   Yeah, did you go into your messenger and say hey, did
18        I respond to this message --
19   A.   No.
20   Q.   -- some way?  I'm sorry?
21   A.   No.
22   Q.   Was this the first time Jermaine Dyer had messaged
23        you?
24   A.   I believe so.
25   Q.   Do you recall any emotion that you experienced when

Page 155

1    you received this message?
2  A.  I don't recall.
3  Q.  Have you ever gotten the emotion since that time and
4      today of writing him back and addressing what he did
5      to you?
6  A.  No.
7  Q.  Have you expressed your anger to him about what he did
8      to you?
9  A.  No.
10 Q.  Did you ever express your anger to him about what he
11     did to you?
12 A.  No.
13 Q.  Did you ever yell at him or scream at him?
14 A.  No.
15 Q.  Or insult him because of what he did to you?
16 A.  No.
17 Q.  The next day, which would be Saturday, May 9th, and to
18     short circuit this a little bit.
19          MR. SCOTT:  Can I see the exhibit, please?
20          MR. SUAREZ:  Sure.
21 BY MR. SUAREZ:
22 Q.  The next day, Saturday, can I have that?  Can you hand
23     me that, please?  And can I grab that, please?
24          The next day, Saturday, May 9th, what
25     happened Saturday, May 9th?

Page 156

1          MR. SCOTT:  Thank you.
2  A.  I don't recall.  I think they sent us to another
3      resort.
4  BY MR. SUAREZ:
5  Q.  Okay.  And then do you recall what the name of that
6      resort?
7  A.  No.
8  Q.  From May 9th, and you ended up staying until about
9      May 14th, right?
10 A.  Yes.
11 Q.  And do you recall what you did from May 9th to
12     May 14th?
13 A.  No.
14 Q.  Did you keep a log or a journal about what you did
15     May 9th to May 14th?
16 A.  No.
17 Q.  Do you recall whether you texted anybody to either
18     your group chats or messaged or Instagrammed anybody
19     from May 9th to the 14th?
20 A.  Yeah.  I told my friends that I lost my passport and
21     that's why I wasn't home because they were wondering
22     why I was still not home.
23 Q.  So some of your friends reached out to you and said
24     why aren't you here and you told them you lost your
25     passport?

Page 157

1  A.  Yes.
2  Q.  Okay.  And that was an untrue statement at the time?
3  A.  Yes.
4  Q.  Okay.  So you didn't want them to know what had
5      happened?
6  A.  Right.
7  Q.  Okay.  Did you ever lose your passport?
8  A.  No.
9  Q.  Did you message or talk to anybody else at the time?
10 A.  No.
11 Q.  Did you ever, you personally, ever have any
12     interaction with the travel agent or the tour operator
13     that booked this trip for you and for your mom and for
14     Janet and for Paiton?
15 A.  No.
16 Q.  Okay.  Do you even know who the travel agent or the
17     tour operator are?
18 A.  No.
19 Q.  Did you ever e-mail directly with the tour operator or
20     the travel agent that booked this trip?
21 A.  No.
22 Q.  Did you ever personally pay for any items related to
23     this trip in terms of the hotel or the flight?
24 A.  No.
25 Q.  Did you personally pay for any drinks while you were

Page 158

1      in Jamaica?
2  A.  No.
3  Q.  Did you use your credit card while you were in
4      Jamaica?
5  A.  No.
6  Q.  Do you have a credit card at the time?
7  A.  No.
8  Q.  I'm sorry?
9  A.  No.
10 Q.  Did you take cash with you personally to Jamaica?
11 A.  Maybe.
12 Q.  Okay.  Did you buy trinkets or gifts for your friends
13     or something --
14 A.  Yes.
15 Q.  -- while you were in Jamaica?
16 A.  Yes.
17 Q.  I'm sorry?
18 A.  Yes.
19 Q.  Which friends did you buy trinkets and gifts for?
20 A.  Allison, Brianna and Courtney.
21 Q.  What did you buy them?
22 A.  Little wooden decorations.
23 Q.  What were on those decorations?
24 A.  I got them at the resort, they were like there's a
25     giraffe on one and then there's like a wooden like

Page 159

1       elephant like change holder, piggy bank thing.
2   Q.  Okay.  Were you reimbursing your mother for the
3       expense of the trip?
4   A.  No.
5   Q.  Okay.  To cut short, to cut this line of questioning
6       short, this trip was a gift to you, you got on the
7       plane and you paid for nothing, right?
8   A.  Correct.
9   Q.  Okay.  You personally did not contract with any party
10      related to this trip, correct?
11              MR. WEGLARZ:  Form objection.
12              You can answer.
13  A.  Correct.
14  BY MR. SUAREZ:
15  Q.  Let me repeat the question just so we have a clear
16      record.  You personally did not contract with any
17      party related to this trip, correct?
18  A.  Correct.
19  Q.  Did you ever speak to a gentleman by the name of
20      Stetson Arriola?
21  A.  No, I don't think so.
22  Q.  Did you ever speak to any gentleman -- did you ever
23      speak to a gentleman at an entity known as The Mark
24      Travel Corporation or Fun Jet Vacations?
25  A.  No.

Page 160

1   Q.  While you were in Jamaica before the incident, did you
2       have your hair braided?
3   A.  I don't think so.
4   Q.  While you were in Jamaica before the incident, did you
5       befriend or interact with any females in Jamaica that
6       were employed by Beaches Hotel?
7   A.  I don't think so.
8   Q.  I'm sorry?
9   A.  I don't think so.
10  Q.  Were you -- were you involved in the selection of the
11      hotel and the place you would go for vacation?
12  A.  Can you repeat that?
13  Q.  Sure.  Were you involved in the selection of the hotel
14      and the place where you would go on vacation?
15  A.  No.
16  Q.  Okay.  You understand what I'm saying about that, did
17      you -- did you tell your mom, "Hey, I want to go to
18      Jamaica"?
19  A.  It was brought up to me and I said, "Yeah."
20  Q.  So she told you, "Hey, I want to go to Jamaica"?
21  A.  Yes.
22  Q.  And you said, "Great"?
23  A.  Yes.
24  Q.  Okay.  Did you have any involvement in selecting a
25      hotel?

Page 161

1   A.  No.
2   Q.  Did you research the hotel --
3   A.  No.
4   Q.  -- before you got there?
5   A.  No.
6   Q.  Did you research Jamaica before you got there?
7   A.  No.
8   Q.  Did you research Ocho Rios before you got there?
9   A.  No.
10  Q.  Did you -- do you know any friends or relatives that
11      had been to Jamaica before you went there?
12  A.  No.
13  Q.  Did you talk to anybody who had been to Jamaica before
14      you went there?
15  A.  No.
16  Q.  You referenced a phrase earlier in the deposition
17      called a buddy system, right?
18  A.  Right.
19  Q.  Did you and your mother and Paiton and Janet establish
20      that buddy system before you got on the plane or after
21      you got on the plane?
22  A.  I think before.
23  Q.  So before you got on the plane in the days leading up
24      to the trip, there came an understanding between you
25      and the three people that you were going with that you

Page 162

1       all were going to stick together, correct?
2   A.  Correct.
3   Q.  And that you all were going to stick together at the
4       property and away from the property, right?
5   A.  Right.
6   Q.  And you all were going to stick together because you
7       were generally concerned about your safety, right?
8   A.  Right.
9   Q.  And you adhered to that rule once you got to Jamaica,
10      right?
11  A.  Right.
12  Q.  And at any time before the evening of May 8th, did you
13      break that rule?
14  A.  Yes.
15  Q.  Okay.  When did you first break that rule?
16  A.  When I had walked away from Paiton when Jermaine had
17      pulled me aside.
18  Q.  Okay.  So the evening of May 8th, that was the first
19      time that you broke that rule?
20  A.  Yes.
21  Q.  Okay.  Did you ever from May 5th to May 9th order a
22      drink for yourself at a bar, and when I use the word
23      drinks at this deposition, I'm referring to alcoholic
24      beverages; do you understand that?
25  A.  Uh-huh.

Page 163

1   Q.   When I colloquially say drink, you understand that
2        it's an alcoholic beverage?
3   A.   Yes.
4   Q.   Okay.  And by the way, when I used the phrase earlier
5        that meant hook up, do you understand that phrase to
6        mean kissing amongst teenagers?
7   A.   That's what you meant when you say hook up?
8   Q.   I'm asking you what you mean by that.
9   A.   Oh.
10  Q.   What you understood me to say when you used the
11       phrase -- when I used the phrase hook up?
12  A.   When I hear the phrase hook up, I think of like two
13       people like casually having sex.
14  Q.   Okay.  So that's your understanding?
15  A.   Yes.  Is that what you understood that as?
16  Q.   Yes.  That's my understanding.  So kissing and
17       casually having sex, right?
18  A.   Right.
19  Q.   And when you answered your questions earlier, and
20       again, I don't mean to pry, you used that definition
21       of hook up, right?
22            MR. WEGLARZ:  Form objection.
23            But go ahead and answer.
24  A.   What question?
25  BY MR. SUAREZ:

Page 164

1   Q.   Earlier in the deposition I asked you whether before
2        you had gone to Jamaica you had ever hooked up with a
3        boy?
4   A.   Correct.
5   Q.   Right?
6   A.   Yes.
7   Q.   Do you recall that question?
8   A.   Yes.
9   Q.   And the answer to that question was yes, right?
10  A.   No.
11  Q.   So before you had went to Jamaica, you had never
12       hooked up with a boy?
13  A.   Correct.
14  Q.   And before you had went to Jamaica, had you ever made
15       out with a boy?
16  A.   Before I went to Jamaica, I had made out with a boy,
17       yes.
18  Q.   And by make out, I mean consensual kissing, right?
19  A.   Yes.
20  Q.   You understand that, right?
21  A.   Yes.
22  Q.   Going back to the phrase -- going back to the phrase
23       drinks, while you were in Jamaica, you went to the bar
24       and ordered a drink for yourself, right?
25  A.   Yes.

Page 165

1   Q.   And you did that on numerous occasions, right?
2   A.   Yes.
3   Q.   And part of your trip was you were going to have fun,
4        right?
5   A.   Yes.
6   Q.   And part of that fun included drinking, right?
7   A.   Yes.
8   Q.   Okay.  And you drank every day while you were in
9        Jamaica, right?
10  A.   Yes.  I think.
11  Q.   And your mom and Janet and Paiton understood that you
12       were drinking, right?
13  A.   Yes.
14  Q.   Okay.  And several times while you in Jamaica, you got
15       buzzed, right?
16  A.   Yes.
17  Q.   And you enjoyed those buzzes, right?
18  A.   Yes.
19  Q.   And you were having a good time, right?
20  A.   Yes.
21  Q.   It was a chance for you to cut loose and have fun,
22       right?
23  A.   Yes.
24  Q.   At any point during your trip to Jamaica, did you
25       vomit or feel sick because of the amount you had

Page 166

1        drank?
2   A.   No.
3   Q.   At any time while you were in Jamaica, did you wake up
4        with a hangover the next day?
5   A.   No.
6   Q.   What was your drink of choice while you were in
7        Jamaica?
8   A.   I don't remember.
9   Q.   Did the drink have a particular name?
10  A.   I'm sure it did, I just don't know the name of it.
11  Q.   Okay.  While you were in Jamaica, did everybody in
12       your party drink?
13  A.   Yes.
14  Q.   Okay.  Did everybody in your party drink, and by party
15       I mean the four of you, did everybody in your party
16       drink every day?
17  A.   I don't think Janet drank every day.
18  Q.   Okay.  But you, your mom and Paiton drank every day?
19            THE WITNESS:  Did you?
20  A.   I don't know if she drank every day.  She's not
21       usually a big drinker.
22  BY MR. SUAREZ:
23  Q.   Okay.  Did you and Paiton drink every day?
24  A.   I think so.
25  Q.   Did you use marijuana while you were in Jamaica?

Page 167

1  A.  No.
2  Q.  And by use marijuana, I don't mean just smoke it,
3      correct?
4  A.  Correct.
5  Q.  You understood that?
6  A.  Yes.
7  Q.  Did you eat any pot brownies?
8  A.  No.
9  Q.  Did you eat any pot edibles?
10 A.  No.
11 Q.  By pot you understand that I mean marijuana, right?
12 A.  Yes.
13 Q.  Okay.  Do you use any other word for marijuana that
14     perhaps I'm not aware of?
15 A.  No.
16 Q.  For example, weed?
17 A.  Yeah.
18 Q.  Do you associate the word weed with marijuana?
19 A.  Yes.
20 Q.  Did you smoke weed while you were there?
21 A.  No.
22 Q.  Did anybody in your party use marijuana, weed or pot
23     in any of its various forms --
24 A.  No.
25 Q.  -- while you were in Jamaica?

Page 168

1  A.  No.
2  Q.  Before you went to Jamaica, were you aware that
3      popular culture associates Jamaica with weed?
4  A.  Yes.
5          MR. SUAREZ:  No offense.
6  BY MR. SUAREZ:
7  Q.  That was not a mystery to you, correct?
8  A.  Right.
9  Q.  Do you like that reference?
10 A.  What reference?
11 Q.  The fact that Jamaica is known for weed?
12 A.  Yeah.
13 Q.  It's fun, right?
14 A.  Yeah.
15 Q.  And do you like Bob Marley?
16 A.  Yes.
17 Q.  And do you go to Bob Marley festivals?
18 A.  I don't think I have before.
19 Q.  Well, since leaving Jamaica, have you been to Bob
20     Marley festivals?
21 A.  Not a Bob Marley festival, no.
22 Q.  Okay.  I see the distinction you're drawing, reggae,
23     do you like reggae?
24 A.  Yes.
25 Q.  Did you go to reggae festivals before you went to

Page 169

1      Jamaica?
2  A.  No.
3  Q.  Have you been to reggae festivals after you left
4      Jamaica?
5  A.  I've been to festivals after Jamaica, but not like a
6      reggae festival.
7  Q.  Okay.  Have you been to festivals where they play
8      reggae music?
9  A.  No.
10 Q.  Do you still like reggae music?
11 A.  Yes.
12 Q.  Okay.  Any particular artist?
13 A.  No.
14 Q.  Before you went to Jamaica, had you traveled overseas?
15 A.  No.
16 Q.  Since returning from Jamaica, have you traveled
17     overseas?
18 A.  Yes.
19 Q.  Okay.  When did you first travel overseas?
20 A.  The year I went to Jamaica.
21 Q.  How long after you went to Jamaica did you again get
22     on a plane to go overseas?
23 A.  2017.
24 Q.  So about two years after?
25 A.  Yes.

Page 170

1      What was the nature of that trip?
2  A.  It was, I think a spring break trip, all my friends
3      were going.
4  Q.  Who did you go with?
5  A.  A group of like ten.
6  Q.  And are the ten people you went with the same people
7      that you listed earlier, more or less?
8  A.  Some of them, not all.
9  Q.  Okay.  So some of the friends that you had when you
10     were in Jamaica went with you --
11 A.  Yes.
12 Q.  -- on this trip?
13 A.  Uh-huh.
14 Q.  You were 19 at this trip?
15 A.  Yes.
16 Q.  Where did you go?
17 A.  Cancun, Mexico.
18 Q.  Where did you stay?
19 A.  Oasis.
20 Q.  Okay.  Do you recall which side of Cancun?
21 A.  I don't.
22 Q.  Was it -- it was on the beach?
23 A.  Yes.
24 Q.  Okay.  Directly on the beach?
25 A.  Yes.

Page 171

1   Q.   And sand, yes?
2   A.   Yes.
3   Q.   I'm sorry, it's just that there's two sides to Jamaica
4        (sic) and --
5   A.   Okay.
6   Q.   -- I'm trying to ascertain which side you stayed on so
7        that helps.
8   A.   Okay.
9             MR. WEGLARZ:  You meant Mexico, right?
10            MR. SUAREZ:  Yes.  I'm sorry.
11  BY MR. SUAREZ:
12  Q.   I said -- I'm sorry, it's just that there's two sides
13       to Jamaica -- I meant, I'm sorry, it's just that
14       there's two sides to Cancun, and I was trying to
15       ascertain which side you were staying on.
16  A.   Okay.
17  Q.   You stayed on the beach side?
18  A.   Yeah.
19  Q.   Did you research Mexico before going to Cancun?
20  A.   No.
21  Q.   Whose idea was it to go to Cancun?
22  A.   My friend, Faith.
23  Q.   Okay, and --
24            MR. SCOTT:  Sorry, I couldn't hear it.
25            MR. SUAREZ:  She said, "My friend, Faith."

Page 172

1             MR. SCOTT:  Thank you.
2   BY MR. SUAREZ:
3   Q.   What does Faith do?
4   A.   I don't know, I'm not friends with her anymore.
5   Q.   Did you research the hotel before you went to Cancun?
6   A.   No.
7   Q.   Who chose the hotel?
8   A.   Faith's mom.
9   Q.   Okay.  How long were you there?
10  A.   A week.
11  Q.   Did you drink while you were there?
12  A.   Yes.
13  Q.   Was there a buddy system in place when you went there?
14  A.   Uh-huh.
15  Q.   And that's what you and the girls decided before you
16       got there?
17  A.   Yes.
18  Q.   Okay.  Before going to Mexico, did you look at any
19       websites to determine whether Mexico was safe for
20       tourists?
21  A.   No.
22  Q.   Had you ever heard that before going to Mexico, that
23       Cancun was a place to party?
24  A.   Yes.
25  Q.   And kids like to go to Cancun to party, right?

Page 173

1   A.   Yes.
2   Q.   And you wanted to go to Cancun to party, right?
3   A.   Yes.
4   Q.   How long were you there?
5   A.   A week.
6   Q.   And did you drink every day while you were there?
7   A.   Yes.
8   Q.   And did you use weed while you were there?
9   A.   No.
10  Q.   Okay.  Did you go to any -- did you go to any bars or
11       clubs while you were there?
12  A.   No.
13  Q.   Do you recall going to any bars or clubs while you
14       were in Jamaica?
15  A.   No.
16  Q.   Sorry?
17  A.   No.
18  Q.   Had you heard that Cancun was a dangerous place before
19       you went there?
20  A.   No.
21  Q.   You've never heard of tourists getting mugged or
22       assaulted in Cancun?
23  A.   No.
24  Q.   Ma'am, is the -- to your knowledge, is the criminal
25       proceeding related to Jermaine still ongoing?

Page 174

1   A.   I don't know.
2   Q.   Are you scheduled to appear at that proceeding at some
3        point?
4   A.   Yes.
5   Q.   Do you recall when you are scheduled to appear at that
6        proceeding?
7   A.   I think in December.
8   Q.   December of this year?
9   A.   I believe so.
10  Q.   Have you spoken to a lawyer in relation to that
11       proceeding?
12  A.   I don't know.
13            MR. SUAREZ:  I'd like to take a break real
14       quick, is that fine?
15            MR. WEGLARZ:  Yes.
16            (Recess taken at 11:44 a.m.)
17            (Back on the record at 12:15 p.m.)
18  BY MR. SUAREZ:
19  Q.   All right.  So I wanted to ask you a couple of
20       questions about some photos that I don't believe we
21       chatted about.  And this will be quick.
22  A.   Okay.
23  Q.   If we have talked about them, you'll tell me, but I
24       don't think we have.
25  A.   Okay.

Page 175

1   Q.   So the first is I'm handing you what's been marked as,
2        let's see, Exhibit 2 to your deposition.  If you go to
3        page 4, do you mind if we just share this one so that
4        it goes quicker?
5   A.   Yeah, that's fine.
6   Q.   So if you go to page 4, there's a picture of you, I
7        believe, right?
8   A.   Yes.
9   Q.   And there's a drink in front of you, right?
10  A.   Yes.
11  Q.   And I think, I suspect that drink is alcoholic; is
12       that true?
13  A.   Maybe.  I don't know.
14  Q.   Okay.  You're wearing a handkerchief around your neck?
15  A.   Yes.
16  Q.   Or a napkin around your neck, do you know why you're
17       wearing a napkin around your neck?
18  A.   I don't.
19  Q.   There's a companion photo of this I looked at last
20       night that has that napkin on your -- on your face, do
21       you recall what you're doing or why you're doing that?
22  A.   No.
23  Q.   Do you recall what night this was?
24  A.   I thought that might have been the last night, but I
25       don't know for sure.

Page 176

1   Q.   Well, that was in part why I was asking the question,
2        was this, when you say last night, do you mean
3        May 14th or do you mean --
4   A.   Oh, no, that was --
5   Q.   May 8th?
6   A.   Yeah.
7   Q.   So this was the night of the incident?
8   A.   From my memory, I thought it was, but I could be
9        wrong.
10  Q.   Well, who did you have dinner with that night?
11  A.   It was all four of us this night.
12  Q.   Okay.  And so you had dinner early?
13  A.   I don't know.
14  Q.   Okay.  Well, I guess to me, it doesn't seem like this
15       was the night of May 8th, and I'll tell you why,
16       because you appear to be wearing some sort of a black
17       blouse, is that what you were wearing the night of the
18       incident?
19  A.   No.
20  Q.   So this is probably not that night, right?
21  A.   Right.
22  Q.   And I don't believe you had dinner, all four of you on
23       May 8th, correct?
24  A.   Correct.
25  Q.   You only had dinner by yourself with Paiton, right?

Page 177

1   A.   Yes.
2   Q.   So the last night the girls, and by girls I mean the
3        teens and 20 year olds were going off to do their
4        thing and parents were going off to do their thing,
5        right?
6   A.   Right.
7   Q.   Okay.  So picture number 7, you have your face
8        painted?
9   A.   Uh-huh.
10  Q.   Why do you have your face painted?
11  A.   There was face painting going on at the resort.
12  Q.   Okay.  And is that an alcoholic drink that you --
13  A.   Yes.
14  Q.   Yes?  And you're having a good time that day?
15  A.   Yes.
16  Q.   And is this the day of the incident or no?  What day
17       is this?
18  A.   I'm not exactly sure.  It's towards the beginning of
19       the trip, though.
20  Q.   So it's probably Tuesday or Wednesday, right?
21  A.   Yeah.
22  Q.   Okay.  And here, I believe you're -- page 8, you're
23       the person in the blue bikini, right?
24  A.   Yes.
25  Q.   And you're holding a One Love sign?

Page 178

1   A.   Yes.
2   Q.   Why are you holding a One Love sign?
3   A.   I saw it and like yeah.
4   Q.   So you saw it stuck to the ground and you thought it
5        would be fun to pick it up and --
6   A.   Yeah.
7   Q.   -- run around with it?
8   A.   Yes.
9   Q.   Yeah, and you're having a good time?
10  A.   Yes.
11  Q.   Yes.  So you stole the sign?
12  A.   I didn't steal it, I put it back where I found it
13       after.
14  Q.   You borrowed it for a little while?
15  A.   Yes.
16  Q.   And then you took it back?
17  A.   Yes.
18  Q.   And the young lady that's to your right -- or I guess
19       to your left is Paiton, right?
20  A.   Yes.
21  Q.   To me it looks Paiton's having a really good time?
22  A.   Yes.
23  Q.   You're laughing.  It's true that Paiton's having a
24       really good time here, right?
25  A.   Yes.

Page 179

1   Q.   And seems to me that Paiton has had a little bit too
2        much to drink there; is that true?
3   A.   Maybe.
4             MR. WEGLARZ:  Form.
5   A.   I don't know.
6   BY MR. SUAREZ:
7   Q.   Huh?
8   A.   I don't know.
9   Q.   Well, looking at the picture would you believe that's
10       a reasonable assumption?
11            MR. WEGLARZ:  Come on, are you kidding me?
12            MR. SUAREZ:  Look at the picture, I mean --
13            MR. WEGLARZ:  You're able to determine
14       intoxication from a single photo?
15  A.   Yeah.
16            MR. WEGLARZ:  There's no foundation.
17            MR. SUAREZ:  You can just object to form.
18       You can say yes or no.
19  BY MR. SUAREZ:
20  Q.   Does it seem to you that Paiton is having a really
21       good time there and may be intoxicated?
22            MR. WEGLARZ:  Form objection.
23  A.   Sure.
24  BY MR. SUAREZ:
25  Q.   Huh?

Page 180

1   A.   Sure.
2   Q.   Okay.  They talked to you about this picture, right?
3   A.   Uh-huh, yes.
4   Q.   And this is picture 9?
5   A.   Yes.
6   Q.   And Paiton's in this picture too?
7   A.   Yes.
8   Q.   And that appears to be an alcoholic beverage?
9   A.   Yes.
10  Q.   And Paiton's crouched under the sink?
11  A.   Sink, yes.
12  Q.   And she also seems to be having a really good time
13       here, right?
14  A.   Yes.
15  Q.   And then page 10, who's the gentleman in the tank top?
16  A.   That was the person like our guide for the excursion.
17  Q.   Okay.  And when did you meet this gentleman?
18  A.   That day we got to the Blue Hole.
19  Q.   So you met him at the Blue Hole?
20  A.   Yeah, he was like the worker.
21  Q.   So he walked from -- and this gentleman was not
22       associated with Beaches, correct?
23  A.   Correct.
24  Q.   And he's just a guy that worked at the Blue Hole,
25       right?

Page 181

1   A.   Yes.
2   Q.   Is that you doing the Tarzan rope?
3   A.   Yes.
4   Q.   Good time?
5   A.   Yes.
6   Q.   Okay.  This gentleman, I guess walked you from -- from
7        where, from your car to the Blue Hole, correct?
8   A.   I think so.
9   Q.   What was his name?
10  A.   I don't remember.
11  Q.   Did you exchange Facebook or Instagram handles --
12  A.   No.
13  Q.   -- with him?
14  A.   No.
15  Q.   No?  But you did take these sort of selfies with him,
16       right?
17  A.   Yes.
18  Q.   And why did you do that?
19  A.   I don't remember, I --
20  Q.   Did you -- I'm sorry, I don't mean to cut you off.
21  A.   That's okay.
22  Q.   You wanted to say something?
23  A.   I don't remember if it was like his idea or ours.
24  Q.   Okay.  And you took this selfie?
25  A.   He did.

Page 182

1   Q.   And you sent it to anybody?
2   A.   No.
3   Q.   That was on your camera or was that on Paiton's
4        camera?
5   A.   I think it was on mine.
6   A.   I said camera but I mean phone.
7   A.   Yeah.
8   Q.   It was on your phone, right?
9   A.   I think so.
10  Q.   None of you -- none of you took actual cameras to the
11       trip, right?
12  A.   Yes, that's correct.
13  Q.   To the extent you have photographs, it's all on
14       iPhones, right?
15  A.   Yes.
16  Q.   You took a number of photographs with this gentleman,
17       right?
18  A.   Yes.
19  Q.   Why?
20  A.   I don't know.
21  Q.   Did you or Paiton find this gentleman attractive?
22  A.   I don't know.  I don't know if she did.
23  Q.   Did you?
24  A.   I don't think he's like crazy good looking, but I
25       don't think he's ugly.

Page 183

1   Q.   Okay.  And -- okay.  Last photograph, is that you?
2   A.   Yes.
3   Q.   And by last photograph, I mean number 14 or 15, right?
4   A.   Yes.
5   Q.   You're holding a sign that says brownies?
6   A.   Yes.
7   Q.   And if I'm right, that's Bob Marley in a marijuana
8        leaf, right?
9             MR. WEGLARZ:  It is.  Sorry.
10  A.   It's not Bob Marley.
11  BY MR. SUAREZ:
12  Q.   No, no, the person on your sign?
13  A.   Oh, yeah.
14  Q.   On your sign is Bob Marley in a marijuana leaf, right?
15  A.   Yes.
16  Q.   And the gentleman sitting, that's to your left is a
17       guy that's selling pot brownies, right?
18  A.   Yes.
19  Q.   Okay.  And you took this photo?
20  A.   Yeah -- well, someone else did, yeah.
21  Q.   Somebody took it for you, who took it?
22  A.   I don't remember.
23  Q.   And you liked this photo?
24  A.   Yeah.
25  Q.   You sent it to your friends?

Page 184

1   A.   No.
2   Q.   Okay.  And the next photograph is essentially a
3        close-up of the prior photo, 15 is a close-up of the
4        prior photo except his pot brownies are now in a
5        different -- different phase, right?
6   A.   Okay, yes.
7   Q.   And now, admittedly uncertain is whether these
8        colorful little things on his tray are edible gummies
9        or not.  Do you recall whether there were edible
10       gummies on that tray?
11  A.   I don't recall.
12  Q.   See, we did that quickly.  Do you know what it is
13       to -- and I know it has a word, but I don't know what
14       the word is, okay?  On Instagram people do this thing
15       called stories where you just kind of take a video and
16       then you disseminate it to the whole world.  Did you
17       or Paiton or your mom or Janet do a story and post it
18       to the world?
19  A.   No.  I don't think that was the thing during that
20       time.
21  Q.   Okay.  When you got back from Jamaica, did you or
22       Janet or Paiton or your mom do a story about -- about
23       your trip to Jamaica?
24  A.   No.
25  Q.   By the way, The Oasis that you went to in Cancun,

Page 185

1        there's a couple Oasises, so I want to make sure I got
2        the right one.  The one I think you went to is an all
3        inclusive, right?
4   A.   Yes.
5   Q.   And by all inclusive I mean they throw in all the --
6        all the food and all the booze on the property, right?
7   A.   Yes.
8   Q.   Provided that it's national drinks, right?
9   A.   Yes.
10  Q.   And tequila is a national drink in Mexico, right?
11  A.   Yes.
12  Q.   And did you have tequila while you were there?
13  A.   No, I don't like tequila.
14  Q.   All right.  What is your choice of beverage?
15            MR. WEGLARZ:  Asked and answered.
16            But go ahead.
17  BY MR. SUAREZ:
18  Q.   In Cancun, I'm sorry, I don't believe I've asked about
19       Cancun.
20  A.   Vodka lemonades.
21  Q.   Vodka lemonades?
22  A.   Yes.
23  Q.   Was that your choice of drink while you were in
24       Jamaica?
25  A.   No.

Page 186

1   Q.   Everybody that went on that trip with you was a
2        teenager, right, or a young adult in their 20s, right?
3   A.   For the Cancun, Mexico?
4   Q.   Yes.
5   A.   Yes.
6   Q.   No parents went with you on that trip, correct?
7   A.   Right.
8   Q.   Parents were excluded, right?
9   A.   Right.
10  Q.   And no -- no chaperones of any kind were included on
11       that trip, right?
12  A.   Right.
13  Q.   That was a spring break party trip, right?
14  A.   Yes.
15  Q.   Okay.  Both males and females went on that trip?
16  A.   Yes.
17  Q.   And what was -- how many -- how many of each?
18  A.   There was five girls and five boys.
19  Q.   Okay.
20  A.   There might have been six girls actually, five boys.
21  Q.   Were you in a relationship with any of those boys?
22  A.   No.
23  Q.   Okay.  While you were -- going back to Jamaica for a
24       second, Jamaica was also an all inclusive resort,
25       right?

Page 187

1   A.   Right.
2   Q.   And you could have all the drinks, all the booze and
3        all the food was included, right?
4   A.   Right.
5   Q.   By booze I mean alcoholic beverages, right?
6   A.   Yes.
7   Q.   And the staff was not allowed to drink, right?
8   A.   Right.
9   Q.   Did any of the staff members ever ask you to get
10       drinks for them?
11  A.   Where?
12  Q.   In Jamaica.
13  A.   No.
14  Q.   So to be sure, did you and/or Paiton ever get
15       alcoholic drinks for Jermaine, Dwight or Willie?
16  A.   No.
17  Q.   Okay.  The second property you were at, the Sandals
18       property, did you like that property?
19  A.   Yeah.
20  Q.   Nice property?
21  A.   Yes.
22  Q.   I want to ask you, in Exhibit Number -- I will mark an
23       exhibit that we've previously used and I'm going to
24       add a sticker to it as Amber Torralva number 5 dated
25       9-25-19 as previously used as Exhibit 2 with your

Page 188

1        mother.
2                 MARKED FOR IDENTIFICATION:
3                 DEPOSITION EXHIBIT 5
4                 12:30 p.m.
5   BY MR. SUAREZ:
6   Q.   I'm going to hand you a photograph of the resort in
7        Jamaica that you were at, okay?  And I want you to
8        please with your -- with a -- I want to choose a
9        different colored pen.  I'd like you, if you could,
10       tell me, can you identify generally where in this
11       picture of the property where your room was?  Where
12       was 1132?
13  A.   I could be wrong, but maybe over here.
14  Q.   Okay.  Can you do me a favor and circle it in red and
15       then put your -- there we go.  Let me just put an
16       arrow to here.  All right.  Can you do me a favor and
17       initial there.  Thank you.
18  A.   Uh-huh.
19  Q.   And then can you tell me where the bar that you were
20       at doing the karaoke the day of the incident was?  Can
21       you generally point to it?
22  A.   I don't really know.
23  Q.   Okay.  Now, the night of the incident, where -- where
24       did the incident take place in this photograph?
25  A.   I don't know if you can even see it in this picture.

Page 189

1   Q.   What level was it on?
2   A.   I don't know.
3   Q.   Okay.  Was it -- how far was it from a bar?
4             MR. WEGLARZ:  How far from what?  I'm
5        sorry.
6   BY MR. SUAREZ:
7   Q.   How far was the location of the incident from a bar?
8   A.   I am not sure.
9   Q.   Was it on the same level as the bar?
10  A.   Possibly.
11  Q.   So when -- when Paiton went to go get a drink and you
12       came back, and well, you claim you came back, did she
13       have to go up or down a stair?
14  A.   I think it was on the same level.
15  Q.   Okay.  And could you see the bar from the room where
16       the incident occurred?
17  A.   No.
18  Q.   Okay.  Was it near that tower there somewhere?
19  A.   What tower?
20  Q.   This tower.
21  A.   Yes.
22  Q.   Do you recall what level it was at?
23  A.   No.
24  Q.   Did you ever see or pay any invoices from the Beaches
25       resort?

Page 190

1   A.   Did I ever?
2   Q.   Receive or pay any invoices from the Beaches resort?
3   A.   No.
4   Q.   I understand that prior to you going to Jamaica, Janet
5        switched hotels from one hotel to another, right?
6   A.   Yes.
7   Q.   Were you involved in that decision at all?
8   A.   No.
9   Q.   Did you research the Beaches Hotel after Janet told
10       you all had switched hotels?
11  A.   No.
12  Q.   Did you go online to compare the hotels?
13  A.   No.
14  Q.   Did you ever compare the Beaches Hotel with the Moon
15       Palace Hotel?
16  A.   No.
17  Q.   Was the Palace Hotel an all inclusive?
18  A.   I don't know.
19  Q.   It seems really odd to me and I'll be very transparent
20       here that a person of your age and living in this
21       generation that we have no text messages from you
22       regarding this trip.  My question to you is, you
23       texted people about this trip, right?
24  A.   I mean, I talked about it to my friends, but I didn't
25       like text about it to them.

Page 191

1   Q.   You didn't text anybody on this trip?
2   A.   Why would I?
3   Q.   Did you message during this trip?
4   A.   I mean, if someone messaged me, I replied back.
5   Q.   So there are messages during this trip with somebody?
6   A.   Maybe.
7   Q.   Okay.  And there's posts on social media about this
8        trip, right?
9   A.   Yes.
10  Q.   Okay.  I'm going to ask you to preserve those because
11       I don't have any of those.  So I'm going to ask you
12       not to delete them and I'll worry about that with your
13       counselor --
14            MR. WEGLARZ:  Counsel, I provided you all
15       the pictures that were on her Facebook from the trip.
16       That's what those are.
17            MR. SUAREZ:  Well --
18            MR. WEGLARZ:  It looks like there's about
19       125 photos, I provided those to you yesterday.  You
20       guys selected like 14 of those, the 14 pages of the
21       exhibit, that's what you guys are referring to.
22            MR. SUAREZ:  That's somewhat -- I don't
23       want to quibble with you, that's somewhat unfair.  You
24       know, yesterday you give us a thumb drive with about
25       300 photos, I have no idea what they are, I don't know

Page 192

1   where they came from, I don't know how they came from,
2   and what's very odd to me at least about those
3   photographs is that --
4            MR. WEGLARZ:  Yes, sir.
5            MR. SUAREZ:  -- if you have been to an
6   Instagram post or an Instagram page, there is a ton of
7   information and data on those pages and there's
8   screenshots of those pages that have comments,
9   remarks, reactions from folks, likes, dislikes, thumbs
10  up, thumbs down, smiley faces, tragedy faces, a whole
11  host of ways in which the world now communicates and I
12  don't have a single one.  So I'm sorry if I'm a little
13  incredulous that that's the only thing that exists,
14  so.
15           MR. WEGLARZ:  There is a lot of data.
16           MR. SUAREZ:  Correct.
17           MR. WEGLARZ:  So I thought I would extract
18  the relevant parts first so you would have it for the
19  deposition.
20           MR. SUAREZ:  Okay.  So admittedly we can
21  quibble --
22           MR. WEGLARZ:  If there are --
23           MR. SUAREZ:  -- we can quibble about this
24  at another moment, I don't want to waste the witness'
25  time.

Page 193

1            MR. WEGLARZ:  I appreciate that.
2            MR. SUAREZ:  But admittedly we have
3       information that we're missing that I think I'm
4       entitled to, okay, so.
5            MR. SCOTT:  Agree.
6   BY MR. SUAREZ:
7   Q.   Ma'am, what was the name of your high school?
8   A.   Grandville High School.
9   Q.   Did you ultimately graduate have Grandville High
10       School?
11  A.   Yes.
12  Q.   And you graduated on track?
13  A.   Yes.
14  Q.   And you didn't lose any classes during your senior
15       year, correct?
16  A.   Correct.
17  Q.   You passed all your classes in the -- in the fall of
18       your senior year, correct?
19  A.   Yes.
20  Q.   And you passed all your classes in the spring of your
21       senior year?
22  A.   Of 2016, yes.
23  Q.   And you graduated in the class of 2016, right?
24  A.   Yes.
25  Q.   Congratulations.

Page 194

1   A.   Thank you.
2   Q.   Now, admittedly, ma'am, I like to try to tell people
3        where I'm going next so that maybe hopefully sometimes
4        when I do that, it helps speed up the process.  And so
5        the next section that I'm going to cover is a period
6        of time from the time you got back from Jamaica until
7        sort of today, right?
8   A.   Okay.
9   Q.   And so May of 2015 until today, okay?
10  A.   Okay.
11  Q.   And what I'm specifically focusing on is the -- your
12       records related to what I can only surmise is your
13       mental health treatment, okay?
14  A.   Okay.
15  Q.   And I'm going to walk you through it and give you my
16       understanding, and you'll tell me where I'm wrong.
17  A.   Okay.
18  Q.   Okay?  So you got back from Kingston -- excuse me,
19       from Jamaica on May 14, 2015, right?
20  A.   Right.
21  Q.   And then the first medical record that at least I have
22       that relates to your mental health treatment is not
23       until June 8th of 2015, okay?
24  A.   Uh-huh.
25  Q.   And so my first question to you is, did you have any

Page 195

1    treatment from May 14th to June 8th of 2015?
2    A.  I don't believe so.
3    Q.  Okay.  So you waited for about a month to seek mental
4        health treatment, why is that?
5    A.  I didn't want to.
6    Q.  Okay.  And why didn't you want to?
7    A.  Because I didn't want to be reminded of it.
8    Q.  Okay.  And then what caused you to ultimately go seek
9        treatment?
10   A.  My mom forced me.
11   Q.  Okay.  So it was your mom's idea for you to get mental
12       health treatment?
13   A.  Yes.
14   Q.  And she obligated you to go?
15   A.  Yes.
16   Q.  That's why you went for the first time on June 8th?
17   A.  Yes.
18   Q.  And then did you have any input on who would give you
19       treatment?
20   A.  I think she gave me an option, but I didn't really
21       know.
22   Q.  Did you seek -- did you talk to, ultimately talk to
23       one counselor or more than one counselor?
24   A.  I talked to one counselor and then I switched to a
25       different one and I think I stayed with her.

Page 196

1    Q.  Okay.  Your first counselor was who?
2    A.  I don't remember his name, but it was a male.
3    Q.  Okay.  All right.  And then you switched to a female?
4    A.  Uh-huh, yes.
5    Q.  How long after you went from a male did you switch to
6        a female?
7    A.  I don't recall.  Not very long.
8    Q.  So I'm going to hand you a document dated June 8th and
9        I'm going to tab it as Exhibit Number 6.
10               MARKED FOR IDENTIFICATION:
11               DEPOSITION EXHIBIT 6
12               12:42 p.m.
13          MR. SUAREZ:  And I'll let you see it.
14   We're going to need to share these because I don't
15   have -- some I have copies, other ones I don't have
16   copies.
17          MR. WEGLARZ:  Sure.  I think I have copies
18   for myself but if you need me to make copies for
19   everyone, I could do that.
20          MR. SUAREZ:  I'll show you what it is and
21   we can try to go quickly.
22          MR. WEGLARZ:  Yes, sir.
23   BY MR. SUAREZ:
24   Q.  This is a record from Jenison Psychological Services?
25   A.  Yes.

Page 197

1    Q.  Right?  That's who provided you with services, right?
2    A.  Correct.
3    Q.  And they provided you with services from, at least
4        according to my records, intermittently from June 8,
5        2015 until about sometime around October of 2016.
6    A.  Correct.
7    Q.  Does that sound right to you?
8    A.  Yes.
9    Q.  You went to them admittedly for about a year, right?
10   A.  Right.
11   Q.  You didn't go every day, right?
12   A.  Right.
13   Q.  You went --
14   A.  I think it was --
15   Q.  -- about once a month or sometimes a little bit more
16       frequently, right?
17   A.  Right.
18   Q.  And those sessions were about one hour every month,
19       right?
20   A.  Yes.
21   Q.  Okay.  So the first record that at least I -- by the
22       way, after October of 2016, you stopped going to
23       therapy, right?
24   A.  Yes.
25   Q.  And you didn't return, right?

Page 198

1    A.  I just recently returned.
2    Q.  Okay.  And when you say just recently, what does that
3        mean?
4    A.  I think I started back in August, maybe.
5    Q.  Of 2019?
6    A.  Yes.
7    Q.  And so from October of 2016 until August of 2019 you
8        had no treatment, right?
9    A.  It might have been July, but yes.
10   Q.  So from October of 2016 until July of 2019, you had no
11       treatment, right?
12   A.  Right.
13   Q.  Why was that?
14   A.  I felt like I didn't need it anymore.
15   Q.  Okay.  And now in July you went back, right?
16   A.  Right.
17   Q.  And why did you go back?
18   A.  Because of this deposition.
19   Q.  Okay.  And you spoke to a counselor about this
20       deposition?
21   A.  Yes.
22   Q.  Okay.  And so you've been -- you've been twice to a
23       counselor before this deposition?
24   A.  Yes.
25   Q.  Okay.  So and both those sessions were for an hour?

Page 199

1   A.   Uh-huh, yes.
2   Q.   Okay.  And there's a couple things I want to ask you
3        about related to this document.  It says here that you
4        are, as of 2015, you were on probation; is that right?
5   A.   Correct.
6   Q.   Why were you on probation?
7   A.   I had got caught with weed.
8   Q.   And when did you get caught with weed?
9   A.   November 20th.
10  Q.   So November 20, 2014 you got caught with weed?
11  A.   I think it was 2015.
12  Q.   Well, so you got caught with weed before or after the
13       incident?
14  A.   Before the incident.
15  Q.   So it couldn't have been --
16            MR. SCOTT:  Sorry, when was that?
17            MR. SUAREZ:  We're clarifying that.  It
18       was -- she said -- let me just clarify that.
19            MR. SCOTT:  Pardon me.
20  BY MR. SUAREZ:
21  Q.   You got caught with weed before or after the incident?
22  A.   Before the incident.
23  Q.   So if it was November 20th, it must have been
24       November 20, 2014, right?
25  A.   Oh, yeah, sorry.

Page 200

1   Q.   So I'm right?
2   A.   Yes.
3   Q.   Okay.  And it's okay, it's just that I study the
4        records, so some of the dates are easier for me
5        because I've studied the records.
6   A.   Right.
7   Q.   So the first semester of your junior year was 2014,
8        November, you get caught with weed, right?
9   A.   Yes.
10  Q.   How much weed did you get caught with?
11  A.   Just like a gram.
12  Q.   Okay.  And somebody initiated some sort of medical --
13       criminal proceeding with you?
14  A.   Yes.
15  Q.   And without getting into the details, you were placed
16       on probation?
17  A.   Yes.
18  Q.   How long were you placed on probation?
19  A.   A year.
20  Q.   Did you have a lawyer?
21  A.   No.
22  Q.   Okay.  And as part of that probation, did you have to
23       go see a probation officer?
24  A.   Yes.
25  Q.   How often?

Page 201

1   A.   Every month.
2   Q.   Okay.  Once a month?
3   A.   Yes.
4   Q.   For how long?
5   A.   A year.
6   Q.   And you've been -- you completed that probation?
7   A.   Yes.
8   Q.   And after -- after November of 2015, did you go back
9        on probation?
10  A.   After November of 2015?  I think I did.  I think I
11       violated and then I had to do another year.
12  Q.   How did you violate?
13  A.   I got caught stealing.
14  Q.   And what were you stealing?
15  A.   A phone case.
16  Q.   Okay.  And because of that incident, they extended
17       your probation another year?
18  A.   Yes.
19  Q.   And when did you get caught stealing the phone case?
20  A.   It was right before I was going to get off probation,
21       so I don't know when that was.
22  Q.   Okay.  So it must have been sometime before November
23       of 2015 -- of 2015, right?
24  A.   Right.
25  Q.   Okay.  Then the second line here, it says that you

Page 202

1        wanted a -- we're in June of 2015, it says you wanted
2        a medical marijuana card, right?
3   A.   Yes.
4   Q.   Why did you want a medical marijuana?
5   A.   So I could smoke.
6   Q.   So you could smoke?
7   A.   Yes.  But I never got one.
8   Q.   And you're laughing?
9   A.   Yes.
10  Q.   Did you like to smoke weed?
11  A.   Yes.
12  Q.   And do you like to smoke weed?
13  A.   Yes.
14  Q.   When did you start smoking weed?
15  A.   I think when I was 16.
16  Q.   Sometime in your freshman or junior year?
17  A.   Sophomore.
18  Q.   I'm sorry, freshman or sophomore year?
19  A.   Uh-huh.
20  Q.   Yeah?  And I have no idea whether weed is legal or not
21       in Michigan, is it legal?
22  A.   It is legal now.
23  Q.   When did it become legal?
24  A.   In December.
25  Q.   Of?

Page 203

1           THE WITNESS:  This year, right?
2           MS. MARGARET TORRALVA:  Last year.
3    A.  Last year.
4    BY MR. SUAREZ:
5    Q.  So in December of 2018?
6    A.  Yes.
7           MR. SCOTT:  I'm sorry, that's when you
8    ended the probation?
9           THE WITNESS:  No, that's when weed became
10   legal.
11          MR. SCOTT:  I'm sorry.
12          THE WITNESS:  That's okay.
13          MR. SUAREZ:  She ended probation in
14   November of 2014 (sic).
15   BY MR. SUAREZ:
16   Q.  Right?
17   A.  Right.
18   Q.  So weed became legal in December of 2018?
19   A.  Yes.
20   Q.  So any time you were using weed before then, it was
21   illegal, right?
22   A.  Correct.
23   Q.  You used weed in 2013, 2014, 2015, 2016 and 2017,
24   right?
25   A.  Right.

Page 204

1    Q.  And do you smoke weed often?
2    A.  Yes.
3    Q.  And when I say often, how often is that?
4    A.  Like frequently.
5    Q.  So you've got this Cheshire grin on your face.
6           MR. WEGLARZ:  Objection.
7    BY MR. SUAREZ:
8    Q.  And you're now smiling at me.  I'm going to try to do
9    it in a little bit more delicate of a fashion.
10   A.  Okay.
11   Q.  Okay?  In 2014 in your sophomore year of high school,
12   how often did you do weed?
13   A.  Not often then, like every once in a while.
14   Q.  What does every once in a while mean?
15   A.  Well, I didn't start like really getting into it until
16   my junior year.
17   Q.  Okay.  Of high school?
18   A.  Yes.
19   Q.  And when you say really getting into it in your junior
20   year of high school, what does that mean?
21   A.  Well, I started doing it more until I got caught, and
22   then once I got caught, I couldn't do it at all.
23   Q.  So from the summer of 2014 until November of 2015, you
24   were doing it more, right?
25   A.  Yes.

Page 205

1    Q.  And when you say more, what does that mean?
2           MR. WEGLARZ:  Wait a minute, hold on.
3    Objection, I think you're mischaracterizing the
4    testimony.  Did you say November of 2014 through
5    November of 2015?
6           MR. SUAREZ:  No, no, no.  No, I'll read
7    you the question.  I'll read you the question again.
8           MR. WEGLARZ:  Please.
9           MR. SUAREZ:  She said I really got into it
10   my junior year, and so the start of her junior year is
11   sometime at the end of the summer of 2014 until
12   November of 2015, right?
13   BY MR. SUAREZ:
14   Q.  Let's go back.  I get into a rhythm.
15   A.  All right.
16   Q.  All right.  It is a true statement to say that your
17   junior year started sometime after the summer of 2014,
18   right?
19   A.  Correct.
20   Q.  And by popular parlance, that would be September of
21   2014, right?
22   A.  Right.
23   Q.  And you got caught with weed in November of --
24   A.  Yes.
25   Q.  -- 2014, right?

Page 206

1    A.  Yes.
2    Q.  And so September, October, November is your fall
3    semester of junior year, right?
4    A.  Right.
5    Q.  And if I understand you correctly, that's when you
6    "got into weed," right?
7    A.  Yes.
8    Q.  Or you said, "more into it"?
9    A.  Yes.
10   Q.  How frequently were you smoking weed at that time?
11   A.  I don't really remember.  I didn't always have it, so
12   I wasn't always doing it.
13   Q.  Fair to say once a week?
14   A.  No.  Like less.
15   Q.  Once every two weeks?
16   A.  Like maybe.
17   Q.  Okay.  And then you got caught with weed in November
18   of 2014, right?
19   A.  Yes.
20   Q.  But that didn't stop you from doing weed, right?
21   A.  It did.
22   Q.  How long?
23   A.  Until I was off probation.
24   Q.  So you didn't do weed -- your testimony here is that
25   you didn't do weed from November of 2014 until

Page 207

1    November of 2016, that two-year period, you didn't do
2    weed?
3    A.   Yes, because I was tested.
4    Q.   How often were you tested?
5    A.   Whenever I saw her.
6    Q.   Okay.  I don't want to misstate your testimony.  I
7         want to make sure that I'm abundantly accurate, okay?
8    A.   Okay.
9    Q.   From November of 2014 until November of 2016 is your
10        testimony that you didn't do weed?
11   A.   Correct.
12   Q.   Okay.  In any way?
13   A.   Correct.
14   Q.   Shape or form?
15   A.   Correct.
16   Q.   Okay.  And if there is a blood test that reflects weed
17        during that time frame, one of two things happened,
18        either your testimony is wrong or the blood test is
19        wrong, right?
20   A.   Right.
21   Q.   Okay.  Then in November of 2016, you started to do
22        weed again, right?
23   A.   Yes.
24   Q.   And you're doing weed until today, right?
25   A.   Correct.

Page 208

1    Q.   And how often do you do it?
2    A.   Whenever I want to.
3    Q.   When and how?
4    A.   Like weekly.
5    Q.   You didn't smoke weed today, right?
6    A.   No.
7    Q.   Did you smoke weed yesterday?
8    A.   Yes.
9    Q.   Last night?
10   A.   Yes.
11   Q.   Okay.  It says here that you had counseling from a guy
12        called Vincent Morton as a -- as a condition of your
13        probation, right?
14   A.   Yes.
15   Q.   And who's Vincent Morton?
16   A.   That was the one I was referring to earlier.  I had a
17        male and then I switched to the Jenison Psychological.
18   Q.   But the male that you had that gave you counseling,
19        after November of 2014 was related to your weed
20        issues, right?
21   A.   Yes.
22   Q.   Okay.  You had counseling related to your weed issues
23        and then when you came back from Jamaica, you had
24        counseling related to the incident, right?
25   A.   Right.

Page 209

1    Q.   So when you came back from Jamaica and you were -- did
2         you see Vincent Morton after you came back from
3         Jamaica?
4    A.   No.
5    Q.   Okay.  When you came back from Jamaica, did you see a
6         male to treat you for the incident?
7    A.   No.  I talked to Susan.
8    Q.   You only talked to Susan, right?
9    A.   Yes.
10   Q.   Okay.  And you started seeing Susan about a month
11        after you got back from Jamaica, right?
12   A.   Yes.
13   Q.   Okay.  Susan's the lady that your mom told you to go
14        see?
15   A.   Yes.
16   Q.   It says here that there is a family history of
17        depression and anxiety, what is that referring to?
18   A.   My family, some of my family struggles with that.
19   Q.   Does your mother struggle with it?
20   A.   Yes.
21   Q.   Before your trip to Jamaica, did you struggle with
22        anxiety or depression?
23   A.   No.
24   Q.   When you got back from Jamaica and you went into your
25        senior year, were your marks okay your senior year?

Page 210

1    A.   My marks?
2    Q.   Your grades?
3    A.   Oh, I don't know.
4    Q.   You passed all your courses?
5    A.   Yes.
6    Q.   Was your GPA more or less than what it was before your
7         trip in Jamaica?
8    A.   What time?
9    Q.   Until you -- you had grades before you went to
10        Jamaica, right?
11   A.   Yes.
12   Q.   And you had grades when you came back from Jamaica?
13   A.   Yes.
14   Q.   Did you do better before or after?
15   A.   Before.
16   Q.   Okay.  How much -- how much better did you do?
17   A.   Not --
18   Q.   A little bit or not?
19   A.   Just a little bit.
20   Q.   Was it significant or no?
21   A.   Just like a little bit.
22   Q.   It was inconsequential?
23   A.   Yes.
24   Q.   Okay.  In other words, you didn't -- to fast forward
25        this process, you didn't go from being a national

Page 211

1    honor society student to being a regular student,
2    right?
3    A.   Correct.
4    Q.   Before the trip, you were a regular student, right?
5    A.   Yes.
6    Q.   After the trip, you were a regular student, right?
7    A.   Yes.
8    Q.   Okay.  I may skip some of these just to make the
9         process go a little quicker, okay?
10   A.   Okay.
11   Q.   So there's a record here one month after this, so in
12        July, so it must have been your next -- your next
13        visit to the psychologist.
14                 MR. SUAREZ:  And this one I do have a copy
15        for you.
16                 MR. WEGLARZ:  Thank you.
17                 MARKED FOR IDENTIFICATION:
18                 DEPOSITION EXHIBIT 7
19                 12:57 p.m.
20   BY MR. SUAREZ:
21   Q.   And it says there --
22                 MR. SCOTT:  We're shortcutted?
23                 MR. SUAREZ:  I'm sorry?
24                 MR. SCOTT:  We're shortcutted?
25                 MR. SUAREZ:  I'm sorry, yeah, you are.

Page 212

1                  MR. SCOTT:  It's okay.
2                  MR. SUAREZ:  I have enough, I can get --
3                  MR. SCOTT:  It's been my history.
4                  MR. SUAREZ:  I'm sorry.
5                  MR. WEGLARZ:  He likes feeling like he's
6         back at the office.
7                  MR. SUAREZ:  You know what?  I like to make
8         people feel good, so I'm going to try to find you a
9         copy.
10                 MR. SCOTT:  No, don't worry about it.  No,
11        don't worry about it.  I can always look at yours.
12                 MR. WEGLARZ:  I've got mine on a laptop,
13        you can have that.
14                 MR. SCOTT:  Okay.
15   BY MR. SUAREZ:
16   Q.   Okay.  So if you go to the bottom there, it says to
17        the second part, it says in handwriting, it says, "He
18        had befriended her and sent her a friend request on
19        Facebook.  She also received a text from him that was
20        time stamped after the rape."  Do you see that?
21   A.   Yes.
22   Q.   And I highlighted for you to make it easier, but I'm
23        not going to include the highlighted copy as part of
24        the record.
25   A.   Okay.

Page 213

1    Q.   All right.  So does that -- does reading that record
2         now refresh your recollection that the exhibit that we
3         marked as Exhibit 9 -- excuse me, Exhibit 4 which I'm
4         now showing you was received by you --
5    A.   Uh-huh.
6    Q.   -- after the incident?
7    A.   Yes.
8    Q.   Okay.  And here if you believe that record, it also
9         reflects that he had befriended you on Facebook before
10        the incident, right?
11   A.   Right.
12   Q.   Now, sometimes when people become friends on Facebook,
13        there's people that either post a picture or somebody
14        comments about that or somebody hits a like; do you
15        know whether when you became friends with Jermaine on
16        Facebook, somebody did that?
17   A.   No.
18   Q.   So let me put that down for a second.
19   A.   Okay.
20   Q.   Can you hand me that back?
21                 MR. SUAREZ:  Mr. Scott, here, just so you
22        don't feel bad.
23                 MR. SCOTT:  Thank you, my depression is
24        over.
25                 MR. WEGLARZ:  He's got a copy anyways.

Page 214

1                  MR. SUAREZ:  Okay.
2    BY MR. SUAREZ:
3    Q.   So a few weeks -- a few weeks later --
4                  MR. SCOTT:  Thank you.
5    BY MR. SUAREZ:
6    Q.   A few weeks later which is now July 25th of 2015,
7         there is another -- and I'm going to mark it as
8         Exhibit 8.
9                  MARKED FOR IDENTIFICATION:
10                 DEPOSITION EXHIBIT 8
11                 1:00 p.m.
12   BY MR. SUAREZ:
13   Q.   There's another medical record that says, and I'll let
14        you read it -- I'll let you read it, then I'll ask you
15        a question about it.
16                 MR. WEGLARZ:  What number is this?
17                 MR. SUAREZ:  That would be Exhibit
18        Number 9.
19                 MR. WEGLARZ:  Thank you.
20                 MR. SUAREZ:  I'm sorry, it's 8, thank you
21        for the correction, that's Exhibit Number 8.
22   A.   I don't know what that is dealing with.
23                 MS. MARGARET TORRALVA:  Aftermath.
24   A.   Okay.
25   BY MR. SUAREZ:

Page 215

1  Q.  So the part that I want to ask you about, it says,
2      "She and her mother have had conflict because patient
3      wants to come and go with her friends, but her mom
4      worries about keeping her safe."  Do you see that?
5  A.  Yes.
6  Q.  So you wanted to in July of 2015, you wanted to go out
7      and about and continue to live your life, but your mom
8      didn't want you to, right?
9  A.  Yes.
10 Q.  And you were having some, I guess discussions with
11     your mom about that, right?
12 A.  Right.
13 Q.  Okay.  Now, one week after this, or about eight days
14     after this, there's another medical record and this
15     one I'm going to tab as Exhibit Number 9 and let you
16     read that.  Can you hand that to me?
17         MR. WEGLARZ:  What's the date, Luis?
18 A.  7-29.
19         MR. SUAREZ:  7-29.
20         MR. WEGLARZ:  Thank you.
21     MARKED FOR IDENTIFICATION:
22     DEPOSITION EXHIBIT 9
23     1:02 p.m.
24         MR. SUAREZ:  I have a copy for you.
25         MR. WEGLARZ:  Thank you.

Page 216

1  BY MR. SUAREZ:
2  Q.  And that record says that -- well, first thing it
3      says, so one week after it says that you and your mom
4      are getting along better, right?
5  A.  Yeah.
6  Q.  And at the bottom, it says that you applied (sic) to
7      share your story in an art prize project called "The
8      Unveiling" and you continued to work on the trauma
9      narrative and you were calm and you gave good details.
10     Is that what it says?
11 A.  Yes.
12 Q.  Did you ever do the art project called "The
13     Unveiling"?
14 A.  I didn't remember that I did, but I guess I did.
15 Q.  Do you have a copy of that?
16 A.  I don't.
17 Q.  What does that involve?  Or what did that involve, I
18     should say?
19 A.  I don't really remember all that well about it.  I
20     think I only did it with her and she like did
21     something with it.
22 Q.  I'm sorry, I don't understand your response.
23 A.  I think that like when I did it, it was with Susan, so
24     she -- she must have like turned it in or something
25     because I don't remember dealing with it at all.

Page 217

1  Q.  You don't remember that project?
2  A.  No.
3  Q.  And you don't know whether it was exhibited or not?
4  A.  Correct.
5  Q.  And you don't know -- you don't have a copy?
6  A.  No.
7  Q.  It's a double negative.  Do you have a copy?
8  A.  No, I don't.
9  Q.  By the way, I'm standing just because I'm dealing with
10     files, does that make you uncomfortable?
11 A.  No, it's okay.
12 Q.  If it does, I'll sit down.
13 A.  No, it's okay.
14 Q.  I just think it will go quicker if I can move my
15     files, okay?
16 A.  Right.
17 Q.  And if you want me to sit down, just tell me, okay?
18 A.  Okay.
19 Q.  Then you -- so if I want to get a copy of this, the
20     only person that would possibly have a copy would be
21     Susan?
22 A.  If she still has it, I don't know if she would.
23 Q.  Okay.  Great.  The next document is --
24         MR. SUAREZ:  And I apologize, I don't have
25     copies of this one.  So do you mind if we do two at a

Page 218

1      time?
2          MR. WEGLARZ:  I think we have enough
3      lawyers here to handle two exhibits at once, let's
4      give it a run.
5          MR. SUAREZ:  To just speed the process up.
6          MR. WEGLARZ:  Let's see if we can do it.
7  BY MR. SUAREZ:
8  Q.  So I'm going to mark two other pages, one is
9      Exhibit 10, it's a document dated 8-6-15 and another
10     one dated 8-13-15, okay?
11 A.  Okay.
12     MARKED FOR IDENTIFICATION:
13     DEPOSITION EXHIBITS 10-11
14     1:05 p.m.
15 BY MR. SUAREZ:
16 Q.  It appears at that point you began processing some
17     issues related to a boyfriend you had?
18 A.  Okay.
19 Q.  Okay?  I'll let you read them so that it's fair to
20     you.
21 A.  What one goes first, this one?
22 Q.  Yeah, that's 8-6 goes before 8-13.
23 A.  Right.  I have a hard time reading cursive writing,
24     but it's okay.
25         MR. WEGLARZ:  Were you able to read most of

Page 219

1     it?
2     A.   I think so.
3     BY MR. SUAREZ:
4     Q.   Okay.  So I'm going to give you a third one because
5          they all appear to be dealing with the same issue and
6          maybe which I'm now marking as Exhibit 12.
7     A.   Okay.
8     Q.   And it's dated 8-26 of 2015 so, it's August of 2015,
9          just for context, you're going into essentially your
10         senior year.
11                   MARKED FOR IDENTIFICATION:
12                   DEPOSITION EXHIBIT 12
13                   1:07 p.m.
14    BY MR. SUAREZ:
15    Q.   So I've now given you time to read 10, 11 and 12
16         fully, right?
17    A.   Yeah.
18    Q.   And they talk about what you're dealing with as in the
19         first month of your senior year of high school, right?
20    A.   Yeah.  Well, I was actually not in high school like
21         during this time.  This was the last month of summer.
22    Q.   Okay.  So it talks about the last month of summer
23         before your senior year of high school, right?
24    A.   Yeah.
25    Q.   And that's approximately three months after your trip

Page 220

1          to Jamaica, right?
2     A.   Uh-huh.
3     Q.   And those three documents are dealing with an issue
4          you're having with a then boyfriend you were having,
5          right?
6     A.   Uh-huh, yes.
7     Q.   And they're not dealing with anything related to the
8          incident in Jamaica, right?
9     A.   Yeah.
10    Q.   So and what it said in the first one that your
11         boyfriend was having a child with someone he had only
12         been dating with for three months, right?
13    A.   Yeah.
14    Q.   Yeah.  And it says there that he was the only guy you
15         had ever been serious with, right?
16    A.   Yes.
17    Q.   And it talked about how you felt it would be difficult
18         to date somebody with a child, right?
19    A.   Uh-huh, yes.
20    Q.   So to the extent you're having dating issues there,
21         it's related to a gentleman by the name of Justo and
22         not regarding anything in Jamaica, right?
23                   MR. WEGLARZ:  Form objection.
24    A.   Yes.
25    BY MR. SUAREZ:

Page 221

1     Q.   I'm sorry?
2     A.   Yes.
3     Q.   Okay.  And then the next document, it says that your
4          former boyfriend and you had hooked up, right?
5     A.   Yes.
6     Q.   What does that mean?
7     A.   We had sex.
8     Q.   Okay.  And you were thinking about getting back
9          together, but you then found out he had a child,
10         right?
11    A.   Yeah.
12    Q.   And the long and short of it is, you didn't think you
13         wanted to be in a relationship with somebody who was
14         having a child, right?
15    A.   Yes.
16    Q.   And that was a decision you made, right?
17    A.   Yes.
18    Q.   And the final document of 8-26 sort of regurgitates
19         the same thing, but it also says that -- it also
20         reports that you did not have any flashbacks of rape
21         when you were with Justo and it says that was good,
22         right?
23    A.   Yes.
24    Q.   Is that true?
25    A.   Yes.

Page 222

1     Q.   And then it also says that you were able to separate
2          the rape from a consen -- the rape from a consensual
3          act with Justo, right?
4     A.   Yes.
5     Q.   Okay.  That was quick.
6                    Then about a month later, you go back to
7          Susan, the counselor, and this is the document where,
8          this is dated 9-25-15, I tabbed it as Exhibit 13.
9                    MR. SUAREZ:  Here, I have copies of this
10         one.
11                   MARKED FOR IDENTIFICATION:
12                   DEPOSITION EXHIBIT 13
13                   1:11 p.m.
14    BY MR. SUAREZ:
15    Q.   This is the document that says a couple of things,
16         one, it says that you have conflicts with friends.
17         What is that about?  Do you recall?
18    A.   Yes.
19    Q.   What was that about?
20    A.   My friends and I had a falling out.
21    Q.   Why did you have a falling out?
22    A.   I don't really know all of it.  I think that after
23         what happened, I was kind of wilding out and they did
24         not like that.
25    Q.   When you say wilding out, what does that mean?

Page 223

1   A.   I guess doing things I normally wouldn't have been
2        doing.
3   Q.   Like what?
4   A.   Like partying and stuff.
5   Q.   What do you mean by partying?
6   A.   Like on the weekends, like drinking and stuff.
7   Q.   Did you agree with their assessment?
8   A.   Did I?
9   Q.   Did you agree with your friends' assessment?
10  A.   Well, I didn't agree and that's why we stopped.
11  Q.   In your assessment, you were just being a normal
12       senior?
13  A.   Yes.
14  Q.   Senior, right?
15  A.   Uh-huh, yes.
16  Q.   Okay.  And then it says there --
17            MR. SUAREZ:  Do you need --
18            MR. WEGLARZ:  First, what was 12?  That's
19       okay, keep going.
20            THE WITNESS:  I think you might have put it
21       in your book.
22            MR. SUAREZ:  Here, you want 12?
23            MR. WEGLARZ:  Yeah, thanks.
24  BY MR. SUAREZ:
25  Q.   And so in your assessment, you were just being a

Page 224

1        normal senior, right?
2   A.   Yes.
3   Q.   And then it talks about you walking out of a store
4        with a phone, right?
5   A.   Uh-huh, yes.
6   Q.   Is that the first time you ever walked out of a store
7        with something that may not have belonged to you?
8   A.   Say that again, sorry.
9   Q.   I figured you were going to ask me that question
10       again.  Is that the first time you ever walked out of
11       a store without anything that belongs to you?
12  A.   No.
13  Q.   Before your trip to Jamaica, had you ever walked out
14       of a store with something that didn't belong to you?
15  A.   No.
16  Q.   Do you think you walked out of the store with
17       something that didn't belong to you because of your
18       trip to Jamaica?
19  A.   I don't know.
20  Q.   Has anybody ever told you that you walked out of a
21       store with something that didn't belong to you because
22       of your trip to Jamaica?
23  A.   No.
24            MR. WEGLARZ:  Can we stop for a few
25       seconds?

Page 225

1            MR. SUAREZ:  Yeah, sure.
2            (Discussion off the record at 1:15 p.m.)
3            (Back on the record at 2:08 p.m.)
4   BY MR. SUAREZ:
5   Q.   All right.  So ma'am, or Ms., you understand that
6        we're back from lunch and that you're still under
7        oath?
8   A.   Yes.
9   Q.   Did you enjoy your lunch?
10  A.   Yes.
11  Q.   Jimmy John's is good?
12  A.   Yes.
13  Q.   Now I know you're telling the truth.
14            When we last spoke, I just want for
15       context, I want to tell you where we left off.  Where
16       we left off, we were in September of 2015, and then --
17       and this was -- this was the event where you walked
18       out of the store with something that didn't belong to
19       you, right?
20  A.   Right.
21  Q.   And we talked about September you having conflicts
22       with friends, right?
23  A.   Yes.
24  Q.   Those conflicts were short lived, right?
25  A.   For a while, so yeah.

Page 226

1   Q.   Then if you go to two months later in November of
2        2015, so approximately 60 days later, there's another
3        medical record I'm handing the witness, Exhibit
4        Number 14, dated 11-25-15.
5            MARKED FOR IDENTIFICATION:
6            DEPOSITION EXHIBIT 14
7            2:10 p.m.
8            MR. SUAREZ:  And I'll hand counsel a copy.
9   BY MR. SUAREZ:
10  Q.   It says that patient was able to solve her conflicts
11       with friends and is feeling much better about her
12       relationships with others, and then it says that you
13       and your brother went to see your father and it went
14       well; is that right?
15  A.   Yes.
16  Q.   Okay.  And so consistent with what you just said, your
17       issues with your friends resolved themselves, right?
18  A.   Yeah.
19  Q.   And you and your brother visited your father, and that
20       refers to the fact that your father was incarcerated,
21       right?
22  A.   By this time, I don't know if he -- I think he might
23       have been out by then.
24  Q.   Okay.  So let's do this.  Your father was incarcerated
25       for some period of time, right?

Page 227

1   A.   Yes.
2   Q.   How old were you when your father went to jail?
3   A.   Ten.
4   Q.   And how old were you when he left jail?
5   A.   18.
6   Q.   So did he get out of jail before or after your trip to
7        Jamaica?
8   A.   After.
9   Q.   Okay.  That must have been after because you were 18.
10       Do you recall what month your father got out of jail?
11  A.   I don't.
12  Q.   I'm sorry?
13  A.   I don't.
14  Q.   And while your father was in jail, did you ever visit
15       him while he was inside the jail?
16  A.   Yes.
17  Q.   Okay.  How often?
18  A.   Not very often.  I wasn't allowed to see him for the
19       first like five years, so.
20  Q.   Okay.  Your freshman year of high school, did you
21       visit your father while he was in jail?
22  A.   No, I believe it was my like sophomore or junior.
23  Q.   Your sophomore year, do you have a recollection of
24       visiting your father while he was in jail?
25  A.   If I'm like remembering the time correctly, yes.

Page 228

1   Q.   Okay.  And how long was that visit?
2   A.   Like it took about a day because it was a drive there
3        and then we stayed there and then the drive back, so.
4   Q.   And how long were you able to actually see him?
5   A.   Maybe like three hours, three or four.
6   Q.   And then your junior year, did you visit your father
7        while he was in jail?
8   A.   I don't think so.
9   Q.   Okay.  And then after your -- so that within the
10       preceding nine months of your trip, you did not visit
11       your father, correct?
12  A.   Correct.
13  Q.   And after your trip at some point your father leaves
14       jail, right?
15  A.   Yes.
16  Q.   And in November of 2015, you visited your father with
17       your brother, right?
18  A.   Yes.
19  Q.   And do you recall where you visited him?
20  A.   It must have been at where he stays, so the house in
21       Alma.
22  Q.   I'm sorry?
23  A.   The house in Alma is where I'm assuming it was.
24  Q.   Okay.  And in this record, you were -- you were
25       talking to counsel -- to your counselor about issues

Page 229

1        with your father, right?
2   A.   I'm not sure.
3   Q.   Well, can I see the record?
4   A.   Yes.
5   Q.   So here, I just read the thing and I'll read it to
6        you, it says, "Amber was able to remain on probation
7        without adding a violation, which means she will keep
8        her license.  She has also gotten a new job and is
9        planning to start saving money.  She has been able to
10       solve her conflicts with her friends and is feeling
11       much better about her relationship with others.  She
12       and her brother went to visit her father and it went
13       well.  Now that she's 18, she can decide for herself
14       if she has a relationship with her father," right?
15  A.   Right.
16  Q.   That's what it says, right?
17  A.   Yes.
18  Q.   So to the extent you're talking to your therapist
19       about issues here, it has nothing to do with Jamaica
20       and it has to do with issues related to your friends
21       and your father, right?
22  A.   Yes.
23  Q.   Okay.  And I don't mean to pry, but why was your
24       father incarcerated?
25  A.   He had molested my sisters and I.

Page 230

1   Q.   As a child?
2   A.   Yes.
3   Q.   Okay.  Now we go to December of 2015, which is the
4        next record.
5             MARKED FOR IDENTIFICATION:
6             DEPOSITION EXHIBIT 15
7             2:17 p.m.
8   BY MR. SUAREZ:
9   Q.   Can I ask you to take a look at that, please?
10  A.   Uh-huh.
11  Q.   By the way, ma'am, in all of these, there's sort of a
12       thing at the top that says patient's current clinical
13       status and it says mood/affect, appearance, behavior,
14       cognition, safety; do you see that?
15  A.   Uh-huh.
16            MR. WEGLARZ:  Is that a yes?
17  BY MR. SUAREZ:
18  Q.   Is that a yes?
19  A.   Yes.
20  Q.   Sorry.
21            MR. SUAREZ:  Thank you, Counsel.
22  BY MR. SUAREZ:
23  Q.   And most of those reflect the same thing, that your
24       mood is unremarkable, and they don't circle that
25       you're depressed, it says that your appearance is

Case 1:17-cv-21703-MGC   Document 162-24 Entered on FLSD Docket 12/21/2019   Page 61 of
77
Amber Tolzmann, et al
September 25, 2019                    231 to 234

Page 231

1    appropriate, that you're cooperative, that you're
2    intact -- excuse me, your cognition intact, that you
3    have no suicidal ideations and that you're not a risk
4    to others.  Basically that checks out as okay as a
5    clinical status, right?
6  A.  Yes.
7  Q.  Okay.  Are you aware at any time when you went to this
8      therapist where that didn't reflect that?
9           MR. WEGLARZ:  Form objection.
10 A.  I'm not aware.
11 BY MR. SUAREZ:
12 Q.  Are you aware of any time that you went to your mental
13     therapist where your patient's clinical status did not
14     reflect what is on this sheet?
15          MR. WEGLARZ:  Same objection to form.
16 BY MR. SUAREZ:
17 Q.  That there was a difference of some sort?
18 A.  I don't know.
19 Q.  Okay.  So one of the questions, there's a sentence --
20     I'm sorry just --
21          (Discussion off the record at 2:19 p.m.)
22          (Back on the record at 2:19 p.m.)
23 BY MR. SUAREZ:
24 Q.  Back on the record, so referring now to Exhibit 15,
25     one of the things it says here is that as of December

Page 232

1    of 2015, you feel that you've made some poor choices
2    in the past and that it has led to trouble and causing
3    your mother a great deal of stress and that you're
4    refocusing yourself on the future and want to work
5    with helping children.  Do you see that?  I
6    highlighted it --
7  A.  Oh, yeah.
8  Q.  -- I highlighted it for you.
9  A.  Yes.
10 Q.  Okay.  And my question is, do you know what you meant
11     when you said you had made some poor choices in the
12     past?
13 A.  Just getting into trouble probably.
14 Q.  Is that a reference to your possession of marijuana?
15 A.  Yeah.
16 Q.  Anything else?
17 A.  And just like being wild I guess after I got back.
18 Q.  All right.  What else?  Well, the possession of
19     marijuana was before your trip, right?
20 A.  Yes.
21 Q.  What poor choices did you make additionally -- or in
22     addition to, I should say, before your trip to
23     Jamaica?
24 A.  Can you restate that?
25 Q.  Yeah.  So one of the -- one of the poor choices that

Page 233

1    you made before your trip to Jamaica was your
2    possession of marijuana that caused you to be on
3    probation, right?
4  A.  Yes.
5  Q.  My question to you is, what other poor choices did you
6      make before your trip to Jamaica --
7  A.  Oh.
8  Q.  -- that would cause your mother stress?
9           MR. WEGLARZ:  Form objection.
10          But go ahead.
11 A.  Before I went to Jamaica, I didn't -- I wasn't really
12     too wild, I don't think.
13 BY MR. SUAREZ:
14 Q.  What do you mean by that?
15 A.  Like I didn't really get into trouble or do much.
16 Q.  Well, you certainly got into enough trouble to get you
17     at least a year probation, right?
18 A.  Yes.
19 Q.  And by the way, did you go in front of a judge to get
20     that probation?
21 A.  Yes.
22 Q.  Was there a lawyer standing next to you when you were
23     talking to the judge?
24 A.  I don't think I had a lawyer.
25 Q.  Did you cut a plea?

Page 234

1  A.  I believe so.
2  Q.  Did you talk to a prosecutor?
3  A.  Yes.
4  Q.  And do you know what you were charged with?
5  A.  No.
6  Q.  Okay.  Are you certain that it was a gram or would it
7      have been more than a gram?
8  A.  It was not more than a gram.
9  Q.  Do you recall what the charge that -- what length of
10     time in terms of sentencing your possession of
11     marijuana carried?
12 A.  No.
13 Q.  After you got back from Jamaica, what poor choices do
14     you think you made, aside from -- aside from walking
15     out of a store with a phone case?
16 A.  I started hanging out with a different group of
17     friends, and I kind of skipped class a lot and just do
18     things that I normally wouldn't have done.
19 Q.  Like?
20 A.  Like party and drink on the weekends and skip class.
21 Q.  Okay.  But none of that activity affected you from
22     losing a job, correct?
23 A.  Correct.
24 Q.  And none of that activity caused you to gain weight in
25     any way, right?

Page 235

1   A.   Right.
2   Q.   And none of that activity caused you to fail a class,
3        right?
4   A.   Right.
5   Q.   And none of that activity caused you to have physical
6        fights with anybody, right?
7   A.   Right.
8   Q.   And none of that activity caused you to have verbal
9        alterations with anybody, right?
10  A.   Right.
11  Q.   And did you drink to the point of being passed out?
12  A.   No.
13  Q.   Okay.  And did you drink and drive?
14  A.   No.
15  Q.   Did you -- scratch that.
16            Can I have that, please?
17  A.   Uh-huh.
18  Q.   So the next document is the end of 2015, and I'll hand
19       it to you.  And I'm marking that as Exhibit 16.
20            MARKED FOR IDENTIFICATION:
21            DEPOSITION EXHIBIT 16
22            2:25 p.m.
23  BY MR. SUAREZ:
24  Q.   And I'll let you read it before.  Have I now given you
25       a chance to read that?

Page 236

1   A.   Uh-huh, yes.
2   Q.   Okay.  And the first thing is, your clinical status in
3        that document is essentially the same as the one in
4        the prior document, right?
5             MR. WEGLARZ:  Form objection.
6   A.   Yes.
7   BY MR. SUAREZ:
8   Q.   The circles reflect the same circles as the last
9        document, right?
10  A.   Right.
11  Q.   And it says there that you are in a positive place
12       emotionally, right?
13  A.   Uh-huh, yes.
14  Q.   And that you were able to visit your father over
15       Christmas and that you felt that 2015 was a rough year
16       but and you're happy to see it go.  Then it says that
17       you've learned your lesson and will have no further
18       court involvement.  What does that mean?
19  A.   That I won't get into any more trouble with the law.
20  Q.   And is the lesson that you've learned there related to
21       your marijuana usage or to your phone case incident or
22       to something else?
23  A.   To both.
24  Q.   To both of those?
25  A.   Yeah.

Page 237

1   Q.   Okay.  And then about a month later, you go back in
2        the beginning of January of 2016 and I'm marking this
3        as Exhibit 19 (sic).
4             MARKED FOR IDENTIFICATION:
5             DEPOSITION EXHIBIT 17
6             2:27 p.m.
7   BY MR. SUAREZ:
8   Q.   No, I'm sorry, I'm marking this as Exhibit 17.  I'll
9        let you read that.  Have I now given you a chance to
10       read that?
11  A.   Yes.
12  Q.   And it says there you have pressure from family
13       members to confront an older brother regarding drug
14       use and alcohol, right?
15  A.   Uh-huh, yes.
16  Q.   Now, apparently you're going through some issues at
17       that time in January of 2016 related to your brother,
18       right?
19  A.   Yes.
20  Q.   What are those issues?
21  A.   He just was doing a lot at the time.
22  Q.   When you say he's doing a lot, what does that mean?
23  A.   I don't know, like it was concerning at a point.
24  Q.   But I don't know what a lot means, your brother is
25       obviously doing a drug of some sort, right?

Page 238

1   A.   Yes.
2   Q.   And you're saying he's doing a lot of that drug,
3        right?
4   A.   Yes.
5   Q.   What drug is he doing?
6   A.   I think he was doing cocaine.
7   Q.   And that was concerning you, right?
8   A.   Yes.
9   Q.   And somebody in your family wanted you to talk to your
10       brother about that, right?
11  A.   Yes.
12  Q.   Okay.  And according to this, you were being
13       pressured, right?
14  A.   Yes.
15  Q.   Who was pressuring you to do that?
16  A.   I don't remember.
17  Q.   Then it says in the next line, it says you had a text
18       from a close friend stating that you're a different
19       person in a negative way, right?
20  A.   I guess so.
21  Q.   And is that related to what you were going with
22       through your brother?
23  A.   No.
24  Q.   What is that in relation to?
25  A.   I think this was from my friends, the ones that I had

Page 239

1   A.   a falling out with.
2   Q.   Okay.  And which friend sent you that text?
3   A.   I don't remember, but it was either Allison, Brianna
4        or Courtney.
5   Q.   Okay.  Now, I'm going to fast forward to April of
6        2014, right before you are about to graduate from high
7        school, okay?
8             MR. WEGLARZ:  Fast forwarding or fast
9        reversing, you mean April 2015 -- '16?
10  A.   '16.
11            MR. WEGLARZ:  You said 2014, I'm sorry.
12            MR. SUAREZ:  Oh, I'm sorry, you're right, I
13       misspoke.
14  BY MR. SUAREZ:
15  Q.   I'm going to fast forward to April of 2016 right when
16       you are about to graduate from high school, right?
17  A.   Yes.
18  Q.   And I'll hand you Exhibit Number 18.
19            MARKED FOR IDENTIFICATION:
20            DEPOSITION EXHIBIT 18
21            2:31 p.m.
22  BY MR. SUAREZ:
23  Q.   And ask you to take a look at that.  Okay?
24  A.   Okay.
25  Q.   Did I let you read that?

Page 240

1   A.   Yes.
2   Q.   Okay.  The first thing I'd like for you to confirm for
3        me is that your clinical status on the top still
4        reflects that you're okay, right?
5   A.   Yes.
6   Q.   Okay.  And then it says that you continue to do well,
7        right?
8   A.   Yes.
9   Q.   That you are graduating next month and you're almost
10       finished with your community service, right?
11  A.   Yes.
12  Q.   And that the trial in Jamaica is going to take place
13       some time after the graduation, right?
14  A.   Yes.
15  Q.   And then it says that you're building a relationship
16       with your father and that your mother told you that
17       you are now an adult and you could make your own
18       choices and protect yourself, right?
19  A.   Yes.
20  Q.   Actually I said that in reverse order, she said that
21       you could protect yourself and make your own choices,
22       right?
23  A.   Yes.
24  Q.   And when it says there that you're building a
25       relationship with your father, what does that mean?

Page 241

1   A.   Just means that I've been or I was keeping up with him
2        at the time.
3   Q.   Okay.  And do you view that as a good thing?
4   A.   Yes.
5   Q.   Now, about, and then sometime in May you graduated
6        from high school, right?
7   A.   Yes.
8   Q.   Then I have a record from the summer of 2016, right,
9        and for context, in that summer, you had just
10       graduated from high school, right?
11  A.   Yes.
12            MARKED FOR IDENTIFICATION:
13            DEPOSITION EXHIBIT 19
14            2:34 p.m.
15  BY MR. SUAREZ:
16  Q.   You were happy, right?
17  A.   Yes.
18  Q.   And you thought it was a good thing that you had
19       finally graduated from high school, right?
20  A.   Yes.
21  Q.   And then it says there, can I ask you to read it,
22       please?  Not out loud, just to yourself.
23  A.   Okay.
24  Q.   I don't like to ask questions without giving a chance
25       for the person to read the document.  And it says that

Page 242

1        you have conflict with your mother because you don't
2        feel you should have a curfew because you are out of
3        high school, right?
4   A.   Yes.
5   Q.   And your mom tells you that you're out of control,
6        right?
7   A.   Yes.
8   Q.   And that there's a concern from your former friends,
9        right?
10  A.   Yes.
11  Q.   Then it says that you've been going out too much (sic)
12       but you don't feel that you're drinking too much,
13       right?
14  A.   Right.
15  Q.   Do you think you were right?
16  A.   No.
17  Q.   Okay.  This was, when it refers to here that you're
18       out of control, is that because you're partying too
19       much after your graduation?
20  A.   I guess so.
21  Q.   And your mom's telling you, you're partying too much
22       in the summer after your graduation, right?
23  A.   Yes.
24  Q.   Did you resolve that conflict with your mom?
25  A.   Yes.

Page 243

1  Q.  And in fact, two months later, you had a chance to go
2      to -- and don't laugh at me -- I call it Lollapalooza?
3  A.  Oh, yeah.
4  Q.  You had a chance to go to the Lollapalooza festival?
5  A.  I actually didn't go.
6  Q.  And you didn't go, right?
7  A.  Right.
8  Q.  Why didn't you go?
9  A.  I was still on probation during the time that I wanted
10     to go.
11 Q.  And you didn't want to take any chances by going to
12     Lollapalooza, right?
13 A.  Right.
14 Q.  Am I pronouncing that correctly?
15 A.  Yeah.
16 Q.  Every once in a while you get lucky.
17         What's the date of that last document I
18     showed you?
19 A.  6-16-16.
20 Q.  Okay.  So -- so three months -- three months later,
21     you have another medical record dated September 8th of
22     '16, and I remember that because that's the date of my
23     wife's birthday.
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 20

Page 244

1          2:37 p.m.
2  BY MR. SUAREZ:
3  Q.  I'm marking this as Exhibit Number 20 and I'll hand
4      you a copy.  Have I given you a chance to read that?
5  A.  Yes.
6  Q.  Okay.  And that's in September of 2016 and it says
7      there that you feel like you're making better choices,
8      right?
9  A.  Yes.
10 Q.  And that you're adding yoga and meditation to your
11     day, right?
12 A.  Yes.
13 Q.  Did you add yoga and meditation at that time?
14 A.  Yes.
15 Q.  Are you still doing yoga?
16 A.  Yes.
17 Q.  Okay.  And that you feel much more peaceful with
18     yourself, right?
19 A.  Yes.
20 Q.  Okay.  And then about a month later, you stop going to
21     mental health therapy, right?
22 A.  Yes.
23 Q.  Why did you stop?
24 A.  I felt like I didn't need to keep going.
25 Q.  Okay.

Page 245

1  A.  I didn't want to keep paying for it also.
2  Q.  Okay.  I talked to you very little about your
3      employment, can you just quickly tell me what
4      employment you had in high school?
5  A.  I worked at Steak 'n Shake and Logan's Roadhouse in
6      high school.
7  Q.  Both as servers?
8  A.  Yes.
9  Q.  And after high school from 2016 to today, what
10     employment have you had?
11 A.  At Sakura also a server and Ginza also a server.
12 Q.  So you've continue to be a server?
13 A.  Yes.
14 Q.  Have you been employed throughout?
15 A.  Yes.
16 Q.  So you've held a steady job from May of 2016 until
17     today?
18 A.  Yes.
19         MR. WEGLARZ:  Form objection.
20 BY MR. SUAREZ:
21 Q.  I'm sorry?
22 A.  Yes.
23         MR. SUAREZ:  What's wrong with the form?
24         MR. WEGLARZ:  I'm not sure what you mean by
25     steady job, especially in the eyes of a high school

Page 246

1      student, but that's fine.
2          MR. SUAREZ:  She's not in high school
3      anymore.  I said 2016 until today.
4  BY MR. SUAREZ:
5  Q.  Ma'am, are you -- were you employed in the summer of
6      2016?
7  A.  Yes.
8  Q.  Were you employed in the fall of 2016?
9  A.  Yes.
10 Q.  Were you employed in the spring of 2017?
11 A.  Yes.
12 Q.  Have you been employed from the spring of '17 until
13     today?
14 A.  Yes.
15 Q.  Has there been any involuntary gaps in your
16     employment?
17 A.  No.
18 Q.  Every time you wanted to work, you've been able to
19     work?
20 A.  Yes.
21 Q.  And generally speaking, you work as a server in
22     restaurants?
23 A.  Yes.
24 Q.  Does that make you happy?
25 A.  Yes.

Page 247

1  Q.  Have you ever reviewed something that is known as the
2      Complaint in this case?
3  A.  No.
4  Q.  Have you ever seen a document that where somebody said
5      hey, this is the lawsuit that you filed in this case?
6  A.  No.
7  Q.  So you don't know what allegations your lawyer has
8      made with respect to this lawsuit, right?
9  A.  Right.
10 Q.  When you -- I want to go back to one other -- one
11     other cleanup question, from May of 2015 until today,
12     have you been on any medication?
13 A.  No.
14 Q.  At all?
15 A.  Right.
16 Q.  From May of 2015 until today, have you been prescribed
17     any antidepressants?
18 A.  I don't think so.
19 Q.  From May of 2015 until today, have you been given any
20     pills to help you sleep?
21 A.  No.
22 Q.  Before you went to Mexico, remind me what the date of
23     that was?
24 A.  I don't know.  It was...
25 Q.  I think you said it was about a year after --

Page 248

1  A.  It was in 2017.
2  Q.  Sorry?
3  A.  It was in 2017, I just don't know the month at this
4      current time.
5  Q.  It was around spring break --
6  A.  Yeah.
7  Q.  -- of 2017, right?
8  A.  Yeah, college spring break.
9  Q.  College spring break?
10 A.  Yes.
11 Q.  Have you ever taken college courses?
12 A.  No.
13 Q.  Before you went to that trip, did you go online and
14     research rape as it relates to Mexico?
15 A.  No.
16 Q.  Do you have any idea or do you care what information
17     is out there with respect to rape as it relates to
18     Mexico?
19 A.  No.
20 Q.  Have you -- how is your relationship with your father
21     now?
22 A.  It's fine.
23 Q.  How is your relationship with your mother?
24 A.  It's good.
25 Q.  When you came back from your Jamaica trip, did you

Page 249

1      ever tell any friends about your experiences in
2      Jamaica?
3  A.  Yes.
4  Q.  Which friends?
5  A.  I told my like closest friends.
6  Q.  Who?
7  A.  Allison, Brianna and Courtney and Avery, Emma and
8      Brooke.
9  Q.  So you told your six friends?
10 A.  Yes.
11 Q.  Are you a person that researches safety products for
12     any reason?
13 A.  No.
14 Q.  While you were in Jamaica, do you recall talking to
15     any bus drivers for any reason?
16 A.  No.
17 Q.  Do you recall listening to any bus -- what any bus
18     drivers said for any reason?
19 A.  No.
20 Q.  Do you recall any bus driver talking to you or anybody
21     else about the Moon Palace Resort?
22 A.  I know that was talked about with someone else, but I
23     don't -- I wasn't a part of that.
24 Q.  And you don't have any information about what was
25     talked about, right?

Page 250

1  A.  Right.
2  Q.  Okay.  After you moved to the new hotel, did you visit
3      the spa at the new hotel?
4  A.  No.
5  Q.  Do you know if anybody did?
6  A.  No.
7  Q.  While you were in the Beaches Boscabel Hotel from
8      May 8th to May 15th, did you visit the spa?
9  A.  No.
10 Q.  Do you recall making any statements to anybody at the
11     U.S. Embassy?
12 A.  No.
13 Q.  You've told me that within the last two months you've
14     seen a mental health therapist twice, right?
15 A.  Yes.
16 Q.  Who did you see?
17 A.  Susan Powers.
18 Q.  And that was for less than two hours?
19 A.  Yes.  It was an hour each time, so.
20 Q.  After Mexico, did you -- have you been overseas for
21     any reason?
22 A.  No.
23 Q.  I apologize if I asked you this question before.  I'm
24     not sure if I did.  While you were at the Beaches
25     Boscabel property, did you see any signs or logos with

Page 251

1     the words Fun Jet Travel or The Mark Travel
2     Corporation?
3  A.  No.
4  Q.  Whose idea was it to file this lawsuit?
5  A.  I don't know.
6  Q.  Was it your idea to file this lawsuit?
7  A.  No.
8  Q.  Was it your mother's idea to file this lawsuit?
9  A.  I don't know.
10 Q.  After Justo, have you been in any other relationship
11    with men?
12 A.  Yes.
13 Q.  I'm sorry?
14 A.  Yes.
15 Q.  Are you currently in a relationship?
16 A.  No.
17 Q.  Who were you in a relationship with?
18 A.  Jesse.
19 Q.  And does Jesse have a last name?
20 A.  Bryant.
21 Q.  Okay.  And how long were you in a relationship with
22    Jesse?
23 A.  For about a year.
24 Q.  When did you start seeing Jesse?
25 A.  Well, we were friends for a while before we started

Page 252

1     dating.
2  Q.  When did you start seeing Jesse --
3  A.  We started --
4  Q.  -- as a boyfriend?
5  A.  We started dating in February of 2017.
6  Q.  And you dated until February of 2018 more or less?
7  A.  Yes.
8  Q.  Okay.  Why did you split up?
9  A.  I felt like it was the best thing.
10 Q.  Just weren't getting along?
11 A.  I just felt like we weren't compatible.
12 Q.  Okay.  I don't think I have much more, just going
13    through my notes, okay?  Have you ever done -- used
14    pot brownies or eaten pot brownies?
15 A.  Yes.
16 Q.  Did you eat pot brownies before your trip to Jamaica
17    or after?
18 A.  After.  Well, not like right away, but...
19 Q.  Okay.  Do you try pot gummies?
20 A.  No.
21 Q.  Ma'am, do you have your phone with you today?
22 A.  Yes.
23 Q.  And is Facebook accessible on your phone?
24 A.  Yes.
25 Q.  And is Instagram accessible on your phone?

Page 253

1  A.  Yes.
2  Q.  And that's the same Instagram account -- Facebook
3     account that you've had since the trip to Jamaica?
4  A.  Yes.
5  Q.  Ma'am, have you ever seen any ads with the words Fun
6     Jet Travel or The Mark Travel Corporation?
7  A.  No.
8  Q.  Sorry?
9  A.  No.
10 Q.  Ma'am, do you have tattoos?
11 A.  Yes.
12 Q.  How many?
13 A.  Two.
14 Q.  And where?
15 A.  One on my wrist and right here.  My other wrist, I
16    guess.
17 Q.  What do the ones on your wrist -- what does the one on
18    your left wrist signify?
19 A.  The elements.
20 Q.  What does that mean?
21 A.  Water, earth, fire, air.
22 Q.  And when did you get that tattoo?
23 A.  2018.
24 Q.  Okay.  And how about the one on your right, the right
25    wrist?

Page 254

1  A.  May, this May.
2  Q.  This May?
3  A.  Uh-huh.
4  Q.  Are those the only two tattoos you have?
5  A.  Yes.
6  Q.  Okay.  What does the one on your left -- or right
7     mean, if anything?
8  A.  Nothing, it's just mandala.
9  Q.  Ma'am, where do you -- regarding your residencies,
10    where do you currently live?
11 A.  In Wyoming, Michigan with my mom.
12 Q.  Have you always lived with your mom?
13 A.  Yes.
14 Q.  In the same home?
15 A.  We moved, but yes.
16 Q.  Okay.  And in May of 2015, who was living with you?
17 A.  My mom and her boyfriend, Silvano and myself.
18 Q.  And when did Silvano start living with you?
19 A.  My sophomore year.
20 Q.  And he currently lives with you still?
21 A.  Yes.
22 Q.  And your relationship with Silvano is okay?
23 A.  Yes.
24 Q.  It's clear that you had some, at least one text
25    message and perhaps other with Jermaine Dyer, did you

Page 255

1    have any other messaging with Dwight Davis or William
2    Tapper?
3  A.  No.
4  Q.  Did Paiton have any messaging with Dwight Davis or
5    William Tapper?
6  A.  I don't think so.
7  Q.  Did you get e-mails from either Jermaine Dyer, Dwight
8    Davis or William Tapper?
9  A.  No.
10 Q.  Before you went to Jamaica, had you ever had a weekend
11   with Paiton?
12 A.  No.
13 Q.  Before you went to Jamaica, had you ever spent an
14   overnight with Paiton?
15 A.  Yes.
16 Q.  And what occasion?
17 A.  When my mom would visit Janet.
18 Q.  You would -- you would have sleepovers there?
19 A.  Yes.
20 Q.  Did you -- did you ever vacation with Paiton before
21   then?
22 A.  No.
23 Q.  Had you ever been out with Paiton before going to
24   Jamaica?
25 A.  No.

Page 256

1  Q.  Had you ever been drinking with Paiton before going to
2    Jamaica?
3  A.  No.
4  Q.  Had you ever done marijuana with Paiton before going
5    to Jamaica?
6  A.  No.
7  Q.  Did you ever review any confirmation e-mails or
8    itineraries regarding your trip --
9  A.  No.
10 Q.  -- to Jamaica?
11 A.  No.
12 Q.  How did you originate the phrase Mystical Flower?
13       MR. WEGLARZ:  Asked and answered.
14 BY MR. SUAREZ:
15 Q.  I'm sorry, and I apologize if I asked you this before.
16   I don't know, I just came up with it.
17 Q.  Do you have e-mail addresses?
18 A.  Yes.
19 Q.  Have you had the same e-mail address since Jamaica?
20 A.  I believe so.
21 Q.  What's your e-mail address?
22 A.  Ambertorralva@yahoo.com.
23 Q.  Did you have that e-mail address in high school?
24 A.  I don't know.
25 Q.  I believe yesterday you said you're about, I don't

Page 257

1    know, 5' 7", 5' 8"; is that right?
2  A.  About 5' 6".
3  Q.  5' 6"?
4  A.  Yes.
5  Q.  And you weigh about 105 pounds, right?
6  A.  About 115.
7  Q.  And it seems to me you've been about the same height
8    and same weight since May of 2015, right?
9  A.  Yes.
10 Q.  You haven't increased weight and you haven't decreased
11   weight, right?
12 A.  I don't think so.
13 Q.  You look pretty much the same, right?
14 A.  Yes.
15 Q.  Have you ever used cigarettes?
16 A.  No.
17 Q.  Do you use JUUL --
18 A.  No.
19 Q.  -- or any other type of --
20 A.  No vape, no.
21 Q.  -- smokeless, vape or anything like that?
22 A.  No.
23 Q.  When you booked your trip to Mexico, how did you do
24   it?
25 A.  My friend, Faith's mom did it.

Page 258

1  Q.  I'm sorry?
2  A.  My friend, Faith's mom did all the booking.
3  Q.  So you just gave Faith's mom the money?
4  A.  Correct.
5  Q.  And relied on her to do everything?
6  A.  Yes.
7  Q.  You didn't really care one way or the other who did
8    it, right?
9  A.  Right.
10 Q.  When you were in Jamaica, did you use the water slides
11   every day?
12 A.  No.
13 Q.  Which date did you not?  And by every day, I mean May
14   5th, 6th, 7th, 8th and 9th?
15 A.  I believe I only went on like the last day or the last
16   couple days.
17 Q.  Okay.  Did you do it on the last day, May 8th?
18 A.  Yes.
19 Q.  Was Jermaine working on that slide on May 8th?
20 A.  I think so.
21 Q.  By the way, we talked about your lip being swollen as
22   a result of the incident on May 8th, how long did that
23   last?
24 A.  I'm not entirely sure, maybe about a week.
25 Q.  Did you need stitches because of that?

Page 259

1   A.   No.
2   Q.   Did you need any type of antibiotic or cream of any
3        kind for that?
4   A.   I don't believe so.
5   Q.   How's your relationship with Paiton now?
6   A.   It's good.  We don't talk much.  But we're like civil
7        with each other.
8   Q.   When you came back from Jamaica, your relationship was
9        essentially the same as what it was before Jamaica?
10  A.   Yes.
11  Q.   You're friendly, but you aren't the best of friends,
12       right?
13  A.   Right.
14  Q.   Do you socialize with her?
15  A.   Not that often.
16  Q.   Do you socialize with her the same way you socialized
17       before your trip to Jamaica?
18  A.   Yes.
19  Q.   How's your relationship with Janet?
20  A.   It's good.
21  Q.   How's your relationship with your mother?
22  A.   It's good.
23  Q.   Would you say otherwise if she weren't sitting next to
24       you?
25  A.   No, I would say the same thing.

Page 260

1             MS. MARGARET TORRALVA:  I would say I can
2        get up and go out.
3   BY MR. SUAREZ:
4   Q.   Did you see Dwight Davis, William Tapper, Jermaine
5        Dyer touch either your mom or Janet?
6   A.   No.
7             MR. SUAREZ:  Todd, while I look at my
8        notes.
9             MR. WEGLARZ:  Yes, sir.
10            MR. SUAREZ:  Would you mind if Mr. Scott
11       asks questions and I come back and that way saving
12       some time?
13            MR. WEGLARZ:  I don't mind at all.
14            MR. SUAREZ:  Okay.
15            Ma'am, I don't think I have much further.
16       Let me just look at my notes.
17            THE WITNESS:  Okay.
18            MR. SUAREZ:  Mr. Scott's going to ask you
19       some questions now.
20            THE WITNESS:  Okay.
21                    EXAMINATION
22  BY MR. SCOTT:
23  Q.   Hi.
24  A.   Hello.
25  Q.   I am Mr. Safra's partner, he had to leave so I just

Page 261

1        have a few questions, okay?
2   A.   Okay.
3   Q.   You took the trip to Mexico in 2017?
4   A.   Yes.
5   Q.   Have you taken any other trips out of the country
6        since 2017?
7   A.   Yes.
8   Q.   Where have you gone?
9   A.   I've gone to Canada and also in 2017, there was a
10       music festival and I went again in July, not the same
11       year, so 2018.
12  Q.   Where did you go -- where did you go in July 2018?
13  A.   Toronto.
14  Q.   Okay.
15  A.   There was a show.
16  Q.   Which show again?
17  A.   Zeds-Dead, Zeds-Dead.
18  Q.   What is that?
19  A.   They're two deejays like EDM.
20  Q.   Who did you go with?
21  A.   My friends Emma, Avery and Brooke.
22  Q.   Where in Canada?
23  A.   Toronto.
24  Q.   Other than the two trips to Canada in those two years,
25       have you gone in any other countries outside the

Page 262

1        United States?
2   A.   No.
3   Q.   Concerning the 2017 trip to Mexico and Cancun, you
4        stayed at what hotel?
5   A.   Oasis Resort.
6   Q.   And you were with all teenagers, right?
7   A.   Some of them were older, like 20s, 21, 22, 23.
8   Q.   And that was at the time of the spring break?
9   A.   Yes.
10  Q.   So there were a lot of young people there?
11  A.   Yes.
12  Q.   Would you -- I'm looking at the website from the hotel
13       that you stayed at, and it describes it this way:  The
14       879 room midrange Oasis Cancun is an all inclusive
15       beach hotel; is that true?
16  A.   Yes.
17  Q.   And bills itself as an entertainment resort; would you
18       agree with that?
19  A.   Yes.
20  Q.   This is a one -- this is a year-around party property;
21       would you agree with that?
22  A.   Yes.
23  Q.   And particularly with a young spring break atmosphere?
24  A.   Yes.
25  Q.   So that's why you went?

Page 263

1  A.  Yeah, I didn't book it, but yeah.  That's what my
2      friends chose.
3  Q.  A couple of questions, and I apologize.  But I'm just
4      curious about your criminal arrest in 2014.  Can you
5      tell me the facts surrounding the arrest?  What were
6      you doing?  What happened, how were you arrested?
7  A.  I was at school.  I was in my car and I got searched,
8      like they searched my car, pulled me out of class.
9  Q.  Okay, let's take, break that down.  So you were on
10     school property?
11 A.  Yes.
12 Q.  Okay.  And that's high school?
13 A.  Yes.
14 Q.  Okay.  And the car was searched?
15 A.  Yes.
16 Q.  Who searched the car?
17 A.  I don't remember what his place was, but there was
18     like -- there's a principal out there and Mr. Kinibal
19     (phonetic), I don't remember like his place of duty.
20 Q.  Was there a police officer?
21 A.  Later on there was.
22 Q.  Okay.  And that's in the city of Grandville?
23 A.  Yes.
24 Q.  Was it the Grandville police who arrested you?
25 A.  I wasn't like arrested, but I was like suspended.

Page 264

1  Q.  I'm interrupting you, I apologize.
2  A.  That's okay.
3  Q.  The school officials came out.
4  A.  Yes.
5  Q.  And they brought you out of school?
6  A.  Yes.
7  Q.  What happened next?
8  A.  They searched my car.
9  Q.  Okay.
10 A.  And then found it.
11 Q.  Okay.  And how much -- was it marijuana?
12 A.  Yes.
13 Q.  And how much marijuana was there?
14 A.  It was like only a gram, so just a little bit.
15 Q.  What happened next?
16 A.  I was sent to the office and then I talked to Officer
17     Greco and --
18 Q.  Who?
19 A.  Officer Greco.
20 Q.  Was he a police officer?
21 A.  Yeah, he was like the school cop.
22 Q.  Oh, okay.
23 A.  Yes.
24 Q.  So the school police officer interviewed you first?
25 A.  Yes.

Page 265

1  Q.  Okay.
2  A.  And then I got suspended and then from there I had
3      like a court date.
4  Q.  When Officer Greco interviewed you, what did he say,
5      what did you say?
6  A.  I don't recall.
7  Q.  Okay.  Fair enough.  Sometime -- were you suspended
8      from school?
9  A.  Yes.
10 Q.  For how long?
11         THE WITNESS:  Two weeks, right?  I think
12     so.
13         MR. SCOTT:  No helping.
14         MS. MARGARET TORRALVA:  I didn't say
15     anything.
16         MR. SCOTT:  I know, you were very good.
17 BY MR. SCOTT:
18 Q.  Was this the first time you had ever been arrested?
19 A.  Yes.
20 Q.  Had you ever had a speeding ticket or a ticket of any
21     nature?
22 A.  No.
23 Q.  First run-in at all with the law?
24 A.  Yes.
25 Q.  What was the next event that occurred?  Did you find

Page 266

1      out -- did you speak to the actual police department,
2      did they come out and interview you?
3  A.  No.
4  Q.  So how -- how did the criminal proceeding initiate?
5  A.  I think Officer Greco was the one who did it.
6  Q.  And you were ultimately charged?
7  A.  Yes.
8  Q.  With a crime?
9  A.  Yes.
10 Q.  What were you charged with?
11 A.  Possession of marijuana.
12 Q.  Okay.  In what court were you charged?
13 A.  The Grandville court.
14 Q.  State court?  Is there a county?  What county is
15     Grandville in?
16 A.  I want to say Kent, but I could be wrong.
17 Q.  Okay.  And how were you served with criminal papers?
18 A.  I'm not sure.
19 Q.  Were you arrested?
20 A.  I was not arrested.  Like I never got put in handcuffs
21     or anything, but I had a court date and then from
22     there, like some more court dates.
23 Q.  Did you receive like a charging document like a
24     criminal charges where you read it and then you said
25     that, you know, with your name on it, State of

Page 267

1      Michigan versus so and so?
2  A.  Yes.
3  Q.  Okay.  And you can't remember how you received those
4      papers?
5  A.  I think in the mail.
6  Q.  Okay.  And do you recall what you were charged with?
7  A.  No.
8  Q.  Do you know the difference between a misdemeanor and a
9      felony?
10 A.  Yes.
11 Q.  Was it a misdemeanor or felony?
12 A.  It was a misdemeanor.
13 Q.  Okay.  So you were facing punishment up to one year in
14     jail?
15 A.  I guess so.
16 Q.  Don't guess.  I'm not trying to put words in your
17     mouth.
18 A.  Okay.  I don't know.
19 Q.  Okay.  What was the next event in this process?
20 A.  Court.
21 Q.  Okay.  And who did you go to court with?
22 A.  My mom.
23 Q.  Did you have a lawyer?
24 A.  No.
25 Q.  The -- did you enter into what they call -- and I'm

Page 268

1      sure you've seen this on TV, a plea agreement with the
2      state?
3  A.  Oh, yes.
4  Q.  Was it in writing?
5  A.  I don't remember.
6  Q.  If I were to go to the county where you lived, would I
7      find records of you being charged there; do you know?
8  A.  I don't know.
9  Q.  Do you keep -- did you keep any of the criminal papers
10     that you received?
11 A.  Most likely not.
12 Q.  Huh?
13 A.  Most likely not.
14 Q.  Okay.  So if I were to ask you to bring them tomorrow
15     or to give them to your lawyer, you would not be able
16     to do that?
17 A.  Correct.
18 Q.  Okay.  So tell me what occurred?  Did you have to
19     appear in front of a judge?
20 A.  Yes.
21 Q.  How did you arrange the plea agreement?  Who
22     negotiated for you the plea agreement?
23 A.  I don't know.  I don't remember.
24 Q.  You didn't have a lawyer?
25 A.  Correct.

Page 269

1  Q.  You didn't do it yourself or did you?
2  A.  I don't recall.
3  Q.  Did your mother do it?
4  A.  I don't know.
5  Q.  You don't know who negotiated the plea agreement for
6      the one-year probation?
7  A.  Correct.
8  Q.  Okay.  Did you have to appear in front of a judge and
9      say you were guilty?
10 A.  Yes.
11 Q.  And did the judge pass judgment on you and give you
12     one year's probation?
13 A.  Yes.
14 Q.  Okay.  How often did you have to report to your
15     probation officer?
16 A.  Every month.
17 Q.  How often did you have to take a drug test?
18 A.  Whenever she did...
19 Q.  There were many conditions to your probation, right?
20     There were many conditions to your probation?
21 A.  Oh, yes.
22 Q.  Like no use of drugs?
23 A.  Right.
24 Q.  What other, what were some of the other conditions?
25 A.  No drinking of course, like I had community service.

Page 270

1  Q.  What did you for community service?
2  A.  I don't remember.  I remember I did like I had to
3      clean the middle school for one of my things.
4  Q.  That would make sense they would make you do work at
5      the school.
6  A.  Yeah.
7  Q.  Okay.  How would you describe your probation officer?
8  A.  Scary.
9  Q.  Say what?
10 A.  Scary.
11 Q.  Serious?
12 A.  Scary.
13 Q.  Oh, okay.  It's probably a good description.
14 A.  She was nice, but she was scary.
15 Q.  Was she strict?
16 A.  Yeah.  She was pretty.
17 Q.  Pretty, pretty strict?
18          MR. SUAREZ:  Pretty as in physically
19     pretty --
20          THE WITNESS:  Yeah.
21          MR. SUAREZ:  -- or pretty strict?  So she
22     was attractive?
23          THE WITNESS:  Yeah.
24          MR. WEGLARZ:  Luis latched onto that.
25 BY MR. SCOTT:

Page 271

1  Q.  She was pretty and strict?
2  A.  Yes.
3  Q.  All right.
4         MR. SUAREZ:  I'm always paying attention,
5  Todd.  I look like I'm not, but I am.
6  BY MR. SCOTT:
7  Q.  How long in your probation did you get in trouble with
8      the purse (sic)?
9  A.  It was right towards the end.
10  Q.  Okay.  Tell me what happened there.
11  A.  Happened where?
12  Q.  What happened with, how did you get arrested there?
13  A.  I was walking out and then they stopped me and then
14      from there.
15  Q.  What store were you in?
16  A.  Wal-Mart.
17  Q.  Okay.  And was there security officers that stopped
18      you there, at there?
19  A.  I don't recall.  Just a worker.
20  Q.  And this arrest occurred after you had had the
21      incident at Beach's hotel, right?
22  A.  Yes.
23  Q.  When you were arrested at that time, were you arrested
24      by the Wal-Mart people or did they call the police?
25  A.  No.

Page 272

1  Q.  What happened?
2  A.  They told like what was going to be happening and I
3      think we got something in the mail about like a court
4      date.
5  Q.  What did they tell you, the Wal-Mart people?
6  A.  I don't recall.
7  Q.  But you weren't arrested?
8  A.  Correct.
9  Q.  And what did you get in the mail?
10  A.  I think a court date.
11  Q.  In the law there's something called a violation of
12      probation, is that what you received in the mail, that
13      you had violated your probation?
14  A.  Yes.
15  Q.  How did that make you feel that you had to go back to
16      court?
17  A.  Not good.
18  Q.  When you went back to court, did you go back in front
19      of the same judge you did the first time?
20  A.  Yes.
21  Q.  Did you have a lawyer that time?
22  A.  I don't think so, no.
23  Q.  Did you go to court by yourself?
24  A.  My mom.
25  Q.  Okay.  And you had to appear again in front of the

Page 273

1      judge, right?
2  A.  Yes.
3  Q.  And how did you work out, did you work out a plea
4      arrangement again?
5  A.  I believe so.
6  Q.  Was the arrest and everything like that and going to
7      court a second time in front of the same judge a scary
8      event?
9  A.  Yes.
10  Q.  Were you upset?
11  A.  Yes.
12  Q.  Were you afraid?
13  A.  Yes.
14  Q.  What happened at your court appearance?
15  A.  I don't recall.
16  Q.  Did you have to stand up in front of the judge and
17      admit that you committed a crime by stealing the purse
18      (sic)?
19  A.  Yes.  It was a phone case.
20         MR. SUAREZ:  Is it a purse or a phone case?
21  A.  Phone case.
22  BY MR. SCOTT:
23  Q.  Phone, I'm sorry.  I thought you said purse.  Phone.
24      I apologize, every time I used the word purse, change
25      it to phone.

Page 274

1  A.  Phone case.
2  Q.  Okay.  Phone case.  Had you ever stolen anything
3      before in a store?
4  A.  Yes.
5  Q.  How many occasions?
6  A.  Not that many, like two or three times.
7  Q.  Was that while you were on probation?
8  A.  No.
9  Q.  Before?
10  A.  Maybe it was on probation.
11  Q.  Okay.  Did the judge then enter an order amending, as
12      I understand it, the prior probation to extend an
13      additional year from the date it was supposed to
14      expire?
15  A.  Yes.
16  Q.  And then you had to go back and meet with the
17      probation officer again, right?
18  A.  Yes.
19  Q.  Was she tougher on you after the violation of
20      probation than before?
21  A.  Yeah.
22  Q.  She was stricter also, too, wasn't she?
23  A.  Yeah.
24  Q.  How did that make you feel?
25  A.  Not the greatest, but I mean, I got why.

Page 275

1  Q.   Okay.  Fair enough.  Did you have any other run-ins
2       during the probation violation?
3  A.   No.
4  Q.   And ultimately in November of what, 2017, you got off
5       probation?  Was it 2017?
6  A.   I think it might have been 2016.
7  Q.   2016?
8  A.   Yes.
9  Q.   Yeah, 2016, I apologize.
10 A.   That's okay.
11 Q.   Okay.
12           MR. SCOTT:  That's all I have.
13           MR. SUAREZ:  I've got just a few more
14      questions, if that's okay.
15           MR. WEGLARZ:  That's fine.
16                  RE-EXAMINATION
17 BY MR. SUAREZ:
18 Q.   Do you know whether there are any videos of your trip?
19 A.   Videos of my trip, I don't believe so.
20 Q.   Do you know whether there's any videos of yourself,
21      your mother, Janet or Paiton taken after the trip
22      because of the trip?
23 A.   No.
24 Q.   Okay.  Would you have a problem if any of your friends
25      went to the Beaches Boscabel Resort on vacation?

Page 276

1           MR. WEGLARZ:  I'm sorry, I didn't hear
2       that.
3           MR. SUAREZ:  I asked her if she would have
4       a problem if any of her friends went to the Beaches
5       Boscabel Resort on vacation.
6           MR. WEGLARZ:  If they were to go to that
7       location now?
8           MR. SUAREZ:  Yeah.
9  A.   I wouldn't have a problem with it, I would tell them
10      about what happened, if they don't already know.  It's
11      not my control.
12 BY MR. SUAREZ:
13 Q.   Is there -- did you keep -- apologies if I asked you
14      this question before.  Did you keep a journal or log
15      after your trip about your trip?
16           MR. WEGLARZ:  Asked and answered.
17           Go ahead.  You can answer again.
18 A.   I did not.  I have a journal that I started after, but
19      it wasn't talking about exactly like about Jamaica.  I
20      just started a journal.
21 BY MR. SUAREZ:
22 Q.   Just --
23 A.   Just to like journal.
24 Q.   I don't want to pry into your personal life.  Is there
25      anything in that journal that relates to your rape,

Page 277

1       your incident or what you experienced?
2  A.   Yes.
3  Q.   Okay.  Have you shared that journal with your
4       counselor or with anybody?
5  A.   No.
6  Q.   I'm going to ask you to preserve that journal and I'll
7       arrange with counsel to see how we get a copy, okay?
8  A.   You need that?
9           MR. WEGLARZ:  I think he's just asking if
10      you could keep it, retain it, don't do anything with
11      it.
12           THE WITNESS:  Oh.
13           MR. WEGLARZ:  He will discuss with me how
14      to produce it and then I will let you know what I want
15      you to do with it.
16           THE WITNESS:  Okay.
17           MR. SUAREZ:  Exactly.
18           MR. WEGLARZ:  You'll probably have to turn
19      it over to me, though.
20 BY MR. SUAREZ:
21 Q.   I don't want you to go home and destroy pages that
22      relate to this -- this case and this incident, okay?
23 A.   Uh-huh.
24 Q.   If you have pages in there that relate to a music
25      festival that you went to, then maybe I don't need

Page 278

1       those pages, but anything that relates to this
2       incident, I would probably need.  So I will arrange
3       with counsel to get those pages, okay?
4  A.   Okay.
5  Q.   While you were in Jamaica, do you recall anyone
6       keeping a log of sort of what people were ordering and
7       when they were ordering?
8  A.   No.
9  Q.   I'm curious, how does it work when you go to that
10      hotel and you want food or drinks, do you just go and
11      show them your card or do you show them a wristband or
12      what do you do?
13 A.   I don't recall.
14 Q.   Okay.  How did you meet Justo?
15 A.   At school.
16 Q.   He was a classmate of yours?
17 A.   Yes.
18 Q.   What nationally is Justo?
19 A.   Mexican.
20 Q.   Okay.  How long -- how long were you in a relationship
21      with Justo?
22 A.   We weren't really ever in a relationship, but we like
23      had talked and stuff and it was like a thing.
24 Q.   Okay.  When did you first start your thing?
25 A.   Junior year.

Page 279

1  Q.  Before or after your trip to Jamaica?
2  A.  I believe it was after.
3  Q.  Okay.  Are you aware of any alleged rapes that have
4      occurred in Ocho Rios other than the alleged rape that
5      happened to you and your friend?
6  A.  No.
7  Q.  Did you shop off the property in Jamaica?
8  A.  Did I shop?
9  Q.  Outside of the Beaches property in Jamaica?
10 A.  Yes.
11 Q.  Where did you go?
12 A.  I don't know.  I don't recall.
13         MR. SUAREZ:  Ma'am, I have no further
14      questions at this time except to say thank you very
15      much for today and for your testimony today, I
16      appreciate it.
17         THE WITNESS:  No problem.
18         MR. WEGLARZ:  But I'll take a couple
19      minutes and then we'll be back and I'll probably have
20      a couple questions and then hopefully we'll be done.
21         (Recess taken at 3:21 p.m.)
22         (Back on the record at 3:40 p.m.)
23         MR. SUAREZ:  An objection for one is
24      objection for all?
25         MR. WEGLARZ:  Yes, sir, I'm fine with that.

Page 280

1          MR. SUAREZ:  Thank you.
2                 EXAMINATION
3  BY MR. WEGLARZ:
4  Q.  Hi, Amber.
5  A.  Hello.
6  Q.  I have just a couple questions for you and I won't be
7      nearly as long, so hopefully we will be done in a few
8      minutes.
9          MR. SUAREZ:  Objection, form, I'm teasing.
10      I'm teasing.  That was just for you.
11 BY MR. WEGLARZ:
12 Q.  Exhibit Number 3 that we marked earlier today is a
13      copy of the statement you provided to the police down
14      in Jamaica, correct?
15 A.  Correct.
16 Q.  And this statement was produced after you went down to
17      the police station and actually answered a lot of
18      questions for the police officers there within 24
19      hours after the sex assaults, correct?
20         MR. SUAREZ:  Objection, form.
21         MR. SCOTT:  Objection, leading.
22         MR. SUAREZ:  Form.
23 BY MR. WEGLARZ:
24 Q.  And what happened was the officer would ask you
25      certain questions and you would answer those questions

Page 281

1      to the best of your ability, correct?
2  A.  Correct.
3          MR. SUAREZ:  Objection, form.
4  BY MR. WEGLARZ:
5  Q.  And you were being truthful and accurate to the best
6      of your ability, correct?
7          MR. SUAREZ:  Objection, form.
8          MR. SCOTT:  Same.
9          MR. SUAREZ:  Let me just explain to you
10      what's going on so that you don't look at us funny as
11      to what we're doing.  He gets to ask you a question
12      and I need you to pause for a nano second to allow me
13      to object to the form of a question, it's lawyer
14      stuff.
15         THE WITNESS:  Okay.
16         MR. SUAREZ:  And then you can answer and
17      that way we're not all three talking at the same time.
18      So if you just give me 20 seconds to say objections or
19      2 seconds to say objection to form, that would be
20      great.
21         THE WITNESS:  Okay.
22         MR. SUAREZ:  You indicated that if he
23      objects, it's good for both of us?
24         MR. WEGLARZ:  Yes, yes.
25         MR. SCOTT:  Okay, thank you.

Page 282

1  BY MR. WEGLARZ:
2  Q.  I'll reask the question.  What happened was the
3      officer would ask you certain questions, you would
4      answer those questions truthfully and accurately to
5      the best of your ability, correct?
6          MR. SUAREZ:  Objection to form.
7  A.  Yes.
8  BY MR. WEGLARZ:
9  Q.  And then once you were done answering these questions
10      for the police officer, they then showed you this
11      report that the officer wrote out based upon your
12      responses, correct?
13 A.  Yes.
14 Q.  And then you were asked to sign each page of this
15      report, correct?
16 A.  Correct.
17 Q.  And this report is dated May the 9th of 2015; is that
18      correct?
19 A.  Yes.
20 Q.  I think you told us earlier that you didn't really
21      have an opportunity to review that statement there at
22      the police department, correct?
23         MR. SUAREZ:  Objection to form,
24      mischaracterizing the testimony.
25 A.  Correct.

Page 283

```
1   BY MR. WEGLARZ:
2   Q.   Since then, though, you have had an opportunity to
3        review this statement very thoroughly, correct?
4   A.   Right.
5            MR. SUAREZ:  Objection to form.
6   BY MR. WEGLARZ:
7   Q.   And other than the couple of things that you pointed
8        out for us earlier today, you find this statement to
9        be true and accurate, correct?
10           MR. SUAREZ:  Objection, form.
11  A.   Yes.
12  BY MR. WEGLARZ:
13  Q.   And I want to direct your attention to page 4 of
14       Exhibit Number 3, your statement.  And you see where
15       at the first paragraph there, it says, "The first time
16       I saw Jermaine is on Tuesday, May 5, 2015"?
17  A.   Yes.
18  Q.   Okay.  And it says, "After I came off the banana boat
19       at the resort," do you see that?
20  A.   Yes.
21  Q.   And that's true and accurate, that was the first time
22       you saw Jermaine, correct?
23  A.   Correct.
24  Q.   And according to your statement, Jermaine walked up to
25       you and Paiton, introduced himself, asked you for your
```

Page 284

```
1        names and you and Paiton provided your names, correct?
2   A.   Correct.
3   Q.   And he then asked you how long you were staying at the
4        resort and then you and Paiton told him that as well,
5        correct?
6   A.   Correct.
7   Q.   And then the next paragraph says, "I continued seeing
8        him at the resort and he is always talking to Paiton
9        and I and sometimes hitting on us."  Did I read that
10       correctly?
11  A.   Yes.
12  Q.   And is that what you recall happening?
13  A.   Yes.
14  Q.   Okay.  And the statement says, "When I say he was
15       hitting on us, I mean he was being flirtatious."  Did
16       I read that correctly?
17  A.   Correct.
18  Q.   And is that what you recall him doing?
19  A.   Yes.
20  Q.   It says, "But Paiton and I never took up his offer."
21       Do you recall that happening?
22  A.   Yes.
23  Q.   And then your statement says, "He would call us
24       beautiful ladies and ask us if we were going to any
25       parties or clubs off property."  Did I read that
```

Page 285

```
1        correctly?
2   A.   Yes.
3   Q.   And is that what happened?
4   A.   Yes.
5            MR. SUAREZ:  Object to the form because I
6        think you read it incorrectly.
7            MR. WEGLARZ:  Off the record.
8            (Discussion off the record at 3:46 p.m.)
9            (Back on the record at 3:46 p.m.)
10  BY MR. WEGLARZ:
11  Q.   Back on.  Is it your recollection that Jermaine
12       several times would ask you about what parties or
13       clubs you and Paiton would be going to off property?
14           MR. SUAREZ:  Objection to form.
15  A.   I don't remember if it was several times, but I know
16       for sure he had asked.
17  BY MR. WEGLARZ:
18  Q.   He asked that at least on one occasion, correct?
19  A.   Correct.
20  Q.   You explained to him no, we're not going to any clubs
21       or parties off resort, we're here with our parents?
22  A.   Yes.
23  Q.   And then you already told us about how you gave either
24       your Instagram or your Facebook user name to Jermaine,
25       correct?
```

Page 286

```
1   A.   Yes.
2   Q.   Now, were you aware that there were supposedly rules
3        in the country of Jamaica and in the resorts in
4        Jamaica that prohibited resort employees from
5        fraternizing with guests?
6            MR. SUAREZ:  Objection to the form.
7   BY MR. WEGLARZ:
8   Q.   Did you know that there were rules that strictly
9        prohibited that type of conduct?
10           MR. SUAREZ:  Object to the form.
11  A.   I was not aware.
12           MR. SCOTT:  Object.  Assumes a fact not in
13       evidence at this point.
14  BY MR. WEGLARZ:
15  Q.   And were you aware that there were rules in Jamaica
16       that said if you witness a resort employee
17       fraternizing with a guest, you should report that
18       conduct immediately to hotel management and to the
19       U.S. Embassy?
20           MR. SUAREZ:  Objection.
21  BY MR. WEGLARZ:
22  Q.   Were you aware that those were the rules down there?
23           MR. SUAREZ:  Object to the form.
24           MR. SCOTT:  Same objection.
25  A.   I was not aware.
```

Case 1:17-cv-21703-MGC   Document 162-34 Entered on FLSD Docket 12/21/2019   Page 75 of 77
Amber Tolomeo, et al
September 25, 2019                                    287 to 290

Page 287

1  BY MR. WEGLARZ:
2  Q.  If you were told that those were the rules, if you
3      were told or if you were to read those anywhere, say
4      even at the resort, would you have reported this
5      conduct here by Jermaine that we just read from your
6      statement?
7              MR. SUAREZ:  Object to the form.
8              MR. SCOTT:  Form.
9  BY MR. WEGLARZ:
10 Q.  Go ahead.
11 A.  Can you restate that?  I don't want to like say the
12     wrong thing.
13 Q.  Sure.  If you were aware that there were these
14     rules --
15 A.  Okay.
16 Q.  -- that prohibited fraternization between hotel
17     workers and the guests and that if you observed such
18     fraternization you should report it, would you have
19     reported the conduct that your statement describes by
20     Jermaine here?
21 A.  Yes.
22             MR. SUAREZ:  Objection to form.
23 BY MR. WEGLARZ:
24 Q.  And you would have reported that to your mother as
25     well as to the hotel management?

Page 288

1              MR. SUAREZ:  Object to the form.
2  A.  Yes.
3  BY MR. WEGLARZ:
4  Q.  And if the rules said you need to report it to the
5      U.S. Embassy, you would have made sure that was done
6      as well, correct?
7  A.  Correct.
8              MR. SUAREZ:  Object to the form.
9  BY MR. WEGLARZ:
10 Q.  Were you aware or were you told or were you advised
11     that the State Department had concerns about the
12     number of sex assaults being committed by hotel
13     workers at resorts?
14             MR. SUAREZ:  Object to the form.
15 A.  I was not aware.
16 BY MR. WEGLARZ:
17 Q.  Had you become aware of that, had you been made known
18     of that, that the State Department had such a concern
19     before you left on this trip, would you have even gone
20     to Jamaica?
21             MR. SUAREZ:  Objection to form.
22 A.  I would have chose somewhere else.
23 BY MR. WEGLARZ:
24 Q.  You told us about how you went to Mexico for -- was
25     that for spring break with your senior class?

Page 289

1  A.  Yes.  College spring break.
2  Q.  And when you went down to Mexico, did you have any
3      problems with any resort workers hitting on you?
4  A.  No.
5  Q.  Any resort workers come up to you and ask you for your
6      Facebook or your Instagram user name?
7  A.  No.
8              MR. SUAREZ:  Object to the form.
9  BY MR. WEGLARZ:
10 Q.  And to be safe, you stayed at the resort while in
11     Cancun and you always stayed with your friends,
12     correct?
13 A.  Correct.
14             MR. SUAREZ:  Object to form.
15 BY MR. WEGLARZ:
16 Q.  And you didn't have to fear the hotel staff, did you?
17             MR. SUAREZ:  Object to the form.
18 A.  Correct.
19 BY MR. WEGLARZ:
20 Q.  Let me show you Exhibit 1 of your deposition.  It
21     appears to be a resort guest registration and there's
22     page 1 and if you look at page 2, there's a bunch of
23     words here talking about we're not liable for this,
24     we're not liable for that and then a third page
25     appears to be some signatures.  First of all, do you

Page 290

1      recall ever seeing page 2 of Exhibit Number 1 here
2      with all this language telling you about all these
3      rules and what they're liable for, not liable for?
4              MR. SUAREZ:  Object to form.
5  A.  I don't recall.
6  BY MR. WEGLARZ:
7  Q.  When you checked in at the resort in Jamaica, do you
8      recall having to sign a tablet before they would let
9      you up to your room?
10 A.  Yes.
11 Q.  And when you signed the tablet, do you recall seeing
12     anything other than just a space for your signature?
13             MR. SUAREZ:  Object to the form.
14 BY MR. WEGLARZ:
15 Q.  Go ahead.
16 A.  I just remember signing.
17 Q.  And if you look at Exhibit Number 1 on the third page
18     I believe you see some signatures here, do you
19     recognize any of these signatures as being yours?
20             MR. SUAREZ:  Object to form.
21 A.  Yes.
22 BY MR. WEGLARZ:
23 Q.  Is this how your signature always looks or is that --
24 A.  No.
25 Q.  Explain that, what's going on there?

Page 291

1   A.   It was like jittery or glitchy.

2   Q.   Okay.  It doesn't sound like that's a fully

3        operational tablet --

4             MR. SUAREZ:  Object to the form.

5   BY MR. WEGLARZ:

6   Q.   -- by the appearance of your signature there, correct?

7             MR. SUAREZ:  Object to form.

8   A.   Correct.

9   BY MR. WEGLARZ:

10  Q.   You can't even read your signature there, can you?

11            MR. SUAREZ:  Object to form.

12  A.   Correct.

13  BY MR. WEGLARZ:

14  Q.   I think you told us earlier in your deposition that

15       you may have sent some text messages to your friends

16       or through your group chats while you were in Jamaica,

17       correct?

18            MR. SUAREZ:  Object to form.

19  A.   Yes.

20  BY MR. WEGLARZ:

21  Q.   Any such messages you would have sent, any such text

22       messages I thought you said you would have done

23       through iMessage?

24  A.   Yes.

25  Q.   And iMessage, there's no app for iMessage that keeps

Page 292

1        all your text messages, is there?

2             MR. SUAREZ:  Object to form.

3   A.   I don't believe so.

4   BY MR. WEGLARZ:

5   Q.   They just stay on your phone, correct?

6             MR. SUAREZ:  Object to form.

7   BY MR. WEGLARZ:

8   Q.   Until you delete them?

9             MR. SUAREZ:  Object to form.

10  A.   Right.

11  BY MR. WEGLARZ:

12  Q.   You don't have that phone anymore, do you?

13            MR. SUAREZ:  Object.

14  BY MR. WEGLARZ:

15  Q.   That phone you were using in Jamaica?

16            MR. SUAREZ:  Object to form.

17  A.   Correct.

18  BY MR. WEGLARZ:

19  Q.   I thought you told us hours ago that when you went to

20       the Jamaican police station, did they retain your

21       phone?  Did they take your phone?

22  A.   They did.

23  Q.   And how long did they take your phone for?

24  A.   Until I got to leave, so like the whole extra week I

25       was there, I did not have it.

Page 293

1   Q.   So four or five days?

2   A.   Yes.  It was awful.

3   Q.   And also within your statement you provided to the

4        police, it represents that you resisted Jermaine's

5        forcefulness and assaultive actions by trying to push

6        his arms and hands away from you and he was trying to

7        pull down your shorts, correct?

8             MR. SUAREZ:  Object to form.

9   A.   Correct.

10  BY MR. WEGLARZ:

11  Q.   And you recall telling Jermaine no several times,

12       correct?

13            MR. SUAREZ:  Object to form.

14  A.   Correct.

15  BY MR. WEGLARZ:

16  Q.   And even though you resisted him, he was able to

17       physically overpower you, correct?

18            MR. SUAREZ:  Object to form.

19  A.   Correct.

20  BY MR. WEGLARZ:

21  Q.   You were a virgin when you left for that trip to

22       Jamaica, true?

23            MR. SUAREZ:  Object to form.

24  A.   True.

25  BY MR. WEGLARZ:

Page 294

1   Q.   You lost your virginity as a result of a rape that

2        occurred at the Beaches Ocho Rios Resort --

3             MR. SUAREZ:  Object to form.

4   BY MR. WEGLARZ:

5   Q.   -- is that true?

6   A.   True.

7             MR. WEGLARZ:  I think that's all I have,

8        thank you very much.

9             THE WITNESS:  Thank you.

10            MR. WEGLARZ:  All set?

11            MR. SCOTT:  Go ahead.

12            MR. SUAREZ:  No further questions.

13                 RE-EXAMINATION

14  BY MR. SCOTT:

15  Q.   A couple.  When you spoke to him, did you ever tell

16       them that you didn't want to talk to him?

17  A.   When I spoke to who?

18  Q.   When you spoke to the --

19            MR. SUAREZ:  Jermaine.

20  BY MR. SCOTT:

21  Q.   Jermaine, did you ever tell him you didn't want to

22       speak to him?

23  A.   No.

24  Q.   Did you ever try to avoid him?

25  A.   No.  I didn't think he was harmful before the

Page 295

1     incident.
2  Q.  Did Paiton try to avoid him?
3  A.  I'm not sure.
4  Q.  You don't know?
5  A.  I don't know.
6  Q.  In fact, you met him and spoke to him and walked with
7       him on the night of the 8th, did you not?
8  A.  Yes.
9  Q.  Did you ever report these flirtations to the hotel?
10 A.  No.
11 Q.  Did you ever go to the hotel management or one of the
12      supervisors and say to them are they, employees like
13      this allowed to do this?
14 A.  No.
15 Q.  Did you ever tell your mother about the flirtations of
16      Jermaine?
17 A.  I don't think so.
18          MR. SCOTT:  That's all I have.
19               RE-EXAMINATION
20 BY MR. WEGLARZ:
21 Q.  If you were told that they had rules that strictly
22      prohibited fraternization between hotel workers and
23      the guests, had you known those were the rules, would
24      you have ever gone into that room with Jermaine that
25      night?

Page 296

1           MR. SUAREZ:  Object to form.
2  A.  No.
3  BY MR. WEGLARZ:
4  Q.  Did anyone while you were there at the resort from the
5       5th through the 8th, did the resort staff serve you
6       alcohol?
7           MR. SUAREZ:  Object to the form.
8  A.  Yes.
9  BY MR. WEGLARZ:
10 Q.  Did anyone ever ask you for your identification?
11 A.  No.
12          MR. SUAREZ:  Object to form.
13 BY MR. WEGLARZ:
14 Q.  Did anyone ever ask you what your age was?
15          MR. SUAREZ:  Object to form.
16 A.  No.
17          MR. WEGLARZ:  That's all I have.
18               RE-EXAMINATION
19 BY MR. SUAREZ:
20 Q.  Two questions, ma'am.  You drank alcohol on that trip
21      in front of your mother, correct?
22 A.  Correct.
23 Q.  And when Jermaine grabbed your hand on the evening in
24      question, you didn't swat his hand away, correct?
25 A.  Correct.

Page 297

1          MR. SUAREZ:  No further questions.
2          MR. SCOTT:  Okay.
3          MR. WEGLARZ:  We're all set.
4     (The deposition was concluded at 3:57 p.m.
5  Signature of the witness was not requested by
6  counsel for the respective parties hereto.)

Page 298

1               CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF WAYNE   )
5
6          I, KATHRYN L. JANES, certify that this
7       deposition was taken before me on the date
8       hereinbefore set forth; that the foregoing questions
9       and answers were recorded by me stenographically and
10      reduced to computer transcription; that this is a
11      true, full and correct transcript of my stenographic
12      notes so taken; and that I am not related to, nor of
13      counsel to, either party nor interested in the event
14      of this cause.
15
16
17
18
19
20
21
22          KATHRYN L. JANES, CSR-3442
23          Notary Public,
24          Wayne County, Michigan.
25  My Commission expires:  October 22, 2022